**TARTER KRINSKY & DROGIN LLP**
*Proposed Attorneys for Golden Seahorse LLC*
*dba Holiday Inn Manhattan Financial District*
*Debtor and Debtor-in-Possession*
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
Scott S. Markowitz, Esq.
Rocco A. Cavaliere, Esq.
smarkowitz@tarterkrinsky.com
rcavaliere@tarterkrinsky.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:

GOLDEN SEAHORSE, LLC
dba Holiday Inn Manhattan Financial District,[1]

                                        Debtor.
-------------------------------------------------------------x

Chapter 11

Case No. 22-11582 (PB)

**DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 361, AND 363 OF THE BANKRUPTCY CODE AND RULES 2002, 4001 and 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) AUTHORIZING USE OF CASH COLLATERAL, (II) GRANTING REPLACEMENT LIENS ON THE DEBTOR'S COLLATERAL, (III) GRANTING ADEQUATE PROTECTION AND (IV) SCHEDULING A FINAL HEARING TO CONSIDER THE MOTION**

TO:    THE HONORABLE PHILIP BENTLEY
        UNITED STATES BANKRUPTCY JUDGE

Golden Seahorse LLC dba Holiday Inn Manhattan Financial District ("Hotel" or "Debtor"),

debtor and debtor-in-possession, hereby files this motion (the "Motion") pursuant to sections

105(a), 361, and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the

"Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), for entry of an interim order (the "Interim Order"), a copy of which is

---

[1] The Debtor's last four digits of its tax identification number is 4770.  The Debtor's principal place of business is
99-103 Washington Street, New York, New York.

annexed as **Exhibit "A"** and a final order (the "Final Order") authorizing the Debtor to (i) use cash collateral (the "Cash Collateral") of Wilmington Trust, National Trustee, as Trustee for the benefit of the Registered Holders of Commercial Mortgage Pass-Through Certificates Series 2019-C6, Wells Fargo Commercial Mortgage Trust 2018-C47, Commercial Mortgage Pass-Through Certificates, Series 2018-C47 and CSAIIL 2018-C14 Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2018-C14 (collectively, "Wilmington Trust") and Hi Fidi B Note Owner LLC, an affiliate of Triangle Capital Group LLC ("Note B Lender, together with Wilmington Trust, the "Prepetition Lenders"), (ii) grant replacement liens to Prepetition Lenders on the Debtor's post-petition room revenues and cash, (iii) grant certain adequate protection to the Prepetition Lenders and (iv) schedule a final hearing to consider the relief requested in this Motion.   In support of the Motion, the Debtor respectfully represents as follows:

## PRELIMINARY STATEMENT

As more fully set forth in the *Declaration of Jubao Xie Pursuant to Local Bankruptcy Rule 1007-4* (the "Local Rule Declaration"), which is incorporated herein, this bankruptcy case was precipitated by the need to preserve the Debtor's business for the benefit of all creditors and other stakeholders after entry of a state court order dated September 27, 2022 appointing a receiver pursuant to a provision in the Loan (defined below). The receiver has not taken control of the Debtor's operations as of the Petition Date.   Meanwhile, the Debtor's current management has successfully steered the Debtor to profitability after overcoming significant challenges presented by the Covid-19 pandemic.

The Debtor needs use of Cash Collateral in order to maintain and preserve the Debtor's business operations and preserve approximately 94 jobs of employees employed by an unaffiliated third-party management company and an unaffiliated housekeeping staffing company, pending

either a confirmable plan (which may include a sale of the Hotel) or resolution of disputes with Wilmington Trust.  Granting the relief requested herein will provide the Debtor with the cash the Debtor needs to continue operations and maintain relationships with its vendors and patrons and ultimately successfully emerge from Chapter 11 as a going concern business.  It is critical, therefore, the Debtor be authorized to use Cash Collateral to preserve the value of the Debtor's business and operations for the benefit of all constituents, including the Prepetition Lenders.

As will be further described below, counsel to the Debtor has had productive discussions with counsel to Wilmington Trust regarding the Debtor's request for use of Cash Collateral and has agreed to a form of the Interim Order, together with a copy of the budget annexed thereto.  As such, the Debtor expects that its request for use of Cash Collateral will be uncontested but to the extent the Debtor's request unexpectedly becomes contentious, the Debtor respectfully submits there is adequate cause and basis to approve the Motion over the objection of the Prepetition Lenders.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§157 and 1334 and the standing Order of Referral of Cases to Bankruptcy Judges of the Southern District Court of New York.   This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory basis for the relief requested herein are §§ 105(a), 361, and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014, as well as Local Bankruptcy Rule 4001-5.

## BACKGROUND

2.      On November 29, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and intends to continue in the operation of its

business as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

3.    The Debtor operates the Hotel which is a full-service hotel located at 99 Washington Street, New York, NY 10016.  In addition to the Hotel, the Debtor also owns an adjacent neighboring property at 103 Washington Street, New York, NY 10016, whereby the Debtor leases space to Amazon Restaurant and Bar d/b/a St. George Tavern. The Debtor constructed the Hotel between 2010 and 2014 and it opened for business in October 2014. Pursuant to a license/franchise agreement dated October 15, 2014, the Hotel operates under the Holiday Inn flagship/brand.  The Hotel is fifty (50) stories, the tallest Holiday Inn in the world and consists of 492 rooms and includes a full-service restaurant at the Hotel.

4.    The Hotel is managed by Crescent Hotels & Resorts ("Crescent"), a third-party unaffiliated management company that is known as one of the leading hotel management companies in the industry. As is customary, most of the Hotel's employees are employed by Crescent and the Hotel advances funds to Crescent to cover the payroll and related expenses. Crescent receives a management fee of 1.5% of the Hotel's revenues.  In addition, the Hotel is a party to a contract with General Personnel LLC, an entity that provides the Hotel with approximately 60 housekeeping employees.

5.    In or about September 2018, the Hotel obtained a $137.2 million loan from Ladder Capital Finance LLC (the "Loan").  The Loan was ultimately split into four separate tranches and as of the Petition Date, three tranches in the amount of roughly $87 million are held by Wilmington Trust and one tranche in the amount of roughly $50 million is held by Note B Lender. The Loan matures in September 2028.  The non-default interest rate under the Loan is 5.259%, which equates to roughly $620,000 in monthly interest payments. The Debtor was current on all payments under the Loan up until the onset of the Covid-19 pandemic in March

2020. As of the Petition Date, the full amount of the $137.2 million in principal remains outstanding, together with unpaid interest.

6.      As the Court is likely aware, the Covid-19 pandemic devastated the New York City hotel industry, and the Debtor, like most of the New York City hotels, was closed from March 2020 through July 2020. Although the Debtor reopened the Hotel at the end of July 2020, occupancy levels in late 2020 were significantly below pre-pandemic levels requiring Debtor's ownership to lend millions of dollars to the Debtor to cover the Hotel's operating expenses.  The Hotel then experienced another setback in late December 2021 with the proliferation of the new Omicron variant, causing another shutdown of the tourism industry, forcing the Hotel to close yet again from January 2022 to April 2022.

7.      As a direct result of the Covid-19 pandemic, the Debtor defaulted on the Loan. Thereafter, Wilmington Trust, in 2021, swept all of the Debtor's funds in its separate cash management account that included sales taxes due to New York State and Hotel's occupancy taxes due to New York City.  The Debtor attempted to reach a consensual resolution with Midland Loan Services, the special servicer to Wilmington Trust but unfortunately, the special servicer rejected the Debtor's overtures and proceeded to commence an action in March 2022 to, among other things, (i) foreclose on the mortgage, (ii) appoint a receiver and (iii) enjoin the Debtor from taking certain actions.  By Decision and Order dated September 27, 2022, the Honorable Frances A. Kahn, III granted Wilmington Trust's motion to appoint a receiver but denied Wilmington Trust its request for injunctive relief finding it had not satisfied the factors for a preliminary injunction and that such relief was, in any event, superfluous, to the appointment of a receiver.

8.      Faced with the prospect of a complete loss of equity and value as well as the

potential loss of rights under various contracts and licenses as a result of the appointment of the receiver, the Debtor determined that Chapter 11 was necessary to preserve the Debtor's business and maximize value for all creditors and constituents. As further discussed below, the Debtor commenced this chapter 11 case in order to attempt to negotiate a restructuring of the Loan or to utilize the provisions of the Bankruptcy Code to confirm a plan of reorganization over Wilmington Trust's objection. The Hotel's operations have greatly improved over the last six months and the Hotel's occupancy rate was approximately 92% in September 2022 and approximately 90% in October 2022 with an ADR of over $200.[2] The Debtor's current cash flow is sufficient to meet the debt service at the non-default rate.

9.      Additional information about the Debtor and its operations is located in the Local Rule Declaration, filed contemporaneously with the Debtor's bankruptcy petition.

## PREPETITION SECURED LOAN

10.      The Debtor is the fee simple owner of the Hotel and the adjacent commercial and residential property. As of the Petition Date, Wilmington Trust held approximately $87 million of the $137 million original Loan. In addition, Note B Lender recently acquired the "Note B" tranche of the Loan in the principal amount of $50 million, which Note B is junior to the other tranches held by Wilmington Trust. As noted herein, the non-default interest on the Loan is 5.29% and the Loan matures in September 2028. To the best of the Debtor's knowledge, the accrued and unpaid interest is more than $10 million.[3] The Debtor believes the value of the Hotel is greater than the amounts owed to the Prepetition Lenders. Further, the Debtor's projections, as set forth in the 13-week cash flow projection (the "Budget") annexed as **Exhibit**

---

[2] The average daily rate (ADR) is a metric widely used in the hospitality industry to indicate the average revenue earned for an occupied room on a given day.
[3] Depending upon whether the default interest under the Loan is permitted.

"**B**" reflects the Debtor will be able to make its regular roughly $620,000 monthly interest due under the Loan.

## RELIEF REQUESTED AND BASIS FOR RELIEF

11.    By this Motion, the Debtor seeks interim and final orders to obtain the use of Cash Collateral pursuant to section 363(c)(2) in order in order to preserve and maintain the Debtor's operations, pending a confirmable plan or such other options deemed beneficial to the Debtor and its constituents.

