**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Golden Seahorse LLC*
*dba Holiday Inn Manhattan Financial District*
*Debtor and Debtor-in-Possession*
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
Scott S. Markowitz, Esq.
Rocco A. Cavaliere, Esq.
smarkowitz@tarterkrinsky.com
rcavaliere@tarterkrinsky.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:                                                          Chapter 11

GOLDEN SEAHORSE, LLC
dba Holiday Inn Manhattan Financial District,[1]        Case No. 22-11582 (PB)

                                    Debtor.
------------------------------------------------------------x

## DEBTOR'S MOTION FOR AUTHORITY TO ENTER INTO AN AGREEMENT WITH NEW YORK CITY HEALTH AND HOSPITALS CORPORATION FOR USE OF THE DEBTOR'S HOTEL THROUGH APRIL 30, 2024

TO:    THE HONORABLE PHILIP BENTLEY
       UNITED STATES BANKRUPTCY JUDGE

Golden Seahorse LLC dba Holiday Inn Manhattan Financial District ("Hotel" or "Debtor"),

debtor and debtor-in-possession, hereby files this motion (the "Motion") pursuant to sections 105(a)

and 363(b) and (c) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy

Code") and Rules 2002 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), for entry of an order authorizing the Debtor to enter into that certain Hotel Use Agreement

dated January 13, 2023 (the "Agreement") with the New York City Health and Hospitals

Corporation ("NYCHH"), a New York public benefit corporation,  and granting related relief.  In

---

[1] The Debtor's last four digits of its tax identification number are 4770.  The Debtor's principal place of business is 99-103 Washington Street, New York, New York.

support of the Motion, the Debtor respectfully represents as follows:

## PRELIMINARY STATEMENT

As more fully set forth in the *Declaration of Jubao Xie Pursuant to Local Bankruptcy Rule 1007-4* (the "Local Rule Declaration"), which is incorporated herein, this bankruptcy case was precipitated by the need to preserve the Debtor's business for the benefit of all creditors and other stakeholders after entry of a state court order dated September 27, 2022 appointing a receiver pursuant to a provision in the Loan (defined below). The filing of the bankruptcy case allowed the Debtor's current management to continue with the operations of the hotel known as the Holiday Inn Financial District (the "Hotel"). Since the Petition Date, the Debtor has been profitable and has met its forecasted numbers under the Court approved budgets set forth in the interim and final orders approving use of cash collateral.

At all times, the Debtor's goal has been to stabilize operations and maximize value for the estate and all of its creditors and stakeholders. To that end, the Debtor remains committed to working with the Prepetition Lenders (defined below) and other constituents on formulating a plan of reorganization that will allow for either a reinstatement of the prepetition loan, which carries a very favorable 5.25% interest rate, or a sale of the Hotel and related property to a party submitting the highest and best offer. The Debtor remains on track to pursue these initiatives.

In the meantime, the Debtor has been approached by NYCHH, a public benefit corporation that that has been tasked with the unenviable responsibility of housing asylum seekers and migrants that have been bused to or come to New York City from other locations. NYCHH is currently working with other hotels in New York City to procure rooms to address this recent national crisis, supplementing its prior experience working with hotels housing the homeless during the Covid-19 pandemic in 2020. As Mayor Adams and others have noted, the migrant crisis is a national

problem. The City of New York is admirably doing its best to tackle the crisis head-on, by among other things, providing for shelters and other accommodations to displaced individuals seeking asylum.  The City of New York, however, cannot address these problems on their own, and thus requires assistance from third parties, such as the Debtor. After several weeks of discussions and negotiations, the Debtor has entered into the Agreement with NYCHH, a copy of which is annexed hereto as **Exhibit "A"** which will provide NYCHH with all of the 492 Rooms at the Hotel in order to advance NYCHH's mission (at the behest and request of the City of New York) to ensure proper housing for migrants.

While the Debtor's willingness to be a good corporate citizen by contracting with NYCHH to further the public interest in addressing this recent national crisis is a noble goal in its own right, the Debtor's decision to enter into the Agreement is mainly justified by the substantial economic benefits that come with this Agreement.  As will be explained more fully below, this Agreement significantly improves the Debtor's bottom line by increasing 2023 projected net operating income by approximately $5.5 million in 2023 alone and an additional $5 million in 2024.  Prior to the filing of the Motion, the Debtor, through counsel, had numerous communications with respective counsel to the Prepetition Lenders and Holiday Hospitality Franchising, LLC  (the "Franchisor" or "Holiday Inn") to address any concerns and answer any questions pertaining to the Agreement.  As of the filing of the Motion, the Debtor's understanding is that Holiday Inn will not object to the Motion and the Prepetition Lenders are still considering whether to object to the Motion. The Debtor commits to continuing to communicate with these important constituents to address any additional issues or questions, if any, in advance of the hearing to consider this Motion.

In sum, the Debtor respectfully submits the Court should approve this Agreement under either section 363(c)(1) as an ordinary course transaction or pursuant to sections 105(a) and 363(b)

of the Bankruptcy Code.  The Agreement is in furtherance of the Debtor's business judgment and in the best interest of the estate and all its stakeholders, and entry into the Agreement also admirably furthers the public interest in addressing the national crisis that has disproportionately affected several municipalities, including New York City.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§157 and 1334 and the standing Order of Referral of Cases to Bankruptcy Judges of the Southern District Court of New York.   This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory basis for the relief requested herein are §§ 105(a) and 363(b) and (c) of the Bankruptcy Code and Bankruptcy Rules 2002 and 9014.

## BACKGROUND

2.      On November 29, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and has continued in the operation of its business as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

3.      The Debtor operates the Hotel which is a full-service hotel located at 99 Washington Street, New York, NY 10016.  In addition to the Hotel, the Debtor also owns an adjacent neighboring property at 103 Washington Street, New York, NY 10016, whereby the Debtor leases space to Amazon Restaurant and Bar d/b/a St. George Tavern. The Debtor constructed the Hotel between 2010 and 2014 and it opened for business in October 2014. Pursuant to a license/franchise agreement dated October 15, 2014, the Hotel operates under the Holiday Inn flagship/brand.  The Hotel is fifty (50) stories, the tallest Holiday Inn in the world and consists of 492 rooms and includes a full-service restaurant at the Hotel.

4.      In or about September 2018, the Hotel obtained a $137.2 million loan from Ladder Capital Finance LLC (the "Loan").  The Loan was ultimately split into four separate tranches and as of the Petition Date, three tranches in the amount of roughly $87 million are held by Wilmington Trust, National Association as trustee for various note holders and one tranche in the amount of roughly $50 million is held by Note B Lender (collectively, the "Prepetition Lenders"). The non-default interest rate under the Loan is 5.259%, which equates to roughly $612,000 in monthly interest payments. The Debtor was current on all payments under the Loan up until the onset of the Covid-19 pandemic in March 2020 when the Hotel was forced to close from March 2020 through June 2020. As of the Petition Date, the full amount of the $137.2 million in principal remains outstanding, together with unpaid interest. The non-default interest on the Loan is 5.29% and the Loan matures in September 2028.  According to the Prepetition Lenders' *Statement of Additional Prepetition Secured Obligations Assertions Pursuant to Final Cash Collateral Order*  Dkt. No. 39], the unpaid non-default interest alone is over $11 million.

5.      As a direct result of the Covid-19 pandemic, the Debtor defaulted on the Loan. Thereafter, Wilmington Trust, in 2021, swept all of the Debtor's funds in its separate cash management account that included sales taxes due to New York State and Hotel's occupancy taxes due to New York City.  The Debtor attempted to reach a consensual resolution with Midland Loan Services, the special servicer to Wilmington Trust but unfortunately, the special servicer rejected the Debtor's overtures and proceeded to commence an action in March 2022 to, among other things, (i) foreclose on the mortgage, (ii) appoint a receiver and (iii) enjoin the Debtor from taking certain actions.  By Decision and Order dated September 27, 2022, the Honorable Frances A. Kahn, III granted Wilmington Trust's motion to appoint a receiver but denied Wilmington Trust its request for injunctive relief finding it had not satisfied the factors

for a preliminary injunction and that such relief was, in any event, superfluous, to the appointment of a receiver.

6.      Faced with the prospect of a complete loss of equity and value as well as the potential loss of rights under various contracts and licenses as a result of the appointment of the receiver, the Debtor determined that Chapter 11 was necessary to preserve the Debtor's business and maximize value for all creditors and constituents.  As further discussed below, the Debtor commenced this chapter 11 case in order to attempt to negotiate a restructuring and/or reinstatement of the Loan or to utilize the provisions of the Bankruptcy Code to confirm a plan of reorganization over Wilmington Trust's objection. The Hotel's operations have greatly improved over the last seven months and the Hotel's occupancy rate was approximately 85% in November 2022 and approximately 93% in December 2022.

7.      On December 21, 2022, this Court entered the *Final Order (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Adequate Protection to the Pre-Petition Lenders, (III) Modifying the Automatic Stay and (IV) Granting Related  Relief.*  See Dkt. No. 38.

**PRINCIPAL TERMS OF AGREEMENT BETWEEN DEBTOR AND NYCHH**

8.      As noted herein, the Agreement is annexed as **Exhibit "A"** to this Motion.  The Court and parties in interest are referred to the Agreement for a full recitation of its terms. However, set forth below is a summary of some of the key terms of the Agreement:

- Use of Hotel and Term:  The Agreement provides NYCHH with 100% of the 492 Rooms at the Hotel and use of the entire building, including the restaurant, through April 30, 2024, unless otherwise terminated by the Parties, provided that NYCHH may not terminate this Agreement without cause until after at least one hundred eighty (180) days after commencement of the Agreement.  See Agreement, I(b), (d) and (f).

- Payment Terms and Commencement Date:  NYCHH anticipates needing 300 Rooms no later than January 25, 2023, with the balance of 192 Rooms one week later.  NYCHH will pay $190 per Room per day, such that when

fully occupied, the Debtor shall receive $93,480 per day and $2,804,400 per month (based on a 30 day calendar month), with the parties agreeing to reconcile any additional amounts owed for other services and costs, including with respect to the actual length of months. <u>See</u> Agreement, I(b) and (m).

- <u>Security and Food</u>.  NYCHH will provide 24 hour security and shall be primarily responsible for removal of any Guests that may be unruly or otherwise pose a danger or nuisance to the other Guests, the employees and contractors and the Hotel. <u>See</u> Agreement, II.  NYCHH is responsible for providing food to all Guests but may use the Hotel's restaurant with NYCHH's own personnel in providing such service. <u>See</u> Agreement, II.

- <u>Housekeeping, Front Desk and Repairs</u>.  The Debtor shall continue to provide housekeeping services to all Guests at least three times a week, with a requirement that NYCHH ensure that each Guest voluntarily provides access at least once per week for housekeeping.  Further, Debtor will continue to have personnel at front desk to address any inquiries.  Moreover, Debtor shall provide maintenance staff to address service calls. <u>See</u> Agreement, III.2 and III.3.

- <u>Indemnification and Insurance</u>. Debtor shall maintain Commercial General Liability insurance and other forms of coverage standard in the industry.  The Agreement includes standard indemnity provisions to the extent of any damages during the Agreement's term. <u>See</u> Agreement, IV.1 and IV.2.

- <u>Non-Interference With Debtor's Bankruptcy Initiatives</u>.  The Agreement makes clear that nothing in the Agreement shall prevent the Debtor from marketing or selling the Hotel to another third party or pursuing confirmation of a Chapter 11 plan, in each case with the anticipation that the Agreement would be assumed by the Debtor or assigned to a third party as the case may be. <u>See</u> Agreement, I.l.

## <u>RELIEF REQUESTED AND BASIS FOR RELIEF</u>

9.    By this Motion, the Debtor initially seeks a finding the entry into the Agreement is in the ordinary course of business under section 363(c)(1) of the Bankruptcy Code such that approval is not necessary.  Alternatively, to the extent the Court views this Agreement as an agreement outside of the ordinary course of business, the Debtor seeks approval pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.

**A.    Entry Into the Agreement For Use of the Rooms At the Hotel Is
Arguably In The Ordinary Course of Business of the Debtor**

10.    The Debtor operates a Hotel with the main objective of selling its Rooms to the public at large in furtherance of maximizing revenue and, to the best of its ability, ensuring that all Rooms are fully occupied, to the extent possible.  Like most hotels, the Debtor procures most of its business from tourists and business people through online reservations.  Occasionally, the Debtor enters into agreements with airlines, by way of example, that procure a subset of rooms for its pilots and flight attendants and others.  It is also not uncommon for the Debtor to enter into an agreement with other third parties to "block rooms" for an extended period of time.  For instance, in 2017 to 2019, the Debtor entered into a contract with Norwegian Airlines for a block of 100 rooms per day for their airline crews departing and arriving from JFK and Newark airports.

11.    The Debtor believes that entry into the Agreement is arguably an ordinary course of business transaction which would not ordinarily require bankruptcy court approval.  See 11 U.S.C. § 363(c)(1) ("…the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing").  Courts generally determine whether a transaction is in the "ordinary course" by applying the "horizontal" and "vertical" tests.  As stated by Judge Beatty several years ago:

> [t]he inquiry deemed horizontal is whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry. The inquiry deemed vertical analyzes the transactions 'from the vantage point of a hypothetical creditor and [the inquiry is] whether the transaction subjects a creditor to economic risk of a nature different from those he accepted when he decided to extend credit.'

