UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:                                                    Chapter 11

GOLDEN SEAHORSE, LLC,
dba Holiday Inn Manhattan Financial District,[1]          Case No. 22-11582 (PB)


                              Debtor.

------------------------------------------------------------x

## OBJECTION TO DEBTOR'S MOTION FOR AUTHORITY TO ENTER INTO AN AGREEMENT WITH NEW YORK CITY HEALTH AND HOSPITALS CORPORATION FOR USE OF THE DEBTOR'S HOTEL THROUGH APRIL 30, 2024 AND SECURED LENDERS' CROSS-MOTION TO ALLOW SUPER-PRIORITY ADMINISTRATIVE EXPENSE PURSUANT TO 11 U.S.C. § 507(b)

Wilmington Trust, National Association, as Trustee for the benefit of the registered holders of Commercial Mortgage Pass-Through Certificates Series 2018-C6 ("Trust 1"), to the securitization trustee for the benefit of registered holders of Wells Fargo Commercial Mortgage Trust 2018-C47, Commercial Mortgage Pass-Through Certificates, Series 2018-C47 ("Trust 2") and the securitization trustee for the benefit of CSAIL 2018-C14 Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2018-C14, respectively ("Trust 3"; together with Trust 1 and Trust 2, collectively, the "A Note Holders"), and HI FIDI B Note Owner LLC ("HI FIDI" or "B Note Holder"; together with the A Note Holders, the "Secured Lenders"), hereby file this Opposition to *Debtor's Motion for Authority to Enter Into an Agreement With New York City Health And Hospitals Corporation for Use of the Debtor's Hotel Through April 30, 2024* [ECF No. 54] ("Motion") filed by Debtor Golden Seahorse, LLC ("Debtor" or "Lessor") seeking to approve a contract (the "Proposed Contract") with New York City Health and Hospitals

---

[1] The Debtor's last four digits of its tax identification number is 4770. The Debtor's principal place of business is 99 Washington Street, New York, New York.

Corporation, a New York public benefit corporation, as agent for the City of New York (the "City" or "NYCHH"). In support, the Secured Lenders state as follows:

## I.    INTRODUCTION

*Breakneck Speed of Use Change*

The Proposed Contract, which would turn the Hotel into a short-term asylum-seeker housing facility, should not be approved by the Court. Such a change of use poses a significant risk of substantial loss to the Secured Lenders. It is the Secured Lenders who have the largest investment in this asset, even larger than the Debtor. The Proposed Contract does not provide sufficient compensation to provide adequate protection of the Secured Lenders' interests being jeopardized.

Indeed, the filing of the Motion, less than a month after entry of the Cash Collateral Order (defined below) entered by the Court on December 20, 2022, is an Event of Default under the Cash Collateral Order.

For more than 30 *months* pre-petition, the Debtor was in default of its mortgage obligations. Now, in around 20 *days* since first informing Secured Lenders, the Debtor seeks to have the Court approve a wholesale change of the use of its property, from a hotel (a time-tested business model and approved under the Cash Collateral Order) to asylum-seeker housing (a novel public venture the request for which is an Event of Default under the Cash Collateral Order).

The Debtor claims that it will be able to generate substantial increased income during the tenure of the proposed new use. But, the Debtor provides no evidence of what it projects will happen after returning to operation of the hotel or how it will perform economically during the transition from asylum-seeker housing back to hotel. In addition, the Debtor has no guaranty that its proposed new use will last longer than 180 days under the Proposed Contract.

The Debtor essentially asks this Court to take a leap of faith on that point.  Secured Lenders respectfully submit that they are unfairly asked to shoulder the risk of the Debtor's leap, while the Debtor cloaks its risk of Secured Lenders' interests in a wrap of virtue by claiming to pursue a public good.    But  public  goods  are  public  responsibilities,  not  ones  to  be  imposed disproportionately on the Secured Lenders.

*The Real Issue*

The Debtor's sole asset is the Hotel (defined below).  The hotel is encumbered by Secured Lenders' mortgage, securing debt in the original principal amount of $137,025,000.00 plus interest, default interest, fees and charges.  The mortgage secures notes with interest rates favorable to the Debtor, an aggregate interest rate of 5.25%, well below current market rates.

The Debtor is in default of its mortgage obligations and has been for nearly three years. The Debtor knows that current market interest rates are considerably higher than what the notes currently provide.  The Debtor wants to preserve its current below-market rate.

The Debtor knows that the only way it can do that is to treat the Secured Lenders as unimpaired under Section 1124.  If the Debtor does not, and if the Debtor proposes a plan that the Secured Lenders do not accept, the Debtor knows that it will be required (if it were to seek cramdown confirmation under Section 1129) to pay current market interest rates, which are substantially higher.

To treat the Secured Lenders as unimpaired, the Debtor knows that it must cure defaults. Leaving aside the Debtor's contention (that the Secured Lenders firmly dispute) that it does not have to pay default interest to cure its defaults and treat the Secured Lenders as unimpaired, even the Debtor admits it owes over $11 million in unpaid contract interest that it must pay to treat the Secured Lenders as unimpaired.

The Debtor lacks the funds currently to do so. The Proposed Contract offers the Debtor an opportunity to generate what the Debtor may believe are sufficient funds to treat the Secured Lenders as unimpaired.

However, the Proposed Contract will so severely adversely impact the Hotel's economic performance. This is especially so when one considers:

(1) anticipated uncompensated damage to the Hotel from those the Proposed Contract proposes to house at the Hotel and the radical proposed changes to the Hotel's use;

(2) the adverse impact on income when the Proposed Contract terminates, at the latest at the end of April 2024, and perhaps as early as 180 days from taking effect, on financial performance during the unspecified lag time for revival of Hotel operations;

(3) perhaps thousands of reservations to be terminated;

(4) the constriction on ability to obtain refinancing when the Proposed Contract terminates;

(5) the potential adverse impact on marketing the Hotel as a hotel after the Proposed Contract, which in turn will adversely impact valuation of the Hotel; and

(6) a series of additional issues that the Debtor appears not to have considered, calling into question whether it in fact exercised its business judgment.

The price the Debtor proposes to pay (in the form of these adverse effects) to gain the short-term additional income the Debtor craves is so high that it is a denial of adequate protection to the Secured Lenders of their perfected security interests in the Hotel and its cash flow.

*Basic Description of Proposed Contract and Hotel*

The Proposed Contract seeks to permit the City to take over the entire 492-room Holiday Inn hotel (the "Hotel") for up to fifteen months to house asylum seekers pending consideration of their applications. The Proposed Contract provides for a per-room payment of $190 per night, but it subjects claims for excess wear and tear to judgment, review and payment by the City. The Debtor's motivation for the Proposed Contract is understandable; it expects a short-term boost to its cash flow, which it intends to try to negotiate a resolution with the Secured Lenders.

However, the Debtor's short-term embrace of the Proposed Contract comes at a heavy price -- jeopardy to the long-term interests of the Hotel; its physical condition and ability to comply with life safety requirements; its compliance with insurance, certificate of occupancy and zoning requirements; its reputation in the market; its ability to take advantage of a time of rapid growth in the lodging industry in New York; and its ability to serve as collateral for a refinancing (likely removing one of the anticipated normal approaches to resolution of a chapter 11 case).