### A.  Use of Cash Collateral Is Critical and Appropriate Here

12.    For the reasons set forth herein, the Debtor requires use of Cash Collateral to provide working capital to pay its ordinary operating expenses.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Specifically, that provision provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral…unless-
>
> (A) Each entity that has an interest in such cash collateral consents; or
> (B) The court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c).  Further, section 363(e) provides that "on request of an entity that has an interest in property…proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  A secured creditor is entitled to adequate protection under Bankruptcy Code Section 363(e) only from the decline in value of its collateral package post-petition. See In re Timbers of Inwood Forest, 484 U.S. 365, 633 (1988); see also In re Weinstein, 227 B.R. 284, 296 (B.A.P. 9th Cir. 1998) ("[T]he amount by which the collateral depreciates is the amount of adequate protection to which the secured creditor is entitled.).

13.     Adequate protection may be provided in various forms, including granting of replacement liens or administrative claims.  Thus, what constitutes adequate protection is decided on a case-by-case basis.  See, e.g., In re Realty Sw. Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).  The critical purpose of adequate protection is to guard against the diminution of a secured creditor's collateral during the period when such collateral is being used by the debtor.  See In re 495 Central Park Avenue Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the chapter 11 reorganization."); MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393 (10th Cir. 1987) (the term "adequate protection" is determined on a case-by-case basis).

14.     As demonstrated below, there are numerous forms of adequate protection being provided to the Prepetition Lenders in satisfaction of sections 363(c)(2) and (2) of the Bankruptcy Code.

## B.    The Debtor Is Providing Adequate Protection to the Prepetition Lenders

15.     As an initial matter, as noted at the outset, the Debtor has already had productive discussions with Wilmington Trust and absent an unexpected turn of events, the Debtor believes the Interim Order is consensual and that Wilmington Trust has no objection to the proposed Budget.[4]

16.     However, notwithstanding the Debtor's belief the hearing will be uncontested, if the Prepetition Lenders do not ultimately consent to the Debtor's use of the Cash Collateral, the Debtor submits the Prepetition Lenders will be adequately protected based upon the forms of adequate

---

[4] Upon information and belief, Wilmington Trust/special servicer also speaks for the Note B Lender.

protection detailed below.

17.    <u>First</u>, consistent with section 361 of the Bankruptcy Code, the Prepetition Lenders will receive replacement liens in the Debtor's post-petition room revenues and cash equal to any diminution in value of their security interests and liens in the room revenues and cash.  In other words, the Prepetition Lenders are adequately protected where income is being generated and the used cash is replaced by new receipts or room revenues from operations. In this case, the Debtor is operating profitably with an approximate 90% occupancy rate and receiving significant hotel room income from patrons using the Hotel.   As stated by one bankruptcy court that analyzed a similar receivable pertaining to rental income (as opposed to hotel room income):

> With regards to rents, a court must look to the stream of future rents to determine whether adequate protection is required. This is because the lien on each month's rents replaces the lien on the prior month's rents, so there is a replacement lien of equal value under Section 361 of the Bankruptcy Code. Therefore, as long as the debtor generates a continuous income stream, the debtor's use of the rental income does not diminish the value of the collateral. The rationale is that the protected cash proceeds are being used to generate new collateral which will be of at least equivalent value of those replaced. Accordingly, if the underlying collateral is not declining in value, the additional cash collateral may be used by the debtor to pay administrative expenses as well as to maintain and improve the underlying collateral.

<u>In re Wrecclesham Grange, Inc.</u>, 221 B.R. 978, 981 (Bankr. M.D. Fla. 1997) (citations omitted); <u>see also</u> <u>499 W. Warren Street Associates, Ltd.</u>, 142 B.R. at 57 (a secured creditor's interest in rent is adequately protected when the rents are reinvested for operational expenses and maintenance because such reinvestment generates additional rents); <u>In re Ledgemere Land Corporation</u>, 116 B.R. 338, 343 (Bankr. D. Mass. 1990) (a secured creditor is adequately protected so long as the receivables being collected and used by the debtor are being replaced by sufficient new receivables in which the creditor is granted a security interest).

18.    Thus, as demonstrated, the Prepetition Lenders are adequately protected by

replacement liens in the Debtor's post-petition room revenues generated from patrons and tourists using the Hotel. The Debtor's proposed use of Cash Collateral will generate additional room revenues post-petition of at least equivalent value to those room revenues used under the Budget. Therefore, the proposed use of Cash Collateral will not diminish the value of the Prepetition Lenders' collateral.

19.     Second, use of the Cash Collateral will allow the Debtor to pay the necessary expenses for the operation of the Hotel.  Courts have made clear that a debtor's use of cash collateral, including cash and room revenues, to preserve and enhance property interests prevents deterioration of the value of the Debtor's property and can constitute adequate protection. See In re 499 W. Warren Street Assoc., Ltd., 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992); In re Constable Plaza Assoc., 125 B.R. 98 (S.D.N.Y. 1991). As the bankruptcy court stated in In re Rancourt, 123 B.R. 143 (Bankr. D.N.H. 1991):

> It is obvious that the movants are in no real danger at this stage of not being covered in full with regard to their secured debt.  This is true because rentals, uniquely among cash collateral categories, have the additional dimension of the real property mortgage reaching an equity cushion in the underlying real property to safeguard the secured debt.  In my view the language "as is necessary" in §363(e) can be appropriately construed to take into account the unique situation of rents-as distinguished from other types of cash collateral that have no such underlying protection.

20.     As the Tenth Circuit Court of Appeals stated, in In re O'Connor, 808 F.2d 1393 (10th Cir. 1987):

> "Because the ultimate benefit to be achieved by a successful reorganization under Chapter 11 inures to all creditors, a fair opportunity must be given to a debtor to achieve that end, while the interest of a secured creditor's property rights must of concern to the courts, interests of all other creditors also have a bearing upon the question of whether use of cash collateral shall be permitted."

21.     In the oft-cited opinion in In re Pine Lake Village Apartment Co., 16 B.R. 750

(Bankr. S.D.N.Y 1982), the late bankruptcy Judge Schwartzberg analyzed the issues which frequently arise in a motion to use cash collateral, finding the protection and maintenance of the mortgagee's collateral, without any diversion of funds to the debtor, clearly ensures the "mortgagee's investment is adequately protected." Id. at 756. See also In re Donato, 170 B.R. 247, 256 (Bankr. D. N.J. 1994) ("The use of cash collateral to pay the operating expenses of the real property in question adequately protects the interest of secured lenders, however, even where the creditor is undersecured."). Thus, the use of Cash Collateral to pay the requisite reasonable operating expenses of the Hotel, in and of itself, constitutes adequate protection.

22.    Third, the Debtor intends to make its monthly interest payments at the non-default rate of approximately $620,000 per month. See In re Worldcom, Inc., 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) ("The legislative history for section 361 of the Bankruptcy Code, which sets forth how adequate protection may be provided under section 363, makes clear the purpose is to insure the secured creditor receives the value for which the creditor bargained for prior to the debtor's bankruptcy"). The Bankruptcy Code expressly recognizes payment of interest at the non-default rate as a component of adequate protection in a real estate case. See Section 362(d)(3)(B)(ii).

23.    Fourth, in addition to the preservation of the Debtor's business and assets, replacement liens, and adequate protection payments, the Debtor respectfully submits the Prepetition Lenders are further adequately protected by virtue of the significant value of the Hotel at this time. As set forth in the Local Rule Declaration, the Debtor believes the value of the Hotel is at least $165 million, an amount greater than the $137.2 million in principal, together with accrued interest, due the Prepetition Lenders. As such, the Debtor believes the Prepetition Lenders are further adequately protected based upon an equity cushion. The Hotel has been recently

appraised by Wilmington Trust but such appraisal was not provided to the Debtor.   In the meantime, the Debtor obtained a broker price opinion from JLL, a reputable real estate broker and advisor, who, as of November 2021, valued the Hotel in the range of $136 million to $141 million, and together with an adjacent property owned by the Debtor, a value of over $150 million.   Notably, this broker price opinion was based on very conservative estimates of revenue per room in 2022 and beyond, which projections have been greatly exceeded in 2022 as business and tourism in New York City has increased much quicker than previously anticipated.   For instance, the broker price opinion reflected a RevPAR of $100, whereas the Budget, consistent with the actual performance of the Hotel in the last few months, shows a RevPAR of roughly $181.[5]   As such, the Debtor believes the Hotel alone has a value in excess of $165 million as of the Petition Date. Numerous courts have held the existence of an equity cushion may, in and of itself, constitute adequate protection for an over-secured creditor.   See, In re Mellor, 734 F.2d. 1396 (9th Cir. 1984); In re Shapiro, 109 B.R. 127 (Bankr. E.D. PA. 1990).   Furthermore, the Debtor has procured adequate insurance to protect the Prepetition Lenders from any loss of value caused by an act of god or other catastrophe such as a fire.

24.    Finally, a chapter 11 process under the jurisdiction of a federal bankruptcy court requires a debtor in possession to provide transparency to creditors and the Court.   The Debtor intends to faithfully discharge its duties and comply with its regular monthly reporting requirement, including the filing of schedules and statement of financial affairs.   The Prepetition Lenders are thus further protected by virtue of their receipt of timely information about the Debtor's operations and assets and liabilities.   Especially to the extent the Prepetition Lenders consent to use of cash

---

[5] Revenue per available room (RevPAR) is a performance measure used in the hospitality industry. RevPAR is calculated by multiplying a hotel's average daily room rate by its occupancy rate. RevPAR is also calculated by dividing total room revenue by the total number of rooms available in the period being measured.

collateral, the Debtor remains open to working with the Prepetition Lenders in providing any other customary financial reporting on a frequent basis as further adequate protection here.  Finally, as set forth in the Interim Order, after providing some notice of their intent to do so, the Debtor has agreed to provide the Prepetition Lenders with the right to access at the Hotel to address inquiries they may have regarding the books and records and operation of the business, among other things.

25.    The Debtor believes the adequate protection proposed herein and in the Interim Order is fair, reasonable and is sufficient to satisfy the requirements of section 363(c) of the Bankruptcy Code.

26.    In sum, the Debtor submits, in the exercise of its business judgment, the use of Cash Collateral will provide the Debtor with immediate access to funds necessary to pay its ordinary and customary operating expenses such as employees, and suppliers, and honor its commitments to patrons of the Hotel.  Further, use of Cash Collateral further supplies the liquidity necessary to continue the going concern value of the Hotel while it attempts to resolve disputes with Wilmington Trust or otherwise confirm a plan of reorganization.