In re Crystal Apparel, Inc., 207 B.R. 406, 409 (Bankr. S.D.N.Y. 1997) (citation omitted).

12.     Under the "horizontal" test, there can be little doubt that from an industry-wide perspective a hotel owner's main objective is to fill its Rooms to capacity in furtherance of increasing revenue.  That is exactly what the Agreement does by ensuring that all 492 Rooms will be utilized and paid for by NYCHH at a favorable rate of $190 per day per Room.  While the type of person that is using the Hotel rooms may be different (i.e. asylum seeker/migrant versus tourist), it does not change the fact the rooms are being used for the same exact purpose of providing shelter and accommodations at an agreed upon price.  Similarly, under the "vertical" test (also referred to as "creditor expectations test"), as set forth in the budget attached to the *Declaration of Jianfeng "Jeff" Qin* (the "Qin Declaration") in support of this Motion, annexed hereto as **Exhibit "B"**, the Debtor anticipates approximately $5.5 million in additional revenue in 2023 alone that will be generated by the Debtor's entry into the Agreement.  It can hardly be said that under the circumstances any hypothetical creditor would not expect a business to take advantage of a sizable increase in business nor would such hypothetical creditor be able to claim an "economic risk" here, where the Debtor has negotiated for guaranteed income, as opposed to maintaining the status quo and relying on a traditional revenue stream generated from the cyclical tourism industry.

13.     As a result, because the Debtor's entry into the Agreement is arguably in furtherance of the ordinary course of business, the Debtor does not technically need to seek permission from the Court under section 363(c)(1).  However, because the entry into the Agreement covers asylum seekers and migrants rather than tourists and relates to the use of Hotel Rooms for a longer period of time than the usual tourist occupies the Rooms, the Debtor is nonetheless, out of an abundance of caution, seeking a determination from the Court the Debtor may enter into the Agreement pursuant to section 363(c)(1) of the Bankruptcy Code.

**B.    In the Alternative, This Court Should Approve The Agreement
Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code**

14.    Alternatively, to the extent the Court views the Agreement as a transaction "outside of the ordinary course of business", the Debtor respectfully submits the Debtor's entry into the Agreement should nonetheless be approved as a reasonable exercise of the Debtor's business judgment under section 363(b) of the Bankruptcy Code.   It is a well-settled bankruptcy law principle that a debtor-in-possession enjoys broad discretion in operating its business.  In light of this broad discretion enjoyed by a debtor-in-possession, the Debtor submits that in evaluating the Debtor's request to enter into this Agreement, this request should be viewed in light of the overriding goal of Chapter 11, which is to enable the Debtor to reorganize its financial affairs and to continue in business operations for the benefit of the estate and its creditors and stakeholders. "The paramount policy and goal of Chapter 11 . . . to which all other bankruptcy policies are subordinated, is the rehabilitation of the Debtor." In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1985). This primary goal of rehabilitation has been recognized by the Supreme Court in NLRB v. Bildisco & Bildisco, 465 U.S. 513, 104 S. Ct. 1188, 79 L. Ed. 2d 482 (1984).

15.    The clear legislative purpose of Chapter 11, to provide an orderly procedure for rehabilitation of a troubled enterprise for the benefit of creditors, equity holders and society in general is often recognized by the courts.  See, e.g., In re Jeppson, 66 B.R. 269, 272 (Bankr. D. Utah 1986); In re Consolidated Operating Partners, L.P., 91 B.R. 113 (Bankr. D. Colo. 1988).

16.    The Bankruptcy Code carries a presumption of reasonableness as applied to business decisions made by a debtor-in-possession.  Where management of a debtor "articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." See In re:

Johns-Manville Corp., 60 B.R. 612 (Bankr. S.D.N.Y. 1986); In re All Seasons Industries, Inc.,

121 B.R. 822 (Bankr. N.D. Ind. 1990). As the Fifth Circuit noted in Richard Leasing Co. Capital

Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985):

> In the absence of special circumstances or a specific code provision, we
> see no reason to require the debtor to do more than justify its actions under
> the `business judgment' standard if creditors object. More exacting
> scrutiny would slow the administration of the debtor's estate and increase
> its costs, interfere with the bankruptcy codes' provision for private control
> of administration of the estate, and threaten the Court's ability to control a
> case impartially.

17.    The business judgment should be left "to the board room and not to the Court." In

re Simasko Products Co., 47 B.R. 444, 449 (D. Colo. 1985). If a debtor-in-possession's decision

is made in good faith and upon a reasonable basis, courts should not second guess the debtor's

decision. In re Curlew Valley Associates, 14 B.R. 507, 513, 514 (Bankr. D. Utah 1981).   A

debtor's business decision should be approved unless that decision "derives from bad faith, whim

or caprice." In re Helm, 335 BR. 528, 538 (Bankr. S.D.N.Y. 2006) (quoting In re Cent. Jersey

Airport Servs., LLC, 282 B.R. 176, 183 (Bankr. D. N.J. 2002) (internal quotations omitted).

18.    The business judgment rule is a standard of review which gives great deference to

the regular decisions made by a debtor's management. Absent this standard, courts would

constantly be involved in complex corporate decision making and reviewing business decisions

on a detailed level. In effect, bankruptcy courts would be managing the debtor's business

contrary to the clear intent of the Bankruptcy Code. These management tasks are, respectfully,

not within the Court's expertise. As the Second Circuit noted in Joy v. North, 692 F.2d 880, 886

(2nd Cir. 1982) in a different, but relevant context:

> After the fact litigation is a most imperfect device to evaluate corporate
> business decisions. The circumstances surrounding a corporate decision
> are not easily reconstructed in a courtroom years later, since business
> imperatives often call for quick decisions inevitably based on less than

perfect information. The entrepreneur's function is to encounter risks and to confront uncertainty, and a reasoned decision at the time made may seem a wild hunch a few years later against a background of perfect knowledge.

19. For all of the foregoing reasons, "parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." <u>See</u> <u>Integrated Resources</u>, 147 B.R. at 656; <u>see also</u> <u>In re Tower Air, Inc.</u>, 416 F.3d 228, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

20. Consistent with the foregoing authorities, the Debtor respectfully submits the Court should approve the Debtor's entry into the Agreement as a reasonable exercise of its business judgment. There are numerous reasons (outlined below) why this Agreement is in the best interest of the estate and all constituents and should be approved by this Court.

21. <u>First</u>, as referenced in the budget annexed to the Qin Declaration, the Debtor projects that under the Agreement, the Debtor's ultimate net operating income will increase by $5.5 million in 2023 alone and an additional $5 million in 2024 for a total of approximate $10 million, even after taking into account and paying, on a regular basis, the Franchisor on account of all royalties and sales and marketing fees aggregating 7.5% of revenues under the license agreement between the parties. This additional liquidity will enhance the Debtor's options for ultimate emergence from this Chapter 11 case, including helping the Debtor in addressing unpaid non-contractual interest due to the Prepetition Lenders and reinstating the loan.

22. <u>Second</u>, the Agreement includes important terms negotiated by the Debtor to ensure that NYCHH provides adequate security and food to all of the Guests of NYCHH that will be staying at the Hotel. It is the Debtor's understanding the security will include at least one security personnel on every other floor of the Hotel. This is in addition to the Debtor's regular

security personnel. Furthermore, the Debtor will continue to provide housekeeping services on a regular basis at least three times a week. The Debtor also negotiated a provision requiring NYCHH to ensure entry into all rooms at least once a week to the extent that any Guests are not voluntarily providing access. This will allow the Debtor to maintain the cleanliness of the Hotel as well as monitor the conditions of the Rooms on a timely basis to ensure that any repairs or issues are dealt with and paid for by NYCHH on a timely basis.

23.    Third, the hotel industry, in particular, and the tourism industry, as a whole, in New York City, have experienced a surprising resurgence that is almost at pre-pandemic levels. However, notwithstanding the Debtor's cautious optimism about the future of tourism in New York, as has always been the case, the winter season from January to mid-March is much slower in New York City than in other months of the year. By way of example, whereas, in December 2022, the Debtor was at 93% occupancy, in January 2023, it is projected the Debtor will be at 70% occupancy with an ADR of just $110.[2]  By this Agreement, the Debtor has ensured that 100% of the Rooms will be occupied with a guaranteed income stream of over $93,000 per day through April 30, 2024, absent an early termination in accordance with the Agreement. Indeed, the Debtor purposely negotiated for a term through April 30, 2024 in order to capture the revenue from this Agreement for the traditionally slower winter season in early 2024, as opposed to ending the Agreement at an earlier point, such as December 31, 2023, by way of example. Indeed, even if the Agreement is terminated in August 2023, for instance, after the six month guaranteed minimum period under the Agreement, the Debtor will benefit from the busy travel season in New York City in September through December 2023.  As such, the length of the

---

[2] The average daily rate (ADR) is a metric widely used in the hospitality industry to indicate the average revenue earned for an occupied room on a given day.

Agreement strikes an appropriate balance between the needs and goals of the Debtor and NYCHH.

24.    <u>Fourth</u>, the Agreement provides a guaranteed fixed income stream to the Debtor over the term of the Agreement in a competitive industry that is often impacted by any number of issues outside of the Debtor's control.  For instance, as the country learned in 2020, nothing can be taken for granted.  And while the return to normal lives is well underway, occasional surges in the Covid-19 virus percolate from time to time, which could theoretically lead to future governmental shutdowns or recommendations and guidance from the Centers for Disease Control or other health agencies to stay indoors and avoid travel. Further, there are many macroeconomic reasons that could unexpectedly arise that must be considered as well.    The increase in inflation in 2022, which is continuing in 2023, is well documented.  Many financial experts expect a recession in 2023, potentially with some layoffs.    Thus, these foregoing circumstances threaten to tighten the purse-strings of the ordinary citizen in the foreseeable future.  In these circumstances, the tourism industry could suffer setbacks.  While the Debtor is certainly hopeful that the foregoing risks will not come to pass and is genuinely very optimistic about the future of the tourism and hospitality industries as a whole, faced with these uncertainties that it cannot control, the Debtor could not pass up the guaranteed income to be generated under the Agreement.

25.    <u>Fifth</u>, the Agreement also includes a provision that makes clear that entry into the Agreement does not mean the Debtor is prohibited from pursuing, on a parallel track, a possible reorganization plan or a sale of the Debtor's Hotel and related property.[3]    It would be anticipated that in either case, the Agreement would be assumed, or assumed and assigned to a third party, as

---

[3] The Debtor believes by entering into the Agreement, it will generate monies which should enable the Debtor with some additional capital infusion to reinstate the Loan.

the case may be.  Moreover, the Debtor believes that since the Net Operating Income will increase exponentially, at least in the short term, the Agreement could potentially lead to higher bids or otherwise increase the number of prospective purchasers that may become more interested in making a bid for the Hotel through an auction and sale process.

26.    Sixth, the Agreement was not considered in a vacuum but was the result of arms-length bargaining between the parties, over the course of several weeks.  By way of background, when the Debtor was first approached by NYCHH in mid-December, NYCHH requested only a small portion of Rooms, i.e. roughly 100 Rooms.  After analyzing this request, the Debtor rejected such proposal as the logistics of housing asylum seekers in only 100 Rooms, while also servicing hundreds of other tourists were too difficult.  The Debtor was also understandably concerned about potential backlash from tourists using the Hotel at the same time as asylum seekers.  A split was also problematic insofar as NYCHH desired use of the Debtor's restaurant for provision of food service, but the restaurant is an amenity that is commonly provided to the tourists at the Hotel.  Numerous other complications arose leading ultimately to NYCHH obtaining additional funding to make a proposal for 100% of the Rooms at the Hotel., which as noted, is very beneficial to the Debtor.  Aside from the economics, the Agreement provides other non-economic terms requested by the Debtor regarding the Guests' use of the Hotel, including security and other important considerations.

27.    Last, but certainly not least, while the Debtor's obvious main objective is to ensure that it maximizes value for the estate and all constituents, which the Agreement undoubtedly ensures, entry into the Agreement is also important for the public interest.  The plight of these asylum seekers and migrants is well documented and is now a national crisis which is disproportionately affecting a small number of municipalities, including New York

City.  These human beings deserve shelter and a warm bed and meals while they determine their future and next steps.  The Debtor has the ability to play a small role in providing such amenities. In light of the shortage of shelters and affordable housing, absent the support of New York City and its agencies as well as private entities such as hotels and other buildings "stepping up" to allow these asylum seekers and migrants to use their facilities for a short period of time, tens of thousands of desperate and hungry asylum seekers and migrants would be forced to walk the streets of the City aimlessly in the midst of the winter season.  While a bankruptcy case's main focus is often the economics of a deal (which the Debtor has met in any event), there are instances, including this one, in which a court should consider whether the public interest would be served by consummation of a transaction.  See e.g. In re Chrysler LLC, 405 B.R. 84, 96 (Bankr. S.D.N.Y. 2009) (approving sale, noting, among other things, the "overriding concern of the U.S. and Canadian governments to protect the public interest"); see also In re C2 Media LLC, 2010 WL 2910902 at *3 (approving agreement, for a number of reasons, including because it was "in the public interest, as it will result in the continued operation of the assets"); see also In re Trans World Airlines, Inc., 2001 WL 1820326 (approving sale under section 363(b), noting "substantial public interest in preserving the value of TWA as a going concern" and "public interest that favors an organized rehabilitation"); In re Jewish Memorial Hospital, 13 B.R. 417, 419 (Bankr. S.D.N.Y. 1981) ('the health and safety of the general public is undisputably a paramount public interest"); see In re Miles, 1992 W 48577 (Bankr. E.D. Pa. March 4, 1992) (denying relief from stay to lender to pursue foreclosure relief as "public interest is served by preventing the Debtors from being rendered homeless").  There is no question that the public interest would be served by approval of the Agreement.