*Relegating the Franchisor to the Sidelines*

It is Secured Lenders' understanding that IHG, the franchisor of the Holiday Inn brand for the Hotel, is not formally objecting to the Proposed Contract. However, since IHG made clear at the beginning of the case that preservation of this hotel as a Holiday Inn is its primary goal in this chapter 11 case, and since IHG could be vulnerable to the Debtor seeking to reject the IHG Agreement, as defined herein, if IHG were to object, a lack of formal objection by IHG should be presumed to be the product of coerced silence. After all, operating the Hotel as an asylum seekers'

residence is not consistent with the Hotel's brand, how it is marketed or how it may be impaired from being marketed after the Proposed Contract ends.[2]

## II.    FACTUAL BACKGROUND

### A.    The Hotel, Secured Lenders' Claims and Cash Collateral Order

The Court is familiar with the background of this case.  The Debtor owns the Hotel.  It owes the Secured Lenders $137,025,000 in principal plus interest and other charges.  The Debtor has already agreed that the principal is due and owing without counterclaim, offset or defense. The parties have worked cooperatively to enter a final cash collateral order [ECF No. 38] (the "Cash Collateral Order")[3] whereby the Debtor is using the cash revenues from the Hotel to operate the Hotel and providing recognition of Secured Lenders' liens, payment of contract interest and other forms of adequate protection.

### B.    The Hotel as Holiday Inn

IHG is the franchisor under a license agreement (the "IHG Agreement") pursuant to which the Debtor operates the Hotel as a Holiday Inn.  IHG has informed the Court that the Hotel is the tallest hotel in the Holiday Inn system and one that IHG wishes to continue to see operated as a Holiday Inn under an assumed IHG Agreement.

### C.    Summary of Proposed Contract

---

[2] For some sense of perspective giving rise to Secured Lenders' concerns, the Secured Lenders invite the Court to review the following:

- https://nypost.com/2023/01/10/tons-of-food-gets-tossed-by-nyc-hotel-because-migrants-wont-eat-it/?utm_campaign=iphone_nyp&utm_source=mail_app

- https://abc7ny.com/amp/migrants-nyc-hotel-the-row/12685066/

[3] Terms not otherwise defined herein shall have the meanings ascribed to them in the Cash Collateral Order.

The Proposed Contract is summarized by the Debtor in the Motion. Below Secured Creditors respond to certain arguments that the Debtor has made in the Motion that require response.

In addition, certain details that the Motion does not address require emphasis. First, the City is not agreeing in advance to an estimated compensation amount for damage beyond ordinary wear and tear. Instead, the Debtor is being made subject to a claims process that potentially will result in the City (being incentivized to avoid paying claims) taking an unduly narrow approach of damage beyond ordinary wear and tear while delaying and reducing claims payments. Since experience teaches that converting asylum-seeker housing back to a hotel room can cost significant sums, that likely damage sum is being purloined to a claims resolution process that imposes the risk of unfavorable outcomes on the Secured Lenders.

Second, the Debtor has not provided a plan for how to convert back to ordinary hotel operations. In addition, the Debtor provides no projections of the lag time to revert back to regular Hotel operations or the losses to be generated during such lag time. Thus, the Secured Lenders have not received any information to be able to assess how long recovery of hotel operations will take and what losses the Debtor will sustain on re-conversion. Those losses could erase the increased cash flow the Debtor expects to generate during the short term of the Proposed Contract. This is separate and apart from the fact that, if the Proposed Contract is approved, the Debtor will have to cancel many reservations, which can be presumed to generate ill will in the marketplace when it eventually must return to Hotel operations and which may give rise to additional claims, perhaps even with administrative priority.

Third, the Proposed Contract will result in the Debtor requiring 24 to 36 months of post-Proposed Contract performance to establish a track record that will permit maximum refinancing

7

ability.  That in effect removes refinancing as a feasible chapter 11 exit strategy.  The Debtor steadfastly asserts that the Proposed Contract does not prohibit the Debtor from seeking to sell or refinance the Hotel.  The Proposed Contract's terms do not do so; however, the Proposed Contract's existence will do so.

Fourth, the Proposed Contract imposes additional risks to the Hotel and its physical structure that the Motion indicates the Debtor has not contemplated.  These are set forth at length in the report of Secured Lenders' expert referenced below.

Fifth, the risk of reputational loss is real.  Vacation and business travelers who learn of the Hotel's use as an asylum-seeker housing facility could be dissuaded from making their reservations at the Hotel, seeking out competitors not burdened by such a reputation and anticipated problems as delineated above.  Moreover, those whose reservations are cancelled (there are based on Debtor representative testimony likely at least 8,000 reservation-nights presently) can be expected to provide poor online reviews, adversely affecting the Hotel's reputation.  That has happened at the ROW Hotel since it has entered into an asylum-seeker agreement.  Such reputational harm will adversely impact income generation at the Hotel and its valuation.

Secured Lenders understand that among those who would be housed at the Hotel under the Proposed Contract are simply immigrants looking to build life anew.  However, noble aspirations do not always by nobility alone translate into the reality of how people conduct themselves.  Unlike hotel guests, the asylum seekers will not be paying their own money to stay at the Hotel and will not be making reservations with credit cards that secure claims for damages to property.

The Secured Lenders should not be forced to shoulder disproportionately the desire of other public officials to carry out what in theory may be a noble public policy.  The Fifth Amendment to the Constitution is designed to achieve that very result.  While the Proposed Contract

8

commendably provides for the City to pay for the space it is proposing to use, the imposition of substantial costs is demonstrably in excess of the benefits being provided to the Debtor. This results in denial of adequate protection to the Secured Lenders of their interests in the Hotel and related property as recognized under the Cash Collateral Order.

Private property may be taken for public use, but only upon payment of just compensation. When protection of a lien interest is inadequate, the compensation is not just. That is the result that the Debtor proposes here, and it should not be approved.

### III.    LEGAL STANDARD

### a.  Section 363(c)(1) is Not the Relevant Standard.

The Proposed Contract is not an ordinary course transaction. Even the Debtor implicitly recognizes this, since the bulk of the Debtor's Motion argues that the Proposed Contract meets the out-of-the-ordinary course standard for approval.

As a preliminary matter, the Debtor must concede that the Secured Lenders' Loan Agreement requires Secured Lenders' approval to change the use of the Hotel as drastically as is proposed here. Were the Debtor to enter into the Proposed Contract outside of bankruptcy without Secured Lenders' consent, the Debtor would be in default of its obligations under the Loan Agreement. By contending that the Proposed Contract is in the ordinary course of business, the Debtor implicitly contends that breaching its obligations is its ordinary course of business. That contention alone suffices to show that the Proposed Contract is not an ordinary course transaction.

Similarly, as discussed below, the Proposed Contract triggers an Event of Default under the Cash Collateral Order. Again, the Debtor cannot plausibly claim that defaulting under a cash collateral order is the ordinary course of business.