27.    Absent use of Cash Collateral, the Debtor's operations will cease, resulting in a significant diminution in the value of the Debtor's assets, leading to a potential fire sale at liquidation value rather than going concern value.  There is no question that if the Debtor is unable to utilize Cash Collateral, it would significantly reduce the value of the Debtor and its assets to the detriment of all parties, including the Prepetition Lenders. Further, to the detriment of all parties, including the Prepetition Lenders, an abrupt cessation of the Debtor's business and/or replacement of Debtor's experienced management with an expensive and inexperienced receiver would drastically reduce the likelihood of future profits.  Finally, but certainly not least, approximately ninety-four people will lose their jobs if use of Cash Collateral is not permitted.

eternal

## NOTICE AND REQUEST FOR PRELIMINARY HEARING

28.    A motion to approve the use of Cash Collateral on a final basis requires at least fourteen (14) days notice.  However, Bankruptcy Rule 4001(b)(2) provides the Court may conduct a preliminary hearing prior to the normal 14 day notice period if the Debtor is able to establish the use of Cash Collateral is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.  The Debtor requires immediate access to use Cash Collateral to make the necessary payments set forth in the Budget annexed hereto as **Exhibit "B"**.

29.    As requested herein, the Debtor respectfully requests the Court hold a preliminary hearing no later than December 1, 2022 as salaries of outside employees are paid to the management company on or before December 2, 2022 and numerous other necessary expenses need to be paid on a postpetition basis.   At the preliminary hearing, the Debtor will request authority to utilize Cash Collateral in the amount of up to $1.5 million on an interim basis, subject to the Budget, pending a final hearing on the approval of use of Cash Collateral.  The amounts requested are what is necessary to avoid immediate and irreparable harm to the Debtor. Indeed, absent immediate use of Cash Collateral, the Debtor may be forced to cease operations.

30.    In accordance with rule 4001(b) of the Bankruptcy Rules, the Debtor will provide notice of this Motion by email and overnight mail upon (i) the Office of the United States Trustee for the Southern District of New York; (ii) the Debtor's twenty (20) largest unsecured creditors, (iii) the Prepetition Lenders and their counsel, if any, (iv) the Internal Revenue Service (collectively, the "Notice Parties").

31.    The Debtor further requests the Court set a date that is no later than twenty five (25) days after the Petition Date as a final hearing for consideration of entry of any final order authorizing use of Cash Collateral.  The Debtor intends to mail the notice of final hearing to the

Notice Parties by first class mail, and respectfully request the Court consider such notice sufficient under Bankruptcy Rule 4001(b)(2).

32.     No previous application for the relief requested herein has been made to this Court or any other Court.

**WHEREFORE**, for all of the foregoing reasons, the Debtor respectfully requests the Court grant the relief requested in the Motion and grant the Debtor such other and further relief as this Court deems just and proper.

Dated:  New York, New York
           November 29, 2022

                                        **TARTER KRINSKY & DROGIN LLP**
                                        *Proposed Attorneys for Golden*
                                        *Seahorse LLC, dba Holiday Inn*
                                        *Manhattan Financial District*
                                        *Debtor and Debtor-in-Possession*


                                        By:    /s/ Scott S. Markowitz
                                               Scott S. Markowitz, Esq.
                                               Rocco A. Cavaliere, Esq.
                                               1350 Broadway, 11th Floor
                                               New York, New York 10018
                                               (212) 216-8000
                                               smarkowitz@tarterkrinsky.com
                                               rcavaliere@tarterkrinsky.com

**EXHIBIT A**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:                                                      Chapter 11

GOLDEN SEAHORSE, LLC
dba Holiday Inn Manhattan Financial District,[1]            Case No. 22-11582 (PB)


                          Debtor.

-------------------------------------------------------------x

## INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDER, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of Golden Seahorse LLC, as a debtor and debtor in possession (the "Debtor") in the above-captioned Chapter 11 case (the "Case"), seeking entry of an order (this "Interim Order") pursuant to sections 105, 361, 362, 363 and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") *inter alia*:

(i)        authorizing the Debtor to use the Prepetition Collateral (as defined herein), including all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") of the Prepetition Lenders (as defined herein) under the Prepetition Documents (each as defined herein), and providing adequate protection to the Prepetition Lenders;

(ii)       modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of this Interim Order; and

---

[1] The Debtor's last four digits of its tax identification number is 4770.  The Debtor's principal place of business is 99 Washington Street, New York, New York.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion or the Local Rule Declaration.

(iii)        scheduling a final hearing (the "<u>Final Hearing</u>") within 30 days of the Petition Date to consider the relief requested in the Motion on a final basis (the "<u>Final Order</u>").

The Court having considered the Motion, the *Declaration of Jubao Xie Pursuant to Local Bankruptcy Rule 1007 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York* (the "<u>Local Rule Declaration</u>") and the evidence submitted and argument made at the interim hearing held on December _____, 2022 (the "<u>Interim Hearing</u>"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b) and (d), and all applicable Local Rules; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtor and its estate pending the Final Hearing; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A.        **<u>Petition Date</u>**.  On November 29, 2022 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>").

B.        **<u>Debtor in Possession</u>**.  The Debtor has continued in the management and operation of its business and property as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.        **<u>Jurisdiction and Venue</u>**.  This Court has jurisdiction over the case, the

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for the Case and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

      D.    **Notice**. Notice of the Motion and the Interim Hearing have been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

      E.    **Debtor's Stipulations**. Without prejudice to the rights of parties in interest as set forth in paragraph 11 herein, the Debtor, on its behalf and on behalf of its estate, admits, stipulates, acknowledges, and agrees as follows (paragraphs **E(i) through E(xxvii)** below are referred to herein, collectively, as the "Debtor's Stipulations"):

      (i)    *Prepetition Loan*. Pursuant to that certain Loan Agreement dated as of September 18, 2018 between Golden Seahorse LLC as Borrower and Ladder Capital Finance LLC (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Agreement," and collectively with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition Documents"), Ladder Capital Finance LLC ("Original Lender") extended a loan (the "Prepetition Loan") to the Debtor pursuant to the Prepetition Documents in an aggregate principal amount of up to $137,025,000; and

      (ii)    *Note Splitter Agreement*. Pursuant to that certain Note Splitter and Modification Agreement and Omnibus Amendment to Loan Documents, dated September 18, 2018, the Original Note was split, severed, and modified into four (4) promissory notes: (a) the first note being that certain Replacement Promissory Note A-1, dated September 18, 2018, executed by Debtor in favor of Original Lender in the amount of Thirty-Two Million Twenty Five Thousand and 00/100 Dollars ($32,025,000.00) ("Note A-1"); (b) the second note being that

certain Replacement Promissory Note A-2, dated September 18, 2018, executed by Debtor in favor

of Original Lender  in the amount of Thirty-Five Million and 00/100 Dollars ($35,000,000.00)

("Note A-2"); (c) the third note being that Replacement Promissory Note A-3, dated September

18, 2018, executed by Debtor in favor of Original Lender in the amount of Twenty Million and

00/100 Dollars ($20,000,000.00) ("Note A-3"); and (d) the fourth note being that Replacement

Promissory Note B, dated September 18, 2018, executed by Debtor in favor of Original Lender  in

the amount of Fifty Million and 00/100 Dollars ($50,000,000.00) ("Note B" or the "Junior Note"

and together with Note A-1, A-2 and A-3, the "Severed Notes").

       (iii)    *Note Reallocation Agreement*.  Pursuant to that Note Reallocation

and Modification Agreement, dated November 6, 2018, Debtor and Ladder II (defined below, and

the initial transferee of Notes A-1, A-2 and A-3 from Original Lender) agreed that the amounts

evidenced by Note A-1 and Note A-3 were reallocated amongst two (2) promissory notes in favor

of Ladder II (who, at that time and pursuant to the allonges and deliveries to Ladder II by Original

Lender, was the holder of Note A-1 and Note A-3), the first being Replacement Promissory Note

A-1-A, dated November 6, 2018, in the original principal amount of Twenty-Seven Million

Twenty-Five Thousand and No/100 Dollars ($27,025,000.00) ("Note A-1-A") and the second

being Replacement Promissory Note A-3-A, dated November 6, 2018, in the original principal

amount of Twenty Five Million and No/100 Dollars ($25,000,000.00) ("Note A-3-A"; collectively

with Note A-1-A, the "Replacement Notes"; the Replacement Notes together with Note A-2, the

"A Notes"; the A Notes together with Note B, the "Note").

       (iv)    *Initial Allonges to A Notes*.  Allonges to Note A-1, Note A-2, and

Note A-3 were executed and delivered from Original Lender to Ladder Capital Finance II LLC

and Series TRS of Ladder Capital Finance II LLC, a series of Ladder Capital Finance II LLC, each

4

a Delaware limited liability company ("Ladder II") as of October 9, 2018.

        (v)    *Allonge to B Note.* An allonge to Note B was executed and delivered from Original Lender to IGIS US Private Placement Real Estate Investment Trust No. 228 ("IGIS").

        (vi)    *Allonges to A Note Holders.* Subsequently, allonges to Note A-1-A, A-2 and A-3-A were executed and delivered from Ladder II to Wilmington Trust, National Association, as Trustee for the benefit of the registered holders of Commercial Mortgage Pass-Through Certificates Series 2018-C6 ("Trust 1"), to the securitization trustee for the benefit of registered holders of Wells Fargo Commercial Mortgage Trust 2018-C47, Commercial Mortgage Pass-Through Certificates, Series 2018-C47 ("Trust 2") and the securitization trustee for the benefit of CSAIL 2018-C14 Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2018-C14, respectively ("Trust 3"; together with Trust 1 and Trust 2, collectively, the "A Note Holders"). The A Note Holders are the current holders of Notes A-1-A, A-2 and A-3-A, respectively.

        (vii)    *Allonge to B Note Holder.* Subsequently, pursuant to the Assignment and Assumption between IGIS and HI FIDI B Note Owner LLC ("HI FIDI" or "B Note Holder") dated February 8, 2022 (the "Assignment and Assumption"), IGIS assigned the Note, that certain Co-Lender Agreement by and between Original Lender and IGIS dated September 18, 2018 (the "Co-Lender Agreement"), and the other Loan Documents to HI FIDI, who assumed the commitments, obligations, and liabilities of IGIS under the Loan Documents and Co-Lender Agreement. An allonge to Note B was executed and delivered from IGIS to HI FIDI. HI FIDI is the current holder of Note B.