28.    In sum, the Debtor submits, in the exercise of its business judgment, that entry into

the Agreement is in the best interests of the Debtor, its estate, and all creditors and constituents.

## NOTICE OF MOTION

29.     Under the Bankruptcy Rules, a motion to approve the entry into the Agreement requires at least fourteen (14) days' notice and possibly twenty-one (21) days.  However, as set forth in the Debtor's Motion to Shorten Time for a Hearing, and supporting documents, the Debtor requests the Court schedule a hearing to consider the Motion on approximately seven (7) days' notice in order to satisfy the NYCHH's desire to provide accommodations to numerous asylum seekers and migrants as quickly as possible.

30.     No previous application for the relief requested herein has been made to this Court or any other Court.

**WHEREFORE**, for all of the foregoing reasons, the Debtor respectfully requests the Court grant the relief requested in the Motion and grant the Debtor such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        January 17, 2023

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Golden Seahorse LLC*
*dba Holiday Inn Manhattan*
*Financial District*
*Debtor and Debtor-in-Possession*


By:     /s/ Scott S. Markowitz
        Scott S. Markowitz, Esq.
        Rocco A. Cavaliere, Esq.
        1350 Broadway, 11th Floor
        New York, New York 10018
        (212) 216-8000
        smarkowitz@tarterkrinsky.com
        rcavaliere@tarterkrinsky.com

**EXHIBIT A**

This Hotel Use Agreement is made as of January 17, 2023 (this "**Agreement**" or "**Hotel Agreement**") between NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, a New York public benefit corporation with offices at 50 Water Street, 17th Floor, New York, NY 10004 ("**H+H**") and Golden Seahorse LLC, Debtor in Possession, a New York limited liability company, with offices at 99 Washington Street, New York, NY 10006 ("**Owner**"). Each of H+H and Owner may be referred to as a "**Party**" and collectively as the "**Parties.**"

| H+H: | Hotel: |
|---|---|
| **H+H Contact:** Chris Keeley | **Name of "Hotel": Holiday Inn Financial District** |
| **Title:** | **Address: 99 Washington Street, New York, NY 10006** |
| | **Commencement Date: On or before January 25, 2023 (Subject to Bankruptcy Court Approval)** |
| | **Expiration Date April 30, 2024** |
| **Address: 50 Water Street** | **Hotel Contact: Greg Riley** |
| **City, State, Zip: New York, NY 10004** | **Title: General Manager** |
| **Phone: 646.695.6565** | **Phone:** 484-894-0823 |
| **Email:** chris.keeley@nychhc.org | **Email:** greg.riley@crescenthotels.com |

## I.    Hotel Agreement

a.    Owner is a debtor and debtor in possession in a Chapter 11 bankruptcy case pending in the Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), Bankr. Case. No. 22-11582.

b.    Owner will make available to H+H 100% of the 492 rooms in the Hotel (the "**Rooms**") at a rate of $190.00 per room per day (the "**Room Rate**") for the term of this Agreement and H+H shall pay for all such available rooms regardless of whether they are occupied by H+H or its guests.

c.    The Rooms will be used as temporary housing for H+H's clients referred and overseen by H+H or its contractors ("**Guests**").

d.    This Agreement includes the use of, and access to the entire Hotel building, including but not limited to all Rooms, meeting spaces, Guest storage spaces, appurtenant outdoor spaces such as atria, Guest areas/spaces, and the restaurant on the first and second floor at 103 Washington Street, etc. The only portions of the Hotel that shall not be available to H+H are the mechanical rooms.

089271\1\170087422.v1

e.   This Agreement shall be effective only after Owner obtains authority to enter into this Agreement from the Bankruptcy Court, and Owner will utilize best efforts to obtain such authority within ten (10) days of the full execution and delivery of this Agreement.  The term of this Hotel Agreement shall commence within three (3) business days of entry of an order by the Bankruptcy Court approving Owner's entry into this Agreement, provided the term shall commence no later than January 25, 2023 (the "**Commencement Date**") provided further that H+H may have access to the Hotel two (2) business days in advance for set up and staff training prior to any Guest occupancy.  On the Commencement Date, Owner shall deliver to H+H a total of three hundred (300) Rooms.  Approximately seven days thereafter, Owner shall deliver to H+H the remaining 192 additional Rooms.  All deliveries of Rooms shall be made in full floor increments.  No delivery of a partial floor shall be accepted.

f.   Either Party shall have the right to terminate this Agreement in the event of a material breach by the other Party; provided that the non-breaching Party gives the allegedly breaching Party a notice describing in detail the nature of such material breach and the allegedly breaching Party fails to cure such material breach within 30 days of the giving of such notice.  To the extent the allegedly breaching Party disagrees with the notice of termination and cure, such Party shall be permitted, on no less than 7 business days' notice to seek relief from the Bankruptcy Court in order to prevent the termination of the Agreement. Notwithstanding the foregoing, in the event of a breach by either of the Parties that creates a danger to the health or safety of the Guests, then, notwithstanding the 30-day period to cure such breach, the non-breaching party may immediately upon notice to the other Party, remove the Guests from the Hotel and the Room Rate shall be suspended until the hazardous condition has been remedied.  Additionally, H+H may terminate this Agreement without cause at any time 60 days after giving notice of termination to Owner, provided however in no event shall H+H be permitted to terminate this Agreement without cause until after one hundred eighty (180) days after the Commencement Date (the "**Early Termination Period**").

g.   In addition to the Room Rate, H+H shall pay any and all applicable federal, state, municipal or other taxes, including New York City Hotel occupancy taxes (unless exempted), fees, or assessments imposed on or applicable to H+H's use of the Hotel.  Attached as Appendix 1 is a letter from the NYS Department of Taxation and Finance confirming H+H's tax exemption which Owner will rely on and present to excuse the payment of applicable taxes.

h.   Owner shall allow H+H's contractors (including but not limited to security, food service vendors and medical personnel) to enter the Hotel to provide services to the Guests or for other purposes, as it deems necessary. All such third-party contractors shall be chosen in H+H's sole discretion.  Owner shall reasonably cooperate with all such third-party contractors, including allowing such contractors access into and throughout the Hotel as reasonably necessary to carry out their duties and allowing them to store materials pertaining to their work in the Hotel.  For the avoidance of all doubt, the Owner shall continue to employ and/or utilize, at its own expense, its

own Employees and other independent contractors, including but not limited to its front desk personnel and office employees contracted to Owner by Crescent Hotels and Resorts and housekeeping personnel contracted to the Owner by General Personnel Services Inc.

i.      The Room Rate is fixed.  No amenity (other than as provided in this Agreement) or similar charges other than the fixed Room Rate are allowed when billing for Rooms.  No other charges, such as amenities, pay-per view, non-domestic telephone calls, or room service are allowed and none of the foregoing are required to be provided by Hotel other than Wi Fi and domestic telephone service.

j.      Owner will provide for the laundering of Guests' personal laundry at the same rate charged Owner by its outside vendor.  The Parties represent to each other that no broker's fees or commissions shall be due to any party in connection with this Agreement.  Each Party represents and warrants it has dealt with no broker in connection with this Agreement and each will indemnify the others for all costs, liabilities and expenses (including reasonable attorneys' fees) if such representation and warranty is inaccurate or alleged to be inaccurate.

l.      Nothing in this Agreement shall prevent the Owner from (i) marketing and selling the Hotel to another third party, or (ii) pursuing the confirmation of a Chapter 11 plan of reorganization in Owner's bankruptcy case, in each instance it being contemplated that this Agreement would be assumed by Owner and/or assigned to a third party, as the case may be.

m.      **Payment Arrangements**:

   **1.      The Initial Payments Relating to the First 300 Rooms:**

On the later of three business days after the Bankruptcy Court approves the Agreement or February 1, 2023, H+H shall pay Owner an amount equal to the Room Rate for three hundred (300) Rooms for the period from the Commencement Date to January 31, 2023.[1]

Assuming the Commencement Date has occurred, on or before February 1, 2023, H+H shall pay Owner an amount of $1,596,000 equal to the Room Rate for three hundred (300) Rooms for the period from February 1, 2023 to February 28, 2023.

   **2.      The Initial Payments Relating to the Additional 192 Rooms:**

---

[1] By way of example, if the Commencement Date is January 25, 2023, H+H shall pay Owner the amount of $399,000, calculated as follows: (i) $190 Room Rate, multiplied by (ii) 300 Rooms, multiplied by seven calendar days.

3

On or before seven days after the Commencement Date, H+H shall pay Owner an amount of $1,021,440, which is equal to the Room Rate for one hundred ninety-two (192) Rooms for the period from February 1, 2023 to February 28, 2023.[2]

**3.    The Future Payments Relating to the 492 Rooms**

As set forth in this Agreement, it is anticipated that all of the Hotel's 492 Rooms will have been delivered to H+H prior to March 1, 2023.  As such, as of March 1, 2023, H+H shall pay Owner monthly and on the first day of each calendar month the Room Rate for the full Hotel at $93,480/day. The payment due March 1, 2023 and all subsequent months shall be $2,804,400 provided that periodically, Owner shall adjust with H+H to account for overpayments or underpayments made during the prior months based upon the actual length of the months, and for any other adjustments or additional charges or credits as may be due.  Owner may invoice H+H for any underpayment which H+H shall pay within 30 days.  If H+H is due a credit for any overpayment, it shall be applied to the amount next due from H+H or, if at the end of the term, promptly remitted to H+H by check.

Owner may invoice H+H monthly at the end of each calendar month for any charges other than the Room Rate incurred during the preceding month, including any charges associated with damages to the rooms in excess of reasonable wear and tear.  H+H shall pay all undisputed invoices (for all vendors and scope of services that H+H has preapproved in writing whether detailed herein or contracted after the signing of this document) within 30 days after receipt of such invoice.  At present, there are no preapproved vendors.

Payment shall be made only for rooms that are made available and delivered in clean and usable condition.  The pro-rata, per room rate of any rooms (i) not made available (ii) not delivered in clean and habitable condition and/or (iii) not delivered with working furniture will be deducted from the Room Rate.  H+H shall have the option to add, at its cost, any additional refrigerators and microwaves to Rooms, provided however that any additional utility costs borne by Owner as a result of the use of additional refrigerators and microwaves shall be borne by H+H, with the parties to agree to work in good faith after the Commencement Date to reconcile what portion of any utility charges relate to additional refrigerators and microwaves required by H+H.  Any such additional refrigerators and microwaves shall be the property of H+H which H+H may remove from the Hotel upon the expiration or earlier termination of this Agreement.  Owner represents that each Room has the electrical power capacity for the operation of such appliances.

H+H has represented and warranted that H+H has the authority and power to remove all Guests at the conclusion of the term of this Agreement (i.e. April 30, 2024). To the extent any Guests remain after the term of this Agreement, without the consent of Owner, Owner shall be entitled to liquidated damages equal to

---

[2] It is anticipated that the 192 Rooms will be delivered on or about February 1, 2023. The figures set forth herein shall be adjusted accordingly to the extent that the 192 Rooms are delivered slightly before or after February 1, 2023.

089271\1\170087422.v1

$750.00 per Room per day, representing the fair value of Owner's loss of the opportunity to rent such Room(s) in the normal course. In addition to the foregoing, Owner shall have the right to seek relief from the Bankruptcy Court to forcefully remove any Guests through, among other things, contempt orders or through the use of the United States Marshal's Office or similar governmental agency or unit, to the extent necessary.

## II.    H+H Services

1)    Security:  H+H shall provide 24-hour security and/or Guest access control through H+H or its contractors.  H+H shall use reasonable efforts to ensure that Guests comply with Hotel rules and applicable laws while staying at the Hotel.  Notwithstanding the foregoing, Owner shall be permitted to employ its own security at the Hotel.  To the extent that any Guests are unruly, engage in any illegal activities, vandalize the Hotel, or otherwise pose a danger to any other Guest, employee or independent contractor, or to the proper functioning and structure of the Hotel, H+H is obligated to immediately remove such Guests from the Hotel, provided that in the event that H+H fails to immediately remove such Guests from the Hotel, Owner reserves the right to use its own security or contact the police as it deems appropriate.

2)    Food: H+H may provide food services to all or a portion of the Rooms.  Owner shall also make available for H+H's use the first and second floor of the restaurant located at 103 Washington Street.  As noted in the Agreement, H&H may provide for refrigerators and microwaves in certain Rooms but in no event shall any Guests be permitted to use hot plates or toaster ovens or any other appliance which may increase the risks for fire and other safety hazards.

## III.    Owner's Responsibilities

1)    Uses/Rooms:

a.    Owner shall provide the Rooms to H+H as provided herein unless prevented due to conditions beyond Owner's control.

b.    Each Room shall contain standard room furniture. If H+H requires that certain standard room furniture be removed, Owner shall use commercially reasonable efforts to remove the same prior to 14 days following the Commencement Date.  If any room is described as being ADA accessible on the Checklist, Owner shall keep all features, furniture, and attachments which make the room ADA accessible in good working order such that the room remains ADA accessible through the Expiration Date.

c.    Immediately upon request, Owner shall also provide H+H with key cards for all Rooms with electronic locks for emergency access to all Rooms.  To the extent that H+H shall need emergency access to Rooms, Owner shall provide H+H with the anti-lockout emergency access tool to open any latch chains or similar interior door locking devices.

d.    Owner shall provide no parking.