In any event, the Debtors assert that entry into the Proposed Contract is arguably an ordinary course of business transaction which would not ordinarily require bankruptcy court approval. *See* Motion, at 8. Based on the fact that it filed this Motion requesting a hearing, among other reasons, the Debtor itself likely understands that entry into the Proposed Contract is certainly not ordinary. Pursuant to Section 363(c)(1), a debtor in possession "may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). However, a debtor in possession is prohibited from using cash collateral in the ordinary course of business absent authorization by the court or consent from the entity that has an interest in the collateral. 11 U.S.C. § 363(c)(2).

The Proposed Contract is clearly not within the ordinary course of the Debtor's business. The very purpose of requiring notice and a hearing if a transaction is other than in the ordinary course of business is for circumstances like this one. It allows for "creditors, who have a vital interest in maximizing realization from assets of the estate, have an opportunity to review the terms of the proposed transaction and to object if they deem the terms and conditions are not in their best interest." *In re Crystal Apparel, Inc.,* 220 B.R. 816, 830 (Bankr. S.D.N.Y. 1998). Thus, "if the debtor were to agree to do something extraordinary or to do an act which is inimical to the theory and philosophy of the Code . . . pursuant to section 363(b)(1) the agreement is not enforceable absent notice and a hearing." *Id.* (internal quotations omitted). "The showing of ordinary course of business assures that neither the debtor nor any of its creditors can do anything abnormal either to dissipate assets or gain inappropriate advantage over other creditors." *Id.*

Ordinariness is measured by "how often a given type of event occurs." *Id.* at 832. If a transaction is not one which creditors would expect a debtor to enter into without notice to creditors

and other interest parties, then the transaction is almost certainly not within the ordinary course of the debtor's business. *See e.g., Id.* ("[T]he test further analyzes the transaction 'from the vantage point of hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit.'") (citation omitted); *see also In re Waterfront Companies, Inc. v. Johnston*, 56 B.R. 31, 35 (Bankr. D. Minn. 1985) (finding that post-petition indemnity agreement signed by the debtor's majority shareholder was not type of transaction which creditors expect a debtor will enter into without notice to creditors and other interested parties).

The Proposed Contract would, outside bankruptcy, require Secured Lenders' consent and IHG's consent. Outside bankruptcy, the Debtor would not have the ability to reject the IHG License Agreement were IHG not to consent, so IHG lack of objection should not be considered a point in Debtor's favor here. In any event, the Proposed Contract also requires Secured Lenders' consent under the Loan Agreement and the Cash Collateral Order. The primary reason why the Secured Lenders' consent is required under those instruments is precisely because changing the use of the Hotel to anything other than a Hotel is, by core essence, a change in the ordinary course.

Therefore, the Proposed Contract is certainly not one that the Secured Lenders contemplated or expected the Debtor to enter into without notice and a hearing. First, the Cash Collateral Order obligates the Debtor to adhere to the Loan Documents to the extent not otherwise modified in the Cash Collateral Order. Seeking approval of a change of use from the Hotel without Secured Lenders' consent, contrary to the provisions of the Cash Collateral Order, cannot be considered ordinary course. Moreover, considering the Proposed Contract as "ordinary" would clearly violate the policy of Section 363(c)(1) which is "designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and

protecting secured creditors and others from dissipation of the estate's assets." *See In re Crystal Apparel, Inc.,* 220 B.R. at 832.

In addition, Secured Lenders are prepared to provide expert testimony that operating an entire hotel as asylum-seeker housing for potentially over a year is not the ordinary course of business for a hotel. *See* Report of Alan Tantleff dated January 23, 2023 ("Tantleff Report").[4] Specifically, the Proposed Contract is not the type of contract that hotels enter into often, nor is a type of contract that the Debtor has entered into before (and absent its quest for cash to fund its reinstatement effort probably would not contemplate). The Tantleff Report highlights a series of additional reasons why the Proposed Contract is not in the ordinary course.[5] Among them, first and foremost, is that a hotel is for transient guests. The Proposed Contract will result in housing residents at the Hotel, not transient guests.

The Proposed Contract is a unique contract with a long-term commitment, the terms of which will affect the feasibility of a plan, and thus, notice and a hearing is required by the Code. *See id.* ("a debtor owning a building with three store units will need to obtain court approval of a new lease because it is making a long-term commitment, the terms affect the feasibility of a plan."). Moreover, obtaining court approval of the transaction is not burdensome on the Debtor, which is illustrated by the fact that it already has filed a motion with notice and a hearing date. *Id.* ("Nor is obtaining court approval of only three transactions burdensome.").

Based on the foregoing, the relevant analysis is under Section 363(b)(1), as described below.

---

[4]    See the Tantleff Report conclusion at Page 23 stating that "[i]t is for these reasons that I conclude that the Proposed Transaction is not normal and customary, is not in the normal course of business, and presents significant risk to the Debtors, its Creditors and its Stakeholders…"

[5]    See Tantleff Report at page 9 summarizing the four opinions reached.

### b.    Section 363(b)(1) is the Controlling Code Provision Here.

Section 363(b)(1) of the Bankruptcy Code allows a debtor to "use, sell, or lease" property outside of the ordinary course of business after notice and a hearing.  This right, however, is not unfettered, but rather the debtor must exercise sound business judgment and demonstrate a legitimate business justification for the proposed transaction.  *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983) ("[T]here must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b).");[6] *see also Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430 B.R. 65, 83 (S.D.N.Y. 2010) ("The overriding consideration for approval of a Section 363 sale [or lease] is whether a good business reason has been articulated.") (internal quotations omitted).  In determining whether a good business reason exists to grant a motion to approve a sale or lease under Section 363(b), "a court should consider all of the salient factors pertaining to the proceeding and act to further the diverse interests of the debtor, creditors, and equity holders."  *In re Chrysler LLC*, 405 B.R. 84, 95 (Bankr. S.D.N.Y.) (internal quotations omitted).

---

[6]    The *Lionel* court set forth a variety of factors courts may consider in determining whether the debtor has presented a valid business reason, including the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained, which of the alternatives of the use, sale or lease the proposal envisions, and whether the asset is increasing or decreasing in value. 722 F.2d at 1071.

### c. Section 363(e) Requires Adequate Protection; Proposed Contract Lacks It and Would Violate Cash Collateral Order

Moreover, a debtor may not sell or lease property under Section 363(b) without the Court providing "adequate protection" to an "entity that has an interest" in the property to be used, sold, or leased, if such entity has requested such protection. 11 U.S.C. § 363(e). The Secured Lenders qualify as an "entity" that may invoke § 363(e). The Cash Collateral Order conclusively establishes that.

Such adequate protection may be provided by:

> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity to the extent that . . . use, sale or lease under section 363 of this title . . . results in a decrease in the value of such entity's interest in such property;

> (2) providing such entity an additional or replacement lien to the extent that such stay, use, sale, lease or grant results in a decrease in the value of such entity's interest in such property; or

> (3) granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361. In any hearing held under section 363, "[i]t is well settled that the debtor bears the burden to demonstrate that a creditor is adequately protected." *See In re S. Side House, LLC*, 474 B.R. 391, 408 (Bankr. E.D.N.Y. 2012); *see also* 11 U.S.C. § 363(p); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 104 (Bankr. S.D.N.Y. 1991) ("The debtor has the burden of demonstrating that the creditor will be adequately protected if it is authorized to use the cash collateral.").