089271\1\170016701.v3

(viii)    *Mortgage*.   As security for the payment of the Loan, on or about September 18, 2018, Debtor executed and delivered to Original Lender that certain Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents and Security Agreement dated September 18, 2018 (the "Mortgage") securing the obligations under the Note.

(ix)    *Recording of Mortgage*.   The Mortgage was recorded in the New York Office of the City Register on October 1, 2018, CRFN 2018000325482.

(x)    *Encumbrance on Property*.   The Mortgage, evidencing a first priority lien, encumbers that certain real property described therein (all property given as security thereunder, the "Property").

(xi)    *Security Interest in Personal Property, Including Accounts, General Intangibles and Revenues*.   In addition to being a real property mortgage, the Mortgage is a "security agreement" within the meaning of the Uniform Commercial Code.   Section 1.3 of the Mortgage provides the Mortgage is intended to be a security agreement pursuant to the Uniform Commercial Code for any of the items specified above as part of the Property which, under applicable law, may be subject to a security interest pursuant to the Uniform Commercial Code, and under that section Borrower granted to Original Lender a security interest in said items.   This includes, inter alia, all of the Debtor's accounts, general intangible and revenues, including without limitation those derived from or arising from the operation of the Property.

(xii)    *Assignment of Rents*.   As additional security for the payment of the Loan, on or about September 18, 2018, Debtor executed and delivered to Original Lender, an Assignment of Leases and Rents securing the obligations under the Note (the "Assignment of Rents").

6

(xiii)  *Perfection of Assignment of Rents*.  The Assignment of Rents was duly recorded in the New York Office of the City Register on October 1, 2018, CRFN 2018000325483.

(xiv)  *Guaranty*.  As further security for the payment of the Loan, on or about September 18, 2018, Jubao Xie, an individual, (the "Guarantor") executed and delivered to Original Lender, a Guaranty of Recourse Obligations guaranteeing the payment of certain obligations under the Loan Documents (the "Guaranty").

(xv)  *Environmental Indemnity Agreement*.  As further security for the payment of the Loan, on or about September 18, 2018, Guarantor executed and delivered to Original Lender, that certain Environmental Indemnity Agreement indemnifying Original Lender with respect to certain environmental representations, warranties and covenants with respect to certain obligations under the Loan Documents (the "Environmental Indemnity Agreement").

(xvi)  *Cash Management Agreement*.  Debtor also executed and delivered to Original Lender that certain Cash Management Agreement dated September 18, 2018.  The Cash Management Agreement provides for, *inter alia*, security interests in and control over cash proceeds of the Debtor's operations on the terms and conditions set forth therein.

(xvii)  *Collateral Assignment*.  As additional security for the payment of the Loan, on or about September 18, 2018, Debtor executed and delivered to Original Lender, a Collateral Assignment of Agreements, Licenses, Permits and Contracts securing the obligations under the Note (the "Collateral Assignment").

(xviii) *DACA*.  Pursuant to that Deposit Account Control Agreement dated September 18, 2018 by and among Debtor, Original Lender, and Wells Fargo Bank, National Association ("Wells Fargo"), Debtor and Secured Creditor agreed that all Rents and other Gross

Revenue (as defined in the Loan Agreement) would be deposited into an account designated by and established for the benefit of Secured Creditor, and Debtor and Secured Creditor at Wells Fargo (the "Deposit Account Control Agreement" or "DACA").  In addition, Debtor executed and delivered to Original Lender that certain Cash Management Agreement dated September 18, 2018, which provides for, *inter alia*, security interests in and control over cash proceeds of the Debtor's operations on the terms and conditions set forth therein.  The DACA provides for, *inter alia*, security interests in and control over cash proceeds of the Debtor's operations on the terms and conditions set forth therein, including with respect to funds transmitted from the accounts governed by the DACA to the account under the Cash Management Agreement upon the occurrence of a Cash Management Period (as defined in the Loan Agreement).

(xix)    *Original Lender Assignment of Mortgage.*  Effective as of October 9, 2018, the Mortgage was assigned by Original Lender to Ladder II through execution and delivery of the Assignment of Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents and Security Agreement (the "Original Lender Assignment of Mortgage").  Allonges to Note A-1, Note A-2, and Note A-3 were executed and delivered from Original Lender to Ladder II.  The Original Lender Assignment of Mortgage was recorded in the Office of the New York City Register, CRFN 2018000384205.

(xx)    *Original Lender Assignment of Assignment of Rents.*  Effective as of October 9, 2018, Original Lender executed and delivered to Ladder II, an Assignment of Assignment of Leases and Rents securing the obligations under the Note (the "Original Lender Assignment of Assignment of Rents").  The Assignment of Assignment of Rents was recorded in the New York City Register, CRFN 2018000384206.

(xxi)    *Ladder II Assignment of Mortgage.*    Effective no later than as of December 11, 2018, the Mortgage and Original Lender Assignment of Mortgage were assigned to Secured Creditor through execution and delivery of the Assignment of Mortgage.    Allonges to Note A-1-A (which had replaced Note A-1 by this time), Note A-2, and Note A-3-A (which had replaced Note A-3 by this time) were executed and delivered from Ladder II to Secured Creditor. This Assignment of Mortgage ("Ladder II Assignment of Mortgage") was recorded in the Office of the New York City Register, CRFN 2019000016907.

(xxii)    *Ladder II Assignment of Assignment of Rents.*    Effective as of December 11, 2018, Ladder II executed and delivered to Secured Creditor, an Assignment of Assignment of Leases and Rents securing the obligations under the Note (the "Ladder II Assignment of Assignment of Rents").    This Ladder II Assignment of Assignment of Rents was recorded in the New York City Register, CRFN 019000005858.

(xxiii)    *County UCC Financing Statements.*    A UCC-1 Financing Statement was filed in the New York Office of the City Register, at CRFN 20180000325486 (the "Original County UCC"), and a UCC-3 Assignment of Financing Statement was filed in the New York Office of the City Register, at CRFN 2018000384207, whereby the Original County UCC was assigned to Ladder II (the "Ladder II UCC-3 Assignment").    Thereafter, a UCC-3 Assignment of Financing Statement was filed in the New York Office of the City Register, at CRFN 2019000005859, whereby the Ladder II UCC-3 Assignment was assigned to Secured Creditor (the "Secured Creditor UCC-3 Assignment," together with the Ladder II UCC-3 Assignment, the "UCC-3 Assignments").

(xxiv)    *State UCC Financing Statements.*    A UCC-1 Financing Statement was filed with the Delaware Secretary of State, at file number 20186851592 (the "Original

Delaware UCC"), and a UCC-3 Assignment of Financing Statement was filed with the Delaware Secretary of State, at file number 20188183879, whereby the Original Delaware UCC was assigned to Ladder II (the "Ladder II Delaware UCC-3 Assignment"). Thereafter, a UCC-3 Assignment of Financing Statement was filed in the Delaware Secretary of State, at file number 20190540885, whereby the Ladder II UCC-3 Assignment was assigned to Series TRS of Ladder Capital Finance II LLC (the "Ladder TRS Delaware UCC-3 Assignment"), and a UCC-3 Assignment of Financing Statement was filed with the Delaware Secretary of State, at file number 20192239890, whereby the Ladder TRS Delaware UCC-3 Assignment was assigned to Secured Creditor (the "Secured Creditor Delaware UCC-3 Assignment," together with the Ladder II Delaware UCC-3 Assignment and Ladder TRS Delaware UCC-3 Assignment, the "Delaware UCC-3 Assignments").

(xxv)   *Loan Documents*.  To be clear, the "Loan Documents" include the Loan, the Loan Agreement, Original Note, the Co-Lender Agreement, Mortgage, the Assignment of Rents, Assignment of Assignment of Rents, Assignment of Mortgage, the Cash Management Agreement, the Deposition Account Control Agreement, the Guaranty, the Management Agreement, the Original Lender Assignment of Mortgage, and the Ladder II Assignment of Mortgage and all other instruments or documents evidencing or securing the obligations of Debtor under the Note and/or any other loan document, including the above-described UCC-1 and UCC-3 financing statements.  The A Note Holders and the B Note Holder collectively shall be referred to as the "Prepetition Lenders."

(xxvi) *Prepetition Secured Obligations*.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Loan was not less than approximately $137,025,000 (collectively, together with accrued and unpaid interest, any fees,

expenses and disbursements (including attorneys' fees and related expenses and disbursements), guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtor's obligations pursuant to, or secured by, the Prepetition Documents, and all interest, fees, costs and other charges to the extent allowable under section 506(b) of the Bankruptcy Code, the "Prepetition Secured Obligations").    The Prepetition Secured Obligations constituting the original principal amount of the Notes in the collective aggregate amount of $137,025,000.00 (the "Original Principal Prepetition Secured Obligations") are not subject to defense, offset or counterclaim of any kind or nature under Section 506(a) and 502 of the Bankruptcy Code.    The Prepetition Lenders assert, and the Debtor does not dispute, that Prepetition Secured Obligations in addition to the Original Principal Prepetition Secured Obligations are also due and owing (and with respect to certain categories of Prepetition Secured Obligations will continue to accrue post-petition).    Prepetition Lenders have not as of the Petition Date calculated such other Prepetition Secured Obligations and within 30 days of entry of this Interim Order will file with the Court and deliver to the Debtor submit a proposed chart of what is due and owing in addition to Original Principal Prepetition Secured Obligations (the "Additional Prepetition Secured Obligations Assertions").    Within 30 days of filing and delivery of the Additional Prepetition Secured Obligations Assertions, the Debtor will file with the Court and deliver to the Prepetition Lenders a statement of which of the Additional Prepetition Secured Obligations Assertions the Debtor concurs are, like the Original Principal Prepetition Secured Obligations and not subject to defense, offset or counterclaim of any kind or nature under Section 506(a) and 502 of the Bankruptcy Code and subject to the same treatment in this Interim Order in all respects as the Original Principal Prepetition Secured Obligations.    As to the remainder of the Additional Prepetition Secured

Obligations Assertions, the Debtor and the Prepetition Lenders shall be deemed to have reserve all rights concerning their allowance (the "Reserved Obligations") and all objections thereto.