089271\1\170087422.v1

2)     <u>Services</u>:

    a.    Owner shall provide all information required in the Checklist to H+H attached as Attachment 1 herein, upon request, and shall notify H+H if there are any changes to such Checklist after its submission.

    b.    Owner will identify on-site staff to serve as emergency contacts in the event that Owner or H+H require an immediate response to any inquiry, and will submit the name, cell phone number, email and other contact information for this purpose. H+H reserves the right to require Owner to replace any emergency contacts that fail to appropriately respond to emergencies. Owner's POC shall each be available on a 24 hour/ 7 days per week basis. Hotel's POC is Greg Riley, General Manager, tel: 484-894-0823, email: greg.riley@crescenthotels.com.

    c.    Owner shall assign on-site management to the Hotel as it would during normal hotel operations responsible for general hotel operations and management of the Hotel's staff. Such staff shall be available on a 24 hour, 7 days per week basis.

    d.    Owner shall assign a reception/lobby attendant (which may be the same personnel as described in 2(c) above) to provide front of house operations including coordinating with H+H and, if applicable, 3rd party contractors retained by H+H for services such as food service. The lobby staff shall be available on a 24 hour, 7 days per week basis. Lobby staff shall be responsible for contacting rooms with notifications as required by H+H.

    e.    Owner shall maintain all hotel corridors, stairwells, elevators, and other common areas in a clean and sanitary condition.

    f.    Owner shall clean each Room three times each week or upon Guest check out. To the extent any Guest does not voluntarily provide access to its Room for housekeeping at least once every week, H+H shall be responsible for ensuring that such Guest cooperates in allowing housekeeping to enter the Room at least once every week.

    g.    Fresh linens, sheets, blankets, pillows and pillowcases, towels, soap, shampoo, conditioner and toilet paper shall be delivered upon check-in and refreshed, as necessary but not less often than three times per week.

    h.    Owner shall replace linens and towels on a one-for one exchange 3 times per week or as needed if they become soiled.

    i.    If a Guest checks out between 10AM and 3PM, Owner shall make the room available for a subsequent Guest within four hours of such check out. If a Guest checks out between 3PM and 10AM, Owner shall make the room available for a subsequent Guest by 10AM the following calendar day, or 3 hours after such check out, whichever is later.

089271\1\170087422.v1

j.  Owner shall pick up trash from the Rooms daily.

k.  Owner shall provide extermination and pest control services daily. Extermination must be performed by a certified pesticide applicator. In addition, extermination must be performed monthly at the Hotel and more often in Rooms as conditions require, and where vermin is identified. Extermination activities cannot be performed while Guests are in the room. If any Guest does not cooperate with Owner in connection with extermination, Owner shall not be obligated to exterminate in such Guest's room.

l.  All Rooms shall be equipped with a telephone which can make and receive an unlimited number of domestic calls.

m.  If Hotel is equipped with Wi-Fi, Guests and any H+H staff or contractors shall have free access to Wi-Fi service at all times.

n.  Owner shall provide one security guard at the Hotel lobby/entrance 24 hours per day.

3)  <u>Repairs and Maintenance.</u>

a.  Owner shall provide maintenance staff to support service calls (i.e. clogged toilet etc.) for Rooms.  Maintenance staff shall also be at the Hotel to ensure that all building systems, structural elements, safety equipment, furniture and fixtures are fully functional at all times. Such staff shall promptly respond to complaints from H+H. Further, the POC will provide a phone number for non-business hours so that he/she is responsive to any issue with the Hotel systems.

b.  Owner shall maintain a valid Certificate of Occupancy, or an unexpired Temporary Certificate of Occupancy.   If Temporary Certificate of Occupancy expires, then Owner shall immediately provide H+H with a detailed plan for renewing the expired Temporary Certificate of Occupancy. Except as otherwise agreed to by the Parties, Owner shall be responsible for all maintenance and repairs of the hotel building and Rooms.

c.  Owner will keep the Hotel premises free of New York City Department of Building, Fire Department of New York, and Environmental Control Board life safety violations to the best of its abilities. If any life safety violations exist either prior to use by H+H, or at the time of execution of this Agreement, then Owner shall prioritize their resolution at no cost to H+H. Owner shall provide a list of such life safety violations to H+H prior to execution of this Agreement, and such life safety violations may also be documented in a corrective action plan issued by H+H to the Hotel.  Any notice by a City agency of a life safety violation of code, rules or regulations issued prior to the Expiration Date must be addressed promptly and may result in a reduction or potential exit of H+H from the Hotel.

7

Notwithstanding anything contained herein to the contrary, the Hotel shall be permitted to perform life safety repairs or perform work to the Hotel and Rooms as required under applicable law (e.g., Local Law 11). The above notwithstanding, to the extent that any safety violations are caused by the Guests, H+H must address such violations promptly, absent which Owner may terminate this Agreement or otherwise seek relief from the Bankruptcy Court.

d.    Owner may enter the Rooms at any and all times for inspection, repairs, and maintenance, but shall use reasonable care not to disturb any occupant of any such room or its possessions in so doing except in cases of emergency or if dangerous, unsanitary or hazardous conditions exist, or illegal activities are being conducted, in or about such room.

4)    Alterations/Damage to Rooms

a.    No additions, alterations or improvements to the Rooms may be made.

b.    If the Hotel or any part is damaged by fire or other cause the Room Rate shall be appropriately abated until such damage is restored.  If a substantial part of the Hotel should be so damaged, H+H may elect to terminate this Agreement entirely on 10 days' notice as to such Room.  Neither the right of termination or rent abatement shall apply if H+H, its contractors or Guests were the cause of the fire or other cause.

c.    Guests are not permitted to smoke or use illegal drugs in the Rooms, nor are Guests permitted to write on walls or otherwise vandalize the Rooms in any way.

d.    Owner shall not make any claim against H+H or the City for normal wear and tear to the Hotel or Rooms.  In the event of any dispute between Owner and H+H and the City concerning whether damage is "normal wear and tear", such dispute will be decided by the Bankruptcy Court

e.    H+H will reimburse Owner for the reasonable cost of repairing any damages caused by misconduct or negligence of H+H, its employees, contractors or the Guests promptly following submission of an appropriately documented report of a joint walkthrough itemizing and photographing said damages; provided that reasonable wear and tear shall be excepted.  H+H reserves the right to be present during any such walk-through. Invoices for damages must contain this documentation, including all itemized associated costs.

f.    For damages to be considered, Owner must create an incident report that includes the following with respect to the alleged damage:

1.    Date damage was discovered.

2.      Number of Rooms or other portions of the Hotel damaged.

3.      Description of damages including photographic evidence.

4.      Owner's affirmation that it affirms that the damage occurred on or about that date of its discovery and that it was, to the best of Owner's knowledge, caused by the Guest.

5.      Itemized estimate of repairs.

6.      Any additional information that supports the claim.

g.      Reimbursement for damages will be considered on a monthly basis by H+H provided that in the event H+H rejects Owner's requests for reimbursement, Owner shall be permitted to apply to the Bankruptcy Court for appropriate relief.

5)    <u>Communication</u>

a.      Inquiries regarding any Guest must be referred to H+H.  Owner shall give immediate notice to H+H of any emergency response situation occurring at the Hotel.

b.      The H+H POC shall be Chris Keeley (chris.keeley@nychhc.org).

6)    <u>Confidentiality</u>

All individual identifying information, including Guest names, received by or in the possession of any Party in the course of this Agreement shall be kept confidential and shall not be disclosed except as herein provided or as required by law.

**IV.    The Parties' Joint Responsibilities**

1)    **Insurance**

A.      Hotel shall maintain workers' compensation insurance, employers' liability insurance, and disability benefits insurance, in accordance with Law on behalf of, or in regard to, all employees of the Hotel providing services under this Hotel Agreement.

B.      Within 10 Days of award of this Agreement Owner shall submit proof of workers' compensation insurance and disability benefits insurance (or proof of a legal exemption) to H+H in a form reasonably acceptable to H+H.

C.      Owner shall maintain Commercial General Liability insurance in the amount of at least Two Million Dollars ($2,000,000) per occurrence for bodily injury (including death) and at least Four Million Dollars ($4,000,000) in the aggregate. Coverage must be at least as broad as the coverage provided by the most recently issued ISO Form CG 00 01, primary and non-contributory, and "occurrence" based rather than "claims-made." Such coverage shall list

9

H+H and the City of New York together with their respective officials and employees, as additional insureds with coverage at least as broad as the most recently issued ISO Form CG 20 10 or CG 20 26.

        D.      Nothing set forth in this Agreement shall change the Owner's obligation to comply with its insurance commitments under its loan agreement and mortgage, including with respect to mortgagee insured, additional insured or loss payee provisions.

    2)    **Indemnification**

        a.      To the fullest extent permitted by Law, Owner shall defend, indemnify, and hold harmless H+H, including its officials, contractors, service providers, and employees, against any and all claims (even if the allegations of the claim are without merit), judgments for damages on account of any injuries or death to any person or damage to any property, and costs and expenses to which H+H, or its contractors, service providers, officials or employees, may be subject to or which they may suffer or incur or incur arising out of the operations of the Hotel under this Agreement; provided, however, such indemnity shall not apply to the extent that such damages, etc. arose due to the negligence or wrongful acts of H+H, its employees, contractors or the Guests.. Insofar as the facts or law relating to any of the foregoing would preclude such indemnitees from being completely indemnified by Owner, such indemnitees shall be entitled to be partially indemnified by Owner to the fullest extent permitted by law. To the extent that H+H asserts indemnity claims against Owner, such claims shall be determined by the Bankruptcy Court and to the extent allowed, paid in the order of priority under the provisions of the Bankruptcy Code, and under no circumstances shall such indemnity claims have priority over the secured liens and claims of the Owner's prepetition lenders.

        b.      To the fullest extent permitted by Law, H+H shall indemnify, defend, and hold harmless Owner, its manager(s), their respective owners, affiliates and subsidiaries, the successors and assigns of the foregoing, and each of their respective officers, managers, members, partners, directors, employees, (collectively, the "**Hotel Parties**") from and against any and all losses, damages, causes of action, suits, claims, judgments or expenses, including but not limited to fees and court costs (collectively, "**Claims**"), made or asserted by any third parties (including any third party actions of Owner's employees or Guests), which Claims arise out of any alleged injuries or death to any person or alleged damage to any property, or arise out of any alleged illness, death, sickness (including any and all COVID-19 related exposures or claims), in any case, caused by or associated with H+H's use or occupancy of the Hotel as provided herein, including any such claims arising from the actions or failures to act of H+H's contractors, excluding Claims arising from the negligence or intentional tortious acts of any Hotel Party. Insofar as the facts or law relating to any of the foregoing would preclude such indemnitees from being completely indemnified by H+H,

such indemnitees shall be partially indemnified by H+H to the fullest extent permitted by law.

### 3)    Governing Law:

This Agreement will be governed by and interpreted pursuant to the laws of the State of New York, excluding any laws regarding the choice or conflict of laws.

### 4)    Jurisdiction:

Should any disagreement arise out of the interpretation and enforcement of this Agreement, the Bankruptcy Court shall maintain jurisdiction over any disputes which arise between the Parties as long as Owner's Chapter 11 case remains pending.

## V.    Additional Applicable Terms

### 1)    Incorporation of Exhibits & Order of Priority

The Parties agree to incorporate as though set forth fully herein the terms and conditions set forth in the following attached Exhibits and Appendices: Exhibit A: H+H's Standard Terms and Conditions with a FEMA Rider; and Attachment 1: the checklists of required information regarding participating hotels (Checklist 1 and Checklist 2). In the event of a conflict between this Agreement and any of the Exhibits incorporated herein, the following order of governance will apply: (1) this Agreement, including Attachment 1 (2) Exhibit A.

### 2)    Entire Agreement

This Agreement, including the exhibits and appendices attached hereto, constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement and all prior or contemporaneous agreements or understandings are merged into this Agreement. If any provision of this Agreement is found invalid or unenforceable, the remainder of this Agreement will still be valid and enforceable to the fullest extent permitted by law.

This Agreement may not be modified or amended except in writing and signed by all Parties.

### 3)    Counterparts and Electronic Signatures

This Agreement may be signed in multiple counterparts with the same effect as if the Parties had signed the same document. The counterparts of this Hotel Agreement may be signed and delivered electronically (including by email or PDF). All signatures so obtained and transmitted shall be deemed to be original signatures for all purposes under this Hotel Agreement.

089271\1\170087422.v1

**IN WITNESS WHEREOF,** the parties have signed below as of the date first above written.

NEW YORK CITY HEALTH AND                    GOLDEN SEAHORSE LLC
HOSPITALS CORPORATION

By: _____               By: _____
Keith Tallbe, Chief Procurement Counsel

                                            Name: _____
                                            Title: _____

## Exhibit A

### New York City Health and Hospitals Corporation's
### Standard Terms and Conditions

These terms and conditions ("**Terms and Conditions**") are entered into by and between New York City Health and Hospitals Corporation, located at 50 Water Street, New York, New York 10004, ("NYC Health + Hospitals") and Golden Seahorse LLC, a New York limited liability company with offices at 99 Washington Street, New York, NY 10006 ("Vendor"), each individually referred to as a "Party" and together as the "Parties."