The Debtor appears to concede that the Cash Collateral Order will continue in effect. The Cash Collateral Order was the result of a collaborative effort between the Debtor and the Secured

Lenders that produced an agreement to permit use of the Secured Lenders' cash collateral for operation of the Hotel in a way that the Secured Lenders agreed provided adequate protection.

However, the terms and conditions of the Cash Collateral Order were premised on continued operation of the Hotel - as a hotel.  Indeed, Paragraph 17 of the Cash Collateral Order provides: "Nothing herein contained shall be construed to alter, modify, or change in any respect the terms and conditions of the Loan Documents to constitute Prepetition Lenders' consent to any impairment of any of the Prepetition Secured Obligations."  Under Section 4.2.4 of the Loan Agreement, the Debtor is not to change the current use of the Property (as defined in the Loan Agreement, which includes the Hotel) in any material respect without prior written Secured Lenders consent.  The Debtor cannot pass the "straight face" test if it argues that the Proposed Contract is not a change of the current use of the Property in its most material respect. Secured Lenders do not consent to the Proposed Contract; they have an interest in the continued use of the Hotel as a hotel.

One central reason for this is that transient guests paying by credit card trigger fewer risks than non-transient occupants who do not provide a credit card as security against room damages. Under the Loan Agreement and Cash Collateral Order, the Debtor is required to exclude non-transient occupants.  In essence, Secured Lenders, through their right of consent to any change in the use of the Property from a hotel, thus have the right to exclude non-transient guests from the Hotel.  Changing this use is not trivial.  "[T]he right to exclude [others is] 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.' " *Loretto v. Teleprompter Manhattan CATV Corp*., 458 U.S. 419, 433, 102 S.Ct. 3164, 3175, 73 L.Ed.2d 868 (1982), quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 100 S.Ct. 383, 391, 62 L.Ed.2d

332 (1979).  Depriving a party of the right to exclude effectuates a taking that requires just compensation, in the form of sufficient adequate protection.

In a similar vein, the Proposed Contract runs afoul of the Cash Collateral Order.  Paragraph 10(e) of the Cash Collateral Order prohibits the Debtor from using the Collateral (including the Hotel) and Cash Collateral in "seeking to amend or modify any of the rights granted to the Prepetition Lenders under this Final Order or the Prepetition Documents, including seeking to use Cash Collateral and/or Collateral on a contested basis."  The consent right of Secured Lenders with respect to change of use of the Hotel is one such right granted under the Loan Agreement and the Cash Collateral Order.  *See* Section 4.2.4 of the Loan Agreement and Paragraph 17 of the Cash Collateral Order.

In addition, approving the Proposed Contract would trigger Events of Default under Paragraphs 7(c) and 7(i) of the Cash Collateral Order, which provide that an Event of Default arises from "(c) the entry of any order by the Court granting, or the filing by the Debtor of any motion or other request seeking, the use of the Collateral (including Cash Collateral) for any purpose other than as permitted in this Final Order" or "(j) the Debtor shall file, or the Debtor shall fail to contest in good faith the filing of, a motion for entry of an order materially adversely impacting the rights and interests of the Prepetition Lenders."  Since the Cash Collateral Order preserves in effect the Loan Agreement's provision requiring Secured Lenders' consent to change the use of the Hotel, allowing change in use over Secured Lenders' objection runs afoul of Section 7(c) of the Cash Collateral Order.  Moreover, by eviscerating the Secured Lenders' consent right, the Motion is one materially adversely impacting the rights and interests of the Secured Lenders. Permitting Events of Default denies Secured Lenders adequate protection and is a separate independent basis to deny the Motion.

This is critical, because the Proposed Contract creates far more jeopardy to the Secured Lenders' collateral than the Loan Agreement's contemplated use of the Hotel as, well, a hotel. The cash payments provided under the Cash Collateral Order do not compensate for the adverse threats to the value of the Hotel under the Proposed Contract (in the form of converting the occupants from transient guests paying with credit cards to residents with no credit card security, anticipated damages to the physical property, loss of income post-end of Proposed Contract and impact on ability to refinance and maximize sale value). The economics of the adequate protection under the Cash Collateral Order were premised on the Debtor's adherence to the Cash Collateral Order, which included among other requirements the adherence to the Hotel use requirement. The Debtor is not providing anything to counterbalance the disruption of the economic balance that it is causing by seeking to change the use of the Hotel. No other lien has been proposed and no other mechanism is being proposed that will "result in the realization by [the Secured Lenders] of the indubitable equivalent of" their liens on the Hotel and its cash flow. *Cf.* 11 U.S.C. §361(3). Thus, the Proposed Contract denies the Secured Creditors adequate protection and cannot be approved.

### d.  The Detriments of the Proposed Contract Outweigh its Benefits

The Proposed Contract poses a risk of jeopardy to the Hotel's insurance, compliance with the certificate of occupancy and fire safety. The Proposed Contract poses a risk of impaired future financing for the Hotel. The Proposed Contract poses a substantial risk to the economics of refurbishment after asylum-seeker departures, with only a speculative dispute mechanism for claims against the City as "security" for such potential damage. In addition, the Debtor in pursuing the Proposed Contract appears not to have considered many hazards that the Tantleff Report raises.

Each of these requires some further explanation. The jeopardy to the ability to finance the Hotel stems from the following.

## A. Impairment of Financing Ability

During the two years of COVID, the Hotel did not experience ordinary operating and financial metrics. During most of 2022, the Hotel was operating while the Debtor was still in default of its financial obligations (as the Motion acknowledges), while the Debtor was diverting cash from the cash management system, and while the Debtor was failing to pay its sales tax obligations.[7] *See* Debtor's Schedules, Docket No. 4, Page 12, Section 2.4. Thus, the 2020 through 2022 years accumulated with abnormal financial operating results. Now, the Proposed Contract would saddle the Hotel with yet another year of abnormal operating results. The result of what will be four years of abnormal operating results will impede the ability of the Debtor for several years to obtain financing in the market. This is because the Debtor will not have actual normal financial operating results to demonstrate to potential lenders.

Similarly, a potential purchaser of the Hotel will face impairment of its ability to obtain financing for the Hotel. Lenders seek to finance hotels based on their track record of financial performance as hotels. The Proposed Contract impedes that.[8]

Under the Proposed Contract, for at least another three, the Debtor is, in essence, excising from its options the ability of itself to refinance or for a third party to obtain maximum financing for a purchase of the Hotel. Such impairment of finance availability will adversely affect the value to be obtained for the Hotel if it is subject to market scrutiny. See Tantleff Report, pages 17-18 .[9]

Depriving the parties of the ability to obtain genuine market scrutiny results in an impairment of value and a negation of one possible pathway for a solution. This would provide

---

[7]  The Debtor's schedules list sales tax obligations as priority claims, the Motion acknowledges non-payment of certain sales taxes pre-petition.

[8] See Tantleff Report, pages 17-18.