(xxvii) *Prepetition Liens and Prepetition Collateral.* As more fully set forth in the Prepetition Documents, prior to the Petition Date, the Debtor granted to the Prepetition Lenders security interests in and continuing liens on (the "Prepetition Liens") substantially all of the Debtor's assets and property, including, without limitation, fixtures, equipment and leases, the proceeds, products, accessions, rents, and profits of the foregoing and cash held in accounts with the Prepetition Lenders, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition Collateral"). The Debtor represents that as of the Petition Date, (a) the Prepetition Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Lenders for fair consideration and reasonably equivalent value; (b) the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens senior by operation of law (solely to the extent such liens were valid, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the Prepetition Documents (the "Permitted Prior Liens"); (c) the Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtor enforceable in accordance with the terms of the applicable Prepetition Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Secured Obligations exist, and no portion of the Prepetition Liens or Prepetition Secured Obligations is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, or subordination

12

(equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtor and its estate have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against the Prepetition Lenders or any of its affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition Loan; (f) the Debtor has waived, discharged, and released any right to challenge any of the Prepetition Secured Obligations, the priority of the Debtor's obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Secured Obligations; and (g) the Prepetition Secured Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

F.    **Subordination.**    Pursuant to that certain Co-Lender Agreement dated as of September 18, 2018, the rights of Note B Lender to receive payments of interest, payments and other amounts with respect to Note B shall at all times be junior, subject and subordinate to the A Note Holders' rights in connection with the A Notes, as more fully set forth in the Co-Lender Agreement between and among the Prepetition Lenders.

G.    **Adequate Protection**.    The Prepetition Lenders are entitled to receive adequate protection, including for any diminution in value of its interest in the Prepetition Collateral resulting from the imposition of the automatic stay or the Debtor's use, sale or lease of the Prepetition Collateral ("Diminution in Value"), pursuant to the terms and conditions set forth herein.

H.    **Good Faith**.    The Prepetition Lenders and the Debtor have negotiated at arms' length and in good faith, and the Prepetition Lenders have agreed to permit the Debtor to use its Cash Collateral for the Specified Period, subject to the terms and conditions set forth herein,

which terms and conditions are fair and reasonable, are in the best interests of the Debtor and its estate, and have been stipulated to by the Debtor in the exercise of its sound business judgment.

I.      **Immediate Entry**.    Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

J.      **Interim Hearing**.    Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtor, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) United States Trustee for the Southern District of New York (the "U.S. Trustee"); (ii) those entities or individuals included on the Debtor's list of 20 largest unsecured creditors; (iii) counsel to Wilmington Trust; and (iv) all other parties entitled to notice under the Bankruptcy Rules and the Local Rules.  The Debtor has made reasonable efforts to afford the best notice possible under the circumstances.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.      Motion Granted.  The Motion is granted, subject to the terms and conditions set forth in this Interim Order.  All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled.

2.      Authorization to Use Cash Collateral.  Subject to the terms and conditions of this Interim Order, and in accordance with the Budget, the Debtor is authorized to use Cash Collateral for the period (the "Specified Period") from the Petition Date through the date which is the earliest to occur of: (a) the Termination Date, (b) thirty (30) days after the Petition Date and

(c) entry of the Final Order.

3.    <u>Adequate Protection Liens and Claims</u>.    As adequate protection of the interests of the Prepetition Lenders in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtor hereby grants to the Prepetition Lenders: (a) pursuant to sections 361 and 363(e) of the Bankruptcy Code, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "<u>Adequate Protection Liens</u>") on the Prepetition Collateral and any property or property of the estate acquired by the Debtor post-petition (including any which, had such property been acquired by the Debtor prepetition would have constituted Prepetition Collateral (the "<u>Postpetition Collateral</u>") (collectively, the "<u>Collateral</u>"); and (b) as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim (the "<u>Adequate Protection Superpriority Claim</u>") in the Case or any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Case, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>").  The Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the Collateral; *provided that*, the Adequate Protection Liens shall be subject to the Carve Out and shall be junior only to, as applicable: (i) the Permitted Prior Liens and (ii) the Prepetition Liens.  Other than liens to secure payment of real estate taxes or as explicitly set forth in the Loan Documents, the Debtor is not aware of any Permitted Prior Liens This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of the Adequate Protection Liens. The Adequate Protection Liens and security interests granted herein on property of the Debtor's estate are valid, binding, effective, enforceable, and fully perfected, and no filing or recordation or other act in accordance with any applicable local, state, or federal law, rule, or regulation, is necessary to create

089271\1\170016701.v3

or perfect such liens and security interests.  The above provision notwithstanding, Debtor shall cooperate with Prepetition Lenders to execute such documents and instruments, and do such other things as Prepetition Lenders may reasonably request, to evidence and perfect such replacement liens and security interests for the convenience and information of third parties, and to evidence the obligations assigned hereunder.  Except with respect to the Carve Out, the Adequate Protection Superpriority Claim shall have priority over all administrative expense claims and unsecured claims against the Debtor or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 506(c) (subject to entry of the Final Order granting such relief), 507(b), 546(c), 546(d), 726 (subject to a Final Order granting such relief, and solely to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code.

4.    <u>Adequate Protection Payments and Protections for Prepetition Lenders</u>.

(a)    As further adequate protection, the Debtor is authorized to pay in cash monthly interest at the nondefault rate due under the Prepetition Documents (but subject to the Challenge rights to the extent preserved in paragraph 11 below).

(b)    The Debtor shall (i) maintain books, records, and accounts to the extent and as required by the Prepetition Documents; (ii) reasonably cooperate with, consult with, and provide to the Prepetition Lenders all such information and documents the Debtor is obligated (including upon reasonable request by the Prepetition Lenders) to provide under the Prepetition Documents or the provisions of this Interim Order; (iii) insure the Prepetition Collateral as required under the Prepetition Documents (including without limitation having Prepetition Lenders named as additional insureds and loss payees under all required insurance policies); and (iv) permit the Prepetition Lenders to consult with the Debtor's management and advisors on matters concerning

16

the Debtor's business, financial condition, operations, and assets.

    5.    <u>Budget</u>.

    (a)    *Approval of Budget*.  The use of Cash Collateral during the Specified Period is permitted solely in accordance with a cash collateral budget (the "<u>Budget</u>")[4] approved by the Prepetition Lenders in their sole discretion, which Budget shall depict, on a weekly basis and line item basis (i) projected cash receipts, (ii) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees of the Debtor's professionals and advisors) and any other fees and expenses), and (iii) net cash flow, for the first thirteen (13) week period from the Petition Date.  The Budget shall be updated, modified, or supplemented by the Debtor with the written consent of the Prepetition Lenders, but in any event the Budget shall be updated by the Debtor not less than one time in each four (4) consecutive week period, and no such updated, modified, or supplemented budget shall be effective until approved by the Prepetition Lenders, in its sole discretion, and once so approved shall be deemed the Budget; *provided, however*, in the event the Prepetition Lenders, on the one hand, and the Debtor on the other hand, cannot agree as to an updated, modified or supplemented budget, the Debtor shall continue to operate under the most recent prior-approved Budget and such disagreement shall give rise to an Event of Default once the period covered by such prior Budget has terminated.

    (b)    *Payment Limitations*.  During the term of this Interim Order and except as otherwise provided in this Interim Order, or in any subsequent order of this Court, regardless of whether any of the following items appear in the Budget, Debtor shall not use any Cash Collateral for the following purposes: (1) for the payment of any pre-petition debts or obligations of Debtor or claims against Debtor (other than pre-petition insurance continued in

---

[4] A copy of the initial approved Budget is attached hereto as <u>Exhibit A</u>.

089271\1\170016701.v3

effect post-petition and wages and benefits of employees as provided in the Budget, which wages and benefits shall be limited in amount to those having priority under 11 U.S.C. §507(a)(4)), unless specifically authorized to do so by the Bankruptcy Court on at least twenty (20) days' notice to Prepetition Lenders and an opportunity for Prepetition Lenders to be heard (it being understood that Prepetition Lenders reserve all rights to object to any such payment on any ground at law or equity); (2) for the payment of any debts or obligations of Debtor that are not directly related to the management or operation of the Property; (3) for the payment to any company, individual, or entity related to Debtor or an insider (as defined in Section 101(31) of the Bankruptcy Code) of Debtor (other than salaries to insiders permitted under Paragraph 5(a) of this Interim Order); or (4) for prepayment of services that have not yet been rendered, goods which have not yet been received, or any other items and expense for which payment is not currently due (other than utility deposits authorized under Section 366(b) and pre-payment of insurance to the extent required by any of the Debtor's insurers), unless Debtor obtains prior express written permission of Prepetition Lenders or is specifically authorized to do so by the Bankruptcy Court on notice to Prepetition Lenders and an opportunity for Prepetition Lenders to be heard.

6.    <u>Modification of Automatic Stay</u>.  The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order.

7.    <u>Events of Default</u>.  Immediately upon the occurrence and during the continuation of an Event of Default under this Interim Order, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, the Prepetition Lenders may declare (any such declaration delivered by the Prepetition Lenders shall be referred to herein as a "<u>Termination Declaration</u>") (A) a

termination, reduction, or restriction on the ability of the Debtor to use Cash Collateral; and/or (B) the application of the Carve Out has occurred through delivery of the Carve Out Trigger Notice (as defined herein) (the date a Termination Declaration is delivered by electronic mail to counsel for the Debtor and to the U.S. Trustee shall be referred to herein as the "Termination Date").  The occurrence of any Event of Default identified in this Interim Order or the occurrence of any of the following events, unless consented to or waived by the Prepetition Lenders in advance, in writing, in its sole and absolute discretion, shall constitute an "Event of Default":

(a)    the failure of the Debtor to be in compliance with the Budget, subject to a variance in any week of 10% from the amount set forth in the Budget for such period;

(b)    the failure of the Debtor to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order (including, without limitation, the payment of all amounts to the Prepetition Lenders authorized hereunder);

(c)    the failure of the Debtor to obtain a Final Order on the Motion on terms acceptable to the Prepetition Lenders on or before forty (40) days after the Petition Date;

(d)    the entry of any order by the Court granting, or the filing by the Debtor of any motion or other request seeking, the use of the Collateral (including Cash Collateral) for any purpose other than as permitted in this Interim Order;

(e)    the filing of a motion by the Debtor to grant any lien upon or affecting any Collateral;

(f)    the entry of an order (or the filing by the Debtor of a motion seeking such an order) reconsidering, amending, supplementing, staying, vacating or otherwise modifying this Interim Order or any Final Order entered consistent with subparagraph (c) above;

(g)      the appointment of a trustee, receiver or an examiner in the Case or any Successor Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Debtor;

(h)      the dismissal of the Case, or the conversion of the Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or the Debtor filing a motion or other pleading seeking the dismissal of the Case under section 1112 of the Bankruptcy Code or otherwise or the conversion of the Case to Chapter 7 of the Bankruptcy Code;

(i)      the filing of a motion seeking, or the Court shall enter an order granting, relief from or modifying the automatic stay of section 362 of the Bankruptcy Code to allow any creditor to execute upon or enforce a lien on any Collateral;

(j)      the existence of any claim or charges, or the entry of any order of the Court authorizing any claims or charges, entitled to superpriority administrative expense claim status in any Case pursuant to section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the Prepetition Lender under this Interim Order;

(k)      the Debtor shall file, or the Debtor shall fail to contest in good faith the filing of, a motion for entry of an order materially adversely impacting the rights and interests of the Prepetition Lenders;

(l)      the Debtor shall challenge, support or encourage a challenge of any payments made to the Prepetition Lenders with respect to the Prepetition Secured Obligations or any other payment to the Prepetition Lenders authorized hereunder;

(m)      the Debtor shall fail to contest in good faith a request to take any action that if taken by the Debtor would constitute an event of default under this paragraph 7; and

20

(n)     the automatic stay shall be modified, reversed, revoked or vacated in a manner that has a material adverse impact on the rights and interests of the Prepetition Lenders.