### Definitions

**Agreement:** the agreement between the Parties that consists of these Terms and Conditions, and the Agreement relating to the subject matter hereof ("Incorporated Documents"). The Incorporated Documents shall be made part of this Agreement unless specifically stated otherwise in writing signed by both Parties. To the extent of any inconsistencies between the Hotel Agreement and these Terms and Conditions, the Agreement shall control. Further, to the extent of any inconsistencies between the Agreement and any order approving the Hotel Agreement, the Bankruptcy Court's order shall control.

**The City:** The City of New York.

**NYC Health + Hospitals:** New York City Health and Hospitals Corporation, a public benefit corporation established by the laws of the State of New York.

**Services:** actions provided by a Vendor under this Agreement for the benefit of NYC Health + Hospitals, such as software support, equipment maintenance, professional services (e.g., legal), non-professional services (e.g., cleaning), consultations, and the like.

**Vendor:** the individual or entity providing Goods or Services under this Agreement.

**Vendor Employee(s):** owners, partners, members, officers, directors, employees, agents, or any other person under the reasonable control of Vendor.

### Article I. General Business Terms

1. Term and Extension of Term
The term of this Agreement shall be the Commencement Date through April 30, 2024 (the "Initial Term").

2. Termination
See the Hotel Use Agreement.

3. Payment
See the Hotel Use Agreement.

### Article II. Mandatory Terms and Conditions

1. Order of Precedence
These Terms and Conditions shall prevail in the event of a conflict between these Terms and Conditions and any Incorporated Documents.

13

2. Governing Law

This Agreement shall be governed, construed and enforced in accordance with the laws of the State of New York without giving effect to its principles of conflicts of laws.

3. Legal Disputes

3.1 Other than disputes pertaining to the responsibilities and obligations of the Parties and interpretation of the Agreement which shall be determined by the Bankruptcy Court as long as Owner's Chapter 11 case remains pending, pursuant to New York City Health and Hospitals Corporation Act, Chapter 1016-69, Section 20, all actions against NYC Health + Hospitals shall be brought in the City, in the county in which the cause of action arose, or if it arose outside of the City, in the City, County of New York.

3.2 Actions against NYC Health + Hospitals by Vendor arising out of this Agreement must be commenced within six months of the expiration or termination of this Agreement.

3.3 Neither Party shall make a claim for personal liability against any individual, officer, agent or employee of the other, nor of the City, pertaining to anything done or omitted in connection with this Agreement.

3.4 This section shall survive expiration or termination of this Agreement.

4. Diversity Contracting

Intentionally omitted.

5. Investigations

5.1 In furtherance of its obligations under Chapter 34 of the New York City Charter, Vendor shall fully cooperate with any investigation, audit or inquiry related to this Agreement conducted by NYC Health + Hospitals, the City, or the State of New York that is empowered directly, or by designation to compel the attendance of witnesses to examine under oath.

5.2 If Vendor, an officer or director of Vendor, or any person under the reasonable control of Vendor refuses to testify for a reason other than the assertion of his or her privilege against self-incrimination in an investigation, audit, or inquiry conducted by NYC Health + Hospitals, the City, the State of New York that is a party in interest in, and is seeking testimony concerning the award of, or performance under, any transaction, agreement, lease, permit, contract, or license entered into with NYC Health + Hospitals, the City, the State of New York, any political subdivision thereof or local development, then NYC Health + Hospitals may convene a hearing, upon not less than five days written notice to the parties involved, to determine if any penalties shall attach for the failure of such person to testify.

5.3 The penalties that may attach after a final determination may include but shall not exceed: (i) the disqualification of Vendor for a period not to exceed five years from the date of an adverse determination for any person or any entity of which such person was a member at the time the testimony was sought, from submitting bids for, or transacting business with, or entering into or obtaining any contract, lease, permit or license with or from NYC Health + Hospitals or the City, and/or (ii) the cancellation or termination of any and all such existing NYC Health + Hospitals or City contracts, leases, permits, or licenses that the refusal to testify concerns and that have not been assigned as permitted hereunder, nor the proceeds of which pledged, to an unaffiliated and unrelated institutional lender for fair value prior to the issuance of the notice scheduling the hearing, without NYC Health + Hospitals or the City incurring any penalty or damages on account of such cancellation or termination.  Any monies lawfully due for goods delivered, work done, or

fees accrued prior to the cancellation or termination shall be paid by NYC Health + Hospitals or the City, as applicable.  As used in this paragraph license or permit shall be defined as a license, permit, franchise, or concession not granted as a matter of right.

5.4 This section shall survive expiration or termination of this Agreement.

6. Audit

6.1 Pursuant to Chapter 5 of the New York City Charter, at NYC Health + Hospitals' reasonable request made upon reasonable notice, Vendor shall make available all records and books pertaining to this Agreement during normal business hours for audit, inspection and/or investigation by NYC Health + Hospitals, the City, acting through its Comptroller, the U.S. government or any other persons authorized by NYC Health + Hospitals.  Such audit, inspection and/or investigation may include examination and review of the source and application of all funds from NYC Health + Hospitals, the City, the State of New York, the federal government, private sources, or any other source.  If an audit, inspection, or investigation is commenced as set forth in this section, NYC Health + Hospitals may withhold payment hereunder until Vendor provides the cooperation required hereunder.

6.2 Vendor shall maintain accurate books and records in accordance with generally accepted accounting principles.  Vendor shall retain such documents for six years after the final payments, expiration or termination of this Agreement, whichever is later.

6.3 This section shall survive expiration or termination of this Agreement.

7. Fair Practices

7.1 Any violation of the representations or warranties set forth in this section shall constitute a material breach of this Agreement, and NYC Health + Hospitals shall have the right to immediately terminate this Agreement without liability for any damages resulting therefrom.

7.2 Vendor warrants that no Vendor Employee is an elected official, officer or employee of NYC Health + Hospitals or the City.

7.3 Vendor and Vendor Employees shall not directly or indirectly give any gift in any form, including but not limited to money, service, loan, travel, entertainment to members of NYC Health + Hospitals' Board of Directors, Community Advisory Boards, officers, employees, or personnel.

7.4 Vendor shall not represent any party other than NYC Health + Hospitals related, or substantially related, to the Services to be performed under this Agreement without NYC Health + Hospitals' advance written consent.

7.5 Vendor warrants that neither Vendor nor any Vendor Employee has any conflict of interest relating to the performance of this Agreement which is materially adverse to NYC Health + Hospitals or the City and shall not acquire such conflict of interest during the term of this Agreement.

8. Responsibility Determination

8.1 Vendor represents and warrants that any information submitted as part of NYC Health + Hospitals' vendor responsibility determination process, including PASSPort, have been, or will be, fully answered in accordance with the requirements set forth by the New York City Mayor's Office of Contract Services.

The veracity of the information submitted is a material inducement to NYC Health + Hospitals' execution of this Agreement.

8.2 If clearance from the City's Office of Inspector General cannot be obtained prior to execution of this Agreement and if subsequent to the execution of this Agreement NYC Health + Hospitals receives information from the Office of the Inspector General of the kind that would typically lead to a finding that a vendor is not responsible to receive a contract from NYC Health + Hospitals, then NYC Health + Hospitals may terminate this Agreement immediately without liability for any damages resulting therefrom.

8.3 Vendor must submit new PASSPort questionnaires every three years from the date of its last submission of PASSPort questionnaires so long as this Agreement is in effect.

9. Vendor Representations

Vendor represents and warrants that it and each of its Vendor Employees providing Services under this Agreement are properly licensed to perform such Services by the applicable licensing entities.

Vendor represents and warrants that it is registered do business in the State of New York and the City of New York.

Vendor represents and warrants that it is financially capable of fulfilling all requirements of this Agreement, that there are no legal proceedings against it that could threaten performance of this Agreement, and that the it is a validly organized entity that has the authority to enter into this Agreement. Vendor is not prohibited by any loan, contract, financing arrangement, trade covenant, or similar restriction from entering into this Agreement.

10. Vendor Employee Screening

NYC Health + Hospitals may require Vendor Employees that enter NYC Health + Hospitals premises to participate in its Vendor Employee screening system and Vendor shall comply with all requirements of such system.  NYC Health + Hospitals shall have sole discretion as to whether any Vendor Employees may access NYC Health + Hospitals premises.

11. Criminal Background Checks

Intentionally omitted.

12. Excluded Providers

12.1 Vendor represents and warrants that Vendor and Vendor Employees are not individuals or entities excluded from participation in federal or state health care programs.  Vendor shall ensure the eligibility of Vendor and Vendor Employees to participate in federal and state health care programs and further warrants that it will notify NYC Health + Hospitals in writing if Vendor or any Vendor Employees become excluded from such participation during the term of this Agreement. NYC Health + Hospitals may terminate this Agreement immediately without liability for any damages resulting therefrom should Vendor or Vendor Employees be excluded from participation in federal or state health care programs.

14.2 Vendor warrants that it is not currently a party to a Corporate Integrity Agreement or Certification of Compliance Agreement with any state or federal governmental agency.  Vendor shall promptly notify NYC Health + Hospitals if it becomes a party to such agreement during the term of this Agreement.

15. Principles of Professional Conduct

16

12.2 If Vendor, Vendor 's Employees, or any Vendor subcontractors provide billing or coding functions, furnish health care services or items, or monitor the health care provided by NYC Health + Hospitals, then each such party shall comply with NYC Health + Hospitals' Principles of Professional Conduct ("POPC"), and shall (i) adopt the POPC or their own code of conduct that includes the POPC's core objectives or substantially similar compliance goals, (ii) not violate the POPC or their own similar code, (iii) not engage in unprofessional conduct as defined in the POPC, (iv) timely report to NYC Health + Hospitals in writing any violation of the POPC of which it becomes aware, and (v) fully cooperate, to the extent applicable, with any investigation by NYC Health + Hospitals, the City or by any governmental agency arising out of this Agreement.

## 13. New York State Law 10 NYCRR 400.4

Notwithstanding any other section of this Agreement, NYC Health + Hospitals shall remain responsible for ensuring that any Services provided pursuant to this Agreement complies with all pertinent federal, state and local statutes, rules and regulations, and shall comply with Chapter V of Title 10 of the NY Code of Rules and Regulations, entitled "Medical Facilities – Minimum Standards."

## 14. Nondiscrimination

NYC Health + Hospitals' adopted Chapter 56 of the New York City Charter, formerly Mayor's Executive Order 50, dated April 25, 1980, as amended ("Chapter 56"), and the rules and regulations promulgated thereunder.  Vendor shall comply with all rules and regulations under Chapter 56, and shall not engage in any unlawful discrimination.  This section applies to all Vendor subcontractors and Vendor Employees. Violation of this section may be deemed a material breach of this Agreement, and may result in a declaration of non-responsibility with NYC Health + Hospitals or the City.

## 15. MacBride Fair Employment Principles

This section does not apply if Vendor is a not-for-profit corporation or governmental entity.  Pursuant to the MacBride Fair Employment Principles (Section 165 of the New York State Finance Law), Vendor warrants that it (i) has no business operations in Northern Ireland, or (ii) shall take lawful steps in good faith to conduct any business operations in Northern Ireland in accordance with the MacBride Fair Employment Principles, and shall permit independent monitoring of compliance with such principles by NYC Health + Hospitals or the City.

## 16. Joint Commission Standards

If this Agreement falls within the scope of Joint Commission Standard LD.04.03.09 (the Goods or Services are directly related to patient care) then Vendor shall work in good faith with NYC Health + Hospitals to set forth specific key performance indicators in an attachment to this Agreement against which the performance of Vendor under this Agreement can be meaningfully measured on a regular periodic basis. Such attachment shall become part of this Agreement.

## 17. HIPAA

17.1 If at any time NYC Health + Hospitals determines that a business associate agreement compliant with the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) ("HIPAA") is required to be executed to comply with HIPAA, Vendor shall comply with such requirement. Failure to comply with this section shall constitute a material breach of this Agreement and NYC Health + Hospitals shall have the right to immediately terminate this Agreement without liability for any damages resulting therefrom.

089271\1\170087422.v1

17.2 NYC Health + Hospitals is a Hybrid Entity and Organized Health Care Arrangement as defined under the HIPAA Privacy Rule.  NYC Health + Hospitals' Correctional Health Services division does not engage in electronic transactions as defined in 45 CFR and was removed from HIPAA applicability at NYC Health + Hospitals' option pursuant to CFR 164.105(a)(2)(iii)(D).  Any agreement exclusively for its Correctional Health Services division shall not require a business associate agreement.

<h2 align="center">Article III.  General Terms and Conditions</h2>

### 1. Independent Contractor

Vendor's relationship with NYC Health + Hospitals and the City is that of an independent contractor and not that of an employee.  Vendor covenants that neither it nor any Vendor Employees nor any Vendor subcontractors will hold themselves out as, nor claim to be, employees of NYC Health + Hospitals or the City, and that they will not make any claim, demand, or application to or for any right or privilege applicable to an employee of NYC Health + Hospitals or the City including, but not limited to, Workers' Compensation, benefits, pension, payroll taxes, or Social Security.

### 2. Subcontractors

2.1 Vendor is not permitted to subcontract, in whole or in part, performance of any obligation under this Agreement without the prior written consent of NYC Health + Hospitals, except the third-party vendors listed on Schedule A shall be permitted. Approval by NYC Health + Hospitals of subcontractors specifically set forth in an approved Diversity Vendor Utilization Plan shall be considered prior written consent by NYC Health + Hospitals.