[9]  The Supreme Court has made it clear that market scrutiny is the preferred way to assess valuation in a case such as this. *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 North LaSalle*, 526 U.S. 434 (1999).

the Debtor an unfair advantage in trying to retain ownership of the Hotel at a reduced valuation while impairing the Secured Lenders' claims by an amount more than what would result if valuation were to be established by market scrutiny based on proper financing conditions.

The Debtor may dismiss the lack of future financing by claiming that its plan will reinstate the existing below-market interest rate loan through 2028 because the Debtor is going to cure defaults and render the Secured Lenders unimpaired.  However, in excess of $32 million is required for the Debtor to cure all defaults.  See *Additional Prepetition Secured Obligations Assertions Pursuant To Final Cash Collateral Order* [ECF No. 39], p.4.

The Debtor can be expected to contend that that figure is far lower because it purports to have challenges to certain components of the Secured Lenders' claim.  That essentially is a factual dispute.  Resolution of that factual dispute and its effect on plan confirmability are premature.  The Debtor's contention cannot serve as a basis negate a serious objection to a fundamental shift in property use that will adversely affect the Secured Lenders' collateral and cut off a path to maximum refinancing.  "I'm going to confirm a plan that reinstates the Loan, so I don't have to worry about lack of financing access" is not a valid response to this objection of the Secured Lenders.

### B.  Imposition of Damages; Jeopardy to Insurance

The Proposed Contract creates a risk of imposition of millions of dollars of costs for restoration of damage anticipated to be done by the occupants under the Proposed Contract.  In any event, long-term use of a hotel room by a non-transient guest will necessitate refurbishment to make the room viable for Hotel customers.  Refurbishment comes at a cost.  There is no reason to conclude that the Proposed Contract treats such refurbishment as beyond ordinary wear and tear

for which it will compensate the Debtor. That means that the Debtor will be taking on substantial refurbishment costs that will decrease the claimed value of the Proposed Contract.

Ignoring this risk is an abnegation of exercise of business judgment. The risk is real, demonstrable and consistent with such changes in use.[10]

The City contract does not provide compensation for that. Instead, the City provides a claim adjustment process whereby it will determine if excess wear and tear has incurred and then, and only then, will it compensate the Debtor. As the payor, the City will have every incentive to skew the claim resolution process to minimize payments. This will come at the expense of the Senior Lenders' collateral. The substitution of actual cash payments for damages secured by transient guests' credit cards with an untested claim resolution process with delays and uncertainty of payment is not a satisfactory provision of adequate protection of the Secured Lenders' right to be protected against damage to their collateral. Given the novelty of this program of the NYCHH, even the Debtor admits that no track record exists to judge the claim payment process of the NYCHH.

In addition, the contracting party is NYCHH, not the City of New York. There is no provision in the Proposed Contract for the full faith and credit of the City of New York to back the NYCHH claim payment obligations. If that is the case, then the Debtor and the City are seeking to jeopardize the Secured Lenders' collateral without at the same time having the City commit to backing even the untested claims resolution process.

In considering this, it is important to recall that the asylum seekers are not hotel guests. A hotel guest who pays with a credit card agrees to be liable for damage to the physical structure and to the equipment. That hotel occupant backs that commitment with a credit card that provides

---

[10] See Tantleff Report, pages 14-16.

recourse to secure the payment of damages caused by the hotel occupant.  The complete change of proposed use of the Hotel removes that key element from the overall financial reality of the Hotel.

Another obstacle that the Proposed Contract ignores is potential managerial and employee turnover.  As reports of outcomes at other hotels converting to asylum-seeker residences have shown (see note 1, supra), increase in turnover in hotel management and employees is a real concern.  Most of the hotel management and employees came to work at the Holiday Inn FiDi to work at a hotel.  They did not sign up for managing the very different concerns of asylum-seekers.

Moreover, the Debtor does not have the responsibility under the Proposed Contract for evicting asylum seekers who abuse the property.  The Proposed Contract does not provide that power to the Debtor.  The Debtor simply can report an incident to the City.  As any cursory review of public housing will show, the City has a miserable track record with being a diligent landlord in enforcing evictions against those who cause damage to property.  It is not as if the Secured Lenders have the ability to compel daily inspections by a Debtor and rigorous enforcement of eviction of those who damage the property.  Instead, the process becomes attenuated, with insufficient mechanism to compensate the Secured Lenders for abuse of the collateral that causes damage.  This places the Secured Lenders in the unjustified position of risking the loss.

This is a heightened risk, because the extended stays of the asylum seekers could turn them into residents instead of guests.  That would entitle them to eviction prevention rights that transient hotel guests lack.  Subjecting Secured Lenders' collateral to the risk of involuntary tenancies of insolvent tenants with heightened eviction protections is an unfair exposure.

Making matters worse, the Proposed Contract tends to inflame the risk of cooking equipment fires.  The Proposed Contract calls for providing refrigerators and microwaves.

Experience teaches that expecting the occupants to use cooking equipment is prudent.  Indeed, refrigerators and microwaves are likely to encourage the use of cooking equipment.  The cooking equipment heightens fire risks and other property damage risks.  The risk of fires is a particularly acute concern given the physical structure of this Hotel, where evacuation because of small size could pose a daunting challenge.  The Debtor simply has failed to consider these.[11]

Expecting no instances of illegal cooking equipment because the Proposed Contract has a rule against it is naïve.  Reports of other outcomes at other asylum seeker hotels compels all concerned to anticipate illegal cooking equipment use.  That will not be prevented simply by a clause in the Proposed Contract.  That simply creates a risk which should not be imposed on Secured Lenders and their collateral.

## C.  Jeopardy to Return to Hotel Operation Viability and to Reputation

The Debtor has not explained how it will handle canceling what are likely thousands of existing reservations.[12]  Mass reservation cancellations have the potential to affect the Hotel's ability to attract future reservations.

In addition, reservation cancellations could trigger substantial claims.  For reservations made pre-petition, such reservations could carry priority in part under 11 U.S.C. §507(c)(7).  For reservations made post-petition, such reservations could trigger administrate expense liability.  The

---

[11] See Tantleff Report, pages 14-15

[12]  The Debtor's hotel management company's assistant general manager testified at his deposition on January 23, 2023 that, as of January 23, 2023, the Hotel had advance reservations for 40% of the February and 20% of the March room nights.  There are at least 13,500 available room nights in any month, or 27,000 over a two-month period.  Thus, the Debtor's representative apparently is estimating over 8,000 current reservation-nights, all of which would have to be dishonored were the Proposed Contract approved.  The Debtor's representative has given insufficient consideration to the adverse impact of cancelling so many reservation-nights.  Also, the Debtor's representative has testified that he expects his management company to mollify the holders of cancelled reservations by offering to accommodate them at other Crescent hotels.  However, the Debtor has admitted that none of those hotels are located in downtown Manhattan.

Debtor has provided no information about the scope of such liabilities. They would erode some of the income the Debtor hopes to find.

Reservation cancellations can be expected to trigger adverse online reviews for the Hotel. That has happened at the ROW Hotel, another hotel that has been reported to have entered into an asylum-seeker housing agreement. A recent review of TripAdvisor reveals under 27,000 reviews, over 2,700 rating that hotel terrible and over 2,700 rating it poor. Review of comments indicates reservation cancellations and adverse physical impact on that hotel's facilities by the occupants heavily drove terrible reviews.[13] The Debtor did not take this into account.