8.      <u>Proofs of Claim</u>.   Notwithstanding any order entered by this Court in relation to the establishment of a bar date in the Case or any Successor Cases to the contrary, the Prepetition Lenders shall not be required to file proofs of claim in the Case or any Successor Cases for any claims arising under, or in connection with, the Prepetition Documents or this Interim Order (including, without limitation, the Prepetition Secured Obligations).   The Debtor's stipulations, admissions, and acknowledgments and the provisions of this Interim Order shall be deemed to constitute a timely filed proof of claim for the Prepetition Lenders with regard to any and all claims arising under, or in connection with, the Prepetition Documents or this Interim Order (including, without limitation, the Prepetition Secured Obligations).   Notwithstanding the foregoing, Prepetition Lenders are authorized to file proofs of claim, and Debtor reserves all defenses with respect to the Reserved Obligations and any amounts of Prepetition Secured Obligations asserted by Prepetition Lenders in such proofs of claim that are in addition to the Prepetition Secured Obligations exclusive of the Reserved Obligations.

9.      <u>Carve Out</u>.

(a)     *Carve Out*.  As used in this Interim Order, the "<u>Carve Out</u>" means (i) all fees required to be paid to (A) the Clerk of the Court and (B) the Office of the United States Trustee under section 1930(a)(6) of title 28 of the United States Code plus interest, if any, pursuant to 31 U.S.C. § 3717; (ii) all reasonable fees and expenses up to $50,000 (and any interest thereon) incurred by a trustee under section 726(b) of the Bankruptcy Code; and (iii) to the extent allowed at any time (regardless of whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (as defined below)), whether by interim order, procedural order, or otherwise, all

accrued and unpaid fees and expenses incurred by persons or firms retained by the Debtor pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "Debtor Professionals") and a Committee (if appointed) pursuant to sections 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") (such fees and expenses, the "Allowed Professional Fees") at any time on or prior to the first business day following delivery by the Prepetition Lenders of a Carve Out Trigger Notice (as defined herein), *provided* that the amount of such Allowed Professional Fees shall not exceed (exclusive of item (vi) below), at any time, in the aggregate, the lesser of (iv) the amount set forth for Allowed Professional Fees in the Budget at such time and (v) the sum of $800,000.00, and separately (vi) the amount of fees for any Committee challenging any Prepetition Secured Obligations or Prepetition Liens shall be limited to $25,000.  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Prepetition Lenders to lead restructuring counsel for the Debtor, the U.S. Trustee, and lead counsel to a Committee (if appointed), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined herein), stating that the Carve Out has been triggered.  Each Professional Person shall deliver bi-weekly (on Thursday of each such week, beginning on the second Thursday following the Petition Date) to the Debtor (and the Debtor shall cause the same to be delivered to the Prepetition Lenders on the same day received by the Debtor) a statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the preceding week by such Professional Persons (through Saturday of such week).

(b)    *Carve Out Reserves.*  On the day on which a Carve Out Trigger Notice is given by the Prepetition Lenders (the "Carve Out Trigger Date"), the Carve Out Trigger Notice shall be deemed a demand to the Debtor, and authorization for the Debtor, to utilize cash

089271\1\170016701.v3

on hand and proceeds of the Collateral to fund a reserve in an amount equal to the Carve Out. The Debtor shall deposit and hold such amounts in a segregated account at the Prepetition Lenders in trust exclusively to pay such unpaid Allowed Professional Fees (the "Carve Out Reserves"). For the avoidance of doubt, the Carve Out Reserves shall constitute the primary source for payment of Allowed Professional Fees entitled to benefit from the Carve Out, and any lien priorities or superpriority claims granted pursuant to this Interim Order or the Final Order to secure payment of the Carve Out shall be limited to the Carve Out Reserves, once funded. Following payment of all Allowed Professional Fees entitled to benefit from the Carve Out, any remaining funds in the Carve Out Reserves shall be distributed to the Prepetition Lenders on account of any outstanding obligations (including, without limitation, the Prepetition Secured Obligations) owing to the Prepetition Lenders. Notwithstanding anything to the contrary contained herein, immediately upon the payment of all outstanding Prepetition Secured Obligations, the Debtor shall fund the Carve Out Reserves (to the extent not already funded) in accordance with this paragraph in the amount calculated as of the date that payment of all outstanding Prepetition Secured Obligations is made, and following such funding, the Prepetition Lenders shall be released from all further liability from the Carve Out.

(c)    *No Direct Obligation To Pay Allowed Professional Fees*. The Prepetition Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Case or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the Prepetition Lenders in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement. Nothing herein shall be construed as a consent to

the allowance of any professional fees or expenses of any Professional Person or shall affect the right of the Prepetition Lenders to object to the allowance and payment of such fees and expenses.

        (d)    *Payment of Carve Out On or After the Carve Out Trigger Date.*  Any payment or reimbursement made on or after the occurrence of the Carve Out Trigger Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

        10.    <u>Limitations on Use of Cash Collateral and Carve Out</u>.  The Collateral (including Cash Collateral) and the Carve Out may not be used in connection with: (a) preventing, hindering, or delaying any of the Prepetition Lenders' permitted enforcement or realization upon any of the Collateral; (b) using or seeking to use Cash Collateral except as provided for in this Interim Order or a further court order; (c) selling or otherwise disposing of Collateral without the consent of the Prepetition Lenders; (d) incurring Indebtedness (as defined in the Prepetition Documents) without the prior consent of the Prepetition Lenders; (e) seeking to amend or modify any of the rights granted to the Prepetition Lenders under this Interim Order or the Prepetition Documents, including seeking to use Cash Collateral and/or Collateral on a contested basis; (f) objecting to or challenging in any way the Prepetition Liens, Prepetition Secured Obligations, Prepetition Collateral, or any other claims or liens, held by or on behalf of the Prepetition Lenders; (g) asserting, commencing, or prosecuting any claims or causes of action whatsoever against the Prepetition Lenders, or any of its respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees; (h) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition Liens, Prepetition Secured Obligations, or any other rights or interests of the Prepetition Lenders; or (i) seeking to subordinate, recharacterize, disallow, or

avoid the Prepetition Secured Obligations; *provided*, *however*, the Carve Out and such collateral proceeds may be used for allowed fees and expenses in an amount not to exceed $25,000 in the aggregate incurred solely by a Committee (if appointed) in investigating (but not prosecuting or challenging) the Debtor's Stipulations.

11.    <u>Effect of Stipulations on Third Parties</u>.

(a)    *Generally*. The Debtor's Stipulations set forth in paragraph E of this Interim Order are and shall be binding on the Debtor, the Debtor's estate, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including any official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "<u>Committee</u>"), unless and to the extent that a party in interest (other than the Debtor, as to which any Challenge (as defined below) is irrevocably waived and relinquished) with proper standing granted by order of the Bankruptcy Court has properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "<u>Challenge</u>") and (i) such Challenge is filed and/or commenced by no later than (A) for a Committee (if appointed), sixty (60) days from the date of entry of the Final Order, or (B) seventy-five (75) days following the entry of the Final Order for any other party in interest with requisite standing (the occurrence of (A) or (B), as applicable, the "<u>Challenge Deadline</u>"), as such applicable date may be extended in writing from time to time in the sole discretion of the Prepetition Lenders, or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any such judgment has

become a final judgment that is not subject to any further review or appeal.

(b)    *Binding Effect*.  To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Debtor's Stipulations, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Debtor's Stipulations shall, pursuant to this Interim Order, become binding, conclusive, and final on any person, entity, or party in interest in the Case, and their successors and assigns, and in any Successor Case for all purposes and shall not be subject to challenge or objection by any party in interest, including a trustee, responsible individual, examiner with expanded powers, or other representative of the Debtor's estate.  Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Debtor's Stipulations shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (a) above except to the extent that any of such Debtor's Stipulations are expressly the subject of a timely and properly filed Challenge, which Challenge is successful as set forth in a final judgment as provided in subparagraph (a) above, and only as to plaintiffs or movants that have complied with the terms hereof.  Upon a successful Challenge brought pursuant to this paragraph 11, the Court may fashion any appropriate remedy.

12.    <u>Sections 506(c)/552(b)/No Marshaling</u>.  Subject to entry of a Final Order granting such relief, (a) no costs or expenses of administration which have been or may be incurred in the Case at any time shall be charged against the Prepetition Lenders, any of its claims or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise; (b) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply

089271\1\170016701.v3

to the Prepetition Lenders, with respect to proceeds, products, offspring or profits of any of the Collateral; and (c) the Prepetition Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral and any proceeds shall be received and applied pursuant to this Interim Order, notwithstanding any other agreement or provision to the contrary.

13.    <u>No Waiver by Failure to Seek Relief</u>.  The entry of this Interim Order and/or the failure of the Prepetition Lenders to seek relief or otherwise exercise its rights and remedies under this Interim Order, the Prepetition Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Prepetition Lenders.  Furthermore, the receipt by the Prepetition Lenders of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Lenders are adequately protected.

14.    <u>DIP Accounts</u>.