2.2 If NYC Health + Hospitals authorizes in writing Vendor's use of a subcontractor, then Vendor shall not be relieved of any obligation under this Agreement and shall ensure all work performed by such subcontractor is in accordance with this Agreement. Upon request, a copy of each proposed subcontract shall be provided to NYC Health + Hospitals.

### 3. Indemnification

See Hotel Use Agreement.

### 4. Limitation of Liability

4.1 NYC Health + Hospitals' liability to Vendor arising out of this Agreement shall not exceed the amount that is unpaid to Vendor at the time such liability accrued.

4.2 Neither Party, nor their respective employees or agents, shall be liable to the other for indirect, punitive, exemplary or consequential damages.  Neither Party's officers, directors, agents or employees shall have personal liability to the other Party under this Agreement except in cases of fraud.

4.3  This section shall survive expiration or termination of this Agreement.

### 5. Notices

5.1 All notices or communications required or permitted to be given hereunder shall be in writing and if to NYC Health + Hospitals shall be sent to 50 Water Street, New York, New York 10004, Attn: General Counsel and if to Vendor at the address specified below. Notices may be sent by hand delivery, U.S. Postal Service certified mail return receipt requested or by nationally recognized courier next business day

089271\1\170087422.v1

delivery.  Notices shall be deemed given upon delivery if delivery is made by hand, within three business days if sent by certified mail and on the next business day if sent by recognized courier with next business day delivery specified.

5.2 Notices to Vendor shall be sent to:

>       Golden Seahorse LLC
>       99 Washington Street
>       New York, NY 10006
>       Attn: Jeff Qin

5.3 This section shall survive expiration or termination of this Agreement.

## 6. Compliance with Law

Vendor shall comply with all applicable laws, rules and regulations, including New York State and the City's wage laws. Each and every provision of law required to be inserted in this Agreement shall be and is deemed to be included.

## 7. Intellectual Property Infringement

7.1 Vendor warrants that the sale and use of Goods or Services provided shall not give rise to any claim of infringement of any third-party patent, copyright, trademark, or trade secret rights.

7.2 Notwithstanding any other section of this Agreement, Vendor shall indemnify and defend NYC Health + Hospitals and the City, their respective directors, officers, employees and agents, from and against any and all losses, liabilities, judgments, awards and costs (including legal fees and out-of-pocket expenses reasonably incurred) arising out of or related to any claim that NYC Health + Hospitals' or the City's use of the Services or Goods infringes, induces the infringement of, or violates and any third-party's intellectual property rights. . If the facts or law relating to any of the foregoing would preclude NYC Health + Hospitals from being completely indemnified by Vendor, NYC Health + Hospitals shall be partially indemnified by Vendor to the fullest extent permitted by Law.

7.3 If, as a result of any such claim, NYC Health + Hospitals is enjoined from use of any Services or Goods, or if Vendor believes that NYC Health + Hospitals is likely to become the subject of such a claim, Vendor, at its option and expense shall (i) procure the right for NYC Health + Hospitals to continue to use the Services or Goods, (ii) modify the Services or Goods so that they are not infringing, while remaining functionally equivalent to the Services or Goods to have been provided, or (iii) provide a refund to NYC Health + Hospitals for the infringing Services or Goods.

7.4 This section shall survive expiration or termination of this Agreement.

## 8. Insurance

8.1 Vendor shall not commence performing under this Agreement unless and until all insurance required by this Agreement is in effect and satisfactory proof of such insurance (such as certificates of insurance, amendatory endorsements, additional insured endorsement where applicable, or copy of the declarations and endorsements page) has been provided to and approved by NYC Health + Hospitals.  All insurance shall be primary with respect to Vendor and the additional insureds and issued by an insurer with an A.M. Best rating of A-, Class VII or better. All insurance policies must be issued by insurance companies authorized to do business in New York State.  Such insurance shall waive any right of subrogation against

19

NYC Health + Hospitals. The limits of coverage for all insurance required under this Agreement shall be the greater of (i) the minimum limits set forth herein or (ii) the limits available to Vendor under all primary, excess, and umbrella policies. NYC Health + Hospitals reserves the right to increase the minimum acceptable limits of coverage depending upon the scope of services and the potential risk exposures involved in this Agreement. Vendor's failure to maintain any of the insurance required by this Agreement shall constitute a material breach of this Agreement.

8.2 There shall be no self-insurance program or self-insured retention in excess of $25,000 with regard to any insurance required under this Agreement unless approved in writing by NYC Health + Hospitals. Any self-insurance program shall provide NYC Health + Hospitals with all rights that would be provided by traditional insurance.

8.3 Vendor shall provide NYC Health + Hospitals with a copy of any policy required under this Agreement upon the demand for such policy by NYC Health + Hospitals.

8.4 Any subcontract shall conform to the insurance requirements set forth in this Agreement.

8.5 Vendor shall maintain occurrence based commercial general liability insurance with limits no less than $2,000,000 per occurrence, $4,000,000 in the aggregate. Such insurance shall name (i) "New York City Health and Hospitals Corporation, its officials, and employees" and (ii) "The City of New York, its officials and employees" as additional insureds. Such insurance shall cover claims for property damage, bodily injury, including death, products liability, and ongoing and completed operations liability. Such insurance shall state that coverage shall not be canceled except with notice to the additional insureds.

8.6 If the Services under this Agreement are professional services, then Vendor shall maintain professional liability insurance with limits no less than $1,000,000 per occurrence $2,000,000 in the aggregate. Any policy that is claims-made shall have at least a three-year reporting period.

8.7 If Vendor uses vehicles under this Agreement, then Vendor shall maintain business automobile liability insurance with limits no less than $2,000,000 and at least as broad as the current ISO form CA0001. Such insurance shall name (i) "New York City Health and Hospitals Corporation, its officials, and employees" and (ii) "The City of New York, its officials and employees" as additional insureds. Such insurance shall state that coverage shall not be canceled except with notice to the additional insureds. If vehicles are transporting hazardous materials, the insurance shall be endorsed to provide pollution liability broadened coverage for covered vehicles (endorsement CA 99 48) as well as proof of MCS-90.

8.8 Vendor shall maintain statutory limits of Worker's Compensation insurance and employer's liability insurance with limits no less than $5,000,000 per accident for injury or disease.

<u>9. Intellectual Property</u>

Intentionally omitted.

<u>10. Use of NYC Health + Hospitals' Marks</u>

The prior written approval of NYC Health + Hospitals is required before Vendor or any Vendor Employee may (i) use NYC Health + Hospitals or any of its facilities' names, logos, marks, seals, insignia, symbols or brands or the like in any material for publication through any media of communication, or (ii) make any statement to the press or issue any material for publication through any media of communication relating to this Agreement. The foregoing restriction does not prohibit Vendor from using any such name in direct communications (including marketing materials that contain a list of Vendor's customers) with current or identified prospective customers (such as in a response to a solicitation or another direct communication).

089271\1\170087422.v1

11. Entire Agreement

This Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior or contemporaneous oral or written communications or agreements with respect to such matters.

12. Amendments

This Agreement may not be modified or amended except in writing and signed by both Parties.

13. Assignment

13.1 Neither Party shall assign, subcontract, transfer or otherwise dispose of this Agreement or any interest herein without first obtaining the other Party's prior written consent; if a Party does so without consent of the other Party ("non-consenting Party") it shall constitute a material breach of this Agreement and the non-consenting Party shall have the right to immediately terminate this Agreement without liability for any damages resulting therefrom.

13.2 Should this Agreement be assigned, all rights, benefits and obligations shall be binding upon and inure to the benefit of the Parties, and their respective successors and permitted assigns.

14. Severability

If any section of this Agreement is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining sections shall remain in full force and effect.

15. Waiver

The failure to enforce any right or remedy under this Agreement or at law shall not constitute a waiver of such right or remedy.

16. Delay

16.1 The time of delivery of Goods or performance of Services may be extended in the following ways and with the following consequences:

16.1.1 If delivery or performance by Vendor is delayed by an act or omission of NYC Health + Hospitals, Vendor shall be allowed a corresponding extension of time for performance.

16.1.2 If delivery or performance by Vendor is delayed by a force majeure event such as war, civil insurrection, strikes, weather, etc., Vendor shall promptly give notice to NYC Health + Hospitals of the circumstances and the anticipated delay duration, and Vendor shall be allowed a corresponding extension of time.

16.1.3 Should a delay necessitate NYC Health + Hospitals to purchase Goods or Services from a third-party, NYC Health + Hospitals may do so without liability to Vendor and NYC Health + Hospitals shall be relieved of the obligation to purchase such Goods or Services from Vendor.

089271\1\170087422.v1

## 17. Confidentiality

Each Party has materials and information that have been or might be made available to the other in connection with this Agreement and may consist of confidential and proprietary information ("Confidential Information") of the other Party and shall not disclose the Confidential Information of the other Party except as otherwise set forth in this section.  Confidential Information shall include any information relating to the Services, identity of customers or patients, business practices, trade secrets, business opportunities, pricing terms, and financial information.  Only those employees or consultants requiring the use of Confidential Information in the performance of this Agreement shall receive such Confidential Information and only if such employees or consultants are bound by a confidentiality agreement as protective as this section.  Neither Party shall be liable to the other with regard to any Confidential Information that: (i) was publicly known at the time it was disclosed, (ii) was legally known to the receiving party at the time of disclosure, (iii) was disclosed pursuant to law or court order, or (iv) was disclosed with the prior written approval of the disclosing party.  This section shall survive the termination or expiration of this Agreement.

## 18. Execution

This Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original, and when taken together shall constitute one and the same agreement.  Electronic, facsimile or PDF image signatures shall be treated as original signatures.

### Article IV. Terms and Conditions Specific to Goods

Intentionally omitted.

### Article V. Terms and Conditions Specific to Services

The following shall apply if Vendor provides Services under this Agreement.

Warranty for Services

Vendor warrants that the Services will be performed (i) in a diligent, professional and workmanlike manner in accordance with the highest applicable industry standards and applicable laws and regulations, (ii) in accordance with the requirements under this Agreement, and (iii) by experienced, qualified and properly trained and appropriately licensed personnel.  If Vendor fails to meet the specifications as set forth herein, Vendor will, without additional compensation, promptly correct or revise any errors or deficiencies in the Services provided.

22

**FEMA RIDER**

**1. FEMA Reimbursement Documentation**. Some or all of the cost of the services herein may qualify for reimbursement by the Federal Emergency Management Administration ("FEMA") or other federal programs.  Accordingly, Vendor shall at its own reasonable expense invoice NYC Health + Hospitals as directed by NYC Health + Hospitals to meet FEMA standards. Further, Vendor shall prepare at its own reasonable expense any reports required or useful in applying for FEMA reimbursement.  Should the cost of preparing documents for FEMA reimbursement become unreasonable, NYC Health + Hospitals shall at its own expense offer to Vendor the services of a third-party to perform such services, and Vendor shall cooperate with such third-party.

**2. Debarment**. Vendor certifies that neither it nor its principals is currently in a state of debarment, suspension, or other ineligible status as a result of prior performance, failure, fraud, or violation of applicable laws. Vendor further certifies that neither it nor its principals is debarred, suspended, otherwise excluded from or ineligible for participation in federal assistance programs. NYC Health + Hospitals reserves the right to terminate this Agreement if knowledge of debarment, suspension or other ineligibility has been withheld by the Vendor.  Vendor must comply with 2 C.F.R. Part 180, subpart C and 2 C.F.R. Part 3000, subpart C, and must include a requirement to comply with these regulations in any lower tier covered transaction it enters into.

**3. Lobbying**. Vendor certifies, to the best of its knowledge and belief, that:

> 3.1 No federal appropriated funds have been paid or will be paid, by or on behalf of it, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any federal agreement, the making of any federal grant, the making of any federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any federal agreement, grant, loan, or cooperative agreement;

> 3.2 If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this federal agreement, grant, loan, or cooperative agreement, it will complete and submit Standard Form-LLL.

> 3.3 It will require that the language of this Section E be included in the award documents for all subcontracts at all tiers.

> 3.4 This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by 31 U.S.C. § 1352.

**4. Records Access**. Vendor shall grant access to NYC Health + Hospitals, New York State, New York City or any other pass-through entity, FEMA, Inspectors General, and/or the Comptroller General of the United States, or any of their duly authorized representatives, to any books, documents, papers, and/or records of Vendor that are pertinent to the Agreement for the purpose of making audits, examinations, excerpts, and transcripts. The right also includes timely and reasonable access to Vendor's personnel for the purpose of

interview and discussion related to such documents. The rights of access in this section are not limited to the required retention period but last as long as the records are retained.

**5. Agreement Changes**. If not provided elsewhere in the Agreement, NYC Health + Hospitals and the Vendor must agree in writing to any changes to the Agreement, including changes to pricing and scope. All changes must meet the requirements of 2 C.F.R. Part 200, including Subpart E entitled "Cost Principles."

**6. Logos**. The Vendor shall not use Department of Homeland Security ("DHS") seal(s), logos, crests, or reproductions of flags or likenesses of DHS agency officials without specific FEMA preapproval.

**7. Federal Government not a Party**. The Vendor acknowledges and understands that the federal government is not a party to this Agreement and is not subject to any obligations or liabilities to NYC Health + Hospitals, Vendor or any other party pertaining to any matter resulting from the Agreement.