The Debtor has not set forth a plan for returning the Hotel to maximal financial operations following termination of the Proposed Contract. This leaves the parties in interest unable to evaluate the adverse economic impact and scope of losses to be incurred from that transition. If the losses consume the increased projected income during the Proposed Contract, the economic overall result is an exercise in futility. And, since the Proposed Contract can be terminated in as few as 180 days, such a circumstance will skew the economics more adversely.

The implementation of the Proposed Contract also carries the risk of jeopardizing the value of the Hotel because of the adverse reputational effect. The stems from the Hotel, instead of being a Holiday Inn for over a year, becoming identified in the market as an asylum seeker residence. The Debtor does not provide any evidence to substantiate how readily a hotel used to house asylum seekers can return to the market with full occupancy at pre-asylum contract rates as a full-service hotel. The risk cannot be dismissed by deferring to the Debtor's business judgment, as the Debtor

---

[13]     See    https://www.tripadvisor.com/Hotel_Review-g60763-d1938661-Reviews-Row_NYC_Hotel-New_York_City_New_York.html

has no experience with such a conversion and has provided no other evidence of the effects of such conversion.

Thus, as to this point, there has been no actual exercise of business judgment by the Debtor to which deference would otherwise be due. And, in any event, business judgment deference does not constitute adequate protection. The Debtor cannot "pay" for the cost of acquiring greater short-term cash flow with jeopardy to the value of the Hotel after the short-term contract providing the cash flow expires.

Moreover, there is a substantial risk that this Hotel would suffer substantial impairment of its ability to achieve the occupancy rates, average daily room rates and income generated by the Hotel pre-Proposed Contract. Such impairment is at risk of coming from a reluctance of customers to stay at the Hotel if it becomes perceived not as a hotel but rather as a public short-term housing facility. There is unfortunately ample precedent for conversion from hotel use to experience delays and declines in performance upon cessation of the non-hotel use.[14] If that happens, lower occupancy rates, average daily room rates and income are the expected result. The Debtor believes that Hotel customers will return. That requires a leap of faith. If the leap falls short, the impact to valuation could be cataclysmic.

## D.  Risk to Existing Franchise and Imposition of Cost for New One

Unfortunately, the Proposed Contract and its after-effects could also trigger a need for a drastic remedy for such a disfavored reputational association. To avoid the stigma of reputational decline, which may occur if the Holiday Inn FIDI becomes reputationally associated with not being operated as a hotel but rather as a public short-term housing facility, the specter of a new franchisor has to be considered. However, that would come with substantial cost. Rejection of the existing

---

[14] See Tantleff Report, pages 17-18.

franchise agreement would trigger a substantial unsecured claim for IHG, and procurement of a new franchise agreement would likely require the expenditure of millions of dollars both to comply with new brand standards and to carry out a property improvement program ("PIP") that the new franchisor would impose.  In short, saddling the Hotel with such risk of reputational damage creates a substantial risk that restoring the Hotel's reputation in the hotel market in New York City could require a change of franchise, which in turn would require expenditure of many more millions of dollars to obtain a new franchise than the short-term cash flow boost from the Proposed Contract will generate.

This creates a disturbing irony.  Substantial IHG opposition to the Proposed Contract might further persuade the Court to deny its approval.  The Court is entitled to infer that, given IHG initial objection to the Proposed Contract, its reversal was procured by an implicit threat to reject the IHG franchise agreement.  IHG, therefore, can be inferred to have withheld an objection in an effort to avoid rejection of its franchise agreement.  However, restoring the reputation of the Hotel appears to pose a substantial risk of a need for termination of that very franchise agreement, anyway, should rebranding be necessary.

## E.  Passing Up Favorable Current Economics

In addition, changing the use of the Hotel from its current one as a full-service hotel to asylum housing takes the property out of the realm of a hotel at a time of greatly improving hotel economics in New York City.  Recovery continues in the hospitality space and Debtor can only speculate about a possible downturn.  *See* Motion, ¶24.  The Debtor is not contending that Hotel occupancy rates and average daily room rates are likely to continue to fall during 2023.  *Ibid*.  As travel from China resumes as that country ends its COVID restrictions, this set of metrics will only continue to improve more.  This means that the Debtor does not contest that the Hotel is poised to

enter a very optimistic period of increased occupancy and rates if it continues to operate as a hotel. *Ibid*. Indeed, the Debtor reports that it achieved 93% occupancy in December 2022. *Id*. at ¶16. Taking a prosperous period out of the operation as a hotel and potentially impeding the facility's reputation as a hotel is completely contrary to the protection of the value of the collateral.

## F.  Excision of Restaurant Revenue

In addition, the Proposed Contract will lead to the cessation of restaurant revenues at the Hotel.  As noted above, the asylum seekers will be having their meals provided by the City.  No outside consumers will come in to use the restaurant space to obtain meals for which they will be paying.  The net result is that the City will be furnishing meals, the furnishing of which will not result in extra revenue to the Hotel and which will terminate the flow of non-hotel guests who eat at the restaurant and pay for it.

To summarize, it appears that, with respect to a number of significant operational and financial concerns, the Debtor has not addressed how they are to be ameliorated.  It relies on its belief and a lack of projections.  That amounts to non-exercise of business judgment with respect to those issues.  The Court should not defer to a business judgment that has not in fact been exercised.

## IV.    FLAWED BORROWER CONTENTIONS

The Debtor submits a number of contentions in support of the Proposed Contract that are not supportable.  In order, corresponding to the numbered paragraphs of the Debtor's Motion, they are:

8.    First bullet point:  The City may terminate the Proposed Contract after 180 days. So, the income that the Debtor projects through April 2024 is not guaranteed.  And the Proposed Contract allows termination on as little as 60 days' notice.  Thus, in as few as 120 days after the

commencement of the Proposed Contract, the City could issue notice of termination. That would skew the Debtor's economics drastically worse. Last bullet point: The Debtor asserts that "nothing in the Agreement shall prevent the Debtor from marketing or selling the Hotel to another third party or pursuing confirmation of a Chapter 11 plan." Perhaps nothing "in" the Agreement does, but "the Agreement" itself in essence undermines the Debtor's ability to pursue meaningful refinancing, because the Debtor will be delaying further its return to normal hotel operations and ability to establish a financing track record.[15]

11.    The Debtor cites to a decision that notes that qualifying as an ordinary course transaction requires concluding that "from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry." The Debtor provides no basis for concluding that entering into longer-term asylum housing arrangements are "commonly undertaken" by hotels operating at 93% occupancy (such as the Hotel). Secured Lenders respectfully refer the Court to the Tantleff Report for a comprehensive discussion of additional reasons why the complete change of use under the Proposed Contract is not the ordinary course.[16]

12.    The Debtor contends that "Under the "horizontal" test, there can be little doubt that from an industry-wide perspective a hotel owner's main objective is to fill its Rooms to capacity in furtherance of increasing revenue." The Debtor conveniently leaves out the words at the end that should be included: "over the long term." Filling the rooms to capacity for between 180 days and 15 months, while lacking a plan to fill the rooms after that time period and while incurring substantial refurbishing costs to do so, is not a prescription for filling the rooms to capacity over the long term.