(a)    The Debtor is authorized to (i) continue to use the bank accounts in existence as of the Petition Date which shall be converted to "Debtor-in-Possession" accounts; (ii) maintain and use, in their present form, all preprinted correspondence and business forms; *provided* that the Debtor shall include, or direct others to include, the designation "Debtor-in-Possession" and the corresponding case number on all checks; and (iii) pay any ordinary course bank fees and processor fees incurred in connection with the Debtor's bank accounts, irrespective of whether such fees arose prior to or after the Petition Date.

(b)    The Debtor is authorized, with the consent of the Prepetition Lenders (with respect to any bank accounts at the Prepetition Lenders' bank) and with notice to the U.S. Trustee, to open any new bank accounts as a "Debtor-in-Possession" bank account or

close any existing bank accounts as it deems necessary and appropriate, *provided that* any new account is opened with the Prepetition Lenders or with any bank approved by (and on terms consented to by) the Prepetition Lenders, and so long as any such bank is an authorized depository by the U.S. Trustee pursuant to the U.S. Trustee's Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees. All such accounts and the funds contained therein maintained with the Prepetition Lenders shall be deemed proceeds of the Prepetition Collateral and shall be subject to the Prepetition Liens, Adequate Protection Liens and Adequate Protection Superpriority Claim.

(c)    Each of the Debtor's banks is authorized, without further order of the Court, to deduct the applicable fees and expenses associated with the nature of the deposit and cash management services rendered to the Debtor, whether arising prepetition or postpetition, from the appropriate accounts of the Debtor, and, further, to charge-back to the appropriate accounts of the Debtor any amounts resulting from returned checks or other returned items that result from wire transfers, ACH transactions, or other electronic transfers of any kind, regardless of whether such items were deposited or transferred prepetition or postpetition and regardless of whether the returned items relate to prepetition or postpetition items or transfers.

(d)    Any and all banks of the Debtor are authorized to continue to maintain, service and administer the Debtor's bank accounts as accounts of the Debtor as a debtor in possession, without interruption and in the ordinary course, and to receive, process, honor and pay, to the extent of available funds, any and all checks, drafts, wires, credit card payments, and ACH transfers issued and drawn on the Debtor's bank accounts after the Petition Date by the holders or makers thereof, as the case may be; *provided* that those certain existing deposit agreements between the Debtor and the Debtor's banks shall continue to govern the postpetition

cash management relationship between the Debtor and the respective bank, and all of the provisions of such agreements shall remain in full force and effect.  Any bank of the Debtor may rely upon the representations of the Debtor with respect to whether any check, draft, wire or other transfer drawn or issued by the Debtor should be honored pursuant to any order of this Court, and no bank that honors a check or other item drawn on any account (a) at the direction of the Debtor, (b) in a good-faith belief that this Court has authorized such check or item to be honored, or (c) as a result of an innocent mistake made despite implementation of customary item handling procedures, shall be deemed to be nor shall be liable to the Debtor, its estate, or any other party on account of such prepetition check or other item being honored postpetition.

15.    Access.  Prepetition Lenders shall, during regular business hours and upon three (3) days notice to Debtor, have access to the Property and to the books and records of Debtor. Debtor shall further provide representatives of Prepetition Lenders with reasonable opportunities to obtain information from Debtor with respect to the operation of the Property, its books, records, and management of the Property.  Debtor shall further permit Prepetition Lenders' appraiser to inspect the Property and will provide Prepetition Lenders' appraiser with historical and current information regarding the Property and its operation.  Further, Debtor shall permit access to Prepetition Lenders' representatives and agents on five (5) days notice during business hours for the purpose of examining any and all information and documents relating to the Debtor's past and current financial condition, assets and transfers.  Debtor shall cooperate reasonably with all of Prepetition Lenders' representatives and agents in providing all such information and documents requested.  A copy of this Interim Order shall constitute sufficient authorization for any party presented it to provide all such information requested by Prepetition Lenders' representatives and agents.

089271\1\170016701.v3

16.     <u>Binding Effect of Interim Order</u>.  Immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtor, the Prepetition Lenders, all other creditors of the Debtor, a Committee (if appointed), or any other court appointed committee, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Case, any Successor Cases, or upon dismissal of the Case or any Successor Case.  To the extent any provision of this Interim Order conflicts with or is inconsistent with any provision of the Motion, the provisions of this Interim Order shall control to the extent of such conflict.

17.     <u>Lack of Discharge</u>.  The obligations of the Debtor with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in the Case, or the Prepetition Lenders has otherwise agreed in writing.

18.     <u>No Other Modification of Loan Documents</u>.  Nothing herein contained shall be construed to alter, modify, or change in any respect the terms and conditions of the Loan Documents to constitute Prepetition Lenders' consent to any impairment of any of the Prepetition Secured Obligations.  Nothing herein shall prejudice Prepetition Lenders' rights to challenge any aspect of this bankruptcy case or to seek any relief under Title 11 or Title 28 with respect to any aspect of this bankruptcy case (other than as provided in this Interim Order).

19.     <u>Preservation If Modification Without Prepetition Lenders' Consent</u>. If any or all of the provisions of this Interim Order are hereafter modified, vacated, or stayed without the prior, written consent of the Prepetition Lenders, such modification, vacation, or stay shall not affect (i) the validity of any obligation, indebtedness or liability incurred by the Debtor to the Prepetition Lenders before the effective date of such modification, vacation, or stay; or (ii) the validity or enforceability of any security interest, lien, priority or other protection authorized,

089271\1\170016701.v3

created, or confirmed hereby.  Notwithstanding any such modification, vacation, or stay, any indebtedness, obligations, or liabilities incurred by the Debtor to the Prepetition Lenders before the effective date of such modification, vacation, or stay shall be governed in all respects by the original provisions of this Interim Order, and the Prepetition Lenders shall be entitled to all the rights, remedies, privileges, and benefits granted herein with respect to all such indebtedness, obligations, or liabilities.

20.     <u>Non-Waiver</u>.  Without derogating from any of the express terms of this Stipulation and Order, no approval, agreement, or consent requested of the Prepetition Lenders by the Debtor pursuant to the terms of this Interim Order or otherwise shall be inferred from any action, inaction, or acquiescence of the Prepetition Lenders other than a writing acceptable to the Prepetition Lenders that is signed by the Prepetition Lenders and expressly shows such approval, agreement or consent, without limitation.

21.     <u>Preservation of Rights</u>.  Except to the extent otherwise expressly provided herein, nothing herein shall be deemed or construed to waive, limit, or modify the rights of the Prepetition Lenders to obtain further adequate protection and other statutory protections for the use of the Collateral and Cash Collateral, or to seek other relief in this bankruptcy case in accordance with any provision of the Bankruptcy Code or applicable law, and all of the Debtor's rights to contest any such requests and seek use of Cash Collateral notwithstanding the Prepetition Lenders' lack of consent are preserved.

22.     <u>Survival</u>.  The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the Prepetition Lenders pursuant to this Interim Order, shall continue in the Case, in any Successor Cases and shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in the Case; (b)

089271\1\170016701.v3

converting the Case to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing the Case or any Successor Cases; or (d) pursuant to which this Court abstains from hearing the Case or Successor Cases.

23.     <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order is scheduled for **December__, 2022 at ___:__ a.m. (EST)** before the Honorable Philip Bentley, United States Bankruptcy Judge at the United States Bankruptcy Court for the Southern District of New York.  The Debtor, or an agent appointed for such purpose, shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>"), together with copies of this Interim Order and the Motion, on: (a) the parties having been given notice of the Interim Hearing; and (b) any party which has filed prior to such date a request for notices with this Court.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on **December  __, 2022, at 5:00 p.m. (EST)**, which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtor, Tarter, Krinsky & Drogin LLP, Attn: Scott S. Markowitz, Esq. and Rocco A. Cavaliere, Esq.; (ii) counsel to Prepetition Lenders, Perkins Coie LLP, Attn: Gary Eisenberg, Esq., and (iii) counsel to the Committee (if appointed).

24.     *Nunc Pro Tunc* <u>Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

089271\1\170016701.v3

25.    <u>Retention of Jurisdiction</u>.   The Court has and will retain jurisdiction to

enforce the terms of, any and all matters arising from or related to this Interim Order.

Dated: December ___, 2022
       New York, New York


_____
THE HONORABLE PHILIP BENTLEY
UNITED STATES BANKRUPTCY JUDGE

33

**EXHIBIT A**

(to the proposed Interim Order)