**8. Program Fraud and False or Fraudulent Statements or Related Acts**. The Vendor acknowledges that 31 U.S.C. Chap. 38 (Administrative Remedies for False Claims and Statements) applies to the Vendor's actions pertaining to this Agreement.

089271\1\170087422.v1

**Exhibit C**

**Checklist 1 and Checklist 2**

**(see attached)**

089271\1\170087422.v1

**Exhibit D**

**H+H's Sales Tax Exemption**

**(see attached)**

089271\1\170087422.v1



January 17, 2023

New York City Health and Hospitals
160 Water St 6th Floor
New York NY  10038


Dear Sir or Madam:

The Tax Law exempts New York State governmental entities such as your organization, New York City Health and Hospitals, from the payment of New York State and local sales and use taxes on their purchases. In order to make tax exempt purchases, a New York State governmental entity must present vendors with the entity's official purchase order or other documentation (e.g., payment voucher, contract of sale, Form AC 946, *Tax Exemption Certificate*, Form ST-129, *Exemption Certificate - Tax on occupancy of hotel rooms*, etc.) which indicates that the purchaser is a New York State governmental entity.

**Tax exemption numbers and Form ST-119.1, *Exempt Organization Exempt Purchase Certificate*, are not issued to New York State governmental entities.** If a vendor requests a tax exemption number or Form ST-119.1, *Exempt Organization Exempt Purchase Certificate*, from you, the New York City Health and Hospitals may give the vendor a copy of this letter. This will assure the vendor that a governmental purchase order, or other evidence that New York City Health and Hospitals is the purchaser, and this letter are the only documentation the vendor needs in order to not collect sales tax.

For additional information, please refer to Publication 843, *A Guide to Sales Tax in New York State for Exempt Organizations*, which is available on the New York State Tax Department website at www.tax.ny.gov.


New York State Department of Taxation and Finance
OTPA-Taxpayer Guidance Division
Sales Tax Exempt Organizations Unit

**Exhibit E**

**Accessible to People with Disabilities Room Details**

Accessible rooms have grab bars in shower area and next to the toilet. Roll in showers, lower handlebars in the shower, shower head and a shower handle with hose, no cabinets under sink for easy wheelchair access.

089271\1\170087422.v1

SCHEDULE A

089271\1\170087422.v1

**EXHIBIT B**

**Tarter Krinsky & Drogin LLP**
*Attorneys for Golden Seahorse LLC,*
*Debtor and Debtor-in-Possession*
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
Scott S. Markowitz, Esq.
Rocco A. Cavaliere, Esq.
smarkowitz@tarterkrinsky.com
rcavaliere@tarterkrinsky.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

In re:

                                                    Chapter 11

GOLDEN SEAHORSE, LLC
dba Holiday Inn Manhattan Financial District,[1]        Case No. 22-11582 (PB)


                        Debtor.
---------------------------------------------------------------x

### DECLARATION OF JIANFENG QIN IN SUPPORT OF DEBTOR'S MOTION FOR AUTHORITY TO ENTER INTO AN AGREEMENT WITH NEW YORK CITY HEALTH AND HOSPITALS CORPORATION FOR USE OF THE DEBTOR'S HOTEL THROUGH APRIL 30, 2024

I, Jianfeng Qin, declare, pursuant to section 1746 of title 28 of the United States Code, that:

1.       I am over the age of eighteen and reside in New Jersey.

2.       I am the assistant general manager of the Holiday Inn Manhattan Financial District ("Hotel" or "Debtor"), a limited liability company organized under the laws of the State of Delaware. The Hotel filed a voluntary chapter 11 petition with the Clerk of this Court on November 29, 2022 (the "Petition Date").

3.       In my capacity as the Debtor's assistant general manager, I am fully familiar with the Debtor's day to day operations, business and financial affairs and books and records. I am

---

[1] The Debtor's last four digits of its tax identification number are 4770. The Debtor's principal place of business is 99-103 Washington Street, New York, New York.

duly authorized to make this declaration (the "Declaration") on behalf of the Debtor and I am competent to testify, to the extent necessary.

4.      I respectfully submit this Declaration in support of the Debtor's Motion pursuant to sections 105(a) and 363(b) and (c) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") and Rules 2002 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order authorizing the Debtor to enter into that certain Hotel Use Agreement dated January 13, 2023 (the "Agreement") with the New York City Health and Hospitals Corporation ("NYCHH"), a New York public benefit corporation,  and granting related relief (the "Motion").

5.      I have reviewed the Motion and adopt as my testimony the various statements and facts set forth in the Motions.  In addition, I was intimately involved in the preparation of the Debtor's bankruptcy schedules and appeared at the Section 341(a) meeting of creditors as the Debtor's representative.  I also previously assisted the Debtor's indirect ultimate owner, Jubao Xie, and Debtor's counsel, in connection with the facts set forth in the *Declaration of Jubao Xie Pursuant to Local Bankruptcy Rule 1007-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York* (Dkt. No. 3) (the "First Day Declaration").  To the extent necessary, I adopt the statements and facts set forth in the First Day Declaration as my additional testimony in further support of the Motion.

6.      As it relates to the Debtor's Motion, in addition to the facts and statements in the Motion and the First Day Declaration (to the extent applicable), which I adopt as my testimony, I believe, in consultation with the Debtor's member and sole equity owner, and other management, the Debtor's entry into the Agreement is a reasonable exercise of the Debtor's business judgment.

7.      I can further attest that I was intimately involved in the preparation of the budget attached hereto as **Exhibit "A"** which reflects the revenue and expenses of the Debtor for the

period from January 2023 to April 30, 2024 to the extent the Debtor enters into the Agreement.

The budget also includes a column reflecting the figures used in the original budget attached to

the Court's final cash collateral order, as expanded through April 30, 2024 to reflect revenue and

expenses to the extent the Debtor continued to operate as a traditional transient hotel in the next

year.  As reflected in the budget, the Debtor anticipates a roughly $5.5 million increase in its

bottom line (i.e. net income) by entering into this Agreement for 2023 alone. Through April

2024, the difference between operating income with the Agreement and without the Agreement

is even greater, reflecting an additional $5.08 million increase in net income.  In total, by

entering into the Agreement, the Debtor projects an increase of approximately $10.5 million

between now and April 2024 as compared to operating the Hotel as a transient hotel.

8.      I note this budget includes a line item that allows for payments of royalties and

sales and marketing fees to Holiday Inn (the "Franchisor") totaling over $2.5 million in 2023

alone, despite the fact the Hotel will not be utilizing the services or brand recognition in

generating revenue in the year ahead.  The Debtor is prepared to continue payments because the

Debtor wishes to maintain its relationship with the Franchisor as there remain eleven (11) more

years on the license agreement between the parties.

9.      Based on my experience in the hotel industry, this Agreement will not affect the

valuation of the Hotel in any negative way.  In fact, it may very well increase the value to the

extent of the increased guaranteed revenue to be generated, at least over the next fifteen (15)

months, from the Agreement.[2]  While the tourism industry has increased in the 4th Quarter of

2022, a welcome development for the Hotel and the country at large, this guaranteed income is

especially important to the extent that there is any slowdown in tourism due to any future surges

of Covid-19 or macroeconomic concerns such as a possible recession or continuing inflation.

---

[2] The Agreement should also enable the Debtor to generate funds required to cure defaults under the mortgage and reinstate.

Current industry surveys indicate that interest in travel will increase in the future, although the latest results also suggest that travel aspirations for some have been downgraded recently, perhaps due to economic concerns.

10.    Finally, the Debtor is pleased to be a small part of the difficult solution to the national crisis involving asylum seekers/migrants that have been bused to or otherwise arrived in New York City.

11.    Accordingly, I believe approval of the Motion is in the best interest of the Debtor, its estate and its creditors, including the Prepetition Lenders, and therefore, the Debtor respectfully requests approval of the Motion.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 17th day of January 2023