---

[15] See Tantleff Report, pages 17-18.

[16] See Tantleff Report, pages 11-13.

Compounding this is that the Debtor will have to dishonor perhaps thousands of reservations. The Debtor ignores this in presenting its Motion. It cannot be ordinary course to dishonor thousands of reservations, without a plan for reclaiming customer loyalty. Plus, those cancellations will generate additional claims that the Debtor has not calculated, many of which could have administrative priority.

Actually, the Debtor has the objective is backwards. The objective is increasing revenue; filling rooms can be an element of that, but sacrificing brand quality, physical plant quality and reputation in the industry in order just to fill rooms is counter to that objective.

Furthermore, the asylum-seeker occupying for a long term is a different "customer" from the short-term transient hotel guest (who pays with a credit card immediately subject to surcharge to compensate for damage caused by the occupant). A complete change of customer base is not the ordinary course.

The Debtor contends that "the Debtor has negotiated for guaranteed income." But that guaranty is only for 180 days, and the Debtor has provided no basis to conclude that losses following this 180-day guaranteed period will not more than consume the increased guaranteed income. It has not actually exercised its business judgment on this point.

Finally, changing the use of the Hotel so drastically requires Secured Lenders' consent under the Loan Agreement. That is not forthcoming here. In essence, the Debtor is contending that breaching its Loan Agreement is its ordinary course of business.

14 and 16. The Debtor piously cites the business judgment rule. Its failure to mention its obligation to provide adequate protection to Secured Lenders in exercising that business judgment is telling. Here, a specific Bankruptcy Code provision applies that tempers deference to the Debtor's business judgment - the requirement to provide adequate protection to Secured Lenders.

The Court is not permitted to defer to the Debtor's business judgment on whether adequate protection is being provided.

17. The Debtor contends that "The business judgment should be left 'to the board room and not to the Court.'" However, the Debtor's board room itself agreed long ago that in borrowing $137,025,000, it would not change the use of the Hotel without Secured Lenders' consent. Secured Lenders are not required to bear the risk of the Debtor's rush to exercise its new business judgment.

21. The Debtor projects an additional $10 million of net income under the Proposed Contract, through 2024. But, the Debtor has not provided a projection if the City exercises its right to terminate effective 180 days after commencement. More importantly, the Debtor has not provided projections of net income during the transition period after the end of the Proposed Agreement, disabling the Court and parties in interest from determining how much future losses will erode the projected short-term income increase. Finally, the Debtor has not provided a projection of damages for cancelling thousands of reservations or what the damage will be to the Hotel and its reputation from doing so, or how that will impede a return to viability after termination of the Proposed Contract.

22. The Debtor expects "to ensure that any repairs or issues are dealt with and paid for by NYCHH on a timely basis." However, the Proposed Contract embodies a novel program. Moreover, based on other experiences reported in the press, Secured Lenders are concerned that NYCHH does not timely evict misbehaving occupants and that NYCHH does not rigorously enforce rules against cooking equipment (creating fire hazards). Such laxity imposes the cost on Secured Lenders. Moreover, NYCHH has no track record of how reliably it pays claims for damages beyond ordinary wear and tear. Placing the Secured Lenders and the Debtor at the mercy

of NYCHH's determinations (where NYCHH has every incentive to be stingy), in contrast to the ability to surcharge a transient guest's credit card for damages, is a huge risk for Secured Lenders.

23.    The Debtor claims that "Indeed, even if the Agreement is terminated in August 2023, for instance, after the six-month guaranteed minimum period under the Agreement, the Debtor will benefit from the busy travel season in New York City in September through December 2023." That is a statement of blind faith.  It presupposes, without evidentiary basis, that Hotel operations will resume and rebound fully upon termination.  It ignores the need for down time to repair rooms. It ignores the need for recovery of market position with hotel customers.  Those potential customers may include those among the thousands with cancelled current reservations.[17]  Other hotels' review histories counsel extraordinary leeriness about the Proposed Contract.  Moreover, if NYCHH were to terminate on sixty days' notice, the Debtor has no basis to assert that such a quick rebound of hotel customers will occur.  An equally plausible result if termination occurs in August 2023 is that ramp-up to return to normal hotel operations takes 120 days, resulting in full return right during the Debtor's own acknowledged slow time.

24.    The Debtor raises the specter of a recession, asserting that "the tourism industry could suffer setbacks" despite being "genuinely very optimistic about the future of the tourism and hospitality industries as a whole."  Yet, it asserts that it "could not pass up the guaranteed income to be generated under the Agreement."  It is precisely to prevent such rash rushes that the Loan Agreement provides for Secured Lenders' consent to be required, since the Debtor being unable to pass up the guaranteed income comes at primary risk to Secured Lenders.

---

[17]  Holders of such reservations may be creditors of the Debtor and yet likely were not given notice of the Motion.  That means that, absent Secured Lenders raising this point here, these potential creditors' interests would be ignored completely.

25.    The Debtor contends that, because of the Proposed Contract's potential for increased income, "the Agreement could potentially lead to higher bids or otherwise increase the number of prospective purchasers that may become more interested in making a bid for the Hotel through an auction and sale process."  This sentence is a useful line to use in evidence classes in law school to demonstrate rank speculation.   The Debtor's rank speculation cannot provide adequate protection to Secured Lenders on this point.

26.    The Debtor admits that it was "understandably concerned about potential backlash from tourists using the Hotel at the same time as asylum seekers."  The Debtor does not appear to have given the same concern to backlash from tourists using the Hotel after it becomes known as the home of asylum seekers.  Also, the Debtor has not appeared to have considered backlash from thousands of cancelled reservations (or, frankly, the dollar volume of claims arising from them). It is precisely its failure to do so that has caused Secured Lenders the concerns they have.

27.    The Debtor nobly appeals to concerns about the public interest.  The insinuation is that an objection is in callous disregard of the public interest.  Secured Lenders resent any insinuation. The public interest is first and foremost served by adherence to the Constitution, the supreme law of the land.  See U.S. Constitution, Article VI.  That includes the fifth amendment, which requires payment of just compensation when the government takes private property for public use.  Clearly, the City of New York could not simply have demanded that the Debtor house the asylum seekers for free.  It could not have demanded that Secured Lenders forego their right to payment of interest so that the asylum seekers could be housed for free.  As the holders of the mortgage on the Hotel, Secured Lenders also have a consent right with respect to the use of the Hotel over which the Debtors seek to run roughshod.  Taking that right requires just compensation in the form of adequate protection.

As the House Report underlying the Bankruptcy Code has noted, "Adequate protection is not intended to be confined strictly to the constitutional protection required. The section, and the concept of adequate protection, is based as much on policy grounds as on constitutional grounds. Secured Creditors should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy laws. Thus, this section recognizes that availability of alternate means of protecting a secured creditor's interests. While the creditor might not receive his bargain in kind, the purpose of the section is to ensure that the secured creditor receives in value essentially what he bargained for." H.R. Rep. No. 595 at 339, 1978, U.S. Code Cong. & Ad. News at 5787, 6295. Secured Lenders bargained for the risks associated with security interests in a hotel and protected themselves by obtaining a consent right over changing the use of their collateral from use as a hotel. Imposing on them the far greater risks of asylum-seeker housing and constraints on return to operation as a hotel is not that for which they bargained. And, if this is such a compelling deal, why is the Debtor not pointing to evidence of other competing hotels clamoring for this business whom it had to outbid and outwit to get it?