**Golden Seahorse LLC**

**CASH FLOW PROJECTION IN CHAPTER II**
**FIRST THIRTEEN WEEKS**

| | #1 | #2 | #3 | #4 | #5 | #6 | #7 | #8 | #9 | #10 | #11 | #12 | #13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WEEK BEGINNING ------> | FILING DATE 27-Nov | 4-Dec | 11-Dec | 18-Dec | 25-Dec | 1-Jan | 8-Jan | 15-Jan | 22-Jan | 29-Jan | 5-Feb | 12-Feb | 19-Feb |
| **CASH - BEGINNING BALANCE** | 2,172,064 | 2,458,882 | 2,252,324 | 2,662,369 | 3,049,711 | 1,776,360 | 1,052,436 | 1,012,418 | 1,048,839 | 1,049,597 | 1,111,945 | 516,588 | 598,204 |
| **CASH RECEIPTS PROJECTED IN CH.11** | 603,788 | 740,607 | 741,472 | 740,579 | 740,133 | 242,885 | 263,082 | 279,046 | 271,646 | 284,596 | 293,673 | 308,357 | 314,524 |
| **CASH AVAILABLE FOR DISBURSEMENTS** | 2,775,852 | 3,199,489 | 2,993,796 | 3,402,948 | 3,789,844 | 2,019,245 | 1,315,518 | 1,291,464 | 1,320,485 | 1,334,193 | 1,405,618 | 824,945 | 912,728 |
| **PROJECTED PAYROLL DISBURSEMENTS IN CH. 11** | | | | | | | | | | | | | |
| PAYROLL - Hotel employees | 45,300 | 45,300 | 45,300 | 45,300 | 45,300 | 45,300 | 45,300 | 45,300 | 38,800 | 38,800 | 38,800 | 38,800 | 38,800 |
| PAYROLL - THIRD PARTY (Housekeeping and Fire Safety Director) | 58,960 | 58,960 | 58,960 | 58,960 | 58,960 | 58,960 | 58,960 | 58,960 | 44,500 | 44,500 | 44,500 | 44,500 | 44,500 |
| TOTAL PAYROLL & RELATED EXPENSE | 104,260 | 104,260 | 104,260 | 104,260 | 104,260 | 104,260 | 104,260 | 104,260 | 83,300 | 83,300 | 83,300 | 83,300 | 83,300 |
| **OTHER DISBURSEMENTS IN CH 11** | | | | | | | | | | | | | |
| ROOMS DEPARTMENT OPERATING EXPENSE | 70,729 | 70,729 | 70,729 | 79,582 | 79,582 | 79,582 | 79,582 | 54,665 | 54,665 | 54,665 | 54,665 | 59,430 | 59,430 |
| BANQUET DEPARTMENT EXPENSES | - | - | - | - | - | - | - | - | - | - | - | - | - |
| TELEPHONE DEPARTMENT EXPENSES | 2,649 | 2,649 | 2,649 | 2,649 | 2,649 | 2,649 | 2,649 | 2,905 | 2,905 | 2,905 | 2,905 | 2,905 | 2,905 |
| OTHER REVENUE  DEPARTMENT EXPENSES | 753 | 753 | 753 | 753 | 753 | 753 | 753 | 753 | 753 | 753 | 753 | 753 | 753 |
| ADMINISTRATIVE & GENERAL | 29,499 | 29,499 | 29,499 | 35,835 | 35,835 | 35,835 | 35,835 | 18,424 | 18,424 | 18,424 | 18,424 | 17,403 | 17,403 |
| SALES & MARKETING EXPENSES | 22,033 | 22,033 | 22,033 | 26,690 | 26,690 | 26,690 | 26,690 | 12,746 | 12,746 | 12,746 | 12,746 | 13,378 | 13,378 |
| PROPERTY OPERATIONS AND MAINTENANCE | 3,566 | 3,566 | 3,566 | 3,554 | 3,554 | 3,554 | 3,554 | 3,600 | 3,600 | 3,600 | 3,600 | 4,205 | 4,205 |
| ENERGY COSTS | 17,583 | 17,583 | 17,583 | 19,654 | 19,654 | 19,654 | 19,654 | 13,472 | 13,472 | 13,472 | 13,472 | 10,489 | 10,489 |
| FRANCHISE ROYALTIES | 30,189 | 37,030 | 37,074 | 37,074 | 37,029 | 37,007 | 12,144 | 13,154 | 13,952 | 13,582 | 14,230 | 14,684 | 15,726 |
| FRANCHISE - OTHER COSTS | 24,152 | 29,624 | 29,659 | 29,659 | 29,605 | 9,715 | 10,523 | 11,162 | 10,866 | 11,384 | 11,747 | 12,334 | 12,581 |
| MANAGEMENT FEES | 9,057 | 11,109 | 11,122 | 11,109 | 11,102 | 3,643 | 3,946 | 4,186 | 4,075 | 4,269 | 4,405 | 4,625 | 4,718 |
| RENOVATION COSTS - BUDGET ALLOWANCE | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| ATTORNEY FEES | | | | | 50,000 | | | | | | 50,000 | | |
| INTEREST EXPENSE | | 612,440 | | | | 612,440 | | | | | 612,440 | | |
| EQUIPMENT LEASING | | 3,389 | | | | 3,389 | | | | | 3,389 | | |
| INSURANCE | | | | | | 50,000 | | | | | 50,000 | | |
| REAL ESTATE TAXES | | | | | 1,610,293 | | | | | | | | |
| TOTAL OTHER DISBURSEMENTS IN CH. 11 | 212,710 | 842,905 | 227,167 | 248,977 | 1,909,224 | 862,549 | 198,840 | 138,365 | 187,588 | 138,948 | 805,730 | 143,441 | 144,088 |
| **TOTAL PROJECTED DISBURSEMENTS IN CH. 11** | 316,970 | 947,165 | 331,427 | 353,237 | 2,013,484 | 966,809 | 303,100 | 242,625 | 270,888 | 222,248 | 889,030 | 226,741 | 227,388 |
| **CASH - ENDING BALANCE** | 2,458,882 | 2,252,324 | 2,662,369 | 3,049,711 | 1,776,360 | 1,052,436 | 1,012,418 | 1,048,839 | 1,049,597 | 1,111,945 | 516,588 | 598,204 | 685,340 |

**EXHIBIT B**

**Golden Seahorse LLC**

**CASH FLOW PROJECTION IN CHAPTER 11**
**FIRST THIRTEEN WEEKS**

| | #1 | #2 | #3 | #4 | #5 | #6 | #7 | #8 | #9 | #10 | #11 | #12 | #13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WEEK BEGINNING ------> | 27-Nov | 4-Dec | 11-Dec | 18-Dec | 25-Dec | 1-Jan | 8-Jan | 15-Jan | 22-Jan | 29-Jan | 5-Feb | 12-Feb | 19-Feb |
| **CASH - BEGINNING BALANCE** | 2,172,064 | 2,458,882 | 2,252,324 | 2,662,369 | 3,049,711 | 1,776,360 | 1,052,436 | 1,012,418 | 1,048,839 | 1,049,597 | 1,111,945 | 516,588 | 598,204 |
| **CASH RECEIPTS PROJECTED IN CH.11** | 603,788 | 740,607 | 741,472 | 740,579 | 740,133 | 242,885 | 263,082 | 279,046 | 271,646 | 284,596 | 293,673 | 308,357 | 314,524 |
| **CASH AVAILABLE FOR DISBURSEMENTS** | 2,775,852 | 3,199,489 | 2,993,796 | 3,402,948 | 3,789,844 | 2,019,245 | 1,315,518 | 1,291,464 | 1,320,485 | 1,334,193 | 1,405,618 | 824,945 | 912,728 |
| **PROJECTED PAYROLL DISBURSEMENTS IN CH. 11** | | | | | | | | | | | | | |
| PAYROLL - Hotel employees | 45,300 | 45,300 | 45,300 | 45,300 | 45,300 | 45,300 | 45,300 | 45,300 | 38,800 | 38,800 | 38,800 | 38,800 | 38,800 |
| PAYROLL - THIRD PARTY (Housekeeping and Fire Safety Director) | 58,960 | 58,960 | 58,960 | 58,960 | 58,960 | 58,960 | 58,960 | 58,960 | 44,500 | 44,500 | 44,500 | 44,500 | 44,500 |
| TOTAL PAYROLL & RELATED EXPENSE | 104,260 | 104,260 | 104,260 | 104,260 | 104,260 | 104,260 | 104,260 | 104,260 | 83,300 | 83,300 | 83,300 | 83,300 | 83,300 |
| **OTHER DISBURSEMENTS IN CH 11** | | | | | | | | | | | | | |
| ROOMS DEPARTMENT OPERATING EXPENSE | 70,729 | 70,729 | 70,729 | 79,582 | 79,582 | 79,582 | 79,582 | 54,665 | 54,665 | 54,665 | 54,665 | 59,430 | 59,430 |
| BANQUET DEPARTMENT EXPENSES | - | - | - | - | - | - | - | - | - | - | - | - | - |
| TELEPHONE DEPARTMENT EXPENSES | 2,649 | 2,649 | 2,649 | 2,649 | 2,649 | 2,649 | 2,649 | 2,905 | 2,905 | 2,905 | 2,905 | 2,905 | 2,905 |
| OTHER REVENUE  DEPARTMENT EXPENSES | 753 | 753 | 753 | 753 | 753 | 753 | 753 | 753 | 753 | 753 | 753 | 753 | 753 |
| ADMINISTRATIVE & GENERAL | 29,499 | 29,499 | 29,499 | 35,835 | 35,835 | 35,835 | 35,835 | 18,424 | 18,424 | 18,424 | 18,424 | 17,403 | 17,403 |
| SALES & MARKETING EXPENSES | 22,033 | 22,033 | 22,033 | 26,690 | 26,690 | 26,690 | 26,690 | 12,746 | 12,746 | 12,746 | 12,746 | 13,378 | 13,378 |
| PROPERTY OPERATIONS AND MAINTENANCE | 3,566 | 3,566 | 3,566 | 3,554 | 3,554 | 3,554 | 3,554 | 3,600 | 3,600 | 3,600 | 3,600 | 4,205 | 4,205 |
| ENERGY COSTS | 17,583 | 17,583 | 17,583 | 19,654 | 19,654 | 19,654 | 19,654 | 13,472 | 13,472 | 13,472 | 13,472 | 10,489 | 10,489 |
| FRANCHISE ROYALTIES | 30,189 | 37,030 | 37,074 | 37,029 | 37,007 | 12,144 | 13,154 | 13,952 | 13,582 | 14,230 | 14,684 | 15,418 | 15,726 |
| FRANCHISE - OTHER COSTS | 24,152 | 29,624 | 29,659 | 29,623 | 29,605 | 9,715 | 10,523 | 11,162 | 10,866 | 11,384 | 11,747 | 12,334 | 12,581 |
| MANAGEMENT FEES | 9,057 | 11,109 | 11,122 | 11,109 | 11,102 | 3,643 | 3,946 | 4,186 | 4,075 | 4,269 | 4,405 | 4,625 | 4,718 |
| RENOVATION COSTS - BUDGET ALLOWANCE | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| ATTORNEY FEES | | | | | 50,000 | | | | | | 50,000 | | |
| INTEREST EXPENSE | | 612,440 | | | | 612,440 | | | | | 612,440 | | |
| EQUIPMENT LEASING | | 3,389 | | | | 3,389 | | | | | 3,389 | | |
| INSURANCE | | | | | | 50,000 | | | | | 50,000 | | |
| REAL ESTATE TAXES | | | | | 1,610,293 | | | | | | | | |
| TOTAL OTHER DISBURSEMENTS IN CH. 11 | 212,710 | 842,905 | 227,167 | 248,977 | 1,909,224 | 862,549 | 198,840 | 138,365 | 187,588 | 138,948 | 805,730 | 143,441 | 144,088 |
| **TOTAL PROJECTED DISBURSEMENTS IN CH. 11** | 316,970 | 947,165 | 331,427 | 353,237 | 2,013,484 | 966,809 | 303,100 | 242,625 | 270,888 | 222,248 | 889,030 | 226,741 | 227,388 |
| **CASH - ENDING BALANCE** | 2,458,882 | 2,252,324 | 2,662,369 | 3,049,711 | 1,776,360 | 1,052,436 | 1,012,418 | 1,048,839 | 1,049,597 | 1,111,945 | 516,588 | 598,204 | 685,340 |