/s/ Jianfeng Qin
Jianfeng Qin

**EXHIBIT A**

**CRESCENT**
HOTELS & RESORTS

Full Year - YTD Edition Income Statement

Year over Year Edition with Secondary Budget

Compare

**Holiday Inn Manhattan Financial District (0365)**

| | January 2023 | February 2023 | March 2023 | April 2023 | May 2023 | June 2023 | July 2023 | August 2023 | September 2023 | October 2023 | November 2023 | December 2023 | Total AMT | %REV | Budget AMT | %REV | Variance AMT | %REV | Actuals Last Year January-December 2022 AMT | %REV | Variance AMT | %REV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ROOMS AVAILABLE | 15,252 | 13,776 | 15,252 | 14,760 | 15,252 | 14,760 | 15,252 | 15,252 | 14,760 | 15,252 | 14,760 | 15,252 | 179,580 | | 179,580 | | 0 | 0.0 | 179,580 | | 0 | 0.0 |
| ROOMS SOLD | 9,737 | 12,432 | 15,252 | 14,760 | 15,252 | 14,760 | 15,252 | 15,252 | 14,760 | 15,257 | 14,760 | 15,252 | 172,726 | 100.0 | 163,564 | 99.6 | 9,162 | 0.4 | 149,430 | 99.6 | 23,296 | 0.0 |
| OCCUPANCY | 63.8 | 90.2 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 96.2 | | 91.1 | | 5.1 | 0.4 | 83.2 | | 13.0 | 0.4 |
| ADR | 115.99 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 189.94 | 190.00 | 190.00 | 185.82 | 100.0 | 181.00 | 99.6 | 4.82 | 0.4 | 170.39 | 99.6 | 15.43 | 0.4 |
| REVPAR | 74.05 | 171.46 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 178.73 | | 164.86 | | 13.87 | 0.4 | 141.78 | | 36.95 | 0.4 |
| TOTAL REVPAR | 74.14 | 171.46 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 178.74 | | 165.46 | | 13.28 | 0.4 | 142.41 | | 36.32 | 0.0 |
| | | | | | | | | | | | | | | | | | | | | | | |
| **OPERATING REVENUE** | | | | | | | | | | | | | | | | | | | | | | |
| Rooms | 1,129,395 | 2,362,080 | 2,897,880 | 2,804,400 | 2,897,880 | 2,804,400 | 2,897,880 | 2,897,880 | 2,804,400 | 2,897,880 | 2,804,400 | 2,897,880 | 32,096,355 | 100.0 | 29,605,425 | 99.6 | 2,490,930 | 0.4 | 25,461,638 | 99.6 | 6,634,717 | 0.4 |
| Other Operated Departments | 218 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 218 | 0.0 | 27,530 | 0.1 | -27,312 | -0.1 | 23,533 | 0.1 | -23,315 | -0.1 |
| Miscellaneous Income | 1,204 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,204 | 0.0 | 80,097 | 0.3 | -78,893 | -0.3 | 89,704 | 0.4 | -88,499 | -0.3 |
| **TOTAL OPERATING REVENUE** | 1,130,818 | 2,362,080 | 2,897,880 | 2,804,400 | 2,897,880 | 2,804,400 | 2,897,880 | 2,897,880 | 2,804,400 | 2,897,880 | 2,804,400 | 2,897,880 | 32,097,778 | 100.0 | 29,713,052 | 100.0 | 2,384,726 | 0.0 | 25,574,875 | 100.0 | 6,522,903 | 0.0 |
| | | | | | | | | | | | | | | | | | | | | | | |
| **DEPARTMENTAL EXPENSES** | | | | | | | | | | | | | | | | | | | | | | |
| Rooms | 499,775 | 400,286 | 471,804 | 454,275 | 474,142 | 454,800 | 467,175 | 472,924 | 454,890 | 472,308 | 457,573 | 467,725 | 5,547,676 | 17.3 | 7,959,601 | 26.9 | -2,411,925 | -9.6 | 6,639,871 | 26.1 | -1,092,195 | -8.8 |
| Food and Beverage | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 2,917 | 0.0 | -2,917 | 0.0 |
| Other Operated Departments | 739 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 739 | 338.7 | 9,189 | 33.4 | -8,450 | 305.3 | 17,003 | 72.3 | -16,264 | 266.4 |
| **TOTAL DEPARTMENTAL EXPENSES** | 500,514 | 400,286 | 471,804 | 454,275 | 474,142 | 454,800 | 467,175 | 472,924 | 454,890 | 472,308 | 457,573 | 467,725 | 5,548,415 | 17.3 | 7,968,790 | 26.8 | -2,420,376 | -9.5 | 6,659,791 | 26.0 | -1,111,376 | -8.8 |
| | | | | | | | | | | | | | | | | | | | | | | |
| **UNDISTRIBUTED OPERATING EXPENSES** | | | | | | | | | | | | | | | | | | | | | | |
| Administrative and General | 73,700 | 95,540 | 108,299 | 98,010 | 103,872 | 104,118 | 102,796 | 103,477 | 101,596 | 102,244 | 102,320 | 102,631 | 1,198,603 | 3.7 | 1,903,019 | 6.4 | -704,416 | -2.7 | 1,570,814 | 6.1 | -372,211 | -2.4 |
| Information and Telecommunications Systems | 11,620 | 10,285 | 10,285 | 10,285 | 10,385 | 10,385 | 10,385 | 10,385 | 10,385 | 10,385 | 10,510 | 10,810 | 126,009 | 0.4 | 140,244 | 0.5 | -14,235 | -0.1 | 123,854 | 0.5 | 2,155 | -0.1 |
| Sales and Marketing | 141,303 | 196,327 | 219,348 | 212,337 | 219,348 | 212,337 | 219,823 | 219,348 | 212,337 | 219,348 | 212,837 | 219,848 | 2,504,541 | 7.8 | 2,873,289 | 9.7 | -368,748 | -1.9 | 2,452,500 | 9.6 | 52,041 | -1.8 |
| Property Operation and Maintenance | 67,726 | 52,438 | 54,342 | 49,047 | 54,803 | 59,754 | 51,503 | 54,503 | 51,728 | 55,204 | 53,358 | 51,703 | 656,110 | 2.0 | 571,413 | 1.9 | 84,697 | 0.1 | 438,909 | 1.7 | 217,202 | 0.3 |
| Utilities | 96,497 | 70,008 | 85,850 | 83,091 | 85,856 | 83,091 | 85,856 | 85,856 | 83,091 | 85,856 | 83,691 | 85,856 | 1,014,635 | 3.2 | 791,969 | 2.7 | 222,666 | 0.5 | 695,016 | 2.7 | 319,619 | 0.4 |
| **TOTAL UNDISTRIBUTED EXPENSES** | 390,847 | 424,598 | 478,130 | 452,771 | 474,165 | 469,686 | 470,364 | 473,569 | 459,138 | 473,066 | 462,717 | 470,848 | 5,499,898 | 17.1 | 6,279,934 | 21.1 | -780,036 | -4.0 | 5,281,093 | 20.6 | 218,805 | -3.5 |
| | | | | | | | | | | | | | | | | | | | | | | |
| **GROSS OPERATING PROFIT** | 239,457 | 1,537,197 | 1,947,946 | 1,897,355 | 1,949,574 | 1,879,915 | 1,960,342 | 1,951,387 | 1,890,372 | 1,952,506 | 1,884,110 | 1,959,307 | 21,049,465 | 65.6 | 15,464,328 | 52.0 | 5,585,137 | 13.5 | 13,633,990 | 53.3 | 7,415,475 | 12.3 |
| | | | | | | | | | | | | | | | | | | | | | | |
| MANAGEMENT FEES | 16,962 | 35,431 | 43,468 | 42,066 | 43,468 | 42,066 | 43,468 | 43,468 | 42,066 | 43,468 | 42,066 | 43,468 | 481,467 | 1.5 | 445,696 | 1.5 | 35,771 | 0.0 | 384,004 | 1.5 | 97,463 | -0.0 |
| | | | | | | | | | | | | | | | | | | | | | | |
| INCOME BEFORE NON-OPERATING INCOME & EXPENSES | 222,494 | 1,501,765 | 1,904,478 | 1,855,289 | 1,906,105 | 1,837,849 | 1,916,874 | 1,907,919 | 1,848,306 | 1,909,038 | 1,842,044 | 1,915,838 | 20,567,998 | 64.1 | 15,018,632 | 50.5 | 5,549,366 | 13.5 | 13,249,986 | 51.8 | 7,318,012 | 12.3 |
| | | | | | | | | | | | | | | | | | | | | | | |
| **NON-OPERATING INCOME AND EXPENSE** | | | | | | | | | | | | | | | | | | | | | | |
| Rent | 3,389 | 3,386 | 3,389 | 3,389 | 3,389 | 3,389 | 3,389 | 3,389 | 3,389 | 3,389 | 3,389 | 3,389 | 40,665 | 0.1 | 40,665 | 0.1 | -0 | -0.0 | 40,664 | 0.2 | 1 | -0.0 |
| Property and Other Taxes | 268,435 | 268,435 | 268,435 | 268,435 | 268,435 | 268,435 | 289,910 | 289,910 | 289,910 | 289,910 | 289,910 | 289,910 | 3,350,070 | 10.4 | 3,350,070 | 11.3 | 0 | -0.8 | 3,100,468 | 12.1 | 249,602 | -1.7 |
| Insurance | 60,605 | 60,605 | 60,605 | 60,605 | 60,605 | 63,635 | 63,635 | 63,635 | 63,635 | 63,635 | 63,635 | 63,635 | 748,470 | 2.3 | 748,470 | 2.5 | -0 | -0.2 | 659,395 | 2.6 | 89,075 | -0.2 |
| Fixed Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 6,904,192 | 27.0 | -6,904,192 | -27.0 |
| **TOTAL NON-OPERATING INCOME AND EXPENSES** | 332,429 | 332,426 | 332,429 | 332,429 | 332,429 | 335,459 | 356,934 | 356,934 | 356,934 | 356,934 | 356,934 | 356,934 | 4,139,205 | 13.9 | 4,139,205 | 13.9 | -0 | -1.0 | 10,704,719 | 41.9 | -6,565,514 | -29.0 |
| | | | | | | | | | | | | | | | | | | | | | | |
| EARNINGS BEFORE INTEREST, TAXES, DEPRECIATION, AND AMORTIZATION | -109,935 | 1,169,339 | 1,572,049 | 1,522,860 | 1,573,676 | 1,502,390 | 1,559,940 | 1,550,985 | 1,491,372 | 1,552,104 | 1,485,110 | 1,558,904 | 16,428,793 | 51.2 | 10,879,426 | 36.6 | 5,549,367 | 14.6 | 2,545,267 | 10.0 | 13,883,526 | 41.2 |
| | | | | | | | | | | | | | | | | | | | | | | |
| **INTEREST, DEPRECIATION, AND AMORTIZATION** | | | | | | | | | | | | | | | | | | | | | | |
| Interest Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 612,440 | 2.4 | -612,440 | -2.4 |
| **TOTAL INTEREST, DEPRECIATION, AND AMORTIZATION** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 612,440 | 2.4 | -612,440 | -2.4 |
| | | | | | | | | | | | | | | | | | | | | | | |
| INCOME BEFORE INCOME TAXES | -109,935 | 1,169,339 | 1,572,049 | 1,522,860 | 1,573,676 | 1,502,390 | 1,559,940 | 1,550,985 | 1,491,372 | 1,552,104 | 1,485,110 | 1,558,904 | 16,428,793 | 51.2 | 10,879,426 | 36.6 | 5,549,367 | 14.6 | 1,932,827 | 7.6 | 14,495,966 | 43.6 |
| NET INCOME (LOSS) | -109,935 | 1,169,339 | 1,572,049 | 1,522,860 | 1,573,676 | 1,502,390 | 1,559,940 | 1,550,985 | 1,491,372 | 1,552,104 | 1,485,110 | 1,558,904 | 16,428,793 | 51.2 | 10,879,426 | 36.6 | 5,549,367 | 14.6 | 1,932,827 | 7.6 | 14,495,966 | 43.6 |
| | | | | | | | | | | | | | | | | | | | | | | |
| NET INCOME (LOSS) LESS REPLACEMENT RESERVE | -109,935 | 1,169,339 | 1,572,049 | 1,522,860 | 1,573,676 | 1,502,390 | 1,559,940 | 1,550,985 | 1,491,372 | 1,552,104 | 1,485,110 | 1,558,904 | 16,428,793 | 51.2 | 10,879,426 | 36.6 | 5,549,367 | 14.6 | 1,932,827 | 7.6 | 14,495,966 | 43.6 |

**January - April 2024 - 11th Edition Income Statement**

| Holiday Inn Manhattan Financial District (0365) | January 2024 AMT | February 2024 AMT | March 2024 AMT | April 2024 AMT | Total AMT | %REV | Budget AMT | %REV | Variance AMT |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | January-April, 2023 - Secondary Budget | | Compare |
| ROOMS AVAILABLE | 15,252 | 14,268 | 15,252 | 14,760 | 59,532 | | 59,532 | | 0 |
| ROOMS SOLD | 15,252 | 14,268 | 15,252 | 14,760 | 59,532 | 100.0 | 47,843 | 80.4 | 11,689 |
| OCCUPANCY | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | | 80.3 | | 19.7 |
| ADR | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 100.0 | 133.06 | 99.5 | 56.94 |
| REVPAR | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | | 109.96 | | 80.05 |
| TOTAL REVPAR | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | | 110.48 | | 79.53 |
| | | | | | | | | | |
| **OPERATING REVENUE** | | | | | | | | | |
| Rooms | 2,897,880 | 2,710,920 | 2,897,880 | 2,804,400 | 11,311,080 | 100.0 | 6,499,296 | 99.5 | 4,811,784 |
| Other Operated Departments | 0 | 0 | 0 | 0 | 0 | 0.0 | 8730 | 0.1 | -8,730 |
| Miscellaneous Income | 0 | 0 | 0 | 0 | 0 | 0.0 | 22,065 | 0.3 | -22,065 |
| **TOTAL OPERATING REVENUE** | **2,897,880** | **2,710,920** | **2,897,880** | **2,804,400** | **11,311,080** | **100.0** | **6,530,091** | **100.0** | **4,780,989** |
| | | | | | | | | | |
| **DEPARTMENTAL EXPENSES** | | | | | | | | | |
| Rooms | 471,804 | 439,133 | 471,804 | 454,275 | 1,837,016 | 16.2 | 2,374,928 | 36.4 | -537,913 |
| Food and Beverage | 0 | 0 | 0 | 0 | 0 | 0.0 | 0 | 0.0 | 0 |
| Other Operated Departments | 0 | 0 | 0 | 0 | 0 | 0.0 | 2,830 | 0.0 | -2,830 |
| **TOTAL DEPARTMENTAL EXPENSES** | **471,804** | **439,133** | **471,804** | **454,275** | **1,837,016** | **16.2** | **2,377,756** | **36.4** | **-540,740** |
| | | | | | | | | | |
| **UNDISTRIBUTED OPERATING EXPENSES** | | | | | | | | | |
| Administrative and General | 108,299 | 95,540 | 108,299 | 98,010 | 410,148 | 3.6 | 532,278 | 8.2 | -122,130 |
| Information and Telecommunications Systems | 10,285 | 10,285 | 10,285 | 10,285 | 41,140 | 0.4 | 46,480 | 0.7 | -5,340 |
| Sales and Marketing | 219,348 | 196,327 | 219,348 | 212,337 | 847,360 | 7.5 | 693,585 | 10.6 | 153,775 |
| Property Operation and Maintenance | 54,342 | 52,438 | 54,342 | 49,047 | 210,169 | 1.9 | 185,069 | 2.8 | 25,100 |
| Utilities | 85,856 | 70,008 | 85,856 | 83,091 | 324,811 | 2.9 | 215,115 | 3.3 | 109,696 |
| **TOTAL UNDISTRIBUTED EXPENSES** | **478,130** | **424,598** | **478,130** | **452,771** | **1,833,629** | **16.2** | **1,672,530** | **25.6** | **161,099** |
| | | | | | | | | | |
| **GROSS OPERATING PROFIT** | **1,947,946** | **1,847,189** | **1,947,946** | **1,897,355** | **7,640,436** | **67.5** | **2,479,804** | **38.0** | **5,160,632** |
| | | | | | | | | | |
| MANAGEMENT FEES | 43,468 | 40,664 | 43,468 | 42,066 | 169,666 | 1.5 | 97,951 | 1.5 | 71,715 |
| | | | | | | | | | |
| **INCOME BEFORE NON-OPERATING INCOME & EXPENSES** | **1,904,478** | **1,806,525** | **1,904,478** | **1,855,289** | **7,470,770** | **66.0** | **2,381,853** | **36.5** | **5,088,917** |
| | | | | | | | | | |
| **NON-OPERATING INCOME AND EXPENSE** | | | | | | | | | |
| Rent | 3,389 | 3,386 | 3,389 | 3,389 | 13,553 | 0.1 | 13,556 | 0.2 | 0 |
| Property and Other Taxes | 268,435 | 268,435 | 268,435 | 268,435 | 1,073,740 | 9.5 | 1,073,740 | 16.4 | 0 |
| Insurance | 60,605 | 60,605 | 60,605 | 60,605 | 242,420 | 2.1 | 242,420 | 3.7 | 0 |
| Fixed Other | 0 | 0 | 0 | 0 | 0 | 0.0 | 0 | 0.0 | 0 |
| **TOTAL NON-OPERATING INCOME AND EXPENSES** | **332,429** | **332,426** | **332,429** | **332,429** | **1,329,713** | **11.8** | **1,329,716** | **20.4** | **0** |
| | | | | | | | | | |
| **EARNINGS BEFORE INTEREST, TAXES, DEPRECIATION, AND AMORTIZATION** | **1,572,049** | **1,474,099** | **1,572,049** | **1,522,860** | **6,141,057** | **54.3** | **1,052,139** | **16.1** | **5,088,918** |
| | | | | | | | | | |
| **INTEREST, DEPRECIATION, AND AMORTIZATION** | | | | | | | | | |
| Interest Expense | 0 | 0 | 0 | 0 | 0 | 0.0 | 0 | 0.0 | 0 |
| **TOTAL INTEREST, DEPRECIATION, AND AMORTIZATION** | **0** | **0** | **0** | **0** | **0** | **0.0** | **0** | **0.0** | **0** |
| | | | | | | | | | |
| INCOME BEFORE INCOME TAXES | 1,572,049 | 1,474,099 | 1,572,049 | 1,522,860 | 6,141,057 | 54.3 | 1,052,139 | 16.1 | 5,088,918 |
| **NET INCOME (LOSS)** | **1,572,049** | **1,474,099** | **1,572,049** | **1,522,860** | **6,141,057** | **54.3** | **1,052,139** | **16.1** | **5,088,918** |
| | | | | | | | | | |
| **NET INCOME (LOSS) LESS REPLACEMENT RESERVE** | **1,572,049** | **1,474,099** | **1,572,049** | **1,522,860** | **6,141,057** | **54.3** | **1,052,139** | **16.1** | **5,088,918** |