Housing asylum seekers may be a noble public policy undertaking. The cost of providing for that noble cause is not permitted under the Constitution to be imposed disproportionately upon Secured Lenders, however. Unfortunately, that is what the Proposed Contract would do. That cannot be approved. Nobility of purpose does not set aside the constitutional imperative to provide just compensation in the form of adequate protection. Cf. *Nollan v. California Coastal Com'n*, 483 U.S. 825, 841-842 (1987) ("Rather, California is free to advance its "comprehensive program," if it wishes, by using its power of eminent domain for this "public purpose," *see* U.S. Const., Amdt. 5; but if it wants an easement across the Nollans' property, it must pay for it.")

32

## V.    SUMMARY OF OBJECTION

The net result of the Motion is that the Debtor proposes to enter into a Proposed Contract that will impair the value of the Hotel, thereby potentially limiting the value of the collateral that secures Secured Lenders' secured claim. The Debtor will use this as a means to dangle additional cashflow as a method of trying to cure the substantial defaults, while trying to convince the Court that the Debtor is contributing the maximum amount of cashflow and otherwise should be permitted to reinstate at a low interest rate the existing mortgage.

This amounts to a *sub rosa* plan prematurely early. *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983). The Debtor clearly is going to seek to reinstate the existing mortgage at a lower interest rate with a cap on total debt payments. By doing so, the Debtor will be seeking to force the Secured Lenders to accept the interest rate that currently is below market for several years while the property accumulates a new normal operational track record to permit refinancing or sale to a third party who can obtain financing. This creates a situation where the Debtor is essentially driving down the current value of the Hotel for the purpose of trying to lock in reduced payments to creditors so that when the future upside appreciation occurs, the Debtor keeps it all. That is unfair, impracticable, a denial of adequate protection, not permitted by the Bankruptcy Code, and should not be countenanced by this Court.

## VI.    CROSS-MOTION TO ALLOW SUPER-PRIORITY ADMINISTRATIVE EXPENSE PURSUANT TO 11 U.S.C. § 507(b)

As the Cash Collateral Order recognizes, the Secured Lenders are "entitled to receive adequate protection, including for any diminution in value of its interest in the Prepetition Collateral resulting from the imposition of the automatic stay or the Debtor's use, sale or lease of the Prepetition Collateral ("Diminution in Value")." Cash Collateral Order, p. 14. As adequate

protection of the Secured Lenders in the Prepetition Collateral, the Debtor is authorized to pay monthly adequate protection payments at the nondefault rate, and the Debtor granted both (a) Adequate Protection Liens, as defined in the Cash Collateral Order, on the Collateral (both pre and postpetition collateral), and (b) "as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in the Case." Cash Collateral Order, p. 15. The Bankruptcy Code also provides, as a matter of law, that the Debtor's failure to adequately protect is remedied by a super-priority administrative expense. *See* 11 U.S.C. § 507(b). In other words, Section 507(b) of the Bankruptcy Code grants a super-priority administrative claim to secured creditors when the adequate protection they were granted fails. Specifically, Section 507(b) "provides that when adequate protection has been given to a secured creditor and later proves to be inadequate, the creditor becomes entitled to a super-priority administrative expense to the extent that the preferred adequate protection was insufficient." *In re Carpet Ctr. Leasing Co.*, 991 F.2d 682, 685 (11th Cir.1993).

As explained above, *see infra* Section III(c), the cash payments provided under the Cash Collateral Order do not and will not adequately compensate Secured Lenders for the adverse threats to the value of the Hotel under the Proposed Contract. If the Proposed Contract is approved, the value of the Hotel is exposed to decrease in value on account of, among other things, conversion of the occupants from transient guests paying with credit cards to residents with no credit card security, anticipated damages to the physical property, loss of income post-end of Proposed Contract and impact on ability to refinance and maximize sale value. The economics of the adequate protection under the Cash Collateral Order were premised on the Debtor's adherence to that Oorder, which included, among other requirements, the adherence to the Loan Documents, including the adherence to the Hotel use requirement. If the Proposed Contract is approved, the

economics will change, and they will not be the same as they were when the Cash Collateral Order was entered; however, no other lien has been proposed and no other mechanism is being proposed that will result in the "realization by the [Secured Lenders] of the indubitable equivalent of" their liens on the Hotel and its cash flow.  11 U.S.C.  §361(3).  Accordingly, if the Proposed Contract is approved, the Secured Lenders will be entitled to a super-priority administrative expense for the amount of any diminution in value of the Hotel that results from entry into the Proposed Contract. *See In re Wilson Seafresh, Inc.*, 263 B.R. 624, 630 (Bankr. N.D. Fla. 2001) (granting secured creditor section 507(b) claim totaling the difference between the value of its collateral when it was granted adequate protection versus the amount ultimately realized by the secured creditor).  If the Court determines to approve the Proposed Contract notwithstanding the Secured Lenders' objection, the Court should include an express provision in its order approving the Proposed Contract that affirms the Secured Lenders' entitlement to a super-priority administrative expense for the amount of any diminution in value of the Hotel that results from entry into the Proposed Contract.

## VII.    CONCLUSION

For the foregoing reasons, Secured Lenders respectfully request that this Court deny the Motion. If the Court decides not to deny the Motion, then the  Secured Lenders respectfully request this Court enter an order determining that they are entitled to a super-priority administrative expense equal in amount to the difference between the value of the Hotel prior to entry into the Proposed Contract and the value of the Hotel post-termination of the Proposed Contract, as may be found by the Court, and any other relief this Court deems just and equitable.  Further, the Secured Lenders reserve their rights to assert damages against third parties for any decline in value to its collateral

caused by the Proposed Contract for the Debtor's entry into said contract in violation of the Secured Lenders' loan documents.

DATED: January 23, 2023                    PERKINS COIE LLP

                                    By:   /s/ Gary F. Eisenberg
                                          Gary F. Eisenberg, Esq.
                                          1155 Avenue of the Americas, 22nd Floor
                                          New York, NY 10036-2711
                                          Telephone: (212) 262-6900
                                          Fax: (212) 977-1649
                                          Email: geisenberg@perkinscoie.com

                                          *Attorneys for Wilmington Trust, National
                                          Association, as Trustee for the benefit of
                                          the Registered Holders of Commercial
                                          Mortgage Pass-Through Certificates
                                          Series 2018-C6, Wells Fargo Commercial
                                          Mortgage Trust 2018-C47, Commercial
                                          Mortgage Pass-Through Certificates,
                                          Series 2018-C47 And CSAIL 2018-C14
                                          Commercial Mortgage Trust, Commercial
                                          Mortgage Pass-Through Certificates,
                                          Series 2018-C14 and as authorized
                                          representative for HI FIDI B Note Owner
                                          LLC*