# **EXHIBIT A**

Expert Report

*In re: GOLDEN SEAHORSE, LLC,* **Debtor**

---

Case No. 22-11582 (PB)

Chapter 11

United States Bankruptcy Court

Southern District of New York

---

Expert Report

of

Alan Tantleff

Senior Managing Director

FTI Consulting, Inc.

January 23, 2023

*This Report evaluates solely the economic impacts of a proposed transaction between the Debtor and New York City Health and Hospitals Corporation to utilize the Debtor's property for a purpose which is neither normal nor customary, nor which is its intended use. This Report, and its author and colleagues, do not take a position with respect to the social considerations or any public policy benefits of the proposed transaction.*

1

# Table of Contents

Scope Of Retention And Compensation ................................................................. 3

Summary Of Qualifications ................................................................................. 5

**General Background** ........................................................................................ 7

The Hotel and its Owner ................................................................................... 7

The Bankruptcy Filing ...................................................................................... 7

The Proposed Transaction ................................................................................. 8

Summary Of Opinions ...................................................................................... 9

Bases For Opinions .......................................................................................... 11

Opinion #1 ..................................................................................................... 11

The Proposed Transaction is neither normal nor customary, nor in the ordinary of course of business. ............................................................................................... 11

Opinion #2 ..................................................................................................... 14

The Debtors should anticipate significant damage associated with occupants who are not staying at the Property on a transient/short-term basis. ........................................ 14

Opinion #3 ..................................................................................................... 17

The contemplated use will interfere with the Debtor's efforts to sell the Hotel or refinance it now or in the future. .......................................................................................... 17

Opinion #4 ..................................................................................................... 19

In my experience, such efforts have unintended consequences and need to be carefully anticipated. ..................................................................................................... 19

**Insurance Considerations** ............................................................................... 19

**Guest versus "Tenant" Status** ......................................................................... 21

**Electrical Consumption and Considerations** ...................................................... 21

**Community Opposition** ................................................................................... 22

Conclusion and Certification .............................................................................. 23

Exhibit A:  Documents Relied Upon .................................................................... 24

Exhibit B: Curriculum Vitae / Qualifications of Alan N. Tantleff ............................... 26

Exhibit C – Redacted Airline Crew Room Contracts ............................................... 31

WT_000002

7      TERM AND TERMINATION ................................................................................................ 51

7.2    TERMINATION FOR CAUSE ............................................................................................ 51

7.3    TERMINATION FOR CONVENIENCE ............................................................................. 51

LIABILITY AND DAMAGES................................................................................................... 52

Annex 1███████Rates ████████Crew Members ........................................................... 54

Annex 2     ████████Rates Other XXXXX Employees and Distressed Passengers (█████).................. 55

## Scope Of Retention And Compensation

On November 29, 2022, Golden Seahorse LLC (**"Debtor"** or **"Borrower"**) filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in the Southern District of New York. The Debtor owns and operates the Holiday Inn Manhattan Financial District, a 50-story, 492-room full-service hotel located 99 Washington Street, New York, New York (**"Hotel"** or **"Property"**).[1]

FTI Consulting (**"FTI"**) was retained by Perkins Coie LLP (**"Counsel"**) to provide certain financial advisory and consulting services in relation to Counsel's representation of in connection with its representation of Midland Loan Services, a division of PNC Bank, National Association, as special servicer (the **"Client"**) in connection with the secured indebtedness owed by Debtor and secured by the Property. I have prepared this Expert Report (**"Report"**) at the request of Counsel, with regard to its objection to the Debtor's Motion for Authority to Enter into an Agreement with New York City Health and Hospitals Corporation (**"Proposed Transaction" or "Proposed Agreement"**).

I have been asked to evaluate the Proposed Transaction and provide my opinions with respect to the economic consequences – for the Hotel and the Client – of entering into this Proposed Agreement. With assistance from other FTI professionals working under my supervision, I have evaluated and formed opinions as to these matters, as set forth in this Report. *** This Report, and its author and his colleagues, do not take a position with respect to the social considerations or any public policy benefits associated with the Proposed Transaction.*** The documents I have considered are listed in ***Exhibit A***.

FTI is being compensated for my time at an hourly rate of $1,150. FTI also is being reimbursed for reasonable direct expenses incurred in connection with the rendition of our services. Compensation payable to FTI is not contingent on the nature of my findings or the outcome of this case.

---

[1] Debtor's Motion for Authority to Enter into an Agreement with New York City Health and Hospitals Corporation for Use of the Debtor's Hotel Through April 30, 2024.

WT_000003

WT_000004

# Summary Of Qualifications

I am currently a Senior Managing Director in the Corporate Finance/Restructuring practice of FTI and the leader of its Hospitality, Gaming, and Leisure practice. In this capacity, I routinely advise owners on the status of, and strategies for, their hotel investments.

I have approximately 35 years' experience in the ownership, asset management, operations and brokerage of hotel investments. Throughout my career, I have addressed a multitude of issues facing owners, lenders and operators of hotels, including issues related to the asset management of hotel investments. In addition, I have extensive experience valuing, financing and selling hotels, as a hotel broker, a principal owning hotels and as a third-party advisor.

I am often involved in the disposition of hotels, so I remain closely in touch with market participants – buyers, lenders and brokers – discussing how hotels are financed, valued and sold. In 2021 alone, I was responsible for the disposition of 18 hotels in the liquidation of Eagle Hospitality Trust as the Chief Restructuring Officer and Interim President of the bankrupt company.

Over the years, from time to time, issues have arisen that have forced me to consider various changes of use.  Those have included closing hotels entirely, expanding/renovating/repositioning them, converting them to homeless shelters, converting them to residential, or converting part of a hotel to an alternate use.

I joined FTI in September 2010. Prior to that, I was a Managing Director at Hotel Asset Value Enhancement, a boutique asset management and advisory practice dedicated to the hospitality industry. In this capacity, I oftentimes served as an "asset manager" – the owner's representative for upscale, upper upscale, select service, luxury and boutique hotels.

Before that, I worked at BlackRock Financial Services, where I led the company's efforts in hospitality workouts and restructurings for the company's $6 billion subordinated debt portfolio. Blackrock's subdebt portfolio included investments in a wide variety of hotel property types, often requiring the valuation of the underlying real estate and addressing issues that impacted the collateral hotels' performance.

For approximately ten years, I held senior management positions at Jones Lang LaSalle Hotels, where I was a sales or mortgage broker involved day to day in the valuation and sale of our clients' hotel investments – a role which naturally required me to be in close contact with investors and lenders and to understand the drivers of hotel real estate value. I also oversaw Jones Lang LaSalle's asset management and consulting practices; in this role, I provided operational oversight and investment management for numerous third-party owners of hotels, resorts, and boutique hotels.

Prior to that, I worked at Granite Partners (now Savilles) as a sales broker and mortgage broker dealing with all types of real estate asset classes, including retail, office, multifamily, industrial and hotels.

WT_000005

Similarly, for approximately ten years, I worked at The Prudential Insurance Company of America (at the time the largest private owner of commercial real estate in the country) with a large hotel investment portfolio. In that capacity, I routinely valued hotels for the insurer; bought, sold and financed hotels; and "asset-managed" its hotel portfolio.

I started my career at the Sands Casino Hotel in Atlantic City, where I was the Senior Operations Analyst responsible for the profitable, efficient and prudent operation of various departments within this high-profile casino-hotel.

I received my Bachelor of Science degree in Hotel Management from the School of Hotel Administration, Cornell University in 1987, and my Master of Science in Real Estate and Investment and Development from New York University in 1992. I am a Certified Part 36 Judiciary Receiver in the State of New York, a Certified Insolvency and Restructuring Advisor ("CIRA"), a certified Turnaround Professional from the Turnaround Management Association, and a licensed real estate broker in the State of New York.

During my approximate 35-year career, I have served in numerous capacities as a financial advisor and expert both in bankruptcies and non-litigative workouts/restructurings related to hospitality and real estate assets. I have advised boards of directors, lenders, borrowers, special servicers, and other stakeholders on numerous high-profile hospitality disputes, restructuring matters, operational realignments, hotel management agreement negotiations, and litigation matters. I have provided expert testimony in a wide variety of hospitality industry related engagements, including feasibility analyses, lost profit analyses, valuations, sale processes, and hotel management agreements. I have been engaged to advise on hotel projects throughout the United States, Caribbean Islands, Latin America, Asia, Europe, and Russia.

I am affiliated with numerous real estate, hospitality, and financial restructuring related associations and membership organizations, both as a member and in leadership positions, including the Cornell Hotel Society, the Cornell Real Estate Finance Council, the Lodging Industry Investment Council, and the New York University Real Estate Institute Alumni Organization.

I have earned numerous awards and accolades throughout my career, including Real Estate New York's Top "40 under 40" influential people in New York real estate, RealShare New York's "Commercial Broker All-Stars," and National Real Estate Investor's "Exit Strategy Guru" in an article about the timely disposition of hotel assets. Recently, I was named to *Turnaround and Workout Magazine's* "People to Watch."

Attached as ***Exhibit B*** of this Report is my curriculum vitae and list of publications and prior testimony.

WT_000006

# General Background[2]

## The Hotel and its Owner

The Debtor is a New York limited liability company which owns and operates the Holiday Inn Manhattan Financial District, a 50-story, 492-room full-service hotel located 99 Washington Street, New York, New York. The Debtor is owned and controlled by Jubao Xie, a person, through intermediate entities. [3]

The Debtor constructed the Hotel between 2010 and 2014, and it opened for business in October 2014. Pursuant to a license/franchise agreement dated October 15, 2014, the Hotel operates under the Holiday Inn flagship/brand. The Hotel is a full-service hotel. The Debtor owns an adjacent neighboring property at 103 Washington Street, New York, NY 10016, whereby the Debtor leases space to Amazon Restaurant and Bar doing business as St. George Tavern marketed to Hotel visitors. The Hotel has a fitness center, and business center as well.

The Hotel is managed by a third-party unaffiliated management company, Crescent Hotels & Resorts (**"Management Company"**). In addition, the Hotel outsources its housekeeping services with General Personnel Services Inc. which provides the Hotel with approximately 60 housekeeping employees.

On or about September 2018, the Hotel obtained a $137,025,000 loan from Ladder Capital Finance LLC. The loan was ultimately split into four separate tranches, and as of the Petition Date, three tranches in the amount of roughly $87 million are held by Wilmington Trust, National Trustee, as Trustee for the benefit of various CMBS note holders (collectively, the **"Lenders"**) and one tranche in the amount of roughly $50 million is held by HI FIDI B Note Owner LLC (**"HI FIDI B Note Owner"**, and together with the Lenders, the **"Secured Creditors"**). The Loan matures in September 2028.

## The Bankruptcy Filing

The Debtor defaulted on the Loan in 2020 and, on November 29th, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in the Southern District of New York. On December 21, 2022, the Court entered the Final Order (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Adequate Protection to the Pre-Petition Lenders, (III) Modifying the Automatic Stay and (IV) Granting Related Relief. The Hotel has continued in the operation of its business as a debtor-in-possession pursuant to §1107 and §1108 of the Bankruptcy Code. As of the

---

[2] Debtor's Motion for Authority to Enter into an Agreement with New York City Health and Hospitals Corporation for use of the Debtor's Hotel Through April 30, 2024 (Case no. 22-11582 (PB) (the "NYCHH Motion").
[3] Declaration of Jubao Xie.

WT_000007

Petition Date, the full amount of the $137,025,000.00 in principal remains outstanding, together with unpaid interest.

## The Proposed Transaction

On January 17th, Tarter Krinsky & Drogin (**"Debtor's Counsel"**), on behalf of the Debtor, filed a Motion for Authority to Enter into an Agreement with New York City Health and Hospitals Corporation (**"NYCHH"**) for use of the Debtor's Hotel Through April 30, 2024 (the **"Proposed Transaction" and the "Proposed Agreement"**).

The Proposed Agreement provides NYCHH with use of 100% of the 492 Rooms at the Hotel and use of the entire building, including the restaurant, through April 30, 2024, provided that NYCHH may not terminate the Proposed Agreement without cause until after at least one hundred eighty (180) days after commencement of the Proposed Agreement. NYCHH anticipates needing 300 rooms no later than January 25, 2023, with the balance of 192 rooms one week later. NYCHH will pay $190 per room per day, such that when fully occupied, the Debtor shall receive $93,480 per day and $2,804,400 per month (based on a 30-day calendar month), with the parties agreeing to reconcile any additional amounts owed for other services and costs, including with respect to the actual length of months. The Proposed Agreement states that the NYCHH will provide 24-hour security and shall be primarily responsible for any guests (**"Residents"**) that may be unruly or otherwise pose a danger or nuisance to the other Residents, the employees and contractors and the Hotel.[4] NYCHH is responsible for providing food to all Residents but may use the Hotel's restaurant with NYCHH's own personnel in providing such service. It further notes that the NYCHH may install refrigerators and microwaves in the hotel guestroom units.[5]

The Proposed Agreement further notes that the Debtor shall continue to provide housekeeping services to all Residents at least three times a week, with a requirement that NYCHH ensure that each Resident voluntarily provides access at least once per week for housekeeping. Further, Debtor will continue to have personnel at the front desk to address any inquiries. Moreover, Debtor shall provide maintenance staff to address service calls.

In addition, the Proposed Agreement states that the Debtor shall maintain Commercial General Liability insurance and other forms of coverage standard in the industry (**"Property Insurance"**).[6]

The Proposed Agreement notes that nothing in it shall prevent the Debtor from marketing or selling the Hotel to another third party or pursuing confirmation of a Chapter 11 plan, in each case with the anticipation that the Proposed Agreement would be assumed by the Debtor or assigned to a third party.[7]

---

[4] I note that the Debtor uses the word "Guest" when describing the Proposed Transaction. I use the word "Resident," a distinction I explain later in this Report.
[5] NYCHH Motion.
[6] *Ibid.*
[7] *Ibid.*

WT_000008

## Summary Of Opinions

My opinions related to the NYCHH Motion are summarized below and examined in detail throughout this Report.

### Opinion #1:

**The Proposed Transaction is neither normal nor customary, nor in the ordinary of course of business.**

There is uniform consensus that "hotels" are establishments for the lodging of <u>transient</u> travelers. The Proposed Agreement calls for the housing of Residents on a semi-permanent or long-term basis, or more than that of a normal and customary transient traveler.

### Opinion #2

**The Debtors should anticipate significant damage associated with occupants who are not staying at the Property on a transient/short-term basis.**

In my experience, I have seen the damage inflicted by long-term occupants of hotels. In addition to my personal experience, there have been notable news and investigative reports of hotels suffering from substantial damage while housing long-term occupants. While the Debtor's motion highlights the projected net income that the Proposed Agreement will help generate, it makes no mention of the additional costs that may be incurred, costs which could very well equal or exceed the projected net income.

### Opinion #3

**The contemplated use will interfere with the Debtor's efforts to sell the Hotel or refinance it now or in the future.**

Entering into this Proposed Agreement will disrupt the Hotel's "intended use" cash flows for a prolonged period of time. In addition to the fifteen-month contract, there will likely be a downtime period following expiration of the Proposed Agreement for the Hotel to repair damage and restore it to brand standards, as well as potentially over a year for the Hotel to stabilize its position in the marketplace and re-establish corporate accounts (and corporate rates).

In my experience, it is difficult to sell or refinance a property that is not being used for its intended purpose. This will generate significantly limited interest and subsequently hinder the Debtor's ability to maximize value for the estate and all of its creditors and stakeholders.

### Opinion #4

**In my experience, such efforts have unintended consequences and need to be carefully anticipated.**

Entering into this Proposed Agreement could have significant unintended consequences.  I explain how the Proposed Transaction violates zoning and the Property's Certificate of Occupancy. It may also, cause the Debtor's Property Insurance to be voided. In addition, the Property may not be

WT_000009

designed for the electrical loads required for the change in use, and Residents may be considered tenants (and thus removal would need to be conducted under the purview of the courts in eviction proceedings).

WT_000010

# Bases For Opinions

## Opinion #1

The Proposed Transaction is neither normal nor customary, nor in the ordinary of course of business.

There is uniform consensus that "hotels" are establishments for the lodging of **transient** travelers. In common usage, the term "hotel" relates to a building that provides services and lodging on a "short term basis."[8]  The Oxford Dictionary defines a "hotel" as an "establishment providing accommodations, meals, and other services for travelers and tourists."[9]

In New York City, the NYC Department of Finance describes a hotel as "a building or a portion of a building that is regularly used and kept open for the lodging of occupants. A building comes within the definition of a hotel if, among other factors:…the typical occupant is a transient or public traveler; the relationship between the operator of the establishment and the occupant of the accommodations is that of an innkeeper and guest and not of a landlord and tenant."[10]

Furthermore, with regard to transient occupants, the Code of Federal Regulations ("CFR") relating to Labor notes in particular that "an establishment whose primary income is from providing a permanent place of residence or from providing residential facilities complete with bedrooms and kitchens for leased periods longer than three months would not be considered a hotel within the meaning of the Act."[11]

Normal and ordinary course of business is a standard use to indicate within a specified period that a business has engaged in activities considered normal for that specific business.[12]  The Proposed Agreement contemplates housing persons on a long-term or semi-permanent basis. However, it being established that hotels are meant to serve transient travelers – and not to provide residential facilities for extended periods – the nature of the occupants' stay per the Proposed Agreement does not adequately meet the terms relating to the "normal and ordinary course of business".

There is some debate as what constitutes something other than a transient occupant.  The CFR suggests three months as a time period where a guest is no longer considered to be a guest, but rather a resident.  The New York City hotel tax code allows an exemption for occupants who stay more than ninety days, who are more akin to "residents" than "guests."  In fact, the NYC tax code includes a "Permanent Resident Exclusion" which it defines as 180 days: "For Hotel Tax purposes, a *permanent resident* is an occupant of a room or rooms in a hotel for at least 180 consecutive days."  New York State views this slightly differently as noted in the NYC tax code: "For New York State Sales Tax purposes, the number of consecutive days required to qualify for the **permanent resident** exclusion is 90, not 180." [emphasis added] In all instances, a guest is a transient occupant for a few days or weeks, but those who

---

[8] Wikipedia, "Hotel".
[9] Oxford Learners Dictionary, "Hotel".
[10] NYC Finance Memorandum: Guidance for Hotel Operators Subject to the New York City Tax on Hotel Occupancy.
[11] Code of Federal Regulations, 29 CFR Ch. V (7–1–02 Edition).
[12] Cornell Legal Information Institute, Wex Legal Dictionary, "Ordinary course of business".

WT_000011

occupy apartments or even hotels for periods of thirty days or ninety days or longer are generally considered "residents."[13]

Many consider the time period somewhat irrelevant – in my experience a hotel is not one's primary place of residence, but accommodations that can be occupied when traveling away from home, for various purposes, but the key element is that the guest is away from its permanent place of residence.

To support its position that the Proposed Transaction is ordinary business, the Debtor uses the example of its contract with Norwegian Airlines.[14] From 2017 to 2019, the Debtor entered into a contract with Norwegian Airlines for a block of one hundred rooms per day for airline crew members that were **departing and arriving** from JFK and Newark airports during that period of time. The Debtor believes that this is a comparable instance of rooms being blocked for extended periods of time similar to what is being proposed in the Proposed Transaction. However, although the company, Norwegian Airlines, paid for a block of rooms for a period, individual airline crew members were staying at the hotel on a temporary or transient basis – coming and going as their flight schedules required – and therefore fit the criteria of transient occupants. Airline crews are only able to stay at a hotel until they are expected to fly to their next destination – usually within a few nights of arriving – per their job requirements. The blocking of rooms for the occupants in the Proposed Agreement is for a significantly longer period of time than just a few nights. Moreover, the anticipated stay by each occupant is likely to be more than just a few nights.

Appendix C contains redacted agreements between airlines and undisclosed hotels that are similar to the agreement that was presumably entered into between Norwegian Airlines and the Hotel. Airline crew contracts are a normal and customary component of certain hotel's operations, as they serve the needs of this niche of the traveling public. As is stated in the contract, the purpose of the agreement is to house flight crews and distressed passengers; it is implicit per this agreement that while the airline has the block of rooms for a defined period, crew members and distressed passengers will be coming and going in accordance with flight schedules, and not grounded for more than three months. The sample agreements talk about the provision of customary hotel services, including check-in and check-outs, "wake-up calls," housekeeping and other services generally provided to transient hotel occupants or guests.[15]

I further note that the airlines acknowledge that they are responsible for the payment of taxes, because their travelers are "guests" and "transient occupants" and thus the hotels are responsible for the collection and remittance of sales taxes or transient occupancy taxes, depending on the municipality.  The fact that the airline has contracted for a block of rooms does not exempt the Hotel from collecting taxes on transient travelers.

---

[13] NYC Finance Memorandum: Guidance for Hotel Operators Subject to the New York City Tax on Hotel Occupancy.
[14] NYCHH Motion.
[15] Redacted airline crew room contracts, Exhibit C.

WT_000012

I have also reviewed the Certificate of Occupancy[16] for the Property, a document issued by the New York City Building Department that governs its use, which "certifies that the premises described herein conforms substantially to…the requirements of all applicable laws, rules and regulations for the uses and occupancies specified. ***No change of use or occupancy shall be made unless a new Certificate of Occupancy is issued***. [emphasis added]" The Certificate of Occupancy notes that the hotel includes "Hotel Rooms" and spaces incidental to running a hotel.

Per the effective Certificate of Occupancy, the building occupancy group classification is "J-1", which includes buildings and spaces that are primarily occupied by individuals "on a day-to-day or week-to-week basis."[17]  A building occupancy group classification of "J-2" would more accurately describe the Property usage as indicated by the Proposed Agreement, which allows for units "that are occupied for permanent residence purposes," with "permanent residence purposes" defined by the housing maintenance code as "occupancy of a dwelling unit by the same natural person or family for 30 consecutive days or more."[18]  Thus the Proposed Transaction is not in compliance with the Property's Certificate of Occupancy.

Accordingly, the intended use of the building per the Certificate of Occupancy is not appropriate for non-transient occupants. While I recognize that it is unlikely that the city would penalize the Hotel for changing the intended use or occupancy given the circumstances, this is one more indication that a) the Proposed Transaction is not normal or customary nor in the ordinary course of business, b) it subjects the Lenders to economic risk of a nature different from those which were accepted at the time the decision was made to extend credit, c) could destabilize operations in the event that the Property is shut down by the city or the fire department, and d) could have unintended consequences, an issue I discuss in detail later in this Report.

---

[16] Certificate of Occupancy, CO Number 104592175F.
[17] New York City Administrative Code, as amended through 1/9/2023. Title 27, Chapter 1, Subchapter 3, Article 11, §27-264.
[18] *Ibid.*, Chapter 2, Subchapter 1, Article 1, §27-2004.

WT_000013

## Opinion #2

**The Debtors should anticipate significant damage associated with occupants who are not staying at the Property on a transient/short-term basis.**

In my experience, I have seen the damage inflicted by long-term occupants of hotels. In addition to my personal experience, there have been notable news and investigative reports of hotels suffering from substantial damages while housing long-term occupants.

For example, many years ago, I inspected the Hilton JFK Hotel in Queens. The Hilton JFK entered into an agreement to serve as a homeless shelter and subsequently experienced significant damage to the building. The damage from long-term occupants that I personally observed included: painting on walls, removal of equipment, movement of equipment, installation of equipment, hanging of pictures, and extraordinary wear and tear associated with cooking in the rooms (which were not designed for such use).

Most recently, the ROW Hotel in Times Square has been featured in numerous headlines detailing the damage sustained by the hotel after it entered into an agreement to house long-term occupants. For example, ABC7NY published an interview with an anonymous housekeeping attendant at the ROW, who reported that "the conditions of the rooms are horrible. The carpets are bad. They write on the walls. I would say 95% of those rooms are destroyed."[9] The attendant further noted that [s/he] "has to notify security every day about cooking devices in the rooms."[19]  Spectrum News NY1 similarly reported an interview with Felipe Rodriguez, another housekeeper at the hotel, who noted that the occupants "have been using hot plates to cook inside their rooms, which is prohibited because it's considered a fire hazard."[20]

The NYCHH Motion notes that the NYCHH "shall have the option to add…refrigerators and microwaves to [guest] rooms." The addition of refrigerators in the room certainly encourages that cooking use.

Although the Proposed Agreement states that NYCHH will be installing "refrigerators and microwaves" to accommodate the Residents and providing meals in the Hotel restaurant, I believe it is almost a certainty that long-term occupants will choose to cook in the Hotel. The above issues occurred at the ROW Hotel despite Eric Adams, Mayor of New York City, noting that the occupants there are provided with hot meals per their request.[8] Longer-term residents will end up cooking despite any regulations or prohibitions against it, and this cooking creates extraordinary wear and tear on any facility that was not constructed to accommodate such use.

Cooking in guestrooms also presents a fire and life safety hazard.  This is widely acknowledged in the industry and confirmed in the NYCHH Motion: "[NYCHH] may provide for refrigerators and microwaves in certain [guest]rooms but in no event shall any [Residents] be permitted to use hot plates

---

[19]Eyewitness News ABC7NY: Workers at Migrant Hotel in Midtown tell Eyewitness News about Safety, Health Concerns.
[20]Spectrum News NY1: Migrants Clash with NYC Hotel Staff Over use of Hot Plates.

WT_000014

or toaster ovens or any other appliances which may *increase the risks for fire and other life safety hazards*." [emphasis added][21]

The hotel industry incorporates a subset of hotels called "extended stay." These hotels are purpose built for travelers who wish to stay longer than the industry's typical length of stay of (say) one or two nights.  This subset has become popular because it is purpose-built with kitchens and other facilities suitable for cooking: "An extended stay hotel, also known as service apartment, is a cross between an apartment complex and an all-suite hotel.  Its guest room units are generally larger than those found in a standard, all-suite hotel and contain more living space, larger closets, and a full kitchen."[22]  Even these properties accommodate transient travelers with a typical length of stay of four to seven nights."[23] The Property is not an extended stay property: "The Debtor operates the Hotel which is a full-service hotel."[24]

The liability incurred by hosting long-term occupants in hotels is systemic and well-documented. In January 2017, New York State Senators Jeff Klein, Diane Savino, Tony Avella, Marisol Alcantara, Jesse Hamilton and Jose Peralta, joined by advocates, released an investigative report detailing deplorable conditions at New York City hotels titled "Horrors in Homeless Housing." The investigative report emphasizes how the use of hotels in New York City to house the homeless population has resulted in numerous health, fire, building, and code violations. The investigation found that 78% of identified hotels that are used to house the homeless currently have a total of 433 open violations, with the 10 worst sites accounting for 67.9% of all violations. Overall, those with violations averaged 8.68 per site, with Manhattan hotels having the highest average of over 20 violations per hotel. In the case of the Dawn Hotel in Manhattan, the worst site with 78 open violations, investigators found open citations for broken floors, broken sinks, toilets that will not flush, issues with fire escapes, unlawful cooking spaces, potentially dangerous electric hot plates and contaminated lead paint.[25]

This report confirms that despite the best efforts of regulatory agencies, abuses are widespread, and these agencies struggle with the enforcement of the rules that govern the use of the facilities. Furthermore, there is consistent documentation and evidence that Residents cook in their rooms despite available alternatives: "Citations include issues with…illegal cooking apparatuses."[26]

While the Debtor's motion highlights the projected net income that the Proposed Agreement will help generate, it makes no mention of the additional costs that will be incurred. And, while the Proposed Transaction provides for reimbursement of any charges associated with damages to the rooms, it does not explicitly define what "in excess of reasonable wear and tear" entails, and it explicitly allows for a "dispute" process when such claims are submitted by the Debtor. Moreover, as I note in Opinion #4, it is not likely that the Debtor's insurance policy will allow for reimbursement of damages.

---

[21] NYCHH Motion.
[22] "Hotel Market Analysis and Valuation," The Appraisal Institute by Stephen Rushmore, MAI, John  W. O'Neill, MAI, PdD, and Stephen Rushmore, Jr.
[23] STR, Resource Glossary, "Hotel types".
[24] NYCHH Motion.
[25] Independent Democratic Conference, Horrors in Homeless Housing.
[26] *Ibid.*

WT_000015

From time to time throughout my career, I have seen damage inflicted in hotels from cooking, including burns in the carpet, burns on furniture and stains on carpets and linen from food. Of course, damage is oftentimes inflicted by transient guests (transient guests typically pay with a credit card that the hotel can surcharge to obtain compensation for any damage caused), but in my experience cooking in a guestroom (particularly ones that are as small as in the Property) is likely to cause significant damage to the premises and its furniture and finishes.

16

WT_000016

## Opinion #3

The contemplated use will interfere with the Debtor's efforts to sell the Hotel or refinance it now or in the future.

As mentioned earlier, the Proposed Agreement notes that nothing in the agreement shall prevent the Debtor from marketing or selling the Hotel to another third party or pursuing confirmation of a Chapter 11 plan, in each case with the anticipation that the Proposed Agreement would be assumed by the Debtor or assigned to a third party as the case may be. "At all times, the Debtor's goal has been to stabilize operations and maximize value for the estate, and all of its creditors and stakeholders. To that end, the Debtor remains committed to…a sale of the hotel."

In my experience, it is difficult to sell a property that is not being used for its intended purpose, and will generate significantly limited interest – and therefore, lower purchase prices – among investors.

First, I note that the Proposed Transaction would violate the building's Certificate of Occupancy, nor is it in compliance with current zoning laws.  That is certain to cause potential buyers and their lenders to avoid the transaction.

Furthermore, hotel owners and lenders want to own and lend on **hotels**. The first step in underwriting an asset is to estimate the cash flow that the asset will bring. When describing its Hospitality Property Cashflow analysis, Morningstar's CMBS Property Cash Flow Underwriting and Valuation Guidelines remarks that it will first "review and analyze the hotel's ADR, occupancy, and overall operating results for the prior three years; we look for performance trends, including market penetration rates, and analyze them in light of the overall macroeconomic environment prevalent for each operating period."[27]  Performing an adequate valuation of a hotel property is traditionally based on an analysis of historic room rates and occupancy, as well as fluctuations in the market, which all help to determine the hotel's relative competitiveness.

If the Debtor enters into this Proposed Agreement, it will be difficult for investors and appraisers to determine how much the Hotel would be worth in the marketplace given its "normal" cash flows have been interrupted. This will likely reduce interest in any sale process given the uncertainty as to how much cash the Hotel will be able to generate in the future when operating per its intended use. Efforts to refinance the Hotel, now or in the future, will also be significantly impacted.

Furthermore, lenders, which drive transactions, will be unable to underwrite properly the property, and thus will be unable to provide financing to potential purchasers.

Moreover, the Proposed Agreement will subject the Lenders to enhanced economic risk, given that there will be a period of transition for the Hotel after the Proposed Agreement with NYCHH has expired. In addition to the costs, there will be a downtime period for the Hotel to repair damages and restore any required brand standards. It will also take an unknown period of time for the Property to ramp back up and stabilize itself as a hotel that caters to "normal" transient guests and tourists. Re-

---

[27]Morningstar: CMBS Property Cash Flow Underwriting and Valuation Guidelines

17

establishing corporate accounts (and corporate rates) could take over a year once renovations are complete, as corporate account requests for proposals are typically negotiated in the fall.

Hospitality properties can produce cash flow volatility, and further disruption of the Hotel's cash flows will undoubtedly affect the valuation and the Debtor's ability to maximize value for the estate and all of its creditors and stakeholders.

18

WT_000018

## Opinion #4

*In my experience, such efforts have unintended consequences and need to be carefully anticipated.*

Utilizing the Hotel for purposes which it was not intended is likely to have unintended consequences, which subject the Debtor and its creditors to significant risk.

### Insurance Considerations

My first concern is the Hotel's insurance policy.  Insurance policies typically have requirements that the insurer be notified of material changes, and such policies can be terminated in the event that the property experiences a material change.  In my experience, a prudent hotel owner should navigate carefully those activities that place its insurance policy at risk.

In my experience, most commercial property policies, including the Hotel's existing insurance, have a Material Fact clause embedded within the policy language. This typically states that the policy holder has a continuing duty not only at inception and renewal but throughout the life of the policy to declare to insurers any changes which may be regarded as a Material Fact. A Material Fact is one which would influence an insurer as to whether to continue to cover the risk and/or the premium to be charged. Failure to disclose a Material Fact could result in the claim being turned down and/or the policy being voided. An insurer has to rely upon the information provided by the policy holder to decide whether they wish to insure the policy holder or to continue to insure the policy holder and to charge a premium.

Changing the Property use from a full-service hotel to one that houses migrants (short-term or long-term) could also be considered a "material change in the nature or extent of the risk occurring after the first effective date of the current Policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the Policy was issued or last renewed."[28] This is also grounds for the insurer to cancel the policy.

I am in possession of the Hotel's insurance policy, which is similar in format to others that I have reviewed throughout my career.  The Property's insurance may be in jeopardy if the Hotel were to switch to housing long-term occupants. Below I highlight excerpts from the policy [emphasis added][29]:

c. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Policy is void as to all Insureds in any case of fraud by any Insured as it relates to this Policy at any time. ***It is also void if any Insured, at any time, intentionally conceals or misrepresents a material fact concerning***:

(1) This Policy;

***(2) The Property Insured***;

---

[28] Zurich Edge II Policy EDGE II 400 – C (07/20) pages 60, 146
[29] *Ibid*

WT_000019

(3) The Insured's interest in Property Insured; or

(4) A claim under this Policy.


Similarly:


(1) Cancellation

(b) For Policies in Effect 60 Days or Less, the Company may cancel this Policy by mailing
or delivering to the First Named Insured written notice of cancellation at least:

…

v. Material physical change in the property insured, occurring after issuance or last
annual renewal anniversary date of the Policy, which results in the property becoming
uninsurable in accordance with the Company objective, uniformly applied underwriting
standards in effect at the time the Policy was issued or last renewed; or *material
change in the nature or extent of the risk, occurring after issuance or last annual
renewal anniversary date of the Policy, which causes the risk of loss to be substantially
and materially increased beyond that contemplated at the time the Policy was issued
or last renewed;*


The cancellation of the Property Insurance would have dire consequences to both the Debtor
and its creditors.

There have been recent relevant instances of litigation between insurers and their policy holders
over this exact issue. For example, the MAve Hotel, a boutique hotel in New York City, is suing Certain
Underwriters at Lloyds London over a denied insurance claim for over $1 million in property damage.
According to a report by Insurance Business Magazine, the MAve Hotel alleges the damage was caused
by homeless families it had sheltered for three years as part of a deal with Acacia, a local social services
group. MAve Hotel discovered substantial, direct physical loss and intentional damage to its guest
rooms, hallways and other common areas after Acacia and the families participating in the shelter
program all left in October 2020. The hotel emphasized that the damage sustained was beyond regular
wear and tear, including numerous punctures in walls and ceilings, as well as vandalized and defaced
furniture, headboard covers, carpeting, and wall hangings. MAve Hotel's lawsuit asserts breach of
contract, stating in its complaint that it had submitted a claim for coverage to its insurers on January 06,
2021, but third-party policy administrator Vanguard Claims Administration denied coverage for the
claim in April. The lawsuit is still yet to be settled.[30]

---

[30] Insurance Business Magazine: Hotel Sues Lloyd's underwriters, HDI Global Specialty Over Denied Insurance Claim

WT_000020

It is important to note that while I use this article to highlight the challenges maintaining Property Insurance, the parties to this policy acknowledge the significant damage caused to the Property.  Furthermore, it is worth noting that the damage was (fortunately) limited to $1 million and not a larger claim for further damage or catastrophic loss.

## Guest versus "Tenant" Status

Another potential unintended consequence of the Hotel converting to housing long-term occupants is the change in occupant legal standing. Under New York law, a guest becomes a tenant after a stay at a hotel/motel for thirty consecutive days. As a tenant, occupants are afforded different legal protections to being a guest.[31] New York City Administrative Code further specifies that "if someone has an active lease—or has been in the [unit] for more than 30 days—they need to be legally evicted with due process, a key right for tenants."[32] The change in legal status of the occupants can open up all involved parties to potential litigation.

I have already discussed that the Debtor has not incorporated any "downtime" into its projections – it assumes the NYCHH lease expires and then the hotel returns back to "normal" without any recognition that the hotel will likely need to close for a time necessary to fix damage caused by Residents and there will be a period of time necessary to "stabilize" operations.  The prospect of a standing change from guest to tenant status occurring at the end of the term could lead to a lengthened time period to return to full operations back to a hotel and maximum utilization of all of the hotel's room in that effort.

Hoteliers are quite aware of the eviction requirements for Residents/Tenants (vs. guests) and how problematic that can be for hotel managers.  New York City is particularly friendly to tenants and eviction requires a lengthy judicial process.

## Electrical Consumption and Considerations

In my experience, the introduction of electrical appliances such as refrigerators and microwave ovens will significantly increase the electrical consumption of the Property, and it may not have been designed for such use. The Proposed Agreement allows for the NYCHH to install "refrigerators and microwaves" in guestrooms, but it is unclear that the electrical outlets and electrical systems have been designed for this significant increase in consumption.  The Debtor must warrant that the Hotel has been designed to accommodate these uses: "[Debtor] represents that each [guest]Room has the electrical power capacity for the operation of such [refrigerator and microwave oven] appliances."[33]

---

[31] Neighborhood Legal Services: I Live on a Hotel or Motel, What are my Rights?
[32] Justia US Law: Matter of West 58th St. Coalition, Inc. v City of New York
[33] NYCHH Motion.

WT_000021

That issue, which to my knowledge has not been confirmed by any authoritative source or by the Debtor, creates significant risk to the premises.  This is further exacerbated by the introduction of hot plates or toaster ovens, which despite preclusions to their introduction in guestrooms, regulatory agencies struggle to enforce.

## Community Opposition

Community opposition is always a concern when changing uses. Zoning laws are created to establish the parameters for what is an acceptable use for land and buildings, which protect the neighborhood and its residential and commercial tenants, owners and occupants.

As previously discussed, the Proposed Transaction is not in compliance with the Property's Certificate of Occupancy nor its current designated use.

Community opposition is a factor that must be accommodated into the analysis.  In a proposed transaction involving the Park Savoy Hotel, local community activists (the" West 58th Coalition") mounted a campaign to prevent the use of the hotel as a homeless shelter, including filing multiple lawsuits ("Matter of West 58th St. Coalition, Inc. v City of New York").[34]

---

[34] https://law.justia.com/cases/new-york/court-of-appeals/2021/33.html

22

## Conclusion and Certification

It is for these reasons that I conclude that the Proposed Transaction is not normal and customary, is not in the normal course of business, and presents significant risk to the Debtors, its Creditors and its Stakeholders, as detailed above.

I reserve the right to update or modify this Report and my opinions and conclusions herein based on additional information or developments that may come to my attention.

Executed this 23rd day of January 2023 at Los Angeles, California.

_____

By:    Alan Tantleff

WT_000023

## Exhibit A:  Documents Relied Upon

**Court Documents**

1. Declaration of Jubao Xie Pursuant to Local Bankruptcy Rule 1007-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (Case no. 22-11582 (PB)

2. Debtor's Motion for Authority to Enter into an Agreement with New York City Health and Hospitals Corporation for use of the Debtor's Hotel Through April 30, 2024 (Case no. 22-11582 (PB)

3. Debtor's Motion for an Order Shortening Time and Scheduling Hearing to Consider Debtor's Motion for Authority to Enter into an Agreement with New York City Health and Hospitals Corporation for use of the Debtor's Hotel Through April 30, 2024 (Case no. 22-11582 (PB)

4. Interim Order Authorizing the Debtor to Make Payment of Certain Pre-Petition Wages, Salaries, Payroll Taxes And Reimbursable Expenses to General Personnel Services Inc. On Account Of Pre-Petition Obligations Related to Employees Provided to the Debtor And Granting Related Relief (Case no. 22-11582 (PB)

**Reports and Guidelines**

5. NYC Finance Memorandum: Guidance for Hotel Operators Subject to the New York City Tax on Hotel Occupancy.

6. Code of Federal Regulations, 29 CFR Ch. V (7–1–02 Edition).

7. Certificate of Occupancy, CO Number 104592175F.

8. New York City Administrative Code, as amended through 1/9/2023. Title 27.

9. Independent Democratic Conference, Horrors in Homeless Housing.

10. Morningstar: CMBS Property Cash Flow Underwriting and Valuation Guidelines.

11. Zurich Edge II Policy EDGE II 400 – C (07/20).

12. 2006 New York City Administrative Code - Unlawful Eviction.

13. "Hotel Market Analysis and Valuation," the Appraisal Institute, by Stephen Rushmore, MAI, John W. O'Neill, MAI, PhD, and Stephen Rushmore, Jr.

**Other Documents**

14. Cornell Legal Information Institute, Wex Legal Dictionary, "ordinary course of business".

15. Spectrum News NY1: Migrants Clash with NYC Hotel Staff Over use of Hot Plates.

16. Eyewitness News ABC7NY: Workers at Migrant Hotel in Midtown tell Eyewitness News about Safety, Health Concerns.

24

17. Insurance Business Magazine: Hotel Sues Lloyd's underwriters, HDI Global Specialty Over Denied Insurance Claim.

18. Neighborhood Legal Services: I Live on a Hotel or Motel, What are my Rights?

19. Justia US Law: Matter of West 58th St. Coalition, Inc. v City of New York.

WT_000025

# Exhibit B: Curriculum Vitae / Qualifications of Alan N. Tantleff

**EXPERT QUALIFICATIONS**

Alan Tantleff is a Senior Managing Director at FTI Consulting and is based in New York. In addition to being a senior leader in the company's Real Estate practice, he leads FTI Consulting's Hospitality, Gaming and Leisure and its Capital Markets practices. Mr.

Tantleff is a respected industry and structured finance professional with 30 years of diverse, hands-on experience in areas of commercial real estate, development, workouts and restructuring, asset management, structured debt and equity financing, and acquisitions and dispositions.

Very active in various segments of the commercial real estate industry throughout his career, Mr. Tantleff has served in numerous capacities as a financial advisor and expert both in bankruptcy/workout and non-restructuring related disputes. Mr. Tantleff has advised boards of directors, lenders, borrowers, special servicers, and other stakeholders on numerous high profile real estate restructuring matters, foreclosures, operational realignments, asset and hotel management agreements. In fact, Mr.

Tantleff was recently ranked one of North America's Top Crisis Management Professionals, ranking 26th.

Mr. Tantleff applies his broad background and experience in the industry to a wide variety of consulting, dispute resolution, litigation and bankruptcy engagements, including corporate turnarounds, business process improvement, and financial restructurings and bankruptcies. He is experienced in representing all stakeholders, including debtors, creditors and equity interests. Mr. Tantleff has broad experiences in capital market transactions, including debt and equity financing, note sales, and individual asset sales. Throughout his career, he has sold or financed more than $4 Billion of hospitality and commercial real estate assets.

Prior to joining FTI Consulting, Mr. Tantleff was a Managing Director at Hotel Asset Value Enhancement, a boutique asset management and advisory practice dedicated to the hospitality industry. Before that, he worked at BlackRock Financial Services, assisting the efforts in workouts and restructurings of the financial manager's $6 billion sub debt portfolio. He held senior management positions at Jones Lang LaSalle, Granite Partners (Savilles), The Prudential Insurance Company of America and Sands Casino Hotel in Atlantic City.

Mr. Tantleff has earned numerous awards and accolades throughout his career, including Real Estate New York's Top "40 under 40" influential people in New York real estate and RealShare New York's "Commercial Broker All-Stars." Recently, he was named to Turnaround and Workout Magazine's "People to Watch," and National Real Estate Investor named him "Exit Strategy Guru" in an article about the timely disposition of hotel assets. He has penned numerous articles and columns in various trade and industry publications.

**Articles and Publications**

- "Year In Review," International Society of Hospitality Consultants, Volume 2, January 2023
- CARES ACT: Immediate Tax Relief for Real Estate Investors," April 2020
- "Five Rules of Thumb: Crisis Management for Hospitality Executives," March 2020
- "Tantleff's Financing Themes for 2014," hotelsmag.com, October 2013
- "Five Reasons Casinos Fail," Acquisition International Magazine, August 2013

WT_000026

**Disclosure of Deposition / Expert Reports / Trial Testimony**

- Affidavit in Support of TRO for Guardian Realty Partners, LLC, Guardian REH Fee Owner, LP, and Guardian REH, LP; Supreme Court of New York, Country of New York, Case No. 654132/2022
- Wilmington Trust v. Argentic Real Estate Finance, LLC; Supreme Court of New York, County of New York, Case No. 650084/2021
- WC Braker Portfolio, LLC and WC Braker Portfolio B, LLC v. ATX Braker, LLC; Supreme Court of New York, County of New York, Case No. 651792/2022
- 34th Hotel Ventures, LLC v. AON Risk Services Northeast, Inc. et al.; Supreme Court of New York, County of New York, Case No. 651155/2019
- Virgin Hotels San Francisco, LLC v. 250 Fourth Development, L.P.; Supreme Court of the State of California, County of San Francisco, Case No. CGC-20-584350
- 96 Wythe Acquisition, LLC; United States Bankruptcy Court Southern District of New York, Case No. 21-22108-RDD
- 187 Kent, LLC v. Invictus 187 Mezz, LLC and 187 Mezz, LLC; Supreme Court of New York, County of New York, Case No. 656125/2021
- TDC Pointe Member, LLC and TDC Pointe, LLC v. ROC Debt Strategies II Mortgage Capital, LLC; Supreme Court of New York, County of New York
- Lincoln Street Mezz II, LLC v. One Lincoln Mezz 2, LLC; Supreme Court of New York, County of Kings, Case No. 530492/2021
- NSC Investments, LLV and TCC/Korea Operating, LLV v. POSCO Engineering and Construction Co., LTD; International Court of Arbitration of the International Chamber of Commerce, Case No. 24343/HTG
- Huntington Way Associates, LLC and RRI Associates, LLC and WB-US Enterprises, Inc. Case No. 01-20-0015-392
- Elitech B.V. Razvoj Golf D.O.O. v. The Republic of Croatia; International Centre for Settlement of Investment Disputes, Case No. ARB/17/32
- EHT US 1, Inc. et al; United States Bankruptcy Court District of Delaware, Case No. 21-10036 (CSS)
- GVS Portfolio I B, LLC; United States Bankruptcy Court District of Delaware, Case No. 21-10690 (CSS)
- Knotel et al.; United States Bankruptcy Court District of Delaware, Case No. 21-10146 (MFW)
- HFZ Capital Group V. CIM Group; CCO Condo Portfolio (NY) Mezzanine, LLC and CCO Condo Portfolio (AZ) Junior Mezzanine, LLC Supreme Court of New York County of New York, Case No. Index No. 656178/2020
- GVS Portfolio I B LLC, V. Teachers Insurance Annuity Association of America, Supreme Court of New York County of New York, Case No. Index No. 654095/2020
- Atlas Brookview Mezzanine LLC, and Atlas Brookview LLC v. DB Brookview LLC, Supreme Court of New York County of New York, Case No. Index No. 653986/2020
- D2 Mark LLC v. OREI Investments LLC, Supreme Court of New York County of New York, Index No.

27

652259/2020

- AB Stable VIII LLC v. MAPS Hotels and Resorts One LLC, Court of Chancery of the State of Delaware, Case No. 2020-0310 JTL
- The Sands Harbor Marina Corp. Et al. v. Wells Fargo Insurance Services of Oregon, Inc. Et al, Case No. 09-cv-3855 (JS) (AYS), United States District Court Eastern District of New York.
- Barthelemy Holdings LLC v Duet Group Ltd & ors, Case No. CL-2017-000370, High Court of Justice, Queen's Bench Division Commercial Court, United Kingdom.
- Hermitage Inn Real Estate Holding Company, LLC, Case No. 19-10214, United States Bankruptcy Court for the District of Vermont
- Berkshire Bank v. Hermitage Inn Real Estate Holding Company, LLC. et. al., Case No. 63-2-18, Superior Court of Vermont, Windham Unit.
- Staybridge Suites Baton Rouge Litigation, Case No. 27-TR-CV-18-75, State of Minnesota Fourth Judicial District Court, County of Hennepin
- RCHFU, LLC et al. v. Marriott Vacations Worldwide Corporation, et al., United States District Court for Colorado
- Earl C. Charles et al. v. The Ritz-Carlton Hotel Company, LLC, et al., Case No 13-1-0640(2), The Circuit Court of the Second Circuit State of Hawaii
- Narayan v. Marriott International, Inc., Case No. 12-1-0586-(3), The Circuit Court of the Second Circuit State of Hawaii
- Kenneth Pasternak v. Adam Mermelstein, Treetop, et al., Case No. L-2356-16, Superior Court of New Jersey, Bergen County
- Bank of America, N.A. v. Stonestreet Hospitality Realty Company LLC; et al., Case No. KNL-CV-16-6026981-S, Superior Court Judicial District of New London, Connecticut
- Central Grocers, Inc., Case No. 17-13886, United States Bankruptcy Court Northern District of Illinois
- UCF DoubleTree Hotel Litigation, Case No. 1:15-cv-08537, United States District Court Northern District of Illinois
- International Centre for Dispute Resolution, Case No. 01-15-0005-1591
- JD Holdings, L.L.C. v. Dowdy, C.A. 7480-VCL, Delaware Court of Chancery
- Singapore seated Uncitral Arbitration concerning the termination of a management services agreement
- P7 Owner LLC v. Arbor Realty Trust, Inc., Arbor Realty Participation LLC, New York Supreme Court, County of New York
- 904 Tower Apartment LLC and Madison Apartment 905 LLC v. The Mark Hotel LLC, Case No. 10cv9701, United States District Court for the Southern District of New York
- Host Hotels & Resorts, L.P. et al. v. Fox Rothschild LLP, Circuit Court of Montgomery County, Maryland
- Nuveen High Yield Municipal Bond Fund; et al. v. Crews & Associates, Inc.; et al., Circuit Court of Pulaski County, Arkansas
- Hong Kong International Arbitration Center, Case Nos. A12175 and A12176

WT_000028

- Kenneth A. Barton, Angeline B. Davis et. al. v. RCI, LLC, Civil Action No. 10-3657 (PGS)(DEA), United States District Court for the District of New Jersey
- ICC International Court of Arbitration [Miami] Case No. 18610/VRO/AGF/RD
- London Court of International Arbitration, Case Nos. 101687
- London Court of International Arbitration, Case Nos. 101688 and 101690
- London Court of International Arbitration, Case Nos. 101689 and 101691
- Nesbitt Portland Property LLC, Case No. 12-12883, United States Bankruptcy Court for the Central District of California (Santa Barbara)
- Transwest Resort Properties, Inc. Case No. 4:10-bk-37134, United States Bankruptcy Court for the District of Arizona
- Lafayette Yard Community Development Corp., Case No. 3:13-bk-30752, United States Bankruptcy Court for the District of New Jersey
- M Waikiki, LLC, Case No. 11-02371, United States Bankruptcy Court for the District of Hawaii
- SW Boston Hotel Venture, LLC, et al., Case No. 10-14535-JNF, United States Bankruptcy Court for the District of Massachusetts
- ALT Hotel LLC, Case No. 11-19401 (ABG), United States Bankruptcy Court for the Northern District of Illinois, Eastern Division

**Recent Speaking Engagements**

- "'Checking In' with Hotel Leaders," Cornell Real Estate Conference, October 2022
- "How to be an Expert Expert: The ins/outs of expert testimony in today's market," ISHC Annual Conference, September 2022
- "Bartender, I'll Take a Quarantini: The Fits and Starts of a Post-Pandemic Hospitality Industry," NMFA Annual Conference, May 2022
- "Owners – Emerging Approaches to Litigation," ALIS Law, January 2022
- "Dealing with Workouts & Debt Issues," ALIS Law, July 2021
- "Current Issues in Real Estate Restructurings: Views from the Experts and the Bench," New York City Bar Association, June 2021
- "6x8: Recovery Top of Mind - Episode 1," ALIS Law, March 2021
- "Distressed Real Estate during COVID," Debtwire, December 2020
- "Real Estate Workouts: Unique Challenges Facing EB-5 in the Wake of COVID-19," IIUSA Virtual Industry Forum, November 2020
- "Crisis-Driven Workouts, Foreclosures and Bankruptcies in the Hotel and Lodging Industry," Georgetown Law Center, October 2020
- "Paul Hastings University," June 2020
- "The Impact of COVID-19 on The Hospitality Industry," Turnaround Management Association of Florida, June 2020
- "The Impact of COVID-19 on The Hospitality Industry," CREFC-Commercial Real Estate Finance Council, May 2020

WT_000029

- "Commercial Real Estate in the Wake of a Pandemic- How Borrowers and Lenders Are Responding to COVID-19," Center for Real Estate Finance, Cornell University, April 2020
- "TMA Town Hall: Leading Through Crisis," Turnaround Management Association, April 2020
- "Legal Challenges with Brand Consolidation and New Brands," ALIS Law, January 2020
- "Placemaking," Cornell Real Estate Annual Conference, October 2019
- "Bankruptcy Battleground: EB-5 Workouts and Restructurings," American Bankruptcy Institute, March 2019
- "Disputes with Owners," ALIS Law, January 2019
- "How we Live Work and Play in….2018," Cornell Real Estate Annual Conference, October 2018
- "High Yield on the West Coast," CREFC-Commercial Real Estate Finance Council, May 2018
- "Legal & Business Issues in Refinancing," ALIS Law, January 2018
- "Israel Real Estate Summit," DLA Piper, March 2017

**Arbitration / Mediation**

- Third-Party Arbitrator between Sydell Holdings, LLC and Yucaipa U.S. Hospitality Partners Holdings, Inc.

WT_000030

# Exhibit C – Redacted Airline Crew Room Contracts

**Agreement 1**

**CREW ACCOMMODATION AGREEMENT**

a) If HOTEL COMPANY is not able to provide such additional rooms, HOTEL COMPANY will help ███████ or ██████ book it's Crew Members in other hotel facilities in the surrounding area that are of equal or better caliber.  Rooms must be reserved under the ████████ name and flight number and not under individual Crew Members' names.  HOTEL COMPANY will use appropriate sign in sheets, submitting same at month's end with invoices.

b) The minimum standard for all rooms for Crew members shall be the Standard Room of the HOTEL.  Rooms shall be allocated to Crew Members on a single occupancy basis. All rooms must contain blackout shades, iron, ironing board in room or on request, alarm clock, fridge, telephone with message light, and hairdryer.

c) During the term should the operations of ████████ change or be revised resulting in increasing, reducing or eliminating the need for crew accommodation at the HOTEL, ████████ may increase, reduce or eliminate the room requirements specified in this Agreement  by notice with immediate effect and without penalty.

1. **Room Charges**

   a) During the validity period of this Agreement, the room charges for Crew Members shall be a flat rate of:

   01 March 2023– 29 Februrary 2024 USD95.00 per room per day plus11% tax ($105.45 inclusive of tax)

   01 March 2024 - 28 February 2025 USD98.00 per room per day plus11% tax ($108.78 inclusive of tax)

   b) HOTEL COMPANY understands that ████████ monthly flight schedule may have early arriving flights.  The rooms for the early arriving Crew Members are to be held the night prior in order for the Crew Members to check-in prior to 11AM. If the hotel is at 90% occupancy the night prior of the scheduled arrival date.  HOTEL COMPANY will charge ████████ for the scheduled rooms being held the night prior the 50% contracted rate in accordance with Clause 3a) based on tiered pricing.

   c) HOTEL COMPANY will not charge ████████ a second day charge for rooms checking out prior to 4PM for evening flight departures.  For departures after 4PM, ███████ will be charged 50% contracted rate in accordance with Clause 3a) tiered pricing if the hotel is at 90% occupancy or higher the night of the departure. The monthly flight schedule will show the total number of rooms ███████ will be responsible to pay not including early arrival and late check-out fees based on arrival/departure times or any extra room requests which require written authorization in the form of an email or fax from ████████ or its representative.

   d) No show rooms will only be billed if HOTEL COMPANY has displaced revenues for those room nights when HOTEL reaches 100% occupancy rate.  HOTEL COMPANY shall submit an

31

occupancy report in support of any displaced revenues.  If HOTEL COMPANY is able to sell any cancelled or no show room(s) for any given night, then no charges will be assessed for the night regardless of ████████ attrition.

e)  In compliance with applicable laws, the ███████ rooms will be tax exempt after 31 days of continuous occupancy at HOTEL.  At that time, taxes already paid within the 30 days will be refunded back to ██████.  Any rooms used above the minimum number of continuously occupied rooms per night will be subject to the applicable tax of 11%.  This will remain in force as long as the tax laws remain as such.  If there are any changes to the tax laws, HOTEL COMPANY is required in writing to provide such changes to ████████ and ██████.

f)  The HOTEL COMPANY shall not charge ████████ or any Crew Member for family members or friends sharing a room with a Crew Member. Maximum number of occupants per room is 4, including the Crew Member.

g)  During the validity period of this Agreement, the HOTEL COMPANY agrees to charge all staff of ████████ travelling on business or leisure and any disrupted passengers the same rate as stipulated in Clause 3a) a flat rate of USD95 per room per day  exclusive of 11% tax and inclusive of complimentary in-room internet access (Wi-Fi) when Hotel is at 90% occupancy or lower and at USD149 exclusive of 11% tax when Hotel is at 90% occupancy or higher.

h)  During the validity period of this Agreement, HOTEL COMPANY is responsible to ensure ████████ contracted room rate stated in Clause (3g) is made available by the HOTEL COMPANY's appointed █████ for accessibility and that the contracted room rate is up to date and available at the time of booking.

i)  Rates for ███████ Corporate Travel will be loaded by HOTEL COMPANY into ██████ utilizing the instructions in Appendix 1.

j)  For staff travelling on business, the invoice, statement or receipt issued by the HOTEL COMPANY shall be made in the name of '████████████ in addition to the name of the staff member; and must clearly show each of the applicable tax being charged.

k)  Hotel agrees to provide rooms, upon availability, for all Airline employees at the rates listed above while travelling on leisure travel. The hotel shall load the above room rates on the ████ on the basis of defined viewer-ship utilizing the following information:

These rates should be made available through the █████ until the hotel has reached 95% booked occupancy. Hotel agrees to have the rates loaded into the ██████ immediately upon signing of this Agreement.

WT_000032

l) ▇▇▇▇▇may book up to four (4) rooms per contract year for member(s) of Airline Crew Administration to conduct unannounced quality assurance visits at HOTEL.  In an attempt to keep room inventory available during busy times, such visits will be booked under Crew Member status no more than forty-eight (48) hours prior to the visit.  Upon ▇▇▇▇▇written notification to HOTEL COMPANY that a quality assurance visit has taken place, HOTEL COMPANY will deduct these room(s) from the monthly invoice billing.

## 2.  Room Allocation

The HOTEL COMPANY agrees that:

a) Crew Members shall not be allocated rooms on the ground floor, or rooms that have adjoining doors, or are near noisy areas, such as night clubs, lobbies, private function rooms, room service centres, elevators, vending machines and other locations likely to produce noise.  Crew shall not be allocated to rooms for physically challenged guests.

b) Crew Members shall be allocated the quietest rooms for maximum crew rest.

c) All Crew Members shall be allocated to non-smoking rooms.

d) In the event 'Do Not Disturb' sign is on, the room should not be entered by HOTEL staff except for emergency reason.

e) In the event HOTEL COMPANY receives 3 or more complaints within a thirty (30) day period for the same type of complaint from ▇▇▇▇▇and one or more Crew Members are unable to fly as a result of the equivalent complaint, ▇▇▇▇▇shall be reimbursed 100% for the room nights of said effected Crew Members.

f) HOTEL COMPANY will award ▇▇▇▇▇with three (3) room nights free of charge for every scheduled Crew Member that is moved to another hotel.

HOTEL COMPANY will provide one (1) room night free of charge for every scheduled Crew Member that waits over thirty (30) minutes from the time of entry into Hotel to receive his/her room key. Should the crew arrive earlier than monthly schedule, ▇▇▇▇▇must provide ample time for preparations.

## 3.  Benefits for ▇▇▇▇▇Staff

The HOTEL COMPANY shall provide the following benefits to each ▇▇▇▇▇Staff Member:

a) A special rate of $13.00 inclusive of tax and service charge for the 2 Eggs Your Way breakfast at ▇▇▇▇▇ Restaurant inclusive of hot and cold food items for 12/1/2022 -11/30/2023 and no more than 3% increase for 12/1/2023 – 11/30/2023.

b) 10% discount on all food and beverages within the HOTEL, including room service, alcoholic beverages, or special promotions but excluding ▇▇▇▇▇2 Eggs Your Way breakfast.

33

c) 35% discount on all laundry charges within the HOTEL.

d) Complimentary internet access (Wi-Fi) in the rooms and in the public areas.

e) Complimentary use of the following facilities: Fitness Centre and Pool.

f) Complimentary use of crew lounge located on 2nd Floor with 2 computers for internet access, tea/coffee making facilities accessible 24 hours daily.

g) Complimentary bottled water (2) per day per room.

h) Complimentary tea/coffee making facilities in the room.

i) Complimentary use of safety deposit boxes in-room.

j) HOTEL COMPANY shall provide an expedited check-in and check-out procedure for Crew Members.

k) In the event of a serious illness that might require hospitalization or a visit to a medical facility, the HOTEL staff shall escort the affected Crew Members to the particular hospital.

l) 24-Hours room service with a reasonable variety of hot and cold food beverages.

m) Complimentary Hotel Shuttle within a 5-miles radius of hotel on a request basis.

## 4. Allowances

a) The HOTEL COMPANY shall, without delay, provide the latest restaurant menus and any other relevant information for review of meal prices on twice a year basis by 1 June and 1 December and any other time during the year where there is to be a significant menu change, to the following party:
Email: ██████@██████.com

## 5. Payment of Room Charges & Personal Accounts

a) The HOTEL COMPANY shall invoice ██████ for the Hotel Accommodation supplied on the basis and in the form determined by ██████.

b) Payment for room charges for Crew Members shall be made by ██████ directly to the HOTEL COMPANY. The HOTEL COMPANY shall render to ██████ a monthly consolidated statement of all room charges incurred in relation to the rooms occupied by Crew Members in any period. ██████ shall make payment to the HOTEL COMPANY within forty five (45) days of receipt of a validly presented and accurate statement. In the event that ██████, acting in good faith, has reason to believe that any statement rendered to it pursuant to this Clause 8b) is inaccurate or incomplete,

34

the time within which ███████ shall be obligated to make payment in respect of said statement shall be deferred until such time that the parties hereto have resolved any queries or questions raised by ███████.

c) The HOTEL COMPANY shall follow the new ███████ Invoicing Procedures when notified by ███████ or ███████.

   i) HOTEL COMPANY will enter the arriving Crew Members' identification numbers from the sign in sheet into the ACES invoicing system on a daily basis. Within five (5) business days following the end of the month, HOTEL COMPANY will utilize the ███████ invoicing system to create an electronic invoice for the prior month. Invoices will only be paid upon proper submission of the electronic invoice through the ███████ invoicing system. Invoices are due and payable by ███████ within forty (45) business days of ███████ acceptance of the electronic invoice submitted.

   ii) Except as otherwise provided in this Agreement, ███████ will only pay for rooms used by Crew Members. All determinations of whether a room was occupied by a Crew Member will be made by reference to the ███████ electronic sign in sheet entry provided by HOTEL COMPANY on the ███ invoicing system.

   iii) Upon request from ███████, HOTEL COMPANY shall include in the electronic invoice submission as an attachment, original hotel invoice, original hardcopy sign-in sheets, hotel occupancy report and/or guest folio for the Services. HOTEL COMPANY shall retain all original hardcopy sign-in sheets for a period of not less than one hundred and eighty (180) days from invoice date.

   iv) HOTEL COMPANY shall establish direct billing privileges for ███████ and render invoices for the room accommodations and related services on a monthly basis. Payment terms shall be billing every forty five (45) business days. Payment net forty five (45) business days upon receipt of the properly submitted invoices via ███████ invoicing system.

d) HOTEL COMPANY shall email the invoices for Crew accommodations to:
███████_███@███████.com and where requested to ███████@███████.com

e) It is expressly acknowledged by HOTEL that ███████ acting solely as agent for a disclosed principal, ███████, and that ███████ and/or its related entities and/or affiliates shall have no direct liability for payment to HOTEL for any charges incurred by ███████.

f) Payment for telephone charge of '*Duty Travel Medical Assistance Programme*' hotline [Telephone number: Call from USA and Canada: **+1** ███████ and call from other countries: **+1** ███████ ] shall be made by ███████ directly to the HOTEL COMPANY. The HOTEL COMPANY shall render to ███████ a statement of all telephone charges made to the above numbers by Crew Members. Payment schedule shall follow the same as Clause 8a).

g) Crew Members shall not be required to provide security in any form to the HOTEL COMPANY for incidental items charged to their personal account by the HOTEL COMPANY. The HOTEL COMPANY shall present individual Crew Members with a consolidated statement of their personal accounts at the time said Crew Members check-out of the HOTEL after their stay, and said accounts shall be payable by Crew Members directly to the HOTEL.

35

h) It shall be the sole responsibility of the HOTEL COMPANY to recover personal charges incurred by Crew Members directly from said Crew Members at the time they check-out from the HOTEL. ▓▓▓▓ shall not accept responsibility for uncollected or late charges levied in respect of personal charges incurred by any Crew Members. ▓▓▓▓▓ may be able to assist in the collection of outstanding charges from Crew Members.

## 6. Refurbishment

Prior to the HOTEL COMPANY undertaking any planned, non-emergency refurbishment work within the HOTEL or its grounds that has impact on guestrooms or significant noise within guestroom premises, the HOTEL COMPANY shall give sixty (60) days' prior written notice to ▓▓▓▓ and/or ▓▓▓▓ of the scope, duration and schedule of planned refurbishment. The HOTEL COMPANY shall make all efforts to ensure that the Crew Members are able to take undisturbed rest at all times. Should ▓▓▓▓ determine at its discretion that this is not possible, the HOTEL COMPANY shall at its cost arrange alternative accommodation for Crew Members during the period of refurbishment works at a hotel which, in ▓▓▓▓ view, is at least of an equivalent standard to the HOTEL. The HOTEL COMPANY shall give sufficient notice to ▓▓▓▓ in planned refurbishment situations and notice as soon as possible in emergency situations so that the appropriate hotel assessment(s) can be carried out prior to the move. Whatever the arrangement, there shall be no additional cost to ▓▓▓▓.

## 7. Termination

a) In the event that the HOTEL fails to meet the contractual standards required by ▓▓▓▓ and the HOTEL COMPANY refuses, neglects or fails to rectify the defects/breaches to the reasonable satisfaction of ▓▓▓▓ within a reasonable time frame relative to the seriousness of the situation specified by ▓▓▓▓, ▓▓▓▓ may terminate this Agreement by giving seven (7) days written notice to the HOTEL COMPANY.

b) During any cure period for HOTEL's breach under this Clause 10a), ▓▓▓▓ reserves the right to relocate Crew Members to another hotel of at least equal quality. HOTEL COMPANY will pay the alternate hotel and bill ▓▓▓▓ either the rates specified in Clause 3a) or the alternate hotel's rate, whichever is lower. The HOTEL COMPANY may terminate this Agreement by giving sixty (60) days' prior written notice to ▓▓▓▓ if ▓▓▓▓ fail to pay the HOTEL COMPANY in accordance with the provisions of Clauses 8 hereof.

c) ▓▓▓▓ may terminate this Agreement by giving seven (7) days' prior written notice to the HOTEL COMPANY in the event of :

   i) Any material breach by the HOTEL COMPANY of any provision of this Agreement; or

   ii) Termination of Crew Members' layover in the city where the HOTEL is situated, or

WT_000036

iii) Overriding operational reasons of ███████; or

iv) Overriding security concerns of ███████; or

v) Financial difficulties of the HOTEL COMPANY where the HOTEL COMPANY is or is deemed to be or admits that it is insolvent or unable to pay its debts as they fall due or suspends or announces its intention to suspend payment of all or a class of its indebtedness or a moratorium is declared in respect \of any of its indebtedness or a winding-up petition or order is filed or made against the HOTEL COMPANY.

vi) If HOTEL changes ownership, management or chain affiliation and cannot carryout contract terms.

d)  ███████ has the right and may terminate this Agreement prior to the expiration date herein stipulated without cause and without penalty.  In such an event, ███████ shall provide a written ninety-day (90) prior notice stating the intent to terminate this Agreement.   In the event this Agreement is between ███████ and a HOTEL COMPANY which has never previously provided rooms at HOTEL to Crew Members, ███████ may terminate this Agreement within ninety (90) days from the Effective Date in its sole and absolute discretion without cause and without penalty upon five (5) days written notice to HOTEL COMPANY.

e)  ███████ shall have the right to execute immediate termination of this Agreement in the event that the HOTEL fails any on-site inspection conducted by representatives of ███████ or ███████ subsequent to the commencement date of the Agreement."

## 8.  Notices

a) Notices hereunder shall be sent by fax, email, international courier or first class recorded postal delivery.  The authorized addresses and fax numbers of the parties are as follows:

XXXXX                                The HOTEL COMPANY

b)  A notice given in writing in accordance with this paragraph will be deemed to have been received in the case of a fax, on issue to the sender of a written or printed confirmation report or, if the day of issue is not a business day, at 10a.m. (local time where the authorized fax number of the intended recipient is located) on the next business day. If in the case of email, the service is only effective when it is actually received in readable form and in the case of mail, on the date stated on the delivery note presented by the courier or postal representative upon delivery.

WT_000037

c) The term "business day" means a day which is not a Saturday or a Sunday or a public holiday in the country of transmission or the country where the authorized fax number of the intended recipient is located.

## 9.  Indemnity & Insurance

a) The HOTEL COMPANY shall be liable for and will defend, indemnify and hold harmless ▮▮▮▮▮, its agents, employees, officers and directors, including without limitation all Crew Members, in respect of any and all loss, cost, expenses, claims or legal proceedings for death or injury to any person, and loss of or damage to any property, arising out of the acts and/or omissions of the HOTEL COMPANY or the HOTEL COMPANY 's employees, officers, directors, agents or sub-contractors whether committed in the performance of this Agreement or otherwise.

b) The HOTEL COMPANY shall arrange and maintain comprehensive public liability insurance with a reputable insurance company to cover all of its liabilities arising under this Clause 12 and if so requested shall forthwith produce a certified copy of the policy of insurance and a receipt for the payment of the current premium to ▮▮▮▮▮ for its inspection.  Any limitations, monetary or otherwise, in such policies shall be notified to ▮▮▮▮▮ but any such limitations shall not be construed as a limit on the liability of the HOTEL COMPANY under this Clause 12 and the HOTEL COMPANY shall remain liable in full for the matters and to the extent not covered by the policy.

It is agreed and understood that ▮▮▮▮▮ is authorized to negotiate contractual obligations on behalf of ▮▮▮▮▮ regarding ▮▮▮▮▮ lodging, subject always to the agreement and consent of ▮▮▮▮▮. HOTEL COMPANY will seek collection only from ▮▮▮▮▮. HOTEL COMPANY indemnifies and holds XXXXX harmless from any liabilities, charges or attorney fees incurred in the collection of amounts due from ▮▮▮▮▮

## 10. Force Majeure

In the event that the performance of this Agreement by either ▮▮▮▮▮ or the HOTEL COMPANY is interrupted or prevented by force majeure, including, but not limited to, acts of God, flood, typhoon, earthquake, tidal wave, landslide, fire, plague, epidemic, quarantine restriction, perils of the sea, war or serious threat of the same, civil commotion, act of terrorism or serious threat of the same, blockade, arrest or restraint of government, rules or people, sabotage, or any other causes or circumstances whatsoever beyond the hindered party's reasonable control that makes it illegal or impossible to travel, then that hindered party shall not, whilst the event of force majeure continues, be liable for loss or damage, or failure or delay in performing its obligations under this Agreement.

## 11. Assignment

WT_000038

The HOTEL COMPANY agrees to notify ██████ of any impending change in ownership or Management Company or impending bankruptcy or receivership proceedings.  HOTEL COMPANY shall not have a right to terminate this Agreement in the event of a change ownership, management or chain.

## 12. Confidentiality

The HOTEL COMPANY and ██████, their servants, officers, directors, agents or representatives shall not disclose to any third party the terms or existence of this Agreement unless the prior written agreement of both parties has been obtained and except as may be reasonably incidental to performance of their respective obligations under this Agreement or if disclosure is required by law.  In the event that any disclosure of the terms or existence of this Agreement is required by law, the disclosing party shall forthwith advise the other party hereto of such impending disclosure, whereupon the parties hereto shall cooperate in good faith to ensure that only such disclosure as is required by law shall be made.

For the avoidance of doubt, ██████ shall have the right to disclose the terms of this Agreement to its subsidiaries, affiliated companies or any consultants, controllers or professional advisers appointed by ██████ as the case may be, without the prior written agreement of the HOTEL COMPANY.

## 13. Applicable Laws

XXXXXXXXXXXXXXXXXXXXXXXX

## 14. Supply Chain Sustainability Code of Conduct

"Code of Conduct" means the ██████ Supply Chain Sustainability Code of Conduct.  The Code of Conduct is published on the ██████. It may be amended from time to time. HOTEL COMPANY shall keep itself informed of any amendments to the Code of Conduct by regularly consulting the latest edition.

In performing its obligations under this Agreement, the HOTEL COMPANY shall comply (and shall procure that each of its employees, agents and subcontractors comply) at all relevant times with the Code of Conduct.  For the purpose of ensuring that the HOTEL COMPANY is complying with the

39

WT_000039

Code of Conduct, the HOTEL COMPANY shall as reasonably requested by ███████ from time to time allow ███████ to inspect the production process of the goods or performance of the services.

The HOTEL COMPANY shall notify ███████ as soon as reasonably practicable if it becomes aware that performance of its obligations under this Agreement may breach the Code of Conduct. The HOTEL COMPANY shall promptly provide ███████ with a corrective action plan to be implemented within a specific time period agreed by the HOTEL COMPANY and ███████. If the HOTEL COMPANY fails to comply with the corrective action plan, then ███████ may by written notice terminate this Agreement and any other contractual agreement with the HOTEL COMPANY. Upon termination, the HOTEL COMPANY shall on demand:

a) return to ███████ all amounts paid to the HOTEL COMPANY with respect to goods or services to the extent that those goods have not been delivered to ███████ and/or those services have not been completed in accordance with this Agreement or any other contractual arrangements between ███████ and the HOTEL COMPANY;

b) return to ███████ all written information provided by ███████ in connection with this Agreement and any other contractual arrangements between ███████ and the HOTEL COMPANY (including any plans, drawings, specifications, data and any other information whatsoever provided by or at the order of ███████).

Upon termination, neither party shall have any further obligations to the other, save for obligations which accrued before that termination and any obligations expressly stated to survive the termination of this Agreement or the relevant contractual arrangements.

## 15. Anti-bribery Provisions

The HOTEL COMPANY represents warrants and undertakes that:

a) It has read and understood the "Expectations of Business Partners" set out in Appendix 2 of this Agreement.

b) It is in compliance with the "Expectations of Business Partners" and all applicable anti-bribery laws in connection with the performance of this Agreement.

c) In the event the HOTEL COMPANY subcontracts any of its rights or obligations under this Agreement to a sub-contractor or sub-agent pursuant to the terms of this Agreement, it shall ensure that every sub-contractor or sub-agent contains anti-bribery terms equivalent to those imposed on the HOTEL COMPANY, whether contained in this Agreement or agreed separately.

d) It shall promptly report to ███████ any request or demand for any undue financial or other advantage of any kind received by the HOTEL COMPANY in connection with the performance of this Agreement. The HOTEL COMPANY further represents and warrants that to the best of its knowledge and belief neither it nor any of its affiliates, officers, directors, employees and sub-contractors or sub-agents appears on any list of entities or individuals debarred from tendering or participating in any project funded by any multi-lateral or bi-lateral aid agency, has at any time been found by a court in any jurisdiction to have breached any anti-bribery laws or has at any time been investigated or is being investigated or been suspected in any

40

jurisdiction of having engaged in any conduct which would constitute a breach of any anti-bribery laws.

## 16. Services to be provided by ███████

HOTEL COMPANY acknowledges and agrees that:

a) ███████ has appointed ███████ as its managed services provider in respect of Crew Member hotel accommodation and ███████ shall act as the contract manager representing ███████ in dealing with day-to-day operational matters with HOTEL and HOTEL COMPANY in connection with this Agreement;

b) HOTEL and HOTEL COMPANY shall work with ███████ (in its capacity as ███████ appointed contract manager) with respect to the HOTEL and this Agreement including, but not limited to: (i) termination, extension or renewal of this Agreement (ii) negotiation or agreement as to costs, fees and rates in connection with this Agreement; ~~(iii) [insert]; and (iii) [insert];~~

c) ███████ may by notice require it to work with another contract manager as replacement of and/or change the scope in which the HOTEL COMPANY shall work with ███████ or such replacement contract manager; and

d) ███████ or such replacement contract manager is appointed by ███████ to manage the day-to-day operational matters only, which shall not include making, defending or settling of any legal claims in connection with this Agreement or providing any services not in conformance with the terms of this Agreement.   If ███████ or any replacement contract manager notifies or instructs HOTEL COMPANY of any of the above matters, HOTEL COMPAY shall promptly seek confirmation from ███████ and shall not act on any such notice or instruction until ███████ has verified it.

e) Any agreement between HOTEL COMPANY and XXXXX shall be signed solely by ███████ and under no circumstances is ███████ authorized to enter into this Agreement with HOTEL COMPANY.

## 17. Miscellaneous

a)  The HOTEL COMPANY also represents and warrants that the services provided to the Crew Members during their stay at the HOTEL shall be in every way identical with those available to its full-tariff guests.

b)  The HOTEL COMPANY may not assign or transfer any of its rights, obligations or interests hereunder to any party without ███████ prior written consent.

c)  The HOTEL COMPANY shall not use ███████ trademarks, corporate name and other source or business identifiers in connection with the HOTEL COMPANY's promotional and marketing materials, publicity, marketing and advertising, without ███████ prior written consent.

d)  The HOTEL COMPANY agrees that under no circumstances shall it publicize to its other HOTEL guests or to the public that ███████ Crew Members are staying at the HOTEL. The HOTEL

41

COMPANY shall safeguard this information and shall not divulge room numbers of Crew Members to any other person but if requested, will offer to have the Crew Member contacted by telephone.

e)  At the time of check-out, the HOTEL employees shall not carry crew baggage except for loading onto crew bus.  No amendment to this Agreement will be effective unless in writing and executed by both parties.

f)  HOTEL COMPANY acknowledges that ▮▮▮▮ sole obligations pursuant to this Agreement shall be to provide the Services specified in Clause 20 of this Agreement as agent for ▮▮▮▮.

g)  In the event any matter not mentioned in this Agreement arises, ▮▮▮▮ and the HOTEL COMPANY shall co-operate and consult with each other on a case by case basis and attempt to solve any problem amicably and in good faith.

## 18. Emergency Undertaking

a)  In the unlikely event of a major incident involving ▮▮▮▮ aircraft and/or passengers, HOTEL COMPANY agrees to provide ▮▮▮▮ with all unsold rooms that it requires for the use of ▮▮▮▮ staff, passengers and all relatives for as long as the rooms are available.

b)  HOTEL COMPANY further agrees that:

i)  The room rate will be the same as the crew rate as stipulated in Clause 3a) or at best rate available;

ii) It will close sales and book all available rooms to ▮▮▮▮ and block additional rooms as they are vacated;

iii)HOTEL restaurant will be kept open around the clock if necessary and light refreshments will be made available for all conference rooms;

iv)HOTEL shuttle service will be made available to assist with transportation needs;

v)  parking facilities will be provided for ▮▮▮▮ staff on provision of valid ID; and

vi)HOTEL staff will be notified of the sensitive nature of the incident.

c)  ▮▮▮▮ agrees that in such an event it will:

i)  Pay for all rooms used under this clause;

ii) Pay any additional sums reasonably incurred in respect of other facilities used such as conference facilities and restaurants; and

iii)Continually update HOTEL COMPANY as to the requirement of rooms and notify them of predicted requirements.

WT_000042

Agreed and accepted on behalf of:

XXXXX

WT_000043

**Agreement 2**

AGREEMENT REGARDING ACCOMMODATION OF  AIRLINE CREW

between



and

**AGREEMENT REGARDING ACCOMODATION OF ▮▮▮▮▮ CREWS AND OTHER PERSONNEL**

WT_000044

This agreement is entered into on this day, ██████████ by and between:

██████████████

██████████████

████████

hereinafter referred to as "██████████"

and

██████████████

██████████████

██████████████

██████████████

██████████████

hereinafter referred to as **"Hotel".**

**1  SCOPE OF AGREEMENT**

Subject to the terms and conditions of this agreement, Hotel undertakes to make available Hotel rooms during the term of this agreement for accommodation of ████ aircraft crew, other aircraft crew operating on behalf of ██████ ('Wet Lease Crew'), (hereinafter all jointly referred to as "Crew Members") and other employees and so called distressed passengers at the prices set out herein.

████ enters into this agreement on its own behalf and on behalf of each member of the ██████. Each member of the ██████ may benefit from this agreement and shall be responsible for the acts and omissions under this agreement of the members of the ██████ Group as for its own acts and omissions . The "██████ Group" means ██████ and all companies/entities in which ██████, from time to time, directly or indirectly owns more than 50 percent of the issued share capital and/or votes.

The Agreement comprises this main agreement and the following annexes:

Annex 1          Annex 2

WT_000045

Annex 3    ██████ Rates ██████ Crew Members

Annex 4    ██████ Rates Other ██████ Employees and Distressed Passengers (!RR) Contact
Persons

██████ General Terms and Conditions
██████ Code of Conduct

WT_000046

In case of any discrepancy between the main agreement and the annexes, the main agreement shall prevail and, in case of any discrepancy between the annexes, !he annexes shall prevail in the order set out *above*.

*2.* ROOM REQUIREMENT PLANS

████ will for each calendar month (on or around the 17th day of the preceding month and in any event at least two weeks before the date the rooms are to be used) send to Hotel a firm order plan in writing for rooms at the Hotel required for that particular month (each such plan a "Room Requirement Plan"). Each Room Requirement Plan will set out the dates when Hotel rooms are being requested, the number of Hotel rooms required for each such date, the time *of* day that such Hotel rooms should be available and any special requirements or service requests in relation to stays at the Hotel. The Room Requirement Plan is binding on the Hotel and Hotel undertakes to provide Hotel rooms in accordance therewith.

Each Room Requirement Plan will constitute a binding order by ████ for Hotel rooms, provided, however, that ████ shall have the right through written notice to Hotel:

(i)     no later than 6:00 PM local time on the day before scheduled arrival, to freely add subject to availability as well as cancel an unlimited number of Hotel rooms in relation to the Room Requirement Plan; and

(ii)    no later than 1:00 PM local time on the scheduled date of arrival, to add subject to availability or cancel up to 2 rooms.

Changes to the Room Requirement Plan requested in accordance with (i) - (ii) above shall be binding on Hotel and Hotel undertakes to provide Hotel rooms in accordance therewith.

Hotel may not relocate Crew Members unless ████ has specifically approved such relocation in writing. Relocation will only be accepted in exceptional circumstances and at ████ sole discretion.

Any and all costs and expenses, including transportation, for relocations will be borne by Hotel. ████ shall only be charged with the standard room rate set out in Annex 1 and Annex 2.

47

█████ will no later than on the day before scheduled arrival send to Hotel a list specifying the names of the Crew Members who will be accommodated in the Hotel rooms together with estimated check-in times.

Check-in or check-out before or after regularly posted check-in and check-out times of the Hotel may be done by the Crew Members at no additional charge or costs. Early check- in applies as agreed with the Hotel and late checkout until 05.00 p.m. local time.

### 3    HOTEL'S OBLIGATIONS

#### 3.1    ROOMS, STANDARD AND SAFETY

Hotel rooms ordered hereunder shall always be properly cleaned in accordance with good international hotel standards.

All rooms shall further be equipped with a bath and/or shower, toilet facility and other facilities which other international hotels of equal standard offer.

The locations of the offered rooms within the Hotel should be such as that every reasonable effort has been done by the Hotel to avoid disturbance from local traffic, lifts, kitchen, night clubs or similar activities.

Rooms on the ground floor should not be allocated to █████ crew.

The Hotel undertakes to maintain all applicable national standards of regulation for security and safety, but in no event less than █████ standard requirements *for* security and safety as communicated by █████ █████ may inspect the observance of such rules and regulations at any time .

#### 3.2    ROOMS, AVAILABILITY

The Hotel guarantees that all rooms ordered through a Room Requirement Plan (as amended in accordance with section 2.2) shall always be available at the dates and times set out in such Room Requirement Plan.

If one or more rooms should not be ready for use in compliance with a confirmed Hotel room order, █████ shall receive a discount of 25 % of the agreed Hotel room price for each commenced hour of delay and room.

48

WT_000048

### 3.3    MISCELLANEOUS

██████ shall always be treated as most favoured customer, and in all respect be guaranteed the best possible service in relation to other customers.

All rooms shall be non-smoking rooms, except for smoking rooms which have been requested in advance in a Room Requirement Plan.

Family members and other associated persons may stay in the Crew Member's Hotel room at no extra cost. Breakfast is not included.

All Hotel facilities such as sauna, swimming pool, training and exercise facilities, etc. may be used free of any additional charge by the Crew Members provided these facilities are not run by a third party and therefore would cause the Hotel extra costs.

The Hotel shall be responsible for ensuring that the personal expenses of the Crew Members are collected upon departure.

49

WT_000049

**4    PRICES AND DISCOUNTS**

All prices are set out in Annex 1-2. ▮▮▮▮ shall pay the Hotel room rates detailed in Annex 1-2, which are inclusive of any and all service charges, excluding applicable VAT, city tax and other taxes. Breakfast is excluded.

**5    INVOICING AND PAYMENT**

Invoices related all Crew Members, except Wet Lease Crew, shall be submitted electronically via  invoicing system monthly in arrears and shall fall due for payment 45 days after receipt by ▮▮▮▮.

Invoices related ▮▮▮▮ Group aircraft crew shall contain a reference to the ▮▮▮▮ Group company to which the relevant aircraft crew belongs.

Invoices related to Wet Lease Crew shall be submitted to the operating carrier to which the relevant crew belongs. In the event a separate agreement with the operating carrier is requested, the same prices as in Annex 1 shall apply to that agreement.

No invoice, administration, service charge or other charge may be added to the invoice and all applicable taxes shall be specified therein .

The invoice shall also refer to the applicable Room Requirement Plan and shall specify number of rooms used during the relevant month, and shall be dated and submitted the last day of the month.

Invoices related all Crew Members, except Wet Lease Crew, should be addressed as follows (failure to use the correct address details may result in a payment delay, which delay will be for Hotel's risk and account):



Invoices can be emailed to ▮▮▮▮▮▮▮▮▮▮▮▮

WT_000050

6    **CONTACT**

The persons set out in Annex 3 shall be each party's primary point of contact for all matters concerning the administration, interpretation, performance and review of this agreement. All notifications under this agreement shall be made in writing and be addressed in accordance with Annex 3

# 7   TERM AND TERMINATION

### 7.1    TERM OF AGREEMENT

This agreement shall become effective as of 01April 2019 and shall continue in force up to and including 31march 2021.

If the agreement is not terminated by either party through written notice no later than 2 months prior to the expiry of the initial term or any extended term, the agreement shall be automatically extended on the same terms and conditions for additional periods of 1 year. In case of such extension, Hotel may increase the room rates set out in Annex 1 and Annex 2 by a maximum of 90% of the yearly increase (if any) in the in the Hotels and Restaurants-Index (HICP) with January 2020 as the base month and year. The first indexation may be made as per April 2021

## 7.2  TERMINATION FOR CAUSE

Each party shall have the right to terminate this agreement by written notice with immediate effect if:

(i) the other party is in breach of a material obligation of this agreement which has continued unremedied for more than 30 days after written notice thereof; or
{ii) the other party is reasonably deemed to be or becomes insolvent, is reasonably deemed to be or admits its inability to pay its debts as they mature, or otherwise files for or is declared bankrupt or in liquidation, receivership, debt restructuring, or seeks or enters into an arrangement with a majority of its creditors, or any other situation having a similar effect or result.

## 7.3    TERMINATION FOR CONVENIENCE

At any time during the term of this agreement, ████ shall have the right to cancel this agreement by giving 60 days advance written notice thereof and the Hotel shall have the corresponding right to cancel this agreement by giving 60 days advance written notice to ████. Termination in accordance with this section 7.3 shall not *affect* ████ duty to pay for Hotel rooms used up to and including the day of termination.

WT_000051

### LIABILITY AND DAMAGES

Each party is liable for any damage or loss caused through its wilful or negligent acts and omissions in connection with this agreement, and shall indemnify the other party from any damages, losses, costs or claims incurred in connection therewith. However, each party's liability hereunder is limited to direct damages only, provided however that in case of death or personal injury and/or in case of gross negligence or wilful misconduct, no limitation of liability shall apply.

The Hotel is responsible and liable for the actions and omissions of its subcontractors to the same extent as for its own acts and omissions.

**8 TERNAL INFORMATION**

All advertisements, articles, press releases and other information aimed at a wider circle of receivers, in which ████ is mentioned by name or with logo type, shall be approved in advance by ████ in writing.

**9 CONFIDENTIALITY**

Each party shall treat as confidential and shall not disclose to any third party any information relating to the other's business activities which is disclosed in writing or orally by the disclosing party to *the* receiving party and which is of a confidential, proprietary or commercially sensitive nature. The receiving party may not disclose such information to third parties without the explicit written consent of the disclosing party.

Further, confidential information provided by ████ to Hotel may only be used by the Hotel for the proper performance of its obligations hereunder and be made known solely to its employees and sub-contractors on a need-to-know-basis. The Hotel shall ensure that all employees and sub-contractors are made aware of and adhere to the confidentiality obligations herein.

The receiving party shall not be liable for disclosing confidential information of the other party if such information has already been disclosed to the public other than by breach of this obligation, or if the receiving party is under a duty by law *or* binding court order to disclose such information.

The confidentiality obligations herein shall survive termination of this agreement for a period of 5 years.

Notwithstanding the confidentiality provisions of the Agreement. ████ may share confidential and proprietary information provided by the Hotel with its alliance partners *for* the purpose of

52

WT_000052

developing potential joint bids, provided that the alliance partner agrees to being bound by the confidentiality obligations herein to the same extent as these obligations apply to ██████.

**10  FORCE MAJEURE**

To the extent a party is prevented from properly fulfilling this agreement by circumstances beyond its control, including but not limited to work stoppages, strikes, lock-outs, civil strikes, civil disobedience, national and international crisis, political and/or protest demonstrations, which circumstances such party could not reasonably have foreseen and the consequences of which it could not reasonably have avoided or overcome. such party shall be relieved from its duties to perform or to meet its obligations hereunder for as long as these circumstances prevail ("Force Majeure"). If a party is prevented from fulfilling this agreement due to such Force Majeure for a period exceeding 3 months, the other party shall be entitled to terminate the agreement, or parts thereof. For thee avoidance of doubt, Hotel rooms not utilized due to a Force Majeure event will relieve ██████ from all liability to pay for such ro.

WT_000053

**APPLICABLE LAW AND DISPUTE RESOLUTION**

This agreement will be governed by and construed in accordance with ███████████.

# Annex 1 ███ Rates ███ Crew Members

| Destination | Hotel Name | Currency | Crew Member Rate |
|---|---|---|---|
| ██████████████████████████████████████████████████████████████ | | | |

The ████ Crew Member Rate is per standard room per night excluding VAT but including City Tax and any other applicable taxes . Breakfast is excluded.

Transport to and from the airport is included in the room rate as of 2 crew members.

For a single crew member the hotel will arrange transport at and additional charge of €10 per way

A day room will be invoiced at 50% of the above rate. A day room is a room that is made available between 09.00 AM and 04.00 PM, local time.

Ordinary Breakfast Buffet price is offered to █████ Crew for EUR 11

In connection with departures before regular breakfast time of Hotel, Crew Members shall have the option to purchase a so called continental breakfast with yoghurt, bread, cheese and ham . The price for this service is EUR 7 and is to be requested in connection with check-in.

The payment for the breakfast is the responsibility of the Airline Crew member and is not to be invoiced to █████.

54

WT_000054

All prices for food and beverages (exclusive of alcoholic beverages, breakfast and tobacco) consumed in the Hotel restaurants by Crew Members will be reduced by 25% compared to the otherwise applicable price.

No fee will be collected for calling toll free number.

Hotel bikes may be borrowed upon availability  at no charge.

Access to internet will be *offered* to Crew Members at no

extra cost.

Crew Members have the right to receive a 15% discount on laundry services (if *offered).*

If transportation between the airport and the Hotel is to be arranged by the Hotel, prices and other conditions for that service will be negotiated separately.

## Annex 2     █████Rates Other XXXXX Employees and Distressed Passengers (███)

| Destination | Hotel Name | Currency | IRR Rate |
|---|---|---|---|
| ██████████████████████ | | EUR | 100 |
| Destination | Hotel Name | Currency | IRR Rate |
| ██████████████████████ | | EUR | 100 |

████employees (other than crew members) and distressed passengers will be accommodated by Hotel and included under this agreement upon ████request and subject to availability on the same terms and conditions as crew members.

The rate is per standard room per night excluding applicable VAT, City Tax and any other applicable taxes. Breakfast is included in the price offered.

WT_000055

Rates for group movements such as seminars, conventions, and meetings for 12
participants or more may be negotiated in each case based on market situation
at the destination.

WT_000056

Confidential

Issue date: ███████

## CREW ACCOMMODATION AGREEMENT

This agreement (hereinafter referred to as "Agreement") is entered by and between ███████████, (hereinafter referred to as "███████████" with registered office address XXXXX), acting by and through its limited agent, XXXXX  d/b/a XXXXX (hereinafter referred to as "XXXXX") and XXXXX (hereinafter referred to as "HOTEL COMPANY, relative to the provision by the HOTEL COMPANY of  lodging and other services at XXXXX (hereinafter referred to as "HOTEL") for the cockpit and cabin crews of XXXXX, as well as the crews of any third party authorized by XXXXX to operate its flights  (hereinafter collectively referred to as  "Crew Members"):

1.  **Validity Period**

    This Agreement shall commence with effect from 01March 2023 *(the "Effective Date")* and shall continue until 28February 2025 inclusive ("Initial Term"), with the option to be extended until 28February 2026 upon written notice being provided to the HOTEL COMPANY of at least 3 (three) months prior to the expiry date of the Initial Term at XXXXX's sole discretion, unless otherwise terminated in accordance with Clause 10 of this Agreement.

2.  **Provision of Rooms**

    a)  HOTEL COMPANY shall set aside the number of rooms at HOTEL appearing on the schedule which covers a thirty (30) day period, specifically for the purpose of accommodating Crew Members.  XXXXX will provide HOTEL COMPANY with the actual number of rooms required for the crew layovers during the upcoming thirty (30) day period with a room requirement schedule prior to the start of that period. The number of rooms appearing on this schedule will be reserved and set aside by HOTEL COMPANY for XXXXX's use.

    b)  The number of rooms actually required shall be based upon the prevailing crew layover patterns of XXXXX which may vary from time to time.

    c)  The HOTEL COMPANY shall guarantee immediate availability of the number of rooms agreed in Clauses 2a) and 2b) upon arrival of Crew Members no Crew Member shall be required to wait for a room. For the avoidance of doubt, the HOTEL COMPANY undertakes that all Crew Members shall be accommodated in the HOTEL at the location specified in this Agreement, and under no circumstances shall any Crew Members be accommodated in, transported or removed to, any other hotel premises during the Validity period of this Agreement.

    d)  Hotel shall provide wake up calls to all crew members sixty (60) minutes prior to the established hotel departure time listed on the schedule and signing sheet. The hotel understands that hotel departure time may vary or change due to operation needs, the hotel is responsible adjusting.

    e)  In the event XXXXX agrees that HOTEL COMPANY may walk Crew Members, and for reasons other than renovations or Force Majeure, HOTEL COMPANY agrees to procure and transport Crew Members to a hotel of equal or greater stature in a similar location, which is agreed to in writing by XXXXX. XXXXX shall pay the lower of the replacement hotel's rate or the rate outlined in this Agreement for such other hotel, and HOTEL COMPANY will provide XXXXX with pass thru billing whereby XXXXX will pay HOTEL COMPANY for such replacement accommodations as if the crew members had never been walked (i.e. HOTEL COMPANY will pay the replacement hotel and bill XXXXX the rate listed in this Agreement.)

    f)  There may be occasions where XXXXX requires more than the number of rooms listed on the schedule at any time during the month.  HOTEL COMPANY will make every reasonable effort to house the additional Crew Members, in rooms of an equal or higher standard, at the rate(s) set forth in Clause 3a). HOTEL COMPANY further agrees to provide XXXXX or XXXX electronically via XXXXsupplier portal a confirmation number for any additional rooms within twenty (20) minutes of booking request.

Registered office: ███████████████

WT_000057

Confidential

████████

Issue date: ████████

## CREW ACCOMMODATION AGREEMENT

If HOTEL COMPANY is not able to provide such additional rooms, HOTEL COMPANY will help ████████ or ████████ book it's Crew Members in other hotel facilities in the surrounding area that are of equal or better caliber. Rooms must be reserved under the ████████ name and flight number and not under individual Crew Members' names. HOTEL COMPANY will use appropriate sign in sheets, submitting same at month's end with invoices.

g)  The minimum standard for all rooms for Crew members shall be the Standard Room of the HOTEL. Rooms shall be allocated to Crew Members on a single occupancy basis. All rooms must contain blackout shades, iron, ironing board in room or on request, alarm clock, fridge, telephone with message light, and hairdryer.

h)  During the term should the operations of ████████ change or be revised resulting in increasing, reducing or eliminating the need for crew accommodation at the HOTEL, ████████ may increase, reduce or eliminate the room requirements specified in this Agreement  by notice with immediate effect and without penalty.

## 3.  Room Charges

a)  During the validity period of this Agreement, the room charges for Crew Members shall be a flat rate of:

01 March 2023– 29 Februrary 2024 USD95.00 per room per day plus11% tax ($105.45 inclusive of tax)
01 March 2024 -  28 February 2025 USD98.00 per room per day plus11% tax ($108.78 inclusive of tax)

b)  HOTEL COMPANY understands that ████████ monthly flight schedule may have early arriving flights.  The rooms for the early arriving Crew Members are to be held the night prior in order for the Crew Members to check-in prior to 11AM. If the hotel is at 90% occupancy the night prior of the scheduled arrival date.  HOTEL COMPANY will charge ████████ for the scheduled rooms being held the night prior the 50% contracted rate in accordance with Clause 3a) based on tiered pricing.

c)  HOTEL COMPANY will not charge ████████ a second day charge for rooms checking out prior to 4PM for evening flight departures. For departures after 4PM, ████████ will be charged 50% contracted rate in accordance with Clause 3a) tiered pricing if the hotel is at 90% occupancy or higher the night of the departure. The monthly flight schedule will show the total number of rooms ████████ will be responsible to pay not including early arrival and late check-out fees based on arrival/departure times or any extra room requests which require written authorization in the form of an email or fax from ████████ or its representative.

d)  No show rooms will only be billed if HOTEL COMPANY has displaced revenues for those room nights when HOTEL reaches 100% occupancy rate.  HOTEL COMPANY shall submit an occupancy report in support of any displaced revenues.   If HOTEL COMPANY is able to sell any cancelled or no show room(s) for any given night, then no charges will be assessed for the night regardless of ████████ attrition.

e)  In compliance with applicable laws, the ████████ rooms will be tax exempt after 31 days of continuous occupancy at HOTEL.  At that time, taxes already paid within the 30 days will be refunded back to ████████.  Any rooms used above the minimum number of continuously occupied rooms per night will be subject to the applicable tax of 11%.  This will remain in force as long as the tax laws remain as such. If there are any changes to the tax laws, HOTEL COMPANY is required in writing to provide such changes to ████████ and ████████.

Registered office: ████████████████

**Confidential**

█████████

Issue date: ████████

## <u>CREW ACCOMMODATION AGREEMENT</u>

f) The HOTEL COMPANY shall not charge ████████ or any Crew Member for family members or friends sharing a room with a Crew Member. Maximum number of occupants per room is 4, including the Crew Member.

g) During the validity period of this Agreement, the HOTEL COMPANY agrees to charge all staff of ████████ travelling on business or leisure and any disrupted passengers the same rate as stipulated in Clause 3a) a flat rate of USD95 per room per day exclusive of 11% tax and inclusive of complimentary in-room internet access (Wi-Fi) when Hotel is at 90% occupancy or lower and at USD149 exclusive of 11% tax when Hotel is at 90% occupancy or higher.

h) During the validity period of this Agreement, HOTEL COMPANY is responsible to ensure ████████ contracted room rate stated in Clause (3g) is made available by the HOTEL COMPANY's appointed ████████ for accessibility and that the contracted room rate is up to date and available at the time of booking.

i) Rates for ████████ Corporate Travel will be loaded by HOTEL COMPANY into ████████ utilizing the instructions in Appendix 1.

j) For staff travelling on business, the invoice, statement or receipt issued by the HOTEL COMPANY shall be made in the name of '████████ in addition to the name of the staff member; and must clearly show each of the applicable tax being charged.

k) Hotel agrees to provide rooms, upon availability, for all Airline employees at the rates listed above while travelling on leisure travel. The hotel shall load the above room rates on the GDS on the basis of defined viewer-ship utilizing the following information:



IATA #:
Pseudo City Code:
Rate Code:
Description:
GDS:
These rates should be made available through the ████████ until the hotel has reached 95% booked occupancy. Hotel agrees to have the rates loaded into the ████████ immediately upon signing of this Agreement.

l) ████████ may book up to four (4) rooms per contract year for member(s) of Airline Crew Administration to conduct unannounced quality assurance visits at HOTEL. In an attempt to keep room inventory available during busy times, such visits will be booked under Crew Member status no more than forty-eight (48) hours prior to the visit. Upon ████████ written notification to HOTEL COMPANY that a quality assurance visit has taken place, HOTEL COMPANY will deduct these room(s) from the monthly invoice billing.

**4. Room Allocation**

The HOTEL COMPANY agrees that:

a) Crew Members shall not be allocated rooms on the ground floor, or rooms that have adjoining doors, or are near noisy areas, such as night clubs, lobbies, private function rooms, room service centres, elevators, vending machines and other locations likely to produce noise. Crew shall not be allocated to rooms for physically challenged guests.

b) Crew Members shall be allocated the quietest rooms for maximum crew rest.

Registered office: ████████████

WT_000059

Confidential

<span style="background:black;color:black">████████</span>

Issue date: <span style="background:black;color:black">████████</span>          **CREW ACCOMMODATION AGREEMENT**

    c)   All Crew Members shall be allocated to non-smoking rooms.

    d)   In the event 'Do Not Disturb' sign is on, the room should not be entered by HOTEL staff except for emergency reason.

    e)   In the event HOTEL COMPANY receives 3 or more complaints within a thirty (30) day period for the same type of complaint from ████████ and one or more Crew Members are unable to fly as a result of the equivalent complaint, ████████ shall be reimbursed 100% for the room nights of said effected Crew Members.

    f)   HOTEL COMPANY will award ████████ with three (3) room nights free of charge for every scheduled Crew Member that is moved to another hotel.

HOTEL COMPANY will provide one (1) room night free of charge for every scheduled Crew Member that waits over thirty (30) minutes from the time of entry into Hotel to receive his/her room key. Should the crew arrive earlier than monthly schedule, ████████ must provide ample time for preparations.

**5.  Benefits for ████████ Staff**

The HOTEL COMPANY shall provide the following benefits to each ████████ Staff Member:

    a)   A special rate of $13.00 inclusive of tax and service charge for the 2 Eggs Your Way breakfast at ████████ Restaurant inclusive of hot and cold food items for 12/1/2022 - 11/30/2023 and no more than 3% increase for 12/1/2023 – 11/30/2023.

    b)   10% discount on all food and beverages within the HOTEL, including room service, alcoholic beverages, or special promotions but excluding ████████ 2 Eggs Your Way breakfast.

    c)   35% discount on all laundry charges within the HOTEL.

    d)   Complimentary internet access (Wi-Fi) in the rooms and in the public areas.

    e)   Complimentary use of the following facilities: Fitness Centre and Pool.

    f)   Complimentary use of crew lounge located on 2nd Floor with 2 computers for internet access, tea/coffee making facilities accessible 24 hours daily.

    g)   Complimentary bottled water (2) per day per room.

    h)   Complimentary tea/coffee making facilities in the room.

    i)   Complimentary use of safety deposit boxes in-room.

    j)   HOTEL COMPANY shall provide an expedited check-in and check-out procedure for Crew Members.

    k)   In the event of a serious illness that might require hospitalization or a visit to a medical facility, the HOTEL staff shall escort the affected Crew Members to the particular hospital.

    l)   24-Hours room service with a reasonable variety of hot and cold food beverages.

    m)   Complimentary Hotel Shuttle within a 5-miles radius of hotel on a request basis.

Registered office: <span style="background:black;color:black">████████</span>

**Confidential**

███████

Issue date: ███████

<b><u>CREW ACCOMMODATION AGREEMENT</u></b>

**6.  Allowances**

a)  The HOTEL COMPANY shall, without delay, provide the latest restaurant menus and any other relevant information for review of meal prices on twice a year basis by 1 June and 1 December and any other time during the year where there is to be a significant menu change, to the following party:
Email: ███████@███████.com

**7.  Payment of Room Charges & Personal Accounts**

a)  The HOTEL COMPANY shall invoice ███████ for the Hotel Accommodation supplied on the basis and in the form determined by ███████.

b)  Payment for room charges for Crew Members shall be made by ███████ directly to the HOTEL COMPANY.  The HOTEL COMPANY shall render to ███████ a monthly consolidated statement of all room charges incurred in relation to the rooms occupied by Crew Members in any period. ███████ shall make payment to the HOTEL COMPANY within forty five (45) days of receipt of a validly presented and accurate statement.  In the event that ███████, acting in good faith, has reason to believe that any statement rendered to it pursuant to this Clause 8b) is inaccurate or incomplete, the time within which ███████ shall be obligated to make payment in respect of said statement shall be deferred until such time that the parties hereto have resolved any queries or questions raised by ███████.

c)  The HOTEL COMPANY shall follow the new ███████ Invoicing Procedures when notified by ███████ or ███████.

  i)  HOTEL COMPANY will enter the arriving Crew Members' identification numbers from the sign in sheet into the ACES invoicing system on a daily basis.  Within five (5) business days following the end of the month, HOTEL COMPANY will utilize the ███████ invoicing system to create an electronic invoice for the prior month.  Invoices will only be paid upon proper submission of the electronic invoice through the ███████ invoicing system.  Invoices are due and payable by ███████ within forty (45) business days of ███████ acceptance of the electronic invoice submitted.

  ii)  Except as otherwise provided in this Agreement, ███████ will only pay for rooms used by Crew Members. All determinations of whether a room was occupied by a Crew Member will be made by reference to the ███████ electronic sign in sheet entry provided by HOTEL COMPANY on the ███████ invoicing system.

  iii)  Upon request from ███████, HOTEL COMPANY shall include in the electronic invoice submission as an attachment, original hotel invoice, original hardcopy sign-in sheets, hotel occupancy report and/or guest folio for the Services. HOTEL COMPANY shall retain all original hardcopy sign-in sheets for a period of not less than one hundred and eighty (180) days from invoice date.

  iv)  HOTEL COMPANY shall establish direct billing privileges for ███████ and render invoices for the room accommodations and related services on a monthly basis.  Payment terms shall be billing every forty five (45) business days.  Payment net forty five (45) business days upon receipt of the properly submitted invoices via ███████ invoicing system.

d)  HOTEL COMPANY shall email the invoices for Crew accommodations to:
███████@███████.com and where requested to ███████@███████.**com**

e)  It is expressly acknowledged by HOTEL that ███████ acting solely as agent for a disclosed principal, ███████, and that ███████ and/or its related entities and/or affiliates shall have no direct liability for payment to HOTEL for any charges incurred by ███████.

5 of 12

Confidential

██████████

Issue date: ██████████

## CREW ACCOMMODATION AGREEMENT

f) Payment for telephone charge of 'Duty Travel Medical Assistance Programme' hotline [Telephone number: Call from USA and Canada: +1 ██████ and call from other countries: +1 ██████ ] shall be made by ██████ directly to the HOTEL COMPANY. The HOTEL COMPANY shall render to ██████ a statement of all telephone charges made to the above numbers by Crew Members. Payment schedule shall follow the same as Clause 8a).

g) Crew Members shall not be required to provide security in any form to the HOTEL COMPANY for incidental items charged to their personal account by the HOTEL COMPANY. The HOTEL COMPANY shall present individual Crew Members with a consolidated statement of their personal accounts at the time said Crew Members check-out of the HOTEL after their stay, and said accounts shall be payable by Crew Members directly to the HOTEL.

h) It shall be the sole responsibility of the HOTEL COMPANY to recover personal charges incurred by Crew Members directly from said Crew Members at the time they check-out from the HOTEL. ██████ shall not accept responsibility for uncollected or late charges levied in respect of personal charges incurred by any Crew Members. ██████ may be able to assist in the collection of outstanding charges from Crew Members.

## 8.   Refurbishment

Prior to the HOTEL COMPANY undertaking any planned, non-emergency refurbishment work within the HOTEL or its grounds that has impact on guestrooms or significant noise within guestroom premises, the HOTEL COMPANY shall give sixty (60) days' prior written notice to ██████ and/or ██████ of the scope, duration and schedule of planned refurbishment. The HOTEL COMPANY shall make all efforts to ensure that the Crew Members are able to take undisturbed rest at all times. Should ██████ determine at itsdiscretion that this is not possible, the HOTEL COMPANY shall at its cost arrange alternative accommodation for Crew Members during the period of refurbishment works at a hotel which, in ██████ view, is at least of an equivalent standard to the HOTEL. The HOTEL COMPANY shall give sufficient notice to ██████ in planned refurbishment situations and notice as soon as possible in emergency situations so that the appropriate hotel assessment(s) can be carried out prior to the move. Whatever the arrangement, there shall be no additional cost to ██████.

## 9.   Termination

a) In the event that the HOTEL fails to meet the contractual standards required by ██████ and the HOTEL COMPANY refuses, neglects or fails to rectify the defects/breaches to the reasonable satisfaction of ██████ within a reasonable time frame relative to the seriousness of the situation specified by ██████, ██████ may terminate this Agreement by giving seven (7) days written notice to the HOTEL COMPANY.

b) During any cure period for HOTEL's breach under this Clause 10a), ██████ reserves the right to relocate Crew Members to another hotel of at least equal quality. HOTEL COMPANY will pay the alternate hotel and bill ██████ either the rates specified in Clause 3a) or the alternate hotel's rate, whichever is lower. The HOTEL COMPANY may terminate this Agreement by giving sixty (60) days' prior written notice to ██████ if ██████ fail to pay the HOTEL COMPANY in accordance with the provisions of Clauses 8 hereof.

c) ██████ may terminate this Agreement by giving seven (7) days' prior written notice to the HOTEL COMPANY in the event of :

   i)   Any material breach by the HOTEL COMPANY of any provision of this Agreement; or

   ii)  Termination of Crew Members' layover in the city where the HOTEL is situated, or

   iii) Overriding operational reasons of ██████ ; or

Registered office: ██████████████████

WT_000062

**Confidential**

██████

Issue date: ██████          <u>**CREW ACCOMMODATION AGREEMENT**</u>

    iv)  Overriding security concerns of ██████; or

    v)  Financial difficulties of the HOTEL COMPANY where the HOTEL COMPANY is or is deemed to be or admits that it is insolvent or unable to pay its debts as they fall due or suspends or announces its intention to suspend payment of all or a class of its indebtedness or a moratorium is declared in respect \of any of its indebtedness or a winding-up petition or order is filed or made against the HOTEL COMPANY.

    vi)  If HOTEL changes ownership, management or chain affiliation and cannot carryout contract terms.

    d)  ██████has the right and may terminate this Agreement prior to the expiration date herein stipulated without cause and without penalty.  In such an event, ██████shall provide a written ninety-day (90) prior notice stating the intent to terminate this Agreement.   In the event this Agreement is between ██████and a HOTEL COMPANY which has never previously provided rooms at HOTEL to Crew Members, ██████may terminate this Agreement within ninety (90) days from the Effective Date in its sole and absolute discretion without cause and without penalty upon five (5) days written notice to HOTEL COMPANY.

    e)  ██████shall have the right to execute immediate termination of this Agreement in the event that the HOTEL fails any on-site inspection conducted by representatives of ██████or ██████subsequent to the commencement date of the Agreement."

## 10.  Notices

    a)  Notices hereunder shall be sent by fax, email, international courier or first class recorded postal delivery. The authorized addresses and fax numbers of the parties are as follows:

    XXXXX                                        The HOTEL COMPANY

    b)  A notice given in writing in accordance with this paragraph will be deemed to have been received in the case of a fax, on issue to the sender of a written or printed confirmation report or, if the day of issue is not a business day, at 10a.m. (local time where the authorized fax number of the intended recipient is located) on the next business day. If in the case of email, the service is only effective when it is actually received in readable form and in the case of mail, on the date stated on the delivery note presented by the courier or postal representative upon delivery.

    c)  The term "business day" means a day which is not a Saturday or a Sunday or a public holiday in the country of transmission or the country where the authorized fax number of the intended recipient is located.

## 11.  Indemnity & Insurance

    a)  The HOTEL COMPANY shall be liable for and will defend, indemnify and hold harmless ██████, its agents, employees, officers and directors, including without limitation all Crew Members, in respect of any and all loss, cost, expenses, claims or legal proceedings for death or injury to any person, and loss of or damage to any property, arising out of the acts and/or omissions of the HOTEL COMPANY or the HOTEL COMPANY 's employees, officers, directors, agents or sub-contractors whether committed in the performance of this Agreement or otherwise.

Registered office: ██████

Confidential

**Issue date:** ███████        <u>**CREW ACCOMMODATION AGREEMENT**</u>

b) The HOTEL COMPANY shall arrange and maintain comprehensive public liability insurance with a reputable insurance company to cover all of its liabilities arising under this Clause 12 and if so requested shall forthwith produce a certified copy of the policy of insurance and a receipt for the payment of the current premium to ███████ for its inspection. Any limitations, monetary or otherwise, in such policies shall be notified to ███████ but any such limitations shall not be construed as a limit on the liability of the HOTEL COMPANY under this Clause 12 and the HOTEL COMPANY shall remain liable in full for the matters and to the extent not covered by the policy.

It is agreed and understood that ███████ is authorized to negotiate contractual obligations on behalf of ███████ regarding ███████ lodging, subject always to the agreement and consent of ███████. HOTEL COMPANY will seek collection only from ███████. HOTEL COMPANY indemnifies and holds XXXXX harmless from any liabilities, charges or attorney fees incurred in the collection of amounts due from ███████.

## 12. Force Majeure

In the event that the performance of this Agreement by either ███████ or the HOTEL COMPANY is interrupted or prevented by force majeure, including, but not limited to, acts of God, flood, typhoon, earthquake, tidal wave, landslide, fire, plague, epidemic, quarantine restriction, perils of the sea, war or serious threat of the same, civil commotion, act of terrorism or serious threat of the same, blockade, arrest or restraint of government, rules or people, sabotage, or any other causes or circumstances whatsoever beyond the hindered party's reasonable control that makes it illegal or impossible to travel, then that hindered party shall not, whilst the event of force majeure continues, be liable for loss or damage, or failure or delay in performing its obligations under this Agreement.

## 13. Assignment

The HOTEL COMPANY agrees to notify ███████ of any impending change in ownership or Management Company or impending bankruptcy or receivership proceedings. HOTEL COMPANY shall not have a right to terminate this Agreement in the event of a change ownership, management or chain.

## 14. Confidentiality

The HOTEL COMPANY and ███████, their servants, officers, directors, agents or representatives shall not disclose to any third party the terms or existence of this Agreement unless the prior written agreement of both parties has been obtained and except as may be reasonably incidental to performance of their respective obligations under this Agreement or if disclosure is required by law. In the event that any disclosure of the terms or existence of this Agreement is required by law, the disclosing party shall forthwith advise the other party hereto of such impending disclosure, whereupon the parties hereto shall cooperate in good faith to ensure that only such disclosure as is required by law shall be made.

For the avoidance of doubt, ███████ shall have the right to disclose the terms of this Agreement to its subsidiaries, affiliated companies or any consultants, controllers or professional advisers appointed by ███████ as the case may be, without the prior written agreement of the HOTEL COMPANY.

## 15. Applicable Laws

XXXXXXXXXXXXXXXXXXXXXX

**Confidential**

██████████

Issue date: ████████          **CREW ACCOMMODATION AGREEMENT**

**16. Supply Chain Sustainability Code of Conduct**

"Code of Conduct" means the ██████ Supply Chain Sustainability Code of Conduct. The Code of Conduct is published on the ██████. It may be amended from time to time. HOTEL COMPANY shall keep itself informed of any amendments to the Code of Conduct by regularly consulting the latest edition.

In performing its obligations under this Agreement, the HOTEL COMPANY shall comply (and shall procure that each of its employees, agents and subcontractors comply) at all relevant times with the Code of Conduct. For the purpose of ensuring that the HOTEL COMPANY is complying with the Code of Conduct, the HOTEL COMPANY shall as reasonably requested by ██████ from time to time allow ██████ to inspect the production process of the goods or performance of the services.

The HOTEL COMPANY shall notify ██████ as soon as reasonably practicable if it becomes aware that performance of its obligations under this Agreement may breach the Code of Conduct. The HOTEL COMPANY shall promptly provide ██████ with a corrective action plan to be implemented within a specific time period agreed by the HOTEL COMPANY and ██████. If the HOTEL COMPANY fails to comply with the corrective action plan, then ██████ may by written notice terminate this Agreement and any other contractual agreement with the HOTEL COMPANY. Upon termination, the HOTEL COMPANY shall on demand:

a)  return to ██████ all amounts paid to the HOTEL COMPANY with respect to goods or services to the extent that those goods have not been delivered to ██████ and/or those services have not been completed in accordance with this Agreement or any other contractual arrangements between ██████ and the HOTEL COMPANY;

b)  return to ██████ all written information provided by ██████ in connection with this Agreement and any other contractual arrangements between ██████ and the HOTEL COMPANY (including any plans, drawings, specifications, data and any other information whatsoever provided by or at the order of ██████).

Upon termination, neither party shall have any further obligations to the other, save for obligations which accrued before that termination and any obligations expressly stated to survive the termination of this Agreement or the relevant contractual arrangements.

**17. Anti-bribery Provisions**

The HOTEL COMPANY represents warrants and undertakes that:

a)  It has read and understood the "Expectations of Business Partners" set out in Appendix 2 of this Agreement.

b)  It is in compliance with the "Expectations of Business Partners" and all applicable anti-bribery laws in connection with the performance of this Agreement.

c)  In the event the HOTEL COMPANY subcontracts any of its rights or obligations under this Agreement to a sub-contractor or sub-agent pursuant to the terms of this Agreement, it shall ensure that every sub-contractor or sub-agent contains anti-bribery terms equivalent to those imposed on the HOTEL COMPANY, whether contained in this Agreement or agreed separately.

d)  It shall promptly report to ██████ any request or demand for any undue financial or other advantage of any kind received by the HOTEL COMPANY in connection with the performance of this Agreement. The HOTEL COMPANY further represents and warrants that to the best of its

Registered office: ██████████

**Confidential**

██████

Issue date: ██████          <u>**CREW ACCOMMODATION AGREEMENT**</u>

knowledge and belief neither it nor any of its affiliates, officers, directors, employees and sub-contractors or sub-agents appears on any list of entities or individuals debarred from tendering or participating in any project funded by any multi-lateral or bi-lateral aid agency, has at any time been found by a court in any jurisdiction to have breached any anti-bribery laws or has at any time been investigated or is being investigated or been suspected in any jurisdiction of having engaged in any conduct which would constitute a breach of any anti-bribery laws.

**18.  Services to be provided by** ██████

HOTEL COMPANY acknowledges and agrees that:

a)   ██████ has appointed ██████ as its managed services provider in respect of Crew Member  hotel accommodation and ██████ shall act as the contract manager representing ██████ in dealing with day-to-day operational matters with HOTEL and HOTEL COMPANY in connection with this Agreement;

b)   HOTEL and HOTEL COMPANY shall work with ██████ (in its capacity as ██████ appointed contract manager) with respect to the HOTEL and this Agreement including, but not limited to: (i) termination, extension or renewal of this Agreement (ii) negotiation or agreement as to costs, fees and rates in connection with this Agreement; ~~(iii) [insert]; and (iii) [insert]~~;

c)   ██████ may by notice require it to work with another contract manager as replacement of ██████ and/or change the scope in which the HOTEL COMPANY shall work with ██████ or such replacement contract manager; and

d)   ██████ or such replacement contract manager is appointed by ██████ to manage the day-to-day operational matters only, which shall not include making, defending or settling of any legal claims in connection with this Agreement or providing any services not in conformance with the terms of this Agreement.   If ██████ or any replacement contract manager notifies or instructs HOTEL COMPANY of any of the above matters, HOTEL COMPAY shall promptly seek confirmation from ██████ and shall not act on any such notice or instruction until ██████ has verified it.

e)   Any agreement between HOTEL COMPANY and XXXXX shall be signed solely by ██████ and under no circumstances is ██████ authorized to enter into this Agreement with HOTEL COMPANY.


**19.  Miscellaneous**

a)   The HOTEL COMPANY also represents and warrants that the services provided to the Crew Members during their stay at the HOTEL shall be in every way identical with those available to its full-tariff guests.

b)   The HOTEL COMPANY may not assign or transfer any of its rights, obligations or interests hereunder to any party without ██████ prior written consent.

c)   The HOTEL COMPANY shall not use ██████ trademarks, corporate name and other source or business identifiers in connection with the HOTEL COMPANY's promotional and marketing materials, publicity, marketing and advertising, without ██████ prior written consent.

d)   The HOTEL COMPANY agrees that under no circumstances shall it publicize to its other HOTEL guests or to the public that ██████ Crew Members are staying at the HOTEL. The HOTEL COMPANY shall safeguard this information and shall not divulge room numbers of Crew Members to any other person but if requested, will offer to have the Crew Member contacted by telephone.

Registered office: ██████

WT_000066

Confidential

██████████

Issue date: ██████████                    **CREW ACCOMMODATION AGREEMENT**

   e)   At the time of check-out, the HOTEL employees shall not carry crew baggage except for loading onto crew bus.  No amendment to this Agreement will be effective unless in writing and executed by both parties.

   f)   HOTEL COMPANY acknowledges that ██████sole obligations pursuant to this Agreement shall be to provide the Services specified in Clause 20 of this Agreement as agent for ██████.

   g)   In the event any matter not mentioned in this Agreement arises, ██████and the HOTEL COMPANY shall co-operate and consult with each other on a case by case basis and attempt to solve any problem amicably and in good faith.

## 20. Emergency Undertaking

   a)   In the unlikely event of a major incident involving ██████aircraft and/or passengers, HOTEL COMPANY agrees to provide ██████with all unsold rooms that it requires for the use of ██████staff, passengers and all relatives for as long as the rooms are available.

   b)   HOTEL COMPANY further agrees that:

      i)   The room rate will be the same as the crew rate as stipulated in Clause 3a) or at best rate available;

      ii)   It will close sales and book all available rooms to ██████and block additional rooms as they are vacated;

      iii) HOTEL restaurant will be kept open around the clock if necessary and light refreshments will be made available for all conference rooms;

      iv) HOTEL shuttle service will be made available to assist with transportation needs;

      v)   parking facilities will be provided for ██████staff on provision of valid ID; and

      vi) HOTEL staff will be notified of the sensitive nature of the incident.

   c)   ██████agrees that in such an event it will:

      i)   Pay for all rooms used under this clause;

      ii)   Pay any additional sums reasonably incurred in respect of other facilities used such as conference facilities and restaurants; and

      iii) Continually update HOTEL COMPANY as to the requirement of rooms and notify them of predicted requirements.

Agreed and accepted on behalf of:

     XXXXX

     XXXXX

Registered office: ██████████████████

WT_000067

**Confidential**

▮▮▮▮▮

Issue date: ▮▮▮▮▮

## CREW ACCOMMODATION AGREEMENT

XXXXX

Registered office: ▮▮▮▮▮▮▮▮▮▮

WT_000068

AGREEMENT REGARDING ACCOMMODATION OF ███████ AIRLINE CREW

between



and

I(13)

WT_000069

**AGREEMENT REGARDING ACCOMODATION OF** ██████████**CREWS
AND OTHER PERSONNEL**

This agreement is entered into on this day, ████████████by and between:

████████████████

████████████████

██████████

hereinafter referred to as "████████"

and

████████████████

████████████████

████████████████

████████████████

████████████████

hereinafter referred to as **"Hotel".**

## 1   SCOPE OF AGREEMENT

Subject to the terms and conditions of this agreement, Hotel undertakes to make available Hotel rooms during the term of this agreement for accommodation of ████████aircraft crew, other aircraft crew operating on behalf of ████████ ('Wet Lease Crew'), (hereinafter all jointly referred to as "Crew Members") and other employees and so called distressed passengers at the prices set out herein.

████████enters into this agreement on its own behalf and on behalf of each member of the ████████████. Each member of the ████████████may benefit from this agreement and ████████shall be responsible for the acts and omissions under this agreement of the members of the ████████████Group as for its own acts and omissions . The "████████Group" means ████████████and all companies/entities in which ████████████, from time to time, directly or indirectly owns more than 50 percent of the issued share capital and/or votes.

The Agreement comprises this main agreement and the following annexes:

Annex 1     ████████Rates ████████Crew Members
Annex 2     ████████Rates Other ████████Employees and Distressed Passengers (!RR)
Annex 3     Contact Persons
Annex 4     ████████General Terms and
Annex 5     Conditions ████████Code of Conduct

WT_000070

In case of any discrepancy between the main agreement and the annexes, the main agreement shall prevail and, in case of any discrepancy between the annexes, !he annexes shall prevail in the order set out *above*.

## 2   ROOM REQUIREMENT PLANS

███████will for each calendar month (on or around the 17th day of the preceding month and in any event at least two weeks before the date the rooms are to be used) send to Hotel a firm order plan in writing for rooms at the Hotel required for that particular month (each such plan a "Room Requirement Plan"). Each Room Requirement Plan will set out the dates when Hotel rooms are being requested, the number of Hotel rooms required for each such date, the time *of* day that such Hotel rooms should be available and any special requirements or service requests in relation to stays at the Hotel. The Room Requirement Plan is binding on the Hotel and Hotel undertakes to provide Hotel rooms in accordance therewith.

Each Room Requirement Plan will constitute a binding order by ███████for Hotel rooms, provided, however, that ██████shall have the right through written notice to Hotel:

(i)     no later than 6:00 PM local time on the day before scheduled arrival, to freely add subject to availability as well as cancel an unlimited number of Hotel rooms in relation to the Room Requirement Plan; and

(ii)    no later than 1:00 PM local time on the scheduled date of arrival, to add subject to availability or cancel up to 2 rooms.

Changes to the Room Requirement Plan requested in accordance with (i) - (ii) above shall be binding on Hotel and Hotel undertakes to provide Hotel rooms in accordance therewith.

Hotel may not relocate Crew Members unless ██████has specifically approved such relocation in writing. Relocation will only be accepted in exceptional circumstances and at ██████sole discretion.

Any and all costs and expenses, including transportation, for relocations will be borne by Hotel. ███████shall only be charged with the standard room rate set out in Annex 1 and Annex 2.

██████will no later than on the day before scheduled arrival send to Hotel a list specifying the names of the Crew Members who will be accommodated in the Hotel rooms together with estimated check-in times.

Check-in or check-out before or after regularly posted check-in and check-out times of the Hotel may be done by the Crew Members at no additional charge or costs. Early check-in applies as agreed with the Hotel and late checkout until 05.00 p.m. local time.

WT_000071

## 3    HOTEL'S OBLIGATIONS

### 3.1    ROOMS, STANDARD AND SAFETY

Hotel rooms ordered hereunder shall always be properly cleaned in accordance with good international hotel standards.

All rooms shall further be equipped with a bath and/or shower, toilet facility and other facilities which other international hotels of equal standard offer.

The locations of the offered rooms within the Hotel should be such as that every reasonable effort has been done by the Hotel to avoid disturbance from local traffic, lifts, kitchen, night clubs or similar activities.
Rooms on the ground floor should not be allocated to ▮▮▮▮ crew.

The Hotel undertakes to maintain all applicable national standards of regulation for security and safety, but in no event less than ▮▮▮▮ standard requirements *for* security and safety as communicated by ▮▮▮▮. ▮▮▮▮ may inspect the observance of such rules and regulations at any time .

### 3.2    ROOMS, AVAILABILITY

The Hotel guarantees that all rooms ordered through a Room Requirement Plan (as amended in accordance with section 2.2) shall always be available at the dates and times set out in such Room Requirement  Plan.

If one or more rooms should not be ready for use in compliance with a confirmed Hotel room order, ▮▮▮▮ shall receive a discount of 25 % of the agreed Hotel room price for each commenced hour of delay and room.

### 3.3    MISCELLANEOUS

▮▮▮▮ shall always be treated as most favoured customer, and in all respect be guaranteed the best possible service in relation to other  customers.

All rooms shall be non-smoking rooms, except for smoking rooms which have been requested in advance in a Room Requirement Plan.

Family members and other associated persons may stay in the Crew Member's Hotel room at no extra cost. Breakfast is not included.

All Hotel facilities such as sauna, swimming pool, training and exercise facilities, etc. may be used free of any additional charge by the Crew Members provided these facilities are not run by a third party and therefore would cause the Hotel extra costs.

The Hotel shall be responsible for ensuring that the personal expenses of the Crew Members are collected upon departure.

4(13)

**4   PRICES AND DISCOUNTS**

All prices are set out in Annex 1-2. █████ shall pay the Hotel room rates detailed in Annex 1-2, which are inclusive of any and all service charges, excluding applicable VAT, city tax and other taxes. Breakfast is excluded.

**5   INVOICING AND PAYMENT**

Invoices related all Crew Members, except Wet Lease Crew, shall be submitted electronically via █████ invoicing system monthly in arrears and shall fall due for payment 45 days after receipt by █████.

Invoices related █████ Group aircraft crew shall contain a reference to the █████ Group company to which the relevant aircraft crew belongs.

Invoices related to Wet Lease Crew shall be submitted to the operating carrier to which the relevant crew belongs. In the event a separate agreement with the operating carrier is requested, the same prices as in Annex 1 shall apply to that agreement.

No invoice, administration, service charge or other charge may be added to the invoice and all applicable taxes shall be specified therein .

The invoice shall also refer to the applicable Room Requirement Plan and shall specify number of rooms used during the relevant month, and shall be dated and submitted the last day of the month.

Invoices related all Crew Members, except Wet Lease Crew, should be addressed as follows (failure to use the correct address details may result in a payment delay, which delay will be for Hotel's risk and account):



Invoices can be emailed to █████████████

6   **CONTACT**

The persons set out in Annex 3 shall be each party's primary point of contact for all matters concerning the administration, interpretation, performance and review of this agreement. All notifications under this agreement shall be made in writing and be addressed in accordance with Annex 3

S(1) .

## 7    TERM AND TERMINATION

### 7.1    TERM OF AGREEMENT

This agreement shall become effective as of 01April 2019 and shall continue in force up
to and including 31march 2021.

If the agreement is not terminated by either party through written notice no later than 2
months prior to the expiry of the initial term or any extended term, the agreement shall be
automatically extended on the same terms and conditions for additional periods of 1 year.
In case of such extension, Hotel may increase the room rates set out in Annex 1 and
Annex 2 by a maximum of 90% of the yearly increase (if any) in the in the Hotels and
Restaurants-Index (HICP) with January 2020 as the base month and year. The first
indexation may be made as per April 2021

### 7.2    TERMINATION FOR CAUSE

Each party shall have the right to terminate this agreement by written notice with
immediate effect if:

(i)      the other party is in breach of a material obligation of this agreement which has
continued unremedied for more than 30 days after written notice thereof; or

{ii) the other party is reasonably deemed to be or becomes insolvent, is reasonably
deemed to be or admits its inability to pay its debts as they mature, or otherwise
files for or is declared bankrupt or in liquidation, receivership, debt restructuring,
or seeks or enters into an arrangement with a majority of its creditors, or any
other situation having a similar effect or result.

### 7.3    TERMINATION FOR CONVENIENCE

At any time during the term of this agreement, ▆▆▆▆shall have the right to cancel this
agreement by giving 60 days advance written notice thereof and the Hotel shall have the
corresponding right to cancel this agreement by giving 60 days advance written notice to
▆▆▆▆. Termination in accordance with this section 7.3 shall not *affect* ▆▆▆▆duty to
pay for Hotel rooms used up to and including the day of termination.

## 8    LIABILITY AND DAMAGES

Each party is liable for any damage or loss caused through its wilful or negligent acts and
omissions in connection with this agreement, and shall indemnify the other party from any
damages, losses, costs or claims incurred in connection therewith. However, each party's
liability hereunder is limited to direct damages only, provided however that in case of death
or personal injury and/or in case of gross negligence or wilful misconduct, no limitation of
liability shall apply.

The Hotel is responsible and liable for the actions and omissions of its subcontractors to
the same extent as for its own acts and omissions.

WT_000074

### 9   EXTERNAL INFORMATION

All advertisements, articles, press releases and other information aimed at a wider circle of receivers, in which ▆▆▆▆▆ is mentioned by name or with logo type, shall be approved in advance by ▆▆▆▆ in writing.

### 10   CONFIDENTIALITY

Each party shall treat as confidential and shall not disclose to any third party any information relating to the other's business activities which is disclosed in writing or orally by the disclosing party to *the* receiving party and which is of a confidential, proprietary or commercially sensitive nature. The receiving party may not disclose such information to third parties without the explicit written consent of the disclosing party.

Further, confidential information provided by ▆▆▆▆ to Hotel may only be used by the Hotel for the proper performance of its obligations hereunder and be made known solely to its employees and sub-contractors on a need-to-know-basis. The Hotel shall ensure that all employees and sub-contractors are made aware of and adhere to the confidentiality obligations herein.

The receiving party shall not be liable for disclosing confidential information of the other party if such information has already been disclosed to the public other than by breach of this obligation, or if the receiving party is under a duty by law *or* binding court order to disclose such information.

The confidentiality obligations herein shall survive termination of this agreement for a period of 5 years.

Notwithstanding the confidentiality provisions of the Agreement. ▆▆▆▆ may share confidential and proprietary information provided by the Hotel with its alliance partners *for* the purpose of developing potential joint bids, provided that the alliance partner agrees to being bound by the confidentiality obligations herein to the same extent as these obligations apply to ▆▆▆▆.

### 11   FORCE MAJEURE

To the extent a party is prevented from properly fulfilling this agreement by circumstances beyond its control, including but not limited to work stoppages, strikes, lock-outs, civil strikes, civil disobedience, national and international crisis, political and/or protest demonstrations, which circumstances such party could not reasonably have foreseen and the consequences of which it could not reasonably have avoided or overcome. such party shall be relieved from its duties to perform  or to meet its obligations  hereunder  for as long as these circumstances prevail ("Force Majeure"). If a party is prevented from fulfilling this agreement due to such Force Majeure for a period exceeding  3  months,  the other  party shall be entitled to terminate the agreement, or parts thereof. For t11e avoidance of doubt, Hotel rooms not utilized due to a Force Majeure event will  relieve ▆▆▆▆ from  all liability to pay for such rooms.

### 12   AMENDMENTS

Changes and additions to this agreement shall be made in writing.

WT_000075

## 13  APPLICABLE LAW AND DISPUTE RESOLUTION

This agreement will be governed by and construed in accordance with ███████████.

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

WT_000076

This agreement has been made in duplicate, of which each party has retained one.

 on



WT_000077

**1    ]Annex 1█████Rates █████Crew Members**

| Destination | Hotel Name | Currency | Crew Member Rate |
|---|---|---|---|
| ████████████ | ████████████ | ████████████ | ████████████ |

The █████Crew Member Rate is per standard room per night excluding VAT but including City Tax and any other applicable taxes . Breakfast is excluded.
Transport to and from the airport is included in the room rate as of 2 crew members.
For a single crew member the hotel will arrange transport at and additional charge of €10 per way

A day room will be invoiced at 50% of the above rate. A day room is a room that is made available between 09.00 AM and 04.00 PM, local time.

Ordinary Breakfast Buffet price is offered to █████Crew for EUR 11

In connection with departures before regular breakfast time of Hotel, Crew Members shall have the option to purchase a so called continental breakfast with yoghurt, bread, cheese and ham . The price for this service is EUR 7 and is to be requested in connection with check-in.

The payment for the breakfast is the responsibility of the Airline Crew member and is not to be invoiced to █████.

All prices for food and beverages (exclusive of alcoholic beverages, breakfast and tobacco) consumed in the Hotel restaurants by Crew Members will be reduced by 25% compared to the otherwise applicable price.

No fee will be collected for calling toll free number.
Hotel bikes may be borrowed upon availability  at no charge.

Access to internet will be *offered* to Crew Members at no extra cost.

Crew Members have the right to receive a 15% discount on laundry services (if *offered)*.

If transportation between the airport and the Hotel is to be arranged by the Hotel, prices and other conditions for that service will be negotiated separately.

WT_000078

## 2  Annex 2  █████ Rates Other XXXXX Employees and Distressed Passengers (███)

| Destination | Hotel Name | Currency | IRR Rate |
|---|---|---|---|
| ████████████ | ████████████ | EUR | 100 |
| Destination | Hotel Name | Currency | IRR Rate |
| ████████████ | ████████████ | EUR | 100 |

████employees (other than crew members) and distressed passengers will be accommodated by Hotel and included under this agreement upon ██████request and subject to availability on the same terms and conditions as crew members.

The rate is per standard room per night excluding applicable VAT, City Tax and any other applicable taxes. Breakfast is included in the price offered.

Rates for group movements such as seminars, conventions, and meetings for 12 participants or more may be negotiated in each case based on market situation at the destination.

WT_000079

### 3    Contact Persons

**For** ▉▉▉▉
**Reservations and Operations:**



**Invoicing:**



**Contracts:**



**For the Hotel:**
**Reservations:**



**Operational and invoicing matters:**



**Contractual matters:**

WT_000080

Name: 

**4**   **Annex 4** ███████████ **General Terms and Conditions**

**5**   **Annex 5** ███████████ **Code of Conduct**

WT_000081

# NYC Buildings

## *Certificate of Occupancy*

**CO Number:**  **104592175F**

This certifies that the premises described herein conforms substantially to the approved plans and specifications and to the requirements of all applicable laws, rules and regulations for the uses and occupancies specified. No change of use or occupancy shall be made unless a new Certificate of Occupancy is issued. *This document or a copy shall be available for inspection at the building at all reasonable times.*

**A.**

| | | |
|---|---|---|
| **Borough:** Manhattan | **Block Number:** 00053 | **Certificate Type:** Final |
| **Address:** 99 WASHINGTON STREET | **Lot Number(s):** 2 | **Effective Date:** 10/26/2018 |
| **Building Identification Number (BIN):** 1088967 | **Building Type:** New | |

*For zoning lot metes & bounds, please see BISWeb.*

**B.**

**Construction classification:** 1-C  (1968 Code)

**Building Occupancy Group classification:** J-1  (1968 Code)

**Multiple Dwelling Law Classification:** HAEB

**No. of stories:** 50    **Height in feet:** 488    **No. of dwelling units:** 492

**C.** **Fire Protection Equipment:**
None associated with this filing.

**D.** **Type and number of open spaces:**
None associated with this filing.

**E.** **This Certificate is issued with the following legal limitations:**
None

**Borough Comments:** None

_____
Borough Commissioner

_____
Commissioner

**DOCUMENT CONTINUES ON NEXT PAGE**



Page 2 of 3

## *Certificate of Occupancy*

**CO Number:**        **104592175F**

| Permissible Use and Occupancy |
|---|

All Building Code occupancy group designations are 1968 designations, except RES, COM, or PUB which are 1938 Building Code occupancy group designations.

| Floor From To | Maximum persons permitted | Live load lbs per sq. ft. | Building Code occupancy group | Dwelling or Rooming Units | Zoning use group | Description of use |
|---|---|---|---|---|---|---|
| 001 | | OG | D-2 | | 5 | WATER & GAS METER ROOM (ABOVE BASE FLOOD ELEVATION). |
| 001 | 74 | 100 | F-4 | | 6 | (AREA ABOVED BASE FLOOD ELEVATION BAR/LOUNGE) |
| 001 | | 100 | J-1 | | 5 | HOTEL LOBBY(PORTION OF LOBBY IS SUBJECT TO FLOODING) |
| 002 | | 50 | D-2 | | 5 | MECH RM.METER RMS,CONED VAULT. |
| 002 | 10 | 40 | E | | 5 | HOUSEKEEPING,OFFICES, STAFF ROOM |
| 003 | | 40 | J-1 | 11 | 5 | 11 HOTEL ROOMS |
| 003 | | 40 | D-2 | | 5 | LAUNDRY ROOM |
| 003 | 10 | 50 | J-1 | | 5 | EXERCISE ROOM |
| 004 | | 40 | D-2 | | 5 | LAUNDRY ROOM |
| 004  005 | | 40 | J-1 | 12 | 5 | 12 HOTEL ROOMS ON EACH FLOOR LOCKER ROOM |
| 004  005 | 20 | 40 | E | | 5 | OFFICES |
| 005 | 20 | 40 | E | | 5 | OFFICES |
| 006 | | 40 | J-1 | 12 | 5 | 12 HOTEL ROOMS,STORAGE/MECHANICAL ROOMS. |

_____
Borough Commissioner

_____
Commissioner

**DOCUMENT CONTINUES ON NEXT PAGE**

WT_000083



# *Certificate of Occupancy*

**CO Number:        104592175F**

| Permissible Use and Occupancy | | | | | |
|---|---|---|---|---|---|
| All Building Code occupancy group designations are 1968 designations, except RES, COM, or PUB which are 1938 Building Code occupancy group designations. | | | | | |
| Floor From To | Maximum persons permitted | Live load lbs per sq. ft. | Building Code occupancy group | Dwelling or Rooming Units | Zoning use group | Description of use |
| 007 | 40 | J-1 | 13 | 5 | 13 HOTE ROOMS,LAUNDRY ROOM |
| 008 | 40 | J-1 | 12 | 5 | 12 HOTE ROOMS |
| 009 | 40 | J-1 | 10 | 5 | 10 HOTEL ROOMS. |
| 010   050 | 40 | J-1 | 10 | 5 | TEN HOTEL ROOMS ON EACH FLOOR |
| ROF | 150 | D-2 | | 5 | BOILER ROOM,BULKHEAD,EMR, ELECTRICAL FIRE PUMP ROOM |

NOTE: THESE PREMISES KNOWN AS BLK: 594 LOTS: 2, 3, 39 HAVE BEEN DECLARED ONE ZONING AS PER ZR. HAVE BEEN RECORDED AT CITY REGISTER UNDER CRFN#20080000239295 & 20080000239294 & 2012000417577 THESE PREMISES ARE LOCATED WITHIN THE FLOOD HAZARD AREA. THE 1ST FLR (LOWEST LEVEL) WILL BE LOCATED ABOVE THE BASE FLOORD ELEVATION. PORTION OF LOBBY OF SUBJECT TO FLOODING

**END OF SECTION**

_____
Borough Commissioner

_____
Commissioner

*END OF DOCUMENT*

This content is from the eCFR and is authoritative but unofficial.

**Title 29 - Labor**

**Subtitle B - Regulations Relating to Labor**

**Chapter V - Wage and Hour Division, Department of Labor**

**Subchapter B - Statements of General Policy or Interpretation Not Directly Related to Regulations**

**Part 779 - The Fair Labor Standards Act as Applied to Retailers of Goods or Services**

**Subpart D - Exemptions for Certain Retail or Service Establishments**

**Hotels and Motels Hotels and...**

**Authority:** Secs. 1-19, 52 Stat. 1060, as amended; 75 Stat. 65; Sec. 29(B), Pub. L. 93-259, 88 Stat. 55; 29 U.S.C. 201-219.

**Source:** 35 FR 5856, Apr. 9, 1970, unless otherwise noted.

## § 779.383 "Hotel" and "motel" exemptions under section 13(b)(8).

(a) *General.* A hotel or motel establishment may qualify for exemption from the Act's overtime pay requirements, even if it is in an enterprise described in section 3(s) and is not exempt under section 13(a)(2) because it exceeds the monetary test for exemption under that section. The first part of section 13(b)(8) provides that the overtime provisions of section 7 of the Act shall not apply with respect to "any employee employed by an establishment which is a hotel, motel * * *." The 13(b)(8) exemption is applicable irrespective of the annual dollar volume of sales of a hotel or motel establishment or of the enterprise of which it is a part.

(b) *Definition of "hotel".* The term *hotel* as used in section 13(b)(8) means an establishment known to the public as a hotel, which is primarily engaged in providing lodging or lodging and meals for the general public. Included are hotels operated by membership organizations and open to the general public and apartment hotels which provide accommodations for transients. However, an establishment whose income is primarily from providing a permanent place of residence or from providing residential facilities complete with bedrooms and kitchen for leased periods longer than 3 months would not be considered a hotel within the meaning of the Act. An apartment or residential hotel is not considered a hotel for purposes of section 13(b)(8) unless more than half of its annual dollar volume is derived from providing transient guests representative of the general public with lodging or lodging and meals. (See paragraph (c) of this section.) Establishments in which lodging accommodations are not available to the public are not included. Also excluded from the category of hotels are rooming and boarding houses, and private residences commonly known as tourist homes. Resort or other hotels even if they operate seasonally are regarded as hotel. (See Cong. Rec., August 25, 1966, pages 19729-19732; Cong Rec., August 26, 1966, pages 19907-19911.)

(c) *"Transient guests".* In determining who are "transient guests" within the meaning of § 779.382 and paragraph (b) of this section, as a general rule the Department of Labor would consider as transient a guest who is free to come and go as he pleases and who does not sojourn in the establishment for a specified time or permanently. A transient is one who is entertained from day to day without any express contract or lease and whose stay is indefinite although to suit his convenience it may extend for several weeks or a season.

(d) *Definition of "motel".* The term *motel* as used in section 13(b)(8) means an establishment which provides services similar to that of a "hotel" described in paragraph (b) of this section, but which caters mostly to the motoring public, providing it with motor car parking facilities either adjacent to the room or cabin

rented or at some other easily accessible place. Included in the term "motel" are those establishments known to the public as motor hotels, motor lodges, motor courts, motor inns, tourist courts, tourist lodges and the like.

(e) *Hotel and motel establishments engaged in other activities.* The primary function of a hotel or motel is to provide lodging facilities to the public. In addition, most hotels or motels provide food for their guests and many sell alcoholic beverages. These establishments also may engage in some minor revenue producing activities; such as, the operation of valet services offering cleaning and laundering service for the garments of their guests, news stands, hobby shops, the renting out of their public rooms for meetings, lectures, dances, trade exhibits and weddings. The exception provided for "hotels" and "motels" in section 13(b)(8) will not be defeated simply because a "hotel" or a "motel" engages in all or some of these activities, if it is primarily engaged in providing lodging facilities, food and drink to the public.

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Golden Seahorse LLC*
*dba Holiday Inn Manhattan Financial District*
*Debtor and Debtor-in-Possession*
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
Scott S. Markowitz, Esq.
Rocco A. Cavaliere, Esq.
smarkowitz@tarterkrinsky.com
rcavaliere@tarterkrinsky.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:                                                        Chapter 11

GOLDEN SEAHORSE, LLC
dba Holiday Inn Manhattan Financial District,[1]    Case No. 22-11582 (PB)

                              Debtor.
------------------------------------------------------------x

## DEBTOR'S MOTION FOR AUTHORITY TO ENTER INTO AN AGREEMENT WITH NEW YORK CITY HEALTH AND HOSPITALS CORPORATION FOR USE OF THE DEBTOR'S HOTEL THROUGH APRIL 30, 2024

TO:    THE HONORABLE PHILIP BENTLEY
       UNITED STATES BANKRUPTCY JUDGE

       Golden Seahorse LLC dba Holiday Inn Manhattan Financial District ("Hotel" or "Debtor"),

debtor and debtor-in-possession, hereby files this motion (the "Motion") pursuant to sections 105(a)

and 363(b) and (c) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy

Code") and Rules 2002 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), for entry of an order authorizing the Debtor to enter into that certain Hotel Use Agreement

dated January 13, 2023 (the "Agreement") with the New York City Health and Hospitals

Corporation ("NYCHH"), a New York public benefit corporation,  and granting related relief.  In

---

[1] The Debtor's last four digits of its tax identification number are 4770.  The Debtor's principal place of business is
99-103 Washington Street, New York, New York.

support of the Motion, the Debtor respectfully represents as follows:

## **PRELIMINARY STATEMENT**

As more fully set forth in the *Declaration of Jubao Xie Pursuant to Local Bankruptcy Rule 1007-4* (the "Local Rule Declaration"), which is incorporated herein, this bankruptcy case was precipitated by the need to preserve the Debtor's business for the benefit of all creditors and other stakeholders after entry of a state court order dated September 27, 2022 appointing a receiver pursuant to a provision in the Loan (defined below). The filing of the bankruptcy case allowed the Debtor's current management to continue with the operations of the hotel known as the Holiday Inn Financial District (the "Hotel"). Since the Petition Date, the Debtor has been profitable and has met its forecasted numbers under the Court approved budgets set forth in the interim and final orders approving use of cash collateral.

At all times, the Debtor's goal has been to stabilize operations and maximize value for the estate and all of its creditors and stakeholders. To that end, the Debtor remains committed to working with the Prepetition Lenders (defined below) and other constituents on formulating a plan of reorganization that will allow for either a reinstatement of the prepetition loan, which carries a very favorable 5.25% interest rate, or a sale of the Hotel and related property to a party submitting the highest and best offer. The Debtor remains on track to pursue these initiatives.

In the meantime, the Debtor has been approached by NYCHH, a public benefit corporation that that has been tasked with the unenviable responsibility of housing asylum seekers and migrants that have been bused to or come to New York City from other locations. NYCHH is currently working with other hotels in New York City to procure rooms to address this recent national crisis, supplementing its prior experience working with hotels housing the homeless during the Covid-19 pandemic in 2020. As Mayor Adams and others have noted, the migrant crisis is a national

problem. The City of New York is admirably doing its best to tackle the crisis head-on, by among other things, providing for shelters and other accommodations to displaced individuals seeking asylum.  The City of New York, however, cannot address these problems on their own, and thus requires assistance from third parties, such as the Debtor. After several weeks of discussions and negotiations, the Debtor has entered into the Agreement with NYCHH, a copy of which is annexed hereto as **Exhibit "A"** which will provide NYCHH with all of the 492 Rooms at the Hotel in order to advance NYCHH's mission (at the behest and request of the City of New York) to ensure proper housing for migrants.

While the Debtor's willingness to be a good corporate citizen by contracting with NYCHH to further the public interest in addressing this recent national crisis is a noble goal in its own right, the Debtor's decision to enter into the Agreement is mainly justified by the substantial economic benefits that come with this Agreement.  As will be explained more fully below, this Agreement significantly improves the Debtor's bottom line by increasing 2023 projected net operating income by approximately $5.5 million in 2023 alone and an additional $5 million in 2024.  Prior to the filing of the Motion, the Debtor, through counsel, had numerous communications with respective counsel to the Prepetition Lenders and Holiday Hospitality Franchising, LLC  (the "Franchisor" or "Holiday Inn") to address any concerns and answer any questions pertaining to the Agreement.  As of the filing of the Motion, the Debtor's understanding is that Holiday Inn will not object to the Motion and the Prepetition Lenders are still considering whether to object to the Motion. The Debtor commits to continuing to communicate with these important constituents to address any additional issues or questions, if any, in advance of the hearing to consider this Motion.

In sum, the Debtor respectfully submits the Court should approve this Agreement under either section 363(c)(1) as an ordinary course transaction or pursuant to sections 105(a) and 363(b)

of the Bankruptcy Code.  The Agreement is in furtherance of the Debtor's business judgment and in the best interest of the estate and all its stakeholders, and entry into the Agreement also admirably furthers the public interest in addressing the national crisis that has disproportionately affected several municipalities, including New York City.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§157 and 1334 and the standing Order of Referral of Cases to Bankruptcy Judges of the Southern District Court of New York.   This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory basis for the relief requested herein are §§ 105(a) and 363(b) and (c) of the Bankruptcy Code and Bankruptcy Rules 2002 and 9014.

## BACKGROUND

2.      On November 29, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and has continued in the operation of its business as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

3.      The Debtor operates the Hotel which is a full-service hotel located at 99 Washington Street, New York, NY 10016.  In addition to the Hotel, the Debtor also owns an adjacent neighboring property at 103 Washington Street, New York, NY 10016, whereby the Debtor leases space to Amazon Restaurant and Bar d/b/a St. George Tavern. The Debtor constructed the Hotel between 2010 and 2014 and it opened for business in October 2014. Pursuant to a license/franchise agreement dated October 15, 2014, the Hotel operates under the Holiday Inn flagship/brand.  The Hotel is fifty (50) stories, the tallest Holiday Inn in the world and consists of 492 rooms and includes a full-service restaurant at the Hotel.

4.      In or about September 2018, the Hotel obtained a $137.2 million loan from Ladder Capital Finance LLC (the "Loan").   The Loan was ultimately split into four separate tranches and as of the Petition Date, three tranches in the amount of roughly $87 million are held by Wilmington Trust, National Association as trustee for various note holders and one tranche in the amount of roughly $50 million is held by Note B Lender (collectively, the "Prepetition Lenders"). The non-default interest rate under the Loan is 5.259%, which equates to roughly $612,000 in monthly interest payments. The Debtor was current on all payments under the Loan up until the onset of the Covid-19 pandemic in March 2020 when the Hotel was forced to close from March 2020 through June 2020. As of the Petition Date, the full amount of the $137.2 million in principal remains outstanding, together with unpaid interest. The non-default interest on the Loan is 5.29% and the Loan matures in September 2028.   According to the Prepetition Lenders' *Statement of Additional Prepetition Secured Obligations Assertions Pursuant to Final Cash Collateral Order*  Dkt. No. 39], the unpaid non-default interest alone is over $11 million.

5.      As a direct result of the Covid-19 pandemic, the Debtor defaulted on the Loan. Thereafter, Wilmington Trust, in 2021, swept all of the Debtor's funds in its separate cash management account that included sales taxes due to New York State and Hotel's occupancy taxes due to New York City.   The Debtor attempted to reach a consensual resolution with Midland Loan Services, the special servicer to Wilmington Trust but unfortunately, the special servicer rejected the Debtor's overtures and proceeded to commence an action in March 2022 to, among other things, (i) foreclose on the mortgage, (ii) appoint a receiver and (iii) enjoin the Debtor from taking certain actions.   By Decision and Order dated September 27, 2022, the Honorable Frances A. Kahn, III granted Wilmington Trust's motion to appoint a receiver but denied Wilmington Trust its request for injunctive relief finding it had not satisfied the factors

for a preliminary injunction and that such relief was, in any event, superfluous, to the appointment of a receiver.

6.        Faced with the prospect of a complete loss of equity and value as well as the potential loss of rights under various contracts and licenses as a result of the appointment of the receiver, the Debtor determined that Chapter 11 was necessary to preserve the Debtor's business and maximize value for all creditors and constituents.  As further discussed below, the Debtor commenced this chapter 11 case in order to attempt to negotiate a restructuring and/or reinstatement of the Loan or to utilize the provisions of the Bankruptcy Code to confirm a plan of reorganization over Wilmington Trust's objection. The Hotel's operations have greatly improved over the last seven months and the Hotel's occupancy rate was approximately 85% in November 2022 and approximately 93% in December 2022.

7.        On December 21, 2022, this Court entered the *Final Order (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Adequate Protection to the Pre-Petition Lenders, (III) Modifying the Automatic Stay and (IV) Granting Related  Relief.*  See Dkt. No. 38.

## PRINCIPAL TERMS OF AGREEMENT BETWEEN DEBTOR AND NYCHH

8.        As noted herein, the Agreement is annexed as **Exhibit "A"** to this Motion.  The Court and parties in interest are referred to the Agreement for a full recitation of its terms. However, set forth below is a summary of some of the key terms of the Agreement:

- Use of Hotel and Term:  The Agreement provides NYCHH with 100% of the 492 Rooms at the Hotel and use of the entire building, including the restaurant, through April 30, 2024, unless otherwise terminated by the Parties, provided that NYCHH may not terminate this Agreement without cause until after at least one hundred eighty (180) days after commencement of the Agreement.  See Agreement, I(b), (d) and (f).

- Payment Terms and Commencement Date:  NYCHH anticipates needing 300 Rooms no later than January 25, 2023, with the balance of 192 Rooms one week later.  NYCHH will pay $190 per Room per day, such that when

fully occupied, the Debtor shall receive $93,480 per day and $2,804,400 per month (based on a 30 day calendar month), with the parties agreeing to reconcile any additional amounts owed for other services and costs, including with respect to the actual length of months. <u>See</u> Agreement, I(b) and (m).

- <u>Security and Food</u>.  NYCHH will provide 24 hour security and shall be primarily responsible for removal of any Guests that may be unruly or otherwise pose a danger or nuisance to the other Guests, the employees and contractors and the Hotel. <u>See</u> Agreement, II.  NYCHH is responsible for providing food to all Guests but may use the Hotel's restaurant with NYCHH's own personnel in providing such service. <u>See</u> Agreement, II.

- <u>Housekeeping, Front Desk and Repairs</u>.  The Debtor shall continue to provide housekeeping services to all Guests at least three times a week, with a requirement that NYCHH ensure that each Guest voluntarily provides access at least once per week for housekeeping.  Further, Debtor will continue to have personnel at front desk to address any inquiries. Moreover, Debtor shall provide maintenance staff to address service calls. <u>See</u> Agreement, III.2 and III.3.

- <u>Indemnification and Insurance</u>. Debtor shall maintain Commercial General Liability insurance and other forms of coverage standard in the industry. The Agreement includes standard indemnity provisions to the extent of any damages during the Agreement's term. <u>See</u> Agreement, IV.1 and IV.2.

- <u>Non-Interference With Debtor's Bankruptcy Initiatives</u>.  The Agreement makes clear that nothing in the Agreement shall prevent the Debtor from marketing or selling the Hotel to another third party or pursuing confirmation of a Chapter 11 plan, in each case with the anticipation that the Agreement would be assumed by the Debtor or assigned to a third party as the case may be. <u>See</u> Agreement, I.l.

## <u>RELIEF REQUESTED AND BASIS FOR RELIEF</u>

9.      By this Motion, the Debtor initially seeks a finding the entry into the Agreement is in the ordinary course of business under section 363(c)(1) of the Bankruptcy Code such that approval is not necessary.  Alternatively, to the extent the Court views this Agreement as an agreement outside of the ordinary course of business, the Debtor seeks approval pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.

**A.    Entry Into the Agreement For Use of the Rooms At the Hotel Is
Arguably In The Ordinary Course of Business of the Debtor**

10.    The Debtor operates a Hotel with the main objective of selling its Rooms to the

public at large in furtherance of maximizing revenue and, to the best of its ability, ensuring that all

Rooms are fully occupied, to the extent possible.  Like most hotels, the Debtor procures most of its

business from tourists and business people through online reservations.  Occasionally, the Debtor

enters into agreements with airlines, by way of example, that procure a subset of rooms for its pilots

and flight attendants and others.  It is also not uncommon for the Debtor to enter into an agreement

with other third parties to "block rooms" for an extended period of time.  For instance, in 2017 to

2019, the Debtor entered into a contract with Norwegian Airlines for a block of 100 rooms per day

for their airline crews departing and arriving from JFK and Newark airports.

11.    The Debtor believes that entry into the Agreement is arguably an ordinary course

of business transaction which would not ordinarily require bankruptcy court approval.  See 11

U.S.C. § 363(c)(1) ("…the trustee may enter into transactions, including the sale or lease of

property of the estate, in the ordinary course of business, without notice or a hearing, and may

use property of the estate in the ordinary course of business without notice or a hearing").  Courts

generally determine whether a transaction is in the "ordinary course" by applying the

"horizontal" and "vertical" tests.  As stated by Judge Beatty several years ago:

> [t]he inquiry deemed horizontal is whether, from an industry-wide perspective,
> the transaction is of the sort commonly undertaken by companies in that industry.
> The inquiry deemed vertical analyzes the transactions 'from the vantage point of a
> hypothetical creditor and [the inquiry is] whether the transaction subjects a
> creditor to economic risk of a nature different from those he accepted when he
> decided to extend credit.'

In re Crystal Apparel, Inc., 207 B.R. 406, 409 (Bankr. S.D.NY. 1997) (citation omitted).

12.     Under the "horizontal" test, there can be little doubt that from an industry-wide perspective a hotel owner's main objective is to fill its Rooms to capacity in furtherance of increasing revenue.  That is exactly what the Agreement does by ensuring that all 492 Rooms will be utilized and paid for by NYCHH at a favorable rate of $190 per day per Room.  While the type of person that is using the Hotel rooms may be different (i.e. asylum seeker/migrant versus tourist), it does not change the fact the rooms are being used for the same exact purpose of providing shelter and accommodations at an agreed upon price.  Similarly, under the "vertical" test (also referred to as "creditor expectations test"), as set forth in the budget attached to the *Declaration of Jianfeng "Jeff" Qin* (the "Qin Declaration") in support of this Motion, annexed hereto as **Exhibit "B"**, the Debtor anticipates approximately $5.5 million in additional revenue in 2023 alone that will be generated by the Debtor's entry into the Agreement.  It can hardly be said that under the circumstances any hypothetical creditor would not expect a business to take advantage of a sizable increase in business nor would such hypothetical creditor be able to claim an "economic risk" here, where the Debtor has negotiated for guaranteed income, as opposed to maintaining the status quo and relying on a traditional revenue stream generated from the cyclical tourism industry.

13.     As a result, because the Debtor's entry into the Agreement is arguably in furtherance of the ordinary course of business, the Debtor does not technically need to seek permission from the Court under section 363(c)(1).  However, because the entry into the Agreement covers asylum seekers and migrants rather than tourists and relates to the use of Hotel Rooms for a longer period of time than the usual tourist occupies the Rooms, the Debtor is nonetheless, out of an abundance of caution, seeking a determination from the Court the Debtor may enter into the Agreement pursuant to section 363(c)(1) of the Bankruptcy Code.

**B.    In the Alternative, This Court Should Approve The Agreement
Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code**

14.    Alternatively, to the extent the Court views the Agreement as a transaction "outside of the ordinary course of business", the Debtor respectfully submits the Debtor's entry into the Agreement should nonetheless be approved as a reasonable exercise of the Debtor's business judgment under section 363(b) of the Bankruptcy Code.   It is a well-settled bankruptcy law principle that a debtor-in-possession enjoys broad discretion in operating its business.  In light of this broad discretion enjoyed by a debtor-in-possession, the Debtor submits that in evaluating the Debtor's request to enter into this Agreement, this request should be viewed in light of the overriding goal of Chapter 11, which is to enable the Debtor to reorganize its financial affairs and to continue in business operations for the benefit of the estate and its creditors and stakeholders. "The paramount policy and goal of Chapter 11 . . . to which all other bankruptcy policies are subordinated, is the rehabilitation of the Debtor." In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1985). This primary goal of rehabilitation has been recognized by the Supreme Court in NLRB v. Bildisco & Bildisco, 465 U.S. 513, 104 S. Ct. 1188, 79 L. Ed. 2d 482 (1984).

15.    The clear legislative purpose of Chapter 11, to provide an orderly procedure for rehabilitation of a troubled enterprise for the benefit of creditors, equity holders and society in general is often recognized by the courts.  See, e.g., In re Jeppson, 66 B.R. 269, 272 (Bankr. D. Utah 1986); In re Consolidated Operating Partners, L.P., 91 B.R. 113 (Bankr. D. Colo. 1988).

16.    The Bankruptcy Code carries a presumption of reasonableness as applied to business decisions made by a debtor-in-possession.  Where management of a debtor "articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." See In re:

Johns-Manville Corp., 60 B.R. 612 (Bankr. S.D.N.Y. 1986); In re All Seasons Industries, Inc.,

121 B.R. 822 (Bankr. N.D. Ind. 1990). As the Fifth Circuit noted in Richard Leasing Co. Capital

Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985):

> In the absence of special circumstances or a specific code provision, we
> see no reason to require the debtor to do more than justify its actions under
> the `business judgment' standard if creditors object. More exacting
> scrutiny would slow the administration of the debtor's estate and increase
> its costs, interfere with the bankruptcy codes' provision for private control
> of administration of the estate, and threaten the Court's ability to control a
> case impartially.

17.     The business judgment should be left "to the board room and not to the Court." In

re Simasko Products Co., 47 B.R. 444, 449 (D. Colo. 1985). If a debtor-in-possession's decision

is made in good faith and upon a reasonable basis, courts should not second guess the debtor's

decision. In re Curlew Valley Associates, 14 B.R. 507, 513, 514 (Bankr. D. Utah 1981).   A

debtor's business decision should be approved unless that decision "derives from bad faith, whim

or caprice." In re Helm, 335 BR. 528, 538 (Bankr. S.D.N.Y. 2006) (quoting In re Cent. Jersey

Airport Servs., LLC, 282 B.R. 176, 183 (Bankr. D. N.J. 2002) (internal quotations omitted).

18.     The business judgment rule is a standard of review which gives great deference to

the regular decisions made by a debtor's management. Absent this standard, courts would

constantly be involved in complex corporate decision making and reviewing business decisions

on a detailed level. In effect, bankruptcy courts would be managing the debtor's business

contrary to the clear intent of the Bankruptcy Code. These management tasks are, respectfully,

not within the Court's expertise. As the Second Circuit noted in Joy v. North, 692 F.2d 880, 886

(2nd Cir. 1982) in a different, but relevant context:

> After the fact litigation is a most imperfect device to evaluate corporate
> business decisions. The circumstances surrounding a corporate decision
> are not easily reconstructed in a courtroom years later, since business
> imperatives often call for quick decisions inevitably based on less than

perfect information. The entrepreneur's function is to encounter risks and to confront uncertainty, and a reasoned decision at the time made may seem a wild hunch a few years later against a background of perfect knowledge.

19. For all of the foregoing reasons, "parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." See Integrated Resources, 147 B.R. at 656; see also In re Tower Air, Inc., 416 F.3d 228, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

20. Consistent with the foregoing authorities, the Debtor respectfully submits the Court should approve the Debtor's entry into the Agreement as a reasonable exercise of its business judgment. There are numerous reasons (outlined below) why this Agreement is in the best interest of the estate and all constituents and should be approved by this Court.

21. First, as referenced in the budget annexed to the Qin Declaration, the Debtor projects that under the Agreement, the Debtor's ultimate net operating income will increase by $5.5 million in 2023 alone and an additional $5 million in 2024 for a total of approximate $10 million, even after taking into account and paying, on a regular basis, the Franchisor on account of all royalties and sales and marketing fees aggregating 7.5% of revenues under the license agreement between the parties. This additional liquidity will enhance the Debtor's options for ultimate emergence from this Chapter 11 case, including helping the Debtor in addressing unpaid non-contractual interest due to the Prepetition Lenders and reinstating the loan.

22. Second, the Agreement includes important terms negotiated by the Debtor to ensure that NYCHH provides adequate security and food to all of the Guests of NYCHH that will be staying at the Hotel. It is the Debtor's understanding the security will include at least one security personnel on every other floor of the Hotel. This is in addition to the Debtor's regular

security personnel.  Furthermore, the Debtor will continue to provide housekeeping services on a regular basis at least three times a week. The Debtor also negotiated a provision requiring NYCHH to ensure entry into all rooms at least once a week to the extent that any Guests are not voluntarily providing access. This will allow the Debtor to maintain the cleanliness of the Hotel as well as monitor the conditions of the Rooms on a timely basis to ensure that any repairs or issues are dealt with and paid for by NYCHH on a timely basis.

23.    <u>Third</u>, the hotel industry, in particular, and the tourism industry, as a whole, in New York City, have experienced a surprising resurgence that is almost at pre-pandemic levels. However, notwithstanding the Debtor's cautious optimism about the future of tourism in New York, as has always been the case, the winter season from January to mid-March is much slower in New York City than in other months of the year.  By way of example, whereas, in December 2022, the Debtor was at 93% occupancy, in January 2023, it is projected the Debtor will be at 70% occupancy with an ADR of just $110.[2]  By this Agreement, the Debtor has ensured that 100% of the Rooms will be occupied with a guaranteed income stream of over $93,000 per day through April 30, 2024, absent an early termination in accordance with the Agreement.  Indeed, the Debtor purposely negotiated for a term through April 30, 2024 in order to capture the revenue from this Agreement for the traditionally slower winter season in early 2024, as opposed to ending the Agreement at an earlier point, such as December 31, 2023, by way of example. Indeed, even if the Agreement is terminated in August 2023, for instance, after the six month guaranteed minimum period under the Agreement, the Debtor will benefit from the busy travel season in New York City in September through December 2023.  As such, the length of the

---

[2] The average daily rate (ADR) is a metric widely used in the hospitality industry to indicate the average revenue earned for an occupied room on a given day.

Agreement strikes an appropriate balance between the needs and goals of the Debtor and NYCHH.

24.    <u>Fourth</u>, the Agreement provides a guaranteed fixed income stream to the Debtor over the term of the Agreement in a competitive industry that is often impacted by any number of issues outside of the Debtor's control.  For instance, as the country learned in 2020, nothing can be taken for granted.  And while the return to normal lives is well underway, occasional surges in the Covid-19 virus percolate from time to time, which could theoretically lead to future governmental shutdowns or recommendations and guidance from the Centers for Disease Control or other health agencies to stay indoors and avoid travel. Further, there are many macroeconomic reasons that could unexpectedly arise that must be considered as well.  The increase in inflation in 2022, which is continuing in 2023, is well documented.  Many financial experts expect a recession in 2023, potentially with some layoffs.  Thus, these foregoing circumstances threaten to tighten the purse-strings of the ordinary citizen in the foreseeable future.  In these circumstances, the tourism industry could suffer setbacks.  While the Debtor is certainly hopeful that the foregoing risks will not come to pass and is genuinely very optimistic about the future of the tourism and hospitality industries as a whole, faced with these uncertainties that it cannot control, the Debtor could not pass up the guaranteed income to be generated under the Agreement.

25.    <u>Fifth</u>, the Agreement also includes a provision that makes clear that entry into the Agreement does not mean the Debtor is prohibited from pursuing, on a parallel track, a possible reorganization plan or a sale of the Debtor's Hotel and related property.[3]  It would be anticipated that in either case, the Agreement would be assumed, or assumed and assigned to a third party, as

---

[3] The Debtor believes by entering into the Agreement, it will generate monies which should enable the Debtor with some additional capital infusion to reinstate the Loan.

the case may be. Moreover, the Debtor believes that since the Net Operating Income will increase exponentially, at least in the short term, the Agreement could potentially lead to higher bids or otherwise increase the number of prospective purchasers that may become more interested in making a bid for the Hotel through an auction and sale process.

26.    <u>Sixth</u>, the Agreement was not considered in a vacuum but was the result of arms-length bargaining between the parties, over the course of several weeks. By way of background, when the Debtor was first approached by NYCHH in mid-December, NYCHH requested only a small portion of Rooms, <u>i.e.</u> roughly 100 Rooms. After analyzing this request, the Debtor rejected such proposal as the logistics of housing asylum seekers in only 100 Rooms, while also servicing hundreds of other tourists were too difficult. The Debtor was also understandably concerned about potential backlash from tourists using the Hotel at the same time as asylum seekers. A split was also problematic insofar as NYCHH desired use of the Debtor's restaurant for provision of food service, but the restaurant is an amenity that is commonly provided to the tourists at the Hotel. Numerous other complications arose leading ultimately to NYCHH obtaining additional funding to make a proposal for 100% of the Rooms at the Hotel., which as noted, is very beneficial to the Debtor. Aside from the economics, the Agreement provides other non-economic terms requested by the Debtor regarding the Guests' use of the Hotel, including security and other important considerations.

27.    <u>Last</u>, but certainly not least, while the Debtor's obvious main objective is to ensure that it maximizes value for the estate and all constituents, which the Agreement undoubtedly ensures, entry into the Agreement is also important for the public interest. The plight of these asylum seekers and migrants is well documented and is now a national crisis which is disproportionately affecting a small number of municipalities, including New York

City. These human beings deserve shelter and a warm bed and meals while they determine their future and next steps. The Debtor has the ability to play a small role in providing such amenities. In light of the shortage of shelters and affordable housing, absent the support of New York City and its agencies as well as private entities such as hotels and other buildings "stepping up" to allow these asylum seekers and migrants to use their facilities for a short period of time, tens of thousands of desperate and hungry asylum seekers and migrants would be forced to walk the streets of the City aimlessly in the midst of the winter season. While a bankruptcy case's main focus is often the economics of a deal (which the Debtor has met in any event), there are instances, including this one, in which a court should consider whether the public interest would be served by consummation of a transaction. See e.g. In re Chrysler LLC, 405 B.R. 84, 96 (Bankr. S.D.N.Y. 2009) (approving sale, noting, among other things, the "overriding concern of the U.S. and Canadian governments to protect the public interest"); see also In re C2 Media LLC, 2010 WL 2910902 at *3 (approving agreement, for a number of reasons, including because it was "in the public interest, as it will result in the continued operation of the assets"); see also In re Trans World Airlines, Inc., 2001 WL 1820326 (approving sale under section 363(b), noting "substantial public interest in preserving the value of TWA as a going concern" and "public interest that favors an organized rehabilitation"); In re Jewish Memorial Hospital, 13 B.R. 417, 419 (Bankr. S.D.N.Y. 1981) ('the health and safety of the general public is undisputably a paramount public interest"); see In re Miles, 1992 W 48577 (Bankr. E.D. Pa. March 4, 1992) (denying relief from stay to lender to pursue foreclosure relief as "public interest is served by preventing the Debtors from being rendered homeless"). There is no question that the public interest would be served by approval of the Agreement.

28.     In sum, the Debtor submits, in the exercise of its business judgment, that entry into

the Agreement is in the best interests of the Debtor, its estate, and all creditors and constituents.

## NOTICE OF MOTION

29.    Under the Bankruptcy Rules, a motion to approve the entry into the Agreement requires at least fourteen (14) days' notice and possibly twenty-one (21) days.  However, as set forth in the Debtor's Motion to Shorten Time for a Hearing, and supporting documents, the Debtor requests the Court schedule a hearing to consider the Motion on approximately seven (7) days' notice in order to satisfy the NYCHH's desire to provide accommodations to numerous asylum seekers and migrants as quickly as possible.

30.    No previous application for the relief requested herein has been made to this Court or any other Court.

**WHEREFORE**, for all of the foregoing reasons, the Debtor respectfully requests the Court grant the relief requested in the Motion and grant the Debtor such other and further relief as this Court deems just and proper.

Dated:  New York, New York
       January 17, 2023

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Golden Seahorse LLC*
*dba Holiday Inn Manhattan*
*Financial District*
*Debtor and Debtor-in-Possession*

By:    /s/ Scott S. Markowitz
       Scott S. Markowitz, Esq.
       Rocco A. Cavaliere, Esq.
       1350 Broadway, 11th Floor
       New York, New York 10018
       (212) 216-8000
       smarkowitz@tarterkrinsky.com
       rcavaliere@tarterkrinsky.com

**EXHIBIT A**

WT_000104

This Hotel Use Agreement is made as of January 17, 2023 (this "**Agreement**" or "**Hotel Agreement**") between NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, a New York public benefit corporation with offices at 50 Water Street, 17th Floor, New York, NY 10004 ("**H+H**") and Golden Seahorse LLC, Debtor in Possession, a New York limited liability company, with offices at 99 Washington Street, New York, NY 10006 ("**Owner**"). Each of H+H and Owner may be referred to as a "**Party**" and collectively as the "**Parties.**"

| H+H: | Hotel: |
|---|---|
| **H+H Contact:** Chris Keeley | **Name of "Hotel": Holiday Inn Financial District** |
| **Title:** | **Address: 99 Washington Street, New York, NY 10006** |
| | **Commencement Date: On or before January 25, 2023 (Subject to Bankruptcy Court Approval)** |
| | **Expiration Date April 30, 2024** |
| **Address: 50 Water Street** | **Hotel Contact: Greg Riley** |
| **City, State, Zip: New York, NY 10004** | **Title: General Manager** |
| **Phone: 646.695.6565** | **Phone:** 484-894-0823 |
| **Email: chris.keeley@nychhc.org** | **Email: greg.riley@crescenthotels.com** |

I.   **Hotel Agreement**

    a.   Owner is a debtor and debtor in possession in a Chapter 11 bankruptcy case pending in the Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), Bankr. Case. No. 22-11582.

    b.   Owner will make available to H+H 100% of the 492 rooms in the Hotel (the "**Rooms**") at a rate of $190.00 per room per day (the "**Room Rate**") for the term of this Agreement and H+H shall pay for all such available rooms regardless of whether they are occupied by H+H or its guests.

    c.   The Rooms will be used as temporary housing for H+H's clients referred and overseen by H+H or its contractors ("**Guests**").

    d.   This Agreement includes the use of, and access to the entire Hotel building, including but not limited to all Rooms, meeting spaces, Guest storage spaces, appurtenant outdoor spaces such as atria, Guest areas/spaces, and the restaurant on the first and second floor at 103 Washington Street, etc.  The only portions of the Hotel that shall not be available to H+H are the mechanical rooms.

089271\1\170087422.v1

WT_000105

e.  This Agreement shall be effective only after Owner obtains authority to enter into this Agreement from the Bankruptcy Court, and Owner will utilize best efforts to obtain such authority within ten (10) days of the full execution and delivery of this Agreement. The term of this Hotel Agreement shall commence within three (3) business days of entry of an order by the Bankruptcy Court approving Owner's entry into this Agreement, provided the term shall commence no later than January 25, 2023 (the "**Commencement Date**") provided further that H+H may have access to the Hotel two (2) business days in advance for set up and staff training prior to any Guest occupancy. On the Commencement Date, Owner shall deliver to H+H a total of three hundred (300) Rooms. Approximately seven days thereafter, Owner shall deliver to H+H the remaining 192 additional Rooms. All deliveries of Rooms shall be made in full floor increments. No delivery of a partial floor shall be accepted.

f.  Either Party shall have the right to terminate this Agreement in the event of a material breach by the other Party; provided that the non-breaching Party gives the allegedly breaching Party a notice describing in detail the nature of such material breach and the allegedly breaching Party fails to cure such material breach within 30 days of the giving of such notice. To the extent the allegedly breaching Party disagrees with the notice of termination and cure, such Party shall be permitted, on no less than 7 business days' notice to seek relief from the Bankruptcy Court in order to prevent the termination of the Agreement. Notwithstanding the foregoing, in the event of a breach by either of the Parties that creates a danger to the health or safety of the Guests, then, notwithstanding the 30-day period to cure such breach, the non-breaching party may immediately upon notice to the other Party, remove the Guests from the Hotel and the Room Rate shall be suspended until the hazardous condition has been remedied. Additionally, H+H may terminate this Agreement without cause at any time 60 days after giving notice of termination to Owner, provided however in no event shall H+H be permitted to terminate this Agreement without cause until after one hundred eighty (180) days after the Commencement Date (the "**Early Termination Period**").

g.  In addition to the Room Rate, H+H shall pay any and all applicable federal, state, municipal or other taxes, including New York City Hotel occupancy taxes (unless exempted), fees, or assessments imposed on or applicable to H+H's use of the Hotel. Attached as Appendix 1 is a letter from the NYS Department of Taxation and Finance confirming H+H's tax exemption which Owner will rely on and present to excuse the payment of applicable taxes.

h.  Owner shall allow H+H's contractors (including but not limited to security, food service vendors and medical personnel) to enter the Hotel to provide services to the Guests or for other purposes, as it deems necessary. All such third-party contractors shall be chosen in H+H's sole discretion. Owner shall reasonably cooperate with all such third-party contractors, including allowing such contractors access into and throughout the Hotel as reasonably necessary to carry out their duties and allowing them to store materials pertaining to their work in the Hotel. For the avoidance of all doubt, the Owner shall continue to employ and/or utilize, at its own expense, its

089271\1\170087422.v1

WT_000106

own Employees and other independent contractors, including but not limited to its front desk personnel and office employees contracted to Owner by Crescent Hotels and Resorts and housekeeping personnel contracted to the Owner by General Personnel Services Inc.

i.     The Room Rate is fixed.  No amenity (other than as provided in this Agreement) or similar charges other than the fixed Room Rate are allowed when billing for Rooms.  No other charges, such as amenities, pay-per view, non-domestic telephone calls, or room service are allowed and none of the foregoing are required to be provided by Hotel other than Wi Fi and domestic telephone service.

j.     Owner will provide for the laundering of Guests' personal laundry at the same rate charged Owner by its outside vendor.  The Parties represent to each other that no broker's fees or commissions shall be due to any party in connection with this Agreement.  Each Party represents and warrants it has dealt with no broker in connection with this Agreement and each will indemnify the others for all costs, liabilities and expenses (including reasonable attorneys' fees) if such representation and warranty is inaccurate or alleged to be inaccurate.

l.     Nothing in this Agreement shall prevent the Owner from (i) marketing and selling the Hotel to another third party, or (ii) pursuing the confirmation of a Chapter 11 plan of reorganization in Owner's bankruptcy case, in each instance it being contemplated that this Agreement would be assumed by Owner and/or assigned to a third party, as the case may be.

m.     **Payment Arrangements**:

1.     **The Initial Payments Relating to the First 300 Rooms:**

On the later of three business days after the Bankruptcy Court approves the Agreement or February 1, 2023, H+H shall pay Owner an amount equal to the Room Rate for three hundred (300) Rooms for the period from the Commencement Date to January 31, 2023.[1]

Assuming the Commencement Date has occurred, on or before February 1, 2023, H+H shall pay Owner an amount of $1,596,000 equal to the Room Rate for three hundred (300) Rooms for the period from February 1, 2023 to February 28, 2023.

2.     **The Initial Payments Relating to the Additional 192 Rooms:**

---

[1] By way of example, if the Commencement Date is January 25, 2023, H+H shall pay Owner the amount of $399,000, calculated as follows: (i) $190 Room Rate, multiplied by (ii) 300 Rooms, multiplied by seven calendar days.

089271\1\170087422.v1

WT_000107

On or before seven days after the Commencement Date, H+H shall pay Owner an amount of $1,021,440, which is equal to the Room Rate for one hundred ninety-two (192) Rooms for the period from February 1, 2023 to February 28, 2023.[2]

**3.    The Future Payments Relating to the 492 Rooms**

As set forth in this Agreement, it is anticipated that all of the Hotel's 492 Rooms will have been delivered to H+H prior to March 1, 2023.  As such, as of March 1, 2023, H+H shall pay Owner monthly and on the first day of each calendar month the Room Rate for the full Hotel at $93,480/day. The payment due March 1, 2023 and all subsequent months shall be $2,804,400 provided that periodically, Owner shall adjust with H+H to account for overpayments or underpayments made during the prior months based upon the actual length of the months, and for any other adjustments or additional charges or credits as may be due.  Owner may invoice H+H for any underpayment which H+H shall pay within 30 days.  If H+H is due a credit for any overpayment, it shall be applied to the amount next due from H+H or, if at the end of the term, promptly remitted to H+H by check.

Owner may invoice H+H monthly at the end of each calendar month for any charges other than the Room Rate incurred during the preceding month, including any charges associated with damages to the rooms in excess of reasonable wear and tear.  H+H shall pay all undisputed invoices (for all vendors and scope of services that H+H has preapproved in writing whether detailed herein or contracted after the signing of this document) within 30 days after receipt of such invoice.  At present, there are no preapproved vendors.

Payment shall be made only for rooms that are made available and delivered in clean and usable condition.  The pro-rata, per room rate of any rooms (i) not made available (ii) not delivered in clean and habitable condition and/or (iii) not delivered with working furniture will be deducted from the Room Rate.  H+H shall have the option to add, at its cost, any additional refrigerators and microwaves to Rooms, provided however that any additional utility costs borne by Owner as a result of the use of additional refrigerators and microwaves shall be borne by H+H, with the parties to agree to work in good faith after the Commencement Date to reconcile what portion of any utility charges relate to additional refrigerators and microwaves required by H+H.  Any such additional refrigerators and microwaves shall be the property of H+H which H+H may remove from the Hotel upon the expiration or earlier termination of this Agreement.  Owner represents that each Room has the electrical power capacity for the operation of such appliances.

H+H has represented and warranted that H+H has the authority and power to remove all Guests at the conclusion of the term of this Agreement (i.e. April 30, 2024). To the extent any Guests remain after the term of this Agreement, without the consent of Owner, Owner shall be entitled to liquidated damages equal to

---

[2] It is anticipated that the 192 Rooms will be delivered on or about February 1, 2023. The figures set forth herein shall be adjusted accordingly to the extent that the 192 Rooms are delivered slightly before or after February 1, 2023.

$750.00 per Room per day, representing the fair value of Owner's loss of the opportunity to rent such Room(s) in the normal course. In addition to the foregoing, Owner shall have the right to seek relief from the Bankruptcy Court to forcefully remove any Guests through, among other things, contempt orders or through the use of the United States Marshal's Office or similar governmental agency or unit, to the extent necessary.

## II.   H+H Services

1)   Security:  H+H shall provide 24-hour security and/or Guest access control through H+H or its contractors.  H+H shall use reasonable efforts to ensure that Guests comply with Hotel rules and applicable laws while staying at the Hotel.  Notwithstanding the foregoing, Owner shall be permitted to employ its own security at the Hotel.  To the extent that any Guests are unruly, engage in any illegal activities, vandalize the Hotel, or otherwise pose a danger to any other Guest, employee or independent contractor, or to the proper functioning and structure of the Hotel, H+H is obligated to immediately remove such Guests from the Hotel, provided that in the event that H+H fails to immediately remove such Guests from the Hotel, Owner reserves the right to use its own security or contact the police as it deems appropriate.

2)   Food: H+H may provide food services to all or a portion of the Rooms.  Owner shall also make available for H+H's use the first and second floor of the restaurant located at 103 Washington Street.  As noted in the Agreement, H&H may provide for refrigerators and microwaves in certain Rooms but in no event shall any Guests be permitted to use hot plates or toaster ovens or any other appliance which may increase the risks for fire and other safety hazards.

## III.   Owner's Responsibilities

1)   Uses/Rooms:

    a.   Owner shall provide the Rooms to H+H as provided herein unless prevented due to conditions beyond Owner's control.

    b.   Each Room shall contain standard room furniture. If H+H requires that certain standard room furniture be removed, Owner shall use commercially reasonable efforts to remove the same prior to 14 days following the Commencement Date.  If any room is described as being ADA accessible on the Checklist, Owner shall keep all features, furniture, and attachments which make the room ADA accessible in good working order such that the room remains ADA accessible through the Expiration Date.

    c.   Immediately upon request, Owner shall also provide H+H with key cards for all Rooms with electronic locks for emergency access to all Rooms.  To the extent that H+H shall need emergency access to Rooms, Owner shall provide H+H with the anti-lockout emergency access tool to open any latch chains or similar interior door locking devices.

    d.   Owner shall provide no parking.

089271\1\170087422.v1

WT_000109

2)   <u>Services</u>:

   a.   Owner shall provide all information required in the Checklist to H+H attached as Attachment 1 herein, upon request, and shall notify H+H if there are any changes to such Checklist after its submission.

   b.   Owner will identify on-site staff to serve as emergency contacts in the event that Owner or H+H require an immediate response to any inquiry, and will submit the name, cell phone number, email and other contact information for this purpose.  H+H reserves the right to require Owner to replace any emergency contacts that fail to appropriately respond to emergencies. Owner's POC shall each be available on a 24 hour/ 7 days per week basis. Hotel's POC is Greg Riley, General Manager, tel: 484-894-0823, email: greg.riley@crescenthotels.com.

   c.   Owner shall assign on-site management to the Hotel as it would during normal hotel operations responsible for general hotel operations and management of the Hotel's staff. Such staff shall be available on a 24 hour, 7 days per week basis.

   d.   Owner shall assign a reception/lobby attendant (which may be the same personnel as described in 2(c) above) to provide front of house operations including coordinating with H+H and, if applicable, 3rd party contractors retained by H+H for services such as food service.  The lobby staff shall be available on a 24 hour, 7 days per week basis. Lobby staff shall be responsible for contacting rooms with notifications as required by H+H.

   e.   Owner shall maintain all hotel corridors, stairwells, elevators, and other common areas in a clean and sanitary condition.

   f.   Owner shall clean each Room three times each week or upon Guest check out. To the extent any Guest does not voluntarily provide access to its Room for housekeeping at least once every week, H+H shall be responsible for ensuring that such Guest cooperates in allowing housekeeping to enter the Room at least once every week.

   g.   Fresh linens, sheets, blankets, pillows and pillowcases, towels, soap, shampoo, conditioner and toilet paper shall be delivered upon check-in and refreshed, as necessary but not less often than three times per week.

   h.   Owner shall replace linens and towels on a one-for one exchange 3 times per week or as needed if they become soiled.

   i.   If a Guest checks out between 10AM and 3PM, Owner shall make the room available for a subsequent Guest within four hours of such check out. If a Guest checks out between 3PM and 10AM, Owner shall make the room available for a subsequent Guest by 10AM the following calendar day, or 3 hours after such check out, whichever is later.

WT_000110

j. Owner shall pick up trash from the Rooms daily.

k. Owner shall provide extermination and pest control services daily. Extermination must be performed by a certified pesticide applicator. In addition, extermination must be performed monthly at the Hotel and more often in Rooms as conditions require, and where vermin is identified. Extermination activities cannot be performed while Guests are in the room. If any Guest does not cooperate with Owner in connection with extermination, Owner shall not be obligated to exterminate in such Guest's room.

l. All Rooms shall be equipped with a telephone which can make and receive an unlimited number of domestic calls.

m. If Hotel is equipped with Wi-Fi, Guests and any H+H staff or contractors shall have free access to Wi-Fi service at all times.

n. Owner shall provide one security guard at the Hotel lobby/entrance 24 hours per day.

3) <u>Repairs and Maintenance.</u>

a. Owner shall provide maintenance staff to support service calls (i.e. clogged toilet etc.) for Rooms.  Maintenance staff shall also be at the Hotel to ensure that all building systems, structural elements, safety equipment, furniture and fixtures are fully functional at all times. Such staff shall promptly respond to complaints from H+H. Further, the POC will provide a phone number for non-business hours so that he/she is responsive to any issue with the Hotel systems.

b. Owner shall maintain a valid Certificate of Occupancy, or an unexpired Temporary Certificate of Occupancy.  If Temporary Certificate of Occupancy expires, then Owner shall immediately provide H+H with a detailed plan for renewing the expired Temporary Certificate of Occupancy. Except as otherwise agreed to by the Parties, Owner shall be responsible for all maintenance and repairs of the hotel building and Rooms.

c. Owner will keep the Hotel premises free of New York City Department of Building, Fire Department of New York, and Environmental Control Board life safety violations to the best of its abilities. If any life safety violations exist either prior to use by H+H, or at the time of execution of this Agreement, then Owner shall prioritize their resolution at no cost to H+H. Owner shall provide a list of such life safety violations to H+H prior to execution of this Agreement, and such life safety violations may also be documented in a corrective action plan issued by H+H to the Hotel.  Any notice by a City agency of a life safety violation of code, rules or regulations issued prior to the Expiration Date must be addressed promptly and may result in a reduction or potential exit of H+H from the Hotel.

7

Notwithstanding anything contained herein to the contrary, the Hotel shall be permitted to perform life safety repairs or perform work to the Hotel and Rooms as required under applicable law (e.g., Local Law 11). The above notwithstanding, to the extent that any safety violations are caused by the Guests, H+H must address such violations promptly, absent which Owner may terminate this Agreement or otherwise seek relief from the Bankruptcy Court.

d.   Owner may enter the Rooms at any and all times for inspection, repairs, and maintenance, but shall use reasonable care not to disturb any occupant of any such room or its possessions in so doing except in cases of emergency or if dangerous, unsanitary or hazardous conditions exist, or illegal activities are being conducted, in or about such room.

4)   Alterations/Damage to Rooms

a.   No additions, alterations or improvements to the Rooms may be made.

b.   If the Hotel or any part is damaged by fire or other cause the Room Rate shall be appropriately abated until such damage is restored.  If a substantial part of the Hotel should be so damaged, H+H may elect to terminate this Agreement entirely on 10 days' notice as to such Room.  Neither the right of termination or rent abatement shall apply if H+H, its contractors or Guests were the cause of the fire or other cause.

c.   Guests are not permitted to smoke or use illegal drugs in the Rooms, nor are Guests permitted to write on walls or otherwise vandalize the Rooms in any way.

d.   Owner shall not make any claim against H+H or the City for normal wear and tear to the Hotel or Rooms.  In the event of any dispute between Owner and H+H and the City concerning whether damage is "normal wear and tear", such dispute will be decided by the Bankruptcy Court

e.   H+H will reimburse Owner for the reasonable cost of repairing any damages caused by misconduct or negligence of H+H, its employees, contractors or the Guests promptly following submission of an appropriately documented report of a joint walkthrough itemizing and photographing said damages; provided that reasonable wear and tear shall be excepted.  H+H reserves the right to be present during any such walk-through. Invoices for damages must contain this documentation, including all itemized associated costs.

f.   For damages to be considered, Owner must create an incident report that includes the following with respect to the alleged damage:

1.   Date damage was discovered.

8

2.      Number of Rooms or other portions of the Hotel damaged.

3.      Description of damages including photographic evidence.

4.      Owner's affirmation that it affirms that the damage occurred on or about that date of its discovery and that it was, to the best of Owner's knowledge, caused by the Guest.

5.      Itemized estimate of repairs.

6.      Any additional information that supports the claim.

g.      Reimbursement for damages will be considered on a monthly basis by H+H provided that in the event H+H rejects Owner's requests for reimbursement, Owner shall be permitted to apply to the Bankruptcy Court for appropriate relief.

5)     <u>Communication</u>

a.      Inquiries regarding any Guest must be referred to H+H.  Owner shall give immediate notice to H+H of any emergency response situation occurring at the Hotel.

b.      The H+H POC shall be Chris Keeley (chris.keeley@nychhc.org).

6)     <u>Confidentiality</u>

All individual identifying information, including Guest names, received by or in the possession of any Party in the course of this Agreement shall be kept confidential and shall not be disclosed except as herein provided or as required by law.

## IV.   **The Parties' Joint Responsibilities**

1)     **Insurance**

A.      Hotel shall maintain workers' compensation insurance, employers' liability insurance, and disability benefits insurance, in accordance with Law on behalf of, or in regard to, all employees of the Hotel providing services under this Hotel Agreement.

B.      Within 10 Days of award of this Agreement Owner shall submit proof of workers' compensation insurance and disability benefits insurance (or proof of a legal exemption) to H+H in a form reasonably acceptable to H+H.

C.      Owner shall maintain Commercial General Liability insurance in the amount of at least Two Million Dollars ($2,000,000) per occurrence for bodily injury (including death) and at least Four Million Dollars ($4,000,000) in the aggregate. Coverage must be at least as broad as the coverage provided by the most recently issued ISO Form CG 00 01, primary and non-contributory, and "occurrence" based rather than "claims-made." Such coverage shall list

     WT_000113

H+H and the City of New York together with their respective officials and employees, as additional insureds with coverage at least as broad as the most recently issued ISO Form CG 20 10 or CG 20 26.

> D.  Nothing set forth in this Agreement shall change the Owner's obligation to comply with its insurance commitments under its loan agreement and mortgage, including with respect to mortgagee insured, additional insured or loss payee provisions.

### 2)  **Indemnification**

> a.  To the fullest extent permitted by Law, Owner shall defend, indemnify, and hold harmless H+H, including its officials, contractors, service providers, and employees, against any and all claims (even if the allegations of the claim are without merit), judgments for damages on account of any injuries or death to any person or damage to any property, and costs and expenses to which H+H, or its contractors, service providers, officials or employees, may be subject to or which they may suffer or incur or incur arising out of the operations of the Hotel under this Agreement; provided, however, such indemnity shall not apply to the extent that such damages, etc. arose due to the negligence or wrongful acts of H+H, its employees, contractors or the Guests..  Insofar as the facts or law relating to any of the foregoing would preclude such indemnitees from being completely indemnified by Owner, such indemnitees shall be entitled to be partially indemnified by Owner to the fullest extent permitted by law.  To the extent that H+H asserts indemnity claims against Owner, such claims shall be determined by the Bankruptcy Court and to the extent allowed, paid in the order of priority under the provisions of the Bankruptcy Code, and under no circumstances shall such indemnity claims have priority over the secured liens and claims of the Owner's prepetition lenders.

> b.  To the fullest extent permitted by Law, H+H shall indemnify, defend, and hold harmless Owner, its manager(s), their respective owners, affiliates and subsidiaries, the successors and assigns of the foregoing, and each of their respective officers, managers, members, partners, directors, employees, (collectively, the "**Hotel Parties**") from and against any and all losses, damages, causes of action, suits, claims, judgments or expenses, including but not limited to fees and court costs (collectively, "**Claims**"), made or asserted by any third parties (including any third party actions of Owner's employees or Guests), which Claims arise out of any alleged injuries or death to any person or alleged damage to any property, or arise out of any alleged illness, death, sickness (including any and all COVID-19 related exposures or claims), in any case, caused by or associated with H+H's use or occupancy of the Hotel as provided herein, including any such claims arising from the actions or failures to act of H+H's contractors,  excluding Claims arising from the negligence or intentional tortious acts of any Hotel Party. Insofar as the facts or law relating to any of the foregoing would preclude such indemnitees from being completely indemnified by H+H,

10

WT_000114

such indemnitees shall be partially indemnified by H+H to the fullest extent permitted by law.

### 3)    Governing Law:

This Agreement will be governed by and interpreted pursuant to the laws of the State of New York, excluding any laws regarding the choice or conflict of laws.

### 4)    Jurisdiction:

Should any disagreement arise out of the interpretation and enforcement of this Agreement, the Bankruptcy Court shall maintain jurisdiction over any disputes which arise between the Parties as long as Owner's Chapter 11 case remains pending.

## V.    Additional Applicable Terms

### 1)    Incorporation of Exhibits & Order of Priority

The Parties agree to incorporate as though set forth fully herein the terms and conditions set forth in the following attached Exhibits and Appendices: Exhibit A: H+H's Standard Terms and Conditions with a FEMA Rider; and Attachment 1: the checklists of required information regarding participating hotels (Checklist 1 and Checklist 2).  In the event of a conflict between this Agreement and any of the Exhibits incorporated herein, the following order of governance will apply: (1) this Agreement, including Attachment 1 (2) Exhibit A.

### 2)    Entire Agreement

This Agreement, including the exhibits and appendices attached hereto, constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement and all prior or contemporaneous agreements or understandings are merged into this Agreement.  If any provision of this Agreement is found invalid or unenforceable, the remainder of this Agreement will still be valid and enforceable to the fullest extent permitted by law.

This Agreement may not be modified or amended except in writing and signed by all Parties.

### 3)    Counterparts and Electronic Signatures

This Agreement may be signed in multiple counterparts with the same effect as if the Parties had signed the same document. The counterparts of this Hotel Agreement may be signed and delivered electronically (including by email or PDF). All signatures so obtained and transmitted shall be deemed to be original signatures for all purposes under this Hotel Agreement.

11

**IN WITNESS WHEREOF,** the parties have signed below as of the date first above written.

NEW YORK CITY HEALTH AND
HOSPITALS CORPORATION

GOLDEN SEAHORSE LLC

By: _____
Keith Tallbe, Chief Procurement Counsel

By: _____

Name: _____
Title: _____

12

WT_000116

## Exhibit A

### New York City Health and Hospitals Corporation's
### Standard Terms and Conditions

These terms and conditions ("**Terms and Conditions**") are entered into by and between New York City Health and Hospitals Corporation, located at 50 Water Street, New York, New York 10004, ("NYC Health + Hospitals") and Golden Seahorse LLC, a New York limited liability company with offices at 99 Washington Street, New York, NY 10006 ("Vendor"), each individually referred to as a "Party" and together as the "Parties."

### Definitions

**Agreement:** the agreement between the Parties that consists of these Terms and Conditions, and the Agreement relating to the subject matter hereof ("Incorporated Documents"). The Incorporated Documents shall be made part of this Agreement unless specifically stated otherwise in writing signed by both Parties. To the extent of any inconsistencies between the Hotel Agreement and these Terms and Conditions, the Agreement shall control. Further, to the extent of any inconsistencies between the Agreement and any order approving the Hotel Agreement, the Bankruptcy Court's order shall control.

**The City:** The City of New York.

**NYC Health + Hospitals:** New York City Health and Hospitals Corporation, a public benefit corporation established by the laws of the State of New York.

**Services:** actions provided by a Vendor under this Agreement for the benefit of NYC Health + Hospitals, such as software support, equipment maintenance, professional services (e.g., legal), non-professional services (e.g., cleaning), consultations, and the like.

**Vendor:** the individual or entity providing Goods or Services under this Agreement.

**Vendor Employee(s):** owners, partners, members, officers, directors, employees, agents, or any other person under the reasonable control of Vendor.

### Article I. General Business Terms

1. Term and Extension of Term
The term of this Agreement shall be the Commencement Date through April 30, 2024 (the "Initial Term").

2. Termination
See the Hotel Use Agreement.

3. Payment
See the Hotel Use Agreement.

### Article II. Mandatory Terms and Conditions

1. Order of Precedence
These Terms and Conditions shall prevail in the event of a conflict between these Terms and Conditions and any Incorporated Documents.

13

WT_000117

## 2. Governing Law

This Agreement shall be governed, construed and enforced in accordance with the laws of the State of New York without giving effect to its principles of conflicts of laws.

## 3. Legal Disputes

3.1 Other than disputes pertaining to the responsibilities and obligations of the Parties and interpretation of the Agreement which shall be determined by the Bankruptcy Court as long as Owner's Chapter 11 case remains pending, pursuant to New York City Health and Hospitals Corporation Act, Chapter 1016-69, Section 20, all actions against NYC Health + Hospitals shall be brought in the City, in the county in which the cause of action arose, or if it arose outside of the City, in the City, County of New York.

3.2 Actions against NYC Health + Hospitals by Vendor arising out of this Agreement must be commenced within six months of the expiration or termination of this Agreement.

3.3 Neither Party shall make a claim for personal liability against any individual, officer, agent or employee of the other, nor of the City, pertaining to anything done or omitted in connection with this Agreement.

3.4 This section shall survive expiration or termination of this Agreement.

## 4. Diversity Contracting

Intentionally omitted.

## 5. Investigations

5.1 In furtherance of its obligations under Chapter 34 of the New York City Charter, Vendor shall fully cooperate with any investigation, audit or inquiry related to this Agreement conducted by NYC Health + Hospitals, the City, or the State of New York that is empowered directly, or by designation to compel the attendance of witnesses to examine under oath.

5.2 If Vendor, an officer or director of Vendor, or any person under the reasonable control of Vendor refuses to testify for a reason other than the assertion of his or her privilege against self-incrimination in an investigation, audit, or inquiry conducted by NYC Health + Hospitals, the City, the State of New York that is a party in interest in, and is seeking testimony concerning the award of, or performance under, any transaction, agreement, lease, permit, contract, or license entered into with NYC Health + Hospitals, the City, the State of New York, any political subdivision thereof or local development, then NYC Health + Hospitals may convene a hearing, upon not less than five days written notice to the parties involved, to determine if any penalties shall attach for the failure of such person to testify.

5.3 The penalties that may attach after a final determination may include but shall not exceed: (i) the disqualification of Vendor for a period not to exceed five years from the date of an adverse determination for any person or any entity of which such person was a member at the time the testimony was sought, from submitting bids for, or transacting business with, or entering into or obtaining any contract, lease, permit or license with or from NYC Health + Hospitals or the City, and/or (ii) the cancellation or termination of any and all such existing NYC Health + Hospitals or City contracts, leases, permits, or licenses that the refusal to testify concerns and that have not been assigned as permitted hereunder, nor the proceeds of which pledged, to an unaffiliated and unrelated institutional lender for fair value prior to the issuance of the notice scheduling the hearing, without NYC Health + Hospitals or the City incurring any penalty or damages on account of such cancellation or termination.  Any monies lawfully due for goods delivered, work done, or

14

WT_000118

fees accrued prior to the cancellation or termination shall be paid by NYC Health + Hospitals or the City, as applicable.  As used in this paragraph license or permit shall be defined as a license, permit, franchise, or concession not granted as a matter of right.

5.4 This section shall survive expiration or termination of this Agreement.

## 6. Audit

6.1 Pursuant to Chapter 5 of the New York City Charter, at NYC Health + Hospitals' reasonable request made upon reasonable notice, Vendor shall make available all records and books pertaining to this Agreement during normal business hours for audit, inspection and/or investigation by NYC Health + Hospitals, the City, acting through its Comptroller, the U.S. government or any other persons authorized by NYC Health + Hospitals.  Such audit, inspection and/or investigation may include examination and review of the source and application of all funds from NYC Health + Hospitals, the City, the State of New York, the federal government, private sources, or any other source.  If an audit, inspection, or investigation is commenced as set forth in this section, NYC Health + Hospitals may withhold payment hereunder until Vendor provides the cooperation required hereunder.

6.2 Vendor shall maintain accurate books and records in accordance with generally accepted accounting principles.  Vendor shall retain such documents for six years after the final payments, expiration or termination of this Agreement, whichever is later.

6.3 This section shall survive expiration or termination of this Agreement.

## 7. Fair Practices

7.1 Any violation of the representations or warranties set forth in this section shall constitute a material breach of this Agreement, and NYC Health + Hospitals shall have the right to immediately terminate this Agreement without liability for any damages resulting therefrom.

7.2 Vendor warrants that no Vendor Employee is an elected official, officer or employee of NYC Health + Hospitals or the City.

7.3 Vendor and Vendor Employees shall not directly or indirectly give any gift in any form, including but not limited to money, service, loan, travel, entertainment to members of NYC Health + Hospitals' Board of Directors, Community Advisory Boards, officers, employees, or personnel.

7.4 Vendor shall not represent any party other than NYC Health + Hospitals related, or substantially related, to the Services to be performed under this Agreement without NYC Health + Hospitals' advance written consent.

7.5 Vendor warrants that neither Vendor nor any Vendor Employee has any conflict of interest relating to the performance of this Agreement which is materially adverse to NYC Health + Hospitals or the City and shall not acquire such conflict of interest during the term of this Agreement.

## 8. Responsibility Determination

8.1 Vendor represents and warrants that any information submitted as part of NYC Health + Hospitals' vendor responsibility determination process, including PASSPort, have been, or will be, fully answered in accordance with the requirements set forth by the New York City Mayor's Office of Contract Services.

089271\1\170087422.v1

WT_000119

The veracity of the information submitted is a material inducement to NYC Health + Hospitals' execution of this Agreement.

8.2 If clearance from the City's Office of Inspector General cannot be obtained prior to execution of this Agreement and if subsequent to the execution of this Agreement NYC Health + Hospitals receives information from the Office of the Inspector General of the kind that would typically lead to a finding that a vendor is not responsible to receive a contract from NYC Health + Hospitals, then NYC Health + Hospitals may terminate this Agreement immediately without liability for any damages resulting therefrom.

8.3 Vendor must submit new PASSPort questionnaires every three years from the date of its last submission of PASSPort questionnaires so long as this Agreement is in effect.

9. Vendor Representations

Vendor represents and warrants that it and each of its Vendor Employees providing Services under this Agreement are properly licensed to perform such Services by the applicable licensing entities.

Vendor represents and warrants that it is registered do business in the State of New York and the City of New York.

Vendor represents and warrants that it is financially capable of fulfilling all requirements of this Agreement, that there are no legal proceedings against it that could threaten performance of this Agreement, and that the it is a validly organized entity that has the authority to enter into this Agreement. Vendor is not prohibited by any loan, contract, financing arrangement, trade covenant, or similar restriction from entering into this Agreement.

10. Vendor Employee Screening

NYC Health + Hospitals may require Vendor Employees that enter NYC Health + Hospitals premises to participate in its Vendor Employee screening system and Vendor shall comply with all requirements of such system.  NYC Health + Hospitals shall have sole discretion as to whether any Vendor Employees may access NYC Health + Hospitals premises.

11. Criminal Background Checks

Intentionally omitted.

12. Excluded Providers

12.1 Vendor represents and warrants that Vendor and Vendor Employees are not individuals or entities excluded from participation in federal or state health care programs.  Vendor shall ensure the eligibility of Vendor and Vendor Employees to participate in federal and state health care programs and further warrants that it will notify NYC Health + Hospitals in writing if Vendor or any Vendor Employees become excluded from such participation during the term of this Agreement. NYC Health + Hospitals may terminate this Agreement immediately without liability for any damages resulting therefrom should Vendor or Vendor Employees be excluded from participation in federal or state health care programs.

14.2 Vendor warrants that it is not currently a party to a Corporate Integrity Agreement or Certification of Compliance Agreement with any state or federal governmental agency.  Vendor shall promptly notify NYC Health + Hospitals if it becomes a party to such agreement during the term of this Agreement.

15. Principles of Professional Conduct

WT_000120

12.2 If Vendor, Vendor's Employees, or any Vendor subcontractors provide billing or coding functions, furnish health care services or items, or monitor the health care provided by NYC Health + Hospitals, then each such party shall comply with NYC Health + Hospitals' Principles of Professional Conduct ("POPC"), and shall (i) adopt the POPC or their own code of conduct that includes the POPC's core objectives or substantially similar compliance goals, (ii) not violate the POPC or their own similar code, (iii) not engage in unprofessional conduct as defined in the POPC, (iv) timely report to NYC Health + Hospitals in writing any violation of the POPC of which it becomes aware, and (v) fully cooperate, to the extent applicable, with any investigation by NYC Health + Hospitals, the City or by any governmental agency arising out of this Agreement.

## 13. New York State Law 10 NYCRR 400.4

Notwithstanding any other section of this Agreement, NYC Health + Hospitals shall remain responsible for ensuring that any Services provided pursuant to this Agreement complies with all pertinent federal, state and local statutes, rules and regulations, and shall comply with Chapter V of Title 10 of the NY Code of Rules and Regulations, entitled "Medical Facilities – Minimum Standards."

## 14. Nondiscrimination

NYC Health + Hospitals' adopted Chapter 56 of the New York City Charter, formerly Mayor's Executive Order 50, dated April 25, 1980, as amended ("Chapter 56"), and the rules and regulations promulgated thereunder.  Vendor shall comply with all rules and regulations under Chapter 56, and shall not engage in any unlawful discrimination.  This section applies to all Vendor subcontractors and Vendor Employees. Violation of this section may be deemed a material breach of this Agreement, and may result in a declaration of non-responsibility with NYC Health + Hospitals or the City.

## 15. MacBride Fair Employment Principles

This section does not apply if Vendor is a not-for-profit corporation or governmental entity.  Pursuant to the MacBride Fair Employment Principles (Section 165 of the New York State Finance Law), Vendor warrants that it (i) has no business operations in Northern Ireland, or (ii) shall take lawful steps in good faith to conduct any business operations in Northern Ireland in accordance with the MacBride Fair Employment Principles, and shall permit independent monitoring of compliance with such principles by NYC Health + Hospitals or the City.

## 16. Joint Commission Standards

If this Agreement falls within the scope of Joint Commission Standard LD.04.03.09 (the Goods or Services are directly related to patient care) then Vendor shall work in good faith with NYC Health + Hospitals to set forth specific key performance indicators in an attachment to this Agreement against which the performance of Vendor under this Agreement can be meaningfully measured on a regular periodic basis. Such attachment shall become part of this Agreement.

## 17. HIPAA

17.1 If at any time NYC Health + Hospitals determines that a business associate agreement compliant with the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) ("HIPAA") is required to be executed to comply with HIPAA, Vendor shall comply with such requirement. Failure to comply with this section shall constitute a material breach of this Agreement and NYC Health + Hospitals shall have the right to immediately terminate this Agreement without liability for any damages resulting therefrom.

089271\1\170087422.v1

WT_000121

17.2 NYC Health + Hospitals is a Hybrid Entity and Organized Health Care Arrangement as defined under the HIPAA Privacy Rule.  NYC Health + Hospitals' Correctional Health Services division does not engage in electronic transactions as defined in 45 CFR and was removed from HIPAA applicability at NYC Health + Hospitals' option pursuant to CFR 164.105(a)(2)(iii)(D).  Any agreement exclusively for its Correctional Health Services division shall not require a business associate agreement.

## Article III.  General Terms and Conditions

### 1. Independent Contractor

Vendor's relationship with NYC Health + Hospitals and the City is that of an independent contractor and not that of an employee.  Vendor covenants that neither it nor any Vendor Employees nor any Vendor subcontractors will hold themselves out as, nor claim to be, employees of NYC Health + Hospitals or the City, and that they will not make any claim, demand, or application to or for any right or privilege applicable to an employee of NYC Health + Hospitals or the City including, but not limited to, Workers' Compensation, benefits, pension, payroll taxes, or Social Security.

### 2. Subcontractors

2.1 Vendor is not permitted to subcontract, in whole or in part, performance of any obligation under this Agreement without the prior written consent of NYC Health + Hospitals, except the third-party vendors listed on Schedule A shall be permitted. Approval by NYC Health + Hospitals of subcontractors specifically set forth in an approved Diversity Vendor Utilization Plan shall be considered prior written consent by NYC Health + Hospitals.

2.2 If NYC Health + Hospitals authorizes in writing Vendor's use of a subcontractor, then Vendor shall not be relieved of any obligation under this Agreement and shall ensure all work performed by such subcontractor is in accordance with this Agreement. Upon request, a copy of each proposed subcontract shall be provided to NYC Health + Hospitals.

### 3. Indemnification

See Hotel Use Agreement.

### 4. Limitation of Liability

4.1 NYC Health + Hospitals' liability to Vendor arising out of this Agreement shall not exceed the amount that is unpaid to Vendor at the time such liability accrued.

4.2 Neither Party, nor their respective employees or agents, shall be liable to the other for indirect, punitive, exemplary or consequential damages.  Neither Party's officers, directors, agents or employees shall have personal liability to the other Party under this Agreement except in cases of fraud.

4.3  This section shall survive expiration or termination of this Agreement.

### 5. Notices

5.1 All notices or communications required or permitted to be given hereunder shall be in writing and if to NYC Health + Hospitals shall be sent to 50 Water Street, New York, New York 10004, Attn: General Counsel and if to Vendor at the address specified below. Notices may be sent by hand delivery, U.S. Postal Service certified mail return receipt requested or by nationally recognized courier next business day

WT_000122

delivery. Notices shall be deemed given upon delivery if delivery is made by hand, within three business days if sent by certified mail and on the next business day if sent by recognized courier with next business day delivery specified.

5.2 Notices to Vendor shall be sent to:

> Golden Seahorse LLC
> 99 Washington Street
> New York, NY 10006
> Attn: Jeff Qin

5.3 This section shall survive expiration or termination of this Agreement.

6. Compliance with Law

Vendor shall comply with all applicable laws, rules and regulations, including New York State and the City's wage laws. Each and every provision of law required to be inserted in this Agreement shall be and is deemed to be included.

7. Intellectual Property Infringement

7.1 Vendor warrants that the sale and use of Goods or Services provided shall not give rise to any claim of infringement of any third-party patent, copyright, trademark, or trade secret rights.

7.2 Notwithstanding any other section of this Agreement, Vendor shall indemnify and defend NYC Health + Hospitals and the City, their respective directors, officers, employees and agents, from and against any and all losses, liabilities, judgments, awards and costs (including legal fees and out-of-pocket expenses reasonably incurred) arising out of or related to any claim that NYC Health + Hospitals' or the City's use of the Services or Goods infringes, induces the infringement of, or violates and any third-party's intellectual property rights. . If the facts or law relating to any of the foregoing would preclude NYC Health + Hospitals from being completely indemnified by Vendor, NYC Health + Hospitals shall be partially indemnified by Vendor to the fullest extent permitted by Law.

7.3 If, as a result of any such claim, NYC Health + Hospitals is enjoined from use of any Services or Goods, or if Vendor believes that NYC Health + Hospitals is likely to become the subject of such a claim, Vendor, at its option and expense shall (i) procure the right for NYC Health + Hospitals to continue to use the Services or Goods, (ii) modify the Services or Goods so that they are not infringing, while remaining functionally equivalent to the Services or Goods to have been provided, or (iii) provide a refund to NYC Health + Hospitals for the infringing Services or Goods.

7.4 This section shall survive expiration or termination of this Agreement.

8. Insurance

8.1 Vendor shall not commence performing under this Agreement unless and until all insurance required by this Agreement is in effect and satisfactory proof of such insurance (such as certificates of insurance, amendatory endorsements, additional insured endorsement where applicable, or copy of the declarations and endorsements page) has been provided to and approved by NYC Health + Hospitals. All insurance shall be primary with respect to Vendor and the additional insureds and issued by an insurer with an A.M. Best rating of A-, Class VII or better. All insurance policies must be issued by insurance companies authorized to do business in New York State. Such insurance shall waive any right of subrogation against

089271\1\170087422.v1
WT_000123

NYC Health + Hospitals. The limits of coverage for all insurance required under this Agreement shall be the greater of (i) the minimum limits set forth herein or (ii) the limits available to Vendor under all primary, excess, and umbrella policies. NYC Health + Hospitals reserves the right to increase the minimum acceptable limits of coverage depending upon the scope of services and the potential risk exposures involved in this Agreement. Vendor's failure to maintain any of the insurance required by this Agreement shall constitute a material breach of this Agreement.

8.2 There shall be no self-insurance program or self-insured retention in excess of $25,000 with regard to any insurance required under this Agreement unless approved in writing by NYC Health + Hospitals. Any self-insurance program shall provide NYC Health + Hospitals with all rights that would be provided by traditional insurance.

8.3 Vendor shall provide NYC Health + Hospitals with a copy of any policy required under this Agreement upon the demand for such policy by NYC Health + Hospitals.

8.4 Any subcontract shall conform to the insurance requirements set forth in this Agreement.

8.5 Vendor shall maintain occurrence based commercial general liability insurance with limits no less than $2,000,000 per occurrence, $4,000,000 in the aggregate. Such insurance shall name (i) "New York City Health and Hospitals Corporation, its officials, and employees" and (ii) "The City of New York, its officials and employees" as additional insureds. Such insurance shall cover claims for property damage, bodily injury, including death, products liability, and ongoing and completed operations liability. Such insurance shall state that coverage shall not be canceled except with notice to the additional insureds.

8.6 If the Services under this Agreement are professional services, then Vendor shall maintain professional liability insurance with limits no less than $1,000,000 per occurrence $2,000,000 in the aggregate. Any policy that is claims-made shall have at least a three-year reporting period.

8.7 If Vendor uses vehicles under this Agreement, then Vendor shall maintain business automobile liability insurance with limits no less than $2,000,000 and at least as broad as the current ISO form CA0001. Such insurance shall name (i) "New York City Health and Hospitals Corporation, its officials, and employees" and (ii) "The City of New York, its officials and employees" as additional insureds. Such insurance shall state that coverage shall not be canceled except with notice to the additional insureds. If vehicles are transporting hazardous materials, the insurance shall be endorsed to provide pollution liability broadened coverage for covered vehicles (endorsement CA 99 48) as well as proof of MCS-90.

8.8 Vendor shall maintain statutory limits of Worker's Compensation insurance and employer's liability insurance with limits no less than $5,000,000 per accident for injury or disease.

<u>9. Intellectual Property</u>

Intentionally omitted.

<u>10. Use of NYC Health + Hospitals' Marks</u>

The prior written approval of NYC Health + Hospitals is required before Vendor or any Vendor Employee may (i) use NYC Health + Hospitals or any of its facilities' names, logos, marks, seals, insignia, symbols or brands or the like in any material for publication through any media of communication, or (ii) make any statement to the press or issue any material for publication through any media of communication relating to this Agreement. The foregoing restriction does not prohibit Vendor from using any such name in direct communications (including marketing materials that contain a list of Vendor's customers) with current or identified prospective customers (such as in a response to a solicitation or another direct communication).

## 11. Entire Agreement

This Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior or contemporaneous oral or written communications or agreements with respect to such matters.

## 12. Amendments

This Agreement may not be modified or amended except in writing and signed by both Parties.

## 13. Assignment

13.1 Neither Party shall assign, subcontract, transfer or otherwise dispose of this Agreement or any interest herein without first obtaining the other Party's prior written consent; if a Party does so without consent of the other Party ("non-consenting Party") it shall constitute a material breach of this Agreement and the non-consenting Party shall have the right to immediately terminate this Agreement without liability for any damages resulting therefrom.

13.2 Should this Agreement be assigned, all rights, benefits and obligations shall be binding upon and inure to the benefit of the Parties, and their respective successors and permitted assigns.

## 14. Severability

If any section of this Agreement is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining sections shall remain in full force and effect.

## 15. Waiver

The failure to enforce any right or remedy under this Agreement or at law shall not constitute a waiver of such right or remedy.

## 16. Delay

16.1 The time of delivery of Goods or performance of Services may be extended in the following ways and with the following consequences:

16.1.1 If delivery or performance by Vendor is delayed by an act or omission of NYC Health + Hospitals, Vendor shall be allowed a corresponding extension of time for performance.

16.1.2 If delivery or performance by Vendor is delayed by a force majeure event such as war, civil insurrection, strikes, weather, etc., Vendor shall promptly give notice to NYC Health + Hospitals of the circumstances and the anticipated delay duration, and Vendor shall be allowed a corresponding extension of time.

16.1.3 Should a delay necessitate NYC Health + Hospitals to purchase Goods or Services from a third-party, NYC Health + Hospitals may do so without liability to Vendor and NYC Health + Hospitals shall be relieved of the obligation to purchase such Goods or Services from Vendor.

21

## 17. Confidentiality

Each Party has materials and information that have been or might be made available to the other in connection with this Agreement and may consist of confidential and proprietary information ("Confidential Information") of the other Party and shall not disclose the Confidential Information of the other Party except as otherwise set forth in this section.  Confidential Information shall include any information relating to the Services, identity of customers or patients, business practices, trade secrets, business opportunities, pricing terms, and financial information.  Only those employees or consultants requiring the use of Confidential Information in the performance of this Agreement shall receive such Confidential Information and only if such employees or consultants are bound by a confidentiality agreement as protective as this section.  Neither Party shall be liable to the other with regard to any Confidential Information that: (i) was publicly known at the time it was disclosed, (ii) was legally known to the receiving party at the time of disclosure, (iii) was disclosed pursuant to law or court order, or (iv) was disclosed with the prior written approval of the disclosing party.  This section shall survive the termination or expiration of this Agreement.

## 18. Execution

This Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original, and when taken together shall constitute one and the same agreement.  Electronic, facsimile or PDF image signatures shall be treated as original signatures.

### Article IV. Terms and Conditions Specific to Goods

Intentionally omitted.

### Article V. Terms and Conditions Specific to Services

The following shall apply if Vendor provides Services under this Agreement.

Warranty for Services

Vendor warrants that the Services will be performed (i) in a diligent, professional and workmanlike manner in accordance with the highest applicable industry standards and applicable laws and regulations, (ii) in accordance with the requirements under this Agreement, and (iii) by experienced, qualified and properly trained and appropriately licensed personnel.  If Vendor fails to meet the specifications as set forth herein, Vendor will, without additional compensation, promptly correct or revise any errors or deficiencies in the Services provided.

089271\1\170087422.v1

WT_000126

# FEMA RIDER

**1. FEMA Reimbursement Documentation**. Some or all of the cost of the services herein may qualify for reimbursement by the Federal Emergency Management Administration ("FEMA") or other federal programs. Accordingly, Vendor shall at its own reasonable expense invoice NYC Health + Hospitals as directed by NYC Health + Hospitals to meet FEMA standards. Further, Vendor shall prepare at its own reasonable expense any reports required or useful in applying for FEMA reimbursement. Should the cost of preparing documents for FEMA reimbursement become unreasonable, NYC Health + Hospitals shall at its own expense offer to Vendor the services of a third-party to perform such services, and Vendor shall cooperate with such third-party.

**2. Debarment**. Vendor certifies that neither it nor its principals is currently in a state of debarment, suspension, or other ineligible status as a result of prior performance, failure, fraud, or violation of applicable laws. Vendor further certifies that neither it nor its principals is debarred, suspended, otherwise excluded from or ineligible for participation in federal assistance programs. NYC Health + Hospitals reserves the right to terminate this Agreement if knowledge of debarment, suspension or other ineligibility has been withheld by the Vendor. Vendor must comply with 2 C.F.R. Part 180, subpart C and 2 C.F.R. Part 3000, subpart C, and must include a requirement to comply with these regulations in any lower tier covered transaction it enters into.

**3. Lobbying**. Vendor certifies, to the best of its knowledge and belief, that:

> 3.1 No federal appropriated funds have been paid or will be paid, by or on behalf of it, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any federal agreement, the making of any federal grant, the making of any federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any federal agreement, grant, loan, or cooperative agreement;

> 3.2 If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this federal agreement, grant, loan, or cooperative agreement, it will complete and submit Standard Form-LLL.

> 3.3 It will require that the language of this Section E be included in the award documents for all subcontracts at all tiers.

> 3.4 This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by 31 U.S.C. § 1352.

**4. Records Access**. Vendor shall grant access to NYC Health + Hospitals, New York State, New York City or any other pass-through entity, FEMA, Inspectors General, and/or the Comptroller General of the United States, or any of their duly authorized representatives, to any books, documents, papers, and/or records of Vendor that are pertinent to the Agreement for the purpose of making audits, examinations, excerpts, and transcripts. The right also includes timely and reasonable access to Vendor's personnel for the purpose of

089271\1\170087422.v1

WT_000127

interview and discussion related to such documents. The rights of access in this section are not limited to the required retention period but last as long as the records are retained.

**5. Agreement Changes**. If not provided elsewhere in the Agreement, NYC Health + Hospitals and the Vendor must agree in writing to any changes to the Agreement, including changes to pricing and scope. All changes must meet the requirements of 2 C.F.R. Part 200, including Subpart E entitled "Cost Principles."

**6. Logos**. The Vendor shall not use Department of Homeland Security ("DHS") seal(s), logos, crests, or reproductions of flags or likenesses of DHS agency officials without specific FEMA preapproval.

**7. Federal Government not a Party**. The Vendor acknowledges and understands that the federal government is not a party to this Agreement and is not subject to any obligations or liabilities to NYC Health + Hospitals, Vendor or any other party pertaining to any matter resulting from the Agreement.

**8. Program Fraud and False or Fraudulent Statements or Related Acts**. The Vendor acknowledges that 31 U.S.C. Chap. 38 (Administrative Remedies for False Claims and Statements) applies to the Vendor's actions pertaining to this Agreement.

089271\1\170087422.v1

WT_000128

**Exhibit C**

**Checklist 1 and Checklist 2**

**(see attached)**

089271\1\170087422.v1

WT_000129

**Exhibit D**

**H+H's Sales Tax Exemption**

**(see attached)**

089271\1\170087422.v1

WT_000130



January 17, 2023

New York City Health and Hospitals
160 Water St 6th Floor
New York NY  10038


     Dear Sir or Madam:

       The Tax Law exempts New York State governmental entities such as your organization, New York City Health and Hospitals, from the payment of New York State and local sales and use taxes on their purchases. In order to make tax exempt purchases, a New York State governmental entity must present vendors with the entity's official purchase order or other documentation (e.g., payment voucher, contract of sale, Form AC 946, *Tax Exemption Certificate*, Form ST-129, *Exemption Certificate - Tax on occupancy of hotel rooms*, etc.) which indicates that the purchaser is a New York State governmental entity.

       **Tax exemption numbers and Form ST-119.1, *Exempt Organization Exempt Purchase Certificate*, are not issued to New York State governmental entities.** If a vendor requests a tax exemption number or Form ST-119.1, *Exempt Organization Exempt Purchase Certificate*, from you, the New York City Health and Hospitals may give the vendor a copy of this letter. This will assure the vendor that a governmental purchase order, or other evidence that New York City Health and Hospitals is the purchaser, and this letter are the only documentation the vendor needs in order to not collect sales tax.

       For additional information, please refer to Publication 843, *A Guide to Sales Tax in New York State for Exempt Organizations*, which is available on the New York State Tax Department website at www.tax.ny.gov.


New York State Department of Taxation and Finance
OTPA-Taxpayer Guidance Division
Sales Tax Exempt Organizations Unit

**Exhibit E**

**Accessible to People with Disabilities Room Details**

Accessible rooms have grab bars in shower area and next to the toilet. Roll in showers, lower handlebars in the shower, shower head and a shower handle with hose, no cabinets under sink for easy wheelchair access.

SCHEDULE A

089271\1\170087422.v1

WT_000133

**EXHIBIT B**

WT_000134

**Tarter Krinsky & Drogin LLP**
*Attorneys for Golden Seahorse LLC,*
*Debtor and Debtor-in-Possession*
1350 Broadway, 11ᵗʰ Floor
New York, New York 10018
(212) 216-8000
Scott S. Markowitz, Esq.
Rocco A. Cavaliere, Esq.
smarkowitz@tarterkrinsky.com
rcavaliere@tarterkrinsky.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:

GOLDEN SEAHORSE, LLC
dba Holiday Inn Manhattan Financial District,[1]

Debtor.
-------------------------------------------------------------x

Chapter 11

Case No. 22-11582 (PB)

**DECLARATION OF JIANFENG QIN IN SUPPORT OF DEBTOR'S
MOTION FOR AUTHORITY TO ENTER INTO AN AGREEMENT WITH
NEW YORK CITY HEALTH AND HOSPITALS CORPORATION
<u>FOR USE OF THE DEBTOR'S HOTEL THROUGH APRIL 30, 2024</u>**

I, Jianfeng Qin, declare, pursuant to section 1746 of title 28 of the United States Code,

that:

1.      I am over the age of eighteen and reside in New Jersey.

2.      I am the assistant general manager of the Holiday Inn Manhattan Financial

District ("<u>Hotel</u>" or "<u>Debtor</u>"), a limited liability company organized under the laws of the State

of Delaware. The Hotel filed a voluntary chapter 11 petition with the Clerk of this Court on

November 29, 2022 (the "<u>Petition Date</u>").

3.      In my capacity as the Debtor's assistant general manager, I am fully familiar with

the Debtor's day to day operations, business and financial affairs and books and records. I am

---

[1] The Debtor's last four digits of its tax identification number are 4770.  The Debtor's principal place of business is
99-103 Washington Street, New York, New York.

WT_000135

duly authorized to make this declaration (the "Declaration") on behalf of the Debtor and I am competent to testify, to the extent necessary.

4.      I respectfully submit this Declaration in support of the Debtor's Motion pursuant to sections 105(a) and 363(b) and (c) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") and Rules 2002 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order authorizing the Debtor to enter into that certain Hotel Use Agreement dated January 13, 2023 (the "Agreement") with the New York City Health and Hospitals Corporation ("NYCHH"), a New York public benefit corporation,  and granting related relief (the "Motion").

5.      I have reviewed the Motion and adopt as my testimony the various statements and facts set forth in the Motions.  In addition, I was intimately involved in the preparation of the Debtor's bankruptcy schedules and appeared at the Section 341(a) meeting of creditors as the Debtor's representative.  I also previously assisted the Debtor's indirect ultimate owner, Jubao Xie, and Debtor's counsel, in connection with the facts set forth in the *Declaration of Jubao Xie Pursuant to Local Bankruptcy Rule 1007-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York* (Dkt. No. 3) (the "First Day Declaration").  To the extent necessary, I adopt the statements and facts set forth in the First Day Declaration as my additional testimony in further support of the Motion.

6.      As it relates to the Debtor's Motion, in addition to the facts and statements in the Motion and the First Day Declaration (to the extent applicable), which I adopt as my testimony, I believe, in consultation with the Debtor's member and sole equity owner, and other management, the Debtor's entry into the Agreement is a reasonable exercise of the Debtor's business judgment.

7.      I can further attest that I was intimately involved in the preparation of the budget attached hereto as **Exhibit "A"** which reflects the revenue and expenses of the Debtor for the

period from January 2023 to April 30, 2024 to the extent the Debtor enters into the Agreement.

The budget also includes a column reflecting the figures used in the original budget attached to

the Court's final cash collateral order, as expanded through April 30, 2024 to reflect revenue and

expenses to the extent the Debtor continued to operate as a traditional transient hotel in the next

year.  As reflected in the budget, the Debtor anticipates a roughly $5.5 million increase in its

bottom line (i.e. net income) by entering into this Agreement for 2023 alone. Through April

2024, the difference between operating income with the Agreement and without the Agreement

is even greater, reflecting an additional $5.08 million increase in net income.  In total, by

entering into the Agreement, the Debtor projects an increase of approximately $10.5 million

between now and April 2024 as compared to operating the Hotel as a transient hotel.

8.      I note this budget includes a line item that allows for payments of royalties and

sales and marketing fees to Holiday Inn (the "Franchisor") totaling over $2.5 million in 2023

alone, despite the fact the Hotel will not be utilizing the services or brand recognition in

generating revenue in the year ahead.  The Debtor is prepared to continue payments because the

Debtor wishes to maintain its relationship with the Franchisor as there remain eleven (11) more

years on the license agreement between the parties.

9.      Based on my experience in the hotel industry, this Agreement will not affect the

valuation of the Hotel in any negative way.  In fact, it may very well increase the value to the

extent of the increased guaranteed revenue to be generated, at least over the next fifteen (15)

months, from the Agreement.[2]  While the tourism industry has increased in the 4th Quarter of

2022, a welcome development for the Hotel and the country at large, this guaranteed income is

especially important to the extent that there is any slowdown in tourism due to any future surges

of Covid-19 or macroeconomic concerns such as a possible recession or continuing inflation.

---

[2] The Agreement should also enable the Debtor to generate funds required to cure defaults under the mortgage and reinstate.

Current industry surveys indicate that interest in travel will increase in the future, although the latest results also suggest that travel aspirations for some have been downgraded recently, perhaps due to economic concerns.

10.     Finally, the Debtor is pleased to be a small part of the difficult solution to the national crisis involving asylum seekers/migrants that have been bused to or otherwise arrived in New York City.

11.     Accordingly, I believe approval of the Motion is in the best interest of the Debtor, its estate and its creditors, including the Prepetition Lenders, and therefore, the Debtor respectfully requests approval of the Motion.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 17th day of January 2023

/s/ Jianfeng Qin
Jianfeng Qin

**EXHIBIT A**

WT_000139

**Holiday Inn Manhattan Financial District (0365)**

| | January 2023 | February 2023 | March 2023 | April 2023 | May 2023 | June 2023 | July 2023 | August 2023 | September 2023 | October 2023 | November 2023 | December 2023 | Total AMT | %REV | Budget AMT | %REV | Actuals Last Year Jan-Dec 2022 AMT | %REV | Variance AMT | %REV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ROOMS AVAILABLE | 15,252 | 13,776 | 15,252 | 14,760 | 15,252 | 14,760 | 15,252 | 15,252 | 14,760 | 15,252 | 14,760 | 15,252 | 179,580 | | 179,580 | 0 | 0.0 | | 179,580 | 0.0 |
| ROOMS SOLD | 9,737 | 12,432 | 15,252 | 14,760 | 15,252 | 14,760 | 15,252 | 15,252 | 14,760 | 15,257 | 14,760 | 15,252 | 172,726 | 100.0 | 163,564 | 99.6 | 9,162 | 0.4 | 149,430 | 99.6 | 23,296 | 0.4 |
| OCCUPANCY | 63.8 | 90.2 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 96.2 | | 91.1 | 5.1 | 0.4 | 83.2 | 13.0 | 0.4 |
| ADR | 115.99 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 189.94 | 190.00 | 190.00 | 185.82 | 100.0 | 181.00 | 99.6 | 4.82 | 0.4 | 170.39 | 99.6 | 15.43 | 0.4 |
| REVPAR | 74.05 | 171.46 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 178.73 | | 164.86 | 13.87 | 0.4 | 141.78 | 36.95 | 0.4 |
| TOTAL REVPAR | 74.14 | 171.46 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 178.74 | | 165.46 | 13.28 | 0.4 | 142.41 | 36.32 | 0.4 |
| | | | | | | | | | | | | | | | | | | | | |
| **OPERATING REVENUE** | | | | | | | | | | | | | | | | | | | | |
| Rooms | 1,129,395 | 2,362,080 | 2,897,880 | 2,804,400 | 2,897,880 | 2,804,400 | 2,897,880 | 2,897,880 | 2,804,400 | 2,897,880 | 2,804,400 | 2,897,880 | 32,096,355 | 100.0 | 29,605,425 | 99.6 | 2,490,930 | 0.4 | 25,461,638 | 99.6 | 6,634,717 | 0.4 |
| Other Operated Departments | 218 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 218 | 0.0 | 27,530 | 0.1 | -27,312 | -0.1 | 23,553 | 0.1 | -23,315 | -0.1 |
| Miscellaneous Income | 1,204 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,204 | 0.0 | 80,097 | 0.3 | -78,893 | -0.3 | 89,704 | 0.4 | -88,499 | -0.3 |
| **TOTAL OPERATING REVENUE** | 1,130,818 | 2,362,080 | 2,897,880 | 2,804,400 | 2,897,880 | 2,804,400 | 2,897,880 | 2,897,880 | 2,804,400 | 2,897,880 | 2,804,400 | 2,897,880 | 32,097,778 | 100.0 | 29,713,052 | 100.0 | 2,384,726 | 0.0 | 25,574,875 | 100.0 | 6,522,903 | 0.0 |
| | | | | | | | | | | | | | | | | | | | | |
| **DEPARTMENTAL EXPENSES** | | | | | | | | | | | | | | | | | | | | |
| Rooms | 499,775 | 400,286 | 471,804 | 454,275 | 474,142 | 454,800 | 467,175 | 472,924 | 454,890 | 472,308 | 457,573 | 467,725 | 5,547,676 | 17.3 | 7,959,601 | 26.9 | -2,411,925 | -9.6 | 6,639,871 | 26.1 | -1,092,195 | -8.8 |
| Food and Beverage | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 2,917 | 0.0 | -2,917 | 0.0 |
| Other Operated Departments | 739 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 739 | 338.7 | 9,189 | 33.4 | -8,450 | 305.3 | 17,003 | 72.3 | -16,264 | 266.4 |
| **TOTAL DEPARTMENTAL EXPENSES** | 500,514 | 400,286 | 471,804 | 454,275 | 474,142 | 454,800 | 467,175 | 472,924 | 454,890 | 472,308 | 457,573 | 467,725 | 5,548,415 | 17.3 | 7,968,790 | 26.8 | -2,420,376 | -9.5 | 6,659,791 | 26.0 | -1,111,376 | -8.8 |
| | | | | | | | | | | | | | | | | | | | | |
| **UNDISTRIBUTED OPERATING EXPENSES** | | | | | | | | | | | | | | | | | | | | |
| Administrative and General | 73,700 | 95,540 | 108,299 | 98,010 | 103,872 | 104,118 | 102,796 | 103,477 | 101,596 | 102,244 | 102,320 | 102,631 | 1,198,603 | 3.7 | 1,903,019 | 6.4 | -704,416 | -2.7 | 1,570,814 | 6.1 | -372,211 | -2.4 |
| Information and Telecommunications Systems | 11,620 | 10,285 | 10,285 | 10,285 | 10,285 | 10,385 | 10,385 | 10,385 | 10,385 | 10,385 | 10,510 | 10,810 | 126,009 | 0.4 | 140,244 | 0.5 | -14,235 | -0.1 | 123,854 | 0.5 | 2,155 | -0.1 |
| Sales and Marketing | 141,303 | 196,327 | 219,348 | 212,337 | 219,348 | 212,337 | 219,823 | 219,348 | 212,337 | 219,348 | 212,837 | 219,848 | 2,504,541 | 7.8 | 2,873,289 | 9.7 | -368,748 | -1.9 | 2,452,500 | 9.6 | 52,041 | -1.8 |
| Property Operation and Maintenance | 67,726 | 52,434 | 54,342 | 49,047 | 54,803 | 59,754 | 51,503 | 54,503 | 51,728 | 55,204 | 53,358 | 51,703 | 656,110 | 2.0 | 571,413 | 1.9 | 84,697 | 0.1 | 438,909 | 1.7 | 217,202 | 0.3 |
| Utilities | 96,497 | 70,008 | 85,856 | 83,091 | 85,856 | 83,091 | 85,856 | 85,856 | 83,091 | 85,856 | 83,691 | 85,856 | 1,014,635 | 3.2 | 791,969 | 2.7 | 222,666 | 0.5 | 695,016 | 2.7 | 319,619 | 0.4 |
| **TOTAL UNDISTRIBUTED EXPENSES** | 390,847 | 424,598 | 478,130 | 452,771 | 474,165 | 469,686 | 470,364 | 473,569 | 459,138 | 473,066 | 462,717 | 470,858 | 5,499,898 | 17.1 | 6,279,934 | 21.1 | -780,036 | -4.0 | 5,281,093 | 20.6 | 218,805 | -3.5 |
| | | | | | | | | | | | | | | | | | | | | |
| **GROSS OPERATING PROFIT** | 239,457 | 1,537,197 | 1,947,946 | 1,897,355 | 1,949,574 | 1,879,915 | 1,960,342 | 1,951,387 | 1,890,372 | 1,952,506 | 1,884,110 | 1,959,307 | 21,049,465 | 65.6 | 15,464,328 | 52.0 | 5,585,137 | 13.5 | 13,633,990 | 53.3 | 7,415,475 | 12.3 |
| | | | | | | | | | | | | | | | | | | | | |
| MANAGEMENT FEES | 16,962 | 35,431 | 43,468 | 42,066 | 43,468 | 42,066 | 43,468 | 43,468 | 42,066 | 43,468 | 42,066 | 43,468 | 481,467 | 1.5 | 445,696 | 1.5 | 35,771 | 0.0 | 384,004 | 1.5 | 97,463 | -0.0 |
| | | | | | | | | | | | | | | | | | | | | |
| **INCOME BEFORE NON-OPERATING INCOME & EXPENSES** | 222,494 | 1,501,765 | 1,904,478 | 1,855,289 | 1,906,105 | 1,837,849 | 1,916,874 | 1,907,919 | 1,848,306 | 1,909,038 | 1,842,044 | 1,915,838 | 20,567,998 | 64.1 | 15,018,632 | 50.5 | 5,549,366 | 13.5 | 13,249,986 | 51.8 | 7,318,012 | 12.3 |
| | | | | | | | | | | | | | | | | | | | | |
| **NON-OPERATING INCOME AND EXPENSE** | | | | | | | | | | | | | | | | | | | | |
| Rent | 3,389 | 3,386 | 3,389 | 3,389 | 3,389 | 3,389 | 3,389 | 3,389 | 3,389 | 3,389 | 3,389 | 3,389 | 40,665 | 0.1 | 40,665 | 0.1 | -0 | -0.0 | 40,664 | 0.2 | 1 | -0.0 |
| Property and Other Taxes | 268,435 | 268,435 | 268,435 | 268,435 | 268,435 | 268,435 | 289,910 | 289,910 | 289,910 | 289,910 | 289,910 | 289,910 | 3,350,070 | 10.4 | 3,350,070 | 11.3 | 0 | -0.8 | 3,100,468 | 12.1 | 249,602 | -1.8 |
| Insurance | 60,605 | 60,605 | 60,605 | 60,605 | 60,605 | 63,635 | 63,635 | 63,635 | 63,635 | 63,635 | 63,635 | 63,635 | 748,470 | 2.3 | 748,470 | 2.5 | -0 | -0.2 | 659,395 | 2.6 | 89,075 | -0.2 |
| Fixed Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 6,904,192 | 27.0 | -6,904,192 | -27.0 |
| **TOTAL NON-OPERATING INCOME AND EXPENSES** | 332,429 | 332,426 | 332,429 | 332,429 | 332,429 | 335,459 | 356,934 | 356,934 | 356,934 | 356,934 | 356,934 | 356,934 | 4,139,205 | 13.9 | 4,139,205 | 13.9 | -0 | -1.0 | 10,704,719 | 41.9 | -6,565,514 | -29.0 |
| | | | | | | | | | | | | | | | | | | | | |
| **EARNINGS BEFORE INTEREST, TAXES, DEPRECIATION, AND AMORTIZATION** | -109,935 | 1,169,339 | 1,572,049 | 1,522,860 | 1,573,676 | 1,502,390 | 1,559,940 | 1,550,985 | 1,491,372 | 1,552,104 | 1,485,110 | 1,558,904 | 16,428,793 | 51.2 | 10,879,426 | 36.6 | 5,549,367 | 14.6 | 2,545,267 | 10.0 | 13,883,526 | 41.2 |
| | | | | | | | | | | | | | | | | | | | | |
| **INTEREST, DEPRECIATION, AND AMORTIZATION** | | | | | | | | | | | | | | | | | | | | |
| Interest Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 612,440 | 2.4 | -612,440 | -2.4 |
| **TOTAL INTEREST, DEPRECIATION, AND AMORTIZATION** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 612,440 | 2.4 | -612,440 | -2.4 |
| | | | | | | | | | | | | | | | | | | | | |
| INCOME BEFORE INCOME TAXES | -109,935 | 1,169,339 | 1,572,049 | 1,522,860 | 1,573,676 | 1,502,390 | 1,559,940 | 1,550,985 | 1,491,372 | 1,552,104 | 1,485,110 | 1,558,904 | 16,428,793 | 51.2 | 10,879,426 | 36.6 | 5,549,367 | 14.6 | 1,932,827 | 7.6 | 14,495,966 | 43.6 |
| **NET INCOME (LOSS)** | -109,935 | 1,169,339 | 1,572,049 | 1,522,860 | 1,573,676 | 1,502,390 | 1,559,940 | 1,550,985 | 1,491,372 | 1,552,104 | 1,485,110 | 1,558,904 | 16,428,793 | 51.2 | 10,879,426 | 36.6 | 5,549,367 | 14.6 | 1,932,827 | 7.6 | 14,495,966 | 43.6 |
| | | | | | | | | | | | | | | | | | | | | |
| **NET INCOME (LOSS) LESS REPLACEMENT RESERVE** | -109,935 | 1,169,339 | 1,572,049 | 1,522,860 | 1,573,676 | 1,502,390 | 1,559,940 | 1,550,985 | 1,491,372 | 1,552,104 | 1,485,110 | 1,558,904 | 16,428,793 | 51.2 | 10,879,426 | 36.6 | 5,549,367 | 14.6 | 1,932,827 | 7.6 | 14,495,966 | 43.6 |

WT_000140

**January - April 2024 - 11th Edition Income Statement**

| Holiday Inn Manhattan Financial District (0365) | January 2024 | February 2024 | March 2024 | April 2024 | Total | | Budget | | Variance |
|---|---|---|---|---|---|---|---|---|---|
| | | | | January-April, 2023 - Secondary Budget | | | Compare | | |
| | AMT | AMT | AMT | AMT | AMT | %REV | AMT | %REV | AMT |
| ROOMS AVAILABLE | 15,252 | 14,268 | 15,252 | 14,760 | 59,532 | | 59,532 | | 0 |
| ROOMS SOLD | 15,252 | 14,268 | 15,252 | 14,760 | 59,532 | 100.0 | 47,843 | 80.4 | 11,689 |
| OCCUPANCY | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | | 80.3 | | 19.7 |
| ADR | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 100.0 | 133.06 | 99.5 | 56.94 |
| REVPAR | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | | 109.96 | | 80.05 |
| TOTAL REVPAR | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | | 110.48 | | 79.53 |
| | | | | | | | | | |
| **OPERATING REVENUE** | | | | | | | | | |
| Rooms | 2,897,880 | 2,710,920 | 2,897,880 | 2,804,400 | 11,311,080 | 100.0 | 6,499,296 | 99.5 | 4,811,784 |
| Other Operated Departments | 0 | 0 | 0 | 0 | 0 | 0.0 | 8730 | 0.1 | -8,730 |
| Miscellaneous Income | 0 | 0 | 0 | 0 | 0 | 0.0 | 22,065 | 0.3 | -22,065 |
| **TOTAL OPERATING REVENUE** | **2,897,880** | **2,710,920** | **2,897,880** | **2,804,400** | **11,311,080** | **100.0** | **6,530,091** | **100.0** | **4,780,989** |
| | | | | | | | | | |
| **DEPARTMENTAL EXPENSES** | | | | | | | | | |
| Rooms | 471,804 | 439,133 | 471,804 | 454,275 | 1,837,016 | 16.2 | 2,374,928 | 36.4 | -537,913 |
| Food and Beverage | 0 | 0 | 0 | 0 | 0 | 0.0 | 0 | 0.0 | 0 |
| Other Operated Departments | 0 | 0 | 0 | 0 | 0 | 0.0 | 2,830 | 0.0 | -2,830 |
| **TOTAL DEPARTMENTAL EXPENSES** | **471,804** | **439,133** | **471,804** | **454,275** | **1,837,016** | **16.2** | **2,377,756** | **36.4** | **-540,740** |
| | | | | | | | | | |
| **UNDISTRIBUTED OPERATING EXPENSES** | | | | | | | | | |
| Administrative and General | 108,299 | 95,540 | 108,299 | 98,010 | 410,148 | 3.6 | 532,278 | 8.2 | -122,130 |
| Information and Telecommunications Systems | 10,285 | 10,285 | 10,285 | 10,285 | 41,140 | 0.4 | 46,480 | 0.7 | -5,340 |
| Sales and Marketing | 219,348 | 196,327 | 219,348 | 212,337 | 847,360 | 7.5 | 693,585 | 10.6 | 153,775 |
| Property Operation and Maintenance | 54,342 | 52,438 | 54,342 | 49,047 | 210,169 | 1.9 | 185,069 | 2.8 | 25,100 |
| Utilities | 85,856 | 70,008 | 85,856 | 83,091 | 324,811 | 2.9 | 215,115 | 3.3 | 109,696 |
| **TOTAL UNDISTRIBUTED EXPENSES** | **478,130** | **424,598** | **478,130** | **452,771** | **1,833,629** | **16.2** | **1,672,530** | **25.6** | **161,099** |
| | | | | | | | | | |
| **GROSS OPERATING PROFIT** | **1,947,946** | **1,847,189** | **1,947,946** | **1,897,355** | **7,640,436** | **67.5** | **2,479,804** | **38.0** | **5,160,632** |
| | | | | | | | | | |
| MANAGEMENT FEES | 43,468 | 40,664 | 43,468 | 42,066 | 169,666 | 1.5 | 97,951 | 1.5 | 71,715 |
| | | | | | | | | | |
| **INCOME BEFORE NON-OPERATING INCOME & EXPENSES** | **1,904,478** | **1,806,525** | **1,904,478** | **1,855,289** | **7,470,770** | **66.0** | **2,381,853** | **36.5** | **5,088,917** |
| | | | | | | | | | |
| **NON-OPERATING INCOME AND EXPENSE** | | | | | | | | | |
| Rent | 3,389 | 3,386 | 3,389 | 3,389 | 13,553 | 0.1 | 13,556 | 0.2 | 0 |
| Property and Other Taxes | 268,435 | 268,435 | 268,435 | 268,435 | 1,073,740 | 9.5 | 1,073,740 | 16.4 | 0 |
| Insurance | 60,605 | 60,605 | 60,605 | 60,605 | 242,420 | 2.1 | 242,420 | 3.7 | 0 |
| Fixed Other | 0 | 0 | 0 | 0 | 0 | 0.0 | 0 | 0.0 | 0 |
| **TOTAL NON-OPERATING INCOME AND EXPENSES** | **332,429** | **332,426** | **332,429** | **332,429** | **1,329,713** | **11.8** | **1,329,716** | **20.4** | **0** |
| | | | | | | | | | |
| **EARNINGS BEFORE INTEREST, TAXES, DEPRECIATION, AND AMORTIZATION** | **1,572,049** | **1,474,099** | **1,572,049** | **1,522,860** | **6,141,057** | **54.3** | **1,052,139** | **16.1** | **5,088,918** |
| | | | | | | | | | |
| **INTEREST, DEPRECIATION, AND AMORTIZATION** | | | | | | | | | |
| Interest Expense | 0 | 0 | 0 | 0 | 0 | 0.0 | 0 | 0.0 | 0 |
| **TOTAL INTEREST, DEPRECIATION, AND AMORTIZATION** | **0** | **0** | **0** | **0** | **0** | **0.0** | **0** | **0.0** | **0** |
| | | | | | | | | | |
| INCOME BEFORE INCOME TAXES | 1,572,049 | 1,474,099 | 1,572,049 | 1,522,860 | 6,141,057 | 54.3 | 1,052,139 | 16.1 | 5,088,918 |
| **NET INCOME (LOSS)** | **1,572,049** | **1,474,099** | **1,572,049** | **1,522,860** | **6,141,057** | **54.3** | **1,052,139** | **16.1** | **5,088,918** |
| | | | | | | | | | |
| **NET INCOME (LOSS) LESS REPLACEMENT RESERVE** | **1,572,049** | **1,474,099** | **1,572,049** | **1,522,860** | **6,141,057** | **54.3** | **1,052,139** | **16.1** | **5,088,918** |

WT_000141

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------x
In re:

GOLDEN SEAHORSE LLC
dba Holiday Inn Financial District,[1]

Debtor.
-------------------------------------------------x

Chapter 11

Case No.: 22-11582 (PB)

### ORDER SHORTENING TIME TO CONSIDER DEBTOR'S MOTION FOR AUTHORITY TO ENTER INTO AN AGREEMENT WITH NEW YORK CITY HEALTH AND HOSPITALS CORPORATION <u>FOR USE OF THE DEBTOR'S HOTEL THROUGH APRIL 30, 2024</u>

Upon the motion (the "Motion to Shorten") of Golden Seahorse LLC, the above-captioned debtor and debtor-in-possession (the "Debtor"), by its counsel, Tarter Krinsky & Drogin LLP, for an order pursuant to Rules 2002 and 9006 of the Federal Rules of Bankruptcy Procedure shortening the time for notice of a hearing to consider Debtor's motion, pursuant to sections 105(a) and 363(b) and (c) of title 11 of the United States Code, 11 U.S.C. §§ 101, <u>et seq</u>. (the "<u>Bankruptcy Code</u>") and Rules 2002 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), for entry of an order authorizing the Debtor to enter into that certain Hotel Use Agreement dated January 17, 2023 (the "<u>Agreement</u>") with the New York City Health and Hospitals Corporation ("<u>NYCHH</u>"), a New York public benefit corporation,  and granting related relief  (the "<u>Motion</u>"); and the declaration of Scott S. Markowitz in support of the Motion to Shorten; and it appearing that cause exists to shorten notice under the circumstances; it is hereby

**ORDERED**, that a hearing (the "<u>Hearing</u>") to consider the Motion shall be held on

---

[1] The Debtor's last four digits of its tax identification number are 4770.  The Debtor's principal place of business is 99-103 Washington Street, New York, New York.

WT_000142

January 25, 2023 at 10:00 a.m. via ZOOM for Government to consider the relief requested

in the Motion;[2] and it is further

ORDERED, that notice of the Motion shall be sufficient if (a) a complete copy of

this Order and the Motion with all exhibits are sent by Federal Express overnight delivery,

and by email to the extent email addresses are known, on January 18, 2023 to the following

parties and persons: (i) counsel to the Prepetition Lenders (as defined in the Motion), (ii)

counsel to the Franchisor (as defined in the Motion), (iii) **Amazon Restaurant & Bar**

**Inc., (iv) any individual or entity that has filed a notice of appearance in this case**, and

(v) the Office of the United States Trustee; and (b) this order is served upon on all creditors

via regular first class mail on **January 18, 2023, along with notice that ensures a process**

**whereby any party that requests a copy of the Motion in advance of the Hearing shall**

**receive it promptly**; and it is further **[PB 01/18/2023]**

ORDERED, that objections, if any, to the relief requested in the Motion shall be

filed with the Court **(with an electronic copy to the chambers of the Honorable Philip**

**Bentley at pb.chambers@nysb.uscourts.gov),** and served upon Tarter Krinsky & Drogin

LLP, 1350 Broadway, 11th Floor, New York, New York 10018, Attn: Scott S. Markowitz,

Esq. and Rocco A. Cavaliere, Esq., so as to be received no later than January 24, 2023 at

12:00 p.m. **[PB 01/18/2023]**

Dated: New York, New York
      January 18, 2023

                /s/ Philip Bentley
                **HONORABLE PHILIP BENTLEY**
                **UNITED STATES BANKRUPTCY JUDGE**

---

[2] The Hearing will be held via Zoom for Government videoconferencing. Participants are required to register their appearance by 4:00 p.m. one business day before any scheduled Zoom or in person hearing with the eCourt Appearances tool on the Court's website. If you require assistance, please contact Judge Bentley's Chambers or Court services at 212-284-4040. The Hearing may be adjourned, from time to time, by announcement in open Court without any further or other notice thereof.

089271\1\170086633.v1

WT_000143

**TARTER KRINSKY & DROGIN LLP**
*Proposed Attorneys for Golden Seahorse dba Holiday Inn Manhattan Financial District*
*Debtor and Debtor-in-Possession*
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
Scott S. Markowitz, Esq.
Rocco A. Cavaliere, Esq.
smarkowitz@tarterkrinsky.com
rcavaliere@tarterkrinsky.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
In re:                                                                :
                                                                         :        Chapter 11
Golden Seahorse LLC dba Holiday Inn                    :
Manhattan Financial District,                              :        Case No.: 22- 11582 (PB)
                                                                         :
                                          Debtor.            :
------------------------------------------------------------ x

## DECLARATION OF JUBAO XIE PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 OF THE LOCAL BANKRUPTCY RULES FOR THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

I, Jubao Xie, declare, pursuant to section 1746 of title 28 of the United States Code, that:

1.      I, through my ownership of Hysendal USA LLC, am the managing member of Golden Seahorse LLC dba Holiday Inn Manhattan Financial District (the "Hotel" or "Debtor") a limited liability company organized under the laws of the State of Delaware. The Hotel intends to file a voluntary chapter 11 petition with the Clerk of this Court on or about November 29, 2022 (the "Petition Date"). I am duly authorized to make this declaration (the "Declaration") on behalf of the Debtor.

2.      I am familiar with the Debtor's day to day operations, business, and financial affairs, and books and records. I am above eighteen years of age and I am competent to testify.

3.      I submit this Declaration in accordance with Rule 1007-2 of the Local Rules of this court (the "Local Bankruptcy Rules") to assist this court (the "Court") and parties in interest in understanding the circumstances that compelled the commencement of the chapter 11 case,

WT_000144

and in support of the Debtor's petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge and my discussions with other members of the Debtor's management team.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.

5.      Parts I through III of this Declaration provide an overview of the Debtor's business, events giving rise to the commencement of this chapter 11 case and the Debtor's capital structure.  Part IV sets forth the information required by Local Bankruptcy Rule 1007-2.

## I.   **THE DEBTOR'S BUSINESS**

6.      The Debtor operates the Hotel which is a full-service hotel located at 99 Washington Street, New York, NY 10006.  In addition to the Hotel, the Debtor also owns an adjacent neighboring property at 103 Washington Street, New York, NY 10006, whereby the Debtor leases space to the Amazon Restaurant and Bar dba St. George Tavern among other retailers and residents. The Debtor constructed the Hotel between 2010 and 2014 and it opened for business in October 2014.  Pursuant to a license/franchise agreement dated October 15, 2014, the Hotel operates under the Holiday Inn flagship/brand.  The Hotel is fifty stories, the tallest Holiday Inn in the world and consists of 492 rooms and includes a full service restaurant at the Hotel.

7.      The Hotel is managed by Crescent Hotels & Resorts ("Crescent"), a third-party unaffiliated management company that is known as one of the leading hotel management companies in the industry. Many of the Hotel's employees are employed by Crescent and the Hotel advances funds to Crescent to cover the payroll and related expenses. Crescent receives a management fee of 1.5% of the Hotel's revenues.   In addition, the Hotel outsources its

2

WT_000145

housekeeping services with General Personnel Services Inc. which provides the Hotel with approximately 60 housekeeping employees.

8.    In or about September 2018, the Hotel obtained a $137,025,000 loan from Ladder Capital Finance LLC (the "Loan").  The Loan was ultimately split into four separate tranches and as of the Petition Date, three tranches in the amount of roughly $87 million are held by Wilmington Trust, National Trustee, as Trustee for the benefit of the Registered Holders of Commercial Mortgage Pass-Through Certificates Series 2019-C6, Wells Fargo Commercial Mortgage Trust 2018-C47, Commercial Mortgage Pass-Through Certificates, Series 2018-C47 and CSAIIL 2018-C14 Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2018-C14 (collectively, the "Lender") and one tranche in the amount of roughly $50 million is held by Triangle Capital Group LLC ("Triangle, together with Lender, the "Secured Creditors").  The Loan matures in September 2028.  The non-default interest rate under the Loan is 5.259%, which equates to approximately $620,000 in monthly interest payments. The Debtor was current on all payments under the Loan up until the onset of the Covid-19 pandemic in March 2020. As of the Petition Date, the full amount of the $137,025,000.00 in principal remains outstanding, together with unpaid interest.

9.    As the Court is aware, the Covid-19 pandemic devastated the New York City hotel industry, and the Debtor, like most of the New York City hotels, was closed from March 2020 through July 2020. Although the Debtor reopened the Hotel at the end of July 2020, occupancy levels in late 2020 were significantly below pre-pandemic levels requiring Debtor's ownership to lend millions of dollars to the Debtor to cover the Hotel's operating expenses.  The Hotel then experienced another setback in late December 2021 with the proliferation of the new Omicron variant, causing another shutdown of the tourism industry, forcing the Hotel to close yet again from January 2022 to April 2022.

WT_000146

10.    As a direct result of the Covid-19 pandemic, the Debtor defaulted on the Loan. Thereafter, the Lender, in 2021, swept all of the Debtor's funds in its separate cash management account that included sales taxes due to New York State and Hotel's occupancy taxes due to New York City.  The Debtor attempted to reach a consensual resolution with Midland Loan Services, the special servicer to the Lender but unfortunately, the Lender rejected the Debtor's overtures and proceeded to commence an action in March 2022 to, among other things, (i) foreclose on the mortgage, (ii) appoint a receiver and (iii) enjoin the Debtor from taking certain actions.  By Decision and Order dated September 27, 2022, the Honorable Frances A. Kahn, III granted the Lender's motion to appoint a receiver but denied the Lender its request for injunctive relief finding the Lender had not satisfied the factors for a preliminary injunction and that such relief was, in any event, superfluous, to the appointment of a receiver.

11.    Faced with the prospect of a complete loss of equity and value as well as the potential loss of rights under various contracts and licenses as a result of the appointment of the Receiver, the Debtor determined that Chapter 11 was necessary to preserve the Debtor's business and maximize value for all creditors and constituents.  As further discussed below, the Debtor commenced this chapter 11 case in order to attempt to negotiate a restructuring of the Loan or to utilize the provisions of the Bankruptcy Code to confirm a plan of reorganization over the Lender's objection. The Hotel's operations have greatly improved over the last six months and the Hotel's occupancy rate was approximately 92% in September 2022 and 90% in October 2022 with an ADR of over $200.   The Debtor's current cash flow is sufficient to meet the debt's service and tax escrow payments at the non-default rate under the Loan.

## II.    **EVENTS LEADING TO THE CHAPTER 11 CASE**

12.    Since the recession of year 2008/2009 there has been a major increase in hotel room supply in Manhattan. Growth of hotel average room rates has been stagnant for

4

approximately ten (10) years – only returning to 2008 levels in 2019, thus room rate increases were falling behind normal inflation during that period.

13.     As set forth above, the Hotel's financial woes are almost exclusively as result of Covid-19 pandemic. If not for the Covid-19 pandemic, the Debtor would not have defaulted on its mortgage payments under the Loan.

### III.     PRE-PETITION CAPITAL STRUCTURE AND INDEBTEDNESS

14.     As noted, the Debtor is a privately held limited liability company. Jubao Xie, directly or indirectly owns substantially all of the Debtor's equity.  As of the Petition Date, the Lender held approximately $87 million of the $137 million original Loan. In addition, Triangle Capital Group LLC recently acquired the B piece of the Loan in the principal amount of $50 million.

15.     Aside from the loan obligations to the Lender and Triangle Capital Group LLC, the Debtor has unsecured debt of approximately $1,300,000.00 and is obligated on loans totaling approximately $1,000,000.00 from the Debtor's owners. In addition to the foregoing, to the extent the Debtor is not able to successfully confirm a Plan or achieve another successful outcome or resolution with the Secured Creditors, the Debtor may face additional rejection damage claims from contract counterparties such as Holiday Inn and Crescent, among others.

### IV.     INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2

16.     I have been advised that Local Bankruptcy Rule 1007-2 requires certain information related to the Debtor which is set forth below.

17.     In accordance with Local Bankruptcy Rule 1007-2(a)(3), there has been no prepetition committee of creditors formed in this chapter 11 case.

18.     In accordance with Local Bankruptcy Rule 1007-2(a)(4), **Exhibit A** hereto is a list containing the names, addresses, and, where available, telephone and facsimile numbers of

the creditors holding the twenty (20) largest unsecured claims (excluding insiders) against the Debtor.

19.    In accordance with Local Bankruptcy Rule 1007-2(a)(5), **Exhibit B** hereto is a list containing the names, addresses, and, where available, telephone and facsimile numbers of the creditors holding the five (5) largest secured claims against the Debtor.

20.    In accordance with Local Bankruptcy Rule 1007-2(a)(6), **Exhibit C** hereto is a list containing a summary of the Debtor's assets and liabilities.

21.    To the best of my knowledge, none of the Debtor's property is in the possession or control of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity. However, as set forth above, the state court recently granted a motion to appoint a receiver but the receiver has not yet qualified.

22.    In accordance with Local Bankruptcy Rule 1007-2(a)(9), **Exhibit D** hereto is a list of the premises leased, or held under other arrangement, from which the Debtor operates its business.

23.    In accordance with Local Bankruptcy Rule 1007-2(a)(10), **Exhibit E** hereto is a list providing the location of the Debtor's substantial assets, the location of its books and records, and the value of any assets held by the Debtor outside the territorial limits of the United States.

24.    In accordance with Local Bankruptcy Rule 1007-2(a)(11), **Exhibit F** hereto is a list of litigation commenced against the Debtor.

25.    In accordance with Local Bankruptcy Rule 1007-2(a)(12), **Exhibit G** hereto is a list containing the names of the individuals who comprise the Debtor's existing senior management, with its tenure with the Debtor, and a brief summary of its relevant responsibilities and experience. The Debtor intends to continue to operate and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6

WT_000149

26.    In accordance with Local Bankruptcy Rule 1007-2(b)(1), **Exhibit H** hereto is the estimated amount of the payroll to employees of the Debtor (exclusive of officers, directors and stockholders) for the 30-day period following the commencement of the Debtor's chapter 11 case.

27.    In accordance with Local Bankruptcy Rule 1007-2(b)(2)(A), **Exhibit I** hereto contains the amounts to be paid to the Debtor's officers, directors, and stockholders for services for the 30-day period following the commencement of the Debtor's chapter 11 case.

28.    In accordance with Local Bankruptcy Rule 1007-2(b)(3), **Exhibit J** hereto contains the estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the commencement of the Debtor's chapter 11 case.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 16th day of November 2022

/s/ Jubao Xie
Jubao Xie

7

**EXHIBIT A**

**GOLDEN SEAHORSE LLC**

**LIST OF TWENTY (20) LARGEST UNSECURED CREDITORS**

WT_000151

Fill in this information to identify the case:

| | |
|---|---|
| Debtor name | **Golden Seahorse LLC** |
| United States Bankruptcy Court for the: | **SOUTHERN DISTRICT OF NEW YORK** |
| Case number (if known): | 22-11582-pb |

☐ Check if this is an

amended filing

# Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

**12/15**

**A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.**

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| H.I. Wall Street Hotel Investo Manhattan Regional Center 158-13 72nd Ave, Suite 2D Fresh Meadows, NY 11365 | | Loan | | | | $4,000,000.00 |
| Intercontinental Hotels Group PO Box 101074 Atlanta, GA 30392 | | License Fees | | | | $350,994.86 |
| NYS Sales Tax Processing PO Box 15172 Albany, NY 12212 | | Sales Taxes | | | | $270,000.00 |
| NYC Department of Finance P.O. Box 3646 New York, NY 10008 | | Hotel Occupancy Taxes | | | | $220,000.00 |
| U.S. Small Business Administra 409 Third St. SW Washington, DC 20416 | | EIDL Loan | | | | $189,000.00 |
| General Personnel Services Inc 3907 Prince Street #5BB Flushing, NY 11354 | | Trade | | | | $92,258.60 |
| Ritz Hotels Services 179 Lafayette St. Paterson, NJ 07501 | | Trade | | | | $61,906.57 |
| Oracle America Inc. PO Box 203448 Dallas, TX 75320 | | Trade | | | | $29,433.07 |

WT_000152

| Debtor | Golden Seahorse LLC | | | Case number *(if known)* | 22-11582-pb | |
|---|---|---|---|---|---|---|
| | Name | | | | | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| Constellation New Energy, Inc. PO Box 4640 Carol Stream, IL 60197 | | Utility | | | | $21,903.11 |
| Jai Mon Tour 1350 Rue Royale Trios Rivieres QB G9A 4J4 | | Trade | | | | $19,788.90 |
| HD Supply Facilities Maintenan P.O. Box 509058 San Diego, CA 92150 | | Trade | | | | $19,720.29 |
| Expedia Group 1111 Expedia Group Way Seattle, WA 98119 | | Trade | | | | $18,784.28 |
| Crescent Hotels & Resorts LLC 10306 Eaton Place Suite 430 Fairfax, VA 22030 | | Management Agreement | | | | $17,855.96 |
| Marsh USA Inc. PO Box 846015 Dallas, TX 75284 | | Trade | | | | $17,381.36 |
| BOOKING.COM BV 5295 Paysphere Circle Chicago, IL 60674 | | Trade | | | | $14,932.82 |
| NYC Water Board PO Box 11863 Newark, NJ 07101 | | Water Charges | | | | $13,286.44 |
| Casey Fire Systems Inc. 39-27 59th Street Woodside, NY 11377 | | Trade | | | | $10,311.24 |
| Agoda International USA Inc. PO Box 735562 Dallas, TX 75373 | | Trade | | | | $8,300.90 |
| Bigintel FSS & Security Manage 47-46 45th Street Suite 3F Woodside, NY 11377 | | Trade | | | | $8,291.92 |
| Hewlett-Packard Financial Serv PO Box 402582 Atlanta, GA 30384 | | Trade | | | | $6,777.28 |

WT_000153

**EXHIBIT B**

**GOLDEN SEAHORSE LLC**

**LIST OF FIVE (5) LARGEST SECURED CREDITORS**

WT_000154

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

In re:                                          :
                                                :    Chapter 11
                                                :
Golden Seahorse LLC dba Holiday Inn             :
Manhattan Financial District,                   :    Case No.: 22-11582 (PB)
                                                :
                        Debtor.                 :

------------------------------------------------------------ x

## **LIST OF CREDITORS HOLDING 5 LARGEST SECURED CLAIMS**

*Following is a list of the debtor's creditors holding the 5 largest secured claims. The list is prepared in accordance with Rule 1007-2(a)(5) of the Local Rules of this court for the filing in this Chapter 11 case.*

| *NAME OF CREDITORS AND COMPLETE MAILING ADDRESS (INCLUDING ZIP CODE)* | *NAME, TELEPHONE NUMBER AND COMPLETE MAILING ADDRESS (INCLUDING ZIP CODE) OF EMPLOYEE, AGENT, OR DEPARTMENT (IF DIFFERENT FROM MAILING ADDRESS) OF CREDITOR FAMILIAR WITH CLAIM* | *AMOUNT OF CLAIM* | *DESCRIPTION AND EST. VALUE OF COLLATERAL SECURING CLAIM* |
|---|---|---|---|
| Wilmington Trust, National Trustee, as Trustee for the benefit of the Registered Holders of Commercial Mortgage Pass-Through Certificates Series 2019-C6, Wells Fargo Commercial Mortgage Trust 2018-C47, Commercial Mortgage Pass-Through Certificates, Series 2018-C47 and CSAIL 2018-C14 Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2018-C14<br><br>100 North Market Street<br>Wilmington, DE 19801 | | $87,025,000 | Mortgage |
| HI FIDI B NOTE OWNER LLC<br>c/o Triangle Capital Group LLC<br>452 Fifth Avenue<br>30th Floor<br>New York, NY 10018 | | $50,000,000 | Mortgage |

## DECLARATION UNDER PENALTY OF PERJURY

I, Jubao Xie, the managing member of Hysendal USA LLC, the sole member of the debtor in this case, declare under penalty of perjury that I have read the foregoing list of creditors holding the five (5) largest secured claims and that it is true and correct to the best of my information and belief.

Dated:  New York, New York
        November 16, 2022

/s/ Jubao Xie
_____
Jubao Xie, Managing Member of Hysendal USA LLC, Sole Member of the Debtor

**EXHIBIT C**

**GOLDEN SEAHORSE LLC**

**BALANCE SHEET**

# GOLDEN SEAHORSE LLC
## ESTIMATED STATEMENT OF ASSETS AND LIABILITIES
### As of 11/15/2022

## ASSETS

Current Assets:

| | |
|---|---|
| Cash | 2,175,064.38 |
| Accounts Receiable | 288,000.00 |
| Prepaid Expenses | 1,894,427.01 |

Total Current Assets   4,357,491.39

Property & Equipment:

| | |
|---|---|
| Real Estate/Air Rights | 165,000,000.00 |
| Furniture, Fixtures & Equipment | 8,186,125.37 |
| Software | 58,845.53 |

**Total Assets**   **$177,602,462.00**

## LIABILITIES

Current Liabilities:

| | |
|---|---|
| Accounts Payable (Trade) | 600,000.00 |
| Taxes Payable | 490,000.00 |

Total Current Liabilities   1,090,000.00

Long Term Liabilities:

| | |
|---|---|
| Secured Debt (Principal) | 137,025,000.00 |
| EIDL | 189,900.00 |
| Money Due to Owner | 1,000,000.00 |
| EB-5 Loan to Debtor's Sole Member | 4,000,000.00 |

Total Long Term Liabilities   142,214,900.00

**Total Liabilities:**   **$143,304,900.00**

# EXHIBIT D

## GOLDEN SEAHORSE LLC'S OWNED PREMISES

| Owned Premises |
| --- |
| 99 Washington Street<br>New York, New York 10006 |
| 103 Washington Street<br>New York, New York 10006 |

# EXHIBIT E

## GOLDEN SEAHORSE LLC

| Location of Debtor's Substantial Assets |
| --- |
| 99 Washington Street<br>New York, NY 10006 |
| 103 Washington Street<br>New York, NY 10006 |

| Location of Debtor's Books and Records |
| --- |
| 103 Washington Street<br>New York, NY 10006 |
| 1965 Waddle Road<br>State College, PA 16803 |

**EXHIBIT F**

**GOLDEN SEAHORSE LLC**

**SIGNIFICANT LITIGATION COMMENCED AGAINST THE DEBTOR PRIOR TO THE PETITION DATE**

| Title of Action | Court | Nature of Action | Status |
|---|---|---|---|
| Wilmington Trust, National Association, as Trustee for the benefit of the registered holders of Commercial Mortgage Pass-Through Certificates Series 2018-C6 v. Golden Seahorse LLC et al. Index No.: 850073/2022 | Supreme Court, County of New York | Mortgage Foreclosure | Pending |

# EXHIBIT G

# GOLDEN SEAHORSE LLC

# DEBTOR'S EXISTING SENIOR MANAGEMENT

| Name/Position | Summary of Responsibilities and Experience |
|---|---|
| Jubao Xie/Managing Member of Hysendal USA LLC, the Sole Member of Golden Seahorse LLC | General management oversight |

# EXHIBIT H

## GOLDEN SEAHORSE LLC

**ESTIMATED AMOUNT OF WEEKLY PAYROLL TO EMPLOYEES EXCLUSIVE OF OFFICERS, DIRECTORS, AND SHAREHOLDERS FOR THE 30-DAY PERIOD FOLLOWING THE PETITION DATE[1]**

| Week Ending | Estimated Gross Payroll |
|-------------|-------------------------|
| 12/2/2022   | $100,998.00             |
| 12/9/2022   | $100,988.00             |
| 12/16/2022  | $100,988.00             |
| 12/23/2022  | $100,988.00             |

---

[1] This includes outsourced labor for housekeeping and related services.

# EXHIBIT I

## GOLDEN SEAHORSE LLC

**ESTIMATED AMOUNT OF WEEKLY PAYROLL TO OFFICERS, DIRECTORS, AND
SHAREHOLDERS FOR THE 30-DAY PERIOD FOLLOWING THE PETITION DATE**

| Week Ending | Estimated Gross Payroll |
|---|---|
| 12/2/2022 | $3,262.00 |
| 12/9/2022 | $3,262.00 |
| 12/16/2022 | $3,262.00 |
| 12/23/2022 | $3,262.00 |

**EXHIBIT J**

**GOLDEN SEAHORSE LLC**

**DEBTOR'S ESTIMATED CASH DISBURSEMENTS AND RECEIPTS FOR THE 30-DAY
PERIOD FOLLOWING THE PETITION DATE**

| | |
|---|---|
| Cash Receipts | $2,689,043.00 |
| Cash Disbursements | $1,956,277.00 |
| Net Cash Gain (Loss) | $732,766.00 |

# Independent Democratic Conference

# Horrors in Homeless Housing



*New York's Unclean, Unsafe, Dangerous Temporary Shelter*
*System and How to Finally Tackle the Homelessness Epidemic*

## January 2017

WT_000166

# Introduction

New York's homeless population has currently reached new highs with more than 73,000 men, women and children sleeping each night in the municipal shelter system. The state has a long and storied history with housing for the homeless, which began in 1979 when a lawyer named Robert Hayes brought a class action lawsuit, Callahan v. Carey, on behalf of homeless men in New York City. The crux of Hayes' argument was that the right to shelter is guaranteed by Article XVII of the New York State Constitution, which states: "the aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions."

Callahan v. Carey permanently altered the manner in which New York City addresses its homeless population. In 1981, a consent decree was issued as settlement to the case; it detailed the city's duty to provide shelter for those who are homeless. This consent decree ultimately created a right to shelter that has helped countless homeless families, but it also gave birth to the City of New York's use of commercial hotels to shelter homeless New Yorkers.

The city gained national attention for its use of hotels to shelter homeless individuals and families in 1987 when the United States Department of Health and Human Services ("HHS") proposed new regulations to only reimburse cities for the first 30 days of a family's stay in emergency housing, including welfare hotels. The move would have caused an immediate loss in federal funds amounting to over $80 million. In November of the same year, the city announced plans to stop housing homeless people in hotels and move the residents to other housing options by 1989. Since then, the city has continued to use hotels to shelter the homeless and has continually faced staunch opposition by community groups, advocates, residents and elected officials at all levels of government, who have called on the city to end this practice.

As of November, the U.S. Department of Housing and Urban Development ("HUD") estimated that New York City's homeless population was 73,523; this count shows more people than the numbers cited by the City Department of Homeless Services because it includes people in traditional DHS shelters as well as other types of shelter in the city. Among this population, are more than 6,100 men, women and children who are living in hotels, many of which are in deplorable condition, riddled with open violations and without necessities, such as a stove.

Furthermore, over the years a number of incidents have drawn attention to the serious safety concerns presented by sheltering homeless families in hotels. Just this past year, a man fatally stabbed a mother and her two daughters at a Staten Island Ramada Inn, which was being used to house homeless families. While the city claims that families typically stay at these hotels for about two weeks, the victim and her daughters had been staying at the Ramada Inn for two months. At the time, the city housed 28 families at the Ramada Inn. The city has since stopped using that hotel to house homeless individuals. At the time of the stabbing, the city used around 41 hotels to house approximately 2,500 homeless people, including 600 children. The city claims that it plans to eliminate the use of hotel rooms for these purposes.[1]

---

[1] http://www.reuters.com/article/us-new-york-crime-stabbing-idUSKCN0VJ22M

Shortly following the aforementioned incident, a repeat offender named Malik Pinnock broke into a hotel partially used as a homeless shelter wielding a machete. For several hours, Pinnock held his girlfriend and two children hostage in the hotel room while threatening to kill them. Police recovered three machetes at the scene.[2]

Despite the city's promises earlier this year, it has in fact *expanded* the use of hotels to house homeless individuals. The city houses an estimated 12 percent of the total homeless population in hotels, compared with 4 percent in January. At the beginning of 2016, the city rented 508 hotel rooms for homeless families with children; today, that number stands at over 2,400.[3]

Sometimes even worse than these homeless hotels are cluster sites, which are essentially temporary housing apartments, used by the city to shelter homeless individuals. This year, an investigation by the New York City Comptroller found that 3,200 cluster units house 11,000 homeless men, women, and children across the City. While 100 property owners participate in the cluster site program, 11 landlords control about half the City's stock of cluster units. Those units account for around 56 percent of the 1,119 "high-priority" health, fire, building, and code violations identified by the Comptroller.[4]

These cluster sites are rife with their own health and safety issues, which sometimes prove to be fatal for the homeless individuals and families they serve. Juan Sanchez is one such victim. After consuming rat poison in the hallway of a cluster site in April 2014, the four-year-old died at Lincoln Hospital. Prior to the incident, the family asked the city to move them, citing deplorable conditions at the site. "The building is infested with rat poisoning and there were always beer cans and empty bags of drugs in the hallways… It was always unhealthy for us to be there," said the mother at the time.[5]

In December 2016, a gruesome multiple fatality in the South Bronx reminded New Yorkers about how perilous building issues can be for those who are living in them, and highlighted the dangerous nature of run down cluster sites. Two sisters, Ibanez and Scylee Vayoh Ambrose, ages two and one, died when a radiator burst in their apartment and scalded them with steam. Doctors at Lincoln Hospital were unable to revive the girls.

These tragedies, and others like them, are preventable. The Comptroller's report issued this year is not the first to condemn conditions at the cluster sites—the Department of Investigation condemned conditions at the units following a 2014 report. The DOI found that "the family shelters it inspected and reviewed are too often unsafe and unhealthy for children and families… and that the family shelter system is in need of aggressive, immediate, as well as long-term reform efforts."[6] In 2015, New York City conducted 8,665 inspections between the Departments of Housing Preservation and Development (HPD), Buildings (DOB), Health and Mental Health (DOHMH), and the Fire Department (FDNY). These inspections identified 17,312 violations.  In early 2016,

---

[2] http://www.ny1.com/nyc/all-boroughs/politics/2016/03/15/unsafe-haven--city-homeless-shelters-are-hotbeds-of-domestic-violence.html
[3] http://www.nytimes.com/2016/12/07/nyregion/homelessness-new-york-city-hotels.html?_r=0
[4] http://www.nydailynews.com/new-york/handful-bad-landlords-endanger-nyc-homeless-families-article-1.2907403
[5] http://www.nydailynews.com/new-york/bronx/bronx-boy-ate-rat-poison-lived-squalor-mom-probed-6-times-article-1.1774880
[6] http://www.nytimes.com/2015/03/13/nyregion/new-york-homeless-shelter-system-violations-report.html

New York City took steps to begin increasing inspections at shelter sites, as well as making the information more transparent. The City created a new Shelter Repair Scorecard that lists conditions at all homeless shelters in New York City that do not meet the applicable regulations, and makes it possible to track progress in dealing with the violations. In addition to this new Shelter Repair Scorecard, the City committed in 2016 to conduct inspections twice per year at all sites used to house homeless individuals and families. The 2016 budget for shelter maintenance and repairs was $54 million.

New York's agencies are caught between a-rock-and-a-hard-place, not because housing the homeless is a foundational moral and legal duty, but because with the growing homelessness population the use of hotels and cluster sites have become a necessity in the absence of more permanent and stable shelter sites.

New York's lawmakers must take expeditious action to quell the homelessness crisis, or the Ambrose girls will not be the last victims of New York's dilapidated cluster site and homeless hotel system.

WT_000169

## Key Findings:

- 49 of 63 hotels identified (78%) currently have open violations.
- These 49 hotels currently have a total of 433 open violations.
- Of hotels with violations, the average number of open violations per hotel was 8.68.
- The top 10 violators were responsible for 294 open violations, accounting for 67.9% of all violations on the list.
- Manhattan had the highest number of violations with 263, and an average of over 20 violations per hotel, over twice the average for all hotels citywide. It was followed by Queens with 63 violations, Brooklyn with 45, and the Bronx with 37. Staten Island did not have any recorded violations.
- Four hotels had a total of 9 open Class C HPD violations; which constitutes violations that are immediately hazardous and can be corrected by HPD through the Emergency Repair Program (ERP) that charges repair costs to landlords.
- The worst violator on the list, Dawn Hotel of NY, LLC, racked up 55 HPD violations, 4 DOB violations, and 19 ECB violations, for a grand total of 78 open violations.
- Citations include issues with dangerous construction, problems with fire escapes, lead paint contamination, illegal cooking apparatuses, broken floors and walls, broken sinks, malfunctioning toilets, areas open to the elements, etc.
- 38 of 41 cluster sites analyzed (93%) had violations.
- The cluster sites reviewed by staff, despite numbering fewer than the homeless hotels (41 vs 63), racked up **2,577 violations.**
- Cluster sites averaged 68 violations per site.
- The top 10 worst cluster sites were responsible for 1,426 violations, or 55% of the total violations at all cluster sites.
- The Bronx has the worst cluster site problem—6 of the worst 10 cluster sites are found in the borough, and it accounts for 46% of all cluster site violations uncovered by the investigation with an average of 118 violations per site. The Bronx was followed by Brooklyn with 99 violations, Manhattan with 39, and Queens with 10. Staten Island had no violations.

## Methodology

To highlight the health and safety issues at these homeless hotels and cluster sites, New York State Senator Jeffrey Klein and the Independent Democratic Conference conducted an investigation into the living conditions at the hotels and cluster sites used for the temporary housing of homeless families across New York City.

Staff identified hotels and cluster sites by reviewing the city's shelter scorecards, which classify shelters by type. These types of temporary shelters are contained in the "family hotel" and "family

cluster" categories. Additionally, not all of the homeless hotels are commercial hotels. Unfortunately, the city omits address data from the shelter scorecard can easily identify and confirm the addresses of these cluster sites and commercial homeless hotels. In the absence of this information, staff was required to use outside information to complete its analysis.

Staff used identifying information from the shelter name, provider, facility type, landlord, and borough fields to identify shelter locations by crosschecking the information against publicly-available data and maps on the internet. Relevant factors in ruling out non-commercial hotels were whether the building included signage, advertised online, had a website and had consumer reviews. This outside information allowed staff to confirm temporary hotel locations and cluster sites with a fair amount of accuracy. Finally, some of the family hotels are established as nonprofit, dedicated shelters; staff attempted to eliminate dedicated nonprofit shelters, to focus specifically on commercial and/or for-profit hotels where possible, checking with publicly available information that the homeless hotel locations analyzed are commercial hotels.

Finally, once staff identified locations, staff checked the status of these shelter locations on the City's Housing Preservation & Development (HPD) and the Department of Buildings (DOB) websites. During the analysis, staff noted that HPD's building database is consistently slow to respond, creating potential transparency issues for citizens who are attempting to obtain building information in some cases. Indeed, addresses that have many violations tend to crash before they can fully load on the website.

Staff collected data regarding open HPD violations, DOB violations, and Environmental Control Board (ECB) violations.

## Data

**Hotels**

| *Rank* | *Name of Hotel* | *Address* | *Borough* | *Number of Open Violations* |
|---|---|---|---|---|
| 1 | Dawn Hotel of NY LLC | 6-8 ST NICHOLAS PLACE | Manhattan | 78 |
| 2 | Frant Hotel | 209/211 WEST 101 STREET | Manhattan | 59 |
| 3 | Ellington Hotel LLC | 610 WEST 111 STREET | Manhattan | 37 |
| 4 | Aladdin Hotel | 317 WEST 45TH STREET | Manhattan | 26 |
| 5 | Apollo Hotel | 2027 7TH AVENUE | Manhattan | 25 |
| 6 | Lincoln Atlantic Motor Inn Inc | 90-35 Van Wyck Expy | Queens | 17 |
| 7 | Park Overlook Hotel | 1938 WEBSTER AVENUE | Bronx | 16 |
| 8 | Galaxy Motel | 860 PENNSYLVANIA AVE | Brooklyn | 16 |
| 9 | Manhattan Center | 315 West 34th Street | Manhattan | 10 |
| 10 | Extended Stay America-NYC LaGuardia Airport | 18-30 WHITESTONE EXP | Queens | 10 |

Of the top ten worst violators, the top five hailed from Manhattan. The top ten hotels alone racked up 294 open violations, or a total 67.9% of *all violations* on the list. These violators averaged 29.4 violations per hotel.

A media search quickly uncovers incidents of tragedy at these homeless hotels. In 2002, a teen committed suicide at the Dawn Hotel after the city seemingly disregarded the fragile state of the teen and his need for permanent and stable housing. Court decrees require a quick shelter placement for medically fragile families, and a city nurse had listed the teen's psychiatric history on a screening that identifies the most vulnerable families. Despite this, the system forced the family between temporary shelter rooms and the crammed Emergency Assistance Unit in The Bronx, where he was required to sleep on the floor. The teen's father claimed at the time that his son committed suicide because he felt threatened that the family  would wind up back at the

Emergency Assistance Unit.[7] Among the Dawn's current 55 open HPD violations are citations for broken floors, broken sinks, toilets that don't flush, issues with fire escapes, unlawful cooking spaces, potentially dangerous electric hot plates and contaminated lead paint.

In 2015, the Daily News conducted an investigation of the cleanliness and violation histories of these hotels. The Frant Hotel, second on our list, owes $191,000 in City code violations and fines, while the Ellington Hotel a few blocks away owed $45,277 in fines. Despite these numerous and repeated violations, DHS routinely gives shelters with dozens of serious code violations a "passing grade."[8] The Frant Hotel's open violations consist mainly of construction issues and failure to file annual inspection reports. Specifically, they failed to file annual boiler inspection reports regarding their low-pressure boiler in 2010, 2011 and 2012 as well as failed to certify corrections on immediately hazardous environmental issues. Architects and engineers deemed the hotel unsafe multiple times, it has failed to comply with building code, and failed to provide adequate safety measures to protect and secure the public safety. Workers made many changes to the building without the required permits, including the installation of water and waste lines and sprinkler systems. Inspectors observed water damage throughout the building, identified unapproved and unsafe electrical equipment multiple times, and noted issues with hose piping for a gas connection. The hotel has also failed to maintain the exterior roof of the building and has failed to file reports indicating the correction of these unsafe conditions.

At the Ellington Hotel, several ECB violations remain open against the property for construction that appears to have disregarded the health and safety of its residents and the public health. Workers failed to use safety netting to protect the public from falling construction debris. Construction commenced without a permit and workers removed exit doors and, leaving the building open to the elements and creating a hazard to its occupants. With work underway, materials blocked exits. HPD cited the building for dangerous lead paint, despite the fact that these hotels house homeless families with young children who are particularly susceptible to lead poisoning and its long-term, permanent effects.

In 2013, an audit from the City Comptroller showed that a Bronx-based shelter operator failed to account for millions of dollars in city payments and racked up massive utility tabs while subjecting his homeless tenants to squalid conditions. The Comptroller called on the city to drop Aguila, which operates the Apollo Hotel. Aguila also owed the city $600,000 at the time of the report. Despite the bad operator's history, DHS paid Aguila $57 million in FY 2013.[9] The Apollo Hotel's open violations consist primarily of failures to comply with commissioner's orders, failures to have systems tested, and failures to maintain building code. Specifically, it has failed to have new or altered plumbing systems tested multiple times, no permits or certificates were issued to show violated conditions have been corrected, and construction has been conducted without permits. More alarming is its failure to properly bond its electrical system, including its fire alarm switch; its occupancy has been over the allowable amount; and it was alerted that there is insufficient water supply for its sprinkler system, which activates in case of emergency. Such a deficiency could result in serious harm or loss of life in the event of a fire.

---

[7] http://www.nytimes.com/2002/08/08/nyregion/mentally-ill-boy-kills-himself-in-shelter-hotel.html
[8] http://www.nydailynews.com/new-york/city-homeless-shelters-rife-vermin-violations-report-article-1.2146727
[9] http://www.nydailynews.com/new-york/bronx/audit-rips-notorious-shelter-operator-article-1.1503255

In 2015, Senator Klein held a press conference in front of the Lincoln Atlantic Motor Inn, pointing out that the location concurrently housed homeless sex offenders, placing homeless residents and families at risk. This year, Lincoln Atlantic is number six on our list, racking up a total of 17 open violations.[10] Open violations at the property concern multiple citations for roach infestations, broken plastered surfaces and paint, failing to file a valid registration certificate, broken or defective lower window sashes, and elevator issues.

Assemblyman Charles Barron in August protested The Galaxy Motel in Brooklyn, which currently has 16 open violations. The Assemblyman and his fellow protestors noted that the hotel, and many like it, is an inadequate stopgap measure that diverts resources, which can create long-term, stable and affordable housing for vulnerable populations.[11]

One Manhattan hotel, the MAve NYC, was recently the target of a New York Post story that divulged the hotel, owned by Assa Properties, housed homeless individuals for the city. At the same time, the city sued one of the company's principals, Salam "Solly" Assa, accusing him and others of turning four Midtown apartment buildings into illegal hotels. The suit alleged that Assa was "conducting a business which places tourists and visitors in illegal occupancies and exposes them to serious fire safety risks." City inspectors discovered obstructed passageways and a lack of fire alarm and sprinkler systems. Despite these transgressions, the city has handed MAve a contract potentially worth millions.[12] The analysis discovered six open violations at MAve, with one Class B HPD violation, two DOB violations, and three ECB violations.

| | Number of Hotels Cited With Open Violations | Total Number of Violations in Borough | Average # of Open Violations per Hotel |
|---|---|---|---|
| Bronx | 10 | 37 | 3.70 |
| Brooklyn | 11 | 45 | 4.09 |
| Manhattan | 13 | 263 | 20.23 |
| Queens | 13 | 63 | 4.85 |
| Staten Island | 0 | 0 | 0 |
| Total | 47 | 408 | 8.68 |

[10] http://queenstribune.com/senators-seek-to-protect-homeless/

[11] http://www.canarsiecourier.com/news/2016-08-18/Other_News/No_More_Shelters_Barrons_Demand.html

[12] http://nypost.com/2016/10/30/luxe-hotel-near-celebrity-homes-sued-for-housing-homeless/



Manhattan ranked worst when measured by number of violations and by average number of violations, with more than twice than the rest of the city. All other boroughs followed distantly, with Queens at 63, Brooklyn at 45, and The Bronx at 37. Staten Island had only two identifiable commercial hotels used for purposes of housing homeless individuals, but neither hotel had violations.

In total, these hotels were responsible for 106 HPD violations, broken down into the following categories:

| *Class A* | *Class B* | *Class C* | *Class I* |
|:---:|:---:|:---:|:---:|
| **21** | **50** | **9** | **26** |

HPD classes violations from A to C. In general, Class A violations are non-hazardous and require correction within 90 days; Class B are hazardous and require correction within 30 days; Class C are immediately hazardous and require correction times ranging from 21 days to *immediate* depending on the type of violation (issues with heat and hot water are regarded as particularly serious as they have the potential to cause imminent human health problems).[13]

**Cluster Sites**

The violation status of New York City's cluster sites is even worse than the hotels being used to temporarily and inadequately house NYC's homeless population. Though there are less cluster sites in the data set than homeless hotels, the number of violations far eclipses the hotels. There are a total 2,577 cluster site violations versus a total 433 for homeless hotels, nearly six times more violations than at the hotels.

---

[13] http://www1.nyc.gov/assets/hpd/downloads/pdf/ABCs-housing-singlepg.pdf

| *Rank* | *Name of Cluster Site* | *Address* | *Borough* | *Number of Open Violations* |
|---|---|---|---|---|
| 1 | BEDCO CLUSTER | 1055 UNIVERSITY AVENUE | Bronx | 185 |
| 2 | LCG COMMUNITY SERVICES CLUSTER | 111 E MOSHOLU PARKWAY N | Bronx | 166 |
| 3 | BEDCO CLUSTER | 250 East 176 Street | Bronx | 158 |
| 4 | LCG BROOKLYN | 1801 Pitkin Avenue | Brooklyn | 144 |
| 5 | CHLDN RESCUE FUND CL MODEL PRG | 1575 TOWNSEND AVENUE | Bronx | 143 |
| 6 | BROOKLYN ACACIA CLUSTER | 2063 NOSTRAND AVENUE | Brooklyn | 142 |
| 7 | LCG COMMUNITY SERVICES CLUSTER | 2723 Barnes Avenue | Bronx | 140 |
| 8 | LCG COMMUNITY SERVICES CLUSTER | 1229 CLAY AVENUE | Bronx | 123 |
| 9 | MONICA HOUSE II, WOMEN IN NEED | 899 MONTGOMERY STREET | Brooklyn | 113 |
| 10 | MONICA HOUSE II, WOMEN IN NEED | 434 SCHENECTADY AVENUE | Brooklyn | 112 |

The worst violator on the list, the cluster site at 1055 University Avenue in The Bronx, made the news as early as 2001. The New York Post cited the cluster as having 27 "poorly maintained scatter-site units," and caseworkers that were dismissive toward the needs of the families there. In mid-2015, the property made the news again when a man was shot there. Specifically, the BEDCO site has outstanding health and safety violations for rodent and roach infestations, instances of mold and hazardous led-based paint in several of the apartments and for failure to install smoke and carbon monoxide detectors in a number of the units. On top of this, the cluster at 1055

University Avenue does not even have a locking front entryway and a handful of units do not have working door locks.

The cluster located at 111 East Mosholu Parkway North in The Bronx also has a host of unresolved issues. Multiple housing units at this site contain mold, have exposed electrical wiring, have illegally blocked fire escapes and are without carbon monoxide and smoke detectors. Additionally, this cluster has continued problems with mice and roach infestations as well a number of hallways containing lead-based paint that are all contributing to a hazardous and unhealthy living environment.

Acts of violence unfortunately surround cluster sites. In 2011, three men fled into the Pitkin Avenue location after the fatal shooting of a Brooklyn woman. In 2015, a victim was beat to death with a baseball bat across the street from the Townsend Avenue site. A screaming, police arrested a knife-wielding man outside the 899 Montgomery Street site in April of this year.

In addition to issues of violence, the 899 Montgomery Street cluster has several health and safety concerns including approximately two-dozen open lead-based paint violations and instances of mold on every level of the building.  Likewise, a number of residents in units in the Pitkin Avenue cluster live without heat and hot water, with broken door locks and defective toilets. In an April 2015 article, the New York Post reported that at the Brooklyn Acacia Cluster in Brownsville, "investigators found one elevator broken, and the other fouled with a large puddle of urine."

The problem of filthy and dilapidated cluster sites is not by any means new; it is something that the city and regulators are well aware of, and have been for years. In a 2009 report by the New York City Comptroller's office that cited violations at the 1575 Townsend Avenue location, the Comptroller's office noted, "DHS also failed to adequately monitor providers to ensure they provided safe and sanitary shelter to homeless families and transitioned them to permanent housing in a timely manner." In that report, the Townsend Avenue location had 75 open HPD violations.[14]

| | Number of Cluster Sites Cited With Open Violations | Total Number of Violations in Borough | Average # of Open Violations Per Cluster Site |
|---|---|---|---|
| *Bronx* | 10 | 1183 | 118 |
| *Brooklyn* | 10 | 988 | 99 |
| *Manhattan* | 8 | 308 | 39 |
| *Queens* | 10 | 98 | 10 |
| *Staten Island* | 0 | 0 | 0 |
| *Total* | 38 | 2577 | 68 |

---

[14] https://comptroller.nyc.gov/wp-content/uploads/documents/FK09_069A.pdf



The average number of violations at these cluster sites dwarfs the average at homeless hotels, at an average of 68 for the cluster sites, and an average of 8.68 at the homeless hotels.

| *Class A* | *Class B* | *Class C* | *Class I* |
|-----------|-----------|-----------|-----------|
| 414 | 1208 | 395 | 2 |

These cluster sites, which number only 41 in total, have racked up 2,019 open violations; an average of *68 per site with violations.* Of HPD violations, over 1,200 are hazardous and almost 400 are *immediately hazardous*. Cluster sites and homeless hotels with hazardous and immediately hazardous violations put homeless families and children at risk, and are unsuitable for occupancy by any family; especially New York's most vulnerable ones.

**Investigation**

Staff investigators visited the Van Cortlandt Motel on Broadway near West 256th Street in North Riverdale to take pictures and provide a glimpse into the living conditions at this hotel and others like it. In early October, Senator Klein attended a meeting where Community Board # 8 members expressed a great deal of consternation regarding the city's citing of homeless individuals at the motel. Despite the city's promises to the contrary, and in spite of the Board's prescient warnings about health and safety at the motel, the city continued to place homeless families at the motel on a temporary basis. A resolution passed by Community Board #8 noted that the "Van Cortlandt Motel is not a fit and habitable place for homeless persons or for any similar transient use."

Similar to other hotels used for these purposes, the Van Cortlandt Motel is unsafe, unfit, and unequipped to house homeless individuals and families.  In both 2014 and 2016, the city's health department found mouse feces inside the hotel, exterior walls with cracks and holes allowing mice to enter the building, and high grass and other debris adjacent to the building that provide habitable

conditions for mice and rats. Further, shortly after Senator Klein's visit to Community Board#8, tragedy struck. Later in October, a four-month-old baby passed away at the motel. Paramedics attempted to revive the unconscious baby, and then rushed him to Montefiore Medical Center, where he could not be saved.[15]

While access is generally limited at these locations, staff were able to obtain access to one of the rooms. What they found inside was perhaps unsurprising given the many violations commercial hotels used as shelters receive on a regular basis:



*Dirty walls, small spaces, and a room with only the most basic of necessities: a bed, a handwashing sink and a shower.*

---

[15] http://www.nydailynews.com/new-york/nyc-crime/4-month-old-baby-dies-hotel-city-quietly-shelter-article-1.2835335



*A covered (and by extension, disabled) smoke detector represents a fire risk to occupants of the room and to the rest of the motel and its occupants.*



*A small bathroom for occupants.*

WT_000180

Publicly available images posted by a disgruntled Yelp user also showcase the conditions at the
Van Cortlandt Motel:



*Damaged Door*

Investigators also obtained a sample of a meal issued to homeless occupants of these hotels.
Because these hotels lack kitchens to clean, prepare, and cook food, occupants must microwave
meals in a common area. This is what a meal looks like:



*A microwave meal is the only option for many homeless occupants of these hotels.*

Even at non-commercial homeless hotels and other New York City shelter locations, conditions can be deplorable, placing homeless families and children at risk. Staff took these pictures at a homeless hotel location at 555 Hutchinson River Parkway in The Bronx:







At another shelter at 548 183rd Street in The Bronx, staff photographed deplorable rust and rot conditions that residents must endure:



WT_000184





WT_000185

# Legislative Solutions

To combat the homeless problem across the state, Senator Klein and the Independent Democratic Conference have developed a multi-pronged approach. This approach addresses every facet of the problem by focusing on prevention, re-housing, and planning. By taking a comprehensive approach to this problem, it is Senator Klein and the IDC's hope to dramatically reduce the homeless population and ensure that those who are in the shelter system have safe, reliable, and stable housing while transitioning into a long-term living situation.

By preventing homelessness in the first place, the IDC hopes to relieve the stress on the both the city's and state's shelter system, reducing the reliance on homeless hotels and cluster sites. Many of these sites are inadequate to house vulnerable individuals, families, and especially young children. The city must reduce its reliance upon them, and step one is preventing homelessness before it starts.

The Home Stability Support program, which combines and consolidates rent supplements into a cohesive, coordinated housing and anti-homelessness program, headlines the homelessness prevention agenda. Senator Klein and the IDC also recommend comprehensive alternatives and policy changes to fix New York's homelessness epidemic.

## Prevention

### Home Stability Support (HSS)

The IDC's premier anti-homelessness program moving into the 2017 budget will be the Home Stability Support program ("HSS"). The HSS program will be a new statewide rent supplement program for families and individuals, who are facing eviction, are currently homeless, or who have lost housing due to domestic violence and/or hazardous conditions. If enacted, this program will replace all existing optional rental supplements currently available and provide greater flexibility and benefits with *substantial* cost savings to the state and local governments. In this regard, it is a win/win proposal with both positive social and economic outcomes.

The HSS program will be 100 percent federally and state-funded and will provide additional local mandate relief by combining and consolidating all existing optional rent supplements currently available under a single program.

HSS will bridge the difference between the shelter allowance and 85 percent of the local Fair Market Rent, set by the US Department of Housing and Urban Development ("HUD") and is regularly adjusted, to provide adequate calculation of benefits being provided under this program. Additionally, local governments will have the option to raise benefits up to 100 percent of the Fair Market Rent. By providing this option, local governments will have the flexibility to meet their specific local need.

Initially, under this program more than 80,000 households would be eligible statewide for benefits under HSS including:

- Those who are homeless in a shelter, on the street, or living in another household, not of their own.
- The more than 3,000 households fleeing domestic violence or living with hazardous conditions.
- Households currently on public assistance and facing eviction, which current estimates show is more than 7,000 households.
- Households presently receiving a rent supplement.

Furthermore, to promote and encourage employment, this program will include a one-year transitional benefit for households that increases their earnings enough to leave public assistance.

Under this proposal, taxpayers see significant savings in three key areas: reduced shelter utilization including the expensive use of commercial hotels, reduced homeless service program costs, and costs associated with the prevention of future evictions. The total cost breakdown of the program would incorporate those individuals who have existing supplements and who are currently benefiting from funding through the shelter system. In total, the estimated cost of the program is $488,600,000 when accounting for those currently in the system and those families and individuals prevented from entering into homelessness.

Approximate savings from reduced use of shelter beds, which tend to be very expensive, and reductions in shelter supplements, will result in a total net savings per year of over $1.725 billion.

### *Domestic Violence Survivor Eligibility*

Families that are forced to flee their homes because of domestic violence-rather than eviction, foreclosure, or a vacate order-cannot satisfy these eligibility criteria. By simply ensuring that domestic violence survivors are included in the eligibility criteria for the new Home Stability Support program, or in the alternative, amending the requirements of the current FEPS program, we can make such families eligible for the supplement, thus helping them avoid homelessness.

### *Prohibiting LINC Discrimination and Expanding Housing Anti-Discrimination Measures*

The LINC (Living in Communities) program, launched in 2014, as a replacement to the Advantage Program, which was discontinued in 2011, as a way to offer rental assistance to housing families in the shelter system to find stable housing and be able to move out of the shelter system.

In December 2015, the Daily News reported that landlords and brokers are illegally turning away prospective tenants who receive rent subsidies and in the process are "thumbing their noses at the law – and getting away with mere slaps on the wrist."

The Daily News investigation reported that the New York City Human Rights Commission did little to punish bad actors caught in the act since the enactment of the source of income law in 2008.

Currently, the Commission can impose civil fines up to $125,000 per violation and up to $250,000 for a "willful wanton or malicious act." The biggest fine as of December 2015 was $20,000, and

that was against a broker cleared of source-of-income bias, but found to have discriminated against a tenant for her marital status.

Fines meted out by the Human Rights Commission average just $5,441.

The report also showed that of the 157 cases resolved since 2008, 62% resulted in zero financial penalty against landlords or brokers. The total compensatory damages amounted to $238,398 over eight years, an average of $29,799 per year. As for actual fines, the city has forced only 34 landlords or brokers to pay a total of $185,000 since 2008.

Additionally, in 2015 DNAinfo reported that approximately 80 percent of the vouchers certified by the City went unused. . Since the program began in 2014, 15,921 families and individuals currently in the shelter system were eligible for the LINC program; however, only 3,220 recipients used vouchers to exit a shelter.

Recipients of the program face opposition from landlords and brokers who turn them away when they mention the voucher and often are not able to find suitable housing willing to accept the voucher, which is against the source-of-income law.

DHS has begun offering a $1,000 signing bonus with landlords who accept the voucher. Additionally, the program is paying three months advance rent in addition to the first month rent and inclusion in a special fund to compensate landlords for any damages exceeding the security deposit.

To deter bad actors from discrimination, the IDC proposes increasing fines and adding minimums.

## Re-Housing

### *Housing Lottery Preference*

Residents who are currently living in the shelter system, but who meet the income requirements for the New York City Housing Lottery would receive a preference to allow families to move quickly from shelters to permanent affordable housing, while freeing up space in shelters to eliminate the need for use of commercial hotels and motels.

## Planning

### *Comprehensive Shelter Survey – Picture of Homelessness*

To get a clear picture of the current state of homelessness in New York City and across New York State – local social service districts will be required to conduct a survey of all individuals in the shelter system across the state. The survey will include the level of services they are approved to receive and their actual level of services. Additionally – OTDA and HRA/DHS will be responsible for a quarterly report to the legislature and the Governor with ongoing survey results and current census and capacity numbers.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

In re:                              :

                                  :      Chapter 11

GOLDEN SEAHORSE LLC         :

dba Holiday Inn Manhattan Financial District,[1]  :      Case No. 22-11582 (PB)

                                  :

                      Debtor.     :

------------------------------------------------------------ x

### INTERIM ORDER AUTHORIZING THE DEBTOR TO MAKE PAYMENT OF CERTAIN PRE-PETITION WAGES, SALARIES, PAYROLL TAXES AND REIMBURSEABLE EXPENSES TO GENERAL PERSONNEL SERVICES INC. ON ACCOUNT OF PRE-PETITION OBLIGATIONS RELATED TO EMPLOYEES PROVIDED TO THE DEBTOR AND GRANTING RELATED RELIEF

Upon consideration of the Debtor's motion for entry of an order authorizing the Debtor to make payment of Employee Obligations[2] (the "Motion"); and it appearing to the Court the Debtor has provided proper and adequate notice of the Motion and further demonstrated the relief is necessary to avoid immediate and irreparable harm; and upon the record established at the hearings held on December 1, 2022 and December 6, 2022 (the "Hearings") including the declaration of Greg Riley dated December 5, 2022 in further support of the Motion [ECF No. 22]; and the testimony at the Hearings; and it further appearing the request for relief is reasonable and proper and sufficient cause appearing therefor; it is hereby

**ORDERED** the Motion is granted to the extent set forth below; and it is further

**ORDERED** that the Debtor is authorized to pay to General Personnel Services Inc. ("General Personnel") all monies necessary to pay the regular and customary pre-petition wages and payroll taxes of the approximately 61 employees of General Personnel who provide regular services to the Debtor; and it is further

---

[1] The Debtor's last four digits of its tax identification number are 4770. The Debtor's principal place of business is 99 Washington Street, New York, New York 10006.

[2] Capitalized terms otherwise undefined herein shall have the meanings set forth in the Motion.

WT_000189

**ORDERED** that no bonuses or severance payments subject to section 503(c) of the Bankruptcy Code have been authorized pursuant to this interim prepetition wage order; and it is further

**ORDERED** that the Debtor is authorized to file tax returns with, and pay any and all processing fees associated with, and all costs incidental to payment of the Employee Obligations authorized by this order, including any associated taxes required to be collected or paid to any appropriate taxing authorities; and it is further

**ORDERED** that any banks or other financial institutions (the "Banks") on which checks were drawn or electronic payment requests made in payment of the Employee Obligations approved herein are authorized and directed to receive, process, honor and pay all such checks and electronic payment requests when presented for payment, and all such Banks are authorized to rely on the Debtor's designation of any particular check or electronic payment request as approved by this Order, *provided, however,* that sufficient funds are available in the Debtor's bank accounts to cover such payments; and it is further

**ORDERED** that notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary, the Debtor is not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order and the Debtor may, in its discretion and without further delay, take any action and perform any act authorized under this Order; and it is further

**ORDERED** that a hearing to consider the entry of the Final Order granting the relief requested in the Motion shall be held on **December 22, 2022 at 10:00 a.m.** (the "Final Hearing"). Any objections or responses to entry of the proposed Final Order granting the

requested relief shall be filed by **December 15, 2022 at 5:00 p.m.,** with the Clerk of the United

States Bankruptcy Court for the Southern District of New York and be served upon (i) the

Debtor; (ii) proposed counsel for the Debtor; (iii) The Office of the United States Trustee, Attn:

Shannon Scott, Esq.; and (iv) counsel to any statutory committee appointed in this chapter 11

case. If no objections are timely received, the Court may enter the proposed Final Order without

a final hearing; and it is further

      **ORDERED** this Court retains jurisdiction with respect to all matters arising from or

related to the implementation of this Order.

Dated: December 7, 2022
     New York, New York

                     /s/ Philip Bentley
                     The Honorable Philip Bentley
                     United States Bankruptcy Judge

Links Relied on

1. Spectrum News NY1: Migrants Clash with NYC Hotel Staff Over use of Hot Plates: https://www.ny1.com/nyc/manhattan/news/2023/01/14/migrants-clash-with-nyc-hotel-staff-over-use-of-hot-plates

2. Eyewitness News ABC7NY: Workers at Migrant Hotel in Midtown tell Eyewitness News about Safety, Health Concerns: https://abc7ny.com/migrants-nyc-hotel-the-row/12685066/#:~:text=NEW%20YORK%20CITY%20(WABC)%20%2D%2D,be%20isolating%20for%20infectious%20diseases.

3. Insurance Business Magazine: Hotel Sues Lloyd's underwriters, HDI Global Specialty Over Denied Insurance Claim: https://www.insurancebusinessmag.com/us/news/breaking-news/hotel-sues-lloyds-underwriters-hdi-global-specialty-over-denied-insurance-claim-314697.aspx

WT_000192

**MORNINGSTAR®**

# CMBS Property Cash Flow Underwriting and Valuation Guidelines

**Morningstar Credit Ratings**
May 2018
Version: 1.0

## Contents

1   Introduction
2   Section 1: Key Sources of Information
2   Section 2: Morningstar Sustainable NCF
14  Section 3: Morningstar Sustainable Value
16  Retail Property Cash Flow Analysis
25  Office Property Cash Flow Analysis
31  Industrial Property Cash Flow Analysis
36  Multifamily Property Cash Flow Analysis
40  Manufactured Housing Property Cash
    Flow Analysis
44  Student Housing Property Cash Flow
    Analysis
48  Self-Storage Property Cash Flow Analysis
52  Hospitality Property Cash Flow Analysis

## Introduction

Morningstar Credit Ratings, LLC takes a bottom-up approach to evaluating commercial real estate securitizations by first analyzing the properties that serve as collateral for a significant percentage of the loans in each pool. This analysis primarily produces sustainable net cash flows and values for the properties through their loan terms, which are key elements of our new issuance credit ratings for all commercial real estate securitizations. Our analysis is based upon both empirical data, including rent rolls and property expenses, as well as qualitative assessments, such as property quality and market conditions.

Because of the idiosyncratic nature of commercial real estate assets, we apply our judgement in the application of these guidelines, and we may consider other factors not listed herein when determining sustainable net cash flows or values, and likewise, we may decide not to apply certain aspects of these guidelines, depending on the situation.

A property's sustainable NCF typically drives our valuations. Morningstar's sustainable NCF is the annual cash flow that we believe a property can reasonably generate on average over the life of a loan. Morningstar defines NCF as net operating income, or NOI, minus capital expenditures (including capital repairs, tenant improvements, and leasing commissions). Excluding nonstabilized properties or those backing floating-rate loans, Morningstar generally does not underwrite NCF that is higher than a property's in-place NCF, although we do allow for exceptions. For conduit/fusion transactions, Morningstar typically does not rely on multiyear projections or forecasting. Instead, we derive sustainable NCF and property value in today's dollars.

Morningstar's sustainable property values are typically based on the direct capitalization of Morningstar's NCF. Our capitalization rates are meant to represent long-term rates, and they vary by property type, property quality and market, and sometimes other factors.

The guidelines presented herein are general in nature and not meant to encompass all the distinct features or characteristics of every property or the performance trends of every real estate market or submarket. Thus, when Morningstar analyzes commercial real estate loans and properties, we try to consider all relevant information and a variety of property- and market-specific factors, and we may make exceptions on an individual basis. We will disclose exceptions to this underwriting guide that are significant to the resulting credit rating in our reports for the related transaction.

WT_000193

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 195 of 654

Page 2 of 59    CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

## Section 1: Key Sources of Information

Morningstar reviews and/or analyzes property-specific information that typically includes, but is not
limited to, the following documents or sources:

► The deal arranger's asset summary report.

► At least three years of historical operating results (financial statements) when available.
Morningstar analyzes historical statements to find trends or anomalies in property performance.

► Property rent roll. We review tenants, lease terms, base rent, rent steps/increases, and tenant
history at the property.

► Property-level store sales and comparable store sales (for retail properties).

► STR, Inc. reports (for hotels). We review the competitive set and compare property performance,
average daily rate, occupancy, revenue per available room, and penetration rates.

► The borrower's budget, compared with historical operating results and the arranger's underwriting.

► Market and submarket data/reports. We review performance trends and current rent and vacancy
levels, evaluating changes in supply within the market or submarket. Morningstar may also search
the Internet to uncover news stories that may shed light on a property, its tenants, or its market.
CoStar Group, Inc. and CBRE Econometric Advisors are third-party data providers that Morningstar
typically relies on for market data, although we may use others.

► Property appraisals (with special attention paid to rent comparables, market leasing assumptions,
property sales comparables, operating expense comparables, and potential for new supply).

► Property condition report/assessment. If deferred maintenance exists at the property, we try to
understand the costs to make repairs, and we review the consultant's recommended annual
reserves.

► Environmental site assessment (phase I/phase II). We aim to understand the condition of the
property and whether recognized environmental conditions exist; if an REC exists, we determine if
the loan structure is adequate to mitigate the risk.

► Seismic report (if applicable). We review the report to understand whether properties in
earthquake-prone areas have insurance coverage.

► Borrower/sponsor information. We review this information to determine whether the borrower has
a clean payment history and whether the borrower is involved in any ongoing litigation that could
affect its ability to operate the related property.

► Real estate tax bills and insurance bills.

► Credit ratings, when available, for major tenants. We may also rely on a credit estimate from
Morningstar's corporate ratings team, when appropriate.

## Section 2: Morningstar Sustainable NCF

The primary goal of Morningstar's loan and property analysis is to determine the annual sustainable NCF
and sustainable value for each property or a sample of the properties in a transaction. Morningstar
defines NCF as NOI minus capital expenditures (including capital reserves, tenant improvements, and
leasing commissions). For conduit/fusion transactions, we typically do not rely on multiyear projections or
forecasting. Sustainable NCF is the cash flow that Morningstar believes a property can reasonably
generate each year over the life of a loan.

Excluding nonstabilized properties or those backing floating-rate loans, Morningstar generally does not
underwrite NCF that is higher than a property's in-place NCF, nor do we rely on pro forma or future cash

WT_000194

MORNINGSTAR

flow, although we do allow for exceptions. We will underwrite contractual rent increases (rent steps) during the term of a loan, provided that we believe it is prudent to include one or more of the future rent increases in the property's cash flow. (See more in the Rent Steps/Straight-Line Rent section below.) Morningstar typically bases its property valuations on the direct capitalization of our underwritten cash flow, whereby we use NCF (not NOI) and a cap rate to calculate our sustainable value. (More on calculating property values is below.)

Income

*Rental Income + Other Income + Expense Recoveries – Vacancy Loss – Concessions*

Expenses

*Fixed Expenses = Taxes + Insurance + Payroll + General and Administrative + Ground Rent*

*Variable Expenses = Utilities + Repairs and Maintenance + Advertising + Common Area Maintenance + Management Fees*

Capital Costs

*Leasing Costs = Tenant Improvement + Leasing Commissions + Replacement Reserves*

**Adjustments to Income**

Rent Steps/Straight-Line Rent – When is Credit Given and How Much?

Typically, we give credit for contractual rent increases based on factors such as the tenant's credit quality (as indicated by its credit rating or credit estimate) and the lease expiration date relative to the loan's maturity date, and so on. For nonrated or below-investment-grade tenants, we give credit for rent steps that occur within 12 months of securitization, provided the adjusted rent is no more than 110% of the market level. For tenants rated BBB-, BBB, or BBB+, or law firms ranked 51-100 on the American Lawyer's top 100 list (Am Law 100), we give credit for rent steps occurring within 24 months of securitization, subject to a maximum rent of 110% of market rent.

If a tenant has a credit rating of A- or better or is a top 50 law firm that has contractual rent increases over its lease term, Morningstar will straight-line the tenant's rent in most instances by discounting the increase in each year and adding the additional rent to our cash flow. The following guidelines generally apply:

► If the tenant's lease expires during the loan term but not within the first five years of the securitization, we typically give credit for rent steps that occur <u>during the lease term</u>, but not beyond, *provided that the adjusted rent is no more than 10% above the then-current market level.*

► If the tenant's lease term extends to the loan maturity date or beyond, then <u>Morningstar will give credit for contractual increases that occur during the loan term</u>, *provided that the adjusted rent is no more than 10% above the then-current market level.*

WT_000195
MORNINGSTAR

CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

To calculate a tenant's straight-line rent, Morningstar will:

► Inflate the in-place rent to include rent steps that occur within the first 24 months of the loan term;
► Calculate the contractual rent increases over the inflated amount from the step above ;
► Discount each annual rent increase, typically using a minimum discount rate of 6.0%; and
► Divide the sum of the discounted rent increases by the number of years in the loan term.

In the example below, a tenant's annual base rent is $100,000 and increases 2% each year. The tenant has a corporate credit rating of A, and thus qualifies to receive credit for the contractual rent steps that occur during the first 24 months of the loan term. Accordingly, we will underwrite $104,040 as the base rent.

Next, we calculate the annual increases in base rent in years three through 10, which total $78,512 (a). We discount each annual increase, in this case by 6.0% (b), and then sum the annual discounted increases, to arrive at a total discounted rent increase of $50,447 (c). We divide the sum by the number of years in the loan term—in this case 10—to arrive at an annual straight-line credit of $5,045, which is added to Morningstar's underwritten cash flow as rental income.

| Year | Contractual Rent ($) | Morningstar U/W Base Rent ($) | Annual Base Rent Increase (a) ($) | Discount Rate (b)* (%) | Discounted Rent Increase ($) |
|------|------|------|------|------|------|
| Year 1 | 102,000 | 104,040 | 0 | 6.00 | 0 |
| Year 2 | 104,040 | 104,040 | 0 | 6.00 | 0 |
| Year 3 | 106,121 | 104,040 | 2,081 | 6.00 | 1,747 |
| Year 4 | 108,243 | 104,040 | 4,203 | 6.00 | 3,329 |
| Year 5 | 110,408 | 104,040 | 6,368 | 6.00 | 4,759 |
| Year 6 | 112,616 | 104,040 | 8,576 | 6.00 | 6,046 |
| Year 7 | 114,869 | 104,040 | 10,829 | 6.00 | 7,202 |
| Year 8 | 117,166 | 104,040 | 13,126 | 6.00 | 8,235 |
| Year 9 | 119,509 | 104,040 | 15,469 | 6.00 | 9,156 |
| Year 10 | 121,899 | 104,040 | 17,859 | 6.00 | 9,973 |
| Totals | | | 78,512 | 6.00 | 50,447 (c) |
| Annual Straight-Line Rent Credit  >>> | | | | | 5,045 |

*Morningstar's discount rate typically will be in the range of 6% to 10%.

**Property Expenses**

► Fixed: Fixed expenses are those that tend to be static over a roughly 12-month period (or longer), often because they are based on either a contract or predetermined rate. Fixed expenses tend not to fluctuate significantly over a short period as a result of changes in occupancy. Morningstar underwrites most fixed expenses based on the current or most-recent contract or obligation when such information is available (for example, the current year's insurance premium or real estate tax bill) plus an inflationary factor of 3%. This rule applies unless there is an indication that the expense will increase significantly during the loan term, in which case we typically rely on the actual future

WT_000196

MORNINGSTAR®

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 198 of 654

Page 5 of 59          CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

expense or a portion thereof. An example of this is a property with a current tax abatement that will either decrease over time (in other words, the tax burden is increasing) or will expire during the loan term.

► Variable: Variable expenses are those that may fluctuate over a short period of time, often in response to changes in a property's occupancy level. Morningstar relies on historical operating results, with more consideration given to the most recently reported expenses, assuming that the property's operations have remained relatively stable over time. We also compare the current and historical expenses against the borrower's budget and the appraiser's expense comparables and make adjustments when it is prudent to do so. Morningstar's variable expenses, particularly utilities and repairs and maintenance, are adjusted when a property's occupancy rate has changed significantly recently. Period-to-period volatility in reported expenses for the same property is not uncommon. If a particular expense exhibits unusual volatility over time, Morningstar will attempt to determine the cause and to normalize our underwritten expense.

► Management Fee: We typically underwrite the management fee as a percentage of effective gross income based on the greater of the contractual rate in the current management agreement and 3% of Morningstar's EGI. If the contract rate is not known, we may rely on the higher of the average rate paid in the past (as indicated in the historical operating statements) and 3.0%. Morningstar also considers the historical expense in the context of market rates as determined by the appraiser for the related property.

  o For institutional-quality properties in major markets, Morningstar may underwrite a management fee that is less than 3% if the fee (on an absolute-dollar basis) is inordinately large compared with the market level or industry standards.

  o If the property is self-managed and the management fee is higher than a reasonable market-based fee, we will underwrite the higher fee to calculate the Morningstar debt service coverage ratio, but may consider adjusting our property value to account for the above-market management fee.

  o For properties in which the contractual fee is significantly above the market level, we usually will underwrite the contractual rate but will adjust our underwritten property value to reflect a management fee that is consistent with the market rate.

  o For hotels, we typically will underwrite the incentive management fee even if it is subordinate to debt service payments.

**Real Estate Taxes**

When underwriting real estate taxes, Morningstar considers the following factors:

► Loan purpose (refinance existing debt or acquire collateral property);
► Likelihood of a property reassessment because of a sale or recent major renovation;
► Potential changes in tax rates in a given locale (for example, because of changes in millage rate); and
► Tax comparables provided in appraisals.

If the loan's purpose is to refinance an existing loan, Morningstar typically will underwrite real estate taxes based on the following, in order of priority:

► The actual current tax bill;

WT_000197



22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 199 of 654
Page 6 of 59          CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

► The appraiser's estimate of current taxes;
► The borrower's budgeted tax expense; and
► The real estate tax expense reported in the most recent 12-month period inflated by 3%.

If the loan is to provide financing to acquire a property, Morningstar will assume that the taxes actually paid in the most recent period do not reflect the taxes that will be owed in the next period, and we will underwrite taxes based on the following:

► The appraiser's estimate of post-acquisition taxes; and
► In the absence of an appraisal, Morningstar will estimate taxes for the upcoming year using the recent purchase price and the millage rate (if available, and assuming a property sale triggers a reassessment in the applicable municipality).

**Tax Abatements**

The real estate taxes paid on multifamily and commercial properties sometimes are directly affected by state or municipal tax incentive programs. These include direct tax abatements and payment in lieu of taxes, or PILOT, programs, which can significantly reduce a property's annual tax obligation below what it otherwise would be in the absence of such programs. When underwriting taxes for a property in which taxes are abated, Morningstar first considers the duration of the abatement in relation to the term of the related loan to ensure that we do not underestimate future taxes.

Therefore, for properties that benefit from an existing tax abatement, Morningstar typically will normalize the tax expense to take into account the actual taxes paid over the loan term. In most cases, we estimate the average actual taxes to be paid during the loan term and use this number as our underwritten tax expense. By using the average of the actual taxes paid during the loan term, we can be reasonably certain that our underwritten cash flow will be sustainable over the term.

The table below illustrates an example of a hypothetical property that has an annual tax obligation of $1,000 and a tax abatement program that runs through the fourth year of a 10-year loan term. The actual taxes paid annually through the end of year four are $700, resulting in a savings of $300 per year for years one through four. However, the abatement program ends at the end of year four, and the property owner will begin paying the full tax obligation of $1,000 at the start of year five.

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Full Tax Load (Uninflated) ($) | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Taxes Actually Paid ($) | 700 | 700 | 700 | 700 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Tax Savings ($) | 300 | 300 | 300 | 300 | 0 | 0 | 0 | 0 | 0 | 0 |

To calculate our normalized tax expense, we take the average of all the taxes paid during the loan term, which is $880 in this case ((($700 x 4) + ($1,000 x 6)) / 10 years). If this were a five-year loan, our normalized tax expense would be $760.

| Loan Term (Months) | 12 | 24 | 36 | 48 | 60 | 72 | 84 | 96 | 108 | 120 |
|---|---|---|---|---|---|---|---|---|---|---|
| Average Tax Payment ($) | 700 | 700 | 700 | 700 | 760 | 800 | 829 | 850 | 867 | 880 |

WT_000198

MORNINGSTAR

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 200 of 654

Page 7 of 59

CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

In some cases, we may adjust our property value to account for tax abatements that burn off close to loan maturity. If an existing tax abatement runs at least three years beyond the loan maturity date, we typically do not adjust our term or balloon values. If, however, the abatement expires within 36 months of maturity, we may increase our cap rate by 25 basis points to 50 basis points to account for the higher future tax load.

**Note on California Properties and Real Estate Taxes**

California's Proposition 13 generally limits annual increases in the base year value of real property to no more than 2%, except when a property changes ownership or undergoes a major renovation or new construction. If the financing for a property is to refinance an existing loan, the 2% rule holds true. If, however, the financing is for an acquisition, the base year value of the property likely will increase significantly more than 2%, and the real estate taxes due in future years will be significantly higher as a result.

Morningstar will underwrite real estate taxes for California properties using one of the following scenarios:

Property Sale/Acquisition – In this scenario, the property is sold.

►   We typically underwrite to the actual real estate taxes after the sale to derive our underwritten NCF.
►   We value the property using our standard approach (direct capitalization method).
►   If a tenant has a triple-net or modified-gross lease, a certain portion of the tax increase may be reimbursable by the tenant. However, if our analysis indicates that the assumed increase in the total reimbursements would result in gross rents being significantly greater than market rent levels, then a lower reimbursement rate and/or a higher cap rate may be warranted.

Loan Refinance (No Sale) – In this scenario, the property's ownership does not change.

►   To underwrite the Morningstar NCF and calculate our DSCR, we typically underwrite real estate taxes at 102% of actual or recently reported taxes.
►   To calculate the Morningstar loan-to-value ratio, we adjust our underwritten value to reflect real estate taxes that are closer to the market level. We do this by:
    o   Multiplying the loan amount by the tax rate to derive our adjusted taxes;
    o   Adjusting our NCF (for the purpose of valuing the property) by inserting the adjusted taxes and recalculating tax recoveries; and
    o   Applying a cap rate to our adjusted NCF.

In the example below, a hypothetical property in California secures a $7.5 million loan to refinance an existing mortgage. The annual tax bill is $80,000. To underwrite Morningstar's sustainable NCF, we would underwrite property taxes of $81,600 to account for Proposition 13's 2% maximum annual increase. Our underwritten NCF is $725,000.

To calculate Morningstar's tax-adjusted value, we first determine the adjusted tax expense by multiplying the loan amount by the actual tax rate (1.5%):

WT_000199

Morningstar®

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff    Pg 201 of 654

Page 8 of 59    CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

*$7.5 million loan amount x 1.5% tax rate = $112,500 adjusted taxes*

Next, we calculate our adjusted NCF by incorporating the adjusted taxes into our underwritten total expenses. In this example, despite our adjusted real estate taxes being $30,900 higher than the base case, our adjusted underwritten NCF is only $9,270 lower because we would underwrite reimbursements at the same recovery ratio as the base case and, therefore, recover $21,630 more in reimbursements. The resulting adjusted property value is lower than the base-case value, and our LTV is higher than the base case.

| | Morningstar U/W NCF | Tax-Adjusted NCF |
|---|---|---|
| Base Rent ($) | 1,100,000 | 1,100,000 |
| Reimbursements (70% ratio) ($) | 547,120 | 568,750 |
| EGI ($) | 1,647,120 | 1,668,750 |
| Real Estate Taxes ($) | 81,600 | 112,500 |
| Operating Expenses ($) | 700,000 | 700,000 |
| Total Expenses ($) | 781,600 | 812,500 |
| NOI ($) | 865,520 | 856,250 |
| Tenant Improvements/Leasing Commissions, Capital Expenditures ($) | 140,520 | 140,520 |
| NCF ($) | 725,000 | 715,730 |
| Cap Rate (%) | 7.00 | 7.00 |
| Morningstar Value ($) | 10,357,143 | 10,224,714 |
| Morningstar LTV (%) | 72.4 | 73.4 |

## Capital Costs, Reserves, and Guarantees

When determining sustainable NCF, we also consider costs to maintain and improve the property, as well as any reserves or guarantees to cover these costs. Capital costs typically consist of reserves for replacements, tenant improvements, and leasing costs.

### Tenant Improvements

Broadly speaking, tenant improvements refer to the costs that a landlord must bear to get either a prospective tenant to sign a new lease or an existing tenant to renew its lease. For this reason, tenant improvements are categorized as new, for new tenants, or renewal, for existing tenants that may renew a lease.

The new category may be further divided into first generation and second generation. The former refers to a building space or area that has not been previously occupied by a tenant (or was completely gutted) and which typically contains nothing but the walls, floor, and ceiling, with little or no improvements, furniture, or fixtures (other than lights and windows). The latter is space that has been previously occupied by a tenant (or tenants) that has since vacated.

Morningstar's underwritten tenant improvement costs per square foot may be based on any one of several factors, including the following:

WT_000200
MORNINGSTAR

CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

► Appraisal assumptions.

► Recently incurred tenant improvement costs at the property.

► Morningstar's default calculations by property type (used in the absence of additional information):

  ○ Retail: 50% of underwritten rent for new leases and 20% of rent for renewals.

  ○ Office: 75% of underwritten rent for new leases and 25% of rent for renewals.

  ○ Industrial: 50% of underwritten rent for new leases and 25% of rent for renewals.

  ○ Multifamily: Typically, not applicable unless a commercial tenant is in place (for example, ground-floor retail).

► Lease term. Typically, we will assume a 10-year lease term, and our underwritten leasing costs will be allocated over an assumed 10-year loan term, regardless of the actual loan term. We may make further adjustments on a case-by-case basis.

► Renewal probability. This represents the likelihood of retaining an existing tenant. Morningstar uses a standard renewal probability of 65%, which means there is a 65% chance an existing tenant will renew its lease and a 35% chance it will not. We may adjust the percentage depending on the individual tenant, type of tenant, current rent, tenant occupancy costs, prevailing market conditions, and the tenant's tenure, commitment to the space, and use.

► Reserve accounts. Morningstar will give credit for money deposited into a lender-controlled reserve account at closing, provided that such money is used for future leasing costs (not allocated for a specific tenant). We do this by dividing the total up-front reserve amount by the loan term and then deducting this amount from our underwritten annual tenant improvements.

► Reserves for leasing costs. Morningstar does not give credit for an up-front cash reserve if it is to be applied to outstanding leasing costs for a tenant already in occupancy (and for which Morningstar already is including the tenant's rent and recoveries in our cash flow analysis).

► Credit quality of tenants. Morningstar will give credit for creditworthy tenants with leases that run beyond the loan term.

► Investment-grade tenants. Morningstar may consider excluding tenant improvements costs for investment-grade tenants with leases that extend beyond the loan term.

### Leasing Commissions

A leasing commission is the amount paid to a real estate broker in exchange for bringing a tenant and landlord together to form a lease agreement. In most cases a commercial lease commission is based on a percentage of the base rent due under the lease. The higher the rent and longer the lease term, the higher the commission. The commission percentage typically falls in the range of 3% to 6% of base rent (for new leases).

Morningstar's underwritten leasing commission may be based on any one of several factors, including the following:

► New versus renewal. Morningstar typically computes a leasing commission using a rate of 4% for new leases and 2% for renewal leases, provided that market rates are less than or equal to Morningstar's standard rates. Thus, if market rates are higher—as determined by the appraiser or other third party—or if the property owner has paid higher rates historically, Morningstar usually will use the higher rates to calculate the commission.

► Renewal rate. As with tenant improvements, Morningstar uses a standard 65% renewal rate, but we may adjust this depending on the circumstances.

WT_000201



CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

► Up-front reserves. Morningstar usually will give credit for leasing commission reserves escrowed at closing. To compute the credit, we divide the total up-front leasing commission reserve amount by the loan term, and we deduct this amount from our underwritten annual leasing commissions.

► Lease term. Typically, we will assume a 10-year lease term and our underwritten leasing costs will be allocated over an assumed 10-year loan term, regardless of the actual loan term. We may make further adjustments on a case-by-case basis.

► Credit quality of tenants. Morningstar usually will give credit for creditworthy tenants with leases that run beyond the term of the loan.

### Loan Reserves

Reserves are funds held (usually) by the lender that are used for key operating or capital expenses. An escrow account typically is established to hold funds for a specific reserve. Common escrow accounts are for real estate taxes, insurance, tenant improvements, leasing commissions, rent abatements, necessary structural repairs, environmental remediation, or reserves for replacement. The following reserves can directly affect Morningstar's NCF analysis:

► Tenant improvements;
► Leasing commissions;
► A reserve for replacement; and
► A reserve for free rent.

Note: Morningstar does not give additional credit for reserves for deferred maintenance or immediate property repairs. However, if the borrower is not escrowing funds to cover the cost of deferred maintenance/immediate repairs, in most cases, Morningstar will deduct the estimated cost from Morningstar's term value and balloon value.

For each reserve type listed above, Morningstar will give credit for the reserve (not to exceed Morningstar's underwritten annual reserve amount) on a normalized basis by reducing Morningstar's related underwritten line item by a fraction of the total reserve amount. The fraction is determined by the number of years in the loan term. If the loan term is 10 years, then the annual credit is:

*Reserve amount ÷ 10 years*

If the up-front reserve amount is $100,000, the annual credit would be $10,000, or $100,000 ÷ 10, and Morningstar would deduct $10,000 from our underwritten annual reserve amount.

Morningstar's cash flow statement would look like this:

| | |
|---|---|
| Net Operating Income ($) | 1,000,000 |
| Tenant Improvements ($) | 25,000 |
| Leasing Commissions ($) | 35,000 |
| Replacement Reserves ($) | 40,000 |
| Total Capital Items ($) | 100,000 |
| Reserve Credit ($) | 10,000 |
| Adjusted Capital Items ($) | 90,000 |
| Net Cash Flow ($) | 910,000 |

WT_000202



22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 204 of 654
Page 11 of 59                    CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

The absence of up-front reserves to cover the following items generally is taken into account when calculating Morningstar's property value. These may include but are not limited to:

► Unpaid leasing costs (tenant improvements and leasing commissions) that the borrower is obligated to pay to a tenant or tenants.
► Deferred maintenance (these are repairs that must be made immediately to a property).
► Unpaid free rent or rent abatements.
► Brand-required hotel property improvement plans.

In each case above, Morningstar will subtract the outstanding amount owed from Morningstar's property value. For example, if a borrower owes $1.0 million to a property tenant for unpaid leasing obligations (such as tenant improvements), we typically will deduct $1.0 million from the property value.

Letters of Credit
Morningstar will consider giving credit for a letter of credit in some instances. For example, we would consider giving some credit if a borrower provided a letter of credit to cover leasing costs, such as outstanding tenant improvements, that are expected to be paid or covered within 24 months.

Sponsor Guarantees
Morningstar will consider giving some credit for certain types of sponsor guarantees if such sponsor carries an investment-grade credit rating. We generally will not give credit for a guarantee from a non-investment-grade entity, although we may make exceptions.

Holdbacks
A holdback is when a lender holds back a portion of the loan proceeds at closing. Typically, the held-back loan proceeds are not released to the borrower until certain events occur or property performance thresholds are met. For example, a $10.0 million loan could be structured with a $1.0 million holdback that the lender agrees to release to the borrower if the borrower successfully leases a certain amount of vacant space in the collateral property.

Morningstar's typical approach to underwriting holdbacks is as follows:

► We typically underwrite the full loan amount, including the holdback amount and calculate Morningstar's loan metrics using the full amount;
► If we are not underwriting a stabilized cash flow, we underwrite cash flow based on current property performance/operations and assume that the performance threshold that governs the release of the holdback is not met;
► We add the held-back loan proceeds to Morningstar's term value and balloon value; and
► If we are underwriting a stabilized cash flow and value, we would not add the held-back loan proceeds to our property value.

Dark Value Analysis
In addition to underwriting sustainable NCF and sustainable value, Morningstar may perform a dark value analysis for properties with a non-investment-grade major tenant that occupies 50% or more of a property and/or contributes 50% or more of total property income. In most cases, we would perform a

WT_000203

MORNINGSTAR

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 205 of 654

Page 12 of 59

CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

dark value analysis regardless of the major tenant's lease expiration date. We also may undertake a dark value analysis for certain properties within a portfolio of assets if some of them are dark or vacant and Morningstar determines that the properties' value is greater than zero. There may be instances in which a dark value analysis is not warranted, which we determine on a case-by-case basis. For instance, we may forgo a dark value analysis if a major tenant carries an investment-grade credit rating and has a lease that extends at least 24 months beyond the loan maturity date.

For properties with a non-investment-grade major tenant, the steps in our dark value analysis are as follows. First, we underwrite a pro forma cash flow for the property using relevant market data to determine income, expenses, and NOI. Second, we calculate a stabilized, or market, value by dividing our pro forma NOI by our stressed cap rate, which is our underwritten cap rate plus 100 basis points. Third, we determine the costs to stabilize, or lease up, the property. These costs include carry costs, downtime/lost income, leasing costs, and other capital costs. The difference between our stabilized or market value and the stabilization costs is the dark value.

The last step is to calculate a blended value that takes into account the probability that the property will become dark or vacant. The blended value is a weighted average of Morningstar's underwritten (in-place) value and our dark value and is based on our estimate of the likelihood, or probability, expressed as a percentage, that the property will become dark or vacant during the loan term or shortly thereafter. We calculate one minus the dark probability and apply this percentage to the underwritten value; we then add this value and the underwritten value.

In the example below, Morningstar's unadjusted sustainable value for a property is $8.4 million, based on leases in place at the time of our analysis. We reunderwrite a pro forma NOI based on market rent, vacancy, and expenses, and we capitalize the NOI using a stressed cap rate of 9.00%, which is 100 basis points higher than our underwritten cap rate, and arrive at a stabilized market value of $7.5 million. We then determine the costs to stabilize the property, which total roughly $1.8 million in our example. Our dark value of nearly $5.8 million is the difference between our stabilized market value and total stabilization costs.

Next, we calculate our final blended value. We calculate the dark value component by multiplying our dark value by our dark probability, 20% in this case, and we calculate the lit value component by multiplying our underwritten value by our lit probability, which is 80%. The sum of these--$1.2 million and $6.8 million--is our blended value, $7.9 million.

WT_000204

MORNINGSTAR

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 206 of 654

Page 13 of 59    CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

| | | |
|---|---|---|
| Morningstar Underwritten Value ($) | 8,437,500 | |
| | | |
| Pro Forma Cash Flow | | |
| Income ($) | 1,000,000 | |
| Expenses ($) | 300,000 | |
| NOI ($) | 700,000 | |
| Capital Items ($) | 25,000 | |
| NCF ($) | 675,000 | |
| Cap Rate (%) | 9.00 | |
| Stabilized Market Value ($) | 7,500,000 | |
| | | |
| Costs to Stabilize | | |
| Tenant Improvements ($) | 250,000 | |
| Leasing Commissions ($) | 250,000 | |
| Downtime ($) | 1,250,000 | |
| Total Costs ($) | 1,750,000 | |
| Dark Value ($) | 5,750,000 | |
| | | Dark/Lit Probability (%) |
| Dark Value Component ($) | 1,150,000 | 20 |
| Lit Value Component ($) | 6,750,000 | 80 |
| Blended Value ($) | 7,900,000 | |

**Government Leases**

Many government entities carry investment-grade credit ratings, so we generally view a lease to such an entity as credit-positive, as it contributes to the stability of a property's cash flow, all things equal. Morningstar generally views government leases that are backed by federal or state government entities as credit-positive, especially if such leases run beyond the loan's maturity date. However, we recognize that leases that contain a nonappropriation clause pose a risk of early termination, albeit a small one in most cases. Therefore, Morningstar will try to consider all relevant factors when underwriting government leases.

Despite investment-grade ratings for the lease signatory, government contracts are not risk-free and carry risk of early termination and nonpayment. The reason is that in most cases the government entity must reserve the right to cancel the contract if the money for payments is not appropriated by Congress, a state legislature, county council, or other legislative body. This reservation of rights is called a nonappropriation clause, and any lease that contains this clause puts the property owner at risk of early lease termination before the contractual lease expiration date.

A government entity's ability to terminate its obligations raises an important issue for an underwriter regarding assessing the risk of nonpayment on the lease.

If a lease contains a nonappropriation clause, Morningstar's first step is to inquire as to whether the lease in question also contains a nonsubstitution clause. This clause essentially states that the government entity agrees not to sign a similar contract with a different counterparty for the same services if the agreement (the lease) is terminated, at least for a specified period of time. A nonsubstitution clause protects against a failure to appropriate funds to meet payment obligations under an existing contract simply because the tenant was able to obtain a better deal somewhere else.

WT_000205

MORNINGSTAR

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 207 of 654

Page 14 of 59
CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

The second step is to consider the purpose for which the leased space is or will be used, in order to determine whether the leased space serves an essential purpose. If Morningstar determines that the government entity needs the leased space to perform an essential service or activity, then the entity has more vested in the lease and is less likely to allow the lease to lapse even in the face of future budgetary constraints.

To assess the likelihood of nonpayment on a government lease, Morningstar considers several factors, including, but not limited to, the following:

► The tenant's length of tenure in a property;
► The amount of capital invested in the property by the tenant;
► Whether the property was built to suit the tenant (a build-to-suit property);
► The degree of security or other specialized improvements required by the tenant to carry out its operations in the building or space;
► The costs to the tenant of moving to a different location, and whether such costs may be financial or not (moving may entail some disruption to current operations/activities); and
► The difference between the contract rent paid under the lease and prevailing market rent.

## Section 3: Morningstar Sustainable Value

### Morningstar Property Quality Scores

Morningstar usually assigns a property score to each property in a transaction, whether or not an analyst actually visits or tours each property. Our property score reflects our overall view of the quality of a property relative to that of its market peers and is based in part on the following:

► Physical characteristics.
  o Location.
  o Age.
  o Property condition (including aesthetic qualities, quality of construction, and the existence of environmental issues).
  o Unique characteristics or amenities.
► Tenant quality.
► Competitiveness within the local market.

Morningstar believes that it's meaningful to compare a property's qualitative characteristics to those of its local peers, as they are the competition. We use the Morningstar property score to adjust our base cap rates, moving the cap rates lower for high-quality properties and higher for those of below-average quality.

We rank properties on a scale of 1 to 5, with 1 indicating the highest quality, and 5 the lowest. (See scale below.) The majority of properties in CMBS conduit deals are ranked 3, or average.

MORNINGSTAR

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 208 of 654

Page 15 of 59

CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

| Quality Score |
| --- |
| 1 - Excellent |
| 2 - Above Average |
| 3 - Average |
| 4 - Below Average |
| 5 - Poor |

**Property Valuations and Cap Rates**

Morningstar typically values commercial and multifamily properties using the direct capitalization approach. We assign each major property type a starting cap rate and then adjust that rate based on a variety of factors, including the following:

► Morningstar property subtype;

► Morningstar property quality score;

► Property class (for some property types);

► Property location;

► Morningstar cap rates assigned to comparable properties;

► Cash flow sustainability (as it relates to tenant tenure and credit quality);

► New supply projections in the market/submarket; and

► Other salient factors (including demographics, below-market rent, and so on).

We calculate the Morningstar property value by dividing Morningstar's underwritten NCF by our adjusted cap rate:

*Morningstar Property Value = Morningstar NCF ÷ Morningstar cap rate*

In some cases, we will adjust our capitalized value to account for the existence or absence of certain up-front cash reserves, tax abatements, holdbacks, and so on. Cap rates for the major property types are shown under the corresponding Cash Flow Analysis section for each property type.

WT_000207

MORNINGSTAR

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21      Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 209 of 654
Page 16 of 59                    CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

*Retail Property Cash Flow Analysis*

From 15,000-square-foot single-tenant corner drug stores to 60,000-square-foot neighborhood centers to 1 million-plus-square-foot super-regional malls, few property types exhibit greater diversity than retail in terms of size, aesthetic qualities, tenancy, foot-traffic volume, sales per square foot, and location. They also tend to be among the most complicated to analyze, owing to the different tenant types, lease structures, and various reimbursement schedules.

Key factors that influence our cash flow analysis and property valuation are in-line tenant sales per square foot, gross anchor sales, sales trends, near-term lease expiration schedules, the relationship between property rents and prevailing submarket rents, tenant quality, occupancy costs, projections for new supply, and consumer drawing power.

We use the following guidelines and analytical judgement to determine a property's sustainable cash flow and value.

**Property Income: Base Rent, Vacancy, Concessions, Recoveries, and Other Income**
<u>Income</u>
► Rental Income
  o Occupied Space: This is based on the property's current or most recent rent roll. We give credit for signed leases only. We typically do not give credit for letters of intent[1].
  o Vacant Space (Gross-Up): We typically gross up vacant space using a market rental rate (as indicated in the related property appraisal or a third-party data provider, or as indicated by actual recent leasing).
  o Rent Steps: Typically, we give credit for contractual rent increases based on factors such as the tenant's credit quality, as indicated by its credit rating, lease expiration date relative to the loan's maturity date, and so on.
    ▪ For nonrated or below-investment-grade tenants, we give credit for rent steps that occur within 12 months of securitization.
    ▪ For tenants rated BBB-, BBB, or BBB+, we give credit for rent steps occurring within 24 months of securitization, and we typically limit the stepped rent to 110% of market rent.
    ▪ If a tenant is rated A- or higher, we give credit for rent steps occurring during the term of the lease (but not beyond the loan term), and we discount stepped rent using a discount rate and limit the underwritten rent to 110% of market rent.
    ▪ Generally, rents that are above-market are marked lower (to market or toward market). However, we will consider underwriting an existing above-market rent for tenants Morningstar considers creditworthy.
  o New Tenants not yet in Occupancy: Typically, we include the income from recently executed leases for tenants not yet in occupancy so long as the tenant is scheduled to take occupancy within 12 months of Morningstar's analysis and all leasing costs (tenant improvements, leasing commissions, or free rent) for the tenant are placed in a cash reserve at closing.
  o Tenants With Near-Term Lease Expirations: Morningstar evaluates income on a tenant-by-tenant basis and may include it if a tenant's rent is at or below market.

---

[1]During the preliminary phase of an analysis, we may give credit for letters of intent or leases that are out for signature but not yet signed. In the final phase of the analysis, credit is only given for signed leases or those that must be signed as a condition of loan closing.

WT_000208

MORNINGSTAR

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 210 of 654

Page 17 of 59

CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

- o Month-to-Month Leases: Morningstar typically excludes the income from these leases; however, we may consider underwriting the rental income for a month-to-month lease if one or more of the following is true:
  - The property has a history (generally five years or longer) of such leases;
  - The tenant in question has occupied space at the property for five or more years;
  - The tenant's lease is below market level; or
  - The tenant has occupied its space and is in the process of negotiating a renewal lease.
- o Weak Retail Store Sales/High Occupancy Cost: We typically adjust rent lower so that the tenant's total occupancy cost is at or below Morningstar thresholds. (See the Occupancy Costs and Adjustments to Income section below.)

► Vacancy
- o For fully occupied properties, Morningstar underwrites a minimum vacancy loss of 5.0% in most cases.
- o Typically, Morningstar underwrites vacancy equal to a property's current economic vacancy; however, we also review the market vacancy assumptions in the related appraisal as well as market data from other sources. Factors that may affect our underwritten vacancy include:
  - A property's vacancy rate compared with the prevailing market rate and with the average vacancy rate of the comparable properties as defined by the appraiser.
  - A property's historical vacancy rate and how it compares with the market vacancy rate over time.
  - Whether the property's average base rent is similar to, lower than, or higher than the average market rent or the appraiser's assumptions of market rent.
  - The presence (or absence) of tenants with an investment-grade rating (BBB- or better).
  - The amount of tenant rollover exposure during the loan term.
  - Characteristics that affect the property's competitiveness in the local market or area, including near-term additions to supply and the amount of capital invested in the property in the past.
- o Long-Term Leases: For some credit tenants, we may decide to take a lower vacancy loss for the related tenant's space (usually 3%-4%) if the related lease extends at least two years beyond loan maturity.
- o Dark Tenants: Typically, we exclude rent from dark tenants and treat the space as vacant space (unless the related tenant carries an investment-grade credit rating and the lease does not expire within 24 months of securitization, in which case we may consider the tenant's rental income).
- o Tenants in Bankruptcy Proceedings: We exclude rent from tenants involved in bankruptcy proceedings and treat the space as vacant.

► Concessions/Credit Loss
- o Concessions/Free Rent: We rely on historical levels (often with more weight given to the concessions in the most-recent financial period) and/or the appraiser's estimate of concessions offered in the market.
- o Credit Loss: We rely on historical operating results, giving more weight to the most recent period. We also consider the borrower's budgeted amount and the appraiser's estimate.

► Expense Recoveries
- o Recovery Ratio: Because our underwritten operating expenses tend to be higher than the issuer's expenses as well as those reported in the most-recent operating statement,

WT_000209

 MORNINGSTAR®

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 211 of 654

Page 18 of 59     CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

Morningstar usually underwrites recoveries based on a recovery ratio multiplied by Morningstar's underwritten expenses. In most cases, we use the recovery ratio from the most-recent period, but we also review the ratio from past periods.

- o New Tenants: The addition of new tenants to a property will alter expense recoveries, and Morningstar will consider adjusting reimbursements to account for the additional leases.
- o Vacancy Loss: Morningstar will consider taking a vacancy loss on the expense recoveries if the historical recovery ratio is based on an occupancy rate that is higher than the underwritten occupancy or if the underwritten expense recoveries are grossed-up to full occupancy.
- o Single-Tenant Properties: We typically underwrite a vacancy loss on recoveries for properties that only have one tenant.

► Other Income

- o Recurring Income: Morningstar first will determine whether an item represents recurring income, that is, income that one would reasonably expect to occur consistently from period to period. Morningstar usually includes recurring income and excludes one-time or nonrecurring items (such as lease termination fees and amortized tenant improvements). We rely on historical trends and/or actual contracts to determine which items are recurring and the amount to be underwritten.
- o Parking: We typically underwrite to existing contracts with third-party operators; for transient parking income, we underwrite based on historical levels and trends.
- o Temporary Tenants: We analyze trends in this income stream; if the income is stable over time and likely to remain so, we will underwrite it based on the historical levels.
- o Percentage Rent: We underwrite on a tenant-by-tenant basis. This income can be volatile because it is directly tied to the tenants' sales, so we review historical trends and consider the likelihood those trends will continue in the future.
- o Specialty Income: We rely on historical trends to underwrite rental income from kiosks because the leases are shorter than those for in-line tenants.
- o Percentage of Sales in Lieu of Base Rent: We analyze tenants that are paying a percentage of sales in lieu of base rent to determine the reason they are not paying base rent (such as a triggered cotenancy clause) and will consider underwriting to recent historical levels if the leases haven't expired.

Expenses

► Fixed

- o Real Estate Taxes: In the absence of actual property tax bills, Morningstar typically increases by 3% the fixed expense reported in the most-recent period. For California properties, see the Note on California Properties and Real Estate Taxes section above.
- o Insurance: In the absence of actual insurance premiums, Morningstar typically increases by 3% the fixed expense reported in the most-recent period.
- o Payroll: Morningstar usually underwrites the expense amount recorded in the trailing 12-month period, assuming that the historical payroll expense is relatively stable from period to period. For acquisition loans, Morningstar will analyze the proposed payroll schedule, if provided, and may include in our analysis some of the information contained therein.
- o General and Administrative: Morningstar usually underwrites the expense amount recorded in the trailing 12-month period, assuming that the historical general and administrative expense is relatively stable from period to period. However, we may underwrite it based on the past three years of performance.

WT_000210



22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff    Pg 212 of 654

Page 19 of 59
CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

- o Ground Rent: Morningstar typically underwrites ground rent based on the actual ground lease agreement. If the agreement stipulates any increases in the lease payment during the loan term, Morningstar generally will underwrite an adjusted ground lease expense based on the average annual ground rent payment over the loan term.
- ► Variable
  - o Utilities: We typically underwrite this expense based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period.
  - o Repairs and Maintenance: We typically underwrite this expense based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period. However, we may underwrite it based on the past three years of performance.
  - o Management Fee: We typically underwrite this as a percentage of EGI based on the greater of the contractual rate in the current management agreement[2] and 3% of Morningstar's EGI. If the contract rate is not known, we may rely on the higher of the average rate paid in the past (as indicated in the historical operating statements) and 3.0%. For institutional-quality properties, we may underwrite a management fee that is less than 3.0% if the fee (on an absolute dollar basis) is inordinately large compared with the market level or industry standards.
  - o Advertising: We typically underwrite this based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period.
  - o Common Area Maintenance: We typically underwrite this based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period.

**Leasing Costs/Replacement Reserves**

- ► Leasing Costs
  - o Tenant Improvements: We typically underwrite these based on a 65% renewal probability, 10-year average lease terms, and the greater of the following:
    - ▪ The appraisal's tenant improvement assumptions;
    - ▪ The property's recently incurred tenant improvement costs; and
    - ▪ 50% of Morningstar's underwritten rent for new leases and 20% of underwritten rent for renewals.
  - o Leasing Commissions: We typically underwrite these based on a 65% renewal probability, 10-year average lease terms, and the greater of the following rates:
    - ▪ 4% for new leases and 2% for renewal leases, and
    - ▪ Market rates, as indicated in the related property appraisal.
  - o Replacement Reserves: We typically underwrite these based on the greater of the following:
    - ▪ The recommended replacement reserve amount indicated in the related property condition report/assessment, inflated by 10%; and
    - ▪ $0.20 per square foot.

---

[2]If we determine that the contractual rate is above the market rate, we will underwrite the actual contractual rate; however, we may adjust our cash flow for our property valuation to reflect a market management fee.

WT_000211

MORNINGSTAR

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 213 of 654
Page 20 of 59                  CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

**Occupancy Costs and Adjustments to Income**

The occupancy cost-to-sales ratio measures the relative health of retail properties and tenants. Depending on the tenant mix, a high average occupancy cost ratio may indicate limited potential to achieve higher rents as tenant leases expire or are up for renewal. The opposite may also be true, however. A low average ratio may indicate that a property owner can achieve higher rent levels as leases roll or are renewed. This is not always the case, however, and a low occupancy cost ratio may actually be a warning sign because it may signify that a tenant's sales are so low that it cannot afford to pay higher rent. This situation is sometimes observed with midtier and Class B regional malls.

Occupancy costs for in-line tenants occupying less than 10,000 square feet typically fall in the 10%-18% range, depending on the property location and type of tenant. However, percentages of 25% or higher are not uncommon for certain types of high-margin retailers. On the other hand, a healthy occupancy cost for a grocery store usually is below 6%. For most other retail tenants, Morningstar typically targets an occupancy cost ratio of 12%-20%.

For individual retail tenants, we calculate the occupancy cost ratio by dividing the tenant's total occupancy costs (base rent plus percentage rent plus recoveries) by the tenant's total annual sales at the location for the most-recent 12-month period. The resulting ratio, expressed as a percentage, allows Morningstar to establish a benchmark to estimate a tenant's ability or willingness to remain in occupancy and pay rent. In cases where we believe a tenant's occupancy cost ratio is above the market level or industry averages, we will consider reducing that tenant's base rent until its occupancy cost ratio is consistent with the market level or industry averages.

Factors Morningstar considers when making occupancy cost adjustments include but are not limited to:

- ▶  The tenant's sales per square foot and sales trends;
- ▶  The type of retail business;
- ▶  The tenant's square footage;
- ▶  The tenant's tenure in the space; and
- ▶  The tenant's contractual rent, including expense reimbursements, versus prevailing market rent.

As a general rule, we will make a rent adjustment only if the tenant meets the following criteria:

- ▶  The tenant is an in-line tenant leasing less than 10,000 square feet;
- ▶  The tenant has been operating at the location for at least 12 months; and
- ▶  The tenant is below the sales-per-square-foot threshold established for the property, usually at least $350.

For larger in-line tenants or those that are of concern, we may undertake an occupancy cost analysis at the tenant level. For large retail properties with dozens of tenants, such as regional malls, we will consider whether to conduct an occupancy cost analysis at the property level—the aggregate approach—or on a tenant-by-tenant basis—the tenant approach.

To calculate the aggregate average occupancy cost for a mall, we sum the total occupancy costs for each tenant that meets our analytical criteria and then divide the sum by the property's aggregate in-line sales

WT_000212

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff    Pg 214 of 654

Page 21 of 59
CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

to arrive at the property's average occupancy cost. Typically, we exclude food-court and kiosk tenants from this analysis and also remove sales from Apple stores, which usually skew the average occupancy cost for the property.

The following is an example of how we compute an occupancy cost ratio for a single tenant and our occupancy cost adjustment for that tenant. In the table below, the tenant has base rent and recoveries that total $60 per square foot, which represent its total occupancy cost at a particular property. If annual sales at the store are $325 per square foot, the tenant's occupancy cost ratio is 18.5% ($60 / $325).

| Base Rent per Square Foot ($) | Recoveries per Square Foot (b) ($) | Total Occupancy Cost per Square Foot (%) | Annual Sales per Square Foot ($) | Occupancy Cost ($Mil) |
|---|---|---|---|---|
| 40 | 20 | 60 | 325 | 18.5 |

If we set our occupancy cost threshold at 15.0%, our maximum total occupancy cost for the tenant is $48.75 per square foot (15% x $325). The difference between the maximum total occupancy cost based on the threshold and the actual occupancy cost is the Morningstar occupancy cost adjustment. In this case, the adjustment is -$11.25 per square foot ($48.75 - $60).

| Occupancy Cost Threshold (d) (%) | Annual Sales per Square Foot (c) ($) | Maximum Total Occupancy Cost per Square Foot (e) ($) | Morningstar Occupancy Cost Adjustment per Square Foot ($) |
|---|---|---|---|
| 15.0 | 325 | 48.75 | -11.25 |

We indicate our aggregate occupancy cost adjustment, the sum of all tenants' occupancy cost adjustments, on a separate line in the cash flow statement, and we deduct this amount from property income.

As a general rule, we will not make an occupancy cost adjustment if a tenant's rent is at or below market level, regardless of the occupancy cost percentage.

An example of the aggregate approach is as follows. The property has aggregate in-line sales of $50.0 million and an aggregate occupancy cost (base rent plus recoveries plus percentage rent) of $10.2 million, which results in a propertywide occupancy cost of 20.4% ($10.2 million / $50.0 million). If we set our occupancy cost ratio at 16%, then our maximum occupancy cost is $8.0 million and our occupancy cost adjustment for the property is -$2.2 million ($8.0 million - $10.2 million).

| Aggregate Sales (a) ($) | Aggregate Occupancy Cost (b) ($) | Total Property Occupancy Cost (b / a) (%) | Target Occupancy Cost (c) (%) | Target Occupancy Cost (d) ($) | Property Occupancy Cost Adjustment ($) |
|---|---|---|---|---|---|
| 50,000,000 | 10,200,000 | 20.4 | 16 | 8,000,000 | -2,200,000 |

WT_000213

MORNINGSTAR

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff    Pg 215 of 654

Page 22 of 59    CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

**Assigning Property Quality Scores and Cap Rates**

Morningstar assigns cap rates to retail properties based on a combination of various qualitative factors, including the following property characteristics:

Property Subtype:

► Neighborhood Centers: These relatively small shopping centers are designed to provide for the daily or weekly needs of consumers in a neighborhood. Often anchored by a grocery store and/or drug store, neighborhood centers often have sizes in the 30,000-square-foot to 125,000-square-foot range. Although configurations vary, most neighborhood centers are built as a straight-line strip of stores.

► Community Centers: Larger than neighborhood centers and almost always anchored, community centers usually offer a wider selection of apparel and other goods than the typical neighborhood center. Common anchors are supermarkets, large drugstores, big-box retailers, and discount stores. Typical sizes are in the 125,000-square-foot to 400,000-square-foot range. Formats vary from the straight-line strip to the L-shape or U-shape layout. They serve a wider trade area than neighborhood centers.

► Power Centers: These are large centers dominated by several large anchors, with a minimum amount of in-line or specialty space. Common anchors are big-box retailers, discount department stores, and warehouse clubs. Anchors are sometimes free-standing. Most power centers are at least 250,000 square feet and tend to serve a large trade area.

► Regional Malls and Super Regional Malls: Regional malls are enclosed shopping malls usually with up to three national or regional department stores or big-box stores that serve as anchors. They tend to be in the 400,000-square-foot to 900,000-square-foot range. Super regional malls are larger versions of regional malls, often with four or more anchor tenants and up to 2 million square feet of space or more. Super regional malls are often destination centers, serving wide trade areas of up to 50 miles and attracting upward of 10 million visitors per year.

► Outlet Centers: These centers consist of manufacturers' and retailers' outlet stores where their brands are sold at a discount. Typically, they are found in rural or tourist locations. Outlet center designs take the form of enclosed malls, a village cluster, or a strip configuration, and typical sizes range from 50,000 square feet to 400,000 square feet.

► Lifestyle Centers: These centers consist of a combination of upscale national retailers and dining and entertaining venues. Most lifestyle centers have an outdoor setting. A typical size is from 150,000 square feet to 500,000 square feet.

► Stand-Alone Retail: Sometimes called general retail, these are single-tenant properties, often with less than 15,000 square feet.

► Urban Retail: These are typically street-level or ground-floor stores in urban areas. Although size varies, these stores usually are in the range of several hundred square feet up to several thousand square feet. Tenants vary as well, from midtier retailers to high-end luxury dealers. Tenants typically pay high rent and pay the costs of fitting out their space.

Physical Characteristics

► Age.
► Condition.
► Aesthetic qualities and appeal.
► Visibility.

WT_000214


22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 216 of 654

Page 23 of 59

CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

► Convenience of ingress/egress.
► Adequacy, proximity, and convenience of parking.
► Relationship between trade-area demographics, tenancy, and product or service offerings.

**Location of Property**

► Urban versus suburban versus rural.
► Accessibility/proximity to interstates and major roads.
► Proximity to other retail shopping and entertainment venues.
► Land use in the surrounding area (including availability of unimproved land).
► Proximity to the area's major employers.

**Market Fundamentals and Demographics**

► Trade area size and characteristics.
► Projections for supply and demand.
► Population size and trends.
► Household income.
► Employment base and drivers.
► Prevailing rental rates and leasing allowances (including tenant improvements, concessions, and free rent).
► Prevailing occupancy rates.

**Property Performance**

► Tenant credit quality.
► Occupancy history.
► Trends in store sales and occupancy costs.
► Lease expiration schedule.

Morningstar's starting cap rate for retail properties is 7.50%. The chart below is a guide to the adjustments we may consider making based on the property quality score, property subtype, sales, and so on. We also may consider factors other than those shown below to determine our final assigned cap rate for a given property.

WT_000215

MORNINGSTAR

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 217 of 654

Page 24 of 59

CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

| | | |
|---|---|---|
| Base Retail Cap Rate (%) | | **7.50** |
| Adjustments (%) | **(+/-)** | |
| | | |
| **Property Quality Score** | | |
| 1 (Excellent) | - | 0.75 |
| 2 (Above Average) | - | 0.50 |
| 3 (Average) | | 0.00 |
| 4 (Below Average) | + | 0.50 |
| 5 (Poor) | + | 0.75 |
| | | |
| **Property Subtype** | | |
| Neighborhood Center | + | 0.25 |
| Community Center | | 0.00 |
| Power Center | - | 0.25 |
| Outlet Center | + | 0.75 |
| Lifestyle Center | - | 0.50 |
| Urban Retail | - | 0.50 |
| Single Tenant | + | 1.00 |
| Trophy Property | - | 0.75 |
| Regional Mall | + | 1.50 |
| | | |
| *Sales-Based Adjustments:* | | |
| Sales per sq ft of $600 or > | - | 1.00 |
| Sales per sq ft of $500 - $599 | - | 0.50 |
| Sales per sq ft of $350 - $449 | | 0.00 |
| Sales per sq ft of $300 - $349 | + | 1.00 |
| Sales per sq ft of <$300 | + | 2.00 |
| Other Qualitative Factors | +/- | 0.50 |

WT_000216

MRNINGSTAR

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 218 of 654

Page 25 of 59

CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

*Office Property Cash Flow Analysis*

Like retail properties, office properties are a diverse property type, and it is not uncommon to see in the same CMBS deal low-rise buildings in suburbia and skyscrapers in the heart of major cities. Key factors that influence Morningstar's sustainable cash flow and property value are the overall quality and physical characteristics of the building, size and depth of the local office market, supply-demand fundamentals of the submarket, credit quality of the tenancy, lease terms, average rent relative to market, and near-term lease expiration schedule, among others.

**Property Income: Base Rent, Vacancy, Concessions, Recoveries, and Other Income**

Income

► Rental Income
  o Occupied Space: This is based on the property's current or most recent rent roll. We give credit for signed leases only. We do not give credit for letters of intent [3].
  o Vacant Space (Gross-Up): We typically gross up vacant space using a market rental rate (as indicated in the related property appraisal or a third-party data provider, or as indicated by actual recent leasing).
  o Rent Steps: Typically, we give credit for contractual rent increases based on factors such as the tenant's credit quality, as indicated by its credit rating, lease expiration date relative to the loan's maturity date, and so on.
    ▪ For nonrated or below-investment-grade tenants, we give credit for rent steps that occur within 12 months of securitization.
    ▪ For tenants rated BBB-, BBB, or BBB+ or law firms ranked 51-100 on the American Lawyer's top 100 list, we give credit for rent steps occurring within 24 months of securitization; we limit stepped rent to 110% of market rent.
    ▪ If a tenant is rated A- or higher or is a law firm ranked in the top 50, we give credit for rent steps occurring during the term of the lease; we discount stepped rent using a discount rate and limit the increase to 110% of market rent.
    ▪ Generally, rents that are above-market are marked lower (to market or toward market). However, we will consider underwriting an existing above-market rent for tenants Morningstar considers creditworthy.
  o New Tenants not yet in Occupancy: Typically, we include income from recently executed leases for tenants not yet in occupancy so long as the tenant is scheduled to take occupancy within 12 months of Morningstar's analysis and all leasing costs (tenant improvements, leasing commissions, or free rent) for the tenant are placed in a cash reserve at closing.
  o Tenants With Near-Term Lease Expirations: Morningstar evaluates income on a tenant-by-tenant basis and may include it if a tenant's rent is at or below market.
  o Month-to-Month Leases: Morningstar excludes the income in most cases; however, Morningstar will consider underwriting the rental income for a month-to-month lease if one or more of the following is true:
    ▪ The property has a history (generally five years or longer) of such leases;
    ▪ The tenant in question has occupied space at the property for five or more years;
    ▪ The tenant's lease is below market level; or
    ▪ The tenant has occupied its space and is in the process of negotiating a renewal lease.

---

[3]During the preliminary phase of an analysis, we may give credit for letters of intent or leases that are out for signature but not yet signed. In the final phase of the analysis, credit is only given for signed leases or those that must be signed as a condition of loan closing.



► Vacancy
  o For fully occupied properties, Morningstar underwrites a minimum vacancy loss of 5.0% in most cases.
  o Typically, Morningstar underwrites vacancy equal to a property's current economic vacancy; however, we also review the market vacancy assumptions in the related appraisal as well as market data from other sources. Factors that may affect our underwritten vacancy include:
    ▪ A property's vacancy rate compared with the prevailing market vacancy rate and/or availability rate and with the average vacancy rate (and/or availability rates) of the comparable properties as defined by the appraiser.
    ▪ A property's historical vacancy rate and how it compares with the market vacancy rate over time.
    ▪ Whether the property's average base rent is similar to, lower than, or higher than the average market rent or the appraiser's assumptions of market rent.
    ▪ The presence (or absence) of tenants with an investment-grade rating (BBB- or better).
    ▪ The amount of tenant rollover exposure during the loan term.
    ▪ Characteristics that affect the property's competitiveness in the local market or area, including near-term additions to supply and the amount of capital invested in the property in the past.
  o Long-Term Leases: For some credit tenants, we may decide to take a lower vacancy loss for the related tenant's space (usually 3%-4%) if the related lease extends at least two years beyond loan maturity.
  o Dark Tenants: Typically, we exclude rent from dark tenants and treat the space as vacant space (unless the related tenant carries an investment-grade credit rating and the lease does not expire within 24 months of securitization, in which case we may consider the tenant's rental income).
  o Tenants in Bankruptcy Proceedings: We exclude rent from tenants involved in bankruptcy proceedings and treat the space as vacant.
► Concessions/Credit Loss
  o Concessions/Free Rent: We typically rely on historical levels (often with more weight given to the concessions in the most-recent financial period) and/or the appraiser's estimate of concessions offered in the market.
  o Credit Loss: We rely on historical operating results, giving more weight to the most recent period. We also consider the amount in the borrower's budget and the appraiser's estimate.
► Expense Recoveries
  o Recovery Ratio: Because our underwritten operating expenses tend to be higher than the issuer's expenses as well as those reported in the most-recent operating statement, Morningstar usually underwrites recoveries based on a recovery ratio multiplied by Morningstar's underwritten expenses. In most cases, we use the recovery ratio from the most-recent period, but we also review the ratio from past periods.
  o New Tenants: The addition of new tenants to a property will alter expense recoveries, and Morningstar will consider adjusting reimbursements to account for the additional leases.
  o Vacancy Loss: Morningstar will consider taking a vacancy loss on the expense recoveries if the historical recovery ratio is based on an occupancy rate that is higher than the underwritten occupancy or if the underwritten expense recoveries are grossed-up to full occupancy.

WT_000218

MORNINGSTAR®

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 220 of 654

Page 27 of 59    CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

- o Single-Tenant Properties: We typically underwrite a vacancy loss on recoveries for properties that only have one tenant.
- ► Other Income
  - o Recurring Income: Morningstar first will determine whether an item represents recurring income, that is, income that one would reasonably expect to occur consistently from period to period. Morningstar usually includes recurring income and excludes one-time or nonrecurring items (such as lease termination fees, interest income, and amortized tenant improvements). We rely on historical trends and/or actual contracts to determine which items are recurring and the amount to be underwritten.
  - o Parking: We underwrite to existing contracts with third-party operators; for transient parking income, we underwrite based on historical levels and trends.

<u>Expenses</u>

- ► Fixed
  - o Real Estate Taxes: In the absence of actual property tax bills, Morningstar typically increases by 3% the fixed expense reported in the most-recent period. For California properties, see the Note on California Properties and Real Estate Taxes section above.
  - o Insurance: In the absence of actual insurance premiums, Morningstar typically increases by 3% the fixed expense reported in the most-recent period.
  - o Payroll: Morningstar usually underwrites the expense amount recorded in the trailing 12-month period, assuming that the historical payroll expense numbers are relatively stable from period to period. For acquisition loans, Morningstar will analyze the proposed payroll schedule, if provided.
  - o General and Administrative: Morningstar usually underwrites the expense amount recorded in the trailing 12-month period, assuming that the historical expense numbers are relatively stable from period to period. However, we may underwrite it based on the past three years of performance.
  - o Ground Rent: Morningstar underwrites ground rent based on the actual ground lease agreement. If the agreement stipulates any increases in the lease payment during the loan term, Morningstar generally will underwrite an adjusted ground lease expense based on the average annual ground rent payment over the loan term.
- ► Variable
  - o Utilities: Typically, we underwrite this expense based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period.
  - o Repairs and Maintenance: Typically, we underwrite this expense based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period. However, we may underwrite it based on the past three years of performance.
  - o Management Fee: We typically underwrite this as a percentage of EGI, based on the greater of the contractual rate in the current management agreement[4] and 3% of Morningstar's EGI. If the contract rate is not known, we may rely on the higher of the average rate paid in the past (as indicated in the historical operating statements) and 3.0%. For institutional-quality office

---

[4]If we determine that the contractual rate is above the market rate, we will underwrite the actual contractual rate; however, we may adjust our cash flow for our property valuation to reflect a market management fee.

WT_000219



22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 221 of 654

Page 28 of 59

CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

buildings in major markets, we may underwrite a management fee that is less than 3.0% if the fee (on an absolute dollar basis) is inordinately large compared with the market level or industry standards.

o   Advertising: Typically, we underwrite this based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period.

o   Common Area Maintenance: Typically, we underwrite this based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period.

**Leasing Costs/Replacement Reserves**

► Leasing Costs

o   Tenant Improvements: We typically underwrite these based on a 65% renewal probability, 10-year average lease terms, and the greater of the following:

- The appraisal's tenant improvement assumptions;
- The property's recently incurred tenant improvement costs; and
- 75% of Morningstar's underwritten rent for new leases and 25% of underwritten rent for renewals.

o   Leasing Commissions: We typically underwrite these based on a 65% renewal probability, 10-year average lease terms, and the greater of the following rates:

- 4%-6% for new leases and 2%-4% for renewal leases, and
- Market rates, as indicated in the related property appraisal.

► Replacement Reserves: We typically underwrite these based on the greater of the following:

o   The recommended replacement reserve amount indicated in the related property condition report/assessment, inflated by 10%; and

o   $0.25 per square foot.

**Assigning Property Quality Scores and Cap Rates**

Morningstar assigns cap rates to office properties based on a combination of various qualitative factors, including the following property characteristics:

Physical Characteristics

► Building class (A, B, or C).
► Structure/design:

o   High rise versus low rise.
o   Size of floor plates.
o   Configuration/layout of floors.
o   Amenities/services.
o   Adequacy, proximity, and convenience of parking

► Age.
► Condition.
► Leadership in Energy and Environmental Design, or LEED, Certification

WT_000220



22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff    Pg 222 of 654

Page 29 of 59          CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

**Location of Property**
► Urban versus suburban.
► Office park versus a stand-alone building.
► Proximity to interstates and major roads.
► Proximity to public transportation.
► Proximity to retail shopping, entertainment venues, and other amenities.
► Land use in the surrounding area (including availability of unimproved land).
► Proximity to the area's major employers.
► Potential changes to local employment trends (for example, large or prominent employers moving in or out of an area).

**Tenant Type**
► Multitenant properties.
► Single-tenant properties.
► Mixed-use properties (usually a retail portion).

**Market Fundamentals and Demographics**
► Trade area characteristics.
► Population size and trends.
► Household income.
► Employment base and drivers.
► Prevailing rental rates and leasing allowances (including tenant improvements, concessions, and free rent).
► Prevailing occupancy rates.

**Property Performance**
► Tenant credit quality.
► Occupancy history.
► Tenant investment in space.
► Lease expiration schedule.

Morningstar's starting cap rate for office properties is 8.0%. The chart below is a guide to the adjustments we may consider making based on class, the property quality score, property subtype, location, and so on. We also may consider factors other than those shown below to determine our final assigned cap rate for a given property.

WT_000221

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 223 of 654
Page 30 of 59          CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

| | | |
|---|---|---|
| Base Office Cap Rate (%) | | **8.00** |
| Adjustments (%) | **(+/-)** | |
| | | |
| Class | | |
| Class A | - | 0.50 |
| Class B | | 0.00 |
| Class C | + | 1.00 |
| *Property Quality Score* | | |
| 1 (Excellent) | - | 0.75 |
| 2 (Above Average) | - | 0.50 |
| 3 (Average) | | 0.00 |
| 4 (Below Average) | + | 0.50 |
| 5 (Poor) | + | 0.75 |
| | | |
| Other Adjustments | | |
| Trophy Property | - | 0.75 |
| Central Business District | - | 0.50 |
| Infill/Urban (non-CBD) | - | 0.25 |
| Suburban | + | 0.50 |
| Tier 1/Gateway | - | 0.25 |
| Secondary Market/Weak Market | + | 0.50 |
| Tertiary Market | + | 0.75 |
| Other Qualitative Factors | +/- | 0.50 |

M⭑RNINGSTAR®

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 224 of 654

Page 31 of 59
CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

*Industrial Property Cash Flow Analysis*

The industrial property category includes a variety of subtypes, each one serving a distinct purpose that is manifested in building size, functional attributes, location, and whether it is a build-to-suit property. CMBS pools can include conventional industrial buildings that house light manufacturing operations, warehouses, research and development and flex buildings, and cold storage facilities. Unlike retail properties, which depend on local population density and the household incomes of consumers in the local market, industrial properties, owing to local zoning laws as well as transportation costs, are sometimes situated in areas of low population density. Proximity to major roadways, interstates, railway and transportation hubs, as well as the nation's ports often is crucial for successful operations and stable property cash flow.

**Property Income: Base Rent, Vacancy, Concessions, Recoveries, and Other Income**

<u>Income</u>

► Rental Income

- o Occupied Space: This is based on the property's current or most recent rent roll. We give credit for signed leases only. We do not give credit for letters of intent [5].

- o Vacant Space (Gross-Up): We typically gross up vacant space using a market rental rate (as indicated in the related property appraisal or a third-party data provider, or as indicated by actual recent leasing).

- o Rent Steps: Typically, we give credit for contractual rent increases based on factors such as the tenant's credit quality, as indicated by its credit rating, lease expiration date relative to the loan's maturity date, and so on.

  - ▪ For nonrated or below-investment-grade tenants, we give credit for rent steps that occur within 12 months of securitization.

  - ▪ For tenants rated BBB-, BBB, or BBB+, we give credit for rent steps occurring within 24 months of securitization, and we limit stepped rent to 110% of market rent.

  - ▪ If a tenant is rated A- or higher, we give credit for rent steps occurring during the term of the lease, and we discount the stepped rent using a discount rate and limit the increase to 110% of market rent.

  - ▪ Generally, we mark rents that are above-market (to market or toward market) as lower. However, we will consider underwriting an existing above-market rent for tenants Morningstar considers creditworthy.

- o New Tenants not yet in Occupancy: Typically, we include income from recently executed leases for tenants not yet in occupancy so long as the tenant is scheduled to take occupancy within 12 months of Morningstar's analysis and all leasing costs (tenant improvements, leasing commission, or free rent) for the tenant are placed in a cash reserve at closing.

- o Tenants With Near-Term Lease Expirations: Morningstar evaluates income on a tenant-by-tenant basis and may include it if a tenant's rent is at or below market.

- o Month-to-Month Leases: Morningstar excludes the income from these leases in some cases; however, we will underwrite the rental income for a month-to-month lease if one or more of the following is true:

  - ▪ The property has a history (generally five years or longer) of such leases;

  - ▪ The tenant in question has occupied space at the property for five or more years;

---

[5]During the preliminary phase of an analysis, we may give credit for letters of intent or leases that are out for signature but not yet signed. In the final phase of the analysis, credit is only given for signed leases.



22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21      Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 225 of 654

Page 32 of 59
CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

- ▪ The tenant's lease is below market level; or
- ▪ The tenant has occupied its space and is in the process of negotiating a renewal lease.

► Vacancy

- o For fully occupied properties, Morningstar typically underwrites a minimum vacancy loss of 5.0% in most cases.
- o Typically, Morningstar underwrites vacancy equal to a property's current economic vacancy; however, we also review the market vacancy assumptions in the related appraisal as well as market data from other sources. Factors that may affect our underwritten vacancy include:
  - ▪ A property's actual vacancy rate compared with the prevailing market rate and with the average vacancy rate of the comparable properties as defined by the appraiser.
  - ▪ A property's historical vacancy rate (and how it compares with the market vacancy rate over time).
  - ▪ Whether the property's average base rent is similar to, lower than, or higher than the average market rent or the appraiser's assumptions of market rent.
  - ▪ The presence (or absence) of tenants with an investment-grade rating (BBB- or better).
  - ▪ The amount of tenant rollover exposure during the loan term.
  - ▪ Characteristics that affect the property's competitiveness in the local market or area, including near-term additions to supply and the amount of capital invested in the property in the past.
- o Long-Term Leases: For some credit tenants, we may decide to take a lower vacancy loss for the related tenant's space (usually 3%-4%) if the related lease extends at least two years beyond loan maturity.
- o Dark Tenants: Typically, we exclude rent from dark tenants and treat the space as vacant space (unless the related tenant carries an investment-grade credit rating and the lease does not expire within 24 months of securitization, in which case we may consider the tenant's rental income).
- o Tenants in Bankruptcy Proceedings: We exclude rent from tenants involved in bankruptcy proceedings and count the space as vacant.

► Concessions/Credit Loss

- o Concessions/Free Rent: We rely on historical levels (often with more weight given to the concessions in the most-recent financial statement) and/or the appraiser's estimate of concessions offered in the market.
- o Credit Loss: We rely on historical operating results, giving more weight to the most recent period. We also consider the amount in the borrower's budget and the appraiser's estimate.

► Expense Recoveries

- o Recovery Ratio: Because our underwritten operating expenses tend to be higher than the issuer's expenses as well as those reported in the most-recent operating statement, Morningstar usually underwrites recoveries based on a recovery ratio multiplied by Morningstar's underwritten expenses. In most cases, we use the recovery ratio from the most-recent period, but we also review the ratio from past periods.
- o New Tenants: The addition of new tenants to a property will alter expense recoveries, and Morningstar will consider adjusting reimbursements to account for the additional leases.
- o Vacancy Loss: Morningstar will consider taking a vacancy loss on the expense recoveries if the historical recovery ratio is based on an occupancy rate that is higher than the underwritten occupancy or if the underwritten expense recoveries are grossed-up to full occupancy.

WT_000224



22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 226 of 654
Page 33 of 59    CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

- o Single-Tenant Properties: We typically underwrite a vacancy loss on recoveries for properties that only have one tenant.
- ► Other Income
  - o Recurring Income: Morningstar first will determine whether an item represents recurring income, that is, income that one would reasonably expect to appear consistently from period to period. Morningstar usually includes recurring income and excludes one-time or nonrecurring items (such as lease termination fees and amortized tenant improvements). We rely on historical trends and/or actual contracts to determine which items are recurring and the amount to be underwritten.

Expenses
- ► Fixed
  - o Real Estate Taxes: In the absence of actual property tax bills, Morningstar typically increases by 3% the fixed expense reported in the most-recent period. For California properties, we typically increase the latest taxes by 2%.
  - o Insurance: In the absence of actual insurance premiums, Morningstar typically increases by 3% the fixed expense reported in the most-recent period.
  - o Payroll: Morningstar usually underwrites the expense amount recorded in the trailing 12-month period, assuming that the historical payroll expense numbers are relatively stable from period to period. For acquisition loans, Morningstar will analyze the proposed payroll schedule, if provided.
  - o General and Administrative: Morningstar usually underwrites the expense amount recorded in the trailing 12-month period, assuming that the historical expense numbers are relatively stable from period to period. However, if this expense has been volatile, we may underwrite it based on the past three years of performance.
  - o Ground Rent: Morningstar typically underwrites ground rent based on the actual ground lease agreement. If the agreement stipulates any increases in the lease payment during the loan term, Morningstar generally will underwrite an adjusted ground lease expense based on the average annual ground rent payment over the loan term.
- ► Variable
  - o Utilities: Typically, we underwrite this expense based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period.
  - o Repairs and Maintenance: Typically, we underwrite this expense based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period. However, if this expense has been volatile, we may underwrite it based on the past three years of performance.
  - o Management Fee: Typically, we underwrite this as a percentage of EGI, based on the greater of the contractual rate in the current management agreement[6] and 3% of Morningstar's EGI. If the contract rate is not known, we may rely on the higher of the average rate paid in the past (as indicated in the historical operating statements) and 3.0%.

---

[6]If we determine that the contractual rate is above the market rate, we will underwrite the actual contractual rate; however, we will adjust our cash flow for our property valuation to reflect a market management fee.

WT_000225

MORNINGSTAR®

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 227 of 654

Page 34 of 59                    CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

- o  Advertising: Typically, we underwrite this based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period.
- o  Common Area Maintenance: Typically, we underwrite this based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period.

**Leasing Costs/Replacement Reserves**

► Leasing Costs
- o  Tenant Improvements: We typically underwrite these based on a 65% renewal probability, 10-year average lease terms, and the greater of the following:
  - ▪ The appraisal's tenant improvement assumptions;
  - ▪ The property's recently incurred tenant improvement costs; and
  - ▪ 50% of Morningstar's underwritten rent for new leases and 25% of underwritten rent for renewals.
- o  Leasing Commissions: We typically underwrite these based on a 65% renewal probability, 10-year average lease terms, and the greater of the following rates:
  - ▪ 4%-6% for new leases and 2%-4% for renewal leases; and
  - ▪ Market rates, as indicated in the related property appraisal.
► Replacement Reserves: We typically underwrite these based on the greater of the following:
- o  The recommended replacement reserve amount indicated in the related property condition report/assessment, inflated by 10%; and
- o  $0.15 per square foot.

**Assigning Property Quality Scores and Cap Rates**

Morningstar assigns cap rates to industrial properties based on a combination of various qualitative factors, including the property characteristics:

► Physical Characteristics of Property
- o  Age.
- o  Condition.
- o  Use:
  - ▪ Warehouse/distribution.
  - ▪ Light manufacturing.
  - ▪ Research and development/flex.
  - ▪ Logistics.
- o  Tenancy: Single tenant versus multiple tenants.
- o  Building structure and design:
  - ▪ Number of loading docks/bays.
  - ▪ Ceiling heights.
  - ▪ Special heating/cooling systems and refrigeration.
  - ▪ Capacity for processing or packaging.
  - ▪ The amount of office space as a percentage of the total space.

WT_000226



22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 228 of 654

Page 35 of 59

CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

► Location of Property
  o Urban versus suburban versus rural.
  o Proximity to interstates and major roads.
  o Proximity to airports, rail lines, and ship ports.
  o Part of an existing industrial complex/park versus a free-standing property.
► Market Fundamentals and Demographics
  o Prevailing rental rates and leasing allowances (including tenant improvements, concessions, or free rent).
  o Prevailing occupancy rates.
► Property Performance
  o Tenant credit quality.
  o Occupancy history.
  o Tenant investment in the space.
  o Lease expiration schedule.

Morningstar's starting cap rate for industrial properties is 8.25%. The chart below is a guide to the adjustments we may consider making based on class, the property quality score, property subtype, location, and so on. We also may consider factors other than those shown below to determine our final assigned cap rate for a given property.

| | | |
|---|---|---|
| Base Industrial Cap Rate (%) | | 8.25 |
| Adjustments (%) | (+/-) | |
| **Class** | | |
| Class A | - | 0.50 |
| Class B | | 0.00 |
| Class C | + | 1.00 |
| *Property Quality Score* | | |
| 1 (Excellent) | - | 0.75 |
| 2 (Above Average) | - | 0.50 |
| 3 (Average) | | 0.00 |
| 4 (Below Average) | + | 0.50 |
| 5 (Poor) | + | 0.75 |
| Other Adjustments | | |
| Infill | - | 0.25 |
| Noninfill/Suburban | + | 0.25 |
| Secondary Market | + | 0.25 |
| Tertiary Market | + | 0.50 |
| Research and Development/Flex | - | 0.50 |
| Other Qualitative Factors | +/- | 0.50 |

WT_000227

MORNINGSTAR®

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 229 of 654

Page 36 of 59                    CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

*Multifamily Property Cash Flow Analysis*

Often viewed as stable cash flow producers, multifamily properties come in two primary subtypes: garden-style properties and mid- or high-rise properties. The former are usually multibuilding complexes found in suburban or rural areas, often with on-site recreational amenities. The latter often consist of a single building, usually in an urban setting, and sometimes include street-level retail tenants. In suburban or rural areas, age, on-site amenities, proximity to employment sources, local shopping, recreational amenities, and access to major roadways are key demand drivers for multifamily properties. Student housing and manufactured housing properties are fundamentally different types and we deal with them separately.

Unlike retail and office properties, whose tenants typically sign multiyear leases, most apartment dwellers rent for 12 months at a time. The short-term nature of apartment leases renders rent roll analysis less crucial for determining sustainable NCF. This means that historical operations and local market conditions typically are more important indicators of sustainable operations and cash flow. It also means that the addition of new supply to a market could adversely affect a property's operations within a short time. Another important consideration is concessions, as there is a complex interplay between a property's concessions (or free rent) and its occupancy rate, because the former is often used to directly influence the latter. Understanding this relationship is essential to making accurate rent and vacancy projections.

In deriving near-term sustainable NCF, we rely on the property's historical operating statements, borrower budget, appraisal, and data from third-party providers. We review the current rent roll to determine the occupancy rate and average rent.

**Property Income: Base Rent, Vacancy, Concessions, Recoveries, and Other Income**
Income
- ► Rental Income
  - o Occupied Units: We typically underwrite occupancy based on the property's current or most recent rent roll or average rent per unit.
  - o Vacant Units (Gross-Up): We typically gross up vacant units using a market rental rate (as indicated in the related property appraisal or a third-party data provider).
  - o Above-Market Rents: Generally, we mark rents lower that are above-market (to market or toward market). However, Morningstar will consider underwriting an existing above-market rent for properties that we expect to outperform their market averages or competitive set.
- ► Vacancy
  - o For fully occupied properties, Morningstar typically underwrites a minimum vacancy loss of 5.0% in most cases.
  - o Typically, Morningstar underwrites vacancy equal to a property's current economic vacancy; however, we also review the market vacancy assumptions in the related appraisal as well as market data from other sources. Factors that may affect our underwritten vacancy include:
    - ▪ A property's vacancy rate compared with the prevailing market rate and with the average vacancy rate of the comparable properties as defined by the appraiser.
    - ▪ A property's historical vacancy rate (and how it compares with the market vacancy rate over time).

WT_000228



22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 230 of 654
Page 37 of 59          CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

- ▪ Whether the property's average rent is similar to, lower than, or higher than the average market rent or the appraiser's assumptions of market rent.
- ▪ Characteristics that affect the property's competitiveness in the local market or area, including near-term additions to supply and the amount of capital invested in the property in the past.

► Concessions/Credit Loss

- o Concessions/Free Rent: We rely on historical levels (often with more weight given to the concessions in the most-recent financial statement) and/or the appraiser's estimate of concessions offered in the market.
- o Credit Loss: We rely on historical operating results, giving more weight to the most recent period. We also consider the amount in the borrower's budget and the appraiser's estimate.

► Other Income

- o Recurring Income: Morningstar first will determine whether an item represents recurring income, that is, income that one would reasonably expect to appear consistently from period to period. Morningstar usually includes recurring income and excludes one-time or nonrecurring items. We rely on historical trends and/or actual contracts to determine which items are recurring and the amount to be underwritten.
- o Parking: We underwrite to existing contracts with third-party operators; for transient parking income, we underwrite based on historical levels and trends.
- o Utility Recoveries: We underwrite based on the percentage of the utilities expense that was collected historically.

Expenses

► Fixed

- o Real Estate Taxes: In the absence of actual property tax bills, Morningstar typically increases by 3% the fixed expense reported in the most-recent period. For California properties, we increase the latest taxes by 2%.
- o Insurance: In the absence of actual insurance premiums, Morningstar typically increases by 3% the fixed expense reported in the most-recent period.
- o Payroll: Morningstar usually underwrites the expense amount recorded in the trailing 12-month period, assuming that the historical payroll expense numbers are relatively stable from period to period. For acquisition loans, Morningstar will analyze the proposed payroll schedule, if provided.
- o General and Administrative: Morningstar usually underwrites the expense amount recorded in the trailing 12-month period, assuming that the historical expense numbers are relatively stable from period to period. However, if this expense has been volatile, we may underwrite it based on the past three years of performance.
- o Ground Rent: Morningstar typically underwrites ground rent based on the actual ground lease agreement. If the agreement stipulates any increases in the lease payment during the loan term, Morningstar generally will underwrite an adjusted ground lease expense based on the average annual ground rent payment over the loan term.

► Variable

- o Utilities: Typically, we underwrite this expense based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period.

WT_000229


22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 231 of 654
Page 38 of 59        CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

o    Repairs and Maintenance: Typically, we underwrite this based on the expense amount
    recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the
    expense is relatively stable from period to period. However, if this expense has been volatile,
    we may underwrite it based on the past three years of performance.

o    Management Fee: We typically underwrite this as a percentage of EGI, based on the greater of
    the contractual rate in the current management agreement[7] and 3% of Morningstar's EGI. If
    the contract rate is not known, we may rely on the higher of the average rate paid in the past
    (as indicated in the historical operating statements) and 3.0%.

o    Advertising: Typically, we underwrite this based on the expense amount recorded in the
    trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively
    stable from period to period.

o    Professional Fees: Typically, we underwrite this based on the expense amount recorded in the
    trailing 12-month period.

► Replacement Reserves: Typically, we underwrite these based on the greater of the following:

o    The recommended replacement reserve amount indicated in the related property condition
    report/assessment, inflated by 10%; and

o    $250 per unit; however, we may adjust this based on the age and quality of the property.

**Assigning Property Quality Scores and Cap Rates**

Morningstar assigns property quality scores and cap rates and makes adjustments based in part on the
following property characteristics:

► Physical Characteristics of Property
o    Property class.
o    Age.
o    Condition.
o    Unit mix.
o    Unit size.
o    Subtype: Garden-style versus midrise versus high-rise.
o    Unit amenities.
o    Common amenities.
o    Aesthetic characteristics/qualities.
o    Security and life safety features, including a gated community.

► Location of Property
o    Urban versus suburban versus rural.
o    Proximity to interstate highways and major roads.
o    Convenience of ingress/egress.
o    Proximity to train stations (and subway entrances for urban locations).
o    Proximity to shopping and entertainment/restaurant venues.
o    Land use in the surrounding area (including the availability of undeveloped land).
o    Proximity to the area's major employers.
o    Potential changes to the local employment picture (for example, large or prominent employers
    moving into or out of the area).

---

[7] If we determine that the contractual rate is above the market rate, we will underwrite the actual contractual rate; however, we will adjust our cash flow for our property valuation to
reflect a market management fee.



22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 232 of 654

Page 39 of 59
CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

► Market Fundamentals and Demographics
   o Employment base and drivers.
   o Prevailing rental rates.
   o Prevailing occupancy rates.
   o Near-term additions to supply.

Morningstar's starting cap rate for multifamily properties is 7.00%. The chart below is a guide to the adjustments we may consider making based on class, the property quality score, property subtype, location, and so on. We also may consider factors other than those shown below to determine our final assigned cap rate for a given property. Student housing cap rates will typically be 0.75% to 1.25% higher than the comparable multifamily cap rate.

| | | |
|---|---|---|
| Base Multifamily Cap Rate (%) | | 7.00 |
| Adjustments (%) | (+/-) | |
| Class | | |
| Class A | - | 0.50 |
| Class B | | 0.00 |
| Class C | + | 1.00 |
| Property Quality Score | | |
| 1 (Excellent) | - | 0.50 |
| 2 (Above Average) | - | 0.25 |
| 3 (Average) | | 0.00 |
| 4 (Below Average) | + | 0.25 |
| 5 (Poor) | + | 0.50 |
| Other Adjustments | | |
| CBD/Infill | - | 0.50 |
| Student Housing | + | 0.75-1.25 |
| Other Qualitative Factors | +/- | 0.50 |

MORNINGSTAR

CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

*Manufactured Housing Property Cash Flow Analysis*

Within the category of manufactured housing communities, Morningstar includes manufactured housing parks, mobile home parks, RV parks, as well as various combinations of these subtypes (for example, parks that offer sites for mobile homes and RVs). The guidelines below deal only with manufactured housing parks.

Manufactured housing parks are income-producing properties that lease pads, or sites, to homeowners, while providing utilities and roads, and, in some cases, recreational amenities and perhaps community services for the owners. The collateral for these loans is the land and improvements that constitute the manufactured housing park, not the manufactured homes. Manufactured housing parks vary in size, from small-scale operations with just a handful of pads and almost no amenities, to large-scale communities with several hundred pads and recreational amenities such as swimming pools, tennis courts, and clubhouses. Higher-end communities often promote a lifestyle and may include golf courses. Communities typically are of two types: all ages or age-restricted to 55 and older.

Today, loans backed by manufactured housing parks (including mobile home and RV parks) account for a small percentage of total outstanding CMBS issuance. The parks are found throughout the United States, many in semirural or rural areas. Like traditional multifamily leases, most leases at these parks are for 12 months, and an analysis of the current rent roll is less critical than a review of historical operating performance and current demand drivers in the market.

**Property Income: Base Rent, Vacancy, Concessions, Recoveries, and Other Income**
<u>Income</u>
- ► Rental Income
  - o Occupied Pads/Units: This is based on the property's current or most recent rent roll or average rent per unit.
  - o Vacant Pads/Units (Gross-Up): We gross up vacant units using a market rental rate (as indicated in the related property appraisal or a third-party data provider).
  - o Above-Market Rents: Generally, we mark to market rents that are above-market (to market or toward market). However, Morningstar will consider underwriting an existing above-market rent for properties that we expect to outperform their market averages.
- ► Vacancy
  - o For fully occupied properties, Morningstar typically underwrites a minimum vacancy loss of 5.0% in most cases.
  - o Typically, Morningstar underwrites vacancy equal to a property's current economic vacancy; however, we also review the market vacancy assumptions in the related appraisal as well as market data from other sources. Factors that may affect our underwritten vacancy include:
    - ▪ A property's vacancy rate compared with the prevailing market rate and with the average vacancy rate of the comparable properties as defined by the appraiser.
    - ▪ A property's historical vacancy rate and how it compares with the market vacancy rate over time.
    - ▪ Whether the property's average base rent is similar to, lower than, or higher than the average market rent or the appraiser's assumptions of market rent.

WT_000232


22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 234 of 654

Page 41 of 59

CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

- ▪ Characteristics that affect the property's competitiveness in the local market or area, including near-term additions to supply and the amount of capital invested in the property in the past.
- ► Concessions/Credit Loss
  - o Concessions/Free Rent: We rely on historical levels (often with more weight given to the concessions in the most-recent financial statement) and/or the appraiser's estimate of concessions offered in the market.
  - o Credit Loss: We rely on historical operating results, giving more weight to the most recent period. We also consider the amount in the borrower's budget and the appraiser's estimate.
  - o Other Income
  - o Recurring Income: Morningstar first will determine whether an item represents recurring income, that is, income that one would reasonably expect to appear consistently from period to period. Morningstar usually includes recurring income and excludes one-time or nonrecurring items. We rely on historical trends and/or actual contracts to determine which items are recurring and the amount to be underwritten.

Expenses

- ► Fixed
  - o Real Estate Taxes: In the absence of actual property tax bills, Morningstar typically increases by 3% the fixed expense reported in the most-recent period. For California properties, we increase the latest taxes by 2%.
  - o Insurance: In the absence of actual insurance premiums, Morningstar typically increases by 3% the fixed expense reported in the most-recent period.
  - o Payroll: Morningstar usually underwrites the expense amount recorded in the trailing 12-month period, assuming that the historical payroll expense numbers are relatively stable from period to period. For acquisition loans, Morningstar will analyze the proposed payroll schedule, if provided.
  - o General and Administrative: Morningstar usually underwrites the expense amount recorded in the trailing 12-month period, assuming that the historical payroll expense numbers are relatively stable from period to period.
  - o Ground Rent: Morningstar typically underwrites ground rent based on the actual ground lease agreement. If the agreement stipulates any increases in the lease payment during the loan term, Morningstar generally will underwrite an adjusted ground lease expense based on the average annual ground rent payment over the loan term.
- ► Variable
  - o Utilities: Typically, we underwrite this expense based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period.
  - o Repairs and Maintenance: Typically, we underwrite this based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period.
  - o Management Fee: We typically underwrite this as a percentage of EGI, based on the greater of the contractual rate in the current management agreement[8] and 3% of Morningstar's EGI. If

---

[8]If we determine that the contractual rate is above the market rate, we will underwrite the actual contractual rate; however, we will adjust our cash flow for our property valuation to reflect a market management fee.

WT_000233



22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff   Pg 235 of 654

Page 42 of 59

CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

the contract rate is not known, we may rely on the higher of the average rate paid in the past (as indicated in the historical operating statements) and 3.0%.

- o Advertising: Typically, we underwrite this based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period.
- o Professional Fees: Typically, we underwrite this based on the expense amount recorded in the trailing 12-month period.
- ► Replacement Reserves: We underwrite these based on the greater of the following:
  - o The recommended replacement reserve amount indicated in the related property condition report/assessment, inflated by 10%; and
  - o $50 per pad.

**Manufactured Housing Park Property Classes**

Morningstar uses the following guidelines to categorize manufactured housing parks:

- ► Class A: The property is newer, usually built after 2000, and is in one of the 50 largest combined statistical areas, or CSAs. It should have at least 100 pads or home sites and offer better-than-average amenities, including a clubhouse, swimming pool, and other recreational areas. The percentage of transient spaces (in other words, RV sites) should be less than 35%. This class usually offers doublewide or triplewide pads. We expect Class A properties to make up a small percentage of the manufactured housing park loans in CMBS.
- ► Class B: These are properties built between 1980 and 2000 that may or may not offer amenities. They may be inside or outside a top 50 CSA. The percentage of transient spaces often will be greater than 35%. Singlewide pads are common for this class. On average, Class B properties account for the vast majority of the manufactured housing park exposure in CMBS.
- ► Class C: These parks are built before 1980, with few or no amenities. They may have unpaved driveways and/or parking areas. Singlewide pads are the norm for this class.

**Assigning Property Quality Scores and Cap Rates**

Morningstar assigns property quality scores and cap rates and makes adjustments based in part on the following property characteristics:

- ► Physical Characteristics of Property
  - o Property class (A, B, or C).
  - o Age.
  - o Pad/site mix (for example, single-wide sites versus double-wide sites, with a preference for the latter type).
  - o Subtype mix (the percentage of manufactured housing park sites, mobile home sites, and RV sites). Morningstar typically will use a higher cap rate if the percentage of income from RV sites exceeds 10%.
  - o Common amenities.
  - o Infrastructure (such as street lighting, paved roads and sidewalks, and so on)
  - o Aesthetic characteristics/qualities
  - o Water and sewer (public versus private).
  - o Resident parking (and whether it is on or off road).

WT_000234



22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff    Pg 236 of 654

Page 43 of 59
CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

- ► Location of Property
  - o Proximity to interstate highways and major roads.
  - o Convenience of ingress/egress.
  - o Proximity to shopping and entertainment venues.
  - o Land use in the surrounding area (including the availability of undeveloped land).
  - o Proximity to the area's major employers.
  - o Potential changes to the local employment picture (for example, large or prominent employers moving to or moving out of the area).
  - o If an over 55-plus community, the proximity to recreational amenities.
- ► Market Fundamentals and Demographics
  - o Employment base and drivers.
  - o Prevailing rental rates.
  - o Prevailing occupancy rates.
  - o Near-term additions to supply.

Morningstar's starting cap rate for manufactured housing properties is 7.75%. The chart below is a guide to the adjustments we may consider making based on class, the property quality score, property subtype, location, and so on. We also may consider factors other than those shown below to determine our final assigned cap rate for a given property.

| Base Manufactured Housing Cap Rate (%) | | 7.75 |
|---|---|---|
| Adjustments (%) | (+/-) | |
| Class | | |
| Class A | - | 0.50 |
| Class B | | 0.00 |
| Class C | + | 1.00 |
| | | |
| Other Adjustments | | |
| High Land Value | - | 0.50 |
| Tertiary/Rural | + | 0.50 |

WT_000235

MORNINGSTAR

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff    Pg 237 of 654

Page 44 of 59

CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

*Student Housing Property Cash Flow Analysis*

Student housing properties present certain operating risks and challenges. One of those challenges is the shortened preleasing period that opens near the end of each academic year as students are making their housing decisions for the upcoming academic year. Failure to attain its preleasing targets usually means that a property will not achieve a stabilized occupancy rate (measured by occupied beds, not units) for an entire academic year, which could put a mortgage loan in jeopardy. In addition, high turnover rates and above-average wear-and-tear on the units result in significantly higher repair and maintenance costs compared with conventional multifamily properties.

One of the most important factors to consider when evaluating a property's competitiveness is its proximity to the college campus it serves. New competition can disrupt market demand, and the risk posed by additional supply is especially acute for those properties that are not within a walkable distance to campus. All things equal, the closer to campus, the greater the likelihood a property will experience relatively steady demand.

To underwrite near-term sustainable NCF, we put significant weight on the property's historical occupancy and operating statements, as these are good indicators of both demand and management competence, and new additions to the market. We also consider the property manager's track record and tenure at the property, as well as the manager's experience in the market and industry.

**Property Income: Base Rent, Vacancy, Concessions, Recoveries, and Other Income**

Income

► Rental Income
  o Occupied Beds: This is based on the property's prevailing average rent per bed.
  o Vacant Beds (Gross-Up): We typically gross up vacant beds using a market rental rate (as indicated in the related property appraisal or a third-party data provider).
  o Above-Market Rents: Generally, we mark above-market rents lower. However, Morningstar will consider underwriting an existing above-market rent for properties that we expect to outperform their market averages.

► Vacancy
  o For fully occupied properties, Morningstar typically underwrites a minimum vacancy loss of 5.0% in most cases.
  o Typically, Morningstar underwrites vacancy equal to a property's current economic vacancy, subject to a minimum vacancy loss of 7.5% in most cases, assuming that the property has exhibited a relatively stable occupancy history; we also review the market vacancy assumptions in the related appraisal as well as market data from other sources. Other factors that may affect our underwritten vacancy include:
    ▪ Proximity to campus.
    ▪ A property's vacancy rate compared with the prevailing market rate and with the average vacancy rate of the comparable properties as defined by the appraiser.
    ▪ A property's historical vacancy rate (and how it compares with the market vacancy rate over time).
    ▪ Whether the property's average base rent is similar to, lower than, or higher than the average market rent or the appraiser's assumptions of market rent.

WT_000236

MORNINGSTAR

CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

- ▪ Factors that affect the property's competitiveness in the local market or area, including near-term additions to supply and the amount of capital invested in the property in the past.
- ► Credit Loss
  - o Credit Loss: We rely on historical operating results, giving more weight to the most recent period. We also consider the amount in the borrower's budget and the appraiser's estimate.
- ► Other Income
  - o Recurring Income: Morningstar first will determine whether an item represents recurring income, that is, income that one would reasonably expect to appear consistently from period to period. Morningstar usually includes recurring income and excludes one-time or nonrecurring items. We rely on historical trends and/or actual contracts to determine which items are recurring and the amount to be underwritten.
  - o Parking: We underwrite to existing contracts with third-party operators; for transient parking income, we underwrite based on historical levels and trends.

Expenses

- ► Fixed
  - o Real Estate Taxes: In the absence of actual property tax bills, Morningstar typically increases by 3% the fixed expense reported in the most-recent period. For California properties, we increase the latest taxes by 2%.
  - o Insurance: In the absence of actual insurance premiums, Morningstar typically increases by 3% the fixed expense reported in the most-recent period.
  - o Payroll: Morningstar usually underwrites the expense amount recorded in the trailing 12-month period, assuming that the historical payroll expense numbers are relatively stable from period to period. For acquisition loans, Morningstar will analyze the proposed payroll schedule, if provided.
  - o General and Administrative: Morningstar usually underwrites the expense amount recorded in the trailing 12-month period, assuming that the historical expense numbers are relatively stable from period to period.
  - o Ground Rent: Morningstar typically underwrites ground rent based on the actual ground lease agreement. If the agreement stipulates any increases in the lease payment during the loan term, Morningstar generally will underwrite an adjusted ground lease expense based on the average annual ground rent payment over the loan term.
- ► Variable
  - o Utilities: Typically, we underwrite this expense based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period.
  - o Repairs and Maintenance: Typically, we underwrite this expense based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period.
  - o Management Fee: Typically, we underwrite this as a percentage of EGI, based on the greater of the contractual rate in the current management agreement[9] and 3% of Morningstar's EGI.

---

[9]If we determine that the contractual rate is above the market rate, we will underwrite the actual contractual rate; however, we may adjust our cash flow for our property valuation to reflect a market management fee.

WT_000237

MORNINGSTAR

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 239 of 654
Page 46 of 59    CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

> If the contract rate is not known, we may rely on the higher of the average rate paid in the past (as indicated in the historical operating statements) and 3.0%.
>
> o Advertising: Typically, we underwrite this based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period.

► Replacement Reserves: Typically, we underwrite these based on the greater of the following:

  o The recommended replacement reserve amount indicated in the related property condition report/assessment, inflated by 10%; and

  o $150 per bed ($500 per unit maximum).

### Assigning Property Quality Scores and Cap Rates

Morningstar assigns property quality scores and cap rates and makes adjustments based in part on the following property characteristics:

► Physical Characteristics of Property

  o Property class.
  o Age.
  o Condition.
  o Unit size.
  o Unit amenities.
  o Common amenities.

► Location of Property

  o Proximity to a college or university.
  o Urban versus suburban versus rural.
  o Proximity to train stations (and subway entrances for urban locations).
  o Proximity to shopping and entertainment/restaurant venues.
  o Zoning restrictions.
  o Land use in the surrounding area (including availability of undeveloped land).

► Market Fundamentals and Demographics

  o Prevailing rental rates.
  o Prevailing occupancy rates.
  o Near-term additions to supply.
  o Growth projections for enrollment at the applicable university or college.

Morningstar's starting cap rate for student housing properties is based on the base cap rate for multifamily properties, 7.00%. Typically, we add 75 basis points to 125 basis points to the multifamily cap rate to arrive at a base rate for student housing. The chart below is a guide to the adjustments we may consider making based on class, the property quality score, location, and so on. We also may consider factors other than those shown below to determine our final assigned cap rate for a given property.

WT_000238

MORNINGSTAR

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 240 of 654

Page 47 of 59
CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

| | | |
|---|---|---|
| Base Multifamily Cap Rate (%) | | 7.00 |
| Adjustments (%) | (+/-) | |
| **Class** | | |
| Class A | - | 0.50 |
| Class B | | 0.00 |
| Class C | + | 1.00 |
| Property Quality Score | | |
| 1 (Excellent) | - | 0.50 |
| 2 (Above Average) | - | 0.25 |
| 3 (Average) | | 0.00 |
| 4 (Below Average) | + | 0.25 |
| 5 (Poor) | + | 0.50 |
| Other Adjustments | | |
| CBD/Infill | - | 0.50 |
| Student Housing | + | 0.75 - 1.25 |
| Other Qualitative Factors | +/- | 0.50 |

MORNINGSTAR

*Self-Storage Property Cash Flow Analysis*

The evolution of the self-storage industry over the last 30 years has been remarkable. The industry has grown into a sophisticated asset class, and yesterday's one-story steel-frame buildings have been transformed into modern facilities with professional management, state-of-the-art security, specialty services, and climate-controlled units. Once owned primarily by local partnerships, today's self-storage facilities are often professionally run by large corporations that manage portfolios in numerous states.

The ability of a property to compete locally depends on many factors, including location and convenience, visibility, level of security, the variety of unit types offered, potential for new supply, and services offered (including truck rental and sale of packing supplies).

**Property Income: Base Rent, Vacancy, Concessions, Recoveries, and Other Income**

Income

► Rental Income
  o Occupied Units: This is based on the property's current or most recent rent roll or average rent per unit (or per square foot).
  o Vacant Units (Gross-Up): We typically gross up vacant units using a market rental rate (as indicated in the related property appraisal, a third-party data provider, or recent leasing activity).
  o Above-Market Rents: Generally, we mark rents that are above-market lower (to market or toward market). However, Morningstar will consider underwriting an existing above-market rent for properties that we expect to outperform their market averages.

► Vacancy
  o For fully occupied properties, Morningstar typically underwrites a minimum vacancy loss of 5.0% in most cases.
  o Typically, Morningstar underwrites vacancy equal to a property's current economic vacancy; however, we also review the market vacancy assumptions in the related appraisal as well as market data from other sources. Factors that may affect our underwritten vacancy include:
    ▪ A property's vacancy rate compared with the prevailing market rate and with the average vacancy rate of the comparable properties as defined by the appraiser.
    ▪ A property's historical vacancy rate (and how it compares with the market vacancy rate over time).
    ▪ Whether the property's average base rent is similar to, lower than, or higher than the average market rent or the appraiser's assumptions of market rent.
    ▪ Characteristics that affect the property's competitiveness in the local market or area, including near-term additions to supply and the amount of capital invested in the property in the past.

► Concessions/Credit Loss
  o Concessions/Free Rent: We rely on historical levels (often with more weight given to the concessions in the most-recent financial statement) and/or the appraiser's estimate of concessions offered in the market.
  o Credit Loss: We rely on historical operating results, giving more weight to the most recent period. We also consider the amount in the borrower's budget and the appraiser's estimate.

WT_000240

MORNINGSTAR®

► Other Income
  o Recurring Income: Morningstar first will determine whether an item represents recurring income, that is, income that one would reasonably expect to appear consistently from period to period. Morningstar usually includes recurring income and excludes one-time or nonrecurring items. We rely on historical trends and/or actual contracts to determine which items are recurring and the amount to be underwritten.

Expenses
► Fixed
  o Real Estate Taxes: In the absence of actual property tax bills, Morningstar typically increases by 3% the fixed expense reported in the most-recent period. For California properties, we increase the latest taxes by 2%.
  o Insurance: In the absence of actual insurance premiums, Morningstar typically increases by 3% the fixed expense reported in the most-recent period.
  o Payroll: Morningstar usually underwrites the expense amount recorded in the trailing 12-month period, assuming that the historical payroll expense numbers are relatively stable from period to period. For acquisition loans, Morningstar will analyze the proposed payroll schedule, if provided.
  o General and Administrative: Morningstar usually underwrites the expense amount recorded in the trailing 12-month period, assuming that the historical expense numbers are relatively stable from period to period. However, if this expense has been volatile, we may underwrite it based on the past three years of performance.
  o Ground Rent: Morningstar underwrites ground rent based on the actual ground lease agreement. If the agreement stipulates any increases in the lease payment during the loan term, Morningstar generally will underwrite an adjusted ground lease expense based on the average annual ground rent payment over the loan term.

► Variable
  o Utilities: Typically, we underwrite this expense based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period.
  o Repairs and Maintenance: Typically, we underwrite this expense based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period. However, if this expense has been volatile, we may underwrite it based on the past three years of performance.
  o Management Fee: Typically, we underwrite this as a percentage of EGI, based on the greater of the contractual rate in the current management agreement[10] and 3% of Morningstar's EGI. If the contract rate is not known, we may rely on the higher of the average rate paid in the past (as indicated in the historical operating statements) and 3.0%.
  o Advertising: Typically, we underwrite this based on the expense amount recorded in the trailing 12-month period, assuming that the vacancy rate is stable and the expense is relatively stable from period to period.
  o Professional Fees: Typically, we underwrite this based on the expense amount recorded in the trailing 12-month period.

---

[10]If we determine that the contractual rate is above the market rate, we will underwrite the actual contractual rate; however, we will adjust our cash flow for our property valuation to reflect a market management fee.

WT_000241

MORNINGSTAR

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff    Pg 243 of 654

Page 50 of 59    CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

► Replacement Reserves: Typically, we underwrite these based on the greater of the following:
- o The recommended replacement reserve amount indicated in the related property condition report/assessment, inflated by 10%; and
- o $0.15 per square foot (or $30 per unit).

### Assigning Property Quality Scores and Cap Rates

Morningstar assigns property quality scores and cap rates and makes adjustments based in part on the following property characteristics:

► Physical Characteristics of Property
- o Age.
- o Condition.
- o Average unit size.
- o Number of climate-controlled units.
- o Security.
► Location of Property
- o Urban/CBD, versus suburban versus rural.
- o Proximity to interstates and major roads.
- o Land use in the surrounding area (including the availability of undeveloped land).
- o Potential changes to the local employment picture (for example, large or prominent employers moving to or moving out of the area).
► Property Management
- o On-site or remote.
- o Management's office hours.
- o Sophistication of management's system.
► Market Fundamentals and Demographics
- o Population size and growth trends.
- o Employment base and drivers.
- o Prevailing rental rates.
- o Prevailing occupancy rates.
- o Near-term additions to supply.

Morningstar's starting cap rate for self-storage properties is 8.25%. The chart below is a guide to the adjustments we may consider making based on class, the property quality score, property subtype, location, and so on. We also may consider factors other than those shown below to determine our final assigned cap rate for a given property.

WT_000242    MORNINGSTAR®

CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

| | | |
|---|---|---|
| Base Self-Storage Cap Rate (%) | | 8.25 |
| Adjustments (%) | (+/-) | |
| | | |
| **Property Quality Score** | | |
| | | |
| 1 (Excellent) | - | 0.75 |
| 2 (Above Average) | - | 0.50 |
| 3 (Average) | | 0.00 |
| 4 (Below Average) | + | 0.50 |
| 5 (Poor) | + | 0.75 |
| | | |
| Other Adjustments | | |
| CBD | - | 0.50 |
| Secondary Location | + | 0.25 |
| Tertiary Location | + | 0.50 |
| Rural | + | 1.00 |
| Other Qualitative Factors | +/- | 0.50 |

WT_000243

MORNINGSTAR

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 245 of 654

Page 52 of 59

CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

*Hospitality Property Cash Flow Analysis*

Hospitality (or lodging) is a broad category that encompasses economy-class motels, select-service and midpriced hotels, five-star luxury resorts, independent hotels, and franchised hotels. Important factors that drive performance include location, chain/brand affiliation, property condition, facilities, amenities, reputation, market orientation, rate structure, and market supply. For some hospitality properties, the supply and demand fundamentals of the local market are the main factors affecting rates and occupancy, while for others, regional or national trends in business travel or tourism play a bigger role.

Hospitality properties are notorious for their cash flow volatility. From new supply to the vagaries of consumer spending to fluctuations in business travel and the macroeconomy — any number of factors can lead to rapid and dramatic changes in average daily rate, or ADR, and occupancy. This, combined with the lack of tenant leases, makes it imperative to use a thoughtful approach to underwriting sustainable cash flow.

**Property Income**

Income

► ADR and Occupancy Rate
  ○ Current and Historical Operating Results: We review and analyze the hotel's ADR[11], occupancy, and overall operating results for the prior three years; we look for performance trends, including market penetration rates, and analyze them in light of the overall macroeconomic environment prevalent for each operating period.
  ○ Competitive Set (as defined by STR or the appraisal): We compare a hotel's performance to that of the competitive set to establish recent market trends and understand how that hotel competes against its market peers.
  ○ Appraisal Comparables: We review the performance of the appraiser's comparable hotel set to understand the local market and how the hotel competes against its peers.
  ○ New Supply: We review the appraisal and industry reports to understand how expected or potential new supply will affect the local market's performance.
  ○ Demand Generators: We review current demand generators for the hotel and its market, and we assess the likelihood that they will remain stable in the near term.
  ○ Segmentation: We review the percentage of business derived from the commercial, meeting and group, and leisure categories and assess sustainability.
  ○ Seasonality: We review the performance history to determine if seasonality is an issue, and if so, if the lender requires a seasonality escrow.
► Departmental Income
  ○ Room Revenue: We underwrite this based on Morningstar's ADR and occupancy assumptions (ADR x occupancy rate).
  ○ Food and Beverage Revenue: We underwrite this based on historical income on a per-occupied-room basis.
  ○ Telephone/Internet Revenue: We underwrite this based on historical income on a per-occupied-room basis.

---

[11] Equal to room revenue divided by room nights sold.

WT_000244



    ○ Other Departments/Ancillary Income: We underwrite this based on the historical revenue on a per-occupied-room basis, and this expense includes items like spa or golf course fees; we also include other sources of rental income such as gift shops or retail tenants.

Expenses
► Departmental Expenses
    ○ Room Expenses: We underwrite these based on historical room expenses on a per-occupied-room basis; we rely on the historical average percentage for guidance.
    ○ Food and Beverage Expenses: We underwrite these based on a percentage of Morningstar's underwritten food and beverage revenue; we rely on the historical average percentage for guidance.
    ○ Telephone/Internet Expenses: We underwrite these based on a percentage of Morningstar's underwritten telephone/Internet revenue; we rely on the historical average percentage for guidance.
    ○ Other Departmental Expenses: We underwrite these based on a percentage of Morningstar's other departments/ancillary income; we rely on the average historical percentage for guidance.
► Fixed/General Expenses
    ○ Real Estate Taxes: In the absence of actual property tax bills, Morningstar typically increases by 3% the fixed expense reported in the most-recent period. For California properties, we increase the latest taxes by 2%.
    ○ Insurance: In the absence of actual insurance premiums, Morningstar typically increases by 3% the fixed expense reported in the most-recent period.
    ○ Other: Most expenses are based on the historical levels or averages per available room.
► Undistributed Expenses
    ○ Management Fee: We typically underwrite this based on the higher of the current management agreement and the historical expense as a percentage of total revenue, with a minimum fee of 3.0% of total revenue, and also consider the historical expense in the context of current market rates as determined by the appraiser for the related property. Morningstar underwrites an incentive management fee, if provided for in the management agreement, even if the fee is subordinate to debt service payments.
    ○ Franchise Fee: We typically underwrite this based on the current franchise agreement and rely on the historical expense as a percentage of total revenue if the contract rate is unavailable. We also review the appraisal to confirm that the contract rate is consistent with the market level.
    ○ Sales and Marketing: We underwrite this based on historical levels, typically as a percentage of total revenue. We may also evaluate this expense on a per-occupied-room basis.
    ○ General and Administrative: We underwrite this based on historical levels and may also evaluate this expense on a per-occupied-room basis.
    ○ Repairs and Maintenance: We underwrite this based on historical levels and may also evaluate this expense on a per-occupied-room basis.
    ○ Utilities: We underwrite this based on historical levels and may also evaluate this expense on a per-occupied-room basis.
    ○ Equipment Rental or Capital Leases: We underwrite these based on current leases and historical levels.
    ○ Ground Rent: We underwrite this ground rent based on the actual ground lease agreement. If the agreement stipulates any increases in the lease payment during the loan term, we

WT_000245



22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 247 of 654

Page 54 of 59
CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

generally will underwrite an adjusted ground lease expense based on the average annual ground rent payment over the loan term.

Note: In most cases we consider a combined management franchise furniture, fixtures, and equipment fee of 10%-15% to be reasonable and within industry standards.

► Furniture, Fixtures, and Equipment: We calculate this as a percentage of total revenue and based on the following property subtypes (subject to review of the percentage specified in the franchise agreement or applicable management agreement):
  o Limited-service – 5.0%
  o Select-service – 4.5%
  o Full-service/luxury – 4.0%
  o Extended-stay – 4.0%

**Assigning Property Quality Scores and Cap Rates**

Morningstar assigns property quality scores and cap rates and makes adjustments based in part on the following property characteristics:

Physical Characteristics of Property
► Property subtype (luxury, full-service, select-service, limited-service, and extended-stay hotels).
► Age.
► Condition.
► Date and scope of the most-recent renovation.
► Exterior condition and aesthetic qualities.
► Amenities:
  o Conference or meeting facilities.
  o Restaurant or banquet facilities.
  o Recreational services or facilities (fitness center, swimming pool, spa, and so on).
  o Business center.

Location of Property
► Urban versus suburban versus resort/destination.
► Proximity to tourist, leisure, recreational, or cultural attractions.
► Proximity to interstates and major roadways.
► Proximity to airports.
► Proximity to corporate office buildings or business parks.
► Proximity to local services or amenities such as restaurants and shopping.
► Barriers to entry.

Competition
► Primary and secondary competitors:
  o Flag/brand affiliation.
  o Age and condition.
  o Number of rooms.
  o Penetration rates.
  o Amenities:

WT_000246



22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 248 of 654

Page 55 of 59

CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

- Number of restaurants.
- Conference/meeting facilities.
- Business-related.
- Leisure-related.

Property Management
► Third-party or affiliated entity.
► Experience.

Hotel Brand Quality
► Reputation and name recognition.
► Franchise contract length and terms.
► Reservation/booking systems.

Property Improvement Plan
► Completion date and scope of the most recent property improvement plan (hard and soft goods).
► If a PIP is in process, the work completed and scope of work yet to be completed.
► Whether the lender is escrowing for a near-term PIP; if a PIP is planned and the associated cost is not reserved as cash, Morningstar will deduct all or a portion of the estimated cost from our property value.

Morningstar's starting cap rate for hotels is 9.25%. The chart below is a guide to the adjustments we may consider making based on class, the property quality score, property subtype, location, and so on. We also may consider factors other than those shown below to determine our final assigned cap rate for a given property.

WT_000247

MORNINGSTAR®

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 249 of 654

Page 56 of 59

CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

| | | |
|---|---|---|
| Base Hotel Cap Rate (%) | | 9.25 |
| Adjustments (%) | (+/-) | |

| Property Quality Score | | |
|---|---|---|
| 1 (Excellent) | - | 0.75 |
| 2 (Above Average) | - | 0.50 |
| 3 (Average) | | 0.00 |
| 4 (Below Average) | + | 0.50 |
| 5 (Poor) | + | 1.00 |
| Subtype | | |
| Luxury | - | 0.75 |
| Full-Service | - | 0.25 |
| Extended-Stay | + | 0.25 |
| Select-Service | + | 0.50 |
| Limited-Service | + | 0.75 |
| Economy | + | 1.00 |
| Resort | - | 0.50 |
| Other Adjustments | | |
| CBD | - | 0.75 |
| Secondary Market | + | 0.25 |
| Tertiary Market | + | 0.50 |
| Rural Area | + | 0.50 |
| Other Qualitative Factors | +/- | 0.50 |

**Morningstar's Approach to Loans Secured by Leased Fee Interests**

A leased fee interest is created when the property owner encumbers its fee simple position by entering into a long-term ground lease agreement (typically 99 years) with a tenant. The tenant, or leasehold improvements owner, would be entitled to use and occupy the improvements during the ground lease term in accordance with the terms of the agreement. Although the real estate is encumbered by a ground lease, the tenant typically is permitted to mortgage its ownership interest by obtaining a leasehold mortgage.

In the typical leased fee mortgage financing, there are several notable characteristics:

► The borrower, or ground lessor (leased fee land owner), benefits from the additional collateral provided by the improvements on the land.

► Under the terms of the ground lease, at the end of the ground lease term, or in the event of a termination of the ground lease as a result of a default by the building owner, the ownership of the improvements will revert to the leased fee land owner.

► The ground rent paid by the leasehold tenant (ground lessee) represents the cash flow that is used to pay the monthly principal and interest due on the mortgage.

WT_000248

MORNINGSTAR

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 250 of 654

Page 57 of 59

CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

► The source of the funds used to pay the ground rent is the NCF generated by the commercial operations of the leasehold improvements. Under the terms of the ground lease, the leasehold owner is responsible for all expenses related to both the land and building, including (but not limited to) all operating expenses, property taxes, insurance, and capital expenditures, as well as the restoration of the improvements after a casualty or partial condemnation.

As depicted below, the leased fee lender has several layers of protection from losses.



Morningstar has a multipronged approach to analyzing mortgages that are secured by leased fee collateral.

1. Underwritten NCF: We perform a look-through analysis by underwriting the NCF and value of the underlying fee simple real estate (excluding ground rent), per our underwriting guidelines. The rationale for a look through analysis is that the leased fee owner has a reversionary interest in the improvements at the end of the lease term. Further, if the leasehold tenant defaults on the ground rent payment, the landlord can evict the tenant by canceling the lease (subject to notice and cure periods), and the improvements would revert to the leased fee owner. Lastly, the leasehold interest often is encumbered by a leasehold mortgage, which provides additional credit support in the form of liquidity. Specifically, in the event of a ground lease default, the leasehold lender should be motivated to step in and cure that default, because not doing so would result in a complete loss for the lender.

2. Ability to Pay: We analyze the ground tenant's ability to pay ground rent during the loan term. Typically, the tenant's NCF excluding ground rent should provide ample cushion to pay ground rent, in addition to being able to pay the leasehold mortgage debt service, if one exists. Typically, we prefer that the NCF without ground rent equal or exceed 3 times the annual ground rent payment. If the property NCF is less than 3 times the annual ground rent, we would consider adjusting our analysis.

3. Cash Flow Model: We may generate a cash flow model if a static, point-in-time approach is deemed insufficient. Specifically, the cash flow model would be used to assess the loan's relevant metrics from origination through the maturity date, including a tail-period, if appropriate. The relevant credit metrics

MORNINGSTAR

would include DSCR and LTV on our look-through NCF, DSCR on actual ground rent, the NCF-to-ground-rent ratio, and the amortization schedule.

4. Ground Rent Steps: If the ground rent escalates during the loan term, we will assess the potential degradation of the tenant's ability to pay, as described above. If the rent steps are predictable, contractual, and relatively small (2% to 3%, for example), then a static analysis may be sufficient. However, if future ground rent steps are large or uncertain, then we may run scenarios to assess the impact of such items.

5. Legal Analysis: Generally, a leased fee position is considered financeable if the lease contains customary leased fee lender protections, such as the ability to cancel the lease, subject to standard notice and cure provisions, when the ground lease tenant is in default on its obligations.

If the lease was newly created and/or the tenant is an affiliate of the landlord, it is prudent for the lender to require a true lease opinion. Nonetheless, certain transactions are at increased risk that the lease be recharacterized in bankruptcy as a financing. If that occurs, then delays, increased costs and expenses, and/or limitations on rights or remedies and/or enforcement by the trust for the mortgage loan collateral may result and negatively affect recoveries and ultimately, the ratings.

Typically, for Morningstar to consider assigning AAA ratings to a portion of a transaction, the ground lease should provide the leased fee lender with predictable cash flows throughout the term, adequate insurance, and almost no risk of the lease being canceled by the tenant. Furthermore, the loan should have almost no maturity risk, which can be achieved through full principal amortization, residual value insurance or other characteristics that would make a maturity default or principal loss unlikely. We will assess the financeability of each ground lease agreement on its merits and make adjustments to our analysis if we deem the agreement to be deficient or lacking in certain protections.

6. Amortization: For transactions with scheduled amortization, we will determine the ending LTV based on our view of the underlying asset's stability and predictability of future ground rent. If the mortgage is fully amortizing over 30 years, for example, the ending LTV may be zero. However, if we have significant uncertainty in projecting the cash flows and relevant credit metrics over that time period, we may limit the ending LTV based on a default scenario that is appropriate for the ratings assigned to the transaction.

WT_000250

M⊙RNINGSTAR®

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 252 of 654

Page 59 of 59
CMBS Property Cash Flow Underwriting and Valuation Guidelines | May 2018

**Morningstar Credit Ratings, LLC**

**For More Information**

+1 800 299-1665

ratingagency@morningstar.com



4 World Trade Center

150 Greenwich Street, 48th Floor

New York, NY 10007 USA

Copyright © 2018 by Morningstar Credit Ratings, LLC ("Morningstar"). All rights reserved. Reproduction or transmission in whole or in part is prohibited except by permission from Morningstar. The information and opinions contained herein have been obtained or derived from sources Morningstar believed to be reliable. However, Morningstar cannot guarantee the accuracy and completeness of the information or of opinions based on the information. Morningstar is not an auditor and, it does not and cannot in every instance independently verify or validate information used in preparation of this report or any opinions contained herein. THE INFORMATION AND OPINIONS ARE PROVIDED "AS IS" AND NOT SUBJECT TO ANY GUARANTIES OR ANY WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE. Morningstar shall not be responsible for any damages or other losses resulting from, or related to, the use of this report or any information or opinions contained herein. The information and opinions herein are provided for information purposes only and are not statements of fact or recommendations to purchase, hold, or sell any securities or make any other investment decisions.

Your use of this report is further governed by Morningstar's Terms of Use located at

https://ratingagency.morningstar.com/MCR/about-us/terms-of-use.

To reprint, translate, or use the data or information other than as provided herein, contact Vanessa Sussman (+1 646 560-4541) or by email to: vanessa.sussman@morningstar.com.

# I LIVE IN A HOTEL OR MOTEL, WHAT ARE MY RIGHTS?

Generally someone who stays at a hotel or motel is a "guest" without much protection under the law. However, in certain circumstances, a hotel/motel guest can become a "tenant" with more legal protection from an eviction.

### I am currently staying at a hotel or motel, can I be forced to leave?

Generally a hotel or motel can force a guest to leave if the hotel or motel guest does not pay for the room or breaks the hotel or motel rules. However, if you have stayed in the hotel or motel long enough to become a tenant, you cannot be put out unless the motel or hotel files an eviction case against you.

### Am I a tenant or a guest?

Under New York law, a guest becomes a tenant after they stay at the hotel/motel for 30 consecutive days (30 days in a row) without checking out.

### How long do I have to live in a hotel or motel to become a tenant?

You have to live in a hotel or motel for 30 days or more to be considered a tenant.

### If I have lived in a hotel or motel for 30 days or more, can I be put out?

Yes. The hotel or motel can end your tenancy in one of two ways. First, if you fall behind in your payments, the hotel owner must give you a written notice demanding full payment within 14 days. If you do not pay what you owe by the time the 14 day period ends, the landlord may start an eviction against you.

The hotel or motel owner can also ask you to leave by giving you a notice. The notice will give you either 30, 60, or 90 days to move. The amount of time you get to move is based on how long you have lived in the hotel or motel. If you do not move by the date in your notice, the hotel or motel may start the eviction process.

### What will happen if I don't move after I receive a notice to move?

If you don't move, the hotel or motel may serve you with court papers. If the hotel or motel wins the eviction case, you will be served a warrant of eviction by a local constable, marshal, or sheriff. You will have 14 days to move. At the end of the 14 days, you can be put out.

### I have lived in a motel or hotel long enough to become a tenant. The owner changed the lock to my room! What should I do?

Call the police. When the police officers arrive, explain the situation to them and ask that they help you re-enter your room. If the police are not helpful, call the station and ask to speak to a captain or a duty officer. If the police refuse to help you, find somewhere safe that you can stay for the night and call Neighborhood Legal Services. We may be able to get you back in your room.

### I am a tenant in a hotel or motel, but the owner called the police and asked that I be put out! What should I do?

When the police arrive, explain to them that you have been staying at the hotel or motel for over 30 days and that makes you a tenant. Be sure to refer to the Section 711 of the New York Real Property Actions and Proceedings Law (RPAPL). If the police insist that you leave anyway, do not make the situation worse. Instead follow their instructions, and then call Neighborhood Legal Services. We may be able to get you back in your room. .

WT_000252

**I am a tenant in a hotel or motel.  Evictions in New York State have been stopped because of COVID-19.  Can I be put out? Does the pause on evictions apply to me?**

If you have lived in the hotel or motel for 30 days or more and you are a tenant, you cannot be put out or evicted before June 18, 2020.

WT_000253

# TITLE 27
# CONSTRUCTION AND MAINTENANCE

## CHAPTER 1
## BUILDING CODE

### SUBCHAPTER 1
### ADMINISTRATION AND ENFORCEMENT

### TABLE OF CONTENTS

| [Sub-Art. or Sec.]* | Art. or Sec.** | |
|---|---|---|
| [100.0] | Art. 1 | **General Provisions** |
| [100.1] | 101 | Title |
| [100.2] | 102 | Purpose |
| [100.3] | 103 | Scope |
| [100.4] | 104 | Interpretation |
| [100.5] | 105 | Effective Date |
| [100.6] | 106 | Enforcement |
| [100.7] | 107 | Variations |
| [100.9] | 108 | Application of References |
| [101.0] | Art. 2 | **Matters Covered** |
| [101.1] | 109 | Building Matters Covered |
| [101.2] | 110 | Matters Not Provided For |
| [102.0] | Art. 3 | **Continuation and Change in Use** |
| [102.1] | 111 | Continuation of Lawful Existing Use |
| [102.2] | 112 | Change in Occupancy or Use |
| [102.3] | 113 | Continuation of Unlawful Existing Use |
| [103.0] | Art. 4 | **Alteration of Existing Buildings** |
| [103.0] | 114 | Alteration of Existing Buildings |
| [103.1] | 115 | Alterations Exceeding Sixty Percent of Building Value |
| [103.2] | 116 | Alterations Between Thirty Percent and Sixty Percent of Building Value |
| [103.3] | 117 | Alterations Under Thirty Percent of Building Value |
| [103.4] | 118 | Alterations Involving Change in Occupancy or Use |
| | 118.1 | Illegal Alterations Involving Change in Occupancy |
| [103.5] | 119 | Alteration Cost: Building Value |
| [103.6] | 120 | Alterations to Multiple Dwellings and Conversions to Multiple Dwellings |
| [103.7] | 121 | Alterations to Residence Buildings |
| [103.8] | 122 | Alterations, Conversions from Seasonal to Year Round Use |
| [103.9] | 123 | Alterations, High Hazard Occupancies |
| | 123.1 | Alterations, Additions, Repairs and Changes in Occupancy or Use Requiring Facilities for People Having Physical Disabilities |
| | 123.2 | Provision of Sprinklers in Existing Buildings |
| [104.0] | Art. 5 | **Minor Alterations: Ordinary Repairs** |
| [104.1] | 124 | Minor Alterations |
| [104.2] | 125 | Ordinary Repairs |
| [104.3] | 126 | Work Not Constituting Minor Alterations or Ordinary Repairs |
| [105.0] | Art. 6 | **Maintenance** |
| [105.1] | 127 | Maintenance Requirements |
| [105.2] | 128 | Owner Responsibility |
| [105.3] | 129 | Exterior Walls and Appurtenances Thereof |
| [106.0] | Art. 7 | **Materials, Assemblies, Forms and Methods of Construction** |
| [106.1] | 130 | General Requirements |
| [106.2] | 131 | Acceptance Requirements |
| | 131.1 | Reference Standards |
| [106.3] | 132 | Inspection Requirements |
| [106.4] | 133 | Alternate or Equivalent Materials |
| [107.0] | Art. 8 | **Service Equipment** |
| [107.1] | 134 | General Requirements |
| [107.2] | 135 | Acceptance Requirements |
| [107.3] | 136 | Inspection Requirements |
| [107.4] | 137 | Alternate or Equivalent Equipment |
| [108.0] | Art. 9 | **Approval of Plans** |
| [108.1] | 138 | Separate Approval of Plans Required |
| [108.2] | 139 | Application for Approval of Plans |
| [108.3] | 140 | Applicant |
| | 140.1 | Registration Requirements |
| [108.4] | 141 | Plans |

Title 27 / Subchapter 1

| [108.5] | 142 | Applicant's Statement | [114.5] | 176 | Exemptions from Permit Requirement |
| [108.6] | 143 | Examination of Application and Plans | **[115.0]** | **Art. 16** | **Applications for Sign Permits** |
| [108.7] | 144 | Approval of Application and Plans | [115.1] | 177 | General Requirements |
| [108.8] | 145 | Conditional Approval of Plans | [115.2] | 178 | Plans Required |
| [108.9] | 146 | Endorsement of Approved Plans | [115.3] | 179 | Exemptions from Permit Requirements |
| **[109.0]** | **Art. 10** | **Permits** | | | |
| [109.1] | 147 | When Permits Required | **[116.0]** | **Art. 17** | **Applications for Equipment Work Permits** |
| [109.2] | 148 | Classification of Permits | | | |
| [109.3] | 149 | Separate Permits Required | [116.1] | 180 | When Equipment Work Permits Required |
| [109.4] | 150 | Application for Permit | | | |
| [109.5] | 151 | Applicant | [116.2] | 181 | Application Requirements |
| [109.6] | 152 | Other Application Requirements | [116.3] | 182 | Plans Required |
| [109.7] | 153 | Place of Filing Applications | [116.4] | 183 | Exemptions from Plan Requirements |
| [109.8] | 154 | Amendments to Applications | [116.5] | 184 | Exemptions from Permit Requirement |
| [109.9] | 155 | Time Limitation of Application | | 184.1 | Alteration and Repair Slip |
| **[110.0]** | **Art. 11** | **Applications for New Building Permits** | **[117.0]** | **Art. 18** | **Applications for Equipment Use Permits** |
| [110.1] | 156 | General Requirements | [117.1] | 185 | When Equipment Use Permits Required |
| [110.2] | 157 | Plans Required | | | |
| [110.3] | 158 | Datum | [117.2] | 186 | Application Requirements |
| [110.4] | 159 | Additional Information | | | |
| [110.5] | 160 | Certification of Performance | [117.3] | 187 | Inspections and Tests |
| | | Bond, License and Insurance Required | [117.4] | 188 | Temporary Use Permit |
| | | | [117.5] | 189 | Exemptions from Equipment Use Permit Requirement |
| [111.0] | **Art. 12** | **Applications for Building Alteration Permits** | | | |
| [111.1] | 161 | General Requirements | [117.6] | 190 | Duration and Renewal of Permit |
| [111.2] | 162 | Plans Required | | | |
| **[112.0]** | **Art. 13** | **Applications for Foundation and Earthwork Permits** | **[118.0]** | **Art. 19** | **Issuance of Permits** |
| | | | [118.1] | 191 | Approval of Permit Application |
| [112.1] | 163 | General Requirements | | | |
| [112.2] | 164 | Plans Required | [118.2] | 192 | Approval of Application in Part |
| [112.3] | 165 | Notice to Adjoining Owners | | | |
| [112.4] | 166 | Protection of Adjoining Properties | [118.3] | 193 | Signature to Permit |
| | | | [118.4] | 194 | Posting of Permit |
| **[113.0]** | **Art. 14** | **Applications for Demolition and Removal Permits** | [118.5] | 195 | Notice of Commencement of Work |
| [113.1] | 167 | General Requirements | [118.6] | 196 | Revocation of Permit |
| [113.2] | 168 | Requirement of Certifications | [118.8] | 198 | Approval of Plans and Permit Applications for Alteration or Demolition of Single Room Occupancy Multiple Dwellings |
| [113.3] | 169 | Notice to Adjoining Owners | | | |
| [113.4] | 170 | Protection of Lot and Adjoining Properties | | | |
| [113.5] | 171 | Requirement of Photographs | | | |
| **[114.0]** | **Art. 15** | **Applications for Plumbing Permits** | [118.9] | 198.1 | Approval of Plans and Permit Applications Where An Asbestos Project is Performed |
| [114.1] | 172 | General Requirements | | | |
| [114.2] | 173 | Plans Required | | | |
| [114.3] | 174 | Exemptions from Plan Requirements | [118.10] | 198.2 | Conversion, Alteration and Demolition of Single Room |
| [114.4] | 175 | Alteration and Repair Slip | | | |

|  |  | Occupancy Multiple Dwellings Prohibited |
|  | 198.3 | Relocation of Tenants in Occupancy in Certain Single Room Occupancy Multiple Dwellings |
| **[119.0]** | **Art. 20** | **Conditions of Permit** |
| [119.1] | 199 | Payment of Fees |
| [119.2] | 200 | Compliance with Code, Etc. |
| [119.3] | 201 | Compliance with Application, Plans, Etc. |
| [119.4] | 202 | Adherence to Lot Diagram |
| [119.5] | 203 | Compliance with Safety Requirements |
| [119.6] | 204 | Builder's pavement |
| **[120.0]** | **Art. 21** | **Department Inspections** |
| [120.1] | 205 | Right of Entry and Inspection |
| [120.2] | 206 | Identification of Inspectors |
| [120.3] | 207 | General Provisions |
| [120.4] | 208 | Preliminary Inspection |
| [120.5] | 209 | Inspections During Progress of Work |
| [120.6] | 210 | Final Inspection |
| [120.7] | 211 | Inspection of Completed Buildings |
| [120.8] | 212 | Inspection Reports |
| **[121.0]** | **Art. 22** | **Certificates of Occupancy** |
| [121.1] | 213 | General Provisions |
| [121.2] | 214 | New Buildings; Sidewalk Requirements |
| [121.3] | 215 | Altered Buildings |
| [121.4] | 216 | Existing Buildings |
| [121.5] | 217 | Change of Occupancy or Use |
| [121.6] | 218 | Temporary Occupancy |
| [121.7] | 219 | Applications for Certificates of Occupancy |
| [121.8] | 220 | Applicant |
| [121.9] | 221 | Statement of Compliance |
| [121.10] | 222 | Issuance of Certificates of Occupancy |
| [121.11] | 223 | Contents of Certificates |
| [121.12] | 224 | Record of Certificates |
| **[122.0]** | **Art. 23** | **Posting Buildings** |
| [122.1] | 225 | Posted Occupancy and Use |
| [122.2] | 226 | Replacement of Posted Signs |
| **[123.0]** | **Art. 24** | **Stop-Work Order** |
| [123.1] | 227 | Stop-Work Notice and Order |
| [123.2] | 228 | Unlawful Continuance |
| **[124.0]** | **Art. 25** | **Fire Protection Plan** |
| [124.1] | 228.1 | Applicability |
| [124.2] | 228.2 | Scope |
| [124.3] | 228.3 | General Requirements |
| [124.4] | 228.4 | Retroactivity |
| **[125.0]** | **Art. 26** | **Special Filing Requirements** |
| [125.1] | 228.5 | General Requirements |
| **Art. 27** | | **Alternative Procedure for Certain Permits** |
| 228.6 | | Contract with Not-For-Profit Corporation |
| 228.7 | | Not-For-Profit Corporation |
| 228.8 | | Examination and Approval of Plans |
| 228.9 | | Issuance of Permits |
| 228.10 | | Fees |
| 228.11 | | Employment Conditions |
| 228.12 | | Inspection |
| 228.13 | | Records |
| 228.14 | | Corruption Prevention Program |
| 228.15 | | Performance Review by the Commissioner |
| 228.16 | | Jurisdiction of the Fire Department |

*"C26" omitted from section numbers in this column.*
**"27" omitted from section numbers in this column.*

## ARTICLE 1  GENERAL PROVISIONS

**§[C26-100.1]   27-101 Title.-** This code shall be known and may be cited as the "building code of the city of New York", and is hereinafter referred to as "this code" or "the code".

**§[C26-100.2]   27-102 Purpose.-** The purpose of this code is to provide reasonable minimum requirements and standards, based upon current scientific and engineering knowledge, experience and techniques, and the utilization of modern machinery, equipment, materials, and forms and methods of construction, for the regulation of building construction in the city of New York in the interest of public safety, health and welfare, and with due regard for building construction and maintenance costs.

**§[C26-100.3]   27-103 Scope. -** This code shall apply to the construction, alteration, repair, demolition, removal, maintenance, occupancy and use of new and existing buildings in the city of New York, including the installation, alteration, repair, maintenance and use of service equipment therein, except as provided in section six hundred forty-three of the charter.

**§[C26-100.4]   27-104 Interpretation.-** This code shall be liberally interpreted to secure the beneficial purposes thereof. Any conflict or inconsistency between the requirements of this code and applicable state and federal laws and regulations shall be resolved in favor of the more restrictive requirement.

WT_000256

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff    Pg 258 of 654

Title 27 / Subchapter 1

**§[C26-100.5]  27-105  Effective date.-** Any work for which an application for a permit was submitted to the department prior to the effective date of this code, (December sixth nineteen hundred sixty-eight), or for which an application for a permit is submitted to the department within a period of twelve months after such date may, however, at the option of the owner, be performed in its entirety in accordance with the requirements of this code, or in accordance with the requirements of the building laws and regulations previously in force in the city of New York, provided that such work is commenced within twelve months after the date of issuance of a permit therefor and is diligently carried on to completion. This section shall not apply to the requirements of article ten of subchapter nineteen of this chapter which shall become effective on December sixth, nineteen hundred sixty-eight.

**§[C26-100.6]  27-106  Enforcement.-** This code shall be enforced by the commissioner of buildings, pursuant to the provisions of section six hundred forty-three of the New York city charter, as amended, except that the fire commissioner shall also enforce the provisions of this code relating to the approved number of persons in places of assembly (overcrowding), obstruction of aisles, corridors, and exits, and to the maintenance of fire alarm equipment and devices, exit and directional signs, emergency lighting, and fire-preventive and fire-extinguishing equipment and devices, and except that the commissioner of ports and terminals shall enforce all the provisions of this code with respect to buildings under the jurisdiction of the department of ports and terminals. Where the installation of exit and directional signs, emergency lighting and sprinkler and fire alarm protection is required by the fire prevention code, the fire commissioner shall require such installations to be in accordance with the provisions of this code.

**§[C26-100.7]  27-107  Variations.-** The requirements and standards prescribed in this code shall be subject to variation in specific cases by the commissioner, or by the board of standards and appeals, under and pursuant to the provisions of paragraph two of subdivision (b) of section six hundred forty-five and section six hundred sixty-six of the charter, as amended.

**§[C26-100.9]  27-108  Application of references.-** Unless otherwise specifically provided in this code, all references to articles and section numbers, or to provisions not specifically identified by number, shall be construed to refer to articles, sections, or provisions of this code.

### ARTICLE 2  MATTERS COVERED

**§[C26-101.1]  27-109  Building matters covered.-** The provisions of this code shall cover all matters affecting or relating to buildings, as set forth in section 27-103 of article one of this subchapter, and shall extend to excavation operations, and to all types of buildings and structures and their appurtenant constructions, including vaults, signs, projections, and accessory additions, together with all surface and sub-surface construction within the curb line, including curb cuts and driveways, the coverings thereof and entrances thereto, and the issuance of permits in reference thereto.

**§[C26-101.2]  27-110  Matters not provided for.-** Any matter or requirement essential for the fire or structural safety of a new or existing building or essential for the safety or health of the occupants or users thereof or the public, and which is not covered by the provisions of this code or other applicable laws and regulations, shall be subject to determination and requirements by the commissioner in specific cases.

### ARTICLE 3  CONTINUATION AND CHANGE IN USE

**§[C26-102.1]  27-111  Continuation of lawful existing use.-** The lawful occupancy and use of any building, including the use of any service equipment therein, existing on the effective date of this code or thereafter constructed or installed in accordance with prior code requirements, as provided in section 27-105 of article one of this subchapter, may be continued unless a retroactive change is specifically required by the provisions of this code.

**§[C26-102.2]  27-112  Change in occupancy or use.-** Changes in the occupancy or use of any building may be made after the effective date of this code, subject to the provisions of section 27-217 of article twenty-two of this subchapter. After a change in occupancy or use has been made in a building, the re-establishment of a prior occupancy or use that would not be lawful in a new building of the same construction class shall be prohibited unless and until all the applicable provisions of this code and other applicable laws and regulations for such re-established occupancy or use shall have been complied with.  A change from a use prohibited by the provisions of this code, but which was permitted prior to the effective date of this code, to another use prohibited by the provisions of this code shall be deemed a violation of this code.

**§[C26-102.3]  27-113 Continuation of unlawful existing use.-**
The continuation of the unlawful occupancy or use of a building after the effective date of this code, contrary to the provisions of this code, shall be deemed a violation of this code.

## ARTICLE 4  ALTERATION OF EXISTING BUILDINGS

**§[C26-103.0] 27-114  Alteration of existing buildings.-**
Subject to the provisions of section 27-105 of article one of this subchapter, and except as otherwise specifically provided by the provisions of this code, the following provisions shall apply to the alteration of existing buildings, whether made voluntarily or as a result of damage, deterioration or other cause, provided, however, that the following alterations shall conform with the requirements of this code regardless of magnitude or cost:

(a)  Alterations or additions to existing standpipes, sprinklers or interior fire alarm and signal systems or a change in use or an enlargement to spaces requiring such protection, as provided in subchapter seventeen of this code.

(b)  Alterations, replacements or new installations of equipment for heating or storing water, as provided in reference standard RS-16.

(c)  Projections beyond the street line, as provided in subchapter four of this code.

(d)  Sprinkler, alarm protection, and emergency lighting requirements for places of assembly, as provided in subchapter eight of this code.

[(e)  Plumbing fixtures required to be installed in conjunction with any change of use, enlargement or addition to any space classified in occupancy group F-4, a place of assembly, dormitory, public building, public bath, school or workers temporary facility, as provided in table RS 16-5 of section P104.1 of reference standard RS-16.]*

(e)** Interior finish work, as provided in section 27-348.

(f)*** Finish flooring and floor covering, as provided in section 27-351.

(g)†The installation or replacement of elevators, as provided in subchapter eighteen of this code.
*Copy in brackets not enacted but probably intended.*
*** As enacted but "(f)" probably intended.*
**** As enacted but "(g)" probably intended.*
*† As enacted but "(h)" probably intended.*

**§[C26-103.1] 27-115  Alterations exceeding sixty percent of building value.-** If the cost of making alterations in any twelve-month period shall exceed sixty percent of the value of the building, the entire building shall be made to comply with the requirements of this code, except as provided in section 27-120 of this article.

**§[C26-103.2] 27-116  Alterations between thirty percent and sixty percent of building value.-** If the cost of making alterations in any twelve-month period shall be between thirty percent and sixty percent of the value of the building, only those portions of the building altered shall be made to comply with the requirements of this code, except as provided in sections 27-120 and 27-121 of this article.

**§[C26-103.3] 27-117  Alterations under thirty percent of building value.-** Except as otherwise provided for in sections 27-120 and 27-121 of this article, if the cost of making alterations in any twelve month period shall be under thirty percent of the value of the building, those portions of the building altered may, at the option of the owner, be altered in accordance with the requirements of this code, or altered in compliance with the applicable laws in existence prior to December sixth, nineteen hundred sixty-eight, provided the general safety and public welfare are not thereby endangered.

**§[C26-103.4] 27-118  Alterations involving change in occupancy or use.-**

(a)  Except as otherwise provided for in this section, if the alteration of a building or space therein results in a change in the occupancy group classification of the building under the provisions of subchapter three, then the entire building shall be made to comply with the requirements of this code.

(b)  Except as otherwise provided for in this section, if the alteration of a space in a building involves a change in the occupancy or use thereof, the alteration work involved in the change shall, except as provided for in this section, be made to comply with the requirements of this code and the remaining portion of the building shall be altered to such an extent as may be necessary to protect the safety and welfare of the occupants.

(c)  When, however, the cost of alterations involved in the change of occupancy of an existing building erected prior to December sixth, nineteen hundred sixty-eight or space therein authorizes the alterations to be made in compliance with the applicable laws in existence on such sixth day of December, nineteen hundred sixty-eight, such change in occupancy may similarly be made in compliance with such prior laws, provided the general safety and public welfare are not thereby endangered, and further provided that the alteration work shall effect compliance with all requirements of this code relating to interior finish work, finish flooring and floor covering, sprinklers, interior fire alarms, fire command and communication systems, elevators, smoke detectors, directional signs, emergency lighting and emergency power.

††**27-118.1    Illegal alterations involving change in occupancy.-** No person, except in accordance with all requirements of this code, shall convert, knowingly take part or assist in the conversion, or permit the maintenance of the conversion, of a residence which is legally approved for occupancy as a dwelling for one or more families, to a residence for occupancy as a dwelling for more than the legally approved number of families. Any person who shall violate or fail to comply with the provisions of this section shall be liable for a civil penalty which may be recovered in a proceeding before the environmental control board pursuant to the provisions of section 26-126.1 of this code.

22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff   Pg 260 of 654

Title 27 / Subchapter 1

Upon the finding of such violation and the imposition of the civil penalty, the Environmental Control Board shall forward to the Internal Revenue Service, the New York State Department of Taxation and Finance and the New York City Department of Finance the name and address of the respondent, the address of the building or structure with respect to which the violation occurred, and the time period during which the violation was found to have existed.

*†† Local Law 65-1997.*

**§[C26-103.5] 27-119 Alteration cost: building value.-** For the purpose of applying the foregoing provisions of this article, the cost of making alterations shall be determined by adding the estimated cost of making the proposed alterations computed as of the time of submitting the permit application, to the actual cost of any and all alterations made in the preceding 12-month period; and the value of the building shall be determined at the option of the applicant on the basis of one and one-quarter times the current assessed valuation of the building, as adjusted by the current State equalization rate, or on the basis of the current replacement cost of the building, provided that satisfactory evidence of current replacement cost is submitted to the commissioner.

**§[C26-103.6] 27-120 Alterations to multiple dwelling[s]\* and conversions to multiple dwellings.-** At the option of the owner, regardless of the cost of the alteration or conversion, an alteration may be made to a multiple dwelling or a building may be converted to a multiple dwelling in accordance with all requirements of this code or in accordance with all applicable laws in existence prior to December sixth, nineteen hundred sixty-eight, provided the general safety and public welfare are not thereby endangered.

*\*Copy in brackets not enacted but probably intended.*

**§[C26-103.7] 27-121 Alterations to residence buildings.-** Alterations to one- or two-family residence buildings erected under the provisions of the building code in effect prior to December sixth, nineteen hundred sixty-eight, and damaged by fire or other catastrophe to the extent of less than fifty percent of the value of the building (except as otherwise provided in section 27-297 of article four of subchapter four of this chapter) may be reconstructed in accordance with the provisions of the building code in effect prior to December sixth, nineteen hundred sixty-eight.

**§[C26-103.8] 27-122 Alterations involving conversions from seasonal to year round use.-**

(a) Buildings converted from seasonal use to year round use shall comply with the minimum building insulation standards as provided in reference standard RS 12-10, energy conservation in new building design, with the exception that the provisions as set forth in opinion 76-16, state of New York, public service commission, dated August thirteenth, nineteen hundred seventy-six, relating to noise control and fire rating shall not apply. The standards set forth in this code relating to noise control and fire rating and other applicable standards shall apply.

(b) All alterations performed in accordance with the requirements of this section shall also be in full compliance with the provisions of subchapter fourteen (inspections) of chapter one of title twenty-six of the administrative code to insure a method of controlled inspection of all converted buildings.

**§[C26-103.9] 27-123 Alterations involving high hazard occupancies.-** Any building erected prior to the effective date of this code (December sixth, nineteen hundred sixty-eight) and complying with section 27-117 of this article may be utilized for new high hazard occupancies without compliance with article two of subchapter six of this chapter on condition that the building or building section for such high hazard occupancy be provided with an approved one source automatic sprinkler system complying with the provisions of subchapter seventeen for B-1 occupancies regardless of the area thereof. Existing high hazard occupancies in structures erected prior to the effective date of this code and complying with section 27-117 of this article may continue to operate, subject to such fire protection requirements as the fire commissioner shall direct.

**\*\*27-123.1 Alterations, additions, repairs and changes in occupancy or use requiring facilities for people having physical disabilities.-** The provisions of subarticle two of article two of subchapter four of chapter one of title twenty-seven of this code shall apply to alterations, additions and repairs made to buildings, as well as to changes in occupancy or use, as set forth below. The provisions of sections 27-115, 27-116, 27-117, 27-118 and 27-120 of this code shall not govern the application of the provisions of such subarticle.

(a) The provisions of subarticle two of article two of subchapter four of chapter one of title twenty-seven of this code shall apply to an entire existing building, as if hereafter erected, when the costs of any alterations, additions or repairs, other than ordinary repairs, made within any twelve-month period immediately following the filing of the application exceed fifty percent of the cost of replacement of the building with one of similar floor space, as estimated by the department at the beginning of that twelve-month period. When such estimated costs of alterations, additions or repairs, other than ordinary repairs, do not exceed fifty percent of such replacement cost, then the provisions of subarticle two of article two of subchapter four of chapter one of title twenty-seven shall apply to such alterations, additions or repairs, although nothing herein is meant to discourage compliance with the standards set forth in subarticle two of article two of subchapter four of chapter one of title twenty-seven in other portions of buildings described in this sentence.

(b)  The provisions of subarticle two of article two of subchapter four of chapter one of title twenty-seven of this code shall apply to an entire existing building, as if hereafter erected, when there is a change in occupancy classification of the building. The provisions of subarticle two of article two of subchapter four of chapter one of title twenty-seven of this code shall apply to a space in a building when there is a change in the occupancy type thereof or in how such space is used.

(c)  When any work not otherwise required to comply with the provisions of subarticle two of article two of subchapter four of chapter one of title twenty-seven is done on an interior accessible route in existing residential buildings, other than in occupancy group J-3, which work involves plumbing fixtures, that work shall be required to comply with section 27-292.8 of this code for the extent of the work being performed, provided such work will not require any structural changes or additional partitions; ordinary repairs and replacement of existing piping shall be exempt from the provisions of this sentence.

(d)  Where additions or alterations subject parts of existing systems to loads exceeding those permitted herein, such parts shall be made to comply with this code.

(e)  The provisions of subarticle two of article two of suchapter four of chapter one of title twenty-seven of this code and of subdivisions b and c of this section shall not apply to the alteration of existing residential buildings, other than adult residential care facilities, which are classified in occupancy group J-2 and contain no more than three dwelling units or which are classified in occupancy group J-3 and are being altered to contain three dwelling units, and which satisfy the requirements of subdivision (d) of section 27-357 of this code, when the cost of any alterations, additions or repairs, other than ordinary repairs, made within any twelve-month period immediately following the filing of the application do not exceed fifty percent of the cost of replacement of the building with one of similar floor space, as estimated by the department at the beginning of that twelve-month period.
**Local Law 58-1987.**

* **§ 27-123.2  Provision of sprinklers in existing buildings.-** Notwithstanding any provision of law to the contrary, the provisions of section 27-954 of this code shall apply to alterations made to buildings, as well as to changes in occupancy or use, as set forth below:

(a)  The provisions of section 27-954 of this code shall apply to an entire existing building that is being altered, when such building is classified in occupancy group J-2 and will have four or more dwelling units upon the completion of the alterations, or is classified in occupancy group J-1, and when the costs of making any alterations to any such J-1 or J-2 building within any twelve-month period exceeds fifty percent of the building value.

(b)  The provisions of section 27-954 of this code shall apply to an entire existing building when the occupancy

classification of the building will change to a residential occupancy group other than occupancy group J-2 with not more than three dwelling units or occupancy group J-3.

(c)  The provisions of section 27-954 of this code shall apply to any space:

(1)  when alterations thereto involve a change in the occupancy or use thereof to a residential occupancy group other than occupancy group J-2 with not more than three dwelling units or occupancy group J-3, or

(2)  when the costs of making alterations thereto within any twelve-month period exceeds fifty percent of the value of the space.

(d)  For the purposes of this section, the cost of making alterations and the value of any such building or space shall be determined as set forth in section 27-119 of this chapter; provided, however, that for purposes of this section:

(1)  the cost of making alterations to a residential building shall be determined based on the aggregate cost of alterations to the residential Portions of such building, and the value of such a building shall be determined based on the aggregate value of the residential portions of the building, exclusive of the value of any non-residential portions of the building; and

(2)  the cost of making alterations to residential spaces in a non-residential building shall be determined based on the collective cost of alterations to such spaces, and the value of such residential spaces shall be determined based on the aggregate value of all such spaces in the building, exclusive of the value of any non-residential portions of the building.

(e)  When a system of automatic sprinklers is installed in any existing building or space pursuant to this section, such system shall comply with the requirements of this code and any other laws and rules applicable to the occupancy group in which such building or space is classified or in which such building or space would be classified if such building or space were classified under this chapter.
**Local Law 10-1999.**

### ARTICLE 5  MINOR ALTERATIONS: ORDINARY REPAIRS

§[C26-104.1]   **27-124  Minor alterations.-**  For the purposes of this code, the term "minor alterations" shall mean minor changes or modifications in a building or any part thereof, excluding additions thereto, that do not in any way affect health or the fire or structural safety of the building. Minor alterations shall not include any of the work described or referred to in section 27-126 of this article, or any other work for which a permit is required under the provisions of articles ten through seventeen of this subchapter.

§[C26-104.2]   **27-125  Ordinary repairs.-**

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff    Pg 262 of 654

Title 27 / Subchapter 1

For the purposes of this code, the term "ordinary repairs" shall mean replacements or renewals of existing work in a building, or of parts of the service equipment therein, with the same or equivalent materials or equipment parts, that are made in the ordinary course of maintenance and that do not in any way affect health or the fire or structural safety of the building or the safe use and operation of the service equipment therein. Ordinary repairs shall not include any of the work described or referred to in section 27-126 of this article or any other work for which a permit is required under the provisions of articles ten through seventeen of this subchapter.

### **§[C26-104.3]   27-126   Work not constituting minor alterations or ordinary repairs. -

(a)   For the purposes of this code, minor alterations or ordinary repairs shall not include the cutting away of any wall, floor, or roof construction, or any portion thereof; or the removal, cutting, or modification of any beams or structural supports; or the removal, change, or closing of any required means of egress; or the rearrangement or relocation of any parts of the building affecting loading or exit requirements, or light, heat, ventilation, or elevator requirements; nor shall minor alterations or ordinary repairs include additions to, alterations of, or rearrangement, relocation, replacement, repair or removal of any portion of a standpipe or sprinkler system, water distribution system, house sewer, private sewer, or drainage system, including leaders, or any soil, waste or vent pipe, or any gas distribution system, or any other work affecting health or the fire or structural safety of the building.

(b)   Minor alterations or ordinary repairs shall include the repair or replacement of any fixture, piping or faucets from the inlet side of a trap to any exposed stop valve.
**Local Law 51-2001.*

## ARTICLE 6  MAINTENANCE

### §[C26-105.1]   27-127   Maintenance requirements.- All buildings and all parts thereof shall be maintained in a safe condition. All service equipment, means of egress, devices, and safeguards that are required in a building by the provisions of this code or other applicable laws or regulations, or that were required by law when the building was erected, altered, or repaired, shall be maintained in good working order.

### §[C26-105.2]   27-128   Owner responsibility.- The owner shall be responsible at all times for the safe maintenance of the building and its facilities.

### *§[C26-105.3]   27-129   Exterior walls and appurtenances thereof.-
In order to maintain a building's exterior walls and appurtenances thereof in a safe condition, the following additional requirements shall apply to all existing buildings or buildings hereafter erected which are greater than six stories in height:

**(a)   Inspection requirements.-** A critical examination of an applicable building's exterior walls and appurtenances thereof shall be conducted at periodic intervals as set forth by rule of the commissioner, but such examination shall be conducted at least once every five years.

(1) The initial examination for any building in existence on February twenty-first, nineteen hundred eighty shall be conducted prior to February twenty-first, nineteen hundred eighty-two and the initial examination for any building thereafter constructed shall be conducted in the fifth year following the erection or installation of any exterior wall and/or enclosures.

(2) Such examination shall be conducted and witnessed by or under the direct supervision of a licensed architect or licensed professional engineer by or on behalf of the owner of the building.

(3) Such examination shall include, in addition to an inspection, a complete review of the most recently prepared report.

(4) Such examination shall also be conducted in accordance with applicable rules promulgated by the commissioner.

**(b)   Notification requirements.-** Whenever an architect or engineer learns through a critical examination of a building's exterior walls and appurtenances thereof of an unsafe condition prior to the filing of a report with the department of buildings pursuant to subdivision (c) of this section, he or she shall notify the owner and the department of buildings immediately in writing of such condition.

**(c)   Report of examination.-**Such architect or engineer shall submit a written report certifying the results of such examination to the commissioner, clearly documenting the condition of the exterior walls and appurtenances thereof, as either safe, unsafe or safe with a repair and maintenance program. The report shall include a record of all significant deterioration, unsafe conditions and movement observed as well as a statement concerning the watertightness of the exterior surfaces. Such report must be signed by and bear the professional seal of such architect or engineer.

**(d)   Necessary repairs.-**
(1)  Unsafe condition.
a.   Upon the filing of the architect's or engineer's report of an unsafe condition with the commissioner, the owner, his or her agent or the person in charge shall immediately commence such repairs or reinforcements and shall undertake such measures as may be required to secure public safety and to make the building's exterior walls or appurtenances thereof conform to the provisions of this code.
b.   All unsafe conditions shall be corrected within thirty days of the filing of the critical examination report.
c.   The architect or engineer shall inspect the premises and file an amended report setting forth the condition of the building within two weeks after

repairs to correct the unsafe condition have been completed.

d.    The commissioner may grant an extension of time of up to ninety days to complete the repairs required to correct an unsafe condition upon receipt and review of an initial extension application submitted by the architect or engineer together with such additional documentation as may be prescribed by rule.

e.    The commissioner may grant a further extension of time to complete the repairs required to remove an unsafe condition upon receipt and review of an application for a further extension submitted by the architect or engineer together with such further documentation as may be prescribed by rule.

(2) Safe condition with a repair and maintenance program. An architect or engineer shall not file a report of a safe condition with a repair and maintenance program for the same building for two consecutive filing periods unless the second such report is accompanied by his or her certification attesting to the correction of all conditions identified in the earlier report as requiring repair.

(e)  Exceptions.- The additional requirements imposed by this section shall not be applied to any part of an exterior wall which is less than twelve inches from the exterior wall of an adjacent building.

(f)  Violations.- Any person who shall violate, or refuse, or neglect to comply with any provisions of this section shall, upon conviction thereof, be punished by a fine of not more than one thousand dollars, or by imprisonment not exceeding six months, or both; and any such person shall, also, for each offense, be subject to the payment of a penalty in the sum of two hundred fifty dollars for each month there is non-compliance, to be recovered in a civil action brought in the name of the commissioner.

(g)  With respect to buildings in existence on March first, nineteen hundred ninety eight, the initial critical examination of an exterior wall which was not subject to such examination under the provisions of paragraph one of subdivision d of this section in effect prior to the effective date of this local law shall be conducted prior to March first, two thousand.
*Local Law 11-1998.*

## ARTICLE 7 MATERIALS, ASSEMBLIES, FORMS AND METHODS OF CONSTRUCTION

**§[C26-106.1]  27-130  General requirements.-** All materials, assemblies, forms, and methods of construction (hereinafter collectively referred to as "material" or "materials") which, in their use, are regulated by the provisions of this code, shall be subject to the requirements for acceptance, as provided in section 27-131 of this article and to the requirements for inspection, as provided in section 27-132 of this article, except as otherwise specifically provided by the provisions of this code. Materials which in their use do not require regulation and control in the interests of public safety, health, and welfare, are not subject to any requirement of acceptance, inspection, test, or approval under the provisions of this code.

**\*§[C26-106.2]  27-131  Acceptance requirements.-** The following requirements shall apply to the initial acceptance of all materials which, in their use, are regulated by the provisions of this code:

(a)  **Methods of acceptance.**-No material of any manufacturer or producer shall be acceptable for the use intended unless and until the material shall have been tested for compliance with code requirements under a test method prescribed by the code, or shall have been tested and approved by the commissioner or shall have been previously approved by the board of standards and appeals, unless such approval is amended or repealed by the commissioner.

(1) Code test method.- Whenever the code prescribes a method for testing any material, the material shall be tested in accordance with such test method (a) under the direction of an architect or engineer, or (b) by a testing service or laboratory acceptable to the commissioner. The commissioner may require the witnessing of tests by his or her representative. The test report showing compliance with code requirements and bearing the signature of the architect or engineer, or the signature of an officer of the testing service or laboratory, as the case may be, shall be filed with the department. The commissioner may require a certificate of the manufacturer or producer, certifying that the material tested was and is equivalent to material of the same kind and quality regularly being manufactured by such manufacturer or producer. Upon the filing of the test report, as provided above, the material shall be acceptable for the use intended, subject to the provisions of subdivisions (d) and (e) of this section.

(2) Commissioner approval.- Materials which in their use are regulated by the provisions of this code but cannot satisfy the requirements of paragraph one of this subdivision shall not be acceptable for the use intended unless and until the material shall have been tested and approved for such use by the commissioner. For the purposes of this requirement, all materials legally acceptable prior to July 1, 1991 shall be permitted subject to the provisions of subdivision d of this section.

(b)  **List of acceptable laboratories and materials.-** A current list of all testing services and laboratories acceptable to the commissioner for the purpose of testing materials, as provided in subparagraph (b) of paragraph one of subdivision (a) of this section and a current list of all acceptable materials, shall be maintained by the department and made available for public inspection.

(c)  **Certification of accepted materials.-** All shipments and deliveries of such materials shall be accompanied by a certificate or label certifying that the

material shipped or delivered is equivalent to the materials tested and acceptable for use, as provided in this section. Such certificate or label is to be provided (1) by the manufacturer or producer of the material, or (2) by a testing service or laboratory acceptable to the commissioner and regularly engaged by the manufacturer or producer to make periodic inspections and/or tests of the material in the course of manufacture or production. In the case of materials previously approved by the board of standards and appeals, the shipment or delivery of the material shall also be accompanied by a tag or label stating that the material has been approved for use by the board, and containing the calendar number under which the material received board approval.

**(d) Retesting of materials.-** All materials tested and acceptable for use, shall be subject to periodic retesting as determined by the commissioner; and any material which, upon retesting is found not to comply with code requirements or the requirements set forth in the approval of the commissioner shall cease to be acceptable for the use intended. During the period for such retesting, the commissioner may require the use of such material to be restricted or discontinued if necessary to secure safety.

**(e) Conflicting test results.-** Whenever there is evidence of conflicting results in the test of any material, the commissioner shall determine the acceptability of the material and/or the acceptable rating for such material.
*Local Law 49-1991.*

**\*§27-131.1 Reference Standards.-** The appendix to this chapter of the administrative code, known as the "building code reference standard", is adopted and promulgated and shall be known as the "building code rules" of said chapter; except for reference standards RS4-3, RS7-2, and such portions of RS16 not included in the "List of Referenced National Standards". The commissioner shall be empowered to issue or amend the building code reference standards acting in consultation with the fire commissioner on all issues relating to fire safety.
*Local Law 49-1991.*

**§[C26-106.3] 27-132 Inspection requirements.-** The following requirements shall apply to the inspection of all materials which, in their use, are regulated by the provisions of this code:

**(a) Controlled inspection.-** All such materials which are designated for "controlled inspection" under the provisions of this code shall be inspected and/or tested to verify compliance with code requirements. Unless otherwise specifically provided by code provisions, all required inspections and tests of materials designated for "controlled inspection" shall be made and witnessed by or under the direct supervision of an architect or engineer retained by or on behalf of the owner or lessee, who shall be, or shall be acceptable to, the architect or engineer who prepared or supervised the preparation of the plans; and the architect or engineer by whom, or under whose direct supervision, the required inspections and tests are made

and witnessed shall file with the department signed copies of all required inspection and test reports, together with his or her signed statement that the material and its use or incorporation into the work comply with code requirements, unless the filing of such reports and statements is specifically waived by code provisions. The provisions of section 27-195 of article nineteen of this subchapter relating to notice of commencement of work shall be complied with prior to the commencement of any work requiring controlled inspection.

**(b) Semicontrolled inspection.-** All such materials that are not designated for controlled inspection under the provisions of this code shall be subject to semicontrolled inspection and, as such, shall be inspected and/or tested to verify compliance with code requirements by the person superintending the use of the material or its incorporation into the work, except that all required inspections and tests may, at the option of the owner or lessee, be made and witnessed by or under the direct supervision of an architect or engineer retained by or on behalf of the owner or lessee, who shall be, or shall be acceptable to, the architect or engineer who prepared or supervised the preparation of the plans. The person superintending the use of the material or its incorporation into the work, or the architect or engineer by or under whose direct supervision the required inspections and tests are made and witnessed, as the case may be, shall file with the department signed copies of all required inspection and test reports, together with his or her signed statement that the material and its use or incorporation into the work comply with code requirements, unless the filing of such reports and statement is specifically waived by code provisions.

**(c) Off-site inspection.-** In all cases where code provisions require that the inspection and/or test of materials be made off-site, or prior to actual use or incorporation into the work, the inspector shall mark or cause to be marked for identification all units (or packages of units) of the material inspected; and the reported results of such inspection shall state that the material was so marked for identification.

**§[C26-106.4] 27-133 Alternate or equivalent materials.-** Whenever the code prescribes the use of a particular material, the commissioner may permit the use of any material shown to be equivalent for the use intended, in terms of health, fire, and/or structural safety. Nothing contained in this code shall be construed to require the use of any particular material for the purpose of meeting performance requirements of this code.

### ARTICLE 8  SERVICE EQUIPMENT

§[C26-107.1]  27-134  **General requirements.-** All service equipment and machinery and devices used in connection therewith (hereinafter collectively referred to as "equipment") which, in their use, are regulated by the provisions of this code, shall be subject to the requirements for acceptance, as provided in section 27-135, and to the requirements for inspection, as provided in section 27-136 of this article, except as otherwise specifically provided by the provisions of this code. Equipment which in its use does not require regulation and control in the interests of public safety, health, and welfare, is not subject to any requirement of acceptance, inspection, test, or approval under the provisions of this code. Elements or appurtenances of equipment or machinery which are in conformity with specifications relating thereto in this code, or which may be designed in their entirety in accordance with accepted engineering design principles based on provisions of this code are not subject to the requirements for acceptance.

§[C26-107.2]  27-135  **Acceptance requirements.-** The requirements for acceptance of materials, as provided in section 27-131 of article seven of this subchapter, shall apply to the initial acceptance of all equipment which, in its use, is regulated by the provisions of this code; and for this purpose, the word "equipment" shall be substituted for the words "or materials" wherever those words occur in section 27-131 of article seven of this subchapter.

§[C26-107.3]  27-136  **Inspection requirements.-** The requirements for inspection of materials, as provided in section 27-132 of article seven of this subchapter, shall apply to the inspection of all equipment which, in its use, is regulated by the provisions of this code; and for this purpose, the word "equipment" shall be substituted for the words "material" and "materials" wherever those words occur in section 27-132 of article seven of this subchapter.

§[C26-107.4]  27-137  **Alternate or equivalent equipment.-** Whenever the code prescribes the use of particular equipment, the commissioner may permit the use of any equipment shown to be equivalent for the use intended, in terms of health, fire and/or structural safety. Nothing contained in this code shall be construed to require the use of any particular equipment for the purpose of meeting performance requirements of this code.

### ARTICLE 9  APPROVAL OF PLANS

§[C26-108.1]  27-138  **Separate approval of plans required.-** Whenever plans are required to be submitted in connection with applications for work permits, as provided in articles ten through seventeen of this subchapter, separate application shall be made for the approval of the plans

therefor. The application may be made at or prior to the time of submitting the work permit application.

§[C26-108.2]  27-139  **Application for approval of plans.-** Applications for approval of plans shall be made on forms furnished by the department, and shall be accompanied by the required fee. The application shall contain a general description of the proposed work, its location, and such other pertinent information as the commissioner may require. All applications for approval of plans for any new construction, in which plumbing fixtures are to be installed, shall be accompanied by the following:

1. Information as to the availability of a public sewer system.

**2.In the event that a private sewage treatment plant is proposed, evidence of submission of plans for approval of such plant to the department of environmental protection and the department of health as required by law[shall be submitted. In the case of plans for the construction of new buildings or the alteration of existing buildings, separate application may be made for the approval of:

(a)  the lot diagram showing compliance with the zoning resolution, as provided in paragraph one of subdivision (a) of section 27-157 of article eleven of this subchapter;

(b)  the foundation plans, as provided in paragraphs one and seven of subdivision (b) of section 27-157 of article eleven of this subchapter;

(c)  the floor and roof plans showing compliance with exit requirements, as provided in paragraph three of subdivision (a) of section 27-157 of article eleven of this subchapter;

(d)  the detailed architectural, structural and mechanical drawings, as provided in subdivisions (a) through (c) of section 27-157 of article eleven of this subchapter.
***Local Law 65-1996.*

*§[C26-108.3]  27-140  **Applicant.-** Applications for approval of plans shall be made in behalf of the owner or lessee or condominium unit owner or cooperative shareholder by the person who prepared or supervised the preparation of the plans, and shall be accompanied by a signed statement of the owner, condominium board of managers or cooperative board of directors stating that the applicant is authorized to make the application. In the case of applications for approval of plans for the construction or alteration of buildings, for the installation or alteration of plumbing or plumbing systems, or for the installation or alteration of service equipment which involves changes in the structure of the building or requirements for fire protection, light, heat, ventilation, or means of egress, the application shall be made by protection, light, heat, ventilation, or means of egress, the application shall be made by an architect or

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 266 of 654

Title 27 / Subchapter 1

engineer. The full names and addresses of the owner, including the condominium unit owner or cooperative shareholder, lessee, and applicant, and of the principal officers thereof, if a corporation, shall be set forth in the application.
*Local Law 72-1991.*

## ** §27-140.1 Registration requirements.-

(a)  No person, other than those described in subdivision (c) of this section, may present, submit, furnish or seek approval of applications for approval of plans or remove any documents from the possession of the department, without first having registered with the department his or her name, address and company affiliation on a form to be furnished by the department. Consistent with article twenty-three-A of the correction law, registration may be denied to any person who has been convicted of a criminal offense relating to bribing or receipt of a bribe, giving or receiving unlawful gratuities, official misconduct, or other corruption-related acts.  The commissioner, after due notice and a hearing before the office of administrative trials and hearings, pursuant to section one thousand forty-eight of the charter and rules established thereunder, shall have the power to revoke, suspend or limit the registration of any person upon a finding that such person has willfully or negligently violated the rules of the department or has engaged in any misconduct arising out of his or her business dealings with the department. Misconduct shall be defined by the rules of the commissioner promulgated pursuant to subdivision (d) of this section.

(b)  No person shall use the term "registered with the department of buildings", "registered" or any similar representation in such a manner as to convey the impression that such person is registered with the department of buildings unless such person is registered in accordance with the provisions of this section.

(c)  The following persons are exempt from the provisions of this section:

(i)    the owners of the premises for which the building applications are filed including, in the case of partnerships or corporations, the general partners or the principal officers of the corporation. Principal officers of a corporation shall include the president, vice presidents, secretary and treasurer;

(ii)  the lessees of such premises authorized by the owner to file building applications;

(iii) condominium unit owners authorized by the condominium board of managers to file building applications;

(iv) cooperative shareholders authorized by the cooperative board of directors to file building applications;

(v)  registered architects licensed by the New York state department of education;

(vi) professional engineers licensed by the New York state department of education;

(vii) attorneys admitted to practice in New York state;

(viii) master plumbers licensed pursuant to article two of subchapter two of chapter one of title twenty-six of this code;

(ix) master fire suppression piping contractors licensed pursuant to article two of subchapter two of chapter one of title twenty-six of this code; and

(x) master electricians licensed pursuant to subchapter one of chapter three of title twenty-seven of this code.

(a)  the commissioner shall promulgate rules for the proper and efficient administration and enforcement of this section.
*Local Law 72-1991.*

## §[C26-108.4]  27-141  Plans.- With each application for approval of plans, there shall be submitted such number of copies of the plans as the commissioner may require. All plans shall comply in form and content with requirements of this code and other applicable laws and regulations.

## §[C26-108.5]  27-142  Applicant's statement.-

(a)  A signed statement of the applicant shall also be submitted with the application, stating that he or she is authorized by the owner to make the application and that, to the best of his or her knowledge and belief, the plans and the work shown thereon comply with the provisions of this code and other applicable laws and regulations. If there are practical difficulties in the way of carrying out the strict letter of the law, the applicant shall set forth the nature of such difficulties in such signed statement.

(b)  In addition to all other requirements of this article, an application for approval of plans for the alteration of an existing building or the construction of a new building shall be accompanied by a signed statement of the applicant certifying either (1) that the building to be altered, or the site of the new building, as the case may be, contains no occupied housing accommodations subject to control under chapter three of title twenty-six of the administrative code, or (2) that the owner has notified the city rent agency of his or her intention to file such plans and has complied with all requirements imposed by the regulations of such agency as preconditions for such filing.

## §[C26-108.6]  27-143  Examination of application and plans.- All applications for approval of plans and all plans submitted in connection therewith, and any amendments thereto, shall be numbered, docketed and examined promptly after their submission. The examination shall be made under the direction of the commissioner for compliance with the provisions of this code and other applicable laws and regulations. The commissioner may at his or her discretion, when the application is submitted by an architect or an engineer,

designate portions of the examination for limited supervisory check. The personnel employed for examination of plans shall be qualified engineers or architects experienced in building construction and design.

**\*§[C26-108.7] 27-144  Approval of application and plans.-**
Except as otherwise provided in section 27-198 and section 27-198.1 of article nineteen of this subchapter, applications and plans complying with the provisions of this code and other applicable laws and regulations shall be approved by the commissioner and written notice of approval shall be given the applicant promptly and no later than forty calendar days after the submission thereof, and applications and plans failing to comply with the provisions of this code and other applicable laws and regulations shall be rejected and written notice of rejection, stating the grounds of rejection, shall be given the applicant promptly and not later than forty calendar days after the submission thereof, except that on or before the fortieth day, the commissioner may on good cause shown, and upon notification to the applicant, extend such times for an additional twenty days. Whenever an application and accompanying plans have been rejected and are thereafter revised and resubmitted to meet stated grounds of rejection, the revised application and plans shall be approved if they meet the stated grounds of rejection, or shall be rejected if they fail to meet the stated grounds of rejection; and written notice of approval or written notice of rejection, stating the grounds of rejection, shall be given the applicant promptly and not later than twenty calendar days after the resubmission thereof.
*Local Law 76-1985, language juxtaposed per Ch. 907-1985.*

**§[C26-108.8] 27-145  Conditional approval of plans.-**
All approvals of plans given prior to the submission of the work permit application shall be conditioned upon and subject to compliance with the requirements of this code and other applicable laws and regulations in effect at the time of submission of the permit application, and shall also be conditioned upon the submission of the work permit application not later than twelve months after the date of notice of plan approval.

**§[C26-108.9] 27-146  Endorsement of approved plans.-**
All plans and amendments thereto, when approved by the commissioner, shall be stamped or endorsed approved under the official seal of the department, followed by a notation of the date of plan approval. One set of such approved plans shall be retained in the department office of the borough in which the building premises or equipment is located; and after the issuance of a work permit, a second set of such approved plans shall be retained at the place where the building premises or equipment is located, and shall be open at all times to inspection by the commissioner and his or her authorized representatives until final inspection of the work is completed.

## ARTICLE 10  PERMITS

**§[C26-109.1]  27-147  When permits required.-**
No building construction or alteration work, foundation or earthwork, demolition or removal work, or plumbing work shall be commenced, and no signs or service equipment of the types listed in articles sixteen and seventeen of this subchapter shall be erected, installed, altered, repaired, or used, nor shall any service equipment of the types listed in article eighteen of this subchapter be used or operated, unless and until a written permit therefor shall have been issued by the commissioner. The provisions of this section shall not apply, however, to minor alterations and ordinary repairs, as defined and delineated in article five of this subchapter or to work or equipment exempted from permit requirements under the provisions of sections 27-176, 27-179, 27-184, and 27-189 of this subchapter.

**§[C26-109.2]  27-148  Classification of permits.-**
For the purposes of this code, permits shall be classified as follows:

**(a)  New building permits**: for the construction of new buildings, as provided in article eleven of this subchapter.

**(b)  Alteration permits**: for the alteration of existing buildings, as provided in article twelve of this subchapter.

**(c)  Foundation and earthwork permits**: for the construction or alteration of foundations, including earthwork excavation and fill, as provided in article thirteen of this subchapter.

**(d)  Demolition and removal permits**: for the demolition or removal of existing buildings, as provided in article fourteen of this subchapter.

**(e)  Plumbing permits**: for the installation or alteration of plumbing and plumbing systems including gas piping, as provided in article fifteen of this subchapter.

**(f)  Sign permits**: for the erection or alteration of signs and sign installations, as provided in article sixteen of this subchapter.

**(g)  Equipment work permits**: for the installation or alteration of service equipment, as provided in article seventeen of this subchapter.

**(h)  Equipment use permits**: for the use and operation of service equipment, as provided in article eighteen of this subchapter.

**\*\* §[C26-109.3] 27-149 Separate permits required.-**
Separate permits shall be required, as provided above, except that separate permits for foundations and earthwork, or for the installation or alteration of service equipment, other than fire suppression piping systems,

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 268 of 654

Title 27 / Subchapter 1

shall not be required whenever plans for such work are included in and form a part of the plans for the construction of new buildings or the alteration of existing buildings.
*** Local Law 107-1993.**

**\*§[C26-109.4]  27-150  Application for permit.-**
All applications for permits shall be submitted on forms furnished by the department, and shall be accompanied by the required fee. The application shall contain a general description of the proposed work or equipment, its location, and such other pertinent information as required pursuant to section 27-198.1 or as the commissioner may require.
*Local Law 76-1985, language juxtaposed per Ch. 907-1985.*

**§[C26-109.5]  27-151  Applicant.-** Applications for permits shall be made by or in behalf of the owner or lessee of the buildings; and if made by a person other than the owner, the application shall be accompanied by a signed statement of the applicant declaring that he or she is authorized by the owner to make the application. The full names of the owner, lessee, and applicant, and of the principal officers thereof, if a corporation, shall be set forth in the application.

**§[C26-109.6]  27-152  Other application requirements.-**
In addition to the foregoing general requirements, applications for permits shall be subject to the further requirements of articles eleven through eighteen of this subchapter, as the same may be applicable.

**\*\*  §[C26-109.7]  27-153  Place of filing applications.-**
Except as otherwise provided by rule, applications for permits and accompanying papers and plans shall be filed in the department office in the borough in which the work or equipment is located. Applications shall be numbered and docketed promptly as received; and for purposes of identification and reference, all such papers shall be marked with the block and lot number of the property to which they apply, and with street and house number where possible.
*** Local Law 107-1993.**

**§[C26-109.8]  27-154  Amendments to applications.-**
Subject to the limitations of section 27-155 of this article, amendments to permit applications and any accompanying plans and papers may be submitted at any time before final inspection of the work or equipment is completed; and such amendments shall be deemed part of the original permit application and shall be filed therewith.

**§[C26-109.9]  27-155  Time limitation of application.-**
An application for a permit shall be deemed to have been abandoned twelve months after date of submission, unless such application has been diligently prosecuted after rejection in whole or in part, or a permit shall have been issued under article nineteen of this subchapter except that the commissioner may, for reasonable cause, grant extensions of time for additional twelve month periods.

### ARTICLE 11  APPLICATIONS FOR NEW BUILDING PERMITS

**§[C26-110.1]  27-156  General requirements.-** All applications for new building permits shall be subject to the requirements of articles nine and ten of this subchapter. In addition, each such application shall set forth the name and business address of the person who is to perform the proposed work, and shall be accompanied by satisfactory evidence of compliance with the provisions of the workers compensation law.

**§[C26-110.2]  27-157  Plans required.-** All such applications shall be accompanied by architectural, structural, and mechanical plans, which shall be complete and of sufficient clarity to indicate the entire nature and extent of the proposed construction work and its compliance with the provisions of this code and other applicable laws and regulations. Composite plans showing architectural, structural, and mechanical parts of a building may be submitted provided that a clear understanding of each part is not impaired. The plans may be submitted with the application for the permit or prior thereto, as provided in section 27-138 of article nine of this subchapter; and the same set of plans may be used for several buildings of the same construction, if such buildings are located on adjoining lots under the same ownership, and if permit applications therefore [*sic*] are filed simultaneously. All such plans shall be drawn to suitable scale and shall be reproduced upon substantial paper, plastic, or cloth, as the commissioner may require; and each plan or drawing shall contain the registration number, seal, signature, and address of the architect or engineer who prepared or supervised the preparation of the plans. Whenever equipment, materials, assemblies, forms, or methods of construction are subject to "controlled inspection", as provided in sections 27-131 and 27-135 of this subchapter, all such equipment, materials, assemblies, forms, or methods of construction shall be listed on the title sheet of the plans, or the sheet immediately following as subject to "controlled inspection" in accordance with code requirements. In no case shall the code be cited or the term "legal" or its equivalent used as a substitute for specific reference to particular code section or standard in order to show compliance with code requirements or other applicable laws or regulations**.**

  **(a)  Architectural plans** shall contain at least the following data and information:
    (1) Lot diagram showing compliance with the zoning resolution, and indicating the size, height and

22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff   Pg 269 of 654

Title 27 / Subchapter 1

location of the proposed construction and all existing structures on the site and their distances from lot and street lines, the established grade and existing curb elevations, and final grade elevations of the site shown by contours or spot grades at reasonable intervals. The lot diagram shall be drawn in accordance with an accurate boundary survey, made by a licensed surveyor, which shall be attached to and form part of the lot diagram.

(2) A statement or notation as to the occupancy group or groups that apply to the building and all parts thereof, the construction class of the building, and whether the building is inside or outside of the fire districts.

(3) Floor and roof plans showing compliance with exit requirements, and with sufficient elevations and cross-sections to indicate all means of egress, and including the number of stories in all parts of the building.

(4) Detailed drawings necessary to show adequately all architectural elements of the building, including those doors, windows, and interior finish schedules, and other details necessary to substantiate all required fire-protection characteristics.

**(b) Structural plans** shall contain at least the following data and information except as provided for in section 27-590 of article one of subchapter ten of this chapter:

(1) Foundation plans, floor plans, levels, and sections, showing all structural requirements.

(2) Detailed drawings showing sizes, sections, and locations of members, and such other information as may be required to indicate clearly all structural elements and special structural engineering features.

(3) A tabulation of the vertical live loads, both uniform and concentrated (including allowances of partition loads), used in the design of the several areas and levels of the building. The locations and loads of each piece of machinery and equipment having a weight in excess of one thousand pounds shall be noted.

(4) Column schedules showing the design load contributed by the framing at any level and the total accumulated design load at each level.

(5) Where trusses are employed, a diagram or table indicating the loads or moments in the various members under the design loading conditions. The requirement for a diagram or table will be waived when the trusses consist of elements selected from load tables or similar data, subject to the requirements for verification in section 27-590 of article one of subchapter ten of this chapter.

(6) Where prestressed members are employed, a schedule or table showing the total prestressing forces and the method and sequence of application.

(7) Foundation plans shall comply with the requirements of subchapter eleven of this chapter and shall show the plan locations, design elevations of the bottoms, and details as to sizes, reinforcements, and construction of all footings, piers, foundation walls, pile groups, and pile caps. The levels of footings of adjacent structures shall be indicated or, if the adjacent structures

are pile supported, this shall be so stated. In addition, there shall be a statement indicating the character and minimum class of the soil strata required for the support of the foundation; the allowable soil pressure used for the design of footings; and the character, class, and presumptive bearing capacity of the bearing stratum to which piling is required to penetrate. The types and design capacities of piling and the records of required borings or test pits shall also be shown.

**(c) Mechanical plans** shall contain at least the following data and information:

(1) The plumbing, heating, ventilating, refrigeration, and other mechanical work to be performed, so drawn as to conform to the architectural and structural aspects of the building. If desired, plans may be composite plans showing one or more types of systems on each plan, provided that a clear understanding of each system shown is not thereby impaired.

(2) Details for each type of work to be performed, and for each type of equipment to be installed, shall be shown, as provided in sections 27-173 and 27-182 of this subchapter.

(3) Information as to the availability of a public sewer system.

** (4) In the event a public sewer system is not available, alternate provisions for disposal of storm water and sanitary sewage. If private sewers are to be constructed pursuant to subdivision b of section fourteen hundred three of the New York city charter, a copy of the sewer plan. If a private sewage treatment plant is to be constructed, a copy of plans of the plant approved by the department of health and the department of environmental protection. If an individual on site private sewage disposal system is to be installed, a site and subsoil evaluation indicating that the site and subsoil conditions comply with the applicable law and rules.
**\*\*Local Law 65-1996.**

**\*§[C26-110.3] 27-158 Datum. -** All elevations on plans shall be referred to the United States coast and geodetic survey mean sea level datum of nineteen hundred twenty-nine (national geodetic vertical datum, NGVD), as provided in section 26-208 of chapter one of title twenty-six of the administrative code, as amended. The following table shall be used to convert NGVD to borough datum elevations:

| Location: | Add to NGVD to obtain borough datum |
|---|---|
| Bronx.................…….....……......... | +2.608 |
| Brooklyn.............……....……....….. | +2.547 |
| Manhattan.........…….…….…....... | +2.752 |
| Queens.................……..……...... | +2.725 |
| Staten Island.........…….…….......... | +3.192 |

**\*Local Law 33-1988.**

**§[C26-110.4]  27-159  Additional information.-**  In addition to the data and information specified under subdivisions (a) through (c) of section 27-157 of this article, the commissioner may require the submission of computations, test reports, and such other data and information as may be necessary to determine compliance with code provisions and other applicable laws and regulations.

**\*\*§[C26-110.5]  27-160  Certification of performance bond, license and insurance required.-**
\*\*\*(a) An applicant for a permit who, pursuant to section 24-526 of the administrative code, is required to construct or repair defects in catch basins or sewers which lie outside of the property shall submit to the department certification from the department of environmental protection that the applicant or owner has provided such department with:

(1) a performance bond or other security satisfactory to such department and approved as to form by the law department of the city for the full cost, as estimated by such department, of constructing the part of the storm water drainage system for such property which shall lie outside of such property and repairing defects in such construction, if and as required by section 24-526 of the administrative code;

(2) any license or other written instrument which such department or the law department of the city may reasonably request which gives such department, its agents and contractors and the surety for a performance bond described in paragraph one of this subdivision the legal right to enter private property to perform work described in paragraph one of this subdivision, pursuant to the terms of the performance bond or in accordance with the conditions of acceptance of other security described in paragraph one of this subdivision, and the legal right to connect to, to extend or to discharge storm water into any private sewer authorized as a point of disposal pursuant to section 24-526 of the administrative code, in the event that the owner of property fails to do so, if and as required pursuant to section 24-526 of the administrative code; and

(3) insurance of a kind and in an amount which such department and the law department of the city deem satisfactory to insure the city fully for all risks of loss, damage to property or injury to or death of persons to whomever occurring, arising out of or in connection with the performance of all work described in this section.

(b) The provisions of this section shall not be construed to abrogate or contravene any contractual obligation of the city to construct storm water drainage systems or parts thereof. The requirements of subdivision (a) of this section shall be inapplicable to an applicant for a new building permit insofar as they relate to any construction work required to be performed by the city pursuant to such a contractual obligation.

*\*\*Note for Excerpts from Local Law 7-1974, see end of Subchapter 1.*
*\*\*\*Local Law 65-1996; Local Law 103-1989.*

## ARTICLE 12 APPLICATIONS FOR BUILDING ALTERATION PERMITS

**§[C26-111.1]  27-161  General requirements.-**
All applications for permits to alter existing buildings shall be subject to the requirements of articles nine and ten of this subchapter and section 27-156 of article eleven of this subchapter.

**\*\*\*§[C26-111.2]  27-162  Plans required.-** All such applications shall be accompanied by such architectural, structural, and mechanical plans as may be necessary to indicate the nature and extent of the proposed alteration work and its compliance with the provisions of this code and other applicable laws and regulations. To the extent necessary, all such applications and plans shall be subject to and shall comply with the requirements of sections 27-157, 27-158, and 27-159 of article eleven of this subchapter. Whenever the proposed alteration work consists of the construction of a substantial horizontal enlargement as defined in subdivision (a) of section P110.2 of reference standard RS-16, the applicant shall submit information as to the availability of a public sewer system pursuant to paragraph three of subdivision (c) of section 27-157 of this code as well as an evaluation of the adequacy of any existing system for the disposal of storm water by any means other than storm or combined sewers, prepared pursuant to paragraph four of subdivision (c) of section 27-157 of this code. The plans may be submitted with the application for the permit or prior thereto, as provided in section 27-138 of article nine of this subchapter.
*\*\*\* Local Law 103-1989.*

## ARTICLE 13 APPLICATIONS FOR FOUNDATION AND EARTHWORK PERMITS

**§[C26-112.1]  27-163  General requirements.-** All applications for foundation and earthwork permits shall be subject to the requirements of articles nine and ten and section 27-156 of article eleven of this subchapter. When the permit sought is solely for earthwork excavation operations, the applicant shall also submit satisfactory evidence that the property is free from any lien for unpaid city taxes, assessments, water rates, bail bonds, or judgments obtained by the city, together with the consent in writing of the mortgagee, if there is any mortgage upon the property, and the consent in writing of the surrogate's court or the supreme court, if the owner of the property is a minor or incompetent.

**§[C26-112.2]  27-164  Plans required**.- All such applications shall be accompanied by a lot diagram, as provided in paragraph one of subdivision (a) of section 27-157 of article eleven of this subchapter, and foundation plans, as provided in subdivision (b)

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 271 of 654

Title 27 / Subchapter 1

of section 27-157 of article eleven of this subchapter, except that when the permit sought is solely for earthwork excavation or fill operations, the applicant shall submit, in lieu of foundation plans, plans showing the exact location, extent, and depth or height of the proposed excavation or fill operation.

**§[C26-112.3] 27-165 Notice to adjoining owners.-** No foundation or earthwork permit shall be issued unless and until at least five days prior written notice of the permit application shall have been given by the applicant to the owners of all adjoining lots, buildings and service facilities which may be affected by the proposed foundation work or earthwork operations.

**§[C26-112.4] 27-166 Protection of adjoining properties.-** All foundation and earthwork operations shall be performed in accordance with the requirements of subchapters eleven and nineteen of this code; and all lots, buildings and service facilities adjoining the foundation and earthwork areas shall be protected and supported in accordance with the requirements of subchapters eleven and nineteen of this code and subchapter seventeen of chapter one of title twenty-six of the administrative code.

## ARTICLE 14 APPLICATIONS FOR DEMOLITION AND REMOVAL PERMITS

**§[C26-113.1] 27-167 General requirements.-** All applications for demolition or removal permits shall be subject to the requirements of article ten, section 27-156 of article eleven, section 27-198 and section 27-198.1 of article nineteen of this subchapter.

**§[C26-113.2] 27-168 Requirement of certifications.-**
(a)  Prior to the issuance of the permit, all gas, electric, water, steam, and other service lines to the building shall be disconnected and certifications to that effect by the respective utility companies or city agencies having jurisdiction shall be filed with the department; and the applicant shall also file with the department a certification by a licensed exterminator that the building has been treated effectively for rat extermination.

(b)  In addition to all other requirements of this article, an application for a permit for the demolition or removal of an existing multiple dwelling shall be accompanied by a signed statement of the applicant certifying either (1) that the dwelling contains no occupied housing accommodations subject to control under chapter three of title twenty-six of the administrative code, or (2) that the owner has notified the city rent agency of his or her intention to apply for such permit and has complied with all requirements imposed by the regulations of such agency as preconditions of such application.

**§[C26-113.3] 27-169 Notice to adjoining owners.-** No demolition or removal permit shall be issued unless and until at least five days prior written notice of the permit application shall have been given by the applicant to the owners of all adjoining lots, buildings and service facilities which may be affected by the proposed demolition or removal work.

**§[C26-113.4] 27-170 Protection of lot and adjoining properties.-** All demolition and removal operations shall be performed in accordance with the requirements of subchapter nineteen of this chapter; and after the building has been demolished or removed, the premises shall be maintained free from all unsafe or hazardous conditions by the proper protection of the lot, restoration of grades, and the erection of necessary retaining walls and fences in accordance with the provisions of article three of subchapter eighteen of this chapter.

**§[C26-113.5] 27-171 Requirement of photographs.-**
(a)  Except as otherwise provided herein, all applications for permits for the demolition or removal of existing buildings shall be accompanied by two sets of photographs of the building or buildings to be demolished or removed. Both sets of photographs shall be received by the department on behalf of the landmarks preservation commission and the municipal archives division of the department of records and information services.

(b)  The commissioner, upon the advice of the commissioner of the department of records and information services and the chairperson of the landmarks preservation commission, shall promulgate such rules and shall prescribe such specifications as may be necessary to carry out the provisions of this section.

(c)  Where photographs are otherwise required to be submitted to the landmarks preservation commission, applications for demolition or removal permits submitted on behalf of the department of housing preservation and development, shall be exempt from the requirements of this section.

(d)  Permits authorized pursuant to section 26-243 of the administrative code, shall be exempt from the requirements of this section.

## ARTICLE 15 APPLICATIONS FOR PLUMBING PERMITS

**§[C26-114.1] 27-172 General requirements.-** All applications for plumbing permits shall be subject to the requirements of articles nine and ten of this subchapter. In addition, each such application shall set forth the name and business address of the licensed master plumber who is to perform or supervise the proposed work, and shall be

accompanied by satisfactory evidence of compliance with the provisions of the workers' compensation law.

**§[C26-114.2] 27-173  Plans required.-** Except as provided in section 27-174 of this article, all applications for plumbing permits shall be accompanied by plans which shall be complete and of sufficient clarity to indicate the nature and extent of the plumbing work to be performed and its compliance with provisions of this code and other applicable laws and regulations. The plans may be submitted with the application for the permit or prior thereto, as provided in article nine of this subchapter. All plans for plumbing work shall comply with the applicable provisions of section 27-157 of article eleven of this subchapter. In addition, the plans shall contain at least the following data and information:

(a)  Single line or diagrammatic plans showing the location, layout, and spacing of all plumbing fixtures, the summation of plumbing loads, the size, location, and material for all building sewers and drains, and the soil, waste, vent, water, and gas distribution piping.

(b)  One floor plan for floors with typical layouts; and stack details shown on one drawing, provided that such details are clearly identified as to location and stack number.

(c)  A riser diagram showing:

(1)  Story heights.

(2)  All plumbing fixtures with diagrammatic arrangement of their connections to soil, waste, and vent piping.

(3)  All soil, waste, and vent stacks from the point of connection with the building drain to their termination above the roof.

(4)  All leader and storm water piping from the point of connection with the building drain to the roof drain.

(5)  All water and gas risers.

(d)  In the case of plans for new plumbing systems, the relative elevation of the lowest fixture referred to the datum provided in section 27-158 of article eleven of this subchapter and the approximate inside top of the public sewers, and the number, size, and location of all proposed sewer connections and relative location and size of all water mains, leaders, and risers; and the plans shall be accompanied by a statement from the department of environmental protection, giving the minimum water pressure in the main serving the building. When required by the commissioner, such data shall also be included on plans for the alteration of existing plumbing systems.

(e)  All appurtenant equipment, including, but not limited to, pumps, ejectors, water tanks, and piping shall be indicated clearly on the plans.

**§[C26-114.3] 27-174 Exemptions from plan requirements.-** The submission of plans shall not be required for any of the following:

(a)  Plumbing or gas piping alterations requiring a repair slip as provided in section 27-175 of this article.

(b)  Plumbing for temporary installations used for exhibition purposes when not designed for sanitary use and not directly connected to a sewerage, water supply, or water distribution system.

(c)  Plumbing for temporary installations used in connection with construction operations, other than plumbing for temporary gas installations for which the submission of plans shall be required.

**\*§[C26-114.4] 27-175 Alteration and repair slip.** –

(a)  An application for a plumbing permit may be treated as an application for an alteration and repair slip where the total cost of the proposed work in the building, as certified by the permit applicant, does not exceed eighteen thousand dollars in any twelve-month period and the proposed work consists of any of the following:

(1) The installation of new plumbing or gas piping, or the rerouting of existing plumbing or gas piping.

(2) The addition of not more than two plumbing fixtures or fixture connections.

(3) The mounting of new plumbing fixtures on existing roughings, other than the mere replacement of existing fixtures constituting a minor alteration or ordinary repair under article five of this subchapter.

(4) The installation or replacement of backflow prevention devices.

(b)  Upon the approval of the application, an alteration and repair slip shall be issued in lieu of a plumbing permit, with same force and effect as if a plumbing permit had been issued.
*\*Local Law 51-2001,Local Law 6-1997.*

**§[C26-114.5] 27-176 Exemptions from permit requirement.-** Plumbing permits shall not be required for the installation or alteration of gas service piping or gas meter piping including meters, valves, regulators, and related equipment, when such work is to be performed and serviced and maintained by utility corporations subject to the jurisdiction of the public service commission; nor shall plumbing permits be required for the emergency repair of gas distribution piping when such work is performed by licensed master plumbers or by utility corporations subject to the jurisdiction of the public service commission, in order to alleviate hazardous conditions, provided that a written report describing the details of such repairs shall be filed with the commissioner upon completion of the work.

## ARTICLE 16 APPLICATIONS FOR SIGN PERMITS

**\*\*§[C26-115.1] 27-177 General requirements**.- All applications for permits to erect or alter signs or sign installations shall be subject to the requirements of

22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff   Pg 273 of 654

Title 27 / Subchapter 1

articles nine and ten of this subchapter. In addition, each such application shall set forth the name and business address of the licensed sign hanger who is to perform or supervise the proposed work and, if the sign or sign location is under the control of an outdoor advertising company, as defined in section 26-259 of this code, the name and, where provided by rule, the registration number of such outdoor advertising company. The application shall be accompanied by satisfactory evidence of compliance with the provisions of the workers' compensation law. Each permit shall have an identification number and shall authorize the erection, alteration or installation of the type of display described in the application. The identification number of the permit and, if the sign is under the control of an outdoor advertising company, the name and, where provided by rule, the registration number of such outdoor advertising company shall be displayed on the sign or on the building or premises on which the sign is located or both in a manner to be provided by rule. If a sign is otherwise in compliance with the administrative code, the zoning resolution and rules adopted pursuant to such provisions, the changing of copy on an existing permitted sign, specifically designed for the use of replaceable copy, and the painting, repainting, cleaning or other normal maintenance and repair of an existing permitted sign, not involving structural changes, shall not require a new permit pursuant to this article and sections 27-147 and 27-148 of the code. The changing of copy on a permitted sign not designed for the use of replaceable copy or any structural change of the sign or sign structure shall require a new permit pursuant to this article and sections 27-147 and 27-148 of the code. No permit for the erection, alteration or installation of a sign or sign structure issued pursuant to this article and sections 27-147 and 27-148 of the code shall be deemed to constitute permission or authorization to maintain a sign which would otherwise be illegal without a maintenance permit for an outdoor sign as required pursuant to section 26-253 of the code or which is otherwise illegal pursuant to any other provision of law nor shall any permit issued hereunder constitute a defense in an action or proceeding with respect to such an unlawful sign.

**\*\*Local Law 14-2001.**

**Footnote:** The following §§ 5,6,7,8 are unconsolidated provisions of Local Law 14 of 2001.

§5. The initial application for registration of an outdoor advertising company pursuant to section 26-260 of the administrative code, as added by section 3 of this local law, shall include a report to the department of buildings identifying:

(a) all signs and supporting structures therefor and

(b) all sign locations that are under the control of such outdoor advertising company and located in:

(i) zoning districts in which signs for advertising purposes are not permitted;

(ii) areas within a distance of two hundred linear feet from and within view of an arterial highway, as such term is defined under subdivision c of section 26-253 of the administrative code, as added by section 3 of this local law; and

(iii) areas within a distance of two hundred linear feet from and within view of a public park with an area of one half acre or more.

Notwithstanding any provision to the contrary of section 26-260 of the administrative code, as added by section 3 of this local law, the commissioner of buildings shall refuse to accept and may return the initial application for registration of an outdoor advertising company:

(i) where such business fails to submit the report required by this section; or

(ii) the commissioner has reasonable cause to believe that such report contains an incomplete or inaccurate listing of signs or sign locations which are required to be included therein.

In the event a company whose initial application for registration has been rejected by the commissioner of buildings pursuant to this subdivision fails thereafter to submit a report acceptable to the commissioner within a time frame specified by the department of buildings, and the commissioner, after notice and opportunity to be heard, affirms his or her determination that such company has not satisfied the requirements of this section, then such outdoor advertising company shall be deemed in violation of subdivision a of section 26-260 of the administrative code, as added by section 3 of this local law, and shall be subject to all provisions of section 26-262 of the administrative code, as added by section 3 of this local law, which apply to a outdoor advertising company which has not registered with the department of buildings. The department shall revoke the registration of an outdoor advertising company if it is subsequently determined by the commissioner, after notice and opportunity to be heard, that such company has filed an incomplete or inaccurate listing of signs which are required to be included in the report provided for under this section, and such company knew or should have known that the listing was incomplete or inaccurate. Notwithstanding the provisions of section six hundred sixty six of the charter, such determinations by the commissioner shall not be subject to review by the board of standards and appeals. The commissioner shall make all reports filed pursuant to this section accessible to the public.

§6.

(a) In addition to the report described in section 5 of this local law, an outdoor advertising company may elect to include in its initial application for registration pursuant to section 26-260 of the administrative code, as added by section 3 of this local law, a compliance plan, prepared in such form

and according to such standards as shall be specified by rules of the department of buildings with regard to such plans and amendments thereto, which plan shall include a schedule for the permanent removal of all signs and any supporting structures therefor which were installed, erected, attached, affixed, painted on, or in any other manner represented on a building or premises prior to December 22, 2000 which are identified in the report submitted pursuant to section 5 of this local law. Such removal shall take place within three annual periods following the commissioner's acceptance of the compliance plan, based on his or her determination that such plan satisfies all requirements of this section. The removal schedule included with such compliance plan shall provide for the removal of equal numbers of signs and any supporting structures therefor during the course of each of such three annual periods, at regular intervals within such annual periods as specified by rule of the department. Such compliance plan shall not include signs which have legal non-conforming use status pursuant to the zoning resolution, provided the outdoor advertising company provides evidence of such status in a form satisfactory to the commissioner. Notwithstanding any provisions to the contrary of subdivision a of section 26-261 of the administrative code, as added by section 3 of this local law, an outdoor advertising company shall not be required to submit a certification pursuant to such subdivision with respect to signs included in the compliance plan provided that the sign is in compliance with the schedule for its removal pursuant to such plan.

(b)  For each sign and any supporting structure therefor included in a compliance plan, the outdoor advertising company shall submit to the department of buildings as part of such compliance plan an instrument, in a form satisfactory to the commissioner of buildings, executed by all persons parties or entities to whom notice is required to be given pursuant to subdivision b of section 26-127.3 of the administrative code, as added by section 2 of this local law, and binding upon all successors and assigns, consenting to:

(i)  removal of such sign and any supporting structure therefor in accordance with the schedule for removal set forth in the compliance plan; and

(ii)  entry by the commissioner, police officers, and authorized representatives of the department upon the building or premises on which the sign and any supporting structure therefor is located for purposes of removal of such sign and any supporting structure therefor by the city, without further proceedings, in the event that such sign and any supporting structure is not removed in accordance with the schedule included in such compliance plan. Such instrument shall be filed and recorded with the clerk or register of the county in which the sign is located.

(c)  As part of a compliance plan, the outdoor advertising company shall also post a bond to the city, with a surety approved by the department, in an amount to be determined by the department by rule based on the number, size and other features of signs and any supporting structures therefor identified in the compliance plan. The bond shall be conditioned such that the obligor will pay all costs incurred by the city with respect to the removal of such signs and any supporting structures therefor in accordance with the consents set forth in instruments filed with respect to such signs pursuant to paragraph b of this section. Nothing herein shall be construed to affect the obligation of an outdoor advertising company to post a bond pursuant to subdivision c of section 26-260 of the administrative code, as added by section 3 of this local law, with respect to signs not eligible for inclusion in the compliance plan.

(d)  The commissioner shall refuse to accept and may return a compliance plan submitted pursuant to this section where he or she determines that it does not satisfy the requirements of this section and rules promulgated pursuant thereto. In the event a company whose initial compliance plan has been rejected by the commissioner of buildings pursuant to this subdivision fails thereafter to submit a compliance plan acceptable to the commissioner within a time frame specified by the department of buildings, and the commissioner, after notice and opportunity to be heard, affirms his or her determination that such company has not satisfied the requirements of this section, then such outdoor advertising company shall be deemed subject to section 7 of this local law. Notwithstanding the provisions of section six hundred sixty-six of the charter, such determination shall not be subject to review by the board of standards and appeals.

(e)  Notwithstanding any provisions to the contrary of section 26-262 of the administrative code, as added by section 3 of this local law, where a sign and any sign structure therefor is included in a compliance plan accepted by the commissioner, no civil penalties or criminal fines and/or imprisonment may be imposed with respect to such sign upon an outdoor advertising company or other party for any violations of the zoning resolution, the administrative code or rules adopted pursuant thereto (except for violations which involve the creation or maintenance of a hazardous condition), nor shall the commissioner of buildings seek the removal of such sign pursuant to section 26-127.3 of the administrative code, as added by section 2 of this local law; provided, however, that:

(i)  the outdoor advertising company is in compliance with the schedule for removal of such sign and any supporting structure therefor set forth in the compliance plan; and

(ii)  the size, height or degree of projection of such sign and any supporting structure therefor has not been increased or enlarged after December 22,

2000. Upon acceptance of a compliance plan pursuant to this section, the commissioner of buildings shall discontinue any administrative, judicial or other enforcement proceedings pending as of such date with respect to such sign (other than collection activities with respect to previously adjudicated violations), unless the commissioner has reasonable cause to believe that the size, height or degree of projection of such sign and any supporting structure therefor has been increased or enlarged after December 22, 2000. Nothing herein shall be construed to prevent the imposition of civil penalties or criminal fines and/or imprisonment upon an outdoor advertising company or other party for violations of the zoning resolution, the administrative code or rules adopted pursuant thereto, with respect to signs which are not eligible for inclusion in a compliance plan submitted pursuant to this section.

(f) The provisions of section 26-253 of the administrative code, as added by section 3 of this local law, shall not apply to a sign under the control of an outdoor advertising company which is included in a compliance plan accepted by the commissioner, provided that the outdoor advertising company is in compliance with the schedule for removal of such sign and any supporting structure set forth in the compliance plan.

(g) The sale, lease, or other transfer of control of a sign, and any supporting structure therefor identified in a compliance plan shall not affect the schedule for the removal of such sign and any supporting structure in accordance with the schedule included in the compliance plan, and any outdoor advertising company which assumes control of such sign and any sign structure shall be responsible for compliance with the terms of the compliance plan with respect thereto. In the event an outdoor advertising company which has submitted a compliance plan pursuant to this section assumes control of a sign and any supporting structure therefor required to be included in the report provided for under section 5 of this local law but not previously included in a compliance plan, such company shall amend its compliance plan to include such sign and supporting structure in the plan, in accordance with rules of the department.

(h) In the event a sign and any supporting structure therefore [sic] is not removed in accordance with the schedule included within a compliance plan, or in the event the registration of the outdoor advertising company which submitted such compliance plan is revoked pursuant to subdivision i of this section, the commissioner shall, in addition to or in lieu of seeking any and all remedies provided for under this local law, be authorized to remove such sign and any supporting structure therefor in accordance with the consents set forth in the instrument filed with respect to such sign pursuant to paragraph (b) of this section.

(i) Notwithstanding any provisions to the contrary of subdivision d of section 26-260 of the administrative

code, as added by section 3 of this local law, in the event that an outdoor advertising company has failed to remove all signs and any supporting structures therefor in accordance with the compliance plan by the end of any of the three annual periods following the commissioner's acceptance of the compliance plan, registration of such company shall be subject to revocation.

(j) The commissioner shall make all compliance plans filed pursuant to this section accessible to the public.

§7. An outdoor advertising company which does not submit a compliance plan pursuant to section 6 of this local law shall be subject to all criminal, civil and other remedies provided for in this local law for any violation of the zoning resolution or the administrative code or rules adopted pursuant thereto with respect to signs under its control, without limitation. Notwithstanding any provision to the contrary of subdivision d of section 26-260 of the administrative code, as added by this local law, relating to the circumstances under which the commissioner is authorized to revoke the registration of an outdoor advertising company, the commissioner of buildings shall, after notice and opportunity to be heard, revoke the registration of any such outdoor advertising company where such company has been found liable on three or more occasions by the environmental control board or a court of competent jurisdiction for violations of the zoning resolution or the administrative code or rules adopted pursuant thereto with respect to signs under its control identified in the report submitted by such outdoor advertising company pursuant to sections 5 of this local law, on the basis that such signs are advertising signs, as defined in section 12-10 of the zoning resolution, which are located in:

(i) zoning districts in which signs for advertising purposes are not permitted;

(ii) areas within a distance of two hundred linear feet and within view of an arterial highway, as such term is defined under subdivision c of section 26-253 of the administrative code, as added by section 3 of this local law; or

(iii) areas within a distance of two hundred linear feet from and within view of a public park with an area of one half acre or more.

§8. All terms as used in sections 5, 6 and 7 of this local law shall be as defined in subchapter four of chapter one of title twenty-six of the administrative code, as added by this local law. The commissioner of buildings shall promulgate rules as necessary for the administration and implementation of sections 5, 6 and 7 of this local law.

***§[C26-115.2] 27-178 Plans required.- All such applications shall be accompanied by plans which

22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff   Pg 276 of 654

Title 27 / Subchapter 1

shall contain at least the following data and information:

(a)  A sketch or drawing showing the size and location of the sign or sign installations in relation to the building or premises upon which the sign is or will be erected.

(b)  Detail drawings showing the dimensions, materials, and construction of the sign, its supporting members, and the foundation or anchorage thereof.

(c)  A tabulation or diagram of all loads and stresses.

(d)  Plans for illuminated signs projecting beyond the street line shall be accompanied by a statement from the department of buildings indicating that such department has received an application from a licensed electrician for inspection of such signs.

**\*\*Local Law 59-1996.**

### §[C26-115.3] 27-179 Exemptions from permit requirements.-
Sign permits shall not be required where the sign is:

(a)  Painted directly on the exterior wall surface of a building or on the surface of a fence.

(b)  A wall sign of not more than six square feet in area.

(c)  A sign erected by employees of a city or other governmental agency, including traffic and other similar signs.

(d)  A ground sign advertising the sale or rental of the premises on which it is erected, provided the sign does not exceed twelve square feet in area.

(e)  A temporary sign erected during construction work and related thereto.

(f)  A temporary sign for special decorative display use for holidays, public demonstrations, or the promotion of civic, welfare or charitable purposes, except that signs that utilize streets or cross streets shall be subject to the requirements of the department of highways.

### ARTICLE 17 APPLICATIONS FOR EQUIPMENT WORK PERMITS

**\*\*§[C26-116.1] 27-180 When equipment work permits required.-** Except as provided in section 27-184 of this article, equipment work permits shall be required for the installation or alteration of the following types of service equipment:

(a)  Air conditioning and ventilating systems.

(b)  Elevators, escalators, moving walks, and stairways, dumbwaiters, etc.

(c)  Fuel burning and fuel oil storage equipment.

(d)  Refrigerating systems.

(e)  Heating systems.

(f)  Boilers.

(g)  Fire suppression piping systems.

**\*\*Local Law 107-1993.**

### §[C26-116.2] 27-181 Application requirements.-
All such applications shall be subject to the applicable requirements of article ten and section 27-156 of this subchapter, and to the applicable requirements of article nine, subdivision (c) of section 27-157 and sections 27-158 and 27-159 of this subchapter whenever plans are required to be submitted in connection with such applications.

**\*§[C26-116.3] 27-182 Plans required.-** Except as provided in section 27-183 and section 27-184.1 applications for equipment work permits shall be accompanied by plans in the following cases and in accordance with the following requirements:
**\* Local Law 6-1997.**

(a)  **Air conditioning and ventilating systems**.- Plans for air conditioning and ventilating systems shall contain at least the following data and information:

(1)  The location and sizes of all ducts; the location of all fire dampers, motors, fans, and filters; the type, air capacity, and size of all equipment; and where the plans are not accompanied by structural plans, the operating weight and manner of support of all equipment weighing in excess of one thousand pounds.

(2)  The locations of smoke detecting devices.

(3)  The location and size of the fresh air intake, the design population, and the index for ventilation for each room or space.

(4)  The amount of air to be exhausted or supplied from each outlet for each room or space.
In the case of ventilating or exhaust systems for ranges, fryers, ovens, and other similar types of restaurant or bakery equipment, for which a hood is required, the plans shall also show the type of extinguishing system, the location of heat detection devices, nozzles, piping, gas controls, manual and automatic control valves, method of joining ducts, method and location of discharging exhaust from building, the location of break-glass controls, and the quantity in cfm designed for each hood.

(b)  **Elevators, etc.-** Plans for elevators, escalators, moving walks and stairways, dumbwaiters, and similar equipment shall contain at least the following data and information.

(1)  The location of all machinery, switchboards, junction boxes, and reaction points, with loads indicated.

(2)  The details of all hoistway conditions including bracket spacing.

(3)  The estimated maximum vertical forces on the guide rails on application of the safety device.

(4)  In the case of freight elevators for class B or C loading, the horizontal forces on the guide-rail faces during loading and unloading; and the estimated maximum horizontal forces in a post wise direction on the guide-rail faces on application of the safety device.

(5)  The size and weight per foot of any rail reinforcements where provided.

**(c) Fuel-burning and fuel-oil storage equipment**.- Plans for fuel-burning equipment and fuel-oil storage equipment shall contain at least the following data and information:

(1) The kind or grade of fuel to be used.

(2) The location, arrangement, size, load, and maximum capacity of the burning, storage and fuel-pumping equipment.

(3) The method or means of providing air to the equipment space, showing duct and opening sizes.

(4) The location, size, and materials for all breechings; the height and size of all chimneys and gas vents; the thickness and type of all insulation materials; and the clearances from combustible walls, partitions, and ceilings.

(5) Diagrams of all piping, including vent and fill piping for oil systems, and all safety cut-off and relief devices and valves in piping.

(6) Where the alteration or replacement of parts for a fuel-oil burning installation does not affect the size of the combustion chamber, the atomization of the fuel, the grade of fuel used, or the maximum capacity of the system, a descriptive statement of the proposed work may be submitted in lieu of plans.

**(d) Refrigerating systems**.- Plans for refrigerating systems shall contain at least the following data and information:

(1) The location of all machinery; the horsepower of compressors; the type and number of pounds of refrigerant to be used; and the air quantities for, and means of, ventilating the machinery space.

(2) The location of emergency switches for compressors and for ventilation in the machinery rooms.

(3) The location of pressure relief piping and any city water connections and water-saving devices.

(4) The tonnage capacity of the machine and the suction and discharge pressures at which the machine is rated.

(5) The operating weight of the equipment.

**(e) Heating systems**.- Plans for heating systems shall contain at least the following data and information:

(1) The temperature to be maintained in every room.

(2) The amount of heat in btu per hour to be provided in every room, and the output capacity in btu per hour of the central heat sources.

**(f) Boilers**.- Plans for boiler installations and boiler alterations shall contain at least the following data and information:

(1) The btu per hour output capacity and operating weight of each boiler; and the pressure setting of the relief valves.

(2) Such other data and information as are required to be contained on plans for fuel-burning equipment, as hereinabove provided.

**[**]**(g)Fire suppression piping systems**. - All applications shall include a plot plan to scale indicating the location of the system in relation to the rest of the building.

**(1) Standpipe systems.** Plans for standpipe systems shall contain at least the following data and information:

(a) The location and size of all risers, cross-connections, hose racks, valves, siamese connections, sources of water supply, piping, and other essential features of the system.

(b) A floor plan for floors that have typical riser locations and no special features within the floor level, with the title of this plan indicating clearly the floors to which the arrangement is applicable.

(c) A riser diagram showing the essential features of the system and indicating the risers, cross-connections, valves, siamese connections, tanks, pumps, sources of water supply, pipe sizes, capacities, floor heights, zone pressures, and other essential data and features of the system.

(d) The available water pressure at the top and bottom floors of each zone, and at each floor where the weight pipe fittings change, shall be shown on the riser diagram. For street pressure-fed systems and fire pumps, a statement from the department of environmental protection, giving the minimum water pressure in the main serving the building, shall be supplied.

**[**]**(2) Sprinkler systems.** Plans for sprinkler systems, whether automatic or non-automatic, shall contain at least the   following data and information:

(e) The location and size of water supplies and the location, spacing, number, and type of sprinklers to be used, with approximate location and size of all feed mains, risers, valves, siamese connections, and other essential features of the system.

(f) A diagram showing the proposed sprinkler system in relation to principal construction features of the building, such as its size, walls, columns, and partitions; and such other information as may be necessary for the evaluation of the system.

(g) The location, number, and type of any electrical or automatic devices to be used in the system.

(h) The available water pressure at the top and bottom floors of each zone shall be shown on the riser diagram. For street pressure-fed systems and fire pumps, a statement from the department of environmental protection, giving the minimum water pressure in the main serving the building, shall be supplied.

**[**]   **(3) Other fire suppression piping systems.** Plans for chemical or gaseous fire suppression piping systems shall contain at least the following data and information.

(a) Type, model number and location of all surface, plenum and duct nozzles; the type, location and surface dimensions of all cooking appliances; the location and type of the automatic fuel shut-off and

statement as to type (gas or electric); location and distance of the remote control or manual pull station.

(b) A statement that board of standards and appeals or department approved grease filters are to be used in any kitchen hood; the dimensions of all hoods and all related ducts.

(c) The brand name, model and board of standards and appeals or department approval number of the fire suppression piping system; the type of extinguishing agent and number and size of agent containers; size, length, and type of all piping that will be used; number and location of all fusible links or detectors and the temperature setting; type, model number and location of all surface, plenum and duct nozzles.

(d) For halon systems, the plan should also include type and concentration of the halon, the method of providing power supply to smoke or heat detectors; if reserve supply is being provided, fire rating of partitions and if the area involved is sprinklered, location of all audible/visible alarms within and outside the location involved and the details of construction of the room to contain the halon.

**Local Law 107-1993.*

### §[C26-116.4] 27-183 Exemptions from plan requirements.-
The submission of plans shall not be required in connection with applications for permits to install or alter fuel-burning and fuel-oil storage equipment under any of the following conditions. However, the commissioner may require the filing of sketches showing compliance with the provisions of this code.

(a) The equipment is to be used for heating a one- or two-family dwelling.

(b) The equipment is fed by gas fuel and is not used with an incinerator.

(c) The capacity of the equipment does not exceed three hundred fifty thousand btu per hour and the capacity of each of the oil storage tanks for the equipment does not exceed two hundred seventy-five gallons, unless the tanks are buried, or are in a multiple dwelling, or in a building adjacent to the line of a subway, or are located above the lowest story of a building, or unless the fuel-burning equipment is located above the lowest story of a building.

### §[C26-116.5] 27-184 Exemptions from permit requirement.- 
An equipment work permit shall not be required in any of the following cases:

(a) Air-conditioning and ventilating systems.- Where the system is a voluntary system serving only one floor of a building and:

(1) Does not use lot line windows for the intake or exhaust of air or the mounting of equipment.

(2) Is not installed in any public hallway, passageway, or stairway.

(3) Does not in any way reduce the ventilation of any room or space below that required by code provisions.

(4) Does not penetrate any fire division, roof, floor, or wall (except that a packaged air-conditioning unit not exceeding 3 tons rated capacity may be used in windows or in sleeves under windows, provided that health, fire and/or structural safety is not thereby impaired).

(b) Elevators, etc.- Where the equipment consists of a portable elevating device used only for handling materials and located and operated entirely within one story.

(c) Fuel-burning and fuel-oil storage equipment.- Where the equipment consists of any of the following:

(1) Portable fuel-burning equipment that does not require a chimney or vent connection.

(2) Portable heaters used in construction work.

(3) Oil-fired heaters having a fuel-storage capacity of 6 gallons or less (except that internal combustion engines of any size shall require a permit).

(d) Refrigerating systems.- Where the system:

(1) Has a capacity of twenty-five tons or less and uses a Group I refrigerant.

(2) Is to be installed in a vehicle, railroad car, or vessel.

(3) Uses water or air as the refrigerant.

(e) Hot water boilers and steam boilers operating at a gauge pressure of not more than fifteen pounds per square inch located in dwellings occupied by less than six families.

### *§ 27-184.1 Alteration and repair slip. -
(a) An application for an equipment work permit for work on an existing combined standpipe or sprinkler system may be treated as an application for an alteration and repair slip where the total cost of the proposed work within the building, as certified by the permit applicant, does not exceed ten thousand dollars in any twelve month period and the proposed work consists of any of the following:

(1) Replacement of parts required for the operation of a combined standpipe or sprinkler system. In the event of emergency an application for an alteration and repair slip must be filed within twenty-four hours after the commencement of the repairs.

(2) Replacement of sprinkler heads. Provided that orifice sizes, type and deflector position remain the same.

(3) Changes that do not alter the type of sprinkler system.

(4) Relocation of piping that does not effect the operation of the sprinkler system.

(5) Rearrangement of not more than twenty sprinkler heads in areas presently sprinklered in light hazard occupancy which will remain light hazard

22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff   Pg 279 of 654

Title 27 / Subchapter 1

occupancy, provided that the addition of sprinkler heads in existing systems shall be limited to light hazard occupancy in rooms or spaces not exceeding eight hundred square feet requiring only one head with the maximum spacing allowed by the code, and provided that the number of new heads does not exceed a total of five.

(6) Relocation of combined fire standpipe auxiliary hose sources and cabinets within ten feet of their original location, provided that the existing covered area is not affected and provided that such relocation complies with subchapter seventeen and reference standard RS 17-1.

(b) Notwithstanding any inconsistent provision of this section, an application for an equipment work permit for work on an existing combined standpipe or sprinkler system may not be treated as an application for an alteration and repair slip for any alteration of primary or auxiliary water supplies.

(c) Upon the approval of the application an alteration and repair slip shall be issued in lieu of an equipment work permit, with the same force and effect as if an equipment work permit had been issued.

(d) The submission of plans shall not be required for an alteration and repair slip.
*Local Law 6-1997.*

## ARTICLE 18  APPLICATIONS FOR EQUIPMENT USE PERMITS

§[C26-117.1]  27-185  **When equipment use permits required.-** Equipment use permits shall be required for the use and operation of the following types of service equipment:

(a)  Air-conditioning and ventilating systems.
(b)  Elevators, escalators, moving walks and stairways, dumbwaiters, etc.
(c)  Fuel-burning and fuel-oil storage equipment.
(d)  Refrigeration systems.
(e)  Heating systems.
(f)  Boilers.

§[C26-117.2]  27-186  **Application requirements.-** All applications for equipment use permits shall be subject to the requirements of article ten of this subchapter**.**

§[C26-117.3]  27-187  **Inspections and tests.-** No equipment use permit shall be issued unless and until the equipment shall have been inspected and tested to determine proper functioning and compliance with the provisions of this code and other applicable laws and regulations.  All inspections and tests shall be conducted in accordance with required inspection and test procedures; and signed copies of all required inspection and test reports shall be filed with the department and form part of the papers accompanying the permit application.  In the case of heating systems, a signed statement by an architect or engineer shall be submitted with the permit application, stating that the system has been operated and

functions satisfactorily and that, to the best of his or her knowledge and belief, the system will meet code temperature requirements.

§[C26-117.4]  27-188  **Temporary use permit.-** The commissioner may, upon request, issue a temporary use permit authorizing partial use and operation of the equipment prior to completion of the installation or alteration work, provided that such partial use and operation may be made safely and without endangering public health, safety and welfare, and further provided that such temporary use permit shall not be issued for a period of more than thirty calendar days, subject to renewal for additional thirty-day periods at the discretion of the commissioner.  All temporary use permits shall be required to be posted in a conspicuous location in or near the equipment covered by the permit, and shall state the nature and extent of the partial use and operation permitted and indicate clearly that full use and operation of the equipment is not permitted.

§[C26-117.5]  27-189  **Exemptions from equipment use permit requirement.-** No equipment use permit shall be required for equipment exempted from the requirement of an equipment work permit under section 27-184 of article seventeen of this subchapter; nor shall an equipment use permit be required for the use and operation of equipment specifically exempted under the provisions of subchapters thirteen and fourteen of this chapter.

§[C26-117.6]  27-190  **Duration and renewal of permit**.- Equipment use permits shall be of indefinite duration, subject to the provisions of section 27-196 of article nineteen of this subchapter, except that permits for the use and operation of elevators and similar equipment and boilers shall be limited to a term of one year from the date of issuance of the permit, subject to annual renewal upon application and proof of compliance with the requirements for periodic inspections as prescribed in subchapters fourteen and eighteen of this chapter. Applications for renewal of such permits shall be submitted on forms furnished by the department, not later than thirty calendar days prior to the expiration date of the permit, accompanied by the required fee; and late applications for renewal shall be subject to the payment of an additional fee of one (1) dollar.

## ARTICLE 19  ISSUANCE OF PERMITS

§[C26-118.1]   27-191   **Approval of permit application.-**All applications for permits and any accompanying plans and papers, including any amendments thereto, shall be examined promptly after their submission for compliance with the

provisions of this code and other applicable laws and regulations. Except as otherwise provided in section 27-198 of this article, applications complying with the provisions of this code and other applicable laws and regulations shall be approved by the commissioner and the permit issued promptly and not later than forty calendar days after the submission thereof, and applications failing to comply with the requirements of this code and other applicable laws and regulations shall be rejected and written notice of rejection, stating the grounds of rejection, shall be given the applicant promptly and not later than forty calendar days after the submission thereof, except that on or before the fortieth day, the commissioner may on good cause shown, and upon notification to the applicant, extend such time for an additional twenty days. Whenever a permit application has been rejected and is thereafter revised and resubmitted to meet stated grounds of rejection, the revised application shall be approved if it meets the stated grounds of rejection, or shall be rejected if it fails to meet the stated grounds of rejection; and the permit shall be issued or written notice of rejection, stating the grounds of rejection, shall be given the applicant promptly and not later than 20 calendar days after the resubmission thereof.

### §[C26-118.2]  27-192  Approval of application in part.-
The commissioner may approve the application and issue a permit for construction of part of a building, including foundations, before complete plans and specifications for the entire building have been submitted and approved, provided that adequate information and detailed plans or statements have been submitted complying with the provisions of this code and any other applicable laws and regulations, and provided further that the holder of such permit shall proceed with the building operation at his or her own risk and without assurance that a permit for construction of the entire building will thereafter be issued**.**

### §[C26-118.3]  27-193  Signature to permit.-
Every permit issued by the commissioner shall have his or her signature affixed thereto; but the commissioner may authorize any subordinate to affix such signature.

### §[C26-118.4]  27-194  Posting of permit.-
A permit card bearing the permit number, application number, location of the premises or equipment for which the permit is issued, and such other information as the commissioner may determine, shall be furnished the applicant in connection with the issuance of the permit; and such permit card shall be posted in a conspicuous place at such location open to public inspection during the entire time of the prosecution of the work or the use and operation of the equipment, or until the expiration of the permit. No such permit card shall be posted or displayed at any location other than the location of the premises or equipment for which the permit was issued.

### §[C26-118.5]  27-195  Notice of commencement of work.-
At least twenty-four hours written notice shall be given to the commissioner before the commencement of any work for which a permit has been issued. Before any work is commenced on an item of construction requiring controlled inspection, all persons responsible for such controlled inspection shall be notified in writing at least seventy-two hours prior to such commencement.

### *§[C26-118.6]  27-196  Expiration of permit.-
Except as otherwise provided in section 27-190 of article eighteen of this subchapter, all permits issued by the commissioner shall expire by limitation and become invalid if the permitted work or use is not commenced within twelve months from the date of issuance of the permit or, if commenced, is suspended or abandoned for a period of twelve months thereafter. All permits for work in a special flood hazard area as delineated in reference standard RS4-4 shall expire if the actual start of permanent construction has not occurred within one hundred eighty-eight days of the date on which such permit is issued. The commissioner may, however, upon good cause shown, reinstate a work permit at any time within a period of two years from the date of issuance of the original permit, provided that the work shall comply with all the requirements of this code and other applicable laws and regulations in effect at the time application for reinstatement is made, and provided further that the applicant shall pay a renewal fee in accordance with section 26-211 of the code.
*Local Law 38-1990; Local Law 33-1988.*

### **§[C26-118.7]  27-197  Revocation of permit.-
The commissioner may, on notice to the applicant, revoke any permit for failure to comply with the provisions of this code or other applicable laws and regulations; or whenever there has been any false statement or any misrepresentation as to a material fact in the application or accompanying plans and papers upon the basis of which the permit was issued; or whenever any permit has been issued in error and conditions are such that a permit should not have been issued. Such notice shall inform the applicant that he or she shall have the right to present to the commissioner or his or her representative within five business days or personal service or ten days of the posting of service by mail information as to why the permit should not be revoked. The commissioner may suspend a permit immediately when the commissioner has determined that an imminent peril to life or property exists and shall at the same time notify the applicant that the permit shall be revoked

and that the applicant has the right to present to the commissioner or his or her representative within five business days of personal service or ten days of the posting of service by mail information as to why the permit should not be revoked.

**Local Law 11-1988.*

### §[C26-118.8]  27-198  Approval of plans and permit applications for alteration or demolition of single room occupancy multiple dwellings.-

a.    For the purposes of this section "single room occupancy multiple dwelling" means either a class A multiple dwelling used in whole or in part as a rooming house or furnished room house or for single room occupancy pursuant to section two hundred forty-eight of the multiple dwelling law or containing rooming units, as such term is defined in section 27-2004 of the housing maintenance code or a class B multiple dwelling. Notwithstanding the foregoing provision, the term "single room occupancy multiple dwelling" shall not include:

(1) college or school dormitories;

(2) clubhouses;

(3) luxury hotels, as such term is defined by the commissioner of housing preservation and development;

(4) residences whose occupancy is restricted to an institutional use such as housing intended for use primarily or exclusively by the employees of a single company or institution;

(5) city-owned multiple dwellings;

(6) any multiple dwelling containing fewer than nine class B dwelling units used for single room occupancy unless the total number of such units is more than fifty percent of the total number of dwelling units in such multiple dwelling; and

(7) any class A or class B multiple dwelling which is

(a) The subject of a program approved by the commissioner of housing preservation and development and related to the rehabilitation and preservation of single room occupancy multiple dwellings other than a program of tax abatement or tax exemption including, but not limited to, programs of tax abatement or tax exemption authorized by subchapter two of chapter two of title eleven of the administrative code or section four hundred twenty-one-a-a of the real property tax law, and

(b) exempted from the provisions of this section by such commissioner.

b. (1) The commissioner shall not approve any plans pursuant to article nine of this subchapter, issue an alteration permit pursuant to article twelve of this subchapter or a demolition permit pursuant to article fourteen of this subchapter for a single room occupancy multiple dwelling:

(a) for the alteration of such dwelling to a class A multiple dwelling to be used in whole or in part for other than single room occupancy purposes or for the demolition of such dwelling, or

(b) with respect to the addition or removal of kitchen or bathroom facilities in such multiple dwelling or such other types of alteration work as shall be prescribed by regulation of the commissioner of housing preservation and development, in consultation with the commissioner, unless

(i) the commissioner of housing preservation and development has certified that there has been no harassment of the lawful occupants of such multiple dwelling within the thirty-six month period prior to the date of the submission of an application for a certification of no harassment or has issued a waiver of such certification,

(ii) the applicant has submitted a sworn statement by or on behalf of all the owners, as such term is defined in paragraph forty-five of subdivision a of section 27-2004 of the housing maintenance code, of such multiple dwelling that there will be no harassment of the lawful occupants of such multiple dwelling by or on behalf of such owners during the construction period, and

(iii) the applicant has submitted a plan which provides for the safety and health of the occupants thereof during the construction period.

(2) Notwithstanding the foregoing provisions, if within the thirty-six month period prior to the date of the submission of an application for a certification of no harassment to the commissioner of housing preservation and development, title to a single room occupancy multiple dwelling was vested in the city, the period of time for which the commissioner of housing preservation and development shall certify whether there has been no harassment of the lawful occupants of such multiple dwelling shall commence from the date on which the title to such property was no longer vested in the city.

(3)    An applicant for such plan approval, alteration or demolition permit shall forward a copy of such application to the commissioner of housing preservation and development, together with an application for a certification of no harassment pursuant to section 27-2093 of the housing maintenance code.

(4)  The time period in which the commissioner is required to approve or reject an application, or resubmission thereof, for such plan approval or alteration permit pursuant to section 27-144 or 27-191 of this subchapter shall commence from the date that the commissioner receives either such certification or a waiver thereof, or notice of the denial of such certification or waiver thereof from the commissioner of housing preservation and development and such sworn statement and plan.

(5)  Where the commissioner of housing preservation and development denies the certification required by this section the commissioner shall reject

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 282 of 654

Title 27 / Subchapter 1

the application for such plan approval, alteration permit or demolition permit.

(6) The commissioner shall be empowered to issue a stop-work notice and order with respect to an alteration or demolition permit or rescind such plan approval, alteration or demolition permit at the request of the commissioner of housing preservation and development pursuant to section 27-2093 of the housing maintenance code.

(7) Where the commissioner rejects an application for such plan approval, alteration or demolition permit pursuant to paragraph five of this subdivision or where the commissioner rescinds such plan approval, alteration or demolition permit pursuant to paragraph six of this subdivision, no further application for plan approval, an alteration or demolition permit, for the purposes described in subdivision b of this section, with respect to the alteration or demolition of such multiple dwelling shall be considered by the commissioner for a period of thirty-six months following the date of the denial of the certification of no harassment by the commissioner of housing preservation and development or the date of the rescission of such certification of no harassment by such commissioner.

(8) The provisions of this subdivision shall not apply to repairs, demolition or any other work performed by a city agency or by a contractor pursuant to a contract with a city agency.

* (9) The commissioner shall not approve any plans or issue any permits based upon a certification of no harassment issued prior to February second, nineteen hundred eighty-seven unless the commissioner of housing preservation and development issues a supplemental certification that there is no reasonable cause to believe that there has been harassment at the multiple dwelling during the period of time from the date of the issuance of the original certification of no harassment to the date of the application for such a supplemental certification. If the commissioner of housing preservation and development finds that there is reasonable cause to believe that harassment has occurred during such period of time he or she shall suspend the original certification of no harassment pursuant to paragraphs two and three of subdivision f of section 27-2093 of the code.
*Local Law 9-1987; Local Law 59-1985, language juxtaposed per Ch. 907-1985.*

**§[C26-118.9] 27-198.1 Approval of plans and permit applications where an asbestos project is performed.-

a.   The commissioner shall not approve any plans pursuant to article nine of this subchapter except plans for the construction of new buildings unless an asbestos investigator has certified that work to be performed will not constitute an asbestos project or the applicant submits with the application for approval of plans an asbestos inspection report completed in accordance with the provisions of section 24-146.1 of subchapter six of chapter one of title twenty-four of the code.

b.   Where the commissioner of environmental protection has by regulation required that, in connection with other work for which a permit but not plans is required under this chapter, that an asbestos investigator certify that the work to be performed will not constitute an asbestos project or that an asbestos inspection report be completed in accordance with the provisions of section 24-146.1 of subchapter six of chapter one of title twenty-four of the code, the commissioner shall not issue such permit unless such certification or such report is submitted in connection with the application for such permit.

c.   Where the commissioner of environmental protection has by regulation required that, in connection with work for which an alteration permit or demolition permit is required under this chapter, that an asbestos investigator certify that the work to be performed will not constitute an asbestos project or that the applicant submit with the application for such permit proof that an asbestos removal plan has been approved by the commissioner of environmental protection in accordance with the provisions of section 24-146.1 of subchapter six of chapter one of title twenty-four of the code, the commissioner shall not issue such permit unless such certification or proof of such approval has been submitted in connection therewith.

d.   The commissioner shall not issue any permit under this chapter for work which constitutes an asbestos project and for which an asbestos inspection report is required unless the applicant at the time of application for such permit certifies on forms prescribed by the commissioner of environmental protection that he or she is familiar with federal, state and local laws and regulations applicable to asbestos related work.

e.   Whenever proof of approval of an asbestos removal plan is required for plan or permit approval, any requirement for the submission of an asbestos inspection report shall be deemed waived.

f.   For purposes of this section, the terms "asbestos", "asbestos inspection report", "asbestos investigator", "asbestos project" and "asbestos removal plan", shall have the meanings as are ascribed in section 24-146.1 of subchapter six of chapter one of title twenty-four of the code.
**Local Law 80-1986. Not applicable to plans submitted prior to April 1, 1987 oramendments or revisions to such plans submitted prior to March 31, 1988; Local Law 76-1985, language juxtaposed per Ch. 907-1985.*

*§[C26-118.10] 27-198.2 Conversion, alteration and demolition of single room occupancy multiple dwellings prohibited.-

a.   Except as otherwise provided in this section and notwithstanding any other provision of law to the contrary, no single room occupancy dwelling unit or

units or portions thereof (i) shall be altered for or converted to use as apartments, whether such alteration or conversion is effected with or without physical alterations, or (ii) shall be altered for or converted to use other than as single room occupancy dwelling units, whether such alteration or conversion is effected with or without physical alterations, or (iii) shall be altered to add either kitchens or bathrooms if such units lacked either of such facilities as of January ninth, nineteen hundred eighty-five or to remove such facilities. No single room occupancy multiple dwelling shall be altered to reduce the number of single room occupancy dwelling units and no single room occupancy multiple dwelling shall be demolished. No single room occupancy multiple dwelling shall be altered to remove kitchens or bathroom facilities which are used for any single room occupancy dwelling unit.

b. 1. For the purposes of this section the term "single room occupancy multiple dwelling" means a multiple dwelling which is either (i) a class A multiple dwelling which is either used in whole or in part for single room occupancy or as a rooming house or furnished room house pursuant to section two hundred forty-eight of the multiple dwelling law or which contains rooming units or (ii) a class B multiple dwelling including, without limitation, hotels, lodging houses, rooming houses, boarding houses and furnished room houses. Notwithstanding the foregoing provision, the term "single room occupancy multiple dwelling" shall not include:

(a) any multiple dwelling which had a certificate of occupancy as a college or school dormitory on January ninth, nineteen hundred eighty-five or if the dwelling had no certificate of occupancy was lawfully used as a college or school dormitory on such date;

(b) any multiple dwelling which had a certificate of occupancy as a clubhouse on January ninth, nineteen hundred eighty-five or if the dwelling had no certificate of occupancy was lawfully used as a clubhouse on such date;

(c) any multiple dwelling which was a residence whose occupancy was restricted to an institutional use such as housing intended for use primarily or exclusively by the employees of a single company or institution on January ninth, nineteen hundred eighty-five;

(d) multiple dwellings owned by the city, the state, or any political subdivision thereof;

(e) hotels in which the rent on October first, nineteen hundred eighty-four, exclusive of governmentally assisted rental payments, charged for seventy-five percent or more of the total number of occupied individual dwelling units was more than fifty-five dollars per day for each unit rented on a daily basis, or more than two hundred fifty dollars per week for each unit rented on a weekly basis or more than eight hundred fifty dollars per month for each unit rented on a monthly basis;

(f) any class A or class B multiple dwelling in which, on January ninth, nineteen hundred eighty-five, either less

than five dwelling units were rooming units or dwelling units other than apartments or less than ten percent of the total number of dwelling units were rooming units or dwelling units other than apartments;

(g) any class A or class B multiple dwelling which is (a) the subject of a project or program related to the rehabilitation and preservation of single room occupancy multiple dwellings approved by the commissioner of housing preservation and development other than a program of tax abatement or tax exemption including, but not limited to, programs of tax abatement or tax exemption authorized by subchapter two of chapter two of title eleven of the code or section four hundred twenty-one-a of the real property tax law, and (b) exempted from the provisions of this section by such commissioner;

(h) any wood-frame multiple dwelling.

(i) any hotel in which during the twelve month period commencing on January first, nineteen hundred eighty-four ninety percent or more of the dwelling units were occupied for less than thirty consecutive days by any one occupant and in which there are no dwelling units subject to regulation pursuant to the rent stabilization law of nineteen hundred sixty-nine, as amended, provided however that this provision shall not apply unless an application for exemption is filed with the department of housing preservation and development in such form and containing such information as the department shall prescribe on or before April thirtieth, nineteen hundred eighty-seven.

2. The status of a vacant building as a single room occupancy multiple dwelling shall be determined by its last legal use prior to vacancy.

3. For the purposes of this section the term "single room occupancy dwelling unit" means a dwelling unit, other than an apartment, in a single room occupancy multiple dwelling.

4. For the purposes of this section the terms "apartment", "dwelling unit", "owner" and "rooming unit" shall be as defined in the housing maintenance code.

c. 1. The commissioner shall not approve any plans pursuant to article nine of this subchapter, issue an alteration permit pursuant to article twelve of this subchapter or a demolition permit pursuant to article fourteen of this subchapter for a single room occupancy multiple dwelling:

(a) for the alteration of such dwelling to a class A multiple dwelling to be used in whole or in part for other than single room occupancy purposes or for the demolition of such dwelling, or

(b) with respect to the addition or removal of kitchen or bathroom facilities in such multiple

dwelling prohibited pursuant to subdivision a of this section, or

(c)  with respect to any other alterations or other work prohibited pursuant to subdivision a of this section.

2. Except as provided in paragraph three of this subdivision, the department shall revoke any such permit or approval granted on or after January ninth, nineteen hundred eighty-five.

3. If demolition of a single room occupancy multiple dwelling has been completed pursuant to a permit issued on or after January ninth, nineteen hundred eighty-five and prior to August fifth, nineteen hundred eighty-five, the department shall not issue a permit for new construction on the site of such demolished dwelling and shall revoke any such permit for new construction issued on or after January ninth, nineteen hundred eighty-five unless the owner makes the payment or provides for replacement units pursuant to subparagraph (a) of paragraph (4) of subdivision d of this section for each single room occupancy dwelling unit which was demolished.

4. The provisions of this section shall not apply to work done pursuant to any permit issued by the department prior to January ninth, nineteen hundred eighty-five.

a.   The provisions of subdivisions a and c shall not apply to a single room occupancy multiple dwelling if:

1. (a) such multiple dwelling had twenty-four or fewer dwelling units on January ninth, nineteen hundred eighty-five and

(i) on January first, nineteen hundred eighty-three and on January ninth, nineteen hundred eighty-five had seven or fewer occupied single room occupancy dwelling units, excluding any owner occupied single room occupancy dwelling units; or

(ii) an individual owner with at least a fifty percent fee interest in the multiple dwelling establishes to the satisfaction of the commissioner of the department of housing preservation and development prior to the issuance of any permit by the department of buildings for work which would otherwise be prohibited pursuant to subdivisions a and c of this section that he or she intends to occupy such premises as his or her primary residence for a period of not less than three years after completion of such work; and

(iii) an application to establish an exemption pursuant to this subparagraph is submitted to the department of housing preservation and development and such application is approved by the department; or

(b) such multiple dwelling had twenty-five or more dwelling units on January ninth, nineteen hundred eighty-five and the residential portion of such dwelling has been continuously vacant since January first, nineteen hundred eighty-three, an application to establish an exemption pursuant to this subparagraph is submitted to the department of housing preservation and development on or before May twenty-ninth, nineteen hundred eighty-

seven and such application is approved by such department; or

2. such multiple dwelling is within an area for which the department of city planning has issued a special permit prior to January ninth, nineteen hundred eighty-five which was conditioned upon a commitment by the developer to provide dwelling units as set forth in such special permit to replace the single room occupancy dwelling units which are lost; or

3. such multiple dwelling is determined by the department or by the fire department to be an unsafe building and the department determines there is no alternative to demolition; or

4. (a) (i) Prior to the issuance of a permit for work which would otherwise be prohibited pursuant to subdivisions a and c of this section, the owner of such single room occupancy multiple dwelling complies with the provisions of §27-198.3 of this code and further provides for the replacement of the single room occupancy dwelling units which would be altered, converted or demolished by paying, to the single room occupancy housing development fund company established pursuant to subdivision i of this section for each dwelling unit which would be altered, converted or demolished as a result of the work, forty-five thousand dollars or such other amount which the commissioner of housing preservation and development determines by regulation would equal the cost of creating a dwelling unit, other than an apartment, to replace such single room occupancy dwelling unit. No such regulation shall be promulgated before January first, nineteen hundred eighty-eight provided, however, that on and after such date such regulation shall be promulgated where the commissioner determines that the cost of creating such a dwelling unit, exceeds forty-five thousand dollars. Each regulation shall indicate the manner in which the cost of creating such a dwelling unit was determined. Notwithstanding the foregoing, where fifty percent or more of the dwelling units of such multiple dwelling are occupied as of January twentieth, nineteen hundred eighty-seven, the owner of such multiple dwelling shall be required to provided for replacement units pursuant to clause (ii) of this subparagraph for such units occupied as of such date; or

(ii) Prior to the issuance of a permit for work which would otherwise be prohibited pursuant to subdivisions a and c of this section, the owner replaces the single room occupancy dwelling units which would be altered, converted or demolished as a result of such work elsewhere within the city by providing dwelling units affordable to persons of low and moderate income, under a plan approved by such commissioner which complies with the provisions of §27-198.3 of this code. "Replacement" shall include but not be limited to the acquisition of an existing

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantliff    Pg 285 of 654

Title 27 / Subchapter 1

multiple dwelling or the creation of such dwelling units either by the construction of a new multiple dwelling or the substantial rehabilitation of an existing multiple dwelling. "Multiple dwelling" shall include but not be limited to a "single room occupancy multiple dwelling". In the event that an existing multiple dwelling is acquired for the purpose of providing replacement units, such multiple dwelling shall be located in the same or adjacent community board in which the single room occupancy multiple dwelling which is to be altered, converted or demolished is located. Where a replacement Plan is submitted to such commissioner, the commissioner shall give notice to the council member and community board for the community district in which the dwelling units to be provided pursuant to such plan are to be located. Such plan shall provide either for the sale or net lease of the multiple dwelling containing such dwelling units to a not-for-profit organization or for such other form of transfer of ownership, management or possession of such multiple dwelling approved by such commissioner.

(iii) Notwithstanding the provisions of item (i) or (ii) of this subparagraph, upon the submission of an application for a permit for such work an owner shall make an application for a certification of no harassment or supplemental certification of no harassment pursuant to the provisions of section 27-2093 of this code and if such application is denied by the commissioner of housing preservation and development or a certification is granted and thereafter revoked and the basis for such denial or revocation is predicated in whole or in part on a determination by such commissioner that harassment occurred at such multiple dwelling after January ninth, nineteen hundred eighty-five, no permit shall be issued on the basis of any payment made pursuant to item (i) or the provision of dwelling units pursuant to item (ii) and such owner shall be subject to the provisions of section 27-2151 of this code and subdivisions a and c of this section. In addition, the sanctions provided by section 27-198 shall apply and no permit shall be issued for a period of two years following the expiration of the sanction period set forth in section 27-198 unless the owner, prior to the issuance of such permit, makes a payment of twice the amount required by item (i) or provides for twice the number of replacement units required by item (ii) for each single room occupancy dwelling unit which would be demolished, altered or converted as a result of the issuance of such permit. Any payment made or replacement units provided prior to such denial or revocation shall be credited against such required amount or units.

(b)  The amount of the payment required to be made or the number of dwelling units required to be provided pursuant to subparagraph (a) of this paragraph may be reduced in whole or in part by the commissioner of housing preservation and development if such commissioner determines that the owner has established:

(i) that there is no reasonable possibility that such owner can make a reasonable rate of return unless the property is altered or converted in a manner prohibited by subdivisions a and c of this section or demolished; and (ii) that neither the owner nor any prior owner intentionally managed the property to impair the ability to earn such return, and (iii) that the requirement that all single room occupancy dwelling units be replaced would substantially impair the feasibility of redeveloping the property for any other use. Such application shall be made to the commissioner of housing preservation and development in a form and manner and containing such information as the commissioner of housing preservation and development shall prescribe. The term "reasonable rate of return" is defined to mean a net annual return of eight and one-half percent of the assessed value of the subject property without recourse to the alteration, conversion or demolition prohibited by subdivisions a and c of this section. If the department of housing preservation and development determines that the assessed value of the subject property has increased as the result of the sale of such property, such department shall disregard the increase in the assessed value resulting from such sale to the extent that such department determines that the amount paid for the property at such sale was in excess of the fair market value of the property on the date of the sale if the property continued to be used for single room occupancy rental housing of the same type and quality after the sale. For the purpose of such determination the property shall be valued subject to the continuation of tenancies existing at the subject property immediately prior to the date of the sale. Notwithstanding the foregoing provision the commissioner shall revoke a determination reducing the payment or the number of replacement dwelling units if the denial or revocation of a certification of no harassment or supplemental certification of no harassment is predicated in whole or in part on a determination by such commissioner that harassment occurred at such multiple dwelling after January ninth, nineteen hundred eighty-five.

e.      The department shall not issue a building permit to allow new construction on the site after demolition pursuant to paragraph three of subdivision d of this section unless the owner makes the payment or provides replacement units pursuant to subparagraph (a) of paragraph four of subdivision d of this section for each single room occupancy dwelling unit which is demolished, provided however that if the department of housing preservation and development determines that the conditions which necessitated or significantly contributed to the need for the demolition were not the result of violations of the housing maintenance code which resulted from intentional acts or substantial negligence of an owner or former owner or his or her agent or was the owner of record prior to January ninth, nineteen hundred eighty-five and such acts did not occur during the period of his or her ownership, the owner may

apply for a reduction of the required replacement units pursuant to subparagraph (b) of paragraph four of subdivision d of this section.

f.    Notwithstanding the provisions of section 27-2077 of the code for purposes of this section, rooming units for persons of low and moderate income provided pursuant to paragraph two or four of subdivision d of this section may be created through alterations of apartment units in a class A multiple dwelling.

g.*    Any person who violates the provisions of this section shall be subject to all of the remedies and penalties provided for in this title except that no civil or criminal penalties shall apply with respect to acts in violation of this section committed prior to August fifth, nineteen hundred eighty-five.

*As enacted but "1" probably intended.*

2. In addition to any other penalties set forth in this subdivision or in any other provisions of law, any person who violates the provisions of this section following August fifth, nineteen hundred eighty-five shall also be liable for a civil penalty in the amount of one hundred fifty thousand dollars for each single room occupancy dwelling unit unlawfully altered, converted or demolished.

3. An owner who falsely represents an intention to occupy a dwelling in order to obtain a permit pursuant to clause (ii) of subparagraph (a) of paragraph one of subdivision d of this section to do work which would otherwise be prohibited pursuant to subdivisions a and c of this section shall be liable for a civil penalty of fifty thousand dollars for each single room occupancy dwelling unit demolished or converted to use as apartments under such permit.

4. Such civil penalties shall be recovered by the corporation counsel in an action in any court of competent jurisdiction. A judgement recovered in such an action shall constitute a lien against the premises with respect to which the violation occurred from the time of the filing of a notice of pendency in the office of the clerk of the county in which such premises is situated. A notice of pendency may be filed at the time of the commencement of this action or at any time before final judgement or order.

5. In addition to any other penalties set forth in this subdivision or in any other provisions of law, the commissioner shall either (i) refuse to issue or shall seek to have revoked the certificate of occupancy of a dwelling which has been altered, converted or demolished after August fifth, nineteen hundred eighty-five to reduce the number of single room occupancy dwelling units in violation of this section unless the owner makes the payment or provides replacement units pursuant to subparagraph (a) of paragraph four of subdivision d of this section for each single room occupancy dwelling unit which was unlawfully altered, converted or demolished, provided, however, that such owner shall not be eligible for a reduction in such payment pursuant to subparagraph (b) of paragraph four of subdivision d of this section; or (ii) order any single room occupancy multiple dwelling to be restored so that the number of single room occupancy dwelling units is increased up to the number of such units prior to such alteration or conversion.

h.    All applications submitted pursuant to this section shall be accompanied by an affidavit of the owner attesting to the accuracy and truthfulness of the information contained therein and an application fee. The department of housing preservation and development is authorized to establish such reasonable fees as may be appropriate.

i.    The commissioner of housing preservation and development shall establish a single room occupancy housing development fund company pursuant to the provisions of article eleven of the private housing finance law or such other provision of law as may be deemed appropriate by the corporation counsel. Monies paid to the company shall be used for the preservation, acquisition and development of dwelling units for persons of low and moderate income pursuant to applicable provisions of law and a preference in the occupancy of such dwelling units shall be given to individuals who are of low income, are single adults and whose last residence was in a single room occupancy multiple dwelling unit which was altered, demolished or converted. On or before June thirtieth, nineteen hundred eighty-eight and annually thereafter the company shall submit a report to the city council and to the mayor describing its activities during the preceding calendar year.

j.    All civil penalties recovered pursuant to any provision of this section shall be single room occupancy housing fund development company established pursuant to subdivision i of this section.

k.    The provisions of this section shall not be construed to alter, affect or amend any of the provisions of the emergency housing rent control act, the emergency tenant protection act of nineteen seventy-four or any local laws enacted pursuant thereto, the emergency housing rent control law, the rent stabilization law of nineteen hundred sixty-nine and the local hotel stabilization law of nineteen hundred sixty-nine.

l. For the purpose of this section and §27-198.3, "commissioner of housing preservation and development" may also mean such other agency or office of the city, as the mayor may direct.

*Local Law 9-1987.*

## *§ 27-198.3  Relocation of tenants in occupancy in certain single room occupancy multiple dwellings.-

a.    An owner who, pursuant to either clause (i) or (ii) of subparagraph (a) of paragraph four of subdivision d of section 27-198.2, seeks an exemption from the provisions of subdivisions a and c of such section, shall be required to offer tenants in

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff    Pg 287 of 654

Title 27 / Subchapter 1

occupancy as of January twentieth, nineteen hundred eighty-seven, or thereafter, an opportunity for relocation to a comparable unit at a comparable rent and such comparable unit shall be located in the same borough in which the single room occupancy unit which is to be exempted is located. Any owner subjected to the provisions of subdivisions a and c of such section shall, on or before April first, nineteen hundred eighty-seven, submit to the commissioner of housing preservation and development a sworn statement containing a list of tenants in occupancy as of January twentieth, nineteen hundred eighty-seven. A "tenant in occupancy" shall be defined as an occupant of a dwelling unit within a single room occupancy multiple dwelling who has lawfully occupied such dwelling unit for thirty consecutive days or longer or who has entered into a lease with respect to such dwelling unit.

b.    On or before April first, nineteen hundred eighty-seven, an owner of a single room occupancy multiple dwelling subject to the provisions of subdivisions a and c of section 27-198.2 of this code shall both post in a conspicuous, common area in such multiple dwelling and mail to each occupant on an annual basis thereafter and to each new occupant within ten days of occupancy, a notice, in a form approved by the commissioner of housing preservation and development, setting forth the rights of tenants in occupancy pursuant to this section and other applicable provisions of law. Such owner shall be subject to a civil penalty of one hundred dollars per day for each and every day that such owner fails to mail, or to post such notice after April first, nineteen hundred eighty-seven.

c.    The commissioner of housing preservation and development shall not authorize the exemption of any single room occupancy dwelling unit from the prohibitions contained in subdivisions a and c of section 27-198.2 of this code unless the owner of such single room occupancy multiple dwelling shall submit a sworn statement to such commissioner accounting for all vacancies occurring at such multiple dwelling after January twentieth, nineteen hundred eighty-seven by submitting to such commissioner a sworn statement by each and every tenant in occupancy at such multiple dwelling, on January twentieth, nineteen hundred eighty-seven, or thereafter, who has vacated such multiple dwelling, that such tenant was advised by the owner, prior to vacating such dwelling, of his or her right to remain at such dwelling and his or her right to be offered relocation by such owner pursuant to this section. Where a vacancy has occurred at such multiple dwelling after January twentieth, nineteen hundred eighty-seven and the owner does not submit the affidavit of such tenant, the owner shall submit an affidavit to such commissioner stating either that such tenant wrongfully refused to sign such affidavit or, if the owner lacks knowledge of the cause for such vacancy, setting forth the period of such tenant's occupancy at such multiple dwelling, the date of such tenant's vacating of such multiple dwelling and the circumstances thereof. The commissioner shall have the discretion not to accept an affidavit which such

commissioner has reason to believe is substantially or materially inaccurate.

d.    Where an owner, pursuant to either clause (i) or (ii) of subparagraph four of subdivision d of section 27-198.2, seeks an exemption from the provisions of subdivisions a and c of such section for single room occupancy dwelling units which had tenants in occupancy as of the date of the application for such exemption, such owner shall submit to the commissioner of housing preservation and development a relocation plan for such tenants. If such plan is approved by such commissioner, the owner shall notify such tenants, in a form approved by such commissioner, of their right to elect to accept the offer of relocation pursuant to such plan within the period of ninety days from the date of such notification. A tenant in occupancy who fails to accept such an offer within such ninety day period or rejects such offer shall be deemed to have waived his or her right to relocation pursuant to this section. Upon approval of a relocation plan by such commissioner, the commissioner, shall notify those parties who have registered with the commissioner as being interested in providing tenants in occupancy with alternative offers of relocation.
*Local Law 9-1987.*

## ARTICLE 20  CONDITIONS OF PERMIT

§[C26-119.1]  27-199  Payment of fees.- No permit shall be issued unless and until the required fee or fees therefor, as prescribed in subchapter three of chapter one of title twenty-six of the administrative code shall have been paid.

§[C26-119.2]  27-200  Compliance with code, etc.- Permits shall be deemed to incorporate the provisions [*sic*] that the applicant, his or her agent, employees, and contractors shall carry out the permitted work or use in accordance with the provisions of this code and other applicable laws and regulations, whether specified or not, except insofar as variations therefrom have been legally permitted or authorized.

§[C26-119.3]  27-201  Compliance with application, plans, etc.-
All work shall conform to the approved application and accompanying plans and papers, and any approved amendments thereto.

§[C26-119.4]  27-202  Adherence to lot diagram.-
All work shall be located strictly in accordance with the approved lot diagram; and no lot or plot shall be changed, increased or diminished in area from that shown on the approved lot diagram, unless and until a revised diagram showing such changes, accompanied by the necessary statement of the owner or applicant,

shall have been submitted to and approved by the commissioner.

**§[C26-119.5] 27-203 Compliance with safety requirements.-**
All building operations shall be conducted in accordance with and subject to the safety requirements of this code and other applicable laws and regulations, including any order or requirement by the commissioner that the building under construction or alteration be vacated, in whole or in part during the progress of the work and until the issuance of a certificate of occupancy.

**\*§[C26-119.6] 27-204 Builder's pavement.-**

a. Every permit issued for the construction or alteration of any building shall contain a statement that no certificate of occupancy or letter of completion shall be issued with respect to such building unless the sidewalk in front of or abutting such building, including but not limited to the intersection quadrant for corner property, shall have been installed and paved or repaired by the owner at his or her own cost, in the manner, of the materials, and in accordance with the standard specifications prescribed by the department of transportation pursuant to sections 19-113 and 19-115 of the code except where the commissioner has determined that such sidewalk is not required, unless the owner of such premises furnishes to the department prior to the issuance of a certificate of occupancy or letter of completion security satisfactory to the department that the sidewalk will be installed and paved or repaired within the time specified by the department. Nothing contained in this subdivision shall impair or diminish the power of the commissioner to waive the requirements of this subdivision if he or she shall determine that conditions do not require the construction [*sic*] of such sidewalks, nor affect the obligations of an owner of property specified under subdivision (a) of section 19-152 of the code, or relieve such owner of any such obligations, or impair or diminish the rights of the city or its agencies to enforce such obligations.

b. No permit shall be granted for the construction or alteration of any building, unless the owner of such premises has furnished to the department a policy of liability insurance, marked paid, in such amounts as may be fixed by the department. Such policy shall insure, indemnify and save the city harmless from all claims, suits, demands, causes of action and judgments by reason of personal injuries, including death, sustained by any person and from any claims, suits, demands, causes of action and judgments for damages to property, occurring on any sidewalk on, abutting or in front of such premises, including but not limited to the intersection quadrant for corner property, up to the date of issuance of such certificate of occupancy or letter of completion or up to the date on the completion of the installation and pavement of such sidewalk in accordance with the standard specifications and regulations prescribed by the commissioner of the department of transportation pursuant to sections 19-113 and 19-115 of the code,

whichever is later. In the event that the owner of the premises is covered by a policy of liability insurance, the department may accept a certificate of endorsement extending such policy to include the city within the policy's coverage.
*Local Law 65-1996.*

## ARTICLE 21 DEPARTMENT INSPECTIONS

**§[C26-120.1] 27-205 Right of entry and inspection.-**
The commissioner or his or her authorized representatives, in the discharge of their duties, shall have authority to enter upon and examine and inspect at all reasonable times any building, enclosure, or premises, or any part thereof, or any signs or service equipment attached thereto or contained therein, for the purpose of determining compliance with the provisions of this code and other applicable laws and regulations.

**§[C26-120.2] 27-206 Identification of inspectors.-**
Officers and employees of the department, in the discharge of their duties, shall identify themselves by exhibiting the official badge of the department; and other authorized representatives of the commissioner shall identify themselves by producing and exhibiting their authority in writing signed by the commissioner.

**§[C26-120.3] 27-207 General provisions.-** All examinations and inspections, including all tests in connection therewith, as required by the provisions of this code and other applicable laws and regulations, shall be made and conducted under the direction of the commissioner and in accordance with such inspection and test procedures as may be prescribed by the provisions of this code or other applicable laws and regulations, with the expense of all tests to be borne by the owner or lessee, or the contractor performing the work. The commissioner may accept inspection and test reports from officers and employees of the department and other government agencies. The commissioner may accept signed statements and supporting inspection and test reports filed by architects, engineers or persons superintending construction work and the installation of equipment, under and pursuant to the requirements of sections 27-131, 27-132, 27-135 and 27-136 of this subchapter.

**§[C26-120.4] 27-208 Preliminary inspection.-**
Before the issuance of a work permit, the commissioner may cause an examination and inspection to be made at the site of the proposed work.
**§[C26-120.5] 27-209 Inspections during progress of work.-** After the issuance of a work permit, inspections shall be made during the progress of the work at such times or at such stages of the work and in such manner as the commissioner shall direct; and such inspections shall include inspection of machinery

and equipment used for hoisting purposes, cableways and rigging purposes. The commissioner may accept signed statements by architects or engineers and supporting inspection and test reports which have been filed with the department covering materials and equipment subject to controlled inspection and semi-controlled inspection, as provided under sections 27-132, 27-133, 27-136 and 27-137 of this subchapter, and the work may, unless otherwise specifically provided by code provisions or directed by the commissioner, proceed without any verifying inspections or test by the department, provided that the names and business addresses of such architects or engineers shall have been set forth in the work permit application or filed in writing with the department not later than ten calendar days prior to the commencement of work thereunder.

**§[C26-120.6] 27-210  Final inspection.-** Upon completion of the work, and before the issuance of any certificate of occupancy or equipment use permit, a final inspection of the work shall be made by the department, at which the architect, engineer, or other person who supervised or superintended the construction, installation or alteration work shall be present; and any and all failures to comply with the provisions of this code or other applicable laws and regulations shall be noted and the owner or lessee promptly notified thereof in writing.

**§[C26-120.7] 27-211  Inspection of completed buildings.-** The commissioner shall cause inspections to be made periodically of completed buildings, and of signs and service equipment installations when so required by the provisions of subchapter four of chapter one of title twenty-six, or other applicable laws and regulations.

**§[C26-120.8] 27-212  Inspection reports.-** All inspection reports shall be in writing and signed by the inspector, or the responsible individual, or an officer of the inspection service, making the examination of inspection; and a record of all inspections shall be kept by the department.

## ARTICLE 22  CERTIFICATES OF OCCUPANCY

*§[C26-121.1] 27-213  General provisions.-All certificates of occupancy shall be issued by the commissioner and the issuance thereof shall be subject to the provisions of this section, and to the provisions of subdivision (b) of section six hundred forty-five of the New York city charter and article five of subchapter three of chapter one of title twenty-six.
*Local Law 91-1989.*

**§[C26-121.2] 27-214  New buildings; sidewalk requirements.-**
   a.   Except as permitted under the provisions of section 27-218 of this article, no building hereafter constructed shall be occupied or used, in whole or in part, unless and until a certificate of occupancy shall have been issued

certifying that such building conforms substantially to the approved plans and the provisions of this code and other applicable laws and regulations.
***b. (1) No certificate of occupancy or letter of completion shall be issued for any building, completed on or after April twenty-third, nineteen hundred sixty-three unless the sidewalk in front of or abutting such building, including but not limited to the intersection quadrant for corner property shall have been installed and paved or repaired by the owner at his or her own cost, in the manner, of the materials, and in accordance with the specifications prescribed by the department of transportation  pursuant to sections 19-113 and 19-115 of the code, or unless the owner of such premises has furnished to the department security satisfactory to it that such sidewalk will be installed and paved or repaired within the time specified by the department or unless the commissioner waives such requirement where conditions do not require the installation of a sidewalk.
      (2) The commissioner of buildings shall insure that streets are suitably improved in accordance with the standards and specifications of the department of transportation as required by subdivision two of section thirty-six of the general city law and shall otherwise carry out the provisions of such subdivision.
   c.   No certificate of occupancy or temporary certificate of occupancy (excluding amendments to previously issued certificates of occupancy) shall be issued on or after April first, nineteen hundred eighty-seven for any existing building which has not fully complied with all requirements of this code applicable to such existing building.
***Local Law 65-1996.*

**§[C26-121.3] 27-215  Altered buildings.-** Except as permitted under the provisions of section 27-218 of this article, no building hereafter altered so as to change from one occupancy group to another, either in whole or in part, or so as to affect any existing means of egress, or so as to increase the number of habitable rooms in the building, and no building hereafter altered for which a certificate of occupancy has not theretofore been issued, shall be occupied or used unless and until a certificate of occupancy shall have been issued certifying that the alteration work for which the permit was issued has been completed substantially in accordance with the approved plans and the provisions of this code and other applicable laws and regulations. If the building was not required to be vacated, either in whole or in part, during the course of the alteration work, the occupancy or use of the building shall not continue more than thirty calendar days after completion of the alteration work, unless a certificate of occupancy has been issued, as above provided.

**\*\*§[C26-121.4]    27-216    Existing buildings.-** Upon application by the owner of an existing building, and subject to the provisions of section 27-111 of article three of this subchapter, the commissioner shall issue a certificate of occupancy for such building, provided that at the time of issuing such certificate, no notices of violation or other notices or orders affecting the building as they relate to the provisions of this code are pending before the department of buildings, and provided further that it is established to the satisfaction of the commissioner, after inspection and investigation, that the alleged use of the building has heretofore legally existed. The issuance of a certificate of occupancy for any existing building on waterfront property not used in conjunction with and in furtherance of waterfront commerce and/or navigation shall be conditioned upon compliance with the provisions of this code regulating means of egress, and upon the issuance of a certificate of completion by the commissioner of ports and trade, and shall be limited to the uses and purposes certified to therein.
*\*\*Local Law 14-1989; Local Law 5-1986, language juxtaposed per Ch. 907-1985.*

**§[C26-121.5]  27-217  Change of occupancy or use.-**
   (a)  No change shall be made in the occupancy or use of an existing building which is inconsistent with the last issued certificate of occupancy for such building, or which would bring it under some special provision of this code or other applicable law or regulation, unless a new certificate of occupancy is issued by the commissioner certifying that such building or part thereof conform to all of the applicable provisions of this code and all other applicable laws and regulations for the proposed new occupancy or use.
   (b)  Except as provided by law, a new certificate of occupancy shall not be required where the change of use is within the same use group as listed in the amended zoning resolution. Where a building exceeds three stories in height and the change does not exceed twenty per cent of the total floor area, an amendment to the existing certificate of occupancy for such new use shall be issued by the commissioner certifying that the proposed new occupancy and use conforms to the provisions of the laws governing building construction and that the proposed use will not be in conflict with any provisions of the labor law, multiple dwelling law or the zoning resolution.

**†§[C26-121.6]  27-218  Temporary occupancy.-** The commissioner may, upon request, issue a temporary certificate of occupancy for a part or parts of a building before the entire work covered by the permit shall have been completed, provided that such part or parts may be occupied safely prior to completion of the building and will not endanger public safety, health or welfare, and further provided that the temporary certificate of occupancy shall be issued initially for a period between ninety and one hundred eighty days, in the case of all buildings classified in occupancy group J-3 or three-family homes, and ninety days for all other buildings subject to renewal for additional ninety-day periods at the discretion of the commissioner. When an applicant applies for an initial temporary certificate of occupancy for longer than ninety days, he or she must state the reason necessary for the longer time period.
*†Local Law 12-1993.*

**\*§[C26-121.7]  27-219  Applications for certificates of occupancy.-** All applications for certificates of occupancy shall be submitted on forms furnished by the department. Each application shall be accompanied by an accurate and complete lot survey made by a licensed surveyor showing the location of any new building and/or any extension to an existing building, the elevation of the first tier of beams or the first floor, the finished grades of all open spaces on the lot, the location and controlling grades of watercourses, paved swales and similar above-grade methods of storm water disposal when permitted by this code, the locations of all catch basins on the property, the established curb level, and the location of all other structures and impervious surfaces, as defined in subdivision (a) of section P110.2 of reference standard RS-16, on the lot. Such lot survey shall also show the location and boundaries of the lot or plot upon which such buildings and structures are located. The commissioner may waive the requirement of such survey in the case of small sheds, stands, signs, and similar small structures. In addition, prior to the issuance of a certificate of occupancy the department shall confirm by inspection that all work relating to the installation of the part of the storm water drainage system which shall lie outside of such property, if and as required by section 24-526 of this code, has been satisfactorily completed.
*\*Local Law 65-1996;  Note: For Excerpts from Local Law 7-1974, see end of Subchapter 1; Local Law 103-1989.*

**§[C26-121.8]  27-220  Applicant.-** The application for a certificate of occupancy shall be made by or in behalf of the owner of the building premises; and if made by a person other than the owner, the application shall be accompanied by a signed statement of the applicant stating that he or she is authorized by the owner to make the application. The full names and addresses of the owner, lessee, and applicant, and of the principal officers thereof, if a corporation shall be stated in the application.

**§[C26-121.9]  27-221  Statement of compliance.-** When a certificate of occupancy for a new or altered building is applied for, the application shall be accompanied by a signed statement of the architect, engineer or other person who supervised or superintended

the construction or alteration work, stating that he or she has examined the approved plans and specifications of the building for which the certificate of occupancy is sought, and that, to the best of his or her knowledge and belief, the building has been erected or altered in accordance with the approved plans and specifications and, as erected or altered, complies with the provisions of this code and all other applicable laws and regulations, except insofar as variations or variances therefrom have been legally permitted or authorized, specifying such variations or variances in such required statement.

**§[C26-121.10]  27-222 Issuance of certificates of occupancy.-**
(a)  All applications for certificates of occupancy and accompanying papers shall be examined promptly after their submission. If the building is entitled to the certificate of occupancy applied for, the application shall be approved and the certificate of occupancy issued by the commissioner within ten calendar days after submission of the application. Otherwise, the application shall be rejected and written notice of rejection stating the grounds of rejection, shall be given to the applicant within ten calendar days of the submission of the application. Wherever an application has been rejected and proof is thereafter submitted establishing that the grounds of rejection have been met and that the building is entitled to the certificate of occupancy applied for, the application shall be approved and the certificate of occupancy issued within ten calendar days after submission of such proof.

(b)  No certificate of occupancy or temporary certificate of occupancy shall be issued until a fire protection plan, if required under the provisions of article twenty-five, has been filed and accepted.

**(c)  No certificate of occupancy shall be issued until compliance with such provisions of chapter three of title twenty-seven of this code as may be required in regulations promulgated by the commissioner is certified by the bureau of electrical control.

This subdivision shall not apply to temporary certificates of occupancy issued by the commissioner pursuant to section 27-218 of this code.
***Local Law 73-1988.**

**§[C26-121.11]  27-223   Contents of certificates.-** In addition to the required certification by the commissioner, each certificate of occupancy shall state the purposes for which the building may be used in its several parts, and shall specify:
(a)  The occupancy group or groups which apply to all parts of the building.
(b)  The maximum permissible live loads on the several floors of the building.
(c)  The occupancy loads in the building and all parts thereof.
(d)  Any special stipulations and conditions of the building permit.

**§[C26-121.12]  27-224   Record of certificates.-** A record of all certificates of occupancy shall be kept by the department; and copies thereof shall be furnished by the department upon request, and on the payment of the fee prescribed in section 26-214 of the administrative code. The certificate of occupancy or a copy thereof shall be available for inspection at the building at all reasonable times.

### ARTICLE 23 POSTING BUILDINGS

**§[C26-122.1]  27-225   Posted occupancy and use.-** All buildings other than buildings classified in occupancy group J shall be posted by the owner with a sign or placard in a form prescribed by the commissioner, which shall be permanently affixed to the structure in a conspicuous location in a public hall or corridor of the building, and which shall state the live loads and the occupant loads in the building and all parts thereof, as provided in subchapters six, eight and nine of this chapter.

**§[C26-122.2]  27-226   Replacement of posted signs.-** All posted signs shall be furnished by the owner and shall be of permanent design, shall not be removed or defaced, and if lost, removed or defaced, shall be immediately replaced. The commissioner may inspect or cause to be inspected periodically all existing buildings for compliance with the provisions of this code in regard to posting; and the inspection  reports shall specify any violation thereof.

### ARTICLE 24 STOP-WORK ORDER

**§[C26-123.1]  27-227   Stop-Work notice and order.-** Upon notice from the commissioner, or his or her authorized representatives, that any work at any building or building site is being executed in violation of the provisions of this code or other applicable laws or regulations, or in a dangerous or unsafe manner, such work shall immediately be stopped. The notice shall be given to the owner or lessee of the property involved, or to the agent of either of them, or to the person or persons doing the work, and may be continued in a stop-work order issued by the commissioner stating the reasons for the issuance of the order and the conditions under which the work may be resumed.

[Conditions warranting issuance of a stop work order include but are not limited to, failure to have a construction site safety coordinator present in the course of on-going construction at those sites where department rules and regulations requires that a construction site safety coordinator be designated and present; the failure to erect a sidewalk shed (or

portions thereof), as required by Section C26-1901.5 of the administrative code, or the removal of a sidewalk shed or portions thereof, when such sidewalk shed is still required pursuant to Section C26-1901.5 of the administrative code.

In addition to the penalties provided for in this title, failure to comply with a stop work order shall be subject to the payment of a penalty in the sum of $500 for each day there is non-compliance, to be recovered in a civil action brought in the name of the commissioner; provided, however, this shall not apply to any work performed to remedy an unsafe or hazardous condition.]*

*Copy in brackets not enacted but probably intended.*
*(§C26-1901.5 referred to is renumbered §27-1021.)*

**§[C26-123.2]  27-228 Unlawful continuance.-** No person shall, with knowledge or notice of a stop-work order, continue or cause to be continued any work covered by such order, except such work as is directed to be performed to remove the violation or the dangerous or unsafe condition.

### ARTICLE 25 FIRE PROTECTION PLAN

**§[C26-124.1]  27-228.1  Applicability.-** This article shall apply to the following buildings and building sections:

(a) High rise buildings or building sections exceeding seventy-five feet in height.

(b) Buildings or building sections classified in occupancy group A, B, C, D, E or G which are two or more stories in height with over twenty thousand gross square feet per floor or are two or more stories in height with a total building floor area exceeding fifty thousand gross square feet.

(c) Any building containing an assembly use having an occupant load of three hundred or more persons.

(d) Buildings or building sections classified in occupancy group H or J-1 which are two or more stories in height and contain sleeping accommodations for thirty or more persons.

(e) Buildings or building sections classified in occupancy group J-2 which contain thirty or more dwelling units and over ten thousand gross square feet of floor area used for mercantile, assembly, educational or institutional purposes.

(f) Alterations to a building or building section listed in subdivisions (a) through (e) of this section, if the cost of the alterations, computed in accordance with section 27-119, exceeds one million dollars or involves a change of use.

**§[C26-124.2]  27-228.2  Scope.-**

(a) The plan shall include the following information, where applicable:

(1) Building description: address; block and lot numbers; number of stories; height in feet; occupancy group; construction classification; occupancy load and department of buildings application number.

(2) Key plans showing all floors, exits, corridors, partitions serving as fire separations or fire divisions, locations and ratings or required enclosures, stairs with pressurization, roof access, exit discharges, locations of frontage space.

(3) Descriptions in narrative form of safety systems and features, including:

a. Communications systems
b. Alarm systems
c. Smoke detection equipment
d. Location of fire command station
e. Elevator recall
f. Emergency lighting and power
g. Standpipes
h. Sprinklers
i. Compartmentation
j. Mechanical ventilation and air conditioning
k. Smoke control systems and equipment
l. Furnishings types and materials
m. Places of assembly
n. Fire department access
o. Other systems, required and voluntary, to be installed

(4) Proof that the fire safety plan, if required, has been filed with the fire department and accepted by that department.

**§[C26-124.3]  27-228.3  General Requirements.-** A fire protection plan, as defined in subchapter two shall be filed with the department by a registered architect or licensed professional engineer whose seal and signature shall be on the plan.

**§[C26-124.4]  27-228.4  Retroactivity.-** The requirements of this article shall apply to all alterations to, and construction of, buildings listed in section 27-228.1 in progress and not yet completed on March twenty-seventh, nineteen hundred eighty-four.

### ARTICLE 26  SPECIAL FILING REQUIREMENTS

**§[C26-125.1]  27-228.5  General Requirements.-** Owners of all existing buildings which are required to comply with the provisions of subdivision (a) of section 27-353.1 (elevator vestibules), section 27-381 and subdivision (b) of section 27-382 (exit lighting), subdivision (b) of section 27-384 (exit signs), section 27-396.3 (signs in sleeping rooms), section 27-777.2 (ventilation in J-1 buildings), subdivision (b) of section 27-929 (sprinklers, fire alarm systems, fire command and communication systems), paragraph two of subdivision (c) of section 27-989 (elevators in

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 293 of 654

Title 27 / Subchapter 1

readiness), section 27-996.1 (locks on hoistway doors) and section 27-996.2 (firemen's service) shall file with the department a report on or before April first, nineteen hundred eighty-seven certifying to the installation of the required fire protection systems in accordance with approved plans and appropriate permits prior to such date. Owners of all existing buildings not already subject to the requirements of article nine of subchapter six of this chapter as of January eighth, nineteen hundred seventy-three shall file with the department a report on or before October first, nineteen hundred eighty-five certifying to the installation of stair and elevator signs meeting the requirements of article nine of subchapter six of this chapter prior to such date. Such reports shall be on such forms and in such manner as prescribed by the commissioner. Failure to file such report by such dates shall be a violation of this section, which shall be punishable pursuant to section 26-125 of title twenty-six of the administrative code.

**Footnote: The following §§ 1 and 10 are unconsolidated provisions of Local Law 7 of 1974**

Section 1.  the council finds that serious flooding and ponding problems exist in areas of the city of New York which are presently without adequate sewers for the disposal of storm water.  The council further finds that these flooding and ponding problems endanger human life and cause substantial property damage. As the primary means of reducing these problems, the city of New York currently is engaged in an accelerated sewer construction program, approved by the council, of unprecedented scope. The city is also engaged in an active program of maintaining existing watercourses and other storm water disposal systems, pursuant to orders of the city's Board of Health. It is the expectation of the council that in the next twenty years the city sewer construction program will provide a large network of storm sewers for the areas of the city which presently lack them. In addition, however, the council recognizes that present construction of new buildings and developments without adequate storm water drainage in these unsewered areas is worsening existing flooding and ponding problems, and that the stringent storm drainage requirements for property owners set forth in this local law, which terminate December thirty-first, nineteen hundred ninety-three, are necessary as a temporary measure until the city has substantially advanced its accelerated sewer construction program.

§10. This local law shall take effect thirty days after it shall have become law. Its requirements insofar as they differ from or are additional to those of the administrative code of the city of New York in effect immediately prior to the effective date of this local law shall apply to the construction of all new buildings for which applications for new building permits have been filed on or after such effective date; provided, however, that such new or different requirements shall not apply to the construction of new buildings on specific sites for which schemes for storm water drainage have been approved by the environmental protection administration on or before such effective date if such construction lawfully commences within five years after such approval. A scheme for storm water drainage for the purpose of this section is an undetailed plan which shows the proposed drains, sewers and/or other means of storm water disposal, which the environmental protection administration normally require property owners to submit to it prior to the submission of a detailed plan for the construction of such facilities.

Effective date, May 16, 1974.

**\*ARTICLE 27**
**ALTERNATIVE PROCEDURE FOR CERTAIN PERMITS**

**27-228.6  Contract with not-for-profit corporation.**- Notwithstanding any other provision of law, the commissioner may enter into a contract with a not-for-profit corporation described in section 27-228.7 to provide for the examination and approval of plans and the issuance of permits by such corporation on behalf of the department for the installation or alteration of plumbing and plumbing systems, including gas piping, as provided in article fifteen of this subchapter, and for the installation or alteration of fire suppression piping systems, as provided in article seventeen of this subchapter.  Such contract shall require the not-for-profit corporation to agree to provide such services in conformity with sections 27-228.8, 27-228.9, 27-228.10, 27-228.11, 27-228.12, 27-228.13 and 27-228.14.

**\*\*27-228.7  Not-for-profit corporation.-** No contract shall be entered into pursuant to this article except with a not-for-profit corporation, a majority of the members of the board of directors of which are city officials.  Such members shall include one person designated by the speaker of the council and officers or employees of the department and the fire department, serving ex officio, and such other persons as provided in the bylaws of such corporation.  No such bylaws shall be adopted by such corporation prior to January 18, 1994.  For the purposes of this article the term "corporation" shall mean a not-for-profit corporation as set forth in this section.
**\*\*Local Law 109-1993; Local Law 107-1993.**

**27-228.8  Examination and approval of plans.**-
    (a)  The corporation shall examine and approve plans in accordance with and in the manner prescribed by the provisions of the charter, the code and the rules of the department relating to the

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 294 of 654

Title 27 / Subchapter 1

examination and approval of plans by the department, except as hereinafter provided.

(b)  Except where authorized by the commissioner, the corporation shall not have the authority to designate

(c)  portions of the examination of plans submitted by architects or engineers for limited supervisory check pursuant to section 27-143 of the code.

(d)  All plans approved by the corporation shall be endorsed with the official seal of the corporation.

(e)  The corporation shall use forms for applications which shall be prescribed by the commissioner.

### 27-228.9  Issuance of permits.-

(a)  The corporation shall issue permits in accordance with and in the manner prescribed by the provisions of the charter, the code and the rules of the department relating to the issuance of permits by the department, except as hereinafter provided.

(b)  Whenever work which requires a plumbing permit or a fire suppression piping system permit is a part of the construction of a new building or the alteration of an existing building, the corporation shall not issue such plumbing permit or fire suppression piping system permit until after the department has issued a new building permit or a building alteration permit to the applicant. The applicant shall submit to the corporation the final plans, approved by the department, for such new building or alteration and a copy of the new building permit or the building alteration permit issued by the department before the plumbing permit and/or the fire suppression piping system permit may be issued.

(c)  The corporation shall act in accordance with guidelines which the commissioner shall establish under which the corporation shall defer the approval of plans or the issuance of permits pending appropriate action by other city agencies.

(d)  The corporation shall not have the power to revoke any of the permits issued by the corporation but may recommend revocation to the commissioner.  The commissioner may revoke permits issued by the corporation pursuant to section 27-197 of the code.

(e)  All determinations of the corporation shall be subject to review by the board of standards and appeals to the same extent and in the same manner as if such determination were made by the department.

(f)  All permits issued by the corporation shall bear the signature of the chief operating officer of the corporation.

### 27-228.10  Fees.-  The corporation shall collect fees on behalf of the department for permits which the corporation issues.  The disposition of such fees shall be governed by the contract between the corporation and the city.

### 27.228.11  Employment conditions.-

(a)  The corporation shall require its salaried officers and employees to agree in writing:

(1)  to refuse to accept gratuities in the performance of their duties for the corporation;

(2)  to be subject to the restrictions set forth in chapter sixty-eight of the New York city charter; and

(3)  to be subject to the restrictions upon outside work, employment and financial interests set forth in section 26-114 of the code.

(b)  The corporation shall require its per diem employees and consultants to agree in writing to refuse to accept gratuities in the performance of their duties for the corporation.

(c)  The corporation shall adopt disciplinary and other procedures to ensure compliance with such agreements.

### 27-228.12  Inspection.-  With respect to the permits issued by the corporation, the corporation shall perform the inspections described in sections 27-208, 27-209 and    27-210 of the code.  For such purpose, employees of the corporation shall be designated as authorized representatives of the commissioner pursuant to section 27-205 with authority to enter upon and examine and inspect at all reasonable times any building.

### 27-228.13  Records.-  The corporation shall keep and maintain records relating to the services performed on behalf of the department in a manner and for such period of time as shall be agreed upon between the department and the corporation.

### 27-228.14  Corruption prevention program.-  The corporation shall develop and implement a corruption prevention program to detect and punish corrupt conduct by employees in carrying out their duties on behalf of the corporation which shall not be less restrictive than the corruption prevention program for employees of the department.  Such program shall provide for the dismissal of employees who are found to be engaged in corrupt activities, including the solicitation and acceptance of gratuities.  The corporation shall not commence services pursuant to the contract until a plan for the implementation of such program has been reviewed and approved by the commissioner.

### 27-228.15  Performance review by the commissioner.-  The commissioner shall establish such procedures for the audit, inspection, examination and review of services performed by the corporation on behalf of the department as may be necessary to ensure that the examination and approval of plans, the issuance of permits and conduct of inspections performed by the corporation are carried out in a manner consistent with the provisions of this article.

### 27-228.16  Jurisdiction of the fire department.-  The provisions of this article shall not be construed to affect, alter or amend the jurisdiction of the fire department over the inspection and testing of plumbing and fire suppression piping systems.
*Local Law 107-1993.*

## SUBCHAPTER 2
## DEFINITIONS

### TABLE OF CONTENTS

| [Sub-Art. or Sec.]* | Art. or Sec.** | |
|---|---|---|
| **[200.0]** | **Art. 1** | **General** |
| [200.1] | 229 | Application of Terms |
| [200.2] | 230 | Definitions in Reference Standards |
| [200.3] | 231 | Tense, Gender, and Number |
| **[201.0]** | **Art. 2** | **Definitions** |
| [201.0] | 232 | Definitions |
| **[202.0]** | **Art. 3** | **Abbreviations** |
| [202.0] | 233 | Abbreviations |

*"C26" omitted from section numbers in this column.
**"27" omitted from section numbers in this column.

### ARTICLE 1 GENERAL

**§[C26-200.1] 27-229 Application of terms.-**
The words and terms listed in this subchapter shall have the meanings given herein. Where terms are not defined they shall have their ordinarily accepted meanings or such as the context may imply.

**§[C26-200.2] 27-230 Definitions in reference standards.-**
Definitions that appear in any building code reference standard shall apply to the provisions of that reference standard only.

**§[C26-200.3] 27-231 Tense, gender, and number.-**
Words used in the present tense include the future; words used in the masculine gender include the feminine and neuter; words used in the singular include the plural, and the plural the singular.

### *** ARTICLE 2 DEFINITIONS
***Italicized words within definitions are themselves defined elsewhere in this section.*

**§[C26-201.0] 27-232 Definitions.-**Words that are capitalized are defined in this section.

**ACCESSORY BUILDING.** -A *building,* the *use* or occupancy of which is incidental to that of the main *building.*

**ACCESSORY USE.**-A *use* or *occupancy* incidental to the principal *use* or *occupancy* of a *building.*

**†ACCESSIBLE.**-A building or portion thereof and the accessory public areas thereof are accessible when they comply with subarticle two of article two of subchapter four of chapter one of title twenty-seven of this code and can be approached, entered and used by people having physical disabilities.

**†ACCESSIBLE ROUTE.**-A continuous unobstructed path connecting all accessible spaces and rooms in a building that can be negotiated by all categories of people having physical disabilities. Interior accessible routes may include corridors, doorways, floors, ramps, elevators, lifts and clear floor space adjacent to fixtures. Exterior accessible routes may include parking access aisles, curb ramps, walks, ramps and lifts.

**ACCESS STAIR.**-A stair between two floors, which does not serve as a *required exit.* (See EXTERIOR STAIR and INTERIOR STAIR).

**†ADAPTABLE DWELLING UNITS.**-Dwelling units which are constructed on an accessible route and equipped as set forth in reference standard RS 4-6, so that they may be converted to be used, with a minimum of structural change, by all categories of people having physical disabilities.
†*Local Law 58-1987.*

**ADDITION.** An extension or increase in *floor area* or *height* of a *building* that increases its exterior dimensions.

**ADJOINING GRADE ELEVATION.**- The average elevation of the final *grade* adjoining all exterior *walls* of a *building,* calculated from grade elevations taken at intervals of ten feet around the perimeter of the *building.*

**AIR CONDITIONING.**-The process by which the temperature, humidity, movement, cleanliness, and odor of air circulated through a space are controlled simultaneously.

**AIR-SUPPORTED STRUCTURE.**-A *structure* consisting of skin diaphragms made of flexible material, which achieves its shape, support, and stability from internal air pressure.

**ALLOWABLE SOIL PRESSURE.**-The maximum stress permitted in soil of a given type and under given conditions.

**ALLOWABLE STRESS.**-The maximum stress permitted at a given point in a structural member under given conditions.

**ALTERATIONS.**- Any *addition,* or change or modification of a *building,* or the *service equipment* thereof, that affects safety or health and that is not classified as a *minor alteration* or *ordinary repair.* The moving of a *building* from one location or position to another *shall* be deemed an alteration.

**AMUSEMENT ATTRACTION.**- A game of chance or skill or similar activity in which the public participates as a form of amusement.

**AMUSEMENT DEVICE.**- A mechanically operated device or *structure,* open to the public, *used* to convey persons in any direction as a form of amusement.

**APARTMENT HOUSE.**-(See MULTIPLE DWELLING.)

**††APPROVED.**-When used in connection with plans, materials and equipment *shall* mean approved by the *commissioner;* when used in connection with materials and equipment, *shall* also mean previously approved by the *board,* unless such approval is amended or repealed by the commissioner; otherwise *shall* mean approved by the department or agency indicated by the text.
††*Local Law 49-1991.*

**ARCHITECT**.-A *person* licensed to practice the profession of architecture under the education law of the state of New York.

**AREA OF REFUGE**.-A floor area to which egress is made through a *horizontal exit* or *supplemental vertical exit.*

**AREAWAY**.-A space below *grade,* adjacent to a *building,* open to the outer air and enclosed by walls.

**ASSEMBLY SPACE**.-Any part of a *place of assembly,* exclusive of a stage, that is occupied by numbers of *persons* during the major period of *occupancy.* Every *tier of seating* shall be considered a separate assembly space.

**ATRIUM**.-A vertical opening or series of openings within a building connecting three or more floors, which may be covered at the top, and which is used for purposes other than an enclosed stairway, elevator hoistway or utility shaft.

**ATTIC**.-The space between the ceiling framing of the top most *story* and the underside of the *roof* framing.

**AUTOMATIC**.-As applied to an *opening protective, shall* mean a door, window, damper, or other device, and its assembly, which is normally open and is designed to close automatically when subjected to a predetermined temperature, rate of temperature rise, or abnormal smoke condition.

**AUTOMATIC DRY STANDPIPE SYSTEM**.- A *standpipe system* in which all piping is filled with air, either compressed or at atmospheric pressure. Water enters the system through a control valve actuated either automatically by the reduction of air pressure within the system or by the manual activation of a remote control located at each hose station.

**AUTOMATIC DRY PIPE SPRINKLER SYSTEM**.- A *sprinkler system* in which the piping up to the sprinkler heads is filled with air, either compressed or at atmospheric pressure, with the water supply controlled by a Type A or Type B *dry pipe valve.*

**AUTOMATIC FIRE PUMP**.-A pump that maintains a *required* water pressure in a fire extinguishing system and which is actuated by a starting device adjusted to cause the pump to operate when the pressure in the system drops below a predetermined pressure, and to stop the pump when the pressure is restored.

**AUTOMATIC OPERATION**.- As applied to an *elevator, shall* mean operation whereby the starting of the car is effected in response to the momentary actuation of operating devices at the landing, and/or of operating devices in the car identified with the landings, and/or in response to an automatic starting mechanism, and whereby the car is stopped automatically at the landings.

**AUTOMATIC WET PIPE SPRINKLER SYSTEM**.-A *sprinkler system* in which all piping and sprinkler heads are at all times filled with water under pressure which is immediately discharged when a sprinkler head operates, with the water continuing to flow until the system is shut off.

**AUTOMOTIVE LIFT**.-A vehicle-lifting device, the purpose of which is to raise an entire vehicle to provide accessibility for under-chassis service.

**AUTOMOTIVE REPAIR SHOP**.-A *building* or space in which *motor vehicles* are repaired.

**AUTOMOTIVE SERVICE STATION**.-A *building,* space, or *premises used* for the storage and sale of motor fuels, and which may also have facilities for lubrication, minor repairs, or washing of *motor vehicles.*

**BACKFLOW** (water supply).-The flow of water or other substances into the distribution pipes of a *potable water* supply from any source other than the intended source.

**BALLOON FRAME**.-Light timber *construction* in which the exterior *walls* consist of studs that are either continuous through floors or interrupted only by thickness of plates.

**BASEMENT**.-A *story* partly underground, but having less than one-half its clear height (measured from finished floor to finished ceiling) below the *curb level;* except that where the *curb level* has not been legally established, or where every part of the *building* is set back more than twenty-five feet from a *street line,* the height *shall* be measured from the *adjoining grade elevation* .(See CELLAR.)

**BEARING**.-As applied to a wall or *partition, shall* mean supporting any vertical load in addition to its own weight.

**BELT-DRIVE MACHINE**.-As applied to an *elevator, shall* mean an indirect-drive machine having a single belt or multiple belts as the connecting means.

**BOARD**.-The board of standards and appeals of the city of New York.

**BOARDER (ROOMER, LODGER)**.- An individual living within a household who pays a consideration for such residence and does not *occupy* such space as an incident of employment therein.

**BREEZEWAY**.-A *structure* open to the outdoors consisting of a *roof,* roof supports, and floor, connecting a garage or other *accessory building* with a *dwelling.*

**BUILDING**.-An enclosed *structure* including *service equipment* therein. The term *shall* be construed as if followed by the phrase *"structure, premises,* or part thereof" unless otherwise indicated by the text.

**BUILDING HOUSE DRAIN**.-That part of the lowest piping of a *drainage system* that receives the discharge from the soil, waste, and other drainage pipes and conveys it to the *building house sewer* by gravity. The building house drain *shall* be considered to extend five feet outside the exterior wall of the *building.*

**BUILDING HOUSE DRAIN (COMBINED)**.-A *building house drain* that conveys storm water in combination with *sewage* or other drainage.

**BUILDING HOUSE DRAIN (SANITARY)**.- A *building house drain* that carries *sewage* only.

**BUILDING HOUSE DRAIN (STORM)**.-That part of the lowest piping of a storm *drainage system* that receives clear water drainage from *leaders,* surface run-off, ground water, subsurface water, condensate, cooling water, or other similar storm or clear drainage and conveys it to the *building house storm sewer* by

gravity. The building house storm drain *shall* be considered to extend five feet outside the exterior wall of the *building.*

**BUILDING HOUSE SEWER**.-That part of the horizontal piping of a drainage system that extends from the end of the *building house drain* and that receives the discharge of the *building house drain* and conveys it to a *public sewer, private sewer,* individual *sewage-disposal system,* or other point of disposal.

**BUILDING HOUSE SEWER (COMBINED)**.- A *building house sewer* that conveys *sewage* in combination with storm water and other clear water wastes.

**BUILDING HOUSE SEWER (SANITARY)**.- A *building house sewer* that carries sewage only.

**BUILDING HOUSE STORM SEWER**.-That part of the horizontal piping of a storm *drainage system* that extends from the *building house storm drain* to the public storm sewer, combined sewer, or other point of disposal.

**BUILDING SECTION**.-A room, floor, group of floors, wing, or any other portion of a *building* contained within *fire divisions.*

**BUILDING SUB-HOUSE DRAIN**.-That portion of a house *drainage system* that cannot drain by gravity into the *building house sewer.*

**BULKHEAD**.-An enclosed *structure* on or above the *roof* of any part of a *building,* enclosing a *shaft,* stairway, tank, or *service equipment,* or other space not designed or *used* for human occupancy. (See PENTHOUSE and ROOF STRUCTURE.)

**CABARET**.-The term cabaret shall mean any room, place or space in which any musical entertainment, singing, dancing or other similar amusement is permitted in connection with an eating and drinking establishment.

**CABLEWAY**.-A power operated system for moving loads in a generally horizontal direction in which the loads are conveyed on an overhead cable, track or carriage.

**CAR DOOR OR GATE**.-As applied to an *elevator, shall* mean the sliding portion of the car that closes the opening giving access to the car.

**CAR DOOR OR GATE SWITCH**.-As applied to an *elevator, shall* mean an electrical device, the function of which is to prevent operation of the driving machine by the normal operating device unless the car door or gate is in the closed position.

**CAR-SWITCH OPERATION**.- Operation of an *elevator* wherein the movement and direction of travel of the car are directly and solely under the control of the operator by means of a manually operated car switch or of continuous-pressure buttons in the car.

**CASING-OFF**.-The elimination of the frictional forces between a portion of a *pile* and the surrounding soil by use of a sleeve between the *pile* and the soil.

**CATCH PLATFORM**.- A platform or other *construction* projecting from the face of a *building,* supported therefrom, and *used* to intercept the fall of objects and to protect individuals and property from falling debris.

**CELLAR**.-A story partly or wholly underground, but having one-half or more of its clear height (measured from finished floor to finished ceiling) below the curb level; except that where the curb level has not been legally established, or where every part of the building is set back more than twenty-five feet from a street line, the height shall be measured from the adjoining grade elevation. Cellars shall not be counted as stories in measuring the height of buildings. (See BASEMENT.)

**CERTIFICATE OF OCCUPANCY**.- (See article twenty-two of subchapter one of this chapter.)

**CHAIN-DRIVE MACHINE**.-As applied to an *elevator, shall* mean an indirect-drive machine having a chain as the connecting means.

**CHARGING CHUTE (INCINERATOR)** . - An enclosed vertical passage through which refuse is fed to an incinerator.

**CHARGING GATE (INCINERATOR)** . - A gate in an incinerator *used* to control the flow of combustion gases into the *charging chute* and the entry of refuse into the combustion chamber.

**CHIMNEY**.-A vertical enclosure containing one or more *flues used t*o remove hot gases from burning fuel, refuse, or from industrial processes.

**CHIMNEY CONNECTOR**.-A pipe or metal breeching that connects combustion equipment to a *chimney.*

**CITY**.-The city of New York.

**CLOSED SHAFT**.-A shaft enclosed at the top.

**COATINGS, FIRE-RETARDANT**.- A material applied to the surface of a building material to improve its flame spread rating.

**COLLECTING SAFE AREA**.-A *safe area* that receives occupants from the *assembly space it serves,* as well as from other *safe areas.*

**COMMISSIONER**.-The commissioner of buildings of the city of New York, or his or her duly authorized representative.

**COMPRESSOR (REFRIGERATION)**.-A machine used for the purpose of compressing a *refrigerant.*

**CONCENTRATED LOAD**.- A conventional representation of an element of *dead* or *live load* whereby the entire load is assumed to act either at a point or within a limited area.

**CONCURRENT LOADS**.-Two or more elements of *dead* or *live load* that, for purposes of design, are considered to act simultaneously.

**CONSTRUCTION**.-Any or all work or operations necessary or incidental to the erection, demolition, assembling, installing, or equipping of buildings, or any alterations and operations incidental thereto. The term "construction" *shall* include land clearing, grading, excavating, and filling. It *shall* also mean the finished product of any such work or operations.

**CONSTRUCTION CLASS (GROUP)**.-The category in which a *building* or space is classified by the provisions of subchapter three of this chapter, based on the *fire-resistance ratings* of its *construction* elements.

**CONSOLE LIFT**.-A section of the *floor area* of a theater or auditorium that can be raised and lowered.

**CONTRACTOR**.-A *person* undertaking *construction*.

**CONTROLLED INSPECTION**.-(See section 27-132 of subchapter one of this chapter.)

**CORRIDOR**.-An enclosed public passage providing a means of access from rooms or spaces to an *exit*.  (See EXIT PASSAGEWAY.)

**COURT**.-An *inner court* or *outer court*.

**CRANE**.-A machine for lifting or lowering a load and moving it horizontally which utilizes wire rope and in which the hoisting mechanism is an integral part of the machine.

**CROSS AISLE**.-An aisle in a *place of assembly* usually parallel to rows of seats, connecting other aisles or an aisle and an exit.

**CROSS-CONNECTION (FIRE EXTINGUISHING SYSTEM)**.- Piping between risers and *siamese connections* in a *standpipe* or *sprinkler system*.

**CROSS-CONNECTION (POTABLE WATER SYSTEM)**.- A physical connection or arrangement between two otherwise separate piping systems, one of which contains *potable water,* and the other of which contains water of questionable safety, or steam, gases, or chemicals whereby there can be a flow from one system to another.

**CURB LEVEL**.-The legally established level on the curb in *front* of a *building,* measured at the center of such *front*.  When a *building* faces on more than one *street,* curb level *shall* mean the average of the legally established levels of the curbs at the center of each *front*.

**CURB LINE**.-The line coincident with the face of the *street* curb adjacent to the roadway.

**DATUM**.-(See section 27-158 of subchapter one of this chapter.)

**DEAD END**.-A portion of a *corridor* in which the travel to an *exit* is in one direction only.

**DEAD LOAD**.-Materials, equipment, *constructions,* or other elements of weight supported in, on, or by the *building* (including its own weight) that are intended to remain permanently in place.

**DECIBEL**.-A unit of measurement of the loudness of sound.  A division of a logarithmic scale for expressing the ratio of two amounts of power or energy.  The number of decibels denoting such a ratio is ten times the logarithm of the ratio.

**DELUGE SPRINKLER SYSTEM**.-An open head *sprinkler system* without water in the system piping, with the water supply controlled by an automatic valve operated by smoke or heat-responsive devices installed throughout the sprinklered area, and independent of the sprinkler heads.

**DEMOLITION**.-The dismantling or razing of all or part of a *building,* including all operations incidental thereto.

**DEPARTMENT**.-The department of buildings of the city of New York.

**DERRICK**.-An apparatus consisting of a mast or equipment members held at the top by guys or braces, with or without a boom, for use with a hoisting mechanism and operating ropes, for lifting or lowering a load and moving it horizontally.

**DRAINAGE SYSTEM**.-All the piping within public or private *premises,* which conveys *sewage*, rain water, or other liquid wastes to a legal point of disposal, but shall not include the mains of public sewer system or private or public sewage-treatment or disposal plant.

**DRAFT CURTAIN**.- A *noncombustible* curtain suspended in a vertical position from a ceiling for retarding the lateral movement of heated air, gases, and smoke along the ceiling in the event of fire.

**DRAFT HOOD**.-A device placed in and made part of a *chimney, vent connector,* or combustion equipment, to (1) insure the ready escape of the products of combustion in the event of no draft, back-draft, or stoppage beyond the draft hood, (2) prevent a back-draft from entering the equipment, or (3) neutralize the effect of excessive stack action of the *chimney flue* upon the operation of the equipment.

**DRY PIPE VALVE**.-A valve that automatically controls the water supply to a *sprinkler system* so that the system beyond the valve is normally maintained dry.

**DUCT (VENTILATION)** . - A pipe, tube, conduit, or an enclosed space within a wall or *structure*, used for conveying air.

**DUMBWAITER**.-A hoisting and lowering mechanism equipped with a car that moves in guides in a substantially vertical direction, the floor area of which does not exceed nine square feet, whose total inside height whether or not provided with fixed or movable shelves does not exceed four feet, the capacity of which does not exceed five hundred pounds, and that is used exclusively for carrying materials.

**DWELLING**.-Any *building occupied* in whole or in part as the temporary or permanent home or residence of one or more *families*.

**DWELLING UNIT**.-One or more rooms in a *dwelling* or building that are arranged, designed, *used* or intended for *use* by one or more *families*.

**ELECTRICALLY SUPERVISED**.-As applied to a control circuit, *shall* mean that in the event of interruption of the current supply or in the event of a break in the circuit, a specific signal will be given.

**ELEVATOR**.-A hoisting and lowering mechanism equipped with a car or platform that moves in guides in a substantially vertical direction, and that serves two or more floors of a *building*.

**ELEVATOR VESTIBULE**.-A room or space enclosed with noncombustible smoke barrier partitions with smoke stop doors conforming to subdivision (c) of section 27-371. Except for such smoke stop doors, openings to elevators shall be the only other door openings permitted in the enclosing partitions.

**EMERGENCY INTERLOCK RELEASE SWITCH**.-

As applied to an *elevator, shall* mean a device to make inoperative, in case of emergency, door or gate electric contacts or door interlocks.

**ENGINEER**.-A *person* licensed to practice the profession of engineering under the education law of the state of New York.

**EQUIVALENT UNIFORM LOAD**.-
A conventionalized representation of an element of *dead* or *live load*, used for the purposes of design in lieu of the actual *dead* or *live load*.

**ESCALATOR**.-A power driven, inclined, continuous stairway used for raising or lowering passengers.

**EXISTING BUILDING**.-A building, whether high rise or low rise:

(1) Which on April first, nineteen hundred eighty-four is complete or under construction, or

(2) For which an application for approval of plans has been filed with the department prior to October first, nineteen hundred eighty-four and construction commenced prior to April first, nineteen hundred eighty-six, provided that those requirements of this code applicable to existing buildings classified in the same occupancy group as the proposed building shall be complied with in accordance with the time limitations set forth in this code.

**EXISTING HIGH RISE BUILDING**.-A building, classified as a high rise structure:

(1) Which on April first, nineteen hundred eighty-four is complete or under construction, or

(2) For which an application for approval of plans has been filed with the department prior to October first, nineteen hundred eighty-four and construction commenced prior to April first, nineteen hundred eighty-six, provided that those requirements of this code applicable to existing buildings classified in the same occupancy group as the proposed building shall be complied with in accordance with the time limitations set forth in this code.

(1)* EXISTING OFFICE BUILDING, ONE HUNDRED FEET OR MORE IN HEIGHT.-An office building one hundred feet or more in height or a building classified in occupancy group E, one hundred feet or more in height:

(1) which on January eighteenth, nineteen hundred seventy-three is complete or under construction, or

(2) for which plans have been filed before January eighteenth, nineteen hundred seventy-three and construction commenced on or before January eighteenth, nineteen hundred seventy-four, or

(3) for which plans are filed on or before January eighteenth, nineteen hundred seventy-four and construction commenced on or before January eighteenth, nineteen hundred seventy-five and further provided that all the requirements for such existing office buildings are fully complied with in the course of construction and before completion.

*As enacted but "(1)" probably intended to be omitted.*

**EXIT**.-A means of egress from the interior of a *building* to an *open exterior space* which is provided by the use of the following, either singly or in combination:  exterior door openings, *vertical exits, exit passageways, horizontal exits,* *interior stairs, exterior stairs* or fire escapes; but not including *access stairs,* aisles, corridor doors or *corridors.*

**EXIT PASSAGEWAY**.-A horizontal extension of a *vertical exit,* or a passage leading from a *yard* or *court* to an *open exterior space.*

**EXTERIOR SEPARATION**.-The shortest distance across an unobstructed outdoor space measured from the furthest projection of the exterior wall of a *building* to an *interior lot line* or to a line halfway between the wall and that of any other *building* on the same lot, or to the centerline of an adjacent *street* or other *public space.*

**EXTERIOR STAIR**.-A stair open to the outdoor air, that serves as a *required exit.* (See ACCESS STAIR and INTERIOR STAIR.)

**FACING**.-As applied to a *sign, shall* mean the surface of the *sign,* upon, against or through which the message of the *sign* is exhibited.

**\*\*FAMILY**.-A single individual; or two or more individuals related by blood or marriage or who are parties to a domestic partnership, and living together and maintaining a common household, with not more than four *boarders, roomers* or *lodgers*; or a group of not more than four individuals, not necessarily related by blood, marriage or because they are parties to a domestic partnership, and maintaining a common household.
*\*\*Local Law 27-1998.*

**FIRE ALARM**.- A system, automatic or manual, arranged to give a signal indicating a fire emergency.

**FIRE AREA**.- A *floor* area enclosed by *fire divisions* and/or exterior walls.

**FIRE CANOPY**.- A solid horizontal projection, extending beyond the exterior face of a *building* wall, located over a wall opening so as to retard the spread of fire through openings from one *story* to another.

**FIRE DISTRICTS**.- The geographical territories established under subchapter four of this chapter for the regulation of *occupancy groups* and *construction classes* within such districts.

**FIRE DIVISION**.- Any construction, vertical, horizontal or otherwise, having the *required fire-resistance rating* and structural stability under fire conditions to provide a fire barrier between adjoining *buildings* or between adjoining or superimposed *fire areas* or *building sections* within the same *building.*

**FIRE DOOR**.-An *opening protective* in the form of a door and its assembly.

**FIRE PROTECTION PLAN**.-A report containing a narrative description of the life and fire safety systems and evacuation system for a structure, in accordance with section 27-228.2.

**FIRE-PROTECTION RATING**.-The time in hours or fractions thereof that an *opening protective* and its assembly will withstand fire exposure as determined by a fire test made in conformity with specified standards of subchapter five of this chapter.

WT_000298

**FIRE-RESISTANCE RATING**.-The time in hours or fractions thereof that materials or their assemblies will withstand fire exposure as determined by a fire test made in conformity with a specified standard of subchapter five of this chapter.

**FIRE RETARDANT TREATED WOOD**.-Wood that has been pressure impregnated with chemicals so as to reduce its combustibility.

**FIRE SAFETY PLAN**.-A description of the fire drill and evacuation procedures for a structure which is required to be submitted to the fire department in accordance with the requirements of section 27-4267 of the administrative code and the regulations of the fire Commissioner.

**FIRE SECTION**.-A sprinklered area within a *building* that is separated from other areas by *noncombustible* construction having a least a two-hour *fire-resistance rating*.

**FIRE SEPARATION**.-Any construction, vertical, horizontal, or otherwise, having the *required fire-resistance rating* to provide a fire barrier between adjoining rooms or spaces within a *building, building section,* or *fire area.*

**FIRESTOP**.- A solid or compact, tight closure to retard the spread of flames or hot gases within concealed spaces.

[*]**FIRE SUPPRESSION PIPING SYSTEM**.- Any system including any and all equipment and materials in connection therewith the purpose of which is to control, to contain, to suppress or to extinguish fire.
*Local Law 107-1993.*

**FIRE WALL**.-A *fire division* in the form of a wall.

**FIRE WINDOW**.-An *opening protective* in the form of a window and its assembly.

**FLAME SPREAD RATING**.-The measurement of the comparative rate of propagation of flame over the surface of a material as determined by a fire test made in accordance with a specified standard in subchapter five of this chapter.

**FLAMMABLE**.-Capable of being easily ignited when exposed to flame, and which burns intensely, or has a rapid rate of flamespread.

**FLASH POINT**.-The lowest temperature at which a liquid gives off sufficient vapor to form an ignitable mixture with air near the surface of the liquid or within the vessel used.

**FLOOR AREA**.-The projected horizontal area inside of walls, *partitions*, or other enclosing *construction*.

**FLOOR AREA (NET)**.-When used to determine the *occupant load* of a space, *shall* mean the horizontal occupiable area within the space, excluding the thickness of walls, and *partitions,* columns, furred-in spaces, fixed cabinets, equipment, and accessory spaces such as closets, machine and equipment rooms, toilets, stairs, halls, *corridors, elevators* and similar unoccupied spaces.

**FLUE**.-An enclosed passageway in a *chimney* to carry products of combustion to the outer air.

**FOLDED PLATE**.-An assembly consisting of one or more units, each unit of which is formed by two or more individually planar elements, termed plates, intersecting at angles.

**FOOTING**.-A *foundation* element consisting of an enlargement of a *foundation pier* or *foundation* wall, wherein the soil materials along the sides of and underlying the element may be visually inspected prior to and during its construction.

**FOUNDATION (BUILDING)**.-A *construction* that transfers *building* loads to the supporting soil.

**FOUNDATION PIER**.-A *foundation* element consisting of a column embedded into the soil below the lowest floor to the top of a *footing* or *pile cap*. Where a pier bears directly on the soil without intermediate *footings* or *pile caps,* the entire length of the column below the lowest floor level *shall* be considered as a foundation pier. Foundation piers *shall* be limited to piers so constructed that the entire surface of the sides of the pier and the *bearing* material under the lower end of the pier can be visually inspected prior to or during *construction,* but which will be concealed in the final work.  Piers below the lowest floor or *basement* level that will be exposed and open to inspection in the final work *shall* be considered as columns. Types of *construction* wherein the sides cannot be visually inspected *shall* be considered as piling.

**FOUNDATION WALL**.-A wall extending below *grade*.

**FRAMEWORK**.-As applied to a *sign, shall* mean the supports, uprights and bracing of the *sign.*

**FRESH AIR**.-Outdoor air.

**FRONT**. - As applied to *building* location on a *lot, shall* mean the distance between lines drawn through the most remote points of the *building* perimeter, projected at right angles to a *frontage space.*

**FRONTAGE SPACE**.-A *street,* or an open space outside of a *building,* not less than thirty feet in any dimension, that is accessible from a *street* by a driveway, lane, or alley at least twenty feet in width, and that is permanently maintained free of all obstructions that might interfere with its use by the fire department.

**FRONT YARD**.-A *yard* extending along the full length of a *street line.*

**GAS DISTRIBUTION PIPING**.-All piping from the house side of the *gas meter piping* that distributes gas supplied by a public utility to all fixtures and apparatus used for illumination or fuel in any *building*.

**GAS METER PIPING**.-The piping from the gas service line valve to the outlet of the meter regulator set or the meter if no regulator is required.

**GAS PIPING SYSTEMS**.-The gas service piping, meter piping and distribution piping.

**GAS SERVICE LINE VALVE**.-The valve located at or below grade on the supply side of the meter or service regulator, if a service regulator is required. If a plug type valve is used it shall be constructed so as to prevent the core from being blown out by the pressure of the gas. In addition, it shall be of a type capable of being locked in the off position by the local gas utility.

**GAS SERVICE PIPING.**-The supply piping from the street main up to and including the gas service line valve.

**GRADE.**-The finished surface of the ground, either paved or unpaved.

**GRADE BEAM.**- A beam, at, near, or below *grade*, spanning between footings, *pile caps* or *foundation piers*, and supporting walls or other elements of a *building*.

**GRANDSTAND.**- A *structure used* to support spectators, either standing or seated, usually outdoors.

**GROUND SIGN.**- A *sign* supported by uprights or braces in or upon the surface of the ground.

**GROUP HOME**- A facility for the care and maintenance of not less than seven nor more than twelve children, operated pursuant to subdivision (c) of section three hundred seventy-four of the social services law, or other provisions of applicable laws, and supervised by the New York state board of social welfare.

**\*\* HABITABLE ROOM.**-A residential room or space, having the minimum dimensions required by section 27-751 of article six of subchapter twelve of this chapter in which the ordinary functions of domestic life are carried on, and which includes bedrooms, living rooms, studies, recreation rooms, kitchens, dining rooms and other similar spaces, but does not include closets, halls, stairs, laundry rooms, or bathrooms.

**\*\****Chapter 559,Laws of 1995.***

**HEIGHT (BUILDINGS).**-The vertical distance from the *curb level* to the highest point of the *roof beams* in the case of flat roofs, or to a point at the average height of the gable in the case of roofs having a pitch of more than one foot in four and one-half feet; except that where the *curb level* has not been legally established, or where every part of the building is set back more than twenty-five feet from a *street line*, the height *shall* be measured from the *adjoining grade elevation*.

**HEREAFTER.**-On or after the effective date of this code.

**HERETOFORE.**-Before the effective date of this code.

**HIGH RISE.**-A structure seventy-five feet or more in height.

**HOISTWAY.**-An enclosed or partly enclosed *shaft* used for the travel of an *elevator, dumbwaiter,* platform or bucket.

**HOISTWAY DOOR.**-As applied to an *elevator shall* mean the hinged or sliding portion of a *hoistway* enclosure, which closes the opening giving, access to a landing.

**HOISTWAY DOOR INTERLOCK.**-A device used to prevent the operation of the driving machine of an *elevator* by the normal operating device unless the *hoistway door* is locked in the closed position, and also used to prevent the opening of the *hoistway door* from the landing side unless the car is within the landing zone and is either stopped or being stopped.

**\*HOISTING MACHINE.**-A power operated machine used for lifting or lowering a load utilizing a drum and wire rope, excluding elevators.   This shall include but not be limited to a crane, derrick and cableway.

**HORIZONTAL EXIT.**-(See Section 27-373 of article five of subchapter six of this chapter.)

**ILLUMINATED SIGN.**-A sign designed or arranged to give forth or reflect light from an attached artificial source.

**IMPACT LOAD.**-A kinetic load of short duration such as that resulting from moving machinery, *elevators*, craneways, vehicles, etc.

**\*As enacted but this definition probably intended to follow definition of "HIGH RISE".**

**INDEPENDENT POLE SCAFFOLD.**-A scaffold supported by multiple rows of uprights, and not depending on the *building* for support.

**INDIRECT WASTE PIPE.**-A drain pipe used to convey liquid wastes which does not connect directly with the *drainage system*, but which discharges into the house *drainage system* through an air break into a *trap*, fixture, receptacle, or interceptor.

**INDUSTRIAL LIFT.**- A hoisting and lowering mechanism of a nonportable power-operated unit for raising or lowering material vertically, operating entirely within one *story* of a *building*.

**INDUSTRIAL WASTE.**- Liquid, gaseous or solid substances, or a combination thereof, resulting from any process of industry, manufacturing, trade or business, or from the development or recovery of any natural resource.

**INNER COURT.**-Any open area, other than a *yard* or portion thereof, that is unobstructed from its lowest level to the sky and that is bounded by either *building walls*, or *building walls* and one or more *lot lines* other than a *street line* or *building walls*, except for one opening on any open area along an *interior lot line* that has a width of less than thirty feet at any point.

**INTERIOR LOT LINE.**-A *lot line* other than a *street line*.

**INTERIOR STAIR.**-A stair within a *building*, that serves as a *required exit*. (See **ACCESS STAIR** and **EXTERIOR STAIR**.)

**LAGGING (PILE).**-Pieces of timber or other material attached to the sides of *piles* to increase resistance to penetration through soil.

**LAMELLA.**-*Shell construction* in which the *shell* is formed by a lattice of interlacing members.

**LANDING DOOR.**-(See HOISTWAY DOOR.)

**LEADER.**-A vertical drainage pipe for conveying storm water from *roof* or gutter drains to a *building house storm drain, building house drain (combined),* or other means of disposal.   The leader *shall* include the horizontal pipe to a single *roof* drain or gutter drain.

**LESSEE.**-The *person* in possession of a *building* under a lease from the owner thereof.

**LICENSE.**- A *written* document issued by the *commissioner* authorizing a *person* to perform specific acts in or in connection with the *construction* or *alteration* of *buildings,* or the installation, *alteration*, and *use* and operation of *service equipment* therein.

**LIVE LOAD**. - All occupants, materials, equipment, *constructions* or other elements of weight supported in,

22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff   Pg 302 of 654

Title 27 / Subchapter 2

on or by a *building* that will or are likely to be moved or relocated during the expected life of the *building*.

**LOAD-BEARING**.-(See BEARING.)

**LOADING RAMP**.-A hinged, mechanically operated lifting device *used* for spanning gaps and/or adjusting heights between loading surfaces, or between loading surfaces and carriers.

**LODGER**.-(See BOARDER.)

**LOT**.-A portion or parcel of land considered as a unit. A zoning lot.

**LOT LINE**.-A line dividing one land unit from another, or from a *street* or other public space. A boundary line of a zoning *lot*.

**LOW RISE**.-A structure less than seventy-five feet in height.

**MALL**.-An enclosed or roofed area used as a pedestrian circulation space and connecting no more than three stories or portions of stories of a building or buildings housing single and/or multiple tenants.

**MANUAL FIRE PUMP**.-A pump that feeds water into a fire extinguishing system that must be started by either the building personnel or members of the fire department.

**MARQUEE SIGN**.-A *sign* placed flat against the front or side fascia of a marquee.

**MECHANICAL VENTILATION**.-The process of introducing outdoor air into, or removing vitiated air from a *building* by mechanical means. A mechanical ventilating system may include air heating, air cooling, or *air conditioning* components.

**MECHANIZED PARKING GARAGE EQUIPMENT**.- Special devices in mechanical parking garages that operate in either stationary or horizontal moving hoistways, that are exclusively for the conveying of automobiles, and in which no *persons* are normally stationed on any level other than the receiving level and in which each automobile during the parking process is moved by means of a power driven transfer device, on and off the elevator directly into parking spaces or cubicles.

**MEZZANINE**.-An intermediate floor between the floor and ceiling of any space. When the total gross *floor area* of all mezzanines occurring in any story exceeds thirty-three and one-third percent of the gross *floor area* of that story such mezzanine shall be considered as a separate story.

**MINOR ALTERATIONS**.-(See Section 27-124 of article five of subchapter one of this chapter.)

**MORTAR (GROUT)**.-A mixture of cementitious materials, fine-aggregates and water.

**MOTOR VEHICLE**.-A conveyance propelled by an internal combustion engine and having a fuel storage tank capacity of more than two gallons.

**MOVING WALK**.-A passenger-carrying device on which *persons* stand or walk, and in which the passenger-carrying surface remains parallel to its direction of motion and is uninterrupted.

**MULTIPLE DWELLING**.-A building containing three or more *dwelling units*. Multiple dwelling shall

not be deemed to include a hospital, school, convent, monastery, asylum or other public institution.

**NONAUTOMATIC SPRINKLER SYSTEM**.- A *sprinkler system* in which all pipes and sprinkler heads are maintained dry and which is supplied with water through a fire department *siamese connection*.

**NONAUTOMATIC STANDPIPE SYSTEM**.- A *standpipe system* in which all piping is maintained dry, and which is supplied with water through a fire department *siamese connection*.

**NONBEARING**.-As applied to a wall or *partition, shall* mean one that supports no vertical load other than its own weight.

*****NONCOMBUSTIBLE**.-A material which, in the form in which it is used in construction, will not ignite and burn when subjected to fire. However, any material which liberates flammable gas when heated to any temperature up to one thousand three hundred eighty degrees Fahrenheit for five minutes shall not be considered noncombustible. No material shall be considered noncombustible which is subject to increase in combustibility beyond the limits established above, through the effects of age, fabrication or erection techniques, moisture, or other interior or exterior atmospheric conditions.

*\*Local Law 13-1987.*

**NONCURRENT LOADS**.-Two or more elements of *dead* or *live* load which, for purposes of design, are considered not to act simultaneously.

**NONLOADBEARING**.-(See NONBEARING.)

**OCCUPANCY**.-The purpose or activity for which a *building* or space is *used* or is designed or intended to be *used.*

**OCCUPANCY GROUP**.-The category in which a building or space is classified by the provisions of subchapter three of this chapter, based on its occupancy or use.

**OCCUPANT LOAD**.-The number of occupants of a space, floor or *building* for whom exit facilities shall be provided.

**OCCUPIABLE ROOM**.-A room or space, other than a *habitable room* designed for human *occupancy* or *use*, in which *persons* may remain for a period of time for rest, amusement, treatment, education, dining, shopping, or other similar purposes, or in which occupants are engaged at work.

**OCTAVE**.-The interval between two sounds having a basic frequency ratio of two. By extension, the octave is the interval [*sic*] between any two frequencies having the ratio 2:1. The standard octave bands are:

|  |  | FREQUENCY (CPS) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Mid-Frequency |  | 63 | 125 | 250 | 500 | 1000 | 2000 | 4000 | 8000 |
| Approximate Frequency Limits | Lower | 45 | 90 | 180 | 355 | 710 | 1400 | 2800 | 5600 |
|  | Upper | 90 | 180 | 355 | 710 | 1400 | 2800 | 5600 | 11120 |

**OIL BUFFER**.-As applied to an *elevator,* shall mean a buffer using oil as a medium which absorbs and

dissipates the kinetic energy of a descending car or counterweight.

**OPEN EXTERIOR SPACE**.-A *street* or other *public space;* or a *yard, court,* or *plaza* open on one or more sides and unroofed or open on all sides, which provides egress to a street or public space.

**OPEN PARKING LOT**.-A *lot*, or portion thereof, *used* for the storage or sale of more than four *motor vehicles*, but not *used* for the repair or servicing of such vehicles.

**OPEN PARKING STRUCTURE**.-A structure open to the outdoors fifty percent or more on two or more sides of *each story, used* for the parking of *motor vehicles*.

**OPEN SHAFT**.-A *shaft* open to the outdoor air at the top.

**OPENING PROTECTIVE**.-An assembly of materials and accessories, including frames and hardware installed in an opening in a wall, *partition*, floor, ceiling or *roof* to prevent, resist, or retard the passage of flame, smoke or hot gases.

**ORDINARY REPAIRS**.-(See section 27-125 of this chapter.)

**OUTER COURT**.-Any open area, other than a *yard* or portion thereof, that is unobstructed from its lowest level to the sky and that, except for an outer court opening upon a *street line*, a *front yard*, or a *rear yard*, is bounded by either *building* walls or *building* walls and one or more *lot lines* other than a *street line*.

**OUTRIGGER SCAFFOLD**.-A scaffold, the platform of which is built upon supports cantilevering beyond the walls of the *building*.

**OUTSIDE GAS SERVICE LINE VALVE**.-The valve located on the gas service piping which can be either exposed or buried.

**OWNER**.-A *person* having legal title to *premises;* a mortgagee or vendee in possession; a trustee in bankruptcy; a receiver or any other *person* having legal ownership or control of *premises*.

**PARAPET**.-The continuation of an exterior wall, fire wall, or party wall above the roof line.

**PARKING TIER**.-A general level of parking.

**PARTITION**.-A vertical unit or assembly of materials that separates one space from another within any *story* of a *building*.

**PARTY WALL**.-A *fire division* on an interior lot line common to two adjoining buildings.

**PENTHOUSE**.-An enclosed *structure* on or above the roof of any part of a building, which is designed or used for human occupancy. (See BULKHEAD and ROOF STRUCTURE.)

**PERMIT**.-A *written* document issued by the *commissioner* authorizing the *construction, alteration,* or *demolition* of a *building*, or the installation, *alteration* or *use* and operation of *service equipment* therein.

**PERSON**.-An individual, partnership, corporation, or other legal entity.

**\*PHYSICAL DISABILITY**.-Any of the following:
(a) impairment requiring use of a wheelchair; or

(b) impairment causing difficulty or insecurity in walking or climbing stairs or requiring the use of braces, crutches or other artificial supports; or impairment caused by amputation, arthritis, spastic condition or pulmonary, cardiac or other ills rendering the individual semi-ambulatory; or

(c) total or partial impairment of hearing or sight causing insecurity or likelihood of exposure to danger in public places; or

*\*Local Law 58-1987.*

(d) impairment due to conditions of aging and incoordination. The term"physical handicap" shall have the same meaning as the term "physical disability" and the phrase people having "physical disabilities" shall include those having one or more physical disabilities.

**PILE**.-A structural element introduced into the ground to transmit loads to lower strata and of such construction that the material underlying the base of the unit or along the sides cannot be visually inspected.

**PILE CAP**.-A construction encasing the heads of one or more piles which transfers loads to the *pile* or *piles*.

**\*\* PLACE OF ASSEMBLY**.-An enclosed room or space in which seventy-five or more persons gather for religious, recreational, educational, political or social purposes, or for the consumption of food or drink, or for similar group activities or which is designed for use by seventy-five or more persons gathered for any of the above reasons, but excluding such spaces in dwelling units; or an outdoor space in which two hundred or more persons gather for any of the above reasons or which is designed for use by two hundred or more persons gathered for any of the above reasons.

*\*\*Local Law 23-1990.*

**PLASTIC**.-A material that contains as an essential ingredient an organic substance of large molecular weight, is solid in its finished state and, at some stage in its manufacture or its processing into finished articles, can be shaped by flow.

**PLASTIC, SLOW BURNING**.-A *plastic* having a rate of combustion within the limits of a specified standard of subchapter five of this chapter.

**PLATFORM FRAME**.-Light timber *construction* in which the exterior walls and bearing walls consist of studs which are interrupted at floors by the entire thickness of the floor *construction*.

**PLUMBING**.-The practice, materials, and fixtures used in the installation, maintenance, extension, and *alteration* of all piping, fixtures, appliances, equipment, and appurtenances in connection with any of the following: sanitary drainage or storm drainage facilities, the venting system and the public or private water supply systems, within or adjacent to any *building*; also the practice and materials used in the installation, maintenance, extension, or *alteration* of storm water, liquid-waste, or sewerage, and water-supply systems of any *premises* and their connection with any point of public disposal or other acceptable terminal.

**Title 27 / Subchapter 2**

**PLUMBING FIXTURES.**-Installed receptacles, devices, or appliances that are supplied with water or which receive or discharge liquids or liquid-borne wastes.

**PLUMBING SYSTEM.**- The water-supply and distribution pipes; plumbing fixtures and traps; soil, waste, and vent pipes; *building house drains* and *building house sewers* including their respective connections, devices, and appurtenances within the property lines of the *premises;* and water-treating or water-using equipment.

**POLE FOOTING.**-A type of *construction* in which a pole embedded in the ground and extending upward to form a column is used for both column and *footing.*

**PONDING.**-The collection of rainwater.

**\*POTABLE WATER.**-Water free from impurities present in amounts sufficient to cause disease or harmful physiological effects. Its bacteriological and chemical quality shall conform to the requirements of the department of health and mental hygiene.
*\*Local Law 22-2002*

**POWER-OPERATED SCAFFOLD.**-Any form of scaffold that is propelled vertically by the use of power machinery.

**PREMISES.**-Land, improvements thereon, or any part thereof.

**\*\*\*PRIMARY ENTRANCE(S).**-
The principal entrance(s) to a building primarily and expressly utilized for day-to-day pedestrian ingress and egress. Side, rear and other entrances solely used for freight and service shall not constitute a primary entrance.
*\*\*\*Local Law 58-1987.*

**PRIVATE GARAGE.**-A *building* or enclosed space used for the parking or storage of not more than four *motor vehicles* having fuel storage tanks of twenty-six gallon capacity or less, and in which no repair, body work, or painting of vehicles is conducted, and in which no gasoline, oil, or similar products are dispensed.

**PRIVATE SEWER.**-A sewer privately owned and controlled by public authority only to the extent provided by law.

**PROJECTING SIGN.**-A *sign* affixed to an exterior wall of a building and extending more than fifteen inches beyond the wall surface.

**PUBLIC AREAS.**-Area(s) within a building usually open to or used by the general public, such as lobbies, corridors, waiting rooms, reception rooms, rest rooms, etc.

**PUBLIC GARAGE.**-A *building* or space used for the parking or storage of *motor vehicles,* other than an *automotive service station, automotive repair shop, open parking structure, or private garage.* Truck loading and shipping areas shall be classified as public garages.

**PUBLIC SEWER.**-A sewer entirely controlled by public authority.

**PUBLIC SPACE.**-An open space outside of a *building,* which is dedicated or devoted to public use by lawful mapping or by any other lawful procedure.

**PURE TONE.**-A soundwave of a single frequency, so called to distinguish it from a complex tone.

**REAR LOT LINE.**-Any *lot line,* except a *street line,* that is parallel or within forty-five degrees of being parallel to, and does not intersect any *street line* bounding such *lot.*

**REAR YARD.**-A *yard* extending for the full length of a *rear lot line.*

**REBOUND.**-Recovery of displacement due to release or reduction of applied load.

**REFRIGERATION.**-The process by which heat is absorbed from a substance by expansion or vaporization of a refrigerant.

**REQUIRED.**-Shall mean required by the provisions of this code.

**RETAINING WALL.**-A wall designed to prevent the lateral displacement of soil or other materials.

**RIGGING LOFT.**-A space above a stage, designed and used for the flying and storage of *scenery and scenic elements.* A space used for the occasional flying of incidental props during a performance shall not be deemed to constitute a rigging loft.

**ROOF.**-The topmost slab or deck of a *building,* either flat or sloping, with its supporting members, not including vertical supports.

**ROOF COVERING.**-The covering applied to the exterior surface of a *roof* for weather resistances, fire resistance, wear, and/or appearance, but not including insulation.

**ROOF SIGN.**-A *sign* erected and maintained on or above the *roof* of a *building.*

**ROOF STRUCTURE.**-An unenclosed *structure* on or above the *roof* of any part of a *building.* (See BULKHEAD and PENTHOUSE.)

**ROOMER.**-(See BOARDER.)

**SAFE AREA.**-An interior or exterior space that serves as a means of egress by providing a transitional area from, and that also serves as a normal means of entry to, an *assembly space.*

**SAFETY (CAR OR COUNTERWEIGHT).**- A mechanical device attached to an *elevator* car frame or to an auxiliary frame, or to the counterweight frame, to stop and hold the car or counterweight in case of predetermined overspeed or free fall, or if the hoisting ropes slacken.

**SCENERY AND SCENIC ELEMENTS.**-Any or all of those devices ordinarily used on a stage in the presentation of a theatrical performance, such as back drops, side tabs, teasers, borders or scrim, rigid flats, set pieces, and all properties, but not including costumes.

**SCHOOL.**-An elementary school, high school, or college, either public or private.

**SEATING SECTION.**-An area of seating bounded on all sides by aisles, *cross aisles*, walls or *partitions.*

**SELF-CLOSING.**-As applied to an *opening protective shall* mean a door, window, damper, or other device, and its assembly that is normally kept in a closed position and that is equipped with an *approved* device to insure immediate closing after having been opened for use.

22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff   Pg 305 of 654

Title 27 / Subchapter 2

**SELF-RELIEVING CONSTRUCTION**.-*Construction* using a type of framing in which the connections are capable of developing a known and dependable moment capacity but which, under larger moments, are capable of rotating (without fracture) an amount sufficient to accommodate the deflection due to the excess of the applied moment over the moment capacity.

**SERVICE EQUIPMENT**.-Equipment, including all components thereof, which provides sanitation, power, light, heat, cooling, ventilation, air-conditioning, refuse disposal, fire-fighting, transportation, or similar facility for a building which by design becomes a part of the *building,* and which is regulated by the provisions of this code.

**SEWAGE**.-Any liquid waste containing animal or vegetable matter in suspension or solution, and may include liquids containing chemicals in solution.

**SEWAGE DISPOSAL SYSTEM**.-A system for the disposal of *sewage* by means of a septic tank, cesspool, or mechanical treatment, all designed for use apart from a *public sewer* to serve a single establishment, *building,* or development.

**SEWAGE EJECTOR**.-A mechanical device used to pump or eject *sewage.*

**SHAFT**.-A vertical, inclined, or offset passage, or *hoistway*, penetrating through two or more floors of a *building* or through a floor and *roof.* (See CLOSED SHAFT and OPEN SHAFT.)

**SHALL**.-As used in this code, is always to be construed as mandatory.

**SHELL**.-A *structure* consisting of a curved or folded slab whose thickness is small compared to its other dimensions, and which is characterized by its three dimensional load-carrying behavior. The term *shall* include those forms of *construction* that approximate slab surfaces, such as *lamellas* and lattices.

**SIAMESE CONNECTION**.-A fitting connected to a fire extinguishing system and installed on the outside of a *building*, with two hose inlets for use of the fire department, to furnish or supplement the water supply to the system.

**SIDE LOT LINE**.-Any *lot line* that is not a *street line* or a *rear lot line.*

**SIDEWALK ELEVATOR**.-A freight *elevator* that operates between a sidewalk or other area outside of a *building* and floor levels inside the *building* below such area which has no landing opening into the *building* at its upper limit of travel, and which is not used to carry automobiles.

**SIDE YARD**.-A *yard extending* along a *side lot line* from the *required front yard* (or from the *street line* if no *front yard* is *required*) to the *required rear yard* (or to the *rear lot line if* no rear yard is *required*).

**SIDEWALK SHED**.-A construction over a public sidewalk, used to protect pedestrians from falling objects.

**SIGN**.-An outdoor *structure,* banner or other device, designed or *used* as an advertisement, or announcement for the information or attraction of the public; consisting of the *framework* and all letters, words, numerals, illustrations, illumination, decorations, trade marks, emblems, symbols or other figures or characters.

**SINGLE POLE SCAFFOLD**.-A platform resting on putlogs or crossbeams, the outer ends of which are supported on ledgers secured to a single row of posts or uprights, and the inner ends of which are supported by a wall.

**SMOKE BARRIER**.- Any continuous non-combustible construction, vertical, horizontal, or otherwise, such as a wall, floor, or ceiling assembly, that is designed and constructed to restrict the spread of smoke.

**SMOKE-STOP DOOR**.-A door or set of doors placed in a *corridor* to restrict the spread of smoke and to retard the spread of fire by reducing draft.

**SOIL VENT**.-(See STACK VENT.)

**SOUND POWER**.-The rate at which sound energy is radiated by a source.

**SOUND POWER LEVEL**.-The ratio, expressed in *decibels,* [*sic*] of the *sound power* of a source to the reference power of ten-thirteen watts.

**SOUND PRESSURE LEVEL**.-The square ratio, expressed in decibels*,* of a sound pressure to a reference pressure of 0.0002 dynes per square centimeter.

**SPANDREL WALL**.-That portion of an exterior wall between the top of one opening and the bottom of another in the *story* directly above.

**SPARK ARRESTER**.-A device to prevent sparks, embers, or other ignited material above a given size from being expelled to the atmosphere from the top of a *chimney.*

**SPECIAL WASTE**.-Wastes that require special treatment before entry into the normal *plumbing system.*

**SPRAY BOOTH**.-A compartment in which spraying with any substance is carried on, consisting of at least two sides, a back, and a top.

**SPRAYING SPACE OR DIPPING SPACE**.-Any portion of a *building* in which the actual work of spraying, dipping, or immersing any article with or into *flammable* substances takes place.

**SPRINKLER ALARM**.-An apparatus constructed and installed so that a flow of water through the sprinkler system equal to, or greater than, that required for a single automatic sprinkler head will cause an alarm to be given.

**SPRINKLER SYSTEM**.-A system of piping and sprinkler heads connected to one or more sources of water supply.

**STACK**.-(See CHIMNEY.)- Also, a general term applying to any vertical line of soil, waste, vent, or inside leader piping. It shall not include vertical fixture and vent branches that do not extend through the *roof* or that pass through not more than two *stories* before being reconnected to the *vent stack* or *stack vent.*

**STACK VENT**.-The extension of a soil or waste stack above the highest horizontal drain connected to a plumbing *stack.*

**STAGE**.-An area used in the presentation of a live performance at anytime and includes: the performing area and non-audience areas that are open to the performing area. It may be level or raised with or without scenic elements, and generally is serviced by stage illumination appliances and control panels. For places of assembly classified as occupancy group F-1A or F-1B, the word stage shall be defined in accordance with the definition set forth in sections 27-546 and 27-547 of article three of subchapter eight of this code.

**STAGE LIFT**.-A movable section of a stage floor, designed to carry scenery between staging areas and the stage, and also *used* to be raised to and temporarily retained at elevations above or below the stage level.

**STANDPIPE SYSTEM**.-A system of piping, for fire-fighting purposes, consisting of connections to one or more sources of water supply, and serving one or more hose outlets.

**STORM DRAIN**.-(See BUILDING STORM DRAIN.)

**STORM SEWER**.-A sewer used for conveying rain water, surface water, condensate, cooling water, or similar clear liquid wastes which do not contain organic materials or compounds subject to decomposition.

**STORY**.-That portion of a *building* that is between a floor level and the next higher floor level or *roof* above.

**STREET**.-A thoroughfare dedicated or devoted to public use by legal mapping or other lawful means.

**STREET FLOOR**.-A floor, usually the principal entrance floor, that is not more than one-half *story* above or below *grade* at the location from which egress is provided to the *street.*

**STREET LINE**.-A *lot line* separating a *street* from other land.

**STREET MAIN**.-(See WATER MAIN and GAS SERVICE PIPING.)

**STRUCTURE**.-An assembly of materials forming *construction* for *occupancy* or *use*, including among others: *buildings*, stadia, tents, reviewing stands, platforms, stagings, observation towers, radio towers, tanks, trestles, open sheds, coal pockets, shelters, fences, and display *signs.*

**SUBSTRATE**.-A surface upon which a finish material is directly applied and which extends completely behind such finish material.

**SUMP PIT**.-A tank or pit that receives clear liquid wastes that do not contain organic materials or compounds subject to decomposition, located below the normal grade of the gravity system and that must be emptied by mechanical means.

**SUMP PUMP**.-A mechanical device used to pump the liquid waste from a *sump pit* into the gravity *drainage system.*

**SUPPLEMENTAL VERTICAL EXIT**.-An enclosed stair, ramp or *escalator* providing means of egress to an area of refuge at another level nearer to the *street floor.*

**THIS CODE**.-The building code.

**TIER OF SEATING**.-A general level of seating, such as an orchestra (usually the main tier), a balcony, or gallery.

**TRAILER CAMP**.-A *lot* or parcel of land used for temporary or permanent *occupancy* by two or more mobile homes or travel trailers.

**TRANSFER COLUMN**.-A column supported by beams, girders, trusses or similar members and reacting on two or more columns at a lower level.

**UNIFORMLY DISTRIBUTED LOAD**.-A conventionalized representation of an element of *dead* or *live load* as a load of uniform intensity, distributed over an area.

**\*USABLE DWELLING UNITS**.-Dwelling units which are accessible, constructed and equipped as set forth in reference standard RS 4-6, so as to be usable by all categories of people having physical disabilities.
*\*Local Law 58-1987.*

**USE (USED)**.-The purpose for which a *building, structure,* or space is *occupied* or utilized, unless otherwise indicated by the text. Use (used) *shall* be construed as if followed by the words "or is intended, arranged, or designed to be used".

**VAULT (SIDEWALK)**.-Any space below the surface of the sidewalk portion of a *street,* that is covered over, except those openings that are used exclusively as places for descending, by means of steps, to the *cellar* or *basement* of any *building.*

**VENT (GAS)**.-A *flue* or *duct,* used to convey the products of combustion from gas-fired equipment to the outdoor air by natural draft.

**VENT STACK (PLUMBING)**.-A vertical vent pipe extending through more than two *stories*, which is then connected to a *stack vent* or is otherwise extended through the *roof,* installed primarily for the purpose of providing circulation of air to and from any part of a *drainage system.*

**VENT SYSTEM (COMBUSTION)**.-A *gas vent* or *chimney,* together with a *vent connector* that forms a continuous unobstructed passageway from gas burning equipment to the outdoor air for the purpose of removing *vent gases.*

**VENT SYSTEM (PLUMBING)**.-A pipe or pipes installed to provide a flow of air to or from a *drainage system* or to provide a circulation of air within such system to protect *trap seals* from siphonage and back pressure.

**VERTICAL EXIT**.-A stair, ramp, or *escalator* serving as an *exit* from one or more floors above or below the street floor.

**WALL SIGN**.-A *sign* affixed to the exterior wall of a *building,* no part of which projects more than fifteen inches from the wall surface.

**WATER-DISTRIBUTION PIPING**.-The pipes in a *building* or *premises* that convey water from the *water service pipe* to the *plumbing fixtures* and other water outlets.

**WATER (STREET) MAIN**.-A water-supply pipe for public or community use controlled by public authority.

**WATER-SERVICE PIPE**.-The pipe from the *water (street) main* or other source of water supply to the *building* served.

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff    Pg 307 of 654

Title 27 / Subchapter 2

**WATER SUPPLY SYSTEM**.-The *water-service pipe,* the *water-distribution piping,* and all of the necessary connecting pipes, fittings, control valves, and appurtenances used for conveying water in a *plumbing system.*

**WET STANDPIPE SYSTEM**.-A *standpipe system* in which all of the piping is filled with water under pressure that is immediately discharged upon the opening of any hose valve.

**WINDING-DRUM MACHINE**.-As applied to an *elevator, shall* mean a geared-drive machine in which the hoisting ropes are fastened to and wind on a drum.

**WORKERS' HOIST**.-A hoisting and lowering mechanism equipped with a car that moves in guides in a substantially vertical direction and that is used primarily for raising and lowering workers to the working levels.

**WRITING (WRITTEN)**.-The term *shall* be construed to include handwriting, typewriting, printing, photo-offset, or any other form of reproduction in legible symbols or characters.

**WRITTEN NOTICE**.-A notification in *writing* delivered by hand to the *person* or parties intended, or delivered at or sent by mail to the last business address known to the party giving such notice.

**YARD**.-That portion of a *lot* extending open and unobstructed from the lowest level to the sky along the entire length of a *lot line.*

**ZONE**.-A vertical division of a *building* fire *standpipe system* used to establish the water working pressures within the system and also to limit the pressure at the lowest hose outlet in the zone.

**ZONING RESOLUTION**.-The zoning resolution of the city of New York, adopted December fifteenth, nineteen hundred sixty-one, including all amendments thereto.

## ARTICLE 3 ABBREVIATIONS

**Abbreviations. §[C26-202.0]27-233**

| | |
|---|---|
| bhp:  brake horsepower | I.P.S.:  iron pipe size |
| Btu:  British [*sic*] thermal unit | lb.:  pound |
| C:  centigrade | mph:  miles per hour |
| cfm:  cubic feet per minute | oz.:  ounce |
| cps:  cycles per second | P.C.E.:  pyrometric cone equivalent |
| cu. ft.:  cubic feet | pcf:  pounds per cubic foot |
| db:  decibel | plf:  pounds per linear foot |
| dia.:  diameter | psf:  pounds per square foot |
| F:  fahrenheit | psi:  pounds per square inch |
| fpm:  feet per minute | psia:  pounds per square inch absolute |
| fps:  feet per second | psig:  pounds per square inch gauge |
| fsp:  fire standpipe | rpm:  revolutions per minute |
| ft.:  foot | sec.:  second |
| gal.:  gallon | swp:  steam working pressure |
| gpm:  gallons per minute | sq. ft.:  square foot |
| gps:  gallons per second | sq. in.:  square inch |
| h.p.:  horsepower | sq. yd.:  square yard |
| hr.:  hour | STC:  sound transmission class |
| in.:  inch | Tag:  tagliabue |
| INR:  impact noise rating | wwp:  water working pressure |

**Note**—For abbreviation of name of referenced national organizations, see reference standard RS 2-1.

**Title 27 / Subchapter 2**

**This page is intended to be left blank**

22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff   Pg 309 of 654

Title 27 / Subchapter 3

# SUBCHAPTER 3
# OCCUPANCY AND CONSTRUCTION CLASSIFICATION

## TABLE OF CONTENTS

| [Sub-Art. or Sec.]* | Art. or Sec.** | |
|---|---|---|
| [300.0] | Art. 1 | **General** |
| [300.1] | 234 | Scope |
| [300.2] | 235 | Reference Standards |
| [300.3] | 236 | Definitions |
| [301.0] | Art. 2 | **Occupancy Classifications** |
| [301.1] | 237 | Occupancy Groups |
| [301.2] | 238 | Classification of Spaces |
| [301.3] | 239 | Classification of Buildings |
| [301.4] | 240 | Separation of Occupancies |
| [301.5] | 241 | Classification Tables |
| [301.6] | 242 | Multiple Occupancy or Use |
| [302.0] | Art. 3 | **Occupancy Group A-High Hazard** |
| [302.1] | 243 | Classification |
| [302.2] | 244 | Location Restrictions |
| [303.0] | Art. 4 | **Occupancy Group B-Storage** |
| [303.1] | 245 | Classification |
| [303.2] | 246 | Occupancy Group B-1 |
| [303.3] | 247 | Occupancy Group B-2 |
| [304.0] | Art. 5 | **Occupancy Group C-Mercantile** |
| [304.1] | 248 | Classification |
| [305.0] | Art. 6 | **Occupancy Group D-Industrial** |
| [305.1] | 249 | Classification |
| [305.2] | 250 | Occupancy Group D-1 |
| [305.3] | 251 | Occupancy Group D-2 |
| [305.4] | 252 | Location Restrictions |
| [306.0] | Art. 7 | **Occupancy Group E-Business** |
| [306.1] | 253 | Classification |
| [307.0] | Art. 8 | **Occupancy Group F-Assembly** |
| [307.1] | 254 | Classification |
| [307.2] | 255 | Occupancy Group F-1 |
| [307.3] | 256 | Occupancy Group F-2 |
| [307.4] | 257 | Occupancy Group F-3 |
| [307.5] | 258 | Occupancy Group F-4 |
| [308.0] | Art. 9 | **Occupancy Group G-Educational** |
| [308.1] | 259 | Classification |
| [309.0] | Art. 10 | **Occupancy Group H-Institutional** |
| [309.1] | 260 | Classification |
| [309.2] | 261 | Occupancy Group H-1 |
| [309.3] | 262 | Occupancy Group H-2 |
| [310.0] | Art. 11 | **Occupancy Group J-Residential** |
| [310.1] | 263 | Classification |
| [310.2] | 264 | Occupancy Group J-1 |
| [310.3] | 265 | Occupancy Group J-2 |
| [310.4] | 266 | Occupancy Group J-3 |
| [311.0] | Art. 12 | **Occupancy Group K-Miscellaneous** |
| [311.1] | 267 | Classification |
| [312.0] | Art. 13 | **Doubtful Occupancies** |
| [312.1] | 268 | Classification |
| [313.0] | Art. 14 | **Construction Classifications** |
| [313.1] | 269 | Construction Classes |
| [313.2] | 270 | Classification of Buildings and Spaces |
| [313.3] | 271 | Classification Table |
| [313.4] | 272 | False Designation |
| [313.5] | 273 | Minimum Requirements |
| [314.0] | Art. 15 | **Construction Group I-Noncombustible** |
| [314.1] | 274 | Classification |
| [314.2] | 275 | Construction Class I-A |
| [314.3] | 276 | Construction Class I-B |
| [314.4] | 277 | Construction Class I-C |
| [314.5] | 278 | Construction Class I-D |
| [314.6] | 279 | Construction Class I-E |
| [315.0] | Art. 16 | **Construction Group II-Combustible** |
| [315.1] | 280 | Classification |
| [315.2] | 281 | Construction Class II-A |
| [315.3] | 282 | Construction Class II-B |
| [315.4] | 283 | Construction Class II-C |
| [315.5] | 284 | Construction Class II-D |
| [315.6] | 285 | Construction Class II-E |
| [316.0] | Art. 17 | **Mixed Construction** |
| [316.1] | 286 | Classification |
| [316.2] | 287 | Restrictions |

*"C26" omitted from section numbers in this column.

**"27" omitted from section numbers in this column.

## LIST OF TABLES

Table No.

3-1    Occupancy Classifications
3-2    Typical Occupancies for Occupancy Classification
3-3    Construction Classes
3-4    Construction Classifications Notes to Table 3-4.

## ARTICLE 1  GENERAL

§[C26-300.1]  27-234 Scope.-The provisions of this subchapter shall establish and control the classification of all buildings, and spaces therein, with respect to occupancy group and class of construction.

§[C26-300.2]  27-235 Reference standards.-

Occupancy and construction classifications which appear in the several reference standards of this code shall apply to the provisions of the reference standard only unless otherwise indicated.

**§[C26-300.3]  27-236  Definitions.-**For definitions to be used in the interpretation of this subchapter, see subchapter two of this chapter.

## ARTICLE 2 OCCUPANCY CLASSIFICATIONS

**§[C26-301.1]  27-237  Occupancy groups.-**Table 3-1 lists occupancy groups and sub groups that shall be established for classifying buildings and spaces in accordance with the provisions of articles three through twelve of this subchapter.

### TABLE 3-1  OCCUPANCY CLASSIFICATIONS

| Occupancy Group | Classification | Fire Index |
|---|---|---|
| A | High hazard | 4 |
| B-1 | Storage (moderate hazard) | 3 |
| B-2 | Storage (low hazard) | 2 |
| C | Mercantile | 2 |
| D-1 | Industrial (moderate hazard) | 3 |
| D-2 | Industrial (low hazard) | 2 |
| E | Business | 2 |
| F-1a | Assembly (theaters, etc.) | 1 |
| F-1b | Assembly (churches, concert halls, etc.) | 1 |
| F-2 | Assembly (outdoors) | 1 |
| F-3 | Assembly (museums, etc.) | 1 |
| F-4 | Assembly (restaurants, etc.) | 1 |
| G | Education | 1 |
| H-1 | Institutional (restrained) | 1 |
| H-2 | Institutional (incapacitated) | 1 |
| J-1 | Residential (hotels, etc.) | 1 |
| J-2 | Residential (apartment houses, etc.) | 1 |
| J-3 | Residential (one-and-two-family dwellings) | 1 |
| K | Miscellaneous | 1 |

**§[C26-301.2]  27-238  Classification of spaces.-**Every space or room hereafter altered or erected shall, for the purposes of this code, be classified in one of the occupancy groups listed in Table 3-1 according to the occupancy or use of the space or room.

**§[C26-301.3]  27-239  Classification of buildings.-**Every building hereafter erected or altered under the provisions of section 27-115 of article four of subchapter one of this chapter shall, for the purposes of this code, be classified in one of the occupancy groups listed in table 3-1 according to the main use or dominant occupancy of the building.  However, at the option of the applicant, subject to the approval of the commissioner, buildings may be classified in any other occupancy group, provided such occupancy group has a higher fire index, as listed in table 3-1, than the fire index of the occupancy group classification of the main use or dominant occupant.

**§[C26-301.4]  27-240  Separation of occupancies.-**Occupancies within buildings shall be separated from one another as follows:

a.  Spaces classified in occupancy groups having a higher fire index, as listed in table 3-1, than the fire index of the occupancy group classification of the building, shall be separated from adjoining spaces by construction meeting the fire-resistance rating requirements for fire divisions under the provisions of subdivision (a) of section 27-339 of article five of subchapter five of this chapter. Such occupancies shall, for the purposes of this code, be classified and treated as separate buildings (hereinafter referred to as "building section").

b.  Spaces classified in occupancy groups having the same or lower fire index, as listed in table 3-1, than the fire index of the occupancy group classification of the building, shall be separated from adjoining spaces by construction meeting the fire-resistance rating requirements for fire separations under the provisions of subdivision (b) of section 27-339 of article five of subchapter five of this chapter.

**§[C26-301.5] 27-241 Classification tables.**-Table 3-2 and reference standard RS 3-3 list representative occupancies that shall be used as a basis for classifying buildings and spaces by occupancy.

**§[C26-301.6] 27-242 Multiple occupancy or use.**-When a building or space is used for multiple purposes, involving different activities at different times, the building or space shall be given a separate occupancy group classification for each of the activities involved. The design and construction of the building or space shall be in accordance with the most restrictive provisions of this code that apply to any of the occupancy group classifications utilized. However, a minor variation of any occupancy or use of a space from technical compliance with a particular space occupancy classification shall not be prohibited if such variation is normally associated with the occupancy classification and no specific danger or hazard is created.

### ARTICLE 3 OCCUPANCY GROUP A-HIGH HAZARD

**§[C26-302.1] 27-243 Classification.**-Buildings and spaces shall be classified in the high hazard occupancy group when they are used for storing, manufacturing, or processing potentially-explosive products or materials, or highly-combustible or highly-flammable products or materials that are likely to burn with extreme rapidity. The high hazard group shall also include: uses that involve storing, processing, or handling any materials that produce explosive dust, or that result in the division of matter into fine particles subject to spontaneous ignition; uses that employ solids or substances that ignite or produce flammable gases on contact with water; and any other uses that constitute a high fire hazard because of the form, character, or volume of the materials involved.

(a) Typical material contents.-Acetylene gas and gases under pressure of fifteen psig or more and in quantities greater than twenty-five hundred cubic feet, including hydrogen, illuminating gas, natural gas, and all other gases subject to explosion; gas piping at pressure levels above fifteen psig regardless of the quantities of gas; celluloid and celluloid products; cotton batting; kerosene; fuel or other oils having a flash point under 200°F [*sic*] (tag closed cup), except five hundred fifty gallons or less in one- and two-family dwellings; refrigerating systems using high hazard refrigerants as defined in subchapter thirteen of this chapter, and except that in buildings lawfully occupied as garages prior to December sixth, nineteen hundred sixty-eight the storage of tank trucks or other vehicles, approved by the fire commissioner for the transportation of products having a flash point of over 100°F [*sic*] (tag open cup), and where the product contained in the cargo space of the vehicles is pending delivery, shall only be considered to constitute a high hazard occupancy when the product is stored in quantities greater than forty-five thousand gallons.

(b) Typical occupant activities.-Artificial [*sic*] flower and synthetic leather manufacture; ammunition, explosives, and fireworks manufacture, sales or storage; dry cleaning or dyeing; using or storing gasoline or other combustible solvents as outlined in article six of subchapter seven of this chapter; feather renovating; fruit ripening processes; hydrogenation processes; match manufacture or storage; metal enamelling or japanning; paint and varnish manufacture; paint spraying or dipping, as specified in article three of subchapter seven of this chapter; derivation of petroleum products by application of heat; processing of paper or cardboard in loose form; pyroxylin products manufacture and storage; rag sorting and storage; shoe polish manufacture; straw goods manufacture or broom corn storage; tar, pitch, or resin processing; waste paper sorting, shredding, storage, or baling; cotton waste processes.

**§[C26-302.2] 27-244 Location restrictions.**-No space classified in the high hazard occupancy group shall be located above the second story of any building or building section classified in construction group II containing a space classified in occupancy group J-1 or J-2.

### ARTICLE 4 OCCUPANCY GROUP B-STORAGE

**§[C26-303.1] 27-245 Classification.**-Buildings and spaces shall be classified in the storage occupancy group when they are used primarily for storing goods. When the goods stored are highly combustible, flammable, or potentially explosive, the building or space shall meet the requirements for high hazard occupancies when the latter are more restrictive than the corresponding requirements for the storage classification. The storage occupancy group consists of sub groups B-1 and B-2.

**§[C26-303.2] 27-246 Occupancy group B-1.**-Shall include buildings and spaces used for storing any flammable or combustible materials that is likely to permit the development and propagation of fire with moderate rapidity.

(a) Typical material contents: bags (cloth, burlap, and paper); bamboo and rattan; baskets; belting (canvas and leather); books and paper in rolls or packs; buttons, including cloth-covered, pearl, or bone; boots and shoes; cardboard and cardboard boxes; wearing apparel; cordage; furniture; furs; glue, mucilage, paste, and size; horn and combs other than celluloid; leather enamelling or japanning; linoleum; livestock; lumber; photo-engraving supplies; silk; soap; sugar; tobacco; cigars, cigarettes, and snuff; upholstery and mattresses; wax candles.

**\*TABLE 3-2 TYPICAL OCCUPANCIES
FOR OCCUPANCY CLASSIFICATION**

| Occupancy Group | Designation | Representative Occupancies |
|---|---|---|
| HIGH HAZARD | A | Paint shop and storerooms; industrial smoke houses; grain elevators; tanneries with enamelling or japanning; distilleries; sugar, starch, cereal, feed, flour, and grist mills; any space containing gas distribution piping at pressure levels above fifteen psig |
| STORAGE | B-1 | Warehouses; storerooms; freight depots; stables; coal pockets; group 1 public garages** |
| | B-2 | Warehouses; storerooms; private garages; green houses; group 2 public garages** |
| MERCANTILE | C | Retail stores; shops; sales rooms; markets |
| INDUSTRIAL | D-1 | Baking plants; breweries; automotive repair shops; foundries [*sic*]; heliports; scenery shops |
| | D-2 | Mechanical and electrical equipment rooms; power plants, and boiler and furnace rooms, except those containing gas distribution piping at pressure levels above fifteen psig; commercial laundries; vocational training shops; laboratories; nonresidential kitchens |
| BUSINESS | E | Office buildings; banks; civic administration buildings; radio and television stations not classified as places of assembly or as equipment rooms; telephone exchanges; barber and beauty shops; automotive service stations; neighborhood family care centers; medical offices or group medical centers |
| [ASSEMBLY | F-1a | Theaters; playhouses; opera houses]*** |
| | F-1b | Churches; lecture halls; court rooms; convention halls; concert halls; sports arenas; planetariums; motion picture theaters |
| | F-2 | Grandstands; bleachers; stadiums; drive-in theaters; amusement attractions and devices; bandstands; skating rinks |
| | F-3 | Exhibition halls; galleries; gymnasiums; museums; passenger terminals; bowling alleys; billiard parlors; skating rinks |
| | F-4 | Restaurants; night clubs; cabarets; dance halls; ballrooms; banquet rooms; cafeterias; snack bars; taverns; coffee houses |
| EDUCATIONAL | G | Schools; academies; universities; libraries |
| INSTITUTIONAL | H-1 | Jails; prisons; reformatories; mental institutions |
| | H-2 | Hospitals; sanitariums; clinics; nursing homes; orphanages; homes for the aged; day nurseries |
| RESIDENTIAL | J-1 | Hotels; motels; lodging houses; rooming houses |
| | J-2 | Apartment houses; apartment hotels; school dormitory buildings |
| | J-3 | One-family and two-family dwellings; rectories; convents; [group homes]*** |
| MISCELLANEOUS | K | Sheds; fences; signs |

\*This list of occupancies is representative only and is not complete.
See reference standard RS 3-3 for additional listings.
\*\*See article ten of subchapter seven of this chapter.
\*\*\*Copy in brackets not enacted but probably intended.

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff    Pg 313 of 654

Title 27 / Subchapter 3

**§[C26-303.3] 27-247 Occupancy group B-2.-**Shall include buildings and spaces used for storing noncombustible materials and materials that do not ordinarily burn rapidly.

### ARTICLE 5 OCCUPANCY GROUP C - MERCANTILE

**§[C26-304.1] 27-248 Classification.-**Buildings and spaces shall be classified in the mercantile occupancy group when they are used for display and sales of goods accessible to public inspection. Highly combustible or flammable goods, such as those made of pyroxylin products, shall be limited to small quantities that do not constitute a high hazard; if not so limited, the occupancy shall meet the requirements for high hazard occupancies when the latter are more restrictive than the corresponding requirements for the mercantile classification.

### ARTICLE 6 OCCUPANCY GROUP D-INDUSTRIAL

**§[C26-305.1] 27-249 Classification.-**Buildings and spaces shall be classified in the industrial occupancy group when they are used for fabricating, assembling, manufacturing, or processing products, materials, or energy, except that when any products or materials, or other products or materials used in their manufacture are highly combustible, flammable, or explosive, the occupancy shall meet the requirements for high hazard occupancies when the latter are more restrictive than the corresponding requirements for the industrial classification. The industrial occupancy group consists of sub groups D-1 and D-2.

**§[C26-305.2] 27-250 Occupancy group D-1.-**Shall include buildings and spaces in which the fabrication, assembly, manufacturing, or processing represents a moderate fire hazard due to the extent and nature of such operations, or to the materials involved**.**

(a) Typical occupant activities-Canning, including food products and condensed and powdered milk manufacturer; dry cleaning or dyeing using or storing solvents having a flash point between $100°$ F and $138.2°$ F (Tag closed-cup); electrolytic processes; glass manufacture, leather tanning and treating, excluding enamelling or japanning; sugar refining; textile milling, including canvas, cotton, cloth, bagging, burlap, carpets, and rugs; upholstering; woodworking; cotton dressmaking; and manufacturing or processing materials such as those outlined in subdivision (a) of section 27-246 of article four of this subchapter.

**§[C26-305.3] 27-251 Occupancy group D-2.-**This group shall include buildings and spaces in which the fabrication, assembly, manufacturing, or processing represents a low fire hazard.

**§[C26-305.4] 27-252 Location restrictions.-**No space classified in the industrial group D shall be located above the second story of any building or building section classified in construction group II containing a space classified in occupancy group J-1 or J-2.

### ARTICLE 7 OCCUPANCY GROUP E-BUSINESS

**§[C26-306.1] 27-253 Classification.-**Buildings and spaces shall be classified in the business occupancy group when they are occupied for transacting business; for rendering professional services; or for performing other commercial services that may incidentally involve the storage of limited quantities of stocks of goods for office use or purposes. Buildings and spaces used for prosecuting public or civic services shall also be classified in this group.

### ARTICLE 8 OCCUPANCY GROUP F-ASSEMBLY

***§[C26-307.1] 27-254 Classification.-**Buildings and spaces exclusive of dwelling units shall be classified in the assembly occupancy group when they are designed for use by any number of persons for religious, recreational, political or social purposes, or for the consumption of food or drink or for similar group activities; or when occupied by seventy-five people or more for educational purposes. When such occupancies are enclosed and contain or are designed for use by seventy-five or more persons or are outdoor spaces and contain or are designed for use by two hundred or more persons, they shall comply with the requirements of subchapter eight of this chapter for places of assembly.
**Local Law 23-1990.*

**§[C26-307.2] 27-255 Occupancy group F-1.-**Shall include those buildings and spaces in which, during the major period of occupancy, the persons assembled comprise a seated or otherwise passive audience to a performance or presentation, and have their attention focused in a common direction or at a common subject. Occupancy group F-1 consists of two subdivisions F-1a and F-1b.

(a) Occupancy group F-1a.-Includes buildings and spaces in which scenery and scenic elements are used.

(b) Occupancy group F-1b.-Includes buildings and spaces in which scenery and scenic elements are not used.

**§[C26-307.3] 27-256 Occupancy group F-2.-**Shall include all outdoor structures and spaces.

**§[C26-307.4]  27-257  Occupancy group F-3.-**Shall include buildings and spaces in which the persons assembled are physically active and do not have a common center of attention.

**§[C26-307.5]  27-258  Occupancy group F-4.-**Shall include buildings and spaces in which persons assemble for dancing or for the consumption of food or drink, or for any combination of dancing, eating, drinking, or entertainment.

### ARTICLE 9 OCCUPANCY GROUP G-EDUCATIONAL

**§[C26-308.1]  27-259  Classification.-**Buildings, building sections and spaces shall be classified in the educational occupancy group when persons occupy them for instruction or other educational purposes except those spaces occupied as a place of assembly. These spaces shall be classified in occupancy group F-assembly, under the provisions of article eight of this subchapter. Such buildings, building sections and spaces occupied for instruction and used exclusively by adults may be classified, by the commissioner in occupancy group E-business and if so classified such buildings, building sections and spaces shall comply with the requirements for such classification.

### ARTICLE 10 OCCUPANCY GROUP H-INSTITUTIONAL

**§[C26-309.1]  27-260  Classification.-**Buildings and spaces shall be classified in the institutional occupancy group when persons suffering from physical limitations because of health or age are harbored therein for care or treatment; when persons are detained therein for penal or correctional purposes; or when the liberty of the inmates is restricted. The institutional occupancy group consists of sub groups H-1 and H-2.

**§[C26-309.2]  27-261  Occupancy group H-1.-**Shall include buildings and spaces used for the detention of persons under restraint.

**§[C26-309.3]  27-262  Occupancy group H-2.-**Shall include buildings and spaces used for the care or treatment of persons with physical limitations because of health or age. This shall not include medical or dental offices providing services to ambulatory non-hospitalized persons, such as neighborhood family care centers, medical or dental offices, group medical offices, and the like.

### ARTICLE 11 OCCUPANCY GROUP J-RESIDENTIAL

**§[C26-310.1]  27-263  Classification.-**Buildings and spaces shall be classified in the residential occupancy group when families or households dwell therein, or when sleeping accommodations, with or without dining facilities, are provided therein for individuals. Excluded from this group are those buildings and spaces classified under the institutional occupancy group. The residential occupancy consists of sub groups J-1, J-2, and J-3.

**§[C26-310.2]  27-264  Occupancy group J-1.-**Shall include buildings and spaces that are primarily occupied for the shelter and sleeping accommodation of individuals on a day-to-day or week-to-week basis.

**§[C26-310.3]  27-265  Occupancy group J-2.-**Shall include buildings with three or more dwelling units that are primarily occupied for the shelter and sleeping accommodation of individuals on a month-to-month or longer-term basis.

**§[C26-310.4]  27-266  Occupancy group J-3.-**Shall include buildings occupied as one-family or two-family dwellings, or as convents or rectories.

### ARTICLE 12 OCCUPANCY GROUP K-MISCELLANEOUS

**§[C26-311.1]  27-267  Classification.-**Structures of a temporary character, and minor occupancies not classified in any other specific occupancy group, shall be classified in the miscellaneous occupancy group. Such structures and occupancies shall be constructed, equipped, and maintained to meet the requirements of this code commensurate with the fire and life hazard incidental to their use. The miscellaneous occupancy group includes all accessory structures such as sheds, fences, and similar constructions.

### ARTICLE 13 DOUBTFUL OCCUPANCIES

**§[C26-312.1]  27-268  Classification.-**When a building or space is used for an occupancy not specifically provided for in this code, or when its classification is otherwise uncertain, such building or space shall be included in the occupancy group that it most nearly resembles with respect to the existing or proposed life and fire hazard, and it shall be so classified by the architect or engineer subject to the approval of the commissioner.

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff    Pg 315 of 654

Title 27 / Subchapter 3

## ARTICLE 14 CONSTRUCTION CLASSIFICATIONS

**§[C26-313.1] 27-269 Construction classes.-**Table 3-3 lists construction classes that shall be established for classifying buildings and spaces by construction in accordance with the provisions of articles fifteen, sixteen and seventeen of this subchapter.

### TABLE 3-3 CONSTRUCTION CLASSES

| Construction Group | Class |
|---|---|
| I-Noncombustible | I-A— (4-hr. protected) I-B— (3-hr. protected) I-C— (2-hr. protected) I-D— (1-hr. protected) I-E— (unprotected) |
| II-Combustible | II-A— (heavy timber) II-B— (protected wood joist) II-C— (unprotected wood joist) II-D— (protected wood frame) II-E— (unprotected wood frame) |

**§[C26-313.2] 27-270 Classification of buildings and spaces.-**Every building, room, or space hereafter altered or erected shall, for the purposes of this code be classified in one of the construction classes listed in table 3-3.

**§[C26-313.3] 27-271 Classification table.-**The fire-resistance ratings of construction elements in hours listed in table 3-4 shall be used as a basis for classifying buildings and spaces by construction. Fire-resistance ratings shall be based on the test procedures of reference standard RS 3-1 and shall apply to all occupancy groups except as specifically noted. For hazardous occupancies involving an exceptionally high degree of fire risk or an exceptionally high concentration of combustible or flammable contents, the commissioner may increase the requirements of table 3-4.

**§[C26-313.4] 27-272 False designation.-**No building or space shall be designated a given construction class unless it conforms to the minimum requirements for that class; and no building or space shall be posted, used, designated, or advertised as of a given construction class unless it complies with the minimum requirements of this code for that class.

**§[C26-313.5] 27-273 Minimum requirements.-**When a class of construction is utilized which is superior to that required for any particular use, nothing in this code shall be construed to require full compliance with the requirements for the higher class; the designated construction classification of the building or space shall be that of the lesser classification, unless all of the requirements for the higher class are met.

### ARTICLE 15 CONSTRUCTION GROUP I-NONCOMBUSTIBLE

**§[C26-314.1] 27-274 Classification.-**Buildings or spaces in noncombustible construction group I are those in which the walls, exitways, shafts, structural members, floors, and roofs are constructed of noncombustible materials and assemblies affording the fire-resistance ratings specified in table 3-4. The noncombustible construction group I consists of classes I-A, I-B, I-C, I-D, and I-E.

**§[C26-314.2] 27-275 Construction class I-A.-**
Includes buildings and spaces in which the bearing walls and other major structural elements are generally of four-hour fire-resistance rating.

**§[C26-314.3] 27-276 Construction class I-B.-**
Includes buildings and spaces in which the bearing walls and other major structural elements are generally of three-hour fire-resistance rating.

**§[C26-314.4] 27-277 Construction class I-C.-**
Includes buildings and spaces in which the bearing walls and other major structural elements are generally of two-hour fire-resistance rating.

**§[C26-314.5] 27-278 Construction class I-D.-**
Includes buildings and spaces in which the bearing walls and other major structural elements are generally of one-hour fire-resistance rating.

**§[C26-314.6] 27-279 Construction class I-E.-**
Includes buildings and spaces in which the bearing walls and other major structural elements generally have no fire-resistance rating.

### ARTICLE 16 CONSTRUCTION GROUP II-COMBUSTIBLE

**§[C26-315.1] 27-280 Classification. -** Buildings and spaces in combustible construction group II are those in which the walls, partitions, structural members, floors, and roofs are constructed wholly or partly of combustible materials affording the required degree of fire-resistance specified in table 3-4. The combustible construction group II consists of classes II-A, II-B, II-C, II-D, and II-E.

Title 27 / Subchapter 3

| TABLE 3-4 | | | CLASS I-A | | CLASS I-B | | CLASS I-C | | CLASS I-D | | CLASS I-E | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CONSTRUCTION ELEMENT | | Rating in Hrs. | Ext.[a,b] Open'g | Rating in Hrs. | Ext.[a,b] Open'g | Rating in Hrs. | Ext.[a,b] Open'g | Rating in Hrs. | Ext.[a,b] Open'g | Rating in Hrs. | Ext.[a,b] Open'g |
| Exterior Walls with an Exterior Separation of | 3'-0" or less | Bearing | 4 | N.P. | 3 | N.P. | 2 | N.P. | 2 | N.P. | 2 | N.P. |
| | | Non-bearing[f] | 2 | | 2 | | 2 | | 2 | | 2 | |
| | More than 3'-0" but less than 15'-0" | Bearing | 4 | 3 1/3 % protected | 3 | 3 1/3 % protected | 2 | 3 1/3 % protected | 2 | 3 1/3 % protected | 2 | 6 2/3 % protected |
| | | Non-bearing[f] | 2 | | 2 | | 2 | | 2 | | 2 | |
| | 15'-0" or more but less than 30'-0" | Bearing | 4 | 3 1/3 % | 3 | 3 1/3 % | 2 | 3 1/3 % | 1 | 3 1/3 % | 0 | N.L. |
| | | Non-bearing[f] | 1½ | | 1½ | | 1 | | 0 | | 0 | |
| | 30'-0" or more | Bearing | 4 | N.L. | 3 | N.L. | 2 | N.L. | 1 | N.L. | 0 | |
| | | Non-bearing[f] | 0 | | 0 | | 0 | | 0 | | 0 | |
| Interior bearing walls and bearing partitions. | | | 4 | | 3 | | 2 | | 1 | | 0[g,i] | |
| Enclosure of vertical exits[e], exit passageways, hoistways and shafts. | | | 2 | | 2 | | 2 | | 2 | | 2 | |
| Fire divisions and fire separations. | | | See Article 5 | | | | | | | | | |
| Columns[k], girders, trusses (other than roof trusses) and framing. | Supporting one floor | | 3 | | 2 | | 1½ | | 1 | | 0[g,i] | |
| | Supporting more than one floor[l] | | 4 | | 3 | | 2 | | 1 | | 0[g,i] | |
| Structural members supporting a wall. | | | Same as required fire resistance of wall supported, but not less than rating required for member by the class of construction. | | | | | | | | | | |
| Floor construction including beams. | | | 3 | | 2 | | 1½ | | 1 | | 0[g,i] | |
| Roof construction, including beams, trusses and framing, including arches, domes, shells, cable supported roofs and roof decks[h]. | 15'-0" or less in ht. above floor to lowest member | | 2 | | 1½ | | 1[i] | | 1[i] | | 0[g,i] | |
| | 15'-0" to 20'-0" in ht. above floor to lowest member | | 2[c,i] or 1[d,i] | | 1½[c,i] or 1[d,i] | | 1[i] | | 1[i] | | 0[g,i] | |
| | 20'-0" or more in ht. above floor to lowest member | | 2[c,i] or 0[d,g,i] | | 1½[c,i] or 0[d,g,i] | | 1[c,i] or 0[d,g,i] | | 1[c,i] or 0[d,g,i] | | 0[g,i] | |

†TABLE 3-4 CONSTRUCTION CLASSIFICATIONS

CONSTRUCTION GROUP 1 NONCOMBUSTIBLE

Required fire-resistance ratings of construction elements in hours, based on the test procedures of reference standard RS 3-1.

Key:

N.P.—Not permited
N.L.—No limit

Noncombustible Materials

Notes:

a. The area of openings permitted in exterior walls at any story shall be obtained by multiplying the percentage shown in the table by the exterior separation distance in feet, and then multiplying that product by the square-foot area of the façade of that story. Requirements for protected exterior openings shall not apply to churches. [.Protected openings within an exterior separation of 3 ft. 0 inch or less are permitted for buildings classified in Occupancy Groups J-2 and J-3 provided, however said openings do not exceed in total area 10% of the façade of the story in which they are located. The openings however, may not be credited towards meeting any of the mandatory natural light or ventilation requirements of Art. 12* Protection of openings with an exterior separation of 3 ft. to 30 ft. shall not be required for J2 and J3 occupancy groups.]** or to buildings classified in occupancy groups J-2 and J-3*** See section 27-331 of article four of subchapter five of this chapter for additional requirements for exterior walls and exterior wall openings.

b. Upon special application, the commissioner may permit exterior wall openings to be constructed in excess of the permitted area established by table 3-4 if such openings at the time of their construction are located at least sixty feet in a direct line from any neighboring building except as otherwise permitted by footnote f. Such additional openings may not, however, be credited toward meeting any of the mandatory natural light or ventilation requirements of subchapter twelve of chapter on of this title. If any neighboring building is later altered or constructed to come within the above distance limitation, the affected exterior openings shall immediately be closed with construction meeting the fire-resistance rating requirements for exterior wall construction of the building in which they are located.

*Now Subchapter 12.
**Copy in brackets not enacted but probably intended.
***Copy from closing brackets to these asterisks enacted but probably intended to be omitted.
†Local Law 77-1988

120

**Title 27 / Subchapter 3**

| | | CONSTRUCTION ELEMENT | | CLASS II-A | | CLASS II-B | | CLASS II-C | | CLASS II-D | | CLASS II-E | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Rating in Hrs. | Ext. a,b Open'g | Rating in Hrs. | Ext. a,b Open'g | Rating in Hrs. | Ext. a,b Open'g | Rating in Hrs. | Ext. a,b Open'g | Rating in Hrs. | Ext. a,b Open'g |
| Exterior Walls with an Exterior Separation of | 3'-0" or less | Bearing | | 2 | N.P. | 2 | N.P. | 2 | N.P. | 2 | N.P. | 2 | N.P. |
| | | Non-bearing f | | 2 | | 2 | | 2 | | 2 | | 2 | |
| | More than 3'-0" but less than 15'-0" | Bearing | | 2 | 3 1/3 % protected | 2 | 3 1/3 % protected | 2 | 3 1/3 % | 1 | 6 2/3 % | 1 | 6 2/3 % |
| | | Non-bearing f | | 2 | | 2 | | 2 | | 1 | | 1 | |
| | 15'-0" or more but less than 30'-0" | Bearing | | 2 | 3 1/3 % | 2 | 3 1/3 % | 2 | 3 1/3 % | 1 | N.L. | 0 | N.L. |
| | | Non-bearing f | | 2 | | 2 | | 2 | | 1 | | 0 | |
| | 30'-0" or more | Bearing | | 1 | N.L. | 1½ | N.L. | 1½ | N.L. | 1 | N.L. | 0 | N.L. |
| | | Non-bearing f | | 0 | | 0 | | 0 | | 0 | | 0 | |
| Interior bearing walls and bearing partitions. | | | | 2 | | 1 | | 0 | | 1 | | 0 | |
| Enclosure of vertical exits e, exit passageways, hoistways and shafts. | | | | 2 | | 2 | | 1 i | | 1 | | 1 | |
| Fire divisions and fire separations. | | | | See Article 5 | | | | | | | | | |
| Columns k, girders, trusses (other than roof trusses) and framing. | | Supporting one floor | | see section 27-623 | | 1 | | 0 or 1 j | | 1 | | 0 | |
| | | Supporting more than one floor | | see section 27-623 | | 1 | | 0 or 1 j | | 1 | | 0 | |
| Structural members supporting a wall. | | | | Same as required fire resistance of wall supported, but not less than rating required for member by the class of construction. | | | | | | | | | |
| Floor construction including beams. | | | | see section 27-623 | | 1 | | 0 or 1 j | | 1 | | 0 | |
| Roof construction including beams, trusses and framing, including arches, domes, shells, cable supported roofs and roof decks h. | | 15'-0" or less in ht. above floor to lowest member | | see section 27-623 | | ¾ | | 0 | | ¾ | | 0 | |
| | | 15'-0" to 20'-0" in ht. above floor to lowest member | | see section 27-623 | | ¾ | | 0 | | ¾ | | 0 | |
| | | 20'-0" or more in ht. above floor to lowest member | | see section 27-623 | | ¾ | | 0 | | ¾ | | 0 | |

**TABLE 3-4 (continued)**

**TABLE 3-4 CONSTRUCTION CLASSIFICATIONS (continued)**

**CONSTRUCTION GROUP II COMBUSTIBLE**

Required fire-resistance ratings of construction elements in hours, based on the test procedures of reference standard RS 3-1.

**Key:**

N.P.—Not permited

N.L.—No limit

▓ Noncombustible Materials

---

c. Applies to occupancy groups A,B-1,B-2, and D-1

d. Applies to all occupancy groups other than those described in footnote c.

e. See subdivision (i) of section 27-375 of article five of subchapter six of this chapter for exceptions to stair enclosure requirements.

f. When two or more buildings are constructed on the same lot, and the combined floor area of the buildings does not exceed the limits established by tables 4-1 and 4-2 for any one of the buildings, no fire-resistance rating shall be required for nonbearing portions of the exterior walls of those buildings facing each other, and there shall be no limitation on the permitted amount of exterior openings.

g. Fire retardant treated wood complying with the requirements of section 27-328 of article three of subchapter five of this chapter may be used.

h. Tabulated ratings apply to buildings over one story in height. In one story buildings roof construction may be of material having 0 hour fire-resistance rating.

i. Materials which are not noncombustible, as defined in subchapter two of chapter one of this title, may be used in nonbearing construction elements if they fall into one of the following categories:

1. Materials having a structural base of noncombustible materials as defined in subchapter two, and having a surface not over one-eighth inch thick which when tested in accordance with the provisions of reference standard RS 3-2 has a flame spread rating not higher than fifty.

2. Materials which when tested in accordance with the provisions of reference standard RS 3-2 have a surface flame spread rating not higher than twenty-five without evidence of continued progressive combustion, and which are of such composition that surfaces which would be exposed by cutting through the material in any way would not have a flame spread rating higher than twenty-five without evidence of continued progressive combustion.

WT_000316

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 318 of 654

Title 27 / Subchapter 3

**Notes for Table 3-4 (continued)**

j. Applies to the construction of the street floor and all construction below the level of the street floor in building or spaces classified in occupancy group J-2 except where the space below the street floor does not exceed five feet in height.

k. Columns supporting the roof of a one-story building shall have the same fire-resistance rating as required for a column supporting one floor in a building of the same construction class.

l. Members supporting loads of not more than two floors or one floor and a roof need not have a fire-resistance rating greater than the floor construction fire-resistance requirement in buildings classified in occupancy groups G, H, and J-2, not including unsprinklered spaces of other occupancies, and in fully sprinklered buildings in occupancy groups E and J-1.

**§[C26-315.2]  27-281  Construction class II-A.-**
Includes heavy timber construction in which fire-resistance is attained by limiting the minimum sizes of wood structural members and the minimum thickness and composition of wood floors and roofs; by avoiding concealed spaces under floors and roofs or by providing fire-stopping protection for these spaces; and by using fastenings, construction details, and adhesives for structural members as required by article seven of subchapter ten of this chapter. The minimum dimensions for framing members shall be prescribed in section 27-623 of article seven of subchapter ten of this chapter, except that members which are protected to provide a fire-resistance rating of at least one hour need not comply with this requirement.

**§[C26-315.3]  27-282  Construction class II-B.-**
Includes buildings and spaces in which the exterior walls, fire walls, exitways, and shaft enclosures are of noncombustible materials having the required fire-resistance ratings; and in which the floors, roofs, and interior framing are wholly or partly of wood of smaller dimensions than required for class II-A construction, or are of other combustible or noncombustible materials, having the required fire-resistance ratings.

# SUBCHAPTER 4
# BUILDING LIMITATIONS

## TABLE OF CONTENTS

| [Sub-Art. Or Sec.]* | Art. Or Sec.** | |
|---|---|---|
| **[400.0]** | **Art.1** | **General** |
| [400.1] | | Scope |
| [400.2] | | Standards |
| [400.3] | | Definitions |
| **[401.0]** | **Art. 2** | **Building Access** |
| | **Sub-Art. 1** | **Fire Department Access** |
| [401.1] | 291 | Frontage |
| [401.2] | 292 | Building Access |
| | **Sub-Art. 2** | **Facilities for People Having Physical Disabilities** |
| | 292.1 | Scope |
| | 292.2 | Standards |
| | 292.3 | Definitions |
| | 292.4 | General Requirements |
| | 292.5 | Accessibility |
| | 292.6 | Waiver of Requirements |
| | 292.7 | Special Requirements of Other City Departments |
| | 292.8 | Adaptable Dwelling Units |
| | 292.9 | Usable Dwelling Units |
| | 292.10 | Usable Spaces |
| | 292.11 | Assembly Spaces |
| | 292.12 | Public Toilet Rooms |
| | 292.13 | Drinking Fountains |
| | 292.14 | Public Telephones |
| | 292.15 | Alarms |
| | 292.16 | Controls and Operating Mechanisms |
| | 292.17 | Tactile Warnings |
| | 292.18 | Signage |
| | 292.19 | Parking Spaces |
| | 292.20 | Passanger Loading Zones |
| **[402.0]** | **Art. 3** | **Fire Districs** |
| [402.1] | 293 | Inside Fire Districs |
| [402.2] | 294 | Outside Fire Districts |
| [402.3] | 295 | Mixed Districs |
| **[403.0]** | **Art.4** | **Limitations Inside the Fire Districts** |
| [403.1] | 296 | Limitations |
| [403.2] | 297 | Exemptions |
| [403.3] | 298 | Additions to Existing Buildings |
| **[404.0]** | **Art. 5** | **Limitations Outisde the Fire Districts** |
| [404.1] | 299 | Limitations |
| [404.2] | 300 | Additions to Existing Buildings |
| **[405.0]** | **Art. 6** | **Area Limitations** |
| [405.1] | 301 | Area Limitations of Buildings |
| [405.2] | 302 | Area limitations of Spaces |
| [405.3] | 303 | Frontage Increase |
| [405.4] | 304 | Existing Excessive Area |
| **[406.0]** | **Art. 7** | **Height Limitations** |
| [406.1] | 305 | Height Limitations of Buildings |
| [406.2] | 306 | Measurement |
| **[407.0]** | **Art. 8** | **General Projection Limitations** |
| [407.1] | 307 | Permissible Projections Beyond the Street Line |
| [407.2] | 308 | Ramps |
| [407.3] | 309 | Special Restrictions |
| [407.4] | 310 | Projections Removable |
| [407.5] | 311 | Permission Revocable |
| [407.6] | 312 | Existing Projections |
| **[408.0]** | **Art. 9** | **Permissible Projections Beyond Street Lines** |
| [408.1] | 313 | Projections Above Grade |
| [408.2] | 314 | Projections Below Grade |
| [408.3] | 315 | Restrictions on Construction and Projections on Certain Streets, Parkways, Boardwalks and Beaches |
| **[409.0]** | **Art. 10** | **General Limitations on Occupancy and Construction Within Special Flood Hazard Areas** |
| [409.1] | 316 | Permit Restrictions |
| | 316.1 | Permit Application Contents |
| [409.2] | 317 | Occupancy and Construction Restrictions |
| [409.3] | 317.01 | Definitions for Special Flood Hazard Areas |
| [409.4] | 317.02 | Exceptions within Special Flood Hazard Areas |

*
 "C26" omitted from section numbers in this column.
**
 "27" omitted from section numbers in this column.

## LIST OF TABLES

Table No.
4-1  Area and Height Limitations for Unsprinklered Buildings and Spaces.
4-2  Area and Height Limitations for Sprinklered Buildings and Spaces.

22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantliff   Pg 320 of 654

Title 27 / Subchapter 4

## ARTICLE 1  GENERAL

**§[C26-400.1]  27-288  Scope. -**The provisions of this article establish building access requirements; shall regulate the division of the city of New York into fire districts and control the occupancy groups and construction classes permitted therein; shall regulate permissible building areas, height and projections beyond the street line and shall establish special flood hazard areas and a regulatory flood datum in the city of New York and regulate permissible occupancies and construction or other improvement below such flood datum within such flood hazard areas.

**§[C26-400.2]  27-289  Standards. -** The provisions of reference standard RS-4 shall be a part of this subchapter.

**§[C26-400.3]  27-290  Definitions. -** For definitions to be used in the interpretation of this subchapter, see subchapter two of this chapter.

## *ARTICLE 2  BUILDING ACCESS
## SUBARTICLE 1  FIRE DEPARTMENT ACCESS

**§[C26-401.1]  27-291  Frontage. -** Every building, exclusive of accessory buildings, shall have at least eight per cent of the total perimeter of the building fronting directly upon a street or frontage space. For the purposes of this section, building perimeter shall be measured at that story having the maximum enclosed floor area.

**§[C26-401.2]  27-292  Building access. -** Provisions shall be made for access by the fire department to every building as follows:
**(a) Above grade. -** Access shall be provided directly from the outdoors to each story below a height of one hundred feet except to the first story or ground floor, by at least one window or readily identifiable access panel within each fifty feet or fraction thereof of horizontal length of every wall that fronts on a street or frontage space. Windows shall be openable or breakable from both the inside and the outside, and shall have a size when open of at least twenty-four inches by thirty-six inches. Panels shall be openable from both the inside and outside and shall have a height when open of forty-eight inches and a width of at least thirty-two inches. The sill of the window or panel shall not be higher than thirty-six inches above the inside floor.
**(b) Below grade. -** Access shall be provided directly from the outdoors to the first basement or cellar story below grade, except as provided in paragraphs two, three and four of this subdivision, within each one hundred feet or fraction thereof of horizontal length of every wall that fronts on a street or frontage space. Such access shall be by stairs, doors, windows or other

means that provide an opening forty-eight inches high and thirty-two inches wide, the sill of which shall not be higher than thirty-six inches above the inside floor. If an areaway is used to provide below grade access, the minimum horizontal dimension shall be at least one-third the depth of the areaway or six feet whichever is less.
(1) Access to additional stories below grade is not mandatory since they are required to be sprinklered as provided in subdivision k of section 27-954 of article four of subchapter seventeen of this chapter.
(2) One- and two-family dwellings need not provide direct access.
(3) Any building classified in occupancy group J-2 not more than three stories in height and with not more than two dwelling units on any story need not provide direct access when such first basement or cellar story is used for dwelling units or for uses accessory to the residential use in the building.
(4) Except as provided in paragraph three of this subdivision, for buildings classified in occupancy group J-1 or J-2 only one direct access from the outdoors to the first basement or cellar story consisting of a stair or door shall be required when such story is used for dwelling units or for uses accessory to the residential use in the building.
**(c) Signs. -** Where wall signs are erected to cover doors or windows of existing buildings, access panels shall be provided as necessary to comply with the requirements of subdivisions (a) and (b) of this section.
**(d) Location. -** Wherever practicable, one access opening in each story shall provide access to a stairway, or where there is no stairway at the exterior wall, one access opening in each story shall be located as close as practicable to a stairway.
**(e) Exemptions. -** The provisions of subdivisions (a) through (d) of this section shall not apply to any story that is completely protected by an automatic sprinkler system conforming to the construction requirements of subchapter seventeen.
*Local Law 58-1987.*

## *SUBARTICLE 2  FACILITIES FOR PEOPLE HAVING PHYSICAL DISABILITIES

**§27-292.1 Scope. -** As set forth in this subarticle, buildings shall be provided with accessible routes, usable or adaptable space and accessible elements and facilities to make buildings accessible and usable by, and to establish a safe environment for, all categories of people having physical disabilities.

**§27-292.2 Standards. -** The pertinent provisions of reference standard RS 4-6 shall be part of this subarticle.

**§27-292.3 Definitions. -** For definitions to be used in

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 321 of 654

Title 27 / Subchapter 4

the interpretation of this subarticle, see section 27-232 and reference standard RS 4-6.

§27-292.4 General Requirements. -
(a) This subarticle shall apply to all buildings or portions thereof and their accessory areas, except as specified in this subarticle.
(b) The provisions of this subarticle shall be supplemental to and take precedence over less restrictive provisions of this code in the following articles and sections and in their referenced national standards:
(1) Subchapter four, building limitations
a. §27-308 ramps
(2) Subchapter six, means of egress
a. §27-357 (d) building access
b. §27-371 (e) door opening width
c. §27-377 ramps
(3) Subchapter seven, special uses and occupancies
a. Article ten, public garages
b. Article eleven, open parking structures
c. Article thirteen, open parking lots
d. Article fifteen, swimming pools
(4) Subchapter eight, places of assembly
a. §27-531 Seating in assembly spaces
(5) Subchapter sixteen, plumbing and gas piping
a. Reference standard RS-16, paragraph (c) of section P104.1 Facilities for physically handicapped
b. Reference standard RS-16, paragraph (d) of section P104.1 accessibility
(6) Subchapter seventeen, fire alarm, detection and extinguishing equipment
c. Article six, smoke detecting devices
(7) Subchapter eighteen, elevators and conveyors
a. Reference standard RS 18-1
(c) Facilities in existence on the effective date of this subarticle which comply with the requirements of this subarticle or of other provisions of this code relating to the provision of facilities for people with physical disabilities shall not be diminished to less than those which would be required were the building in which the facilities are located hereafter erected.

§27-292.5 Accessibility. -
(a) Primary entrance(s). - The primary entrance(s) for buildings shall be accessible, except for buildings classified in occupancy group A, J-3 and/or other spaces which normally are not frequented by the public or employees of the facility.
(b) Exterior accessible route. - Except as provided in this subarticle, buildings shall be provided with an exterior accessible route to permit entry at the primary entrance(s) of the building from the following locations:
(1) Public street or sidewalk
(2) Driveways
(3) Parking areas

(4) Passenger loading zones
(5) Transportation stops
(c) Interior accessible route. - Except as provided in this subarticle, in buildings having (an) interior route(s) to one or more of the following spaces or facilities, such route(s) shall be (an) interior accessible route(s) from the entrance(s) usable by all categories of people having physical disabilities to adaptable or usable dwelling units and other spaces and facilities on the same premises including but not limited to:
(1) Laundry rooms
(2) Refuse disposal locations
(3) Mailbox areas
(4) Recreational, assembly and tenants' meeting rooms
(5) Storage rooms
(6) Management offices
(7) Stores
(8) Dining areas
(9) Parking areas
Where the only route to one or more of such spaces or facilities is an exterior route, such route shall be accessible.
(d) Path of travel. - The path of travel in exterior and interior accessible routes shall provide unobstructed safe access and applicable items in such path of travel shall comply with the requirements set forth in reference standard RS 4-6.
(e) Elevators. - Where provided, all elevators shall comply with subchapter eighteen, reference standard RS 18-1, where an interior accessible route is required.
(f) Assembly occupancies. - For assembly occupancies having a mezzanine or balcony which provides a similar view as that from the main floor, accessibility to the mezzanine or balcony shall not be required provided toilet rooms are on the main floor.
(g) Restaurants. - For restaurants, dining rooms and similar occupancies having the same services on levels other than the main floor, accessibility to such levels shall not be required provided that toilet rooms are on the main floor.
(h) Storage. - For buildings in which the intended use is the storage of goods or merchandise, the only requirement shall be accessibility at the primary entrance and an interior accessible route to offices where business may be conducted.
(i) Non-grade stories of small non-residential buildings. - The following non-residential buildings or parts thereof are exempt from the provisions of this subarticle concerning requirements for people having physical disabilities, to the extent set forth in subdivisions (1) and (2) of this subsection:
(1) construction of such new buildings the total floor area of which is two thousand five hundred square feet or less;
(2) alterations to such building already existing where the alterations are being made to an above. -grade story

having a total floor area of two thousand five hundred square feet or less or to a below-grade story having a total floor area of two thousand square feet or less.

Notwithstanding the foregoing, floor areas frequented by the public for assembly, governmental, public utility or health facility purposes shall not be exempted unless equivalent functional accessible facilities are provided on the first story.

**(j)** Where the floor area is more than two thousand five hundred square feet but less than five thousand square feet, a vertical wheelchair lift enclosed in construction having the required fire-resistance rating and connecting not more than two contiguous levels is permitted in lieu of an accessible route as set forth in reference standard RS 4-6.

**(k)** Where the below-grade cumulative floor area is more than two thousand square feet but not more than five thousand square feet, a vertical wheelchair lift enclosed in construction having the required fire-resistance rating and connecting not more than two contiguous levels is permitted in lieu of an accessible route as set forth in reference standard RS 4-6.

**\*§27-292.6 Waiver of requirements.** (1) The commissioner may waive the requirements of this subarticle or of subdivision (d) of section 27-357 of this code for the alteration of existing buildings, and for any new building for which a formal application together with plans required by such application was filed with an agency of the city or with the battery park city authority prior to September first, nineteen hundred eighty-seven, when such application was required by law or regulation to be approved by such agency; provided, however, that such waiver would not significantly adversely affect provisions for health, safety and security and that equally safe and proper alternatives are prescribed and, further, that such waiver is based upon a specific finding that strict compliance with the requirement:

(a)  would create an undue economic burden; or
(b)  would not achieve its intended objective; or
(c)  would be physically or legally impossible; or
(d)  would be unnecessary in light of alternatives which insure the achievement of the intended objective or which, without a loss in the level of safety, achieve the intended objective more efficiently, effectively or economically; or
(e)  would entail a change so slight as to produce a negligible additional benefit consonant with the purposes of this code.

(2)  Each application for a waiver under subdivision one of this section shall be made to the commissioner in writing, setting forth each requirement sought to be waived and the specific reason or reasons therefor. The commissioner shall determine, under all of the circumstances presented by such application, which of

such requirements may appropriately be waived. The commissioner shall render such determination in a writing, which shall set forth in detail, the commissioner's findings and conclusions with respect to each requirement sought to be waived. A copy of such written determination shall be forwarded to the applicant. Such written determination shall be filed with the department and shall be available for public inspection.

(3)  The mayor's office for the handicapped or its successor agency shall be consulted by and shall advise the commissioner concerning each application for a waiver under this section.

<sup>*</sup> *Local Law 65-1988.*

**§27-292.7    Special requirements of other city departments. -** The commissioner upon good cause may waive the requirements of this subarticle for the construction of buildings or spaces, or for the alteration of existing buildings to meet the special requirements of other city departments in regard to any of the following:
(a) Firehouses
(b) Correctional facilities
(c) Cargo handling facilities on the waterfront
(d) Wholesale food markets

**§27-292.8    Adaptable dwelling units. - (a) General requirements.**

(1)  Adaptable dwelling units are units that contain habitable rooms, kitchens, kitchenettes and bathrooms in residential buildings other than in occupancy group J-3 which when constructed are on an accessible route (except as set forth in this subdivision) and are constructed and equipped as defined in section 27-232 and as set forth in this subarticle so that they can be converted to be used, with a minimum of structural change, by all categories of people having physical disabilities.

(2)  Such units shall be provided with door widths and clear floor spaces for making dwelling units usable as set forth in reference standard RS 4-6 when occupied by people having physical disabilities.

(3)  Interior access, floor surfaces, adaptable kitchens, adaptable kitchenettes and adaptable bathrooms in these dwelling units shall comply with the requirements set forth in reference standard RS 4-6.

(4)  Where an adaptable dwelling unit occupies two or more stories within itself, accessibility shall only be required at the first story of such dwelling unit provided that:
a.  The second story is accessible from without; or that
b.  Equivalent accessible functional facilities are provided on the first story; or that
c.  The stair within the dwelling unit has a minimum width of three feet.

**(b) Number of adaptable dwelling units. -**
(1)  All dwelling units in buildings with elevators shall

be adaptable unless usable dwelling units are provided in accordance with section 27-292.9.

(2)  At least one but not less than twenty-five percent of the total number of dwelling units in buildings without an elevator, which have dwelling units on the ground floor and which contain three or more dwelling units, shall be adaptable, unless usable dwelling units are provided in accordance with section 27-292.9. Such adaptable dwelling unit(s) shall be located on the ground floor. Where determination by percentage results in a number containing a decimal of 0.5 or more, the next higher number shall be used, but such number shall not exceed the number of dwelling units actually proposed for the ground floor.

**(c)  Adaptable bathrooms, kitchens and kitchenettes. -** Adaptable bathrooms, kitchens and kitchenettes within adaptable dwelling units shall be constructed and equipped in accordance with requirements set forth in reference standard RS 4-6 with respect to the following:

Access doorway or opening

Clear floor space

Floor surface

Bathroom, kitchen and kitchenette facilities and controls capable of being made usable

Space and utilities for usable range, (or cooktop or oven), refrigerator/freezer, (dishwasher if provided).

Such items shall include water closet and toilet paper dispenser, lavatory and removable base cabinet, mirrors, medicine cabinet, bathtub and controls, bathtub and shower enclosure, reinforced areas for grab bars, clearance between opposing base cabinets, counter tops, appliances and walls, adjustable or replaceable sink and removable base cabinet, as well as storage cabinets, drawers and shelves.

**(d)  Washing machines and clothes dryers within adaptable dwelling units. -** Where washing machines and clothes dryers are located within adaptable dwelling units, they shall comply with or be capable of being converted to the requirements set forth in reference standard RS 4-6.

**(e)  Emergency warning devices within adaptable dwelling units. -** Emergency warning devices within adaptable dwelling units shall be capable of being converted to audible and visual indication as required and to conform to the requirements set forth in subchapter seventeen, article six, reference standard RS 17-11, reference standard RS 17-12 and reference standard RS 4-6.

**§27-292.9 Usable dwelling units. -**
**(a)  General requirements. -**

(1)  Usable dwelling units are units in residential buildings in other than occupancy group J-3 which are accessible, constructed and equipped, as defined in section 27-232 and as set forth in this subarticle, so as to be usable by people having physical disabilities. A usable dwelling unit shall be established by conversion from an adaptable dwelling unit when the unit becomes occupied by a person having a physical disability.

(2)  Access, storage, controls, windows, doors, floor surfaces, kitchens, kitchenettes and bathrooms, appliances and emergency warning devices in these units shall comply with the requirements set forth in reference standard RS 4-6.

**(b)  Number of usable dwelling units.** (1) Hotels. - In lieu of the requirements of section 27-292.8 in buildings in occupancy group J-1 having ten or more units, not less than five percent of the total number of units shall be constructed as usable units. In all buildings in occupancy group J-1 there shall be available portable smoke detectors of both audible and visual design. The number of detectors available shall be three percent of the number of sleeping rooms with a minimum of one operational detector per building. Proprietors shall post conspicuously a sign at least three inches in height, at the main desk or other similar station, advising of the availability of such detectors. Such detectors shall have a flash frequency range of sixty to one hundred twenty flashes per minute; and, where the average illuminance with motion present is more than twenty lumens per square foot, the visible signaling appliance shall have an effective intensity rating between one hundred and one thousand candela. Hard wiring of audible/visual detectors into an existing central closed-circuit alarm system shall be permitted in lieu of such portable detectors. Where determination by percentage results in a number containing a decimal of 0.5 or more, the next higher number shall be used. Notwithstanding the foregoing, entrance doors to all dwelling units in occupancy group J-1 having ten or more units, and to all bathrooms in such units, shall be no less than thirty-two inches in width.

(2)  Adult residential care facilities.- All units in adult residential care facilities shall be usable. "Adult residential care facility" shall mean a family type home for adults, a shelter for adults, a residence for adults, an enriched housing program or an adult home, which contains three or more dwelling units and which provides board and temporary or long-term residential care and services to adults who, though not requiring continual medical or nursing care, are by reason of physical or other limitations associated with age, physical or mental disabilities or other factors unable or substantially unable to live independently. Such facilities shall be considered to be within occupancy group J-2.

**(c)  Usable bathrooms, kitchens and kitchenettes. -** Usable bathrooms, kitchens and kitchenettes within usable dwelling units shall be constructed and equipped in accordance with requirements set forth in reference standard RS 4-6 with respect to the following:

Access doorway or opening

Clear floor space
Floor surface
Bathroom, kitchen and kitchenette facilities and controls
Space and utilities for usable range, (or cooktop or oven), refrigerator/freezer, (dishwasher if provided).
Such items shall include usable water closet and toilet paper dispenser, lavatory and base cabinet, bathtub and controls, bathtub and shower enclosure, grab bars, clearance between opposing base cabinets, counter tops, appliances and walls, sink and base cabinet.

**(d) Washing machines and clothes dryers within usable dwelling units. -** Where washing machines and clothes dryers are located within usable dwelling units, they shall comply with or be capable of being converted to the requirements set forth in reference standard RS 4-6.

**(e) Emergency warning devices within usable dwelling units. -** Emergency warning devices within usable dwelling units shall be capable of being converted to audible and visual indication as required and to conform to the requirements set forth in subchapter seventeen, article six, reference standard RS 17-11, reference standard RS 17-12 and reference standard RS 4-6.

**§27-292.10 Usable spaces. -**
**(a) Functional spaces and rooms.**
(1) Except as otherwise provided in section 27-292.5, spaces and rooms intended for general public and occupant use shall be accessible and usable. Such spaces and rooms include but are not necessarily limited to the following:
Mercantile spaces
Industrial spaces
Business spaces
Assembly spaces
Educational spaces
Institutional spaces
Toilet rooms
Bathrooms, bathing facilities, shower rooms.
(2) Doors and floor surfaces in usable spaces shall comply with the requirements set forth in reference standard RS 4-6.
(3) Where seating, tables and/or work stations are provided in usable spaces, at least one and not less than five percent shall comply with the requirements set forth in reference standard RS 4-6.
**(b) Toilet rooms. -**
(1) The location and number of water closets, urinals and lavatories shall be provided in accordance with the requirements set forth in table RS 16-5.
(2) Except where exempted in subdivision (i) of section 27-292.5 or section 27-292.6, facilities for people having physical disabilities shall be provided in toilet rooms or in a readily accessible location. Where such

toilet room is designed for use by not more than one person at a time and has provision for locking from the inside, such toilet room shall be permitted to be used by either sex.
(3) Where toilet rooms are not accessible by elevator, they shall be located so that people with physical disabilities need not travel more than one story thereto by ramp.
**(c) Bathing facilities. -**
(1) The location and number of plumbing fixtures shall be provided in accordance with the requirements set forth in table RS 16-5 and in reference standard RS 4-6.
(2) Each required bathing facility shall be accessible and at least one of each type of fixture or accessory that is provided in such bathing facility shall comply with the requirements set forth in table RS 16-4 and in reference standard RS 4-6.

**§27-292.11 Assembly spaces. -**
(a) Assembly spaces other than places of assembly shall be provided with a minimum of accessible wheelchair viewing positions as follows:

| Capacity of Assembly Space | Number of Viewing Positions |
| --- | --- |
| 1 to 25 | Minimum 1 |
| 26 to 50 | Minimum 2 |
| 51 to 74 | Minimum 3 |

(b) Places of assembly shall be provided with accessible wheelchair viewing positions in accordance with subparagraph h of paragraph (1) of subdivision (a) of section 27-531.
(c) Size and placement of wheelchair location, surfaces, access to performing area and listening systems, where required, shall comply with the provisions of reference standard RS 4-6. These positions may be utilized by persons who do not use wheelchairs provided that the positions are delineated on the approved seating plans, the seating is readily removable and the positions are unsold one full working day before the performance.

**§27-292.12 Public toilet rooms. -** Where public toilet rooms are provided, there shall be at least one water closet stall and lavatory fixture for each sex which is accessible to and usable by people having physical disabilities and complies with the requirements of paragraph (c) of section P104.1 of reference standard RS 16-1 and reference standard RS 4-6.

**§27-292.13 Drinking fountains. -**
(a) Location and number of drinking fountains shall be provided in accordance with the requirements set forth in table 16-5.
(b) At least one drinking fountain on a story on which drinking fountains are provided shall be accessible and

comply with the requirements set forth in reference standard RS 4-6.

(c) Where outside drinking fountains are provided, at least one shall be accessible and comply with the requirements set forth in reference standard RS 4-6.

**§27-292.14 Public telephones. -** At each location where public telephones are provided, at least one telephone shall be accessible and usable by people who use wheelchairs and at least one telephone shall be accessible and usable by persons with hearing impairment, and each such accessible telephone shall comply with the requirements set forth in reference standard RS 4-6.

**§27-292.15 Alarms. -** Where emergency warning systems are provided in spaces used by people having physical disabilities such systems shall comply with the requirements set forth in reference standard RS 4-6. Portable audible/visual smoke detecting devices in existing group J-1 occupancies shall comply with the provisions of paragraph (1) of subdivision (b) of section 27-292.9.

**§27-292.16 Controls and operating mechanisms. -** Where controls and operating mechanism for light switches, dispensers, alarms and other similar devices are provided, they shall be accessible and comply with the requirements set forth in reference standard RS 4-6.

**§27-292.17 Tactile warnings. -** Tactile warnings shall be provided at hazardous locations on floors, doors, stairs, hazardous vehicular areas and pools, and shall comply with applicable requirements as set forth in reference standard RS 4-6.

**§27-292.18 Signage. -**
(a)  Symbols of accessibility shall be provided at the following locations:
Parking spaces designated as reserved for people having physical disabilities
Passenger loading zones
Public toilet and bathing facilities
Drinking fountains
Public telephones
(b)  Information and directional signage shall be provided where deemed necessary.
(c)  Symbols and characters shall comply with the applicable requirements set forth in reference standard RS 4-6.

**§27-292.19 Parking spaces. -**
(a) Where parking areas or garages are provided, at least one parking space but not less than five percent of the total number of parking spaces provided shall be suitable for use by people having physical disabilities.

Where determination by percentage results in a number containing a decimal of 0.5 or more, the next higher number shall be used.
(b) Location, space, size and signage for parking spaces suitable for use by people having physical disabilities shall comply with provisions set forth in reference standard RS 4-6.

**§27-292.20    Passenger loading zones. -** Where passenger loading zones are provided, location and access aisles for at least one vehicle (with respect to multiple dwellings) or zones (with respect to other buildings) shall comply with the requirements set forth in reference standard RS 4-6.
*Local Law 58-1987.*

### ARTICLE 3 FIRE DISTRICTS

**§[C26-402.1]    27-293  Inside fire districts. -** The following city areas are hereby established as being inside the fire districts:
(a)  All of the borough of Manhattan.
(b)  All of the borough of Bronx.
(c)  All of the borough of Brooklyn.
(d)  Such portions of the boroughs of Staten Island and Queens as are indicated on the "fire district maps" (reference standards RS 4-1 and RS 4-2).

**§[C26-402.2]    27-294    Outside fire districts.** - All areas not included inside the fire districts shall be designated as outside fire districts.

**§[C26-402.3] 27-295    Mixed districts. -** Any building located on the boundary line of a fire district, so that it is both inside and outside the district, shall be of a type of construction required for the fire districts if more than twenty-five per cent of the total floor area of the building is located therein.

### ARTICLE 4 LIMITATIONS INSIDE THE FIRE DISTRICTS

**§[C26-403.1]    27-296    Limitations. -** No buildings in those combinations of construction classes and occupancy groups prohibited by tables 4-1 and 4-2 shall be erected inside the fire districts or shall be moved from outside to inside the fire districts, or from one lot to another inside the fire districts. No building or space classified in occupancy group J-1 or J-2 may be located on a lot containing a building classified in construction group I-E, II-D or II-E.

**§[C26-403.2]    27-297    Exemptions. -** The following constructions shall be exempt from the provisions of section 27-296 of this article:
**(a)  One- or two-family dwellings.** - One- or two-

family detached or semi-detached dwellings of two stories or less in height and two thousand five hundred square feet or less in area located within zoning residence districts [R-2, R3-1, R3-2, R-4 and R-5]* may be constructed or reconstructed of construction groups II-D combustible materials, or if damaged for any cause, only the damaged portions shall be required to be reconstructed to conform to II-D construction. In addition, one-family dwellings located within zoning residence district [R. -1]* anywhere in the city, may be of combustible group II-E construction in conformance with the area and height limits established by tables 4-1 and 4-2.

*
*Copy in brackets not enacted but probably intended.*

(b) **Fences. -** Fences not over six feet high may be erected of wood or other combustible material.

(c) **Storm enclosures, bay windows, etc. -** Storm enclosures, bay windows and similar appendages may be constructed of combustible materials in accordance with the provisions of section 27-336 of article four of subchapter five of this chapter.

(d) **Accessory buildings for open parking lots. -** Parking lot offices and similar accessory buildings not more than ten feet high and not more than one hundred fifty square feet in area may be constructed of combustible materials when on the same lot or accessory to a lot used for motor vehicle parking, and when located at least six feet from any lot line or building.

(e) **Temporary structures. -** Temporary platforms, reviewing stands, and similar miscellaneous structures may be constructed of combustible materials and used for a limited period of time, subject to the approval of the commissioner.

(f) **Greenhouse. -** Greenhouses may be constructed of combustible materials when accessory to a one - or two-family dwelling on the same lot and when located at least six feet from any lot line or building.

(g) **Roof structures. -** Cooling towers, antenna supports, and other roof structures may be constructed of combustible materials in accordance with the provisions of section 27-338 of subchapter five of this chapter.

(h) **Bins, tanks, and towers. -** Coal and material bins, water towers, tank structures, and trestles may be constructed of wood planking and timbers of dimensions not less than as required for class II-A construction when not over thirty-five feet high and having an exterior separation of at least thirty feet.

(i) **Signs. -** Ground signs, wall signs, roof signs, and temporary signs may be constructed of combustible materials within the limitations established in article eighteen of subchapter seven of this chapter.

**§[C26-403.3] 27-298 Additions to existing buildings. -** No building inside the fire districts may be increased

in area or height to exceed the limitations of tables 4-1 and 4-2. (See Tables 4-1 and 4-2).

## ARTICLE 5  LIMITATIONS OUTSIDE THE FIRE DISTRICTS

**§[C26-404.1]  27-299 Limitations. -** No buildings in those combinations of construction classes and occupancy groups prohibited by tables 4-1 and 4-2 shall be erected outside the fire districts. No building or space classified in occupancy group J-1 or J-2 may be located on a lot containing a building classified in construction group I-E, II-D or II-E. No building classified in construction group I-E, II-D or II-E shall be located on a lot containing a building or space classified in occupancy group J-1 or J-2.

**§[C26-404.2] 27-300 Additions to existing buildings. -** No building outside of the fire districts may be increased in area or height to exceed the limitations of tables 4-1 and 4-2.

## ARTICLE 6 AREA LIMITATIONS

**§[C26-405.1] 27-301 Area limitations of buildings. -** No building or building section shall be constructed or altered so as to exceed the area limits established by tables 4-1 and 4-2 based on the occupancy group classification of the building or building section, except as these may be specifically modified by other provisions of this code.

**§[C26-405.2] 27-302  Area limitations of spaces. -** No occupancy within a building or building section shall be constructed or altered so as to exceed in total cumulative area the area limits established by tables 4-1 and 4-2, except as these may be specifically modified by other provisions of this code.

**§[C26-405.3]  27-303 Frontage increase. -** When a building has more than twenty-five per cent of the total perimeter of the building fronting directly upon a street or frontage space, the tabular areas listed in tables 4-1 and 4-2 may be increased 1.33 per cent for each one per cent of such excess frontage.

**§[C26-405.4]  27-304 Existing excessive area**. - Any building existing on December sixth, nineteen hundred sixty-eight that exceeds the maximum allowable area permitted under the provisions of this section, may be enlarged if the addition is separated from the existing building by a fire division meeting the requirements of subchapter five of this chapter, and if the additional area does not exceed the limits established by tables 4-1 and 4-2 for the specific occupancy group and construction class.

### ARTICLE 7 HEIGHT LIMITATIONS

**§[C26-406.1]  27-305 Height limitations of buildings.** - No building or building section shall be constructed or altered so as to exceed the height limits established by tables 4-1 and 4-2 based on the occupancy group classification of the building or building section, except as these may be specifically modified by other provisions of this code.

**§[C26-406.2]  27-306 Measurement.** - In applying the provisions of this code governing height limits, the following appurtenant structures shall not be included in the height of the building unless the aggregate area of all such structures exceeds thirty-three and one-third percent of the area of the roof of the building upon which they are erected:

(a)  Roof tanks and their supports.

(b) Ventilating, air conditioning, and similar building service equipment.

(c)  Roof structures, bulkheads, and penthouses.

(d)  Chimneys.

(e)  Parapet walls four feet or less in height.

Title 27 / Subchapter 4

**\*TABLE 4-1 AREA AND HEIGHT LIMITATIONS FOR UNSPRINKLERED BUILDINGS AND SPACES**

| Occupancy Group | | NONCOMBUSTIBLE CONSTRUCTION GROUP I | | | | | COMBUSTIBLE CONSTRUCTION GROUP II | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Class IA | Class IB | Class IC | Class ID | Class IE | Class IIA | Class IIB | Class IIC | Class IID | Class IIE |
| HIGH HAZARD A[c] | Area | N.P. | N.P. | N.P. | N.P. | N.P. | N.P. | N.P. | N.P. | N.P. | N.P. |
| | Height | N.P. | N.P. | N.P. | N.P. | N.P. | N.P. | N.P. | N.P. | N.P. | N.P. |
| STORAGE B-1 | Area | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | N.P. | 1,000 | N.P. |
| | Height | 75'-0" | 75'-0" | 65'-0"(5) | 75'-0" | 40'-0"(3) | 50'-0"(4) | 50'-0"(4) | | 40'-0"(3) | |
| STORAGE B-2[b] | Area | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,600 | 8,400 | 2,100 |
| | Height | 75'-0" | N.L. | 75'-0" | 75'-0"(6) | 40'-0"(3) | 75'-0"(6) | 75'-0"(6) | 40'-0"(3) | 40'-0"(3) | 40'-0"(3) |
| MERCANTILE C | Area | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 5,600 | 8,400 | 2,100 |
| | Height | 75'-0" | 75'-0" | 75'-0" | 75'-0"(6) | 40'-0"(3) | 75'-0"(6) | 75'-0"(6) | 40'-0"(3) | 40'-0"(3) | 40'-0"(3) |
| INDUSTRIAL D-1 | Area | 7,500 | 7,500 | 7,500 | 7,500 | 3,500 | 7,500 | 7,500 | N.P. | 1,400 | N.P. |
| | Height | 75'-0" | 75'-0" | 65'-0"(5) | 65'-0"(5) | 40'-0"(3) | 50'-0"(4) | 50'-0"(4) | | 40'-0"(3) | |
| INDUSTRIAL D-2 | Area | N.L. | N.L. | N.L. | 17,500 | 10,500 | 14,700 | 14,700 | 5,600 | 8,400 | 2,100 |
| | Height | 75'-0" | 75'-0" | 75'-0" | 75'-0"(6) | 40'-0"(3) | 75'-0"(6) | 75'-0"(6) | 40'-0"(3) | 40'-0"(3) | 40'-0"(3) |
| BUSINESS E | Area | 75'-0"[d,f] | 75'-0"[d,f] | N.L. 75'-0"[d,f] | 75'-0"[d,f] | 10,500 | 14,700 | 14,700 | 5,600 | 8,400 | 2,100 |
| | Height | 75'-0" | 75'-0" | | 75'-0"(6) | 40'-0"(3) | 75'-0"(6) | 75'-0"(6) | 40'-0"(3) | 40'-0"(3) | 40'-0"(3) |
| ASSEMBLY F-1 | Area | | | N.L. | 17,500 | 10,500 | 14,700 | 14,700 | 5,600 | 8,400 | 2,100 |
| | Height | 75'-0" | 75'-0" | 75'-0" | 75'-0"(6) | 40'-0"(3) | 75'-0"(6) | 75'-0"(6) | 40'-0"(3) | 40'-0"(3) | 40'-0"(3) |
| ASSEMBLY F-2[c] | Area | N.L. | N.L. | N.L. | 17,500 | 17,500 | N.L. | N.L. | 12,600 | 15,400 | 9,100 |
| | Height | | | | | 75'-0"(6) | 75'-0"(6) | 75'-0"(6) | 65'-0"(5) | 75'-0"(6) | 65'-0"(5) |
| ASSEMBLY F-3 | Area | | | N.L. | 17,500 | 10,500 | 14,700 | 14,700 | 5,600 | 8,400 | 2,100 |
| | Height | 75'-0" | 75'-0" | 75'-0" | 75'-0"(6) | 40'-0"(3) | 75'-0"(6) | 75'-0"(6) | 40'-0"(3) | 40'-0"(3) | 40'-0"(3) |
| ASSEMBLY F-4[g] | Area | | | N.L. | 17,500 | 10,500 | 14,700 | 14,700 | 5,600 | 8,400 | 2,100 |
| | Height | 75'-0" | 75'-0" | 75'-0" | 75'-0"(6) | 40'-0"(3) | 75'-0"(6) | 75'-0"(6) | 40'-0"(3) | 40'-0"(3) | 40'-0"(3) |
| EDUCATIONAL G | Area | N.L. | | N.L. | 17,500 | 10,500 | 14,700 | 14,700 | 5,600 | 8,400 | 2,100 |
| | Height | 75'-0" | 75'-0" | 75'-0" | 75'-0"(6) | 40'-0"(3) | 75'-0"(6) | 75'-0"(6) | 40'-0"(3) | 40'-0"(3) | 40'-0"(3) |
| INSTITUTIONAL H-1 | Area | 17,500 | 14,000 | 10,500 | 7,000 | N.P. | 4,200 | 4,200 | N.P. | N.P. | N.P. |
| | Height | N.L. | 75'-0" | 65'-0"(5) | 50'-0"(4) | | 50'-0"(4) | 50'-0"(4) | | | |
| INSTITUTIONAL H-2 | Area | 17,500 | 14,000 | 10,500 | 7,000 | N.P. | 4,200 | 4,200 | N.P. | N.P. | N.P. |
| | Height | N.L. | 75'-0" | 65'-0"(5) | 50'-0"(4) | | 50'-0"(4) | 50'-0"(4) | | | |
| RESIDENTIAL J-1 | Area | N.P. | N.P. | N.P. | N.P. | N.P. | N.P. | N.P. | N.P. | N.P. | N.P. |
| | Height | | | | | | | | | | |
| \*RESIDENTIAL J-2 When Constructed Subject to the Requirements of §27-954(t) or Altered Subject to the Requirements of §27-123.2 | Area | N.P. | N.P. | N.P. | N.P. | N.P. | N.P. | N.P. | N.P. | N.P. | N.P. |
| | Height | | | | | | | | | | |
| \*RESIDENTIAL J-2 When Not Subject to the Requirements of §27-954(t) or Altered Subject to the Requirements of §27-123.2 | Area | N.L. | N.L. | N.L. | 17,500 | N.P. | 10,000 | 10,000 | 5,600 | N.P. | N.P. |
| | Height | | | 75'-0" | 75'-0"(6) | | 75'-0"(6) | 75'-0"(6) | 40'-0"(3) | | |
| RESIDENTIAL J-3 | Area | N.L. | N.L. | N.L. | 17,500 | 10,500 | 14,700 | 14,700 | 5,600 | 8,400 | 2,100 |
| | Height | | | 75'-0" | 75'-0"(6) | 40'-0"(3) | 75'-0"(6) | 75'-0"(6) | 40'-0"(3) | 40'-0"(3) | 40'-0"(3) |

N.L.– No Limit          N.P.– Not Permitted          Not Permitted Inside Fire Districts[a]

132

**Title 27 / Subchapter 4**

**Notes for Table 4-1:**

Tabulated areas are given in sq. ft. and establish maximum gross area permitted on any one story within a building or fire area. See section 27-303 and subdivision (e) of section 27-328 for permissible area increases. Tabulated heights are given in feet and number of stories (in parentheses).

[a] See section 27-297 for construction exemptions.

[b] See article eleven of subchapter seven of chapter one of this title for area and height limitations of open parking structures.

[c] See paragraph two of subdivision (b) of section 27-548 for grandfathered limitations.

[d] See subdivision (c) of section 27-339 for area limitations for existing office buildings one hundred feet or more in height with mechanical ventilation and/or air-conditioning systems that serve floors other than the floor on which the equipment is located.

[e] Spaces in occupancy group A solely due to their containing gas distribution piping at pressure levels above fifteen psig may be unsprinklered and conform with the area and height limitations set forth in table 4-2, provided other fire protection requirements set forth in section 27-404 and subchapters five and seventeen of chapter one of this title are met.

[f] See section 27-954 for area limitations for buildings less than seventy-five ft. in height.

[g] See subdivisions (u) and (v) of section 27-954 for requirements pertaining to F-4 spaces within J-1 buildings, catering establishments and banquet halls with occupant load of three hundred or more persons.

* *Local Law 16-1999.*

133

Title 27 / Subchapter 4

**TABLE 4-2 AREA AND HEIGHT LIMITATIONS FOR SPRINKLERED BUILDINGS AND SPACES**

| Occupancy Group | | NONCOMBUSTIBLE CONSTRUCTION GROUP I | | | | | COMBUSTIBLE CONSTRUCTION GROUP II | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Class IA | Class IB | Class IC | Class ID | Class IE | Class IIA | Class IIB | Class IIC | Class IID | Class IIE |
| HIGH HAZARD A | Area | N.L. | 17,500 | 14,000 | 10,500 | 3,500 | 7,700 | 7,700 | N.P. | 1,400 | N.P. |
| | Height | | 75'-0"(6) | 65'0"(5) | 65'0"(5) | 40'-0"(3) | 50'-0"(4) | 50'-0"(4) | | 50'-0"(4) | |
| STORAGE B-1 | Area | N.L. | N.L. | N.L. | 17,500 | 10,500 | 14,700 | 14,700 | 5,600 | 8,400 | 2,100 |
| | Height | | | 85'-0"(7) | 75'-0"(6) | 50'-0"(4) | 75'-0"(6) | 75'-0"(6) | 40'-0"(3) | 50'-0"(4) | 40'-0"(3) |
| STORAGE B-2b | Area | N.L. | N.L. | N.L. | N.L. | 17,500 | N.L. | N.L. | 12,600 | 15,400 | 9,100 |
| | Height | | | | 85'-0"(7) | 50'-0"(4) | 85'-0"(7) | 85'-0"(7) | 50'-0"(4) | 50'-0"(4) | 50'-0"(4) |
| MERCANTILE C | Area | N.L. | N.L. | N.L. | N.L. | 17,500 | N.L. | N.L. | 12,600 | 15,400 | 9,100 |
| | Height | | | | 85'-0"(7) | 50'-0"(4) | 85'-0"(7) | 85'-0"(7) | 50'-0"(4) | 50'-0"(4) | 50'-0"(4) |
| INDUSTRIAL D-1 | Area | N.L. | N.L. | N.L. | 17,500 | 10,500 | 14,700 | 14,700 | 5,600 | 8,400 | 2,100 |
| | Height | | | 85'-0"(7) | 75'-0"(6) | 50'-0"(4) | 75'-0"(6) | 75'-0"(6) | 40'-0"(3) | 50'-0"(4) | 40'-0"(3) |
| INDUSTRIAL D-2 | Area | N.L. | N.L. | N.L. | N.L. | 17,500 | N.L. | N.L. | 12,600 | 15,400 | 9,100 |
| | Height | | | | 85'-0"(7) | 50'-0"(4) | 85'-0"(7) | 85'-0"(7) | 50'-0"(4) | 50'-0"(4) | 50'-0"(4) |
| BUSINESS E | Area | N.L. | N.L. | N.L. | N.L. | 17,500 | N.L. | N.L. | 12,600 | 15,400 | 9,100 |
| | Height | | | | 85'-0"(7) | 50'-0"(4) | 85'-0"(7) | 85'-0"(7) | 50'-0"(4) | 50'-0"(4) | 50'-0"(4) |
| ASSEMBLY F-1 | Area | N.L. | N.L. | N.L. | N.L. | 17,500 | N.L. | N.L. | 12,600 | 15,400 | 9,100 |
| | Height | | | | 85'-0"(7) | 50'-0"(4) | 85'-0"(7) | 85'-0"(7) | 50'-0"(4) | 50'-0"(4) | 50'-0"(4) |
| ASSEMBLY F-2 | Area | N.L. | N.L. | N.L. | N.L. | N.L. | N.L. | N.L. | 19,600 | N.L. | 16,100 |
| | Height | | | | 85'-0"(7) | | | | 75'-0"(6) | | 75'-0"(6) |
| ASSEMBLY F-3 | Area | N.L. | N.L. | N.L. | N.L. | 17,500 | N.L. | N.L. | 12,600 | 15,400 | 9,100 |
| | Height | | | | 85'-0"(7) | 75'-0"(4) | 85'-0"(7) | 85'-0"(7) | 50'-0"(4) | 50'-0"(4) | 50'-0"(4) |
| ASSEMBLY F-4 | Area | N.L. | N.L. | N.L. | N.L. | 17,500 | N.L. | N.L. | 12,600 | 15,400 | 9,100 |
| | Height | | | | 85'-0"(7) | 75'-0"(4) | 85'-0"(7) | 85'-0"(7) | 50'-0"(4) | 50'-0"(4) | 50'-0"(4) |
| EDUCATIONAL G | Area | N.L. | N.L. | N.L. | N.L. | 17,500 | N.L. | N.L. | 12,600 | 15,400 | 9,100 |
| | Height | | | | 85'-0"(7) | 75'-0"(4) | 85'-0"(7) | 85'-0"(7) | 50'-0"(4) | 50'-0"(4) | 50'-0"(4) |
| INSTITUTIONAL H-1 | Area | N.L. | N.L. | 17,500 | 11,200 | 7,000 | 11,200 | 11,200 | 3,500 | 4,000 | N.P. |
| | Height | | 85'-0"(7) | 65'-0"(5) | 65'-0"(5) | 50'-0"(4) | 65'-0"(5) | 65'-0"(5) | 40'-0"(3) | 50'-0"(4) | |
| INSTITUTIONAL H-2 | Area | N.L. | N.L. | 17,500 | 11,200 | 7,000 | 11,200 | 11,200 | 3,500 | 4,000 | N.P. |
| | Height | | 85'-0"(7) | 75'-0"(6) | 65'-0"(5) | 50'-0"(4) | 65'-0"(5) | 65'-0"(5) | 40'-0"(3) | 50'-0"(4) | |
| RESIDENTIAL J-1 | Area | N.L. | N.L. | N.L. | N.L. | N.P. | N.L. | N.L. | N.P. | N.P. | N.P. |
| | Height | | | | 85'-0"(7) | | 85'-0"(7) | 85'-0"(7) | | | |
| RESIDENTIAL J-2 | Area | N.L. | N.L. | N.L. | N.L. | N.P. | N.L. | N.L. | 12,600 | N.P. | N.P. |
| | Height | | | | 85'-0"(7) | | 85'-0"(7) | 85'-0"(7) | 50'-0"(4) | | |
| RESIDENTIAL J-3 | Area | N.L. | N.L. | N.L. | N.L. | 17,500 | N.L. | N.L. | 12,600 | 15,400 | 9,100 |
| | Height | | | | 85'-0"(7) | 50'-0"(4) | 85'-0"(7) | 85'-0"(7) | 50'-0"(4) | 50'-0"(4) | 50'-0"(4) |

N.L. — No Limit          N.P.—Not Permitted          Not permitted inside Fire Districtsª

134

**Notes for Table 4-2:**

Tabulated areas are given in square feet and establish maximum gross area permitted on any one story within a building or fire area.  See section 27-303 for permissible area increases. Tabulated heights are given in feet and number of stories (in parentheses).

a See section 27-297 for construction exemptions.

b See article eleven of subchapter seven of this chapter for area and height limitations of open parking structures.

## ARTICLE 8 GENERAL PROJECTION LIMITATIONS

**§[C26-407.1]    27-307    Permissible projections beyond the street line. -** No part of a new building, or of any alteration or addition to an existing building, shall be constructed to extend beyond the street line, except as specifically provided in this subchapter.

**\*§[C26-407.2]  27-308  Ramps. –**
(a) When a building erected prior to December sixth, nineteen hundred sixty-nine is altered to provide access to individuals who use wheelchairs, ramps constructed to provide such access may, with the approval of the commissioner, project beyond the street line for a distance of not more than forty-four inches.
(b) Ramps shall comply with the applicable provisions of reference standard RS 4-6.
*Local Law 58-1987.*

**§[C26-407.3]    27-309    Special restrictions. -** The provisions of this subchapter shall not authorize any projections beyond the street line on those streets where removal of all, or certain projects has been directed by any action of the board of estimate or the former board of estimate and apportionment, or which has been, or may be, directed by any action of the council or the board of estimate, except those projections that are permitted in conformity with such actions.

**§[C26-407.4]    27-310    Projections removable. -** All projections permitted beyond the street line by the provisions of this subchapter shall be constructed so that they may be removed at any time without endangering the structural safety or fire safety of the building except that footings as permitted under subdivision (a) of section 27-314 of article nine of this subchapter need not be removable.

**§[C26-407.5]    27-311  Permission revocable. -** Any permission, expressed or implied, permitting the construction of projections within the area of the street under the provisions of this subchapter shall be revocable by the council or the board of estimate, except footings as permitted under subdivision (a) of section 27-314 of article nine of this subchapter.

**§[C26-407.6]  27-312  Existing projections. -** Any part of a building that projects beyond a street line on January first, nineteen hundred thirty-eight may be maintained as constructed until its removal is directed by the council or the board of estimate.

**(a)  Alterations. –**
Alterations to existing projections beyond the street line may be permitted in whole or in part, provided that such alterations conform with the requirements of this subchapter.

## ARTICLE 9 PERMISSIBLE PROJECTIONS BEYOND STREET LINES

**§[C26-408.1]    27-313    Projections above grade. -** Subject to the provisions of article eight of this subchapter the following projections may be constructed, above grade, to project beyond the street line:
**(a)  Fixed Projections. -** Fixed projections are those elements listed below, generally of an architectural character, that form an integral part of the building facade. The aggregate area of all fixed projections constructed to extend beyond the street line shall not exceed ten square feet within any one hundred square feet of wall area, except that a veneer may be applied to the entire facade of a building erected before December sixth, nineteen hundred sixty-eight, if such veneer does not project more than four inches beyond the street line. The area of any fixed projection shall be measured at that vertical plane, parallel to the wall, in which the area of the projection is greatest. This plane of measurement may be at the street line, the line of maximum projection, or any point in between.
(1)  ENTRANCE DETAILS. - Entrance details, including steps, and doors when fully open, may be constructed to project beyond the street line not more than eighteen inches. Entrance steps that project beyond the street line shall be guarded at each end by railings or check pieces at least three feet high or by other members of the entrance detail providing equivalent protection.
(2) ARCHITECTURAL DETAILS. - Details such as cornices, eaves, bases, sills, headers, band course, opening frames, sun control devices, rustications, applied ornament or sculpture, grilles, windows when fully open, air conditioning units, and other similar elements may be constructed to project not more than four inches beyond the street line when less than ten feet above the ground or sidewalk level, and not more than ten inches beyond the street line when more than ten feet above the ground or sidewalk level.
(3) BALCONIES. -Balconies, including railings and supporting brackets, no parts of which are less than ten

feet above the ground or sidewalk level, may be constructed to project not more than twenty-two inches beyond the street line. When permitted by the provisions of subchapter six of this chapter, fire escapes that are part of a required exit may be constructed to project not more than four feet six inches beyond the street line provided no part, including any movable ladder or stair, is lower than ten feet above the ground or sidewalk level when not in use.

(4) MARQUEES. - Marquees may be erected on public buildings, theaters, hotels, terminals, large department stores, supermarkets, multi-family dwellings, and similar buildings of an essentially public nature, or upon a warehouse or market in an established market area as designated by reference standard RS 4-3, so as to project beyond the street line, but not nearer than two feet to the curb line, provided that no parts of such marquees are less than ten feet above the ground or sidewalk level. Marquees must not be more than two feet to curb lines hereafter established or changed. When measured from top to bottom, marquees shall not be thicker nor shall the fascia be higher than three feet. This dimension shall include all decorations, but shall exclude any tension supports suspending the marquee from the wall. Marquees shall be supported entirely from the building and be constructed of noncombustible materials, except that the roof or any part of the roof may contain skylights complying with the requirements of subdivision (d) of section 27-338 of article four of subchapter five of this chapter. Marquee roofs shall be drained in accordance with the provisions of subchapter sixteen of this chapter. When the occupancy or use of a building with a marquee projecting beyond the street line is changed to occupancy or use for which a marquee is not permitted by this section the marquee shall be removed.

(5) LIGHT FIXTURES. - Light fixtures that are supported entirely from the building may be constructed to project not more than two feet beyond the street line, provided no part of the fixture is less than eight feet above the ground or sidewalk level.

(6) FLAGPOLES. - Flagpoles that are supported entirely from the building may be constructed to project not more than eighteen feet beyond the street line, but not closer than two feet to the curb line, provided that no part of the flagpole is less than fifteen feet above the ground or sidewalk level.

(7) WALL SIGNS. - Wall signs may be constructed to project not more than twelve inches beyond the street line when conforming to the requirements of subchapter seven of this chapter.

(8) PROJECTING SIGNS. - Projecting signs may be constructed to project not more than ten feet beyond the street line, but not closer than two feet to the curb line, when conforming to the requirements of subchapter seven of this chapter, and provided that no part of the

sign is less than ten feet above the ground or sidewalk level.

(b) **Awnings.** - Awnings supported entirely from the building may be constructed to project beyond the street line as follows:

(1) STORE FRONT AWNINGS. - Store front awnings may be constructed to project beyond the street line not more than eight feet, provided no part of the awning is less than eight feet above the ground or sidewalk level, except for a flexible valance, which may be not less than seven feet above the ground or sidewalk level, and provided that the awning box or cover does not project more than twelve inches.

(2) AWNINGS. - Awnings over windows or doors may be constructed to project beyond the street line not more than five feet, provided that no part of the awning is less than eight feet above the ground or sidewalk level.

(3) CONSTRUCTION. - Awnings shall be constructed of a noncombustible frame covered with flameproofed canvas or cloth, slow-burning plastic, sheet metal, or other equivalent material.

(c) **Storm enclosures.** -Storm enclosures projecting not more than eighteen inches beyond the street line may be permitted during the period between November fifteenth and the following April fifteenth. Such enclosures shall be removed at the end of this period. Construction shall follow the requirements of section 27-336 of subchapter five of this chapter.

(d) **Bridges between buildings**. - Bridges connecting buildings, and projecting beyond street lines, may be constructed subject to the approval of the board of estimate and the department of highways. Such bridges shall be of a construction class that is at least equal to the higher class of the two buildings connected, and shall otherwise comply with the provisions of this code and other applicable laws and regulations.

(e) **Sidewalk cafes. -** (1) Enclosures for sidewalk cafes, where permitted by the commissioner of consumer affairs, may be provided beyond the building line, within a street, provided such enclosures are constructed of incombustible material or slow-burning plastic or other material which will not support combustion, and provided the sides of such enclosures do not extend more than eight feet above the sidewalk.

(2) Awnings supported entirely from the building may be placed over sidewalk cafes provided they are at least eight feet clear above the sidewalk and provided they are within the limits specified by the commissioner of consumer affairs. Such awnings shall be supported on metal frames and constructed of canvas treated to render it fire-resistive or other material, which will not support combustion.

(3) No part of any awning, enclosure, fixture or equipment of a sidewalk cafe shall be located beneath a fire-escape so as to obstruct operation of fire-escape

22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff   Pg 333 of 654

Title 27 / Subchapter 4

drop ladders or counter-balanced stairs or to obstruct any exit from a building.

(4)   a. Removable platforms shall be constructed to provide for a continuous unbroken and level floor without openings or cracks so as to prevent any material or liquid from falling through to the area beneath; no papers, trash or other materials may be permitted to accumulate in the area beneath the floor of the platform.

b. No part of the platform shall obstruct an exit from any building.

c. No part of the platform shall cover a cellar entrance, areaway or other vent, except that an easily removable section, prominently designated, will be permitted if acceptable to the commissioner.

d. No siamese connection or hydrant may be obstructed in any way that would hinder its use by the fire department.

(5) In addition to the requirements specified herein, the commissioner may promulgate such additional regulations necessary to secure safety.

(f)   **Curb cuts. -** The lowering of any curb or the change of grade of any sidewalk for the purpose of providing a driveway across such curb or sidewalk shall be constructed in accordance with the specifications prescribed in section 27-558 of article three of subchapter nine of this chapter or as required by the commissioner. The commissioner shall limit the length of any curb cut for the purpose of providing a driveway across such curb or sidewalk, when in the opinion of the commissioner the actual use or intended use of such driveway would endanger the public. The owner shall maintain every part of such driveway in accordance with the specifications prescribed in section 27-558 of article three of subchapter nine of this chapter. Where the vehicular use of such driveway, in the opinion of the commissioner is dangerous to the public, the commissioner shall order the owner to discontinue use of such driveway and restore the curb and sidewalk as required by the department of transportation. Upon the failure of the owner to comply with such order, the commissioner may inform the commissioner of transportation of such failure to comply and request the cooperation of the commissioner of transportation acting under his or her authority pursuant to section twenty-nine hundred four of the New York city charter in the enforcement of this section.

**§[C26-408.2]   27-314   Projections below grade. -** Subject to the provisions of article eight of this subchapter the following projections may be constructed below grade to project beyond the street line:

(a)   **Footings. -** Exterior wall and column footings may be constructed to project beyond the street line not more than twelve inches, provided that the top of the footing is not less than eight feet below the ground or sidewalk level.

(b)   **Foundation walls. -** Foundation walls required to support permitted projections may be constructed to project not more than the permitted projection beyond the street line.

(c)   **Vaults. -** Vaults licensed by the commissioner of transportation may be constructed to project beyond the street line but not beyond the curb line. Vault covers shall be set flush with the sidewalk and surfaced with non-skid material.

(d)   **Tunnels between buildings. –**
Tunnels connecting buildings, and projecting beyond street lines, may be constructed subject to the approval of the board of estimate and the department of transportation. Such tunnels shall comply with the provisions of this code and other applicable laws and regulations.

**\*§[C26-408.3]   27-315- Restrictions on construction and projections on certain streets, parkways, boardwalks and beaches. -**
Notwithstanding the foregoing provisions of this article, it shall be unlawful to build, erect, make areaways, steps or other projection s prohibited by sections 19-131, 19-132, 19-135 of the code.

\* *Local Law 104-1993.*

## \*ARTICLE 10 GENERAL LIMITATIONS ON OCCUPANCY AND CONSTRUCTION WITHIN SPECIAL FLOOD HAZARD AREAS

**§[C26-409.1]   27-316   Permit restrictions. -** Within special flood hazard areas, as delineated in reference standard RS 4-4, applications for permits shall be subject to the following:

(a)   Permissible uses and other measures to reduce flood losses shall take precedence over any conflicting laws.

(b)   Major repairs or alterations shall be with construction materials and utility equipment that are resistant to flood damage, and use construction methods and practices that will minimize flood damage.

(c)   New and proposed construction or substantial improvements shall be protected against flood damage, be designed (or modified) and anchored to prevent flotation, collapse, or lateral movements of the structure, use construction materials and utility equipment that are resistant to flood damage, and use construction methods and practices that will minimize flood damage.

(d)   New and proposed developments and construction shall minimize flood damage, locate, elevate and construct all public utilities such as gas, sewer, electrical and water systems to minimize or eliminate flood damage, and provide adequate drainage so as to reduce exposure to flood hazards.

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 334 of 654

Title 27 / Subchapter 4

(e)  New or replacement water supply systems and/or sanitary sewage systems shall be designed to minimize or eliminate infiltration of floodwaters into the systems, and discharges from the systems into floodwaters, and require on-site disposal systems to be located so as to avoid impairment of them or contamination from them during flooding.

(f)  Subdivision proposals and other proposed new developments and construction shall (i) minimize flood damage, (ii) have all public utilities, such as sewer, gas, electrical and water systems located and constructed to minimize or eliminate flood damage, and (iii) provide adequate drainage so as to reduce exposure to flood hazards.

(g)  Upon placement of the lowest floor, or flood-proofing by any means, the holder of any permit to which this section applies shall submit to the department a certification of the elevation of the lowest floor, or where applicable of the lowest flood-proofed elevation, in relation to mean sea level. Provided, however, that in areas designated as Zone V in reference RS 4-4, such permit holder shall certify to the department the elevation, in relation to mean sea level, of the bottom of the lowest structural member of the lowest floor. Such certification shall be prepared by a registered architect or licensed professional engineer.

(h)  Compliance with the foregoing shall be accomplished in accordance with sections 27-317, 27-317.1, 27-317.2, 27-550, 27-580, 27-652, 27-771, 27-787 and subdivision (aa) of section 27-901 of this title and reference standards RS 4-4 and RS 4-5.

§  27-316.1    Permit application contents. - Applications for permits for construction within special flood hazard areas, as delineated in reference standard RS 4-4, shall contain the following information:

(a)  the elevation in relation to mean sea level of the proposed lowest floor (including basement or cellar);

(b)  for non-residential structures, the elevation in relation to mean sea level to which such structure will be flood-proofed;

(c)  a certification from a registered architect or licensed professional engineer that heating, ventilation, air conditioning, plumbing, electrical and other services facilities within the structure will be located or constructed so as to prevent water from entering or accumulating within the components during conditions of flooding;

(d)  for non-residential structures intended to be floodproofed, a certification from a registered architect or licensed professional engineer that the flood-proofing design and methods of construction of such structure are in accordance with reference standard RS 4-5 and with accepted standards of practice to make such structure watertight, with walls substantially impermeable to the passage of water, and with structural components

having the capability of resisting hydrostatic and hydrodynamic loads and effects of buoyancy;

(e)  for structures within Zone V, as delineated in reference standard RS 4-4, a certification from a registered architect or licensed professional engineer that the design and methods of construction of such structure are in accordance with reference standard RS 4-5 and with accepted standards of practice for meeting the requirements of subdivision (f) of section 27-317 of this code; and

(f)  a description, where applicable, of the extent to which any watercourse will be altered or relocated as a result of the proposed work.

§[C26-409.2]  27-317 Occupancy and construction restrictions. -

(a)  Within special flood hazard areas, as delineated in reference standard RS 4-4, no building in occupancy group classification J1, J2 or J3 shall be constructed or altered so as to have the lowest floor below the base flood elevation.

(b) New construction or substantial improvements of non-residential buildings within special flood hazard areas, as delineated in reference standard RS 4-4, shall have the lowest floor elevated to or above the base flood elevation; or, together with attendant utilities and sanitary facilities, shall be floodproofed up to the level of the base flood elevation, in accordance with the requirement of reference standard RS 4-5. Provided, however, that new construction or substantial improvements of non-residential buildings within area designated as Zone V in reference standard RS 4-4 shall meet the requirements of subdivision (f) of this section.

(c) Any encroachment in the floodway, as delineated in reference standard RS 4-4, including fill, new construction, substantial improvement, or any other development that would result in any increase in flood levels within the community during the occurrence of the base flood discharge, shall be prohibited.

(d) Manufactured homes shall be anchored to resist flotation, collapse or lateral movement and shall be elevated on a permanent foundation to or above the base flood elevation or, when no base flood elevation has been determined, two feet above the highest adjacent grade. Methods of anchoring may include, but are not limited to, use of over-the-top or frame ties to ground anchors. No park trailers or travel trailers shall be permitted within special flood hazard areas, as delineated in reference standard RS 4-4.

(e)  In the case of alterations constituting a substantial improvement to parts of non-residential and non-institutional buildings below the base flood elevation, all parts below the base flood elevation need comply with the applicable requirements of reference standard RS 4-5.

(f)  All new construction and substantial improvements

22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff   Pg 335 of 654

Title 27 / Subchapter 4

of buildings within Zone V, as delineated in reference standard RS 4-4, shall be performed pursuant to the provisions of RS 4-5. Such construction and improvements shall have the lowest floor elevated on adequately anchored pilings or columns and securely anchored to such piles or columns to prevent flotation, collapse or lateral movement resulting from the simultaneous action of wind and water loads on all building components, and, the lowest portion of the structural members of the lowest floor, other than the pilings or columns, shall be elevated to or above the base flood elevation. For purposes of this subdivision, wind and water loading values shall each have a one percent chance of being equalled or exceeded in any given year (one hundred year mean recurrence interval). In addition:

(1)  The installation of anchoring to anchored pilings or columns shall be subject to controlled inspection.

(2)  The space below the lowest floor shall be free of obstruction or, alternatively, such space shall be constructed with break-away walls of an open lattice type construction, which is intended to collapse under stress from abnormally high tides or wind driven water without jeopardizing the structural support of the building. Such space shall not be used for human habitation.

(3)  The use of fill for structural support of buildings within Zone V shall not be permitted.

(4)  The man-made alteration of sand dunes within Zone V which would increase potential flood damage to buildings shall not be permitted.

(5)  All new construction within Zone V shall be located landward of the reach of mean high tide.

(g)  All new construction and substantial improvements of buildings within Zone A, as delineated in reference standard RS 4-4 shall be performed pursuant to the provisions of reference standard RS 4-5. Where such construction or improvement is not floodproofed, any fully enclosed space below the lowest floor that is subject to flooding, as defined in section 27-317.1 of this code, shall be designed to equalize hydrostatic flood forces on exterior walls automatically (without human intervention) by allowing for the entry and exit of floodwaters. Design for meeting this requirement shall be certified by a registered architect or licensed professional engineer or shall meet or exceed the following minimum criteria:

(1)  A minimum of two openings, having a total net area of not less than one square inch for every square foot of enclosed space subject to flooding, shall be provided.

(2)  The bottom of all openings shall be no higher than one foot above grade.

(3)  Openings may be equipped with screens, louvers, valves or other coverings or devices provided that they permit the automatic entry and exit of floodwaters.

(h)  When used within special flood hazard areas, as delineated in reference standard RS 4-4, breakaway walls shall have a design safe loading resistance of not less than ten and no more than twenty pounds per square foot. Use of a breakaway wall which exceeds a design safe loading resistance of twenty pounds per square foot shall be permitted only if a registered architect or licensed professional engineer certifies that the proposed design meets the following conditions:

(1)  Breakaway wall collapse will result from a water load less than that which would occur during the base flood; and

(2)  the elevated portion of the building and supporting foundation system will not be subject to collapse, displacement, or other structural damage due to the effects of wind and water loads acting simultaneously on all building components (structural and non-structural). Maximum wind and water loading values used in this determination shall each have a one percent chance of being equalled or exceeded in any given year (one hundred year mean recurrence interval).

**§[C26-409.3]  27-317.1 Definitions for special flood hazard areas.** - The following definitions shall supplement the definitions that appear in article two of subchapter two of this chapter and shall apply only to the provisions of article ten of subchapter four of this chapter and to the reference standards contained therein:

**AREA OF SPECIAL FLOOD HAZARD.** - The land in the flood plain delineated in reference standard RS 4-4 as subject to a one percent or greater chance of flooding in any given year. Such area is designated on the Flood Insurance Rate Map (FIRM) as Zone A, AE, AH, AI-99, V, VE or VI-30. Such area is also known as the base flood plain or one hundred year flood plain.

**BASEFLOOD.** - The flood having a one percent chance of being equalled or exceeded in any given year.

**BASEFLOOD ELEVATION.** - The level (in feet) indicated on the Flood Insurance Rate Map (FIRM).

**BREAKAWAY WALL.** - wall that is not part of the structural support of the building to which it is attached and is intended through its design and construction to collapse under specific later loading forces without causing damage to the elevated portion of the building or the supporting foundation system.

**DEVELOPMENT.** - Any man-made change to improved or unimproved real estate, including but not limited to buildings or other structures, mining, dredging, filling, grading, paving, excavation or drilling operations located within the area of special flood hazard.

**ELEVATED BUILDING.** - A non-basement building (i) constructed, in an area designated as Zone A in reference standard RS 4-4, to have the top of the elevated floor, or in an area designated as Zone V in reference standard RS 4-4, to have the bottom of the

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 336 of 654

Title 27 / Subchapter 4

lowest horizontal structural member of the elevated floor elevated above the ground level by means of pilings, columns (posts and piers), or shear walls parallel to the flow of water, and (ii) adequately anchored so that the structural integrity of such building is not impaired during a flood of up to the magnitude of the base flood. In an area designated as Zone A in reference standard RS 4-4, such term also includes a building elevated by means of fill or solid foundation perimeter walls with openings sufficient to permit the unimpeded movement of flood waters. In an area designated as Zone V in reference standard RS 4-4, such term also includes a building otherwise meeting the definition of elevated building in which the lower area is enclosed by means of breakaway walls meeting the standards of subdivision (h) of section 27-317 of this code.

**FLOOD OR FLOODING**. - A general and temporary condition of partial or complete inundation of normally dry land areas resulting from:

(1) the overflow of inland or tidal waters; or

(2) the unusual and rapid accumulation or runoff of surface waters from any source.

**FLOOD BOUNDARY AND FLOODWAY MAP (FBFM).** - An official map issued by the Federal Emergency Management Agency on which the regulatory floodway along water courses is delineated.

**FLOOD HAZARD BOUNDARY MAP (FHBM).** - An official map issued by the Federal Emergency Management Agency on which areas of special flood hazard are delineated.

**FLOOD INSURANCE RATE MAP (FIRM).** - The official map on which the Federal Emergency Management Agency has delineated the areas of special flood hazards. Such map includes the flood boundary and floodway map and the flood hazard boundary map, as defined in this section.

**FLOOD PLAIN.** - Any land area susceptible to being inundated by water from any source (see "flood or flooding").

**FLOOD PROOFING.** - Any combination of structural and non-structural additions, changes or adjustments to structures to reduce or eliminate flood damage to real estate, improved real property, water and sanitary utilities, or structures and their contents.

**FLOODWAY OR REGULATORY FLOODWAY**. - The channel of a river or other watercourse and the adjacent land areas that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than one foot.

**HIGHEST ADJACENT GRADE**. - The highest natural elevation of the ground surface, prior to construction, next to the proposed walls of a structure.

**LOWEST FLOOR**. - The lowest level including cellar or basement of the lowest enclosed area. For the purpose of this article, an unfinished or flood resistant enclosure, usable solely for the parking of vehicles, building access or storage in an area other than a basement, is not considered a structure's lowest floor, provided that such enclosure shall not be built so as to render the structure in violation of the requirements of subdivision (g) of section 27-317 of this code.

**MANUFACTURED HOME**. - A structure, transportable in one or more sections, which is built on a permanent chassis and designed to be used with or without a permanent foundation when connected to required utilities.

**MIXED USE BUILDING**. - Any building occupied in part for residential use, with one or more nonresidential uses located on a story below the lowest story occupied entirely by such residential use.

**NATIONAL GEODETIC VERTICAL DATUM (NGVD).** - A vertical control used as a reference for establishing elevations within the flood plain, as provided in section 27-158 of this code.

**NEW CONSTRUCTION**. - Buildings for which the "start of construction" commenced on or after November sixteenth, nineteen hundred eighty-three.

**SAND DUNES**. - Naturally occurring accumulations of sand in ridges or mounds landward of a beach.

**START OF CONSTRUCTION**. - The date on which the building permits was issued, provided, however, that the actual start of construction, repair, reconstruction, placement or substantial improvement is within one hundred eighty days of such date. "Actual start" means either the first placement of permanent construction of a building on a site, such as pile driving, the pouring of slabs, or footings, or any work beyond the stage of excavation; or, for a building without a cellar, basement or poured footings, the first permanent framing or assembly of such building or any part thereof on its piling or foundations. "Permanent construction" does not include land preparation, such as clearing, grading and filling; nor does it include excavation for a cellar, basement, footings, piers or foundations or the erection of temporary forms; nor does it include the installation on the property of accessory buildings, such as garages or sheds not occupied as dwelling units or not as part of the main building.

**SUBSTANTIAL IMPROVEMENT**. - Any repair, reconstruction, alteration, or improvement of a building, the cost of which equals or exceeds fifty percent of its market value either:

(1) before the alteration, improvement, or repair is started, or

(2) if the building has been damaged and is being restored, before such damage occurred.

For the purposes of this definition, "substantial improvement" is considered to occur when the first alteration of any wall, ceiling, floor, or other structural parts of the building commences, whether or not that alteration affects the external dimensions of the

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 337 of 654

Title 27 / Subchapter 4

building. The term "substantial improvement" does not, however, include either:

(1)   any project for improvement of a building to comply with state or local health, sanitary, or safety code specifications which are solely necessary to assure safe conditions, or

(2)   any alteration of a building designated as worthy of preservation because of historic or architectural importance, or a building within an area so designated by the landmarks preservation commission, or listed on the national register of historic places or state inventory of historic places.

**ZONE A**. - A symbol used on the flood insurance rate map to designate an area of special flood hazard without velocity (wave action). When not shown on the flood insurance rate map, the water surface elevation may be determined from available data by the registered architect or licensed professional engineer of record.

**ZONE V**. - A symbol used on the flood insurance rate map to designate an area of special flood hazard with velocity (wave action). When not shown on the flood insurance rate map, the water surface elevation may be determined from available data by the registered architect or licensed professional engineer of record.

**§[C26-409.4]   27-317.2   Exceptions within special flood hazard areas**. - Mixed use buildings may be constructed within Zone A, as delineated in reference standard RS 4-4, with non-habitable portions below the base flood elevation, provided all of the following conditions are met:

(a)   The building is constructed so as to provide entrance access at or above the base flood elevation.

(b)   The portion of the building and all service equipment below the base flood elevation are floodproofed, in accordance with reference standard RS 4-5.

(c)   No habitable rooms may be located in such cellar or basement.

(d)   A water closet and/or a wash basin may be located in an enclosed space not to exceed four feet by four feet six inches in such cellar or basement, and no roughing therein shall be allowed to accommodate any additional fixtures.

(e)   No accessory kitchens shall be allowed in such cellar or basement; however, one two-compartment laundry tray or similar appliance may be installed outside the water closet compartment.

[**]   (f)   The building permit application filed with the department of buildings or the work permit application filed with the department of ports and trade shall state that:

(1)   The premises is located within the special flood hazard area;

(2)   The cellar or basement is located below the level of the base flood elevation; and

(3)   No portion of the cellar or basement may be used for living purposes.

[**](g) A deed restriction noting all of the above is to be recorded in the county clerk's office and the page and liber number indicated on either the building permit application and certificate of occupancy filed with and issued by the department of buildings or the work permit application and the certificate of completion filed with and issued by the department of ports and trade.

[**]  *Local Law 14 -1989.*

[*]  *Local Law 33-1988.*

**Title 27 / Subchapter 4**

This page is intended to be left blank

# SUBCHAPTER 5
# FIRE PROTECTION CONSTRUCTION REQUIREMENTS

## TABLE OF CONTENTS

| [500.0] | Art.1 | **General** |
| [500.1] | 318 | Scope |
| [500.2] | 319 | Standards |
| [500.3] | 320 | Definitions |
| [500.4] | 321 | Use of Combustibles |
| [501.0] | Art.2 | **Fire Protection Test Procedures** |
| [501.1] | 322 | Test |
| [502.0] | Art. 3 | **Fire-Resistance Requirements** |
| [502.1] | 323 | Requirements for Structural Members and Assemblies |
| [502.2] | 324 | Protection of Structural Members |
| [502.3] | 325 | Elevators |
| [502.4] | 326 | Lintels |
| [502.5] | 327 | Ceilings |
| [502.6] | 328 | Fire-Retardant Treated Wood |
| [502.7] | 329 | Opening Protectives |
| [502.8] | 330 | Slow Burning Plastic |
| [503.0] | Art. 4 | **Prevention of Exterior Fire Spread** |
| [503.1] | 331 | Exterior Walls |
| [503.2] | 332 | Party Walls |
| [503.3] | 333 | Parapets on Exterior Walls |
| [503.4] | 334 | Protective Guards |
| [503.5] | 335 | Exterior Trim |
| | 335.1 | Acoustical and Thermal Insulation |
| [503.6] | 336 | Porticos, Porches, etc. |
| [503.7] | 337 | Roof Coverings |
| [503.8] | 338 | Roof Structures |
| [504.0] | Art. 5 | **Prevention of Interior Fire Spread** |
| [504.1] | 339 | Fire Segregation of Occupancies |
| [504.2] | 340 | Fire Divisions |
| [504.3] | 341 | Fire Separations |
| [504.4] | 342 | Openings in Fire Divisions and Separations |
| [504.5] | 343 | Ducts, Pipes and Conduits Through Rated Construction |
| [504.6] | 344 | Shafts |
| [504.7] | 345 | Firestopping |
| [504.8] | 346 | Partitions and Furring |
| [504.9] | 347 | Folding Partitions |
| [504.10] | 348 | Interior Finish |
| [504.11] | 349 | Coatings |
| [504.12] | 350 | Ceiling Construction |
| [504.13] | 351 | Finish Flooring and Floor Coverings |
| [504.14] | 352 | Fireplaces—Repeated |
| [504.15] | 353 | Smoke and Heat Venting |
| [504.16] | 353.01 | Smoke Protection, Elevators and Escalators |

## LIST OF TABLES

**Table No.**

| 5-1 | Fire Separations |
| 5-2 | Fire Divisions |
| 5-3 | Opening Protectives for Fire Divisions and Fire Separations |
| 5-4 | Interior Finish Requirements |

*"C26" omitted from section numbers in this column.*
**"27" omitted from section numbers in this column.*

## ARTICLE 1 GENERAL

**§[C26-500.1]  27-318  Scope. -** The provisions of this subchapter shall govern the use and assembly of all materials of construction with respect to fire resistance, flame spread resistance, and smoke and toxic fume limitation. The provisions shall also control the location and function of integral structural and fire protective elements of buildings, and provide for the installation of safeguards against the spread of fire within buildings and between buildings.

**§[C26-500.2]  27-319  Standards. -** The provisions of the reference standard RS-5 shall be a part of this subchapter.

**§[C26-500.3]  27-320  Definitions. -** For definitions to be used in the interpretation of this subchapter, see subchapter two of this chapter.

**§[C26-500.4]  27-321  Use of combustibles. -** The use of combustible component materials in units or assemblies shall be limited to construction group II, except as hereinafter expressly permitted in construction group I. Combustible aggregates may be integrated with other materials to form a noncombustible material provided that the entire mixture, in the form in which it is to be used in construction, meets the requirement of this code for noncombustibility.

## ARTICLE 2 FIRE PROTECTION TEST PROCEDURES

**§[C26-501.1]  27-322  Tests. -** Samples of all materials or assemblies of materials required by this code to have a fire-resistance rating, fire-protection rating, or flame spread rating, or required to be noncombustible, fire-retardant treated, or slow burning, shall be tested under the applicable test procedures specified herein, in accordance with the acceptance requirements of section 27-131 of article one of subchapter one of this chapter. The fire-resistance rating of materials and assemblies listed in reference standard RS 5-1 may be used to determine conformance with the fire resistance requirements of this code. In addition to the performance results, test reports shall give all technical data pertaining to the nature of the constituent materials, such as the physical properties, chemical composition and properties, coefficient of expansion, thicknesses of materials, etc. Except as listed in reference standard RS 5-1, any assembly using a component having a structural base of noncombustible material covered with an integrally manufactured combustible surfacing material, shall be approved for fire-resistance rating.

## ARTICLE 3 FIRE-RESISTANCE REQUIREMENTS

**§[C26-502.1]  27-323  Requirements for structural members and assemblies. -** The fire-resistance rating of construction assemblies and the protection of structural members shall comply with the requirements of table 3-4, based on the test procedures of reference standard RS 5-2, and their materials or combinations of materials shall be in accordance with the specifications of materials used in the test.

**\*§[C26-502.2] 27-324 Protection of structural members.-** Columns, girders, trusses, beams, lintels, etc. that are required to be fire protected, and that support only one floor or a roof, and/or a non-bearing wall not more than one story high, shall be individually encased on all sides with materials having the required fire-resistance rating; or shall be protected by a ceiling as specified in section 27-327 of this article having the required fire-resistance rating; or shall be protected by a combination of both a ceiling and individual encasement which, together, provide the required fire-resistance rating. Columns, girders, trusses, beams, lintels, etc. that are required to be fire protected, and that support more than one floor or support a bearing wall or wall more than one story high, shall be individually encased on all sides for their entire length or height with materials having the required fire-resistance rating. Trusses that support only two stories or one story and a roof may be fire protected by an envelope that encompasses the entire truss with materials of the required fire-resistance rating.

**(a) Embedments and enclosures. -** Pipes, wires, conduits, ducts, or other service facilities shall not be embedded in the required fire protection of a structural member that is required to be individually encased; except that pipes, wires, and conduits may be installed in the space between the required fire protection and the structural member protected, provided that where such facilities pierce the required fire protection, the area of the penetrations does not exceed two percent of the area of the fire protection on any one face, the penetrations are closed off with close-fitting metal escutcheons or plates and the concealed space shall be firestopped at each story in accordance with the provisions of section 27-345 of article five of this subchapter.

**(b) Impact protection. -** Where the fire protective covering of a structural member is subject to impact damage from moving vehicles, the handling of merchandise, or other activity, the fire protective covering shall be protected by corner guards or by a substantial jacket of metal or other noncombustible material, to a height adequate to provide full protection. Where applicable, such protection shall be designed in accordance with the requirements of section 27-558 of article three of subchapter nine of this chapter.

**(c) Structural members in cavity walls. -** Where structural members occur within exterior cavity walls,

portions of such structural members facing the exterior need not be individually fire protected if the outer width of the cavity wall provides the required fire-resistance rating and is located not more than two and one-half inches from such structural members, and if all surfaces of the structural members are fire protected from the interior of the building by materials having the required fire-resistance rating.

**(d) Prestressing steel. -** Minimum covering of prestressing steel shall comply with the requirements of reference standard RS 5-15.

**(e) Exterior exposed structural members. -** Structural members exposed to the outdoors on buildings that do not exceed two stories or thirty feet in height, which are required by table 3-4 to have a fire-resistance rating not exceeding one hour, need not be protected on any face of the member that has an exterior separation of thirty feet or more, provided the outdoor area within the thirty feet separation distance is not used for storage of materials, or for motor vehicle parking.

**(f) Inspection of fire protection. -** The installation of all required sprayed-on fire protection of structural members except those encased in concrete shall be subject to the controlled inspection requirements of section 27-132 of article seven of subchapter one of this code.

*Local Law 34-1988.*

**§[C26-502.3] 27-325 Elevators. -** Structural members or car frames for elevators located within shaft enclosures need not be fire protected.

**§[C26-502.4] 27-326 Lintels. -** Lintels over openings wider than four feet in masonry walls, other than in walls of masonry veneer on wood frame structures, shall be fire protected as required by section 27-324 of this article for structural members, when the full load over the opening is not relieved by a masonry arch of required strength. The members of an assembled metal lintel that support only outer face masonry that is securely bonded or anchored to backing need not be fire protected, provided that the inner members of the assembly support the full load imposed upon the lintel and are fire protected as required for structural members supporting masonry.

**(a) Stone lintels. -** The use of stone lintels on spans exceeding four feet shall not be permitted unless supplemented by fire protected structural members or masonry arches of the required strength to support the superimposed loads.

**§[C26-502.5] 27-327 Ceilings. -**
**(a)** Ceilings that contribute to the required fire-resistance rating of a floor or roof assembly shall be continuous between exterior walls, vertical fire divisions, fire separations, corridor partitions or any other partitions having at least the same fire resistance rating as the ceiling. All such fire-rated partitions shall be constructed as set forth in section 27-340 or

subdivision (a) of section 27-341, as appropriate. The concealed space above such ceiling shall be firestopped into areas not exceeding three thousand square feet with materials listed in section 27-345 of this subchapter for the full height of the concealed space. Access to each such concealed space may be through one or more openings, not exceeding nine square feet and protected by self-closing opening protectives having the fire-protection rating required by table 5-3.

**(1)** Firestopping shall not be required where the structural members within the concealed space are individually protected with materials having the required fire-resistance rating, or where the ceiling is not an essential part of the fire-resistive assembly; nor shall firestopping be required where a concealed space is sprinklered in accordance with the construction requirements of subchapter seventeen of this chapter.

**(b) Electrical and other openings in ceilings. -** Ceilings required to have a fire-resistance rating may be pierced to accommodate noncombustible electric outlet boxes or recessed lighting fixtures if the aggregate area of such openings does not exceed sixteen square inches in each ninety square feet of ceiling area and the electrical outlet boxes or recessed lighting fixtures are constructed of steel at least .022 inches thick and sealed tightly at the ceiling. Noncombustible pipes, ducts, and additional or larger electrical or other service facilities may pierce ceilings that are required to have a fire-resistance rating only when the type of ceiling to be used has been tested with such types of facilities installed in place and the proportionate area of openings for such facilities to be installed in the ceiling does not exceed the proportionate area of such openings in the assembly tested, and provided no opening is larger than that in the assembly tested. Protection for such openings shall be the same as provided in the test. Duct openings installed in accordance with the foregoing shall be protected by fire dampers complying with the requirements of subchapter thirteen of this chapter.

**§[C26-502.6] 27-328 Fire retardant treated wood. -**
**(a) Material. -** Fire retardant treated wood shall be pressure treated with fire retardant chemicals in accordance with reference standards RS 5-3 and RS 5-4. Where used as a structural element or as furring, the material shall have a flame spread rating not greater than twenty-five when tested in accordance with reference standard RS 5-5 when exposed for a period of at least thirty minutes, with no evidence of significant progressive combustion. Where used as interior finish or trim, the material shall have a flame spread rating that meets the requirements of section 27-348 of this subchapter for the location in which it is used. Subsequent to treatment, material two inches thick or less shall be air dried or kiln dried to an average moisture content of not more than nineteen percent.

**(b) Label. -** All fire-retardant treated wood shall bear the identification of a testing laboratory or producer

certifying to the performance thereof, in accordance with the acceptance requirements of section 27-131 of article seven of subchapter one of this chapter.

**(c) Application.** - Fire-retardant treated wood may not be used where exposed to the weather or in interior spaces where the relative humidity is normally eighty percent or more. There shall be no fabrication of the material after treatment, such as cutting, shaping, or grooving for splines or ring connectors so as to expose untreated surfaces, except that the material may be cut to length, shaped, or grooved if the exposed surfaces or edges are tightly butted against other material that is noncombustible or that is fire retardant treated, so that no untreated wood is left exposed to danger of ignition. Holes may be bored or cut for plumbing or heating pipes and for electric outlets only if the openings are covered [*sic*] with tightly-fitted noncombustible escutcheons or cover plates. The allowable working stresses of the material shall be ninety percent of the allowable stresses for untreated lumber of like classification**.**

**(d) Where permitted in construction group I-** Fire-retardant treated wood may be used in buildings of construction group I in the following cases:

(1) As permitted by table 3-4.

(2) For interior non-bearing partitions that are not required to have a fire-resistance rating.

(3) For interior furring and blocking of exterior walls, furring and blocking of interior walls and partitions, and framing of suspended ceilings provided the furring, blocking, and framing do not affect the integrity, or reduce the fire-resistance rating, of the construction element.

(4) For interior finish and trim.

**(e) Area increase.** - Fire-retardant treated wood may be used in construction group II buildings in lieu of untreated wood for wall studs, bearing partition studs, columns, beams, girders, joists, rafters, trusses, sole and cap plates, subflooring and roof decks, and when so used, the area limitations of tables 4-1 and 4-2, for buildings of construction group II, may be increased by thirty-three and one-third percent.

**§[C26-502.7]  27-329  Opening protectives.** - Opening protectives, including frames, self-closing devices, and hardware, shall be classified as to fire-protection rating in accordance with the test procedures of reference standards RS 5-6 and RS 5-7, and shall be installed, maintained, and operated in accordance with the provisions of reference standard RS 5-8. All opening protectives shall bear the identification of a testing laboratory or agency certifying to the performance rating thereof, in accordance with the acceptance requirements of section 27-131 of subchapter one of this chapter.

**§[C26-502.8]  27-330  Slow burning plastic.** - Slow burning plastic shall be of a material that burns no faster than two and one-half inches per minute in sheets 0.060 in. thick when tested in accordance with reference standard RS 5-12 or that is not consumed in less than two minutes when tested in accordance with reference standard RS 5-13. The thickness of the plastic material shall be determined by method **"**B**"** of reference standard RS 5-14.

# ARTICLE 4
# PREVENTION OF EXTERIOR FIRE SPREAD

**§[C26-503.1]  27-331  Exterior walls.** - Exterior walls shall comply with the fire-resistance rating requirements of table 3-4. Where provisions of this code require a space or facility to be enclosed, the construction requirements for the enclosure shall not apply to any exterior wall that forms part of the enclosure.

**(a) Openings in exterior walls.** - In addition to the requirements of table 3-4 and subchapters six and eight of this chapter, exterior openings above the third floor level of a building or above a height of forty feet, except buildings in occupancy J-3, open parking structures, and buildings of construction class II-D and II-E, shall have opening protectives when (1) any part of the opening is less than thirty feet distant in a direct unobstructed line not in the same plane, from an opening in another building or from a wood frame building or (2) any part of the opening is above and less than thirty feet in a direct unobstructed line from, any roof construction that has a fire-resistance rating of less than one hour or that has unprotected openings therein within this distance, whether the roof construction is on the same building or on an adjacent building.

**(b)   Opening protective required ratings. -**In a building or space classified in occupancy group A, all opening protectives shall be three-quarter hour (class E) opening protectives meeting the requirements of reference standard RS 5-8. Such protectives shall be fixed self-closing or automatic. Alternatively, these openings may be protected with three-quarter hour (class F) protectives together with outside sprinklers installed in accordance with construction requirements of subchapter seventeen of this chapter. In such cases, there shall be an automatic dry pipe sprinkler head centered over each opening with the orifice directed against the opening. All opening protectives required by table 3-4 or by subdivision (a) above in buildings classified in other than occupancy group A shall be three-quarter hour (class F) openings.

**(c)   First story openings.** - Opening protectives required by table 3-4 may be omitted in show windows or other openings on the lowest story of a building facing on a street or public space.

**(d)   Nonautomatic protectives.** - Required opening protectives in exterior openings, if not self-closing or automatic, shall be kept closed by the occupants at all times when not required for light or ventilation under

the provisions of subchapter twelve of this chapter.

**(e) Construction of unprotected openings. -** Exterior windows and doors, including their frames and glazing, that are not required by this code to have a fire-protection rating, may be of combustible materials. Below a height of seventy-five feet, slow-burning plastic glazing may be used in windows. Glazing in balcony doors shall comply with the requirements of paragraph four of subdivision (g) of section 27-369 of article five of subchapter six of this chapter.

**(f) Vertical separation of openings. -** In buildings classified in occupancy groups A, B, C, D and E, exceeding three stories or forty feet in height, openings located vertically above one another in exterior walls except in stairway enclosures, shall be separated by a spandrel wall at least three feet high between the top of one opening and the bottom of the opening immediately above; or each such opening above the lower one shall be protected against fire by an opening protective; or a fire canopy of noncombustible materials, extending out at least two feet horizontally from the wall and at least as long as the width of the lower opening, shall be constructed between the two openings. Spandrels and fire canopies shall be constructed to provide at least the fire-resistance rating required for the exterior wall, but in no event less than one hour.

**§[C26-503.2] 27-332 Party walls. -** The construction, design, and fire-resistance rating of party walls shall be the same as required by this code for vertical fire divisions. Concealed spaces in cornices and eaves shall be fire-stopped as a continuation of the party wall**.**

**§[C26-503.3] 27-333 Parapets on exterior walls. -** Parapets shall be provided on all exterior walls of buildings of construction class II-A, II-B, or II-C that have roof construction of combustible materials.

**(a) Exceptions. -** A parapet need not be provided on the exterior wall of any building:

(1) That is less than twenty-two feet high; or

(2) Whose roof has a pitch of more than twenty degrees to the horizontal and whose overhang, fascia, cornice or gutter is of noncombustible construction, or if of combustible construction is separated from the roof and ceiling construction by construction having the fire-resistance rating required for the exterior wall of the building. Combustible members, excluding roof sheathing and its supporting members, if covered by a class A roof covering and complying with the restrictions as required by section 27-335 of this article, shall not extend through this construction, but shall have at least four inches of solid noncombustible material below, at the sides, and at the ends of such members; or

(3) That is provided with a fire canopy at, or not more than two feet below the roof level, continuous around that portion of the wall that is without a parapet, constructed as required by subdivision (f) of section 27-

331 of this article.

**(b) Construction. -** Parapets required under this section shall be of materials and assembly having at least the fire-resistance rating of the wall below, and shall be at least two feet high.

**§[C26-503.4] 27-334 Protective guards. -** Buildings that are more than twenty-two feet in height and have roofs that are flatter than twenty degrees to the horizontal shall be provided with a parapet not less than three feet six inches high, or be provided with a three foot six inch high railing or fence, or a combination of a parapet and railing or fence which together are not less than three feet six inches high. Railings or fences may be located inward from the face of the exterior wall a distance not exceeding six feet, and shall be of a type that will prevent children from crawling through or over them. Where roofs are used for recreational purposes, wire fencing at least ten feet high shall be constructed. Where ball games are played on roofs the wire fencing shall be extended to provide an overhead closure. Except on buildings of classes II-D or II-E construction, railings or fences shall be of noncombustible material. Railings shall be constructed as required in section 27-558 of article three of subchapter nine of this chapter.

**§[C26-503.5] 27-335 Exterior trim. -** For the purposes of this section, exterior trim shall be defined as any material, other than door and window frames and sash, that is applied to exterior walls and which, if removed or destroyed, will not reduce the structural stability of the building enclosure, and which is installed so as not to reduce the required fire-resistance rating of the enclosure. Exterior trim shall include cornices, overhanging eaves, fascias, belt courses, pilasters, surrounds, gutters, leaders, half-timber work, shutters, trellises, etc.

**(a) Combustible exterior trim:**

(1) May not be used on buildings required to be of construction group 1 except that slow-burning plastics or approved equivalent materials may be used up to a height of twenty-five feet, provided that such trim covers not more than five percent of the surface area of the building enclosure (openings not included), or not more than one thousand square feet.

(2) May be used to a height of forty feet on buildings of construction class II-A, II-B, and II-C provided that such trim covers not more than ten percent of the surface area of the building enclosure (openings not included), projects not more than eight inches beyond the outside face of the building enclosure, and has an exterior separation of at least fifteen feet measured from the outermost surface of the trim.

EXCEPTION - Cornices, gutters, or overhanging roofs, when permitted, may project up to three feet beyond the outside face of the building enclosure if they are at least eight inches above the topmost opening, are

firestopped as required by section 27-345 of article five of this subchapter and either:

a. have their combustible structural members protected by soffits and fascias of a material or assembly having at least a one hour fire-resistance rating, or

b. have all their combustible members separated from the roof and ceiling construction by construction having the fire-resistance rating required for the exterior wall, with at least four inches of solid noncombustible material below, at the sides, and at the ends of such members;

(3) May be used to an unlimited extent in buildings of construction classes II-D and II-E on exterior walls that are not required to have a fire-resistance rating.

*§27-335.1 Acoustical and thermal insulation; use in noncombustible construction. -

(a) Notwithstanding any provision of this code to the contrary, acoustical or thermal insulation, which is not noncombustible, may be used where noncombustible construction is required if:

(1) it satisfactorily passes a test for determining noncombustibility of elementary materials, based on the test procedures of A.S.T.M. E136-65, and, upon exposure to fire will not produce products of decomposition or combustion that are more toxic in point of concentration than those given off by wood or paper when decomposing or burning under comparable conditions; or

(2) it has a flame-spread rating not greater than twenty-five, a smoke developed rating not greater than fifty, is without evidence of continued progressive combustion when tested in accordance with the test procedure of reference standard RS 5-5, and upon exposure to fire will not produce products of decomposition or combustion that are more toxic in point of concentration than those given off by wood or paper when decomposing or burning under comparable conditions.

(b) Notwithstanding any provision of subdivision a of this section or any other provision of this code to the contrary, acoustical or thermal insulation, which is not noncombustible and which does not meet the requirements of subdivision a of this section, may be used where noncombustible construction is required subject to the approval of the commissioner, and provided it is installed in a composite method of construction, with a minimum of three inches of unpierced masonry or concrete on all sides.

(c) Notwithstanding any provision of subdivision a or b of this section or any other provision of this code to the contrary, thermal insulation, which is not noncombustible and which does not meet the requirements of subdivisions a and b of this section, may be installed in an exterior wall system in any noncombustible construction group, provided that:

(1) such insulation is of a thickness no greater than four inches; provided, additional thickness used exclusively for decorative or leveling purposes shall be permissible, where the area of such additional thickness

does not exceed fifteen percent of the [*sic*] wall area on any single story;

(2) such insulation has a heat value not in excess of six thousand Btu per square foot;

(3) such insulation is installed in a composite method of construction and is separated from interior spaces by a thermal barrier having at least a one-hour fire resistance rating;

(4) such insulation has a flame spread rating not greater than twenty-five and a smoke developed rating not greater than four hundred fifty, and is covered with, and sealed or joined by, material having a flame spread rating not greater than twenty-five and a smoke developed rating not greater than fifty, when tested in accordance with the procedures of reference standard RS 5-5;

(5) such insulation is installed in a manner which meets the requirements for firestopping set forth in section 27-345;

(6) upon exposure to fire, the exterior wall system and each of its components will not produce products of decomposition or combustion that are more toxic in point of concentration than those given off by wood or paper when decomposing or burning under comparable conditions;

(7) the structure on which the exterior wall system is installed meets the requirements of section 27-331 pertaining to minimum horizontal and vertical separation distances; provided, however, that such insulation shall not be used on the exterior surface of a wall of a court or shaft if the horizontal or vertical separation distance between such wall and another wall of such court or shaft is less than twenty feet;

(8) the use of such insulation on soffits or other horizontal areas shall not extend more than three feet beyond the outside face of the building enclosure;

(9) the use of such insulation on buildings having party walls meets the requirements of section 27-332;

(10) such insulation meets the acceptance requirements of section 27-131;

(11) the results of a fire test of a representative portion of the exterior wall system meet the requirements of reference standard RS 5-21;

(12) the edge or face of the assembly containing such insulation is labeled with the following information:

a. the name of a nationally recognized testing laboratory acceptable to the commissioner which has inspected such insulation;

b. the model of the exterior wall assembly for which such insulation is listed by a nationally recognized testing laboratory acceptable to the commissioner;

c. the identity of the manufacturer of such insulation;

d. the flame spread and smoke developed ratings; and

(13) the installation of such insulation shall be subject to controlled inspection to ensure that the installation is fully consistent with the terms of the listing by a nationally recognized testing laboratory acceptable to the

commissioner, acceptance requirements of section 27-131 and the manufacturer's installation recommendations.

(d) The commissioner may, with regard to thermal insulation, the use of which is authorized by this subdivision, establish by regulation training criteria for persons installing such insulation, and prohibit the installation of such insulation by persons not adequately trained. Any person installing such insulation shall certify to the commissioner that the installation is fully consistent with the terms of the listing by a nationally recognized testing laboratory acceptable to the commissioner, acceptance requirements of section 27-131 and the manufacturer's installation recommendations.

(e) Definitions. As used in this section:

(1) "Composite method of construction" shall mean a method of construction in which diverse materials are combined to form an assembly, whether the assembly is prefabricated or fabricated at the site of installation.

(2) "Exterior wall system" shall include the exterior walls of a building and the appurtenances thereof.

*Local Law 13-1987.*

### §[C26-503.6] 27-336 Porticos, porches, etc. -

Porticos, entranceways, storm enclosures, bay windows, oriel windows, porches, or similar appendages may be constructed of combustible materials or assemblies on buildings of construction class II-E to an unlimited extent, and on buildings of construction classes II-A, II-B, II-C, and II-D under all of the following conditions:

(a) The building is classified in occupancy group J-2 or J-3.

(b) The building is not more than three stories or forty feet high.

(c) The appendage has an exterior separation on all exposed sides of at least fifteen feet, measured from the outermost surface of the appendage.

(d) The appendage is so constructed that its removal or destruction will not reduce the structural stability or fire resistive integrity of the building.

(e) The vertical surface area of the combustible portions of the appendage, including any exterior trim, is not more than ten percent of the total wall area (windows excluded) of the building.

(f) The appendage has a superficial roof area not exceeding one hundred fifty square feet and is included in the area limitations of table 4-1 and 4-2 for the entire building.

(g) The appendage is not higher than the sills of the second story windows.

(h) The roof of the appendage has a class A roof covering.

(i) The soffit or ceiling covering the combustible roof framing of the appendage has a one hour fire-resistance rating.

(j) The requirements of subdivisions (h) and (i) of this section shall not apply in the case of roofs or awnings over patios or entrance platforms where the area of vertical exposure of the patios or platforms to the outdoors is equal to at least that of the patio or platform area. Plastic shall be slow burning; canvas or other fabric shall be noncombustible or flameproofed in accordance with the provisions of title fifteen of the administrative code.

### §[C26-503.7] 27-337 Roof coverings. –

Roof coverings shall be classified as A, B, or C on the basis of their resistance to exterior fire exposure as listed in reference standard RS 5-9, or as determined by tests made in conformance with reference standard RS 5-10 for those not listed.

(a) **Limitations of use.** - Every roof placed on a building shall be covered with Class A or B roof covering, except Class C roof coverings may be placed on buildings classified in occupancy group J when not more than three stories or forty feet in height, and on buildings permitted by this code to be of Class II-D or II-E construction. The use of roofing having no rating is prohibited, except for replacement to the extent of twenty-five percent of the roof area in any twelve month period.

(b) **Combustible roof decking.** - Unless attached directly to noncombustible framework, all roof coverings shall be applied to a closely fitted deck; except that wood shingles, to the extent permitted in subdivision (a) of this section, may be applied to wood slats.

(c) **Roof insulation.** - Combustible roof insulation may be applied on top of roof decking or slab provided that it is protected with the roof covering applied directly thereto.

### §[C26-503.8] 27-338 Roof structures. -

(a) **Construction of penthouses.** - Enclosure walls of penthouses shall comply with the requirements for exterior walls of table 3-4 for the construction class of the building on which they are erected. Roofs of penthouses shall comply with the requirements for roof construction of table 3-4 and section 27-337 of article five of subchapter six of this chapter.

(b) **Construction of bulkheads.** - Bulkheads shall be constructed of noncombustible materials having a one hour fire-resistance rating, except that in buildings of construction class II-E, they may be constructed of combustible materials having a one hour fire-resistance rating.

(c) **Scuttles**. - Scuttles shall be constructed of noncombustible materials, or of combustible materials covered on the top, sides, and edges with noncombustible materials.

(d) **Skylights.** - For the purposes of this section, the term "skylight" shall be construed to include the sash, frames, and glazing of roof monitors and sawtooth roofs.

(1) SASH AND FRAMES. - Skylights that are inclined at less than sixty degrees to the horizontal on all buildings of other than construction classes II-D and II-E, shall have sash and frames constructed of noncombustible materials, and their glazing shall be as

22-11582-pb Doc 65-1 Filed 01/24/23 Entered 01/24/23 11:20:21 Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff Pg 346 of 654

Title 27 / Subchapter 5

prescribed in paragraph two of this subdivision. Skylights that are inclined at greater than sixty degrees to the horizontal shall have sash and frames constructed as required for windows, and their glazing shall be as required for windows. Glass, glass blocks, or plastic used in skylights shall be designed and constructed to withstand the same live loads as required for roofs plus any concentrated live loads required herein.

(2) GLAZING. -

a. Skylights over stairways and shafts. - Skylights placed over stairways and shafts shall be glazed with plain glass not more than one-eighth inch thick or unreinforced plastic not more than three-sixteenths of an inch thick.

b. Skylights over other spaces. - Skylights in all locations other than over stairways and shafts shall be glazed with one-quarter inch wired glass, plain glass, glass block, or plastic of material and installation complying with subparagraph c of this paragraph.

c. Plastic. - Plastic used for the glazing of skylights other than skylights over stairways and shafts shall be slow burning plastic. The aggregate area of skylight openings, other than over stairways and shafts, shall not exceed thirty per cent of the floor area of any room or space sheltered by the roof in which they are located. The edges of plastic, if exposed, shall be protected by metal or other noncombustible material. Skylights in which plastic is used, if on roofs having a pitch of twenty degrees to the horizontal or less, shall be constructed in accordance with the following:

1. The area within the curbs of each skylight shall not exceed five square feet, except that this area may be of any size, limited only by other provisions of this section, if the opening is protected on all sides by a noncombustible railing thirty-six inches in height complying with the provisions of section 27-558 of article three of subchapter nine of this chapter for railings; or the skylight is subdivided into areas of five square feet or less by noncombustible muntins or bars capable of supporting a live load of three hundred pounds at any point; or a noncombustible screen or grid capable of supporting a load of three hundred pounds over any one foot by two foot area as provided above, integral with, or not more than three feet below the skylight, with the wire or bars spaced into areas of five square feet or less (if above the roof, the wires shall be of corrosion resistive metal).

2. There shall be a minimum clear distance of three feet between skylights.

(3) SEPARATION OF SKYLIGHTS FROM STRUCTURES. – There shall be at least ten feet between a plain glass or plastic skylight and any door in a stair bulkhead located above the roof in which the skylight is located, and at least ten feet between such a skylight and any opening in any roof structure or other wall above the roof not equipped with an opening protective. On buildings up

to one hundred feet in height, there shall be at least ten feet from such a skylight to the outside face of an exterior wall facing on a frontage space.

(4) SCREENS. - Plain glass skylights shall be protected on their underside by noncombustible screens having a mesh not smaller than three-quarters of an inch by three-quarters of an inch nor larger than one inch by one inch of at least No. 12 B. & S. gage [*sic*] wires. The screen shall be installed tight against the roof opening or shall project on all sides for a distance of not less than the distance of the screen below the glass, and shall be of such material and construction so as to support a load of three hundred pounds over any one foot by two foot area. The provisions for wire glass or screen protection shall not apply to glass block skylights.

**(e)  Greenhouses.** - Greenhouses on the roofs of buildings other than buildings of construction class II-D or II-E shall be constructed of noncombustible framework and shall be glazed with plain or wire glass, or slow burning plastic. The floors of greenhouses shall be constructed at least as required for roof construction in table 3-4 for the construction class of the building on which it is located.

**(f)  Construction of sloping roofs. -** Roofs having a slope of more than sixty degrees to the horizontal shall be constructed of material having the same fire-resistance rating as required for an exterior non-bearing wall of the building of which it is a part. When the slope is sixty degrees or less to the horizontal, the sloping roof shall be constructed as required for the roof of the building. Where the back of a false mansard is exposed to the outdoors, the back shall be covered with noncombustible material or with roof coverings as required for the roof of the building.

**(g) Dormers. -** Roofs of dormers shall be of the same type of construction and have roof covering of the same class as required for the roof of the building on which they are located. The walls of dormers shall be constructed of materials having the same fire resistance rating as required for non-bearing exterior walls of the building on which they are located; except that in buildings of construction classes II-A, II-B, II-C, and II-D, the walls may be constructed of combustible framing provided that the outside face of the framing is protected with noncombustible sheathing and the aggregate area of all such dormer walls, including openings therein, does not exceed twenty percent of the roof area.

**(h) Water tanks. -**

(1) SUPPORTS. - All water tanks placed in or on a building and having a capacity of more than five hundred gallons shall be supported on noncombustible walls or framing. When such tank is located within the building, above the lowest story, its framing shall be fire protected as required for columns supporting one

floor or the tank shall be located within a room or space that is enclosed with construction having a fire-resistance rating equivalent to that otherwise required for the protection of the framing.

**(i)  Cooling towers. -** Cooling towers shall be constructed of noncombustible materials, except as follows:

(1)   Outside the fire districts, when located on a building three stories or forty feet in height or less of construction group I, cooling towers may be constructed of combustible materials provided they are not more than fifteen feet high and do not exceed seven hundred fifty square feet in area.

(2)   Outside the fire districts, when located on the ground and not exceeding three stories or forty feet in height or one thousand five hundred square feet in area, cooling towers may be constructed of combustible material provided they are protected by a noncombustible screen, fence, or wall at least twenty feet from the tower and at least seven feet high.

(3)  Filling and drift eliminators may be of combustible materials if the towers are provided with automatic sprinkler protection complying with the construction provisions of subchapter seventeen.

(4)  Filling and drift eliminators may be of combustible materials where the towers are not provided with automatic sprinkler protection, provided all of the following conditions are met:

a. The cooling tower is constructed of noncombustible material;

b. The cooling tower is located on a building in construction group I-A or I-B;

c. The cooling tower and filling and drift eliminators are located at least thirty feet away from any windows or fresh air intakes which are at an elevation above the roof on which the cooling tower is located, whether in the same building or in an adjoining building;

d. The cooling tower is located not less than fifteen feet from the nearest lot line; and

e. The cooling tower is located not less than ten feet from any chimney, except that the distance shall be not less than twenty feet from a chimney venting products of combustion other than from gas or oil fired appliances, whether on the same building or an adjoining building.

(5) In no event shall cooling towers or filling and drift eliminators be constructed of materials that contain asbestos.

**(j)  Miscellaneous roof structures. -** The following roof structures may be constructed of combustible material if less than twelve feet high above the roof: antenna supports; flagpoles; clothes drying frames; duckboarding or platforms that do not cover more than twenty per cent of the roof area at that level.

# ARTICLE 5
# PREVENTION OF INTERIOR FIRE SPREAD

**§[C26-504.1] 27-339  Fire segregation of occupancies.-**
**(a)  Segregation by fire divisions. -** When different occupancies are to be segregated by fire divisions under the provisions of section 27-240 of subchapter three of this chapter, the occupancies shall be separated from each other, vertically and horizontally, by fire divisions having at least the fire-resistance ratings listed in table 5-2 for the occupancy groups involved. Every building section shall be constructed of elements having at least the fire-resistance rating of a construction class required for the area and height of the building section as listed in tables 4-1 and 4-2.

**(b)  Segregation by fire separations. -** When different spaces are to be segregated by fire separations under the provisions of section 27-240 of subchapter three of this chapter, the occupancies shall be separated from each other, vertically and horizontally, by fire separations having at least the fire-resistance ratings listed in table 5-1. In buildings of construction group I, fire separations shall be constructed of noncombustible materials.

**(c)   Compartmentation. -** Notwithstanding the provisions of Table 4-1, in existing office buildings one hundred feet or more in height having air-conditioning and/or mechanical ventilation systems that serve more than the floor on which the equipment is located, unsprinklered floor areas, more than forty feet above curb level, shall be subdivided by fire separations into spaces or compartments of the size required by paragraphs one through five of this subdivision. Floor area shall be defined as the area within exterior walls and excluding any areas enclosing stairs, corridors, elevators and shafts:

(1) Unless otherwise provided below, all unsprinklered floor areas shall be segregated by one-hour fire separations into spaces or compartments not to exceed seventy-five hundred square feet.

(2) Where the floor area exceeds ten thousand square feet, at least one of the subdividing fire separations shall be of two-hour fire-resistive construction, creating areas of refuge, complying with section 27-372 of article five of subchapter six of this code except that the requirement for an elevator in each area shall not apply.

(3) The floor area or any subdivided area may be increased to not more than fifteen thousand square feet if complete area protection by approved devices for the detection of products of combustion other than heat is provided within such increased area and provided further than*** at least one of the subdividing fire separations shall be of two-hour fire-resistive construction where the floor area exceeds fifteen thousand square feet, creating areas of refuge in the same manner and under the same conditions as provided in two of this subdivision. The activation of any such detectors shall have the same effect as provided in subdivision (f) of section 27-972 of article five of subchapter seventeen of this code.

**Title 27 / Subchapter 5**

## TABLE 5-1 FIRE SEPARATIONS

**Key**: Fire-resistance ratings are given in hours. For Table 5-1, read above heavy line. For Table 5-2, read below heavy line.
**NR**—No Requirement

| OCCU-PANCY | A | B-1 | B-2 | C | D-1 | D-2 | E | F-1a | F-1b | F-2 | F-3 | F-4 | G | H-1 | H-2 | J-1 | J-2 | J-3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | 4 | 4 | 4 | 4 | 4 | 4 | 4[c] | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| B-1 | 4 | 3 | NR | 1[bc] | NR | NR | 1[ac] | 1[c] | 1[c] | — | 1[c] | 1[c] | 1[c] | 1½[c] | 1½[c] | 1[c] | 1[c] | 1[c] |
| B-2 | 4 | 3 | 2 | NR | NR | NR | NR | NR | NR | — | NR | NR | NR | NR | NR | NR | NR | NR |
| C | 4 | 3 | 2 | 2 | 1 | NR | 1[a] | 1 | 1 | — | NR | NR | NR | NR | 1 | 1 | 1 | 1 |
| D-1 | 4 | 3 | 3 | 3 | 3 | NR | 1[a] | 1 | 1 | — | 1 | 1 | 1 | 1½ | 1½ | 1 | 1 | 1 |
| D-2 | 4 | 3 | 2 | 2 | 3 | 2 | NR | NR | NR | — | NR | NR | NR | NR | NR | NR | NR | NR |
| E | 4 | 3 | 2 | 2 | 3 | 2 | 2 | NR | NR | — | NR | NR | NR | 1[a] | 1[a] | 1[a] | 1[a] | 1[a] |
| F-1a | 4 | 3 | 2 | 2 | 3 | 2 | 2 | 2 | NR | — | NR | NR | NR | 1 | 1 | 1 | 1 | 1 |
| F-1b | 4 | 3 | 2 | 2 | 3 | 2 | 2 | 2 | 2 | — | NR | NR | NR | 1 | 1 | 1 | 1 | 1 |
| F-2 | 4 | 3 | 2 | 2 | 3 | 2 | 2 | 2 | 2 | 2 | — | — | — | — | — | — | — | — |
| F-3 | 4 | 3 | 2 | 2 | 3 | 2 | 2 | 2 | 2 | 2 | 2 | NR | NR | 1 | 1 | 1 | 1 | 1 |
| F-4 | 4 | 3 | 2 | 2 | 3 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | NR | 1½ | 1½ | 1 | 1 | 1 |
| G | 4 | 3 | 2 | 2 | 3 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | NR | NR | 1 | 1 | 1 |
| H-1 | 4 | 3 | 2 | 2 | 3 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | NR | 1 | 1 | 1 |
| H-2 | 4 | 3 | 2 | 2 | 3 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 1 | 1 | 1 |
| J-1 | 4 | 3 | 2 | 2 | 3 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | NR | NR |
| J-2 | 4 | 3 | 2 | 2 | 3 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | NR |
| J-3 | 4 | 3 | 2 | 2 | 3 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |

## TABLE 5-2 FIRE DIVISIONS

### NOTES FOR TABLES 5-1 AND 5-2

[a] An office, or group of offices, whose use is accessory to an occupancy, and totals four hundred square feet or less in area shall not be required to have a fire separation. Such office, or group of offices, totalling more than four hundred square feet in area shall not be required to have a fire separation if such offices exit directly, without having to pass through the area of the related occupancy.

[b] Counters and backbars for the sale of publications, tobacco products, liquors, or candies, or for making of reservations for travel, car rental, or theatre, or otherwise involving similar business and mercantile activities that are accessory to an occupancy and are limited in area to one hundred square feet, within the area of the occupancy, need not comply with the requirements of this table.

[c] The provisions of this table shall not apply to closets seventy-five square feet or less in area.

[d] Nonresidential kitchens need not be separated by fire separations from adjoining dining spaces, provided:
(1) The cooking equipment is vented directly to the outdoors, and
(2) 2* draft curtain of noncombustible material, at least twenty-four inches down from the ceiling, is provided to separate the cooking facilities from dining spaces, and
(3) Sprinkler heads constructed in accordance with the provisions of subchapter seventeen of this chapter, are provided on the cooking facilities side of the curtain, or any opening between the kitchen and dining space, located within twenty-four inches of the curtain or opening, and spaced not more than forty-eight inches on centers if the opening is more than sixty inches wide. When fire separations are provided double-action doors may be permitted.

[e] Kitchens having a floor area of fifty-nine square feet or less located within dwelling units shall be separated from adjacent spaces by partitions having a fire-resistance rating of at least one hour except for the entrances thereto which need [not]** comply with section 27-342 of this article. If doors are provided they may be of wood.

[f] In buildings or spaces classified in occupancy group J-1 or J-2 all partitions in dwelling units located in cellars shall have a minimum fire-resistance rating of one hour.

*As enacted; "A" probably intended.*
**Copy in brackets not enacted but probably intended.*

(4) In existing buildings, existing fire separations of one-hour fire-resistive construction may be accepted in lieu of the fire separation of two hour fire-resistive construction providing all other requirements of paragraphs two and three of this subdivision are complied with.

(5) Regardless of the floor area, no subdivision of the floor area shall be required under this subdivision when complete sprinkler protection is provided in accordance with the construction provisions of subchapter seventeen of this chapter.

(6) Existing office buildings one hundred feet or more in height shall comply with the requirements of this subdivision as follows:

a. Whenever an alteration is performed involving partition changes, compliance with this subdivision shall be required in that portion of the building being altered.

b. At least one-third of the total floor area of the building not in compliance with the requirements of this subdivision on February seventh, nineteen hundred seventy-three, shall comply with such requirements on or before December thirteenth, nineteen hundred eighty-one. Complete plans showing such compliance for the phase of the work to be done shall be filed with, and a permit secured from, the commissioner on or before September thirteenth, nineteen hundred eighty.

c. At least two-thirds of the total floor area of the building not in compliance with the requirements of this subdivision on February seventh, nineteen hundred seventy-three, shall comply with such requirements on or before August seventh, nineteen hundred eighty-four.

d. Full compliance shall be provided on or before February seventh, nineteen hundred eighty-eight.

(7) In existing office buildings one hundred feet or more in height where compliance would cause practical difficulty or undue hardship, the commissioner may waive or modify the requirements of paragraphs one through five of this subdivision and accept alternatives fulfilling the intent of these requirements. Where compliance with the time requirements of paragraph six of this subdivision would cause undue hardship, the commissioner, with the approval of the fire commissioner, may extend the time for compliance, in accordance with rules and regulations to be promulgated. Before such application for a time extension shall be considered all required applications and plans must be filed and approved, permits obtained and a good faith effort towards completion of the work shall have been made.

***As enacted; "that" probably intended.**

## §[C26-504.2]  27-340  Fire divisions. - Fire divisions shall be constructed of noncombustible materials or assembly of noncombustible materials to provide the fire-resistance ratings required by table 5-2. Vertical fire divisions shall be continuous between foundation,

roof, or horizontal fire divisions, and through any concealed space in floor or roof construction. Horizontal fire divisions shall be continuous between exterior walls and/or vertical fire divisions.

(a)  When roof construction is combustible on both sides of a vertical fire division, the vertical fire division shall extend through the roof construction to a height of at least four inches above the high point at the roof framing.  Decking shall tightly butt the fire division. Above the decking of roofs that are flatter than twenty degrees to the horizontal, blocking shall be constructed to form cants on both sides of the fire division with slopes not steeper than 1:4.  Combustible decking shall not extend over the top of the fire division.

(b)  Except as required in subdivision (c) of this section, when roof construction is noncombustible on one or both sides of a vertical fire division, the vertical fire division may terminate at the underside of the noncombustible roof construction provided the junction of the wall and roof construction is made smoke tight.

(c)  When a vertical fire division is required by table 5-2 to have a fire-resistance rating of three or four hours, and the roof construction has a fire-resistance rating of less than two hours, the fire division shall extend above the roof construction to form a parapet at least three feet high.

(d)  Fire divisions shall be so constructed that the removal or collapse of construction on one side will not endanger the support of construction on the other side.

(e)  Fire divisions shall be made smoke tight at their junction with exterior walls.  In buildings of construction class II-D and II-E, exterior walls shall be constructed of noncombustible materials for a distance of at least eighteen inches on each side of the fire division, or the fire division shall project at least twelve inches through the exterior wall.

(f)  Fire divisions may be offset if the construction between the offset divisions, including their supports, has at the same fire-resistance rating as the fire division, with all hollow spaces within the construction firestopped with noncombustible material.

(g)  Where combustible members such as joists, beams, or girders bear on, or frame into, vertical fire divisions, such members shall not extend through the wall and shall have at least four inches of solid noncombustible material below, at the sides, and at the ends of each such member.

(h)  Chases or recesses shall not be cut into fire divisions so as to reduce their thickness below that required for the fire-resistance rating.

(i)  Vertical fire divisions that are hollow shall be firestopped with at least four inches of noncombustible material so as to prevent passage of flame, smoke, or hot gases through the hollow spaces to the story above or below, or to hollow spaces within connecting floor or roof construction.

22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff   Pg 350 of 654

Title 27 / Subchapter 5

**§[C26-504.3] 27-341 Fire separations.** - Fire separations shall be constructed of materials or assembly of materials having at least the fire-resistance ratings required by table 5-1.

**(a) Different tenancies.** - Different tenant apartments, suites, stores, offices, or other spaces that are not separated from each other by fire divisions, shall be separated from each other by fire separations having at least the fire-resistance rating prescribed in table 5-1, but in no case less than one hour, and shall continue through any concealed spaces of the floor or roof construction above.

**§[C26-504.4] 27-342 Openings in fire divisions and separations.** - Openings in fire divisions and fire separations that are required to have a fire-resistance rating, shall be protected by opening protectives having the fire-resistance ratings prescribed in table 5-3, shall not exceed the limits in size and area herein prescribed, and shall comply with the provisions of section 27-329 of article three of this subchapter. Door and other openings in enclosures of vertical exits, exit passageways, corridors, and places of assembly shall be protected by opening protectives as required by the provisions of subchapters six and eight of this chapter. When such enclosures also serve as fire divisions or fire separations, openings therein shall be protected as required by the provisions of this subchapter.

**TABLE 5-3 OPENING PROTECTIVES FOR FIRE DIVISIONS AND FIRE SEPARATIONS**

| Fire-resistance Rating of Fire Division or Fire Separation in which Opening Occurs (hr.) | Fire Protection Rating of Opening Protective |
|---|---|
| 3 or 4 | 3 hr. (Class A)* |
| 2 or 1 ½ | 1 ½ hr. (Class B) |
| 1 | ¾ hr. (Class C) |

*
**Notes for Table 5-3:**
Shall consist of two one and one-half hour (class B) opening protectives, with one protective installed on each face of a fire division or fire separation.

**(a) Size of opening.** - In buildings that are not sprinklered no opening through a fire division or fire separation shall exceed one hundred twenty square feet in area, with no dimension greater than twelve feet, and the aggregate width of all openings at any level shall not exceed twenty-five percent of the length of the wall. Where the areas on both sides of a fire division or fire separation are sprinklered in accordance with the construction provisions of subchapter seventeen of this chapter, the size of the opening may be one hundred fifty square feet in area, with no dimension greater than fifteen feet. In buildings fully sprinklered in compliance with the provisions of subchapter seventeen of this chapter, the size and aggregate width of openings through fire divisions or fire separations shall be unlimited. When a fire division or fire separation serves as a horizontal exit also, it shall have no opening other than door openings not exceeding fifty-six square feet in area, the aggregate width of all openings at any level shall not exceed twenty-five percent of the length of the wall, and shall comply with the provisions of section 27-373 of article five of subchapter six of this chapter.

**(b) Conveyor openings.** - Where fire doors or shutters are impractical for the protection of conveyor openings in fire divisions or fire separations, a system of water spray nozzles may be used. At least four nozzles shall be provided on each side of the opening so as to give complete coverage of the opening. Nozzles shall be controlled by an automatic valve actuated by a heat detector. Nozzles shall be located at an angle not more than thirty degrees between the centerline of nozzle discharge and a line perpendicular to the plane of the opening. The water discharge rate shall be at least three gallons per square foot per minute. When conveyor openings through floors are protected by this method, the openings shall also be provided with a noncombustible enclosure constructed around the conveyor from the floor up to or slightly beyond the spray nozzles, and draft curtains shall be provided extending twenty-four inches below and around the floor opening.

**§[C26-504.5] 27-343 Ducts, pipes and conduits through rated construction.** -

(a) Installation of ducts which pass through construction required to have a fire-resistance rating shall comply with the requirements of subchapter thirteen, provided that, notwithstanding the provisions of subchapter thirteen or reference standard RS 13-1, noncombustible ducts which pass through construction required to have a fire-resistance rating of one hour must be provided with fire dampers unless:
(1) The building is classified in occupancy group C, E, or H-2; and
(2) Complete sprinkler protection is provided for the floor in accordance with subchapter seventeen; or
(3) The openings for the ventilation ducts do not exceed three square feet in area; or
(4) The duct is protected on both sides of the partition for a distance equal to the maximum duct dimension by a sleeve affording one hour fire separation for such horizontal distance.

**(b) Noncombustible pipes and conduits.** –
Noncombustible pipes and conduits may pass through construction required to have a fire-resistance rating

provided that the space between the pipe or conduit and its sleeve or opening does not exceed one-half inch and is completely packed with mineral wool or equivalent noncombustible material and is closed off by close-fitting metal escutcheons on both sides of the construction; and provided further that the aggregate net area of such openings does not exceed twenty-five square inches in any one hundred square feet of wall or floor area (excluding the areas of openings for sleeves which are firestopped in conformance with this section and section 27-345).

(c) Openings for passage of pipe and ducts whose aggregate net area exceeds twenty-five square inches in any one hundred square feet of wall or floor area (excluding opening for sleeves which are firestopped in conformance with this section and section 27-345) may pierce constructions required to have a fire-resistance rating only when the type of construction to be used has been tested with such types of facilities installed in place and the proportionate area of openings of such facilities to be installed in the construction does not exceed the proportionate area of openings in the assembly tested, and provided no opening is larger than that in the assembly tested. Protection of such openings shall be the same as provided in the test. All openings through hollow fire rated construction shall be sleeved with sheet metal least No. 14 U.S. std. gage thick.

§[C26-504.6] 27-344 Shafts. - The requirements of this section shall apply to all shafts, except that floor openings accommodating a slide pole in a fire house and openings other than for ventilation, chimneys or gas vents in buildings three stories or less in height classified in occupancy group J-3 shall be exempt from these requirements, and except as more restrictive requirements may be specified for chimneys and gas vents in subchapter fifteen of this chapter, stairway enclosures in subchapter six, duct enclosures in subchapter thirteen, elevator, escalator, and dumbwaiter enclosures in subchapter eighteen of this chapter, and except as permitted in reference standard RS 5-18.

(a)  Construction. - Shafts shall be enclosed with materials having at least fire-resistance rating required by table 3-4. A shaft that serves the topmost story of a building shall extend through the roof at least thirty-six inches above any combustible roof construction. Where the roof construction is of noncombustible materials, the shaft shall extend through any concealed space within the roof construction and may terminate at the underside of the roof deck. Pipes and ducts penetrating shaft construction shall comply with the requirements of section 27-343 of this article.

(b)  Combustible contents. - Shafts shall be kept free of bookstacks or other combustible contents except for stair construction as permitted under subchapter six of this chapter, duct and pipe coverings as permitted under subchapters thirteen and sixteen, and elevator car enclosures as permitted under subchapter eighteen of this chapter.

(c)  Openings in shafts. - All shaft openings below the top terminus shall be provided with opening protectives that comply with section 27-329 of this subchapter and table 5-3. In shafts that contain only one opening below the roof terminus, no opening protective need be provided. Openings in elevator and dumbwaiter shafts shall comply only with the requirements of subchapter eighteen of this chapter. Where a window is located in a shaft wall that is an exterior wall and is ten stories or less above grade or three stories or less above a roof, it shall be protected against entrance by a permanently secured grille consisting of 5/8 in. dia. bars, 10 in. o. c. vertically, or by a stationary metal sash window having 1/8 in. thick solid section steel muntins, 8 in. o. c. one way. This protection shall not be required in stair shafts where there is a stair landing or platform not more than three feet directly below the window sill.

(d) Smoke venting of closed shafts. - All closed shafts having an area exceeding four square feet, other than elevator or dumbwaiter shafts, shall be provided with a smoke vent having an area of at least three and one-half percent of the maximum shaft area at any floor, but in no event less than one-half square foot. Elevator and dumbwaiter shaft vents shall comply with the requirements of subchapter eighteen of this chapter. Smoke vents may be windows, louvers, skylights, vent ducts, or similar devices. Vent ducts shall be enclosed by construction having the same fire resistance rating as required for the shaft enclosure. Such vent ducts shall extend vertically, diagonally, or horizontally as provided below.

(1)  Through any roof of the building provided the vent opening is at least ten feet from any window, door, outside stairway, or interior lot line. This dimension may be reduced to five feet if the vent duct is extended up to at [sic] least the level of the top of the window or door. A vent that is required to extend above a roof shall extend at least eight inches above a roof assembly constructed of noncombustible materials, and at least thirty-six inches above a roof assembly constructed of combustible materials that are within a horizontal distance of ten feet.

(2)  Through an exterior wall of the building, provided there are no openings in the wall within a distance of thirty feet vertically above the vent opening, and within five feet either side of the vent opening. When a side of a shaft is an exterior wall or a wall of a roof bulkhead, the required vent may be a louver or window. Any window or louver located in a shaft wall above a roof constructed of combustible materials shall have its sill at least thirty-six inches above the roof.

(e) Terminus of shaft vents. - Of the total required vent area for shafts, at least one-third shall be clear opening to

22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff   Pg 352 of 654

Title 27 / Subchapter 5

the outdoors, either in the form of fixed louvers, ridge vents, or hooded or goosenecked openings. In lieu thereof, skylights or trap doors may be used if constructed and arranged to open automatically by fusible link or other mechanical device when subjected to a temperature of one hundred sixty degrees Fahrenheit or to a rapid rise in temperature at a rate of fifteen to twenty degrees Fahrenheit per minute. The remaining portion of the required vent area may be a window or skylight glazed with plain glass not more than one-eighth inch thick or slow burning plastic.

**(f)   Machine rooms. -** Any compartment containing machinery that communicates with a shaft enclosure shall comply with all requirements for shafts. The required louver or glazing shall not be located in any door leading into such compartment.

**§[C26-504.7]   27-345   Firestopping. -**Concealed spaces within partitions, walls, floors, roofs, stairs, furring, pipe spaces, column enclosures, etc. that would permit passage of flame, smoke, fumes, or hot gases from one floor to another floor or roof space, or from one concealed area to another, shall be firestopped to form an effective draft barrier, or shall be filled with noncombustible material in accordance with the requirements of this section. Firestopping shall not be required where a concealed space is sprinklered in accordance with the construction provisions of subchapter seventeen of this chapter, or is constructed as a shaft.

**(a)   Firestopping materials. -**In buildings of construction group I, firestopping or fill shall be of noncombustible material that can be shaped, fitted, and permanently secured in position. In buildings of construction group II, firestopping may be of combustible material consisting of wood not less than two inches nominal thickness with tight joints, two layers of one inch nominal thickness assembled so that there are no through joints or of one-half inch exterior type plywood with joints backed, except that noncombustible firestopping shall be used in concealed spaces of fire divisions and where in contact with fireplaces, flues, and chimneys. Noncombustible firestopping may be masonry set in mortar, concrete, three- quarter inch thick mortar or plaster on noncombustible lath, plasterboard at least three-eighths of an inch thick, fire-rated wallboard at least five-eighths of an inch thick, sheet metal at least No. 14 U.S. std. gage thick, solid web metal structural members, asbestos-cement board at least one-quarter of an inch thick, or equivalent rigid noncombustible material. Mineral, slag, or rockwool may be used for firestopping when compacted to a density of at least three and one-half pounds per cubic foot into a confined space of least dimension not more than one-third its second dimension.

(1)   The performance of through-penetration fire stops shall be measured and specified according to reference standard RS 5-19.

(2)   The commissioner may accept reference standard RS 5-19 test data results from an independent laboratory acceptable to the commissioner pursuant to subdivision (c) of section 27-131, when such data is submitted by a registered architect or licensed professional engineer to justify the usage of fire stops or the details of their installation not specified herein.

**(b) Hollow partitions and furred spaces. -** All hollow partitions and furred out spaces shall be firestopped at each floor level. Firestops shall be the full thickness of the hollow space or furred out space.

**(c)   Stairs. -** Concealed spaces within stair construction shall be firestopped between stringers at the top and bottom of each flight of stairs so as not to communicate with concealed spaces in the floor, roof or intermediate landing construction.

**(d) Ceiling spaces. -** Floor or roof assemblies required to have a fire-resistance [*sic*] rating shall have any concealed spaces therein firestopped in accordance with section 27-327 of this subchapter.

**(e) Exterior cornices. -** Exterior cornices and eaves, constructed of combustible materials or with combustible framing, shall be firestopped at the ends of fire divisions and party walls, and at maximum intervals of twenty feet. If not continuous, they shall have closed ends and at least four inches separation between adjoining sections**.**

**(f)   Trim and finish. -** Where combustible trim and finish is permitted all hollow spaces shall be firestopped at ten foot intervals or shall be solidly filled with noncombustible materials.

**(g) Duct and pipe spaces. -** Ducts and pipes enclosed in construction that does not meet the requirements of this code for shaft construction shall be firestopped at every floor level.

**(h) Inspection of firestopping. -**The installation of all required firestopping shall be subject to the controlled inspection requirements of section 27-132 of article seven of subchapter one of this chapter, except that the architect or engineer need not be retained by the owner. Firestopping shall not be concealed from view until inspected.

**§[C26-504.8]   27-346 Partitions and furring. -** In buildings of construction group I, partitions and furring shall be constructed of noncombustible materials, except that nonbearing partitions that are not required to have a fire-resistance rating, and furring may be constructed of fire retardant treated wood as provided in subdivision (d) of section 27-328 of article three of this subchapter, and except that such partitions and furring, may be constructed of combustible materials in spaces classified in occupancy group E, J-2, or J-3, provided the following conditions are met:

(a) the space containing the combustible partitions does not exceed five thousand square feet in area within a noncombustible enclosure having a fire-resistance

rating of at least one hour.
(b) the space is in a single tenancy.
(c) glass or slow burning plastic is used for glazing.

**§[C26-504.9]   27-347   Folding partitions. -**Folding partitions shall not be used as partitions that are required by this code to have a fire-resistance rating.
**(a) Construction group I. -** In buildings of construction group I, folding partitions may be used if they are constructed of noncombustible materials, or of fire retardant treated wood, or are constructed of noncombustible frame covered with fabric that has a class A interior finish rating. Where partitions of combustible materials are permitted by section 27-346 of this article, folding partitions may also be constructed of combustible materials.
Where doors constructed of materials having a class C interior finish rating are permitted by section 27-348 of this article, folding doors may be constructed of combustible materials.
**(b)   Construction group II. -** In buildings of construction group II, folding partitions may be constructed of combustible materials, surfaced with interior finish materials meeting the requirements of section 27-348 of this article.

**§[C26-504.10] 27-348   Interior finish. -**
**(a)   Definition. -** For the purposes of this section, interior finish shall mean those materials that form the exposed interior surfaces of a building and that are part of or affixed to walls, fixed or folding partitions, ceilings, and other construction elements.
**(b)   Classification. -** Interior finish materials shall be classified in accordance with the surface flame-spread rating obtained as prescribed in the provisions of reference standard RS 5-5. Where an interior finish material is comprised of two or more materials laminated, glued, nailed, or otherwise secured together, the test rating for flame spread shall be based upon the composite of the materials in the form in which it will be used in construction. Interior finish materials shall be grouped in the following classes, in accordance with their surface flame spread characteristics:

| Interior Finish Class | Flame Spread Rating |
|---|---|
| A | 0 to 25 |
| B | 26 to 75 |
| C | 76 to 225 |
| D | Over 225 |

**(c)   Requirements.** - Interior finishes and exposed structural or construction materials shall have a flame-spread rating not greater than that designated by the class prescribed for the various occupancy groups in which they are used, as listed in table 5-4. Exceptions to these requirements are:
(1)   Finish flooring and floor coverings, which are subject to the requirements of section 27-351.
(2)   Wall coverings and coatings that are less than 0.036 in. [*sic*] in total thickness, when applied directly to a noncombustible, or fire-retardant treated wood, substrate.
(3)   Exposed structural members and planking in buildings of class II-A construction, which may be left exposed in any room or space, except in exits.
(4)   Twenty per cent (20%) of the aggregate wall and ceiling area of any room, space, or corridor required to have a class A or B interior finish may be finished with materials having a class C rating. This allowance shall include the area of doors, folding partitions, windows, glazing, skylights, luminous ceilings, trim, bases, chair rails, panels, moldings, etc. This exception shall not operate as a waiver of other requirements of this code relating to opening protectives.
(5)   When a sprinkler system is provided in any room or space, and is installed in compliance with the construction provisions of subchapter seventeen of this chapter, interior finish materials may be one class higher in flame-spread rating than required by table [*sic*] 5-4.
**(d)   Smoke density. -** No material shall be used for interior finish in the following locations if the material develops smoke in greater density than the rating shown, based upon a test conducted in accordance with the provisions of reference standard RS 5-5. Materials used for interior finish that cover not more than twenty percent of the aggregate wall and ceiling area of any room, space, or corridor shall be exempt from the above requirements.

| Location or Occupancy……………… | Smoke Developed Rating |
|---|---|
| Exits, Corridors……………………… | 25 |
| Occupancy groups H-1 and H-2…….. | 50 |
| Rooms in which the net floor area per occupant is ten square feet, or less…... | 100 |

**(e)   Toxicity. -** No material shall be used in any interior location that, upon exposure to fire will produce products of decomposition or combustion that are more toxic in point of concentration than those given off by wood or paper when decomposing or burning under comparable conditions.
**(f)  Attachment of interior finish. -**
(1)   To be credited with the same rating, interior finish materials that were applied to a substrate when tested shall be applied at the building to an equivalent substrate.

[*]TABLE 5-4  INTERIOR FINISH REQUIREMENTS CLASS

| Occupancy Group Classification of the Space | Occupancy Group Designation | Exits and Shafts | Corridors[b] | Rooms More Than 1500 Sq. Ft. in Area[a] | Rooms Less Than 1500 Sq. Ft. in Area[a] |
|---|---|---|---|---|---|
| High Hazard | A | A | A | B | B |
| Storage | B-1 | A | A | B | C |
| Storage | B-2 | A | B | B[c] | C |
| Mercantile | C | A | B | B[c] | C |
| Industrial | D-1 | A | A | B | C |
| Industrial | D-2 | A | B | B[c] | C |
| Business | E | A | B | C | C |
| Assembly | F-1[a] | A | B | B | B[d] |
| Assembly | F-1b | A | B | B[c] | B[c, d] |
| Assembly | F-2 | A | B | B[c] | B[c, d] |
| Assembly | F-3 | A | B | B[c] | B[c, d] |
| Assembly | F-4 | A | B | B[c] | C |
| Educational | G | A | A | B | C |
| Institutional | H-1, H-2 | A | A | B | B[d] |
| Residential | J-1, J-2 | A | A | B[e] | B[e,f] |
| Residential | J-3 | B | D | D | D |

**NOTES FOR TABLE 5-4:**

[a] In determining the applicable requirements for rooms or enclosed spaces, the occupancy group classification of the room or enclosed space shall be the governing factor, regardless of the occupancy group classification of the building. For the purposes of this table, the area of a room shall be that floor area contained within enclosing construction in which interior doors or other interior openings represent not more than ten percent of the area of the enclosing construction. Interior doors or windows that are constructed of noncombustible materials and that are self-closing or automatic may be ignored in computing door or opening area. Rooms or spaces that have unprotected openings constituting more than ten percent of the area of enclosing construction shall not be considered as a room. Interior finish requirements for rooms are based upon rooms being enclosed in ceiling high partitions. Partitions, to be considered ceiling high, shall extend up to the floor or roof construction above or to a ceiling having at least a three-quarter hour fire-resistance rating. Partitions that do not comply with this requirement shall not be considered as enclosing the spaces, and the rooms or spaces on both sides thereof shall be considered as one.

[b] Rooms or spaces through which it is necessary for occupants of an adjacent room to pass in order to reach the only exit shall, for the purposes of this table, be considered as corridors. Where used in corridors, class B finish material shall not extend more than fifty feet between separations of class A finish material that are at least two feet wide.

[c] On the street floor of one-story buildings in construction group II, ceilings, beams, trusses, etc. that are twenty feet or more in height from the floor to their lowest part, may have a class C finish.

[d] Class C interior finish may be used in offices, or groups of offices, whose use is accessory to an occupancy, provided such offices are separated from the occupancy, by construction having at least a two hour fire-resistance rating.

[e] Class C interior finish may be used in the residential rooms of one- and two-story motels when there is a direct exit from each room to the exterior.

[f] Interior finish when used in the following spaces shall be at least class B:
  (1) Kitchens, cooking spaces, and pantries in buildings classified in occupancy groups other than J-2 and J-3.
  (2) Repair and maintenance rooms.
  (3) Boiler rooms and incinerator combustion rooms.

***Superscripts in body of this table (which refer to notes) not enacted but probably intended.***

(2) Interior finish materials shall be cemented or otherwise secured in place in the same manner and with materials equivalent to those used in flame-spread tests conducted in accordance with subdivision (b) of this section for the applicable classification.

(3) Where walls, ceilings, partitions, or other construction elements are required to have a fire-resistance rating or are required to be constructed of noncombustible materials, and the interior finish is secured to studs or furring, the surface of the interior finish facing the concealed space shall either have a class A rating, shall be applied to a substrate that has a class A rating, or shall have the concealed space completely filled with noncombustible material.

§[C26-504.11]  27-349  Coatings. - Coatings applied in the field by brush or spray shall not be used as flame-spread retardants except on existing surfaces of buildings existing on December sixth, nineteen hundred sixty-eight, and then only with the express permission of, and in a manner directed by, the commissioner.

§[C26-504.12]  27-350  Ceiling construction. - Ceilings that are to be suspended below floor or roof construction by means of a framing system shall consist of supporting hangers, carrying channels and a supporting grid complying with reference standard RS 5-16 or shall have supporting hangers and carrying channels and a supporting grid that can be demonstrated to the satisfaction of the commissioner to be of strength adequate to support the ceiling material. The hangers and supporting grid shall be of noncombustible materials. In buildings of construction group II, every other hanger supported from wood members shall be attached by a through bolt or clinched through nail. Where, in table 3-4, floor or roof construction is required to have a fire-resistance rating, a ceiling having no fire-resistance rating may be suspended below the fire-resistance construction.

 (a) Luminous ceilings. - For the purpose of this section, a luminous ceiling shall be defined as a ceiling consisting of translucent, louvered, egg-crated, mesh, or similar light-diffusing material suspended from the ceiling or structural framework. A suspended ceiling containing less than twenty square feet of translucent, louvered, egg-crated, mesh, or similar material in any one hundred square feet of ceiling area shall not be considered a luminous ceiling, and shall be constructed and installed in accordance with department of buildings requirements for lighting fixtures. Luminous ceilings shall, in addition to the requirements of this section, conform to all of the requirements of section 27-348 of this article for interior finish.

*Local Law 59-1996.

(1) LUMINOUS CEILINGS OF NONCOMBUSTIBLE MATERIAL.- Luminous ceilings constructed of glass and/or metal or other noncombustible materials may be used in any location.

(a) Glass used in luminous ceilings, unless it is wire glass or heat-resistant glass as specified below, shall not weigh more than two psf, nor shall any pane be larger than eight square feet in area. If glass used in luminous ceilings is wire glass, or is heat resistant by reason of having a maximum coefficient of expansion of 36 x 10.7 in. per in. per degree C, the glass may be of any weight and any size, limited only by considerations of structural safety.

(b) Luminous ceilings installed below sprinkler heads shall be constructed of a type of noncombustible louver, mesh, or other open material that will not impede the flow of water from the sprinkler heads over the intended area of coverage. The luminous ceiling shall be constructed so as

to provide access to all heads and valves.

(2) LUMINOUS CEILINGS OF COMBUSTIBLE MATERIAL.- Luminous ceilings constructed of combustible materials shall not be installed in:

a. Any exit or corridor.

b. Any room classified in occupancy group H, or any room leading therefrom as defined in note b of table 5-4.

c. Any room in which the net floor area per occupant is twenty square feet or less, or any room leading therefrom as defined in note b of table 5-4.

d. Luminous ceilings constructed elsewhere than in the spaces listed in subparagraphs a, b, and c above shall be exempt from the provisions of section 27-348 of this article, provided that:

1.  The panels of such ceilings are of slow-burning plastic;

2.  The panels are installed above or below sprinklers that are constructed in accordance with the provisions of subchapter seventeen of this chapter;

3.  No individual plastic panel exceeds ten feet in maximum dimension. Where installed below sprinkler heads, the plastic shall be a material that will fall from its mounting at a temperature at least fifteen degrees lower than the temperature at which the sprinkler heads are designed to operate or are constructed of open material which will not impede the flow of water from the sprinkler heads. Luminous ceilings shall be installed so as to provide ready access to all heads and valves.

(b) Suspension of new ceilings below existing suspended ceilings. - In construction group I a new ceiling may be suspended below not more than one existing suspended ceiling and shall be supported directly from the ceiling carrying channels adjacent to the hangers. In construction group II, an existing suspended ceiling shall be completely removed before a new ceiling may be suspended.

§[C26-504.13]  27-351  Finish flooring and floor coverings. - Finish flooring and floor coverings shall comply with the following:

(a) In buildings or spaces classified in occupancy group A and in all exits except those in buildings of construction group II-E, finish flooring shall be of noncombustible material and except as otherwise provided for stairs in subdivision (h) of section 27-375 of article five of subchapter six of this chapter.

(b) Flooring in buildings or spaces of construction group I. - Except as provided in subdivision (a) of this section combustible finish flooring may be used in buildings or spaces of construction group I when cemented directly to the top surface of noncombustible floor construction, or attached to combustible or noncombustible sleepers. When attached to sleepers, the space between the noncombustible floor construction and the bottom of flooring shall be solidly filled with noncombustible material to within one-quarter inch of the flooring, or the space between the sleepers under the flooring shall be firestopped into areas of not more than twenty square feet, and provided further that no open

spaces shall extend under or through fire divisions or through fire separations. Combustible insulating or sound absorbing boards not more than one-half inch thick and having a flame-spread rating not greater than Class C may be used when attached directly to noncombustible floor construction and covered with finish flooring.

**(c) Flooring in buildings or spaces of construction group II. -** Except as provided in subdivision (a) of this section, finish flooring in buildings or spaces of construction group II may be of combustible material.

**(d) Floor coverings. -**

(1) Exits. - Where exits are required under any provision of this code, carpets and carpet assemblies shall not be installed in such exits, except that wool carpeting may be installed in lobby areas, exit passageways and convenience stairs.

(2) Flammability requirements. - The requirements of this subdivision shall apply to carpets and carpet assemblies only when used as a floor covering (for requirements pertaining to carpets and carpet assemblies used as interior finishes, see section 27-348 of this article). For purposes of this subdivision, carpeting assemblies shall include the carpet, its underlay, and adhesives which when tested as a composite shall be representative of the proposed installation.

a. Pill test. - All carpets and underlayments shall pass a methanine pill test in accordance with the requirements of reference standard RS 5-20.

b. Critical radiant flux test. - Carpets and carpet assemblies shall be tested by the method for critical radiant flux in accordance with the requirements of reference standard RS 5-20. The time frame for such test shall be at least a fifteen minute exposure.

1. Carpets and carpet assemblies representative of the actual installation on floors of corridors, shall have a minimum critical radiant flux of 0.5 watts per square centimeter (W/cm$^2$).

2. Carpets and carpet assemblies representative of the actual installation on floors of general areas shall have a minimum critical radiant flux of 0.4 W/cm$^2$.

c. Smoke developed ratings. - Carpets and carpet assemblies representative of the actual installation on floors of corridors or general areas shall be tested for smoke developed ratings in accordance with the requirements of reference standard RS 5-20. The smoke developed ratings in either the flaming or no-flaming mode shall not exceed three hundred within the first four minutes of the test.

d. The manufacturer of the carpets and carpet assemblies shall submit a certificate from an independent laboratory acceptable to the commissioner pursuant to section 27-131, showing the complete test data results, prior to final acceptance. The certification shall state that the material is treated for fire resistance and shall indicate the service life of the treatment or that the material is inherently fire resistant by virtue of its construction, chemical properties and/or composition. Materials which are not inherently fire resistant may be used only when the certified fire resistant service life exceeds that of the planned service life of the carpets and carpet assemblies with consideration being given to cleaning, traffic, and other conditions of use which may affect the treatment.

$^*$**§[C26-504.14] 27-352 Fireplaces. - REPEALED**
*Local Law 80-1989.*

**§[C26-504.15] 27-353 Smoke and heat venting. -**

(a) Where the floor area of a one-story building classified in occupancy group A, B-1, or D-1 is greater in depth than one hundred feet from a frontage space, that portion beyond one hundred feet shall be provided with roof vents and smoke curtains complying with the requirements of reference standard RS 5-11. Where the effective area of vents are glazed with plain glass or plastic not thicker than one-eighth inch, they need not be provided with automatic opening devices.

(b) Buildings classified in occupancy group E, one hundred feet or more in height, having air-conditioning and/or mechanical ventilation systems that serve more than the floor on which the equipment is located, shall be provided with at least one smoke shaft by means of which smoke and heat shall be mechanically vented to the outdoors as provided in reference standard RS 5-17. Buildings that are sprinklered throughout shall be exempt from the smoke shaft requirements.

(c) Existing office buildings, one hundred feet or more in height, having air-conditioning and/or mechanical ventilation systems that serve more than the floor on which the equipment is located, shall be provided with at least one smoke shaft by means of which smoke and heat shall be mechanically vented to the outdoors as provided in reference standard RS 5-17, or in lieu of such smoke shaft or shafts, all interior enclosed stairs other than a fire tower or access stairs may be provided with a system of pressurization for fire emergency use.

Such pressurization shall be provided by means of a system or systems as provided in reference standard RS 5-18. Such buildings shall comply with the smoke and heat venting requirements herein on or before September thirteenth, nineteen [sic] hundred eighty-two. Complete plans showing such compliance shall be filed with, and a permit secured from, the commissioner on or before September thirteenth, nineteen hundred eighty.

Existing buildings that are sprinklered throughout shall be exempt from the smoke shaft and stair pressurization requirements.

An existing building, which is to be sprinklered throughout, shall be exempt from the smoke shaft and stair pressurization requirements under the following conditions:

(1) the installation proceeds in conformance with a schedule acceptable to the commissioner, setting forth the sequence and corresponding time for installation in the various locations. On or before September thirteenth, nineteen hundred eighty such a schedule, as well as complete plans of the installation, shall be filed with, and a

permit secured from, the commissioner for the phase of the work to be done as required by paragraph two of this subdivision.

(2) at least one-third of the total floor area of the building, including but not limited to the entrance lobby, corridors and elevator landing areas, is sprinklered on or before December thirteenth, nineteen hundred eighty-one.

(3) at least two-thirds of the total floor area of the building is sprinklered on or before December thirteenth, nineteen hundred eighty-two.

(4) the building is sprinklered throughout on or before December thirteenth, nineteen hundred eighty-three.

Where compliance with the time requirements of this subdivision would cause undue hardship, the commissioner, with the approval of the fire commissioner, may extend the time for compliance, in accordance with rules and regulations to be promulgated. Before such application for a time extension shall be considered all required applications and plans must be filed and approved, permits obtained and a good faith effort towards completion of the work shall have been made.

## §[C26-504.16]    27-353.1    Smoke protection for elevators and escalators. -

(a) Elevators.- In existing buildings classified in occupancy group J-1, at every floor above the main entrance floor, all passenger elevators [*sic*] shall open only into elevator vestibules, except for:

(1) Such existing buildings which contain spaces classified in occupancy group C or F and have an automatic sprinkler system protecting all spaces (except boiler rooms) not in occupancy group J-1 and all exits and corridors serving such spaces located on or below the lowest floor containing sleeping rooms as well as all storage closets no matter where located, except that storage closets less than seventy-five square feet may, in the alternative, be provided with smoke detectors which shall be of the central supervisory type connected to an approved central station; or

(2) Such existing buildings, which contain no, spaces in occupancy group C or F, and have either:

a. An automatic sprinkler system protecting all public areas and storage closets; or

b. An automatic sprinkler system protecting all sleeping rooms and storage closets.

c. Notwithstanding subparagraphs a and b of this paragraph, storage closets less than seventy-five square feet may be provided with smoke detectors of the central supervisory type connected to an approved central station.

d. Notwithstanding any other provision of this code, the sprinklers serving the storage closets may be connected with the domestic water supply.

**(b) Escalators. -** In buildings and existing buildings classified in occupancy group J-1, fire protection for escalators shall be provided by any one of the following methods:

(1) Enclosure in accordance with sections 27-375 and

27-378 if escalator is used as an exit; or

(2) Automatic rolling shutters in accordance with reference standard RS 18-1; or

(3) Kiosks in accordance with reference standard RS 18-1; or

(4) Where the building section is fully protected by a supervised automatic sprinkler system and the escalator sprinklers are spaced to protect exposed sides of the escalator opening, a noncombustible heat apron constructed to bank heat around the sprinkler heads adjacent to the opening where the bottom edge of the draft curtain is not less than twelve inches below the bottoms of sprinkler heads when heads are in operation, and in no event less than twenty-four inches below the ceiling; or

(5) Spray nozzles in accordance with reference standard RS 18-1.

(c) The requirements of this subdivision shall be complied with on or before April first, nineteen hundred eighty-seven.

**This page is intended to be left blank**

22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff   Pg 359 of 654

Title 27 / Subchapter 6

# SUBCHAPTER 6
# MEANS OF EGRESS

## TABLE OF CONTENTS

| [Sub-Art. or Sec.]* | Art. or Sec.** | |
|---|---|---|
| **[600.0]** | **Art. 1** | **General** |
| [600.1] | 354 | Scope |
| [600.2] | 355 | Definitions |
| [600.3] | 356 | Inadequate Exits for Existing Structures |
| **[601.0]** | **Art. 2** | **Determination of Exit Requirements** |
| [601.1] | 357 | Exit Requirements |
| [601.2] | 358 | Occupant Load |
| [601.3] | 359 | Capacity of Exits |
| [601.4] | 360 | Travel Distance |
| **[602.0]** | **Art. 3** | **Location of Exits** |
| [602.1] | 361 | Arrangement |
| [602.2] | 362 | Tenant Spaces |
| [602.3] | 363 | Remote Location |
| [602.4] | 364 | Exit Discharge |
| **[603.0]** | **Art. 4** | **Number of Exits** |
| [603.1] | 365 | Egress from Rooms and Spaces |
| [603.2] | 366 | Exits from Floors |
| [603.3] | 367 | Exit Reduction |
| **[604.0]** | **Art. 5** | **Access Requirements and Exit Types** |
| [604.1] | 368 | General |
| [604.2] | 369 | Corridors |
| [604.3] | 370 | Exit Passageways |
| [604.4] | 371 | Doors |
| [604.5] | 372 | Area of Refuge |
| [604.6] | 373 | Horizontal Exits |
| [604.7] | 374 | Supplemental Vertical Exits |
| [604.8] | 375 | Interior Stairs |
| [604.9] | 376 | Exterior Stairs |
| [604.10] | 377 | Ramps |
| [604.11] | 378 | Escalators |
| [604.12] | 379 | Moving Walkways |
| [604.13] | 380 | Fire Escapes |
| **[605.0]** | **Art. 6** | **Exit Lighting** |
| [605.1] | 381 | Requirements |
| [605.2] | 382 | Power Source |
| **[606.0]** | **Art. 7** | **Exit Signs** |
| [606.1] | 383 | Requirements |
| [606.2] | 384 | Power Source |
| [606.3] | 385 | Exit Sign Design |
| [606.4] | 386 | Directional Sign Design |
| [606.5] | 387 | False Exits |
| **[607.0]** | **Art. 8** | **Exit Signs for Existing Buildings** |
| [607.1] | 388 | Retroactive Provisions |
| [607.2] | 389 | Designation of Required Means of Egress |
| **[608.0]** | **Art. 9** | **Stair and Elevator Signs** |
| [608.1] | 390 | Applicability |
| [608.2] | 391 | Signs at Elevator Landings |
| [608.3] | 392 | Floor Numbering Signs |
| [608.4] | 393 | Stair and Elevator Identification Signs |
| [608.5] | 394 | Stair Re-entry Signs in Office Buildings |
| [608.6] | 395 | Materials for Signs |
| [608.7] | 396 | Signs in Existing Buildings |
| **[609.0]** | **Art. 10** | **Signs in Sleeping Rooms** |
| [609.1] | 396.1 | Applicability |
| [609.2] | 396.2 | Requirements |
| [609.3] | 396.3 | Retroactive requirements |
| **[610.0]** | **Art.11** | **Emergency Power** |
| [610.1] | 396.4 | Requirements |
| [610.2] | 396.5 | Registration |
| [610.3] | 396.6 | Applicability |

*"C26" omitted from section numbers in this column.
**"27" omitted from section numbers in this column.

## LIST OF TABLES

**Table No.**

6-1  Determination of Exit and Access Requirements
6-2  Occupant Load Requirements Net Area Table
6-3  Maximum Occupant load-Spaces with One Door
6-4  Maximum Riser Height and Minimum Tread Width

## ARTICLE 1 GENERAL

§[C26-600.1] 27-354 Scope. -
The provisions of this subchapter shall control the design, construction, protection, location, arrangement and maintenance of required exit facilities to provide safe means of egress from all buildings hereafter erected, altered or changed in occupancy, except that exit requirements for special uses and occupancies, as provided in subchapters seven and eight of this chapter, shall take precedence over the provisions of this subchapter and except further that buildings in existence on December sixth, nineteen hundred sixty-eight shall comply with the applicable requirements of section 27-356 of this article, section 27-371 of article five of this subchapter and articles eight and nine of this subchapter.

§[C26-600.2] 27-355 Definitions. - For definitions to be used in the interpretation of this subchapter, see subchapter two of this chapter.

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 360 of 654

Title 27 / Subchapter 6

**§[C26-600.3] 27-356 Inadequate exits for existing structures.-** Every structure existing on December sixth, nineteen hundred sixty-eight which is not provided with exit facilities as prescribed in this code, and in which the exit facilities are, in the opinion of the commissioner, inadequate for the safety of the occupants, shall be provided with such means of egress or fire protection as the commissioner shall direct.

### ARTICLE 2 DETERMINATION OF EXIT REQUIREMENTS

**§[C26-601.1] 27-357 Exit requirements. -** The determination of exit requirements for a building shall be based upon the occupancy group classification of the building, the number of occupants, the floor area, the travel distance to an exit, and the capacity of the exits, as provided in table 6-1 and herein. Every floor of a building shall be provided with exit facilities for its occupant load. The occupant loads of floors shall not be cumulative for the purpose of designing vertical exits, except where one floor is used by another as a means of egress. Vertical exits provided from any floor above grade may serve simultaneously all floors above grade, and vertical exits provided from any floor below grade may serve simultaneously all floors below grade.

**(a) Mixed occupancy. -** When a building is classified in more than one occupancy group in accordance with the provisions of section 27-239 of article two of subchapter three of this chapter, the exit requirements for the entire building shall be determined on the basis of the occupancy group having the strictest exit requirements, or the exit requirements for each building section shall be determined separately.

**(b) Incidental occupancies. -** When a building contains incidental occupancies classified in occupancy groups other than that under which the building is classified, the exit requirements for the floor on which such occupancies occur shall be based upon those of the occupancy group under which the building is classified; but the access and exit requirements for the incidental occupancy shall be based upon the occupancy group classification of the incidental occupancy.

**(c) Multiple occupancy or use. -** Where a building, floor, or space is used for multiple purposes involving different activities at different times, that occupancy involving the greatest number of occupants shall be used in determining the exit requirements.

**\*\*\*(d) Building access. -** All buildings classified in other than occupancy groups A, mechanical and electrical equipment rooms and boiler and furnace rooms of D-2 or J-3 shall have at least one primary entrance accessible to and usable by individuals who use wheelchairs. Such entrance shall provide access to a level that makes elevators available in buildings where elevators are provided. Where ramps are used to comply with this requirement, they shall have a slope not greater than one in twelve and shall otherwise conform to the provisions of section 27-377 and reference standard RS 4-6.

The commissioner may waive the requirements of this section in the alteration of buildings existing on the effective date of this code in accordance with section 27.292† of this code.

**\*\*\*Local Law 58-1987.**

**†As enacted but "27-292" probably intended.**

**§[C26-601.2] 27-358 Occupant load. -** The number of occupants for whom exit facilities shall be provided shall be established either (1) by the actual number of occupants for whom each occupied space, floor, or building, as the case may be, is designed, or (2) by using the appropriate occupant-area ratios from table 6-2, whichever is larger. The occupant load of any space shall include the occupant load of all spaces that discharge through it in order to gain access to an exit.

**(a) Unlisted occupancies. -** Where data regarding the sq. ft. per person for an occupancy is not listed in table 6-2, the occupant load shall be established by an architect or engineer, subject to the approval of the commissioner.

**(b) Modifications. -**
(1) When the actual occupant load of any space will be significantly lower than that listed in table 6-2, the commissioner may establish a lower basis for the determination of the occupant load.
(2). When a building existing on December sixth, nineteen hundred sixty-eight is altered or changed in occupancy or use so as to require enlarged exit facilities, the commissioner may authorize the alteration or change in occupancy or use without an enlargement of exit facilities, provided the occupant load is limited to that accommodated by the existing exit facilities as determined by the provisions of this code, and the building or space is posted accordingly with a sign. Such signs shall be at least twelve inches in width and sixteen inches in height. The lettering shall be red on a white background. The letters shall be not less than one inch high and the numerals not less than one and one-quarter inches high.

**(c) Nonsimultaneous occupancy. -** The occupant load of toilets, locker rooms, meeting rooms, storage rooms, employee cafeterias, and similar rooms or spaces that are not occupied at the same time as other rooms or spaces on the same floor of a building, may be omitted from the occupant load calculation of the floor on which they are located to the extent that such spaces serve occupied rooms on the same floor.

**TABLE 6-1  DETERMINATION OF EXIT AND ACCESS REQUIREMENTS**

| Occupancy Group of Building or Space | Group Desig-nation | Maximum Travel Distance (ft.) [a] | | Capacity Number of Persons per Unit of Width | | | | Corridors [i] | |
|---|---|---|---|---|---|---|---|---|---|
| | | Unsprinklered | Sprinklered | Doors Openings [m] | | Stairs, Escalators [k] | Ramps, [b] Corridors, Exit Passage-ways, [j] Horizontal Exits | Min. Width (in.) | Max. Dead End [h] (length in ft.) |
| | | | | To Outdoors at Grade | All Other Exit and Corridor Doors | | | | |
| High Hazard | A | N.P. | 150 | 50 | 40 | 30 | 50 | 36 | N.P. |
| Storage | B-1 [c] | 100 | 150 | 75 | 60 | 45 | 75 | 36 | 50 |
| | B-2 [c] | 125 | 175 | 75 | 60 | 45 | 75 | 36 | N.R. |
| Mercantile | C | 150 | 200 | 100 | 80 | 60 | 100 | 36 | 50 |
| Industrial | D-1 | 125 | 175 | 100 | 80 | 60 | 100 | 44 | 50 |
| | D-2 | 150 | 200 | 100 | 80 | 60 | 100 | 44 | 50 |
| Business | E | 200 | 300 | 100 | 80 | 60 | 100 | 44 | 50 |
| Assembly* | F | 150 | 200 | 100 | 80 | 60 | 100 | 44 | 30 |
| Educational | G | 150 | 200 | 100 | 80 | 60 | 100 | 66 [e] | 30 [d] |
| Institutional | H-1 | 125 | 175 | 50 | 40 | 30 | 50 | 36 | 40 |
| | H-2 | 125 | 175 | 30 | 30 | 15 | 30 | 96 [f] | 30 [g] |
| Residential | J-1 | 150 | 200 | 50 | 40 | 30 | 50 | 36 | 40 |
| | J-2 | 150 | 200 | 50 | 40 | 30 | 50 | 36 | 40 |
| | J-3 | N.R. | N.R. | N.R. | N.R. | N.R. | N.R. | N.R. | N.R. |

N.P. — Not Permitted
N.R. — No Requirements (except as provided in section 27-375)
*See Table 8-1 for exit and access requirements applying to places of assembly.

**Notes:
[a] For method of measurement, see subdivision (c) of section 27-360 of this article.
[b] Reduce listed capacity of ramps by twenty-five percent when slope exceeds one in ten.
[c] Except for public garages. (See article ten of subchapter seven of this chapter.)
[d] There shall not be more than one classroom on each side of a corridor between an exit and the end of the corridor (dead end).
[e] Applies to corridors serving classrooms. Other corridors shall have a minimum width of forty-four inches.
[f] Applies to corridors serving patients. Other corridors shall have a minimum width of forty-four inches.
[g] There shall be no patient bedrooms between an exit and the end of the corridor (dead end).
[h] See subdivision (d) of section 27-369 of article five of this subchapter for permissible increase.
[i] See section 27-369 of article five of this subchapter.
[j] See section 27-370 of article five of this subchapter.
[k] See section 27-378 of article five of this subchapter.
[m] Where a door opening is divided by mullions into two or more doors openings, each such opening shall be measured separately in computing the number of units of exit width.
***There is no note l.**

**§[C26-601.3] 27-359 Capacity of exits. -**
The capacity of exits and access facilities shall be measured in units of width of twenty-two inches, and the number of persons per unit of width shall be determined by the occupancy group classification and type of exit as listed in table 6-1. Fractions of a unit of width less than twelve inches shall not be credited. Where twelve inches or more are added to one or more full units of width, one-half unit of width may be credited. Where computations of total required width give fractional results, the next larger integral number of exit units or integral number plus one-half, shall be used. A fraction less than one-half may be neglected in cases where such fraction constitutes less than ten per cent of the total required number of units. Notwithstanding any of the above computations, no exit or access facility shall be narrower than the minimum width requirements specified in table 6-1, or elsewhere in this code.

### TABLE 6-2 OCCUPANT LOAD REQUIREMENTS NET AREA TABLE

| Occupancy | Net Floor Area per Occupant (sq. ft.) |
|---|---|
| Billiard rooms………………………… | 50 |
| Bowling alleys……………………….. | 50 |
| Classrooms………………………….. | 20 |
| Dance floors………………………… | 10 |
| Dining spaces (nonresidential)……… | 12 |
| Exhibition spaces…………………... | 10 |
| Garages and open parking structures.. | 250 |
| Gymnasiums………………………… | 15 |
| Habitable rooms…………………….. | 140 |
| Industrial shops…………………….. | 200 |
|   In schools……………………….. | 30 |
| Institutional sleeping rooms | |
|   Adults……………………………. | 75 |
|   Children (except as listed below)... | 50 |
|   Day Care | |
|     a. under 6 mos………………….. | 50 |
|     b. 6 mos. *– 2 yrs……………… | 40 |
|     c. 2 yrs. *– 6 yrs……………….. | 30 |
|   Institutional staff, all…………….. | 30 |
| Kindergartens……………………….. | 35 |
| Kitchens (nonresidential)…………... | 200 |
| Laboratories………………………… | 50 |
|   Preparation rooms…………………. | 100 |
| Libraries……………………………. | 25 |
| Locker rooms……………………….. | 12 |
| Offices……………………………… | 100 |
| Passenger terminals or platforms…... | 1.5xC |
| Sales areas (retail)…………………... | |
|   1st floor or basement……………... | 25 |
|   All other floors……………………. | 50 |
| Seating areas (audience) in all places of assembly | |
|   Fixed seats………………………... | D |
|   Moveable seats……………………. | 10 |
| Skating rinks……………………….. | 15 |
| Stages (See subchapter eight)………. | — |
| Standing room (audience) in all places of assembly………………………... | 4 |
| Storage rooms………………………. | 200 |

Notes:
C—capacity of all passenger vehicles that can be unloaded simultaneously.
D—designed number of seats or occupants.
*Dash not enacted but probably intended

§[C26-601.4] 27-360 Travel distance. -
**a) General requirement. -**
The maximum travel distance from the most remote point in any room or space to the center of a door opening directly on an open exterior space, a vertical exit, an interior stair, an exit passageway or to a horizontal exit shall not be greater than the limit specified in table 6-1 for the occupancy group classification of the room or space.

**(b) Travel distance within dwelling units. -**
In buildings classified in occupancy groups J-1 and J-2, the maximum travel distance from the centerline of a door from any habitable room within a dwelling unit either to the centerline of a door opening on a corridor or to the center of a door opening on an exit shall not be greater than forty feet, except that for buildings classified in occupancy group J-2 of construction class I-A, the distance may be increased to fifty feet. Such travel distances shall be included in the maximum travel distance established in subdivision (a) of this section.

**(c) Measurement. -** Travel distance shall be measured along a natural and unobstructed path of travel. Where the path of travel is over an access stair, it shall be measured along an inclined straight line through the center of the outer edge of each tread.

### ARTICLE 3 LOCATION OF EXITS

§[C26-602.1] 27-361 Arrangement. -
All exits and access facilities shall be located so that they are clearly visible, or their locations clearly indicated, and they shall be kept readily accessible and unobstructed at all times.

§[C26-602.2] 27-362 Tenant spaces. -
When more than one tenant occupies a building or floor area, each tenant shall have direct access to the required number of exits without passing through premises occupied by other tenants, except as permitted for balconies in subdivision (g) of section 27-369 of article five of this subchapter.

§[C26-602.3] 27-363 Remote location. -
When more than one exit is required from a floor of a building, each exit shall be placed as remote from the others as is practicable. Door openings to scissor stairs shall be* at least fifteen feet distant from each other. In all other buildings, the minimum distance between such doors shall be the greater of thirty feet or one-third the maximum travel distance of the floor, provided, however, that where such distance will result in travel distances exceeding those authorized in section 27-357 additional vertical exits shall be provided.
*As enacted but this sentence probably intended to begin "Door openings to vertical exits in buildings in occupancy group G or J-2 shall be"...*

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantliff    Pg 363 of 654

Title 27 / Subchapter 6

## §[C26-602.4] 27-364 Exit discharge. –

All vertical exits shall extend in a continuous enclosure to discharge directly, or by way of a yard, court, or exit passageway, to an open exterior space. When vertical exits serving floors above grade continue in the same enclosure to serve floors below grade, the portion of such vertical exits above grade shall be separated from the portion below grade by construction having at least a one hour fire-resistance rating, with three-quarter hour self-closing doors opening in the direction of exit travel from the floors below grade, except that buildings classified in residential occupancy group J-3 and educational occupancy group G shall be exempt from this requirement.

### ARTICLE 4 NUMBER OF EXITS

#### §[C26-603.1] 27-365 Egress from rooms and spaces. -

(a) There shall be at least two door openings, remote from each other and leading to exits, from every room or enclosed space in which the total occupant loads exceeds the number of persons listed in table 6-3.

### TABLE 6-3 MAXIMUM OCCUPANT LOAD— SPACES WITH ONE DOOR
#### [Max. Occupant Load]**

| Occupancy Group Classification | Max. Occupant Load with One Door |
|---|---|
| A | 10 |
| B | 50 |
| C | 75 |
| D | 50 |
| E | 75 |
| F | 75 |
| G | 75 |
| H | 15 |
| J | 20 |

***[] As enacted but this heading probably intended to be omitted.*

(b) Except as otherwise provided for in subdivisions (c) and (d) of this section, in buildings of combustible construction group II exceeding two stories in height there shall be at least two door openings from each J-1 or J-2 dwelling unit which shall be remote from each other. Each door opening shall lead to separate exits either directly or by separate corridors or one door opening shall lead to an exit and the other to a balcony complying with subdivision (g) of section 27-369 of article five of this subchapter.

(c) In buildings or spaces classified in occupancy group J-2 not more than three stories and forty feet in height, occupied by not more than four families on each story and of combustible construction group II there shall be at least two door openings from each J-2 dwelling unit which shall be remote from each other. One door opening shall lead to an exit and the other to a balcony complying with subdivision (g) of section 27-369 of article five of this subchapter.

(d) Buildings not exceeding three stories in height and occupied exclusively by not more than one family on each story without boarders, roomers or lodgers are exempt from the provisions of subdivisions (b) and (c) of this section.

#### §[C26-603.2] 27-366 Exits from floors. -

1. There shall be at least two independent exits, remote from each other, from every floor of a building, except that only one exit may be provided from floors in:

(a) One and two family dwellings.

(b) Buildings classified in occupancy group J-2 of Noncombustible construction group I or occupancy group E that are not more than sixty feet in height, have a gross area of two thousand square feet or less per floor, and have a maximum travel distance of fifty feet on any floor.

(c) Buildings classified in occupancy group J-1 or J-2 that are not more than two stories and thirty feet in height and have a maximum travel distance of eighty feet and the corridors and stair enclosure are provided with automatic sprinkler protection complying with the construction provisions of subchapter seventeen of this chapter.

(d) Buildings classified in occupancy group J-2 occupied exclusively by not more than one family on each story without boarders, roomers or lodgers and not more than three stories and forty feet in height, and the stair enclosure is provided with automatic sprinkler protection complying with the construction provisions of subchapter seventeen of this chapter and without openings between any garage and the exit passageway.

(e) Buildings classified in occupancy group J-2 not more than three stories and forty feet in height occupied by not more than four families on each story.

2. Notwithstanding the exit requirements of this section, in buildings classified in occupancy group J-2 of construction class I-A, one level of an apartment occupying a part of not more than two floors need only be provided with a balcony that complies with subdivision (g) of section 27-369 of article five of this subchapter, provided that, in addition, the stair within such apartment shall be at least two feet six inches in width and terminates not more than twenty feet from a corridor door on the other level that shall provide the required access to at least two independent exits. The center line of such corridor door shall be not more than fifty feet from any room within such apartment.

3. Notwithstanding any other provision of this section, when, within a building, any place of assembly has an occupant load between five hundred and nine hundred ninety-nine persons, there shall be provided at least three independent exits, remote from each other, from each floor; any such place of assembly with an occupant load of one thousand or more persons shall be provided with at least four independent exits, remote from each other, from each floor.

### §[C26-603.3] 27-367 Exit reduction. -

When a floor area has access to areas of refuge that comply with the requirements of section 27-372 of article five of this subchapter; the number of persons for whom vertical exits are to be provided may be reduced to fifty per cent of the occupant load of the floor area when one area of refuge is provided, and may be reduced to thirty-three and one-third per cent of the floor area when two areas of refuge are provided. This section shall not be applicable to any new or altered place of assembly, except for such places of assembly in fully sprinklered office buildings which occupy less than twenty per cent of the floor area occupied by the principal use.

### ARTICLE 5 ACCESS REQUIREMENTS AND EXIT TYPES

### §[C26-604.1] 27-368 General. -

(a) Means of egress shall be provided for all buildings by one or more of the facilities listed below. Access and exit facilities not specifically covered in this section shall not be used to satisfy the exit requirements of this code. Fire escapes shall not be permitted on new construction, with the exception of group homes. Fire escapes may be used as exits on buildings existing on December sixth, nineteen hundred sixty-eight when such buildings are altered, subject to the approval of the commissioner, or as provided in subdivision (b) hereof. Elevators or escalators shall be provided in all new buildings exceeding four stories in height except that buildings or building sections classified in occupancy group H-2 exceeding one story in height and buildings or building sections classified in occupancy group G or J-1 exceeding two stories in height shall be provided with elevators.

(b) In group homes all floors used by children shall have alternate exits remotely located from each other and readily accessible to the occupants. Fire escapes shall be permitted as the second means of egress.

### §[C26-604.2] 27-369 Corridors.-

Corridors shall be kept readily accessible and unobstructed at all times. Corridors shall be kept free of combustible contents except that in buildings classified in occupancy groups G, H-1 and H-2, combustible contents may be stored in noncombustible lockers and combustible bulletin boards meeting the requirements of table 5-4 shall be permitted.

(a) Capacity. - The capacity and minimum width of corridors shall be as listed in table 6-1. Width shall be measured in the clear between the narrowest points produced by any projections such as radiators, lockers, drinking fountains, or room or locker door swings, except that such width may be reduced by projections up to eighteen inches wide to the extent of two inches per unit of exit width if the total area of such projections does not exceed five percent of the area of the wall on which they occur.

(b) Height. - Corridors shall have a clear height of seven feet six inches for at least seventy-five percent of the floor area, with no point less than seven feet in height. No projection below the ceiling shall be located so as to obstruct full view of exit signs.

(c) Length. - Corridors shall be subdivided by smoke barriers, as defined in subchapter two, into the following lengths:

Educational occupancy group G.............………..300 ft.
Institutional occupancy groups H-1 and H-2.......150 ft.
Residential occupancy groups J-1 and J-2...........150 ft.

Where smoke barriers are penetrated by doors, such doors shall be smoke stop doors in conformance with subdivision (c) of section 27-371 of this article.

(d) Dead ends. - Dead ends in corridors shall not exceed the length listed in Table 6-1, except that in all occupancy groups except occupancy group H, when a corridor is completely enclosed in construction having a two hour fire-resistance rating, with all corridor doors being self-closing and having a fire protection rating of one and one-half hours, the permissible length of dead ends may be increased one hundred percent above the length listed in table 6-1. Dead end distance shall be measured from the centerline of the door opening nearest to the closed end of the corridor to the center of an exit door opening, or the center of that point in the corridor where travel to two or more exits becomes available in two directions.

(e) Changes in level. - Changes in level requiring less than two risers in a corridor shall be by a ramp complying with section 27-377 of this article. Risers and treads shall comply with the requirements of subdivision (e) of section 27-375 of this article.

(f) Exterior corridors. - Exterior corridors shall be roofed, and shall have solid floors drained to prevent accumulations of standing water. Such floors may serve as fire canopies when so constructed. Exterior corridors shall be protected along their outer side by guards or parapets at least three feet six inches high. Openings in guards or parapets shall be of such dimensions as to prevent the passage of a five-inch dia. ball. Where the outer side of an exterior corridor is more than fifty percent enclosed with solid material, it shall be treated as an interior corridor.

(g) Balconies. - Balconies may serve as a means of egress from dwelling units in buildings classified in occupancy group J-2 under the following conditions:

(1) They shall serve at least two dwelling units.

(2) They shall be constructed as required for exterior corridors, except that parapets or guards shall not be higher than four feet on the outer side of the balcony.

(3) The dwelling units served by balconies shall be

separated from each other by construction having at least a two hour fire-resistance rating. Such separation shall extend at least three feet beyond the outside face of the exterior wall of the building, although such projection may be reduced to two feet six inches provided that any window opening on each such balcony served by the fire separation shall be at least two inches from such fire separation for every one inch that such separation is less than thirty-six inches. An opening at least twenty inches wide shall be provided between the end of this separation and the balcony parapet or guard, and the opening shall be maintained free and unobstructed for the full height of the balcony, except that privacy screens openable from either side may be permitted in the opening.

(4) Access from dwelling units to the balconies shall be through doors having glass panels at least two feet wide and four feet high, without muntins, screens, or other obstructions to hinder entry by breaking the glass panels. The doors shall be lockable only from the inside by devices that can be easily released from the outside after breaking the glass. A combination lock or lock required to be opened by a key or removable device or tool shall not be used.

**(h) Construction. -**

(1) INTERIOR CORRIDORS. - Interior corridors shall be completely enclosed within fire separations to provide a minimum fire-resistance rating of one hour except as otherwise provided in subparagraphs a through c of this paragraph:

a. For buildings or spaces classified in occupancy group J-1 or J-2 of combustible construction group II exceeding two stories in height, except for buildings not exceeding three stories in height and occupied exclusively by not more than one family on each story without boarders, roomers or lodgers, corridors shall be enclosed within fire separations providing a minimum fire-resistance rating of two hours.

b. Corridor partitions may be omitted or may be constructed of unrated noncombustible material in buildings in occupancy group H-2 in the following instances: nurses stations not exceeding three hundred fifty square feet in area, waiting spaces, lounges and recreational spaces for patients and visitors which do not exceed five hundred square feet in area, spaces used solely for public telephones, and all other spaces which are completely protected by an automatic wet sprinkler system complying with the construction requirements of subchapter seventeen of this code.

c. Corridor partitions may be omitted in spaces of occupancy group H-1 used for detention of persons under legal restraint.

(2) EXTERIOR CORRIDORS AND BALCONIES. - Exterior corridors and balconies shall be constructed of non-combustible materials.

**(i) Borrowed lights. -** No operable transoms shall be permitted in walls of corridors. In corridors required to

have a one hour fire-resistance rating, fixed one-quarter inch wire glass panels may be installed in not more than twenty percent of the common wall between the corridor and any room or space, provided that no panel exceeds seven hundred twenty square inches in area; however, openings permitted in paragraph three of subdivision (h) of section 27-370 of this article may be permitted provided all of the limitations and requirements specified in that section are complied with, except that openings in corridor walls serving as fire divisions required to have a fire-resistance rating shall be limited to those specified in section 27-342 of article five of subchapter five of this chapter.

**(j) Ventilation. -** Corridors shall be ventilated in accordance with the requirements of subchapter twelve of this chapter. Corridors shall not be used as open plenums or as ducts to exhaust air from rooms or spaces opening upon them, except as permitted in reference standard RS 13-1.

**(k) Interior finish. -** The interior finish of corridors shall be in accordance with the requirements of table 54.

## §[C26-604.3] 27-370 Exit passageways. –

Exit passageways shall be maintained free of obstructions at all times. Not more than fifty percent of the total number of vertical exits provided for a building may be served by a single exit passageway, except as provided in subdivision (h) of section 27-370 of this article.

**(a) Capacity. -** The capacity of exit passageways shall be as listed in table 6-1.

**(b) Width. -** The width of an exit passageway serving one vertical exit shall be equal to the width of the vertical exit. The width of an exit passageway serving two or more vertical exits shall be equal to seventy-five percent of the width of all of the vertical exits that it serves. Width shall be measured in the clear between the narrowest points at any projections such as radiators, door swings, or pilasters.

**(c) Height. -** Exit passageways shall have a clear height of seven feet six inches for at least seventy-five percent of the floor area, with no point less than seven feet in height. No projection below the ceiling shall be located so as to obstruct full view of exit signs.

**(d) Changes in level. -** Changes in level requiring less than two risers in an exit passageway shall be by a ramp complying with section 27-377 of this article. Risers and treads shall comply with the requirements of subdivision (e) of section 27-375 of this article.

**(e) Construction.-** The construction of exit passageways shall be as required by table 3-4 for the applicable construction class of the building.

**(f) Openings. -** No openings other than exit doors shall be permitted in exit passageways, except as provided in subdivision (h) of this section.

**(g) Interior finish.-** The interior finish of exit passageways shall be in accordance with the requirements of table 5-4.

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 366 of 654

Title 27 / Subchapter 6

**(h) Street floor lobbies.** - Street floor lobbies may be used as exit passageways when they comply with the requirements of subdivisions (a) through (g) of this section subject to the following modifications:

(1) VERTICAL EXITS SERVED. - One hundred percent of the total number of vertical exits provided for a building may be served by a street floor lobby, if egress is provided in two different directions from the discharge points of all vertical exits to open exterior spaces that are remote from each other.

(2) WIDTH. - Street floor lobbies serving as exit passageways shall be increased in width to accommodate the occupant load of all communicating spaces on the lobby floor that exit through them. The capacity per unit of width shall be as listed in table 6-1.

(3) OPENINGS.- Openings between street floor lobbies serving as exit passageways and elevators or communicating spaces shall comply with the following:

a. Doors. -

1. Doors to stairways and elevators, and unsprinklered communicating spaces classified in occupancy group B-2, D-2, F-1 or F-2 shall be self-closing fire doors having a one and one-half hour fire protection rating.

2. Doors to unsprinkled communicating spaces classified in occupancy group G, H or J, or sprinklered communicating spaces classified in occupancy group B-2, D-2, F-1 or F-2 may be either:

(a) self-closing fire doors having a three-quarter hour fire protection rating, or

(b) glass or other noncombustible doors installed in conjunction with automatic fire doors having a one and one-half hour fire protection rating, with sprinkler heads installed over the doors on the room side.

3. No other door openings shall be authorized except as otherwise provided in this section.

b Other openings. - Other openings to spaces classified in occupancy group C, E, F, G, H or J shall be permitted, provided they have a maximum length of eight feet and a maximum height of eight feet, are glazed by one-quarter inch polished plate glass or equivalent and are protected by automatic fire doors having a one and one-half hour fire protection rating and by automatic sprinklers complying with the construction requirements of subchapter seventeen of this chapter over the openings on the room side.

c. Separations and limitations. - Openings permitted by subparagraphs a and b of this paragraph shall not exceed in total length fifty percent of the length of such enclosure wall except where the length of such wall is less than sixteen feet. Adjoining openings shall be separated from each other a minimum of three feet by construction having a two hour fire-resistance rating.

d. Notwithstanding the restrictions in subparagraphs

a, b, and c of this paragraph, the following openings may be authorized:

1. A space classified in occupancy group C, E, F-3 or F-4 within fire separations having a minimum fire-resistance rating of one hour, with an area not exceeding twenty-five hundred square feet, may have an unlimited length of show window under the following conditions:

(a) The maximum depth of show window shall be three feet.

(b) Automatic sprinklers complying with the construction requirements of subchapter seventeen of this chapter, shall be provided in the show window display area.

(c) The show window display area shall be protected on all sides, except for the glazed window, by construction having a two hour fire-resistance rating with access provided by means of a fireproof self-closing door having a three-quarter hour fire protection rating.

(d) The show window shall be glazed by one-quarter inch polished plate glass or equivalent.

(e) Glass or other noncombustible doors may be used for entrance to or egress from the space within fire separations when installed in combination with automatic fire doors having a one and one-half hour fire protection rating. Such automatic fire doors shall be located on the room side and shall be held open by approved door-holding devices actuated to release automatically upon the activation of smoke detecting devices, whether of the photoelectric cell or other approved type. In addition, automatic sprinkler heads, complying with the construction requirements of subchapter seventeen of this chapter, shall be provided over the door openings on the room side.

2. A space classified in occupancy group C, E, F-3, or F-4 within fire separations having a minimum fire-resistance rating of one hour, with an area not exceeding three thousand square feet, may have a maximum total length of unprotected openings upon a corridor or exit passageway not exceeding fifty percent of the space frontage along such corridor or exit passageway under the following conditions:

(a) The entire space shall be provided with automatic sprinklers complying with the construction requirements of subchapter seventeen of this chapter.

(b) The show window shall be glazed by one-quarter inch polished plate glass or equivalent.

(c) All corridor or exit passageway doors shall be self-closing, noncombustible, and smokeproof.

3. Show windows or other openings of unlimited lengths and heights shall be permitted on any corridor or exit passageway without requirements for fire-resistance doors under the following conditions:

(a) The entire floor area, including the corridors or exit passageways, shall be provided with automatic sprinklers complying with the construction requirements of subchapter seventeen of this chapter.

(b) The occupancy of all spaces on the floor shall be limited to occupancy groups C, E, F-3 and F-4.

(c) The widths of the corridors or passageways shall exceed the requirements of table 6-1 or subdivision (b) of this section, whichever is applicable, by at least fifty percent.

(d) All doors opening on the corridors or exit passageways shall be smokeproof, noncombustible, self-closing doors.

(e) Show windows or other openings shall be glazed by one-quarter inch polished plate glass or equivalent.

(f) Each corridor or exit passageway shall be provided with a fresh air intake, a positive smoke exhaust system and smoke detectors which, when activated, shall permit circulation only of fresh air.

(4) OCCUPANCY. - Street floor lobbies serving as exit passageways may be occupied by newsstands, candy and tobacco stands, information booths or similar occupancies, if such stands or booths are constructed of noncombustible materials, or of materials which comply with the requirements of section 27-348 of article five of subchapter five of this chapter for interior finish for exit passageways, provided that such stands or booths:

a. do not occupy more than one hundred square feet or five percent of the net floor area of the lobby, whichever is greater; and

b. do not reduce the required clear width of the lobby at any point; and

c. if constructed of combustible materials are protected by no less than two automatic sprinkler heads. Water for such sprinkler heads may be supplied from the domestic water supply system.

### §[C26-604.4] 27-371 Doors. -

Exit doors and doors providing access to exits shall comply with the following:

**(a) Exit doors. -** Doors for required exits shall be self-closing swinging doors with a one and one-half hour fire protection rating, except in occupancy group J-3 buildings and except that:

(1) Exterior street floor exit doors having an exterior separation of more than fifteen feet need not have a fire-protection rating.

(2) Doors into stairs and exit passageways shall have at least a three-quarter hour fire protection rating.

**(b) Corridor doors**. - Doors that provide access to interior corridors required to have a one hour fire-resistance rating shall be self-closing swinging fire doors with a three-quarter hour fire-protection rating, except that in buildings classified in occupancy group G, in which an acceptable interior fire alarm system is installed and in which regular supervised fire drills are held, the doors to rooms or spaces devoted exclusively to non-hazardous uses in occupancy group G need not

be fire-rated, provided they are swinging, self-closing one and three-quarter inch solid core wood, and have a maximum area of seven hundred twenty square inches of one-quarter inch thick wired glass vision panels. Other corridor doors except those provided for in subdivision (d) of section 27-369 of this article, shall be self-closing, swinging, noncombustible or one and three-quarter inch solid core wood doors, except that in buildings classified in occupancy group H-2 the doors need not be self-closing. Noncombustible mail slots having an area not exceeding forty square inches may be provided in corridor doors when the opening is protected by a closure activated by gravity or a spring device so as to keep it closed when not in use. Noncombustible louvers may be installed in corridor doors opening into toilets, service sink closets, and electric closets. Notwithstanding the foregoing restrictions in this subdivision, doors not prohibited by subdivision (d) of this section may open from spaces into corridors when in compliance with all of the provisions of paragraph three of subdivision (h) of section 27-370 of this article.

**(c) Smoke stop doors. -** Smoke stop doors shall be self-closing, swinging doors of metal, metal covered, or one and three-quarter inch solid core wood with clear wire glass panels having a minimum area of six hundred square inches per door and a maximum area of twelve hundred ninety-six square inches per door, except that in buildings not over two stories high, smoke stop doors may be of one and three-eighths inch solid core wood with clear wire glass panels, unless the doors are also used as horizontal exits in which case they shall comply with the provisions of subdivision (b) of section 27-373 of this article. Smoke stop doors may be double-acting but shall close the opening completely with only such clearance as is reasonably necessary for proper operation. Smoke stop doors shall normally be in the closed position, except that they may be left open if they are arranged to close automatically by an approved device which is actuated by an interior fire alarm system meeting the requirements of subchapter seventeen of this chapter.

**(d) Prohibited doors.** - Vertically sliding doors, rolling shutters, and folding doors shall not be used as exit doors or as corridor doors, except that overhead garage doors may serve as exits from buildings classified in occupancy group J-3, and except that sliding or rolling doors or gates may be used in F-2 places of assembly provided they are kept open when the place of assembly is occupied. Revolving doors may be used only to the extent permitted by subdivision (m) of section 27-371 of this article. Automatic horizontally sliding fire doors shall be permitted only in horizontal exits in fire divisions required to have a four hour fire-resistance rating as specified in Table 5-3.

**(e) Door opening widths.-** The capacity of exit and corridor door openings shall be as listed in table 6-1.

Door jambs or stops and the door thickness when open shall not reduce the required width by more than three inches for each twenty-two inches of width. The maximum width of any swinging door leaf shall be forty-eight inches. The minimum nominal width of corridor and exit door openings shall be thirty-six inches, except that where a door opening is divided by mullions into two or more door openings, the minimum nominal width of each such opening shall be thirty-two inches. The minimum nominal width of other door openings shall be as follows:

(1) Door openings to all habitable and occupiable rooms. - thirty-two inches.

(2) Door swinging in pairs (no mullion), opening. - forty-eight inches.

(3) Door openings to rooms used by bedridden patients and all single door openings used by patients in buildings classified occupancy group H-2. - forty-four inches.

(4) Door openings to toilet rooms in buildings to which the public has free access shall be thirty-two inches.

(5) Door openings giving access to at least one toilet, lavatory and bathtub or shower in each dwelling unit, in buildings or spaces classified in occupancy group J-1 or J-2, when such dwelling unit is accessible to individuals in wheelchairs [*sic*] - thirty-two inches.

(6) Door openings giving access to all toilets, lavatories and bathtubs or showers serving single room occupancies, which are accessible to individuals in wheelchairs-thirty-two inches.

*(7) Door openings for people having physical disabilities shall additionally comply with the requirements of reference standard RS 4-6.
*Local Law 58-1987.*

**(f) Door heights.-** The minimum nominal door opening height for exit and corridor doors shall be six feet eight inches. Door jambs, stops, sills, and closers shall not reduce the clear opening to less than six feet six inches.

**(g) Door swing.-** Exit doors, corridor doors from rooms or spaces classified in high hazard occupancy group A, or from factories as defined in the labor law, and corridor doors from rooms required to have more than one door under the provisions of section 27-365 of article four of this subchapter, shall swing in the direction of exit travel, except:

(1) Doors from rooms of instruction in buildings classified in occupancy group G, having an occupant load of less than seventy-five persons.

(2) Exterior street floor exit doors from lobbies in buildings classified in occupancy groups J-2 and J-3.

(3) Exterior street floor exit doors from spaces in occupancy group C or E not exceeding two thousand square feet in area, and occupied by less than fifty persons, where the maximum travel distance to a door does not exceed fifty feet.

**(h) Floor level. -** The floor on both sides of all exit and corridor doors shall be essentially level and at the same elevation for a distance, perpendicular to the door opening, at least equal to the width of the door leaf, except that where doors lead out of a building the floor level inside may be seven and one-half inches higher than the level outside.

**(i) Closed doors. -** Exit doors and corridor doors shall normally be kept in the closed position, except that corridor doors in buildings classified in occupancy group H-2 shall be exempt from this requirement.

**(j) Door and window hardware. -** Doors and windows shall be equipped with hardware as follows:

(1) FIRE PROTECTION REQUIREMENTS. -

a. Exit doors and corridors shall be readily openable at all times from the side from which egress is to be made and shall not require a key to operate from that side, except that:

1. Locks may be used in penal and mental institutions and areas, where required for security.

2. Locks may be used in banks, museums, jewelry stores and other places where extra safeguards are required, subject to the approval of the commissioner, and provided the locks are equipped with electrical release devices for remote control in case of emergency.

3. Stairways leading from the top floor to a roof may be provided with locked wire mesh gates openable by key in buildings classified in occupancy group G. The use of a hook and eye closing device on the inside of all doors to roofs shall be permitted.

*b Doors opening into interior stair enclosures shall not be locked from either side with the following exceptions:

1. Doors may be locked to prevent access to the stair at the street floor.

2. In buildings classified in occupancy group E, less than one hundred feet in height, the doors may be locked on the stair side on each floor above the street floor.

3. In buildings classified in occupancy group E, one hundred feet or more in height, and existing office buildings one hundred feet or more in height, the doors may be locked on the stair side above the street floor except that at intervals of four stories or less, doors shall be openable from the stair side without the use of a key to permit reentry at such floors. In addition, the door on every floor where a keyed switch is required by the provisions of subchapter eighteen of this chapter shall be openable from the stair side without the use of a key to permit reentry at such floors.

4. When a locked door is provided with an automatic fail safe system for opening such door in the event of the activation of any automatic fire detecting device or when any elevator in readiness as provided in section 27-989 of subchapter eighteen of this chapter is activated, such door shall be deemed as openable from

the stair side [*sic*]. The installation of such automatic fail safe system shall comply with the requirements of reference standards RS 17-3A and RS 17-3B, whichever is applicable. Stair reentry signs required under section 27-394 of article nine of this subchapter shall specify that reentry is provided only during fire emergencies.

*\*Local Law 14-1993.*

c. Latch bolts shall be provided on all exit doors and corridor doors to hold them in a closed position against the pressure of expanding gases except that this requirement shall not apply to doors in stair enclosures in buildings classified in occupancy group G.

(2) SECURITY REQUIREMENTS. - The following provisions shall apply to all buildings erected or altered after December sixth, nineteen hundred sixty-eight that may be classified in residential occupancy group J-2. Existing buildings in such group shall comply with the requirements of article eleven of subchapter two.

a. Building entrance doors and other exterior exit doors shall be equipped with heavy duty lock sets with auxiliary latch bolts to prevent the latch from being manipulated by means other than a key. Latch sets shall have stopwork in the inside cylinder controlled by a master key only. Outside cylinders of main entrance door locks shall be operated by the tenants' key, which shall not be keyed to also open the tenants' apartment door. A light or lights shall be provided at or near the outside of the front entranceway of the building providing not less than five foot candles intensity measured at the floor level for the full width of the entranceway.

b. Doors to dwelling units shall be equipped with a heavy duty latch set and a heavy duty dead bolt operable by a key from the outside and a thumbturn from the inside. Those doors shall also be equipped with a chain guard so as to permit partial opening of the door. Dwelling unit entrance doors shall also be equipped with a viewing device located so as to enable a person on the inside of the entrance door to view a person immediately outside.

c. All openable windows shall be equipped with sash locks designed to be openable from the inside only. Grilles lockable from the inside only may be placed on the inside or outside of windows that are accessible from grade but that do not serve to provide access to exits.

d. Buildings classified in occupancy group J-2 containing eight or more dwelling units shall be provided with an intercommunication system located at the door giving access to the main entrance hall or lobby, consisting of a device or devices for voice communication between the occupant of each dwelling unit and a person outside said door to the main entrance hall or lobby, and permitting such dwelling unit occupant to release the locking mechanism of said door from the dwelling unit.

(k) **Panic hardware.** -

(1) Exit doors shall be equipped with fire exit bolts when providing an exit from:

a. Buildings classified in occupancy group G, except exit doors opening directly outdoors at grade from rooms having an occupant load of less than seventy-five persons,

b. F-1 places of assembly,

c. F-2, F-3 and F-4 places of assembly having an occupant load exceeding three hundred persons, except places of assembly having doors that are not equipped with locks and are openable at all times.

(2) Fire exit bolts shall be of an approved type, and shall release when a pressure exceeding fifteen pounds is applied to the releasing device in the direction of exit travel. The bars or panels shall extend at least two-thirds of the width of the door and shall be placed at least thirty inches, but not more than forty-four inches above the floor.

(l) **Power operated doors.** - Power operated doors or power assisted manually operated doors, may be used as exit or corridor doors provided they remain closed in case of power failure but shall be manually operable. No power operated door shall be credited as a required exit unless it swings in the direction of exit travel.

(m) **Revolving doors.** - Revolving doors shall not be used as exits in buildings classified in occupancy group F-1 or F-2, G, or H; nor shall revolving doors be used in any occupancy as interior doors providing access to exits, at the foot of stairs, or at the head of basement stairs. Where revolving doors are used as exits, they shall comply with the following:

(1) They may provide not more than one unit or exit width for each revolving door and not more than fifty percent of the required exit capacity at any location, provided that the revolving doors are located adjacent to, or within twenty feet, of swinging doors that provide the remaining required exit capacity at that location.

(2) They shall be collapsible, and designed and constructed so that:

a. Each wing is independently supported by a hanger with a corrosion resistant safety release which, when pressure of between sixty to eighty pounds is exerted simultaneously on the wings on opposite sides of the door pivot, the door wings will fold back on themselves in the direction of egress.

b. Each wing is provided with at least one push bar and glazed with at least 7/32 in. plate or tempered glass.

c. The inside diameter of the enclosure is at least six feet six inches.

d. The freely operable maximum rate of revolving speed is controlled so that it is not greater than fifteen rpm.

e. The upper surface of the floor finish within the door enclosure is flush with the adjacent floor area, and permanently secured in place.

(3) The owner shall be responsible at all times for the operation and maintenance of revolving doors, and shall have the doors inspected at intervals not to exceed

six months. All parts of the doors, including the safety releases and speed control mechanism, shall be maintained in good working order. Inspection reports shall be made in writing and kept on file at the premises for at least two years.

**(n) Turnstiles.** - No turnstile or other device designed to restrict travel shall be placed so as to obstruct any required exit, except that approved turnstiles that turn freely in the direction of exit travel may be used in any occupancy where revolving doors are permitted. Turnstiles shall be not more than thirty-six inches nor less than thirty inches high and shall be of such design as to provide twenty-two inches clear width as the turnstile rotates. Each turnstile may be credited with a capacity of one unit of exit width. Not more than fifty percent of the required exit capacity may be provided by turnstiles at any location. The balance of the required exit capacity shall be provided by swinging doors located within twenty feet of the turnstiles. Turnstiles over thirty-six inches high shall meet the applicable requirements of this code for revolving doors.

## §[C26-604.5] 27-372 Area of refuge. -

Areas of refuge shall comply with the following:

**(a) Separation.** - Areas of refuge shall be separated from the area which they serve by construction having at least a two hour fire-resistance rating.

**(b) Floor area.** - Areas of refuge shall provide clear public space or space occupied by the same tenant or owner, adequate in size to hold the occupant load it receives from the floor area it serves as computed by the provision of section 27-367 of article four of this subchapter, in addition to its own occupant load, allowing at least three square feet per person, except that in buildings classified in occupancy group H-2 for patient areas only, the allowance shall be at least thirty square feet per person.

**(c) Required exits.** - Areas of refuge shall be provided with at least one vertical exit. When an area of refuge is located higher than the eleventh floor of a building, the vertical exit shall be supplemented by at least one elevator.

**(d) Locking.** - Doors providing access to areas of refuge shall be kept unlocked at all times when any floor area served by the area of refuge is occupied.

## §[C26-604.6] 27-373 Horizontal exits. –

A horizontal exit to an area of refuge may consist of doors through walls or partitions having at least a two hour fire-resistance rating; of a balcony or exterior vestibule leading around the end of a fire division to another fire area or building; or it may be a bridge or tunnel between two buildings. Horizontal exits shall comply with the following:

**(a) Capacity.** - The capacity of horizontal exits shall be as listed in table 6-1. Only the widths of doors swinging in the direction of exit travel to the area of refuge shall be counted.

**(b) Door requirements.** - Doors shall be swinging, self-closing doors having a fire protection rating of one and one-half hours, except that doors [*sic*] in fire divisions having a three hour or four hour fire-resistance rating shall have opening protective as required by table 5-3. Each swinging door shall swing in the direction of exit travel, and when travel is in both directions, as when two areas of refuge serve as areas of refuge for each other, at least two door openings shall be provided, the doors of which shall swing in opposite directions. Signs shall be placed over each door on the side from which egress is made, indicating the exit door.

**(c) Balconies, bridges and tunnels.** - When serving as horizontal exits, balconies, bridges, and tunnels shall comply with the following:

(1) Their width shall be equal to at least the width of the doors opening on them, but in no case less than three feet eight inches.

(2) They shall be enclosed at each end by doors complying with subdivision (b) of this section.

(3) The floor level at doors shall be the same as that of the building except that the floor level of open balconies or open bridges shall be approximately seven and one-half inches lower.

(4) Where there is a difference in level between the areas connected, the floors of the horizontal exit shall be ramped not more than one inch in ten inches.

(5) Exterior wall openings within thirty feet horizontally of any open bridge or balcony or below any open bridge or balcony shall be provided with opening protectives having a three-quarter hour fire protection rating.

(6) Balconies shall not face or open on yards or courts less than twelve feet wide, and shall be constructed as required for exterior corridors.

(7) Exterior bridges shall be constructed of noncombustible materials. Interior bridges or tunnels shall be constructed of materials providing a two hour fire-resistance rating.

## §[C26-604.7] 27-374 Supplemental vertical exits. -

Enclosed interior stairs, ramps, or escalators may provide access to an area of refuge located on a floor nearer to the street floor, when complying with the following:

**(a) Limitation.** - They shall be supplemental vertical exits serving no other purpose than to connect a floor area with an area of refuge.

**(b) Capacity.** - The capacity of supplemental vertical exits shall be as listed for stairs in table 6-1.

**(c) Construction.** - Supplemental vertical exits shall comply with all of the construction requirements for interior stairs as provided in section 27-375 of this article.

**(d) Openings.** - There shall be no openings insupplemental vertical exit enclosures other than the exit doors and doors leading into the area of refuge.

**(e) Identification.** - Every supplemental vertical exit shall have a sign at the entrance designating its destination reading, "EXIT TO AREA OF REFUGE ON..... FLOOR."

**§[C26-604.8] 27-375  Interior stairs. -** Interior stairs shall comply with the following requirements:

**(a) Capacity. -** The capacity of interior stairs shall be as listed in table 6-1.

**(b) Width. -** The width of interior stairs shall be the clear width between walls, grilles, guards, or newel posts. Stair stringers may project into the required width not more than two inches on each side of the stair. No interior stair shall be reduced in width in the direction of exit travel. Interior stairs shall be at least forty-four inches wide except as follows:

(1) Interior stairs may be not less than thirty-six inches wide when serving not more than thirty occupants per stair on any floor in buildings classified in occupancy groups J-1 and J-2, or when serving buildings classified in occupancy group J-3 and exceeding four stories in height, or when serving not more than sixty occupants per stair on any floor in buildings classified in occupancy groups E, B, and D.

(2) Interior stairs may be not less than thirty inches wide when serving mezzanines having an occupant load not exceeding twenty-five persons or when located in buildings classified in occupancy group J-3 not more than three stories in height. Interior stairs in four story buildings classified in occupancy group J-3 shall be a minimum of thirty-three inches in width.

**(c) Headroom. -** The clear headroom shall be at least seven feet, except that in buildings classified in occupancy groups J-2 and J-3, the minimum clear headroom may be six feet eight inches. Headroom in a flight of stairs shall be measured vertically between two parallel inclined planes, one of which contains the line of the nosing or upper front edge of each tread and extends to its intersection with a landing and the other of which is through any point directly above the first plane that limits the headroom of the stair.

**(d) Landings and platforms. -** Landings and platforms shall be provided at the head and foot of each flight of stairs, except at the head of basement stairs in one-and two-family dwellings, and shall comply with the following:

(1) The minimum width of landings and platforms perpendicular to the direction of travel shall be equal to at least the width of the stairs except that on a straight-run stair, the distance between risers of upper and lower flights at intermediate landings or platforms need not be more than forty-four inches.

(2) The maximum vertical rise of a single flight of stairs between floors, between landings or platforms, or between a floor and a landing or platform, shall not exceed eight feet in buildings classified in occupancy groups F and H, and twelve feet in all other occupancy groups. No flight of stairs shall have less than two risers.

(3) Landings and platforms shall be enclosed on sides by walls, grilles or guards at least three feet high.

**(e) Risers and treads. -** Risers and treads shall comply with table 6-4 and with the following:

(1) The sum of two risers plus one tread exclusive

of nosing shall be not less than twenty-four nor more than twenty-five and one-half inches.

(2) Riser height and tread width shall be constant in any flight of stairs from story to story.

(3) Winders shall not be permitted in required exit stairs except in one- and two-family dwellings and except as permitted in subdivision 1 of this section. The width of winder treads when measured eighteen inches from the narrower end shall be at least equal to the width of treads above or below the winding section.

(4) Curving or skewed stairs may be used as exits when the tread and riser relationship is in accordance with table 6-4 when measured at a point eighteen inches in from the narrow end of the tread; and no tread shall be more than three inches narrower or three inches wider at any point than the width established eighteen inches in from the narrow end.

**(f) Guards and handrails. -** Stairs shall have walls, grilles, or guards at the sides and shall have handrails on both sides, except that stairs less than forty-four inches wide may have a handrail on one side only. Handrails shall provide a finger clearance of one and one-half inches, and shall project not more than three and one half inches into the required stair width.

(1) Stairs more than eighty-eight inches wide shall have intermediate handrails dividing the stairway into widths that maintain the nominal multiples of twenty-two inches, but the widths shall not be greater than eighty-eight inches nor less than forty-four inches.

(2) The height of handrails above the nosing of treads shall be not more than thirty-four inches nor less than thirty inches.

(3) Handrails shall be returned to walls and posts when terminated, except in one and two-family dwellings.

(4) Handrails shall be designed to support loads in compliance with the requirements of subchapter nine of this chapter.

(5) Handrails in all stairs shall be of materials having a flame-spread rating not exceeding one hundred fifty.

**(g) Stair doors. -** Doors providing access to stairs shall comply with the requirements of subdivision (a) of section 27-342 of article five of subchapter five of this chapter and subdivision (e) of section 27-371 of this article. The swing of stair doors shall not block stairs or stair landings, nor shall any door at any point of its swing reduce the effective width of the landing or stair to less than seventy-five percent of the required width of the landing or stair, or to less than the width of the door opening on them. The width of doors from a stair shall not be less than the number of units of exit width required for the capacity of the stair, but in no case shall the door width be less than required by subdivision (e) of section 27-371 of this article.

**(h) Stair construction. -**
Risers, treads, stringers, landings, platforms, and guards, exclusive of handrails, shall be built of noncombustible materials except that interior stairs in buildings of construction group II may be built of combustible materials in buildings classified in occupancy group B-

2, C, D or E when the buildings are two stories in height or less, and in buildings classified in occupancy group J-2 or J-3 when the buildings are not more than three stories in height, and in the case of J-2 occupancy group, when occupied by not more than three families. Interior stairs shall have solid treads. All risers shall be closed except as otherwise provided in subdivision (i) of this section. When of combustible construction, the soffit of interior stairs shall be fire protected by material having a minimum fire resistive rating of one hour or five-eighths inches gypsum wall board or equivalent, or the space beneath shall be enclosed without openings by material having a one hour fire resistance rating unless permitted to have open risers by subdivision (I) of this section. Where two separate interior stairs are contained within the same enclosure (so called "scissor stairs"), each stair shall be separated from the other by noncombustible construction having a fire resistance rating equal to that required for the stair enclosure. Stairs, platforms, and landings shall be designed to support all loads in compliance with the requirements of subchapter nine of this chapter. Treads and landings shall be built of or surfaced with nonskid materials.

**(i) Stair enclosures. -**

(1) Interior stairs shall be enclosed with construction complying with the requirements of Table 3-4 except that:

a. In buildings three stories or less in height excluding those classified in occupancy group J-1 or J-2 combustible construction group II, the enclosing construction may have a one hour fire resistant rating.

b. Stairs in buildings or spaces classified in occupancy group J-3 and not more than three stories in height, need not be enclosed except as otherwise required in subdivision (a) of section 27-341 of article five of subchapter five of this chapter. Stairs may have open risers in one family dwellings and group homes.

c. Unenclosed stairs in buildings classified in assembly occupancy group F may be permitted as provided in subchapter eight of this chapter.

d. Stairs from floors or mezzanines may be unenclosed, with open or closed risers.

e. In buildings classified in occupancy group J-2 occupied exclusively by not more than one family on each story without boarders, roomers or lodgers and not more than three stories in height, the enclosing construction may have a one hour fire-resistance rating which may be constructed of combustible material provided that the stair enclosure is protected with an automatic sprinkler system complying with the construction provisions of subchapter seventeen of this chapter.

f. In buildings classified in occupancy group J-1 or J-2 not more than two stories in height of combustible construction group II, the enclosing construction may have a one hour fire-resistance rating which may be constructed of combustible material; however, where only one vertical exit is provided the stair enclosure shall be protected throughout with an automatic sprinkler system constructed in accordance with the provisions of subchapter seventeen of this chapter.

g. Except as provided in subparagraphs (a), (e) and (f) of this paragraph, in all buildings or spaces classified in occupancy group J-1 or J-2, the enclosing construction shall be of masonry or an approved equivalent material having at least a two hour fire-resistant rating.

(2) Access stairs connecting not more than two stories which do not serve as a required exit may be constructed without an enclosure in buildings classified in other than occupancy group H-2. Such stairs shall be additional to and shall not obstruct or interfere with required exit facilities. When the first story below grade is served by an interior, unenclosed access stair, it shall be sprinklered in accordance with the construction provisions of subchapter seventeen of this chapter.

(3) The interior finish of interior stair enclosures shall be in accordance with the requirements of table 5-4.

(4) Stair enclosures shall be vented in accordance with the requirements for shafts in subdivision (d) of section 27-344 of article five of subchapter five of this chapter except that stair enclosures for buildings or spaces classified in occupancy group J-1 or J-2 shall be vented as follows:

a. In occupancy group J-2 buildings three stories in height and with not more than one dwelling unit per story or two stories in height with not more than two dwelling units per story, shall be provided with a skylight at least nine square feet in area, glazed with plain glass with a wire screen over and under and provided with fixed or movable ventilators having a minimum open area of forty square inches.

b. In occupancy group J-1 or J-2 buildings two stories in height with more than two dwelling units per story shall be provided with a skylight of at least twenty square feet in area, glazed with plain glass, with a wire screen over and under and provided with fixed or movable ventilators having a maximum open area of forty square inches.

c. In occupancy group J-1 buildings exceeding two stories in height and in occupancy group J-2 buildings three stories in height with more than one dwelling unit per story or exceeding three stories in height shall be provided with a skylight at least twenty square feet in area, glazed with plain glass with a wire screen over and under and provided with fixed or movable ventilators having a minimum open area of one hundred forty-four square inches. In lieu of the skylight and ventilators a window of equal area may be provided with fixed louvers having a minimum open area of one hundred forty-four square inches installed in or immediately adjacent to the window.

(5) When dwelling units are located over a space classified in occupancy group C or E on the street floor, they shall be provided with a separate enclosed interior stair, or with an exterior stair.

**(j) Openings and obstructions to stair enclosures.-** No piping of any kind, with the exception of piping

required or permitted in subchapter seventeen of this code, shall be permitted within a stair enclosure. No openings of any kind, other than windows, fire department access panels, exit doors and openings specifically authorized in reference standard RS 5-18 shall be permitted within a stair enclosure. Pipes required or permitted by such subchapter seventeen and protected in accordance therewith which do not reduce the required clearances of the enclosure may be permitted. Ducts protected in accordance with the requirements of subchapter thirteen of this chapter, which do not reduce the required clearances of the enclosure, may be permitted. In addition, in buildings in occupancy group J-2, which are three stories or less in height and occupied by not more than two families on each story, a door from an apartment may open directly into a stair, and the door may swing into the apartment.

**(k) Roof access. -**

(1) Except as otherwise provided for in paragraphs two and three of this subdivision, in buildings or in building sections more than three stories or forty feet high with roofs having a slope of less than twenty degrees, access to the roof shall be provided by at least one interior stair, except that access to setback roof areas may be through a door or window opening to the roof. Interior stairs extending to roofs shall be enclosed in bulkheads of fire-resistant construction meeting the requirements of subchapter five of this chapter.

(2) In buildings or in building sections classified in occupancy group J-1 or J-2 more than two stories in height, except as otherwise provided for in paragraph three of this subdivision, with roofs having a slope of fifteen degrees or less all interior stairs, except those terminating at a level of a setback roof, shall extend to the roof and shall be enclosed in bulkheads of fire-resistive construction meeting the requirements of subchapter five of this chapter. Stairs terminating at the level of a setback shall provide access to the setback roof areas through a door except where the setback is less than four feet in width, measured from the inside of the parapet wall, and less than ten feet in length.

(3) In buildings or in building sections classified in occupancy group J-1 or J-2 two stories in height and in occupancy group J-2 three stories in height with not more than one dwelling unit per story with roofs having a slope of fifteen degrees or less, access to the roof shall be provided through a scuttle at least twenty-one inches in width and twenty-eight inches in length and shall comply with subdivision (c) of section 27-338 of article four of subchapter five of this chapter. Scuttles shall be located within each stair enclosure with a stationary iron ladder leading thereto.

**(l) Spiral stairs. -** Spiral stairs may serve as access stairs between two floors or levels in accordance with the provisions of paragraph two of subdivision (i) of this section. Such stairs may not serve as required exits, except that unenclosed spiral stairs when built of noncombustible materials and having a tread length of

at least thirty inches may serve as exits from mezzanines or balconies having an occupant load not exceeding twenty-five persons.

### TABLE 6-4 MAXIMUM RISER HEIGHT AND MINIMUM TREAD WIDTH

| Occupancy Group Classification of Building | Maximum Riser Height (in.) | Minimum Tread[1] Width (in.) |
|---|---|---|
| Residential J-3 (with closed risers)… | 8 ¼ | 9 plus 1 ¼ nosing |
| Residential J-3 (with open risers)… | 8 ¼ | 9 plus ½ nosing |
| Residential J-2 (with only three dwelling units)…… | 8 ¼ | 9 plus 1¼ nosing |
| Assembly F………. | 7 ½ | 9 ½ plus nosing |
| Institutional H-2….. | 7 | 10 plus nosing |
| All others[2]……….. | 7 ¾ | 9 ½ plus nosing |

**Notes for TABLE 6-4:**

[1] Treads may be undercut a distance equal to the nosing. A nosing shall not be required when tread width is eleven inches or wider.

[2] The proportions and dimensions of treads and risers may be adjusted in buildings classified in occupancy group G to suit the age of occupants, subject to the approval of the commissioner.

### §[C26-604.9] 27-376 Exterior stairs. -

Exterior stairs may be used as exits in lieu of interior stairs provided they comply with all of the requirements for interior stairs, except enclosure, and except as modified below:

**(a) Capacity. -** The capacity of exterior stairs shall be as listed in Table 6-1.

**(b) Height limitation. -** No exterior stair shall exceed seventy-five feet or six stories in height.

**(c) Construction. -** Exterior stairs shall be constructed entirely of non-combustible materials, except that in buildings classified in occupancy groups other than G, F, or H, or construction group II, located outside the fire districts, exterior stairs may be built of combustible materials when the buildings are two stories or thirty feet in height or less and have an occupant load not exceeding forty persons per floor above the street below. Exterior stairs shall be roofed, and shall be protected along their outer sides as required for exterior corridors in subdivision (f) of section 27-369 of this article. Treads, landings, and platforms shall be solid and unperforated. Risers may be partially open to permit water and snow to drain.

**(d) Opening protective. -** In buildings four stories or fifty feet in height or more, there shall be no openings

22-11582-pb Doc 65-1 Filed 01/24/23 Entered 01/24/23 11:20:21 Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff Pg 374 of 654

Title 27 / Subchapter 6

in the building walls adjoining exterior stairs other than one-quarter* hour self-closing swinging fire doors, and no openings nearer than ten feet to the stair (measured horizontally) that are not provided with three-quarter hour opening protectives.

**(e) Location** - No exterior stair shall be located nearer than ten feet to an interior lot line.

**(f) Discharge.-** Exterior stairs shall extend continuously to grade.

*As enacted but "three-quarter hour" probably intended.*

§[C26-604.10] 27-377 Ramps. -

Interior or exterior ramps may be used as exits in lieu of interior or exterior stairs provided they comply with the applicable requirements for interior stairs in section 27-375 of this article or exterior stairs in section, 27-376 of this article respectively, and with the following:

**(a) Capacity-** The capacity of ramps shall be as listed in Table 6-1.

**(b) Maximum grade**. - Ramps shall not have a slope steeper than 1 in 8, except that in buildings classified in occupancy group H the slope shall not exceed 1 in 12, and except as provided in subchapter eight of this chapter for places of assembly.

**(c) Design-**

(1) CHANGES IN DIRECTION.- Ramps shall be straight, with changes in direction being made at level platforms or landings, except that ramps having a slope not greater than 1 in 12 at any place, may be curved.

(2) LENGTH.- The sloping portion of ramps shall be at least three feet but not more than thirty feet long between level platforms or landings.

(3) PLATFORMS - Level platforms or landings, at least as wide as the ramp, shall be provided at the bottom, at intermediate levels where required, and at the top of all ramps. Level platforms shall be provided on each side of door openings into or from ramps having a minimum length in the direction of exit travel of three feet, and when a door swings on the platform or landing a minimum length of five feet.

(4) DOORS. - Door openings into or from ramps shall comply with the requirements for stairs in subdivision (g) of section 27-375 of this article. No door shall swing over the sloping portion of a ramp.

(5) GUARDS AND RAILINGS - Guards and railings of ramps shall comply with the applicable requirements of subdivision (f) of section 27-375 of this article except that only ramps having a slope steeper than 1 in 12 need comply with the requirements for handrails and intermediate handrails shall not be required.

(6) SURFACE. - Interior ramps exceeding a slope of 1 in 10 and all exterior ramps shall be provided with nonslip surfaces.

**(7)** Ramps for people having physical disabilities shall additionally comply with the requirements of reference standard RS 4-6.

**Local Law 58-1987.*

§[C26-604.11] 27-378 Escalators. -

Escalators may be used as exits in lieu of interior stairs provided they comply with all of the requirements of subchapter eighteen of this chapter and with the applicable requirements for enclosed interior stairs, except as modified below:

**(a) Capacity. -** The capacity of escalators as listed in table 6-1 shall be based on the following:

**MINIMUM WIDTH (IN.) AT:**

| Step | Balustrade[1] | Enclosure [2] | Units of Exit Width |
|------|-----------|------------|---------------------|
| 24 | 32 | 52 | 1 ½ |
| 40 | 48 | 68 | 2 |

Notes:

[1] Measured twenty-seven inches above front edge of tread.

[2] Clear width above handrails.

**(b) Acceptable exits. -**

Only escalators moving in the direction of exit travel may be credited as exits, except that any escalator may be credited when it is connected to an automatic fire detection system that will cause it to stop simultaneously with the detection of fire. The detection system shall comply with the construction provisions of subchapter seventeen of this chapter. Where an escalator provides exit facilities from only one floor of a building, the automatic detection system shall be located on that floor. Where escalators provide exit facilities from more than one floor, the detection system shall be located on all floors so served, and shall cause escalators on all floors of the section of the building that they serve to stop operating. The stopping mechanism shall operate to bring the escalator to a gradual, rather than an abrupt stop.

**(c) Escalators not used as exits. -** Escalators that do not serve as exits, and that connect more than two stories of a building, shall be completely enclosed with noncombustible construction having a three-quarter hour fire-resistance rating, except that in buildings completely protected by an automatic sprinkler system complying with the construction requirements of subchapter seventeen of this chapter, such escalators may, alternatively, be protected by one of the methods specified in subchapter eighteen of this chapter.

§[C26-604.12] 27-379 Moving walkways. -

Pedestrian walkways consisting of conveyor belts shall be considered as exit passageways if level, or as ramps if inclined, and shall be acceptable as exits if they comply with the applicable requirements for exit passageways or ramps, and with the following:

**(a) Capacity** - The capacity shall be as listed under exit passageways or ramps, as the case may be, in table 6-1.

**(b) Acceptable exits-** Only walkways moving in the direction of exit travel may be credited as exits, except that any moving walkway may be credited when it is connected to an automatic fire detection system that

will cause it to stop simultaneously with the detection of fire on the floor it serves. Such detection system shall comply with the construction provisions of subchapter seventeen of this chapter.

**(c) Design and construction.** - Walkways shall comply with the requirements of subchapter eighteen of this chapter.

**(d) Enclosure**. - Walkways that do not serve as exits, but are inclined so as to require an opening in any floor, shall be enclosed as required for escalators in subdivision (c) of section 27-378 of this article.

## §[C26-604.13] 27-380 Fire escapes. –

Fire escapes constructed on existing buildings when altered or as a second means of egress for group homes as permitted by section 27-368 of this article shall comply with the following:

**(a) Capacity. -** The capacity of fire escapes shall be as listed in table 6-1 for stairs.

**(b) Stairs. -** The minimum width of fire escape stairs shall be twenty-two inches. Treads shall have a minimum width of eight inches, exclusive of a required one inch nosing. The maximum height of risers shall be eight inches. No flight of stairs shall exceed twelve feet in height between landings.

**(c) Landings.** - Landings shall be provided at each story served by fire escapes. The minimum width of landings shall be three feet, and the minimum length shall be four feet six inches. Floor openings in landings shall be at least twenty-two inches by twenty-eight inches.

**(d) Handrails and guards. -** Handrails having a minimum height of thirty-two inches above the tread nosing shall be provided on both sides of stairs, and guards having a minimum height of thirty-six inches shall be provided on all open sides of landings, openings in guards shall be of such dimensions as to prevent the passage of a five inch dia. ball.

**(e) Construction. -**
Fire escapes shall be constructed of noncombustible materials adequately protected against deterioration by corrosion or other effects of exposure to the weather, and shall be designed to comply with the requirements of subchapter nine of this chapter.

**(f) Access -** Access to fire escapes shall be by doors or windows having a minimum clear opening of twenty-four inches in width and thirty inches in height. Such doors or windows shall have a fire protection rating of three-quarters of an hour except in buildings classified in occupancy group J-2.

**(g) Discharge.-** The top landing of fire escapes shall be provided with a stair or gooseneck ladder leading to the roof, except that this requirement shall not apply to buildings having a roof pitch of more than twenty degrees. The lowest landing of fire escapes shall be not more than sixteen feet above grade and shall be provided with a stair to grade, which may be counterbalanced.

## ARTICLE 6 EXIT LIGHTING

### §[C26-605.1] 27-381 Requirements. -

Corridors and exits shall be provided with artificial lighting facilities, except as otherwise permitted by the provisions of subchapter twelve of this chapter, in accordance with the following:

(a) Illumination of at least two foot candles measured at the floor level shall be maintained continuously, during occupancy, in exits and their access facilities for their full length, at changes in direction in and intersections of corridors, balconies, exit passageways, stairs, ramps, escalators, bridges, tunnels, landings, and platforms, and as provided in subchapter eight of this chapter for places of assembly, except that this requirement shall not apply to dwelling units.

(b) In buildings classified in occupancy groups B-1 and B-2, exit lighting need only be maintained when a section of floor is occupied.

(c) Illumination shall be so arranged that the failure of any one light shall not leave any area in darkness.

(d) Phosphorescent materials shall not be used as a method of providing illumination, nor shall battery operated electric lights or portable lamps or lanterns be used as primary sources of lighting.

*(e) (1)Buildings and existing buildings containing an F-4 place of assembly with an occupant load of three hundred or more persons shall install emergency lighting in each vertical exit serving the floor on which the place of assembly is located so as to provide a continuously lighted passage to the exterior of the building. Such lighting shall be connected to an emergency power source or to storage battery equipment meeting the requirements of the commissioner.
*Local Law 59-1996.

(2) Existing buildings required to comply with this subdivision shall install the emergency lighting on or before April first, nineteen hundred eighty-seven.

### §[C26-605.2]  27-382 Power source. -

*(a) Where a total of more than four lights is required, exit lighting shall be connected to an emergency power source or to storage battery equipment meeting the requirements of the commissioner, provided, however, that in existing buildings, the exit lighting may be on circuits that are separate from the general lighting and power circuits, taken off ahead of the main switch.

(b) Existing high rise buildings classified in occupancy group C, D or H and existing buildings classified in occupancy group E, G or J-1 (except for "residential hotels," as such term is defined by the commissioner pursuant to rules and regulations) shall comply with the requirements of this section on or before April first, nineteen hundred eighty-seven.
*Local Law 59-1996.

## ARTICLE 7 EXIT SIGNS

### §[C26-606.1] 27-383 Requirements. -

Except in occupancy groups J-2 and J-3, the location of every exit on every floor and every opening from a room classified in occupancy group J-1 and containing cubicles shall be clearly indicated by exit signs. Such signs shall be placed at an angle with the exit opening if such placement is required for the signs to serve their purpose. In long corridors, in open floor areas, and in all other situations where the location of the exit may not be readily visible or understood, directional signs shall be provided to serve as guides from all portions of the corridor or floor.

### §[C26-606.2] 27-384 Power source. -

*(a) Where a total of more than four exit and/or directional signs is required, the signs shall be connected to an emergency power source or to storage battery equipment meeting the requirements of the commissioner, provided, however, that in existing buildings, the signs may be on circuits that are separate from the general lighting and power circuits, taken off ahead of the main switch.

*Local Law 59-1996.

(b) Existing high rise buildings classified in occupancy group C, D or H and existing buildings classified in occupancy group E, G or J-1 (except for "residential hotels," as such term is defined by the commissioner pursuant to rules and regulations) shall comply with the requirements of this section on or before April first, nineteen hundred eighty-seven.

### §[C26-606.3] 27-385 Exit sign design. -

Exit signs shall read only "exit" and shall be of the externally lighted, internally lighted, or electroluminescent type, except that they may be nonilluminated in buildings not provided with artificial lighting.

(a) The artificial light source on externally lighted signs shall provide a red light, either by the use of an incandescent colored bulb or other visible red light source, so as to provide at least twenty-five foot candles on the exposed face of the sign. Visibility of the sign shall not be obscured by the location of the light source.

(b) For internally lighted signs, the average initial brightness of the letters shall be at least twenty-five ft. lamberts, and where an illuminated background is used, its average initial brightness shall be at least two hundred fifty ft. lamberts. The light source shall not be modified or changed nor shall lamp life multipliers be used so as to reduce these brightness levels.

(c) The letters of exit signs shall be red. The background of externally lighted signs shall be white. The background of internally lighted signs shall be either stenciled metal with a light gray or white color, or translucent frosted, opal glass, slow-burning plastic, or the plastic edge-glow type with white plastic separators. The letters for internally lighted signs shall be translucent red.

(d) The letters shall be block lettering at least four and one-half inches high with nine-sixteenths inch strokes, except in buildings and spaces classified in occupancy group F and J-1, where they shall be at least eight inches high with the strokes at least three-quarters of an inch wide.

(e) In locations where breakage may occur, exit signs shall be of shock resistant materials, or shall otherwise be protected against breakage.

(f) Except for buildings not provided with artificial lighting and buildings which maintain one or more auxiliary systems for emergency exit lighting in the event of a public utility failure, there shall be either (1) an illuminated exit sign with the background thereon made of an approved phosphorescent material or (2) a material with an opaque text and placed adjacent to or as close as possible to such illuminated sign. The phosphorescent material after exposure to normal lighting conditions shall be capable of remaining visible in total darkness for a period of at least eight hours. The signs shall be washable, non-toxic, non-radioactive and if subjected to fire must be self-extinguishing when the flame is removed.

### §[C26-606.4] 27-386 Directional sign design.-

Directional exit signs shall comply with all of the requirements for exit signs in section 27-385 of this article, and shall read "EXIT" with a horizontal arrow or arrows indicating the direction to the exit or exits. However, when the arrow is below the letters, the letters may be three and three-eighths inches high and nine-sixteenths inch strokes, except in buildings and spaces classified in occupancy group F where they shall be at least five inches high with nine-sixteenths inch strokes. The arrow or arrows shall be red.

### §[C26-606.5] 27-387 False exits. -

Any door, passageway, stair, or other means of communication that is not an exit or that is not a way to an exit, but is so located as to be mistaken for an exit, shall be identified with a sign reading "NOT AN EXIT," shall be identified by a sign indicating its use or purpose or shall be provided with a directional exit sign.

## ARTICLE 8 EXIT SIGNS FOR EXISTING BUILDINGS

### §[C26-607.1] 27-388 Retroactive provisions. –

Except as otherwise provided, the provisions of this subchapter are not retroactive except that the provisions of this article and article nine of subchapter six of this chapter for certain existing office buildings are retroactive. Signs required by this article must be installed no later than March sixth, nineteen hundred sixty-nine. Where auxiliary systems for emergency exit lighting are to be provided, the installation must commence no later than May sixth, nineteen hundred sixty-nine.

#### §C26-60[7.2] 27-389 Designation of required means of egress. -

(a) Except for spaces classified in occupancy J-2 and J-3, the location of each required means of egress on every floor of every structure shall be clearly indicated by exit signs. Such signs shall be placed at an angle with the exit doorway if such placement shall be required for such signs to serve their purpose adequately. These signs shall be of an approved phosphorescent material, which after exposure to normal lighting conditions shall be capable of remaining visible in total darkness for a period of at least eight hours. They shall also be washable, non-toxic, non- radioactive, and if subjected to fire must be self-extinguishing when the flame is removed. Except for illuminated signs, these signs shall have a phosphorescent background and opaque text. Where means of egress were required to be indicated by an illuminated exit sign, there shall be either (1) an illuminated exit sign with the lettering thereon made of the approved phosphorescent material, or (2) a supplemental exit sign made of the approved phosphorescent material with an opaque text, and placed adjacent to or as close as possible to such illuminated sign.

(b) Except for spaces classified in occupancy groups J-2 and J-3, in long corridors, in open floor areas and in all other situations where the location of the means of egress may not be readily discernible or understood by the occupants, directional signs shall be provided and maintained to serve as guides from all portions of the floor or corridor. These signs shall be of an approved phosphorescent material which after exposure to normal lighting conditions shall be capable of remaining visible in total darkness for a period of at least eight hours. They shall also be washable, non-toxic, non-radioactive, and if subjected to fire must be self-extinguishing when the flame is removed. Except for illuminated signs these signs shall have a phosphorescent background and opaque text. Where a directional sign was required to be illuminated there shall be either (1) an illuminated directional sign with the lettering, indicator, symbol or other device thereon made of the aforesaid phosphorescent material, or (2) a supplemental directional sign with the same lettering, indicator, symbol or device as appears on the illuminated sign, but opaque, on a background made of the aforesaid phosphorescent material and placed adjacent to or as close as possible to such illuminated sign.

(c) Except where otherwise permitted by the provisions of any law, the lettering of exit signs shall be of letters of at least eight inches high.

(d) In those buildings not provided with artificial lighting, in those buildings which maintain one or more auxiliary systems for emergency exit lighting in the event of a public utility failure, and in those buildings for which the installation of one or more such auxiliary systems is commenced on or before August sixth, nineteen hundred sixty-nine, the signs need not be phosphorescent but shall otherwise conform to this section.

### ARTICLE 9 STAIR AND ELEVATOR SIGNS

#### *§[C26-608.1] 27-390 Applicability. -

This article is applicable to all buildings and existing buildings which have at least one elevator which is subject to periodic inspections pursuant to section 27-998, any existing office building occupied or arranged to be occupied for an occupant load of more than one hundred persons above or below the street level or more than a total of five hundred persons in the entire building.
*Local Law 96-1985, language juxtaposed per Ch. 907-1985.

#### §[C26-608.2] 27-391 Signs at elevator landings.-

A sign shall be posted and maintained on every floor at the elevator landing. The sign shall read "IN CASE OF FIRE, USE STAIRS UNLESS OTHERWISE INSTRUCTED." The lettering shall be at least one-half inch block letters in red with white background or as otherwise approved by the commissioner. Such lettering shall be properly spaced to provide good legibility. The sign shall also contain a diagram showing the location where it is posted and the location and letter identification of the stairs on the floor. The sign shall be at least ten inches by twelve inches, located directly above a call button and securely attached to the wall or partition. The top of such sign shall not be above six feet from the floor level. The diagram on such sign may be omitted provided that signs containing such diagram are posted in conspicuous places on the respective floor. In such case, the sign at the elevator landing shall be at least two and one half inches by ten inches and the diagram signs shall be at least eight inches by twelve inches.

#### §[C26-608.3] 27-392 Floor numbering signs. -

A sign shall be posted and maintained within each stair enclosure on every floor, indicating the number of the floor. The numerals shall be of bold type and at least three inches high. The numerals and background shall be in contrasting colors. The sign shall be securely attached to the stair side of the door.

#### §[C26-608.4] 27-393 Stair and elevator identification signs. -

Each stair and each bank of elevators shall be identified by an alphabetic letter. A sign indicating the letter of identification for the elevator bank shall be posted and maintained at each elevator landing directly above or as part of the sign specified in section 27-391 of this article. The stair identification sign shall be posted and maintained on the occupancy side of the stair door. The letter on the sign shall be at least three inches high, of bold type and of contrasting color from the background. Such signs shall be securely attached.

#### §[C26-608.5] 27-394 Stair re-entry signs in office buildings.-

Signs shall be posted and maintained on the stair door at each floor in buildings classified in occupancy group E occupied or arranged to be occupied for an occupant

load of more than one hundred persons above or below the street level or more than a total of five hundred persons in the entire building indicating whether re-entry is provided into the building and the floor where such re-entry is provided. The lettering and numerals of the signs shall be at least one-half inch high of bold type. The lettering and background shall be contrasting colors and the signs shall be securely attached approximately five feet above the floor. The signs shall read as follows and may be either independent or combined with the corresponding sign required by sections 27-392 and 27-393 of this article.

(a) Where no re-entry is provided from the stairs to any floor, the sign shall read "NO RE-ENTRY FROM THIS STAIR" and such sign shall be on the occupancy side of the stair door at each floor. No re-entry sign shall be required on the stair side of the door.

(b) Where re-entry is provided to specified floors:

(1) On the stair side of the door at floors where re-entry is provided, the sign shall read "RE-ENTRY ON THIS FLOOR."

(2) Where no re-entry is provided on that floor, the sign on the stair side of the door shall read "NO RE-ENTRY, NEAREST RE-ENTRY ON THE __ AND __ FLOORS" The floor numbers of the nearest re-entry below and the nearest re-entry floor above shall be entered in the blank spaces.

### §[C26-608.6] 27-395 Materials for signs. –
Signs required by this article shall be of metal or other durable material.

### §[C26-608.7] 27-396 Signs in existing buildings. -

(a) Signs installed prior to the enactment of this article may be accepted by the commissioner, provided that such signs will adequately accomplish the intended purpose.

(b) In buildings existing prior to January eighteenth, nineteen hundred seventy-three, the commissioner may modify the requirements as to location of signs where compliance would cause practical difficulty or undue hardship.

(c) All existing buildings not already subject to the requirements of this article as of January eighteenth, nineteen hundred seventy-three shall comply with the requirements of this article on or before October first, nineteen hundred eighty-five.

### ARTICLE 10 SIGNS IN SLEEPING ROOMS

### §[C26-609.1] 27-396.1 Applicability. -
This article is applicable to buildings and existing buildings classified in occupancy group J-1.

### §[C26-609.2] 27-396.2 Requirements. -
All buildings and existing buildings classified in occupancy group J-1 shall post and maintain a sign on the inside of every door opening onto a public corridor giving access to a sleeping room. The sign shall contain a diagram showing the location where it is posted and the location and letter

identification of the exit stairs on the floor. The diagram shall indicate the number of doors opening onto the public corridor which must be passed to reach each exit stair. The sign shall be at least eight inches by ten inches, located on the inside of the door and securely attached thereto. The top of such sign shall not be more than six feet from the floor level. Such sign shall contain such additional information as the fire department may require.

### §[C26-609.3] 27-396.3 Retroactive requirements. -
All existing buildings required to comply with the provisions of this article shall post the requisite signs on or before April first, nineteen hundred eighty-seven. Signs installed prior to such date may be accepted by the commissioner, provided that such signs adequately accomplish the intended purpose.

### ARTICLE 11 EMERGENCY POWER

### §[C26-610.1] 27-396.4 Requirements. -
Where required by this article or any other provision of this code, an emergency power system shall be provided. The emergency power system shall have a power source and fuel supply sufficient to operate the following equipment in accordance with rules and regulations promulgated by the department, where such equipment is required to be provided by this code:
(a) Fire pumps and booster pumps.
(b) At least three elevators at one time, with manual transfer to other elevators.
(c) Alarm systems.
(d) Communication systems.
(e) Emergency lighting, if battery packs are not provided.
(f) Ventilating systems used for smoke venting or control.
(g) Stair pressurization.

### §[C26-610.2] 27-396.5 Registration. –
Emergency power generation equipment shall be registered with the department of environmental protection, bureau of air resources in accordance with the requirements of section 24-109 of title twenty-four of the administrative code.

### §[C26-610.3] 27-396.6 Applicability. –
Emergency power systems meeting the requirements of this article shall be provided in the following buildings and building sections:
(a) High rise buildings and building sections classified in occupancy group C, E, G or H.
(b) Buildings and building sections classified in occupancy group E or G which do not exceed seventy-five feet in height but have a gross area of over fifteen thousand square feet per floor or a total gross area of one hundred thousand square feet or more.
(c) Spaces classified in occupancy group F-4 having an occupant load of three hundred or more persons.
(d) Buildings and building sections classified in occupancy group J-1.
(e) Buildings and building sections containing an atrium.

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff    Pg 379 of 654

Title 27 / Subchapter 7

## SUBCHAPTER 7
### SPECIAL USES AND OCCUPANCIES

### TABLE OF CONTENTS

| [Sub-Art. or Sec.]* | Art. or Sec.** | |
|---|---|---|
| **[700.0]** | **Art. 1** | **General** |
| [700.1] | 397 | Scope |
| [700.2] | 398 | Standards |
| [700.3] | 399 | Definitions |
| **[701.0]** | **Art. 2** | **High Hazard Occupancies** |
| [701.1] | 400 | Application |
| [701.2] | 401 | Explosion Hazard and Unlisted Occupancies |
| [701.3] | 402 | Other Requirements |
| [701.4] | 403 | Location |
| [701.5] | 404 | Sprinkler Requirements |
| [701.6] | 405 | Ventilation of Storage Occupancies |
| **[702.0]** | **Art. 3** | **Occupancies Involving Spray or Dip Finishing** |
| [702.1] | 406 | Application |
| [702.2] | 407 | Classification |
| [702.3] | 408 | Location of Processes |
| [702.4] | 409 | Construction |
| [702.5] | 410 | Ventilation |
| [702.6] | 411 | Drying Equipment |
| [702.7] | 412 | Sprinklers |
| **[703.0]** | **Art. 4** | **Uses and Occupancies Involving Radioactive Materials and Radiation-Producing Equipment** |
| [703.1] | 413 | Application |
| [703.2] | 414 | City, State, and Federal Regulations |
| [703.3] | 415 | Laboratories |
| [703.4] | 416 | Radiation Machines |
| [703.5] | 417 | Storage |
| **[704.0]** | **Art. 5** | **Boiler and Furnace Rooms** |
| [704.1] | 418 | Application |
| [704.2] | 419 | Enclosure |
| [704.3] | 420 | Location |
| [704.4] | 421 | Clearances |
| [704.5] | 422 | Ash Storage Pits and Bins |
| [704.6] | 423 | Exit Requirements |
| [704.7] | 424 | Ventilation |
| **[705.0]** | **Art. 6** | **Dry Cleaning Establishments** |
| [705.1] | 425 | Application |
| [705.2] | 426 | Classification |
| [705.3] | 427 | Construction Requirements |
| [705.4] | 428 | Ventilation |
| [705.5] | 429 | Coin-Operated Units |
| [705.6] | 430 | Sprinklers |
| [705.7] | 431 | Separation of Direct-Fired Dryers |
| **[706.0]** | **Art. 7** | **Heliports** |
| [706.1] | 432 | Application |
| [706.2] | 433 | Classification |
| [706.3] | 434 | Construction |
| [706.4] | 435 | Limitations |
| [706.5] | 436 | Exits |
| [706.6] | 437 | Fire Protection |
| **[707.0]** | **Art. 8** | **Automotive Service Stations** |
| [707.1] | 438 | Application |
| [707.2] | 439 | Classification |
| [707.3] | 440 | Gasoline and Diesel Oil Motor Vehicle Fuel Storage |
| [707.4] | 441 | Location of Pumps |
| [707.5] | 442 | Heating Equipment |
| **[708.0]** | **Art. 9** | **Automotive Repair Shops** |
| [708.1] | 443 | Application |
| [708.2] | 444 | Classification |
| [708.3] | 445 | Volatile Flammables |
| [708.4] | 446 | Ventilation |
| [708.5] | 447 | Sprinklers |
| [708.6] | 448 | Heating Equipment |
| [708.7] | 449 | Pits |
| **[709.0]** | **Art. 10** | **Public Garages** |
| [709.1] | 450 | Application |
| [709.2] | 451 | Classification |
| [709.3] | 452 | Construction |
| [709.4] | 453 | Group 1 Public Garages in Buildings of Other Occupancy Classification |
| [709.5] | 454 | Roof Storage of Motor Vehicles |
| [709.6] | 455 | Sprinklers |
| [709.7] | 456 | Ventilation |
| [709.8] | 457 | Exits |
| [709.9] | 458 | Ramps |
| [709.10] | 459 | Heating Equipment |
| | 459.1 | Parking Spaces for People Having Physical Disabilities |
| **[710.0]** | **Art. 11** | **Open Parking Structures** |
| [710.1] | 460 | Application |
| [710.2] | 461 | Height and Area Limitations |
| [710.3] | 462 | Construction |
| [710.4] | 463 | Exterior Walls |
| [710.5] | 464 | Curbs and Bumpers |
| [710.6] | 465 | Railings |
| [710.7] | 466 | Floor Openings |
| [710.8] | 467 | Motor Fuel Pumps |
| [710.9] | 468 | Mechanical Parking |
| [710.10] | 469 | Exits |
| [710.11] | 470 | Ramps |
| [710.12] | 471 | Elevators |
| [710.13] | 472 | Standpipes |

|          | 472.1 | Parking Spaces for People Having Physical Disabilities |
| **[711.0]** | **Art. 12** | **Private Garages** |
| [711.1] | 473 | Application |
| [711.2] | 474 | Classification |
| [711.3] | 475 | Attached Garages |
| [711.4] | 476 | Connection by Breezeway |
| [711.5] | 477 | Floors |
| [711.6] | 478 | Ventilation |
| **[712.0]** | **Art. 13** | **Open Parking Lots** |
| [712.1] | 479 | Application |
| [712.2] | 480 | Curb Cuts |
| [712.3] | 481 | Protection of Adjoining Property |
| [712.4] | 482 | Accessory Uses and Occupancies |
|          | 483 | Parking Spaces for PeopleHaving Physical Disabilities |
| **[714.0]** | **Art. 15** | **Swimming Pools** |
| [714.1] | 488 | Application |
| [714.2] | 489 | Construction |
| [714.3] | 490 | Dressing Facilities |
| [714.4] | 491 | Ventilation and Heating |
| [714.5] | 492 | Water Circulation, Water Treatment, and Drainage |
| [714.6] | 493 | Safety Precautions |
|          | 493.1 | Facilities for People Having Disabilities |
| **[715.0]** | **Art. 16** | **Radio and Television Towers** |
| [715.1] | 494 | Application |
| [715.2] | 495 | Location and Access |
| [715.3] | 496 | Construction |
| [715.4] | 497 | Loads |
| **[716.0]** | **Art. 17** | **Outdoor Signs and Display Structures** |
| [716.1] | 498 | Application |
| [716.2] | 499 | Obstructions |
| [716.3] | 500 | Ground Signs |
| [716.4] | 501 | Wall Signs |
| [716.5] | 502 | Projecting Signs |
| [716.6] | 503 | Roof Signs |
| [716.7] | 504 | Marquee Signs |
| [716.8] | 505 | Illuminated Signs |
| [716.9] | 506 | Temporary Signs |
| [716.10] | 507 | Use of Combustible Materials |
| [716.11] | 508 | Maintenance and Inspection |
|          | **Art. 17-A** | **Youth Protection Against Tobacco Advertising and Promotion Act** |
|          | 508.1 | Short Title |
|          | 508.2 | Definitions |
|          | 508.3 | Tobacco Product Advertisement Restriction |
|          | 508.4 | Non-compliant Advertisements to be Removed |
|          | 508.5 | Sponsorship of and at Events |
|          | 508.6 | Injunctive Relief |
|          | 508.7 | Penalties |

|          | 717.0 | Art. 18 | **Fences** |
| [717.0] | | | |
| [717.1] | 509 | | Permitted Heights |
| **[718.0]** | **Art. 19** | | **Tents and Air-Supported Structures** |
| [718.1] | 510 | | Location and Height |
| [718.2] | 511 | | Separation |
| [718.3] | 512 | | Fire Protection |
| [718.4] | 513 | | Exits |
| [718.5] | 514 | | Structural Requirements |
| [718.6] | 515 | | Flame Resistance |
| [718.7] | 516 | | Pressurization System |
| [718.8] | 517 | | Certificate of Occupancy |
| **[719.0]** | **Art. 20** | | **Occupancies Involving Storage of Nitric Acid** |
| [719.1] | 518 | | Application |
| [719.2] | 519 | | Location |
| [719.3] | 520 | | Construction Requirements |
| [719.4] | 521 | | Ventilation |
| **[720.0]** | **Art. 21** | | **Atriums** |
| [720.1] | 521.1 | | Applicability |
| [720.2] | 521.2 | | Classification |
| [720.3] | 521.3 | | Construction |
| [720.4] | 521.4 | | Fire Protection Equipment |
| [720.5] | 521.5 | | Means of Egress |
| [720.6] | 521.6 | | Fire Alarm and Communication System |
| [720.7] | 521.7 | | Signs |
| [720.8] | 521.8 | | Smoke Control |
| [720.9] | 521.9 | | Emergency Power |
| **[721.0]** | **Art. 22** | | **Malls** |
| [721.1] | 521.10 | | Applicability |
| [721.2] | 521.11 | | Classification |
| [721.3] | 521.12 | | Construction-General |
| [721.4] | 521.13 | | Fire Protection Equipment |
| [721.5] | 521.14 | | Egress |
| [721.6] | 521.15 | | Smoke Control |
| [721.7] | 521.16 | | Signs |

*"C26" omitted from section numbers in this column.
*"27" omitted from section numbers in this column.

### LIST OF TABLES

**Table No.**

7-1  Height and Area Limitations of Open Parking Structures

7-2  Ground Signs and Wall Signs (Noncombustible Materials)

7-3  Roof Signs, Projecting Signs, and Marquee Signs (Noncombustible Materials)

7-4  Ground Signs and Wall Signs (Combustible Materials)

7-5  Roof Signs (Combustible Materials)

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 381 of 654

Title 27 / Subchapter 7

## ARTICLE 1 GENERAL

### §[C26-700.1] 27-397 Scope. –
This subchapter shall apply only to those building types, uses, and occupancies specifically regulated herein, and the requirements of this subchapter shall be in addition to the general requirements of other subchapters of this code governing the size, location, fire protection, means of egress, construction, and service equipment of buildings. Chemical plants, packing plants, refineries, and similar special occupancies may be constructed in accordance with the practices and requirements of the particular industry, subject to the approval of the commissioner.

### §[C26-700.2] 27-398 Standards. -
The provisions of reference standard RS-7 shall be a part of this subchapter.

### §[C26-700.3] 27-399 Definitions. -
For definitions to be used in the interpretation of this subchapter, see subchapter two of this chapter.

## ARTICLE 2 HIGH HAZARD OCCUPANCIES

### §[C26-701.1] 27-400 Application. -
This section shall apply to the construction, alteration, and use of buildings or spaces for high hazard occupancies classified in occupancy group A under the provisions of subchapter three of this chapter.

### §[C26-701.2] 27-401 Explosion hazard and unlisted occupancies.-
Buildings or spaces of high hazard occupancies that involve explosion hazards or that are not specifically provided for in this code, shall be constructed to provide any necessary additional protection adequate for the hazard involved subject to approval by the commissioner.

### §[C26-701.3] 27-402 Other requirements. -
The occupancy and use of high hazard buildings and spaces shall also be subject to the applicable requirements of chapter four of this title.

### §[C26-701.4] 27-403 Location. -
High hazard occupancies shall not be located within, or attached to, a building occupied for any other use, unless separated from such other use by noncombustible construction having not less than a four hour fire resistance rating.

### §[C26-701.5] 27-404 Sprinkler requirements. -
Sprinkler protection meeting the construction requirements of subchapter seventeen of this chapter shall be installed in all high hazard occupancies. Where the nature of the fire hazard is such that water is not effective as an extinguishing agent, the extinguishing agent to be used, shall be subject to the approval of the fire commissioner.

### §[C26-701.6] 27-405 Ventilation of storage occupancies.-
Rooms or spaces used for the storage of flammable paints, solvents, anesthetic agents, fuel or other oils having a flash point under two hundred degrees Fahrenheit (Tag closed cup) or other inflammable vaporous materials shall be vented to the outdoors by gravity or mechanical means, with independent supply and exhaust openings or ducts. If ventilation is provided by gravity means, the total net free openable area of supply and exhaust openings shall be equal to at least one percent of the floor area of the room, equally divided between supply and exhaust. If ventilation is provided by mechanical means, the system shall be designed to provide at least two air changes per hour. Where there are explosion hazards, see section 27-401 of this article. The construction of all ventilating systems shall be in accordance with the requirements of subchapter thirteen of this chapter.

## ARTICLE 3 OCCUPANCIES INVOLVING SPRAY OR DIP FINISHING

### §[C26-702.1] 27-406 Application. -
This section shall apply to the construction, alteration, and use of buildings or spaces for the spraying, dipping, or drying of flammable paints, varnishes, and lacquers or other flammable materials, mixtures, or compounds used for painting, varnishing, staining, or similar purposes.

### §[C26-702.2] 27-407 Classification. -
All occupancies involving spray painting, dipping, and drying with flammable materials shall be classified in high hazard occupancy group A.

### §[C26-702.3] 27-408 Location of processes. -
Spraying, dipping, or drying processes shall be located in accordance with the requirements of 27-403 of article two of this subchapter.

### §[C26-702.4]27-409 Construction. -
 (a) Spray Booths. - Spray booths shall be substantially constructed of noncombustible materials. Panels of polished wired glass at least one-quarter inch thick, not exceeding seven hundred twenty square inches in area and not more than forty-eight inches in any linear dimension, may be used in the sides of spray booths.
    (1) Spray booths shall be provided with a mechanical ventilating system meeting the requirements of section 27-410 of this article.
    (2) Each spray booth having a frontal area larger than nine square feet shall have a noncombustible deflector or curtain at least six inches deep installed along the upper outer edge of the booth, over the opening, and shall be protected with an automatic sprinkler system. The interior of ducts shall be

protected with sprinklers complying with the construction requirements of subchapter seventeen of this chapter, installed not more than twelve feet apart in horizontal ducts, and the sprinklers shall be accessible through duct access doors.

**(b) Dip tanks. -** Dip tanks, including their supports and drainboards when provided, shall be of an approved type.

## §[C26-702.5] 27-410 Ventilation. –

Spraying or dipping spaces shall be mechanically ventilated during spraying or dipping operations so that the velocity of air is at least one hundred linear feet per minute in the breathing zone of the operator, conveying air toward the exhaust hood. The ventilating system shall be of sufficient capacity to prevent the accumulation of mist or vapors. Air shall be admitted to the spraying or dipping spaces in an amount equal to the capacity of the fan or fans and in a manner that prevents short-circuiting the path of air in the working zone of such spaces. The exhaust fan control shall be interconnected with spray guns so that they cannot be operated without the ventilation system being in operation. Exhaust fans shall, in addition, be arranged to operate independently of spray guns. Ventilation equipment shall be kept in operation for a sufficient length of time after spraying or dipping operations to exhaust all vapors, fumes, or residues of spraying materials from the spray, space dip space,* or drying room.

(a) Ventilating ducts shall run directly to the outer air and be protected with a hood against the weather. Ventilating ducts shall be installed in accordance with the requirements of subchapter thirteen of this chapter, but shall not terminate within ten feet horizontally of any chimney outlet, or within twenty feet of any exit or any opening in an adjoining wall.

(b) Make-up air shall be supplied from a point outside the spraying or dipping space.

(c) The exhaust system from any spraying, dipping or drying space shall not be connected to any other ventilating system or be discharged into a chimney or flue used for the purpose of conveying gases of combustion.

(d) Exhaust fan blades shall be constructed of nonferrous material. Fan blades not coming in direct contact with spraying fumes need not comply with this requirement.

(e) Adequate access doors or panels, tightly fitted, shall be provided to permit inspection and cleaning of ducts.
*As enacted but probably intended to read "spray space, dip space".

## §[C26-702.6] 27-411 Drying equipment. -

Ovens and furnaces operated in connection with spray or dip finishing processes shall be of an approved type.

## §[C26-702.7] 27-412 Sprinklers. -

Sprinkler protection shall be provided in all spraying, dipping, or drying spaces using flammable materials in accordance with the construction requirements of subchapter seventeen of this chapter.

## ARTICLE 4 USES AND OCCUPANCIES INVOLVING RADIOACTIVE MATERIALS AND RADIATION-PRODUCING EQUIPMENT

## §[C26-703.1] 27-413 Application. -

This section shall apply to the construction, alteration, and use of buildings or spaces for radioactive materials and radiation-producing equipment.

## §[C26-703.2] 27-414 City, state and federal regulations. -

In addition to the requirements of this section, occupancies involving radioactive materials and radiation-producing equipment shall also comply with applicable requirements of the city health code, relating to radiological hazards, of part thirty-eight of the state industrial code relating to radiation protection, and of title ten of the code of federal regulations relating to atomic energy.

## §[C26-703.3] 27-415 Laboratories. -

All laboratories required to register under the requirements of the New York City health code shall comply with the following:

**(a) Construction-** All buildings in which such laboratories occur shall be of noncombustible group I construction.

**(b) Floors -** All floors shall comply with the fire-resistance requirements for the class of construction, and provide the degree of radioactive resistance required by applicable city, state, and federal regulations. A finished material shall be applied to provide a continuous nonporous surface, which may be readily removed.

**(c) Interior finish. -** All insulation of acoustical treatments and interior partitions shall be of noncombustible material. Walls and ceilings shall have nonporous finishes of class A rating.

**(d) Sprinkler protection. -** Automatic sprinkler protection complying with the construction provisions of subchapter seventeen of this chapter shall be provided, and such protection shall be designed for the type of combustible materials wherever such material is used, and for the radioactive material that may be expected to melt, vaporize, or oxidize under fire conditions. Laboratory equipment susceptible to damage from water or other materials used in the sprinkler system may be shielded by hoods except when the equipment provides a source of combustion. Where sprinkler protection uses water, or small water-spray installations are used to fight small isolated fires, floors shall be provided with drainage so that water may be carried to retention tanks for later disposal as required by the New York city health code when contamination of the water is to be anticipated.

**(e) Electrical controls. -** Electrical controls and equipment shall be installed in accordance with the

requirements of the electrical code of the city of New York.

**(f) Ventilation.** - Exhaust air from areas in which radioactive materials are used or stored shall be exhausted to the outdoors in such manner as not to create a health hazard, and shall not be recirculated to other areas of the building. Air pressure in rooms in which radioactive materials are used or stored shall be maintained below the [*sic*] air pressure of adjoining rooms, so that there is no flow of radioactive gases or dusts into adjoining rooms.

(1) Ducts shall be of sheet steel of not less than No. 16 manufacturers' standard gage [*sic*] or of other equivalent noncombustible material having a melting point above eighteen hundred degrees Fahrenheit. Exhaust ducts within the building, on the discharge side of the fan, shall be welded airtight. Exhaust ducts within the building, on the suction side of the fan shall have laps in the direction of air flow with smoke-tight joints, and shall be subjected to a smoke test in accordance with the requirements for chimneys in subchapter fifteen of this chapter. Access hatches with tight-closing covers shall be provided for cleaning and for fire-fighting in the exhaust system ducts.

(2) Fume hoods shall be exhausted to the outdoors. Controls for hood fans shall be interlocked so that contaminated air cannot be drawn into any space from a hood where the exhaust fan is not in operation.

(3) Fan equipment other than the impeller and impeller housing shall be located outside the exhaust stream.

(4) When the degree of contamination of the exhaust stream exceeds the concentration limits permitted by the health code, the duct system shall be equipped with devices to decontaminate the air to a safe level before discharging to the outdoor air.

**(g) Plumbing.** - Drainage lines from sinks used for radioactive wastes shall be without traps, and shall lead to retention tanks when required by the provisions of the New York city health code.

### §[C26-703.4]  27-416  Radiation machines.-Radiation
machines or particle accelerators, linear accelerators, cyclotrons, synchrotons, betatrons, or bevatrons shall be located only in buildings of noncombustible group I construction; however, this requirement shall not apply to conventional medical, dental, research, or industrial x-ray machines of less than one million volt capacity.

### §[C26-703.5]  27-417  Storage. -
Radioactive materials shall be stored in sealed containers. When required by the commissioner to avoid too concentrated an exposure within any one space, radioactive materials shall be stored in vaults designed in accordance with the radiation shielding or other requirements for the materials to be stored. When any materials are subject to melting, vaporization, or oxidation under fire conditions, the storage vaults shall be constructed of walls having a fire-resistance rating of at

least four hours, and the vaults shall be equipped with automatic sprinklers complying with the construction requirements of subchapter seventeen of this chapter and shall be vented through devices to decontaminate the air to a safe level. Doors opening into storage vaults shall meet shielding requirements and have a fire-protection rating of not less than three hours. All bins, shelving, partitions, and pallets in storage vaults shall be of noncombustible materials. Other methods of storage permitted by the health department or the atomic energy commission, such as storage under water, may be used.

## ARTICLE 5 BOILER AND FURNACE ROOMS

### §[C26-704.1] 27-418 Application. -
This section shall apply to the construction, alteration, and use of buildings or spaces for the enclosure of boilers, furnaces, and similar fuel-burning, heat-producing equipment.

### §[C26-704.2] 27-419 Enclosure. -
Boilers or furnaces hereafter installed in any building, other than replacement boilers and furnaces and boilers or furnaces used to heat one- or two-family dwellings, shall be enclosed and separated from the rest of the building by noncombustible construction having at least a one hour fire-resistance rating, except that:

(a) All boilers carrying more than fifteen psi pressure and having a rating in excess of ten horsepower, shall be located in a room or compartment separated from the rest of the building by noncombustible construction having at least a two hour fire-resistance rating.

(b) Boilers or furnaces located adjacent to, or within, automotive repair shops, public garages (group 1), or any occupancy classified in high hazard occupancy group A shall be located in separate buildings or, in rooms enclosed by noncombustible construction having at least a two hour fire-resistance rating. Entrance to such enclosed rooms shall be from the outdoors, or through an intervening vestibule constructed of materials having a two hour fire-resistance rating. The floor area of such vestibules shall be at least fifty square feet, but not more than seventy-five square feet. Ventilation shall be provided by a louver permanently open to the outdoor air having a net free area of one hundred forty-four square inches, located near the floor. Vestibule doors shall be one and one-half hour self-closing fire doors, with a six inch high sill provided at the door between the vestibule and the boiler room. Both doors shall swing in the direction of the boiler room.

(c) Boilers having a rated gross capacity of less than sixty-seven thousand btu per hour for generating steam shall not be required to be enclosed, except as provided in subdivision (b) of this section.

(d) Electric or fuel-fired space heaters need not be enclosed when they are approved for installation without enclosure and are installed in accordance

with the conditions of approval.

(e) Boilers and furnaces used in conjunction with commercial and industrial processes need not be enclosed, subject to the approval of the commissioner.

### §[C26-704.3] 27-420 Location. -
Rooms containing boilers or furnaces, or other equipment of similar or greater explosion hazard, shall not be located within fifty feet of any place of assembly, unless separated from such place of assembly by construction complying with the provisions of section 27-401 of article two of this subchapter.

### §[C26-704.4] 27-421 Clearances. -
Enclosing construction for boilers and furnaces shall meet the minimum clearance requirements prescribed in subchapter fourteen of this chapter.

### §[C26-704.5] 27-422 Ash storage pits and bins.-
Ash storage pits and bins not located within a boiler room enclosure shall be constructed of two hour fire-resistive construction, except that roofs over ash pits may be constructed of noncombustible materials.

### §[C26-704.6] 27-423 Exit requirements. -
In every room containing a boiler, furnace, or incinerator, the maximum travel distance from any point within the room to an exit shall not exceed fifty feet. When two or more exits are so required, only the main exit shall comply with the size and construction requirements of subchapter six of this chapter. The other exit or exits may be noncombustible ladders or stairs leading to exit openings not less than thirty-two inches by forty-eight inches.

### §[C26-704.7] 27-424 Ventilation. -
Boiler and furnace rooms shall be ventilated in accordance with the provisions of section 27-807 of article nine of subchapter fourteen of this chapter.

## ARTICLE 6 DRY CLEANING ESTABLISHMENTS

### §[C26-705.1] 27-425 Application. –
This section shall apply to the construction, alteration, and use of buildings or spaces for dry cleaning or dry dyeing operations.

### §[C26-705.2] 27-426 Classification. –
Dry cleaning and dry dyeing establishments shall be classified as follows:

(a) High hazard.- All establishments employing gasoline or other solvents having a flash point below $100^{O}$F (tag. closed-cup).

(b) Moderate hazard. - All establishments employing solvents having a flash point between $100^{O}$F and $138.2^{O}$F (tag. closed-cup).

(c) Low hazard. - All establishments employing solvents with a flash point higher than $138.2^{O}$F (tag. closed-cup).

### §[C26-705.3] 27-427 Construction requirements. -
(a) High hazard. - The construction or installation of high hazard dry cleaning establishments shall be prohibited.

(b) Moderate hazard. - Moderate hazard dry cleaning establishments shall meet all of the requirements of this code applicable to industrial occupancy group D-1 buildings. The floor finish in moderate hazard dry cleaning establishments shall be noncombustible and impervious.

(c) Low hazard. -
Low hazard dry cleaning establishments shall meet all of the requirements of this code applicable to industrial occupancy group D-2 buildings.

(d) Equipment.- All dry cleaning machines and equipment shall be of an approved type.

### §[C26-705.4] 27-428 Ventilation. –
Mechanical ventilation systems in moderate hazard plants shall be adequate to effect ten complete air changes per hour. Low hazard dry cleaning establishments shall be provided with mechanical ventilation adequate to effect four complete air changes per hour. Ventilating systems shall be arranged in such manner as to prevent solvent vapors from being admitted to the combustion area of any device requiring an open flame. Sufficient make-up air shall be introduced into all parts of the establishment to equal the air exhausted by the dry cleaning units, dryers, and exhaust ventilating system. Such air shall not contain any flammable vapors. Openings or stacks discharging solvent vapor-air mixtures to the outdoors shall be located in accordance with the provisions of subchapter thirteen of this chapter.

### §[C26-705.5] 27-429 Coin-operated units-
In coin-operated establishments all dry cleaning units shall be installed in such a manner that the working or maintenance portion of the equipment shall be separated from the front of the units by solid noncombustible partitions. Coin-operated units shall be located within a diked area, all parts of which are impervious to the solvent used in such units. The diked section shall be a four inch curb above the floor. Provisions shall be made for the collection of solvent spillage into tanks of capacity sufficient to contain all of the solvent in the dry cleaning units served, and for return of the solvent to the cleaning units through a closed pipe system. Access doors to the space in back of the units shall be kept closed and locked. Solvent storage tanks and other sources of danger shall be so situated as to be inaccessible to the general public. In addition to the mechanical ventilation required for low hazard dry cleaning establishments, the following mechanical ventilation shall be provided:

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 385 of 654

Title 27 / Subchapter 7

(a) All dry cleaning units shall have facilities that create an inward flow of one hundred cubic feet of air per minute into the unit when the loading door is opened.

(b) Emergency ventilation of the space in back of the dry cleaning units shall be provided so that in emergencies a minimum of one air change per minute in the enclosed space will be provided. Emergency ventilation equipment shall be on a circuit that is separate from the general lighting and power circuits, and shall be taken off ahead of the main switchboard, or shall be connected to the emergency lighting power source when such source is provided.

(c) A scavenger duct system shall be provided in the space in back of the units at each unit, and shall be designed to pick up vapor surrounding the equipment near the floor and exhaust it at the rate of one hundred cubic feet per minute. Scavenger ducts shall not be less than five square inches in area.

### §[C26-705.6] 27-430 Sprinklers. -
Automatic sprinkler protection complying with the construction provisions of subchapter seventeen of this chapter as required for occupancy group D-1, shall be provided for moderate hazard dry cleaning establishments. In addition, in moderate hazard establishments each dry cleaning unit shall be provided with automatic extinguishing equipment, such as a carbon dioxide system, or a steam jet of not less than three-quarters of an inch at a pressure of fifteen psi.

### §[C26-705.7] 27-431 Separation of direct-fired dryers. -
In moderate hazard dry cleaning establishments, direct-fired dryers shall not be used. In low hazard dry cleaning establishments using nonflammable solvents only, direct fired dryers may be used, but such dryers shall not be located within twenty-five feet of a dry cleaning unit unless a noncombustible partition (which may be glazed), equipped with self-closing doors, is provided between the dry cleaning unit and the flame producing device. This partition may provide either complete or partial separation, provided that any partial separation shall be so arranged that the line of air travel around the partition from the cleaning units to the dryer is a minimum of twenty-five feet. Where a solid noncombustible partition is constructed extending to the ceiling and all portions of the enclosure are solid, except for self-closing access doors, and outdoor air for combustion and drying is supplied, the separation may be reduced to fifteen feet.

### ARTICLE 7 HELIPORTS

### §[C26-706.1] 27-432 Application. -
This section shall apply to the construction, alteration, and use of building roofs, or parts thereof, as heliports.

### §[C26-706.2] 27-433 Classification. -
Heliports on building roofs shall be classified in industrial occupancy group D-1. They shall be separated from all other portions of the building by construction meeting the requirements of table 5-2 for fire divisions.

### §[C26-706.3] 27-434 Construction. -
Heliports shall be permitted only on buildings classified in noncombustible construction group I. All heliport construction above the building roof shall be noncombustible. No openings in the roof shall be permitted in the landing area. Roof openings outside the landing area shall be protected from flammable liquid spillage by four inch curbs and shall be surrounded by metal railings at least three feet complying with the requirements of subchapter nine of this chapter. The landing area shall be enclosed with a substantial metal fence or skirt.

### §[C26-706.4] 27-435 Limitations. -
No refueling facilities shall be provided, and no major aircraft repair or maintenance facilities shall be provided.

### §[C26-706.5] 27-436 Exits. -
At least two means of egress, meeting the requirements of subchapter six of this chapter, shall be provided for each landing area. The exits shall be remote from each other and shall lead to the building stairways.

### §[C26-706.6] 27-437 Fire protection. - Heliports shall be provided with fire-foam extinguishing equipment and fire alarm facilities meeting the following requirements:

(a) At least two hose stations housing approved foam generating equipment shall be provided remote from each other and located adjacent to outlets of the building standpipe system or other source of water supply. Hoses shall be provided with nozzles and related equipment for dispensing foam to all portions of the roof.

(b) The building standpipe system or other source of water supply shall be capable at all times of providing two hose streams simultaneously, each of which will afford foam application at a total water rate of at least sixty gallons per minute at a nozzle pressure [sic] of seventy-five psi for a period of ten minutes.

(c) A fire alarm system meeting the installation requirements of subchapter seventeen of this chapter shall be provided with a direct connection to the central station of an operating fire alarm company and with a local alarm to all heliport personnel.

### ARTICLE 8 AUTOMOTIVE SERVICE STATIONS

### §[C26-707.1] 27-438 Application. -
This section shall apply to the construction, alteration, and use of buildings or spaces as automotive service stations.

### §[C26-707.2] 27-439 Classification. -
Automotive service stations shall be classified in business occupancy group E.

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 386 of 654

Title 27 / Subchapter 7

§[C26-707.3] *27-440 Gasoline and diesel oil motor vehicle fuel storage. - All volatile flammable liquids and diesel oil motor vehicle fuel storage tanks shall be installed below ground and vented to the open air except for such above ground [*sic*] installation as may be authorized by the rules of the fire commissioner. The installation and venting of storage tanks shall be in accordance with applications and plans approved by the commissioner and shall also meet the requirements of chapter four of this title and the rules of the fire commissioner. Except as otherwise provided for in chapter four of this title or the rules of the fire commissioner, underground tank installations shall comply with the following:

(a) The top of the tanks shall be at least two feet below finished grade and at least two feet below the level of any cellar or basement floor within ten feet of the tanks.

(b) Tanks shall be supported on foundations complying with subchapter eleven of this chapter.

(c) Tanks shall be located so that the forces from any building foundation and support loads are not transmitted to the tanks. The distance from any part of a tank to the nearest wall of any basement, pit or cellar, or from any property line that may be built upon, shall not be less than three feet.

(d) Tanks shall be covered with a structurally supported reinforced concrete slab at least eight inches thick extending at least twelve inches beyond the horizontal outlines of the tanks and placed over a coverage of suitable clean backfill material.

(e) All concrete shall have a minimum compressive strength of twenty-five hundred pounds per square inch at twenty-eight days.

*Local Law 68-1999.*

§[C26-707.4] 27-441 Location of pumps. -
No gasoline pumps or other mechanical equipment shall be installed so as to permit servicing of motor vehicles standing on a public street. Canopies and supports over pumps and service equipment shall be noncombustible, except that they may be of construction having a one hour fire resistance rating or of heavy timber construction meeting the requirements of section 27-623 of article seven of subchapter ten of this chapter when located more than twenty feet from interior lot lines and from any building or structure.

§[C26-707.5] 27-442 Heating equipment. -
Heat generating equipment for automotive service stations shall be enclosed in accordance with the requirements of section 27-419 of article five of this subchapter.

## ARTICLE 9 AUTOMOTIVE REPAIR SHOPS

§[C26-708.1] 27-443 Application. -
This section shall apply to the construction, alteration, and use of buildings or spaces as automotive repair shops.

§[C26-708.2] 27-444 Classification. -
Automotive repair shops shall be classified in industrial occupancy group D-1.

§[C26-708.3] 27-445 Volatile flammables. -
All volatile flammables shall be stored and handled in accordance with the provisions of chapter four of this title.

§[C26-708.4] 27-446 Ventilation. -
All spaces used for the repair of motor vehicles shall be provided with mechanical ventilation adequate to provide four air changes per hour.

(a) Exhaust gases. -Where engines are to be run for test purposes or adjustments, provisions shall be made to collect the exhaust gases from each vehicle and to discharge such gases to the outer air by means of a positively induced draft. The discharge opening from such system shall be located as required by subchapter thirteen of this chapter.

(b) Pits. -  All pits for inspection or repair shall have mechanical exhaust ventilation taken from near the bottom of the pits. Pit exhaust systems shall be adequate to provide at least four air changes per hour.

§[C26-708.5] 27-447 Sprinklers. -
Automatic sprinkler protection complying with the construction provisions of subchapter seventeen of this chapter shall be provided as required by occupancy group D-1.

§[C26-708.6] 27-448 Heating equipment. -
Heat generating equipment for automotive repair shops shall be enclosed in accordance with the requirements of section 27-419 of article five of this subchapter.

§[C26-708.7] 27-449 Pits. -
All pits shall be provided with two means of egress.

## ARTICLE 10 PUBLIC GARAGES

§[C26-709.1] 27-450 Application. –
This section shall apply to the construction, alteration, and use of buildings or spaces as public garages. Any areas of such buildings in which gasoline, oil, and similar products are dispensed shall meet the requirements of article eight of this subchapter; any areas in which motor vehicles are repaired shall meet the requirements of article nine of this subchapter; and any areas in which any paint spraying is done shall meet the requirements of article three of this subchapter.

§[C26-709.2] 27-451 Classification. -
Public garages shall be classified according to their specific uses as follows:

**(a) Group 1. -** Buildings or spaces used for the parking of vehicles having fuel storage tanks in excess of twenty-six gallon capacity; or used for the parking of vehicles of any size, and in which mechanical repair, body work, or painting of vehicles is conducted, or in which gasoline, oil, or similar products are dispensed. Group 1 public garages shall be classified in storage occupancy group B-1.

**(b) Group 2. -** Buildings or spaces used exclusively for the parking of vehicles having fuel storage tanks of twenty-six gallon capacity or less, and in which no repair, body work or painting of vehicles is conducted, and in which no gasoline, oil, or similar products are dispensed. Group 2 public garages shall be classified in storage occupancy group B-2.

### §[C26-709.3] 27-452 Construction. -

The street floor construction of group 1 public garages shall have at least a two hour fire-resistance rating. Where openings are provided in the floor of any public garage, they shall be protected by railings complying with the requirements of subchapters nine and ten of this chapter, with a curb or ramp at least six inches high above the floor. All floors shall be concrete or equivalent noncombustible material. Columns in parking areas shall comply with the provisions of section 27-559 of article three of subchapter nine of this chapter.

### §[C26-709.4] 27-453 Group 1 public garages in buildings of other occupancy classification. -

No group 1 public garage shall be located within, or attached to, a building occupied for any other use, unless separated from such other use by construction meeting the requirements of table 5-2 for fire divisions. Elevators, stairways, and exit passageways connecting group 1 garages to other occupancies shall be accessible only through vestibules constructed of materials having a two hour fire-resistance rating. The floor area of such vestibules shall be at least fifty square feet but not more than seventy-five square feet. Ventilation shall be provided by a louver permanently open to the outdoor air having a net free area of one hundred forty-four square inches, located near the floor. Vestibule doors shall be one and one-half hour self-closing fire doors, with a six inch high sill provided at the door between the vestibule and the garage. Both doors shall swing in the direction of the elevators, stairways or exit passageways.

### §[C26-709.5] 27-454 Roof storage of motor vehicles.-

Roofs of buildings shall not be used for the parking or storage of motor vehicles unless the building is of class 1-A, 1-B, or 1-C construction, or is an open parking structure. When the roof of a building is used for parking of motor vehicles, it shall be provided with a parapet wall or guard rail at least three feet six inches high, and with curbs or wheel guards of noncombustible

materials of at [*sic*] least eight inches high. Such guards shall be substantially anchored to prevent any vehicle from striking the parapet wall or guard rail. Guard rails shall comply with the requirements for railings in subchapter nine of this chapter.

### §[C26-709.6] 27-455 Sprinklers. -

(a) Automatic sprinkler protection complying with the construction provisions of article four of subchapter seventeen shall be provided as required for occupancy group B-1 or B-2 respectively, except that in existing buildings lawfully occupied as garages prior to December sixth, nineteen hundred sixty-eight, storage of forty-five thousand gallons or less of product having a flash point over one hundred degrees [*sic*] F (tag open cup) in the cargo space of tank truck or other vehicles approved for such storage by the fire commissioner, pending delivery, shall not be deemed to require sprinkler protection.

(b) Smoke detection or thermostatic alarm with central office connection. -A thermostatic alarm system or smoke detection system equipped with a central office connection complying with subchapter seventeen of this code, and reference standard RS 17-3 of the appendix to this code may be provided in lieu of the sprinkler system required under the preceding subdivision in existing buildings lawfully occupied as garages prior to December sixth, nineteen hundred sixty-eight, when the storage of fuel oils or other products having a flash point over one hundred degrees F (tag open cup) is twenty-two thousand five hundred gallons or more but not exceeding forty-five thousand gallons in the cargo space of tank trucks or other vehicles approved for such storage by the fire commissioner, pending delivery.

(c) Portable fire fighting appliances, as the fire commissioner may direct, shall be provided in existing buildings lawfully occupied as garages prior to December sixth, nineteen hundred sixty-eight, when the storage of fuel oils or other products, having a flash point over one hundred degrees F (tag open cup), in the cargo space of tank trucks or other vehicles approved for such storage by the fire commissioner, pending delivery, is less than twenty-two thousand five hundred gallons.

### §[C26-709.7] 27-456 Ventilation. -

Public garages shall be ventilated in accordance with provisions of section 27-766 of article eight of subchapter twelve of this chapter and the following:

(a) Garage spaces above or below grade except as provided in subdivision (e) of this section shall be provided with mechanical ventilation according to one of or a combination of the following methods:

(1) Air exhaust at the rate of not less than one cfm per square foot of total floor area with properly designed means for air inflow.

(2) Air supply at the rate of not less than one cfm per square foot of total floor area with properly designed means for air outflow.

(3) Air exhaust or air supply at a rate sufficient to maintain an average concentration of carbon monoxide not to exceed one hundred parts per one million parts of air for periods longer than one hour and with a maximum concentration at any time not to exceed four hundred parts of carbon monoxide per one million parts of air. The concentration of carbon monoxide shall be determined by periodic tests taken between three and four feet from the floor by means of approved carbon monoxide detector tubes or other equivalent means. This method of mechanical ventilation may be used only if the overall design includes automatic ventilating fan control by means of approved carbon monoxide monitoring devices or by other approved means located so as to provide full protection for the occupancy.

(b) The provisions of section 27-766 of article eight of subchapter twelve of this chapter shall apply.

(c) Air supply shall be taken from an uncontaminated source. Exhaust outlets shall be located in accordance with the requirements of subchapter thirteen with one-half of them located six inches above floor level. In public garages where motor vehicles are parked by mechanical means, the ventilation requirements shall be one-half of those required above.

(d) No automotive service pits shall be installed in floors below the street floor. Pits shall have mechanical exhaust ventilation taken from near the bottom.

(e) Garage spaces above grade provided with natural ventilation having a free openable area of at least five percent of the total floor area of the space and having adjustable openings measuring at least six inches by four inches located within six inches of the floor and at most sixteen feet apart on all outside and court walls need not be provided with mechanical ventilation.

### §[C26-709.8] 27-457 Exits. -
Public garages shall be provided with at least two exits from each tier of parking. One of the exits may be a ramp used by service vehicles, when serving not more than one level below grade. All vertical exits shall have a minimum width of thirty-six inches and shall be enclosed in two hour fire-resistive construction, except as permitted by section 27-458 of article ten of subchapter seven of this chapter. No exit in a group 1 public garage shall have a path of travel through a fuel dispensing area. In group 2 public garages occurring [*sic*] in occupancy group J-2 buildings, overhead doors shall be of the automatic self-closing type.

**(a) Travel distance. -**No point in any public garage shall be more than one hundred feet from an exit, except that such distance may be increased to one hundred fifty feet when the garage is fully sprinklered.

**(b) Repair and fuel spaces. -** Spaces in group 1 public garages used for the repair of motor vehicles or the dispensing of fuel shall be provided with at least two exits, within the travel distance limitations of subdivision (a)  of this section.

**(c) Roof parking. -** When the roof of a building is used for parking, interior vertical exits shall be enclosed in a bulkhead constructed as required by subchapter five of this chapter.

### §[C26-709.9] 27-458 Ramps. -
Vehicular ramps in public garages shall not exceed a gradient of one in seven, and their surfaces shall be nonslip. A landing having a minimum length of twenty feet shall be provided at the discharge point at the street level, within the street line. Ramps serving as required exits shall be enclosed in construction having a two hour fire-resistance rating except that openings for motor vehicles at each parking tier may be protected by a water curtain consisting of deluge-type sprinkler heads supplying at least three gallons of water per minute per linear foot of opening.

### §[C26-709.10] 27-459 Heating equipment. -
Heat generating equipment for public garages shall be enclosed in accordance with the requirements of section 27-419 of article five of subchapter seven of this chapter.

### *§27-459.1 Parking spaces for people having physical disabilities. -
Parking spaces for people having physical disabilities [*sic*] shall comply with the requirements of section 27-292.19 and reference standard RS 4-6.
*Local Law 58-1987.*

### ARTICLE 11 OPEN PARKING STRUCTURES

### §[C26-710.1] 27-460 Application. -
This section shall apply to the construction, alteration, and use of open parking structures. Open parking structures in buildings of other occupancy group classification shall not be permitted unless separated from other occupancies by construction having at least a two hour fire resistance rating.

### §[C26-710.2] 27-461 Height and area limitations. -
The height of the top parking surface, and the area per parking tier, shall not exceed the limitations listed in table 7-1.

### TABLE 7-1
### HEIGHT AND AREA LIMITATION[S] ** OF OPEN PARKING STRUCTURES

| Construction Classification | Maximum Allowable Height (ft.) | Allowable area per Parking Tier (sq. ft.) |
|---|---|---|
| 1A | Unlimited | Unlimited |
| 1B | Unlimited | Unlimited |
| 1C | 100 | 50,000 |
| 1D | 100 | 50,000 |
| 1E | 75 | 30,000 |

**Copy in brackets not enacted but probably intended.*

a.  The area of an open parking structure having not more than two tiers above grade shall not be limited.

b.  Open parking structures of construction class 1C, or 1D exceeding three parking levels may be sixty thousand square feet on any parking level provided they shall have at least fifty percent of their perimeter, fifty percent open.

c.  Open parking structures of construction class 1C or 1D, exceeding three parking levels, may be one hundred thousand square feet on any parking level when fifty percent of the perimeter is fifty percent open, and may be one hundred twenty-five thousand square feet on any parking level when seventy-five percent of the perimeter is fifty percent open and may be one hundred fifty thousand square feet on any parking level when one hundred percent of the perimeter is fifty percent open in all aforementioned cases and shall have frontage space on at least two sides, and the horizontal distance on any level to an open exterior wall shall not exceed two hundred feet.

d.  Open parking structures of construction class 1E exceeding three parking levels may be fifty thousand square feet on any parking level when fifty percent of the perimeter is fifty percent open and may be sixty-two thousand five hundred square feet on any parking level when seventy-five percent of the perimeter is fifty percent open and may be seventy-five thousand square feet on any parking level when one hundred percent of the perimeter is fifty percent open in all aforementioned cases and shall have frontage space on at least two sides, and the horizontal distance on any level to an open exterior wall shall not exceed two hundred feet.

e.  The allowable areas specified in notes b, c and d above shall apply only to open parking structures used exclusively for the parking and storage of passenger vehicles accommodating not more than nine passengers but not including trailers, campers or similar vehicles.

### §[C26-710.3] 27-462 Construction. -
All materials used in the construction of open parking structures shall be noncombustible. Columns in parking areas shall comply with the provisions of section 27-559 of article three of subchapter nine of this chapter. Interior finishes shall be class A. The minimum clear height of any parking tier shall be at least six feet six inches.

   **(a) Below grade.-**  Any portion of an open parking structure extending below grade shall comply with all of the requirements for public garages as provided in article ten of this subchapter.

### §[C26-710.4] 27-463 Exterior walls. -
An exterior enclosure wall shall be required on any side of an open parking structure located within fifteen feet of an interior lot line. Such walls shall be noncombustible construction having at least a two hour fire-resistance rating.

### §[C26-710.5] 27-464 Curbs and bumpers. -
Curbs or bumpers of noncombustible materials shall be provided at the perimeter of each parking tier. Such curbs or bumpers shall be at least eight inches high, substantially anchored, and so located that no part of any motor vehicle will contact a wall, partition or railing.

### §[C26-710.6]27-465 Railings. -
Substantial railings or protective guards of noncombustible materials shall be provided at the perimeter of all parking tiers, except where exterior walls are provided, and around all interior floor openings. Such railings or guards shall be at least three feet six inches high, and shall be designed in accordance with the requirements of subchapter nine of this chapter.

### §[C26-710.7] 27-466 Floor openings. -
A curb or ramp at least six inches high shall also be provided at all interior floor openings. All floors shall be pitched to provide adequate drainage.

### §[C26-710.8] 27-467 Motor fuel pumps. -
Motor fuel pumps and facilities may be provided within an open parking structure as an accessory use. Such facilities shall comply with the requirements for the storage and handling of volatile flammables as provided in chapter four of this title. The area used for such purpose shall be located on the street floor. No pedestrian exit from any parking area shall have a path of travel through any fuel dispensing area.

### §[C26-710.9] 27-468 Mechanical parking. -
Open parking structures in which motor vehicles are parked by mechanical means shall comply with the requirements for open parking structures, except that the requirements for means of egress may be modified as provided in section 27-469 of this article.

### §[C26-710.10] 27-469 Exits. -
   (a) Driver parking. -  Open parking structures with driver parking shall be provided with at least two exits from each tier. One of the exits may be a ramp used by motor vehicles, when serving not more than one level below grade. Exit stairs shall have a minimum width of thirty-six inches and may be unenclosed, except that they shall be enclosed in noncombustible construction having at least a two hour fire-resistance rating if the first riser of the stair is more than thirty feet from one of the open exterior walls of the structure. No point on any tier of parking shall be more than one hundred feet from an exit.

   (b) Mechanical parking. - Open parking structures with mechanical parking equipment shall be provided with at least one exit from each tier of parking. Such exit may be unenclosed, but shall have a minimum width of thirty-six inches. No point on any tier of parking shall be more than two hundred feet from an exit.

### §[C26-710.11] 27-470 Ramps. -
Ramps used for the movement of motor vehicles and as required exits need not be enclosed when serving tiers above grade. Such ramps shall have a gradient not exceeding one in seven, with nonslip surfaces. A landing

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 390 of 654

Title 27 / Subchapter 7

having a minimum dimension of twenty feet shall be provided at the discharge point of all ramps at the street level, within the street line. Where a ramp is also used for the parking of motors vehicles, it shall be considered as a parking tier and may not serve as an exit for the occupants of the structure.

### §[C26-710.12] 27-471 Elevators. -
Passenger elevators in open parking structures shall comply with the requirements of subchapter eighteen of this chapter, except that hoistways may be enclosed with noncombustible construction.

### §[C26-710.13] 27-472 Standpipes.-
Open parking structures shall be provided with standpipe in accordance with the requirements of subchapter seventeen of this chapter.

**\*§27-472.1 Parking spaces for people having physical disabilities. -** Parking spaces for people having physical disabilities shall comply with the requirements of section 27-292.19 and reference standard RS 4-6.
*\*Local Law 58-1987.*

## ARTICLE 12 PRIVATE GARAGES

### §[C26-711.1] 27-473 Application. -
This section shall apply to the construction, alteration, and use of buildings or spaces as private garages.

### §[C26-711.2] 27-474 Classification. -
Private garages shall be classified in storage occupancy group B-2.

### §[C26-711.3] 27-475 Attached garages. -
Private garages attached to, or located above or below, a dwelling shall have walls, partitions, floors, and ceilings separating the garage from the dwelling, having a fire-resistance rating of at least one hour, except that such fire-resistive construction shall not be required between a dwelling and a carport when such carport is open on at least two sides. Any openings in the dwelling in required walls or partitions shall be protected with one and three-quarter inch solid core wood doors or equivalent

### §[C26-711.4] 27-476 Connection by breezeway. -
When a breezeway connects a garage with a dwelling, such a breezeway shall be firestopped at all points of connection to the garage.

### §[C26-711.5] 27-477 Floors. -
Garage floors shall be of concrete or equivalent noncombustible material that will not absorb flammable liquids. The sills of all door openings connecting a garage with a dwelling shall be raised at least four inches above the garage floor.

### §[C26-711.6] 27-478 Ventilation. -
No air used for heating, cooling, or ventilation shall be circulated through garages to dwellings.

## ARTICLE 13 OPEN PARKING LOTS

### §[C26-712.1] 27-479 Application. -
This section shall apply to the construction, alteration, and use of open parking lots. Open parking lots shall be unobstructed and free of other uses. All driveways and open spaces used for the parking or storage of motor vehicles shall be surfaced with concrete asphalt, or equivalent durable, dustless material.

### §[C26-712.2] 27-480 Curb cuts. -For the purpose of this section, a curb cut shall be defined as the total length of cut curb, including splays.

(a) For street frontages of one hundred feet or less, the amount of cut curb shall not exceed sixty percent of the frontage of the lot. No single curb cut shall exceed thirty feet in length, and there shall not be more than two curb cuts on any street frontage of one hundred feet or less. The minimum distance between two curb cuts shall be five feet.

(b) For additional street frontage over one hundred feet there may be an additional curb cut for each fifty feet of frontage.

(c) No curb cut shall commence within eight feet of a side lot line, except that on lots with street frontages of fifty feet or less, or on corner lots, the curb cut may commence two feet six inches from the side lot line.

(d) The distance of curb cuts from the intersection of street lines shall comply with the zoning resolution.

(e) Notwithstanding any of the above computations, no curb cut shall be less than ten feet.

### §[C26-712.3] 27-481 Protection of adjoiningproperty. -
**(a) Curbs and bumpers. -** Open parking lots shall be completely separated from adjoining land by curbs or bumpers of concrete, masonry, steel, heavy timber, or other similar and equally substantial materials, securely anchored so as to stop motor vehicles. Curbs and bumpers shall be at least eight inches high and eight inches wide. The only openings permitted in required curbs and bumpers shall be for drainage and for motor vehicle entrances and exits, and at pedestrian entrances.
**\*\* (b) Drainage. –** Where the surface paving of an open parking lot is non- porous, such lot shall be drained as required by subdivisions (b), (c) or (d) of section P110.2 of reference standard RS-16, as applicable. An asphaltic concrete surface, not to exceed one and one-half inches in thickness after compaction, shall be considered a porous surface provided such surface will pass an amount of water equivalent to one-half inch of rainfall per hour and provided such surface is underlaid by permeable soil, except that whenever an off-street

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 391 of 654

Title 27 / Subchapter 7

parking facility is constructed in connection with the construction of a new building, or whenever such parking facility falls within the definition of a substantial horizontal enlargement as set forth in subdivision (a) of section P110.2 of reference standard RS-16, all storm water falling or coming to rest on such parking facility shall be disposed of as provided in section P110.2 of reference standard RS-16.

** *Local Law 103-1989.*

**§[C26-712.4] 27-482 Accessory uses and occupancies. -** Parking lot offices, attendant shelters, storage facilities, and similar structures used in conjunction with open parking lots may be provided for accessory use, but shall comply with all of the provisions of this code applicable to the specific use or occupancy.

Motor vehicle fuel pumps. - Fuel pumps for the servicing of motor vehicles may be provided for accessory use in conjunction with open parking lots when complying with the requirements for the storage and handling of volatile flammables as provided in chapter four of this title. Fuel pumps shall be at least thirty feet from any parking space or interior lot line.

\*§27-483 **Parking spaces for people having physical disabilities. -** Parking spaces for people having physical disabilities shall comply with the requirements of section 27-292.19 and reference standard RS⸴4-6.
\**Local Law 58-1987.*

### ARTICLE 15  SWIMMING POOLS

**§[C26-714.1] 27-488 Application. -**
This section shall apply to the construction, alteration and use of all indoor and outdoor pools intended for swimming or bathing purposes, except for pools that have less than eighteen inches in depth of water at every point. Pools above grade having a maximum water depth of forty-eight inches above grade and an area not exceeding five hundred square feet that are accessory to J-3 occupancies and that are privately used for noncommercial purposes shall be exempt from the provisions of this subchapter except that such pools shall comply with the requirements of section 27-493 of this article. All pools not exempt from the provisions of this subchapter shall comply with the applicable provisions of subchapter sixteen of this chapter. No building permit shall be required for pools exempted by this section.

Regardless of any contrary provision, any pool existing on January first, nineteen hundred sixty-nine, which is accessory to J-3 occupancies, and that is privately used for noncommercial purposes shall be exempt from the provisions of this subchapter except that such pools shall comply with the requirements of section 27-493 of this article.

**§[C26-714.2] 27-489 Construction. -**

Pools shall be constructed so as to be water tight and easily cleaned. They shall be built of nonabsorbent materials with smooth surfaces and shall be free of open cracks and open joints.

**(a) Walls. -** The walls of pools shall be vertical for at least the top two feet six inches below the normal water level. The junctions between the side walls and the bottom shall be coved. A pool overflow shall be provided meeting the requirements of reference standard RS-16.

**(b) Bottom slopes.-** The bottom of any portion of a pool where the water is less than five feet six inches deep shall have a maximum slope of one foot vertically for every fifteen feet horizontally.

**(c) Ladders.-** There shall be a ladder or steps with handrails at the deep end and at the shallow end of every pool. Ladders and steps shall have nonslip treads.

**(d) Walkways.-** Every pool shall have a walkway at least five feet wide around its entire perimeter. The walkway shall have a nonslip surface and be so constructed that it does not drain into the pool.

**(e) Hand-holds. -** Every pool shall be constructed so that either the overflow gutter, if provided, or the top of the side walls afford a continuous hand-hold for bathers.

**(f) Markings.-** Permanent markings showing the depth of the shallow end, break points, diving depth, and deep end shall be provided so as to be visible from both inside and outside the pool.

**(g) Spectator area. -** Areas exclusively intended for spectators shall meet the applicable requirements of subchapter eight of this chapter for places of assembly.

**(h) Diving boards and towers.-** Diving towers shall be rigidly constructed and permanently anchored. The depth of the water below a diving board shall be at least eight feet six inches for boards one meter (3.28 ft.) or less above the water. For diving boards more than one meter and not more than three meters (9 ft. 10 in.) above the water, the depth below the board shall be at least twelve feet. For diving boards or platforms more than three meters above the water, the depth below the board shall be at least sixteen feet. Indoor pools shall provide at least twelve feet overhead clearance above all diving boards.

**§[C26-714.3] 27-490 Dressing facilities. -**
Toilet rooms, shower rooms, and indoor dressing areas shall be constructed of nonabsorbent materials with smooth-finish walls and partitions. Floors shall have a nonslip surface impervious to moisture, free of cracks or open joints, and sloped to drains. The junctions between the side walls and floors shall be covered. Individual dressing rooms or cubicles within indoor dressing areas shall be excluded from the above requirements. Cabanas and dressing rooms that are not a part of any other occupancy shall also be excluded.

**Toilets and Showers.-** Toilets, lavatories, and showers, including piping, shall be provided in accordance with the requirements of subchapter sixteen of this chapter.

### §[C26-714.4] 27-491 Ventilation and heating. -

Indoor pools, dressing rooms, toilets, and shower rooms shall be ventilated in accordance with the requirements of subchapter twelve of this chapter. Unless used only between May first and October thirty-first, such spaces shall be heated in accordance with the requirements of subchapter twelve of this chapter.

### §[C26-714.5] 27-492 Water circulation, water treatment, and drainage. -

The supply, circulation, treatment, and drainage of water for pools shall meet the requirements of subchapter sixteen of this chapter and the health code.

### §[C26-714.6] 27-493 Safety precautions. -

(a) No overhead electrical conductors shall be installed within fifteen feet of any swimming pool. All metal fences, enclosures, or railings that might become electrically charged as a result of contact with broken overhead conductors or from any other cause near, or adjacent to, a swimming pool shall be grounded in accordance with the provisions of lightning protection in the electrical code of the city of New York.

(b) Every outdoor swimming pool, fish pond, or other pool greater than eighteen inches deep at any point shall be protected by an enclosure, barrier or other means adequate to make such pool inaccessible to small children which including gates thereto shall be at least four feet high above the adjacent ground.

All gates shall be self-latching with latches located at least four feet high above the ground or otherwise made inaccessible to small children from the outside.

### *§27-493.1 Facilities for people having disabilities. –

Facilities for people having physical disabilities shall comply with the requirements of subarticle two of article two of subchapter four and of subchapter sixteen.
*Local Law 58-1987.*

### ARTICLE 16 RADIO AND TELEVISION TOWERS

### §[C26-715.1] 27-494 Application. –

This section shall apply to the construction, alteration, and use of radio and television towers on buildings. Radio and television receiving antennas more than twenty feet high above a roof shall be deemed to be such towers and shall be subject to the requirements of this section.

### §[C26-715.2] 27-495 Location and access. -

Towers shall be so located, and equipped with ladders or other devices, as to be readily accessible for inspection purposes. No guy wire or other accessories shall cross or encroach upon any street or pass over any electric power line.

### §[C26-715.3] 27-496 Construction. -

Towers located on the roofs of buildings shall be constructed of noncombustible materials. Isolated towers less than one hundred feet high and supported directly from the ground may, when located outside of the fire districts, be constructed of timber meeting the requirements of construction class II-A. All towers shall be grounded for lightning protection in accordance with the provisions of the electrical code of the city of New York.

### §[C26-715.4] 27-497 Loads. -

Towers shall be designed in accordance with the load requirements of subchapter nine of this chapter**.**

### ARTICLE 17 OUTDOOR SIGNS AND DISPLAY STRUCTURES

### §[C26-716.1] 27-498 Application. -

This section shall apply to the construction, alteration, and use of all outdoor signs and display structures, together with their appurtenant and auxiliary devices.

(a) No sign may be hung or attached upon or on the outside of any building unless such work is performed by or under the supervision of a licensed sign hanger.

(b) No sign shall be erected until a permit therefor has been obtained from the commissioner in accordance with the provisions of article two of subchapter eleven of this chapter.

### §[C26-716.2] 27-499 Obstructions. - 

No sign shall be erected so as to obstruct free ingress to, or egress from, a required door, window, stairs, or other required exits, or be placed so as to prevent free passage from one part of a roof to any other part. No sign shall be attached in any manner to a fire escape or exterior stair, or placed so as to interfere with any opening for light or ventilation required under the provisions of subchapter twelve of this chapter.

### §[C26-716.3] 27-500 Ground signs. -

(a) **Location.** -No part of a ground sign shall be erected so as to project beyond the street line, except as specifically permitted by the provisions of subchapter four of this chapter.

(b) **Material** -Inside the fire districts, ground signs shall be constructed entirely of noncombustible materials, except as permitted in sections 27-506 and 27-507 of this article. Outside the fire districts, the structure of ground signs exceeding twenty-five hundred square feet in facing or display area shall be constructed of noncombustible materials, and the facing of such signs shall be noncombustible, except as permitted in sections 27-506 and 27-507 of this article. The bottom of the facing of all ground signs shall be at least thirty inches above the ground, which space may be filled with open lattice work or decorative trim.

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff    Pg 393 of 654

Title 27 / Subchapter 7

**(c) Support.** -Ground signs shall be constructed and anchored to resist loads acting in any direction on the sign, in accordance with the provisions of subchapter nine of this chapter.

(1) Anchors and supports shall be designed for safe bearing loads on the soil and for an effective resistance to pullout amounting to a force twenty-five percent greater than the required resistance to overturning. Anchors and supports shall penetrate to a depth of at least four feet.

(2) Whenever anchors or supports consist of wood embedded in the soil, the wood shall be treated under pressure as specified in subchapter eleven of this chapter before erection. This requirement shall not apply to signs, which are not to remain in place for more than six months.

(3) Members furnishing structural support for signs shall be designed in accordance with the requirements of subchapter ten of this chapter, and shall be of adequate thickness to meet the corrosion conditions.

### §[C26-716.4] 27-501 Wall signs. -

**(a) Limitations**. - Wall signs shall not extend beyond the top or ends of the wall surface on which they are placed unless meeting all the requirements of this code regulating roof signs, projecting signs, or ground signs as the case may be. Wall signs shall not project beyond street lines except as permitted in subchapter four of this chapter.

**(b) Materials. -**Inside the fire districts, wall signs shall be constructed entirely of noncombustible materials except as permitted in sections 27-506 and 27-507 of this article. Outside the fire districts, the framework of wall signs exceeding five hundred square feet in facing or display area shall be constructed of noncombustible materials, and the facing of such signs shall be noncombustible except as permitted in sections 27-506 and 27-507 of this article.

**(c) Supports.** -Wall signs shall be constructed and supported to resist loads acting in any direction on the sign in accordance with the provisions of subchapter nine of this chapter. Attachment shall be by means of metal anchors, bolts, or similar devices. Wooden blocks or anchorage with wood used in connection with screws or nails shall not be used, except in the case of wall signs attached to buildings having walls of wood.

**(d) Fire department access. -**Wall signs that are, or have been, erected to cover doors or windows required by this code for fire department access to existing buildings shall be provided with access panels as required by section 27-292 of article two of subchapter four of this chapter. Existing wall signs shall be altered or otherwise arranged to comply with this requirement on or before December sixth, nineteen hundred seventy.

### §[C26-716.5] 27-502 Projecting signs. -

**(a) Location**. -Projecting signs, other than temporary signs, shall not be constructed on those streets and avenues listed in reference standard RS 7-2, and shall not be constructed to project beyond the street line except as permitted in subchapter four of this chapter**.**

**(b) Limitations. -**Projecting signs whose width when measured at a plane parallel to the building wall, does not exceed two feet may extend not more than five feet above the main roof level of the building to which they are attached; except that for buildings thirty-five feet high or less, such projecting signs may be erected to a maximum height of forty feet above grade but in no case to a height of more than fifteen feet above the main roof level.

**(c) Materials.-**All projecting signs shall be constructed of noncombustible materials except as permitted in sections 27-506 and 27-507 of this article.

**(d) Supports. -**Projecting signs shall be constructed and supported to resist loads acting in any direction on the sign in accordance with the provisions of subchapter nine of this chapter. Attachment shall be by means of metal anchors, bolts, supports, chains, wire ropes, rods, or other similar devices. No staples or nails shall be used to secure any projecting sign to any building. Turnbuckles or other equivalent means of adjustment shall be placed in all chains, wire ropes, or rods supporting or bracing projecting signs. All chains, wire ropes, or rods, and their attachments, shall be galvanized or of corrosion-resistant material, and no such supports shall be attached to an unbraced parapet wall.

### §[C26-716.6] 27-503 Roof signs. -

**(a) Location.-**Roof signs shall be set back a minimum of six feet from the face of the walls of the building on which they are erected.

**(b) Materials. -**Inside the fire districts, roof signs shall be constructed entirely of noncombustible materials except as permitted in sections 27-506 and 27-507 of this article. Outside the fire districts, the framework of roof signs exceeding fifteen hundred square feet in facing or display area or having any part more than sixty-five feet above grade shall be constructed of noncombustible materials, and the facing of such signs shall be noncombustible, except as permitted in sections 27-506 and 27-507 of this article.

**(c) Supports. -**Roof signs shall be constructed and anchored to resist loads acting in any direction on the sign in accordance with the provisions of subchapter nine of this chapter. Such signs shall be so constructed as to leave a clear space of at least seven feet between the roof and the lowest part of the sign, and at least five feet between the vertical supports thereof.

### §[C26-716.7] 27-504 Marquee signs. -

**(a) Limitations.** -No part of a marquee sign shall project above or below the marquee fascia, except that in the case of theaters licensed under the provisions of subchapters one and three of chapter two of title twenty of the administrative code, marquee signs may project not more than eight feet above nor more than one foot below the fascia, provided that the total height of such

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 394 of 654

Title 27 / Subchapter 7

signs does not exceed nine feet and the lowest part of such signs is at least ten feet above the ground or sidewalk level. Marquee signs may extend the full length of the marquee on all sides, but in no case shall they project beyond the ends of the marquee.

**(b) Materials**. -All marquee signs shall be constructed of noncombustible materials except as permitted in sections 27-506 and 27-507 of this article.

**(c) Supports. -**Construction and anchorage of marquee signs shall conform to the requirements for projecting signs under subdivision (d) of section 27-502 of this article.

### §[C26-716.8] 27-505 Illuminated signs. -

**General**. -All ground signs, wall signs, roof signs, projecting signs, and marquee signs may be lighted by internal or external sources when complying with the following requirements:

(1) ILLUMINATION. - No sign shall be illuminated by other than electrical means. All wiring and accessory electrical equipment shall conform to the provisions of the electrical code of the city of New York.

(2) MATERIALS. -Every illuminated sign shall be constructed of noncombustible materials except as permitted in section 27-507 of this article.

(3) PERMISSIBLE PROJECTIONS.-Lighting reflectors may project beyond the top or face of all signs, provided that every part of such reflector is at least ten feet above the ground or sidewalk level. In no case shall such reflectors project beyond a vertical plane two feet inside the curb line. Reflectors shall be constructed, attached, and maintained so that they shall not be, or become, a hazard to the public.

### §[C26-716.9] 27-506 Temporary signs. -

**(a) Materials.** -Temporary signs not more than five hundred square feet in area may be constructed of combustible materials. Temporary signs more than one hundred square feet in area shall be made of rigid materials with rigid frames. Temporary signs shall be securely attached to their supports, and shall be removed as soon as they are torn or damaged, but in no case later than thirty days after their erection.

**(b) Limitations. -**Temporary signs of combustible materials shall not extend more than one foot over, or into, a street, except that when permitted by the department of transportation, temporary banners or signs of combustible materials may be suspended from buildings or poles to extend across streets, and except that temporary signs of combustible materials constructed without a frame may be attached flat against, or suspended from the fascia of a canopy or marquee, provided that the lowest part of any such sign is at least nine feet above the ground or sidewalk level.

### §[C26-716.10] 27-507 Use of combustible materials. -

**(a) General. -**In all signs required to be constructed of noncombustible materials under the provisions of this code, wood or other materials of combustible characteristics similar to wood may be used for moldings, cappings, trim, nailing blocks, letters, latticing, and other purely ornamental features.

**(b) Slow-burning plastics.** -Slow-burning plastics may be used in sign construction subject to the following conditions and requirements.

(1) If all parts of the sign other than the letters and decorations are made from noncombustible materials, the display surface or sign facing may be made of slow-burning plastic, or may be occupied or covered by letters and decorations made from, or faced with, slow-burning plastics not exceeding a total area calculated from the values given in tables 7-2 and 7-3.

#### TABLE 7-2  GROUND SIGNS AND WALL SIGNS (NONCOMBUSTIBLE MATERIALS)

| Area of Facing or Display Surface | Area Occupied or Covered by Plastics |
|---|---|
| 150 sq. ft. or less | 100 per cent of display surface area |
| Over 150 sq. ft. but not over 2,000 sq. ft. | 150 sq. ft. plus 50 per cent of the difference between 150 sq. ft. and the area of the display surface |
| Over 2,000 sq. ft. | Not over 1,050 sq. ft. without permission of the commissioner |

#### TABLE 7-3  ROOF SIGNS, PROJECTING SIGNS, AND MARQUEE SIGNS (NONCOMBUSTIBLE MATERIALS)

| Area of Facing or Display Surface | Area Occupied or Covered by Plastics |
|---|---|
| 150 sq. ft. or less | 100 per cent of display surface area |
| Over 150 sq. ft. but not over 2,000 sq. ft. | 150 sq. ft. plus 25 per cent of the difference between 150 sq. ft. and the area of the display surface |
| Over 2,000 sq. ft. | Not more than 575 sq. ft. without permission of the commissioner |

(2) If combustible materials are permitted in the framework, moldings, cappings, trim, nailing blocks, latticing or other parts of the sign, the display surface or sign facing may be occupied or covered by letters and decorations made from or faced with slow-burning plastics not exceeding a total area calculated from the values given in tables 7-4 and 7-5.

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 395 of 654

Title 27 / Subchapter 7

## TABLE 7-4  GROUND SIGNS AND WALL SIGNS (COMBUSTIBLE MATERIALS)

| Area of Facing or Display Surface | Area Occupied or Covered by Plastics |
|---|---|
| 300 sq. ft. or less | 50 per cent of display surface area |
| Over 300 sq. ft. but not over 2,000 sq. ft. | 150 sq. ft. plus 25 per cent of the difference between 150 sq. ft. and the total area of the display surface |
| Over 2,000 sq. ft. | Not more than 575 sq. ft. without permission of the commissioner |

## TABLE 7-5 ROOF SIGNS (COMBUSTIBLE MATERIALS)

| Area of Facing or Display Surface | Area Occupied or Covered by Plastics |
|---|---|
| 1,000 sq. ft. or less | 25 per cent of display surface area |
| Over 1,000 sq. ft. but not over 2,000 sq. ft. | 250 sq. ft. plus 10 per cent of the difference between 1,000 sq. ft. and the total area of the display surface |
| Over 2,000 sq. ft. | Not more than 350 sq. ft. without permission of the commissioner |

**§[C26-716.11] 27-508 Maintenance and inspection.-**
**(a)Maintenance**. -All signs, together with all supports, braces, guys, and anchors, shall be kept in good repair at all times, and when not adequately galvanized or constructed of corrosion-resistant materials, shall be painted periodically to prevent corrosion. It shall be the duty and responsibility of the owner or lessee of every sign to maintain the immediate premises occupied by the sign in a safe, clean, sanitary, and inoffensive condition and free and clear of all obnoxious substances.
**(b)Annual inspection. -** Every sign for which a permit is required shall be inspected at least once in every calendar year.

## * ARTICLE 17-A

## YOUTH PROTECTION AGAINST TOBACCO ADVERTISING AND PROMOTION ACT

**§ 27-508.1 Short title. -**
This article shall be known and may be cited as the "Youth Protection Against Tobacco Advertising and Promotion Act."

**§ 27-508.2 Definitions. -**
For the purposes of this article, the following terms shall be defined as follows:

a. "Amusement arcade" means any enclosed business establishment, open to the public, whose primary purpose is the operation of coin-operated amusement devices within the meaning of subchapter three of chapter two of title 20 of this code.

b. "Child day care center" means (I) any child care arrangement, public, private or parochial child care center, school-age child care program, day nursery school, kindergarten, play school or other similar school or service operating pursuant to authorization, license or permit of the city or state, (ii) any facility that provides child care services as defined in section four hundred ten-p of the New York State social services law, or (iii) any child day care center as defined in section three hundred ninety of the New York State social services law. The definition of "child day care center" applies whether or not care is given for compensation but does not include child day care centers located in private dwellings and multiple dwelling units.

c. "Cigarette" means any product which consists of (i) any roll of tobacco wrapped in paper or in any substance not containing tobacco or (ii) any roll of tobacco wrapped in any substance containing tobacco which, because of its appearance, the type of tobacco used in the filler, or its packaging and labeling is offered for use or purchase by consumers as a cigarette described in (i) of this subdivision.

d. "Cigarette tobacco" means any product that consists of loose tobacco and is intended for use by consumers in a cigarette.

e. "Multiple dwelling" means any building or structure that may lawfully be occupied as the residence or home of three or more families living independently of each other.

f. "Multiple dwelling unit" means any unit of residential accommodation in a multiple dwelling.

g. "Person" means any natural person, partnership, co-partnership, firm, company, corporation, limited liability corporation, agency as defined in section eleven-hundred fifty of the New York City charter, association, joint stock association or other legal entity.

h. "Playground" means any outdoor premises or grounds owned or lawfully operated by or on behalf of, the board of education, the department of parks and recreation, or any public, private or parochial school, any child day care center or any youth center, which contains any device, structure or implement, fixed or portable, used or intended to be used by persons under the age of eighteen for recreational or athletic purposes including, but not limited to, play equipment such as a sliding board swing, jungle gym, sandbox, climbing bar, wading pool, obstacle course, swimming pool, see-saw, baseball diamond, athletic field, or basketball court.

i. "Private dwelling" means any building or structure or portion thereof that may lawfully be occupied for residential purposes by not more than two families,

including the grounds of such building or structure.

j. "School building" means any building or structure or any portion thereof, owned, occupied by, or under the custody or control of any public, private or parochial institution and lawfully used for the primary purpose of providing educational instruction to students at or below the twelfth grade level.

k. "Smokeless tobacco" means any product that consists of cut, ground, powdered, or leaf tobacco that is intended to be placed by the consumer in an oral cavity.

l. "Tobacco product" means a cigarette, smokeless tobacco or cigarette tobacco.

m. "Tobacco product advertisement" means any written word, picture, logo, symbol, motto, selling message, poster, placard, sign, photograph, device, graphic display or visual image of any kind, recognizable color or pattern of colors, or any other indicia of product identification identical or similar to, or identifiable with, those used for any brand of tobacco product, or any combination thereof, the purpose or effect of which is to promote the use or sale of a tobacco product through such means as, but not limited to, the identification of a brand of a tobacco product, a trademark of a tobacco product or a trade name associated exclusively with a tobacco product.

n. "Tobacco product promotion" means (i) any item or service marketed, licensed, sold or distributed, whether indoors or outdoors, which is not a tobacco product but which bears the brand of a tobacco product, a trademark of a tobacco product or a trade name associated exclusively with a tobacco product, alone or in conjunction with any written word, picture, logo, symbol, motto, selling message, poster, placard, sign, photograph, device, graphic display or visual image of any kind, recognizable color or pattern of colors, or any other indicia of product identification identical or similar to, or identifiable with those used for any brand of a tobacco product, or (ii) any gift or item other than a tobacco product offered or caused to be offered to any person purchasing a tobacco product in consideration of the purchase thereof, or to any person in consideration of furnishing evidence, such as credits, proofs-of-purchase, or coupons, of such purchase; provided, however, that a tobacco product promotion shall not include any gift or item provided through the exchange or redemption through the mail of any such credits, proofs-of-purchase, coupons or other evidence of the purchase of a tobacco product.

o. "Youth center" means any building or structure or portion thereof, lawfully occupied by any person for the primary purpose of operating a trade school (including those conducting after-school, vocational, remedial, tutorial, educational assistance programs) or an indoor recreational center (including recreational, cultural, physical fitness, or sports programs) for persons under the age of eighteen years, and which has been certified as such to the department in accordance with the procedure to be set by

the department. Such certification shall be accepted by the department but nothing in this subdivision shall prevent the commissioner from removing a certified youth center from consideration as a youth center if she or he determines it does not meet the criteria of a youth center.

**§ 27-508.3 Tobacco product advertisement restriction. -**

a. It shall be unlawful for any person to place, cause to be placed, to maintain or to cause to be maintained, a tobacco product advertisement within one thousand feet, in any direction, of any school building, playground, child day care center, amusement arcade or youth center, in any outdoor area including, but not limited to, billboards, roofs and sides of buildings, rolling shutters or gates, any enclosures into which rolling shutters or gates retract, water tanks and towers and free-standing signboards; provided, however, that any tobacco product advertisement on an awning projecting from the outside of a premises as of July 1, 1997 where tobacco products are sold or offered for sale may be retained until two years from the effective date of this law.

b. It shall be unlawful for any person to place, cause to be placed, to maintain, or cause to be maintained, a tobacco product advertisement in the interior of a building or structure which is within one thousand feet, in any direction, of any school building, playground, child day care center, amusement arcade or youth center, when such advertisement is within five feet of any exterior window or any door which is used for entry or egress by the public to the building or structure; provided, however, that tobacco product advertisements may be placed or maintained in the interior of any such premises where such advertisements are (I) parallel to the street and face inward, or (ii) affixed to a wall panel or similar fixture that is perpendicular to the street regardless of whether such advertisements are illuminated or not illuminated.

c. Nothing in this section shall prevent a person from placing, causing to be placed, maintaining, or causing to be maintained, a single sign, poster, placard or label no larger than six square feet and containing only black text, in any language, not exceeding eight inches in height on a white background stating "TOBACCO PRODUCTS SOLD HERE" or such words translated into any language, within ten feet of an entrance to the premises where tobacco products are sold or offered for sale.

d. Nothing in this section shall prevent a tobacco product manufacturer, distributor or retailer from placing, causing to be placed, maintaining, or causing to be maintained, its corporate or other business name on a building or structure, in any location, where such building or structure or a portion thereof is owned, operated or leased by such manufacturer, distributor or retailer and that building or structure is the principal place of business of such manufacturer, distributor or retailer in the city of New York; provided, however, that the corporate or other

business name of such manufacturer, distributor or retailer is registered or filed in the United States or such manufacturer, distributor or retailer is authorized to do business in any state, and the corporate or business name of such manufacturer, distributor or retailer does not include any brand name or trademark of a tobacco product, alone or in conjunction with any written word, picture, logo, symbol, motto, selling message, poster, placard, sign, photograph, device, graphic display or visual image of any kind, recognizable color or pattern of colors, or any other indicia of product identification identical or similar to, or identifiable with, those used for any brand of a tobacco product.

e.  This section shall not apply to any tobacco product advertisement on a motor vehicle. Nothing in this subdivision shall be construed to authorize the placement of a tobacco product advertisement in a location where such placement is otherwise prohibited by the rules of the department of transportation or other applicable law.

**§ 27-508.4 Non-compliant advertisements to be removed.-**
The owner, operator or lessee of any location or premises where a tobacco product advertisement is prohibited or restricted pursuant to the requirements of section 27-508.3 of this article shall have thirty days from the effective date of the local law that added this section to remove any non-compliant tobacco product advertisements.

**§ 27-508.5 Sponsorship of and at events.** -
Nothing in this article shall prevent a tobacco products manufacturer, distributor, or retailer who sponsors, in whole or in part, any athletic, musical, artistic, or cultural event, or team or entry in a competition or exhibition in any location from displaying or causing to be displayed the corporate or other business name of such sponsor; provided, however, that the corporate or other business name of such sponsor is registered or filed in the United States or such sponsor is authorized to do business in any state, and the corporate or other business name of such sponsor does not include any brand name or trademark of a tobacco product, alone or in conjunction with any written word, picture, logo, symbol, motto, selling message, poster, placard, sign, photograph, device, graphic display or visual image of any kind, recognizable color or pattern of colors, or any other indicia of product identification identical or similar to, or identifiable with, those used for any brand of a tobacco product.
*Local Law 3-1998.*

***§27-508.6 Injunctive relief. -**
Whenever any person has engaged in any act or practice which constitutes a violation of any provision of this article or of chapter thirteen of title eleven of this code, or of subchapter one of chapter two of title twenty of this code, or of any rule promulgated thereunder, the

city may make application to a court of competent jurisdiction for an order enjoining such act or practice.
***Local Law 2-2000; Local Law 3-1998.*

**§27-508.7 Penalties. -**
Notwithstanding the provisions of sections 26-122, 26-125 and 26-248 of this code, a violation of this article shall not subject any person to liability for a criminal offense.
**Local Law 10 -1998.*

### ARTICLE 18 FENCES

**§[C26-717.1] 27-509 Permitted heights. -**
In other than residence districts as established by the zoning resolution, fences may be erected throughout the city to a maximum height of ten feet. In residence districts, no fences, whether of masonry, steel, wood, or any other materials shall be erected to a height of more than six feet above the ground, except that fences used in conjunction with nonresidence buildings and public playgrounds, excluding buildings accessory to dwellings, may be erected to a height of fifteen feet. Higher fences may be permitted by the commissioner where required for the enclosure of public playgrounds, school yards, parks, and similar public facilities.

### ARTICLE 19 TENTS AND AIR-SUPPORTED STRUCTURES

**§[C26-718.1] 27-510 Location and height. -**
Tents or air-supported structures may be erected inside or outside of the fire districts provided they are not more than one story high above the ground, or above a roof that meets the requirements of subchapter five of this chapter for fire divisions.

**§[C26-718.2] 27-511 Separation. -**
No tent or air-supported structure shall be erected closer than twenty feet to any interior lot line nor closer than thirty feet in any direction to an unprotected opening, required exterior stairway or corridor, or required exit door, on the same level or above the level of the tent or air-supported structure. A tent or air-supported structure may abut another building on the same lot if there are no unprotected openings or exits above or within thirty feet as above stipulated, if there is no door between them that is a required exit, and if the exterior wall separating them meets the requirements of subchapter five of this chapter for fire divisions.
  **Exceptions. -** Requirements for separation from other buildings on the site shall be waived where a tent or air-supported structure is used for on-site temporary shelter for construction work, or incidental fabrication of construction elements to be used on the site of construction.

## §[C26-718.3] 27-512 Fire protection. -

The ground enclosed by a tent or air-supported structure, and the ground for a distance of at least ten feet outside of same, shall be cleared and maintained clear of all combustible material or vegetation. No open flame of any kind shall be employed within the structure, or closer than twenty feet to any part of the enclosure fabric. Fire extinguishing facilities shall be provided in accordance with the requirements of chapter four of this title.

## §[C26-718.4] 27-513 Exits. -

Notwithstanding any other requirements of subchapters six and eight of this chapter, travel distance to an exit from any point within a tent or air-supported structure shall not exceed seventy-five feet. Exit doors in air-supported structures shall close automatically against normal operational pressures. Opening force at the edge of such doors shall not exceed fifteen pounds, with the structure at operational pressure. Exit doors shall be located in frames so constructed that they will remain operative and support the weight of the structure in a state of total collapse.

## §[C26-718.5] 27-514 Structural requirements. -

**(a) Tents.** - Tents shall be guyed, supported, and braced to withstand a wind pressure of ten pounds per square foot of projected area of the tent. The poles and their supporting guys, stays, stakes, fastenings, etc. shall be of sufficient strength and attached so as to resist wind pressure of twenty psf of projected area of the tent.

**(b) Air-supported structures. -**

(1) Air-supported structures shall be anchored to the ground or supporting structure by either ballast distributed, and adequate to resist the inflation lift load, the aerodynamic lift load, and the drag (shear) load due to wind impact. The latter factors shall be based on a wind velocity of at least seventy miles per hour, and an estimated stagnation of not less than 0.5q for structures on grade whose height is equal to, or less than, the width of the structure. For greater heights, or for elevated structures, increased anchorage shall be provided, justified by analytical and/or experimental data.

(2) The skin of the structure shall be of such strength, and the joints so constructed, as to provide a minimum dead load strip tensile strength at seventy degrees F of four times the seventy mph design load (inflation and aerodynamic loading). The joints shall provide a dead load strip tensile strength of one hundred sixty degrees F of twice the seventy mph design load (i.e., a factor of safety of four and two respectively). In addition, the material shall provide a trapezoidal tear strength of at least fifteen percent of the maximum design tensile load. Material and joint strengths shall be so certified by the manufacturer, justified by analytical and/or experimental data.

## §[C26-718.6] 27-515 Flame resistance. -

**(a) Tents.** - All materials used for tents shall be treated to be flameproofed and shall remain flameproofed in accordance with chapter four of this title.

**(b) Air-supported structures.** All fabrics that have a base fabric weight of 6.4 oz. per square yard or less or that are used to enclose spaces classified in occupancy group C, E, F, G, H or J shall have an extinction time of not more than two seconds when tested under the small scale test method of reference standard RS 7-3. All other fabrics shall have a flame extinction time of not over one minute and/or a flame spread of not over one inch per minute when tested in accordance with the provisions of reference standard RS 7-4.

## §[C26-718.7] 27-516 Pressurization system. -

Air-supported structures shall be inflated and shall remain inflated during all periods of occupancy to a minimum differential pressure of 0.88 in. and a maximum differential pressure of 1.50 in. of water. Ventilation flow per occupant, either through vents or anticipated leakage, shall comply with the requirements of subchapter twelve of this chapter.

**Occupied spaces.** - Where the net floor area per occupant is one hundred fifty square feet or less, the structure shall be provided with at least two blowers, each of which shall have adequate capacity to maintain the required inflation pressure. In addition, an auxiliary engine-generator set capable of powering one blower, or a supplementary blower powered by an internal combustion engine, either of which shall have the capacity to run continuously for four hours, shall be located outside the structure, shall be weather protected, and shall be arranged to automatically operate the blower within twenty seconds upon failure of the normal source. Heat shall be provided from a source outside the structure so arranged as to prevent the spread of fire to the structure. The temperature within the air-supported structure shall be maintained at the temperature required by subchapter twelve of this chapter, but not less than fifty degrees Fahrenheit during periods of snowfall.

## §[C26-718.8] 27-517 Certificate of occupancy. -

Certificates of occupancy for tents or air-supported structures shall be issued for a period not exceeding one year, and such certificates may be renewed for one year periods thereafter if the tent or air-supported structure complies with all laws, rules and regulations in effect at the time of request for renewal.

## ARTICLE 20 OCCUPANCIES INVOLVING STORAGE OF NITRIC ACID

## §[C26-719.1] 27-518 Application.- 

This article shall apply to the construction, alteration and use of buildings or spaces wherein nitric acid is stored.

## §[C26-719.2] 27-519 Location. -

Carboys containing nitric acid shall be stored in storage vaults.

**§[C26-719.3] 27-520 Construction requirements. -**

(a) Vaults shall be constructed of incombustible acid-resistant material with a fire resistance of at least one hour.

(b) Doors opening into such storage vaults shall be self-closing, noncombustible fire doors with a fire-protection rating of at least three-quarters of an hour.

(c) Vault floors shall be constructed of acid-resistant brick, concrete treated with sodium silicate or other acid-proof material and shall incorporate a dike constructed of the same material, whose height shall be adequate to contain the acid plus the neutralizing substance that would be necessary to neutralize said acid plus six inches.

(d) The floor shall be provided with a valved drain, which shall be connected to the drainage system in accordance with the requirements of subchapter sixteen of this chapter.

**§[C26-719.4] 27-521 Ventilation. -**

Mechanical ventilation systems for storage vaults shall be adequate to effect ten complete air changes per hr. Exhaust shall be taken from within twelve inches above the level of the top of the dike. The exhaust system shall be independent of exhaust systems serving other parts of the building and the openings to the outdoors shall be located in accordance with the provisions of subchapter thirteen of this chapter for system conveying vapors.

## ARTICLE 21 ATRIUMS

**§[C26-720.1] 27-521.1 Applicability. -**

This article shall apply to the construction, alteration and use of atriums.

**§[C26-720.2] 27-521.2 Classification.-** An atrium shall be classified in occupancy group F-3.

**§[C26-720.3] 27-521.3 Construction. -**

(a) Atriums may be constructed only in buildings in noncombustible construction groups 1-A, 1-B and 1-C.

(b) An atrium shall be fully enclosed except that openings of any size into the two lowest levels of an atrium shall be permitted if such openings are provided with opening protectives having a fire-resistance rating of at least one and one-half hours or are provided with sprinklers no more than six feet apart.

(c) The minimum horizontal clear dimension of an atrium shall be forty feet, provided, however that this dimension can be reduced to twenty feet where sprinkler spacing on the occupied side adjacent to glass panels authorized by subdivision (d) of this section is no more than four feet or the minimum atrium area is twelve hundred square feet.

(d) Atrium enclosing walls shall be of at least two hour fire-resistant construction or of glass that is wired, laminated, or tempered and is provided with sprinklers on the occupied side spaced no more than six feet apart, except

as otherwise permitted by subdivision (c) of this section.

**§[C26-720.4] 27-521.4 Fire protection equipment. -**

(a) Smoke detectors. - In all spaces opening onto an atrium, a smoke detecting system shall be installed in accordance with the requirements of reference standard RS 17-5E.

(b) Standpipes. - At least one standpipe outlet in addition to a riser or risers within required stairways, shall be installed in every atrium.

(c) Sprinklers. -

(1) Every story or mezzanine within an atrium that overhangs another story or mezzanine within fifty feet shall have the overhang sprinklered in accordance with section 27-956 of article four of subchapter seventeen of this chapter, except that atrium ceilings less than fifty feet above the atrium floor but more than thirty feet above the floor may alternatively be provided with smoke detectors, which shall be of the central supervisory type connected to an approved central station. Every room or space opening onto the atrium shall be sprinklered, no matter where located.

(2) Except as otherwise permitted by subdivision (c) of section 27-521.3 of this article, at glass panels permitted by subdivision (d) of such section, sprinklers on the occupied side at all levels shall be spaced six feet apart parallel to the glass and that distance away from the glass panels so as to insure complete glass wetting upon activation. No obstructions to such wetting capability shall be permitted.

(3) Every sprinkler system for an atrium shall be provided with sources of water supply in accordance with article four of subchapter seventeen of this chapter.

**§[C26-720.5] 27-521.5 Means of egress. -**

(a) No vertical exits shall discharge into an atrium at any level.

(b) Atrium corridors shall have a width equal to or greater than one hundred fifty per cent of that required by either table 6-1of subchapter six or table 8-1 of subchapter eight, as applicable.

(c) An unenclosed path of travel to a required exit shall be permitted, except that access to one of the required vertical exits shall be only through an enclosed passageway or corridor conforming to the requirements for exits of subchapter six.

**§[C26-720.6] 27-521.6 Fire alarm and communication system. -**

An interior fire alarm and communication system shall be installed in accordance with the requirements of reference standard RS 17-3.

**§[C26-720.7] 27-521.7 Signs. -**

Atriums shall be provided with all signs required by articles seven and nine of subchapter six of this chapter, regardless of the occupant load of the atrium.

**§[C26-720.8] 27-521.8 Smoke control. -**

(a) In all atriums there shall be provided a system of mechanical ventilation of sufficient capacity to exhaust at least six air changes per hour of the combined volumes of the atrium and all spaces with an open connection to the atrium, or 1 cfm/sq. ft. from all such spaces, whichever is greater, using either dedicated fan equipment or the building ventilation system arranged to shut down automatically, with manual override capability. Make-up air shall be supplied at the lowest level of an atrium at a rate equal to seventy-five percent of exhaust.

(b) All atriums shall have a gravity ventilation system equipped with remote manual controls to remove smoke if the mechanical exhaust system fails.

(c) A ventilation system serving an atrium shall not be interconnected with any other system serving another space.

(d) Ventilation systems supplying occupied spaces shall not be interconnected with the general atrium supply.

### §[C26-720.9] 27-521.9 Emergency power. -
All atriums shall be provided with an emergency power system meeting the requirements of article eleven of subchapter six of this chapter.

## ARTICLE 22 MALLS

### §[C26-721.1] 27-521.10 Applicability. - This article shall apply to the construction, alteration and use of malls.

### §[C26-721.2] 27-521.11 Classification. -
A mall shall be classified in occupancy group C.

### §[C26-721.3] 27-521.12 Construction; General. -
(a) A mall may be constructed only in buildings in noncombustible construction groups I-A, I-B and I-C.

(b) The minimum horizontal clear dimension at any level in a mall shall be twenty feet.

(c) Where different tenancies have openings to a mall the tenancies shall be separated in accordance with section 27-341 of article five of subchapter five of this chapter.

(d) All openings between a mall and other spaces shall be provided with a noncombustible draft curtain that shall extend downward a minimum of twenty-four inches below the lowest ceiling adjacent to such draft curtain or shall meet the requirements of clause three of subparagraph d of paragraph three of subdivision (h) of section 27-370 of article five of subchapter six of this chapter relating to show windows.

### §[C26-721.4] 27-521.13 Fire protection equipment. -
(a) Smoke detectors. - Smoke detectors meeting the specifications of section 27-981 of article six of subchapter seventeen shall be located at the ceiling and adjacent to each return air intake.

(b) Standpipes. - At least one standpipe outlet shall be installed in every mall.

(c) Sprinklers. - An automatic wet sprinkler system shall be installed in every mall.

(1) All spaces with openings between such spaces and a mall shall be fully sprinklered in accordance with subchapter seventeen of this chapter and reference standard RS 17-2 regardless of floor area or occupancy classification.

### §[C26-721.5] 27-521.14 Egress. - The exits for a mall shall be of sufficient capacity to accommodate the aggregate occupant load of the mall and all spaces opening onto the mall.

### §[C26-721.6] 27-521.15 Smoke control . -
(a) In all malls there shall be provided a system of mechanical ventilation of sufficient capacity to exhaust at least six air changes per hour of the combined volumes of the mall and all spaces with an open connection to the mall, or 1 cfm/sq. ft. from all such spaces, whichever is greater, using either dedicated fan equipment or the building ventilation system arranged to shut down automatically, with manual override capability. Make-up air shall be supplied at the lowest level of a mall at a rate equal to seventy-five per cent of exhaust.

(b) All malls shall have a gravity ventilation system equipped with remote manual controls to remove smoke if the mechanical exhaust system fails.

(c) A ventilation system serving a mall shall not be interconnected with any other system serving another space.

(d) Ventilation systems supplying occupied spaces shall not be interconnected with the general mall supply.

### §[C26-721.7] 27-521.16 Signs. -
Malls shall be provided with all signs required by articles seven and nine of subchapter six of this chapter, regardless of occupant load of the mall.

## SUBCHAPTER 8
## PLACES OF ASSEMBLY

### TABLE OF CONTENTS

| [Sub-Art.<br>or Sec.]* | Art.<br>or Sec.** | |
|---|---|---|
| **[800.0]** | **Art. 1** | **General** |
| [800.1] | 522 | Scope |
| [800.2] | 523 | Definitions |
| [800.3] | 524 | Tents and Air Supported Structures |
| **[801.0]** | **Art. 2** | **Basic Requirements** |
| [801.1] | 525 | General |
| | 525.1 | Place of Assembly Permit |
| [801.2] | 526 | Location |
| [801.3] | 527 | Posted Capacity |
| [801.4] | 528 | Approved Seating Plans |
| [801.5] | 529 | Enclosure and Interior Finish |
| [801.6] | 530 | Means of Egress |
| [801.7] | 531 | Seating in Assembly Spaces |
| [801.8] | 532 | Aisles and Cross Aisles |
| [801.9] | 533 | Travel Distance |
| [801.10] | 534 | Exit Openings |
| [801.11] | 535 | Safe Areas |
| [801.12] | 536 | Corridors |
| [801.13] | 537 | Exit Passageways |
| [801.14] | 538 | Vertical Exits |
| [801.15] | 539 | Open Exterior Spaces |
| [801.16] | 540 | Exit Lighting |
| [801.17] | 541 | Exit Signs |
| [801.18] | 542 | Emergency Lighting |
| [801.19] | 543 | Light Projection Sources |
| [801.20] | 544 | Motion Picture Screen |
| **[802.0]** | **Art. 3** | **F-1 Places of Assembly** |
| [802.1] | 545 | General |
| [802.2] | 546 | F-1a Places of Assembly |
| [802.3] | 547 | F-1b Places of Assembly |
| **[803.0]** | **Art. 4** | **F-2 Places of Assembly** |
| [803.1] | 548 | General |
| **[804.0]** | **Art. 5** | **F-3 and F-4 Places of Assembly** |
| [804.1] | 549 | General |

*"C26" omitted from section numbers in this column.
**"27" omitted from section numbers in this column.

### LIST OF TABLES

Table No.
8-1  Determination of Exit and Access Requirements

### ARTICLE 1 GENERAL

**\*\*\*§[C26-800.1] 27-522 Scope. -**
The provisions of this subchapter shall control the design and construction of places of assembly as defined in subchapter two of this chapter. For specific classifications of assembly occupancies, see article eight of subchapter three of this chapter. For place of assembly permit requirements, see section 27-525.1 of article two of this subchapter.
*\*\*\*Local Law 23-1990.*

**§[C26-800.2] 27-523 Definitions. -**
For definitions to be used in the interpretation of this subchapter, see subchapter two of this chapter.

**§[C26-800.3] 27-524 Tents and air supported structures.-**
Places of assembly enclosed by tents or air supported structures shall comply with the provisions of this subchapter regulating indoor places of assembly, and with the provisions of article nineteen of subchapter seven of this chapter.

### ARTICLE 2 BASIC REQUIREMENTS

**§[C26-801.1] 27-525 General. -**
The provisions of this article shall apply to all places of assembly, in addition to the specific requirements of articles three through five of this subchapter for the several categories of places of assembly.

**\*\*§27-525.1  Place of assembly permit. -**
    a.  It shall be unlawful to use or occupy any building or premises or part thereof as a place of assembly unless and until a permit therefor shall have been issued by the department. The permit shall be for a term of one year.
    b.  The application for such permit and such permit shall be in a form prescribed by the commissioner.
    c.  The annual fee for a permit issued pursuant to this section shall be the amount provided for in paragraph seven of subdivision a of section 26-214 of the code. An application for such permit or renewal thereof shall be accompanied by the annual fee, except as otherwise provided in section 26-210 of the code.
    d.  The permit issued pursuant to this section shall be posted in a conspicuous place in the place of assembly, which is covered by such permit.
*\*\*Local Law 23-1990.*

**§[C26-801.2] 27-526 Location. –**
No place of assembly shall be located within two hundred fifty feet of any occupancy containing explosive contents.

22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff   Pg 402 of 654

Title 27 / Subchapter 8

**§[C26-801.3] 27-527  Posted capacity. -**
Signs shall be posted in all assembly spaces, indicating the number of persons who may legally occupy the space. Signs shall not be required where seating is fixed in place in accordance with an approved seating plan and no provision is made for standee spaces. Such signs, where required, shall read as follows:

---

OCCUPANCY BY MORE THAN_____PERSONS
IS DANGEROUS AND UNLAWFUL

Public Assembly License No_____   Commissioner,
(where applicable)  Dept. of Buildings, City of New

---

When a space is occupied for multiple purposes involving different occupant loads the sign shall read as  follows:

---

OCCUPANCY BY MORE THAN
(number)____PERSONS AS____(type of occupancy)____
OR BY
(number)____PERSONS AS____(type of occupancy)____
OR BY
(number)____PERSONS AS____(type of occupancy)____
IS DANGEROUS AND UNLAWFUL
Public Assembly License No_____   Commissioner,
(where applicable)  Dept. of  Buildings, City of New York

---

Signs shall be at least twelve inches wide and sixteen inches high. The lettering shall be red on a white background. The letters shall be at least one inch high and the numerals at least one and one-quarter inches high. Signs shall be framed under a transparent protective cover, and permanently mounted in a location that is conspicuously visible to a person entering the space. Signs shall be lighted by artificial illumination at all times during occupancy to maintain at least five foot candles on the surface of the sign.

**§[C26-801.4] 27-528 Approved seating plans. -**
In every place of assembly providing seating, copies of approved seating plans and approved alternate seating plans shall be kept on the premises. The plans shall be readily available for inspection, and shall provide the following information:
  **(a) For assembly spaces:**
    (1) The location of each seat of each tier of seating, along with the number of occupants of each seating section.
    (2) The location and number of standees for each standee area.
    (3) The total number of occupants of each tier and of the assembly space.
    (4) The location and classification of all exits.

**(b)For safe areas:**
    (1) The furniture and equipment arrangement and location.
    (2) The number of occupants to be accommodated.
  **(c) For stage areas:**
(1) The maximum number of occupants, including audience seating on the stage.
    (2) Any conditions limiting the use of the stage area.
    (3) The location of all exits.
These plans shall not be smaller in size than required for one-eighth inch scale plans.

**§[C26-801.5] 27-529 Enclosure and interior finish. -**
Places of assembly shall be separated from adjoining occupancies by construction meeting the requirements of table 5-1 or table 5-2, whichever may apply. The interior finish of places of assembly shall meet the requirements of table 5-4.

**§[C26-801.6] 27-530 Means of egress. -**
Places of assembly shall be provided with exit facilities meeting all of the requirements of this subchapter and all of the requirements of subchapter six of this chapter. A place of assembly located in a building classified in another occupancy group shall comply with the exit requirements of this subchapter, but may use the exit facilities of the building of which it is a part as a means of egress from the building.

**§[C26-801.7] 27-531 Seating in assembly spaces. -** All seating in assembly spaces shall conform to the following:
  **(a) Seating arrangements.-** Except as otherwise provided in this subchapter, all seating shall be arranged in rows to provide for orderly egress.
    (1) CHAIR SEATING. - Seating patterns employing individual chairs shall comply with the following:
      a. Assembly spaces in which the net floor area, exclusive of stage area, is less than eight square feet per person shall be provided with chairs that are rigidly anchored to the construction or fixed in place by devices that prevent movement in any direction, except that not more than twelve movable chairs may be provided in a box or loge if such box or loge is separated from the main seating pattern by railings or other permanent construction and has an area of at least five square feet per chair.
      b. In assembly spaces where the net floor area, exclusive of stage area, is between eight and twelve square feet per person, movable chairs may be used provided all chairs in a row between aisles are fastened or ganged together to preserve the integrity of the row. Not more than twelve chairs shall be used in any row between aisles.
      c. In assembly spaces where net floor area, exclusive of stage area, is more than twelve square feet per person, individual movable chairs may be used.

Not more than twelve chairs shall be used in any row between aisles.

d. All chairs placed on stepped platforms less than four feet wide shall be anchored or fixed in place.

e. The minimum distance between centerlines of chairs in the same row shall be nineteen inches.

f. The spacing between the back of one chair in any row and any part of the chair in the row behind it, including arm blocks, when the seat is in the lift-up position for automatic operation or in the horizontal position for nonlift-up or nonautomatic operation, when measured horizontally between plumb lines, shall be at least twelve inches, and this spacing shall be increased for any of the following reasons:

1. Where a difference in floor level occurs between any two rows, the spacing shall be increased as follows:

| Difference in Level (in.) | Increase in Space (in |
|---|---|
| 6-10, plus any fraction of an inch.. | 1 |
| 11-16, plus any fraction of an inch | 2 |
| 17-22, plus any fraction of an inch | 3 |
| 23 and over………………………. | 4 |

2. Where it is necessary from any location to pass more than seven chairs to reach the nearest aisle, spacing shall be increased one-quarter of an inch for each chair in excess of seven.

g. Not more than eight chairs shall be provided in any row of seating having access to only one aisle except as provided below for bleacher and platform seating.

h. Performance viewing positions shall be provided for persons who use wheelchairs in accordance with the following schedule.

*Local Law 58-1987.

| Capacity of Assembly Space | Number of Viewing Positions |
|---|---|
| 75 to 100…………. | ……………minimum 4 |
| 101 to 150……….... | ……………minimum 5 |
| 151 to 200……….... | ……………minimum 6 |
| 201 to 300……….... | …………………………7 |
| 301 to 400……….... | …………………………8 |
| 401 to 500……….... | …………………………9 |
| 501 to 1000……...……………. | 2 percent of total |
| Over 1000……….... | 20 plus 1 for each 100 over 1000 |

These positions shall be located so as not to interfere with egress from any row of seats and shall be reachable by means of ramps and/or elevators. Steps shall not be allowed in line of travel from the main approach entry to the designated locations. Size and placement of wheelchair locations, surfaces, access to

performing area and listening systems where required, shall comply with the provisions of reference standard RS 4-6. These positions may be utilized by persons who do not use wheelchairs provided that the positions are delineated on the approved seating plans, the seating is readily removable and the positions are unsold one full working day before the performance.

(2) BLEACHER SEATING. - Fixed or folding bleachers shall comply with the following:

a. For the purpose of determining occupant load, individual seat space width shall be assumed to be eighteen inches. There shall be a space of at least fourteen and one-half inches between the back edge of each seat and the front edge of the seat immediately behind it when measured between plumb lines.

b. The width of footboards and seat boards shall be at least nine and one-half inches. Where wider seat boards are provided, the space between seats may be reduced by an amount equivalent to the increase in width.

c. Sections having not more than ten consecutive rows of seating shall not require aisles. Where there are more than ten consecutive rows, aisles shall be provided at the ends of seat rows, the minimum spacing between seat rows shall be increased to sixteen inches and the required space between seat rows shall be increased by one-quarter of an inch for each seat in excess of seven that it is necessary to pass to reach an aisle. Cross aisles shall be provided at the bottom of each section of seating.

d. Bleacher seating shall be constructed to comply with the requirements of subchapters nine and ten of this chapter

(3) PLATFORM SEATING. - Stepped platforms used for seating without chairs shall comply with the following:

a. For the purpose of determining occupant load, individual seat space width shall be assumed to be eighteen inches.

b. Platforms shall be at least twenty-eight inches deep from front to back.

c. Platform depth shall be increased one-quarter of an inch for each seat in excess of seven that it is necessary to pass to reach an aisle.

d. Aisles complying with section 27-532 of this article shall be provided when the height between levels of platform seating exceeds eight inches

(4) BENCH SEATING. - Bench or pew seating, with or without backs, may be used when complying with the applicable requirements for chair seating in [sic] paragraph one of this subdivision. For the purpose of determining occupant load, individual seat space width shall be assumed to be eighteen inches.

(5) TABLE AND CHAIR SEATING. - Tables and chairs shall be so arranged that the distance from any chair at any table by way of a path between tables and chairs is not greater than eighteen feet to an aisle

leading to an exit. The width of the path shall be at least eighteen inches, except that it may be reduced by one inch for each one foot that the distance to the aisle is less than eighteen feet but may not be reduced to less than twelve inches. Chairs, when placed with the front edge of the seat on a line with the edge of the table, shall not protrude into the path. Booths containing up to eight seats may be used, provided they open directly on an aisle.

(6) COUNTER SEATING. - Counters at which food or beverages are consumed shall be attached to the floor. Fixed or movable chairs or stools may be provided. The number of occupants shall be determined on the basis of one occupant for each eighteen inches of counter length. The width of aisles bordering counters shall be measured excluding a depth of eighteen inches for chair or stool spaces.

(7) STANDEE AREAS. - Standee areas may be permitted within assembly spaces provided each standee space has a minimum width of twenty-two inches and a minimum depth of twenty-one inches. Standee areas shall not encroach on the required exit facilities and shall be separated from the space to be left clear for passage by tape, ribbon or other easily broken material, supported by lightweight posts fixed in stationary sockets, so constructed and placed as to not constitute an obstruction in case of panic or emergency.

(8) PROTECTIVE GUARDS. - Protective guards shall be provided for seating and standee areas as follows:

a. A protective guard at least thirty inches high above the floor shall be provided along the fascia of all balconies, loges, and boxes, except that the guard shall be at least thirty-six inches high at the bottom of stepped aisles. When rails or other parts of such guards are designed with ledges more than two and one-half inches wide, the top surface of the ledges shall slope down toward the seating area at an angle of at least thirty degrees from the horizontal. The guards shall provide an unperforated curb or toeguard at least twelve inches high above the level of the floor of the balcony, loge, or box.

b. A protective guard at least thirty inches high above the floor shall be provided at cross aisles where fixed seat backs of any adjacent lower level do not project at least twenty-four inches above the cross aisle level.

c. A protective guard at least eighteen inches high above the floor shall be provided along the front edge of any stepped platform where fixed seat backs of the adjacent lower level do not project at least eighteen inches above the stepped platform level.

d. A protective guard at least twenty-six inches high above seat level shall be provided at the open ends of bleacher seating, extending from the front of the third row of seats to the back of the

highest row of seats, and continuously along the rear of the seating, except where the seating is adjacent to a wall.

e. Guards shall be designed to meet the load requirements for railings in subchapter nine of this chapter.

§[C26-801.8] 27-532 Aisles and cross aisles. – Assembly spaces shall be served by aisles, cross aisles, or other unobstructed floor areas providing access to exits, except as permitted for bleacher seating in paragraph two of subdivision (a) of section 27-531 of this article.

(a) The capacity of aisles and cross aisles shall be adequate to serve all persons for whom they provide a primary path of travel to an exit. (See section 27-533 of this article.)

(1) CAPACITY. - The capacity of aisles and cross aisles shall be as listed in table 8-1. The unit of exit width shall be twenty-two inches. Seats or other facilities shall not project into an aisle or cross aisle so as to reduce the width of the aisle or cross aisle more than one inch per unit of exit width.

(2) MINIMUM WIDTH. - Aisles and cross aisles shall have a minimum width of forty-four inches except that the width may be at least thirty-six inches under any one or more of the following conditions:

a. In any assembly space having a total of not more than three hundred occupants.

b. When not more than the number of persons permitted for one unit of exit width is served.

c. At the narrowest point when a tapered aisle is permitted under paragraph three of this subdivision.

d. When an aisle parallels and is alongside an enclosure wall or partition that is provided with exit doors spaced not more than sixteen feet on centers, provided such aisle serves only the rows of seats adjacent to it

(3) TAPERED AISLES. - Tapered aisles shall be used where egress is provided only at one end of the aisle, except that uniform aisles may be used when their width for the entire length will accommodate eighty percent of the total occupant load served by the aisle. Tapered aisles shall be widened gradually so that their width at the point of discharge provides for the entire occupant load of the aisle.

(4) UNIFORM AISLES. - Aisles of uniform width shall be used where egress is provided at both ends of an aisle by either cross aisles or exit doors. The width of uniform aisles shall not be less than required for sixty percent of the total occupant load served by the aisles.

(5) AISLE WIDTH AT OPENINGS. - When an aisle or cross aisle discharges directly into exit openings, a space shall be provided in front of such openings that is at least as wide as such openings and at least as deep as the width of the aisle or cross aisle.

(6) CROSS AISLES. - Cross aisles, at any point shall not be closer than twelve feet to a stage area

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 405 of 654

Title 27 / Subchapter 8

using scenery or scenic elements. Steppings shall not be permitted in cross aisles.

(7) AISLE GRADIENTS AND STEPPINGS. - The floors of aisles shall have a gradient of not more than one in eight. Where differences in levels require a greater gradient, steps shall be used, complying with the following:

a. When one riser only is used between levels of platforms, its height shall not exceed eight inches, and where more than one riser is used, none shall exceed seven and three-quarter inches.

b. No riser shall be less than four inches high.

c. No riser shall vary from the height of the riser immediately above or below except that risers that are separated by a tread of seventeen inches or more may vary up to one-quarter inch.

d. The width of treads of intermediate steps between platform levels shall be at least nine and one-half inches, but not more than ten and one-half inches, exclusive of nosings.

e. Treads at the level of platforms and seventeen inches or more in width may slope not more than one-quarter inch in twelve inches.

f. No steps shall be used to enter a row of seats from an aisle unless an unobstructed floor space of at least seven square feet is provided at the level of the aisle, between the aisle and the steps.

g. Each step in an aisle shall be marked along its nosing with a permanent contrasting color stripe, and shall be provided with a step light.

h. The line of risers of aisle steppings shall deviate no more than twenty degrees from a line perpendicular to the centerline of the aisle.

(8) STEPPED AISLE LANDINGS. - Stepped aisles shall
be provided with landings at exit openings, and shall have a length equal to at least the width of the aisle and a slope of not more than one in twelve.

(9) LIGHTING. - Aisles and cross aisles shall be provided at all times with at least one-half foot candle of artificial illumination by electrical means.

(10) VOMITORIES. - Vomitories within assembly spaces shall comply with all of the requirements for aisles, and shall have a clear ceiling height of at least seven feet.

## §[C26-801.9] 27-533 Travel distance. -

At least one exit opening shall be available from every attached seat or standee space in an assembly space, or from the most remote point in the space when movable seats are provided or, when no seats are provided, within the primary travel distance limitation listed in table 8-1. In addition, an alternate exit opening shall be available from every attached seat or standee space, or from the most remote point when attached seats are not provided within the secondary travel distance limitation listed in

table 8-1. Such alternate exit openings may serve to satisfy the requirements for primary travel distance for other seats or locations. Exit openings satisfying the primary and secondary travel distance requirements for any one seat or location shall be separated from each other by a distance of at least twenty-five feet.

(a) Travel distance shall be the measured distance along centerlines of paths of travel to the centerline of the exit opening, as adjusted by penalties for multi-directional or stepped travel as provided below.

(1) No path of travel shall be permitted through rows of seating other than the first leg of travel from a seat to an aisle.

(2) The first thirty-five feet of a primary path of travel and a secondary path of travel may be common to each other except that this distance may be increased to fifty feet in F-2 places of assembly.

(3) Not more than three changes in direction of travel shall be permitted in the path of travel to an exit opening. A change in direction shall be deemed to occur when it is necessary to change direction by a forty-five degrees or greater angle, measured from the preceding line of travel, except that it shall not be considered as a change in direction when it is necessary in an aisle or cross aisle to travel in another direction not more than seven feet.

(4) Travel distance shall be the sum of the distances of all segments of travel to the exit, computed as follows:

| Segment | Length |
| --- | --- |
| First leg of travel | Measured distance |
| Second leg of travel after first change in direction | Measured distance |
| Third leg of travel after second change in direction | 1.25 times measured distance |
| Fourth leg of travel after third change in direction | 1.40 times measured distance |
| Any leg of travel with four or more steps | 1.25 times length of segment as computed above |

## §[C26-801.10] 27-534 Exit openings. -

Exit openings from assembly spaces shall comply with the following:

(a) Capacity. - The capacity of exit openings shall be listed as in table 8-1, based on the number of occupants for whom the opening satisfies the primary travel distance requirement.

(b) Width. - Exit openings shall be at least thirty-six inches wide for single doors and at least sixty-six inches but not more than eighty-eight inches wide for doors swinging in pairs, except that in assembly spaces having an occupant load of over three hundred persons, single door openings shall be at least forty-four inches wide.

Title 27 / Subchapter 8

## TABLE 8-1 DETERMINATION OF EXIT AND ACCESS REQUIREMENTS

| Occupancy Group Classification | Maximum Travel Distance Within Assembly Space (ft.) [a] | | Capacity (number of persons per unit of width) | | | | |
| | | | Doors or Openings | | | | |
| | Primary | Secondary | Aisle and Cross Aisle [e] | From Assembly Space | From Safe Area | Stairs and Escalators | Ramps, Corridors, Safe Areas, Exit Passageways |
|---|---|---|---|---|---|---|---|
| F-1a [b] | 85 | 125 | 80 | 50 | 100 | 60 | 80 |
| F-1b [c] | 100 | 125 | 90 | 80 | 125 | 80 | 100 |
| F2 | 175 | 250 | 400 | 400 | 500 | 320 | 425 |
| F3 | 100 [d] | 125 [d] | 90 | 80 | 125 | 80 | 100 |
| F4 | 85 [d] | 125 [d] | 80 | 50 | 100 | 60 | 80 |

**Notes:**

[a] See section 27-533. When an exit opening from an assembly space discharges into corridor that does not meet the requirements of this code for a safe area, the travel distance shall include the distance within the corridor to an exit.

[b] See paragraph four of subdivision (b) of section 27-546 for stages.

[c] See paragraph three of subdivision (b) of section 27-547 for stages.

[d] In place of assembly completely equipped with automatic sprinklers, this distance may be increased fifty percent.

[e] See section 27-532.

\* *Bracket not enacted but probably intended.*

**(c) Classification.** - Exit openings from assembly spaces shall be classified as follows:

Class. 1.- Exit openings that are used for normal entry to the assembly space, and that open directly to a safe area or to an open exterior space.

Class 2.-Exit openings that are not used for normal entry to the assembly space, and that open directly to a safe area or to an open exterior space.

Class 3.-Exit openings that open from the assembly space into corridors, exit passageways, or vertical exits.

**(d) Distribution of classes.** - The required exit capacity from F-2 places of assembly, and from all other assembly spaces in which the net floor area, exclusive of stage area, is twelve square feet or more per person may be provided by exit openings of any class. The required exit capacity from assembly spaces in which the net floor area, exclusive of stage area, is less than twelve square feet per person shall be distributed so that exit openings of each class are provided to comply with the following requirements:

1. For assembly spaces in which the mean floor level is not more than fifteen feet above or below the adjoining grade elevation, the exit capacity shall be distributed as follows:

Class 1- not less than forty percent

Class 2- not more than sixty percent

Class 3- not more than forty percent

2. For assembly spaces in which the mean floor level is more than fifteen feet, but not more than thirty feet, above or below the adjoining grade elevation, the exit capacity shall be distributed as follows:

Class 1 - not less than sixty percent

Class 3 - not more than forty percent

3. For assembly spaces in which the mean floor level is more than thirty feet above or below the adjoining grade elevation, the exit capacity shall be distributed as follows:

Class 1- not less than one hundred percent

**(e) Location.** - No exit opening shall be closer than twelve feet to any part of a stage using scenery or scenic elements. All exit openings shall be clearly identifiable and shall not be disguised as part of a wall or covered in any way to obscure them from view. Where, because of the configuration of the assembly space enclosure, an exit opening is not visible from all seats using it as a means of egress, directional exit signs shall be placed on the enclosure alongside the exit opening to indicate its location. These signs shall be in addition to those required over the exit opening.

**(f) Locking.** - No exit door shall be locked so as to prevent egress from an assembly space while it is occupied.

## §[C26-801.11] 27-535 Safe areas. –

Safe areas shall comply with the following:

(a) When provided to serve class one or class two exit openings safe areas shall be separated from assembly spaces by noncombustible construction having a two hour fire-resistance rating, and shall serve as transition areas in the line and direction of exit travel. They shall serve for normal entry to the assembly space and may be used as corridors, lobbies, or lounges. No room or space classified in occupancy group A, B-1, D-1, or D-2 shall open upon a safe area. Safe areas shall be at a level not more than six feet above or below the level at which egress is made from the assembly space, except that a separate safe area shall not be required for any assembly space having an occupant load of less than one hundred fifty persons and which is served by a safe area of another assembly space, when such safe area is in the direction of egress. Ventilating systems for safe areas shall not be connected to systems serving any other spaces, unless separated from such systems by fire dampers actuated by smoke detectors meeting the construction requirements of subchapter thirteen of this chapter.

(1) COLLECTING SAFE AREAS. - Places of assembly having more than one assembly space may have a collecting safe area that receives the occupant load discharged into it by other safe areas. Collecting safe areas shall be located within six feet above or below the assembly space nearest to grade.

(2) OCCUPANT LOAD. - The occupant load of a safe area shall be the aggregate occupant load of all exit openings discharging directly into it. The occupant load of a collecting safe area shall be the aggregate occupant load of all exit openings discharging directly into it, plus fifty percent of the occupant load of other safe areas discharging into it.

(3) DIMENSIONS.- Except as provided in subdivision four of this section, the clear unobstructed floor area of each safe area shall be sufficient to accommodate the total occupant load of the safe area on the basis of two square feet per person, not including space occupied by furniture or equipment. The minimum dimension of such unobstructed space shall be eight feet. The width of the unobstructed space shall be measured at right angles to the direction of travel to an exit and shall not be less than required for the occupant load, on the basis of the exit capacity listed in table 8-1. The height of safe areas shall be at least eight feet at all points.

(4) SAFE AREAS NEAR GRADE. - When a safe area provides egress to an open exterior space, either directly or through a vestibule, the safe area need not provide the floor area required by subdivision three of this section when the level of discharge from the safe area to the open exterior space is not more than four feet above or below the grade of the open exterior space.

(5) RAMPS AND STEPS. - Ramps in safe areas shall have a gradient of not more than one in twelve, except that when not exceeding six feet in length, the gradient may be not greater than one in ten. Steps in safe areas shall comply with the following requirements:

a.    No riser shall be less than six inches nor more than seven and one-half inches high.

b. No riser shall vary in height from the riser immediately above or below it.

c. Treads in flights of steps shall be at least ten and one-half inches wide exclusive of nosing, and, except as provided in paragraph d of this subdivision, the sum of two risers plus the width of one tread shall be at least twenty-four inches but not more than twenty-five and one-half inches.

d. No change in levels shall have less than three risers, except that where the intervening tread is between twenty-eight inches and thirty-six inches, two risers may be used when the edge of each tread is marked by a contrasting color stripe.

e. Where exit openings from an assembly space are above or below the level of the safe area, a platform shall be provided at the same level as that of the exit opening. The platform shall be at least one foot wider on each side than the exit opening, and shall extend a minimum of six feet in the direction of exit travel. The sides of such platforms, and of steps or ramps leading from them, shall be protected by guards at least three feet high.

(6) EXITS FROM SAFE AREAS. - The capacity of exits from safe areas shall be as listed in table 8-1.

Exit openings from safe areas shall discharge into exit types as provided in subchapter six of this chapter.

(7) DOOR HARDWARE. - Doors from safe areas or from exits from safe areas opening directly to the outdoors and furnished with locks shall be equipped with fire exit bolts complying with the requirements of paragraph two of subdivision (k) of section 27-371 of subchapter six of this chapter.

## §[C26-801.12] 27-536 Corridors. -

Corridors shall comply with all of the requirements of subchapter six of this chapter, except as modified below:

(a) **Capacity.** - The capacity of corridors shall be as listed in table 8-1.

(b) **Changes in level. -** Changes in level requiring less than three risers in a corridor shall be by a ramp having a slope not greater than one in ten.

## §[C26-801.13] 27-537 Exit passageways. –

Exit passageways shall comply with all of the requirements of subchapter six of this chapter, except as modified below:

(a) **Capacity. -** The capacity of exit passageways shall be as listed in table 8-1.

(b) **Changes in level. -** Changes in level requiring less than three risers in an exit passageway shall be by a ramp having a slope not greater than one in ten.

## §[C26-801.14] 27-538 Vertical exits. –

Stairs, escalators and ramps shall comply with all of the requirements of subchapter six of this chapter, except as modified below:

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff    Pg 408 of 654

Title 27 / Subchapter 8

(a) **Capacity.** - The capacity of stairs, escalators or ramps shall be as listed in table 8-1.

(b) **Width.** - The minimum width of stairs shall be at least forty-four inches, except that where the total occupant load is not more than permitted for one unit of exit width, the minimum width may be thirty-six inches.

(c) **Unenclosed vertical exits.** -
Vertical exits leading directly from one safe area to another, or leading from a safe area directly to an open exterior space, need not be enclosed.

(d) **Ramp slope.** - Ramps serving as vertical exits shall not have a slope greater than one in ten.

### §[C26-801.15] 27-539 Open exterior spaces. -

(a) **Capacity.** - Open exterior spaces shall be adequate in width and area to accommodate the accumulated occupant load of all exits discharging into them on the basis of two square feet per person.

(b) **Minimum dimensions.** - The minimum dimensions of open exterior spaces shall be twenty feet, except that when the principal entrance to the place of assembly is from an open exterior space, the minimum dimension of this space shall be thirty feet. No open exterior space shall have less than four hundred square feet of floor area, and floor area shall be measured exclusive of the following:

  1. The area immediately outside any exit door from the place of assembly for a distance perpendicular to the exit doors of ten feet for the full width of the exit opening.

  2. The area of steps, platforms, stairs, or ramps within or leading to or from the space.

  3. The area of obstructions such as shrubs, trees, fixed furniture, signs, sculptures, pools, and similar obstructions to occupancy or exit travel.

(c) **Above or below grade.** - When an open exterior space is more than fifteen feet above or below the grade of the street or public space to which it discharges, its required area shall be increased by one-third.

(d) **Egress from open exterior spaces.** -
Exterior exit passageways, ramps, or steps leading from open exterior spaces shall be not less in width than required for the occupant load of all exits discharging into the open exterior space. The width of such exit passageways shall be based on the capacities listed in table 8-1, but in no case less than ten feet. Ramps and steps shall comply with the requirements of paragraph (e) of subdivision five of section 27-535 of this article.

### §[C26-801.16] 27-540 Exit lighting. -
In addition to the requirements of subchapter six of this chapter, lighting shall be provided in the following areas:

(a) **Safe areas.** - Safe areas shall be artificially lighted by electrical means at all times during occupancy of a place of assembly so as to provide illumination of at least five foot candles at the level of the floor and on the surface of all stairs, steps, ramps, and escalators within the safe area.

(b) **Open exterior spaces.** -Yards or courts which serve as open exterior spaces shall be artificially lighted by electrical means at all times between sunset and sunrise during occupancy of a place of assembly so as to provide illumination of at least five foot candles at the level of the floor over at least the required area.

### §[C26-801.17] 27-541 Exit signs. –
Signs meeting the requirements of subchapter six of this chapter and subdivision (e) of section 27-534 of this article shall be provided in all assembly spaces to indicate the location of exits and, where necessary, the direction to the exits. All exit or directional signs shall be placed so that they are clearly visible from all parts of the assembly spaces, and the bottom of all signs shall be at least seven feet above floor level. Signs shall be of the internally lighted type in all assembly spaces where the general illumination is reduced to less than five foot candles during a performance or during occupancy. Signs shall be lighted at all times during occupancy.

### §[C26-801.18] 27-542 Emergency lighting. -
All assembly spaces shall be provided with emergency lighting facilities sufficient to provide at least five foot candles of illumination at the floor level. Such lighting shall be on circuits that are separate from the general lighting and power circuits, either taken off ahead of the main switch or connected to a separate emergency lighting power source, and be arranged to operate automatically in the event of failure of the normal lighting system. The provisions of this section shall apply retroactively to all existing places of assembly that are or would be classified in occupancy groups F-3 and F-4 or are changed to such classification under this code, in accordance with the following schedule and specifications:

  1. Cabarets, dance halls, night clubs, and taverns having an occupant load exceeding one hundred fifty persons shall complete the installation required by this section on or before April twelfth, nineteen hundred seventy-nine.

  2. Cabarets, dance halls, night clubs, and taverns having an occupant load of one hundred fifty persons or less shall complete such installation on or before July twelfth, nineteen hundred seventy-nine.

  3. Spaces occupied exclusively as restaurants shall complete such installation on or before October twelfth, nineteen hundred seventy-nine.

4. All other spaces in occupancy groups F-3 and F-4 shall complete such installation on or before January twelfth, nineteen hundred eighty.

5. The wiring shall conform with the electrical code of the city of New York, and have the same protection as specified for wiring in reference standard RS 17-3, RS 17-3A or 17-3B.

6. Storage battery equipment may be used as the sole source of energy provided it conforms with the provisions of section four of reference standard RS 17-3 or consists of two battery packs listed by an acceptable testing laboratory or conforms with nationally accepted standards for such source of emergency energy.

## §[C26-801.19] 27-543 Light projection sources. –
Motion picture projection and other light projection sources shall comply with the following:

**(a) Film.** - The projection, use or storage of film having a nitrocellulose base (commonly known as nitrate film) shall not be permitted except under conditions specified in special permits when issued by the fire department. Safety film meeting the specifications and test standards of reference standard RS 8-1 may be projected, used or stored.

**(b) Projection machines.** - Projection machines shall meet the requirements of the electrical code of the city of New York. The lamp housing of projection machines using carbon-arc or other light sources that emit gaseous discharge shall be equipped with, or connected to a mechanical ventilation system of adequate capacity to exhaust the products of combustion through ducts directly to the outdoors. Such duct systems shall comply with the requirements of subchapter thirteen of this chapter. When more than one projection machine or other facility employing a carbon-arc or similar light source is used, all may be vented by the same duct system if the capacity is adequate for all facilities so connected.

**(c) Other light source facilities.** - All devices, such as spotlights, that employ a carbon-arc or other light source that emits gaseous discharge shall be vented directly as required in subdivision (b) of this section, unless the space in which such devices are located is mechanically ventilated and provides at least two thousand cubic feet of room volume for each device.

**(d) Light or projection rooms or booths.** -
When enclosed, rooms or booths used for the projection of motion picture film or the manipulating of lights shall be built of noncombustible materials, and shall provide a clear working space of at least two feet around the projection apparatus. Such rooms or booths shall be provided with vents opening to a mechanically ventilated area or the outdoors, adequate in size to supply the make-up air required. The rooms or booths shall be provided with at least one noncombustible or metal clad door at least two feet by

six feet opening in the direction of exit travel, and no point within the room, booth, or gallery shall be more than fifty feet from a door opening into a corridor or space that provides access to an exit at a distance not greater than seventy-five feet.

## §[C26-801.20] 27-544 Motion picture screens. -
Motion picture screens shall be noncombustible, or have a flame spread rating not over twenty-five, or be of materials that have been rendered flameproof in accordance with the provisions of chapter four of this title. The construction supporting screens shall be noncombustible, and shall comply with the stage rigging requirements of subchapter nine and with the provisions of subchapter ten of this chapter.

## ARTICLE 3 F-1 PLACES OF ASSEMBLY

## §[C26-802.1] 27-545 General. -
The provisions of this section shall apply to all places of assembly classified in occupancy group F-1 under the provisions of subchapter three of this chapter.

## §[C26-802.2] 27-546 F-1a places of assembly. -
F-1a places of assembly shall comply with all of the requirements of article two of subchapter eight of this chapter, and with the following:

**(a) Construction in seating areas.** -

(1) Scenery or scenic elements may be placed in seating sections of F-1a assembly spaces if such elements:

a. Are noncombustible, or of materials that have been rendered flameproof in accordance with the provisions of chapter four of this title, or have a flame spread rating of twenty-five or less.

b. Are adequately braced or secured.

c. Do not obstruct the required visibility of, or paths of travel to, exit openings.

(2) Platforms or runways for performances, to accommodate the operation of cameras, electronic equipment, or motion picture projection machines not using carbon-arc or other light source that emits a gaseous discharge may be constructed in seating sections, provided such platforms or runways comply with the requirements of paragraph one of subdivision (a) of this section.

**(b) Stage requirements.** -

(1) DEFINITION. -
For the purposes of this section the stage in an F-1a place of assembly shall include the performing area and all other nonaudience areas that are used in the presentation of a performance and that are open to the performing area. The performing area shall be that area between the outer edge of the stage apron and the furthermost up-stage acting boundary, the width being the maximum stage opening to the audience.

(2) STAGE FLOOR CONSTRUCTION. -
The floor construction of stages shall provide fire-resistance ratings complying with the requirements of section 27-240 of article two of subchapter three of this chapter and table 3-4 except as follows:

a. Any portion of the stage floor used for passing scenery and scenic elements to a lower level may consist of heavy timber construction supporting tight fitting traps of at least three inch nominal solid wood or of equivalent materials in terms of fire-resistance, strength, and stiffness properties.

b. Stage lifts shall comply with the provisions of subchapter eighteen of this chapter. Any portion of the stage floor that is equipped with stage lifts shall be of noncombustible construction. Joints between lift platforms and adjacent floors shall be tightly fitted.

c. Finish flooring shall comply with the provisions of section 27-351 of article five of subchapter five of this chapter.

(3) AREAS BELOW THE STAGE. -
When the stage floor is equipped with traps or stage lifts, the room or space below the stage into which the traps or lifts open shall be completely enclosed by construction having at least the fire-resistance rating required for the stage floor, and such room or space shall not be used as a workshop or storage area. Storage shall not be deemed to include the location in this area of scenery or scenic elements used during a performance. However, no combustible material that has a flamespread rating greater than twenty-five or that has not been rendered flameproof in accordance with chapter four of this title may be stored in this location at any time. Under-stage areas shall comply with the requirements of paragraph eleven of this subdivision.

(4) EXITS FROM THE STAGE. -
At least two exits, remote from each other, shall be available from every point on a stage, each within a travel distance limitation of one hundred twenty-five feet. The occupant load of the stage shall be based upon one person per fifteen square feet for the performing area and on one person per fifty square feet for the remaining area. When any portion of a stage is used for audience seating at any time, exits of adequate capacity shall be provided for that portion, within the travel distance limitations for assembly space seating. Exit openings serving a stage directly shall have a capacity of seventy-five persons per unit of exit width.

(5) SCENERY AND SCENIC ELEMENTS. - All scenery or scenic elements shall be of noncombustible materials, or of materials having a flame-spread rating not exceeding twenty-five, or of materials that have been rendered flameproof in compliance with the provisions of chapter four of this title. Scenery and scenic elements not complying with the above requirements may be used only when expressly permitted by the fire department.

(6) RIGGING LOFTS, FLY GALLERIES, AND GRIDIRONS. - Girders, beams, or slats of galleries or gridirons over the stage floor or in the rigging loft need not be fire protected but shall be of noncombustible materials designed in accordance with the provisions of subchapters nine and ten of this chapter.

(7) AUTOMATIC SPRINKLER PROTECTION. - Stages in F-1a places of assembly shall be provided with automatic sprinkler protection complying with the construction provisions of subchapter seventeen of this chapter, as follows:

a. Automatic sprinklers shall be placed above all rigging lofts; and above all stage areas, other than those portions of stage areas specifically designated on approved plans as performing areas which do not have rigging lofts above and that are not at any time used for storage purposes. Sprinklers above rigging lofts shall be located so that no gridiron or other obstruction intervenes between the sprinkler heads and the scenery or scenic elements.

b. When any part of a stage is sprinklered in accordance with the provisions of subparagraph a of this paragraph, or when rigging lofts are provided, such stage areas and rigging lofts shall be completely separated from audience areas by a deluge sprinkler system designed to form a vertical water curtain, with heads spaced to provide a water density of at least three gpm per linear foot. The water curtain system shall be controlled by a deluge valve actuated by a "rate of rise system" and "fixed temperature system." The heat actuating devices shall be located on not more than ten foot centers around the perimeter of the sprinklered area or as otherwise required for the type of device used to assure operation of the system. In addition to the automatic controls, manual operating devices shall be located at the emergency control station as required by paragraph ten of this subdivision, and adjacent to at least one exit from the stage. Such exit shall be remote from the emergency control panel.

c. When openings are provided in the stage floor for stage lifts, trap doors or stairs, sprinklers spaced five feet on centers shall be provided around the opening at the ceiling below the stage, and baffles at least twelve inches in depth shall be installed around the perimeter of the opening.

d. All valves controlling sprinkler supplies shall be provided with tamper switches wired to an annunciator panel located at the emergency control panel.

e. The operation of any section of the sprinkler system and the deluge system shall activate the emergency ventilating equipment required in paragraph eight of this subdivision.

f. The water flow alarm, tamper switches and deluge system equipment shall be provided with central station supervision in addition to the required local alarm.

g. Existing premises shall be required to

conform with this requirement on or before January twelfth, nineteen hundred eighty. However, existing sprinkler systems, which have been previously accepted by the department or by the fire department, shall be deemed in compliance with this requirement.

(8) EMERGENCY VENTILATION. - Emergency ventilation shall be provided for all stages in F-1a places of assembly to provide a means of removing smoke and combustion gases to the outdoors in the event of a fire, as follows:

a. A mechanical exhaust system shall be provided of sufficient capacity to exhaust an amount of air at least equal to the sum of the following:

(1) two cfm per square foot of the performing area.

(2) four cfm per square foot of that portion of stage area that is not designated as performing area.

(3) four cfm per square foot of rigging loft area.

b. The exhaust system shall be designated to be activated both manually and automatically, manual operation shall be by means of a manually operated switch located at the emergency control panel as required by paragraph ten of this subdivision and adjacent to at least one exit from the stage. Such exit shall be remote from the emergency control panel. Automatic activation shall be by means of the sensing devices that start the operation of the sprinklers. Exhaust air openings of ducts shall be located so as to provide the most effective removal of smoke and combustion gases.

c. The exhaust system shall be provided with an automatic emergency by-pass damper in the exhaust duct on the suction side of the fan. Such damper shall close to* the fan in the event of a power failure to the fan motor and shall open directly to the outdoors if the fan is located outside the building, or shall open to a duct leading directly to the outdoors if the fan is located inside the building. When located inside the building, the fan shall be insulated with a minimum of one inch magnesia block or the equivalent in insulating and fire-resistive qualities. Exhaust fans shall have drive and bearings located outside of the fan impeller housing. The exhaust system shall not be connected to exhaust openings in any space other than the stage and rigging loft, and shall be constructed to comply with the provisions of subchapter thirteen of this chapter[. All]** switches shall be clearly labelled "emergency stage ventilation" and shall be painted red.

*As enacted but "to" probably intended to be omitted.
** Copy in brackets not enacted but probably intended.

d. The emergency ventilation system shall be connected to both the normal and emergency light and power circuits.

(9) CURTAINS. - No curtain shall be located between the audience area and the stage unless it is designated to permit the air movement required for emergency ventilation in paragraph eight of this subdivision to bypass or pass through the curtain without excessive billowing, and be made of noncombustible fabrics, as specified in the appendix of reference standard RS 7-3.

(10) EMERGENCY CONTROL PANEL. - An emergency control panel shall be provided, as follows:

a. It shall be located on or adjoining the stage, except that where the stage is surrounded by seating, it shall be located so as to permit a view of the audience and stage areas. It shall be manned in accordance with the requirements of the fire department at all times during the presentation of a performance to an audience.

b. It shall be equipped with tell-tale lights to indicate when feeders and subfeeders of emergency light and power circuits are in operation in assembly spaces and all exits, including safe areas.

c. It shall, when a deluge type sprinkler system is provided, be equipped with manual operating devices to activate the sprinkler system. It shall also be provided with a signal system to show when any portion of the sprinkler system has been deactivated.

d. It shall be provided with switches to provide for operation of the emergency ventilating system. Controls for the ventilating system shall be electrically supervised. The supervisory circuit shall be provided with a trouble bell and light, both of which shall be activated in the event of a failure in the ventilation system. A silencing switch may be provided, and where provided, shall have either an automatic reset or shall ring again when the trouble is corrected.

e. It shall be equipped with a public address system serving loudspeakers in the assembly space. The public address system shall be connected to both the normal and emergency light and power circuits.

f. It shall be equipped with an alarm system and intercom connected to the manager's office, the dressing rooms, and to a supervisory central fire station.

(11) AUXILIARY STAGE SPACES. - Auxiliary stage spaces such as understage areas, dressing rooms, green rooms, storage rooms, work shops, and similar spaces associated with the use of the stage shall comply with the following:

a. No point within any auxiliary stage space shall be more than fifty feet from a door providing access to an exit.

b. There shall be at least two exits available from every auxiliary space, one of, which shall be available within a travel distance of seventy-five feet. A common path of travel of twenty feet to the two exits shall be permitted.

c. The occupant load of dressing rooms shall be based on one person per fifty square feet of area.

d. Auxiliary stage spaces shall be equipped with automatic sprinklers when required by the provisions of subchapter seventeen of this chapter.

e. No workshop involving the use of combustible or inflammable paint, liquids, or gases or their storage

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A - Holiday Inn FiDi Expert Report of A. Tantliff    Pg 412 of 654

Title 27 / Subchapter 8

shall open directly upon a stage.

f. The interior finish of auxiliary stage spaces shall comply with the requirements of table 5-4.

(12) STAGE LIGHTING. - No stage lights shall be placed so that they will develop temperatures on the surface of any material that will cause that material to ignite, or smoke, or cause its flameproofing to deteriorate.

## §[C26-802.3] 27-547 F-1b Places of assembly. -

F-1b places of assembly shall comply with all of the requirements of article two of this subchapter, and with the following:

**(a) Certificate of occupancy.** -
The certificate of occupancy for F-1b places of assembly shall specifically note the prohibition against the use or placement of scenery or scenic elements on or above the stage.

**(b) Stage requirements.** -

(1) DEFINITION. - For the purposes of this section, the stage in an F-1b place of assembly shall be the area where the principal activity viewed by the audience takes place.

(2) CONSTRUCTION. - Raised platforms may be built as stages in F-1b places of assembly when they are supported on floors having the fire-resistance ratings required by table 3-4, in accordance with the following:

a The area below the platform shall be enclosed on all sides with solid construction.

b. The horizontal area of stage construction shall not exceed the following:
Wood frame: maximum area-four hundred square feet.
Fire retardant treated wood: maximum area-twelve hundred square feet.
Noncombustible frame: maximum area-unlimited.

c. The floor of the stage, when wood is used, shall be a least one inch nominal thickness, and shall be laid on a solid, noncombustible backing, or all spaces between supporting members shall be fire-stopped with noncombustible material.

d. In all F-1b places of assembly providing live entertainment, at anytime, the stage, dressing rooms and property rooms shall be provided with automatic sprinkler and fire alarm protection in conformance with the provisions of subchapter seventeen of this chapter. Existing premises shall be required to conform with this requirement on or before January twelfth, nineteen hundred eighty. However, existing sprinkler systems, which have been previously accepted by the department or by the fire department, shall be deemed in compliance with this requirement.

(3) EXITS FROM THE STAGE. -
At least two exits, remote from each other, shall be available from every point on a stage, each within a travel distance limitation of one hundred fifty feet.

The occupant load of the stage shall be based upon one person per twenty-five square feet of area. When any portion of a stage is used for audience seating at any time, exits of adequate capacity shall be provided for that portion, within the travel distance limitations for assembly space seating. Exit openings serving a stage directly shall have a capacity of one hundred persons per unit of exit width.

(4) EMERGENCY CONTROL PANEL. - In F-1b places of assembly having an occupant load over six hundred persons, an emergency control panel shall be provided, as follows:

a. It shall be located so as to have a view of the audience and stage areas, and shall be manned during the presentation of a performance to an audience, by a competent person instructed in its use.

b. It shall be equipped with tell-tale lights to indicate when feeders and subfeeders of emergency light and power circuits are in operation in assembly spaces and all exits, including safe areas.

c. It shall be equipped with a public address system serving loudspeakers in the assembly space. The public address system shall be connected to both the normal and emergency light and power circuits.

## ARTICLE 4 F-2 PLACES OF ASSEMBLY

## §[C26-803.1] 27-548 General. -

The provisions of this section shall apply to all places of assembly classified in occupancy group F-2 under the provisions of subchapter three. F-2 places of assembly shall comply with all of the requirements of article two of this subchapter, and with the following:

**(a) Enclosure.** - To qualify as an F-2 outdoor place of assembly, a place of assembly shall have at least forty percent of the combined surface area of all exterior wall and roof planes open to the outdoors. When a portion of an outdoor place of assembly is enclosed to a greater extent, that portion shall comply with all of the requirements of this code applicable to indoor places of assembly.

**(b) Grandstands.** - Grandstands shall comply with the following:

(1) CONSTRUCTION.- Grandstands shall be designed in accordance with the requirements of subchapters nine and ten of this chapter.

(2) HEIGHT AND AREA.- Grandstands, when built entirely of noncombustible materials, may be of unlimited height and area, and when built of combustible materials, shall be subject to the following limitations:

a. No section of seating shall exceed twenty feet in height, or exceed ten thousand square feet in area.

b. When more than one section of seating is provided, and the separation between them is less than fifty feet, each section shall be separated from the other by construction having a fire-resistance rating of

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff    Pg 413 of 654

Title 27 / Subchapter 8

a least two hours and rising to a height of at least two feet six inches above the levels of seating at each row.

c. No outdoor grandstand of combustible materials shall be erected within less than two-thirds of its height, but in no case less than ten feet, of a building or an interior lot line unless separated therefrom by noncombustible construction having a one hour fire-resistance rating.

(3) SPACES UNDER SEATS. - Spaces under grandstand seats shall be kept free of all combustible materials and shall not be occupied or used for other than egress, unless such spaces are completely enclosed by noncombustible construction having a two hour fire-resistance rating.

(4) PARKING. - Motor vehicle parking spaces shall not be closer than twenty feet to any grandstand unless separated therefrom by noncombustible construction having a one hour fire-resistance rating.

**(c) Stage requirements. -**

(1) DEFINITION. - For the purposes of this section the stage in an F-2 place of assembly shall be the area where the principal activity viewed by the audience takes place.

(2) CONSTRUCTION. - The horizontal area of stage construction shall not exceed the following:

Wood frame: maximum area-five thousand square feet.
Fire retardant treated wood: maximum area-ten thousand square feet. Noncombustible frame: maximum area-unlimited.

(3) EXITS FROM THE STAGE. - At least two exits, remote from each other, shall be available from every point on a stage, each within a travel distance limitation of three hundred feet. The occupant load of the stage shall be based upon one person per fifty square feet of area. When any portion of a stage is used for audience seating at any time, exits of adequate capacity shall be provided for that portion, within the travel distance limitations for assembly space seating. Exit openings serving a stage directly shall have a capacity of four hundred persons per unit of exit width.

(4) EMERGENCY CONTROL PANEL. - In F-2 places of assembly having an occupant load over one thousand persons, an emergency control panel shall be provided as follows:

a. It shall be located so as to have a view of the audience and stage areas, and shall be readily accessible at all times during the presentation of a performance to an audience, to a competent person instructed in its use.

b. It shall be equipped with tell-tale lights to indicate when feeders and subfeeders of emergency light and power circuits are in operation in assembly spaces and all exits.

c. It shall be equipped with a public address system serving loudspeakers in the assembly space. The public address system shall be connected to both the normal and emergency light and power circuits.

**(d) Drive-in-theaters-**

Drive-in theaters shall comply with the following:

(1) Projection booths and projection machines shall comply with the requirements of section 27-543 of article two of this subchapter. Motor vehicle parking spaces shall not be closer than twenty feet to any projection booth or machine.

(2) Projection screens and supporting structures shall comply with the requirements of section 27-544 of article two of this subchapter and shall be designed in accordance with the requirements of subchapters nine and ten of this chapter as applied to signs. Motor vehicle parking spaces shall not be closer than twenty feet to any projection screen.

**(e) Amusement parks. -** Buildings and structures within amusement parks shall be constructed to conform with all of the requirements of this code governing the specific use and occupancy. Amusement devices shall not be placed in operation until they have been made to comply with the provisions of subchapter eighteen of this chapter.

## ARTICLE 5 F-3 AND F-4 PLACES OF ASSEMBLY

**§[C26-804.1] 27-549 General. -**
The provisions of this section shall apply to all places of assembly classified in occupancy group F-3 and F-4 under the provisions of subchapter three of this chapter. F-3 or F-4 places of assembly shall comply with all the requirements of article two of this subchapter and the following:

**(a) Stage requirements. -**

(1) With scenery and scenic elements. - Where an F-3 or F-4 place of assembly provides a stage using scenery and scenic elements, the space shall comply with all of the requirements of this code applicable to F-1a places of assembly.

(2) Without scenery and scenic elements. - Where an F-3 or F-4 place of assembly provides a stage not using scenery or scenic elements, the space shall comply with all of the requirements of this code applicable to F-1b places of assembly.

(3) Cabarets. - In all F-4 places of assembly used as a cabaret, the stage dressing rooms and property rooms shall be provided with automatic sprinkler and fire alarm protection in compliance with the provisions of subchapter seventeen of this chapter. Existing premises shall be required to conform with this requirement on or before January twelfth, nineteen hundred eighty.

**(b) Retroactive provisions.-** On or before January twelfth, nineteen hundred eighty, all places of assembly providing entertainment or used as a cabaret within F-3 or F-4 occupancies shall be provided with automatic sprinkler and fire alarm protection to comply with the provisions of subchapter seventeen of this chapter.

**Title 27 / Subchapter 8**

**This page is intended to be left blank**

## SUBCHAPTER 9
## LOADS

### TABLE OF CONTENTS

| [Sub-Art. or Sec.]* | Art. or Sec.** | |
|---|---|---|
| [900.0] | Art. 1 | General |
| [900.1] | 550 | Scope |
| [900.2] | 551 | Standards |
| [900.3] | 552 | Definitions |
| [901.0] | Art. 2 | Dead Loads |
| [901.1] | 553 | Construction Materials and Assembled Elements of Construction |
| [901.2] | 554 | Service Equipment |
| [901.3] | 555 | Partition Loads |
| [902.0] | Art. 3 | Live Loads |
| [902.1] | 556 | General |
| [902.2] | 557 | Floor Live Loads |
| [902.3] | 558 | Live Loads for Sidewalks, Driveways, and Railings |
| [902.4] | 559 | Columns in Parking Areas |
| [902.5] | 560 | Stage Areas Using Scenery or Scenic Elements |
| [902.6] | 561 | Roof Loads |
| [902.7] | 562 | Moving Loads |
| [902.8] | 563 | Partial Loading Conditions |
| [902.9] | 564 | Floor Loads to be Posted |
| [903.0] | Art. 4 | Live Load Reduction |
| [903.1] | 565 | Roof Loads |
| [903.2] | 566 | Floor Live Loads |
| [903.3] | 567 | Contributory Floor Areas |
| [903.4] | 568 | Foundations and Column Supports |
| [904.0] | Art. 5 | Wind Loads and Earthquake Loads |
| [904.0] | 569 | Wind Loads and Earthquake Loads |
| [905.0] | Art. 6 | Other Loads |
| [905.1] | 570 | Earth Pressures and Foundation Loads |
| [905.2] | 571 | Bins and Bunkers |
| [905.3] | 572 | Prestressing Forces |
| [905.4] | 573 | Construction Loads |
| [905.5] | 574 | Fluid Pressures |
| [905.6] | 575 | Ice |
| [905.7] | 576 | Thermal Forces |
| [905.8] | 577 | Shrinkage |
| [906.0] | Art. 7 | Distribution of Loads |
| [906.1] | 578 | Distribution of Vertical Loads |
| [906.2] | 579 | Distribution of Horizontal Loads |

*"C26" omitted from section numbers in this column.
**"27" omitted from section numbers in this column.

### LIST OF TABLES

Table No.
9-1    Percentage of Live Load

## ARTICLE 1 GENERAL

**§[C26-900.1] 27-550 Scope. -**
Buildings and parts thereof, shall be capable of resisting all levels*** actually imposed thereon without exceeding the allowable stresses prescribed in subchapters ten and eleven of this chapter. In no cases shall the assumed loads be less than the minimum values described herein. In addition, within special flood hazard areas, and below the regulatory flood datum, as described in article ten of subchapter four of this chapter, applicable load requirements of reference standard RS 4-5 shall be applied.
*** *As enacted but "loads" probably intended.*

**§[C26-900.2] 27-551 Standards. -**
The provisions of reference standard RS-9 shall be a part of this subchapter.

**§[C26-900.3] 27-552 Definitions. -**
For definitions to be used in the interpretation of this subchapter, see subchapter two of this chapter.

## ARTICLE 2 DEAD LOADS

**§[C26-901.1] 27-553 Construction materials and assembled elements of construction. -** Except as provided in section 27-555 of this article, the dead load shall be the actual weight of the building materials or construction assemblies to be supported, computed from the unit weights given in reference standard RS 9-1. Where unit weights are not established in reference standard RS 9-1, the actual weights may be determined by analysis or from data in manufacturers' drawings or catalogs. Unit weights less than those given in reference standard RS 9-1 may be used only with approval of the commissioner.

**§[C26-901.2] 27-554 Service equipment. -** Provision shall be made for the weights of all building service equipment including plumbing stacks, piping, heating and air conditioning equipment, electrical equipment, elevators, elevator machinery, flues, and similar fixed equipment. The weights of such equipment (or the allowances therefor) shall be included in the dead load. The weight of equipment that is part of the occupancy of a given area shall be considered as live load. See also paragraph two of subdivision (b) and subdivision (d) of section 27-557 of article three of this subchapter.

**§[C26-901.3] 27-555 Partition loads. -** Weights of all partitions shall be considered, using either actual weights at locations shown on the plans or the equivalent uniform load given in subdivision (b) of this section.

(a) **Actual loads. -** Where actual partition weights are

used, the uniform design live load may be omitted from the strip of floor area under each partition.

**(b) Equivalent uniform load. -** The equivalent uniform partition loads in reference standard RS 9-1 may be used in lieu of actual partition weights except for bearing partitions or partitions in toilet room areas (other than in one- and two-family dwellings), at stairs and elevators, and similar areas where partitions are concentrated. In such cases, actual partition weights shall be used in design. Except as otherwise exempted, equivalent uniform loads shall be used in areas where partitions are not definitely located on the plans, or in areas where partitions are subject to rearrangement or location.*

*As enacted but "relocation" probably intended.*

### ARTICLE 3  LIVE LOADS

**§[C26-902.1] 27-556 General. -**
In addition to the applicable dead, wind, and other loads, the building shall be designed for uniform live loads, for concentrated live loads, or for concurrent combinations of uniform and concentrated live loads, whichever produce the greatest stress.

**§[C26-902.2] 27-557 Floor live loads. -**
**(a) Uniformly distributed live loads. -** The minimum design values established in reference standard RS 9-2 for various occupancies or uses shall be used subject to the provisions of subdivision (d) of this section. Where the occupancy or use of a space does not conform to any of those listed, the design load shall be determined by the architect or engineer subject to approval by the commissioner.

**(b) Concentrated live loads. -**
(1) The building framing shall be capable of supporting the concentrated live loads established in reference standard RS 9-2, placed so as to produce maximum stress.

(2) Floors that support any items of machinery, electrical or mechanical equipment, or other concentrated live load in excess of one thousand pounds (including the weights of pads or bases) shall be designed to support such weight as a concentrated load or group of concentrated loads.

**(c) Nonconcurrence. -**
(1) When a concentrated live load is present, the uniformly distributed live load may be considered to be omitted in the area occupied by the concentrated load.

(2) Where reference standard RS 9-2 indicates that the concentrated live load is nonconcurrent with the uniform live load, it may be assumed that the total concentrated load is to be omitted when the uniform load is present and that the total uniform load is to be omitted when the concentrated load is present.

**(d) Conformance. -** For purposes of determining that the magnitude of the actual live load conforms to or is less than the minimum design live load established in this section, the actual uniform live load shall be approximated by averaging the total load actually applied over a rectangular area of one hundred fifty square feet having no side less than eight feet.

**§[C26-902.3] 27-558 Live loads for sidewalks, driveways, and railings. -**
**(a) Sidewalks and driveways. -**
(1) When supported on grade, all sidewalks for new buildings and alterations shall be subject to inspection and acceptance by the commissioner. Portions of such sidewalks that are located between the curb line and the street line shall be constructed in compliance with the specifications for concrete sidewalks of the department of transportation.

(2) All sidewalks and driveways or portions thereof that are structurally supported shall be designed for a live load of one hundred psf uniformly distributed and in accordance with the provisions of subchapter ten of this chapter. Where subject to intentionally or accidentally imposed wheel loads of vehicles, such portions of sidewalks and driveways shall be designed for a uniformly distributed load of six hundred psf or for the maximum vehicular wheel load that could be imposed thereon, whichever develops the greater stresses.

(3) Appurtenant components of sidewalks and driveways, including manholes, manhole covers, vault covers, gratings, etc., shall be designed for the loads prescribed in paragraph two of this subdivision, or shall conform to the standards of the city agency having jurisdiction.

**(b) Railings and parapets. -**
(1) Railings and parapets around stairwells, balconies, areaways, and roofs, and other railings in similar locations other than those for places of assembly, shall be designed to resist the simultaneous application of a lateral force of forty plf and a vertical load of fifty plf, both applied to the top of the railing. For railings and parapets at the front of theater balconies and in similar locations in places of assembly, the lateral force shall be increased to fifty plf and the vertical load to one hundred plf. An exception is made for railings in one- and two-family dwellings, which shall be designed for a lateral force of twenty plf plus a vertical load of twenty plf, both applied at the top of the railing. The total lateral force and total vertical load shall be at least two hundred pounds each.

(2) Intermediate and bottom rails, if provided, shall be designed for the simultaneous application of forty plf applied horizontally and fifty plf applied vertically; however, lateral and vertical design loads on intermediate and bottom rails need not be considered in the design of posts and anchorages. For railings having solid panels, the panels shall be designed for a uniform lateral load of twenty psf.

(3) Where railings or parapets support fixtures, allowance shall be made for the additional loads imposed thereby.

(4) Railings, bumpers, or similar devices used in parking areas to resist the impact of moving vehicles shall be designed to resist a lateral load of three hundred plf applied at least twenty-one inches above

the roadway; but in no case shall the load be less than twenty-five hundred pounds per vehicle.

## §[C26-902.4] 27-559 Columns in parking areas. -
Unless specially protected, columns in parking areas subject to impact of moving vehicles shall be designed to resist the lateral load due to impact and this load shall be considered a load of infrequent occurrence. For passenger vehicles, this lateral load shall be taken as a minimum of twenty-five hundred pounds applied at least twenty-one inches above the roadway and acting simultaneously with other design loads.

## §[C26-902.5] 27-560 Stage areas using scenery or scenic elements. -
Scenery battens and suspension systems shall be designed for a load of thirty pounds per linear foot of batten length. Loft block and head block beams shall be designed to support vertical and horizontal loads corresponding to a four inch spacing of battens for the entire depth of the gridiron. Direction and magnitude of total forces shall be determined from the geometry of the rigging system including load concentrations from spot line rigging. Locking rails shall be designed for a uniform uplift of five hundred psf with a one thousand pound concentration. Impact factor for batten design shall be seventy-five percent and for loft and head block beams shall be twenty-five per cent. A plan drawn to a scale not less than one-quarter inch equals one foot shall be displayed in the stage area indicating the framing plan of the rigging loft and the design loads for all members used to support scenery or rigging. Gridirons over stages shall be designed to support a uniformly distributed live load of fifty psf in addition to the rigging loads indicated.

## §[C26-902.6] 27-561 Roof loads. -
Roofs and marquees shall be designed for wind, live, and other loads as prescribed in subdivisions (a) through (d) of this section. It may be assumed that maximum wind load occurs with zero live load and that maximum live load occurs with zero wind load. For dwellings an exception is made for awnings, canopies, and patio covers, which may be designed for a live load of twenty psf of horizontal projection.

(a) **Live load.** - Minimum design live loads shall be as follows:

(1) For roofs with slopes up to and including twenty degrees from the horizontal, thirty psf of horizontal projection.

(2) For roofs with slopes greater than twenty degrees from the horizontal, thirty psf of horizontal projection, reduced by one psf for each degree of slope in excess of twenty degrees.

(3) For valleys, live loadings shall be increased to provide for accumulations of snow. The loading intensity shall be assumed to vary from forty-five psf at the low point to fifteen psf at the ridge.

(4) For roofs having curved or pyramidal shapes, the proposed live load shall be established by the architect or engineer, subject to approval by the commissioner.

(b) **Wind load.** - The provisions of section 27-569 of article five of this subchapter shall apply.

(c) **Concentrated loads.** -
The provisions of subdivision (b) of section 27-557 of this article shall apply.

(d) **Special loads.** -

(1) When used for purposes such as promenades, assembly areas, or roof gardens, design shall be made for live loads corresponding to the particular usage, as indicated in reference standard RS 9-2. Such loads shall be considered as nonconcurrent with the wind load or with the live load specified in subdivision (a) of this section. The design live and wind loads for roofs, as specified elsewhere in this subchapter, shall be deemed to provide for incidental use of the roof of a building by the occupants thereof.

(2) Where roofs are intended for the ponding of water, the roof shall be designed for the maximum possible depth of water which may be ponded thereon as determined by the relative levels of roof deck and overflow weirs or scuppers. Such load need not be considered as occurring simultaneously with wind or live load.

(3) Girders and roof trusses (other than joists) over garage areas regularly utilized for the repair of vehicles and over manufacturing floors or storage floors used for commercial purposes shall be capable of supporting, in addition to the specified live and wind loads, a concentrated live load of two thousand pounds applied at any lower chord panel point for trusses, and at any point of the lower flange for girders.

(4) Where roofs are landscaped, the uniform design live load on the landscaped portions shall be thirty psf. The weight of the landscaping materials shall be considered as dead load and shall be computed on the basis of saturation of the earth. The areas adjacent to the landscaped portions shall be considered as assembly areas, unless specific provision is made to prevent such use.

(5) Where equipment is placed on roofs, the design shall provide for the support of such equipment.

## §[C26-902.7] 27-562 Moving loads. –
Where applicable to the use or occupancy of the building, the design shall consider the moving loads described below.

(a) **General.** -The loads established in subdivisions (a) and (b) of section 27-557 of this article shall be assumed to include allowance for ordinary impact conditions.

(b) **Passenger vehicles.** - Areas used for, and restricted by physical limitations of clearance to, the transit or parking of passenger vehicles shall be designed for the uniformly distributed and concentrated loads for parking areas for such vehicles as provided in reference standard RS 9-2, applied without impact. An exception is made for members or constructions which,

because of physical limitations, cannot be subjected to direct load from the vehicle or from a jack or hoist used to shall be designed for the loads corresponding raise or suspend the vehicle. Such members or constructions to the actual usage.

**(c) Truck loads. -** Minimum loads (including vertical, lateral, and longitudinal) and the distribution thereof shall meet the applicable requirements or reference standard RS 9-3, except that impact shall be taken as ten percent of the vertical reaction.

**(d) Railroad equipment. -** Minimum loads (including vertical, lateral, longitudinal, and impact) and the distribution thereof shall meet the applicable requirements of reference standard RS 9-4.

**(e) Crane runways and supports. -**

(1) VERTICAL LOADS. - Actual maximum wheel loads occurring when the crane is lifting its capacity load shall be used. To allow for impact, the lifted load shall be increased twenty-five percent or the wheel loads increased fifteen percent whichever produces greater stress condition.

(2) HORIZONTAL LOADS. -

a. Lateral load (due to crane trolley travel) shall be twenty percent of the sum of the capacity load and the trolley weight, applied one-half at the top of each rail and acting in either direction normal to the runway rail.

b. Longitudinal load (due to crane travel) shall be twenty percent of the maximum total reaction (not including impact) on the rail being considered, applied at the top of the rail and acting parallel to the runway.

**(f) Monorail beams and supports. -**

(1) Vertical loads shall be the sum of the capacity load and trolley weight. To allow for impact, the lifted load shall be increased ten percent for hand-operated and twenty-five percent electrically-operated trolleys.

(2) Longitudinal loads shall be twenty percent of the sum of the capacity load and the weight of the trolley.

(3) Lateral loads shall be twenty percent of the sum of the capacity load and the weight of the trolley.

(4) Centrifugal forces shall be considered for curved tracks.

**(g) Loads on supports for elevators, dumbwaiters, and escalators. -** The provisions of subchapter eighteen of this chapter shall apply.

**(h) Loads on machinery supports. -**
Unless machinery is isolated from the support framing, the reactions of reciprocating or heavy power-driven units shall be increased at least fifty percent and reactions of light shaft - or motor-driven [*sic*] units shall be increased at least twenty-five percent to provide for impact.

**(i) Assembly structures. -**
Seating areas in grandstands, stadiums, and similar assembly structures shall be designed to resist the simultaneous application of a horizontal swaying load of at least twenty-four plf of seats applied in a direction parallel to the row of the seats, and of at least ten plf of

seats in a direction perpendicular to the row of the seats. When this load is used in combination with wind for outdoor structures, the wind load shall be one-half of the design wind load, and the provisions of subchapter ten of this chapter relating to infrequent stress conditions shall apply to this loading condition.

**(j) Heliports and helistops. –**

(1) CONCENTRATED LOADS. -

a. Landing area. - Helicopter landing areas shall be designed for either of the following vertical loads acting at any location:

1. A single concentrated load equal to three quarters of the gross weight of the helicopter and acting on an area of one square foot.

2. Concentrated loads representing the gross wheel reactions of the helicopter acting simultaneously and increased one-third for impact.

b. Taxiing area. - Helicopter taxiing areas shall be designed for concentrated loads in accordance with clause two of this subparagraph.

(2) UNIFORM LIVE LOAD. -
The landing and taxiing areas shall be capable of supporting a uniformly distributed live load of forty psf acting nonconcurrently with the concentrated loads.

## §[C26-902.8] 27-563 Partial loading conditions. -

**(a) Uniformly distributed loads. -**
In continuous framing and cantilever construction, the design shall consider live load on all spans and arrangements of partial live load that will produce maximum stresses in the supporting members. The simplifications given in paragraphs one through three of this subdivision are permissible.

(1) FLOOR AND ROOF FRAMING. -

a. For vertical live load applied to the level under consideration, the far ends of the columns above and below that level may be assured* as fixed.

b. Combinations of live load may be limited to the following:

1. Live load placed on two adjacent spans.

2. Live load placed on alternate spans. The effects of live load on spans more than two spans away from the span under consideration may be neglected.

(2) ARCHES AND GABLED FRAMES. -

a. Live load placed on 1/2 span adjacent to one support.

b. Live load placed on the center 1/4 span.

c. Live load placed on 3/8 the span adjacent to each support.

(3) COLUMNS. - Moments due to vertical loads may be calculated from the live load on the largest single adjacent span of the floor under consideration. This moment shall be assumed to act concurrently with live load on all other floors.

**(b) Moving concentrated loads. -**
Structural members supporting moving concentrated loads shall be designed for only those loads that can physically occur simultaneously and are arranged to produce maximum stresses.

*As enacted but "assumed" probably intended.*

**§[C26-902.9] 27-564 Floor loads to be posted. -**
**(a) Posting required. -**
Posting requirements shall conform to the requirements of section 27-225 of article twenty-three of subchapter one of this chapter.

**(b) Data required. -** The following floor load data shall be shown:

(1) The uniformly distributed design live load for each floor or part thereof.

(2) The weight of any piece of machinery or equipment weighing more than one thousand pounds, and its identifying description and location.

(3) The maximum design wheel load and total maximum weight of any vehicle that may be brought into the building.

(4) The equivalent uniform partition loads or, in lieu of this, a statement to the effect that the design was predicated on actual partition loads.

**ARTICLE 4 LIVE LOAD REDUCTION**

**§[C26-903.1] 27-565 Roof loads.** –
No reduction shall be permitted.

**§[C26-903.2] 27-566 Floor live loads.** –
The uniform live load to be used for design shall be the basic value established in reference standard RS 9-2 multiplied by the percentages given in subdivisions (a) through (d) of this section.

(a) Except as provided in subdivisions (b), (c), and (d) the percentages in table 9-1 shall apply. Contributory areas shall be computed in accordance with section 27-567 of this article.

(b) No live load reduction shall be permitted for the following: members and connections (other than columns, piers, and walls) supporting floor areas used for storage (including warehouses, library stacks, and record storage); areas used for parking of vehicles; and areas used as place of assembly, for manufacturing, and for retail or wholesale sales. For columns, piers, and walls supporting such floor areas the maximum live load reduction shall be twenty percent.

(c) No live load reduction shall be permitted for calculating shear stresses at the heads of columns [sic] in flat slab or flat plate construction.

(d) In lieu of the percentages given in table 9-1, the live load reductions for columns, piers and walls may be taken as fifteen percent of the live load on the top floor, increased successively at the rate of five percent on each successive lower floor, with a maximum reduction of fifty percent; and for girders supporting two hundred square feet or more of floor area, the live load reduction may be taken at fifteen percent. The limitations of subdivisions (b), (c) and (d) of this section shall apply.

**TABLE 9-1 PERCENTAGE OF LIVE LOAD\***

| Contributory Area (sq. ft.) [sic] | Ratio of Live Load to Dead Load\* | | |
| --- | --- | --- | --- |
| | 0.625 or less | 1 | 2 or more |
| 149 or less…………. | 100 | 100 | 100 |
| 150-299…………… | 80 | 85 | 85 |
| 300-449…………… | 60 | 70 | 75 |
| 450-599…………… | 50 | 60 | 70 |
| 600 or more………… | 40 | 55 | 65 |

Note for Table 9-1:
*For intermediate values of live load/dead load, the applicable percentages of live load may be interpolated.

**§[C26-903.3] 27-567 Contributory floor areas. -**
For purposes of computing live load reduction, contributory floor areas shall be determined as follows:

(a) For the design of one-way and two-way slabs: the product of the shorter span length and a width equal to one-half the shorter span length. Ribbed slabs shall be considered as though the slabs were solid.

(b) For the design of slabs in flat plate or flat slab construction: one-half the area of the panel.

(c) For the design of columns and girders or trusses framing into columns: the loaded area directly supported by the column, girder, or truss. For columns supporting more than one floor, the loaded area shall be the cumulative total area of all of the floors that are supported.

(d) For the design of joists and similar multiple members framing into girders or trusses, or minor framing around openings: twice the loaded area directly supported but not more than the area of the panel in which the framing occurs.

**§[C26-903.4] 27-568 Foundations and column supports.-**
The live load to be supported by the foundation or by trusses or girders that support columns shall be the total column reaction reduced as provided in section 27-566 and section 27-567 of this article.

**ARTICLE 5**
**\*WIND LOADS AND EARTHQUAKE LOADS**

**\*§[C26-904.0] 27-569 Wind loads and earthquake loads.-**
**(a) Wind loads.-**
The structural frame and exterior components of all buildings, tanks, and other exposed constructions shall be designed to resist the pressures due to wind as prescribed in reference standard RS 9-5. Wind shall be assumed to act from any direction. For continuous framing, the effects of partial loading conditions shall be considered.

**(b) Earthquake loads.**
Every building, structure and portion thereof shall, at a minimum, be designed and constructed to resist the effects of seismic ground motions as prescribed in reference standard RS 9-6.
**\*Local Law 17-1995.**

## ARTICLE 6 OTHER LOADS

**§[C26-905.1] 27-570 Earth pressures and foundation loads.** - The provisions of article three of subchapter eleven of this chapter shall apply.

**§[C26-905.2] 27-571 Bins and bunkers-**
Loads on component parts of bins and bunkers may be reduced for friction on sidewalls, provided that sidewalls and supports are proportioned for the increased vertical loads. Where stresses would be increased in any component by arching of the fill, the effect of such arching shall be considered.

**§[C26-905.3] 27-572 Prestressing forces.** -
Prestressing forces shall be considered in the design of prestressed concrete structures, cable structures, guyed structures, and multiple intersecting truss webs utilizing tension members.

**§[C26-905.4] 27-573 Construction loads.** -
The provisions of subchapter nineteen of this chapter shall apply.

**§[C26-905.5] 27-574 Fluid pressures.** -
The design of building components shall consider pressures, both positive and negative, of confined fluids and gases.

**§[C26-905.6] 27-575 Ice.** -
The weight of a one-half inch radial thickness of ice on all surfaces shall be considered as part of the live load in the design of open framed or guyed towers.

**§[C26-905.7] 27-576 Thermal forces.** -
The design of enclosed buildings more than two hundred fifty feet in plan dimension shall provide for the forces and/or movements resulting from an assumed expansion corresponding to a change in temperature of forty degrees F. For exterior exposed frames, arches, or shells regardless of plan dimensions, the design shall provide for the forces and/or movements resulting from an assumed expansion and contraction corresponding to an increase or decrease in temperature of forty degrees F for concrete or masonry construction and sixty degrees F for metal construction. For determining required anchorage for piping, the forces shall be determined on the basis of temperature variations for the specific service conditions. Friction forces in expansion bearings shall be considered.

**§[C26-905.8] 27-577  Shrinkage. -**
The design of reinforced concrete components shall provide for the forces and/or movements resulting from shrinkage of the concrete in the amount of 0.0002 times the length between contraction joints for standard weight concrete, and 0.0003 times the length between contraction joints for lightweight concrete. The design of arches and similar structures shall provide for effects of shrinkage, plus rib-shortening, plus plastic flow.

## ARTICLE 7 DISTRIBUTION OF LOADS

**§[C26-906.1] 27-578 Distribution of vertical loads.-**
Distribution of vertical loads to supporting members shall be determined on the basis of a recognized method of elastic analysis or system of coefficients of approximation. Elastic or inelastic displacements of supports shall be considered and, for the distribution of dead loads, the modulus of elasticity of concrete or composition sections shall be reduced to consider plastic flow. Secondary effects, due to warping of the floors shall be considered.

**§[C26-906.2] 27-579 Distribution of horizontal loads**. - The following provisions shall apply to superstructure framing only, and shall not apply to structures wherein horizontal loads are transmitted to the foundation by stay-cables, arches, non-rectangular frames, or by frames, trusses, or shear walls not oriented in vertical planes.

**(a) Distribution of horizontal loads to vertical frames, trusses and shear walls. -** Horizontal loads on the superstructure shall be assumed to be distributed to vertical frames, trusses, and shear walls by floor and roof systems acting as horizontal diaphragms. The proportion of the total horizontal load to be resisted by any given vertical frame, truss, or shear wall shall be determined on the basis of relative rigidity, considering the eccentricity of the applied load with respect to the center of resistance of the frames, trusses, or shear walls. For vertical trusses, web deformations shall be considered in evaluating the rigidity.

**(b) Distribution of horizontal loads within rigid frames of tier buildings. -**
(1) ASSUMPTIONS. - The distribution of horizontal loads within rigid frames of tier buildings may be determined on the basis of a recognized method of elastic analysis or, subject to limitations in paragraph two of this subdivision, may be predicated on one or more of the following simplifying assumptions:

a. Points of inflection in beams or columns are at their midspan and midheight, respectively. The story shear is distributed to the columns in proportion to their stiffnesses.

b. The change in length of columns due to axial effects of the horizontal loads may be neglected.

c. Vertical column loads due to horizontal forces are taken by the exterior columns only, or are resisted by the columns in proportion to the column distances from the neutral axis of the bent.

(2) LIMITATIONS. -

a. For buildings over three hundred feet in height, the change in length of the columns, due to the effects of the horizontal loads, shall be evaluated or the framing proportioned to produce regular movements of the successive joints at each floor so that warping of the floor system may be neglected.

b. Simplifying assumptions used in design shall be subject to approval by the commissioner for any of the following conditions or circumstances:

1.  For buildings over three hundred feet in height or for buildings with a height-width ratio greater than five.

2. At two-story entrances or intermediate floors.

3. Where offsets in the building occur.

4. Where transfer columns occur.

5. In any similar circumstances of irregularities or discontinuities in the framing.

**(c) Distribution of load in self-relieving construction.-** the framing of self-relieving construction may be proportioned on the assumption that connections are fully rigid in resisting moments due to lateral load and that any larger moments due to the gravity loads or due to a combination of gravity and lateral loads will be relieved by deformation of the connection material, provided that:

(1) The fasteners shall be capable of developing the full moment capacity of the connection at the allowable unit stress established in subchapter ten of this chapter.

(2) The connection shall be capable of resisting the moment due to lateral load, and the shear due to lateral load plus vertical load, all at the allowable unit stresses established in subchapter ten of this chapter.

(3) The framing and the building are within the limitations established in subparagraph (b) of paragraph two of subdivision (b) of this section.

(4) The connections shall be detailed to permit the required deformations without fracture, and their capacity to so function shall be verified by test or other means.

**(d) Structural walls and partitions. -** Walls and partitions, if specifically designed to resist the applied forces, may be considered as contributing to the resistance or rigidity of the structure with regard to horizontal loads.

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 422 of 654

**Title 27 / Subchapter 9**

**This page is intended to be left blank**

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 423 of 654

Title 27 / Subchapter 10

**SUBCHAPTER 10**
**STRUCTURAL WORK**

**TABLE OF CONTENTS**

| [Sub-Art. or Sec.]* | Art. or Sec** | |
|---|---|---|
| **[1000.0]** | **Art. 1** | **Scope and General Requirements** |
| [1000.1] | 580 | Scope |
| [1000.2] | 581 | Standards |
| [1000.3] | 582 | Definitions |
| [1000.4] | 583 | Plans |
| [1000.5] | 584 | Permits |
| [1000.6] | 585 | General Requirements |
| [1000.7] | 586 | Materials and Methods of Construction |
| [1000.8] | 587 | Fire Protection Requirements to Apply |
| [1000.9] | 588 | Use of Used and Unidentified Materials |
| [1000.10] | 589 | Equivalent Systems of Design |
| [1000.11] | 590 | Deferred Detailing |
| **[1001.0]** | **Art. 2** | **Structural Design-General Requirements** |
| [1001.1] | 591 | Stability |
| [1001.2] | 592 | Bracing |
| [1001.3] | 593 | Secondary Stresses |
| [1001.4] | 594 | Combination of Loads |
| [1001.5] | 595 | Deflection Limitations |
| **[1002.0]** | **Art. 3** | **Adequacy of the Structural Design** |
| [1002.1] | 596 | General |
| [1002.2] | 597 | Questionable Construction |
| [1002.3] | 598 | Core Tests of Concrete Construction |
| [1002.4] | 599 | Load Tests |
| **[1003.0]** | **Art. 4** | **Masonry** |
| [1003.1] | 600 | General Requirements |
| [1003.2] | 601 | Identification |
| [1003.3] | 602 | Inspection |
| **[1004.0]** | **Art. 5** | **Concrete** |
| [1004.1] | 603 | General Requirements |
| [1004.2] | 604 | Identification of Metal-Reinforcement |
| [1004.3] | 605 | Mixes |
| [1004.4] | 606 | Documentation |
| [1004.5] | 607 | On-Site Inspections |
| [1004.6] | 608 | Admixtures |
| [1004.7] | 609 | Licensed Concrete Testing Laboratories |
| [1004.8] | 610 | Short-Span Concrete Floor and Roof Construction Supported on Steel Beams |
| [1004.9] | 611 | Pneumatically Placed Concrete |
| | 611.1 | Conveying Concrete by Pumping Methods |
| [1004.10] | 612 | Formwork |
| [1004.11] | 613 | Concrete Utilizing Preplaced Aggregate |
| | 613.1 | Precast and Prestressed Concrete |
| | 613.2 | Thin-Section Precast Concrete Construction |
| **[1005.0]** | **Art. 6** | **Steel** |
| [1005.1] | 614 | General Requirements |
| [1005.2] | 615 | Identification |
| [1005.3] | 616 | Quality Control |
| **[1006.0]** | **Art. 7** | **Wood** |
| [1006.1] | 617 | General Requirements |
| [1006.2] | 618 | Identification |
| [1006.3] | 619 | Use of Non-Stress Grade Wood |
| [1006.4] | 620 | Quality Control |
| [1006.5] | 621 | General Construction Requirements |
| [1006.6] | 622 | Empirical Provisions in Lieu of Design |
| [1006.7] | 623 | Heavy Timber Construction (Construction Class II-A) |
| [1006.8] | 624 | Construction Methods |
| **[1007.0]** | **Art. 8** | **Aluminum** |
| [1007.1] | 625 | General Requirements |
| [1007.2] | 626 | Identification |
| [1007.3] | 627 | Quality Control |
| [1007.4] | 628 | Erection |
| **[1008.0]** | **Art. 9** | **Reinforced Gypsum Concrete** |
| [1008.1] | 629 | General Requirements |
| [1008.2] | 630 | Identification of Metal Reinforcement |
| [1008.3] | 631 | Limitations of Use |
| **[1009.0]** | **Art. 10** | **Thin Shell and Folded-Plate Construction** |
| [1009.1] | 632 | General Requirements |
| [1009.2] | 633 | Analysis |
| [1009.3] | 634 | Thin Concrete Shells |
| **[1010.0]** | **Art. 11** | **Suspended Structures** |
| [1010.1] | 635 | General Requirements |
| [1010.2] | 636 | Suspenders |
| [1010.3] | 637 | Tests of Materials for Bridge Wire Suspenders |
| [1010.4] | 638 | Tests of Materials for Other Types of Suspenders |
| [1010.5] | 639 | Design |
| [1010.6] | 640 | Fittings for Wire Cable Suspenders |
| [1010.7] | 641 | Construction |
| [1010.8] | 642 | Protection of Suspenders |
| **[1011.0]** | **Art. 12** | **Glass Panels** |
| [1011.1] | 643 | Scope |
| [1011.2] | 644 | Support for Glass Panels |
| [1011.3] | 643 | Glass Requirements |
| [1011.4] | 646 | Thickness of Glass |

[1011.5]   647   Special Glasses
[1011.6]   648   Installation of Glass Panels
[1011.7]   649   Protection of Glass Panels
[1011.8]   650   Deflection of Support
[1011.9]   651   Panels Subject to Human Impact Loads

*"C26" omitted from section numbers in this column.
**"27" omitted from section numbers in this column.

## LIST OF TABLES

**Table No.**

10-1   Inspection of Materials and Assemblies
10-2   Inspection of Methods of Construction
10-3   Minimum Cement Factor
10-4   Nailing Schedule
10-5   Minimum Weights of Coating-Bridge Wire, Zinc-Coated, for Bridge Strand and Bridge Rope Constructions
10-6   Probability of Breakage for Glass Panels
10-7   Maximum Area of Glass
10-8   Multiplying Factors for Various Types of Glass
10-9   Requirements for Glass Panels Subject to Impact Loads

## ARTICLE 1 SCOPE AND GENERAL REQUIREMENTS

**§[C26-1000.1]  27-580  Scope. -**The provisions of this subchapter, supplemented by the additional requirements of subchapter eleven of this chapter, shall establish minimum requirements for materials, designs, and construction to be used for all structural elements in buildings. In addition, within special flood hazard areas and below the regulatory flood datum, as described in article ten of subchapter four of this chapter, materials, designs and construction required for structural elements by reference standard RS 4-5 shall be applicable.

**§[C26-1000.2]  27-581  Standards. -**The provisions of reference standard RS-10 shall be a part of this subchapter.

**§[C26-1000.3]  27-582  Definitions. -**For definitions to be used in the interpretation of this subchapter, see subchapter two of this chapter.

**§[C26-1000.4]  27-583  Plans. -**For the requirements governing the filing of plans and the work to be shown on the plans, see subchapter one of this chapter.

**§[C26-1000.5]  27-584  Permits. -**
For the requirements governing equipment work permits and equipment use permits, see subchapter one of this chapter.

**§[C26-1000.6]  27-585 General requirements. -**
For purposes of this code, the structural elements of a building shall normally include all floor, roof, and wall framing members and slabs (but not including slabs-on-grade); all piers, walls, footings, piles, and similar elements of the foundation; and all other elements of both foundation and superstructure which, in engineering practice, are proportioned on the basis of calculated stress. Where doubt exists as to the structural nature of an element, the provisions of this subchapter, and of subchapter eleven of this chapter, shall be deemed to apply only to an element in which the materials are stressed in excess of thirty-three and one-third percent of the allowable stress values (without increase for infrequent stress conditions) for such material in its proposed use, or to an element wherein public safety would be involved in the event of excessive distortion under the applied loads.

**§[C26-1000.7] 27-586 Materials and methods of construction. -**
Materials and methods of construction used in the manufacture and/or placement of structural elements in a building shall be subject to the requirements of article seven of subchapter one of this chapter, the inspection provisions established in tables 10-1 and 10-2 and the detailed requirements of articles four through twelve of this subchapter and article thirteen of subchapter eleven of this chapter.

**§[C26-1000.8]  27-587  Fire protection requirements to apply.-**Where a material or method of construction in a specific use is required to provide fire protection as well as structural adequacy, the material or method of construction shall meet both specified requirements.

**§[C26-1000.9]  27-588  Use of used and unidentified materials.-**
The utilization of used materials and unidentified or ungraded materials shall be limited to non-structural elements, except:
(a) Such materials (or elements) may be reused, or continued in use, at stress levels to which the materials or elements were subjected in the previous construction, or at load capacity as demonstrated by load test procedures as described in subdivision (a) of section 27-599 of article three of this subchapter.
(b) Unidentified materials may be graded by the recovery and test of representative samples, or by other means satisfactory to the commissioner.
(c) Used materials shall be considered to be graded where the grade is clearly indicated on the approved plans for the existing construction and may be used at the allowable stress levels for that grade of like material as established in the building code in force at the time the plans for the existing construction were approved.

**§[C26-1000.10]  27-589  Equivalent systems of design. -**

Nothing in this subchapter shall be construed to prohibit the use of any system of design, alternate to those indicated, provided that it can be demonstrated to the satisfaction of the commissioner that such system of design will provide a factor of safety against structural failure consistent with the requirements of articles four through twelve of this subchapter, fire safety in consonance with the requirements of subchapters three through eight of this chapter, and such other characteristics pertinent to the safety of life, health, and property as prescribed in this subchapter or as may be required by the commissioner.

(a) Alternate or equivalent materials or methods of construction shall be subject to the provisions of section 27-133 of article seven of subchapter one of this chapter.

**§[C26-1000.11]  27-590  Deferred detailing. -**
Where structural elements are normally detailed on shop or working drawings, the application for the permit shall so state, and issuance of the permit shall be conditioned upon future submission of such shop or working drawings showing the approval of an architect or engineer with regard to such elements, or of a signed statement by an architect or engineer to the effect that such drawings were prepared to his or her satisfaction. In cases where the detailing of structural elements has been made on the basis of fire-resistance ratings, load tables, or similar data as given in manufacturer's catalogues, the application for approval of the plans shall so state and issuance of such acceptance shall be conditional upon submission of a statement by the manufacturer, or of other supporting documentary evidence of accreditation furnished by the manufacturer, attesting to the accuracy of the data and stating that such data were derived in conformance with the provisions of this code. Where the detailing of structural elements has been made on the basis of data published in technical documents of recognized authority issued by, or accredited by the agency or association promulgating the applicable reference standard cited in this code, such statements will not be required.

## TABLE 10-1 INSPECTION OF MATERIALS AND ASSEMBLIES

| Materials | Elements That Shall be Subject to Controlled Inspection [a,b,d] | Elements That Are Not Subject to Controlled Inspection [a,c,d] |
|---|---|---|
| Steel | None | All structural elements and connections. |
| Concrete | Materials for all structural elements proportioned on the basis of calculated stresses seventy per cent or greater, of basic allowable values. See article five for specific requirements relating to "quality control of materials and batching." | (1) All materials for structural elements proportioned on the basis of calculated stresses less than seventy percent of basic allowable values. (2) Concrete materials for: (a) Short span floor and roof construction proportioned as per section 27-610. (b) Walls and footings for buildings in occupancy group J-3. (3) Metal reinforcement. |
| Aluminum | None | All structural elements and connections. |
| Wood | None | All structural elements and connections. |
| Reinforced gypsum concrete | None | All structural elements. |
| Masonry | None | All structural elements. |
| Other | Requirements as may be established in other subchapters of this code or by the commisioner. | |

**Notes for Table 10-1:**

[a] For general provisions relating to inspection see section 27-132.

[b] All structural materials and assemblies subject to controlled inspection shall be tested and/or inspected at their place of manufacture and evidence of compliance with the provisions of this subchapter shall be provided as stipulated in articles four through twelve.

[c] Mill, manufacturer's and supplier's inspection and test reports will be accepted as evidence of compliance with the provisions of this code for all structural materials and assemblies not subject to controlled inspection.

[d] Basic allowable stress values as referenced herein shall denote allowable stress value without increase for infrequent stress conditions as established in this code or in the applicable reference standard for the material or element in its proposed use.

## ARTICLE 2  STRUCTURAL DESIGN-

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 426 of 654

Title 27 / Subchapter 10

## GENERAL REQUIREMENTS

**§[C26-1001.1]  27-591  Stability. -**Except as provided in article twelve of subchapter eleven of this chapter with regard to foundation elements, a building, or any element thereof shall be proportioned to provide a minimum factor of safety of 1.50 against failure by sliding or overturning. The required stability shall be provided solely by the dead load plus any permanent anchorages, which may be provided.

**§[C26-1001.2]  27-592  Bracing. -**Unless otherwise specified in the reference standards, members used to brace compression members shall be proportioned to resist an axial load of at least two percent of the total compressive design stress in the member braced, plus any transverse shear therein.

**§[C26-1001.3]  27-593  Secondary stresses. –**
Secondary stresses in trusses shall be considered and where of significant magnitude, their effects shall be provided for in the design.

**\*\*§[C26-1001.4]  27-594  Combination of loads. -**
Dead loads, live loads (including impact) and reduced live loads, where applicable, shall be considered as basic loads. Wind, earthquake, thermal forces, shrinkage, and unreduced live loads (where live load reduction is permitted by subchapter nine of this chapter) shall be considered as loads of infrequent occurrence. Members shall have adequate capacity to resist all applicable combinations of the loads listed in subchapter nine of this chapter, in accordance with the following:
*\*\*Local Law 17-1995.*
(a) Where design is based on allowable working stresses, the loads as described in subchapter nine of this chapter shall be multiplied by the following factors and the design shall be based on the resulting load values:
(1) For combinations of basic loads, only, the factor shall be 1.0, except that for the design of temporary structures (defined as a structure, which will be in place six months or less) the factor shall be 0.75.
(2) For any combination of one or more basic loads with any one load of infrequent occurrence, the factor shall be 0.75, except that for the design of temporary structures the factor shall be 0.67.
(3) For any combination of one or more basic loads with two or more loads of infrequent occurrence, the factor shall be 0.67.
    Exception.—The provisions of reference standards RS 10-8 and RS 10-9 relating to increases of allowable unit stresses for short-time loading shall apply.
(b) Where design is based on ultimate strength criteria (including plastic design of steel structures and proportioning of suspended structures), the loads, as described in subchapter nine of this chapter shall be multiplied by the factors indicated in subdivision (e) of

section 27-639 of article eleven of this subchapter and in the applicable reference standards. The design shall be based on the resulting load values.
    Exceptions.—1.  Where combinations of load for which factors are given in the reference standard include the load of wind (or earthquake) the design additionally shall consider combinations of load wherein each other of the loads of frequent\* occurrence as listed in this paragraph are substituted for the load of wind.
    2. The design also shall consider combinations of load wherein two most critical of the loads of infrequent occurrence are combined with the basic loads. For such combination, however, the factors indicated in the reference standards and in subdivision (e) of section 27-639 of article eleven of this subchapter for suspended structures, for the combination of basic loads plus one load of infrequent occurrence may be reduced fifteen percent.
*\*As enacted but "infrequent" probably intended.*

**§[C26-1001.5]  27-595  Deflection limitations. -**
The applicable provisions of the several reference standards cited in this subchapter shall apply. In addition, the total of the dead plus live load vertical deflections (including effects of creep and shrinkage) of members, supporting walls, veneered walls, or partitions constructed of or containing panels of masonry, glass, or other frangible materials shall not exceed 1/360 of the span.

## ARTICLE 3  ADEQUACY OF THE STRUCTURAL DESIGN

**§[C26-1002.1]  27-596  General. -** The structural design of a member or assembly shall be deemed to be adequate if the design computations demonstrate conformance with the applicable standards noted in articles four through twelve of this subchapter. Where, because of practical difficulties, such computations cannot be executed, the structural design may be deemed adequate if the member or assembly is subjected to, and satisfactorily performs under, load tests in accordance with the provisions of subdivision (a) of section 27-599 of this article. Where there is a question as to the adequacy of a completed or partly completed construction, the provisions of section 27-597, 27-598 and subdivision (b) of section 27-599 of this article shall apply.

**§[C26-1002.2]  27-597  Questionable construction. -**
If, upon inspection, it is found that a construction or any part thereof, as built, shows open cracks, spallings, or other signs of distress; or should inspection records show more\*\* significant deficiency of construction; or should laboratory tests on concrete or other materials that have been incorporated into the work indicate deficiency of strength; or should there be a reasonable doubt as to the strength, stability, or adequacy of the construction or any part thereof, such construction may

**Title 27 / Subchapter 10**

be checked to verify the adequacy thereof either by computation, or by core or load tests conducted in accordance with the provisions of section 27-598 or subdivision (b) of section 27-599 of this article or by any combination of these means. Should the adequacy of construction not be verified within a reasonable time, such construction shall be rejected and shall be demolished or reinforced or rebuilt to be made safe in conformance with the requirements of this code. In the event of a disagreement, the final decision as to the acceptance of the work shall be made by the commissioner. All such tests shall be made without expense to the city.

***As enacted but "some" probably intended.**

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21      Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 428 of 654

Title 27 / Subchapter 10

## TABLE 10-2 INSPECTION OF METHODS OF CONSTRUCTION

| Materials | Operations on Structural Elements That Shall be Subject to Controlled Inspection [a,b,d] | Operations on Structural Elements That Are Not Subject to Controlled Inspection [a,c,d] |
|---|---|---|
| Steel | (1) Welding operations and the tensioning of high strength bolts in connections where the calculated stresses in the welds or bolts are fifty percent or more of basic allowable values.<br>(2) Connection of fittings to wire cables for suspended structures, except where cables together with their attached fittings are proof-loaded to not less than fifty-five percent of ultimate capacity. | (1) Welding operations and the tensioning of high strength bolts in connections where the calculated stresses in the welds or bolts are less than fifty percent of basic allowable values.<br>(2) All other fabrication and erection operations not designated for controlled inspection. |
| Concrete | Except for those operations specifically designated in this table are*** not subject to controlled inspection, for all concrete, the operations described in subdivision (a) of section 27-607 shall be subject to controlled inspecion. | (1) All operations relating to the construction of members and assemblies (other than prestressed members) which involve the placement of a total of less than fifty cubic yards of concrete and wherein said concrete is used at levels of calculated stress seventy percent or less of basic allowable values.<br>(2) Placing and curing of concrete for all:<br>(a) Short span floor and roof construction as per section 27-610.<br>(b) Walls and footings for buildings in occupancy group J-3.<br>(3) Size and location of reinforcement for walls and footings for buildings in occupancy group J-3.<br>(4) All other operations not described in subdivision (a) of section 27-607. |
| Aluminum | Welding operations in connections where the calculated stresses in the welds are fifty percent or more of the basic allowable values. | (1) Welding operations in connections where the calculated stresses in the welds are less than fifty percent of basic allowable values.<br>(2) All other fabrication and erection operations not designated for controlled inspection. |
| Wood | Fabrication of glued - laminated assemblies and of plywood components. | All other operations not designated for controlled inspection. |
| Reinforced Gypsum Concrete | None | All operations incident to the fabrication and placement of structural elements. |
| **Reinforced Masonry | (1) Fabrication of prefabricated units.<br>(2) Placement and bedding of units, sizes of members, including thickness of walls and wythes; sizes of columns; the size and position of reinforcement, in place, and provisions for curing and protection against freezing for all reinforced masonry construction unless such operations are specifically not designated for controlled inspection. | **(1) All masonry work for buildings in occupancy group J-3.<br>**(2) All mixing of mortar.<br>**(3) All other operations not designated for controlled inspection. |
| **Un-Reinforced Masonry | Placement and bedding of units and sizes of members including thickness of walls and wythes; sizes of columns; and provisions for curing and protection against freezing for all masonry construction proportioned on the basis of structural analysis as described in section four of reference standard RS 10-1A*, unless such operations are specifically not designated for controlled inspection. | **(1) All masonry work for buildings in occupancy group J-3.<br>**(2) All mixing of mortar.<br>**(3) All other operations not designated for controlled inspection. |
| Piling | See provisions of subchapter eleven. | |

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 429 of 654

Title 27 / Subchapter 10

| Other | Requirments as may be established in other subchapters on this code. |
|---|---|

### Notes for Table 10-2:

[a] For general provisions relating to inspection see section 27-132.

[b] All construction operations designated for controlled inspection shall be inspected by the architect or engineer designated for controlled inspection during the performance of such operation.

[c] Certification by the fabricator or erector, as applicable, will be accepted as evidence of compliance with the provisions of this code for all construction operations not subject to controlled inspection.

[d] Basic allowable stress values as referenced herein shall denote allowable stress value without increase for infrequent stress conditions as established in this code or in the applicable reference standard for the material or element in its proposed use.

*** "A" not enacted but probably intended*
***Local Law 17-1995.**
**** "are"emacted "is" probably intended.***

### §[C26-1002.3] 27-598 Core tests of concrete construction.-

The adequacy of the concrete in a building may be ascertained by the recovery and testing of cores. Cores shall be taken and tested in accordance with the procedure described in reference standard RS 10-16. In lieu thereof, cores cast-in-place and originally cured with the parent concrete, or other device acceptable to the architect or engineer designated for controlled inspection and which will produce test specimens simulating the condition of the concrete in place including the size and proportions specified for core specimens may be utilized to demonstrate the adequacy of the concrete in place. The compressive strength so determined shall meet the requirements for strength tests as described in reference standard RS 10-3.

### §[C26-1002.4] 27-599 Load tests. -

(a) Prequalifying load tests.- The provisions of this section shall apply only to load tests made for the purpose of establishing the structural adequacy of members or assemblies before such members or assemblies are incorporated into the work. Load tests for the purpose of establishing the strength of an element or assembly, in place, after construction, shall conform to the requirements of subdivision (b) of this section.

(1) TEST SPECIMENS. -The test specimens shall be a true representation of the units or assemblies to be used in the work and, unless sufficient tests are conducted on differing specimens to interpolate the performance of members of varying characteristics, test specimens shall be substantially identical with the units or assemblies to be used in service. Particular attention shall be given to matching the type and grade of material and, in the case of concrete, the mix, age, curing, and other pertinent variables.

(2) SUPPORT CONDITIONS AND INTERACTION.- Load tests shall be performed in such a manner that the supports for the members or assemblies being tested will simulate the conditions of support in the building, except that conditions of partial fixity may be approximated by condition of full or zero restraint, whichever produces a more severe stress condition in the member being tested. The test conditions shall be such as to obviate all interaction of fills, finishes, partitions, supports, or members whose interaction normally would be neglected in design. Where continuous, multiple, intersecting, or connected members are used in the test, all interacting members shall be simultaneously and fully loaded and additional tests shall be performed under the partial loading conditions specified in subchapter nine of this chapter. Test specimens shall not be unloaded and reloaded or subjected to cyclical loading, except as specifically required by the provisions of this code and except that the adding of increments of additional load to a member already under load and the application of the test load as described in subparagraph (b) of paragraph three of this subdivision following removal of the test load described in subparagraph (a) of paragraph three of this subdivision will be permitted.

(3) STRENGTH REQUIREMENTS. -The member or assembly, supported as described in paragraph two of this subdivision, shall be capable of supporting:

a. Without visible damage (other than hairline cracks) its own weight plus a test load equal to one hundred fifty percent of the design live load plus one hundred fifty percent of any dead load that will be added at the site; and
b. Without collapse, its own weight plus a test load equal to fifty percent of its own weight plus two hundred fifty percent of the design live load plus two hundred fifty percent of any dead load that will be added at the site. The latter loading shall remain in place for a minimum period of one week. All loading conditions described in subchapter nine of this chapter shall be considered. The design live load shall be the nominal value reduced for contributory area as described in subchapter nine. Except as permitted under paragraph five of this subdivision, units to be tested shall be full size. Load bearing wall and partition assemblies shall be tested both with and without window and door framing where such framing will be included in the final assemblies.

Exception: If the load tests are conducted and the results promulgated in a manner that will permit clear differentiation between the dead and live load components added at the site, then the capacity of the member or assembly without visible damage other than hairline cracks as determined under load test condition in subparagraph a of paragraph three of this subdivision, may be reduced to the weight of the member, plus any dead load that will be added at the site, plus one hundred fifty percent of the design live load; and the capacity of the member or assembly to resist collapse as determined under load test condition in subparagraph b

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 430 of 654

Title 27 / Subchapter 10

of paragraph three of this subdivision may be reduced to one hundred fifty percent of the weight of the member, plus one hundred fifty percent of any dead load that will be added at the site, plus two hundred fifty percent of the design live load.

(4) DEFLECTION REQUIREMENT. -With the member or assembly supported as described in paragraph two of this subdivision, and after loading as required by the provisions of subparagraph a of paragraph three of this subdivision and the removal of said load, the percentage of recovery of the deflection caused by the superimposed load shall be at least seventy-five percent. The deflection under the design live load shall not exceed that permitted in this subchapter.

(5) MODEL TESTS. -Tests on models less than full size may be used to determine the relative intensity, direction, and distribution of stresses and applied loads, but shall not be considered as a proper method for evaluating stresses in, nor the strength of, individual members unless approved by the commissioner for this purpose. Where model analysis is proposed as a means of establishing the structural design, the following conditions shall be met:

a. Analysis shall be made by a firm or a corporation satisfactory to the commissioner.

b. The similitude, scaling, and validity of the analysis shall be attested to by an officer or principal of the firm or corporation making the analysis.

c. A report on the analysis shall be submitted showing test set-ups, equipment, and readings.

**(b) Load tests of completed construction.-** The provisions of this subdivision shall apply to any type of construction where the appropriate reference standard does not provide for load test of completed construction and the construction is questionable. When the appropriate reference standard provides for such load testing, the provisions of reference standard shall be used.

(1) STRENGTH. -The construction shall be loaded in two stages:

(a) With all dead load to which it will be subjected in service plus a superimposed load equal to the design live load reduced as described in subchapter nine of this chapter; and

(b) With a total load, including its own weight, equal to one hundred fifty percent of the total dead load to be supported in service plus one hundred eighty percent of the design live load, reduced for contributory area as described in subchapter nine of this chapter, which load shall remain in place for a minimum period of twenty-four hours.

(2) DEFLECTION REQUIREMENT. -Under the first stage loading, the deflection shall not exceed that permitted in the applicable reference standard. The residual deflection after removal of the second stage loading shall not exceed twenty-five percent of the calculated elastic deflection under the superimposed test load. The structure, after recovery of the deflection shall not show any evidence of serious distress.

(3) INTERACTION.- The load area shall extend to include the loading of all framing and elements that contribute to the strength of the element or elements under test, by way of interaction.

(4) LATERAL LOADS.- Where the elements in question must resist lateral loads in service, such loads shall be simulated in the tests. In such case, the magnitude of the applied live load and lateral load components of the test load may be adjusted as described in section 27-594 of article two of this subchapter, provided that the stress condition under the load increments described in paragraph one of this subdivision is not more critical.

(5) RELOADING. -Unloading and reloading or cyclical loading of test areas will not be permitted, except for the addition of increments of additional load to a member already under load.

[(6) LIMITATION ON USE OF LOAD TESTS OF CONCRETE STRUCTURES. -Where the strength tests of the concrete (as defined in reference standard RS 10-3) that initiate the requirement for load tests show strengths less than 2/3 of the strength required by the design of the specific element, the use of load tests to show the adequacy of the structure will not be permitted.]*

*Copy in brackets not enacted but probably intended.*

## ARTICLE 4  MASONRY

**§[C26-1003.1]  27-600  General requirements. -**
**(a) Unreinforced masonry**. - Materials, design, and construction of unreinforced masonry shall meet the requirements of reference standard RS 10-1.
**(b) Reinforced masonry.** - Materials, design, and construction of reinforced masonry shall meet the requirements of reference standard RS 10-2.

**§[C26-1003.2]  27-601  Identification. -**
**(a) Masonry units. -**Masonry units shall be clearly identified to show the grade of the unit and the compressive strength where called for on the plans.
**(b) Metal reinforcement.-** Reinforcing bars shall be rolled so as to identify the grade of steel and the size. Bundles and rolls of cold-drawn steel wire or welded wire fabric shall be tagged so as to identify the type and grade of steel and the size.

**§[C26-1003.3]  27-602  Inspection. -**The inspection of masonry and masonry construction shall conform to the requirements of tables 10-1 and 10-2.

## ARTICLE 5  CONCRETE

***§[C26-1004.1]  27-603  General requirements**. -
Concrete materials, design, construction, quality, inspection and testing shall meet the requirements of reference standard RS 10-3. Precast concrete construction utilizing a thin skin or slab stiffened or supported by a system of ribs shall conform to the requirements of reference standard RS 10-4.
*Local Law 65-1990.*

**§[C26-1004.2]  27-604  Identification of metal-reinforcement.-** Reinforcing bars shall be rolled so as to

identify type and grade of steel, and size. Bundles and rolls of wire, strands, or welded wire fabric shall be tagged so as to identify the type and grade of steel and the size.

**\*§[C26-1004.3]   27-605   Mixes**.- Concrete may be proportioned, batched, and mixed by any of the following methods:

*\*Local Law 65-1990.*

**(a) Method I. -Mixes with Minimum Cement Content**. -
(1)   MINIMUM CEMENT CONTENT. -The cement content used in the work shall not be less than the content given in table 10-3 for the corresponding strength of concrete.

(2) WATER-CEMENT OR STRENGTH-CEMENT RATIO.- Normal weight concrete proportioned on the basis of preliminary tests shall be produced by using a water-cement ratio corresponding to a point on a strength-cement or water-cement ratio curve. Proportioning of lightweight and heavyweight concrete, and concrete using an aggregate other than natural sand, gravel or stone shall be by using a strength-cement content curve. The point on the respective curves shall represent a strength of concrete at the slump and age called for on the plans at least twenty-five percent higher than the specified strength, f'c. The cement content shall not be less than the content shown in table 10-3.

(3)   PRELIMINARY   TESTS.   -Preliminary tests of concrete shall be made in advance of any concreting operation by a licensed concrete testing laboratory acceptable to the architect or engineer of record. Preliminary tests shall consist of compression strength tests of molded concrete cylinders made in accordance with reference standards RS 10-17 and RS 10-21. A curve representing the relation between the average strength of the concrete at twenty-eight days, or at any other specified age filed with the department, and the strength-cement ratio or the water-cement ratio shall be established for the range of strength values at the slump required for the work. The tests shall include at least four mixes with different strength-cement ratios or four mixes with different water-cement ratios and at least four cylinder specimens for each mix. The cylinder strength tests shall be supplemented by tests to confirm that the cement and aggregates conform to the provisions of reference standard RS 10-3.

(4) PREVIOUSLY ACCEPTED MIXES. -In lieu of the requirements of paragraph three of this subdivision, the architect or engineer designated for controlled inspection may permit the use of mix proportions of aggregates having the same specific gravity, size and gradation; cements of the same type and batch weight; admixtures of the same type and quantity; and other ingredients the same as or equal to those that have been previously submitted with applicable preliminary tests which complied with paragraphs one and two of this subdivision, and which have been accepted by the commissioner within the past year. If any of the mix proportions or ingredients are changed, a separate submission for acceptance shall be required.

(5)   QUALITY   CONTROL   AND   INSPECTION   OF MATERIALS AND OF BATCHING. -Where concrete materials are used for structural elements defined in section 27-585 of article one of this subchapter, quality control and inspection shall be provided at the batch plant by a licensed concrete testing laboratory under the supervision of the architect or engineer designated for controlled inspection, in accordance with the requirements of table 10-1 and in sufficient scope to:
a. Determine and record the actual batched weights of the ingredients and the volume of water charged into the mixer;
b. Verify that such weights conform to the weights and proportions required by the preliminary test mix, adjusted for moisture content, fineness modulus and gradation of aggregates;
c. Verify conformance of the quality and condition of the materials to reference standard RS 10-3;
d. Verify that the aggregates have the same specific gravity, size and gradation; the cement is the same type and batch weight, the admixtures are the same type and quantity; and that any other ingredients are the same as or equal to those used for the preparation of the preliminary test mixes;
e. For all concrete, whether or not designated for controlled inspection, attestation of the results of quality control and inspection at the batch plant shall appear on a ticket accompanying each load of concrete. The attestation for subparagraphs a, b, c and d of this paragraph shall be executed by the licensed concrete testing laboratory.
f. The licensed concrete testing laboratory shall also attest that the slump entrained air content and unit weight of the fresh concrete, as discharged from the mixer at the job site, were tested in accordance with reference standards RS 10-49, RS 10-51, RS 10-52, RS 10-61, RS 10-62, RS 10-63 and RS 10-64, and that all were in compliance with the accepted mix design.

**(b) Method II. -Proportioning on the basis of field experience.** -
(1) PROPORTIONING. -For the computation of the standard deviation in accordance with reference standard RS 10-14, mixes with test data from previous projects, similarly proportioned in accordance with the provisions of subdivision (a) of this section, and having materials of similar density and admixtures and having a slump equal to or greater than that at which the concrete is to be placed shall be used. Such mixes may be accepted subject to the approval of the architect or engineer designated for controlled inspection.
(2) STRENGTH. -The required average strength, f 'c [*sic*], to be used as the basis for the selection of mix proportions, shall in no case be less than fifteen percent higher than the specified strength called for on the plans.
(3) BATCHING. -The concrete shall be produced either in the concrete production facility used to produce the concrete from which the tests were made to develop the field experience data referred to in paragraph one of this subdivision or, subject to the approval of the architect or engineer designated for controlled inspection, in any concrete production facility that has data showing a record of standard deviation equal to or less than that of the original facility.

All concrete proportioned according to field experience shall be produced in a plant with automatic recording equipment for all ingredients.

(4) QUALITY CONTROL AND INSPECTION OF MATERIALS AND OF BATCHING. - When the concrete is batched in a plant where automatic recording equipment documents the batched weights or volumes of cement, aggregates, admixtures and water, no inspection of the materials or of the batching, nor any attestation by a licensed concrete testing laboratory responsible to the architect or engineer designated for controlled inspection, shall be required. A concrete producer shall:

a. Verify that such weights conform to the required weights and proportions, and to the strength-cement ratio or water-cement ratio required by the proportioning established pursuant to paragraph one of this subdivision, adjusted for moisture content, fineness modules and gradation of aggregates.

b. Verify conformance of the quality and condition of the materials to reference standard RS 10-3.

c. Attest, on a ticket accompanying each load, to the specified strength of the concrete, the actual weights or volume of the ingredients, and the weight or volume of water charged into the mixer at the batch plant or to be added at the job site. A statement that subparagraph b of this paragraph has been complied with shall also be included.

d. If at any time the automatic recording equipment becomes inoperative, the concrete production facility may be permitted, but only with the approval of the architect or engineer designated for controlled inspection, to batch and mix concrete for a period not to exceed three consecutive working days. During such a period, the concrete production facility shall engage a concrete batch plant inspector from a licensed concrete testing laboratory to observe and record the actual weights of the cement, aggregates, admixtures and other ingredients, and the weight or volume of water charged into the mixers. If the automatic recording equipment is inoperative for a period longer than three consecutive working days the concrete production facility shall not batch or mix concrete and the architect or engineer designated for controlled inspection shall notify the commissioner in writing that such equipment is inoperative.

**\*TABLE 10-3 MINIMUM CEMENT CONTENT**

| Specified Compressive Strength in 28 Days (f'c)-psi | Minimum Pounds of Cement Per Cubic Yard of Concrete (all aggregates) |
|---|---|
| 3,000 | 540 |
| 3,500 | 610 |
| 4,000 | 660 |
| 5,000 | 800 |
| Over 5,000 | Permitted only by reference standard RS 10-3 |
| 6,000 and over | Permitted only by reference standard RS 10-3 "Special Requirements for High Strength Concrete." |

NOTE: Minimum pounds of cement may be reduced up to 8 percent by the addition of an accepted admixture.
*Local Law 65-1990.*

**(c) Method III. -Average concrete. -**

(1) in lieu of making preliminary tests, average concrete limited to the concrete strengths shown in table 10-3A below may be used, and the cement content shall be not less than the value given in table 10-3A for the corresponding specified compressive strengths, nor shall the total volume of water (moisture plus added water) exceed that specified therein, provided that the total yardage placed does not exceed fifty cubic yards and the levels of calculated stress do not exceed seventy percent of the basic allowable stresses.

**\*TABLE 10-3A**

| Specified compressive strength in twenty-eight days (f'c) pounds per square inch | Minimum pounds of cement per cubic yard of concrete | Maximum permissible total volume of water, U.S. gallons per cubic yard of concrete |
|---|---|---|
| 2000 | 520 | 40 |
| 2500 | 560 | 41 |
| 3000 | 610 | 42 |

*Local Law 65-1990.*

(2) Each load of concrete shall be certified by the producer to the owner, whether produced at a ready mixed plant or site mixed, as to the total quantity of concrete, concrete strength and actual quantities per cubic yard of each material, including water, contained therein. A copy of such certificate shall be available to the department during the progress of the work and for two years thereafter.

**\*§[C26-1004.4] 27-606 Documentation.-** All mix proportions and supporting data shall be submitted for acceptance to the commissioner or to the architect or engineer designated for controlled inspection, as required, prior to the start of any work. All required attestations shall become a part of the documentation to be filed with the commissioner, and shall be subject to verification by strength tests, as hereinafter described, by check sampling of ingredients, or by such other inspections as the commissioner or the architect or engineer designated for controlled inspection may elect. Copies of all documentation filed with the commissioner, all the licensed concrete testing laboratory test data and required attestations, together with the tapes recording the batch weight where automatic recording equipment is used shall be available for inspection for a period of two years after the completion of the project. Such records shall be maintained by the architect or engineer designated for controlled inspection.
*Local Law 65-1990.*

**\*§[C26-1004.5]  27-607  Inspections. -** Inspection of concrete and concrete construction shall conform to the requirements of tables 10-1 and 10-2 and the provisions of this subchapter.

**(a) Controlled inspection**. - Controlled inspection of concrete construction shall include:

(1) STRENGTH TESTS. - Strength tests shall be performed on all structural concrete. The provisions of reference standard RS 10-3 shall apply. A licensed concrete testing laboratory shall, in compliance with reference standards RS 10-17, RS 10-51 and RS 10-52, sample the concrete, make and cure the test specimens at the job site, transport the specimens to the laboratory and test the specimens for compressive strength. Written reports of the results shall be furnished to the architect or engineer designated for controlled inspection and to the concrete producer immediately, but not more than five days following the conclusion of the compression strength tests. Test specimens shall be stored on the job site in an insulated curing box of sufficient size and strength to contain all the specimens made in any four consecutive working days and to protect the specimens from falling over, being jarred or otherwise disturbed during the period of initial curing. The box shall be erected, furnished and maintained by the concrete contractor. Such box shall be equipped to provide the moisture and to regulate the temperature necessary to maintain the proper curing conditions required by reference standard RS 10-52. Such box shall be located in an area free from vibration such as pile driving and traffic of all kinds. No concrete requiring inspection shall be delivered to the site until such storage curing box has been provided. Specimens shall remain undisturbed in the curing box until ready for delivery to the testing laboratory but not less than sixteen hours. Specimens delivered to the laboratory prior to an age of forty-eight hours shall not be demolded prior to delivery. All specimens shall be carefully removed from the box and transported to the laboratory by the licensed concrete testing laboratory in accordance with the provisions of reference standard  RS 10-52. All specimens shall be delivered to the laboratory before the laboratory closes at the end of the second working day following the day the specimens were molded. The date of arrival at the laboratory shall be recorded on the specimen test reports. All concrete failing to meet the specified minimum strength requirements shall be rejected by the architect or engineer designated for controlled inspection pending verification of the adequacy of the construction as described in section 27-598 of article three of this subchapter.

(2) ADDITIONAL TESTS. -Each sample of fresh concrete made in accordance with reference standard RS 10-51 for the purpose of molding strength test specimens shall be made under the supervision of the architect or engineer designated for controlled inspection.

Each sample shall be tested by the licensed concrete testing laboratory to determine its slump in accordance with reference standard RS 10-49, its entrained air content in accordance with reference standards RS 10-61 and RS 10-62, its unit weight in accordance with reference standards RS 10-63 and RS 10-64 and its temperature. If any of the tests fail to meet the specified requirements, the concrete shall be sampled again and the particular test that failed shall be repeated. If the second test fails to meet the specified requirements, then, with the approval of the architect or engineer designated for controlled inspection, adjustments shall be made to the concrete in the mixer to correct the deficiency. Test specimens shall not be molded from any sample that did not meet the specified requirements nor shall the concrete from which the sample was taken be placed in the structure, provided, however, that such concrete may be used elsewhere in the work where it meets or exceeds the specified requirements, but only with the approval of the architect or engineer designated for controlled inspection. In such case, test specimens shall be molded by the licensed concrete testing laboratory, which shall also record the precise location where the concrete was placed in the structure.

(3) CONTROLLED INSPECTION LOG BOOK. - A controlled inspection log book, limited solely to the concrete construction work, readily available to inspectors and representatives of the department, concrete suppliers and the architect and/or engineer of record, shall be maintained at the job site by the architect or engineer designated for controlled inspection, who shall make therein daily entries pertaining to the progress of the work. The entries shall describe, but not be limited to, the location, size and dimensions of the concrete members for which forms were constructed that day; the reinforcement installed in, and the specific locations and time spans of, every concrete placement; the air temperature, wind velocity and direction and other weather conditions during the twenty-four hours after concrete has been placed, specifically at 8 a.m., noon and four p.m., the protections taken against excessive temperatures and adverse weather conditions at each placement made that day; the method used, to cure the concrete and the period during which such methods were maintained; the actual hour when forms were stripped and shores were reinstalled and tensioning was applied to all prestressed members. The log shall become a part of the documentation to be filed with the commissioner as provided in section 27-606 and shall include the attestation of the architect or engineer designated for controlled inspection that the concrete construction work complies with the approved plans and the provisions of this code.

**(b) Other required inspection**. -Quality control or inspection shall be provided with respect to all operations of mixing and placing concrete and reinforcement that are not designated for controlled inspection. In the case of sidewalks, curbs, paving, slabs-on-grade and any work

22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff   Pg 434 of 654

Title 27 / Subchapter 10

designated in table 10-1 under the caption "Elements That Are Not Subject To Controlled Inspection" or in table 10-2 under the caption "Operations on Structural Elements That Are Not Subject to Controlled Inspection," all inspections shall be subject to and in accordance with the requirements of subdivision (b) of section 27-132. If any test to determine the quality or compressive strength of the concrete is required, the fresh concrete shall be sampled and tested for slump, entrained air content, unit weight and temperature. Compression strength test specimens shall be molded only by a licensed concrete testing laboratory or by a person certified by the American Concrete Institute as qualified to perform such function. Attestation shall be executed by the person superintending the use of the material in accordance with the requirements of subdivision (b) of section 27-132 of article seven of subchapter one of this chapter.
*Local Law 65-1990.*

*§[C26-1004.6]  27-608  Admixtures. -*Admixtures may be used in the concrete only where included in the preliminary test mixes made in accordance with paragraph three of subdivision (a) of section 27-605 or mixes proportioned in accordance with the provisions of reference standard RS 10-3. In the case of mixes proportioned in accordance with subdivision (c) of section 27-605, there shall be no reduction of the cement content called for in table 10-3A because admixtures are used in the mix. Where admixtures are used, the provisions of reference standards RS 10-3 and RS 10-44 shall apply. In addition, no anti-freeze agents shall be used. Admixtures shall be added in measured quantities in conformance with the accepted mix design.
*Local Law 65-1990.*

*§[C26-1004.7]  27-609  Licensed concrete testing laboratories.-*
All strength tests of concrete and testing of concrete materials required by the provisions of this section shall be performed by concrete testing laboratories licensed in accordance with the requirements of article nine of subchapter two of chapter one of title twenty-six of the administrative code and rules promulgated by the commissioner. The licensed concrete testing laboratory shall, among other things, analyze, evaluate and test concrete materials; determine whether the materials comply with specifications and pertinent referenced national standards in reference standard RS 10-3; select mix proportions for preliminary tests; recommend the mix proportions to be used on the project for which the tests were made; analyze data from previous projects and compute the standard deviation; and recommend the mix proportions to be used based on such field experience data. At the batch plant or at the job site, the licensed concrete testing laboratory shall, among other things, sample concrete and test for slump, entrained air content, unit weight and temperature, mold compression test specimens; store and cure such specimens on the job site; remove, transport and deliver such specimens to the laboratory; demold, store, cure, cap and test such specimens at the laboratory and furnish written reports of the results of all tests of the materials and concrete to the architect or engineer designated for controlled inspection and to the concrete producer. When tests of the hardened concrete are required, they shall be made by the licensed concrete testing laboratory in accordance with reference standard RS 10-3 and the national standards for making tests for penetration resistance, rebound number, pullout strength and of drilled cores. The architect or engineer designated for controlled inspection is authorized either to dismiss or to employ a particular licensed concrete testing laboratory at any time during the progress of the work.
*Local Law 65-1990.*

§[C26-1004.8]  27-610  Short-span concrete floor and roof construction supported on steel beams. -In lieu of analysis, the following empirical procedures may be used for the design of short-span concrete floor and roof slabs containing draped reinforcement and supported on steel beams. The empirical equations described in subdivisions (c) and (d) of this section shall apply only where the steel beams are placed, or are encased, in a manner that will provide section for the transfer of shear from slabs to beams equivalent to, or in excess of, the slab thickness required by said equations.
(a) Concrete.- The concrete shall have a minimum compressive strength at twenty-eight days of seven hundred psi.
(b) Reinforcement. -Reinforcement shall consist of steel fabric, rods, or other suitable shapes that shall be continuous or successively lapped to function as a continuous sheet. The main reinforcement shall be at least 0.15% of the gross cross section where continuous steel fabric is used and at least 0.25% of the gross cross section where other forms of steel reinforcement are used. All reinforcing shall be draped, with the center of the reinforcement at the center of the span one inch above the bottom of the slab and the center of reinforcement over the support one inch below the top of the slab.
(c) Minimum slab thickness. -The minimum total thickness of concrete floor and roof construction shall be determined by the following formula, but shall not be less than four inches:

$$t = \frac{L}{2} + \frac{w - 75}{200}$$

Where:  t  =  total thickness (in.)
      L = clear span between steel flanges (ft.)
      W = gross uniform load (dead load plus reduced live load) (psf)

**(d) Allowable load**. -The allowable load shall be determined by the following formula:

$$w = \frac{3CA_s}{L^2}$$

Where:  w  = gross uniform load (psf)

        $A_S$ = cross sectional area of main reinforcement (sq. in. per ft. of slab width)

        L  = clear span between steel flanges in feet. (L shall not exceed ten feet in any case, and when the gross floor load exceeds two hund-red psi shall not exceed eight feet)

        C  = the following coefficient for steel having an ultimate strength of at least fifty-five thousand psi;

1. For lightweight aggregate concrete:

a. twenty thousand when reinforcement is continuous.

b. fourteen thousand when reinforcement is hooked or attached to one or both supports.

2. For stone concrete:

a. twenty-three thousand when reinforcement is continuous.

b. fifteen thousand when reinforcement is hooked or attached to one or both supports.

(1) When the above formula is used the reinforcement shall be hooked or attached to one or both supports or be continuous.

(2) If steel of an ultimate strength in excess of fifty-five thousand psi is used, the above coefficient may be increased in the ratio of the ultimate strength to fifty-five thousand but at most by thirty percent.

**(e) Openings in floors and roofs**. -Openings more than one foot six inches on a side shall be framed. All areas encompassing multiple openings aggregating more than one foot six inches in any ten foot width or span of floor or roof slab shall be framed.

**§[C26-1004.9]   27-611   Pneumatically placed concrete.**- Construction methods shall conform to the applicable provisions and recommendations of reference standard RS 10-15.

**\*§27-611.1 Conveying concrete by pumping methods.**- All classes and strengths of concrete may be conveyed by pumping methods. All materials and methods used shall conform to the rules promulgated by the commissioner for conveying concrete by pumping methods.
*Local Law 65-1990.*

**\*§[C26-1004.10]   27-612   Formwork, slip form construction, lift method construction, precast and prestressed construction.**- The provisions of subchapter nineteen of this chapter shall apply.
*Local Law 65-1990.*

**§[C26-1004.11] 27-613 Concrete utilizing preplaced aggregate.** -The use of concrete formed by the injection of grout into a mass of preplaced coarse aggregate will be permitted where it can be demonstrated by successful prototype installation that the proposed mix, materials, and method of placement will produce a concrete of the specified strength and free of areas or inclusions of uncemented aggregate.

**(a) Prototypes.** -At least two prototypes, from either previous work or samples prepared for the proposed project shall be prepared. The forms shall be stripped, and a minimum of six cores recovered and tested to demonstrate the strength of the concrete produced by the proposed materials and methods of installation. In addition, the homogeneity of the prototypes shall be demonstrated by demolishing the prototypes.

**(b) In-place concrete.** -The concrete, as finally placed in the work, shall be prepared using the same materials, mix, equipment, and procedures utilized to prepare the successful prototype installations.

**\*(c) Inspection.** -All preparation and placement of structural concrete utilizing preplaced aggregates shall be subject to controlled inspection. Compression test specimens shall be prepared and tested as required for premixed concrete, except that the specimens shall be prepared under conditions that will simulate the conditions under which the concrete in the work is installed.
*Local Law 65-1990.*

**\*§27-613.1 Precast and prestressed concrete.** –
The provisions of reference standard RS 10-3 shall apply.
*Local Law 65-1990.*

**\*§27-613.2   Thin-section   precast   concrete construction.**- The provisions of reference standard RS 10-4 shall apply.
*Local Law 65-1990.*

## ARTICLE 6  STEEL

**§[C26-1005.1]  27-614  General requirements.** -
Materials, design, and construction methods shall meet the requirements of the following reference standards:

**(a) Structural steel.** -Reference standard RS 10-5.

**(b) Light gage** [*sic*] **cold formed steel.** -
Reference standard RS 10-6.

**(c) Open web steel joists.** -Reference standard RS 10-7.

**§[C26-1005.2]  27-615  Identification.** -Structural steel that is required to have a minimum yield point greater than thirty-six thousand psi shall at all times in the fabricator's plant, be marked, segregated, or otherwise handled so that the separate alloys and tempers are positively identified, and after completion of fabrication, shall be marked to identify the alloy and temper. Such markings shall be affixed to completed members and assemblies or to

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 436 of 654

Title 27 / Subchapter 10

boxed or bundled shipments of multiple units prior to shipment from the fabricator's plant. Open web steel joists shall have identification affixed to each bundle or lift showing size and type.

### §[C26-1005.3] 27-616  Quality control. -
**(a) Reference.** -The provisions of tables 10-1 and 10-2 shall apply.

**(b) Welding operations. -**
(1) Welding work shall be performed only by persons who have obtained a license from the commissioner.
(2) Where manual welding work is not performed in the city of New York, welds shall be made by welders qualified under the provisions of appendix D, parts II and III, of the AWS code for welding in building construction. Qualification with any of the steels permitted by the AWS code shall be considered as qualification to weld any of the other steels permitted by the code.
(3) Tack welds, which are later incorporated into finished welds carrying calculated stress, shall not be considered as structural welds.
(4) The inspection of welding operations stipulated in table 10-2 shall include a check to ascertain that the welders employed on the work have the required license or who are qualified in accordance with paragraph two of this subdivision.

### ARTICLE 7   WOOD

### §[C26-1006.1] 27-617  General Requirements. -
Materials (other than non-stress grade lumber), design, and construction methods shall meet the requirements of the following reference standards:

**(a) Lumber and timber. -**Reference standard RS 10-8.
**(b) Plywood.** -Reference standard RS 10-9.
**(c) Structural glued-laminated lumber.** -Reference standard RS 10-18.

### §[C26-1006.2] 27-618  Identification.-
Except as provided for in subdivisions (a) and (c) of this section, all wood used for structural elements shall be identified as to grade and shall bear an identifying mark of an approved bureau or agency performing the grading, or the official grade mark and trade mark of the bureau or association under whose rules the wood was graded, in accordance with the following:

**(a) Lumber and timber. -**All lumber and timber, including non-stress grade lumber, shall be identified by the grade mark of a lumber grading or inspection bureau or agency approved by the commissioner, except that pre-cut material and rough-sawn lumber may be covered by a certificate of inspection issued by a lumber grading or inspection agency approved by the commissioner in lieu of grade marking.
**(b) Plywood.** -Plywood used structurally shall bear identification as to grade, type, and species group, or

identification index. Such identification shall be affixed by and identified by the trademarks of a testing and grading agency approved by the commissioner.
**(c) Glued-laminated.-** Glued-laminated structural members shall bear identification and/or shall be accompanied by certification in accordance with the provisions of reference standard RS 10-18.
**(d) Resawn lumber. -**Resawn (or reused) lumber shall be marked in accordance with its regraded status.

### §[C26-1006.3]  27-619  Use of non-stress grade wood.-
The use of non-stress grade wood in structural elements shall be limited to the following conditions:
(a)  Studs, joists, and rafters proportioned on the basis of the empirical provisions of section 27-622 of this article.
(b)  The architect or engineer responsible for the design may assign an allowable stress value for the proposed material based on the provisions of reference standard RS 10-8 relating to "other species and grade."  Under such condition, the required species and grade of wood, together with the assigned stress value, shall be conspicuously indicated on the plans.

### §[C26-1006.4]  27-620  Quality control. -Inspection of
the fabrication of glued-laminated assemblies, as stipulated in table 10-2, shall include a check of sizes of members, of fit, and of gluing operations.

### §[C26-1006.5] 27-621 General construction requirements.-
The provisions of this section shall be considered as supplemental to the provisions of the applicable reference standards.
**(a) Firecutting.** -The ends of wood beams, joists, and rafters resting on masonry or concrete walls shall be firecut to a bevel of three inches in their depth.
**(b) Protection of members. -**
(1)  Positive drainage shall be provided for all areas under the building not occupied by basements or cellars.
(2)  All loose wood and debris and all wood forms shall be removed from spaces under the building. All stumps and roots shall be grubbed to a minimum depth of twelve inches.
(3)  Wood members embedded in the ground and used for the support of buildings shall be treated.
(4)  Wood joists or wood structural floors closer than eighteen inches, wood girders closer than twelve inches, or sills closer than eight inches to an exposed ground surface within or without the building shall be treated or shall be of an equivalent resistant species.
(5)  Sleepers, sills, columns, and posts supported on concrete or masonry piers shall be treated or shall be of an equivalent resistant species unless isolated from the ground as specified in paragraph four of this subdivision or by a concrete slab. Where the isolation consists of a concrete slab-on-grade, the sleepers, sills,

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantloff    Pg 437 of 654

Title 27 / Subchapter 10

columns, or posts shall be raised at least three inches above the top of such slab.

(6) Ends of wood girders entering masonry or concrete walls shall be provided with a minimum one-half inch air space on top, sides, and at the end, unless the girder is treated or is of an equivalent resistant species.

(7) Wood or plywood used as siding or a combination of siding and sheathing shall be isolated from exposed ground by at least six inches.

(8) Crawl spaces shall be ventilated as required in subchapter twelve of this chapter.

(9) Where treated timber is required, the preservative treatment shall comply with reference standards RS 10-20 and RS 10-22. Treatment of wood poles shall comply with reference standard RS 10-28. All treated wood shall be handled in accordance with the provisions of reference standard RS 10-29.

## §[C26-1006.6] 27-622 Empirical provisions in lieu of design.

-The provisions of this section may be used in lieu of structural analysis only for those buildings in occupancy group J-3 where the specific occupancies correspond to a live load requirement of forty psf, or less, and to constructions wherein the supporting framing consists of multiple, closely spaced members, such as joists, studs, platform or balloon frames. All wood structural members in other classes of construction shall be proportioned on the basis of the analysis of stresses. All requirements established in this section may be reduced when an analysis of stresses, executed in accordance with reference standard RS 10-8, indicates such reduction is feasible. Sizes of wood members stated in this section are nominal sizes.

**(a) Stud walls and partitions. -**

(1) Studs shall be of equivalent or better grade than the minimum grades for the various species as established in reference standard RS 10-13.

(2) Corner posts shall be 3-stud members or members of equivalent strength.

(3) Load bearing studs shall be set with the larger cross section dimension perpendicular to the wall or partition. Studs in exterior walls of one story buildings of construction class II-D and II-E shall be at least two inches by three inches spaced not more than sixteen inches on center, or where studs are two inches by four inches, spaced not more than twenty-four inches on center. Studs for other classes of construction shall be at least two inches by four inches spaced not more than sixteen inches on center.

(4) Stud walls resting on concrete or masonry shall have sills at least two inches in nominal thickness. Where such sills bear on concrete, they shall be fastened with minimum one-half inch bolts embedded at least six inches. Each sill piece shall have at least two anchor bolts, with one bolt located at least one inch from each end of the plate, and with intermediate spacing not more than eight feet. Where such sills bear on masonry,

they shall be anchored in accordance with the applicable provisions of reference standard RS 10-1.

(5) Stud partitions that rest directly over each other and are not parallel to floor joists or beams may extend down between the joists and rest on the top plate of the partition, partition girder, or foundation below, or may be constructed on sill plates running on top of the beams or joists.

(6) All load bearing stud partitions shall be supported on walls, other partitions, double joists or beams, solid bridging, or on beams at least as wide as the studs. Joists supporting a partition parallel to the joists wherein the joists are spaced apart to permit the passage of piping or duct work shall be provided with solid blocking at intervals of not more than sixteen inches.

(7) Load bearing partitions perpendicular to joists shall not be offset from supporting girders, walls, or partitions by more than the depth of the joists unless the joists are proportioned on the basis of analysis of stress.

(8) In interior walls and in bearing partitions, double studs shall be provided at the sides of openings that are greater than three feet six inches up to six feet in width, and triple-studs shall be provided at the sides of openings of greater width.

(9) Headers shall be provided over each opening in exterior walls and bearing partitions. Where the opening does not exceed three feet, each end of the header shall be supported on a stud or framing anchor. Where the opening exceeds three feet in width each end of the header shall be supported on one stud and where the opening exceeds six feet each end shall be supported on two studs.

(10) All studs in exterior walls and in bearing partitions shall be capped with double top plates installed to provide overlapping at corners and at intersections with other walls and bearing partitions. End joists in double top plates shall be offset at least twenty-four inches. In lieu of double top plates, a continuous header of similar dimensions may be used. For platform frame construction, studs shall rest on a single bottom plate.

**(b) Bracing of exterior walls.** -Exterior stud walls shall be braced by one inch by four inch continuous diagonal strips let into the face of the studs and into the top and bottom plates at each corner of the building. Bracing may also be provided by one of the following means:

(1) Wood board sheathing of one inch nominal thickness, applied diagonally.

(2) For one and two-story dwellings, plywood sheathing at least four feet by eight feet (except where cut to fit around openings and for similar purposes) and at least five-sixteenths of an inch thick on studs spaced sixteen inches or less on centers and at least three-eighths of an inch thick on studs spaced more than

sixteen inches but not exceeding twenty-four inches on centers.

(3)  For one story dwellings and for the upper story of two story dwellings, fiberboard sheathing applied vertically in panels at least four feet by eight feet (except where cut to fit around openings and for similar purposes). Fiberboard sheathing shall be at least one-half inch thick and shall conform to the provisions of reference standard RS 10-27.

(4)  For one story dwellings and for the upper story of two story dwellings, gypsum board sheathing applied horizontally in panels at least two feet by eight feet (except where cut to fit around openings and for similar purposes). Gypsum boards shall be at least one-half inch thick and shall conform to the provisions of reference standard RS 10-19.

**(c)  Floor and roof framing**. -

(1)  SPAN TABLES. -Joists and rafters may be used in accordance with reference standard RS 10-13.

(2) BRIDGING. -In all floor and roof and roof framing, there shall be at least one line of bridging for each eight feet of span. The bridging shall consist of at least one inch by three inch lumber or equivalent metal bracing. A line of bridging or solid blocking shall also be required at supports unless lateral support is provided by nailing to a beam, header, or to the studs. Midspan bridging is not required for floor or roof framing in one- and two-family dwellings where joist depth does not exceed twelve inches. Bridging shall bear securely against and be anchored to the members to be braced.

(3)  NOTCHES. -Notches in the ends of joists and rafters shall not exceed one-fourth the depth unless adequate reinforcement is provided or analysis of stresses indicates that larger openings are feasible without the necessity for reinforcement. Notches in joists or rafters, located in the span shall not exceed one-sixth the depth and shall not be located in the middle third of the span. Bored holes shall not be within two inches of the top or bottom of the joists or rafter and the diameter of any such hole shall not exceed one-third the depth. For stair stringers, the minimum effective depth of the wood at any notch shall be three and one-half inches unless the stringer is continuously supported on a wall or partition.

(4)  SUPPORT. -

a.  Floor or roof framing may be supported on stud partitions.

b.  Tail beams over twelve feet long and all header and trimmer beams over six feet long shall be hung in metal stirrups having anchors, or by other methods providing adequate support. Trimmers and headers shall be doubled where the header is four feet or more in length.

c.  Except where supported on a one inch by four inch ribbon strip and nailed to the adjoining stud, the ends of floor joists shall have at least one and one-half inches of bearing on wood or metal, nor less than four inches on masonry.

d.  Joists framing from opposite sides of and supported on a beam, girder, or partition shall be lapped at least four inches and fastened, butted end-to-end and tied by metal straps or dogs, or otherwise tied together in a manner providing adequate support.

e.  Joists framing into the side of a wood girder shall be supported by framing anchors, on ledger strips at least two inches by two inches, or by equivalent methods.

f.  Wood joists and rafters bearing on masonry walls shall be anchored to such walls in accordance with the applicable provisions of reference standard RS 10-1.

(5)  RAFTERS AND CEILING JOISTS. -

a.  Where rafters meet to form a ridge, they shall be placed directly opposite each other and nailed to a ridge board at least one inch thick, and not less than the cut end of the rafters in depth.

b.  Provisions shall be made to resist the thrust from inclined rafters by connection of collar beams at least one inch by six inches, by connection to joists, or by equivalent means.

c.  Where ceiling joists are not parallel to rafters, subflooring or metal straps attached to the ends of the rafters shall be installed in a manner to provide a continuous tie across the building.

d.  Ceiling joists shall be continuous, or where they meet over interior partitions, shall be securely joined to provide a continuous tie across the building.

e.  Valley rafters shall be double members. Hip rafters may be single members. Valley and hip rafters shall be two inches deeper than jack rafters.

f.  Trussed rafters shall be designed in accordance with the provisions of reference standard RS 10-8.

(6)  Built-up members shall be securely spiked or bolted together and provision shall be made to resist the horizontal shear between laminations.

**(d)  Nailing schedule**. -The size and number of nails for connections shall be in accordance with table 10-4.

## §[C26-1006.7]  27-623  Heavy timber construction (construction class II-A). -

**(a)  Minimum sizes of members**. -To conform to the fire resistance rating requirements for heavy timber construction (construction class II-A), members shall be solid sawn or solid glue-laminated and of the following minimum dimensions: (Sizes of wood members indicated in this section are nominal sizes).

(1)  COLUMNS, FRAMES AND ARCHES. -

a.  Columns shall be at least eight inches in all dimensions when supporting floor loads, and at least six inches wide and eight inches deep when supporting roof and ceiling loads only.

b.  Beams and girders shall be at least six inches wide and ten inches deep.

c.  Frames or arches that spring from grade or the floor line and support floor loads shall be at least eight inches in all dimensions.

**Title 27 / Subchapter 10**

d. Timber trusses supporting floor loads shall have members at least eight inches in all dimensions.

e.  Frames or arches for roof construction that spring from grade or the floor line and do not support floor loads shall have members at least six inches wide and eight inches deep for the lower half of the height, and at least six inches deep for the upper half.

f.  Frames or arches for roof construction that spring from the top of walls or wall abutments, framed timber trusses, and other roof framing, which do not support floor loads, shall have members at least four inches wide and six inches deep. Spaced members may be composed of two or more pieces at least three inches thick when blocked solidly through their intervening spaces or when such spaces are tightly closed by a continuous wood cover plate at least two inches thick secured to the underside of the members. Splice plates shall be at least three inches thick. When protected by approved automatic sprinklers under the roof deck, framing members shall be at least three inches wide.

## TABLE 10-4   NAILING SCHEDULE

| Building Element | Nail Type | Number and Distribution |
|---|---|---|
| Stud to sole plate | Common-toe-nail | 4—8d |
| Stud to cap plate | Common-end-nail | 2—16d |
| Double Studs | Common-direct | 10d 12 in. o.c. or 16d 30in. in o.c. |
| Corner Studs | Common-direct | 16d 30 in. o.c. |
| Sole plate to joist or blocking | Common | 16d 16 in. o.c |
| Double cap plate | Common-direct | 16d 24 in. o.c |
| Cap plate laps | Common-direct | 3—16d |
| Ribbon strip, 6 in. or less | Common-direct | 2—10d each bearing |
| Ribbon strip, over 6 in. | Common-direct | 3—10d each bearing |
| Roof rafter to plate | Common-toe-nail | 3—16d |
| Roof rafter to ridge | Common-toe-nail | 2—16d |
| Jack rafter to hip | Common-toe-nail | 3—10d |
| Floor joists to studs (no ceiling joists) | Common-direct | 5—10d or 3—16d |
| Floor joists to studs (with ceiling joists) | Common-direct | 2—10d |
| Floor joists to sill or girder | Common-toe-nail | 2—16d |
| Double-joist to joist | Common-direct | 10d—staggered at 16 in. |
| Ledger strip | Common-direct | 3—16d at each joist |
| Ceiling joists to plate | Common-toe-nail | 2—16d |
| Ceiling joists to every rafter | Common-direct | (see table following) |
| Ceiling joists (laps over partitions) | Common-direct | 3—16d |
| Collar beam | Common-direct | 4—10d |
| Bridging to joists and rafters | Common-direct | 2—8d each end |
| Bridging to studs | Common-direct or toe | 2—10d each end |
| Diagonal brace (to stud and plate) | Common-direct | 2—8d each bearing |
| Tail beams to headers (when nailing permitted) | Common-end | 1—20d each 4 sq. ft. floor area |
| Header beams to trimmers (when nailing permitted) | Common-end | 1—20d each 8 sq. ft. floor area |
| 1 in. Subflooring (6 in. or less in width) | Common-direct | 2—8d each joist |
| 1 in. Subflooring (over 6 in. in width) | Common-direct | 3—8d each joist |
| 2 in. Subflooring | Common-direct | 2—20d each joist |
| 1 in. Wall Sheathing (8 in. or less in width) | Common-direct | 2—8d each stud |
| 1 in. Wall sheathing (over 8 in. in width) | Common-direct | 2—8d each stud |
| Plywood sheathing and subflooring[a] | Common-direct | |
| 1 in. Roof sheathing (6 in. or less in width) | | 2—8d each rafter |
| 1 in. Roof sheathing (over 6 in. in width) | Corrosion -direct | 3—8d each rafter |
| Shingles, wood | Corrosion-resistive | 2—No.15 B&S each bearing |
| Weather boarding | Common-resistive | 2—8d each bearing |
| 1/2 in. Fiberboard sheathing | 1 1/2 in. galvanized roofing nail<br>6d common nail<br>16 ga. galvanized staples, 1 1/8 in. long, 7/16 in. crown | 3 in c.c. on all edges and 6 in. c.c. at other bearings |
| 25/32 in.  Fiberboard sheathing | 1 3/4 in. galvanized roofing nail<br>8d common nail<br>16 ga. galvanized staples, 1 1/2 in. long, 7/16 [in.]* crown | 3 in c.c. on all edges and 6 in. c.c. at other bearings |
| 1/2 in. Gypsumboard sheathing | 1 1/2 in. galvanized roofing nail<br>11 ga. 3/8 in. to 7/16 in.  head<br>16 ga. galvanized staples, 1 1/2 in. long, 7/16 [in.]* crown | 4 in c.c. on all edges and 8 in. c.c. at other bearings |

**Notes for Table 10-4:**

[a]For nailing of plywood, see reference standard RS 10-9.

*Copy in brackets not enacted but probably intended.*

## CEILING JOIST NAILING TO EVERY RAFTER
### (Number of 16d nails)

| Slope of Roof | 4/12 | | 5/12 | | 6/12 | | 7/12 | | 9/12 | | 12/12 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rafter Spacing, o.c. (in.) | 16 | 24 | 16 | 24 | 16 | 24 | 16 | 24 | 16 | 24 | 16 | 24 |
| Width of building — | | | | | | | | | | | | |
| Up to 24 ft………... | 5 | 8 | 4 | 7 | 3 | 5 | 3 | 4 | 3 | 3 | 3 | 3 |
| 24 to 30 ft………… | 7 | 11 | 6 | 9 | 4 | 7 | 3 | 6 | 3 | 4 | 3 | 3 |

(2)  FLOORS. -
a. Planks shall be splined or tongue-and-groove, not less than three inches thick, covered with one inch tongue-and-groove flooring, laid crosswise or diagonally to the plank, or other surface having equivalent fire resistance; or shall be,
b.  At least four inches wide, set on edge close together and well spiked, and covered the same as for three inch thick plank. The planks shall be laid so that there is no continuous line of end joints except at points of support. Floors shall not extend closer than one-half inch to walls to provide an expansion joint, but the joint shall be covered at top or bottom to avoid flue action.
(3) ROOF DECKS. -Roof decks shall be splined or tongue-and-groove planks at least two inches thick; or tongue-and-groove plywood panels (bonded with exterior glue) at least one and one-eighth inch thick, with face grain perpendicular to supports that shall be spaced not more than forty-eight inches on center; or of planks at least three inches wide set on edge close together and laid as required for floors.
 (b) Construction details. -Self releasing type wall plate boxes or approved hangers shall be provided where beams and girders enter masonry.

§[C26-1006.8]  27-624  Construction methods. -
(a) Fabrication. -All timber shall be accurately cut and framed to a close fit in such a manner that the joints will have even bearing over the contact surfaces. Mortises shall be true to size for their full depth and tenons shall fit snugly. No shimming in joints, or open joints, shall be permitted.
(b) Erection. -
(1) ASSEMBLY. -Joints shall have a tight fit. Fasteners shall be installed in a manner that will not damage the wood. End compression joints shall be brought to full bearing. All framework shall be carried up true and plumb.
(2) TEMPORARY CONNECTIONS.- As erection progresses, the work shall be bolted, or nailed as necessary, to resist all dead load, wind, and erection stresses.
(3) ALIGNMENT. -The structure shall be properly aligned before final tightening of the connections.

### ARTICLE 8  ALUMINUM

§[C26-1007.1]  27-625  General requirements. -
Materials, design, and construction methods shall meet the requirements of reference standards RS 10-10 and RS 10-11.

§[C26-1007.2]  27-626  Identification. -Aluminum for structural elements shall at all times in the fabricator's plant, be marked, segregated, or otherwise handled so that the separate alloys and tempers are positively identified, and after completion of fabrication shall be marked to identify the alloy and temper. Such markings shall be affixed to completed members and assemblies or to boxed or bundled shipments of multiple units prior to shipment from the fabricator's plant.

§[C26-1007.3]  27-627  Quality control. -
(a) Reference. -The provisions of tables 10-1 and 10-2 shall apply.
(b) Welding operations. -
(1)  Welding work shall be performed only by persons who have obtained a license from the commissioner.
(2)  Where manual welding work is not performed in the city of New York, welds shall be made by welders qualified under the applicable provisions of reference standard RS 10-25.
(3)  Tack welds that are not later incorporated into finished welds carrying calculated stress shall not be considered as structural welds.
(4)  The inspection of welding operations stipulated in table 10-2 shall include a check to ascertain that the welders employed on the work have the required license or are qualified in accordance with paragraph two of this subdivision.

§[C26-1007.4]  27-628  Erection. -
(a)  Bracing. -All framework shall be carried up true and plumb. Temporary bracing shall be provided to support all loads imposed upon the framework during construction that are in excess of those for which the framework was designed.
(b) Temporary connections. -As erection progresses, the work shall be securely bolted, or welded, to resist all dead loads, wind, and erection stresses.
(c) Alignment. -The structure shall be properly aligned before riveting, permanent bolting, or welding is performed.

### ARTICLE 9  REINFORCED GYPSUM CONCRETE

§[C26-1008.1]  27-629  General requirements. -
Materials, design, and construction methods shall meet the requirements of reference standard RS 10-12.

§[C26-1008.2]  27-630  Identification of metal reinforcement.-
Bundles or rolls of welded wire fabric shall be securely tagged so as to identify the type and grade of steel, and the size.

**§[C26-1008.3] 27-631  Limitations of use. -**
Reinforced gypsum concrete shall not be used where exposed directly to the weather or where subject to frequent or continuous wetting. Precast units shall be protected by coverings or coatings from the weather and from contact with moisture during shipment and during storage at the work site.

### ARTICLE 10  THIN SHELL AND FOLDED-PLATE CONSTRUCTION

**§[C26-1009.1] 27-632  General requirements**. -Thin shell and folded-plate construction may be used for buildings or portions of buildings, as required in this section and subject to the provisions of this subchapter. The applicable provisions of the several reference standards relating to allowable stresses and the use of structural materials shall apply except as modified in this section.

**§[C26-1009.2] 27-633  Analysis. -**
(1) Unless otherwise permitted by the commissioner, stresses, displacements, and stability of thin shell and folded-plate structures shall be determined on the basis of the assumption of elastic behavior. The shell or plate may be assumed to be homogeneous and isotropic.
(2) The analysis for stability shall consider large deflections, creep effects and the deviation between the actual and theoretical shell surface.

**§[C26-1009.3] 27-634  Thin concrete shells. -**
The provisions of section 403, 404 and 405 of reference standard RS 10-45 shall apply with the following modifications. The remaining sections of reference standard RS 10-45 shall not apply.
(1) The advisory provisions of this standard shall be considered as mandatory.
(2) The minimum ultimate strength of concrete for thin shells shall be three thousand psi.
(3) Change all references to "the building code (ACI 318-63)" to" "reference standard RS 10-4."

### ARTICLE 11  SUSPENDED STRUCTURES

**§[C26-1010.1] 27-635  General requirements. -**

The materials, design, and construction of suspended structures shall meet the applicable requirements of the code and the requirements of this article.

**§[C26-1010.2] 27-636  Suspenders. -**
**(a)  Bridge Wire Cable**. -Bridge wire cables used for suspenders shall be either bridge strand or bridge rope fabricated from galvanized bridge wire.
(1)  WIRE. -Wire shall be produced from rods rolled from high carbon steel, the composition of which shall be controlled to provide internal soundness, uniformity of chemical composition and physical properties, freedom from injurious surface imperfections, and shall meet the following requirements.
a.  The minimum ultimate tensile strength of zinc-coated wire shall be as follows:
Class A coating …....two hundred twenty thousand psi
Class B coating .....……two hundred ten thousand psi
Class C coating …….......…..two hundred thousand psi
b.  Yield strength shall be one hundred fifty thousand psi minimum for zinc-coated wire with class A or Class B coating, one hundred forty thousand psi minimum for zinc-coated wire with class C coating, based on the cross-sectional area of the coated wire when loaded to 0.7% elongation in a ten inch gage length. In determining the yield strength, an initial stress equivalent to forty-two thousand psi, based on cross-sectional area of the coated wire, shall be applied to the wire sample. At this loading, the entensometer shall be attached and an initial dial reading set at the equivalent of 0.15% elongation.
c.  Elongation shall be four percent minimum in a ten inch gage length, determined as the permanent increase in length after failure of a marked section of the wire originally ten inches [sic] in length except that a value of two percent will be permitted for wires 0.110 in. or less in diameter having a class A zinc coating.
d.  The zinc-coated wire must withstand wrapping at a rate not exceeding fifteen turns per minute twice around a mandrel equal to three times the wire diameter without fracture of the steel.
e.  The wire used in bridge strand or bridge rope shall be zinc-coated (galvanized) in accordance with the requirements of table 10-5. Weight of coating shall be determined in accordance with the provisions of reference standard RS 10-24.

### TABLE 10-5-MINIMUM WEIGHTS OF COATING-BRIDGE WIRE, ZINC-COATED, FOR  BRIDGE STRAND AND BRIDGE ROPE CONSTRUCTIONS

| Diameter of coated Wire (in.) | Minimum Weight of Coating (Ounces per Sq. Ft. of Uncoated Wire Surface) | | |
|---|---|---|---|
| | Class A | Class B | Class C |
| 0.041 to 0.061 incl.………….. | 0.40 | 0.80 | 1.20 |
| Over 0.061 to 0.079 incl.……. | 0.50 | 1.00 | 1.50 |
| Over 0.079 to 0.092 incl.……. | 0.60 | 1.20 | 1.80 |
| Over 0.092 to 0.103 | 0.70 | 1.40 | 2.10 |

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 443 of 654

Title 27 / Subchapter 10

| | | | |
|---|---|---|---|
| incl……. | | | |
| Over 0.103 to 0.119 incl……. | 0.80 | 1.60 | 2.40 |
| Over 0.119 to 0.142 incl……. | 0.85 | 1.70 | 2.55 |
| Over 0.142 to 0.187 incl……. | 0.90 | 1.80 | 2.70 |
| Over 0.187………………….. | 1.00 | 2.00 | 3.00 |

(2)  BRIDGE STRAND. -Bridge strands shall be made from wires complying with subparagraphs a through e of paragraph one of this subdivision, and shall meet the following requirements:

a.  The wires shall be made in such lengths that the strands can be manufactured with no splices in the outside wires. Splicing of inner wires during the stranding operation is permissible. When joints are necessary in any wires, they shall be electrically butt welded and shall be recoated in a workmanlike manner. Joints in the wires of strand shall be made and dispersed in a manner that will maintain the minimum specified breaking strength of the strand.

b.  The minimum breaking strength shall be based on tests to destruction and shall be certified by the manufacturer.

c.  Bridge strand shall be prestretched to produce a stable modulus of elasticity of at least the following values for strand wires having class A coating:

one-half inch to two and

nine-sixteenths inches dia…….….twenty-four million psi

two and five-eighths inches and larger..twenty-three million psi

For bridge strands that have classes B and C zinc-coating on the outside wires, the modulus of elasticity shall be not more than one million psi less than the corresponding values for bridge strand with a class A coating. The pre-stretching load shall not exceed fifty-five percent of the breaking strength of the strand.

(3)  BRIDGE ROPE. -Bridge rope shall be made from wires complying with subparagraphs a through e of paragraph one of this subdivision, and shall meet the following requirements:

a.  Joints are permissible in inner and outer wires and shall be electrically butt welded and shall be recoated in a workmanlike manner. Joints in the wires of strand shall be made and dispersed in a manner that will maintain the minimum specified breaking strength of the rope.

b.  The minimum breaking strength shall be based on tests to destruction and shall be certified by the manufacturer.

c.  Bridge rope shall be prestretched to produce a stable modulus of elasticity of at least twenty million psi for rope wires having a class A coating. For bridge rope that has class B and C zinc-coatings on the outside wires, the modulus of elasticity shall be not more than one million psi less than the corresponding value for bridge rope with a class A coating. The prestretching

load shall not exceed fifty-five percent of the breaking strength of the rope.

**(b)  Other materials**.  -Any structural material permitted for use under the provisions of other sections of this subchapter may be used for support of a suspended structure including, but not limited to, types of steel permitted for use under the provisions of reference standard RS 10-5; reinforcing steel and wire, prestressing wire and strand, and high strength alloy steel bars conforming to the requirements of reference standard RS 10-3; and steel conforming to the requirements of reference standards RS 10-66 and RS 10-69. Prestressing wire and strand may be used for suspenders without the application of prestressing force. All such suspenders shall be protected as described in section 27-642 of this article.

**§[C26-1010.3] 27-637  Tests of materials for bridge wire suspenders.** -The following minimum quantities of bridge wire for suspenders shall be tested:

(1)  Tensile strength tests of the wires shall be made of a specimen cut from each coil of zinc coated wire.

(2)  Tests for elongation and for yield strength shall be made on samples from approximately ten percent of the coils of any one size finished wire. If any of these tests fail to meet the specified requirements, all the coils in that lot of finished wire shall be tested and only coils that satisfactorily pass the test shall be used.

(3)  Tests of the zinc coating shall be made of approximately five percent of the coils of any one size of finished wire. If any of these tests fail to meet the specified requirements, all the coils in that lot of finished wire shall be tested and only coils that satisfactorily pass the test shall be used.

**§[C26-1010.4] 27-638  Tests of materials for other types of suspenders.-** The applicable provisions of reference standards RS 10-3 and RS 10-5 shall apply.

**§[C26-1010.5] 27-639  Design.-** The following design requirements shall supplement the applicable provisions of this subchapter.

**(a) Flexibility**.- Suspenders, unless encased, may be considered as perfectly flexible.

**(b) Elastic stretch**.- The elastic stretch of the suspenders shall be considered.

**(c) Displacement**.- Displacement resulting from changes in magnitude and position of load and its effects [*sic*] on stress shall be considered.

**(d) Other considerations**.- Consideration shall be given to the effects of temperature variations, partial and reversible wind loadings, and vibration.

**(e) Allowable working load**. -The allowable working load in suspenders formed from bridge wire cable shall be computed on the basis of factors equal to one and one-half times dead load plus two and one-half times live load or one and two-tenths times dead load plue two times live load plus two times wind load, applied to the specified, minimum, ultimate strength of the suspender. The allowable working load in suspenders conforming to the materials specifications or* several reference standards of this code shall be the allowable working stresses for tension members as prescribed in the applicable reference standard or, for those materials where allowable stresses for tension members are not prescribed, on factors of one and one-half times dead load plus two times live load or one and two-tenths times dead load plus one and one-half times live load, plus one and one-half times wind load, also applied to the specified minimum, ultimate strength of the suspender. In no case, however, shall the factor, applied to the yield strength of the material or to the prestretching or prestressing force, exceed one and one-tenth times dead load plus one and one-quarter times live load.

*\*As enacted but "of" probably intended.*

**§[C26-1010.6] 27-640 Fittings for wire cable suspenders.-** Fittings for wire cable suspenders shall be capable of developing the specified minimum ultimate strength of the attached cable or strand without developing stresses in the fitting equal to, or in excess of, the yield strength of the material in the fitting. One end fitting, of each type and size to be used, shall be tested to insure the adequacy of the fitting to develop the ultimate strength of the cable or strand to which it is to be attached.

**§[C26-1010.7] 27-641 Construction. -**
**(a) General**. -The general provisions of reference standard RS 10-5 relating to erection of steel shall apply.
**(b) Fitting for wire cable suspenders**. -
(1) Only fittings designed for use with the specific wire cable shall be used.
(2) All fittings shall be galvanized in accordance with reference standard RS 10-23.
(3) Zinc used for attaching all speltered fittings shall be at least equal to the grade designated as" high grade" in reference standard RS 10-26.

**§[C26-1010.8] 27-642 Protection of suspenders. -**
**(a) Protected locations**. -All wires in bridge strands, bridge ropes, or other wire rope or strand suspenders placed on the interior of structures or concealed from exposure by interior finish shall have at least a class A coating of zinc. Rods, bars, plates, or shapes used for suspenders shall be given a protective coating as specified for the protection of like material in the applicable reference standard.

**(b) Exposed locations**. -The outside wires of bridge strand or bridge rope suspenders placed in locations exposed to the weather shall have at least a class B coating of zinc and the inside wires shall have at least a class A coating. Rods, bars, plates, or shapes used for suspenders shall be given a protective coating as specified for the protection of like material in the applicable reference standard.

## ARTICLE 12 GLASS PANELS

**§[C26-1011.1] 27-643 Scope.-** The provisions of sections 27-644 through 27-648 of this article shall apply to the use of glass in the exterior wall of a building and shall be limited to exterior application wherein the glass would not be subjected to any loads normal to the face of glass other than those due to wind. For applications involving human impact, the provisions of section 27-651 of this article shall apply. For other cases, the strength and mode of installation of glass shall conform to accepted industry standards.

**§[C26-1011.2] 27-644 Support for glass panels. -** Glass shall be firmly held in place. The supports shall be of adequate strength to resist the applicable design wind loads as prescribed in subchapter nine of this chapter.

**§[C26-1011.3] 27-645 Glass requirements.-** Glass shall meet the requirements of reference standard RS 10-68 for the applicable type, size, thickness and quality.

**§[C26-1011.4] 27-646 Thickness of glass. –** Thicknesses of glass panels shall be chosen either on the basis of statistical probability of breakage (subdivision (a) of this section) or on the basis of table 10-7, at the designer's option.

**(a) Statistical probability**. -Thickness of glass panels shall be chosen so that the statistical probability of breakage when the glass is initially subjected to the design wind load specified in table 9-5-1 does not exceed the values indicated in table 10-6. Probability or load factors used for design shall be derived by test. The sufficiency and validity of such test data shall be subject to approval by the commissioner.

**(b) Alternate requirements**.- Alternative to the requirements of paragraph (a) above, the thickness of glass panels may be chosen from table 10-7. For glass with assured minimum thickness greater than required by reference standard RS 10-68, the maximum areas in table 10-7 may be increased in proportion to the assured minimum thickness.

**[C26-1011.5] 27-647 Special glasses.-** For types of glass other than single annealed sheet and plate glass, allowable maximum areas may be determined by

22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff   Pg 445 of 654

Title 27 / Subchapter 10

multiplying values in table 10-7 by the appropriate multiplying factor listed in table 10-8.

**§[C26-1011.6] 27-648 Installation of glass panels. -**
Glass panels shall be handled and installed so that their strength is not impaired by chipping or scratching, shall be fully and firmly embedded [*sic*] in their supports, and shall be mounted in a manner that will accommodate differential movements due to thermal and loading conditions.

**§[C26-1011.7] 27-649  Protection of glass panels. -**
Glass panels installed in areas where they will be subject to unusual conditions of construction damage, such as spatter from welds or locations near materials hoists, shall be protected by a hardboard covering or its equivalent during the period that such work is in progress.

**§[C26-1011.8]  27-650  Deflection of support.-**
The deflection of members supporting glass panels under the design wind load (measured perpendicular to the plane of the panel) shall not exceed L/175, where L is the span of the supporting member. In no case shall such deflection exceed three-quarters of an inch.

### TABLE 10-6 PROBABILITY OF BREAKAGE FOR GLASS PANELS
### (BASED ON COEFFICIENT OF VARIATION OF 25%)

| Elevation Above Grad of Midpoint of Glass | Area of Panel — Sq. Ft. | | | | |
|---|---|---|---|---|---|
| — Ft………………………... | 0-60 | 60-80 | 80-100 | 100-120 | 120+ |
| 0-50………………………... | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| 50 or more………………… | 1.0% | 0.8% | 0.6% | 0.4% | 0.2% |

### TABLE 10-7 MAXIMUM AREA OF GLASS — SQ. FT.

| Nominal Thickness of Glass-Inches | Elevation Above Grade of Mid-point of Glass-Ft. | | | |
|---|---|---|---|---|
| | 0-50 | 50-300 | 300-600 | 600+ |
| Sheet Glass | | | | |
| Single strength……………….... | 9 | 9 | 8 | 7 |
| Double strength……………… | 13 | 13 | 11 | 10 |
| 3/16"………………………… | 25 | 25 | 21 | 19 |
| 7/32"………………………….. | 32 | 32 | 27 | 24 |
| Plate and Float Glass | | | | |
| 13/64"………………………… | 25 | 25 | 21 | 19 |
| 1/4"…………………………… | 37 | 37 | 32 | 28 |
| 5/16"………………………….. | 54 | 54 | 46 | 40 |
| 3/8"…………………………… | 78 | 74 | 63 | 58 |
| 1/2"………………………….. | 114 | 100 | 86 | 75 |
| 5/8"………………………….. | 152 | 120 | 103 | 90 |
| 3/4"…………………………… | 210 | 137 | 118 | 103 |
| 7/8"…………………………... | 241 | 158 | 135 | 118 |
| 1"………………………….. | 312 | 204 | 175 | 153 |

### TABLE 10-8 MULTIPLYING FACTORS FOR VARIOUS TYPES OF GLASS

| Glass Type | Multiplying Factor |
|---|---|
| Full tempered…………………….... | 4.0 |
| Heat strengthened………………… | 2.0 |
| Factory-fabricated double glazing... | 1.5* |
| Laminated…………….………….. | 0.6 |
| Wired………………………….…. | 0.5 |
| Sandblasted or etched…………… | 0.4 |

*For asymmetrical units base strength on thinner lite.

**§[C26-1011.9] 27-651 Panels subject to human impact loads.**- Glass in prime and storm doors, interior doors, fixed glass panels that may be mistaken for means of egress or ingress, shower doors and tub enclosures, or in similar installations wherein one or more of the following criteria apply, shall meet the requirements set forth in table 10-9, or by comparative tests shall be proven to produce equivalent performance:

(a) openings are located in regularly occupied spaces.
(b) lowest point of panel is less than eighteen inches above finished floor.
(c) minimum dimension of panel is larger than eighteen inches.

### TABLE 10-9 REQUIREMENTS FOR GLASS PANELS SUBJECT TO IMPACT LOADS[a,b]

| *3. Glass Type | Individual Opening Area | Requirements |
|---|---|---|
| Regular plate, sheet or rolled (annealed) | Over 6 sq. ft. | Not less than 3/16 in. thick. Must be protected by a push-bar or protective grille firmly attached on each exposed side[c], if not divided by a muntin. |
| Regular plate, sheet or rolled (annealed), surface sandblasted, etched, or otherwise depreciated | Over 6 sq. ft. | Not less than 7/32 in. thick. Must be protected by a push-bar or protective grille firmly attached on each exposed side[c]. |
| Regular plate, sheet or rolled (annealed), obscure | Over 6 sq. ft. | Not less than 3/16 in. thick. Must be protected by a push-bar or grille firmly attached on each exposed side[c]. |
| Laminated | Over 6 sq. ft. | Not less than 1/4 in. thick. Shall pass impact test requirements of reference standard RS 10-67. |
| Fully-tempered | Over 6 sq. ft. | Shall pass impact test requirements of reference standard RS 10-67. |
| Wired | Over 6 sq. ft. | Not less than 7/32 in. thick. Shall pass impact test requirements of reference standard RS 10-67. |
| All unframed glass doors (swinging) | | Shall be fully-tempered glass and pass impact test requirements of reference standard RS 10-67. |

**Notes for Table 10-9:**

[a]Glass less than single strength (SS) in thickness shall not be used.

[b]If short dimension is larger than 24 in., glass must be double strength (DS) or thicker.

cBuilding owners and tenants shall maintain push-bars or protective grilles in safe condition at all times.

*"3." Enacted but probably not intended.*

**NYC DEPARTMENT OF FINANCE**

08-1REV  November 12, 2021

# FINANCE MEMORANDUM

### Guidance for Hotel Operators Subject to the New York City Tax on Hotel Occupancy

This Finance Memorandum is intended to help owners, operators, or managers of hotels located in New York City (collectively to be referred to in this publication as *operators*) to better understand the tax treatment of various types of occupancies under the New York City Tax on Occupancy of Hotel Rooms.  In addition, it aims to clarify the permanent resident exclusion, and to outline how to properly proceed when a customer claims an exemption from tax.

The Memorandum includes the following topics:

Background                                     page 1
Introduction                                   page 2
Definitions                                    page 2
Computation and Collection of Tax              page 4
Permanent Resident Exclusion                   page 5
Exempt Occupants                               page 8
Exempt Organizations as Operators              page 10
Hotels Operated by Colleges & Universities     page 10
Nontaxable Occupancies                         page 11
Summary Chart                                  page 12

## Background

The New York State Department of Taxation and Finance has issued Publication 848, a guide to New York State and local sales and use taxes administered by the Tax Department as they apply to the operation of a hotel, motel or similar establishment.  This Finance Memorandum is intended to provide similar assistance to hotel operators with respect to the New York City Tax on Hotel Occupancy.

Under the New York City Administrative Code, *a person required to collect tax* includes every operator of a hotel.  Therefore, it is important that we clarify the taxable status of the various types of rentals of rooms in the same way that New York State has done for sales tax.

Sales and use taxes cover a broader range of issues than the Tax on Hotel Room Occupancy, so, naturally, there will be certain topics addressed in Publication 848 that have no counterpart in this Memorandum. Significant differences in treatment have been highlighted.

WT_000446

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 448 of 654
Page 2, Guidance for Hotel Operators Subject to the
New York City Tax on Hotel Occupancy

## Introduction

Hotel Room Occupancy Tax ("Hotel Tax") is imposed on the rent for every occupancy of a room in a *hotel* in New York City. However, the Hotel Tax is not imposed (1) on a permanent resident of the hotel; or (2) on rent for any occupancy that is excluded or exempted from tax under the Administrative Code of the City of New York. (See page 6 for detailed information on the permanent resident exclusion and see page 9 for information on exempt occupants). Also, the Hotel Tax is not imposed on the rental of a room that meets the definition of *place of assembly*. See page 3 for the definition of place of assembly. Operators of hotels are required to collect and pay over the Hotel Tax to the New York City Department of Finance.

## Definitions

**Hotel:** A *hotel* is a building or a portion of a building that is regularly used and kept open for the lodging of occupants. A building comes within the definition of a hotel if, among other factors:

- sleeping accommodations are provided for the lodging of paying occupants on a regular basis;
- the typical occupant is a transient or public traveler;
- the relationship between the operator of the establishment and the occupant of the accommodations is that of an innkeeper and guest and not of a landlord and tenant;
- the occupant does not have an exclusive right or privilege with respect to any particular room or rooms, but instead merely has an agreement for the use or possession of a particular room or rooms; and
- the operator provides maid and linen service or other customary hotel services for its occupants.

The term *hotel* includes the following:

- apartment hotels;
- motels, including motel efficiency units;
- tourist cabins;
- bungalows, furnished apartments and other furnished living units intended for single family use (regardless of whether rentals are for one week or more, and regardless of whether meals, maid service or other common hotel services are provided);
- cottage colonies;
- inns;
- boarding houses or clubs;
- lodging houses;
- rooming houses;
- bed and breakfasts;
- guest houses; and
- similar establishments that are regularly used and kept open for the lodging of occupants.

**Note:** This interpretation differs from New York State in two ways. First, a facility will not be considered a hotel for Hotel Tax purposes if rooms, apartments or units are rented to occupants on fewer than three occasions, or for not more than 14 days in the aggregate, during any four consecutive quarters or any 12-month period ending on the last day of February. Second, bungalows, furnished apartments and other furnished living units intended for single family use are considered hotels regardless of whether rentals are for one week or more, or whether meals, maid service or other common hotel services are provided.

WT_000447

22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff   Pg 449 of 654

Page 3, Guidance for Hotel Operators Subject to the
New York City Tax on Hotel Occupancy

**Operator:** An operator is any person operating a hotel in the City of New York, including, but not limited to, the owner or proprietor of such premises, lessee, sublessee, mortgagee in possession, licensee, or any other person otherwise operating such hotel. A private club that, as an accommodation to its members, makes rooms available to such members in its own buildings is an operator within the meaning of the law.

**Hotel Occupancy:** Hotel occupancy is the use or possession, or the right to the use or possession, of any room or rooms in a hotel.  As explained below, room or rooms in a hotel does not include a place of assembly.  Also, note that the right to use or possession includes the rights of a room remarketer.

**Hotel Occupant:** A hotel occupant is a person who, for a consideration, uses, possesses or has the right to use or possess any room in a hotel under any lease, concession, permit, right to access, license to use, or other agreement.

**Room:** Any portion of a hotel, whether used for dwelling, commercial or any other purpose, is a room, except a bathroom or lavatory, a place of assembly, a store, stand or counter accessible by the public and, a lobby, public dining room or other public room when employed as such. When a lobby, public dining room or other public room is designated by a hotel for exclusive use by an occupant, or specified group of occupants, it will be considered a room. Kitchenettes are also generally considered rooms.
Room Remarketer: A room remarketer is a person who either directly or indirectly reserves, arranges for, coveys, or furnishes occupancy to a hotel occupant and who determines the rent for that occupancy.

**Room Remarketer:** A *room remarketer* is a person who either directly or indirectly reserves, arranges for, coveys, or furnishes occupancy to a hotel occupant and who determines the rent for that occupancy.

**Place of Assembly:** *Place of assembly* means an enclosed room or space in which 75 or more persons gather for religious, recreational, educational, political or social purposes, or an outdoor space in which 200 or more persons gather for any of the above reasons.

If a the room has been certified as a *place of assembly* by the Department of Buildings, or if banquet or catering contracts indicate that at a particular function the expected attendance is 75 or more persons, it will be considered a *place of assembly*.

If a room that qualifies as a *place of assembly* is converted to several smaller rooms by any means, such as folding walls or doors, each separate room must qualify independently as a *place of assembly*.

**Person:** The term *person* includes an individual, partnership, limited liability company, society, association, joint stock company, corporation, estate, receiver, trustee, assignee, referee, and any other person acting in a fiduciary or representative capacity, whether appointed by a court or otherwise, and any combination of the foregoing.

**Rent for Hotel Occupancy:** *Rent for hotel occupancy* is the consideration for occupancy of a room or rooms in a hotel, valued in money or otherwise.  *Rent for hotel occupancy* includes charges for accommodations, services, facilities, amenities and items that accompany the use and possession of the room or rooms, whether those charges are separately stated or included as one sum in the daily rate for the room or rooms.

WT_000448

22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff   Pg 450 of 654
Page 4, Guidance for Hotel Operators Subject to the
New York City Tax on Hotel Occupancy

Examples of charges for services and accommodations that accompany the use or possession of a room include charges for:

- maid service;
- concierge service:
- towel and linen service;
- providing additional beds, cots or other furnishings for occupants
- resort /destination fees.

Reasonable and separately stated charges not deemed to accompany the occupancy of a room or rooms in a hotel are not considered to be rent. For example, reasonable and separately stated charges for food and drink, entertainment, valet and laundry service, theatre ticket service, parking and transportation do not constitute rent.

## Computation and Collection of Hotel Tax

The hotel operator must collect Hotel Tax whenever an occupant or room remarketer rents a hotel room unless a particular exclusion or exemption applies and has been appropriately documented. *See* discussion, pp. 9 thru 14.

The amount of Hotel Tax due on rent for hotel occupancy has two distinct components.

Rent is taxed at a rate of 5.875 % of the amount of rent charged for the use or occupancy of a room. In addition, there is a per room charge for each day a room is occupied.

| If the rent per day for the room is: | The Per Room Charge is: |
|---|---|
| Less than $10 | $0.00 |
| $10 or more, but less than $20 | $ .50 per day |
| $20 or more, but less than $30 | $1.00 per day |
| $30 or more, but less than $40 | $1.50 per day |
| $40 or more | $2.00 per day |

## Means of Payment

*Credit Cards*: When an occupant uses a credit card to pay his or her bill, the credit card company may deduct administrative charges and pay the hotel an amount that represents less than 100% of the occupant's bill. The deduction of the administrative charges by the credit card company does not affect the amount subject to Hotel Tax, or the amount of Hotel Tax due and collectible on the bill.

*Gift Certificates*: Purchases of gift certificates for a stated dollar amount, whether given away for no consideration or sold, are not subject to Hotel Tax.  The gift certificate is the equivalent of money or any other consideration that may be used to pay rent for occupancy of a hotel room.  When the gift certificate is used to pay that rent, Hotel Tax is due on the rent normally subject to Hotel Tax.

WT_000449

22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff   Pg 451 of 654

Page 5, Guidance for Hotel Operators Subject to the
New York City Tax on Hotel Occupancy

*Coupons*: Unlike a gift certificate, a coupon represents a reduction in price offered by either the hotel operator or a third party.  If a hotel accepts a coupon that offers an occupant a discount and the hotel will not be reimbursed by a third party for any part of the discount the occupant receives, then the rate of tax is applied to the discounted charge to the occupant. If the hotel is reimbursed by a third party for all or any part of the coupon discount the occupant receives, the amount of the reimbursement is included in the amount of rent subject to Hotel Tax.

*Hotel Rewards Points Programs*: In a hotel rewards points program original payments for rooms rented in New York City by members earning points are taxed in full even though a portion of the money collected is contributed to central funds set up by the rewards points programs. Credits against those contributions serve to redistribute money that was either actually subject to Hotel Tax or would have been subject to Hotel Tax if the occupancy had been in New York City. We have determined that tax applies to rewards points programs in the following way:

- When a guest who is a program member receives a complimentary room upgrade, the operator must collect Hotel Tax on the value of the original room, but not on the value of the upgrade.

- When a guest who is a program member redeems points for a room, the operator is not required to collect Hotel Tax on the occupancy.

## Permanent Resident Exclusion

Hotel Tax is not imposed on the rent for hotel occupancy paid by a permanent resident of
a hotel.  For Hotel Tax purposes, a *permanent resident* is an occupant of a room or
rooms in a hotel for at least 180 consecutive days. A room remarketer is not considered a permanent resident with respect to any room that the room remarketer rents to an occupant. The rules regarding consecutive days of occupancy for purposes of determining permanent resident status apply to business entities as well as natural persons.

**Note:**  For New York State Sales Tax purposes, the number of consecutive days required to qualify for the permanent resident exclusion is 90, not 180.

## Collection of Tax

When an occupant rents a hotel room or rooms, the hotel operator must collect Hotel Tax on the rent charged regardless of whether the rooms are rented under a contract that provides that the occupant will have the right to occupy the room for 180 consecutive days.  When the hotel operator files its Hotel Tax return, the Hotel Tax required to be collected must be reported and paid to the Department of Finance with the return.

Once a hotel occupant becomes a permanent resident of a room or rooms in a hotel, no further Hotel Tax is payable with respect to the room or rooms, provided that the occupant's days of consecutive occupancy are not interrupted.  This is so, regardless of whether the right to occupy the room or rooms is granted under separate, successive contracts.

WT_000450

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 452 of 654

Page 6, Guidance for Hotel Operators Subject to the
New York City Tax on Hotel Occupancy

**Special Circumstances**

*Changing Rooms in the Same Hotel*: Changing rooms in the same hotel does not interrupt the period of consecutive occupancy.

> *Example:  A hotel occupant occupies a particular room in a hotel for 150 consecutive days, and on the 151st day changes to a different room in the same hotel and occupies the new room for an additional 30 consecutive days. The hotel occupant is a permanent resident of the hotel for purposes of the Hotel Tax.*

*Changing Hotels*:  A permanent resident who transfers from one hotel to another hotel, whether or not run by the same operator, loses permanent resident status and must complete the required number of days at the new establishment before becoming a permanent resident there.  Similarly, a change of hotels by an occupant who is not yet a permanent resident interrupts the number of consecutive days necessary to establish permanent residency.

> *Example: An individual rents a suite of rooms in a hotel located in New York City.  After 175 days, the individual moves to a different hotel owned by the same chain.  He spends another 175 days at the second hotel.  The individual is not a permanent resident of the first hotel because he did not spend at least180 consecutive days in residence there.  He is also not a permanent resident of the second hotel for the same reason.  The individual may not aggregate his time spent between the two hotels to meet the180-consecutive-day criteria for permanent residency.*

*Multiple Occupants*: When a hotel room has more than one occupant that pays or otherwise furnishes consideration for the right to occupy the room, the status of permanent resident is determined individually for each occupant.

> *Example: An individual rents a room in a hotel.  Two weeks later, another person joins the first individual in the same room.  Additional rent is charged by the hotel operator for the second occupancy.  If both individuals continue to occupy the room, the first individual will become a permanent resident two weeks earlier than the second person, and taxes on the additional rent will continue to be due during the two-week period.*

*Rooms Rented by A Business*: For the purpose of determining whether a business entity qualifies as a permanent resident of a hotel, days that an employee, customer, or client of the business or other person authorized by the business occupies a room for which the business pays rent to the hotel are considered days that the room is occupied by the business, provided that the employee, customer, client, or other person does not reimburse or pay the business for the right to occupy the room.

In addition, days that a room or rooms rented by a business remain unoccupied (and for which no one reimburses the business) constitute days of occupancy by the business.

> *Example: A company rents three rooms in a hotel.  One of the rooms is occupied by an employee of the company, one room is occupied by a client, and the last room remains unoccupied.  The employee does not pay for the right to occupy the room; however, the client compensates the company for use of the room.  The days that the room is occupied by the company's employee and the days the third*

WT_000451

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 453 of 654

Page 7, Guidance for Hotel Operators Subject to the
New York City Tax on Hotel Occupancy

*room remains unoccupied are considered to be days of occupancy for the company with respect to such rooms. Accordingly, after180 consecutive days, the company is considered to be a permanent resident of the two rooms. The days that the room is occupied by the company's client, however, are not considered to be days that the room is occupied by the company. Consequently, the company cannot become a permanent resident with respect to the room that is occupied by the client.*

*Temporary Absence:* If a hotel occupant who is a permanent resident permits the operator to rent his or her room(s) during the occupant's temporary absence, and the occupant does not have the right to occupy any other room or rooms in the hotel during that absence, the occupant's period of consecutive occupancy in that hotel is considered to have ended. Therefore, when the hotel occupant resumes occupancy in the hotel, he or she will not be considered a permanent resident of the hotel until a new 180-day period of consecutive occupancy is established. The person to whom the room or rooms are rented during the absence of the former permanent resident may establish permanent resident status based on whether such person occupies the room(s) for the requisite number of consecutive days.

**Hotel Tax Refundable Once Permanent Resident Status Reached**

When 180 consecutive days of occupancy have been reached, the Hotel Tax paid with respect to the 180 days is refundable to the occupant. If an occupant becomes a permanent resident and the hotel operator refunds to the occupant the Hotel Tax previously paid, the hotel operator may take a credit in the amount of the Hotel Tax paid on its next Hotel Tax return. If the hotel operator does not refund the Hotel Tax to the occupant, the occupant may file a claim for refund directly with the Department of Finance.

In determining whether to issue a refund and discontinue collecting Hotel Tax from an occupant who claims to be a permanent resident, the hotel operator may rely upon its books and records to decide whether the claim of permanent residency is valid. However, the Department of Finance recommends that, if the hotel operator cannot rely on its books and records to determine whether a particular occupant is, in fact, a permanent resident, the hotel operator should:

- not issue a refund of the Hotel Tax collected;
- continue to collect the Hotel Tax from the occupant; and
- advise the occupant to request a refund directly from the Department of Finance.

Once the occupant provides documentation that establishes that the Department of Finance granted such a refund request, and the hotel operator has no other reason to conclude that the occupant is not a permanent resident, the hotel operator:

- should discontinue collecting the Hotel Tax from that occupant until it becomes apparent that the occupant is no longer a permanent resident; and
- may refund any Hotel Tax that was paid that was not already refunded by the Department of Finance and take a credit on its tax return in an amount equal to the tax refunded.

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 454 of 654

Page 8, Guidance for Hotel Operators Subject to the
New York City Tax on Hotel Occupancy

## Exempt Occupants

Occupancies by certain individuals and organizations are exempt from Hotel Tax imposed on rent for hotel occupancy.  These exempt individuals and organizations **include, but are not limited to**:

• New York State and any of its agencies, instrumentalities, public corporations and political subdivisions;
• the United States of America and its agencies and instrumentalities;
• the United Nations and any international organizations of which the United States is a member;
• diplomatic missions and diplomats;
• organizations that have qualified for exempt status under New York State sales tax law (to be referred to hereinafter as section 1116(a)(4) exempt organizations) such as qualifying charities and educational institutions, certain posts or organizations consisting of past or present members of the armed forces of the United States and certain Indian nations or tribes ; and
• organizations that are organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary or educational purposes, or to foster national or international amateur sports competition or for the prevention of cruelty to children or animals.

## Verification of the Exemption

*New York City and State:* The exemption from Hotel Tax for New York State and any of its agencies, instrumentalities, public corporations and political subdivisions applies when an employee or representative of New York State or such other related entities rents a room(s) in a hotel while on official business. For New York State and any of its agencies, instrumentalities, public corporations and political subdivisions to claim an exemption from Hotel Tax the following procedure must be followed:

• an employee or representative staying in the hotel while on official business and paying the hotel bill with personal funds (such as with cash, personal check or personal debit or credit card) must furnish the hotel operator with a properly completed NYS Form ST-129, *Exemption Certificate, Tax on occupancy of hotel rooms, or NYS Form AC-946, Tax Exemption Certificate; or*

• where an employee or representative of New York State or any of its related governmental entities makes a direct payment of the hotel bill (such with a state check or standard voucher), the hotel must make a photocopy of the check or voucher.

The hotel operator must retain the exemption certificate or other documentation to substantiate that the transaction was exempt.

*International Organizations:* The exemption from Hotel Tax for the United Nations or any other international organization of which the United States is a member applies when its employees or representatives rent a room(s) in a hotel while on official business.  To establish this exemption, the employee or representative must furnish the hotel operator with a properly completed NYS Form ST-119.1, *Exempt Organization Exempt Purchase Certificate*.

*Diplomatic Missions*: The exemption from Hotel Tax for diplomatic missions applies when its employee or representative or a diplomat rents a room(s) in a hotel and furnishes the operator of the hotel with a copy of a letter of exemption issued by the Department of Finance. To obtain an exemption letter, one must apply to

WT  000453

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 455 of 654
Page 9, Guidance for Hotel Operators Subject to the
New York City Tax on Hotel Occupancy

the Department of Finance in writing and include a copy (or other evidence) of the appropriate treaty or reciprocal agreement between the foreign government involved and the United States.

*NYS Section 1116(a)(4) Exempt Organizations*: The exemption from Hotel Tax applies to any organization determined by New York State Department of Taxation and Finance to be exempt from New York State sales tax under section 1116(a)(4) of the Tax Law. This exemption applies when such an organization, or its employee or representative, occupies the room and the organization is the direct payer of record. The organization must be identified on the hotel bill or invoice along with the individual who occupied the room. The organization is the direct payer of record when payment is made directly from the funds of the organization, such as with a check from the organization, with the organization's credit card, cash or other funds. If the employee or representative pays the hotel bill with a personal check, personal credit card or other personal funds, the exemption afforded by section 1116(a)(4) organizations does not apply. A signed statement by the employee or representative of the exempt organization that certifies that the organization has paid the hotel bill is sufficient to substantiate direct payment. To establish entitlement to this exemption, the employee or representative must furnish the hotel operator with a properly completed NYS Form ST-119.1, *Exempt Organization Exempt Purchase Certificate.*

For veterans posts or organizations exempt from New York State Sales Tax under Tax law section 1116(a)(5) to establish the exemption from Hotel Tax, the authorized representative who is the hotel occupant must furnish the hotel operator with a properly completed NYS Form ST-119.5, *Exempt Organization Certification for Hotel or Motel Occupancy by Representatives of Veterans Organizations*. Payment may be made with funds of the post or organization, such as with a check from the organization, with the organization's credit card, cash or other funds of the organization, or the authorized representative may use a personal check, credit card or cash to pay the bill.

The exemption from Hotel Tax applies when an Indian nation or tribe exempt from New York State Sales Tax under section 1116(a)(6), or a member, officer, or employee of that nation or tribe, rents a room(s) in a hotel and the exempt Indian nation or tribe is the direct payer of record. The Indian nation or tribe must be identified on the hotel bill or invoice along with the individual who occupied the room**.** The Indian nation or tribe is the direct payer of record when payment of the hotel bill is made directly from the funds of the nation or tribe, such as with a check of the nation or tribe, with a credit card of the nation or tribe, cash or other funds of the Indian nation or tribe. If the member, officer or employee pays the hotel bill with a personal check, personal credit card or other personal funds, the exemption afforded certain Indian nations and tribes does not apply. To establish this exemption, the member, officer or employee of the Indian nation or tribe must furnish the hotel operator with NYS Form ST-119.1, *Exempt Organization Exempt Purchase Certificate.*


**Other Exempt Organizations**

An organization (other than a section 1116(a) exempt organization) that believes it qualifies for exemption from Hotel Tax when its employee(s) rents a room(s) in a hotel must furnish the operator of the hotel with a letter of exemption from Hotel Tax issued by the Department of Finance.

To obtain an exemption letter, one must apply to the Department of Finance in writing and include an affidavit stating:

WT_000454

22-11582-pb    Doc 65-1    Filed 01/24/23    Entered 01/24/23 11:20:21    Exhibit A -
Holiday Inn FiDi Expert Report of A. Tantleff    Pg 456 of 654

Page 10, Guidance for Hotel Operators Subject to the
New York City Tax on Hotel Occupancy

**(1)** The type of organization,
**(2)** The purposes for which it is organized,
**(3)** Its actual activities,
**(4)** The source and disposition of its income,
**(5)** Whether or not any of its income is credited to surplus or may inure to any private
    stockholder or individual, and
**(6)** Any other facts that may affect its right to exemption.

The application request must also include a copy of the articles of incorporation, or articles of association, as the case may be, a copy of the by-laws of the organization, a recent financial statement, and a copy any letter that exempts the organization from Federal income tax.

## Exempt Organizations Operating Hotels

When an organization that has been determined to be exempt by the Department of Finance under Rule Section 12-03(b) or by the New York State Department of Taxation and Finance under section 1116(a)(4) of the Tax Law operates a hotel, or offers rooms for rent, the rent is not subject to Hotel Tax provided that:

•     the rooms being rented are located in the same premises in which the organization's other exempt activities are carried out; and
•     the operation of the hotel or the rental of the rooms is in furtherance of the organization's exempt activities.

Example: A YMCA qualifying as an exempt organization under section 1116(a)(4) of the Tax Law rents rooms in the building where it carries on its exempt activities and the rental of rooms is in furtherance of those activities. The rooms are rented at the rate of $20 per day. The rent is not taxable because the YMCA is an exempt organization under section 1116(a)(4) of the Tax Law, the rental of the rooms is an activity carried on in furtherance of its exempt purposes, and the rooms being rented are located on the same premises in which the YMCA's other activities are carried out.

Example: An organization that supports international amateur sports competitions operates a hotel which is open to the general public. The organization's other activities are not carried on in the same building as the hotel, nor is the operation of the hotel in furtherance of the organization's exempt activities. The charges for occupancy at the hotel are subject to Hotel Tax.

## Hotels Operated By Colleges and Universities

A dormitory, apartment, house or other facility operated by a school, college or university to provide living quarters for students is not considered to be a hotel, and the charges to students for occupying the residences are not subject to Hotel Tax.

However, rentals of these accommodations to others (such as parents or relatives of students, alumni of the college or university or attendees of seminars and other educational events) are subject to Hotel Tax.

**Nontaxable occupancies**

*Summer Camps:* A camp for children that provides overnight sleeping accommodations and a program of instructions, training or other organized activities that campers are required to pursue under the supervision of counsellors or other supervisory personnel is not a hotel. However, unless otherwise exempted or excluded from tax, if guest facilities are provided for parents or others, Hotel Tax is due on the occupancy charges.

*Nursing, Rest or Convalescent Homes:* A facility that is registered with or licensed by a New York State governmental agency, whether publicly or privately owned and operated, which accepts persons who require special care on account of age, illness, or mental or physical incapacity, and which provides this special care either by nurses, orderlies or aides, is not considered to be a hotel. Accordingly, the charges for occupancy in this type of facility are not subject to Hotel Tax.

*Complimentary Accommodations:* When a hotel furnishes complimentary accommodations to individuals for which there is no rent or other consideration paid, the hotel is not required to collect Hotel Tax on the normal cost of the room. Exception: Where there is consideration, such as the promise by the occupant of the room to bring future business to the hotel by a tour guide, travel representative or other person, the room is subject to Hotel Tax based on the normal rental price of the room.

*Lodging Furnished to Employees for Owner's Convenience:* Lodging furnished by a hotel operator to an employee for the hotel operator's convenience are not subject to Hotel Tax provided:

•     the employer receives no cash or other consideration for lodging from the employee; and
•     the value of the lodging is not income to the employee under federal or New York State income tax laws.

If a hotel operator receives cash or other consideration from an employee for lodging or the value of the lodging is income to the employee for federal or New York State income tax purposes, the lodging is subject to Hotel Tax. For example, a hotel operator receives other consideration if the cost of the lodging is withheld from the employee's wages.

If an employee becomes a permanent resident of the hotel, the hotel operator is no longer required to collect Hotel Tax on the charges to the employee for occupancy, and the employee is entitled to a refund of Hotel Tax previously paid on charges for occupancy at the hotel.

WT_000456

| Transaction | Taxable? Yes/No/**Other** | Additional comments/explanation, etc. |
|---|---|---|
| **Hotel room revenue** | | |
| Rent received for occupancy (transient room rental) | Yes | If an occupant becomes a permanent resident after 180 days, the entire period of occupancy becomes nontaxable-See page 6 of this FM. |
| Guaranteed no-show revenue | Yes | Customer reserves room in advance. Agreement between customer and hotel provides that if customer cancels reservation within a specified time of his/her scheduled arrival customer must pay the full amount of rental for days reserved. |
| Complimentary rooms | **Other**-not taxable if facts indicate that no consideration is truly being paid for the room(s) | Examples:<br>1) Complimentary rooms provided by hotel to friends or relatives of management, visiting government officials.<br>2) Free rooms provided to employees are not subject to tax provided that the value of the lodging is not considered wages for federal and state personal income tax purposes.<br>3) Free rooms provided to vendors, such as musicians, photographers, or contractors who provide services to the hotel, are subject to tax at the normal cost of the room. |
| Early departure fees | Yes | Considered rent for occupancy |
| Late departure fees | Yes | Considered rent for occupancy. |
| Cancellation fees | No | Amount charged when reservation is cancelled; at no time does the customer have the right to occupy the room. Not considered rent for occupancy. |
| Attrition fees | No | Amount charged because a group did not fulfill their total event commitment; does not constitute rent for occupancy. |

22-11582-pb   Doc 65-1   Filed 01/24/23   Entered 01/24/23 11:20:21   Exhibit A - Holiday Inn FiDi Expert Report of A. Tantleff   Pg 459 of 654

Page 13, Guidance for Hotel Operators Subject to the New York City Tax on Hotel Occupancy

| | | |
|---|---|---|
| Rooms rented to tour operators, meeting planners or others who sell tour packages and meeting packages to their customers which include the use of the rooms by their customers | Yes | Deemed to have been furnished in consideration of efforts to bring future business to hotel and taxable at normal rental charge for room. |
| Pet charges | Yes | Rent for occupancy whether or not separately stated |
| Pet clean-up fees | Yes | Rent for occupancy whether or not separately stated. |
| Child care charges | No | Provided by hotel employees or by unrelated third party. |
| Rollaway bed charges | Yes | Taxable as rent for occupancy. |
| Refrigerator charges | Yes | Taxable as rent for occupancy. |
| Safe charges | **Other- Maybe** | Taxable as rent for occupancy if safe located within room. Not taxable if safe located elsewhere in hotel, such as behind front desk. |
| Damage fees | Yes | Considered incidental part of rent for occupancy or a charge for the maintenance/repair of the damaged property. |
| Resort/Destination Fee | Yes | Considered a part of rent for occupancy |
| **Meeting/Banquet Room Revenue** | | |
| Meeting room revenue | **Other- Maybe** | Meeting rooms exempt if they meet the definition of *place of assembly*, page 3 of this FM |
| Meeting room revenue (meal or break-time food served) | **Other- Maybe** | If not exempt as a *place of assembly*, total charges subject to tax unless food charges are both reasonable and separately stated. |
| Banquet room revenue | **Other- Maybe** | Banquet rooms exempt if they meet the definition of *place of assembly*, page 3 of this FM |
| Banquet room revenue (meal or break-time food served) | **Other- Maybe** | If not exempt as a place of assembly, total charges subject to tax unless food charges are both reasonable and separately stated. |
| Banquet room revenue (room subdivided) | **Other-**Partly Maybe | Smaller units taxable unless each individually exempt as a *place of assembly*. |
| Cancellation fees: banquet rooms | No | Liquidated damages because an event was cancelled. Damages may cover lost revenue not merely room rental, but from food that was ordered but thrown away, party decorations etc. |
| Attrition fees: banquet rooms | No | Fee charged because group did not fulfill their total commitment (example: and event booked for 200 people but only 150 attended. Penalty is charged for 50 non-attendees.) |

WT_000458

FILED: APPELLATE DIVISION - 1ST DEPT 09/24/2020 04:21 PM          2019-3801
NYSCEF DOC. NO. 8                                    RECEIVED NYSCEF: 09/24/2020

# New York Supreme Court

## Appellate Division — First Department

_____

In the Matter of the Application of,

WEST 58TH STREET COALITION, INC.; 152 W. 58 ST.
OWNERS CORP.; SUZANNE SILVER-STEIN; CARROLL
THOMPSON; XIANGHONG DI (STELLA) LEE; DORU
ILIESIU; and ELIZABETH EVANS-ILIESIU,

*Petitioners-Appellants*,

For an Order and Judgment Pursuant to
CPLR Article 78

-*against*-

THE CITY OF NEW YORK; BILL DE BLASIO, in his official
capacity as Mayor of the City of New York; SCOTT M.
STRINGER, in his official capacity as Comptroller of the City of
New York; THE NEW YORK CITY DEPARTMENT OF
HOMELESS SERVICES ("DHS"); THE NEW YORK CITY
HUMAN RESOURCES ADMINISTRATION ("HRA"); THE
NEW YORK CITY DEPARTMENT OF BUILDINGS ("DOB");
STEVEN BANKS, in his official capacity as Commissioner of
DHS and Commissioner of HRA; JACQUELINE BRAY in her
official capacity as Deputy Commissioner of HRA; WESTHAB,
INC.; NEW HAMPTON, LLC; JOHN PAPPAS; PAUL
PAPPAS; B GENCO CONTRACTING CORP.; TMS
PLUMBING & HEATING CORPORATION; and BASS
ELECTRICAL CORPORATION,

*Respondents-Respondents.*

**NY County Index
No.: 56196/2018**

**AD No.:  2019-3801**

## MEMORANDUM OF LAW IN OPPOSITION

RIVKIN RADLER LLP
Attorneys for Petitioners-Appellants
477 Madison Avenue, 20th Floor
New York, New York 10022
Telephone:  (212) 455-9555

WT_000459

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ........................................................................... ii

PRELIMINARY STATEMENT ..................................................................... 1

LEGAL STANDARD FOR REARGUMENT ................................................ 2

ARGUMENT ................................................................................................. 3

POINT I .......................................................................................................... 3

      THE COURT DID NOT OVERLOOK OR
      MISAPPREHEND THE RELEVANT FACTS OR
      MISAPPLY A CONTROLLING PRINCIPLE OF LAW ............. 3

      A.    A Safety Hearing Was Appropriate Under The
            Circumstances ........................................................ 3

      B.    The City Failed To Articulate a Basis For Reargument ....... 4

CONCLUSION ............................................................................................ 10

WT_000460

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Bd. of Managers of Loft Space Condo v. SDS Leonard, LLC,
142 A.D.3d 881 (1st Dep't 2016) ........................................................................ 6

Cirino by Gkanios v. Greek Orthodox Cnty. of Yonkers, Inc.,
193 A.D.2d 576 (2d Dep't 1993) .......................................................................... 6

Foley v. Roche,
68 A.D.2d 558 (1st Dep't 1979) ............................................................. 2, 3, 6, 7

Fosdick v. Town of Hempstead,
126 N.Y. 651 (1891) ............................................................................. 2, 3, 6, 7

Simpson v. Loehmann,
21 N.Y.2d 990 (1968) ........................................................................... 2, 3, 6, 7

Slomin v. Skaarland Constr. Corp.,
207 A.D.2d 639 (3d Dep't 1994) .......................................................................... 7

**Statutes and Other Authorities**

CPLR 78 ....................................................................................................... 1, 3, 7

CPLR 7803(3) ....................................................................................................... 3

CPLR 7804(h) ................................................................................................... 3, 6

New York City Administrative Code § 27-118 .................................................. 2, 8

New York City Administrative Code § 27-118(b) ................................... 3, 4, 5, 8, 9

New York City Administrative Code § 28-118.15 ................................................. 4

WT_000461

## PRELIMINARY STATEMENT

Petitioners-Appellants, West 58th Street Coalition, Inc., 152 W. 58 St.
Owners Corp., Suzanne Silverstein, Carroll Thompson, Xianghong Di Stella Lee,
Doru Iliesui and Elizabeth Evans-Iliesiu (collectively referred to herein as the
"Petitioners" or "Appellants" as appropriate) submit this memorandum of law in
opposition to the motion to reargue an order of this Court, dated August 13, 2020,
(1) modifying an order of the Supreme Court, New York County (Tisch, J.), dated
April 25, 2019, which denied and dismissed Appellants' Article 78 Petition
challenging the determination by Respondents, New York City Department of
Homeless Services ("DHS"), New York City Human Resources Administration
("HRA"), and the New York City Department of Buildings ("DOB")  (together
with the remaining governmental Respondents, the "City" or "City Respondents")
to open a homeless shelter (the "Proposed Shelter" or "Proposed Facility") and (2)
directing a hearing on whether the use is consistent with general safety and welfare
standards.

Petitioners maintain that the Proposed Shelter falls into the R-1 category,
resulting in a change in occupancy that requires the owners to comply with the
Current version of the Building Code.  Although Petitioners disagree with this
Court's contrary interpretation of the Building Code, Petitioners agree that issues
of fact exist as to whether the Building's proposed use would protect the safety and

WT_000462

welfare of its occupants, as required by New York City Administrative Code
§ 27-118.

The City failed to establish that the Court overlooked a fact or misapplied
controlling law in reaching this conclusion.  All the City's arguments were either
rejected by this Court or not presented on appeal.  Thus, this Court should deny
City's motion to reargue.

Both parties, however, recognize that this appeal presents issues of public
importance that should be decided by the Court of Appeals, as demonstrated by
Petitioner's own motion for leave to appeal.  Therefore, Petitioners do not oppose
the City's motion for leave to appeal.

## LEGAL STANDARD FOR REARGUMENT

"A motion for reargument, addressed to the discretion of the court, is
designed to afford a party an opportunity to establish that the court overlooked or
misapprehended the relevant facts, or misapplied any controlling principle of law."
Foley v. Roche, 68 A.D.2d 558, 567 (1st Dep't 1979).  A motion for reargument is
not a vehicle to argue the same questions previously decided or to advance new
arguments.  See Foley, 8 A.D.2d at 567; Fosdick v. Town of Hempstead, 126 N.Y.
651, 652-53 (1891); Simpson v. Loehmann, 21 N.Y.2d 990, 990-991 (1968).
Accordingly, a successful motion to reargue identifies a dispositive argument that

WT_000463

was raised but not considered by the Court.  See <u>Foley</u>, 8 A.D.2d at 567; <u>Fosdick</u>,

126 N.Y. at 652-53; <u>Simpson</u>, 21 N.Y.2d at 990-991.

## ARGUMENT

### POINT I

**THE COURT DID NOT OVERLOOK OR MISAPPREHEND THE RELEVANT FACTS OR MISAPPLY A CONTROLLING PRINCIPLE OF LAW**

**A.** **A Safety Hearing Was Appropriate Under The Circumstances**

Article 78 of the Civil Practice Law and Rules (CPLR) authorizes the

petitioner to ask a court to decide whether a determination by a governmental body

or officer "was made in violation of lawful procedure, was affected by an error of

law or was arbitrary and capricious or an abuse of discretion."  CPLR 7803(3).

The courts have the power to order a hearing if "a triable issue of fact is raised".

CPLR 7804(h).

Section 27-118(b) of the New York City Administrative Code ("the 1968

Grandfathering Provision") provides that when an alteration involves a change in

the occupancy or use to only a portion of a building there are two consequence.

First, "the alteration work involved in the change…shall be made to comply with

the requirements of this code[.]"  <u>Id.</u>  Second, "the remaining portion of the

building shall be altered to such an extent as may be necessary to protect the safety

WT_000464

3

and welfare of the occupants." Id.  Here, the Court arrived at the unremarkable
conclusion that the evidence in the record raised a triable issue of fact about
whether the proposed use of the unchanged "portion of the building" would
"protect the safety and welfare of the occupants."  New York City Administrative
Code § 27-118(b).

## B.    The City Failed To Articulate a Basis For Reargument

Faced with this straightforward application of the law, the City argues that
the Court overlooked that ordering a hearing would violate the law governing
temporary certificates of occupancy.  For example, the City claims the Court
neglected to apply the law related to the respective roles of the DOB and the
reviewing court to its analysis of "whether the building's temporary use would
jeopardize public safety."  City's Memo of Law at 7-8.   Similarly, the City
contends that this Court's decision "rests on City Charter and Administrative Code
provisions that direct DOB to assess whether the building's 'temporary occupancy
and use' would 'in any way jeopardize life or property.'"  City Memo of Law at 11
(quoting Charter § 45(b)(3)(f) and New York City Administrative Code § 28-
118.15).  From this premise, the City concludes that "this Court overlooked the
narrow focus of the temporary use and occupancy assessment and remanded this
case for judicial fact-finding on permanent features of the building, ones entirely
unrelated to temporary use."  City Memo of Law at 11-12.   These arguments

WT_000465

misconstrue this Court's decision and do not present a fact that was overlooked by the Court or a misapplication of a controlling principle.

This Court's decision correctly focuses on the 1968 Grandfathering Provision, which requires the unchanged portion of the building to "be altered to such an extent as may be necessary to protect the safety and welfare of the occupants." See New York City Administrative Code § 27-118(b). The issuance of a TCO does not change this requirement. This Court mentioned the TCO only because the City argued that the existence of a TCO demonstrated that the City had already determined the Building satisfied 1968 Grandfathering Provision. See Resp. Br. at 53-54. In response, the Court did not invalidate the TCO but properly held it created a rebuttable presumption of safety, as Petitioners argued.

The City's arguments on this motion fortify that conclusion. As the City concedes, the inquiry under 1968 Grandfathering Provision is broader than the inquiry for a temporary use and occupancy assessment. See City's Memo of Law at 11-12. But even if the TCO could serve as a proxy for the conclusion required by 1968 Grandfathering Provision that the Building would be safe, that conclusion is still subject to judicial review. As Petitioners explained in the reply brief, "[t]he City cannot point to its own self-certification (through DOB) to justify the very conduct that is being challenged." See Reply Br. at 15.

WT_000466

In this case, the Court correctly concluded that a hearing under CPLR 7804(h) is warranted because of the overwhelming evidence the Building would not protect the safety and welfare of the occupants.  In short, the City's contention that the court "neglected" to apply the proper law with regard to "whether the building's temporary use would jeopardize public safety" is inaccurate because the Court's decision did not address the building's *temporary* use.  <u>See</u> City's Memo of Law at 11 (quotation marks omitted).

Further, this argument is not a basis for reargument because this Court has already rejected it on appeal.  <u>See</u> <u>Foley</u>, 8 A.D.2d at 567; <u>Fosdick</u>, 126 N.Y. at 652-53; <u>Simpson</u>, 21 N.Y.2d at 990-991.  Before this Court, the City advanced the erroneous argument that the DOB's mere issuance of the partial TCO constitutes irrefutable proof that the Building is safe and satisfies the City's obligation to determine whether the Building endangers the general safety and public welfare. <u>See</u> Resp. Br. at 53-54.

The City also had the opportunity to distinguish the authority holding the issuance of a TCO creates a presumption that a building complies with New York City law but can be rebutted by the submission of expert affidavits establishing that the building does not comply with the building code or is otherwise unsafe.  <u>See</u> <u>Bd. of Managers of Loft Space Condo v. SDS Leonard, LLC</u>, 142 A.D.3d 881, 882 (1st Dep't 2016); <u>Cirino by Gkanios v. Greek Orthodox Cnty. of Yonkers, Inc.</u>,

WT_000467

193 A.D.2d 576 (2d Dep't 1993); <u>Slomin v. Skaarland Constr. Corp.</u>, 207 A.D.2d 639 (3d Dep't 1994) (the issuance of a certificate of occupancy would not preclude a finding that there was a dangerous condition in the building). Petitioners raised these arguments in the opening brief (<u>see</u> Appellants' Br. at 32), and the City attempted to distinguish them on the ground that they do not arise in the context of an Article 78 proceeding. The Court rejected this argument and relied on the cases cited by Petitioners. <u>See</u> Graves-Poller Affirmation, Exhibit B at 20. On this motion, the City presents the exact same argument. <u>Compare</u> Respondent's Br. at 50 <u>with</u> City's Memo of Law at 10. Because the City has recycled the same arguments that were rejected on appeal, all the arguments related to the temporary certificate of occupancy are not a basis for reargument. <u>See</u> <u>Foley</u>, 8 A.D.2d at 567; <u>Fosdick</u>, 126 N.Y. at 652-53; <u>Simpson</u>, 21 N.Y.2d at 990-991.

The Court should not be misled by the City's new argument that the DOB can dismiss the legitimate safety concerns in the record without being subject to judicial review due to the nature of those concerns. According to the City, a hearing "makes little sense" because Petitioners challenge "permanent features" of the Building that comply with pre-1968 standards. <u>See</u> City's Memo of Law at 11-14. This argument lacks merit and does not present a controlling principle of law misapplied by this Court because it was not presented on appeal.

WT_000468

As an initial matter, the City does not offer any support for its conclusion that the challenged features are "permanent" in any meaningful sense.  <u>See</u> City's Memo of Law at 2, 3 and 11.  Petitioners experts stated that the Building was a "fire trap" and a "disaster waiting to happen" because, among other things, (a) the Building has only a single means of egress for 150 men; (b) the sole means of egress is too far from the residential rooms; (c) the stairs are too narrow and contain stair winders; (d) the Building contains "dead-end" and "too-narrow" corridors; (e) the Building does not have a means of egress that exits directly to the street; and (f) the Building does not have sprinklers in the residential rooms. (A-140-157;  A-166;  A-171-174;  A-2077-2081;  A-2083-2084).[1]    The City characterizes these challenges as "permanent" without pointing to any record evidence that these dangerous conditions could not be changed.

The City's argument is not strengthened by the fact that some of these conditions are permitted by pre-1968 standards.   The 1968 Grandfathering Provision presupposes that a building can comply with pre-1968 standards but still require alterations to protect the safety and welfare of its occupants.  <u>See</u> New York City Administrative Code § 27-118.   In fact, that is the whole point of the 1968 Grandfathering Provision.   In any event, this argument does not provide a

---

[1] Numbers preceded by "A-" and found in parentheses refer to pages of the appendix.

WT_000469

basis for reargument because the City did not raise this argument on appeal.  See generally Resp. Br.

The DOB allowed the owners to take advantage of the 1968 Grandfathering Provision, it necessarily concluded that the owner did not need to make, or already made, alterations to protect the safety and welfare of the occupants.  That conclusion – separate and apart from the issuance of a temporary certificate of occupancy – is subject to judicial review.  The overwhelming evidence of safety concerns raised a triable issue of fact as to whether the 1968 Grandfathering Provision was satisfied.  Thus, the Court correctly decided that a hearing was appropriate.

In sum, the Court should deny the motion for reargument because the City failed to establish that the Court overlooked a fact or misapplied controlling law, and all the City's arguments were either rejected by this Court or not presented on appeal.  Petitioners, however, do not oppose the City's motion for leave to appeal because, as explained in Petitioner's own motion for leave to appeal, this appeal presents novel issues of public importance.

WT_000470

## **CONCLUSION**

WHEREFORE, Appellants respectfully request that this Court deny the

motion for reargument.

Dated:     New York, New York
           September 24, 2020


               Yours, etc.

               RIVKIN RADLER LLP
               Attorneys for Petitioners-Appellants


                    /s/ *Jeremy Honig*
           By:_____
                 Jeremy B. Honig
                 Cheryl F. Korman
                 Henry Mascia
                 477 Madison Ave., 20th Floor
                 New York, New York 10022
                 (212) 955-4555

Of Counsel:

     Jeremy B. Honig
     Cheryl F. Korman
     Henry Mascia

WT_000471

# Disclosure Statement



It is our pleasure to present the enclosed policy to you
for presentation to your customer.

**INSTRUCTION TO AGENT OR BROKER:**

WE REQUIRE THAT YOU TRANSMIT THE ATTACHED/ENCLOSED DISCLOSURE STATEMENT TO THE CUSTOMER
WITH THE POLICY.

Once again, thank you for your interest, and we look forward to meeting your needs and those of your customers.

WT_000472

# Disclosure Statement

**ZURICH**

### NOTICE OF DISCLOSURE FOR AGENT & BROKER COMPENSATION

If you want to learn more about the compensation Zurich pays agents and brokers visit:

http://www.zurichnaproducercompensation.com

or call the following toll-free number:  (866) 903-1192.

This Notice is provided on behalf of Zurich American Insurance Company

and its underwriting subsidiaries.

WT_000473



# The Zurich EDGE II Policy



# THE ZURICH EDGE II
# TABLE OF CONTENTS

Page No.

THE ZURICH EDGE II DECLARATIONS

SECTION 1. – POLICY INFORMATION
1.1    INSURING AGREEMENT ................................................................... 1D
1.2    POLICY NUMBER ........................................................................... 1D
1.3    NAMED INSURED AND MAILING ADDRESS ..................................... 1D
1.4    PRODUCER ................................................................................... 1D
1.5    POLICY PERIOD ............................................................................ 1D
1.6    COMPANY ..................................................................................... 1D
1.7    SHARE .......................................................................................... 2D
1.8    PREMIUM ...................................................................................... 2D
1.9    PREMIUM PAYABLE ...................................................................... 2D
1.10   TERRITORY ................................................................................... 2D

SECTION 2. – POLICY APPLICABILITY
2.1    INSURED LOCATION ..................................................................... 3D
2.2    CURRENCY ................................................................................... 3D
2.3    POLICY LIMITS OF LIABILITY ........................................................ 3D
2.4    QUALIFYING PERIOD .................................................................... 8D
2.5    DEDUCTIBLES .............................................................................. 8D

THE ZURICH EDGE II COVERAGE FORM

SECTION 3. – PROPERTY DAMAGE
3.1    PROPERTY INSURED .................................................................... 1
3.2    PROPERTY EXCLUDED ................................................................. 1
3.3    EXCLUSIONS ................................................................................ 2

SECTION 4. – TIME ELEMENT
4.1    LOSS INSURED .............................................................................. 4
4.2    TIME ELEMENT COVERAGES ....................................................... 4
       a.   TIME ELEMENT COVERAGE OPTION ..................................... 4
       b.   GROSS EARNINGS ................................................................ 5
       c.   EXTENDED PERIOD OF LIABILITY .......................................... 5
       d.   GROSS PROFIT ..................................................................... 5
       e.   EXTRA EXPENSE ................................................................... 6
       f.   LEASEHOLD INTEREST .......................................................... 7
       g.   EXCLUSIONS ........................................................................ 7
4.3    PERIOD OF LIABILITY ................................................................... 8

SECTION 5. – SPECIAL COVERAGES & DESCRIBED CAUSES OF LOSS
5.1    OPERATION OF SPECIAL COVERAGES & DESCRIBED CAUSES OF LOSS ................................. 10
5.2    SPECIAL COVERAGES ................................................................. 10
       a.   ACCOUNTS RECEIVABLE ...................................................... 10
       b.   BETTER GREEN™ UPGRADE ................................................. 11
       c.   BRANDS AND LABELS ........................................................... 11
       d.   CIVIL OR MILITARY AUTHORITY ............................................ 12
       e.   CIVIL OR MILITARY ORDER PREVENTING SPREAD OF FIRE ...... 12
       f.   CLOUD SERVICE AND COMMUNICATION INTERRUPTION ........ 12

g.      COMPLETED CIVIL ENGINEERING STRUCTURES ........................................... 13
h.      COMPUTER SYSTEMS DAMAGE.................................................................. 13
i.      CONTINGENT TIME ELEMENT....................................................................... 13
j.      CONTRACT PENALTIES................................................................................. 14
k.      CRISIS EVENT ............................................................................................... 14
l.      DEBRIS REMOVAL ........................................................................................ 14
m.      DECONTAMINATION COSTS ......................................................................... 14
n.      DEFERRED PAYMENTS ................................................................................. 15
o.      DELAY IN COMPLETION ............................................................................... 15
p.      DOWN ZONING .............................................................................................. 15
q.      EMERGENCY EVACUATION EXPENSE.......................................................... 16
r.      ERRORS AND OMISSIONS ............................................................................ 16
s.      EXPEDITING COSTS ...................................................................................... 17
t.      FINE ARTS ..................................................................................................... 17
u.      FIRE DEPARTMENT SERVICE CHARGE ....................................................... 17
v.      HISTORICAL BUILDINGS PRESERVATION  ................................................... 17
w.      IMPOUNDED WATER ..................................................................................... 18
x.      INCREASED COSTS OF CONSTRUCTION ..................................................... 18
y.      INGRESS/EGRESS ........................................................................................ 18
z.      INTERNATIONAL INTERDEPENDENCY .......................................................... 19
aa.     INTERRUPTION BY FOOD BORNE ILLNESS OR COMMUNICABLE  DISEASE ....... 19
bb.     LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL..................... 20
cc.     LAND IMPROVEMENTS .................................................................................. 20
dd.     LEASE CANCELLATION  ................................................................................ 20
ee.     LOCKS AND KEYS ......................................................................................... 20
ff.     LOGISTICS EXTRA COST .............................................................................. 21
gg.     METERED SERVICES ..................................................................................... 21
hh.     MISCELLANEOUS PERSONAL PROPERTY ................................................... 21
ii.     MISCELLANEOUS UNNAMED LOCATION ..................................................... 21
jj.     MONEY DURING NORMAL BUSINESS HOURS .............................................. 22
kk.     MONEY IN LOCKED SAFE OR VAULT  .......................................................... 22
ll.     NEWLY ACQUIRED ........................................................................................ 22
mm.     OFF PREMISES SERVICE INTERRUPTION ................................................... 22
nn.     PROFESSIONAL FEES ................................................................................... 23
oo.     PROTECTION AND PRESERVATION OF PROPERTY  .................................... 23
pp.     RADIOACTIVE CONTAMINATION .................................................................. 23
qq.     RESEARCH AND DEVELOPMENT  ................................................................. 24
rr.     RESEARCH ANIMALS .................................................................................... 24
ss.     REWARD PAYMENTS..................................................................................... 24
tt.     SPOILAGE FROM ON PREMISES SERVICE INTERRUPTION  ....................... 24
uu.     TENANTS ACCESS ........................................................................................ 25
vv.     TENANTS RELOCATION AND REPLACEMENT EXPENSE ............................. 25
ww.     TRANSIT ........................................................................................................ 25
xx.     VALUABLE PAPERS AND RECORDS  ............................................................ 26

5.3     DESCRIBED CAUSES OF LOSS ................................................................................ 26
a.      BREAKDOWN OF EQUIPMENT ..................................................................... 26
        Refrigerant  .................................................................................................... 27
        Spoilage From Breakdown Of Equipment  ...................................................... 27
b.      CYBER EVENT ............................................................................................... 27
        Off Premises Service Interruption Cyber Event .............................................. 27
        Protection And Preservation Of Digital Assets ............................................... 28
c.      EARTH MOVEMENT ....................................................................................... 28
d.      FLOOD ........................................................................................................... 29
e.      NAMED STORM .............................................................................................. 29

SECTION 6. – CONDITIONS
6.1    LOSS ADJUSTMENT AND SETTLEMENT ........................................................................... 30
    a.    DUTIES IN THE EVENT OF LOSS OR DAMAGE ..................................................... 30
    b.    CONTROL OF DAMAGED GOODS ........................................................................... 30
    c.    SETTLEMENT OF CLAIMS ...................................................................................... 30
    d.    LOSS ADJUSTMENT/PAYABLE .............................................................................. 31
    e.    ABANDONMENT ...................................................................................................... 31
    f.    APPRAISAL .............................................................................................................. 31
    g.    SUBROGATION ....................................................................................................... 32
    h.    SUIT AGAINST THE COMPANY .............................................................................. 32
    i.    PRIVILEGE TO ADJUST WITH OWNER .................................................................. 32
    j.    VALUATION .............................................................................................................. 32
    k.    CURRENCY FOR LOSS PAYMENT ........................................................................ 34

6.2    GENERAL PROVISIONS .................................................................................................. 34
    a.    CANCELLATION/NON-RENEWAL .......................................................................... 34
    b.    CERTIFICATES OF INSURANCE ........................................................................... 35
    c.    CONCEALMENT, MISREPRESENTATION OR FRAUD ........................................... 35
    d.    CONFORMITY TO STATUTES ................................................................................. 35
    e.    INSPECTIONS AND SURVEYS ............................................................................... 35
    f.    JOINT LOSS ............................................................................................................. 35
    g.    JURISDICTION ........................................................................................................ 36
    h.    LENDERS LOSS PAYEE AND MORTGAGE HOLDER INTERESTS AND OBLIGATIONS ..... 36
    i.    LIBERALIZATION ..................................................................................................... 37
    j.    NO REDUCTION BY LOSS ...................................................................................... 37
    k.    OTHER INSURANCE ............................................................................................... 37
    l.    POLICY MODIFICATION .......................................................................................... 38
    m.    SUSPENDED PROPERTY ....................................................................................... 38
    n.    TITLES ..................................................................................................................... 38
    o.    TRANSFER OF RIGHT AND DUTIES ...................................................................... 38

SECTION 7. – DEFINITIONS
7.    DEFINITIONS ................................................................................................................... 39

<u>FORMS ATTACHED TO THE POLICY</u>

| | |
|---|---|
| U-GU-873-A CW | Disclosure Statement |
| U-GU-874-A CW | Disclosure Statement |
| EDGE II-400-C | The Zurich Edge II - Policy(Cover page) |
| EDGE II-454-D | The Zurich Edge II- Table of Contents |
| U-GU-630-E CW | Disclosure of Important Information Relating to Terrorism Risk Insurance Act |
| U-GU-1191-A CW | SANCTIONS EXCLUSION ENDORSEMENT |
| U-GU-319-F | Important Notice In Witness Clause |
| U-GU-1110-B IL | Illinois Civil Union Act Policyholder Notice |
| U-GU-741 P LA | Louisiana Citizens Property Insurance Corporation2005 Emergency Assessment |
| U-GU-296-F | Texas Important Notice |
| EDGE II-D-100-C | The Zurich Edge II Declarations- Domestic |
| EDGE II-100-C | The Zurich Edge II Coverage Form- Domestic |
| EDGE II-450-C | Appendix A Earth Movement/Earthquake Zones for USA including its Commonwealths and Territories |
| EDGE II-451-E | Appendix B Earth Movement/Earthquake Zones Worldwide except USA including its Commonwealths and Territories |
| EDGE II-452-D | Appendix C Named Storm Zones for USA including its Commonwealths and Territories |
| EDGE II-453-E | Appendix D Named Storm Zones Worldwide except USA including its Commonwealths and Territories |
| Edge II 458-A | Appendix E- Flood Zones |
| EDGE II-201-C AK | Amendatory Endorsement - Alaska |
| EDGE II-203-A AR | Amendatory Endorsement - Arkansas |
| EDGE II-207-G CT | Amendatory Endorsement - Connecticut |
| EDGE II-210-E FL | Amendatory Endorsement - Florida |
| EDGE II-211-B GA | Amendatory Endorsement - Georgia |
| EDGE II-214-D IL | Amendatory Endorsement - Illinois |
| EDGE II-215-B IN | Amendatory Endorsement - Indiana |
| EDGE II-216-A IA | Amendatory Endorsement - Iowa |
| EDGE II-217-B KS | Amendatory Endorsement - Kansas |
| EDGE II-218-C KY | Amendatory Endorsement - Kentucky |
| EDGE II-219-E LA | Amendatory Endorsement - Louisiana |
| EDGE II-220-C ME | Amendatory Endorsement - Maine |

FORMS ATTACHED TO THE POLICY

| | |
|---|---|
| EDGE II-221-D MD | Amendatory Endorsement - Maryland |
| EDGE II-222-D MA | Amendatory Endorsement - Massachusetts |
| EDGE II-224-C MN | Amendatory Endorsement - Minnesota |
| EDGE II-225-A MS | Amendatory Endorsement - Mississippi |
| EDGE II-226-B MO | Amendatory Endorsement - Missouri |
| EDGE II-227-C MT | Amendatory Endorsement - Montana |
| EDGE II-232-C NE | Amendatory Endorsement - Nebraska |
| EDGE II-229-C NV | Amendatory Endorsement - Nevada |
| EDGE II-233-D-NY | Amendatory Endorsement - New York |
| EDGE II-234-B NC | Amendatory Endorsement - North Carolina |
| EDGE II-235-A ND | Amendatory Endorsement - North Dakota |
| EDGE II-236-B OH | Amendatory Endorsement - Ohio |
| EDGE II-237-C OK | Amendatory Endorsement - Oklahoma |
| EDGE II-238-A OR | Amendatory Endorsement - Oregon |
| EDGE II-240-B RI | Amendatory Endorsement - Rhode Island |
| EDGE II-241-C SC | Amendatory Endorsement - South Carolina |
| EDGE II-242-D SD | Amendatory Endorsement - South Dakota |
| EDGE II-243-C TN | Amenatory Endorsement - Tennessee |
| EDGE II-244-B TX | Amendatory Endorsement - Texas |
| EDGE II-246-C VT | Amendatory Endorsement - Vermont |
| EDGE II-252-B VA | Amendatory Endorsement - Virginia |
| EDGE II-248-C WA | Amendatory Endorsement - Washington |
| EDGE II-249-B WV | Amenatory Endorsement - West Virginia |
| EDGE II-250-B WI | Amendatory Endorsement - Wisconsin |
| EDGE II-251-B WY | Amendatory Endorsement - Wyoming |
| EDGE II-318-A | Hail Or Windstorm Other Than Named Storm Sublimits And Valuation |
| U-GU-619-A CW | Schedule Of Forms and Endorsements |
| U-GU-685-C CW | Exclusion of Loss Resulting from Certified Acts of Terrorism with Exceptions and Sub-Limits |
| Edge 303-A | Policy Changes Endorsement- Annual Aggregate Deductible |
| Edge U-GU-303-A | Policy Changes Endorsement- Named Loss Adjuster |
| Edge U-GU-303-A | Policy Changes Endorsement- Rate Matrix Addition |
| N/A | Policy Changes Endorsement- Additional Named Insured |

<u>FORMS ATTACHED TO THE POLICY</u>

| | |
|---|---|
| Edge U-GU-303-A | Policy Changes Endorsement- Earth Movement Exclusion |
| N/A | Policy Changes Endorsement- Policy Deductible |
| N/A | Policy Changes Endorsement- Land Improvements |
| N/A | Policy Changes Endorsement- Historical Buildings Preservation Wording |

| Insured Name: | Crescent Hotels & Resorts |  |
|---|---|---|
| Reference Number: | ERP 1150909-04 | |
| Effective Date: | 05/31/2022 | |

**THIS DISCLOSURE IS ATTACHED TO AND MADE PART OF YOUR POLICY.**

# DISCLOSURE OF IMPORTANT INFORMATION RELATING TO TERRORISM RISK INSURANCE ACT

**SCHEDULE\***

| Premium attributable to risk of loss from certified acts of terrorism for lines of insurance subject to TRIA: |
|---|
| Not Applicable - Terrorism Exclusion |

*Any information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Disclosure of Premium**

In accordance with the federal Terrorism Risk Insurance Act ("TRIA"), as amended, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to the risk of loss from terrorist acts certified under that Act for lines subject to TRIA. That portion of premium attributable is shown in the Schedule above. The premium shown in the Schedule above is subject to adjustment upon premium audit, if applicable.

**B. Disclosure of Federal Participation in Payment of Terrorism Losses**

You should know that where coverage is provided by this policy for losses resulting from certified acts of terrorism, the United States Government may pay up to 80% of insured losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

**C. Disclosure of $100 Billion Cap on All Insurer and Federal Obligations**

If aggregate insured losses attributable to terrorist acts certified under TRIA exceed $100 billion in a calendar year (January 1 through December 31) and an insurer has met its deductible under the program, that insurer shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of Treasury.

**D. Availability**

As required by TRIA, we have made available to you for lines subject to TRIA coverage for losses resulting from acts of terrorism certified under TRIA with terms, amounts and limitations that do not differ materially from those for losses arising from events other than acts of terrorism.

**E. Definition of Act of Terrorism under TRIA**

TRIA defines "act of terrorism" as any act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act ("TRIA"), to be an act of terrorism. The Terrorism Risk Insurance Act provides that the Secretary of Treasury shall certify an act of terrorism:

**1.** To be an act of terrorism;

**2.** To be a violent act or an act that is dangerous to human life, property or infrastructure;

**3.** To have resulted in damage within the United States, or outside of the United States in the case of an air carrier (as defined in section 40102 of Title 49, United States Code) or a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), or the premises of a United States mission; and

**4.** To have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Copyright ©2020 Zurich American Insurance Company
Includes copyrighted material of ISO Properties, Inc. with its permission

No act may be certified as an "act of terrorism" if the act is committed as part of the course of a war declared by Congress (except for workers' compensation) or if losses resulting from the act, in the aggregate for insurance subject to TRIA, do not exceed $5,000,000.

Copyright ©2020 Zurich American Insurance Company
Includes copyrighted material of ISO Properties, Inc. with its permission

# SANCTIONS EXCLUSION ENDORSEMENT



**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

The following exclusion is added to the policy to which it is attached and supersedes any existing sanctions language in the policy, whether included in an Exclusion Section or otherwise:

SANCTIONS EXCLUSION

Notwithstanding any other terms under this policy, we shall not provide coverage nor will we make any payments or provide any service or benefit to any insured, beneficiary, or third party who may have any rights under this policy to the extent that such cover, payment, service, benefit, or any business or activity of the insured would violate any applicable trade or economic sanctions law or regulation.

The term policy may be comprised of common policy terms and conditions, the declarations, notices, schedule, coverage parts, insuring agreement, application, enrollment form, and endorsements or riders, if any, for each coverage provided.  Policy may also be referred to as contract or agreement.

We may be referred to as insurer, underwriter, we, us, and our, or as otherwise defined in the policy, and shall mean the company providing the coverage.

Insured may be referred to as policyholder, named insured, covered person, additional insured or claimant, or as otherwise defined in the policy, and shall mean the party, person or entity having defined rights under the policy.

These definitions may be found in various parts of the policy and any applicable riders or endorsements.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED**



# Important Notice - In Witness Clause

In return for the payment of premium, and subject to the terms of this policy, coverage is provided as stated in this policy.

IN WITNESS WHEREOF, this Company has executed and attested these presents and, where required by law, has caused this policy to be countersigned by its duly Authorized Representative(s).

President               Corporate Secretary

---

**QUESTIONS ABOUT YOUR INSURANCE?**  Your agent or broker is best equipped to provide information about your insurance.  Should you require additional information or assistance in resolving a complaint, call or write to the following (please have your policy or claim number ready):

Zurich in North America
Customer Inquiry Center
1299 Zurich Way
Schaumburg, Illinois 60196-1056
**1-800-382-2150** (Business Hours:  8am - 4pm [CT])
**Email:** info.source@zurichna.com

---



# Illinois Civil Union Act Policyholder Notice

On June 1, 2011, Public Act 96-1513, the Religious Freedom Protection and Civil Union Act ("the Act") became effective.   Under the Act, both same-sex and opposite-sex couples may enter into a civil union.  A party to a civil union is entitled to the same legal obligations, responsibilities, protections, and benefits as are afforded or recognized by the law of Illinois a spouse; whether they derive from statute, administrative rule, common law, or any other source of civil or criminal law.  A marriage between persons of the same sex, a civil union, or a substantially similar legal relationship other than common law marriage, legally entered into in another jurisdiction, shall be legally recognized in Illinois as a civil union.

<u>**CAUTION: FEDERAL LAW RIGHTS MAY OR MAY NOT BE AVAILABLE:**</u>

Illinois law grants parties to a civil union the same benefits, protections and responsibilities that flow from marriage under state law. However, some or all of the benefits, protections and responsibilities related to health insurance that are available to married persons under federal law may not be available to parties to a civil union. For example, the Employee Retirement Income Security Act of 1974, a federal law known as "RISA"controls the employer/employee relationship with regard to determining eligibility for enrollment in private employer health benefit plans. Because of ERISA, Act 91 does not state requirements pertaining to a private employer' enrollment of a party to a civil union in an ERISA employee welfare benefit plan. However,governmental employers (not federal government) are required to provide health benefits to the dependents of a party to a civil union if the public employer provides health benefits to the dependents of married persons. Federal law also controls group health insurance continuation rights under "OBRA"for employers with 20 or more employees as well as the Internal Revenue Code treatment of health insurance premiums. As a result, parties to a civil union and their families may or may not have access to certain benefits under this policy, contract, certificate, rider or endorsement that derive from federal law. You are advised to seek expert advice to determine your rights.

# Louisiana Citizens Property Insurance Corporation
# 2005 Emergency Assessment



The Louisiana legislature established the Louisiana Citizens Property Insurance Corporation to provide insurance to homeowners and other property owners who cannot find insurance coverage in the private market. Louisiana Citizens Property Insurance Corporation is permitted by law to fund its deficits through assessments on the private insurance market.

As a result of the 2005 hurricanes, Louisiana Property Insurance Corporation has issued an Emergency Assessment to be applied to all FAIR Plan assessable insureds. The Emergency Assessment applies to certain property insurance including insurance for fire, allied lines (including mobile homes), homeowners' multi-peril, and the property insurance portion of the commercial multi-peril policies.  Insurers are required to collect and remit the Emergency Assessment to the Louisiana Citizens Property Insurance Corporation. The assessment is pro-rated for subsequent premium changes resulting from endorsement and cancellation activity.

The factor applied to this policy as a result of the Louisiana Citizens Property Insurance Corporation Emergency Assessment for new or renewal policies on or after January 1, 2021 is 2.40%:

2005 LA FAIR Plan Emergency Assessment          2.40%

The emergency assessment is not subject to premium taxes, fees, or commissions.

**Payments of the 2005 LA FAIR Plan Emergency Assessment may be refundable.**

**Information for both individual and business policyholders on how to determine the amount of credit, when the credit can be claimed, what documents should be filed and the required forms is available online at the web site of the Louisiana Department of Revenue:**

**Individual:  http://www.revenue.louisiana.gov/Individuals/CitizensInsuranceTaxCredit**

**Business:  http://www.revenue.louisiana.gov/Businesses/CitizensInsuranceTaxCredit**

# Texas Important Notice



## Have a complaint or need help?

If you have a problem with a claim or your premium, call your insurance company first.If you can't work out the issue, the Texas Department of Insurance may be able to help.

Even if you file a complaint with the Texas Department of Insurance, you should also file a complaint or appeal through your insurance company. If you don't, you may lose your right to appeal.

**Zurich North America**
To get information or file a complaint with your insurance company
   **Call: Customer Inquiry Center at 1-847-413-5438**

   **Toll-free: 1-800-382-2150**

   Email: info.source@zurichna.com
   Mail: 1299 Zurich Way, Schaumburg, IL 60196-1056

**The Texas Department of Insurance**
To get help with an insurance question or file a complaint with the state:
   Call with a question: 1-800-252-3439
   File a complaint: www.tdi.texas.gov
   Email: ConsumerProtection@tdi.texas.gov
   Mail: MC111-1A, P.O. Box 149091, Austin, TX 78714-9091

## ¿Tiene una queja o necesita ayuda?

Si tiene un problema con una reclamación o con su prima de seguro, llame primero a su compañía de seguros. Si no puede resolver el problema, es posible que el Departamento de Seguros de Texas (Texas Department of Insurance, por su nombre en inglés) pueda ayudar.

Aun si usted presenta una queja ante el Departamento de Seguros de Texas, también debe presentar una queja a través del proceso de quejas o de apelaciones de su compañía de seguros. Si no lo hace, podría perder su derecho para apelar.

**Zurich North America**
Para obtener información o para presentar una queja ante su compañía de seguros:
   **Llame a: Customer Inquiry Center at 1-847-413-5438**

   **Teléfono gratuito: 1-800-382-2150**

   Correo electrónico: info.source@zurichna.com
   Dirección postal:1299 Zurich Way, Schaumburg, IL 60196-1056

**El Departamento de Seguros de Texas**
Para obtener ayuda con una pregunta relacionada con los seguros o para presentar una queja ante el estado:
   Llame con sus preguntas al: 1-800-252-3439
   Presente una queja en: www.tdi.texas.gov
   Correo electrónico: ConsumerProtection@tdi.texas.gov
   Dirección postal: MC 111-1A, P.O. Box 149091, Austin, TX 78714-9091



# THE ZURICH EDGE II DECLARATIONS

SECTION 1 – POLICY INFORMATION

1.1.    INSURING AGREEMENT

This Policy Insures against direct physical loss of or damage from a **Covered Cause of Loss**, meaning from any cause unless otherwise excluded, that commences during the Policy Period, to Property Insured at an Insured Location, all subject to the terms, conditions and exclusions stated in this Policy.

No coverage can be provided in violation of any U.S. economic or trade sanctions laws or regulations.  Such coverage, which may be in violation of any U.S. economic or trade sanctions laws and regulations, shall be null and void and the Company shall not be liable to make any payments or provide any defense under this policy.

1.2.    POLICY NUMBER

ERP1150909-04

hereafter referred to as this "Policy".

1.3.    Named Insured and Mailing Address

Crescent Hotels & Resorts

10306 Eaton Pl Ste 430

Fairfax, Virginia  22030

hereafter referred to as the **First Named Insured**.

The following are all hereafter referred to as the "Insured", including legal representatives.

The **First Named Insured** and

any subsidiary of the **First Named Insured**.  The **First Named Insured**'s interest in any partnership, joint venture or other legal entity in which the **First Named Insured** has management control or ownership as now constituted or hereafter is acquired.

1.4.    Producer

MARSH USA INC

1166 AVENUE OF THE AMERICAS

NEW YORK, New York  10036

1.5.    Policy Period

Begins May 31, 2022 at 12:01 AM; Ends May 31, 2023 at 12:01 AM

In the event of a claim, the Policy Period is measured by local time at the location where the loss or damage occurs.

1.6.    COMPANY

Insurance is provided by the following Stock Company:

Zurich American Insurance Company

hereafter referred to as the "Company",

WT_000489
EDGE II-D-100-C (07/20)
2  D

1.9.    PREMIUM PAYABLE

This Policy is issued in consideration of an initial premium.  The **First Named Insured** shown on the Policy is responsible for the payment of all premiums and will be the payee for any return premiums paid by the Company.  Premiums will be paid in the currency designated in Section 2.2. Currency.

1.10.    TERRITORY

Coverage under this Policy applies to all covered loss or damage that takes place in the United States of America (USA), its territories and possessions, including the District of Columbia and the Commonwealth of Puerto Rico.

For the Contingent Time Element and International Interdependency Special Coverages and Off Premises Service Interruption **Cyber Event** coverage, where the territory is extended to worldwide, the following Restricted Countries are excluded:

Afghanistan, Albania, Algeria, Angola, Armenia, Azerbaijan, Belarus, Benin, Botswana, Burkina Faso, Burundi, Cameroon, Cape Verde, Central African Republic, Chad, Comoros, Republic of Congo, Democratic Republic of the Congo, Cuba, Djibouti, Equatorial Guinea, Eritrea, Ethiopia, Gabon, Gambia, Ghana, Guinea, Guinea-Bissau, Georgia, Haiti, Iran, Iraq, Ivory Coast, Kazakhstan, Kampuchea (Cambodia), Kenya, Kyrgyzstan (Kyrgyz Republic), Laos, Lebanon, Lesotho, Liberia, Libya, Macedonia, Madagascar, Malawi, Mali, Mauritania, Mayotte, Mongolia, Montenegro, Mozambique, Myanmar (Burma), Namibia, Niger, Nigeria, North Korea, Pakistan, Palestine, Reunion, Russian Federation, Rwanda, Sao Tomé and Principé, Senegal, Serbia, Sierra Leone, Somalia, Sri Lanka, Southern Sudan, Sudan, Swaziland, Syria, Tajikistan, Tanzania, Tibet, Togo, Turkmenistan, Uganda, Ukraine, Uzbekistan, Western Sahara, Yemen, Zambia, Zimbabwe.

SECTION 2. – POLICY APPLICABILITY

2.1.    INSURED LOCATION

This Policy insures an Insured Location unless otherwise provided.

An Insured Location is a **Location**:

a.    Listed on a Schedule of Locations on file with Company; per most recent statement of values.

b.    Covered as a **Miscellaneous Unnamed Location**; or

c.    Covered under the terms and conditions of the Newly Acquired or Errors and Omissions Coverages.

2.2.    CURRENCY

All amounts, including deductibles and Limits of Liability, indicated in this Policy are in USD unless otherwise indicated by the three-letter currency designator as defined in Table A.1 Currency and Funds code list, International Standards Organization, ISO 4217, edition effective at the inception date of this Policy.

2.3.    POLICY LIMITS OF LIABILITY

The Policy Limit is  $500,000,000 for the total of all coverages combined regardless of the number of **Locations** involved subject to the following provisions:

a.    The Company will pay no more in any one (1) **Occurrence** than its proportionate share of the Policy Limit.

b.    Limits of Liability stated below or elsewhere in this Policy are part of and not in addition to the Policy Limit.

c.    When an **Annual Aggregate** Limit of Liability is shown, the company's maximum amount payable will not exceed such **Annual Aggregate** Limit of Liability.

d.    The most the Company will pay in an **Occurrence** caused by a **Described Cause of Loss** is the Limit of Liability for that **Described Cause of Loss.**

e.    Limits of Liability in an **Occurrence** apply to the total loss or damage, including any insured Time Element loss, at all **Locations** and for all coverages involved.

f.    Limits of Liability

The following are the Limits of Liability (including Time and Distance limitations) in any one (1) **Occurrence** unless otherwise shown.  The Company will pay no more in any one (1) **Occurrence** than its proportionate share.

When **NCP** is shown in the Declarations for any Special Coverage, **Described Cause of Loss** or portion of coverage, in this Policy, then any loss or damage caused by or falling within the coverage provided by that Special Coverage, **Described Cause of Loss** or portion of coverage, is not covered under this Policy.

### (1) PROPERTY DAMAGE AND TIME ELEMENT

| Limits of Liability | Coverage Part |
|---|---|
| $500,000,000 | PROPERTY DAMAGE AND TIME ELEMENT |
| | Property Damage and Time Element combined at scheduled **Locations**: on file with the Company per most recent statement of values |

But not to exceed:

| | |
|---|---|
| $10,000,000 | for new construction or additions at all **Locations** |
| 36 MONTHS | GROSS EARNINGS |

| | |
|---|---|
| 36 MONTHS | **GROSS PROFIT** |
| $100,000,000 | EXTRA EXPENSE and LEASEHOLD INTEREST (combined) |
| 365 DAYS | EXTENDED PERIOD OF LIABILITY |
| 90 days not to exceed $50,000,000 | **ORDINARY PAYROLL** |
| **NCP** | **WAGES** |

(2) SPECIAL COVERAGES

| | |
|---|---|
| **NCP** | BETTER GREEN™ UPGRADE |
| 60 days for property within 5 mile(s), not to exceed $25,000,000 | CIVIL OR MILITARY AUTHORITY |
| **NCP** | **CLOUD SERVICE** AND COMMUNICATION INTERRUPTION |
| **NCP** | COMPLETED CIVIL ENGINEERING STRUCTURES |
| $250,000 | COMPUTER SYSTEMS DAMAGE in the **Annual Aggregate** |
| $20,000,000 | CONTINGENT TIME ELEMENT but not to exceed the following limits: |
| | $20,000,000 per scheduled **Direct Dependent Time Element Location**; but not to exceed **NCP** for Extra Expense, however, **NCP** for **Earth Movement**,  **NCP** for **Flood**, **NCP** for **Named Storm**,  **NCP** for **Cyber Event**; |
| | **NCP** per scheduled **Indirect Dependent Time Element Location**; |
| | **NCP** per unscheduled **Direct Dependent Time Element Location**; |
| | **NCP** per unscheduled **Indirect Dependent Time Element Location**; |
| | **NCP** for **Indirect Dependent Time Element Location** as defined in policy line 7.33.b. (3rd or more tiers); |
| | $10,000,000 per **ATTRACTION PROPERTIES** Located within 5 mile(s) of the Insured Location; |
| $1,000,000 | CONTRACT PENALTIES |
| 1 days for events within 1 mile(s),  not to exceed $1,000,000 | CRISIS EVENT in the **Annual Aggregate** |
| $5,000,000 | DECONTAMINATION COSTS |
| **NCP** | DELAY IN COMPLETION |
| **NCP** | EMERGENCY EVACUATION EXPENSE - IMPENDING LOSS |
| $50,000,000 | ERRORS AND OMISSIONS |
| $100,000,000 | EXPEDITING COSTS |
| $5,000,000 | FINE ARTS  but not to exceed $100,000 limit per item |
| **NCP** | HISTORICAL BUILDINGS PRESERVATION |
| 30 days | IMPOUNDED WATER |
| $250,000,000 | INCREASED COST OF CONSTRUCTION |

| | |
|---|---|
| 60 days for property within 5 mile(s), not to exceed $25,000,000 | INGRESS/EGRESS |
| NCP | INTERNATIONAL INTERDEPENDENCY |
| NCP | INTERRUPTION BY **FOOD BORNE ILLNESS** OR COMMUNICABLE DISEASE |
| $1,000,000 | LAND AND WATER **CONTAMINANT** CLEANUP, REMOVAL AND DISPOSAL in the **Annual Aggregate** |
| $1,000,000 | **LAND IMPROVEMENTS** but $2,500 per tree for trees not replaced within 12 months, but not to exceed $250,000 per **Occurrence**. |
| NCP | LEASE CANCELLATION |
| NCP | LOGISTICS EXTRA COST |
| $10,000,000 | MISCELLANEOUS PERSONAL PROPERTY |
| $10,000,000 | **MISCELLANEOUS UNNAMED LOCATION** |
| NCP | **MONEY** DURING NORMAL BUSINESS HOURS |
| NCP | **MONEY** IN LOCKED SAFE OR VAULT |
| 90 days not to exceed $100,000,000 | NEWLY ACQUIRED |
| $25,000,000 | OFF PREMISES SERVICE INTERRUPTION |
| $5,000,000 | PROFESSIONAL FEES |
| $5,000,000 but not to exceed 48 hours for Gross Earnings or **Gross Profit** | PROTECTION AND PRESERVATION OF PROPERTY |
| NCP | RADIOACTIVE **CONTAMINATION** |
| NCP | RESEARCH AND DEVELOPMENT |
| NCP | RESEARCH ANIMALS |
| NCP | RETRAINING OF EMPLOYEES |
| NCP | SPOILAGE FROM ON PREMISES SERVICE INTERRUPTION |
| NCP | TENANTS ACCESS |
| NCP | TENANTS RELOCATION AND REPLACEMENT EXPENSE |
| $10,000,000 | TRANSIT |
| $100,000,000 | VALUABLE PAPERS AND RECORDS |

(3) **DESCRIBED CAUSES OF LOSS**

| | |
|---|---|
| $500,000,000 | **BREAKDOWN** OF EQUIPMENT not to exceed: $5,000,000 for Refrigerant $5,000,000 for Spoilage from **Breakdown** of **Covered Equipment** |
| NCP | **CYBER EVENT** |

| | |
|---|---|
| $250,000,000 | **EARTH MOVEMENT** in the **Annual Aggregate** but not to exceed the following limits in the **Annual Aggregate:** |
| | a). $50,000,000 for property located in Zone 1 for **Earth Movement** as described in Appendix A & B. But not to exceed: |
| | $30,000,000 in the **Annual Aggregate** for all **Locations** in Caifornia |
| | b). $50,000,000 for property located in Zone 2 for **Earth Movement** as described in Appendix A & B. |
| | c). Not Subject to  a)., and b).: |
| | $10,000,000 as respects Newly Acquired Locations<br>$10,000,000 as respects **Miscellaneous Unnamed Locations** |
| $250,000,000 | **FLOOD** in the **Annual Aggregate** but not to exceed the following limits in the **Annual Aggregate:** |
| | a). $30,000,000 for Property Insured within a High Flood Hazard Zone as described in Appendix E. |
| | b). $50,000,000 for Property Insured within a Medium Flood Hazard Zone as described in Appendix E. |
| | c). $10,000,000 for Property Insured covered under Errors and Omissions, Miscellaneous Personal Property, **Miscellaneous Unnamed Locations**, Newly Acquired or Transit Special Coverages. |
| $500,000,000 | **NAMED STORM** in the **Annual Aggregate** but not to exceed the following limits in the **Annual Aggregate:** |
| | a). $70,000,000 for property located in Zone 1 for **Named Storm** as described in Appendix C & D. |
| | b). $100,000,000 for property located in Zone 2 for **Named Storm** as described in Appendix C & D. |
| | c). Not Subject to  a)., and b).: |
| | $10,000,000 as respects Newly Acquired Locations<br>$10,000,000 as respecdts **Miscellaneous Unnamed Locations** |

g.   Causation Definition:  The following term is included in the definition of the Peril as indicated:

**Storm Surge** is part of  **Named Storm**

h.   Time Specifications:

| | |
|---|---|
| **EARTH MOVEMENT Occurrence** | 168 hours |
| **NAMED STORM Occurrence** | 72 hours |
| Cancellation for non-payment of premium | 10 days |
| Cancellation for any other reason | 45 days |

i.   Valuation as follows:

| | |
|---|---|
| **Finished Stock** | **Selling Price** |
| **Merchandise** that carries the Insured's brand or trade name | **Replacement Cost** |
| All other **Merchandise** | **Replacement Cost** |

| Vehicles | Actual Cash Value |
|---|---|

## 2.4 Qualifying Period

The **Qualifying Period** is the continuous period of time expressed in hours or days which must be exceeded before coverage under this Policy applies.  For the Special Coverages and **Described Cause(s) of Loss** listed below the following **Qualifying Period** applies:

| | |
|---|---|
| **COMPUTER SYSTEMS** DAMAGE applies separately at each Insured Location | 48 Hours |
| CRISIS EVENT applies separately at each Insured Location | 24 Hours |
| OFF PREMISES SERVICE INTERRUPTION applies separately at each Insured Location. | 12 Hours |

## 2.5. DEDUCTIBLES

Each claim for loss, damage, cost or expense as insured against arising out of any one (1) **Occurrence** shall be adjusted separately. The Company shall not be liable unless the Insured sustains covered loss, damage, costs or expense in excess of the deductible(s) stated below and then only for the proportionate share of such excess amount(s).

a. A deductible that applies on a per **Location** basis will apply separately to loss, damage, cost or expense at each **Location** where the loss or damage occurred regardless of the number of **Locations** involved in the **Occurrence**.

b. Unless stated otherwise, if two or more deductibles apply to an **Occurrence**, the total deducted will not exceed the largest applicable deductible.  If two or more deductibles apply on a per **Location** basis in an **Occurrence**, the largest deductible applying to each **Location** will be applied separately to each such **Location**. However, the applicable **Flood** deductible(s) and the applicable **Named Storm** deductible(s) will apply in addition to and regardless of any other deductibles in an **Occurrence.**

c. If separate Property Damage and Time Element loss deductibles are shown, then the deductibles shall apply separately.

d. When a "minimum deductible" per **Occurrence** is shown, the "minimum deductible" is the minimum dollar amount of covered damage that the Insured will retain in any one (1) **Occurrence**.  The amount retained for purposes of applying the "minimum deductible" is the sum of:

(1) The specified location deductible for each Insured Location where the amount of covered damage exceeds the specified location deductible; and

(2) The amount of covered damage for each Insured Location where the amount of covered damage is less than the specified location deductible.

e.  Percentage Deductibles

(1)  When a deductible applies on a percentage basis, whether separately for Property Damage or Time Element or combined for Property Damage and Time Element, the deductible will be calculated as follows:

Property Damage:  The applicable percentage (%) of the value per the most current Statement of Values on file with the Company    for the **Location** where the direct physical loss or damage occurred, per **Location**.

Time Element:  The applicable percentage (%) of the full 12 months Gross Earnings or **Gross Profit** values that would have been earned following the **Occurrence** by use of the facilities at the **Location** where the direct physical loss or damage occurred and all other **Locations** where Time Element loss ensues, per **Location**.

(2)  When a deductible applies on a percentage basis to property that is:

(a)  New construction, renovations or additions; or

(b)  Covered under the Errors and Omissions, Miscellaneous Personal Property, **Miscellaneous Unnamed  Locations**, Newly Acquired or Transit Coverages.

the most current value at the time of the loss of all Property Insured, at the location where the direct physical loss or damage occurred, will be applied in the calculation of the deductible.

f.  Policy Deductible(s)

$25,000 combined Property Damage and Time Element

per **Occurrence** except as follows:

Exceptions to Policy Deductible(s)

(1) **Breakdown** of Equipment

$25,000 combined Property Damage and Time Element

per **Location** for loss or damage caused by **Breakdown**;

(2) Contingent Time Element

$25,000 per **Location**

(3) Crisis Event
$25,000 combined Crisis Event coverages

(4) Earthquake

The following deductibles apply to loss or damage caused by or resulting from Earthquake.

$50,000 combined Property Damage  and Time Element

per **Occurrence** except as follows:

(a)  As respects **Locations** in Zone 1:

(i)   Property Damage - 5%  per **Location**.

(ii)  Time Element -  5% per **Location**.

(iii) The value of the Property Damage and Time Element  deductibles above combined.

(iv) The above Earthquake deductibles are subject to a minimum deductible of  $250,000 combined Property Damage and Time Element per **Occurrence.**

(b) As respects **Locations** in Zone 2:

    (i)  Property Damage - 2% per **Location**.

    (ii)  Time Element - 2% per **Location**.

    (iii)  The value of the Property Damage and Time Element deductibles above combined.

    (iv)  The above Earthquake deductibles are subject to a minimum deductible of $100,000 combined Property Damage and Time Element per **Occurrence.**

(5) **Flood**

The following deductibles apply to loss or damage caused by or resulting from **Flood**.

$50,000 combined Property Damage and Time Element

per **Occurrence** except as follows:

(a) As respects Property Insured within a High Hazard Zone as described in Appendix E.
    (i)  Property Damage and Time Element combined - $500,000 per **Occurrence.**

(b) As respects Property Insured within a Medium Flood Hazard Zone as described in Appendix E.

    (i)  Property Damage and Time Element combined - $100,000 per **Occurrence.**

(c) $50,000 for Property insured covered under Errors and omissions, Miscellaneous Personal Property, **Miscellaneous Unnamed Locations**, Newly Acquired or Transit Special Coverages.

(6) **Named Storm**

The following deductibles apply to loss or damage caused by or resulting from **Named Storm.**

$50,000 combined Property Damage and Time Element

per **Occurrence** except as follows:

(a) As respects **Locations** in Zone 1:

    (i)  Property Damage - 5% per **Location.**

    (ii)  Time Element - 5% per **Location.**

    (iii)  The value of the Property Damage and Time Element deductibles above combined.

    (iv)  The above **Named Storm** deductibles are subject to a minimum deductible of $250,000 combined Property Damage and Time Element per **Occurrence.**

(b) As respects **Locations** in Zone 2:

    (i)  Property Damage - 2% per **Location.**

    (ii)  Time Element - 2% per **Location**.

    (iii)  The value of the Property Damage and Time Element deductibles above combined.

    (iv)  The above **Named Storm** deductibles are subject to a minimum deductible of $100,000 combined Property Damage and Time Element per **Occurrence.**

WT_000497



# THE ZURICH EDGE II
# COVERAGE FORM

## SECTION 3. - PROPERTY DAMAGE

### 3.1.    PROPERTY INSURED

This Policy insures the following property, unless otherwise excluded elsewhere in this Policy, located at an Insured Location or within 1,000 feet thereof or as otherwise provided for in this Policy:

a. The Insured's interest in Real Property, including permanently installed machinery and equipment, construction, additions, renovations, alterations and repairs that the Insured owns, occupies, leases or rents.

b. The Insured's interest in Personal Property, including **Improvements and Betterments**.

c. Property of Others, limited to property:

    (1) In the Insured's care, custody or control;

    (2) In which the Insured has an insurable interest or obligation;

    (3) For which the Insured is legally liable; or

    (4) For which the Insured has agreed in writing prior to any loss or damage to provide coverage.

d. Personal Property of officers and employees of the Insured.

### 3.2.    PROPERTY EXCLUDED

This Policy does not insure the following property:

a. **Money**, **Digital Currency**, precious metal in bullion form, notes and **Securities** except to the extent coverage is provided by the **Money** In Locked Safe Or Vault or **Money** During Normal Business Hours Coverages of this Policy.

b. Watercraft and aircraft, except watercraft or aircraft that are manufactured by the Insured when unfueled and located at an Insured Location.

c. Spacecraft, satellites, associated launch vehicles and any property contained therein.

d. Animals, standing timber and growing crops, except to the extent coverage is provided by the Research Animals Coverage of this Policy.

e. Bridges and tunnels (when not part of a building or structure), dams, dikes, piers, wharfs, docks or bulkheads except to the extent coverage is provided by the Completed Civil Engineering Structures Coverage of this Policy.

f. Land (including underlying soil), water and any other substance in or on land; except this exclusion does not apply to:

    (1) **Land Improvements**;

    (2) Fill that alters the natural condition of land beneath covered **Land Improvements**, bridges, tunnels, dams, dikes, piers, wharfs, docks, bulkheads, railways, transformer enclosures, buildings or structures; or

    (3) Water that is contained in any enclosed tank, piping system or any other processing equipment.

g. **Land Improvements** at a golf course.

h. Mines, mineshafts, caverns and any property contained therein.

i. Vehicles licensed for use on public roads, except vehicles the Insured owns that are operated principally at an Insured Location and vehicles located at an Insured Location that the Insured

manufactures, processes, warehouses or holds for sale.  With respect to such vehicles falling within the aforementioned exception, this insurance will apply only as excess to such vehicles otherwise insured or **Self-insured** for physical loss or damage.

j.   Transmission and distribution lines situated beyond 2,000 feet of the Insured Location.

k.   Property in transit, except to the extent coverage is provided by the Transit Coverage of this Policy.

l.   All contraband property, including property in the course of illegal transit or trade.

m.   Property more specifically insured, except for any excess beyond such more specific insurance.

n.   Property sold by the Insured under a conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to customers except to the extent coverage is provided by the Deferred Payments Coverage of this Policy.

o.   **Digital Assets**, except when they are **Stock in Process**, **Finished Stock**, **Raw Materials**, supplies or **Merchandise** and to the extent coverage is provided by the **Computer Systems** Damage Coverage or if loss or damage is caused by or results from a covered **Cyber Event**.

3.3.   EXCLUSIONS

The following exclusions apply unless otherwise specifically stated elsewhere in this Policy:

a.   This Policy excludes the following unless it results from direct physical loss or damage to Property Insured not excluded by this Policy:

(1)   **Contamination**, and any cost due to **Contamination**, including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy, except to the extent coverage is provided by the Radioactive **Contamination** Coverage of this Policy.

(2)   Changes in size, color, flavor, texture or finish.

(3)   Loss or damage arising from the enforcement of any law, ordinance, regulation or rule regulating or restricting the construction, installation, repair, replacement, improvement, modification, demolition, occupancy, operation or other use, or removal including debris removal of any property.

b.   This Policy excludes:

(1)   Loss or damage arising from delay, loss of market, or loss of use.

(2)   Indirect or remote loss or damage.

(3)   Loss or damage arising from an unexplained disappearance; mysterious disappearance; or shortage disclosed on taking inventory when the factual existence of such shortage is solely dependent on inventory records.

(4)   Loss or damage resulting from the **Suspension** of the Insured's business activities, except to the extent coverage is provided by this Policy.

(5)   Any loss or damage caused by or falling within the coverage provided by any applicable Special Coverage, **Described Cause of Loss**, or portion of coverage if a Limit of Liability is identified as **NCP** in the Declarations.

(6)   Voluntary parting with title or possession of property by an Insured or anyone else to whom an Insured has entrusted the property, if induced to do so by any fraudulent scheme, trick, device or false pretense.

c.   This Policy excludes physical loss or damage directly or indirectly caused by or resulting from any of the following, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

(1)   Nuclear reaction or radiation, any by-product of nuclear reaction, any radiological material or radioactive **Contamination** however caused; but if direct physical loss of or damage to Property Insured by fire or sprinkler leakage results, the Company will pay for the loss or damage caused by the fire or sprinkler leakage.

(2) War, invasion, act of foreign enemy, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power, nationalization, confiscation, requisition, seizure or destruction by the government or any public authority, including action in hindering, combating or defending against any of these.

(3) Any weapon of war or of mass destruction employing biological or chemical warfare, atomic fission, atomic fusion, radioactive force or radioactive material, whether in time of peace or war regardless of who commits the act.

(4) Dishonest, fraudulent or criminal acts by the Insured or any of the Insured's associates, proprietors, partners, officers, employees, directors, trustees or authorized representatives.

This exclusion does not apply to direct physical loss or damage resulting from a **Covered Cause of Loss** intentionally caused by any individual specified above and done without the knowledge of the Insured.  In no event does this Policy cover loss caused by theft by any individual specified above.

(5) Lack of the following services when caused by an event that occurs off the Insured Location (except to the extent coverage is provided by the **Cloud Service** and Communication Interruption, Off Premises Service Interruption and Off Premises Service Interruption **Cyber Event** Coverages of this Policy).  However, if the lack of any of the following services results in a **Covered Cause of Loss**, this exclusion does not apply to the loss or damage caused by the **Covered Cause of Loss**:

(a) Incoming electricity, fuel, water, gas, steam or refrigerant;

(b) Outgoing sewage; or

(c) Incoming or outgoing **Cloud Service**, voice, data or video.

d.  This Policy excludes the following but any resulting physical damage not otherwise excluded is insured:

(1) Loss or damage caused by faulty, inadequate or defective design, specifications, workmanship, construction or materials used.

(2) Loss of or damage to stock or material attributable to manufacturing or processing operations while such stock or material is being processed, manufactured, tested or otherwise worked on.

(3) Loss or damage caused by corrosion, depletion, deterioration, erosion, inherent vice, latent defect, rust, wear and tear.

(4) Loss or damage caused by changes of temperature or changes in relative humidity, all whether atmospheric or not except to the extent coverage is provided by the Spoilage From On Premises Service Interruption or Spoilage From **Breakdown** Of **Covered Equipment** Coverages of this Policy.

However, this exclusion does not apply to loss or damage to machinery or equipment caused by a change in temperature.

(5) Loss or damage caused by settling, cracking, shrinking, bulging or expansion of foundations (including any pedestal, pad, platform or other property supporting machinery), floors, pavements, walls, ceilings or roofs.

(6) Loss or damage caused by insects, animals or vermin.

(7) Cumulative effects of smog, smoke, vapor, liquid or dust.

SECTION 4. – TIME ELEMENT

4.1.    LOSS INSURED

    a.   The Company will pay for the actual Time Element loss sustained by the Insured, as provided in the Time Element Coverages, during the Period of Liability.  The Time Element loss must result from the necessary **Suspension** of the Insured's business activities at an Insured Location.  The **Suspension** must be due to direct physical loss of or damage to property (of the type insurable under this Policy) caused by a **Covered Cause of Loss** at the Insured Location.

        The Company will also pay for the actual Time Element loss sustained by the Insured, during the Period of Liability, at other Insured Locations.  The Time Element loss must result from the necessary **Suspension** of the Insured's business activities at the other Insured Locations.  Such other Insured Locations must depend on the continuation of business activities at the Insured Location that sustained direct physical loss of or damage to property (of the type insurable under this Policy) caused by a **Covered Cause of Loss**.

    b.   Time Element Coverage applies only to the extent that the Insured is:

       (1)  Unable to continue business activities during the Period of Liability; and

       (2)  Able to demonstrate a loss of revenue for the business activities **Suspended**.

    c.   Time Element Coverage applies only to the extent that the loss sustained by the Insured cannot be reduced by:

       (1)  The Insured resuming business activities in whole or part;

       (2)  Using damaged or undamaged property (including **Raw Materials**, **Stock in Process** or **Finished Stock**) at the Insured Location or elsewhere;

       (3)  Using the services or property of others;

       (4)  Working extra time or overtime;

       (5)  The use of other **Locations** not covered under this Policy;

       (6)  Any amount the Insured receives for loss or damage to property valued at **Selling Price**; or

       (7)  Making up lost production within a reasonable period of time not limited to the period during which production is **Suspended**.

    d.   In determining the Time Element loss sustained by the Insured, the Company will include in any calculation the combined operating results of all Insured Locations.

    e.   In determining the Time Element loss sustained by the Insured, the Company will evaluate the experience of the business before and after the physical loss or damage and the probable experience as if the event that caused the direct physical loss or damage had not occurred.

    f.   If **NCP** is shown in the Declarations for any portion of Time Element Coverage in this Policy, then no coverage is provided for any loss falling within that portion of Time Element Coverage.

4.2.    TIME ELEMENT COVERAGES

    a.   TIME ELEMENT COVERAGE OPTION

       (1)  The Insured may elect to receive payment under only one of the following options:

          (a)  Gross Earnings plus Extended Period Of Liability; or

          (b)  **Gross Profit**.

       Coverage afforded under the option elected in a.(1) is in addition to any other Time Element Coverage applicable to the loss.

       (2)  Such option may be exercised by the Insured any time prior to:

          (a)  The Company and the Insured reaching an agreement on the amount of loss; or

          (b)  The issuance of an appraisal award per Condition f. of Subsection 6.1.

(3) If Time Element loss involves more than one **Location**, including interdependency at one or more **Locations**, such Time Element loss will be adjusted by using the single coverage option elected in a.(1) of this paragraph.

b.  GROSS EARNINGS

(1) If the Insured elects option a.(1)(a) of this Section, the Company will pay the actual Gross Earnings loss sustained by the Insured during the Period of Liability.

(2) Gross Earnings value is determined as follows:

(a) The sum of:

(i)  Total net sales value of production;

(ii) Total net sales of **Merchandise** in mercantile or non-manufacturing operations;

(iii) Rental income; and

(iv) Other income derived from the Insured's business activities, including sale of services.

(b) Less the cost of the following:

(i)  **Raw Materials** from which production is derived;

(ii) Supplies consisting of materials consumed directly in conversion of **Raw Materials** into **Finished Stock** or in supplying the service(s) sold by the Insured;

(iii) **Merchandise** sold, including related packaging materials; and

(iv) Service(s) purchased from outsiders (not the Insured's employees) for resale, which do not continue under contract.

(3) Gross Earnings loss is determined as follows:

(a) The lost Gross Earnings value as calculated in (2) above that would have been earned during the Period of Liability; minus

(b) Charges and expenses that do not necessarily continue during the Period of Liability; minus

(c) **Ordinary Payroll** that continues in excess of the number of consecutive days as stated in the Declarations or the Limit of Liability shown for **Ordinary Payroll**.

(4) The Company will pay the reasonable and necessary expenses incurred (except the cost to extinguish a fire) by the Insured to reduce the amount of Gross Earnings loss sustained during the Period of Liability.  This Policy will pay for such expenses to the extent that they do not exceed the amount of Gross Earnings loss that otherwise would have been payable.  This provision will not pay for the cost of permanent repair or replacement of property that has suffered direct physical loss or damage.

(5) The Company will pay the increased tax liability incurred by the Insured due to the profit portion of a Gross Earnings loss payment being greater than the tax liability incurred on the profits that would have been earned had no loss occurred.

c.  EXTENDED PERIOD OF LIABILITY

The Company will continue to pay the actual Gross Earnings loss sustained by the Insured after the end of the Period of Liability until the date the Insured could restore its business (with due diligence) to the condition that would have existed had no direct physical loss or damage occurred, but not to exceed the number of consecutive days, as stated in the Declarations, after the end of the Period of Liability.

d.  **GROSS PROFIT**

If the Insured elects option a.(1)(b) of this Section, the Company will pay the actual **Gross Profit** loss sustained by the Insured during the Period of Liability.

(1) **Gross Profit** loss is determined as follows:

(a) The amount calculated by multiplying the **Rate of Gross Profit** against the amount by which the **Turnover** during the Period of Liability falls short of **Standard Turnover**; minus

(b) Expenses, payable out of **Gross Profit**, that do not necessarily continue during the Period of Liability; minus

(c) **Wages** that continue in excess of the number of consecutive days as stated in the Declarations or the Limit of Liability shown for **Wages**.

(2) The Company will pay the reasonable and necessary expenses incurred (except the cost to extinguish a fire) by the Insured during the Period of Liability to minimize reduction in **Turnover**, but not to exceed the sum that is calculated by multiplying the **Rate of Gross Profit** by the amount of any reduction in **Turnover** thereby avoided.

(3) If during the Period of Liability property is sold or services rendered elsewhere than at the Insured Location for the benefit of the Insured's business activities either by the Insured or by others on the Insured's behalf, the money paid or payable in respect of such sales or services shall be brought into account in arriving at the **Turnover** during the Period of Liability.

(4) Adjustments will be made if any shortage in **Turnover** due to the direct physical loss or damage is postponed by reason of the **Turnover** being temporarily maintained from accumulated stocks of **Finished Stock** or **Merchandise** in warehouses and/or depots.

(5) The Company will pay the increased tax liability incurred by the Insured due to the profit portion of a **Gross Profit** loss payment being greater than the tax liability incurred on the profits that would have been earned had no loss occurred.

(6) The Extended Period of Liability does not apply to **Gross Profit** Coverage.

e. EXTRA EXPENSE

(1) The Company will pay for the reasonable and necessary Extra Expense incurred by the Insured, during the Period of Liability, to resume and continue as nearly as practicable the Insured's normal business activities that otherwise would be necessarily **Suspended**, due to direct physical loss of or damage to property (of the type insurable under this Policy) caused by a **Covered Cause of Loss** at an Insured Location.

(2) Extra Expense means the amount spent to continue the Insured's business activities over and above the expenses the Insured would have normally incurred, had there been no direct physical loss of or damage to property (of the type insurable under this Policy) caused by a **Covered Cause of Loss** at an Insured Location.

(a) Extra Expense includes the increased costs to purchase **Finished Stock** from third parties to fulfill orders (less payment received for the sale of such **Finished Stock**).

(b) Extra Expense does not include any Gross Earnings or **Gross Profit** loss, the cost of permanent repair or replacement of property that has suffered direct physical loss or damage, or expenses otherwise payable elsewhere in the Policy.

(3) The Company will reduce the amount payable as Extra Expense by the fair market value remaining at the end of the Period of Liability for property obtained in connection with the above.

f. LEASEHOLD INTEREST

(1) The Company will pay for the actual Leasehold Interest loss incurred by the Insured (as lessee) resulting from direct physical loss of or damage to a building (or structure) that is leased and not owned by the Insured caused by a **Covered Cause of Loss**, as follows:

(a) If the building (or structure) becomes wholly untenantable or unusable and the lease agreement requires continuation of the rent, the Company will pay the Insured the present value of the actual rent payable for the unexpired term of the lease, not including any options;

(b) If the building (or structure) becomes partially untenantable or unusable and the lease agreement requires continuation of the rent, the Company will pay the Insured for the present value of the proportionate amount of the actual rent payable for the unexpired term of the lease, not including any options; or

(c) If the lease is cancelled by the lessor pursuant to the terms of the lease agreement or by operation of law, this Policy will pay the Insured for their **Lease Interest** for the first (3) months following the loss or damage and for their **Net Lease Interest** for the remaining unexpired term of the lease.

(2) The Insured must use any suitable property or service owned, controlled, or obtainable from any source to reduce the loss.

(3) Exclusion g.(2)(a) of Subsection 4.2. is replaced with the following:

Suspension, cancellation or lapse of any contract, license or order, but if a **Suspension** covered under this Time Element Coverage directly causes the suspension, lapse or cancellation, the Company will cover the resulting Leasehold Interest loss.

(4) This Coverage excludes:

(a) Any loss from the Insured exercising an option to cancel the lease; or

(b) Any loss from an act or omission by the Insured that constitutes default under the lease.

g. EXCLUSIONS

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to Time Element Coverage:

This Policy excludes:

(1) Any loss during any idle period that would have been experienced had the **Suspension** of business activities not occurred.  This includes, but is not limited to, when production, operation, services, delivery or receipt of goods or services or any other business activities would have ceased, or would not have taken place or would have been prevented due to:

(a) Planned or rescheduled shutdowns;

(b) Strikes or other work stoppages; or

(c) Any reason other than physical loss or damage insured by this Policy.

(2) Any increase in Time Element loss due to:

(a) Suspension, cancellation or lapse of any lease, contract, license or order, but if a **Suspension** covered under a Time Element Coverage directly causes the suspension, cancellation or lapse of said lease, contract, license or order, the Company will cover the resulting actual Gross Earnings or **Gross Profit** loss sustained by the Insured during the Period of Liability and any Extended Period of Liability;

(b) Fines or damages for breach of contract or for late or non-completion of orders;

(c) Penalties of any nature, except to the extent coverage is provided by the Contract Penalties Coverage of this Policy; or

(d) Any other consequential or remote factors.

(3) Any Time Element loss sustained by the Insured resulting from loss or damage to property valued at **Selling Price**, nor the time required for their reproduction or replacement unless otherwise provided by the Extra Expense Coverage of this Policy.

(4) Any Time Element loss due to physical loss or damage not insured by this Policy on or off of the Insured Location.

However, in the event that a **Suspension** is due to a **Covered Cause of Loss** and during such **Suspension** a loss that is otherwise excluded occurs, the Company will pay for the Time Element loss which is directly caused by the **Covered Cause of Loss** to Property Insured under this Policy.

(5) Any Time Element loss resulting from damage to Property of Others; however this exclusion does not apply to Time Element loss suffered by the Insured as a direct result of the damage to Property of Others.

4.3.   PERIOD OF LIABILITY

a.   The Period of Liability applying to all Time Element Coverages except **Gross Profit** and Leasehold Interest, or if otherwise stated elsewhere in this Policy, is as follows:

(1)   For building and equipment not under construction, addition, renovation or alteration: The period starting from the time of physical loss or damage of the type insured against and ending when, with due diligence and dispatch, the building and equipment could be repaired or replaced, and made ready for business activities to resume under the same or equivalent physical and operating conditions that existed prior to the damage but not later than the number of consecutive months as stated in the Declarations.  The expiration of this Policy will not limit the Period of Liability.

(2)   For building and equipment under construction, addition, renovation or alteration: The period of time equivalent to that stated in (1) of this paragraph will be applied to the level of business activity that reasonably would have been achieved after construction and startup would have been completed had there been no direct physical loss or damage but not later than the number of consecutive months as stated in the Declarations.  Due consideration will be given to the actual experience of the business after completion of the construction and startup.

(3)   For **Merchandise** and for **Stock in Process**: The period of time required, with the exercise of due diligence and dispatch, to restore **Stock in Process** to the same state of manufacture in which it stood at the inception of the interruption of production resulting from the **Suspension** of the Insured's business activities and the period of time required to replace physically damaged **Merchandise**.

(4)   For **Raw Materials** and supplies: The period of time required, with the exercise of due diligence and dispatch, to replace **Raw Materials** and supplies damaged.

b.   The Period of Liability applying to **Gross Profit** is as follows:

(1)   The period starting from the time of direct physical loss or damage of the type insured against and continuing while the results of the business are directly affected in consequence of such loss or damage and ending not later than the number of consecutive months as stated in the Declarations.  The expiration of this Policy will not limit the Period of Liability.

(2)   For building and equipment under construction, addition, renovation or alteration:  The period starting on the date construction and startup would have been completed had there been no physical loss or damage of the type insured against and continuing while the results of the business are directly affected in consequence of such loss or damage and ending not later than the number of consecutive months as stated in the Declarations.  The expiration of this Policy will not limit the Period of Liability.

The **Rate of Gross Profit** and **Standard Turnover** will be based on the experience of the business after construction is completed and the probable experience during the Period of Liability.

c.   The Period of Liability applying to all Time Element Coverages, except Leasehold Interest or otherwise stated elsewhere in this Policy, does not include any additional time due to the Insured's inability to resume business activities for any reason, including but not limited to:

(1)   Making changes to equipment;

(2)   Making changes to Real Property except to the extent coverage is provided by the Better Green™ Upgrade, Historical Buildings Preservation or Increased Costs of Construction Coverages of this Policy; or

(3)   Re-staffing or retraining employees; except for the period of time to retrain employees to use new machinery or equipment that has been replaced under the terms of this Policy, but not to exceed the number of consecutive days, as stated in the Declarations, after installation of the replacement machinery or equipment.

## SECTION 5. – SPECIAL COVERAGES & **DESCRIBED CAUSES OF LOSS**

5.1. OPERATION OF SPECIAL COVERAGES & **DESCRIBED CAUSES OF LOSS**:

   a. Special Coverages & **Described Causes of Loss** are subject to the applicable Limit of Liability and are included within and will not increase the Policy Limit.

   b. Special Coverages & **Described Causes of Loss** are subject to the Policy provisions, including applicable exclusions and deductibles, all as shown in this section and elsewhere in this Policy, whether or not a Limit of Liability is shown.

   c. If coverage is afforded under any Special Coverage or **Described Cause of Loss**, the applicable Limit of Liability for that Special Coverage or **Described Cause of Loss** is the most the Company will pay for all loss or damage described therein even if coverage is otherwise available under any other part of this Policy.

   d. Any Time Element coverages expressly included in the description of a Special Coverage or **Described Cause of Loss** are included within any Limit of Liability for that coverage stated in f.(2) of Subsection 2.3. Unless Time Element coverages are expressly excluded within a Special Coverage or **Described Cause of Loss**, any Time Element loss covered under this Policy that is not expressly included within the description of a Special Coverage or **Described Cause of Loss** is included within the Time Element Limit of Liability as stated in section f.(1) of Subsection 2.3.

   e. If no Limit of Liability is shown in this Policy, the Limit of Liability for that Special Coverage or **Described Cause of Loss** is included within the Policy Limit.

   f. If **NCP** is shown in the Declarations for any Special Coverage, **Described Cause of Loss** or portion of coverage in this Policy, then any loss or damage caused by or falling within the coverage provided by that Special Coverage, **Described Cause of Loss** or portion of coverage, is not covered under this Policy.

   g. If two or more Limits of Liability apply to a claim for loss or damage, or some part thereof, the lesser applicable Limit of Liability will apply to the claim, or to the part thereof.

   h. The Company will pay no more in any one (1) **Occurrence** than our proportionate share of any applicable Limit of Liability regardless of the number of **Locations** affected by such an **Occurrence** and regardless of whether additional or greater limits would otherwise be available under any other part of this Policy.

   i. In the event of loss or damage involving any one or more of the following Special Coverages or **Described Causes of Loss**, the Company will pay no more for the total of all such coverages combined than our proportionate share of the Policy Limit.

5.2. SPECIAL COVERAGES

   a. ACCOUNTS RECEIVABLE

   (1) The Company will pay for the actual loss sustained by the Insured resulting from direct physical loss of or damage to the Insured's accounts receivable records caused by a **Covered Cause of Loss** as follows:

   (a) All sums due the Insured from customers, provided the Insured is unable to collect these sums;

   (b) Interest charges on any loan obtained by the Insured to offset impaired collections, but only for the period of time reasonable and necessary for the Insured to resume normal collections;

   (c) Necessary collection expenses in excess of normal collection costs; and

   (d) Other expenses, when reasonably incurred by the Insured in re-establishing accounts receivable records.

   (2) For the purpose of this Coverage, credit card charge records will be deemed to represent sums due the Insured from customers until the charge records are delivered to the credit card company.

   (3) When there is proof that direct physical loss of or damage to accounts receivable records has occurred and the Insured cannot accurately establish the total amount of accounts receivable outstanding as of the date of loss, the amount payable will be computed as the sum of:

   (a) The monthly average of accounts receivable during the last available 12 months:

(i) Adjusted in accordance with:

    i    The percentage increase or decrease in the 12 months average of monthly gross revenues which may have occurred in the interim; and

    ii    Any demonstrable variance from the average for the particular month in which the loss occurred; and

(ii) With consideration given to:

    i    The normal fluctuations in the amount of accounts receivable within the fiscal month involved; and

    ii    The total amounts of accounts evidenced by records not lost or damaged, or otherwise established or collected by the Insured; and

(iii) With deductions applied for:

    i    An amount to allow for probable bad debts which the Insured normally would have been unable to collect; and

    ii    The normal collection costs incurred due to accounts receivable.

(b) The reasonable and necessary collection expenses in excess of normal collection costs due to direct physical loss of or damage to accounts receivable records; and

(c) The reasonable and necessary expenses incurred in re-establishing accounts receivable records following direct physical loss of or damage to accounts receivable records.

(4) This Coverage excludes:

(a) Shortage resulting from:

(i) Bookkeeping, accounting or billing errors or omissions; or

(ii) Alteration, falsification, manipulation, concealment, destruction or disposal of accounts receivable records committed to conceal the wrongful giving, taking, obtaining or withholding of **Money**, **Securities** or other property; but only to the extent of such wrongful giving, taking, obtaining or withholding.

(b) Any loss, damage or shortage in **Digital Currency**.

b.  BETTER GREEN™ UPGRADE

(1) The Company will pay the reasonable and necessary costs incurred by the Insured to upgrade buildings (or structures) shown for this Coverage in the Declarations, that have incurred direct physical loss of or damage caused by a **Covered Cause of Loss**, to comply with the minimum requirements of a **Green Standard** that is applicable at the time of the loss or damage. This includes but is not limited to certification fees, accredited professional fees and engineering fees.

(2) Any increase in Time Element loss attributable to upgrading buildings (or structures) to comply with the minimum requirements of a **Green Standard**, is included within the Limit of Liability for this Coverage and is not included within the Time Element Limit of Liability as stated in f.(1) of Subsection 2.3. in the Declarations.

(3) This Coverage applies only to the physically damaged portion of the building (or structure) and does not extend to any undamaged portion, even if both damaged and undamaged portions of the building (or structure) are part of the same material, component or system.

(4) This Coverage excludes costs to upgrade:

(a) Property that processes or transmits **Electronic Data** except when that property is part of an elevator, plumbing, lighting, heating, ventilation, air conditioning or security system; or

(b) Buildings (or structures) that were certified to a **Green Standard** prior to the loss or damage.

c.  BRANDS AND LABELS

The Company will pay for the reasonable and necessary costs for the Insured or the Insured's representative to stamp "salvage", remove, or obliterate the brand, label or trade name on **Finished**

**Stock** or **Merchandise** (including its container) that carries the Insured's brand or trade name, if doing so will not damage the property, when such property has sustained direct physical loss or damage caused by a **Covered Cause of Loss** and the Company has taken possession of it.  The Insured must re-label such property or its containers to comply with any applicable law.

d.    CIVIL OR MILITARY AUTHORITY

(1)    The Company will pay for the actual Time Element loss sustained by the Insured resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** is caused by order of civil or military authority that limits, restricts or prohibits access to the Insured Location.  That order must result from a civil authority's response to direct physical loss or damage caused by a **Covered Cause of Loss** to property not insured under this Policy and located within the distance of the Insured's Location as stated in the Declarations.

(2)    The Company will pay for the actual Time Element loss sustained, subject to the deductible provisions that would have applied had the physical loss or damage occurred at the Insured Location, during the time the order remains in effect, but not to exceed the number of consecutive days following such order, as stated in the Declarations, up to the Limit of Liability applying to this Coverage.

e.    CIVIL OR MILITARY ORDER PREVENTING SPREAD OF FIRE

(1)    The Company will pay for direct physical loss of or damage to Property Insured caused by order of a civil or military authority for the purpose of preventing the spread of fire, provided the fire was caused by a **Covered Cause of Loss**.

(2)    As respects this Coverage, Exclusion c.(2) of Subsection 3.3. does not apply.

f.    **CLOUD SERVICE** AND COMMUNICATION INTERRUPTION

(1)    The Company will pay for direct physical loss of or damage to Property Insured and for the actual Time Element loss sustained by the Insured, during the **Period of Service Interruption**, at Insured Locations caused by the interruption of an incoming service consisting of **Cloud Service**, voice, data or video or from the lack of outgoing voice, data or video.

(2)    The interruption of service must result from direct physical loss of or damage to property of the supplier or property in the care, custody or control of the supplier, of such service located within this Policy's Territory, caused by a **Covered Cause of Loss** that immediately prevents in whole or in part the delivery of such usable services.

(3)    This Coverage will only apply when the **Period of Service Interruption** exceeds the time shown as **Qualifying Period** in the **Qualifying Period** clause of the Declarations section.  If the **Qualifying Period** is exceeded, then this Policy will pay for the amount of loss in excess of the applicable deductible, but not more than the Limit of Liability applying to this Coverage.  The **Qualifying Period** applies to direct physical loss of or damage to Property Insured and Time Element loss sustained.

(4)    As respects **Cloud Service** and Communication Interruption Coverage:

(a)    Exclusions a.(2), c.(5) and d. of Subsection 3.3. do not apply.

(b)    This Coverage excludes loss of or damage to Property Insured and Time Element loss sustained directly or indirectly caused by or resulting from the interruption of such services, when such interruption is caused directly or indirectly by:

(i)    The failure of the Insured to comply with the terms and conditions of any contract(s) the Insured has for the supply of such specified services;

(ii)    **Cyber Event**; or

    (iii) The failure of any satellite or any condition that causes the interruption of, or interference with, transmission(s) to or from any satellite,

regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

g. COMPLETED CIVIL ENGINEERING STRUCTURES

(1) The Company will pay for direct physical loss of or damage to bridges, tunnels, dams, dikes, wharfs, docks or bulkheads and for the actual Time Element loss sustained by the Insured, during the Period of Liability, caused by a **Covered Cause of Loss** at an Insured Location.

(2) This Coverage excludes loss of or damage to:

    (a) Off-shore property; or

    (b) River or marine bridges.

h. **COMPUTER SYSTEMS** DAMAGE

(1) The Company will pay for the:

    (a) Corruption or loss of the Insured's **Digital Assets**; and

    (b) Actual Time Element loss sustained by the Insured, during the **Period of Interruption**,

resulting from direct physical loss of or damage to **Computer Systems** or **Media** directly resulting from a **Covered Cause of Loss** at an Insured Location.

(2) This Coverage will only apply when the **Period of Interruption** exceeds the time shown as **Qualifying Period** in the **Qualifying Period** clause of the Declarations section.  If the **Qualifying Period** is exceeded, then this Policy will pay for the amount of loss in excess of the applicable deductible, but not more than the Limit of Liability applying to this Coverage.

(3) This Coverage excludes loss or damage caused by or resulting from:

    (a) **Cyber Event**; or

    (b) Errors or omissions in processing, copying, programming or machine instructions.

i. CONTINGENT TIME ELEMENT

(1) The Company will pay for the actual Time Element loss sustained by the Insured, during the Period of Liability, directly resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** results from direct physical loss of or damage to property (of the type insurable under this Policy) caused by a **Covered Cause of Loss** at **Direct Dependent Time Element Locations**, **Indirect Dependent Time Element Locations** and **Attraction Properties** located worldwide, except for in Restricted Countries as designated in Section 1.10. and any other country where prohibited by United States law or where trade relations are unlawful as determined by the Government of the United States of America or its agencies.

(2) As respects Contingent Time Element:

    (a) The Insured will influence and cooperate with the **Direct Dependent Time Element Locations**, **Indirect Dependent Time Element Locations** and **Attraction Properties** in every way and take any reasonable and necessary action, including the use of other machinery, supplies or locations, to mitigate the loss payable hereunder.

    (b) In determining the indemnity payable hereunder, the Company will consider the amount of income derived before the date of physical loss or damage and the probable amount of income after the date of loss or damage.

    (c) Exclusion g.(3) of Subsection 4.2. does not apply.

(3) Any Time Element loss directly or indirectly caused by or resulting from any **Terrorist Activity**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss is excluded when the **Direct Dependent Time Element Locations**, **Indirect Dependent Time Element Locations** and **Attraction Properties** are outside of the USA, its territories, possessions and the Commonwealth of Puerto Rico.

(4) As respects **Indirect Dependent Time Element Locations** and **Attraction Properties** any Time Element loss resulting from physical loss or damage caused by or resulting from **Cyber Event**, **Earth Movement**, **Flood**, or **Named Storm**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss is excluded.

j. CONTRACT PENALTIES

The Company will pay for contractual penalties the Insured is legally liable to pay under the provisions of a written contract due to late or non-delivery of products or services to customers that result from direct physical loss of or damage to Property Insured from a **Covered Cause of Loss** at an Insured Location.

k. CRISIS EVENT

(1) The Company will pay for **Crisis Event Expense** actually incurred by the Insured directly attributable to a violent crime, suicide or attempted suicide occurring at an Insured Location or within the distance of the Insured's Location, as stated in the Declarations, that the Insured reasonably believes threatens or impairs the reputation or goodwill of the Insured.

(2) The Company will pay for the actual Time Element loss sustained by the Insured resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** is caused by order of civil or military authority that prohibits access to the Insured Location.  That order must result from a civil or military authority's response to the violent crime, suicide or attempted suicide at the Insured Location or within the distance of the Insured's Location, as stated in the Declarations.

(3) This Coverage will only apply when the period of time that access is prohibited exceeds the time shown as **Qualifying Period** in the **Qualifying Period** clause of the Declarations section.  If the **Qualifying Period** is exceeded, then this Policy will pay for the amount of loss in excess of the Crisis Event Deductible, up to the number of consecutive days as stated in the Declarations, but not more than the Limit of Liability applying to this Coverage.

(4) This Coverage excludes any loss or expense:

(a) Otherwise payable elsewhere in this Policy; or

(b) Caused by or resulting from a violent crime, suicide or attempted suicide initiated by the Insured, or any of the Insured's associates, proprietors, partners, officers, employees, directors, trustees or authorized representatives.

l. DEBRIS REMOVAL

(1) The Company will pay the reasonable and necessary costs incurred by the Insured to demolish and remove debris of property from an Insured Location that remains following direct physical loss of or damage resulting from a **Covered Cause of Loss**.  This includes the cost to demolish the physically undamaged portion of Property Insured due to the enforcement of any law or ordinance regulating the demolition, construction, repair, replacement or use of Real Property at an Insured Location.

(2) This Coverage will also cover the costs of removal of **Contaminated** Property Insured or the **Contaminant** in or on Property Insured only if the **Contamination**, due to the actual (not suspected) presence of **Contaminant(s)**, of the debris resulted from direct physical loss or damage caused by a **Covered Cause of Loss**.

(3) This Coverage excludes costs to remove:

(a) Property Excluded that is **Contaminated**; or

(b) The **Contaminant** in or on Property Excluded, whether or not the **Contamination** results from direct physical loss or damage caused by a **Covered Cause of Loss**.

m. DECONTAMINATION COSTS

If Property Insured is **Contaminated** as a result of direct physical loss of or damage to Property Insured caused by a **Covered Cause of Loss** and there is in force at the time of the loss any law or ordinance regulating **Contamination** due to the actual (not suspected) presence of **Contaminant(s)**, then this Coverage covers, as a direct result of enforcement of such law or ordinance, the increased

cost of decontamination and/or removal of such **Contaminated** Property Insured in a manner to satisfy such law or ordinance. This Coverage applies only to that part of Property Insured so **Contaminated** due to the actual (not suspected) presence of **Contaminant(s)** as a result of direct physical loss of or damage to Property Insured.  The Company is not liable for the costs required for removing **Contaminated** Property Excluded nor the **Contaminant** therein or thereon, whether or not the **Contamination** results from a **Covered Cause of Loss**.

n.  DEFERRED PAYMENTS

(1) The Company will pay for direct physical loss of or damage to Personal Property (of the type insurable under this Policy) caused by a **Covered Cause of Loss**, that has been sold by the Insured under a conditional sale, trust agreement, or installment or deferred payment plan.  Such property must have been delivered to the buyer.

(2) In the event of loss to Personal Property sold under a deferred payment plan, the Insured will use all reasonable efforts, including legal action, if necessary, to collect outstanding amounts due or to regain possession of the property.

(3) This Coverage excludes loss or damage:

(a) Pertaining to products recalled including, but not limited to, the costs to recall, test or to advertise such recall by the Insured;

(b) From theft or conversion by the buyer of the Personal Property after the buyer has taken possession of such Personal Property;

(c) To Personal Property to the extent the buyer continues payments; or

(d) To Personal Property that is not within this Policy's Territory.

o.  DELAY IN COMPLETION

(1) The Company will pay for:

(a) The actual Gross Earnings or **Gross Profit** loss sustained by the Insured; and

(b) The soft costs which would not have been incurred if the delay in completion had not occurred, at **Locations** undergoing additions, renovations, alterations or in the course of construction, limited to the following:

(i) Construction loan fees -The additional cost incurred to rearrange loans necessary for the completion of construction, repairs or reconstruction, including; the cost to arrange refinancing, accounting work necessary to restructure financing, legal work necessary to prepare new documents, charges by the lenders for the extension or renewal of loans necessary;

(ii) Commitment fees, leasing and marketing expenses - The additional cost of returning any commitment fees received from prospective tenant(s) or purchaser(s), the cost of re-leasing and marketing due to loss of tenant(s) or purchaser(s);

(iii) Additional fees – The additional cost for: architects, engineers, consultants, attorneys and accountants needed for the completion of construction, repairs or reconstruction; and

(iv) Carrying costs – The additional cost of: property taxes, building permits, additional interest on loans, realty taxes and insurance premiums,

arising out of a delay in completion, during the **Period of Delay**, resulting from direct physical loss of or damage to construction, additions, renovations or alterations from a **Covered Cause of Loss** at a **Location**.

(2) This Coverage starts when the delay in completion exceeds the Waiting Period as stated in the Declarations.  If the Waiting Period is exceeded, then this Policy will pay up to the number of consecutive days as stated in the Declarations after the Waiting Period**,** but not more than the Limit of Liability applying to this coverage. No deductible applies to this Coverage.

p.  DOWN ZONING

(1) When Real Property at an Insured Location has incurred direct physical loss of or damage caused by a **Covered Cause of Loss** and cannot be repaired, rebuilt, or replaced due to a law or ordinance prohibiting the repairing, rebuilding, or replacing of Real Property to the same height, floor area, number of units or configuration that existed prior to the loss or damage:

    (a) The Insured may elect to:

        (i) Receive payment for the difference between **Actual Cash Value** and **Replacement Cost** for the portion of the Real Property that cannot be repaired, rebuilt, or replaced;

        (ii) Rebuild or replace the Real Property on another site subject to the **Replacement Cost** provision of j.(1) of Subsection 6.1.; or

        (iii) Receive payment for capital expenditures, as per the Capital Expenditure Election for the portion of the Real Property that cannot be repaired, rebuilt, or replaced.

    (b) However, if such law or ordinance is subject to a waiver, that would cost less than any option in (a)(i) through (iii) of this paragraph, that allows for the repair, rebuilding, or replacement of property to the original height, floor area, number of units or configuration, that existed prior to the loss or damage, this Coverage is limited to the cost of such waiver.

    (c) The Period of Liability that applies to such Real Property is the period to repair, rebuild, or replace the Real Property, with due diligence and dispatch, to the same height, floor area, number of units, or configuration, that existed prior to the loss or damage.

(2) Payment under this Down Zoning Coverage is conditional upon the law or ordinance being in force on the date of direct physical loss or damage and such ordinance or law requires compliance as a condition precedent to obtaining a building permit or certificate of occupancy.

(3) This Coverage excludes costs incurred as a direct or indirect result of enforcement of any laws or ordinances regulating any form of **Contamination**.

q. EMERGENCY EVACUATION EXPENSE – IMPENDING LOSS

(1) When there is impending loss or damage to Property Insured resulting from a **Covered Cause of Loss**, the Company will pay the reasonable and necessary costs incurred by the Insured for actions taken to temporarily evacuate occupants from the Insured Location, provided such actions are necessary to protect occupants from injury.  In the event that the Property Insured then does not suffer physical loss or damage from a **Covered Cause of Loss**, the Company will pay the reasonable and necessary costs incurred by the Insured to return occupants to the Insured Location.

(2) This Coverage will only apply when the costs incurred by the Insured exceed the amount shown in the Declarations.

(3) If that amount is exceeded, then this Policy will pay for the costs that exceed such amount, but not more than the Limit of Liability applying to this Coverage.

(4) Paragraph (2) above does not apply if the Property Insured suffers physical loss or damage from a **Covered Cause of Loss**.

r. ERRORS AND OMISSIONS

(1) The Company will pay for direct physical loss of or damage to property (of the type insurable under this Policy) caused by a **Covered Cause of Loss** which is not insured under this Policy because of an unintentional error or omission:

    (a) To include, at the time of the inception date of this Policy, any **Location** owned, occupied, leased or rented by the Insured to be Property Insured; or

    (b) In the description of any **Location** owned, occupied, leased or rented by the Insured,

    but only to the extent this Policy would have otherwise provided coverage had the unintentional error or omission not been made.

(2) The Policy also covers the actual Time Element loss sustained by the Insured, during the Period of Liability, resulting from the necessary **Suspension** of the Insured's business activities at that **Location**, if the **Suspension** is caused by direct physical loss of or damage caused by a **Covered Cause of Loss** to such property.

(3) The Insured must report any unintentional error or omission as soon as possible and pay any additional premium that may be due.

(4) This Coverage does not apply:

  (a) If there is coverage available under Newly Acquired or **Miscellaneous Unnamed Locations** Coverages of this Policy; or

  (b) For any error or omission in Limits of Liability or deductibles.

s. EXPEDITING COSTS

(1) The Company will pay the reasonable and necessary costs incurred by the Insured for the temporary repair of direct physical loss of or damage to Property Insured caused by a **Covered Cause of Loss** and to expedite the permanent repair or replacement of such damaged property.

(2) This Coverage excludes costs recoverable elsewhere in this Policy, including costs for the permanent repair or replacement of damaged property.

t. FINE ARTS

(1) The Company will pay for direct physical loss of or damage to fine arts, including bona fide works of art, works of rarity, works of historical values, works of artistic merit, photographs (positives and negatives), lithographs, illustrations, gallery proofs, original records and similar property caused by a **Covered Cause of Loss** at an Insured Location.

(2) This Policy excludes loss of or damage to fine arts directly or indirectly caused by or resulting from:

  (a) Breakage of bric-a-brac, glassware, marble, porcelain, statuary and similar fragile property resulting from the article being dropped or knocked over, whether intentional or accidental;

  (b) Any repairing, restoring or retouching process; or

  (c) Any pre-existing condition,

  regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

(3) For fine arts articles, the Company will pay the lesser of:

  (a) The reasonable and necessary cost to repair or restore such property to the physical condition that existed on the date of loss;

  (b) The reasonable and necessary cost to replace the article; or

  (c) The value stated on a schedule on file with the Company.

  If the fine arts article cannot be replaced and an appraisal is not available, the valuation will be market value based on prevailing conditions at the time of loss or damage.

u. FIRE DEPARTMENT SERVICE CHARGE

The Company will pay for the reasonable expenses:

(1) Resulting from costs of refilling or recharging fire extinguishing materials expended due to accidental discharge or in the course of protecting Property Insured; or

(2) For Fire Department service charges incurred by the Insured when the Fire Department is called to save or protect Property Insured from a **Covered Cause of Loss** at an Insured Location. The Fire Department service charges are those assumed by contract or agreement prior to loss or damage or required by local ordinance.

v. HISTORICAL BUILDINGS PRESERVATION

(1) For buildings (or structures) that are shown for this Coverage in the Declarations and that are listed with the National Register of Historic Places or that are designated as National Historic Landmarks, the Company will adjust loss or damage on a Historical Replacement Cost basis. Historical Replacement Cost will be the cost to repair, rebuild or replace the damaged parts of buildings (or structures) with the same materials, workmanship and architectural features at the same **Location** and for similar occupancy.

(2) If the same materials, workmanship and architectural features are no longer available, the Company will pay to repair, rebuild or replace with available materials, workmanship and architectural features that resemble those that existed prior to the loss or damage.

(3) Any increase in Time Element loss attributable to repairing, rebuilding or replacement on a Historical Replacement Cost basis is included within the Limit of Liability for this Coverage and is not included within the Time Element Limit of Liability as stated in f.(1) of Subsection 2.3.

(4) If repair, rebuilding or replacement has not started within 2 years from the date of direct physical loss or damage, the Company will not be liable for more than the **Actual Cash Value** of the damaged property.

w.  IMPOUNDED WATER

(1) The Company will pay for the actual Time Element loss sustained by the Insured, during the Period of Liability, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** is caused by the lack of a supply of water stored behind dams or in reservoirs on the Insured Location.  The water supply must be used as a **Raw Material** or for generation of power or for other manufacturing purposes.  The inadequate supply of water must result from the release of the water from the water supply and be caused by direct physical loss of or damage to the dam, reservoir, or connected equipment caused by a **Covered Cause of Loss**.

(2) The Company will pay for the actual Time Element loss sustained in excess of the applicable deductible, but not to exceed the number of consecutive days as stated in the Declarations after the damaged dam, reservoir or connected equipment has been repaired or replaced with the exercise of due diligence and dispatch.

(3) The Period of Liability that applies to this Coverage is the Period of Liability for **Raw Materials** in a.(4) of Subsection 4.3.

x.  INCREASED COST OF CONSTRUCTION

(1) The Company will pay the reasonable and necessary costs incurred by the Insured for the increased costs to:

(a) Repair or rebuild the physically damaged portion of Real Property; and

(b) Rebuild physically undamaged Real Property that has been demolished,

with materials and in a manner to satisfy the minimum requirement of the enforcement of any law or ordinance regulating the demolition, construction, repair, replacement or use of Real Property at an Insured Location, provided:

(c) Such law or ordinance is in force on the date of direct physical loss of or damage to Real Property caused by a **Covered Cause of Loss**; and

(d) Its enforcement is a direct result of direct physical loss of or damage to Real Property caused by a **Covered Cause of Loss**.

(2) This Coverage applies only to the costs described in (1)(a) and (b) of this paragraph.  The costs to repair, rebuild or replace property with property of like kind and quality (other than the costs described in (1)(a) and (b) of this paragraph) are not part of this Coverage and are to be considered direct physical loss of or damage under Subsection 3.1. Property Insured.

(3) This Coverage excludes costs incurred:

(a) Due to any law or ordinance with which the Insured was required to comply with before the loss, even when the Real Property was undamaged and the Insured did not comply.

(b) As a direct or indirect result of enforcement of any laws or ordinances regulating any form of **Contamination**.

y.  INGRESS/EGRESS

(1) The Company will pay for the actual Time Element loss sustained by the Insured resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if ingress or egress to that Insured Location by the Insured's suppliers, customers or employees is hindered or prevented by physical obstruction due to direct physical loss of or damage caused by a **Covered Cause of Loss** to property not insured under this Policy and located within the distance of the Insured Location as stated in the Declarations.

(2) The Company will pay for the actual Time Element loss sustained by the Insured, subject to the deductible provisions that would have applied had the physical loss or damage occurred at the Insured Location, during the time ingress or egress remains hindered or prevented by physical obstruction but not to exceed the number of consecutive days as stated in the Declarations following such obstruction, up to the Limit of Liability applying to this Coverage.

z.   INTERNATIONAL INTERDEPENDENCY

(1) The Company will pay for the actual Time Element loss sustained by the Insured, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location, if the **Suspension** is caused by direct physical loss of or damage to property (of the type insurable under this Policy) caused by a **Covered Cause of Loss** at a **Location**, that would be an Insured Location if it were located in this Policy's Territory.

(2) The **Location** that sustains direct physical loss or damage can be located anywhere in the world except within this Policy's Territory or in Restricted Countries as designated in Section 1.10. and any other country where prohibited by United States law or where trade relations are unlawful as determined by the Government of the United States of America or its agencies.

(3) The Insured Location must depend on the continuation of business activities at the **Location** that sustained direct physical loss or damage caused by a **Covered Cause of Loss**.  The Company will pay for the actual Time Element loss sustained, in excess of the applicable deductible, but not to exceed the number of consecutive days following such **Suspension** as stated in the Declarations up to the Limit of Liability applying to this Coverage.

(4) This Coverage excludes any Time Element loss directly or indirectly caused by or resulting from any **Terrorist Activity**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss, when the **Location** that would be an Insured Location if it were located in this Policy's Territory is outside of the USA, its territories, possessions and the Commonwealth of Puerto Rico.

aa.  INTERRUPTION BY **FOOD BORNE ILLNESS** OR COMMUNICABLE DISEASE

(1) The Company will pay for the actual Time Element loss sustained by the Insured resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** is caused by:

   (a) An order of an authorized governmental agency enforcing any law or ordinance regulating **Food Borne Illness** that limits, restricts or prohibits the providing of food for human consumption at an Insured Location because of the discovery or suspicion of **Food Borne Illness**; or

   (b) An order of an authorized governmental agency enforcing any law or ordinance regulating communicable diseases that limits, restricts or prohibits access to portions of an Insured Location declared uninhabitable due to the threat of the spread of communicable disease; or

   (c) A reasonable decision made by an officer of the Insured that limits, restricts or prevents access to portions of an Insured Location that they deem to be uninhabitable due to the threat of the spread of communicable disease.

(2) The Company will also pay the reasonable and necessary actual costs incurred by the Insured for:

   (a) Cleanup, removal and disposal of the actual (not suspected) presence of substances(s) causing either **Food Borne Illness** or the spread of communicable disease and to restore an Insured Location in a manner so as to satisfy such authorized governmental agency; and

   (b) Public relations services or the cost of using the Insured's employees for reputation management resulting from the actual (not suspected) presence of substances(s) causing either **Food Borne Illness** or the spread of communicable disease.

(3) This Coverage will only apply when the period of time that access is limited, restricted, prohibited or prevented exceeds the time shown as the **Qualifying Period** in the **Qualifying Period** clause of the Declarations section.  If the **Qualifying Period** is exceeded, then this Policy will pay for the amount of loss in excess of the applicable deductible, during the time the order or decision remains in effect, but not to exceed the number of consecutive days, following such order or decision, as stated in the Declarations up to the Limit of Liability applying to this Coverage.

bb. LAND AND WATER **CONTAMINANT** CLEANUP, REMOVAL AND DISPOSAL

(1) The Company will pay the reasonable and necessary costs incurred by the Insured for the cleanup, removal and disposal of the actual (not suspected) presence of **Contaminant(s)** from uninsured property consisting of land (including underlying soil), water or any other substance in or on land at the Insured Location if the release, discharge or dispersal of such **Contaminant(s)** is a result of direct physical loss of or damage to Property Insured caused by a **Covered Cause of Loss**.

(2) This Coverage excludes costs to cleanup, remove and dispose of **Contaminant**(s) from such property:

(a) At any **Location** where the Real Property is not insured by this Policy;

(b) At any property insured by the Newly Acquired, Errors and Omissions or **Miscellaneous Unnamed Location** Coverages of this Policy; or

(c) When the Insured fails to give written notice of loss to the Company within 180 days after the date of the loss.

cc. **LAND IMPROVEMENTS**

(1) The Company will pay for the cost of reclaiming, restoring or repairing **Land Improvements** resulting from direct physical loss of or damage to Property Insured caused by a **Covered Cause of Loss** at an Insured Location.

(2) The Company will pay the amount, per tree, as stated in the Declarations for damaged or lost trees which are not replaced within 12 months from the date of the loss or damage, but not to exceed the amount, per **Occurrence**, stated in the Declarations, for such trees.

(3) This Coverage excludes loss or damage to lawns, plants, shrubs or trees directly or indirectly caused by or resulting from Earthquake, **Flood** or **Named Storm**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

dd. LEASE CANCELLATION

(1) The Company will pay for the value of undamaged **Improvements and Betterments** when the Insured's lease is cancelled by the lessor due to direct physical loss of or damage to property (of the type insurable under this Policy) caused by a **Covered Cause of Loss** at an Insured Location, when such cancellation is permitted by a provision of the lease.

(2) The Company will not be liable for more than a proportion of the original cost of the **Improvements and Betterments** determined as follows:

(a) Multiply the original cost of the **Improvements and Betterments** by the number of days from the **Covered Cause of Loss** to the expiration date of the lease; and

(b) Divide the amount determined in (a) of this paragraph by the number of days from the installation of the **Improvements and Betterments** to the expiration date of the lease.

(c) If the lease contains a renewal option, the expiration of the renewal option period will replace the expiration date of the lease in this calculation.

ee. LOCKS AND KEYS

The Company will pay the reasonable and necessary costs incurred by the Insured to replace, adjust, or reprogram undamaged locks to accept new keys or entry codes at an Insured Location, made necessary due to direct physical loss of or damage to Property Insured caused by a **Covered Cause of Loss**.

ff.  LOGISTICS EXTRA COST

(1)  The Company will pay for the reasonable and necessary additional costs incurred by the Insured to continue usual business activities when the normal movement of goods or materials directly between Insured Locations or directly between an Insured Location and a **Direct Dependent Time Element Location** is disrupted.  The disruption must result from direct physical loss of or damage to property (of the type insurable under this Policy) caused by a **Covered Cause of Loss** within this Policy's Territory.

(2)  This Coverage will only apply when the period of time that the normal movement of goods or materials is disrupted exceeds the time shown as **Qualifying Period** in the **Qualifying Period** clause of the Declarations section.  If the **Qualifying Period** is exceeded, then this Policy will pay for the amount of loss in excess of the applicable deductible, up to the number of consecutive days as stated in the Declarations, but not more than the Limit of Liability applying to this Coverage.

(3)  This Coverage excludes costs:

(a)  Of permanent repair or replacement of damaged property;

(b)  Recoverable elsewhere in this Policy;

(c)  Resulting from physical loss of or damage to property insured under this Policy; or

(d)  Resulting from physical loss of or damage caused by **Earth Movement** to property (of the type insurable under this Policy) located within Zone 1 or Zone 2 as described in Appendix A.

gg. METERED SERVICES

(1)  The Company will pay for the additional expense incurred by the Insured for water, gas, or electricity charges due to the sudden and accidental escape of such service from a system or apparatus caused by a **Covered Cause of Loss** at an Insured Location.

(2)  The additional expense incurred will be determined by comparing:

(a)  The amount charged to the Insured for water, gas or electricity during the period that the sudden and accidental escape of service occurs; with

(b)  The charges the Insured would have normally incurred had there been no sudden and accidental escape of service, adjusted for any other relevant factors affecting the Insured's consumption of water, gas or electricity during such period.

(3)  This Coverage excludes expenses caused by or resulting from continuous or repeated seepage or leakage of water, gas or electricity.

hh. MISCELLANEOUS PERSONAL PROPERTY

(1)  The Company will pay for direct physical loss of or damage caused by a **Covered Cause of Loss** to the following property while within this Policy's Territory but away from an Insured Location:

(a)  The Insured's interest in Personal Property; and

(b)  Property of Others limited to property:

(i)  In the Insured's care, custody or control;

(ii)  In which the Insured has an insurable interest or obligation;

(iii)  For which the Insured is legally liable;

(iv)  For which the Insured has agreed in writing prior to any loss or damage to provide coverage; or

(v)  Under contract to be used in a construction project at an Insured Location.

(2)  This Coverage excludes property in transit or insured under any other Coverage in this Policy.

ii. **MISCELLANEOUS UNNAMED LOCATIONS**

(1)  The Company will pay for direct physical loss of or damage to Property Insured caused by a **Covered Cause of Loss** at a **Miscellaneous Unnamed Location** and the actual Time Element loss sustained by the Insured, during the Period of Liability, resulting from the necessary **Suspension** of the Insured's

business activities if such **Suspension** is caused by direct physical loss of or damage to Property Insured caused by a **Covered Cause of Loss** at a **Miscellaneous Unnamed Location**.

(2)  This Coverage excludes loss or damage that is payable under any other provision in this Policy.

jj.  **MONEY** DURING NORMAL BUSINESS HOURS

(1)  The Company will pay for loss of **Money** that occurs during normal business hours caused by theft while located inside a building at an Insured Location.

(2)  As used in this Coverage, theft means loss of **Money** by means of assault or violence upon the Insured or any employee of the Insured or entry into or exit from buildings at the Insured Location by forcible and violent means evidenced by marks of forced entry.

(3)  All loss or damage caused by one or more persons or involving a single act or series of related acts will constitute a single **Occurrence**.

(4)  The Time Element Coverages do not apply to this Coverage.

kk.  **MONEY** IN LOCKED SAFE OR VAULT

(1)  The Company will pay for loss of **Money** caused by theft while located inside a permanently installed locked safe or vault that is inside a building at an Insured Location, provided the theft does not occur during normal business hours.

(2)  As used in this Coverage, theft means loss of **Money** by means of assault or violence upon the Insured or any employee of the Insured or entry into or exit from buildings at the Insured Location by forcible and violent means evidenced by marks of forced entry or exit.

(3)  All loss or damage caused by one or more persons or involving a single act or series of related acts will constitute a single **Occurrence**.

(4)  The Time Element Coverages do not apply to this Coverage.

ll.  NEWLY ACQUIRED

(1)  The Company will pay for direct physical loss of or damage to property (of the type insurable under this Policy), caused by a **Covered Cause of Loss**, at any **Location** purchased, leased or rented by the Insured after the inception date of this Policy and the actual Time Element loss sustained by the Insured, during the Period of Liability, resulting from the necessary **Suspension** of the Insured's business activities at that **Location**, if the **Suspension** is caused by direct physical loss of or damage to such property caused by a **Covered Cause of Loss**.

(2)  This Coverage applies from the date of purchase, lease or rental and will end at the earliest of:

(a)  The Policy expiration;

(b)  The number of consecutive days as stated in the Declarations, after the Insured first acquired an interest in the Property Insured; or

(c)  When the Insured reports the **Location** to the Insurer.

mm.  OFF PREMISES SERVICE INTERRUPTION

(1)  The Company will pay for direct physical loss of or damage to Property Insured and for the actual Time Element loss sustained by the Insured during the **Period of Service Interruption** at Insured Locations caused by the partial or total interruption of an incoming service consisting of electricity, gas, fuel, steam, water, or refrigeration or from the lack of outgoing sewage service.

(2)  The interruption of service must result from direct physical loss of or damage to property of the supplier of such service located within this Policy's Territory, caused by a **Covered Cause of Loss** that immediately prevents in whole or in part the delivery of such usable services.

that immediately prevents in whole or in part the delivery of such usable services.>

(3) This Coverage will only apply when the **Period of Service Interruption** exceeds the time shown as **Qualifying Period** in the **Qualifying Period** clause of the Declarations section.  If the **Qualifying Period** is exceeded, then this Policy will pay for the amount of loss in excess of the applicable deductible, but not more than the Limit of Liability applying to this Coverage.  The **Qualifying Period** applies to direct physical loss of or damage to Property Insured and Time Element loss sustained.

(4) Exclusions a.(2), c.(5) and d. of Subsection 3.3. do not apply to this Coverage.

(5) This Coverage excludes loss of or damage to Property Insured and Time Element loss sustained directly or indirectly caused by or resulting from the interruption of such services, when such interruption is caused directly or indirectly by:

(a) The failure of the Insured to comply with the terms and conditions of any contract(s) the Insured has for the supply of such specified services;

(b) **Cyber Event**; or

(c) The failure of any satellite or any condition that causes the interruption of, or interference with, transmission(s) to or from any satellite,

regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

nn. PROFESSIONAL FEES

(1) The Company will pay for the actual costs incurred by the Insured, of reasonable fees paid to the Insured's accountants, architects, auditors, engineers, or other professionals and the cost of using the Insured's employees, for producing and certifying any details contained in the Insured's books or documents, or such other proofs, information or evidence required by the Company resulting from loss or damage payable under this Policy for which the Company has accepted liability.

(2) If shown in the Declarations, the Company will also reimburse 50% of covered costs incurred by the Insured in excess of the Limit of Liability up to the maximum limit shown in the Declarations that applies to this Coverage.

(3) This Coverage excludes the fees and costs of:

(a) Attorneys, **Public Adjusters** and loss appraisers, including any of their subsidiary, related or associated entities either partially or wholly owned by them or retained by them for the purpose of assisting them; and

(b) Consultants who provide consultation on coverage or negotiate claims.

oo. PROTECTION AND PRESERVATION OF PROPERTY

(1) The Company will pay for the reasonable and necessary costs incurred by the Insured for actions to temporarily protect or preserve Property Insured; provided such actions are necessary due to actual or impending physical loss or damage due to a **Covered Cause of Loss** to such Property Insured; and

(2) The actual Gross Earnings or **Gross Profit** loss sustained by the Insured for a period of time not to exceed the hours listed in the Declarations prior to and after the Insured first taking reasonable action for the temporary protection and preservation of Property Insured.

(3) This Coverage is subject to the deductible provisions that would have applied had the physical loss or damage occurred.

pp. RADIOACTIVE **CONTAMINATION**

The Company will pay for direct physical loss of or damage to Property Insured and for the actual Time Element loss sustained by the Insured, during the Period of Liability, at Insured Locations caused by sudden and accidental radioactive **Contamination**, including resultant radiation damage, at an Insured Location, provided the radioactive **Contamination** arises out of material at the Insured Location that is:

(1) Commonly known to be radioactive; and

(2)  Used as part of the Insured's business activities, and

there is neither a nuclear reactor capable of sustaining nuclear fission in a self-supporting chain reaction, nor any new or used nuclear fuel which is intended for or which has been used in that type of nuclear reactor at the Insured Location.

qq.  RESEARCH AND DEVELOPMENT

(1)  The Company will pay for the fixed charges and fixed expenses (including **Ordinary Payroll**) actually incurred by the Insured directly attributable to the interruption of research and development project(s) after direct physical loss of or damage to research and development project(s) caused by a **Covered Cause of Loss**, but not to exceed the number of months as stated in the Declarations, up to the Limit of Liability applying to this Coverage.

(2)  Coverage starts when there is direct physical loss of or damage to research and development project(s), caused by a **Covered Cause of Loss**, and ends the earlier of:

(a)  The time period stated in the Declarations; or

(b)  When the research and development project(s) has resumed to the same or equivalent conditions that existed immediately prior to the loss.

(3)  This Coverage excludes payment for any other Time Element loss under this Coverage.  Loss under this Coverage does not include any fixed charges and/or fixed expenses (including **Ordinary Payroll)** otherwise payable elsewhere in the Policy.

(4)  The amount the Company will pay for **Ordinary Payroll** under this Coverage will not exceed the number of consecutive days after the loss or damage occurred and any Limit of Liability, as stated in the Declarations, for **Ordinary Payroll**.

rr.  RESEARCH ANIMALS

(1)  The Company will pay for the reasonable and necessary costs incurred by the Insured to research, replace or restore a Research Animal to the animal's same condition that existed prior to the animal's death caused by a **Covered Cause of Loss**, while anywhere within this Policy's Territory, including while in transit, when the loss is in excess of the amount stated in the Declarations.  No other deductible applies to this Coverage.  This Coverage does not apply to loss of Research Animals that cannot be replaced to the same condition that existed prior to the loss.

(2)  This Coverage excludes costs caused by or resulting from:

(a)  Death or destruction from natural causes, unknown causes, medical procedures including surgery, inoculation, parturition, or abortion;

(b)  Errors or omission in processing and/or failure on the part of the Insured to provide nourishment, medicine or sanitary conditions;

(c)  **Contamination** of animal, food or medicine;

(d)  The intentional slaughter of animals;

(e)  Escape, unless directly resulting from a **Covered Cause of Loss**; or

(f)  Death or destruction resulting from activities of any animal, unless resulting from a **Covered Cause of Loss**.

(3)  The Time Element Coverages do not apply to this Coverage.

ss.  REWARD PAYMENTS

The Company will pay for the cost incurred by the Insured for rewards the Insured pays, other than to the Insured, for information leading to a conviction of any persons for arson or other crimes in connection with a **Covered Cause of Loss** to Property Insured.  No deductible applies to this Coverage.

tt.  SPOILAGE FROM ON PREMISES SERVICE INTERRUPTION

(1)  The Company will pay for spoilage of Property Insured during the **Period of Service Interruption** at Insured Locations caused by the interruption of services consisting of electricity, gas, fuel, steam, water, or refrigeration.

(2) The interruption of service must result from an accidental event that occurs at the Insured Location where the lost or damaged property is located.

(3) This Coverage will only apply when the **Period of Service Interruption** exceeds the time shown as **Qualifying Period** in the **Qualifying Period** clause of the Declarations section.  If the **Qualifying Period** is exceeded, then this Policy will pay for the amount of loss in excess of the applicable deductible, but not more than the Limit of Liability applying to this Coverage.

(4) Exclusions a.(2) and d.(4) of Subsection 3.3. do not apply to this Coverage.

(5) This Coverage excludes loss or damage directly or indirectly caused by or resulting from the interruption of such services, when such interruption is caused directly or indirectly by **Cyber Event** or by the failure of the Insured to comply with the terms and conditions of any contract(s) the Insured has for the supply of such specified services, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

uu. TENANTS ACCESS

(1) The Company will pay for the actual Gross Earnings or **Gross Profit** loss sustained resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if access by the Insured's suppliers, customers or employees is physically obstructed due to the owner, landlord or a legal representative of the building owner or landlord, hindering or preventing access to the Insured Location.

(2) This Coverage will only apply when the period of time that access is hindered or prevented exceeds the time shown as **Qualifying Period** in the **Qualifying Period** clause of the Declarations section.  If the **Qualifying Period** is exceeded, then this Policy will pay for the amount of loss in excess of the applicable deductible, up to the number of consecutive days as stated in the Declarations, but not more than the Limit of Liability applying to this Coverage.

(3) This Coverage excludes loss directly or indirectly caused by or resulting from hindered or prevented access to the Insured Location, when such hindered or prevented access is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contract(s) the Insured has for the use of such Insured Location, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

vv. TENANTS RELOCATION AND REPLACEMENT EXPENSE

(1) The Company will pay for the reasonable and necessary **Moving Costs** when the Insured's tenant(s) at an Insured Location are relocated or moved temporarily and **Tenant Replacement Costs** when the lease of the Insured's tenant(s) at an Insured Location is cancelled, due to direct physical loss of or damage to Property Insured at such Insured Location caused by a **Covered Cause of Loss**.

(2) The **Moving Costs** and **Tenant Replacement Costs** must be incurred no later than the number of consecutive days as stated in the Declarations after the building repairs have been completed. The expiration of this Policy will not limit this time period.

ww. TRANSIT

(1) The Company will pay for direct physical loss of or damage to Property Insured caused by a **Covered Cause of Loss** while such property is in transit within this Policy's Territory, including:

(a) The Insured's interest in Free on Board (F.O.B) shipments, Free-Along-Side (F.A.S) shipments and returned shipments.  The Insured's contingent interest is admitted.

(b) The Insured's loss of property caused by fraud or deceit perpetrated by any person or persons who may represent themselves to be the proper party or parties to receive goods for shipment or accept goods for delivery.

(c) The Insured's legal liability as a carrier of lawful goods and merchandise by vehicles under bills of lading or shipping receipts issued by the Insured, while in the Insured's custody or in the custody of connecting carriers in transit.

(d)  The Insured's interest in general average, salvage and other charges on shipments covered hereunder.

(2)  The Insured is granted the privilege to ship under released or limited bills of lading or shipment receipts.

(3)  This Coverage also insures the actual Time Element loss sustained by the Insured, during the Period of Liability, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location, if the **Suspension** is caused by direct physical loss of or damage to Property Insured caused by a **Covered Cause of Loss**.

(4)  Coverage starts when the vehicle transporting Property Insured leaves the originating location and ends upon arrival at the destination location and the goods are transferred to the custody or control of the consignee, warehouseman or receiver.

(5)  This Coverage excludes loss or damage to:

(a)  Property while waterborne, except:

(i)  While on the navigable inland waterways of a country;

(ii)  While on roll-on/roll-off ferries between countries; or

(iii)  While on coastal shipments.

(b)  Property shipped by mail from the time it passes into custody of any governmental postal service;

(c)  Property for sale while in the care, custody or control of the Insured's sales persons or representatives, except for such property used only for sales sample purposes;

(d)  Any conveyance used for property in transit;

(e)  Property insured under any ocean marine insurance; or

(f)  Property under airborne shipment unless by regularly scheduled passenger airlines or air freight carriers.

(6)  As respects this Coverage, Exclusion b.(6) of Subsection 3.3. does not apply.

(7)  If this Policy expires during the due course of transit, coverage is extended until the shipment is delivered to its final destination and the goods are transferred to the custody or control of the consignee, warehouseman or receiver.

xx. VALUABLE PAPERS AND RECORDS

(1)  The Company will pay for direct physical loss of or damage to inscribed, printed or written documents, manuscripts or records, including abstracts, books, deeds, drawings, films, maps, mortgages, prints and tracings, card index systems, files and tapes caused by a **Covered Cause of Loss** at an Insured Location.  The Company will pay for the value of the blank Personal Property and the reasonable and necessary costs incurred by the Insured to research, replace or restore the information lost or damaged thereon.

(2)  This Coverage excludes:

(a)  Loss of or damage to property that cannot be repaired or restored with like kind or quality; or

(b)  Loss of or damage to **Digital Assets**, **Money**, **Digital Currency** or **Securities**.

5.3.  **DESCRIBED CAUSES OF LOSS**

a.  **BREAKDOWN** OF EQUIPMENT

(1)  The Company will pay for direct physical loss of or damage to **Covered Equipment**, Time Element loss and Special Coverages loss if such loss or damage is caused by a sudden and accidental **Breakdown** of **Covered Equipment**, which manifests itself by physical damage at the time of its **Occurrence** and necessitates repair or replacement, regardless of any other cause or event contributing concurrently or in any other sequence of loss.

(2)  This Coverage includes **Breakdown** of **Covered Equipment** that occurs during operational testing.

(3) All **Breakdown(s)** at any one Insured Location that manifest themselves at the same time and are the result of the same cause will be considered one **Breakdown**.

(4) Refrigerant

The Company will pay for resulting loss or damage, including salvage expense, caused by refrigerant contacting or permeating Property Insured under refrigeration or in process requiring refrigeration caused by a sudden and accidental **Breakdown** of **Covered Equipment** at an Insured Location, but not more than the Limit of Liability applying to Refrigerant in the Declarations.

(5) Spoilage From **Breakdown** Of **Covered Equipment**

The Company will pay for spoilage of **Raw Materials**, **Stock in Process**, **Finished Stock** or **Merchandise**, caused by a sudden and accidental **Breakdown** of **Covered Equipment**, provided the **Raw Materials**, **Stock in Process**, **Finished Stock** or **Merchandise** is in storage or in the course of being manufactured, but not more than the Limit of Liability applying to Spoilage From **Breakdown** Of **Covered Equipment** in the Declarations.

b. **CYBER EVENT**

(1) The Company will pay for:

(a) **Digital Asset Replacement Expenses**;

(b) The actual Time Element loss sustained by the Insured during the **Period of Interruption**; and

(c) Costs to replace all or part of **Computer Systems** or any component thereof, when rendered nonfunctional or useless for its intended purpose,

due to a **Cyber Event** resulting in the corruption or destruction of the Insured's **Digital Assets** while within this Policy's Territory. However, ensuing physical loss or damage to Property Insured from a **Covered Cause of Loss** will not be considered loss by a **Cyber Event** within the terms and conditions of this Policy.

(2) This Coverage will only apply when the **Period of Interruption** exceeds the time shown as **Qualifying Period** in the **Qualifying Period** clause of the Declarations section. If the **Qualifying Period** is exceeded, then this Policy will pay for the amount of loss in excess of the **Cyber Event** Deductible, but not more than the Limit of Liability applying to this Coverage. The **Qualifying Period** applies to **Digital Asset Replacement Expense** and Time Element loss sustained.

(3) This Coverage, as respects to **Cyber Event**, also covers the following:

(a) Computer Forensic Expense

The reasonable fees paid to a professional or the reasonable cost of using the Insured's employees to conduct a computer forensic analysis to investigate and determine the cause and extent of loss to the Insured's **Digital Assets**.

(b) Expediting Expense

The reasonable and necessary costs incurred by the Insured to pay for the temporary repair or to expedite the permanent repair or replacement of the Insured's **Digital Assets** resulting from a **Cyber Event**. This coverage excludes the costs of the permanent repair or replacement of **Digital Assets**.

(4) Off Premises Service Interruption **Cyber Event**

(a) The Company will pay for the physical loss of or damage to Property Insured at an Insured Location and for the actual Time Element loss sustained by the Insured during the **Period of Service Interruption**, directly resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location, resulting directly or indirectly from a **Cyber Event**, regardless of any other event contributing concurrently or in any sequence to the loss, at a service provider company supplying electricity, gas, fuel, steam, water, refrigeration, voice, data, video or **Cloud Services** that immediately prevents in whole or in part the delivery of such usable services, when located worldwide, except for in Restricted Countries as designated in Section 1.10. and any other country where prohibited by United States law or where trade relations are unlawful as determined by the Government of the United States of America or its agencies.

(b)  This Coverage will only apply when the **Period of Service Interruption** exceeds the time shown as **Qualifying Period** in the **Qualifying Period** clause of the Declarations section.  If the **Qualifying Period** is exceeded, then this Policy will pay for the amount of loss in excess of the **Cyber Event** Deductible, but not more than the Limit of Liability applying to this Coverage.

(c)  This Coverage excludes physical loss of or damage to Property Insured and the Time Element loss directly or indirectly caused by or resulting from the interruption of such services, when such interruption is caused directly or indirectly by:

(i)  The failure of the Insured to comply with the terms and conditions of any contract(s) the Insured has for the supply of such specified services; or

(ii)  The failure of any satellite or any condition that causes the interruption of, or interference with, transmission(s) to or from any satellite,

regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

(5)  Protection And Preservation Of **Digital Assets**

(a)  The Company will pay the reasonable and necessary cost incurred by the Insured for actions taken to temporarily protect or preserve **Digital Assets** from further damage, during or after a **Cyber Event**, provided that such costs are over and above the Insured's normal operating expenses; and

(b)  The actual Gross Earnings or **Gross Profit** loss sustained by the Insured for a period of time not to exceed the hours listed in the Declarations as a result of the Insured taking reasonable and necessary actions to temporarily protect or preserve from further damage the Insured's **Digital Assets**, during or after a **Cyber Event**.

(c)  Protection and Preservation of **Digital Assets** coverage does not include the following costs or expenses:

(i)  To correct any deficiencies or problems or to remediate **Program** errors or vulnerabilities that existed prior to the **Cyber Event**;

(ii)  To update, restore, replace or improve any **Digital Assets** to a level beyond that which existed just prior to the **Cyber Event**, unless such costs or expenses are standard technological advancements included within any newer **Digital Assets**;

(iii)  For any contractual penalties.

(6)  **Cyber Event** Coverage excludes loss, damage, corruption or destruction to **Digital Assets** caused by or resulting from:

(a)  Errors or omissions in programming, processing or copying; or

(b)  Correcting any deficiencies or problems including remediation of **Digital Asset** errors or vulnerabilities that existed prior to the **Cyber Event**.

(7)  This Policy excludes expenses or costs of cyber extortion payments or monies paid to third parties for an act, threat or series of threats made to introduce a **Computer Virus** or gain unauthorized access to **Computer Systems**.

(8)  Notwithstanding any other provision of this Policy, including any endorsements forming a part of this Policy, any costs recoverable under **Cyber Event** are payable only under **Cyber Event** and not elsewhere in this Policy.

c.  **EARTH MOVEMENT**

(1)  The Company will pay for direct physical loss of or damage to Property Insured, Time Element loss and Special Coverages loss if such loss or damage is caused by **Earth Movement**, regardless of any other cause or event contributing concurrently or in any other sequence of loss.  However, ensuing direct physical loss of or damage to Property Insured caused by fire, explosion, theft, vandalism, sprinkler leakage or **Flood** will not be considered loss by **Earth Movement** within the terms and conditions of this Policy.

(2) All **Earth Movement** that occurs within the period defined in the Declarations will constitute a single **Occurrence**. The expiration of this Policy will not reduce that period. The Insured may elect the point in time when the period defined in the Declarations begins; but such point in time must not precede the loss of or damage to Property Insured. Any loss or damage from such **Earth Movement** occurring outside of the period defined in the Declarations for a single **Occurrence** of **Earth Movement** will constitute a separate **Occurrence** subject to any additional deductibles and Limits of Liability that apply under this Policy.

d. **FLOOD**

The Company will pay for direct physical loss of or damage to Property Insured, Time Element loss and Special Coverages loss if such loss of or damage is caused by **Flood**, regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, ensuing direct physical loss of or damage to Property Insured caused by fire, explosion, theft, vandalism or sprinkler leakage will not be considered to be loss by **Flood** within the terms and conditions of this Policy.

e. **NAMED STORM**

(1) The Company will pay for direct physical loss of or damage to Property Insured, Time Element loss and Special Coverages loss if such loss or damage is caused by **Named Storm**, regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, ensuing direct physical loss of or damage to Property Insured caused by fire, explosion, theft, vandalism, sprinkler leakage or **Flood** will not be considered loss by **Named Storm** within the terms and conditions of this Policy.

(2) All **Named Storm** damage that occurs within the period defined in the Declarations will constitute a single **Occurrence**. The expiration of this Policy will not reduce that period. The Insured may elect the point in time when the period defined in the Declarations begins; but such point in time must not precede the loss of or damage to Property Insured. Any loss or damage from such **Named Storm** occurring outside of the period defined in the Declarations for a single **Occurrence** of **Named Storm** will constitute a separate **Occurrence** subject to any additional deductibles and Limits of Liability that apply under this Policy.

## SECTION 6. – CONDITIONS

### 6.1.  LOSS ADJUSTMENT AND SETTLEMENT

#### a.  DUTIES IN THE EVENT OF LOSS OR DAMAGE

The Insured must see that the following are done in the event of loss or damage to Property Insured:

(1)  Notify the police if a law may have been broken.

(2)  Give the Company prompt notice of the loss or damage, including a description of the property involved.

(3)  As soon as possible, give the Company a description of how, when and where the loss or damage occurred.

(4)  Take all reasonable steps to protect the Property Insured from further damage.  If feasible, set the damaged property aside and in the best possible order for examination.  Also, keep a record of expenses for emergency and temporary repairs for consideration in the settlement of the claim. This will not increase the Limit of Liability.

(5)  At the Company's request, provide a complete inventory of the damaged and undamaged property, including quantities, costs, values and amount of loss claimed.

(6)  As often as reasonably required, permit the Company to inspect the property, books and records evidencing the loss or damage, including taking some or all of damaged and undamaged property for inspection, testing and analysis, and permit the Company to make copies of the Insured's books and records.

(7)  Permit the Company to question the Insured, the Insured's employees and agents under oath, while not in the presence of any other Insured and at such times as may be reasonably required, about any matter relating to this insurance or the loss or damage.  An Insured's answers must be signed or attested to by a notary public or certified court reporter.

(8)  Give the Company a signed sworn statement of loss containing the information necessary to investigate the claim.  If requested by the Company, the Company will supply the necessary form and the Insured must return this completed form within 60 days of the request or as required by law.

(9)  Cooperate with the Company in the investigation or settlement of the claim.

#### b.  CONTROL OF DAMAGED GOODS

In the event of direct physical loss of or damage to **Finished Stock** or **Merchandise**, caused by a **Covered Cause of Loss**, that carries the Insured's brand or trade name; this Policy gives control of the physically damaged property as follows:

(1)  The Insured will have full rights to the possession, control and disposition of the property.

(2)  The Insured, using reasonable judgment, will decide if the Insured can reprocess or sell the property.

(3)  The Insured will allow the Company to deduct from the amount of loss otherwise payable, the fair market salvage value of the property, which could have been obtained on any sale or other disposition of goods or products through normal insurance industry salvage practices.

#### c.  SETTLEMENT OF CLAIMS

(1)  Loss Payment

In the event of loss or damage to Property Insured, the Company will, at its option:

(a)  Pay the value of lost or damaged property;

(b)  Pay the cost of repairing or replacing the lost or damaged property;

(c)  Take all or any part of the property at an agreed valuation; or

(d)  Pay to repair, rebuild or replace the property with other property of like kind and quality.

(2)  The Company will give notice of its intentions within 30 days after receiving the sworn statement of loss or as required by law.

(3)  The Company will not pay more than the Insured's financial interest in the Property Insured.

(4)  The Company will pay for covered loss or damage within 30 days or as required by law, after receiving the sworn statement of loss, if the Insured has complied with all the terms of this Policy; and

(a)  The Company has reached agreement on the amount of loss; or

(b)  An appraisal award has been made, subject to Condition f. of Subsection 6.1.

(5)  Priority of Payment

In the event of a claim that involves more than one interest and/or coverage and/or peril; the Insured has the option to apportion recovery under this Policy when submitting final proof of loss, subject to the overall amount of claim not exceeding the applicable Limit of Liability and subject to all other terms and conditions of the Policy.

For the purpose of attachment of coverage for excess layers, claims involving any interest and/or peril covered in the primary or underlying excess layers, but not covered in higher excess layers, will be recognized by such excess layers as eroding or exhausting the Occurrence Limits of Liability of the primary and/or underlying excess layer(s).  Nothing, however, will extend coverage in such layers(s) to include loss from any interest and/or peril not covered in the excess layer(s) itself.

d.  LOSS ADJUSTMENT/PAYABLE

Loss, if any, will be adjusted with and payable to the **First Named Insured** as shown on this Policy, or as directed by the **First Named Insured**.

When a Lender or Mortgagee is named in the Certificates of Insurance on file with the Company, the Lender or Mortgagee will be included in loss payments as their interests may appear.

When a Loss Payee is named in the Certificates of Insurance on file with the Company, the Loss Payee will be included in loss payments made to the Insured as their interests may appear.  The Loss Payee has no other rights under this Policy.

When an Additional Insured is named in the Certificates of Insurance on file with the Company, the Additional Insured will be included in loss payments as their interests may appear.

e.  ABANDONMENT

There may be no abandonment of any property to the Company.

f.  APPRAISAL

If the Insured and the Company fail to agree on the value of the property or the amount of loss, each will, on the written demand of either, select a competent, disinterested, and impartial appraiser, who has no direct or indirect financial interest in the claim.  Each will notify the other of the appraiser selected within 20 days of such demand.  The Insured may not invoke Appraisal unless it has first fully complied with all provisions of this Policy, including Duties in the Event of Loss or Damage and has provided the Company with a signed and sworn statement of loss.

The appraisers will first select a competent, disinterested and impartial umpire.  If the appraisers fail to agree upon an umpire within 15 days then, on the request of the Insured or the Company, a judge of a court of record in the jurisdiction in which the appraisal is pending will select the umpire.  The appraisers will then appraise the value of the property or the amount of loss.  For each individual item of Property Insured they will each state the amount of loss based on an **Actual Cash Value** basis and a **Replacement Cost** value basis, as of the date of loss.  For a Time Element loss, they will each state the amount of loss for each Time Element Coverage of this Policy.

If the appraisers fail to agree, they will submit their differences to the umpire.  An award agreed to in writing by any two will determine the amount of loss.

An award will state separately the amount of loss based on the **Actual Cash Value** basis and **Replacement Cost** value basis as of the date of loss for each individual item of Property Insured. For Time Element loss, it will state the amount of loss for each Time Element Coverage of this Policy.

Once there is an award, the Company retains the right to apply all Policy terms and conditions (including but not limited to deductibles, **Qualifying Periods**, exclusions, and Limits of Liability) to the award. The Company further retains its right to deny the claim in whole or in part.

The Insured and the Company will each pay its chosen appraiser and bear equally the other expenses of the appraisal and umpire.

g. SUBROGATION

The Insured is required to cooperate in any subrogation proceedings. To the extent of the Company's payment, the Insured's rights of recovery against any party are transferred to the Company.

The Company acquires no rights of recovery that the Insured has expressly waived prior to a loss, nor will such waiver affect the Insured's rights under this Policy.

Any recovery from subrogation proceedings, less costs incurred by the Company in such proceedings, will be payable to the Insured in the proportion that the amount of any applicable deductible and/or any provable uninsured loss, bears to the entire provable loss amount.

h. SUIT AGAINST THE COMPANY

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless the Insured has fully complied with all the provisions of this Policy. Legal action must be started within 12 months after the date of direct physical loss of or damage to Property Insured or to other property as set forth herein.

If under the laws of the jurisdiction in which the property is located, such 12 months' limitation is invalid, then, any such legal action needs to be started within the shortest limit of time permitted by such laws.

i. PRIVILEGE TO ADJUST WITH OWNER

In the event of loss or damage involving Property of Others in the Insured's care, custody or control, the Company has the right, but not the duty to:

(1) Settle the loss or damage with the owners of such Property.

(2) Provide a defense for legal proceedings brought against the Insured. If provided, the expense for this defense will be at the Company's cost and will not reduce any applicable Limit of Liability.

j. VALUATION

In the event of any claim for direct physical loss of or damage to Property Insured:

(1) **Replacement Cost**

The basis of adjustment is on a **Replacement Cost** basis unless a specific valuation applies. However, the Company will not be liable for more than the **Actual Cash Value** of the damaged property until the damaged property has been repaired, rebuilt or replaced, at which time the difference between the **Actual Cash Value** and **Replacement Cost** will be paid if such repairs, rebuilding or replacement were started within 2 years from the date of direct physical loss or damage.

(2) Pairs, Sets or Components

The Company will pay the reduction in value of fine arts, **Finished Stock** or **Merchandise** that is part of pairs, sets or components directly resulting from physical loss of or damage to other insured parts of pairs, sets or components of such fine arts, **Finished Stock** or **Merchandise** caused by a **Covered Cause of Loss** as follows:

(a) The Company at its option will:

(i) Pay the cost of repairing or replacing any part to restore the pairs, sets or components to its value before the loss or damage;

(ii) Repair or replace any part to restore the pairs, sets or components to its value before the loss or damage; or

(iii) Pay the difference between the value of the pair, set or component before and after the loss or damage.

(b) If settlement is based on a constructive total loss, the Insured will surrender the undamaged parts of such property to the Company.

(3) The following property will be valued as specified below:

(a) **Raw Materials**

For **Raw Materials** and supplies, the **Replacement Cost**.

(b) **Stock in Process**

For **Stock in Process**, the value of **Raw Materials** and labor expended plus the proportion of overhead charges attributable to that **Stock in Process**.

(c) **Finished Stock**

For **Finished Stock** manufactured by the Insured, the valuation as stated in the Declarations. If valued at **Selling Price**, this Policy will also pay the increased tax liability incurred by the Insured due to the profit portion of a loss payment involving **Finished Stock** being greater than the tax liability of the profits that would have been earned had no loss occurred.

(d) **Merchandise**

For **Merchandise** that carries the Insured's brand or trade name, the valuation as stated in the Declarations. For all other **Merchandise**, the valuation as stated in the Declarations.

(e) Deferred Payments

For property insured under Deferred Payments, the lesser of the total amount of unpaid installments less finance charges or the **Actual Cash Value** of the property at the time of loss or the cost to repair or replace with material of like size, kind and quality.

(f) Buildings, Machinery and Equipment

For buildings (or structures) or machinery and equipment, other than stock, offered for sale on the date of loss, the cost to repair or replace but not more than the selling price.

(g) Electrical or Mechanical Equipment

For non-repairable electrical or mechanical equipment, including computer equipment, the cost to replace with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages, represents an improvement in function, or forms part of a program of system enhancement.

(h) **Improvements and Betterments**

**Improvements and Betterments** at **Replacement Cost** if such property is repaired or replaced at the expense of the Insured. For **Improvements and Betterments** which are not repaired, rebuilt or replaced at the expense of the Insured, the Company will not be liable for more than a proportion of the original cost determined as follows:

(1) Multiply the original cost of the **Improvements and Betterments** by the number of days from the date of the loss or damage to the expiration date of the lease; and

(2) Divide the amount determined in a. above by the number of days from the installation date of the **Improvements and Betterments** to the expiration date of the lease.

(3) If the lease contains a renewal option, the expiration date of the renewal option period will replace the expiration date of the lease in this procedure.

(i) Obsolete Property

For property that is useless to the Insured or obsolete, the **Actual Cash Value**.

(j) Vehicles

For vehicles, the valuation as stated in the Declarations.

(k) Capital Expenditure Election

The Insured may elect not to repair or replace damaged Property Insured, however, if loss settlement proceeds are expended on other capital expenditures, on property (of the type

insurable under this Policy) related to the business activities of the Insured, within two years from the date of loss, the **Replacement Cost** of damaged Property Insured will be paid.  As a condition of collecting under this clause, such expenditure must be unplanned as of the date of loss and be made at an Insured Location.  This clause does not extend to Increased Cost of Construction.

k.  CURRENCY FOR LOSS PAYMENT

Losses will be adjusted and paid in the currency designated in Subsection 2.2., unless directed otherwise by the Insured.  In the event of a loss adjustment involving local currency, the exchange-selling rate will be calculated as follows:

(1)  As respects the calculation of deductibles and Limits of Liability, the rate of exchange published in the Midwest Ed. of The Wall Street Journal on the date of loss.

(2)  As respects direct physical loss of or damage to Real and Personal Property:

(a)  The cost to repair or replace Real and Personal Property will be converted based on the rate of exchange published in the Midwest Ed. of The Wall Street Journal on the date of settlement.

(b)  If such property is not replaced or repaired, the conversion will be based on the rate of exchange published in the Midwest Ed. of The Wall Street Journal on the date of loss.

(3)  As respects Time Element loss, the conversion will be based on the average of the rate of exchange published in the Midwest Ed. of The Wall Street Journal on the date of loss and the rate of exchange published in the Midwest Ed. of The Wall Street Journal on the last day of the Period of Liability.

(4)  If the Midwest Ed. of The Wall Street Journal was not published on the stipulated date, the rate of exchange will be as published on the next business day.

6.2.  GENERAL PROVISIONS

a.  CANCELLATION/NON-RENEWAL

(1)  Cancellation

(a)  The **First Named Insured** shown in the Declarations may cancel this Policy by mailing or delivering to the Company advance written notice of cancellation.

(b)  The Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation at least:

(i)  The number of days before the effective date of cancellation if the Company cancels for nonpayment of premium, as stated in the Declarations; or

(ii)  The number of days before the effective date of cancellation if the Company cancels for any other reason, as stated in the Declarations.

(c)  The Company will mail or deliver notice to the **First Named Insured's** mailing address shown in the Declarations of this Policy or any Endorsement attached thereto.

(d)  Notice of cancellation will state the effective date of cancellation.  The Policy Period will end on that date.

(e)  If this Policy is cancelled, the Company will send the **First Named Insured** any premium refund due.  If the Company cancels, the refund will be pro rata.  If the **First Named Insured** cancels, the refund may be less than pro rata but no less than the customary short rate amount.  The cancellation will be effective even if the Company has not made or offered a refund.

(f)  If notice is mailed, proof of mailing will be sufficient proof of notice.

(g)  If under the laws of the jurisdiction in which the property is located, such cancellation terms or conditions are different, then cancellation terms or conditions will be as permitted by such laws.

(2)  Non-renewal

The Company may non-renew this Policy by mailing or delivering to the **First Named Insured** written notice, the number of days before the non-renewal, as permitted by law.

b.  CERTIFICATES OF INSURANCE

Any Certificate of Insurance issued in connection with this Policy is provided solely as a matter of convenience or information for the addressee(s) or holder(s) of such Certificate of Insurance, except as provided under the Policy when a loss payee(s) or mortgagee(s) are named.  The Certificate does not amend, extend or alter the coverage afforded by the Policy.

In the event this Policy is cancelled pursuant to the Cancellation/Non-Renewal provision, other than for nonpayment of premium, and except as provided otherwise, the Company will provide notice of cancellation to those entities set out in the Certificates of Insurance on file with the Company, within 30 days after notifying the **First Named Insured**.  However, in no event will failure to provide notice to entities set out in Certificates of Insurance waive the Company's right or ability to cancel the policy as allowed by law.

The Company hereby authorizes the Producer named on the Policy to issue Certificates of Insurance consistent with the foregoing.

c.  CONCEALMENT, MISREPRESENTATION OR FRAUD

This Policy is void as to all Insureds in any case of fraud by any Insured as it relates to this Policy at any time.  It is also void if any Insured, at any time, intentionally conceals or misrepresents a material fact concerning:

(1)  This Policy;

(2)  The Property Insured;

(3)  The Insured's interest in Property Insured; or

(4)  A claim under this Policy.

d.  CONFORMITY TO STATUTES

Any provisions required by law to be included in policies issued by the Company will be deemed to have been included in this Policy.

If the provisions of this Policy conflict with the laws of any jurisdictions in which this Policy applies, and if certain provisions are required by law to be stated in this Policy, this Policy will be read so as to eliminate such conflict or deemed to include such provisions for Insured Locations within such jurisdictions.

e.  INSPECTIONS AND SURVEYS

(1)  The Company has the right but not the obligation to make inspections and surveys at any time, to give the Insured reports on the conditions found, and to recommend changes.

(2)  Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged.  The Company does not make safety inspections.  The Company does not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public, nor does it represent that conditions are safe, healthful, or comply with laws, regulations, codes or standards.

(3)  This condition applies not only to the Company, but also to any rating, advisory, rate service or similar organization that makes insurance inspections, surveys, reports or recommendations.

f.  JOINT LOSS

This clause applies only if all of the following requirements are met:

(1)  The **Breakdown** of Equipment **Described Cause of Loss** is shown as **NCP** in the Declarations of this Policy and the Breakdown Of Equipment Coverage carried by the Named Insured, insuring the Property Insured contains a similar Joint Loss provision with substantially the same requirements, procedures and conditions as contained in this Policy.

(2)  The loss of or damage to the Property Insured was caused by a **Covered Cause of Loss** for which both the Insurer(s) of the Property Coverage and the Insurer(s) of the Breakdown Of Equipment Coverage admit to some liability for payment under the respective policies.

(3)  The total amount of loss is agreed to by the Insured, the Insurer(s) of the Property Coverage and the Insurer(s) of the Breakdown Of Equipment Coverage.

(4) The Insurer(s) of the Property Coverage and the Insurer(s) of the Breakdown Of Equipment Coverage disagree as to the amount of loss that both should pay that is attributable to:

(a) An accident covered under the Breakdown Of Equipment Coverage; and

(b) A **Covered Cause of Loss** under the Property Coverage.

(5) If the requirements listed above are satisfied, the Insurer(s) of the Property Coverage and of the Breakdown Of Equipment Coverage will make payments to the extent, and in the manner, described in the following:

(a) The Insurer(s) of the Breakdown Of Equipment Coverage will pay, after the Insured's written request, the entire amount of loss that they have agreed as being covered by Breakdown Of Equipment Coverage and one-half (1/2) the amount of loss that is in disagreement.

(b) The Insurer(s) of the Property Coverage will pay, after the Insured's written request, the entire amount of loss that they have agreed as being covered by the Property Coverage and one-half (1/2) the amount of loss that is in disagreement.

(c) The amount in disagreement to be paid by the Insurer(s) of the Breakdown Of Equipment Coverage and the Insurer(s) of the Property Coverage under this Joint Loss provision will not exceed the amount payable under the equivalent loss adjustment provisions of the Insurer(s) of the Property Coverage and the Breakdown Of Equipment Coverage.

(6) The amount to be paid under this Joint Loss provision will not exceed the amount that would have been paid had no Property Coverage or, in the alternative, no Breakdown Of Equipment Coverage been in effect at the time of loss.

(7) Acceptance by the Insured of sums paid under this Joint Loss provision does not alter, waive or surrender any other rights against the Insurer(s).

(8) Additional Conditions:

(a) The Insurer(s) of the Property Coverage and the Insurer(s) of the Breakdown Of Equipment Coverage agree to submit their differences to arbitration within 90 days after payment of the loss under the terms of this Joint Loss provision.

(b) The Insured agrees to cooperate with any arbitration procedures.  There will be three arbitrators: one will be appointed by the Insurer(s) of the Breakdown Of Equipment Coverage and one will be appointed by the Insurer(s) of the Property Coverage.  The two arbitrators will select a third arbitrator.  If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction.  A decision agreed to by two of the three arbitrators will be binding on both parties.  Judgment on any award can be entered in any court that has jurisdiction.  The Insurer(s) of the Breakdown Of Equipment Coverage will pay their designated arbitrator and the Insurer(s) of the Property Coverage will pay their designated arbitrator.  The Insurer(s) of the Breakdown Of Equipment and the Insurer(s) of the Property Coverage will split the expense of the third arbitrator.

g.  JURISDICTION

Any disputes arising hereunder will be exclusively subject to the jurisdiction of a court of competent jurisdiction within the USA.

h.  LENDERS LOSS PAYEE AND MORTGAGE HOLDER INTERESTS AND OBLIGATIONS

(1) When named in Certificates of Insurance on file with the Company, the Company will pay for covered loss to Property Insured under this Policy to each:

(a) Lender Loss Payee (hereinafter referred to as Lender) as its interest may appear, in order of precedence; or

(b) Mortgagee as its interest may appear, in order of precedence.

(2) The interest of the named Lender or Mortgagee in Property Insured under this Policy will not be invalidated by:

(a) Any act or neglect of any Insured.

(b) Commencement of foreclosure, notice of sale, or similar proceedings with respect to the property.

(c) Change in the title or ownership of the property.

(d) Change to a more hazardous occupancy.

(3) The Lender or Mortgagee will notify the Company of any known change in ownership, occupancy, or hazard and, within 10 days of written request by the Company, may pay the increased premium associated with such known change.  If the Lender or Mortgagee fails to pay the increased premium, all coverage under this Policy will cease.

(4) In the event of a claim, upon request of the Company, the Lender or Mortgagee will cooperate in any claim investigation.

(5) If this Policy is cancelled at the request of the Insured or its agent, the coverage for the interest of the Lender or Mortgagee will terminate 10 days after the Company sends to the Lender or Mortgagee written notice of cancellation, unless:

(a) Earlier terminated by authorization, consent, approval, acceptance, or ratification of the Insured's action by the Lender, Mortgagee, or its agent.

(b) This Policy is replaced by the Insured, with a policy providing coverage for the interest of the Lender or Mortgagee, in which event coverage under this Policy with respect to such interest will terminate as of the effective date of the replacement policy, notwithstanding any other provision of this Policy.

(6) The Company may cancel this Policy and/or the interest of the Lender or Mortgagee under this Policy, by sending the specified Lender or Mortgagee written notice 30 days prior to the effective date of cancellation, if cancellation is for any reason other than non-payment of premium.  If the Insured has failed to pay any premium due under this Policy, the Company may cancel this Policy for such non-payment, but will send the Lender or Mortgagee written notice 10 days prior to the effective date of cancellation.  If the Lender or Mortgagee fails to pay the premium due by the specified cancellation date, all coverage under this Policy will cease.

(7) The Company has the right to invoke this Policy's Suspended Property clause.  When the Company suspends the insurance, it will also apply to the interest of any Lender or Mortgagee. The Company will send the named Lender or Mortgagee, at the last known address, a copy of such notice.

(8) If the Company pays a Lender or Mortgagee for any loss, and denies payment to the Insured, the Company will, to the extent of the payment made to the Lender or Mortgagee be subrogated to the rights of the Lender or Mortgagee under all securities held as collateral.  No subrogation will impair the right of the Lender or Mortgagee to recover the full amount of its claim.  At its option, the Company may pay to a Lender or Mortgagee the whole principal due on the debt or mortgage plus any accrued interest and charges.  In this event, all rights and securities will be assigned and transferred from the Lender or Mortgagee to the Company, and the remaining debt or mortgage will be paid to the Company.

(9) If the Insured fails to render proof of loss, the Lender or Mortgagee, upon notice of the Insured's failure to do so, will render proof of loss within 60 days of notice and will be subject to the Insured's duties, obligations and provisions of this Policy when presenting a claim.

(10) In no event will the amount payable to a Lender or Mortgagee exceed the amount which would be payable to the Named Insured.

i.    LIBERALIZATION

If during the period that insurance is in force under this Policy, any filed rules or regulations are revised by statute so as to broaden this insurance without additional premium charge, such extended or broadened insurance will inure to the benefit of the Insured within such jurisdiction, effective the date of the change specified in such statute.

j.    NO REDUCTION BY LOSS

Loss or damage will not reduce the amount of insurance recoverable, except where an **Annual Aggregate** applies.  The reinstatement of any exhausted **Annual Aggregate** is not permitted unless authorized by the Company in writing.

k.    OTHER INSURANCE

Insurance that is intended to pay proportionally with this insurance as a part of a property insurance plan or program expressly written with other participants is not other insurance as described below.

(1) The Company will not be liable if, at the time of loss or damage, there is any other insurance that would attach in absence of this insurance; except, subject to (4) of this paragraph, this insurance will apply only as excess insurance, Difference in Conditions or Difference in Limits insurance after all other insurance has been exhausted. In no event will this insurance apply as contributing insurance.

(2) The Company gives the Insured permission to purchase insurance for all or any part of the deductible(s) in this Policy, and the existence of underlying insurance will not prejudice the Insured's rights under this Policy.

    (a) The deductible and any amount paid under such other insurance that would be covered under this Policy will apply to the deductible that would apply in this Policy.

    (b) This Policy will then apply on an excess, Difference in Conditions or Difference in Limits basis.

(3) The Insured can purchase excess insurance commencing on or after the inception date of this Policy that is specifically excess over the Limits of Liability set forth in this Policy without prejudice to this Policy. The existence of such other insurance will not reduce any liability under this Policy.

(4) The Company will not be liable if, at the time of loss or damage, there is any of the following other insurance that would attach in absence of this insurance:

    (a) A National Flood Insurance Program policy;

    (b) A specific policy for construction, additions, renovations or alterations; or

    (c) A specific policy for **Finished Stock**, **Merchandise**, **Raw Materials** or **Stock in Process**,

except that this insurance:

    (d) Will apply only as excess after the Limit of Liability for the other insurance described in (a) through (c) of this paragraph that has coverage for the loss or damage, has been exhausted by payment; and

    (e) Will not contribute on any basis, drop down, replace or assume any obligation within the Limit of Liability of the other insurance described in (a) through (c) of this paragraph for any reason including, difference in terms or conditions, uncollectibility or application of a sub-limit or deductible, of such insurance.

l.  POLICY MODIFICATION

(1) This Policy contains all of the agreements between the Insured and the Company concerning this insurance. The Insured and the Company may request changes to this Policy. Only endorsements issued by the Company and made a part of this Policy can change this Policy.

(2) Notice to any agent or knowledge possessed by any agent or by any other person will not create a waiver or change any part of this Policy or prevent the Company from asserting any rights under the Policy.

m.  SUSPENDED PROPERTY

When Property Insured is found to be in, or exposed to, a dangerous condition, any of the Company's representatives may immediately suspend this insurance for that property. This can be done by delivering or mailing a written notice to the **First Named Insured's** mailing address or to the address where the Property Insured is located. Once suspended, this insurance can be reinstated only by an endorsement. Any unearned premium due will be returned by the Company.

n.  TITLES

The titles of the various paragraphs and endorsements are solely for reference and will not in any way affect the provisions to which they relate.

o.  TRANSFER OF RIGHTS AND DUTIES

The Insured's rights and duties under this Policy may not be transferred without the Company giving written consent.

SECTION 7. – DEFINITIONS

The following term(s) wherever used in bold in this Policy means:

7.1.   **Actual Cash Value** - The amount it would cost to repair or replace the damaged property, on the date of loss, with material of like kind and quality, with proper deduction for physical depreciation and obsolescence, but in no event more than the fair market value.

7.2.   **Annual Aggregate** -

a.   The maximum amount of loss or damage payable in any one (1) Policy Period regardless of the number of Insured Locations, Coverages or **Occurrences** involved within the same Policy Period.

b.   Policy Period Less Than 24 Months

When the initial Policy Period is for less than 24 months, the **Annual Aggregate** applies to all loss or damage occurring during the Policy Period even if the initial Policy Period is for more than 12 months. If any such Policy is endorsed to extend the initial Policy Period by any amount of time, the **Annual Aggregate** applies to the initial Policy Period plus the extended period of time.

c.   Multi-Year Policy

When the initial Policy Period is for 24 months or more, the **Annual Aggregate** applies separately to loss or damage occurring during each separate successive 12 month period, beginning on the effective date of the Policy.  If the Policy is endorsed to extend the final 12 month period by any amount of time, the **Annual Aggregate** applies to the final 12 month period plus the extended period of time.

7.3.   **Attraction Properties** - A property within the distance described in the Declarations of an Insured Location that attracts customers to the Insured's business.

7.4.   **Average Daily Value (ADV)** - The 100% Gross Earnings or **Gross Profit** value at the Insured Location(s) where the direct physical loss or damage occurred and all other Insured Locations where Time Element loss ensues for the Policy Period divided by the number of working days in the Policy period.  **ADV** does not include **Ordinary Payroll** or **Wages** if **NCP** is shown for **Ordinary Payroll** or **Wages** on the Declarations.

7.5.   **Breakdown** -

a.   A failure of pressure or vacuum equipment;

b.   An electrical failure including arcing; or

c.   A mechanical failure including rupture or bursting caused by centrifugal force.

d.   a. through c. of this paragraph includes an explosion to a steam boiler, electric steam generator, steam piping, steam turbine, steam engine, gas turbine, or moving or rotating machinery when such explosion is caused by centrifugal force or mechanical failure; but not the explosion of gases or fuel within the furnace of any **Covered Equipment** or within the flues or passages through which the gases of combustion pass; nor combustion explosion outside the **Covered Equipment**.

e.   **Breakdown** does not mean or include:

(1)   Malfunction including but not limited to adjustment, alignment, calibration, cleaning or modification;

(2)   Defects, erasures, errors, limitations or viruses in computer equipment and **Programs**;

(3)   Leakage at any valve, fitting, shaft seal, gland packing, joint or connection;

(4)   Damage to any vacuum tube, gas tube or brush;

(5)   Damage to any structure or foundation supporting any **Covered Equipment** or any of its parts;

(6)   Functioning of any safety or protective device; or

(7)   Cracking of any part on an internal combustion gas turbine exposed to the products of combustion.

7.6.   **Certain Water** -

a.   Leakage, escape or discharge of any substance from a fire extinguishing system or equipment, caused by freezing or any other **Covered Cause of Loss**, except for discharge in response to a fire;

b.  Leakage, escape, discharge, back-up or overflow of water or steam from a plumbing, heating, air conditioning or other system or appliance, caused by freezing or any other **Covered Cause of Loss**;

c.  Accidental discharge or leakage from roof drains, gutters, downspouts or similar fixtures or equipment;

d.  Incursion, leakage or seepage of water caused by or resulting from thawing of snow, sleet or ice on a building or structure; or

e.  Incursion, leakage or seepage of rain, snow, sleet or ice, whether driven by wind or not, into the interior of a building or structure unless the building or structure first sustains damage caused by or resulting from a **Covered Cause of Loss** through which the rain, snow, sleet or ice enters.

7.7.  **Cloud Service(s)** - A contracted service in the business of storing, processing and managing the Insured's **Digital Assets** and providing access and use of software or a network of servers hosted away from the Insured Location to store, process and manage the **Digital Assets**.

7.8.  **Computer Systems** – Information Technology (IT), industrial process control or communication systems including any other item or element of IT infrastructure, computer hardware, software and electronic equipment used for the purpose of creating, accessing, processing, protecting, monitoring, storing, retrieving, displaying or transmitting **Digital Assets**.  **Computer Systems** includes associated input and output devices, computer networks and networking equipment, components, file servers, data processing equipment, microchip, microprocessors, computer chips or integrated circuits, but not including the **Digital Assets** contained therein.  **Computer Systems** also includes external drives, **Media**, CD-ROM's or DVD ROM's that are used to process, record or store **Digital Assets**.

7.9.  **Computer Virus** - Any hostile or intrusive software, **Program**, instructions, code or data including any destructive worm, logic bomb, smurf attack, cyber vandalism, malware, Trojan Horse, spyware, rootkits, ransomware, adware, keyloggers, rogue security software or malicious browsers which infiltrates and disrupts computer operations, gathers sensitive information or gains access to **Computer Systems** or **Digital Assets** without consent.

7.10.  **Contamination (Contaminated)** - Any condition of property due to the actual presence of any **Contaminant(s)**.

7.11.  **Contaminant(s)** - Any solid, liquid, gaseous, thermal or other irritant, foreign substance, pollutant or impurity, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), asbestos, ammonia, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease or illness causing agent, other hazardous substances or **Fungus**.

7.12.  **Covered Cause of Loss** – Any cause of direct physical loss of or damage unless otherwise excluded.

7.13.  **Covered Equipment** - Any boiler fired pressure vessel, unfired vessel normally subject to vacuum or internal pressure other than weight of its contents, refrigerating and air conditioning systems, any metal piping and its accessory equipment, and mechanical, or electrical machines or apparatus used for the generation, transmission, or utilization of mechanical or electrical power, not otherwise Property Excluded.

**Covered Equipment** does not include any of the following:

a.  Part of pressure or vacuum equipment that is not under internal pressure of its contents or internal vacuum;

b.  Insulating or refractory material, but not excluding the glass lining of any **Covered Equipment**;

c.  Non-metallic pressure or vacuum equipment unless it is constructed and used in accordance with the American Society of Mechanical Engineers (ASME) code or another appropriate and approved code;

d.  Catalyst;

e.  Vessels, piping and other equipment that is buried below ground and requires the excavation of materials to inspect, remove, repair or replace;

f.  Vehicles, aircraft, self-propelled equipment or floating vessels including any Property Insured (equipment) that is mounted upon or used solely with any one or more vehicle(s), aircraft, self-propelled equipment or floating vessels;

g.  Drag-line, excavation or construction equipment including any Property Insured or **Covered Equipment** that is mounted upon or used solely with any one or more drag-line, excavation, or construction equipment;

h. Felt, wire, screen, die, extrusion plate, swing hammer, grinding disc, cutting blade, non-electrical cable, chain, belt, rope, clutch plate, brake pad, non-metal part or any part or tool subject to periodic replacement; or

i. Equipment or any part of such equipment manufactured by the Insured for sale.

7.14. **Crisis Event Expense** - The reasonable and necessary expenses incurred by the Insured for:

a. A public relations firm, professional communications firm, or crisis management firm;

b. Print advertising or mailing materials to manage the reputation or goodwill of the Insured;

c. Evacuating customers, guests, employees and workers from the Insured Location due to a violent crime, suicide or attempted suicide; and

d. Temporarily relocating guests, if the Insured's business activities are public lodging, by removing guests from the Insured Location to alternative lodging and for charges at the alternative lodging facilities in excess of those that would have been charged at the Insured Location.

7.15. **Cyber Event** - Authorized access, unauthorized access, authorized use, unauthorized use, disappearance of code, malicious act, distortion, malfunction, deficiency, deletion, fault, **Computer Virus**, **Denial of Service Attack** or corruption perpetuated through the Insured's computer network, an internet enabled device or **Computer Systems** that occurs during the Policy Period.

However, as applied in:

a. **Cloud Service** and Communication Interruption Coverage;

b. Off Premises Service Interruption Coverage; and

c. Off Premises Service Interruption **Cyber Event** Coverage,

**Cyber Event** means such **Cyber Event** as defined above but perpetuated through the service provider's computer network, internet enabled device or **Computer Systems** during the Policy Period.

7.16. **Daily Value (DV)** - The 100% Gross Earnings or **Gross Profit** value at the Insured Location(s) where the direct physical loss or damage occurred and all other Insured Locations where Time Element loss ensues for the Period of Liability divided by the number of working days in such Period of Liability. **DV** does not include **Ordinary Payroll** or **Wages** if **NCP** is shown for **Ordinary Payroll** or **Wages** on the Declarations.

7.17. **Denial of Service Attack** - A malicious attack by an authorized or unauthorized party which is designed to slow, deprive or completely interrupt an authorized party from gaining access to the Insured's **Computer Systems**, **Digital Assets** or website.

7.18. **Described Cause(s) of Loss** - **Breakdown** of Equipment, **Cyber Event**, **Earth Movement**, **Flood** or **Named Storm**.

7.19. **Digital Assets** - **Electronic Data**, **Programs**, audio and image files. To the extent they exist as **Electronic Data** and only in that form, **Digital Assets** include the following: accounts, abstracts, deeds, manuscripts, or other documents. **Digital Assets** does not include **Digital Currency**, **Money** or **Securities**.

7.20. **Digital Asset Replacement Expenses** - The reasonable and necessary costs or expenses incurred by the Insured to replace, restore or recollect **Digital Assets** from written records or partially or fully matching **Electronic Data**.

7.21. **Digital Currency** - Any type of currency only available in digital form as digital money, electronic money and electronic currency including but not limited to any type of virtual currency and crypto currency.

7.22. **Direct Dependent Time Element Location** -

a. Any **Location** of a direct: customer, supplier, contract manufacturer or contract service provider to the Insured.

b. Any **Location** of any company under a royalty, licensing fee or commission agreement with the Insured.

c. A **Direct Dependent Time Element Location** does not include any company directly or indirectly supplying to, or receiving from, the Insured, electricity, fuel, gas, water, steam, refrigeration, sewage, **Cloud Service**, voice, data or video.

7.23. **Earth Movement** - Any **Earth Movement** including earthquake, landslide, mine subsidence, earth sinking, rising, shifting, tsunami, volcanic eruption, explosion, effusion or sinkhole collapse.

7.24. **Electronic Data** – Information of any kind that is recorded, transmitted or stored in a form usable in **Computer Systems** or similar devices in non-computer equipment.

7.25. **Finished Stock** -

    a. Stock, which is ready for sale by the Insured, that is manufactured:

        (1) By the Insured; or

        (2) Under the Insureds' direction and to the Insureds' specifications.

    b. For the purposes of the Gross Earnings or **Gross Profit** Coverage only:

        (1) **Finished Stock** also includes whiskey and alcoholic products being aged.

        (2) **Finished Stock** does not include stock that is held for sale at any retail outlet insured under this Policy or that has been sold, that is manufactured:

            (a) By the Insured; or

            (b) Under the Insureds' direction and to the Insureds' specifications.

7.26. **First Named Insured** - The Named Insured listed first in the Named Insured and Mailing Address section of the Declarations.

7.27. **Flood** -

    a. A general and temporary condition of partial or complete inundation of normally dry land areas or structure(s) caused by:

        (1) The unusual and rapid accumulation or runoff of surface waters, waves, tides, tidal waves, the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray from any of these, all whether driven by wind or not; or

        (2) Mudflow or mudslides caused by accumulation of water on or under the ground.

    b. **Flood** also includes the backup of water from a sewer, drain or sump caused in whole or part by **Flood**.

    c. **Flood** also includes **Storm Surge** if shown on the Declarations as part of **Flood**.

    d. **Flood** does not include **Storm Surge** if shown on the Declarations as part of **Named Storm**.

    e. **Flood** does not include loss or damage directly or indirectly caused by or resulting from waves, tides, tidal waves or tsunami, when such waves, tides, tidal waves or tsunami is caused directly or indirectly by **Earth Movement** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

7.28. **Food Borne Illness** - An incidence of food poisoning to a guest, customer, or invitee as a result of food that has been improperly stored, handled, or prepared or tainted food purchased by the Insured.

7.29. **Fungus** (or **Fungi**) - Any form of fungus including, but not limited to, yeast, mold, mildew, rust, smut, mushroom, **Spores**, mycotoxins, odors, or any other substances or gases, products or byproducts produced by, released by, or arising out of the current or past presence of **Fungi**.

7.30. **Green Standard(s)** - The following standards, products, methods and processes for improving the environment, increasing energy efficiency, and enhancing safety and property protection:

    a. LEED[®] Green Building Rating System™ of the U. S. Green Building Council;

    b. Green Globes™ Assessment and Rating System; and

    c. ENERGY STAR[®].

7.31. **Gross Profit** - The sum produced by adding to the **Net Profit or Loss**, the amount of the insured **Standing Charges**.

7.32. **Improvements and Betterments** - Fixtures, alterations, installation or additions comprising part of a building occupied, but not owned, by the Insured and acquired or made at the Insured's expense which the Insured cannot legally move.

7.33. **Indirect Dependent Time Element Location** -

    a. Any **Location** of a company that is a direct: customer, supplier, contract manufacturer or contract service provider to a **Direct Dependent Time Element Location**; or

    b. Any **Location** of a company that is an indirect: customer, supplier, contract manufacturer or contract service provider to a **Direct Dependent Time Element Location**.

    c. An **Indirect Dependent Time Element Location** does not include the locations of any company directly or indirectly supplying to, or receiving from, the **Direct Dependent Time Element Location**, electricity, fuel, gas, water, steam, refrigeration, sewage, **Cloud Service**, voice, data or video.

7.34. **Land Improvements** - Lawns, plants, shrubs or trees; pavements, roadways, sidewalks or similar works, but not including any land (including underlying soil), beneath such property.

7.35. **Lease Interest** - The excess rent paid for the same or similar replacement property over actual rent otherwise payable had there been no loss or damage, plus cash bonuses or advance rent paid (including any maintenance or operating charges) for each month during the unexpired term of the lease.

7.36. **Location** -

    a. As specified in the Schedule of Locations;

    b. If not so specified in the Schedule of Locations:

        (1) A **Location** is a building(s) bounded on all sides by public streets, clear land space or open waterways, each not less than fifty feet wide; or

        (2) A site or tract of land occupied or available for occupancy with tangible property.

7.37. **Media** - Physical data storage devices of all kinds, external drives, magnetic tapes and discs on which **Electronic Data** or **Programs** can be recorded, but not the **Electronic Data** or **Programs** themselves. **Money**, **Digital Currency** or **Securities** are not **Media**.

7.38. **Merchandise** - Goods kept for sale by the Insured which are not **Raw Materials**, **Stock in Process** or **Finished Stock**.

7.39. **Miscellaneous Unnamed Location** - A **Location** owned, leased or rented by the Insured, but not specified in a Statement of Values or Schedule of Locations.

7.40. **Money** - Currency, coins and bank notes whether or not in current use; travelers checks, register checks and money orders held for sale to the public. **Money** does not mean or include **Digital Currency** or **Securities**.

7.41. **Moving Costs** - The reasonable and necessary costs to pack and transport tenants' property, reestablish utility services at an Insured Location, assemble and set up tenants' fixtures and equipment at an Insured Location, and unpacking, including re-shelving tenants' stock and supplies at an Insured Location.

7.42. **Named Storm** - Any storm or weather disturbance that is named by the U. S. National Oceanic and Atmospheric Administration (NOAA) or the U.S. National Weather Service or the National Hurricane Center or any comparable worldwide equivalent.

    **Named Storm** also includes **Storm Surge** if shown on the Declarations as part of **Named Storm**.

7.43. **Net Lease Interest** - The present value of the **Lease Interest** discounted at six percent 6% interest compounded annually (minus the amount paid for the first (3) months **Lease Interest** following the loss or damage and any amounts otherwise payable).

7.44. **Net Profit or Loss** – The net operating profit or loss (exclusive of all capital receipts and accretions and all outlay properly chargeable to capital) resulting from the Insured's business activities after deductions have been made for all charges including depreciation but before the deduction of any taxation chargeable on profits.

7.45. **NCP** - No Coverage Provided.

7.46.   **Occurrence** - All loss(es) or damage that is attributable directly or indirectly to one **Covered Cause of Loss**.  All such loss(es) or damage will be treated as one **Occurrence**.  However, if **Occurrence** is specifically defined elsewhere in this Policy, that definition will apply to the applicable coverage provided.

7.47.   **Ordinary Payroll** - Payroll expenses for all employees except officers, executives, department managers and employees under contract.  Payroll expenses include the payroll, employee benefits (if directly related to payroll), FICA payments, Union dues and Workers' Compensation premiums the Insured pays for and tips or gratuities normally earned by the Insured's employees that would have been properly reported for tax purposes.

7.48.   **Period of Delay** - The period of time between the date construction, additions, renovations or alterations is scheduled to be completed, as stated in the construction contract(s), for the start of business activities or use and occupancy and the actual date on which business activities or use and occupancy can commence with the exercise of due diligence and dispatch.

7.49.   **Period of Interruption** - The period starting when the Insured's **Digital Assets**, **Computer Systems** or **Media** fails to operate and ending when, with due diligence and dispatch, the Insured's **Digital Assets**, **Computer Systems** or **Media** could be restored to the same or equivalent operating condition that existed prior to the failure.  The **Period of Interruption** does not include the additional time to update, restore or improve **Digital Assets**, **Computer Systems** or **Media** to a level beyond that which existed just prior to the loss damage or failure.

7.50.   **Period of Service Interruption** - The period starting when an interruption of a specified service occurs and ending when, with due diligence and dispatch, the service could be restored to the same or equivalent operating condition that existed prior to the failure.

7.51.   **Program** - Any computer software, computer applications, firmware, embedded software or recorded instructions, whether digital or otherwise, for the processing, sequencing, collecting, transmittal, recording, retrieval or storage of **Electronic Data**.

7.52.   **Public Adjusters** - Individuals or groups, including consultants, secured specifically for the purpose of representing the Insured's interest in the adjustment of a claim(s) under this Policy.

7.53.   **Qualifying Period** - The continuous period of time expressed in hours or days which must be exceeded before coverage under this Policy applies.

7.54.   **Rate of Gross Profit** - The rate of **Gross Profit** earned on the **Turnover** during the 12 months immediately prior to the date of the physical loss or damage.

7.55.   **Raw Material** - Materials in the state in which the Insured receives it for conversion into **Stock in Process** or **Finished Stock**.

7.56.   **Replacement Cost** - The cost to repair, rebuild or replace the damaged property (without deduction for depreciation) with materials of like kind, quality and capacity at the same or another site, but not more than the lesser of:

   a.   The cost to repair;

   b.   The cost to rebuild or replace on the same or another site with materials of equivalent size, kind, quality and capacity;

   c.   The necessary cost actually expended in repairing, rebuilding or replacing on the same or another site, but not exceeding the operating capacity that existed at the time of the loss; or

   d.   The Limits of Liability applicable to the lost or damaged property.

7.57.   **Securities** - Negotiable and non-negotiable instruments or contracts representing either **Money** or other property, including:

   a.   Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use;

   b.   Points or any other unit that represents value or can be redeemed for value such as loyalty or reward points; and

   c.   Evidences of debt issued in connection with credit or charge cards, which are not issued by the Insured.

   **Securities** does not mean or include **Money** or **Digital Currency**.

7.58.  **Self-insured** - Any plan of risk retention in which a program or procedure has been established other than insurance to meet the adverse result of loss or damage.

7.59.  **Selling Price** - The regular cash **Selling Price** at the Insured Location where the loss occurs, less all discounts, pilferage, waste, returns and charges to which **Finished Stock** and **Merchandise** would have been subject had no loss occurred.

7.60.  **Spores** - Any reproductive body produced by or arising out of any **Fungus** (or **Fungi**).

7.61.  **Standard Turnover** - The **Turnover** the Insured would have earned during the Period of Liability had no direct physical loss or damage occurred.

7.62.  **Standing Charges** - All costs and expenses used in determining **Net Profit or Loss**, except the following.

   a.  **Raw Materials** from which production is derived;

   b.  Supplies consisting of materials consumed directly in conversion of **Raw Materials** into **Finished Stock** or in supplying the service(s) sold by the Insured;

   c.  **Merchandise** sold, including related packaging materials;

   d.  Service(s) purchased from outsiders (not employees of the Insured) for resale, which do not continue under contract; or

   e.  Sales discounts.

7.63.  **Stock in Process** - **Raw Material** which has undergone any aging, seasoning, mechanical or other process of manufacture at the Insured Location, but which has not become **Finished Stock**.

7.64.  **Storm Surge** - A general and temporary condition of partial or complete inundation by salt water, caused by wind driven waves that result from a **Named Storm**, of normally dry land areas or structure(s) in coastal areas, bays or inland waters connected to an ocean or sea.

7.65.  **Suspension (Suspended)** -

   a.  The slowdown or cessation of the Insured's business activities; or

   b.  As respects rental income; that part or all of the Insured Location is rendered untenantable.

7.66.  **Tenant Replacement Cost** - The reasonable and necessary fees and commissions of real estate brokers or real estate agents and advertising and promotional expenses incurred by the Insured to obtain new tenant leases at an Insured Location until the percentage of occupancy at the Insured Location reaches the same level that existed at the time of loss or damage.

7.67.  **Terrorist Activity** - Any activity;

   a.  Defined as **Terrorist Activity** under the laws of the place where it is committed, or

   b.  Which involves any of the following:

      (1)  The hijacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).

      (2)  The seizing or detaining of, or threatening to kill, injure or continue to detain any person in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.

      (3)  A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of title 18, United States Code) or upon the liberty of such a person.

      (4)  An assassination.

      (5)  The use of any biological, chemical or radioactive material, nuclear material, weapon or device, explosive or firearm (other than for mere personal monetary again), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause damage to property.

      (6)  A threat, attempt, or conspiracy to do any of the foregoing.

      (7)  Any act or acts deemed or declared by any government official, law enforcement agency, intelligence agency or other public authority to be terrorism or a terrorist act(s).

7.68.   **Turnover** - The money (less discounts allowed) paid or payable to the Insured for goods sold and delivered and for services rendered in the course of the Insured's business activities.

7.69.   **Vegetated Roof** - A roof system that includes growing vegetation planted over a waterproofing membrane.

7.70.   **Wages** - The remuneration (including where applicable bonuses, overtime, living allowance (if any) national insurance contribution, holiday pay or other payments pertaining to **Wages** of all employees other than those whose remuneration is treated as salaries in the Insured's books of account.

# Appendix A - Earth Movement/Earthquake Zones for USA including its Commonwealths and Territories

This list is for informational purposes only and does not convey any coverage under the policy.



| Country - The United States of America | | |
|---|---|---|
| State | Zone | Counties/Parishes/Independent Cities |
| ALABAMA | 3 | Colbert, Franklin, Lauderdale, Lawrence, Limestone, Morgan |
| | 4 | Balance of State |
| ALASKA | 1 | Balance of State |
| | 2 | North Slope |
| ARIZONA | 4 | Entire State |
| ARKANSAS | 1 | Clay, Craighead, Crittenden, Cross, Greene, Lee, Mississippi, Poinsett, St Francis |
| | 2 | Independence, Jackson, Lawrence, Lonoke, Monroe, Phillips, Prairie, Randolph, Sharp, White, Woodruff |
| | 3 | Arkansas, Cleburne, Cleveland, Desha, Drew, Faulkner, Fulton, Grant, Izard, Jefferson, Lincoln, Pulaski, Saline, Stone |
| | 4 | Balance of State |
| CALIFORNIA | 1 | Entire State |
| COLORADO | 4 | Entire State |
| CONNECTICUT | 4 | Entire State |
| DELAWARE | 4 | Entire State |
| District of COLUMBIA | 4 | Entire District |
| FLORIDA | 4 | Entire State |
| GEORGIA | 4 | Entire State |
| HAWAII | 1 | Entire State |
| IDAHO | 3 | Bannock, Bear Lake, Caribou, Franklin, Oneida, Power |
| | 4 | Balance of State |
| ILLINOIS | 1 | Alexander, Pulaski |
| | 2 | Bond, Clay, Clinton, Edwards, Franklin, Gallatin, Hamilton, Hardin, Jackson, Jefferson, Johnson, Lawrence, Madison, Marion, Massac, Monroe, Perry, Pope, Randolph, Richland, St. Clair, Saline, Union, Wabash, Washington, Wayne, White, Williamson |
| | 3 | Calhoun, Christian, Clark, Coles, Crawford, Cumberland, Douglas, Edgar, Effingham, Fayette, Greene, Jasper, Jersey, Macoupin, Montgomery, Morgan, Moultrie, Pike, Sangamon, Scott, Shelby |
| | 4 | Balance of State |
| INDIANA | 2 | Crawford, Daviess, Dubois, Gibson, Greene, Knox, Lawrence, Martin, Orange, Perry, Pike, Posey, Spencer, Sullivan, Vanderburgh, Warrick |
| | 3 | Brown, Clay, Fayette, Johnson, Morgan, Monroe, Owen, Rush, Shelby, Union, Vigo |
| | 4 | Balance of State |

| Country - The United States of America | | |
|---|---|---|
| State | Zone | Counties/Parishes/Independent Cities |
| IOWA | 4 | Entire State |
| KANSAS | 4 | Entire State |
| KENTUCKY | 1 | Ballard, Carlisle, Fulton, Hickman, McCracken |
| | 2 | Breckinridge, Butler, Caldwell, Calloway, Christian, Crittenden, Daviess, Graves, Hancock, Henderson, Hopkins, Livingston, Logan, Lyon, Marshall, McLean, Muhlenberg, Ohio, Simpson, Todd, Trigg, Union, Warren, Webster |
| | 4 | Balance of State |
| LOUISIANA | 4 | Entire State |
| MAINE | 4 | Entire State |
| MARYLAND | 4 | Entire State |
| MASSACHUSETTS | 4 | Entire State |
| MICHIGAN | 4 | Entire State |
| MINNESOTA | 4 | Entire State |
| MISSISSIPPI | 1 | DeSoto, Tunica |
| | 2 | Alcorn, Benton, Bolivar, Coahoma, Lafayette, Leflore, Marshall, Panola, Pontotoc, Prentiss, Quitman, Sunflower, Tallahatchie, Tate, Tippah, Tishomingo, Union, Yalobusha |
| | 3 | Calhoun, Carroll, Chickasaw, Choctaw, Clay, Grenada, Holmes, Humphreys , Issaquena, Itawamba, Lee, Lowndes, Monroe, Montgomery, Oktibbeha, Sharkey, Warren, Washington, Webster, Yazoo |
| | 4 | Balance of State |
| MISSOURI | 1 | Bollinger, Butler, Cape Girardeau, Dunklin, Mississippi, New Madrid, Pemiscot, Scott, Stoddard |
| | 2 | Carter, Iron, Jefferson, Madison,  Oregon, Perry, Reynolds, Ripley, St. Francois, Ste. Genevieve, St. Charles, St. Louis, Washington, Wayne, and the City of St Louis |
| | 3 | Audrain, Callaway, Cole, Crawford, Dent, Franklin, Gasconade, Howell, Lincoln, Maries, Marion, Miller, Montgomery, Osage,  Phelps, Pike, Pulaski, Ralls, Shannon, Texas, Warren |
| | 4 | Balance of State |
| MONTANA | 4 | Entire State |
| NEBRASKA | 4 | Entire State |
| NEVADA | 1 | Carson City, Douglas |
| | 2 | Lyon , Storey, Washoe |
| | 3 | Clark |
| | 4 | Balance of State |
| NEW HAMPSHIRE | 4 | Entire State |
| NEW JERSEY | 4 | Entire State |
| NEW MEXICO | 4 | Entire State |

| Country - The United States of America | | |
|---|---|---|
| State | Zone | Counties/Parishes/Independent Cities |
| NEW YORK | 4 | Entire State |
| NORTH CAROLINA | 4 | Entire State |
| NORTH DAKOTA | 4 | Entire State |
| OHIO | 4 | Entire State |
| OKLAHOMA | 4 | Entire State |
| OREGON | 2 | Clackamas, Multnomah, Washington |
| | 3 | Benton, Clatsop, Columbia, Coos, Curry, Douglas, Hood River, Jackson, Josephine, Lane, Lincoln, Linn, Marion, Polk, Tillamook, Yamhill |
| | 4 | Balance of State |
| PENNSYLVANIA | 4 | Entire State |
| RHODE ISLAND | 4 | Entire State |
| SOUTH DAKOTA | 4 | Entire State |
| SOUTH CAROLINA | 1 | Berkely, Charleston, Dorchester |
| | 3 | Bamberg, Beaufort, Calhoun, Clarendon, Colleton, Georgetown, Hampton, Jasper, Orangeburg, Richland, Sumter, Williamsburg |
| | 4 | Balance of State |
| TENNESSEE | 1 | Crockett, Dyer, Haywood, Lake, Lauderdale, Obion, Shelby, Tipton |
| | 2 | Benton, Carroll, Chester, Decatur, Fayette, Gibson, Hardeman, Hardin, Henderson, Henry, Humphreys, Madison, McNairy, Weakley |
| | 3 | Cheatham, Davidson, Dickson, Hickman, Houston, Lawrence, Lewis, Montgomery, Perry, Robertson, Stewart, Wayne |
| | 4 | Balance of State |
| TEXAS | 4 | Entire State |
| UTAH | 2 | Davis, Salt Lake, Utah |
| | 3 | Cache, Morgan, Rich, Summit, Wasatch, Weber |
| | 4 | Balance of State |
| VERMONT | 4 | Entire State |
| VIRGINIA | 4 | Entire State |
| WASHINGTON | 1 | Clallam, Island, Jefferson, King, Kitsap, Mason, Pierce, San Juan, Thurston |
| | 2 | Skagit, Snohomish, Whatcom |
| | 3 | Clark, Cowlitz, Grays Harbor, Lewis, Pacific, Skamania, Wahkiakum, |
| | 4 | Balance of State |
| WEST VIRGINIA | 4 | Entire State |
| WISCONSIN | 4 | Entire State |
| WYOMING | 4 | Entire State |

| Commonwealths and Territories of The United States of America | | |
|---|---|---|
| | Zone | |
| AMERICAN SAMOA | 2 | Entire Territory |
| GUAM | 1 | Entire Territory |
| NORTHERN MARIANA ISLANDS | 2 | Entire Commonwealth |
| PUERTO RICO | 1 | Entire Commonwealth |
| U.S. VIRGIN ISLANDS | 1 | Entire Territory for Limits of Liability |
| | 2 | Entire Territory for Deductibles |
| All other US Territories and Possessions | 2 | Entire Territory |

# Appendix B – Earth Movement/Earthquake Zones Worldwide Except USA its Commonwealths and Territories



This list is for informational purposes only and does not convey any coverage under the policy.

| Country | Zone | Provinces/Territories/States/Counties |
|---|---|---|
| ALBANIA | 1 | Entire Country |
| ALGERIA | 2 | Balance of Country |
| | 4 | Adrar, Bechar, Tamanghasset, Ouargla, Illizi, Tindouf, Ghardaia |
| ANDORRA | 4 | Entire Country |
| ANGUILLA | 1 | Entire Country for Limits of Liability |
| | 2 | Entire Country for Deductibles |
| ANTARCTICA | 3 | Entire Country |
| ANTIGUA & BARBUDA | 4 | Entire State |
| ARGENTINA | 1 | Mendoza, Neuquen, San Juan |
| | 2 | Catamarca, Jujuy, Salta, Tucuman |
| | 4 | Balance of Country |
| ARMENIA | 1 | Entire Country |
| ARUBA | 3 | Entire Country |
| AUSTRALIA including Christmas Island, Cocos (Keeling) Islands | 2 | Christmas Island , Cocos (Keeling) Islands |
| | 3 | Western Australia |
| | 4 | Balance of Country |
| AUSTRIA | 4 | Entire Country |
| AZERBAIJAN | 1 | Entire Country |
| BAHAMAS | 4 | Entire Country |
| BAHRAIN | 4 | Entire Country |
| BANGLADESH | 1 | Entire Country |
| BARBADOS | 1 | Entire Country for Limits of Liability |
| | 2 | Entire Country for Deductibles |
| BELARUS | 4 | Entire Country |
| BELGIUM | 3 | Entire Country |
| BELIZE | 2 | Entire Country |
| BENIN | 4 | Entire Country |
| BERMUDA | 4 | Entire Country |
| BHUTAN | 1 | Balance of Country |
| | 2 | Gasa |

| Country | Zone | Provinces/Territories/States/Counties |
|---|---|---|
| BOLIVIA | 1 | La Paz |
| | 2 | Oruro, Potosi, Tarija |
| | 3 | Beni, Chuquisaca, Cochabamba, Pando, Santa Cruz |
| BOSNIA & HERZEGOVINA | 2 | Entire Country |
| BOTSWANA | 4 | Entire Country |
| BRAZIL | 4 | Entire Country |
| BRITISH VIRGIN ISLANDS | 1 | Entire Country for Limits of Liability |
| | 2 | Entire Country for Deductibles |
| BRUNEI DARUSSALAM | 3 | Entire Country |
| BULGARIA | 2 | Entire Country |
| BURKINA FASO | 4 | Entire Country |
| BURUNDI | 2 | Entire Country |
| CAMBODIA | 4 | Entire Country |
| CAMEROON | 3 | Entire Country |
| CANADA | 2 | British Columbia, Ontario, Quebec, Yukon except listed postal codes with first 3 characters in Zones 3 and 4 |
| | 3 | British Columbia Postal Codes: V8C,V8G,V0M,V0T,V0V,V1M,V2P,V2R,V2S,V2T,V2V,V2W,V2X,V2Y, V3B,V3C,V3E,V3G,V3H,V3J,V3K,V3L,V3N,V3R,V3T,V3V,V3Y,V4N,V4R ,V4S,V4W,V4X,V4Z,V5A,V5B,V5C,V5E,V5G,V5H,V5J,V5K,V5L,V5M, V5N,V5R,V5T,V5V,V5Y,V5Z,V6A,V6B,V6C,V6E,V6G,V6H,V6J,V6K,V6L, V6R,V6T,V6Z,V7G,V7H,V7J,V7K,V7L,V7M,V7N,V7P,V7R,V7S,V7T, V7V,V7W,V7X,V7Y,V8B,V8J New Brunswick Postal Codes: E1G,E1N,E1V,E1X,E2A,E2E,E2G,E2H,E2J,E2K,E2L,E2M,E2N,E2P, E2R,E2S,E2V,E3A,E3B,E3C,E3E,E3L,E3N,E3V,E3Y,E3Z,E4A,E4B, E4C,E4E,E4G,E4J,E4S,E4T,E4V,E4W,E4X,E4Y,E4Z,E5A,E5B,E5C, E5E,E5H,E5J,E5K,E5L,E5M,E5N,E5P,E5R,E5S,E5T,E5V,E6A,E6B,E6C ,E6E,E6G,E6H,E6J,E6K,E6L,E 7A,E7B,E7C,E7E,E7G,E7H,E7J,E7K,E7L,E7M,E7N,E7P,E8A,E8B,E8C, E8E,E8G,E8J,E8K,E8L,E8M,E8N,E8P, E8R,E9A,E9B,E9C,E9E,E9G,E9H, Ontario Postal Codes: K0E,K0G,K6T,K6V,K7A,K7H Quebec Postal Codes: G0E,G0J,G0K,G0M,G0N,G0P,G0S,G0V,G0Y,G0Z,G4R,G4S,G5B,G5J, G5X,G5Y,G5Z,G6A,G6B,G6E,G6G,G6H,G6J,G6K,G6L,G6P,G6R,G6S, G6T,G7A,G7B,G7G,G7H,G7J,G7K,G7N,G7P,G7S,G7T,G7X,G7Y,G7Z, G8A,J0A,J0B,J0E,J0H,J0J,J1A,J1C,J1E,J1G,J1H,J1J,J1K,J1L,J1M,J1N, J1R,J1S,J1T,J1X,J2G,J2H,J2J, J2K,J2L,J2M,J2N,J2R,J2S,J2T,J2X,J3M,J9V |

| Country | Zone | Provinces/Territories/States/Counties |
|---|---|---|
| CANADA (continued) | 4 | British Columbia Postal Codes:<br>V0C,V0J,V1J,V2K,V2M,V0A,V0B,V0E,V0G,V0H,V0K,V0L,V0W,V0X,V1A,V1B,V1C,V1E,V1G,V1H,V1K,V1L,V1N,V1P,V1R,V1S,V1T,V1V,V1W,V1X,V1Y,V1Z,V2A,V2B,V2C,V2E,V2G,V2H,V2J,V2L,V2N,V4T,V4V<br>Ontario Postal Codes:<br>K0H,K0K,K0L,K0M,K7G,K7K,K7L,K7M,K7N,K7P,K7R,K8N,K8P,K8R,K8V,K9A,K9H,K9J,K9K,K9L,K9V,<br>L0A,L0B,L0C,L0E,L0G,L0H,L0J,L0K,L0L,L0M,L0N,L0P,L0R,L0S,L1A,L1B,L1C,L1E,L1G,L1H,L1J,L1K,L1L,L1M,L1P,L1R,L1S,L1T,L1V,L1W,L1X,L1Y,L1Z,L2A,L2E,L2G,L2H,L2J,L2M,L2N,L2P,L2R,L2S,L2T,L2V,L2W,L3B,L3C,L3K,L3M,L3P,L3R,L3S,L3T,L3V,L3X,L3Y,L3Z,L4A,L4B,L4C,L4E,L4G,L4H,L4J,L4K,L4L,L4M,L4N,L4P,L4R,L4S,L4T,L4V,L4W,L4X,L4Y,L4Z,L5A,L5B,L5C,L5E,L5G,L5H,L5J,L5K,L5L,L5M,L5N,L5P,L5R,L5S,L5T,L5V,L5W,L6A,L6B,L6C,L6E,L6G,L6H,L6J,L6K,L6L,L6M,L6P,L6R,L6S,L6T,L6V,L6W,L6X,L6Y,L6Z,L7A,L7B,L7C,L7E,L7G,L7J,L7K,L7L,L7M,L7N,L7P,L7R,L7S,L7T,L8E,L8G,L8H,L8J,L8K,L8L,L8M,L8N,L8P,L8R,L8S,L8T,L8V,L8W,L9A,L9B,L9C,L9G,L9H,L9K,L9L,L9M,L9N,L9P,L9R,L9S,L9T,L9V,L9W,L9Y,L9Z,<br>M1B,M1C,M1E,M1G,M1H,M1J,M1K,M1L,M1M,M1N,M1P,M1R,M1S,M1T,M1V,M1W,M1X,M2H,M2J,M2K,M2L,M2M,M2N,M2P,M2R,M3A,M3B,M3C,M3H,M3J,M3K,M3L,M3M,M3N,M4A,M4B,M4C,M4E,M4G,M4H,M4J,M4K,M4L,M4M,M4P,M4R,M4S,M4T,M4V,M4W,M4X,M4Y,M5A,M5B,M5C,M5E,M5G,M5H,M5J,M5K,M5L,M5M,M5N,M5P,M5R,M5S,M5T,M5V,M5W,M5X,M6A,M6B,M6C,M6E,M6G,M6H,M6J,M6K,M6L,M6M,M6N,M6P,M6R,M6S,M7A,M7Y,M8V,M8W,M8X,M8Y,M8Z,M9A,M9B,M9C,M9L,M9M,M9N,M9P,M9R,M9V,M9W,<br>N0A,N0B,N0C,N0E,N0G,N0H,N0J,N0K,N0L,N0M,N0N,N0P,N0R,N1A,N1C,N1E,N1G,N1H,N1K,N1L,N1M,N1P,N1R,N1S,N1T,N2A,N2B,N2C,N2E,N2G,N2H,N2J,N2K,N2L,N2M,N2N,N2P,N2R,N2T,N2V,N2Z,N3A,N3B,N3C,N3E,N3H,N3L,N3P,N3R,N3S,N3T,N3V,N3W,N3Y,N4B,N4G,N4K,N4L,N4N,N4S,N4T,N4V,N4W,N4X,N4Z,N5A,N5C,N5H,N5L,N5P,N5R,N5V,N5W,N5X,N5Y,N5Z,N6A,N6B,N6C,N6E,N6G,N6H,N6J,N6K,N6L,N6M,N6N,N6P,N7A,N7G,N7L,N7M,N7S,N7T,N7V,N7W,N7X,N8A,N8H,N8M,N8N,N8P,N8R,N8,N8T,N8V,N8W,N8X,N8Y,N9A,N9B,N9C,N9E,N9G,N9H,N9J,N9K,N9V,N9Y,<br>P0A,P0B,P0C,P0E,P0G,P0H,P0J,P0K,P0L,P0M,P0N,P0P,P0R,P0S,P0T,P0V,P0W,P0X,P0Y,P1A,P1B,<br>P1C,P1H,P1L,P1P,P2A,P2B,P2N,P3A,<br>P3B,P3C,P3E,P3G,P3L,P3N,P3P,P3Y,P4N,P4P,P4R,P5A,P5E,P5N,P6A,P6B,P6C,P7A,P7B,P7C,P7E,P7G,P7J,P7K,P7L,P8N,P8T,P9A,P9N<br>Quebec Postal Codes: G0C,G0G,G0W,G4T,G4X,G8B,G8C,G8E,G8G,G8H,G8J,G8K,G8L,G8M,G8N,G8P,J0M,J0Y,J0Z,J9P,J9T,J9X,J9Y,J9ZBalance of Country |
| CAPE VERDE | 4 | Entire Country |
| CAYMAN ISLANDS | 1 | Entire Country for Limits of Liability |
| | 2 | Entire Country for Deductibles |
| CENTRAL AFRICAN REPUBLIC | 4 | Entire Country |
| CHAD | 4 | Entire Country |

| Country | Zone | Provinces/Territories/States/Counties |
|---|---|---|
| CHILE | 1 | Entire Country |
| CHINA | 1 | Liaoning, Tianjin, Hebei, Shandong, Gansu, Sichuan, Shaanxi, Yunnan |
| | 2 | Tibet Autonomous Region, Macau |
| | 3 | Balance of Country |
| | 4 | Hong Kong |
| COLOMBIA | 1 | Antioquia, Cauca, Choco, Narino, Quindio, Risaralda, Valle del Cauca, Bogota |
| | 2 | Balance of Country |
| | 3 | Amazona, Arauca, Caqueta, Casanare, Guainia, Guaviare, Meta, Putumayo, San Anres and Providencia, Vaupes, Vichada |
| COMOROS | 4 | Entire Country |
| CONGO, REPUBLIC OF | 2 | Entire Country |
| COOK ISLANDS | 2 | Entire Country |
| COSTA RICA | 1 | Entire Country |
| CROATIA | 2 | Entire Country |
| CURACAO | 3 | Entire Country |
| CYPRUS | 2 | Entire Country |
| CZECH REPUBLIC | 3 | Entire Country |
| DENMARK | 4 | Entire Country |
| DJIBOUTI | 2 | Entire Country |
| DOMINICA | 1 | Entire Country for Limits of Liability |
| | 2 | Entire Country for Deductibles |
| DOMINICAN REPUBLIC | 1 | Entire Country |
| ECUADOR | 1 | Entire Country |
| EGYPT | 2 | Cairo, Dakahlia, Damietta, Gharbia, Ismailia, Kafr el-Sheikh, Monufia, North Sinai, Port Said, Red Sea, Sharqia, Suez |
| | 3 | Balance of Country |
| EL SALVADOR | 1 | Entire Country |
| EQUATORIAL-GUINEA | 4 | Entire Country |
| ERITREA | 2 | Entire Country |
| ESTONIA | 4 | Entire Country |
| ETHIOPIA | 2 | Balance of Country |
| | 3 | Benishangul, Dure Dawa, Gambela, Harari, Somalia, Tigray |
| FAROE ISLANDS | 4 | Entire Country |
| FEDERATED STATES OF MICRONESIA | 2 | Entire Country |
| FIJI | 1 | Entire Country |

| Country | Zone | Provinces/Territories/States/Counties |
|---|---|---|
| FINLAND | 4 | Entire Country |
| FRANCE | 3 | Entire Country |
| FRENCH GUIANA | 4 | Entire Country |
| FRENCH POLYNESIA | 4 | Entire Country |
| GABON | 2 | Ogooue-Ivindo, Ogooue-Lolo |
|  | 3 | Balance of Country |
| GAMBIA | 4 | Entire Country |
| GERMANY | 3 | Entire Country |
| GHANA | 1 | Accra |
|  | 2 | Balance of Country |
| GIBRALTAR | 3 | Entire Country |
| GREECE | 1 | Entire Country |
| GREENLAND | 3 | Entire Country |
| GRENADA | 1 | Entire Country for Limits of Liability |
|  | 2 | Entire Country for Deductibles |
| GUADELOUPE | 1 | Entire Country for Limits of Liability |
|  | 2 | Entire Country for Deductibles |
| GUATEMALA | 1 | Balance of Country |
|  | 3 | Peten |
| GUINEA | 2 | Boke |
|  | 3 | Balance of Country |
| GUINEA- BISSAU | 3 | Entire Country |
| GUYANA | 3 | Entire Country |
| HAITI | 1 | Entire Country |
| HONDURAS | 1 | Balance of Country |
|  | 3 | Atlantida, Colon, Comayagua, El Paraiso, Francisco Morazan, Gracias a Dios, Islas de la Bahia, Olancho, Yoro |
| HUNGARY | 3 | Entire Country |
| ICELAND | 2 | Northeast Region, South Region, Southern Peninsula Region, Capital Region |
|  | 3 | Balance of Country |
| INDIA | 1 | Arunachal Pradesh, Assam, Gujarat, Haryana, Himachal Pradesh, Jammu and Kashmir, Manipur, Meghalaya, Mizoram, Nagaland, Punjab, Uttarakhand |
|  | 3 | Balance of Country |

| Country | Zone | Provinces/Territories/States/Counties |
|---|---|---|
| INDONESIA | 2 | Balance of Country |
|  | 3 | (Borneo)-East Kalimantan, South Kalimantan,  West Kalimantan, Central Kalimantan, Riau, Jambi, South Sulawesi, Southeast Sulawesi, Bengka-Belitung, West Nusa Tenggara |
| IRAQ | 2 | Entire Country |
| IRELAND | 4 | Entire Country |
| ISLE OF MAN | 3 | Entire Country |
| ISRAEL | 1 | Entire Country |
| ITALY | 1 | Balance of Country |
|  | 3 | Liguria, Lombardy, Marche, Piedmont, Aosta Valley, Trentino-Alto Adige/Südtirol, Veneto, Sardinia |
| IVORY COAST (COTE-D'IVOIRE) | 4 | Entire Country |
| JAMAICA | 1 | Entire Country for Limits of Liability |
|  | 2 | Entire Country for Deductibles |
| JAPAN | 1 | Balance of  Country |
|  | 2 | Prefectures of Akita, Fukui, Fukuoka, Gifu, Gunma, Hiroshima, Ishikawa, Kagoshima, Niigata, Okayama, Okinawa, Saga, Shimane, Tochigi, Tottori, Toyama, Yamaguchi |
| JORDAN | 1 | Balance of Country |
|  | 3 | Ma'an |
| KAZAKHSTAN | 1 | Entire Country |
| KENYA | 2 | Entire Country |
| KIRIBATI | 2 | Entire Country |
| KOSOVO | 3 | Entire Country |
| KUWAIT | 4 | Entire Country |
| KYRGYZSTAN (KYRGYZ REPUBLIC) | 1 | Entire Country |
| LAOS | 2 | Balance of Country |
|  | 3 | Attapu, Bolikhamxai, Champasak, Khammouan, Salavan, Savannakhet, Xekong |
| LATVIA | 4 | Entire Country |
| LEBANON | 1 | Entire Country |
| LESOTHO | 2 | Balance of Country |
|  | 3 | Berea, Butha-Buthe, Leribe, Mokhotlong, Thaba-Tseka |
| LIBERIA | 4 | Entire Country |
| LIBYA | 2 | Entire Country |
| LIECHTENSTEIN | 4 | Entire Country |

| Country | Zone | Provinces/Territories/States/Counties |
|---------|------|----------------------------------------|
| LITHUANIA | 4 | Entire Country |
| LUXEMBOURG | 4 | Entire Country |
| MACEDONIA | 1 | Entire Country |
| MADAGASCAR | 3 | Entire Country |
| MALAWI | 2 | Entire Country |
| MALAYSIA | 3 | Entire Country |
| MALDIVES | 4 | Entire Country |
| MALI | 4 | Entire Country |
| MALTA | 4 | Entire Country |
| MARSHALL ISLANDS | 4 | Entire Country |
| MARTINIQUE | 1 | Entire Country for Limits of Liability |
|  | 2 | Entire Country for Deductibles |
| MAURITANIA | 4 | Entire Country |
| MAURITIUS | 4 | Entire Country |
| MAYOTTE | 2 | Entire Country |
| MEXICO | 1 | Balance of Country |
|  | 4 | Chihuahua, Campeche, Coahuila, Durango, Nuevo Leon, Quintana Roo, San Luis Potosi, Sonora, Tamaulipas, Yucatan, Zacatecas |
| MOLDOVA | 2 | Entire Country |
| MONACO | 3 | Entire Country |
| MONGOLIA | 1 | Balance of Country |
|  | 2 | Govi-Altai, Arkhangai, Bulgan, Selenge, Tov, Ovorkhangai |
|  | 3 | Khentii, Dundgovi, Dornogovi, Dornod, Sukhbaatar |
| MONTENEGRO | 2 | Entire Country |
| MONTSERRAT | 1 | Entire Country For Limits |
|  | 2 | Entire Country for Deductibles |
| MOROCCO | 2 | Fès-Boulemane (Fès) , Gharb-Chrarda-Béni Hssen (Kénitra), Tangier-Tétouan (Tangier) |
|  | 3 | Taza-Al Hoceima-Taounate (Al Hoceima) |
|  | 4 | Balance of Country |
| MOZAMBIQUE | 2 | Manica, Sofala, Zambezia |
|  | 3 | Balance of Country |
| NAMIBIA | 4 | Entire Country |
| NAURU | 2 | Entire Country |
| NEPAL | 1 | Entire Country |

| Country | Zone | Provinces/Territories/States/Counties |
|---|---|---|
| NETHERLANDS | 4 | Balance of Country |
| | 3 | Bonaire |
| | 1 | Saba, Sint Eustatius for Limits of Liability |
| | 3 | Saba, Sint Eustatius for Deductibles |
| NEW CALEDONIA | 3 | Entire Country |
| NEW ZEALAND | 1 | Balance of Country |
| | 3 | Northland, Auckland, Waikato |
| NICARAGUA | 1 | Balance of Country |
| | 3 | RAAN (Bilwi), RAAS (Bluefields) |
| NIGER | 4 | Entire Country |
| NIGERIA | 4 | Entire Country |
| NIUE | 2 | Entire Country |
| NORFOLK ISLAND | 2 | Entire Country |
| NORWAY | 4 | Entire Country |
| OMAN | 4 | Entire Country |
| PAKISTAN | 1 | Balance of Country |
| | 3 | Punjab |
| PALAU | 2 | Entire Country |
| PALESTINE | 1 | Entire Country |
| PANAMA | 2 | Entire Country |
| PAPUA NEW GUINEA | 1 | Entire Country |
| PARAGUAY | 4 | Entire Country |
| PERU | 1 | Entire Country |
| PHILIPPINES | 1 | Entire Country |
| PITCAIRN ISLANDS | 2 | Entire Country |
| POLAND | 4 | Entire Country |
| PORTUGAL | 2 | Lisbon, Santarém, Faro, Azores Autonomous Region |
| | 4 | Balance of Country |
| QATAR | 4 | Entire Country |
| REUNION | 4 | Entire Country |
| ROMANIA | 2 | Entire Country |
| RUSSIAN FEDERATION | 1 | Kamchatka, Buryatia, Tuva, Altai Republic,, Stavropol, Chechnya, Adygea, Krasnodar, Karachay-Cherkessia, Ingushetia, Dagestan, Kabardino-Balkaria, North Ossetia-Alania |
| | 3 | Balance of Country |
| RWANDA | 2 | Entire Country |

| Country | Zone | Provinces/Territories/States/Counties |
|---|---|---|
| SAMOA (WESTERN ) | 2 | Entire Country |
| SAN MARINO | 2 | Entire Country |
| SAO TOME & PRINCIPE | 4 | Entire Country |
| SAUDI ARABIA | 2 | Jizan, Tabuk |
| | 4 | Balance of Country |
| SENEGAL | 3 | Entire Country |
| SERBIA | 2 | Entire Country |
| SEYCHELLES | 4 | Entire Country |
| SIERRA LEONE | 4 | Entire Country |
| SINGAPORE | 4 | Entire Country |
| SINT MAARTEN | 1 | Entire Country for Limits of Liability |
| | 3 | Entire Country for Deductibles |
| SLOVAKIA | 3 | Entire Country |
| SLOVENIA | 2 | Entire Country |
| SOLOMON ISLANDS | 1 | Entire Country |
| SOMALIA | 3 | Entire Country |
| SOUTH AFRICA | 2 | Free State, Western Cape |
| | 3 | Balance of Country |
| SOUTH KOREA | 3 | Entire Country |
| SOUTHERN SUDAN | 3 | Entire Country |
| SPAIN | 2 | Andalusia, Murcia |
| | 3 | Balance of Country |
| SRI LANKA | 3 | Entire Country |
| ST. BARTHELEMY | 1 | Entire Country for Limits of  Liability |
| | 2 | Entire Country for Deductibles |
| ST. KITTS AND NEVIS | 1 | Entire Country for Limits of  Liability |
| | 2 | Entire Country for Deductibles |
| ST. LUCIA | 1 | Entire Country for Limits of  Liability |
| | 2 | Entire Country for Deductibles |
| ST. MARTIN | 1 | Entire Country for Limits of  Liability |
| | 2 | Entire Country for Deductibles |
| ST. VINCENT AND THE GRENADINES | 1 | Entire Country for Limits of  Liability |
| | 2 | Entire Country for Deductibles |
| SURINAME | 4 | Entire Country |
| SWAZILAND | 2 | Entire Country |

| Country | Zone | Provinces/Territories/States/Counties |
|---|---|---|
| SWEDEN | 4 | Entire Country |
| SWITZERLAND | 4 | Entire Country |
| TAIWAN | 1 | Entire Country |
| TAJIKISTAN | 1 | Entire Country |
| TANZANIA | 2 | Kigoma, Arusha, Singida, Dodoma, Manyara, Rukwa, Mbeya, Iringa, Ruvuma, Mtwara |
|  | 3 | Balance of Country |
| THAILAND | 2 | Chiang Rai, Payao, Nan, Chang Mai, Mae Hong Son, Lampang, Lampun, Phrae, Uttaradit, Sukhothai, Tak, Phitsanulok, Kamphaeng Phet, Phichit, Nakhon Sawan, Uthai Thani, Kanchanaburi, Chai Nat, Lop Buri, Sara Buri, Nakon Nayok, Ang Thong, Phra Nakhon Si Ayuthaya, Nakhon Pathom, Sing Buri, Pathum Thani, Bangkok, Samut Songkhram, Samut Sakhon, Nonthaburi, Samut Prakan, Phetchaburi |
|  | 3 | Balance of Country |
| TIMOR-LESTE | 2 | Entire Country |
| TOGO | 3 | Entire Country |
| TONGA | 2 | Entire Country |
| TRINIDAD AND TOBAGO | 1 | Entire Country for Limits of  Liability |
|  | 2 | Entire Country for Deductibles |
| TUNISIA | 2 | Ariana, Béja, Ben Arous, Bizerte, Gafsa, Jendouba, Manouba, Monastir, Nabeul, Sousse, Tunis, Zaghouan |
|  | 3 | Balance of Country |
| TURKEY | 1 | Entire Country |
| TURKMENISTAN | 1 | Entire Country |
| TURKS AND CAICOS | 1 | Entire Country for Limits of  Liability |
|  | 3 | Entire Country for Deductibles |
| TUVALU | 4 | Entire Country |
| UGANDA | 2 | Entire Country |
| UKRAINE | 4 | Entire Country |
| UNITED ARAB EMIRATES | 4 | Entire Country |
| UNITED KINGDOM including Guernsey, Jersey | 3 | Entire Country |
| URUGUAY | 4 | Entire Country |
| UZBEKISTAN | 1 | Entire Country |
| VANUATU | 2 | Entire Country |
| VATICAN CITY | 1 | Entire Country |

| Country | Zone | Provinces/Territories/States/Counties |
|---------|------|----------------------------------------|
| VENEZUELA | 1 | Balance of Country |
| | 2 | Carabobo, Aragua, Guarico, Vargas, Miranda, Dpto Capital, Anzoategui, Monagas |
| | 4 | Delta Amacuro, Bolivar, Amazonas |
| VIETNAM | 2 | Lai Chau, Lao Cai, Yen Bai, Son La, Hoa Binh, Vinh Phu, Hanoi, Hai Phong, Ha Tay, Hai Hung, Thai Binh, Nom Ha, Ninh Binh, Thanh Hoa, Nghe An, Ha Tinh, Quang Binh, Quang Ngai, Binh Dinh, Phu Yen, Khanh Hoa, Ninh Thuan |
| | 3 | Balance of Country |
| WESTERN SAHARA | 4 | Entire Country |
| YEMEN | 4 | Entire Country |
| ZAMBIA | 2 | Northern, Southern |
| | 3 | Balance of Country |
| ZIMBABWE | 3 | Entire Country |

# Appendix C – Named Storm Zones for USA Including its Commonwealths and Territories



This list is for informational purposes only and does not convey any coverage under the policy.

| Country - The United States of America | | |
|---|---|---|
| State | Zone | Counties/Parishes/Independent Cities |
| Alabama | 1 | Baldwin, Mobile |
| | 2 | Clarke, Covington, Escambia, Geneva, Houston, Washington |
| | 3 | Balance of State |
| Connecticut | 3 | Fairfield, Middlesex, New Haven, New London |
| | 4 | Balance of State |
| Delaware | 3 | Entire State |
| Dist. of Columbia | 3 | Entire State |
| Florida | 1 | Bay, Brevard, Broward, Calhoun, Charlotte, Citrus, Collier, Desoto, Dixie, Duval, Escambia, Flagler, Franklin, Glades, Gulf, Hardee, Hendry, Hernando, Highlands, Hillsborough, Indian River, Jefferson, Lee, Levy, Liberty, Manatee, Martin, Miami-Dade, Monroe, Nassau, Okaloosa, Okeechobee, Orange, Osceola, Palm Beach, Pasco, Pinellas, Polk, Santa Rosa, Sarasota, Seminole, St. Johns, St. Lucie, Taylor, Volusia, Wakulla, Walton, Washington |
| | 2 | Balance of State |
| Georgia | 1 | Bryan, Camden, Chatham, Glynn, Liberty, McIntosh |
| | 2 | Appling, Brantley, Bulloch, Charlton, Effingham, Evans, Long, Pierce, Tattnall, Wayne |
| | 3 | Balance of State |
| Hawaii | 1 | Entire State |
| Louisiana | 1 | Acadia, Ascension, Assumption, Calcasieu, Cameron, Iberia, Iberville Jefferson, Jefferson Davis, Lafayette, Lafourche, Livingston, Orleans, Plaquemines, St. Bernard, St. Charles, St. James, St. John the Baptist, St. Martin, St. Mary, St. Tammany, Tangipahoa, Terrebonne, Vermilion, Washington |
| | 2 | Allen, Beauregard, East Baton Rouge, East Feliciana, Evangeline, Pointe Coupee, St. Landry, St. Helena, West Baton Rouge, West Feliciana |
| | 3 | Balance of State |
| Maryland | 1 | Somerset, Wicomico, Worcester |
| | 3 | Anne Arundel, Baltimore, Baltimore City, Calvert, Caroline, Cecil, Charles, Dorchester, Harford, Howard, Kent, Montgomery, Prince George's, Queen Anne's, St. Mary's, Talbot |
| | 4 | Balance of State |
| Massachusetts | 3 | Barnstable, Bristol, Dukes, Essex, Middlesex, Nantucket, Norfolk, Plymouth, Suffolk |
| | 4 | Balance of State |

| Country - The United States of America | | |
|---|---|---|
| State | Zone | Counties/Parishes/Independent Cities |
| Mississippi | 1 | George, Hancock, Harrison, Jackson, Pearl River, Stone |
| | 2 | Amite, Forrest, Greene, Lamar, Marion, Perry, Pike, Walthall, Wilkinson |
| | 3 | Balance of State |
| New Jersey | 3 | Atlantic, Bergen, Burlington, Camden, Cape May, Cumberland, Essex, Gloucester, Hudson, Middlesex, Monmouth, Ocean, Passaic, Salem, Somerset, Union |
| | 4 | Balance of State |
| New York | 3 | Bronx, Kings, Nassau, New York, Queens, Richmond, Rockland, Suffolk, Westchester |
| | 4 | Balance of State |
| North Carolina | 1 | Beaufort, Bertie, Brunswick, Camden, Carteret, Chowan, Columbus, Craven, Currituck, Dare, Hyde, Jones, New Hanover, Onslow, Pamlico, Pasquotank, Pender, Perquimans, Tyrrell, Washington |
| | 3 | Balance of State |
| Rhode Island | 3 | Entire State |
| South Carolina | 1 | Beaufort, Berkeley, Charleston, Colleton, Dorchester, Georgetown, Horry, Jasper |
| | 2 | Allendale, Bamberg, Clarendon, Dillon, Florence, Hampton, Marion, Williamsburg |
| | 3 | Balance of State |
| Texas | 1 | Aransas, Brazoria, Calhoun, Cameron, Chambers, Fort Bend, Galveston, Harris, Jackson, Jefferson, Kenedy, Kleberg, Liberty, Matagorda, Nueces, Orange, Refugio, San Patricio, Victoria, Wharton, Willacy |
| | 2 | Austin, Bee, Brooks, Colorado, DeWitt, Duval, Goliad, Grimes, Hardin, Hidalgo, Jasper, Jim Hogg, Jim Wells, Lavaca, Live Oak, McMullen, Montgomery, Newton, Polk, San Jacinto, Starr, Tyler, Walker, Waller |
| | 4 | Balance of State |
| Virginia | 1 | Counties: Accomack, Gloucester, Isle of Wight, James City, Lancaster, Mathews, Middlesex, Northampton, Northumberland, Surry, York |
| | 1 | Independent Cities: Chesapeake, Franklin City, Hampton, Newport News, Norfolk, Poquoson, Portsmouth, Suffolk, Virginia Beach, and Williamsburg |
| | 3 | Balance of State |
| All Other States | 4 | Entire State |

| Commonwealths, Territories and Possessions of The United States of America | | |
|---|---|---|
| | ZONE | |
| American Samoa | 2 | Entire Territory |
| Guam | 1 | Entire Territory |
| Northern Mariana Islands | 1 | Entire Commonwealth |
| Puerto Rico | 1 | Entire Commonwealth |
| U.S. Virgin Islands | 1 | Entire Territory |
| All other US Territories and Possessions | 1 | Entire Territory |

# Appendix D – Named Storm Zones Worldwide Except USA its Commonwealths and Territories



This list is for informational purposes only and does not convey any coverage under the policy.

| Country | Zone | Provinces/Territories/States/Counties |
|---|---|---|
| ALBANIA | 4 | Entire Country |
| ALGERIA | 1 | Entire Country |
| ANDORRA | 3 | Entire Country |
| ANGUILLA | 1 | Entire Country |
| ANTARCTICA | 4 | Entire Country |
| ANTIGUA & BARBUDA | 1 | Entire Country |
| ARMENIA | 4 | Entire Country |
| ARGENTINA | 4 | Entire Country |
| ARUBA | 1 | Entire Country for Limits of Liability |
| | 3 | Entire Country for Deductibles |
| AUSTRALIA including Christmas Island, Cocos (Keeling) Islands | 1 | Western Australia Postcodes: 6701,6707,6710,6711,6712,6713,6714,6716,6718,6720,6721,6722,6725,6726, 6728,6731,6733,6740,6743,6751,6754,6760,6762,6765, Northern Territory Postcodes: 0800,0810,0812,0820,0822,0828,0829,0830,0832, 0835,0836,0837,0838,0840,0841,0845,0846,0847,0850,0852,0853,0854,0862, 0880,0885,0886, Christmas Island, Cocos (Keeling) Islands |
| | 2 | Queensland Postcodes: 4580,4581,4620,4621,4630,4650,4655,4659,4660, 4662,4670,4671,4673,4674,4676,4677,4678,4680,4694,4695,4697,4699,4700, 4701,4702,4703,4704,4705,4706,4707,4710,4711,4712,4714,4715,4716,4717, 4718,4720,4721,4723,4737,4738,4739,4740,4741,4742,4743,4744,4745,4746, 4750,4751,4753,4754,4756,4757,4798,4799,4800,4801,4802,4803,4804,4805, 4806,4807,4808,4809,4810,4811,4812,4813,4814,4815,4816,4817,4818,4819, 4820,4830,4849,4850,4852,4854,4855,4856,4857,4858,4859,4860,4861,4865, 4868,4869,4870,4871,4872,4873,4874,4875,4876,4877,4878,4879,4880,4881, 4882,4883,4884,4885,4886,4887,4888,4890,4891,4895 |
| | 3 | Balance of Country |
| AUSTRIA | 4 | Entire Country |
| AZERBAIJAN | 4 | Entire Country |
| BAHAMAS | 1 | Entire Country |
| BAHRAIN | 4 | Entire Country |
| BANGLADESH | 1 | Entire Country |
| BARBADOS | 1 | Entire Country |
| BELARUS | 4 | Entire Country |
| BELGIUM | 3 | Entire Country |
| BELIZE | 1 | Entire Country |

| Country | Zone | Provinces/Territories/States/Counties |
|---|---|---|
| BENIN | 4 | Entire Country |
| BERMUDA | 1 | Entire Country |
| BHUTAN | 4 | Entire Country |
| BOLIVIA | 4 | Entire Country |
| BOSNIA & HERZEGOVINA | 4 | Entire Country |
| BOTSWANA | 3 | Entire Country |
| BRAZIL | 4 | Entire Country |
| BRITISH VIRGIN ISLANDS | 1 | Entire Country |
| BRUNEI DARUSSALAM | 4 | Entire Country |
| BULGARIA | 4 | Entire Country |
| BURKINA FASO | 4 | Entire Country |
| BURUNDI | 1 | Entire Country |
| CAMBODIA | 3 | Entire Country |
| CAMEROON | 4 | Entire Country |
| CANADA | 4 | Entire Country |
| CAPE VERDE | 3 | Entire Country |
| CAYMAN ISLANDS | 1 | Entire Country |
| CENTRAL AFRICAN REPUBLIC | 4 | Entire Country |
| CHAD | 3 | Entire Country |
| CHILE | 3 | Entire Country |
| CHINA | 1 | Hainan, Macau,  Guangdong, Fujian, Zhejiang, Shanghai, Jiangsu, Shangdong |
| | 2 | Hong Kong |
| | 4 | Balance of Country |
| COLOMBIA | 3 | Entire Country |
| COMOROS | 3 | Entire Country |
| CONGO, REPUBLIC OF | 4 | Entire Country |
| COOK ISLANDS | 1 | Entire Country |
| COSTA RICA | 1 | Entire Country |
| CROATIA | 3 | Entire Country |
| CURACAO | 1 | Entire Country for Limits of Liability |
| | 3 | Entire Country for Deductibles |
| CYPRUS | 4 | Entire Country |

| Country | Zone | Provinces/Territories/States/Counties |
|---------|------|---------------------------------------|
| CZECH REPUBLIC | 4 | Entire Country |
| DENMARK | 3 | Entire Country |
| DJIBOUTI | 4 | Entire Country |
| DOMINICA | 1 | Entire Country |
| DOMINICAN REPUBLIC | 1 | Entire Country |
| ECUADOR | 4 | Entire Country |
| EGYPT | 4 | Entire Country |
| EL SALVADOR | 2 | Entire Country |
| EQUATORIAL GUINEA | 4 | Entire Country |
| ERITREA | 4 | Entire Country |
| ESTONIA | 3 | Entire Country |
| ETHIOPIA | 4 | Entire Country |
| FAROE ISLANDS | 3 | Entire Country |
| FEDERATED STATES OF MICRONESIA | 1 | Entire Country |
| FIJI | 1 | Entire Country |
| FINLAND | 3 | Entire Country |
| FRANCE | 4 | Entire Country |
| FRENCH GUIANA | 4 | Entire Country |
| FRENCH POLYNESIA | 1 | Entire Country |
| GABON | 3 | Entire Country |
| GAMBIA | 4 | Entire Country |
| GERMANY | 3 | Entire Country |
| GHANA | 3 | Entire Country |
| GIBRALTAR | 3 | Entire Country |
| GREECE | 4 | Entire Country |
| GREENLAND | 4 | Entire Country |
| GRENADA | 1 | Entire Country |
| GUADELOUPE | 1 | Entire Country |
| GUATEMALA | 1 | Izabal |
|  | 2 | Balance of Country |
| GUINEA | 4 | Entire Country |
| GUINEA- BISSAU | 4 | Entire Country |
| GUYANA | 3 | Entire Country |

| Country | Zone | Provinces/Territories/States/Counties |
|---|---|---|
| HAITI | 1 | Entire Country |
| HONDURAS | 1 | Entire Country |
| HUNGARY | 4 | Entire Country |
| ICELAND | 4 | Entire Country |
| INDIA | 1 | Andhra Pradesh, Jharkhand, Mizoram, Orissa, Tamil Nadu, Tripura, West Bengal |
| | 3 | Balance of Country |
| INDONESIA | 3 | Entire Country |
| IRAQ | 4 | Entire Country |
| IRELAND | 3 | Entire Country |
| ISLE OF MAN | 3 | Entire Country |
| ISRAEL | 4 | Entire Country |
| ITALY | 3 | Entire Country |
| IVORY COAST (COTE-D'IVOIRE) | 4 | Entire Country |
| JAMAICA | 1 | Entire Country |
| JAPAN | 3 | Regions of Hokkaido, Tohoku |
| | 1 | Balance of Country |
| JORDAN | 4 | Entire Country |
| KAZAKHSTAN | 4 | Entire Country |
| KENYA | 3 | Entire Country |
| KIRIBATI | 1 | Entire Country |
| KOSOVO | 4 | Entire Country |
| KUWAIT | 4 | Entire Country |
| KYRGYZSTAN (KYRGYZ REPUBLIC) | 4 | Entire Country |
| LAOS | 3 | Entire Country |
| LATVIA | 3 | Entire Country |
| LEBANON | 4 | Entire Country |
| LESOTHO | 4 | Entire Country |
| LIBERIA | 4 | Entire Country |
| LIBYA | 4 | Entire Country |
| LIECHTENSTEIN | 4 | Entire Country |
| LITHUANIA | 3 | Entire Country |
| LUXEMBOURG | 4 | Entire Country |
| MACEDONIA | 4 | Entire Country |
| MADAGASCAR | 2 | Entire Country |

| Country | Zone | Provinces/Territories/States/Counties |
|---|---|---|
| MALAWI | 4 | Entire Country |
| MALAYSIA | 3 | Entire Country |
| MALDIVES | 3 | Entire Country |
| MALI | 4 | Entire Country |
| MALTA | 4 | Entire Country |
| MARSHALL ISLANDS | 2 | Entire Country |
| MARTINIQUE | 1 | Entire Country |
| MAURITANIA | 4 | Entire Country |
| MAURITIUS | 1 | Entire Country |
| MAYOTTE | 1 | Entire Country |
| MEXICO | 1 | Baja California Sur, Colima, Campeche, Chiapas, Guerrero, Jalisco, Michoacan, Oaxaca, Quintana Roo, Tabasco, Tamaulipas, Veracruz, Yucatan |
| | 4 | Balance of Country |
| MOLDOVA | 4 | Entire Country |
| MONACO | 3 | Entire Country |
| MONGOLIA | 4 | Entire Country |
| MONTENEGRO | 4 | Entire Country |
| MONTSERRAT | 1 | Entire Country |
| MOROCCO | 4 | Entire Country |
| MOZAMBIQUE | 1 | Entire Country |
| NAMIBIA | 4 | Entire Country |
| NAURU | 4 | Entire Country |
| NEPAL | 4 | Entire Country |
| NETHERLANDS | 4 | Balance of Country |
| | 1 | Bonaire for Limits of Liability |
| | 3 | Bonaire for Deductibles |
| | 1 | Saba |
| | 1 | Sint Eustatius |
| NEW CALEDONIA | 1 | Entire Country |
| NEW ZEALAND | 3 | Entire Country |
| NICARAGUA | 1 | RAAN (Bilwi), RAAS (Bluefields) |
| | 2 | Balance of Country |
| NIGER | 4 | Entire Country |
| NIGERIA | 4 | Entire Country |
| NIUE | 1 | Entire Country |
| NORFOLK ISLAND | 2 | Entire Country |

| Country | Zone | Provinces/Territories/States/Counties |
|---|---|---|
| NORWAY | 3 | Entire Country |
| OMAN | 3 | Entire Country |
| PAKISTAN | 3 | Entire Country |
| PALAU | 1 | Entire Country |
| PALESTINE | 4 | Entire Country |
| PANAMA | 3 | Entire Country |
| PAPUA NEW GUINEA | 3 | Entire Country |
| PARAGUAY | 4 | Entire Country |
| PERU | 4 | Entire Country |
| PHILIPPINES | 1 | Entire Country |
| PITCAIRN ISLANDS | 1 | Entire Country |
| POLAND | 3 | Entire Country |
| PORTUGAL | 3 | Azores Autonomous Region |
|  | 4 | Balance of Country |
| QATAR | 4 | Entire Country |
| REUNION | 1 | Entire Country |
| ROMANIA | 4 | Entire Country |
| RUSSIAN FEDERATION | 4 | Entire Country |
| RWANDA | 4 | Entire Country |
| SAMOA (WESTERN ) | 1 | Entire Country |
| SAN MARINO | 4 | Entire Country |
| SAO TOME & PRINCIPE | 4 | Entire Country |
| SAUDI ARABIA | 4 | Entire Country |
| SENEGAL | 4 | Entire Country |
| SERBIA | 4 | Entire Country |
| SEYCHELLES | 3 | Entire Country |
| SIERRA LEONE | 4 | Entire Country |
| SINGAPORE | 4 | Entire Country |
| SINT MAARTEN | 1 | Entire Country |
| SLOVAKIA | 4 | Entire Country |
| SLOVENIA | 4 | Entire Country |
| SOLOMON ISLANDS | 2 | Entire Country |
| SOMALIA | 4 | Entire Country |
| SOUTH AFRICA | 4 | Entire Country |

| Country | Zone | Provinces/Territories/States/Counties |
|---------|------|----------------------------------------|
| SOUTH KOREA | 2 | Entire Country |
| SOUTHERN SUDAN | 4 | Entire Country |
| SPAIN | 4 | Entire Country |
| SRI LANKA | 2 | Entire Country |
| ST. BARTHELEMY | 1 | Entire Country |
| ST. KITTS AND NEVIS | 1 | Entire Country |
| ST. LUCIA | 1 | Entire Country |
| ST. MARTIN | 1 | Entire Country |
| ST. VINCENT AND THE GRENADINES | 1 | Entire Country |
| SURINAME | 4 | Entire Country |
| SWAZILAND | 4 | Entire Country |
| SWEDEN | 3 | Entire Country |
| SWITZERLAND | 4 | Entire Country |
| TAIWAN | 1 | Entire Country |
| TAJIKISTAN | 4 | Entire Country |
| TANZANIA | 4 | Entire Country |
| THAILAND | 3 | Entire Country |
| TIMOR-LESTE | 3 | Entire Country |
| TOGO | 4 | Entire Country |
| TONGA | 1 | Entire Country |
| TRINIDAD AND TOBAGO | 1 | Entire Country |
| TUNISIA | 4 | Entire Country |
| TURKEY | 4 | Entire Country |
| TURKMENISTAN | 4 | Entire Country |
| TURKS AND CAICOS | 1 | Entire Country |
| TUVALU | 3 | Entire Country |
| UGANDA | 4 | Entire Country |
| UKRAINE | 4 | Entire Country |
| UNITED ARAB EMIRATES | 4 | Entire Country |
| UNITED KINGDOM including Guernsey, Jersey | 3 | Entire Country |
| URUGUAY | 3 | Entire Country |

| Country | Zone | Provinces/Territories/States/Counties |
|---|---|---|
| UZBEKISTAN | 4 | Entire Country |
| VANUATU | 1 | Entire Country |
| VATICAN CITY | 4 | Entire Country |
| VENEZUELA | 3 | Entire Country |
| VIETNAM | 2 | Entire Country |
| WESTERN SAHARA | 4 | Entire Country |
| YEMEN | 3 | Entire Country |
| ZAMBIA | 4 | Entire Country |
| ZIMBABWE | 4 | Entire Country |

Any country not listed is designated as Zone 1 unless stated differently in the Declarations of this Policy

# Appendix E – Flood Zones



This list of locations below has been identified as High Hazard and/or Medium Hazard **Flood** Zones.

| Zone | Address | Description (if necessary)* |
|---|---|---|
| High | USA, 401 S Van Brunt St, Englewood, NJ 07631 | |
| High | USA, 99 Washington St, New York, NY 10006 | |
| High | USA, 100-108 Onondaga Street East, Syracuse, NY 13202 | |
| Medium | USA, 200 Marina Blvd., Berkeley, CA 94710 | |
| Medium | USA, 6800 Goveners West NV, Huntsville, AL 35806 | |
| Medium | USA, 11 E 7TH STREET, TEMPE, AZ 85281 | |
| Medium | USA, 4114  Jan Cooley Drive, Panama City Beach, FL 32408 | |
| Medium | USA, 6300 GULF BLVD, ST PETE BEACH, FL 33706 | |
| Medium | USA, 1300 Canal St., New Orleans, LA 70112 | |
| | | |
| | | |

*If the 'Description' field(s) above are populated, please note that the information used to populate the field has been provided by the customer in the Statement of Values, and this information is used solely for reference and identification purposes.

# Amendatory Endorsement - Alaska



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  SECTION 6.1 – LOSS ADJUSTMENT AND SETTLEMENT, Paragraph f. APPRAISAL is replaced by the following:

f.      APPRAISAL

If the Insured and the Company fail to agree on the value of the property or the amount of loss, each will, on the written demand of either, select a competent, disinterested, and impartial appraiser, who has no direct or indirect financial interest in the claim.  Each will notify the other of the appraiser selected within 10 days of such demand.  The Insured may not invoke appraisal unless it has first fully complied with all provisions of this Policy, including Duties in the Event of Loss or Damage and has provided the Company with a signed and sworn statement of loss.

The appraisers will first select a competent, disinterested and impartial umpire.  If the appraisers fail to agree upon an umpire within 15 days then, on the request of the Insured or the Company, a judge of a court of record in the jurisdiction in which the appraisal is pending will select the umpire.  The appraisers will then appraise the value of the property or the amount of loss.  They will state separately, the actual cash value and replacement cost value, as of the date of loss and the amount of loss, each item of physical loss or damage or, if for Time Element loss, the amount of loss for each Time Element Coverage of this Policy.

If the appraisers fail to agree, they will submit their differences to the umpire.  An award stating separately the actual cash value and replacement cost value, as of the date of loss and the amount of loss, for each item of physical loss or damage or, if for Time Element loss, the amount of loss for each Time Element Coverage of this Policy agreed to in writing by any two will determine the amount of loss and will be binding on the Company.

Once there is an award, the Company retains the right to apply all policy terms and conditions (including but not limited to deductibles, exclusions, and Limits of Liability) to the award.  The Company further retains its right to deny the claim in whole or in part.

All expenses and fees, not including counsel or adjuster fees, incurred because of the appraisal shall be paid as determined by the umpire.

B.  SECTION 6.1 – LOSS ADJUSTMENT AND SETTLEMENT, Paragraph a. DUTIES IN THE EVENT OF LOSS OR DAMAGE, Subparagraph (7) is replaced with the following:

(7)    Permit the Company to question the Insured, the Insured's employees and agents under oath, while not in the presence of any other Insured and at such times as may be reasonably required, about any matter relating to this insurance or the loss or damage.  The Insured has the right to an attorney being present during any examination under oath. An Insured's answers must be signed or attested to by a notary public or certified court reporter.

C.  SECTION 6.1 – LOSS ADJUSTMENT AND SETTLEMENT, Paragraph h. SUIT AGAINST THE COMPANY, is replaced with the following:

h.      SUIT AGAINST THE COMPANY

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless the Insured has fully complied with all the provisions of this Policy. Legal action must be started within 3 years after the date on which the cause of action accrues.

D. The following is added to SECTION 6.1 – LOSS ADJUSTMENT AND SETTLEMENT:

CAUSE OF LOSS

As required by Alaska Statute Section 21.36.096, we will not deny a claim if a risk, hazard or contingency insured against is the dominant cause of a loss and an excluded risk, hazard, or contingency is also in the chain of causes but operates on a secondary basis.

E. SECTION 6.2 - GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, is replaced with the following:

a. CANCELLATION/NON-RENEWAL/CONDITIONAL RENEWAL

(1) Cancellation

(a) The **First Named Insured** shown in the Declarations may cancel this Policy by mailing or delivering to the Company advance written notice of cancellation.

(b) The Company may cancel this Policy by mailing or delivering to the **First Named Insured** and to the agent or broker of record written notice of cancellation at least the greater of:

(i) 10 days before the effective date of cancellation if the Company cancels for discovery of fraud or material misrepresentation by the insured;

(ii) 20 days or the number of days before the effective date of cancellation if the Company cancels for nonpayment of premium, as stated in the Declarations; or

(iii) 60 days or the number of days before the effective date of cancellation if the Company cancels for any other reason, as stated in the Declarations.

(c) The Company will provide notice by:

(i) by first class to the **First Named Insured's** last known mailing address and to the agent or broker of record, or

(ii) by electronic means to the last known electronic address of the **First Named Insured**, subject to electronic confirmation of receipt.

(d) Notice of cancellation will state the effective date of cancellation.  The Policy Period will end on that date.

(e) If this Policy is cancelled, the Company will send the **First Named Insured** any premium refund due.  If the Company cancels, the refund will be pro rata. If the **First Named Insured** cancels, the refund will be subject to a cancellation fee of 7.5% of any unearned premium.  If the Company cancels, any unearned premium will be returned before the effective date of cancellation or 45 days after the cancellation notice is given in cases of nonpayment, misrepresentation or fraud. If the Insured cancels, any unearned premium will be returned the later of the effective date of cancellation or 45 days after receipt of the request for cancellation.

(f) If notice is mailed, proof of mailing will be sufficient proof of notice.

(g) If under the laws of the jurisdiction in which the property is located, such cancellation terms or conditions are different, then cancellation terms or conditions will be as permitted by such laws.

(2) Non-Renewal

(a) The Company may non-renew this Policy by mailing or delivering to the **First Named Insured** written notice at least 45 days before the non-renewal. Notice will be provided as in paragraph (1)(c) above.

(3) Conditional Renewal

(a) If the premium to renew this policy increases more than 10% for a reason other than an increase in coverage or exposure basis, or if after the renewal there will be a material restriction or reduction in coverage not specifically requested by the **First Named Insured**, the Company shall provide written notice of the change(s) to the **First Named Insured** at least 45 days before the expiration date of the policy. Notice will be provided as in paragraph (1)(c) above.

F.  SECTION 6.2 **-** GENERAL PROVISIONS, Paragraph c. CONCEALMENT, MISREPRESENTATION OR FRAUD is replaced with the following:

c.  CONCEALMENT, MISREPRESENTATION OR FRAUD

The Company will not pay for any loss or damage in any case involving misrepresentations, omissions, concealment of facts, or incorrect statements:

(1)  That are fraudulent;

(2)  That are material either to the acceptance of the risk, or to the hazard assumed by the Company; or

(3)  If the Company, in good faith, would not have:

(a)  Issued the policy or contract;

(b)  Issued a policy or contract in as large an amount, or at the same premium or rate; or

(c)  Provided coverage with respect to the hazard resulting in the loss;

(4)  If the true facts had been made known to the Company as required either by the application for the policy or contract or otherwise.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Arkansas



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  The following is added to SECTION 6.1 – LOSS ADJUSTMENT AND SETTLEMENT, Paragraph f. APPRAISAL:

The appraisal is non-binding and voluntary.

B.  The following is added to SECTION 6.1 – LOSS ADJUSTMENT AND SETTLEMENT, Paragraph g. SUBROGATION:

The Company will be entitled to recovery only after the insured has been fully compensated for the loss or damage sustained, including reimbursement of any applicable deductible amounts.

C.  SECTION 6.1 – LOSS ADJUSTMENT AND SETTLEMENT, Paragraph h. SUIT AGAINST THE COMPANY, is replaced with the following:

h.  SUIT AGAINST THE COMPANY

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless the Insured has fully complied with all the provisions of this Policy. Legal action must be started within 5 years after the date on which the cause of action accrues.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Connecticut



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  The following is added to SECTION 5.1 - OPERATION OF SPECIAL & **DESCRIBED CAUSES OF LOSS**, :

In the event of an electrical outage or interruption of electrical service at an Insured Location from a **Covered Cause of Loss**, Personal Property that is perishable food that you donate to a temporary emergency shelter operated or supervised by a municipality or the state during a state of emergency for a limited time period will be considered physically damaged, for the purpose of coverage as required by Connecticut Public Act 12-123, as amended, only, if:

(1)  The Insured's food establishment is classified as class III or class IV pursuant to regulations adopted under section 19a-36 of Connecticut general statutes;

(2)  The Governor proclaims that a state of emergency exists;

(3)  The electrical outage or interruption of electrical service to the Insured Location  is forecast by the electric supplier to last longer for that Insured Location than the time period prescribed by the Department of Public Health or local director of health, or an authorized agent thereof, for the safe handling of such perishable  food;

(4)  Such perishable food is donated prior to the expiration of the time period described in c) above; and

(5)  The Insured provides us written documentation from such shelter stating the date and time of such donation.

Coverage under this provision is provided only up the applicable Limit of Liability and subject to all other terms and conditions of the policy.

B.  SECTION 5.2 - SPECIAL COVERAGES, Paragraph t. FINE ARTS, Subparagraph (3) is deleted.

C.  SECTION 6.1 - CONDITIONS, LOSS ADJUSTMENT AND SETTLEMENT, paragraph h. SUIT AGAINST THE COMPANY, is replaced with the following:

h.  SUIT AGAINST THE COMPANY

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless the Insured has fully complied with all the provisions of this Policy.   Legal action must be started within 24 months after the date of direct physical loss or damage to Covered Property or to other property as set forth herein.

If under the laws of the jurisdiction in which the property is located, such 24 months limitation is invalid, then, any such legal action needs to be started within the shortest limit of time permitted by such laws.

D.  SECTION 6.1  - LOSS ADJUSTMENT AND SETTLEMENT, Paragraph j. VALUATION, Subparagraph (3)(g) is deleted.

E.  SECTION 6.2 - GENERAL CONDITIONS, Paragraph a. CANCELLATION/NON-RENEWAL, is replaced with the following:

a.  CANCELLATION/NON-RENEWAL

(1) Cancellation

    (a) The **First Named Insured** shown in the Declarations may cancel this Policy by mailing or delivering to the Company advance written notice of cancellation.

    (b) For Policies in effect 60 days or Less, the Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation at least:

        (i) 10 days before the effective date of cancellation if the Company cancels for nonpayment of premium.

        (ii) 30 days before the effective date of cancellation if the Company cancels for any other reason.

    (c) If this Policy has been in effect for 60 days or more, or if it is a renewal or continuation of a Policy issued by the Company, the Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation at least 10 days before the effective date of cancellation if the Company cancels for one or more of the following reasons:

        (i) Nonpayment of premium;

        (ii) Conviction of a crime arising out of acts increasing the hazard insured against;

        (iii) Discovery of fraud or material misrepresentation by the Insured in obtaining the Policy or in perfecting any claim;

        (iv) Discovery of any willful or reckless act or omission by the Insured increasing the hazard insured against; or

        (v) A determination by the Commissioner that continuation of the Policy would violate or place the Company in violation of the law.

    (d) If this Policy has been in effect for 60 days or more, or if it is a renewal or continuation of a Policy issued by the Company, the Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation at least 60 days before the effective date of cancellation if the Company cancels for one or more of the following reasons:

        (i) Physical changes in the property which increase the hazard insured against;

        (ii) A material increase in the hazard insured against; or

        (iii) A substantial loss of reinsurance by the Company affecting this particular line of insurance.

    (e) The Company may not cancel policies in effect for 60 days or more or renewal policies for any reason other than the reasons described above.

    (f) If the Company cancels for nonpayment of premium, the Insured may continue the coverage and avoid the effect of cancellation by payment in full at any time prior to the effective date of cancellation.

    (g) Notice of cancellation will state the reason(s) for cancellation.

    (h) Notice of Cancellation will be delivered or sent by Registered mail, Certified mail, or Mail evidenced by a United States Post Office certificate of mailing.

    (i) The Company will give notice to the **First Named Insured** at the last mailing address known.

    (j) Notice of cancellation will state the effective date of cancellation. The Policy period will end on that date.

    (k) If this Policy is cancelled, the Company will send the **First Named Insured** any premium refund due.  If the Company cancels, the refund will be pro rata.  If the **First Named Insured** cancels, the refund may be less than pro rata.  The cancellation will be effective even if the Company has not made or offered a refund.  Notice of cancellation will state that the excess premium (if not tendered) will be refunded on demand.

    (l) If notice is mailed, proof of mailing will be sufficient proof of notice.

(2) Non-renewal

    The Company may non-renew this Policy by mailing or delivering to the **First Named Insured** written notice of non-renewal at least 60 days before the expiration date of this Policy stating the reason for non-renewal. This notice will be delivered or sent by Registered mail or Certified mail to the last address known to us.  The Company is not required to send this notice if nonrenewal is due to the Insured failure to pay any advance premium required for renewal.

F.  SECTION 6.2 - GENERAL CONDITIONS, Paragraph d. CONFORMITY TO STATUTES, is replaced with the following and supersedes anything to the contrary:

   d.  CONFORMITY TO STATUTES

   Any provisions required by Connecticut law to be included in policies issued by the Company shall be deemed to have been included in this Policy.

   If the provisions of this Policy conflict with the laws of any jurisdictions in which this Policy applies, and if certain provisions are required by Connecticut law to be stated in this Policy, this Policy shall be read so as to eliminate such conflict or deemed to include such provisions for Insured Locations within such jurisdictions.

G.  The following is added to SECTION 6.2 - GENERAL CONDITIONS, Paragraph h. LENDERS LOSS PAYEE AND MORTGAGE HOLDER INTERESTS AND OBLIGATIONS:

   Mortgagee interests and obligations. If loss hereunder is made payable, in whole or in part, to a designated Mortgagee not named herein as the insured, such interest in this Policy may be cancelled by giving to such Mortgagee a 10 days' written notice of cancellation.

   If the Insured fails to render proof of loss such Mortgagee, upon notice, shall render proof of loss in the form herein specified within 60 days thereafter and shall be subject to the provisions hereof relating to appraisal and time of payment and of bringing suit. If this Company shall claim that no liability existed as the mortgagor or owner, it shall, to the extent of payment of loss to the Mortgagee, be subrogated to all the Mortgagee's rights of recovery, but without impairing Mortgagee's right to sue; or it may pay off the mortgage debt and require an assignment thereof and of the mortgage. Other provisions relating to the interests and obligations of such Mortgagee may be added hereto by agreement in writing.

H.  The following is added to SECTION 6.2 - GENERAL CONDITIONS:

   For any loss subject to the Standard Fire Insurance Policy of the State of Connecticut, as set forth in the General Statutes of Connecticut, if any conditions of the Standard Fire Insurance Policy of the State of Connecticut are construed to be more liberal than the conditions of this Policy, then the conditions of The Standard Fire Insurance Policy of the State of Connecticut will apply with respect to the perils insured by the Standard Fire Policy of Connecticut

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Florida



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  SECTION 6.1 - LOSS ADJUSTMENT AND SETTLEMENT, Paragraph c. SETTLEMENT OF CLAIMS, subparagraph (4) is replaced with the following:

(4)  If the Insured has complied with all the terms of this Policy, the Company will pay for covered loss or damage within:

(a)  20 days after receiving the sworn statement of loss and reaching written agreement with the Insured; or

(b)  30 days after receiving the sworn statement of loss; and

(c)  There is an entry of a final judgment; or

(d)  A filing of an appraisal award with the Company.

B.  SECTION 6.1 - LOSS ADJUSTMENT AND SETTLEMENT, Paragraph h. SUIT AGAINST THE COMPANY, is replaced with the following:

h.  SUIT AGAINST THE COMPANY

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless the Insured has fully complied with all the provisions of this Policy. Legal action must be started within 5 years from the date of loss.

C.  The following is added to SECTION 6.1 - LOSS ADJUSTMENT AND SETTLEMENT:

SUPPLEMENTAL OR REOPENED CLAIMS

(1)  A claim, supplemental claim or reopened claim for loss or damage caused by the peril of windstorm or **Named Storm** is barred unless notice of the claim supplemental claim or reopened claim is given to the Company within 3 years after the **Named Storm** first made landfall or the windstorm caused covered damage.

(2)  For purposes of this section, the term "supplemental claim" or "reopened claim" means any additional claim for recovery from the insurer for losses from the same **Named Storm** or windstorm which the insurer has previously adjusted pursuant to the initial claim.

**SINKHOLE**

Upon receipt of a claim for a **Sinkhole Loss** to a covered building, the Company shall meet the following standards in investigating a claim:

(1)  Inspect the Insured's premises to determine if there is **Structural Damage** that may be the result of **Sinkhole Activity**.

(2) If the Company confirms that **Structural Damage** exists but is unable to identify a valid cause of such damage or discovers that such damage is consistent with **Sinkhole Loss**, the Company shall engage a **Professional Engineer** or a **Professional Geologist** to conduct testing as provided in s. 627.7072, Florida Statutes to determine the cause of the loss within a reasonable professional probability and issue a report as provided in s. 627.7073, Florida Statutes only if **Sinkhole Loss** is covered under the policy. Except as provided in subsections (4) and (6), the fees and costs of the **Professional Engineer** or **Professional Geologist** shall be paid by the Company.

(3) Following the initial inspection of the policyholder's premises, the Company shall provide written notice to the Insured disclosing the following information:

  (a) What the Company has determined to be the cause of damage, if the Company has made such a determination.

  (b) A statement of the circumstances under which the Company is required to engage a **Professional Engineer** or a **Professional Geologist** to verify or eliminate **Sinkhole Loss** and to engage a **Professional Engineer** to make recommendations regarding land and building stabilization and foundation repair.

  (c) A statement regarding the right of the Insured to request testing by a **Professional Engineer** or a **Professional Geologist**, the circumstances under which the Insured may demand certain testing, and the circumstances under which the Insured may incur costs associated with testing.

(4) (a) If the Company determines that there is no **Sinkhole Loss**, the Company may deny the claim.

  (b) If coverage for **Sinkhole Loss** is available and the Company denies the claim without performing testing under s. 627.7072, Florida Statutes, the Insured may demand testing by the Company under s. 627.7072, Florida Statutes.

    (i) The Insured's demand for testing must be communicated to the Company in writing within 60 days after the Insured's receipt of the insurer's denial of the claim.

    (ii) The Insured shall pay 50 percent of the actual costs of the analyses and services provided under ss. 627.7072, Florida Statutes and 627.7073, Florida Statutes or $2,500, whichever is less.

    (iii) The Company shall reimburse the Insured for the costs if the Company's engineer or geologist provides written certification pursuant to s. 627.7073, Florida Statutes that there is **Sinkhole Loss**.

(5) If a **Sinkhole Loss** is verified, the Company shall pay to stabilize the land and building and repair the foundation in accordance with the recommendations of the **Professional Engineer** retained pursuant to subsection (2), with notice to the Insured, subject to the coverage and terms of the policy. The Company shall pay for other repairs to the structure and contents in accordance with the terms of the policy. If a covered building suffers a **Sinkhole Loss**, the insured must repair such damage or loss in accordance with the Company's **Professional Engineer's** recommended repairs. However, if the Company's **Professional Engineer** determines that the repair cannot be completed within policy limits, the Company must pay to complete the repairs recommended by the insurer's **Professional Engineer** or tender the policy limits of the affected building to the Insured.

  (a) The Company may limit its total claims payment to the actual cash value of the **Sinkhole Loss**, which does not include underpinning or grouting or any other repair technique performed below the existing foundation of the building, until the Insured enters into a contract for the performance of building stabilization or foundation repairs in accordance with the recommendations set forth in the Company's report issued pursuant to s. 627.7073, Florida Statutes.

  (b) In order to prevent additional damage to the building or structure, the Insured must enter into a contract for the performance of building stabilization and foundation repairs within 90 days after the Company confirms coverage for the **Sinkhole Loss** and notifies the Insured of such confirmation. This time period is tolled if either party invokes the **Neutral Evaluation** process, and begins again 10 days after the conclusion of the **Neutral Evaluation** process.

  (c) After the Insured enters into the contract for the performance of building stabilization and foundation repairs, the Company shall pay the amounts necessary to begin and perform such repairs as the work is performed and the expenses are incurred. The Company may not require the Insured to advance payment for such repairs.

If repair has begun and the aforementioned professional engineer determines that the repairs will exceed the applicable Limit of Insurance, the Company will pay only the remaining portion of the applicable Limit of Insurance upon such determination. The most the Company will pay for the total of all Sinkhole Loss, including building and land stabilization and foundation repair, is the applicable Limit of Insurance on the affected building.

(d) The stabilization and all other repairs to the structure and contents must be completed within 12 months after entering into the contract for repairs described in paragraph (b) unless:

  (i)   There is a mutual agreement between the Company and the Insured;

  (ii)  The claim is involved with the **Neutral Evaluation** process;

  (iii) The claim is in litigation; or

  (iv)  The claim is under appraisal or mediation.

(e) Upon the Company's obtaining the written approval of any lienholder, the Company may make payment directly to the persons selected by the Insured to perform the land and building stabilization and foundation repairs. The decision by the Company to make payment to such persons does not hold the Company liable for the work performed. The Insured may not accept a rebate from any person performing the repairs specified in this section. If an Insured does receive a rebate, coverage is void and the Insured must refund the amount of the rebate to the Company.

(6) If the Company obtains, pursuant to s. 627.7073, Florida Statutes, written certification that there is no **Sinkhole Loss** or that the cause of the damage was not **Sinkhole Activity**, and if the Insured has submitted the **Sinkhole** claim without good faith grounds for submitting such claim, the Insured shall reimburse the Company for 50 percent of the actual costs of the analyses and services provided under ss. 627.7072, Florida Statutes and 627.7073, Florida Statutes; however, an Insured is not required to reimburse the Company more than $2,500 with respect to any claim. The Insured is required to pay reimbursement only if the Insured requested the analysis and services provided under ss. 627.7072, Florida Statutes and 627.7073, Florida Statutes and the Company, before ordering the analysis under s. 627.7072, Florida Statutes, informs the Insured in writing of the Insured's potential liability for reimbursement and gives the Insured the opportunity to withdraw the claim.

(7) The Company may engage a professional structural engineer to make recommendations as to the repair of the structure.

(8) Any claim, including but not limited to, initial, supplemental, and reopened claims under an insurance policy that provides sinkhole coverage is barred unless notice of the claim was given to the insurer in accordance with the terms of the policy within 2 years after the policyholder knew or reasonably should have known about the **Sinkhole Loss**.

## CLAIM COMMUNICATION AND INVESTIGATION

(1) Within 90 days after an insurer receives notice of a property insurance claim from a policyholder, the insurer shall pay or deny such claim or a portion of the claim unless the failure to pay such claim or a portion of the claim is caused by factors beyond the control of the insurer which reasonably prevent such payment. Any payment of a claim or portion of a claim paid 90 days after the insurer receives notice of the claim, or paid more than 15 days after there are no longer factors beyond the control of the insurer which reasonably prevented such payment, whichever is later, shall bear interest at the rate set forth in s. 55.03. Interest begins to accrue from the date the insurer receives notice of the claim. The provisions of this subsection may not be waived, voided, or nullified by the terms of the insurance policy. If there is a right to prejudgment interest, the insured shall select whether to receive prejudgment interest or interest under this subsection. Interest is payable when the claim or portion of the claim is paid. Failure to comply with this subsection constitutes a violation of this code. However, failure to comply with this subsection shall not form the sole basis for a private cause of action.

(2) For purposes of this subsection, the term "claim" means any of the following:

  (a) A claim under an insurance policy providing residential coverage as defined in s. 627.4025(1);

  (b) A claim for structural or contents coverage under a commercial property insurance policy if the insured structure is 10,000 square feet or less; or

  (c) A claim for contents coverage under a commercial tenants policy if the insured premises is 10,000 square feet or less.

# Amendatory Endorsement - Georgia



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under:

**The Zurich Edge II Domestic Policy & Declarations**
**The Zurich Edge II Global Policy & Declarations**
**The Zurich Edge II Domestic Healthcare Policy & Declarations**
**The Zurich Edge II Global Healthcare Policy & Declarations**

A.  Section 1.1 - INSURING AGREEMENT is replaced with the following:

    1.1.   INSURING AGREEMENT

    This Policy Insures against direct physical loss of or damage from a **Covered Cause of Loss,** meaning from any cause unless otherwise excluded, that commences during the Policy Period, to Property Insured at an Insured Location, all subject to the terms, conditions and exclusions stated in this Policy.

    No coverage can be provided in violation of any U.S. economic or trade sanctions laws or regulations.  Such coverage, which may be in violation of any U.S. economic or trade sanctions laws and regulations, shall be frozen and the Company shall not be liable to make any payments or provide any defense under this policy.

B.  Section 6.1 - LOSS ADJUSTMENT AND SETTLEMENT, Paragraph h. SUIT AGAINST THE COMPANY, is replaced with the following:

    h.  SUIT AGAINST THE COMPANY

    No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless the Insured has fully complied with all the provisions of this Policy. Legal action must be started within 24 months after the date of direct physical loss or damage to Property Insured or to other property as set forth herein.

C.  Section 6.2 - GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, Subparagraph (1)(b) is replaced with the following:

    (b)  The Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation at least:

        (i)  10 days before the effective date of cancellation if the Company cancels for nonpayment of premium; or

        (ii)  45 days before the effective date of cancellation if the Company cancels for any other reason.

D.  Section 6.2 - GENERAL PROVISIONS, Paragraph c. CONCEALMENT, MISREPRESENTATION OR FRAUD is replaced with the following:

    c.  CONCEALMENT, MISREPRESENTATION OR FRAUD

    The Company will not pay for any **claim** in any case of fraud by any Insured as it relates to this Policy at any time.  The Company will cancel this Policy in accordance with Georgia law if any Insured, at any time, intentionally conceals or misrepresents a material fact concerning:

        (1)  This Policy;

WT_000579

(2)  The Property Insured;

(3)  The Insured's interest in Property Insured; or

(4)  A claim under this Policy.

E.  The first sentence and subparagraphs (1) and (2) of Section 6.2 - GENERAL PROVISIONS, Paragraph k. OTHER INSURANCE are replaced with the following:

The Company will share loss proportionally with similar or like insurance, or with insurance that is part of a property insurance plan or program expressly written with other participants, and is not other insurance as described below.

(1)  If there is any other insurance that would attach in absence of this insurance, subject to (4) of this paragraph, this insurance will apply only as excess insurance, Difference in Conditions or Difference in Limits insurance after all other insurance has been exhausted.  In no event will this insurance apply as contributing insurance.

(2)  The Company gives the Insured permission to purchase insurance for all or any part of the deductible(s) in this Policy, and the existence of underlying insurance will not prejudice the Insured's rights under this Policy.

(a)  The deductible and any amount paid under such other insurance that would be covered under this Policy will apply to the deductible that would apply in this Policy.

(b)  This Policy will then apply on an excess, Difference in Conditions or Difference in Limits basis over that insurance purchased to cover the deductible.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Illinois



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  SECTION 6.1 - LOSS ADJUSTMENT AND SETTLEMENT, Paragraph h. SUIT AGAINST THE COMPANY, is replaced with the following:

   h.  SUIT AGAINST THE COMPANY

     No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity, unless the Insured has fully complied with all the provisions of this Policy.  Legal action must be started within 12 months after the date of direct physical loss or damage to Property Insured or to other property as set forth herein. However, the Company will extend this period by the number of days between the date the proof of loss is filed and the date the claim is denied in whole or in part.

B.  SECTION 6.2 **-** GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, is replaced with the following:

   a.  CANCELLATION/NON-RENEWAL

    (1)  Cancellation

      (a)  The **First Named Insured** shown in the Declarations may cancel this Policy by mailing or delivering to the Company advance written notice of cancellation.

      (b)  If this Policy has been in effect for 60 days or less, except as provided below when the Policy covers real property other than residential property occupied by four families or less, the Company may cancel this Policy by mailing written notice of cancellation at least:

        (i)  10 days before the effective date of cancellation if the Company cancels for nonpayment of premium; or,

        (ii)  30 days before the effective date of cancellation if the Company cancels for any other reason.

      (c)  If this Policy has been in effect for more than 60 days, except as provided below when the Policy covers real property other than residential property occupied by four families or less, the Company may cancel this Policy only for one or more of the following reasons:

        (i)  Nonpayment of premium;

        (ii)  The Policy was obtained through a material misrepresentation;

        (iii)  The **First Named Insured** has violated any of the terms and conditions of the Policy;

        (iv)  The risk originally accepted has measurably increased;

        (v)  Certification to the Director of Insurance of the loss by reinsurance by the insurer which provided coverage to the Company for all or a substantial part of the underlying risk insured; or

(vi) A determination by the Director that the continuation of the Policy could place the Company in violation of the insurance laws of this State.

(d) If the Company cancels this Policy based on one or more of the above reasons except for nonpayment of premium, the Company will mail written notice at least 60 days before the effective date of cancellation. When cancellation is for nonpayment of premium, the Company will mail written notice at least 10 days before the effective date of cancellation.

(e) The Company will mail notice to the **First Named Insured's** last known mailing address.

(f) Notification of cancellation will also be sent to the **First Named Insured's** broker, if known, or agent of record, if known, and to the mortgagee or lienholder listed on the Policy.

(g) Notice of cancellation will state the effective date and specific reason(s) for cancellation.  The Policy Period will end on that date.

(h) If this Policy is cancelled, the Company will send the **First Named Insured** any premium refund due.  If the Company cancels, the refund will be pro rata.  If the **First Named Insured** cancels, the refund may be less than pro rata but no less than the customary short rate amount.  The cancellation will be effective even if the Company has not made or offered a refund.

(i) If notice is mailed, then proof of mailing will be sufficient proof of notice.

(j) If under the laws of the jurisdiction in which the property is located, such cancellation terms or conditions are different, then cancellation terms or conditions will be as permitted by such laws.

(k) The following applies only if this Policy covers property other than residential property occupied by four families or less:

If any one or more of the following conditions exists at any building that is Covered Property in this Policy, the Company may cancel this Policy by mailing to the **First Named Insured** written notice of cancellation, by both certified and regular mail, if:

(i) After a fire loss, permanent repairs to the building have not started within 60 days of satisfactory adjustment of loss, unless the delay is due to a labor dispute or weather conditions.

(ii) The building has been occupied 60 or more consecutive days.  This does not apply to:

i   Seasonal unoccupancy; or

ii   Buildings under repair, construction or reconstruction, if property secured against unauthorized entry.

(iii) The building has:

i   An outstanding order to vacate;

ii   An outstanding demolition order; or

iii   Been declared unsafe in accordance with the law.

(iv) Heat, water, sewer service or public lighting have not been connected to the building for 30 consecutive days or more.

(l) The Policy will terminate 10 days following receipt of the written notice by the named insured(s).

(m) The following applies only with respect to grain in public grain warehouses:

The **First Named Insured** or the Company may cancel this Policy at any time by mailing to:

i   The other; and

ii   The Director of the Illinois Department of Agriculture (at its Springfield Office);

60 days' written notice of cancellation.

(2)  Non-renewal

(a) The Company may non-renew this Policy by mailing to the Named Insured, at the Insured's last mailing address known to us, written notice of non-renewal, accompanied by the specific reason for non-renewal at least 60 days prior to the expiration of this Policy.  Proof of mailing will be sufficient proof of notice.

(b) If the Company offers to renew or continue and the **First Named Insured** does not accept, this Policy will terminate at the end of the current policy period.  Failure to pay the required renewal or continuation premium when due shall mean that the **First Named Insured** has not accepted the offer.

(c) If the Company fails to mail proper written notice of nonrenewal and the **First Named Insured** obtains other insurance, this Policy will end on the effective date of that insurance.

(d) Notification of nonrenewal will also be sent to the **First Named Insured's** broker, if known, or agent of record, if known, and the mortgagee or lienholder listed on the Policy.

C.  SECTION 6.2 **-** GENERAL PROVISIONS, Paragraph k. Other Insurance, is amended as follows:

1.  Subparagraph (1) is replaced with the following:

(1) The Company will not be liable if, at the time of loss or damage, there is any other insurance that would attach in absence of this insurance; except that this insurance shall apply only as pro rata contributing insurance. However, this provision does not apply to insurance provided under a Mine Subsidence Fund Endorsement.

2.  Subparagraph (4) is replaced with the following:

(4) The Company will not be liable if, at the time of loss or damage, there is any of the following other insurance that would attach in absence of this insurance:

(a) A National Flood Insurance Program policy;

(b) A specific policy for construction, additions, renovations or alterations; or

(c) A specific policy for **Finished Stock**, **Merchandise**, **Raw Materials** or **Stock in Process**,

(d) A Mine Subsidence Fund Endorsement,

except that this insurance:

(e) Will apply only as excess after the Limit of Liability for the other insurance described in (a) through (d) of this paragraph that has coverage for the loss or damage, has been exhausted by payment; and

(f) Will not contribute on any basis, drop down, replace or assume any obligation within the Limit of Liability of the other insurance described in (a) through (c) of this paragraph for any reason including, difference in terms or conditions, uncollectibility or application of a sub-limit or deductible, of such insurance.

D.  SECTION 6.2 **-** GENERAL PROVISIONS, Paragraph m. Suspended Property, is replaced with the following:

m.  Suspended Property

When **Covered Equipment** is found to be in, or exposed to a dangerous condition, any of the Company's representatives may immediately suspend this insurance for such **Covered Equipment,** including loss arising out of the dangerous condition of such **Covered Equipment**.  This can be done by delivering or mailing a written notice to the **First Named Insured's** mailing address or to the address where the **Covered Equipment** is located.  Once suspended, this insurance can be reinstated only by an endorsement.  Any unearned premium due will be returned by the Company.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Indiana



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  SECTION 6.2 - GENERAL PROVISIONS, Paragraph c. CONCEALMENT, MISREPRESENTATION OR FRAUD is replaced with the following:

    c.  CONCEALMENT, MISREPRESENTATION OR FRAUD

      (1)  The Company will not pay for any loss or damage in any case of:

        (a)  Concealment or misrepresentation of a material fact; or

        (b)  Fraud

      committed by an Insured at any time relating to a claim under this Policy.

      However, this does not apply when a claim is made by an **Innocent Coinsured** provided:

        (a)  The property loss or damage occurs to the primary residence of the **Innocent Coinsured** as covered under Property Insured.

        (b)  The **Final Settlement** for the property loss or damage is at least 60% of available insurance proceeds under the Policy.

      (2)  Any payment made pursuant to a claim made by an **Innocent Coinsured** as described above, will be for:

        (a)  The actual cost of repair or replacement of the property that is the subject of the claim if the actual cost of repair or replacement is less than or equal to the maximum limit of coverage under the Policy, or

        (b)  The maximum limit of coverage under the Policy is the actual cost of repair or replacement of the property that is the subject of the claim is greater than the maximum limit of coverage under the Policy.

      Any payment made pursuant to above, is limited to an **Innocent Coinsured's** ownership interest in the property, less any payments the Company makes to a mortgagee or other lienholder with a secured interest in the property.

      (3)  The Company will not pay another coinsured for any part of the claim for which the Company has already paid to an **Innocent Coinsured**.

      (4)  The Company will not pay an amount that is greater than the amount an **Innocent Coinsured** is entitled to under a decree of dissolution of marriage between the Innocent Coinsured and an individual described below.

B.  SECTION 6.2 - GENERAL PROVISIONS, Paragraph k. OTHER INSURANCE, Subparagraph (4), is replaced with the following:

      (4)  The Company will not be liable if, at the time of loss or damage, there is any of the following other insurance that would attach in absence of this insurance:

(a)  A National Flood Insurance Program policy;

(b)  A specific policy for construction, additions, renovations or alterations; or

(c)  A specific policy for **Finished Stock**, **Merchandise**, **Raw Materials** or **Stock in Process**,

(d)  A Mine Subsidence Fund Endorsement,

except that this insurance:

(e)  Will apply only as excess after the Limit of Liability for the other insurance described in (a) through (d) of this paragraph that has coverage for the loss or damage, has been exhausted by payment; and

(f)  Will not contribute on any basis, drop down, replace or assume any obligation within the Limit of Liability of the other insurance described in (a) through (c) of this paragraph for any reason including, difference in terms or conditions, uncollectibility or application of a sub-limit or deductible, of such insurance.

C.  The following is added to SECTION 7 – DEFINITIONS

**Innocent Coinsured** is an insured who:

a.  Did not have knowledge of, cooperate in, or intentionally contribute to a property loss or damage that was caused or arranged by another individual who:

(1)  Is an insured, and:

(2)  Died in connection with the circumstances that caused the property loss or damage; or

(3)  Has been charged with a crime based on a court finding that there is probable cause to believe that the individual committed the crime in connection with the circumstances that caused the property loss or damage;

b.  Signs a sworn affidavit attesting that they did not have knowledge of, cooperate in, or intentionally contribute to the property loss or damage; and

c.  Cooperates in the investigation and resolution of the claim for the property loss or damage, any police investigation related to the property loss or damage, and any criminal prosecution of the individual that caused or arranged the property loss or damage.

**Final Settlement** is a determination:

a.  Of the amount owed by the Company to an **Innocent Coinsured** under Property Insured under this Policy and for property loss or damage to the **Innocent Coinsured's** primary residence; and

b.  Made by:

(1)  Acceptance of a proof of loss by the Company;

(2)  Execution of a release by an **Innocent Coinsured**;

(3)  Acceptance of an arbitration award by the **Innocent Coinsured** and the Company; or

(4)  Judgment of a court of competent jurisdiction.

However, **Final Settlement** does not apply to loss or damage related to contents, personal property or another loss that is not covered under Property Insured under this Policy.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Iowa



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A. SECTION 6.2 **-** GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, Subparagraph (1) Cancellation is replaced with the following:

(1) Cancellation

(a) The **First Named Insured** shown in the Declarations may cancel this Policy by mailing or delivering to the Company advance written notice of cancellation.

(b) The Company may cancel this Policy by mailing or delivering to the **First Named Insured**, at the mailing address shown in the Policy, advance written notice of cancellation, stating the reason for cancellation at least:

(i) 30 days before the effective date of the cancellation if the Company cancels due to loss of reinsurance coverage;

(ii) 10 days before the effective date of cancellation if the Company cancels for any other reason allowed pursuant to Iowa law.

(c) If this Policy is a new Policy and has been in effect for less than 60 days, the Company may cancel for:

(i) 30 days before the effective date of the cancellation if the Company cancels due to loss of reinsurance coverage;

(ii) 10 days before the effective date of cancellation if the Company cancels for any other reason allowed pursuant to Iowa law.

(d) If this Policy has been in effect for more than 60 days or is a renewal of a Policy the Company issued, the Company may cancel this Policy only upon the occurrence, after the effective date of the Policy, of one or more of the following:

(i) Nonpayment of premium; or

(ii) Misrepresentation or fraud made by or with the knowledge of the insured in obtaining the Policy or contract, when renewing the Policy or contract, or in presenting a claim under the Policy or contract; or

(iii) Actions by the insured which substantially change or increase the risk insured; or

(iv) Determination by the Iowa Insurance Commissioner that the continuation of the Policy will jeopardize the Company's solvency or will constitute a violation of the laws of Iowa or any other state; or

(v) The insured has acted in a manner which the insured knew or should have known was in violation or breach of a Policy or contract term or condition; or

(vi) Loss of reinsurance which provides coverage to the Company for a significant portion of the underlying risk insured and if the Iowa Insurance Commissioner determines that the cancellation because of loss of reinsurance coverage is justified.

(e) Notice of cancellation will state the effective date of and the reason for cancellation. The Policy Period will end on that date.

(f) If this Policy is cancelled, the Company will send the **First Named Insured** any premium refund due.  If the Company cancels, the refund will be pro rata.  If the **First Named Insured** cancels, the refund may be less than pro rata but no less than the customary short rate amount.  The cancellation will be effective even if the Company has not made or offered a refund.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Kansas



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  Section 6.1 LOSS ADJUSTMENT AND SETTLEMENT, Paragraph f. APPRAISAL, is replaced with the following:

f.    APPRAISAL

After a dispute has arisen, an appraisal may take place if the Insured and the Company fail to agree on the amount of the loss. However, an appraisal will take place only if both Insured and the Company agree, voluntarily, to have the loss appraised.

If the Insured and the Company agree to an appraisal on the value of the property or the amount of loss, each will, on the written demand of either, select a competent, disinterested, and impartial appraiser, who has no direct or indirect financial interest in the claim.  Each will notify the other of the appraiser selected within 20 days of such demand.  The Insured may not invoke Appraisal unless it has first fully complied with all provisions of this Policy, including Duties in the Event of Loss or Damage and has provided the Company with a signed and sworn statement of loss.

The appraisers will first select a competent, disinterested and impartial umpire.  If the appraisers fail to agree upon an umpire within 15 days then, on the request of the Insured or the Company, a judge of a court of record in the jurisdiction in which the appraisal is pending will select the umpire.  The appraisers will then appraise the value of the property or the amount of loss.  For each individual item of Property Insured they will each state the amount of loss based on an **Actual Cash Value** basis and a **Replacement Cost** value basis, as of the date of loss.  For a Time Element loss, they will each state the amount of loss for each Time Element Coverage of this Policy.

If the appraisers fail to agree, they will submit their differences to the umpire.  An award agreed to in writing by any two will determine the amount of loss.

An award will state separately the amount of loss based on the **Actual Cash Value** basis and **Replacement Cost** value basis as of the date of loss for each individual item of Property Insured.  For Time Element loss, it will state the amount of loss for each Time Element Coverage of this Policy.

Once there is an award, the Company retains the right to apply all Policy terms and conditions (including but not limited to deductibles, **Qualifying Periods**, exclusions, and Limits of Liability) to the award.  The Company further retains its right to deny the claim in whole or in part.

The Insured and the Company will each pay its chosen appraiser and bear equally the other expenses of the appraisal and umpire.

B.  Section 6.1 **-** LOSS ADJUSTMENT AND SETTLEMENT, Paragraph h. SUIT AGAINST THE COMPANY, is replaced with the following:

h.  SUIT AGAINST THE COMPANY

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless the Insured has fully complied with all the provisions of this Policy. Legal action must be started within 5 years after the date of direct physical loss or damage to Insured Property or to other property as set forth herein.

C. Section 6.2 - GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, Subparagraph (1)(b) is replaced with the following:

(b) The Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation at least:

(i)  The number of days before the effective date of cancellation if the Company cancels for nonpayment of premium, as stated in the Declarations, which shall not be less than 5 days if the nonpayment is for a premium installment or at least 30 days before the effective date of cancellation if the Company cancels for any other reason.

(ii) Once this Policy has been in effect for 90 days or more, the Company may cancel for any of the following reasons:

i    Nonpayment of premium;

ii   The Policy was issued because of a material misrepresentation;

iii  Any Insured violated any of the material terms and conditions of the Policy;

iv   Unfavorable underwriting factors, specific to the Insured, exist that were not present at the inception of the Policy;

v    A determination by the commissioner that continuation of coverage could place the insurer in a hazardous financial condition or in violation of the laws of this state; or

vi   A determination by the commissioner that the insurer no longer has adequate reinsurance to meet the insurer's needs.

D. Section 6.2 - GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, Subparagraph (2) is replaced with the following:

(2) Non-renewal

The Company may non-renew this Policy by mailing or delivering to the **First Named Insured,** or to your licensed agent, written notice of the non-renewal at least 60 days before the expiration date of the Policy.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Kentucky



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  SECTION 6.2 **-** GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, Subparagraph (1)(b), is replaced with the following:

(b)  The Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation at least:

(i)  14 days before the effective date of cancellation if this Policy has been in effect for 60 days or less. Cancellation can be for any reason, and the notice will state the reason for cancellation.

(ii)  For Policies in effect for more than 60 days or that are a renewal of a Policy the Company issued:

i   14 days before the effective date of the cancellation, if cancellation is for nonpayment of premium; or

ii   75 days before the effective date of cancellation, if cancellation is for:

a)  Discovery of fraud or material misrepresentation made by the Insured or with the Insureds' knowledge in obtaining the Policy, continuing the Policy, or in presenting a claim under the Policy;

b)  Discovery of willful or reckless acts or omissions on the Insureds' part which increase any hazard insured against;

c)  The occurrence of a change in the risk which substantially increases any hazard insured against after insurance coverage has been issued or renewed;

d)  A violation of any local fire, health, safety, building, or construction regulation or ordinance with respect to any insured property or the occupancy thereof which substantially increases any hazard insured against;

e)  The Company is unable to reinsure the risk covered by the Policy; or

f)  A determination by the commissioner that the continuation of the Policy would place the Company in violation of the Kentucky insurance code or regulations of the commissioner.

B.  SECTION 6.2 **-** GENERAL PROVISIONS, Paragraph k. OTHER INSURANCE, Subparagraph (4), is replaced with the following:

(4)  The Company will not be liable if, at the time of loss or damage, there is any of the following other insurance that would attach in absence of this insurance:

(a)  A National Flood Insurance Program policy;

(b)  A specific policy for construction, additions, renovations or alterations; or

(c)  A specific policy for **Finished Stock**, **Merchandise**, **Raw Materials** or **Stock in Process**,

(d)  A Mine Subsidence Fund Endorsement,

except that this insurance:

(e)  Will apply only as excess after the Limit of Liability for the other insurance described in (a) through (d) of this paragraph that has coverage for the loss or damage, has been exhausted by payment; and

(f)  Will not contribute on any basis, drop down, replace or assume any obligation within the Limit of Liability of the other insurance described in (a) through (c) of this paragraph for any reason including, difference in terms or conditions, uncollectibility or application of a sub-limit or deductible, of such insurance.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Louisiana



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT ONLY APPLIES TO LOCATIONS IN LOUISIANA.**

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.   SECTION 2.3 - POLICY LIMITS OF LIABILITY, Paragraph h. is replaced with the following:

    h.   Time Specifications as follows:

| | |
|---|---|
| **EARTH MOVEMENT Occurrence** | 168 hours |
| **NAMED STORM Occurrence** | 72 hours |
| Cancellation for nonpayment of premium | 10 days |
| Cancellation for any other reason | 60 days |

B.   Section 3.3 EXCLUSIONS, is amended as follows:

1.   Subparagraph a.(1) is replaced with the following:

    (1)   **Contamination** or asbestos, and any cost due to **Contamination** or asbestos including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy.

2.   Subparagraph c.(3) is replaced with the following:

    (3)   Any weapon of war or of mass destruction employing biological or chemical warfare, atomic fission, atomic fusion, radioactive force or radioactive material, regardless of who commits the act.

D.   SECTION 6.1 - LOSS ADJUSTMENT AND SETTLEMENT is amended as follows:

1.   Paragraph f. APPRAISAL is deleted in its entirety.

2.   Paragraph g. SUBROGATION is replaced with the following:

    g.   SUBROGATION

    The Insured is required to cooperate in any subrogation proceedings.  To the extent of the Company's payment, the Insured's rights of recovery against any party are transferred to the Company.

    The Company acquires no rights of recovery that the Insured has expressly waived prior to a loss, nor will such waiver affect the Insured's rights under this Policy.

Any recovery from subrogation proceedings, less costs incurred by the Company in such proceedings, will be payable to the Insured in the proportion that the amount of any applicable deductible and/or any provable uninsured loss, bears to the entire provable loss amount.

The Company will be entitled to recovery only after the insured has been fully compensated for the loss or damage sustained, including expenses incurred in obtaining full compensation for the loss or damage.

3. Paragraph h. SUIT AGAINST THE COMPANY, is replaced with the following:

   h.  SUIT AGAINST THE COMPANY

   A person or organization may bring a suit against the Company including, but not limited to a suit to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Policy or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by the Company, the Insured and the claimant or the claimant's legal representative. Legal action must be started within 24 months after the date of direct physical loss or damage to Covered Property or to other property as set forth herein.

4. Paragraph j. VALUATION, Subparagraph (g) Electrical Or Mechanical Equipment is replaced with the following:

   (g)  Electrical or Mechanical Equipment

   For non-repairable electrical or mechanical equipment, including computer equipment, the cost to replace with equipment that is of like kind and quality to that damaged or destroyed, even if such equipment has technological advantages, represents an improvement in function, or forms part of a program of system enhancement.

H. SECTION 6.2 - GENERAL PROVISIONS, is amended as follows:

1. Paragraph a. CANCELLATION/NON-RENEWAL, is replaced with the following:

   a.  CANCELLATION/NON-RENEWAL

   (1)  Cancellation

      (a)  If this Policy is cancelled, the Company will return any premium refund due.  The cancellation will be effective even if the Company has not made or offered a refund.

         (i)  If the **First Named Insured** cancels, the refund will not be less than 90% of the pro rata unearned premium, rounded to the next higher whole dollar. The refund will be returned within 30 days after the effective date of cancellation.

         (ii)  If we cancel, the refund will be pro rata and we will send the refund to the **First Named Insured**.

      (b)  If we cancel a policy that has been in effect for fewer than 60 days and is not a renewal of a policy we issued, we will give written notice to the **First Named Insured** at least:

         (i)  10 days before the effective date of cancellation, if we cancel for nonpayment of premium; or

         (ii)  60 days before the effective date of cancellation, if we cancel for any other reason.

      (c)  If we cancel a policy that has been in effect for 60 days or more, or is a renewal of a policy we issued, we will give written notice to the **First Named Insured** at least:

         (i)  10 days before the effective date of cancellation, if we cancel for nonpayment of premium; or

         (ii)  30 days before the effective date of cancellation, if we cancel for any other reason.

      (d)  Cancellation of a policy in effect more than 60 days will be based on one of the following reasons:

         (i)  Nonpayment of premium.

         (ii)  Fraud or material misrepresentation made by or with the knowledge of the named insured in obtaining the policy, continuing the policy, or presenting a claim under the policy.

         (iii)  Activities or omissions on the part of the named insured change or increase any hazard insured against.

(iv) Change in the risk, which increases the risk of loss after coverage has been issued or renewed.

(v) Determination by the Commissioner (of Insurance) that the continuation of the policy would jeopardize the solvency of the insurer or place the insurer in violation of the law.

(vi) Violation or breach of policy terms or conditions by the Insured.

(vii) Other approved reasons.

(2) Non-Renewal

(a) If we elect not to renew the policy, we will mail or deliver written notice of nonrenewal to the **First Named Insured** at least 60 days before its expiration date, or its anniversary date if it is a policy written for a term of more than one year or with no fixed expiration date. The notice will include the insured's loss run information for the period the policy has been in force, not to exceed three years.

2. Paragraph c. CONCEALMENT, MISREPRESENTATION OR FRAUD is replaced with the following:

c. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Policy will be canceled in the case of fraud or misrepresentation by any Insured as it relates to

(1) This Policy;

(2) The Property Insured;

(3) The Insured's interest in Property Insured; or

(4) A claim under this Policy; if

the fraud or misrepresentation is (1) false, (2) was made with the intent to deceive, and (3) is material to the risk.

3. The following is added to Paragraph f. JOINT LOSS, Subparagraph (8) Additional Conditions:

The Arbitration process is voluntary and non-binding.

I.   SECTION 7. – DEFINITIONS, Paragraph 7.11 is replaced with the following:

7.11. **Contaminant(s)** - Any solid, liquid, gaseous, thermal or other irritant, foreign substance, pollutant or impurity, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), ammonia, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease or illness causing agent, other hazardous substances or **Fungus**.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Maine



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**The Zurich Edge II Declarations**
**The Zurich Edge II Policy**

A.  SECTION 1 - POLICY INFORMATION, 1.1. INSURING AGREEMENT is replaced with the following:

This Policy Insures against direct physical loss of or damage from a **Covered Cause of Loss,** meaning from any cause unless otherwise excluded, that commences during the Policy Period, to Property Insured at an Insured Location, all subject to the terms, conditions and exclusions stated in this Policy.

No coverage can be provided in violation of any U.S. economic or trade sanctions laws or regulations.  The Company shall not be liable to make any payments or provide any defense under this policy for coverage in violation of any U.S. economic or trade sanction law or regulation.

B.  SECTION 6.1 - LOSS ADJUSTMENT AND SETTLEMENT, Paragraph h. SUIT AGAINST THE COMPANY, is replaced with the following:

h.  SUIT AGAINST THE COMPANY

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless the Insured has fully complied with all the provisions of this Policy.  Legal action must be started within 2 years after the date of direct physical loss or damage to Property Insured or to other property as set forth herein.

C.  Section 6.2 - GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, is replaced with the following:

a.  CANCELLATION/NON-RENEWAL

(1)  Cancellation

(a)  The **First Named Insured** shown in the Declarations may cancel this Policy by mailing or delivering to the Company advance written notice of cancellation.

(b)  The Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation which will not be effective prior to 10 days after the receipt by the **First Named Insured** of the notice.

(c)  The Company will mail or deliver notice to the **First Named Insured's** mailing address shown in the Declarations of this Policy or any Endorsement attached thereto.

(d)  Notice of cancellation will state the effective date of and reasons for cancellation. The Policy Period will end on that date.

(e)  If this Policy is cancelled, the Company will send the **First Named Insured** any premium refund due. If the Company cancels, the refund will be pro rata. If the **First Named Insured** cancels, the refund may be less than pro rata but no less than the customary short rate amount. The cancellation will be effective even if the Company has not made or offered a refund.

(f)  A post office certificate of mailing to the **First Named Insured** at the last known mailing address will be conclusive proof of receipt of notice on the third calendar day after mailing.

(g)  If this Policy has been in effect for 60 days or more, or if it is a renewal or continuation of a Policy issued by the Company, the Company may cancel this Policy only for one or more of the following reasons:

   (i)  Nonpayment of premium;

   (ii)  Fraud or material misrepresentation made by the Insured or with the Insureds consent in obtaining the Policy, continuing the Policy or in presenting a claim under the Policy;

   (iii)  Substantial change in the risk which increases the risk of loss after insurance coverage has been issued or renewed including, but not limited to, an increase in exposure due to regulation, legislation or court decision;

   (iv)  Failure to comply with reasonable loss control recommendations;

   (v)  Substantial breach of contractual duties, conditions or warranties; or

   (vi)  Determination by the superintendent of insurance that the continuation of a class or block of business to which this Policy belongs will jeopardize the Company's solvency or will place the Company in violation of the insurance laws of Maine or any other state.

(2)  Non-renewal

The Company may non-renew this Policy by mailing or delivering to the **First Named Insured** written notice of nonrenewal which will not be effective prior to 30 days after the receipt by the **First Named Insured** of the notice. A post office certificate of mailing to the **First Named Insured** at the last known address will be conclusive proof of receipt of notice on the third calendar day after mailing.

D.  Section 6.2 - GENERAL PROVISIONS, Paragraph c. CONCEALMENT, MISREPRESENTATION OR FRAUD is replaced with the following:

c.  CONCEALMENT, MISREPRESENTATION OR FRAUD

This Policy shall not apply to one or more Insureds who at any time engage in fraudulent conduct as it relates to this Policy. This Policy also does not apply to one or more Insureds, who at any time intentionally conceal or misrepresent a material fact or make a false statement concerning:

   (1)  This Policy;

   (2)  The Property Insured;

   (3)  The Insured's interest in Property Insured; or

   (4)  A claim under this Policy.

E.  Section 6.2 - GENERAL PROVISIONS, Paragraph f. JOINT LOSS, is deleted in its entirety.

F.  Section 7. - DEFINITIONS, Paragraph 7.1 is replaced with the following:

7.1. **Actual Cash Value** - The replacement cost of an insured item of property at the time of loss, less the value of physical depreciation as to the item damaged. "Physical depreciation" means a value as determined according to standard business practices.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Maryland



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  The following is added to SECTION 3.2. PROPERTY EXCLUDED:

Any property, prior to a loss, found to be in, or exposed to, a dangerous condition, by any of the Company's representatives, and the Insured is put on notice for such condition, until the dangerous condition has been corrected.

B.  SECTION 6.1 LOSS ADJUSTMENT AND SETTLEMENT, Paragraph h. SUIT AGAINST THE COMPANY, is deleted in its entirety and replaced by the following:

h.  SUIT AGAINST THE COMPANY

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless the Insured has fully complied with all the provisions of this Policy.  Legal action must be started within 3 years after the date of direct physical loss or damage to Property Insured or to other property as set forth herein.

C.  SECTION 6.2 GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON- RENEWAL, subparagraph (1) Cancellation is replaced with the following:

(1)  Cancellation

(a)  The **First Named Insured** shown in the Declarations may cancel this Policy by mailing or delivering to the Company advance written notice of cancellation.

(b)  When this policy has been in effect for 45 days or less and is not a renewal policy, the Company may cancel this policy by mailing to the **First Named Insured**, at the last mailing address, written notice of cancellation, stating the reason for cancellation, at least:

(i)  10 days before the effective date of cancellation if the Company cancels for nonpayment of premium.

(ii)  15 days before the effective date of cancellation if the Company cancels because the risk does not meet its underwriting standards.

(c)  When this policy has been in effect for more than 45 days or is a renewal policy, the Company may cancel this policy by mailing to the **First Named Insured**, at the last mailing address, written notice of cancellation at least:

(i)  10 days before the effective date of cancellation if the Company cancels for nonpayment of premium.

(ii)  45 days before the effective date of cancellation if the Company cancels for a permissible reason other than nonpayment of premium, stating the reason for cancellation. The Company may cancel only for 1 or more of the following reasons:

i   When there exists material misrepresentation or fraud in connection with the application, policy, or presentation of a claim.

    ii   A change in the condition of the risk that results in an increase in the hazard insured against. A matter or issue related to the risk that constitutes a threat to public safety.

(d) If this policy is cancelled, the Company will send the **First Named Insured** any premium refund due.

    (i)   The refund will be pro rata if:

        i   The **First Named Insured** cancels or:

        ii   The policy is not a renewal policy, and the **First Named Insured** cancels upon receiving written notice that the Company recalculated the premium based on the discovery of a material risk factor during the first 45 days the policy has been in effect.  Other than this type of cancellation, the refund will be calculated as follows:

           a)   For policies written for one year or less, the Company will refund 90% of the pro rata unearned premium. For policies written for more than one year:

           b)   If the policy is cancelled in the first year, the Company will refund 90% of the pro rata unearned premium for the first year, plus the full annual premium for subsequent years.

(e) If the policy is cancelled after the first year, the Company will refund the pro rata unearned premium.

(f) Continuous and Annual Premium Payment Policies:

    (i)   The Company will refund 90% of the pro rata unearned premium for the year in which the policy is cancelled. The Company will retain the minimum premium, except if the policy is cancelled as of the inception date. However, if this policy is financed by a premium finance company and the Company or the premium finance company or the **First Named Insured** cancels the policy, the refund will consist of the gross unearned premium computed pro rata, excluding any expense constant, administrative fee or nonrefundable charge filed with and approved by the insurance commissioner.

    (ii)   The cancellation will be effective even if the Company has not made or offered a refund.

(g) The Company will send notice of cancellation to the **First Named Insured** by certificate of mail if:

    (i)   The Company cancel for nonpayment of premium; or

    (ii)   This policy is not a renewal of a policy the Company issued and has been in effect for 45 days or less.

(h) The Company will send notice to the **First Named Insured** by certificate of mail or by commercial mail delivery service if the Company cancels for a reason other than nonpayment of premium and this policy:

    (i)   Is a renewal of a policy we issued; or

    (ii)   Has been in effect for more than 45 days.

(i) The Company will maintain proof of mailing in a form authorized or accepted by the United States Postal Service or by other commercial mail delivery service when such service is used.  Proof of mailing will be sufficient proof of notice.

D.  SECTION 6.2 GENERAL PROVISIONS, Paragraph c. CONCEALMENT, MISREPRESENTATION OR FRAUD is deleted in its entirety.

E.  SECTION 6.2 GENERAL PROVISIONS, Paragraph m. SUSPENDED PROPERTY is deleted in its entirety.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Massachusetts



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.   The following is added to Section 5.3 – DESCRIBED CAUSES OF LOSS:

MASSACHUSETTS RESIDENTIAL FUEL TANKS SPILLS COVERAGE - PROPERTY REMEDIATION FOR **RELEASE OF HEATING OIL**

a.   With respect to the **Release of Heating Oil** from a **Tank**, or any piping, fuel supply lines, equipment, or systems connected to the **Tank**, at a **Residential Property**, the Company will pay for:

(1)   Reasonable response action costs the Insured incurred under chapter 21E or 21K of the Massachusetts law or applicable regulations, including costs to assess and remediate a **Release Of Heating Oil** impacting soil, indoor air, water and other environmental media at that **Residential Property**; and

(2)   With respect to a **Release Of Heating Oil** for which response action costs are incurred and covered pursuant to (1) above, direct physical loss of or damage to **Personal Property** at that **Residential Property**.

b.   The most the Company will pay under this endorsement for a **Release Of Heating Oil** is the applicable limits provided in this policy or $50,000 whichever is greater, for the total of all loss, damage, or costs regardless of:

(1)   The amount of time over which the **Release Of Heating Oil** continues and regardless of whether the release occurs in repeated intervals;

(2)   The number of **Policy Years** during which the **Release Of Heating Oil** persists;

(3)   Whether the heating oil is released from one or multiple outlets on the **tank** body and its related equipment;

(4)   Whether there are multiple effects, such as damage to **Personal Property**, pollution of land and pollution of water;

(5)   Whether the effects of the **Release Of Heating Oil** are discovered and reported once or discovered and reported over time as such effects become apparent;

(6)   The number of **Locations** affected by the **Release Of Heating Oil**; or

(7)   The number of claims made.

Notwithstanding anything to the contrary in the Policy, the coverage provided by this endorsement is included within the Policy Limit.

c.   The following additional exclusions apply:

The Company will not pay:

(1)   For any loss of business income or any expenses incurred due to interruption or reduction in business operations, including any Time Element Coverages, even if the Policy includes such coverage;

(2)  For any other consequential loss, damage or costs; or

(3)  To replace any heating oil that was released.

d.  The Company will not pay for loss, damage or costs under this endorsement until the amount of loss, damage or costs exceed $1,000.  The Company will then pay the amount of loss, damage or costs in excess of $1,000 up to the applicable limit, subject to all applicable provisions of A. above.  This deductible applies whenever there is a **Release Of Heating Oil** covered under this endorsement.  No other deductible will apply to the coverage provided solely by this endorsement.

e.  When the **Release Of Heating Oil** results from a **Covered Cause Of Loss**, the following apply:

(1)  If the loss or damage described in Paragraph a.(2) above is also covered under another coverage(s) in this Policy, then such covered loss or damage will be settled in accordance with all applicable terms of that coverage and this endorsement will not apply.  Any deductible applicable to that coverage that is higher than $1,000 is recoverable under this endorsement but not to exceed $50,000.

(2)  With respect to pollution of land and water, the costs addressed in Paragraph a.(1) above will be settled under the terms of the Land and Water **Contaminant** Cleanup, Removal and Disposal Coverage and/or the Decontamination Costs Coverage, and this endorsement will apply as excess if the amount of coverage available under the Land and Water **Contaminant** Cleanup, Removal and Disposal Coverage and/or the Decontamination Costs Coverage is less than $50,000.

f.  Coverage applies only in response to a **Release Of Heating Oil** which an insured first discovers or learns of during the current **Policy Year** and reports to the Company as soon as practicable.  If the **First Named Insured** discovers or learns of the **Release Of Heating Oil** during the **Policy Year** and reports it to the Company following the end of that **Policy Year**, coverage will apply, provided this endorsement was in effect when the **First Named Insured** discovered or learned of the **Release Of Heating Oil**, if the **First Named Insured** reported the **Release Of Heating Oil** to the Company as soon as practicable.

B.  The following is added to Section 6 – CONDITIONS:

### STANDARD FIRE POLICY PROVISIONS

Your Policy contains LEGAL ACTION AGAINST US, APPRAISAL and CANCELLATION provisions.

Massachusetts law requires that the Suit, Appraisal and Cancellation provisions of the Massachusetts Standard Fire Policy supersede any similar provisions contained in your Policy. Therefore, all LEGAL ACTION AGAINST US, APPRAISAL and CANCELLATION provisions contained in your policy are void. The Suit, Appraisal and Cancellation provisions of the Massachusetts Standard Fire Policy shall apply instead.

In consideration of the Provisions and Stipulations Herein or Added Hereto and of the Premium Specified in the Declarations, this Company, for the term of years specified in the Declarations from inception date (At 12:01 A.M. Standard Time) to expiration date (At 12:01 A.M. Standard Time) at location of property involved, to an amount not exceeding the amount(s) specified in the Declarations, does insure the Insured named in the Declarations and legal representatives, to the extent of the actual cash value of the property at the time of loss or the valuation terms of the policy, but in no event for more than the interest of the Insured, against all LOSS BY FIRE, LIGHTNING AND BY REMOVAL FROM PREMISES ENDANGERED BY THE PERILS INSURED AGAINST IN THIS POLICY, EXCEPT AS HEREINAFTER PROVIDED, to the property described in the Declarations while located or contained as described in this Policy or pro rata for 5 days at each proper place to which any of the property shall necessarily be removed for preservation from the perils insured against in this Policy, but not elsewhere.

**Assignment of this Policy shall not be valid except with the written consent of this Company.**

This Policy is made and accepted subject to the foregoing provisions and stipulations and those hereinafter stated, which are hereby made a part of this Policy together with such other provisions, stipulations and agreements as may be added hereto, as provided in this Policy.

**Concealment fraud**.

This entire Policy shall be void if, whether before or after a loss, the Insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the Insured therein, or in case of any fraud or false swearing by the Insured relating thereto.

**Uninsurable and excepted property**.

This Policy shall not cover accounts, bills, currency, deeds, evidences of debt, money or securities; nor, unless specifically named herein in writing, bullion or manuscripts.

**Perils not included**.

This Company shall not be liable for loss by fire or other perils insured against in this Policy caused, directly or indirectly, by (a) enemy attack by armed forces, including action taken by military, naval or air forces in resisting an actual or an immediately impending enemy attack; (b) invasion; (c) insurrection; (d) rebellion; (e) revolution; (f) civil war; (g) usurped power; (h) order of any civil authority except acts of destruction at the time of and for the purpose of preventing the spread of fire, provided that such fire did not originate from any of the perils excluded by this Policy; (i) neglect of the Insured to use all reasonable means to save and to preserve the property at and after a loss, or when the property is endangered by fire in the neighboring premises; (j) nor shall this company be liable for loss by theft.

**Other Insurance**.

Other insurance may be prohibited, or the amount of insurance may be limited by endorsement attached hereto.

**Conditions suspending or restricting insurance**.

Unless otherwise provided in writing added hereto this Company shall not be liable for loss occurring (a) while the hazard is increased by any means within the control or knowledge of the Insured; or (b) while the Described Premises, whether intended for occupancy by owner or tenant, are  vacant or unoccupied beyond a period of 60 consecutive days, for residential premises of three units or less and 30 consecutive days for all other premises, or (c) as a result of explosion or riot, unless fire ensues, and in that event for loss by fire only. This paragraph does not suspend or restrict the coverage contained in the following policies: Zurich Edge Domestic Policy, Edge-100-C (09/19); Zurich Edge Global Policy, Edge-101-C (09/19); Zurich Edge Domestic Healthcare Policy, Edge-102-C (09/19); Zurich Edge Global Healthcare Policy, Edge-103-C (09/19).

**Other perils of subject**.

Any other peril to the insured against or subject of insurance to be covered in this Policy shall be by endorsement in writing hereon or added hereto.

**Added provisions.**

The extent of the application of insurance under this Policy and of the contribution to be made by this Company in case of loss, and any other provision or agreement not inconsistent with the provisions of this Policy, may be provided for in writing added hereto, but no provision may be waived except such as by the terms of this Policy is subject to change.

**Waiver provisions**.

No permission affecting this insurance shall exist, or waiver of any provision be valid, unless granted herein or expressed in writing hereto. No provision stipulation or forfeiture shall be held to be waived by any requirement or proceeding on the part of this Company relating to appraisal or to any examination provided for herein.

**Cancellation of Policy**.

This Policy shall be cancelled at any time at the request of the Insured, in which case this Company shall, upon demand and surrender of this Policy, refund the excess of paid premium above the customary short rates for the expired time.  This Policy may be cancelled at any time by this Company by giving to the Insured a 5 days written notice of cancellation, and to the mortgagee to whom this Policy is payable 20 days written notice of cancellation except where the stated reason for cancellation is nonpayment of premium where, in such instance, this Policy may be cancelled at any time by this Company by giving to the Insured a 10 days written notice of cancellation, and the mortgagee a 20 days written notice of cancellation, with or without tender of the excess paid premium above the pro rata premium for the expired time, which excess, if not tendered, shall be refunded on demand. If notice is mailed, proof of mailing will be sufficient proof of notice.  Notice of cancellation shall state that said excess premium (if not tendered) will be refunded on demand and shall state or be accompanied by a statement of the specific reason or reasons for such cancellation. After this Policy has been in effect for 60 days, or after 60 days from any anniversary date, no notice of cancellation shall be effective unless it is based on the occurrence, after the effective date of the Policy, of one or more of the following:

(1) nonpayment of premium;  (2) conviction of a crime arising out of acts increasing the hazard insured against;  (3) discovery of fraud or material misrepresentation by the Insured in obtaining the Policy;  (4) discovery of willful or reckless acts or omissions by the Insured increasing the hazard insured against;  (5) physical changes in the property

insured which result in the property becoming uninsurable; or (6) a determination by the commissioner that continuation of the Policy would violate or place the Insurer in violation of the law. Where the stated reason is nonpayment of premium, the Insured may continue the coverage and avoid the effect of the cancellation by payment at any time prior to the effective date of cancellation.

**Mortgagee interests and obligations**.

Notwithstanding any other provisions of this Policy, if this Policy shall be made payable to a mortgagee of the covered real estate, no act or default of any person other than such mortgagee or his agent or those claiming under him, whether the same occurs before or during the term of this Policy, shall render this Policy void as to such mortgagee nor affect such mortgagee !~ right to recover in case of loss on such real estate; provided, that the mortgagee shall on demand pay according to the established scale of rate for any increase of risk not paid for by the Insured; and whenever this Company shall be liable to a mortgagee for any sum for loss under this Policy for which no liability exists as to the mortgagor, or owner, and this Company shall elect by itself, or with others, to pay the mortgagee, the full amount secured by such mortgage, then the mortgagee shall assign and transfer to the Company interested, upon such payment, the said mortgage together with the note and debt thereby secured.

**Pro rata liability**.

This Company shall not be liable for a greater proportion of any loss than the amount hereby insured shall bear to the whole insurance covering the property against the peril involved.

**Requirements in case loss occurs**.

The Insured shall give immediate written notice to this Company of any loss, protect the property from further damage, forthwith separate the damaged and undamaged personal property, put it in the best possible order, furnish a complete inventory of the destroyed and damaged property, showing in detail the quantity, description, actual cash value and amount of loss claimed; and the Insured shall forthwith render to this Company a signed, sworn statement in proof of loss which sets forth to the best knowledge and belief of the Insured the following: the time and cause of the loss, the interest of the Insured and of all others in the property, the actual cash value of each item thereof and the amount of loss thereto, all encumbrances thereon, all other contracts of insurance, whether valid or not, covering any of said property, any changes in the title, use, occupancy, location, possession or exposures of said property, since the issuing of this Policy, by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of loss and whether or not it then stood on leased ground, and shall furnish a copy of all the descriptions and schedules in all Policies and detailed estimates for repair of the damage. The Insured, as often as may be reasonably required, shall exhibit to any person designated by this Company all that remains of any property herein described, and submit to examinations under oath by any person named by this Company, and subscribe the same; and as often as may be reasonably required, shall produce for examination all books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by this Company or its representative, and shall permit extracts and copies thereof to be made.

**When loss payable**.

In case of any loss or damage, the Company within 30 days after the Insured shall have submitted a statement, as provided in the preceding clause, shall either pay the amount for which it shall be liable, which amount if not agreed upon shall be ascertained by award of referees as hereinafter provided, or replace the property with other of the same kind and goodness, or it may, within 15 days after such statement is submitted, notify the Insured of its intention to rebuild or repair the premises, or any portion thereof separately covered by this Policy, and shall thereupon enter upon said premises and proceed to rebuild or repair the same with reasonable expedition. It is more over understood that there can be no abandonment of the property described to the Company, and that the Company shall not in any case be liable for more than the sum insured, with interest thereon from the time when the loss shall become payable, as provided above. The Company shall be liable for the payment of interest to the Insured at a rate of 1 percent over the prime interest rate on the agreed figure commencing 30 days after the date an executed proof of loss for such figure is received by the Company, said interest to continue so long as the claim remains unpaid.

**Appraisal.**

In case of loss under this Policy and a failure of the parties to agree as to the amount of loss, it is mutually agreed that the amount of such loss shall be referred to three disinterested men, the Company and the Insured each choosing one out of 3 persons to be named by the other, and the third being selected by the 2 chosen, and the award in writing by a majority of the referees shall be conclusive and final upon the parties as to the amount of loss or damage, and such reference, unless waived by the parties, shall be a condition precedent to any right of action in law or equity to recover for such loss; but no person shall be chosen or act as a referee, against the objection of either party, who has acted in a like capacity within 4 months.

**Suit**.

No suit or action against this Company for the recovery of any claim by virtue of this Policy shall be sustained in any court of law or equity in this commonwealth unless commenced within 2 years from the time the loss occurred; provided, however, that if, within said 2 years, in accordance with the provisions of the preceding paragraph, the amount of loss shall have been referred to arbitration after failure of the parties to agree thereon, the limitation of time for bringing such suit or action shall in no event be less than 90 days after a valid award has been made upon such reference or after such reference or award has been expressly waived by the parties. If suit or action upon this Policy is enjoined or abated, suit or action may be commenced at any time within 1 year after the dissolution of such injunction, or the abatement of such suit or action, to the same extent as would be possible if there was no limitation of time provided herein for the bringing of such suit or action.

**Subrogation.**

This Company may require from the Insured an assignment of all rights of recovery against any party for loss to the extent that payment therefore is made by this Company.

C.  The following is added to Section 6.2 - GENERAL PROVISIONS, Paragraph k. OTHER INSURANCE:

Except as provided in (1) below, if there is other insurance covering the same loss, damage or costs covered, the Company will pay only its share of the covered loss, damage, or costs.  The Company's share is the proportion of the loss, damage, or costs that the amount of insurance that applies under this endorsement bears to the total amount of insurance covering such loss, damage, or costs.

(1)  If there is a **Service Agreement** covering the same loss, damage, or costs, this insurance is excess over any other amounts payable under this **Service Agreement**.  If there is a government fund covering the same loss, damage, or costs, the Company will pay its share of the covered loss, damage, or costs.  The Company's share is the proportion of the loss, damage, or costs that the amount of insurance that applies under this endorsement bears to the total amount of insurance covering such loss, damage, or costs to the extent permitted by law.

D.  The following is added to Section 6 – GENERAL PROVISIONS:

MASSACHUSETTS CONDITION

a.  In spite of any provision of any general or special law:

(1)  The Company will not pay for loss or damage to buildings or structures caused by any **Covered Cause of Loss** if the amount of loss is $5,000 or more unless the Insured first submits a certificate of municipal liens from the collector of taxes of the city or town where the property is located.

(2)  The Company will pay to the city or town any amount outstanding on the certificate of municipal liens arising from the provisions of Massachusetts General Law Chapters 40, 59, 60, 80, 83, and 164, Sections 58B through 58F.

(a)  The payment will not exceed the amount of loss payable under this Policy.

(b)  We will send the Insured and the mortgage holder proof of payment to the city or town.

(3)  The claim of the city or town will have priority over the claim of any mortgage holder, assignee, Insured or any other interested party, except where otherwise provided by the laws of the United States.

(4)  The Company will not be liable to any city, town, mortgage holder, assignee, Insured or any other interested party for:

(a)  Amounts paid to a city or town; or

(b)  Amounts not paid to a city or town based upon a certificate showing that no municipal liens exist.

This Paragraph a. does not apply to any owner-occupied one to four-family dwelling if the owner of the dwelling lived there when the claim for loss or damage arose.

b.  The Company will not pay any claim for:

(1)  Loss, damage, or destruction of $1,000 or more to a building or structure; or

    (2) Loss, damage or destruction, of any amount, that causes a building or structure to become:

        (a) Dangerous to life or limb; or

        (b) Unused, uninhabited or abandoned and open to the weather; as provided under Massachusetts General Law, Section 6 of Chapter 143;

    (3) Without giving at least 10 days written notice before such payment to:

        (a) The Building Commissioner or the appointed Inspector of Buildings; and

        (b) The Board of Health or the Board of Selectmen of the city or town where the property is located.

c. If at any time before the Company's payment, the city or town notifies the Company by certified mail of its intent to begin proceedings designed to perfect a lien under Massachusetts General Law:

    (1) Chapter 143, Section 3A or 9; or

    (2) Chapter 111, Section 127B;

The Company will not pay while the proceedings are pending.  The proceedings must be started within 30 days after the Company receives the notice.

Any lien perfected under the Massachusetts General Laws referred to above, will extend to the city or town and may be enforced by it against the proceeds of this Policy.

d. The Company will not be liable to any city, town, mortgage holder, assignee, Insured or any other interested party for:

    (1) Amounts paid to a city or town; or

    (2) Amounts not paid to a city or town under Paragraphs b. and c. above.

E.   The following is added to Section 7 - DEFINITIONS:

**Compliance** means compliance with Massachusetts's law governing release prevention, pursuant to applicable subsection (b) or (c) of section 38J of chapter 148 of the laws of Massachusetts.

**Personal Property** means property owned by you.

**Release Of Heating Oil** means both the release of and the threat of release of heating oil.

**Residential Property** means a 1 to 4 unit dwelling used for living or sleeping located in the Commonwealth of Massachusetts.

**Service Agreement** means a fuel system service plan, property restoration plan, or similar service or warranty agreement, even if it is characterized as insurance

**Tank** means a liquid fuel tank in which heating oil is stored and from which heating oil is delivered or pumped through a fuel supply line to a device for burning oil in heating appliances, whether located within a **Residential Property** or other structure and installed at or below grade level, or located outdoors.  **Tank** does not mean any underground tank, wherever located.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Minnesota



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.   SECTION 6.1 - LOSS ADJUSTMENT AND SETTLEMENT, Paragraph a. DUTIES IN THE EVENT OF LOSS OR DAMAGE, Subparagraph (7) is replaced with the following:

(7)   Permit the Company to question the Insured, the Insured's employees and agents under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the loss or damage, including an Insured's books and records.  In the event of this examination, an Insured's answers must be signed or attested to by a notary public or certified court reporter.  The Insured has the right to an attorney being present during nay examination under oath. Any answers given may be used in future civil or criminal proceedings.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Mississippi



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A. SECTION 6.1 - LOSS ADJUSTMENT AND SETTLEMENT, Paragraph h. SUIT AGAINST THE COMPANY, is replaced with the following:

h.  SUIT AGAINST THE COMPANY

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless the Insured has fully complied with all the provisions of this Policy.  Legal action must be started within 36 months after the date of direct physical loss of or damage to Property Insured or to other property as set forth herein.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Missouri



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  SECTION 5.2 - SPECIAL COVERAGES, Paragraph bb. LAND AND WATER **CONTAMINANT** CLEANUP, REMOVAL AND DISPOSAL, Subparagraph (2)(c) is replaced with the following:

(c)  When the Insured fails to give written notice of loss to the Company within 180 days after inception of the loss, the maximum the Company will pay under this coverage is $25,000.

B.  SECTION 6.1 -CONDITIONS, Paragraph c. SETTLEMENT OF CLAIMS, is amended as follows:

1.  Subparagraph (1) Loss Payment is replaced with the following:

    (1)  Loss Payment

    In the event of a covered cause of loss, the Company will give the Insured notice, within 15 working days after the Company receives a properly executed proof of loss, that the Company:

    (a)  Accept your claim;

    (b)  Denies your claim; or

    (c)  Needs more time to determine whether the Insured's claim should be accepted or denied.

2.  Subparagraph (2) is replaced with the following:

    (2)  If the Company denies the Insured's claim, such notice will be in writing, and will state any policy provision, condition or exclusion used as a basis for the denial.

    (a)  If the Company needs more time to determine whether the Insured's claim should be accepted or denied, the written notice will state the reason(s) why more time is needed.

    (b)  If the Company has not completed its investigation, the Company will notify the Insured again in writing, within 45 days after the date the initial notice is sent informing the Insured that we need more time to determine whether the Insured's claim should be accepted or denied and thereafter every 45 days. The written notice shall state why more time is needed to investigate the Insured's claim.

C.  SECTION 6.1 -CONDITIONS, Paragraph h. SUIT AGAINST THE COMPANY is replaced with the following:

h.  SUIT AGAINST THE COMPANY

The action must be brought within 10 years after the date on which the loss or damage occurred.

D.  The following is added to SECTION 6.1 - CONDITIONS, Paragraph j. VALUATION:

If the Insured fails to notify the Company of their intent within the 2 year timeframe, such failure will not invalidate the claim unless such failure operates to prejudice the Company's rights.

E.  SECTION 6.2 - GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, is amended as follows:

1.  Paragraph (1) Cancellation, subparagraph (b) is replaced with the following:

   (b) The Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation, stating the actual reason for cancellation, at least:

      (i)   10 days before the effective date of cancellation if the Company cancels for nonpayment of premium;

      (ii)  30 days before the effective date of cancellation if cancellation is for one or more of the following reasons:

         i    Fraud or material misrepresentation affecting this policy or a claim filed under this Policy or a violation of any of the terms or conditions of this Policy;

         ii   Changes in conditions after the effective of this Policy which have materially increased the risk assumed;

         iii  The Company becomes insolvent; or

         iv   The Company involuntarily loses reinsurance for this Policy.

      (iii) 60 days before the effective date of cancellation if the Company cancels for any other reason.

2.  Paragraph (2) Nonrenewal is replaced with the following:

   (2) Nonrenewal

   The Company may elect not to renew this policy by mailing or delivering to the **First Named Insured**, at the last mailing address known to the Company, written notice of nonrenewal, stating the actual reason for nonrenewal, at least 60 days prior to the effective date of the nonrenewal.

   If notice is mailed, proof of mailing will be sufficient proof of notice.

All other terms, conditions, provisions and exclusions of this policy remain the same.

WT_000608

# Amendatory Endorsement - Montana



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A. Section 6.2 GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, is replaced with the following:

  a. CANCELLATION/NON-RENEWAL

    (1) Cancellation

      (a) The **First Named Insured** shown in the Declarations may cancel this Policy by mailing or delivering to the Company advance written notice of cancellation.

      (b) If this Policy has been in effect for less than sixty (60) days, the Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation at least:

        (i) 10 days notice prior to the proposed cancellation date for nonpayment of premium; or

        (ii) 10 days notice prior to the proposed cancellation date for any other reason.

      (c) If this Policy has been in effect for 60 days or more, the Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation, prior to the expiration of the agreed term or prior to one year from the effective date of the Policy or renewal, whichever is less, only for one or more of the following reasons:

        (i) Failure to pay a premium when due;

        (ii) Material misrepresentation;

        (iii) Substantial change in the risk assumed, except to the extent that the Company should have reasonably foreseen the change or contemplated the risk in writing the contract;

        (iv) Substantial breaches of contractual duties, conditions or warranties;

        (v) Determination by the Commissioner of Insurance that continuation of the Policy would place us in violation of the Montana Insurance Code; or

        (vi) Such other reasons that are approved by the Commissioner of Insurance. If the Company cancels this Policy for one of the reasons specified above, the Company may cancel this Policy by providing 10 days notice before the effective date of cancellation.

      (d) The Company may cancel any Policy with a term of more than one (1) year by mailing or delivering to the **First Named Insured** written notice of cancellation at least 45 days before the anniversary date of the Policy, such cancellation will be effective on the policy anniversary date.

      (e) The Company will mail or deliver notice to the **First Named Insured's** last mailing address known.

(f) Notice of cancellation will state the effective date of cancellation. The Policy Period will end on that date.

(g) If this Policy is cancelled, the Company will send the **First Named Insured** any premium refund due. If the Company cancels, the refund will be pro rata. If the **First Named Insured** cancels, the refund may be less than pro rata. The cancellation will be effective even if the Company has not made or offered a refund. However, when a financed insurance Policy is cancelled, the Company will send any refund due to the premium finance company on a pro rata basis.

(2) Non-Renewal

(a) The Company may non-renew this Policy by mailing or delivering to the **First Named Insured** written notice, at the last known address, of non-renewal at least 45 days before the expiration of this Policy. This Policy has been written for a term of more than one year.

(b) This non-renewal provision does not apply if the Insured has purchased insurance elsewhere, accepted replacement coverage, requested or agreed to non-renewal, or this Policy is expressly designated as nonrenewable.

B. Section 6.2 GENERAL PROVISIONS, Paragraph c. CONCEALMENT, MISREPRESENTATION OR FRAUD is replaced with the following:

c. CONCEALMENT, MISREPRESENTATION OR FRAUD

The Company does not provide coverage to one or more Insureds who at any time engage in fraudulent conduct as it relates to this Policy. The Company also does not provide coverage to one or more Insureds, who at any time intentionally conceal or misrepresent a material fact or make a false statement concerning:

(i) This Policy;

(ii) The Covered Property;

(iii) The Insured's interest in Covered Property; or

(iv) A claim under this Policy.

C. The following is added to SECTION 6.2 GENERAL PROVISIONS, Paragraph d. CONFORMITY TO STATUTES and supersedes anything to the contrary:

Any provisions required by Montana law to be included in policies issued by the Company shall be deemed to have been included in this Policy.

If the provisions of this Policy conflict with the laws of any jurisdictions in which this Policy applies, and if certain provisions are required by Montana law to be stated in this Policy, this Policy shall be read so as to eliminate such conflict or deemed to include such provisions for Insured Locations within such jurisdictions.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Nebraska



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  SECTION 6.1 - LOSS ADJUSTMENT AND SETTLEMENT, Paragraph f. APPRAISAL, is replaced with the following:

    f.    APPRAISAL

        If the Insured and the Company fail to agree on the value of the property or the amount of loss, upon mutual agreement, each will select a competent, disinterested, and impartial appraiser, who has no direct or indirect financial interest in the claim. Each will notify the other of the appraiser selected within 20 days of such demand. The Insured may not invoke appraisal unless it has first fully complied with all provisions of this Policy, including Duties in the Event of Loss or Damage and has provided the Company with a signed and sworn statement of loss.

        The appraisers will first select a competent, disinterested and impartial umpire. If the appraisers fail to agree upon an umpire within 15 days then, on the request of the Insured or the Company, a judge of a court of record in the jurisdiction in which the appraisal is pending will select the umpire. The appraisers will then appraise the value of the property or the amount of loss. They will state separately, the actual cash value and replacement cost value, as of the date of loss and the amount of loss, each item of physical loss or damage or, if for Time Element loss, the amount of loss for each Time Element Coverage of this Policy.

        If the appraisers fail to agree, they will submit their differences to the umpire. An award stating separately the actual cash value and replacement cost value, as of the date of loss and the amount of loss, for each item of physical loss or damage or, if for Time Element loss, the amount of loss for each Time Element Coverage of this Policy agreed to in writing by any two will determine the amount of loss.

        Once there is an award, the Company retains the right to apply all policy terms and conditions (including but not limited to deductibles, exclusions, and Limits of Liability) to the award. The Company further retains its right to deny the claim in whole or in part.

        The Insured and the Company will each pay its chosen appraiser and bear equally the other expenses of the appraisal and umpire.

B.  The following is added to SECTION 6.1 - LOSS ADJUSTMENT AND SETTLEMENT, Paragraph j. VALUATION:

    When this policy is written to insure any real property in Nebraska against loss by fire, tornado, windstorm, lightning or explosion and the property insured shall be wholly destroyed, without criminal fault on the part of the Insured or the Insured assignee, the amount of the insurance written on such real property shall be taken conclusively to be the true value of the property insured and the true amount of loss and measure of damages

C.  SECTION 6.2 **-** GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, is replaced with the following:

    a.    CANCELLATION/NON-RENEWAL

        (1)  Cancellation

(a) The **First Named Insured** shown in the Declarations may cancel this Policy by mailing or delivering to the Company advance written notice of cancellation.

(b) If this Policy has been in effect for less than 60 days, the Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation, stating the reasons for cancellation at least:

(i) 10 days notice prior to the proposed cancellation date for nonpayment of premium; or

(ii) 60 days notice prior to the proposed cancellation date for any other reason.

(c) If this Policy has been in effect for 60 days or more, or if this is a renewal, the Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation, only for one or more of the following reasons:

(i) Nonpayment of premium;

(ii) The Policy was obtained through material misrepresentation;

(iii) Any Insured has submitted a fraudulent claim;

(iv) Any Insured has violated the terms and conditions of this Policy;

(v) The risk originally accepted has substantially increased;

(vi) Certification to the Director of Insurance of the Company's loss of reinsurance which provided coverage for all or a substantial part of the underlying risk insured; or

(vii) The determination by the Director of Insurance that the continuation of the Policy could place the Company in violation of the Nebraska Insurance Laws.

If the Company cancels this Policy for one of the reasons specified above, the Company may cancel this Policy by providing: 10 days notice prior to the proposed cancellation date for nonpayment of premium or 60 days notice prior to the proposed cancellation date for any other reason.

(d) The Company may cancel any Policy with a term of more than 1 year by mailing or delivering to the **First Named Insured** written notice of cancellation at least 45 days before the anniversary date of the Policy, such cancellation will be effective on the policy anniversary date.

(e) The Company will mail notice by first class mail to the **First Named Insured's** last mailing address known. A United States Postal Service Certificate of Mailing shall be sufficient proof of receipt of notice on the third calendar day after the date of the certificate of mailing.

(f) Notice of cancellation will state the effective date of cancellation. The Policy Period will end on that date.

(g) If this Policy is cancelled, the Company will send the **First Named Insured** any premium refund due. If the Company cancels, the refund will be pro rata. If the **First Named Insured** cancels, the refund may be less than pro rata. The cancellation will be effective even if the Company has not made or offered a refund.

(2) Non-Renewal

The Company may non-renew this Policy. Written notice will be by first class mail to the **First Named Insured**, at the last known address. Notice of non-renewal will be at least 60 days before the expiration of this Policy. A United States Postal Service Certificate of Mailing shall be sufficient proof of receipt of notice on the third calendar day after the date of the certificate of mailing.

C. SECTION 6.2 **–** GENERALPROVISIONS, Paragraph c. CONCEALMENT, MISREPRESENTATION OR FRAUD is replaced with the following:

c. MISREPRESENTATION OR BREACH OF CONDITION OR WARRANTY

A misrepresentation or warranty made by the Insured or on the Insured's behalf in the negotiation of or application for this coverage will void this Policy if:

(1) It is material;

(2) It is made with the intent to deceive to the Company's injury;

(3) The Company relies on it; and

(4)  The Company is deceived to the Company's injury.

A breach of warranty or condition will void the Policy if such breach exists at the time of loss and contributes to the loss.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Nevada



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A. Section 6.2 **-** GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, is replaced with the following:

a. CANCELLATION/NON-RENEWAL

(1) Cancellation

(a) The **First Named Insured** shown in the Declarations may cancel this Policy by mailing or delivering to the Company advance written notice of cancellation.

(b) The Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation at least:

(i) 10 days before the effective date of cancellation if the Company cancels for nonpayment of premium; or

(ii) 30 days before the effective date of cancellation if the Company cancels for any other reason.

(c) The Company will mail or deliver notice to the **First Named Insured's** mailing address shown in the Declarations of this Policy or any Endorsement attached thereto.

(d) Notice of cancellation will state the effective date of cancellation.  The Policy Period will end on that date.

(e) If this Policy is cancelled, the Company will send the **First Named Insured** any premium refund due.  If the Company cancels, the refund will be pro rata.  If the **First Named Insured** cancels, the refund may be less than pro rata but no less than the customary short rate amount.  The cancellation will be effective even if the Company has not made or offered a refund.

(f) If notice is mailed, proof of mailing will be sufficient proof of notice.

(g) If under the laws of the jurisdiction in which the property is located, such cancellation terms or conditions are different, then cancellation terms or conditions will be as permitted by such laws.

(2) If this Policy has been in effect for 70 days or more, or if it is a renewal of a Policy issued by the Company, the Company may cancel this Policy only for one or more of the following reasons:

(a) Nonpayment of premium;

(b) Conviction of the Insured of a crime arising out of acts increasing the hazard insured against;

(c) Discovery of fraud or material misrepresentation in obtaining the Policy or in presenting a claim thereunder;

(d) Discovery of an act or omission or a violation of any condition of the Policy which occurred after the first effective date of the current Policy, and substantially and materially increases the hazard insured against;

(e)  A material change in the nature or extent of the risk occurring after the first effective date of the current Policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the Policy was issued or last renewed;

(f)  A determination by the commissioner that continuation of the Company's present volume of premiums would jeopardize the Company's solvency or be hazardous to the interests of the Company's Policyholders, creditors or the public, or

(g)  A determination by the commissioner that the continuation of the Policy would violate, or place the Company in violation of, any provision of the code.

(3)  If this Policy is written for a term longer than one year, the Company may cancel for any reason at an anniversary, by mailing or delivering written notice of cancellation to the First Named Insured at the last known mailing address at least 60 days before the anniversary date. Notice of cancellation or non-renewal will be mailed, first class or certified, or delivered to the **First Named Insured** at the last known mailing address and will state the reason for cancellation or nonrenewal. The Company will also provide a copy of the notice of cancellation to the agent who wrote the Policy.

(4)  Non-renewal

(a)  The Company may non-renew this Policy by mailing or delivering to the **First Named Insured** written notice at least 60 days before the agreed expiration date. This non-renewal provision does not apply if the Insured has: accepted replacement coverage, requested or agreed to non-renewal, or this Policy is expressly designated as nonrenewable.

(b)  If notice is mailed, proof of mailing will be sufficient proof of notice.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement – New York



| Insured Name | Policy Number | Effective Date | Endorsement Number |
|---|---|---|---|
| Crescent Hotels & Resorts | ERP1150909-04 | 05/31/2022 | |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  SECTION 2.3 – POLICY LIMITS OF LIABILITY, Paragraph g. Causation Definition is deleted.

B.  SECTION 3.3 **-** EXCLUSIONS, Paragraph c. (3) is replaced with the following:

(3) Any weapon of war employing atomic fission, atomic fusion, radioactive force or radioactive material, whether in time of peace or war regardless of who commits the act.

C.  SECTION 5.2 – SPECIAL COVERAGES, Paragraph j. CONTRACT PENALTIES, is deleted.

D.  SECTION 5.2 – SPECIAL COVERAGES, Paragraph k. CRISIS EVENT, is deleted.

E.  SECTION 6.1 – LOSS ADJUSTMENT AND SETTLEMENT, Paragraph f. APPRAISAL, is replaced with the following:

f.  APPRAISAL

If the Insured and the Company fail to agree on the actual cash value of the property, the replacement cost of the property, the extent of the loss or damage, or the amount of loss or damage, each will, on the written demand of either, select a competent, disinterested, and impartial appraiser, who has no direct or indirect financial interest in the claim.  Each will notify the other of the appraiser selected within 20 days of such demand.  The Insured may not invoke Appraisal unless it has first fully complied with all provisions of this Policy, including Duties in the Event of Loss or Damage and has provided the Company with a signed and sworn statement of loss.

If the Insured or the Company fail to proceed with the appraisal of a covered loss after a written demand is made by either party, then either party may apply to a justice of the supreme court residing in the county or to a county judge of the county in which the lost or damaged property is or was located for an order directing the party that failed to proceed with the appraisal to comply with the demand for the appraisal of the loss. Each party will select a competent, disinterested, and impartial appraiser who has no direct or indirect financial interest in the claim and notify the other of the appraiser selected within 20 days of such order.

The appraisers will first select a competent, disinterested and impartial umpire.  If the appraisers fail to agree upon an umpire within 15 days then the Insured or the Company shall apply to a justice of the supreme court residing in the county or to a county judge of the county in which the lost or damaged property is or was located to select the umpire. The application shall be on five days' notice in writing to the other party. Any such notice in writing, when served by the Insured, may be served upon any local agent of the Company.

The appraisers will then determine the actual cash value, the replacement cost, the extent of the loss or damage and the amount of the loss or damage.  For each individual item of Property Insured they will each state the amount of loss based on an **Actual Cash Value** basis and a **Replacement Cost** value basis, as of the date of loss.  For a Time Element loss, they will each state the amount of loss for each Time Element Coverage of this Policy.

If the appraisers fail to agree, they will submit their differences to the umpire.  An award agreed to in writing by any two will determine the amount of loss.

An award will state separately the amount of loss based on the **Actual Cash Value** basis and **Replacement Cost** value basis as of the date of loss for each individual item of Property Insured.  For Time Element loss, it will state the amount of loss for each Time Element Coverage of this Policy.

Once there is an award, the Company retains the right to apply all Policy terms and conditions (including but not limited to deductibles, **Qualifying Periods**, exclusions, and Limits of Liability) to the award.  The Company further retains its right to deny the claim in whole or in part.

The Insured and the Company will each pay its chosen appraiser and bear equally the other expenses of the appraisal and umpire.

F.  SECTION 6.1 – LOSS ADJUSTMENT AND SETTLEMENT, Paragraph h. SUIT AGAINST THE COMPANY, is replaced with the following:

h.  SUIT AGAINST THE COMPANY

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless the Insured has fully complied with all the provisions of this Policy. Legal action must be started within 2 years after the date of direct physical loss or damage to Covered Property or to other property as set forth herein.

G.  SECTION 6.2 **-** GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, is replaced with the following:

a.  CANCELLATION/NON-RENEWAL

(1)  Cancellation

(a)  The **First Named Insured** shown in the Declarations may cancel this Policy by mailing or delivering to the Company advance written notice of cancellation.

(b)  For Policies in Effect 60 Days or Less, the Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation at least:

(i)  30 days before the effective date of cancellation if the Company cancels for any reason not included in paragraph (ii) below.

(ii)  15 days before the effective date of cancellation if the Company cancels for any of the following reasons:

i.  Nonpayment of premium;

ii.  Conviction of a crime arising out of acts increasing the hazard insured against;

iii.  Discovery of fraud or material misrepresentation in the obtaining of the Policy or in the presentation of a claim;

iv.  After issuance of the Policy or after the last renewal date, discovery of an act or omission, or a violation of any Policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current Policy period;

v.  Material physical change in the property insured, occurring after issuance or last annual renewal anniversary date of the Policy, which results in the property becoming uninsurable in accordance with the Company objective, uniformly applied underwriting standards in effect at the time the Policy was issued or last renewed; or material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the Policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the Policy was issued or last renewed;

vi.  Required pursuant to a determination by the Superintendent that the continuation of the Company's present premium volume would jeopardize the Company's solvency or be hazardous to the interest of the Company's policyholders, creditors or the public;

vii.  A determination by the superintendent that the continuation of the Policy would violate, or would place the Company in violation of any provision of the Insurance Code; or

viii.  Where the Company has reason to believe, in good faith and with sufficient cause, that there is a probable risk of danger that the Insured will destroy, or permit to be destroyed, the insured property for the purpose of collecting the insurance proceeds. If the Company cancels for this

reason, the Insured may make a written request to the Department of Financial Services, within 10 days of receipt of this notice, to review the cancellation decision. Also, the Company will simultaneously send a copy of this cancellation notice to the Department of Financial Services.

If notice of cancellation is due to nonpayment of premium, then the notice shall state the amount of premium that must be paid in order to avoid cancellation of the policy.

(c) For Policies in effect for more than 60 days, or if this Policy is a renewal or continuation of a Policy the Company issued, the Company may cancel this Policy only for any of the reasons listed in paragraph 2) above, provided the Company mails the **First Named Insured** written notice at least 15 days before the effective date of cancellation. If notice of cancellation is due to nonpayment of premium, then the notice shall state the amount of premium that must be paid in order to avoid cancellation of the policy.

(d) The Company will mail or deliver notice to the **First Named Insured's** mailing address shown in the Declarations of this Policy or any Endorsement attached thereto and to the authorized agent or broker.

(e) Notice of cancellation will state the effective date of and the reason for cancellation. The Policy Period will end on that date.

(f) If this Policy is cancelled, the Company will send the First Named Insured any premium refund due. If the Company cancels, the refund will be pro rata. If the premium is advanced under a premium finance agreement, the cancellation refund will be pro rata. Under such financed policies, the Company will be entitled to retain a minimum earned premium of 10% of the total policy premium or $60, whichever is greater. The cancellation will be effective even if the Company has not made or offered a refund.

(g) If notice is mailed, proof of mailing will be sufficient proof of notice.

(2) Non-Renewal

(a) The Company may non-renew this Policy by mailing or delivering to the **First Named Insured** written notice along with the reason for non-renewal.

(b) The Company may condition renewal this Policy upon:

(i) Change of limits;

(ii) Change in type of coverage;

(iii) Reduction of coverage;

(iv) Increased deductible;

(v) Addition of exclusion; or

(vi) Increased premiums in excess of 10% exclusive of any premium increase due to and commensurate with insured value added or increased exposure units; or as a result of experience rating, loss rating, retrospective rating or audit.

(c) If the Company decides to non-renew this Policy or to conditionally renew this Policy as provided in paragraph (b), the Company will mail or deliver written notice to the **First Named Insured** shown in the Declarations at least 60 days but not more than 120 days before:

(i) The expiration date; or

(ii) The anniversary date, if this is a continuous Policy.

(d) The Company will mail or deliver notice to the **First Named Insured's** mailing address shown in the Declarations of this Policy or any Endorsement attached thereto and to the authorized agent or broker.

(e) Notice will include the specific reason(s) for non-renewal or conditional renewal, including the amount of any premium increase for conditional renewal and description of any other changes.

(f) If notice is mailed, proof of mailing will be sufficient proof of notice.

If the Company violates any of the provisions above by sending the **First Named Insured** an incomplete or late conditional renewal notice or a late non-renewal notice coverage will remain in effect at the same terms and conditions of this policy at the lower of the current rates or the prior period's rates until 60 days after such notice is mailed or delivered, unless the **First Named Insured**, during this 60 day period, has replaced the coverage or elects to cancel.

The Company will not send the Insured notice of non-renewal or conditional renewal if the Insured, the authorized agent or broker or another insurer of the Insured mails or delivers notice that the Policy has been replaced or is no longer desired.

H.  SECTION 6.2 **-** GENERAL PROVISIONS, SUSPENDED PROPERTY, is replaced with the following:

SUSPENDED PROPERTY

When **Covered Equipment** is found to be in, or exposed to a dangerous condition, any of the Company's representatives may immediately suspend this insurance for such **Covered Equipment**, including loss arising out of the dangerous condition of such **Covered Equipment**.  This can be done by delivering or mailing a written notice to the **First Named Insured's** mailing address or to the address where the **Covered Equipment** is located.  Once suspended, this insurance can be reinstated only by an endorsement.  Any unearned premium due will be returned by the Company.

I.  SECTION 7 – DEFINITIONS is amended as follows:

1.  **Flood**, is replaced with the following:

a.  A general and temporary condition of partial or complete inundation of normally dry land areas or structure(s) caused by:

(1)  The unusual and rapid accumulation or runoff of surface waters, waves, tides, tidal waves, the release of water, the rising, overflowing or breaking of boundaries of nature or man-made bodies of water; or the spray there from all whether driven by wind or not; or

(2)  Mudflow or mudslides caused by accumulation of water on or under the ground.

b.  **Flood** also includes the backup of water from a sewer, drain or sump caused in whole or part by **Flood**.

c.  **Flood** does not include loss or damage directly or indirectly caused by or resulting from waves, tides, tidal waves or tsunami, when such waves, tides, tidal waves or tsunami is caused directly or indirectly by **Earth Movement** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

2.  **Named Storm** is replaced with the following:

**Named Storm** - Any storm or weather disturbance that is named by the U. S. National Oceanic and Atmospheric Administration (NOAA) or the U. S. National Weather Service or the National Hurricane Center or any comparable worldwide equivalent.

3.  **Storm Surge** is deleted.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - North Carolina



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  Section 6.1 - LOSS ADJUSTMENT AND SETTLEMENT, Paragraph h. SUIT AGAINST THE COMPANY, is replaced with the following:

    h.  SUIT AGAINST THE COMPANY

        No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless the Insured has fully complied with all the provisions of this Policy.  Legal action must be started within 3 years after the date of direct physical loss or damage to Covered Property or to other property as set forth herein.

B.  Section 6.2 - GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, is replaced with the following:

    a.  CANCELLATION/NON-RENEWAL

      (1)  Cancellation

          (a)  The **First Named Insured** shown in the Declarations may cancel this Policy by mailing or delivering to the Company advance written notice of cancellation.

          (b)  If this Policy has been in effect for less than 60 days, the Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation at least:

              (i)  15 days notice prior to the proposed cancellation date for nonpayment of premium; or

              (ii)  30 days notice prior to the proposed cancellation date for any other reason.

          (c)  If this Policy has been in effect for 60 days or more, the Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation, prior to the expiration of the agreed term or prior to one year from the effective date of the Policy or renewal, for one or more of the following reasons:

              (i)  Nonpayment of premium;

              (ii)  An act or omission by the Insured or Insured's representative that constitutes material misrepresentation or nondisclosure of a material fact in obtaining the Policy, continuing this Policy or presenting a claim under this Policy;

              (iii)  Increased hazard or material change in the risk assumed that could not have been reasonably contemplated by the parties at the time of assumption of the risk;

              (iv)  Substantial breach of contractual duties, conditions or warranties that materially affects the insurability of the risk;

              (v)  A fraudulent act against the Company by the Insured or Insured representative that materially affects the insurability of the risk;

(vi) Willful failure by the Insured or Insured representative to institute reasonable loss control measures that materially affect the insurability of the risk after written notice by the Company;

(vii) Loss of facultative reinsurance, or loss of or substantial changes in applicable reinsurance as provided in G.S.58-41-30;

(viii) Conviction of the Insured of a crime arising out of acts that materially affect the insurability of the risk;

(ix) A determination by the Commissioner of Insurance that the continuation of the Policy would place the Company in violation of the laws of North Carolina; or

(x) The Insured fails to meet the requirements contained in the Company's corporate charter, articles of incorporation or by-laws when the Company is a company organized for the sole purpose of providing members of an organization with insurance coverage in North Carolina.

If the Company cancels this Policy for one of the reasons specified above, the Company may cancel this Policy by providing 15 days notice prior to the proposed cancellation date for non payment of premium or 30 days notice prior to the proposed cancellation date for any other reason.

(d) Cancellation for nonpayment of premium will not become effective if the Insured pays the premium amount due before the effective date of cancellation.

(e) The Company may also cancel this Policy for any reason not stated above provided the Insured's written consent is received.

(f) The Company will mail or deliver notice to the **First Named Insured's** last mailing address known.

(g) Notice of cancellation will state the effective date of cancellation. The Policy Period will end on that date.

(h) If this Policy is cancelled, the Company will send the **First Named Insured** any premium refund due. If the Company cancels, the refund will be pro rata. If the **First Named Insured** cancels, the refund may be less than pro rata. The cancellation will be effective even if the Company has not made or offered a refund.

(i) If notice is mailed, proof of mailing will be sufficient proof of notice.

(2) NON-RENEWAL

(a) The Company may non-renew this Policy by mailing or delivering to the **First Named Insured** written notice, at the last known address, of non-renewal at least 45 days before the expiration of this Policy if this Policy has been written for one year or less; or the anniversary date of the Policy if this Policy has been written for more than one year or for an indefinite term.

(b) This non-renewal provision does not apply if the Insured has purchased insurance elsewhere, accepted replacement coverage, requested or agreed to non-renewal, or this Policy is expressly designated as nonrenewable.

(c) If notice is mailed, proof of mailing will be sufficient proof of notice.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - North Dakota



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  SECTION 6.1 - LOSS ADJUSTMENT AND SETTLEMENT, Paragraph h. SUIT AGAINST THE COMPANY, is replaced with the following:

h.  SUIT AGAINST THE COMPANY

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless the Insured has fully complied with all the provisions of this Policy.  Legal action must be started within 3 years after the date of direct physical loss of or damage to Property Insured or to other property as set forth herein.

B.  SECTION 6.2 **-** GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, Subparagraph (1)(b) is replaced with the following:

(b)  The Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation at least:

(i)  10 of days before the effective date of cancellation if the Company cancels for nonpayment of premium, as stated in the Declarations; or

(ii)  30 days before the effective date of cancellation if the Company cancels for any other reason, as stated in the Declarations.

C.  SECTION 6.2 **-** GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, Subparagraph (1)(g) is replaced with the following:

(g)  If this Policy has been in effect for 90 days or more, or if it is a renewal or continuation of a Policy issued by the Company, the Company may cancel this Policy only for one or more of the following reasons:

(i)  Nonpayment of premium;

(ii)  Misrepresentation or fraud made by the Insured or with the Insureds knowledge in obtaining the Policy or in presenting a claim under the Policy;

(iii)  Actions by the Insured that have substantially increased or substantially changed the risk insured;

(iv)  Refusal of the Insured to eliminate known conditions that increase the potential for loss after notification by the Company that the condition must be removed;

(v)  Substantial change in the risk assumed, except to the extent that the Company should reasonably have foreseen the change or contemplated the risk in writing the Policy;

(vi)  Loss of reinsurance by the Company for a significant amount of the underlying risk insured. If the Company cancels for this reason, the **First Named Insured** shall have 10 days from the date of receipt of this notice to appeal the cancellation to the insurance commissioner, and the insurance commissioner shall have 5 days of receipt of such appeal to determine if the reason is justified;

(vii) Determination by the insurance commissioner that the continuation of the Policy could place the Company in violation of the insurance laws of North Dakota; or

(viii)    A violation of any local fire, health, safety, building, or construction regulation or ordinance with respect to any insured property or the occupancy thereof which substantially increases any hazard insured against.

D.  SECTION 6.2 **-** GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, Subparagraph (2) Non-renewal is replaced with the following:

(2)  Non-renewal

The Company may non-renew this Policy by mailing or delivering to the **First Named Insured** written notice 45 days before the non-renewal, as permitted by law.

All other terms, conditions, provisions and exclusions of this policy remain the same.

WT_000623

# Amendatory Endorsement - Ohio



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  SECTION 6.1 – LOSS ADJUSTMENT AND SETTLEMENT, Paragraph c. SETTLEMENT OF CLAIMS, is amended as follows:

1.  Subparagraph (2) is replaced with the following:

(2)  The Company will give notice, within 21 days after the Company receives a properly executed, sworn statement of loss, that the Company:

(a)  Accepts the Insured's claim;

(b)  Denies the Insured's claim; or

(c)  Needs more time to investigate the Insured's claim.

If the Company needs more time to investigate the Insured's claim, the Company will provide an explanation for the Company's need for more time. The Company will continue to notify the Insured again in writing, at least every 45 days, of the status of the investigation and of the continued time needed for the investigation.

2.  Subparagraph (4) is replaced with the following:

(4)  The Company will pay for covered cause of loss of or damage to Property Insured within:

(a)  10 days after the Company accepts the Insured's claim if such acceptance occurs within the first 21 days after the Company receives a properly executed proof of loss, unless the claim involves an action by a probate court or other extraordinary circumstances as documented in the claim file; or

(b)  5 days after the Company accepts the Insured's claim if such acceptance occurs more than 21 days after the Company receives a properly executed proof of loss, and

(i)  An appraisal award has been made; or

(ii)  The Company has reached agreement on the amount of loss that was in dispute.

B.  SECTION 6.2 - GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, is replaced with the following:

a.  CANCELLATION/NON-RENEWAL

(1)  Cancellation

(a)  The **First Named Insured** shown in the policy declarations may cancel this policy by mailing or delivering to the Company advance written notice of cancellation.

(b)  If the Insured's policy has been in effect for more than 90 days, or is a renewal of a policy we issued, the Company may cancel this policy only for one or more of the following reasons:

(i)   Nonpayment of premium;

(ii)   Discovery of fraud or material misrepresentation in the procurement of the insurance or with respect to any claims submitted thereunder;

(iii)   Discovery of a moral hazard or willful or reckless acts or omissions on an Insured's part which increases any hazard insured against;

(iv)   The occurrence of a change in the individual risk which substantially increases any hazard insured against after the insurance coverage has been issued or renewed, except to the extent the insurer could reasonably have foreseen the change or contemplated the risk in writing the contract;

(v)   Loss of applicable reinsurance or a substantial decrease in applicable reinsurance, if the Superintendent has determined that reasonable efforts have been made to prevent the loss of, or substantial decrease in, the applicable reinsurance, or to obtain replacement coverage;

(vi)   Failure of an Insured to correct material violations of safety codes or to comply with reasonable written loss control recommendations; or

(vii)  A determination by the Superintendent of Insurance that the continuation of the policy would create a condition that would be hazardous to the policyholders or the public.

(c)   The Company will mail written notice of cancellation to the **First Named Insured**, and agent if any, at the last mailing addresses known to us. Proof of mailing will be sufficient proof of notice.

(d)   The Company will mail notice of cancellation at least:

(i)   10 days before the effective date of cancellation, if the Company cancel for nonpayment of premium; or

(ii)   30 days before the effective date of cancellation, if the Company cancels for any other reason.

(e)   The notice of cancellation will:

(i)   State the effective date of cancellation. The policy period will end on that date.

(ii)   Contain the date of the notice and the policy number, and will state the reason for cancellation.

(f)   Policies written for a term of more than one year or on a continuous basis may be cancelled by the Company for any reason at an anniversary date, upon 30 day's written notice of cancellation.

(g)   If this policy is cancelled, the Company will send the **First Named Insured** any premium refund due. If the Company cancels, the refund will be pro rata. If the **First Named Insured** cancels, the refund may be less than pro rata. The cancellation will be effective even if the Company have not made or offered a refund.

(2)   Nonrenewal

(a)   If the Company elects not to renew this policy, the Company will mail written notice of nonrenewal to the **First Named Insured**, and agent if any, at the last mailing addresses known to the Company.  The notice will contain the date of the notice and the policy number, and will state the expiration date of the policy.

(b)   The Company will mail the notice of nonrenewal at least 30 days before the expiration date of the policy.

(c)   Proof of mailing will be sufficient proof of notice.

C.   SECTION 7 – DEFINITIONS, Paragraph 7.67 **Terrorist Activity** is replaced with the following:

7.67   For the purposes of this endorsement **Terrorist Activity** shall include the following:

a.   "Certified act of terrorism" which means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

(1)   The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act;

(2)   The act resulted in damage:

    (a) Within the United States (including its territories and possessions and Puerto Rico); or

    (b) Outside of the United States in the case of:

        (i) An air carrier (as defined in Section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or

        (ii) The premises of any United States mission; and

    (3) The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

b. "Non-Certified act of terrorism" which means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not certified as a terrorist act pursuant to the federal Terrorism Risk Insurance Act of 2002.

c. **Terrorist Activity** which constitutes "Certified acts of terrorism" is not excluded in this policy, unless otherwise endorsed.

d. **Terrorist Activity** which constitutes "Non-Certified acts of terrorism" is not excluded in this policy, when it occurs in the USA, its territories, possessions and missions, and the Commonwealth of Puerto Rico.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Oklahoma



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  SECTION 6. - CONDITIONS, 6.1. LOSS ADJUSTMENT AND SETTLEMENT, Paragraph f. APPRAISAL, is replaced with the following:

    f.   APPRAISAL

If the Insured and the Company fail to agree on the value of the property or the amount of loss, each will, on the written demand of either, select a competent, disinterested, and impartial appraiser, who has no direct or indirect financial interest in the claim.  Each will notify the other of the appraiser selected within 20 days of such demand.  The Insured may not invoke Appraisal unless it has first fully complied with all provisions of this Policy, including Duties in the Event of Loss or Damage and has provided the Company with a signed and sworn statement of loss.

The appraisers will first select a competent, disinterested and impartial umpire.  If the appraisers fail to agree upon an umpire within 15 days then, on the request of the Insured or the Company, after notice to the non-requesting party via certified mail, a judge of a court of record in the jurisdiction in which the loss occurred will select the umpire.  The appraisers will then appraise the value of the property or the amount of loss.  For each individual item of Property Insured they will each state the amount of loss based on an **Actual Cash Value** basis and a **Replacement Cost** value basis, as of the date of loss.  For a Time Element loss, they will each state the amount of loss for each Time Element Coverage of this Policy.

If the appraisers fail to agree, they will submit their differences to the umpire.  An award agreed to in writing by any two will determine the amount of loss, which will be binding upon the party invoking the appraisal process, yet makes the award non-binding upon the party compelled to participate due to the other party's demand.

An award will state separately the amount of loss based on the **Actual Cash Value** basis and **Replacement Cost** value basis as of the date of loss for each individual item of Property Insured.  For Time Element loss, it will state the amount of loss for each Time Element Coverage of this Policy.

Once there is an award, the Company retains the right to apply all Policy terms and conditions (including but not limited to deductibles, **Qualifying Periods**, exclusions, and Limits of Liability) to the award.  The Company further retains its right to deny the claim in whole or in part.

The Insured and the Company will each pay its chosen appraiser and bear equally the other expenses of the appraisal and umpire.

B.  SECTION 6.2 - GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, is replaced with the following:

    a.   CANCELLATION/NON-RENEWAL

        (1)  Cancellation

(a) The **First Named Insured** shown in the Declarations may cancel this Policy by mailing or delivering to the Company advance written notice of cancellation.

(b) The Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation at least:

    (i) 10 days before the effective date of cancellation if the Company cancels for nonpayment of premium; or

    (ii) 30 days before the effective date of cancellation if the Company cancels for any other reason.

(c) The Company will mail or deliver notice to the **First Named Insured's** mailing address shown in the Declarations of this Policy or any Endorsement attached thereto.

(d) Notice of cancellation will state the effective date of cancellation.  The Policy Period will end on that date.

(e) If this Policy is cancelled, the Company will send the **First Named Insured** any premium refund due.  If the Company cancels, the refund will be pro rata.  If the **First Named Insured** cancels, the Company will return 90% of the pro rata unearned premium, rounded to the next higher whole dollar..  The cancellation will be effective even if the Company has not made or offered a refund.

(f) If notice is mailed, proof of mailing will be sufficient proof of notice.

(g) If under the laws of the jurisdiction in which the property is located, such cancellation terms or conditions are different, then cancellation terms or conditions will be as permitted by such laws.

(2) If this Policy has been in effect for 45 business days or more, or after the effective date of a renewal of this Policy, the Company may cancel this Policy only for one or more of the following reasons:

(a) Nonpayment of premium;

(b) Discovery of fraud or material misrepresentation in the procurement of the insurance or with respect to any claims submitted under it;

(c) Discovery of willful or reckless acts or omissions by the Insured that increase any hazard insured against;

(d) The occurrence of a change in the risk that substantially increases any hazard insured against after insurance coverage has been issued or renewed;

(e) A violation of any local fire, health, safety, building, or construction regulation or ordinance, with respect to any covered property or its occupancy, that substantially increases any hazard insured against;

(f) A determination by the Insurance Commissioner that the continuation of the Policy would place the Company in violation of the insurance laws of this state;

(g) The Insured's conviction of a crime having, as one of its necessary elements, an act increasing any hazard insured against; or

(h) Loss of or substantial changes in applicable reinsurance.

(3) Non-renewal

(a) If the Company decides to non-renew this Policy, the Company will mail or deliver written notice to the **First Named Insured** shown in the Declarations at least 45 days before:

    (i) The expiration date; or

    (ii) The anniversary date of this Policy, if it is written for a term longer than one year or with no fixed expiration date.

(b) The Company will mail or deliver notice to the **First Named Insured's** mailing address known to the Company.

(c) If notice is mailed, proof of mailing will be sufficient proof of notice. It will be considered to have been given to the **First Named Insured** on the day it is mailed.

(d) If notice of non-renewal is not mailed or delivered at least 45 days before the expiration date or an anniversary date of this Policy, coverage will remain in effect until 45 days after notice is given.

(e)  Earned premium for such extended period of coverage will be calculated pro rata, based on the rates applicable to the expiring Policy.

(f)  The Company will not provide notice of nonrenewal if the Company another company within the same insurance group, has offered to issue a renewal Policy, or the Insured has obtained replacement coverage or has agreed in writing to obtain replacement coverage.

(g)  If the Company has provided the required notice of non-renewal as described in (a) above, and thereafter extends the Policy for a period of 90 days or less, the Company will not provide an additional non-renewal notice with respect to the period of extension.

(h)  If the Company elects to renew this Policy, the Company will give written notice of any premium increase, change in deductible, or reduction in limits or coverage, to the **First Named Insured**, at the last mailing address known to the Company.

   (i)   Any such notice will be mailed or delivered to the **First Named Insured** at least 45 days before the expiration date of this Policy or the anniversary date of this Policy, if it is written for a term longer than one year or with no fixed expiration date.

   (ii)  If notice is mailed, proof of mailing will be sufficient proof of notice. It will be considered to have been given to the **First Named Insured** on the day it is mailed.

   (iii) If the **First Named Insured** accepts the renewal, the premium increase or coverage changes will be effective the day following the prior policy's expiration or anniversary date.

   (iv)  If notice is not mailed or delivered at least 45 days before the expiration date or anniversary date of this Policy, the premium, deductible, limits and coverage in effect prior to the changes will remain in effect until:

      i   45 days after notice is given; or

      ii  The effective date of replacement coverage obtained by the Insured; whichever occurs first. If the **First Named Insured** then elects not to renew, any earned premium for the resulting extended period of coverage will be calculated pro rata at the lower of the new rates or rates applicable to the expiring policy.

h.  The Company will not provide notice of the following:

   (i)   Changes in a rate or plan filed with or approved by the Insurance Commissioner or filed pursuant to the Property and Casualty Competitive Loss Cost Rating Act and applicable to an entire class of business; or

   (ii)  Changes based upon the altered nature of extent of the risk insured; or

   (iii) Changes in policy forms filed with or approved by the Insurance Commissioner and applicable to an entire class of business.

B.  SECTION 6.2. - GENERAL PROVISIONS, Paragraph c. CONCEALMENT, MISREPRESENTATION OR FRAUD is replaced with the following:

c.  CONCEALMENT, MISREPRESENTATION OR FRAUD

This Policy is voidable as to all Insureds in any case of fraud by any Insured as it relates to this Policy at any time. It is also voidable if any Insured, at any time, intentionally conceals or misrepresents a material fact concerning:

(1)  This Policy;

(2)  The Covered Property;

(3)  The Insured's interest in Covered Property; or

(4)  A claim under this Policy.

C.  SECTION 6.2. - GENERAL PROVISIONS, Paragraph d. CONFORMITY TO STATUTES is replaced with the following:

d.  CONFORMITY TO STATUTES

Any provisions required by Oklahoma law to be included in policies issued by the Company will be deemed to have been included in this Policy.

If the provisions of this Policy conflict with the laws of any jurisdictions in which this Policy applies, and if certain provisions are required by Oklahoma law to be stated in this Policy, this Policy will be read so as to eliminate such conflict or deemed to include such provisions for Insured Locations within such jurisdictions.

C.  The following is added to SECTION 6.2 – GENERAL PROVISIONS:

FRAUD WARNING

Any person who knowingly and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

All other terms, conditions, provisions and exclusions of this policy remain the same.

WT_000630

# Amendatory Endorsement - Oregon



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
| --- | --- | --- | --- |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  SECTION 3.3 EXCLUSIONS is amended as follows:

1.  Subparagraph c.(4) is replaced with the following:

(4)  Fraudulent or criminal acts by the Insured or any of the Insured's associates, proprietors, partners, officers, employees, directors, trustees or authorized representatives. However, this exclusion does not apply to direct physical loss or damage resulting from a **Covered Cause of Loss** intentionally caused by any individual specified above and done without the knowledge of the Insured.

2.  The following is added to Subparagraph c.:

Loss caused by theft by the Insured or any of the Insured's associates, proprietors, partners, officers, employees, directors, trustees or authorized representatives.

B.  SECTION 6.1.  LOSS ADJUSTMENT AND SETTLEMENT is amended as follows:

1.  Subparagraph a.(8) is replaced with the following:

(8)  Give the Company a signed sworn statement of loss containing the information necessary to investigate the claim.  If requested by the Company, the Company will supply the necessary form and the Insured must return this completed form within 90 days of the request or as required by law.

2.  The following is added to Paragraph f. APPRAISAL.

After a dispute has arisen, an appraisal may take place if the Insured and the Company fail to agree on the amount of the loss. However, an appraisal will take place only if both Insured and the Company agree, voluntarily, to have the loss appraised.

3.  Paragraph h. SUIT AGAINST THE COMPANY is replaced with the following:

h.  SUIT AGAINST THE COMPANY

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless the Insured has fully complied with all the provisions of this Policy. Legal action must be started within 24 months after the date of direct physical loss of or damage to Property Insured or to other property as set forth herein.

C.  SECTION 6.2 **-** GENERAL PROVISIONS, is amended as follows:

1.  Paragraph a. CANCELLATION/NON-RENEWAL, Subparagraph (1)(b) is replaced with the following:

(b)  The Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation at least:

(i)  10 days before the effective date of cancellation if the Company cancels for nonpayment of premium, as stated in the Declarations; or

    (ii)  30 days before the effective date of cancellation if the Company cancels for any other reason, as stated in the Declarations.

2.  Paragraph a. CANCELLATION/NON-RENEWAL, Subparagraph (2) is replaced with the following:

    (2)  Non-renewal

The Company may non-renew this Policy by mailing or delivering to the **First Named Insured** written notice, at least 45 days before the non-renewal.

3.  Paragraph g. JURISDICTION is replaced with the following:

    g.  JURISDICTION

Any disputes arising hereunder will be exclusively subject to the jurisdiction of a court of competent jurisdiction within the State of Oregon.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement Rhode Island



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A. SECTION 6.2 - GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, Subparagraph (1) Cancellation, is replaced with the following:

(1) Cancellation

(a) The **First Named Insured** shown in the Declarations may cancel this Policy by mailing or delivering to the Company advance written notice of cancellation.

(b) The Company may cancel this Policy by mailing or delivering to the **First Named Insured** and agent, if any, written notice of cancellation at least:

(i) The number of days before the effective date of cancellation if the Company cancels for nonpayment of premium, as stated in the Declarations; or

(ii) The number of days before the effective date of cancellation if the Company cancels for any other reason, as stated in the Declarations.

(c) The Company will mail or deliver notice to the **First Named Insured's** and agent's, if any, mailing address shown in the Declarations of this Policy or any Endorsement attached thereto.

(d) Notice of cancellation will state the effective date of cancellation.  The Policy Period will end on that date.

(e) If this Policy is cancelled, the Company will send the **First Named Insured** any premium refund due.  The Company will compute the return premium pro rata and round to the next higher whole dollar if:

(i) The Policy is cancelled at the Company's request; or

(ii) The Policy is cancelled by us at the request of a premium finance company upon default of the first Named Insured, when this policy is financed under a premium finance agreement.

(e) If the **First Named Insured** cancels, the Company will return 90% of the pro rata unearned premium, rounded to the next higher whole dollar. However, when such cancellation takes place during the first year of a multi-year prepaid policy, we will return the full annual premium for the subsequent years. The cancellation will be effective even if the Company has not made or offered a refund.

(f) If notice is mailed, proof of mailing will be sufficient proof of notice.

(g) If under the laws of the jurisdiction in which the property is located, such cancellation terms or conditions are different, then cancellation terms or conditions will be as permitted by such laws.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - South Carolina



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  SECTION 6.2 **-** GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL is amended as follows:

1.  Paragraph (1) Cancellation, Subparagraph (b) is replaced with the following:

    (b) The Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation at least:

    (i)  10 days before the effective date of cancellation if the Company cancels for nonpayment of premium, as stated in the Declarations; or

    (ii)  30 days before the effective date of cancellation if the Company cancels for any other reason, as stated in the Declarations.

2.  Paragraph (1) Cancellation, Subparagraph (c) is replaced with the following:

    (c) The Company will mail or deliver notice to the **First Named Insured's** and agent's last known mailing address.

3.  The following is added to Paragraph (1) Cancellation:

    If this Policy has been in effect 120 days or more, or is a renewal or continuation of a Policy the Company issued, the Company may cancel this Policy only for one or more of the following reasons:

    (i)  Nonpayment of premium;

    (ii)  Material misrepresentation of a fact, which, if known to the Company, would have caused the Company not to issue the Policy;

    (iii)  Substantial change in the risk assumed, except to the extent that the Company should reasonably have foreseen the change or contemplated the risk in writing the Policy;

    (iv)  Substantial breaches of contractual duties, conditions or warranties; or

    (v)  Loss of reinsurance covering all or a significant portion of the particular Policy insured, or where continuation of the Policy would imperil the Company's solvency or place the Company in violation of the insurance laws of South Carolina.

    Prior to cancellation for reasons permitted in item (v). above, the Company will notify the Commissioner, in writing, at least 60 days prior to such cancellation and the Commissioner will, within 30 days of such notification, approve or disapprove such action.

    Any notice of cancellation will state the precise reason for cancellation.

4.  Paragraph (2) Non-Renewal is replaced with the following:

    (2) Non-Renewal

The Company may non-renew this Policy by mailing or delivering to the **First Named Insured** and the agent, written notice, at the last known address, of non-renewal at least:

(i)   60 days if non-renewal is effective between November 1 and May 31; or

(ii)  90 days if non-renewal is effective between June 1 and October 31;

before:

(i)   The expiration date of this Policy, if the Policy is written for a term of one year or less; or

(ii)  An anniversary date of this policy, if the policy is written for a term of more than one year or for an indefinite term.

However, the Company will not refuse to renew a policy issued for a term of more than one year, until expiration of its full term, if anniversary renewal has been guaranteed by additional premium consideration. Any notice of non-renewal will state the precise reason for non-renewal. If notice is mailed, proof of mailing will be sufficient proof of notice.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - South Dakota



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  SECTION 6.1 – LOSS CONDITIONS AND SETTLEMENT, Paragraph f. APPRAISAL, is deleted in its entirety.

B.  SECTION 6.1 – LOSS CONDITIONS AND SETTLEMENT, Paragraph h. SUIT AGAINST THE COMPANY, is replaced with the following:

  h.  SUIT AGAINST THE COMPANY

  Legal action must be started within 72 months after the date of direct physical loss or damage to Covered Property or to other property as set forth herein.

C.  SECTION 6.2 **-** GENERAL PROVISIONS, is amended as follows:

  1.  Paragraph a. CANCELLATION/NON-RENEWAL, Subparagraph (1)(b) is replaced with the following:

    (b)  The Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation at least the greater of 20 days or the number of days before the effective date of cancellation as stated in the Declarations.

  2.  The following is added to Paragraph a. CANCELLATION/NON-RENEWAL, Subparagraph (1) Cancellation:

    If this Policy has been in effect 60 days or more, or is a renewal or continuation of a Policy the Company issued, the Company may cancel this Policy only for one or more of the following reasons:

    (i)  Nonpayment of premium;

    (ii)  Discovery of fraud or material misrepresentation made by or with the knowledge of the named insured in obtaining the policy, continuing the policy, or in presenting a claim under the policy;

    (iii)  Discovery of acts or omissions on the part of the named insured which increase any hazard insured against;

    (iv)  The occurrence of a change in the risk which substantially increases any hazard insured against after insurance coverage has been issued;

    (v)  A violation of any local fire, health, safety, building, or construction regulation or ordinance with respect to any insured property or the occupancy thereof which substantially increases any hazard insured against;

    (vi)  A determination by the director of the Division of Insurance that the continuation of the policy would jeopardize a company's solvency or would place the insurer in violation of the insurance laws of this state;

    (vii)  Violation or breach by the insured of any policy terms or conditions; or

    (vii)  Such other reasons as are approved by the director of the Division of Insurance.

3.  The following is added to Paragraph f. JOINT LOSS, Subparagraph (8) Additional Conditions:

The Arbitration process is voluntary and non-binding.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Tennessee



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  SECTION 6.2 - GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL is amended as follows:

1.  The following is added to Subparagraph (1) Cancellation:

If this Policy has been in effect for 60 days or more, or if this Policy is a renewal of a Policy the Company issued, this Policy may be cancelled only for one or more of the following reasons:

(i) Nonpayment of premium, including any additional premium, calculated in accordance with the Company's current rating manual, justified by a physical change in the insured property or a change in the insured property or a change in its occupancy or use;

(ii) The Insured's conviction of a crime increasing any hazard insured against;

(iii) Discovery of fraud or material misrepresentation on the part of either of the following:

i  The Insured or Insured representative in obtaining this insurance; or

ii  The Insured in pursuing a claim under this Policy.

(iv) Failure to comply with written loss control recommendations;

(v) Material change in the risk which increases the risk of loss after the Company issued or renewed insurance coverage;

(vi) Determination by the insurance commissioner that the continuation of the Policy would jeopardize the Company's solvency or would place the Company in violation of the insurance laws of Tennessee or any other state;

(vii) The Insured's violation or breach of any Policy terms or conditions; or

(viii)        Other reasons that are approved by the insurance commissioner.

The Notice of Cancellation will state the reason for cancellation.

2.  Paragraph (2) Non-renewal is replaced with the following:

(2)  Non-renewal

(a) If the Company decides not to renew this Policy, the Company will mail or deliver written notice of non-renewal to the first Named Insured and agent, at least 60 days before the expiration date unless:

(i) The Company has offered to issue a renewal Policy; or

(ii) The Insured has obtained replacement coverage or has agreed in writing to obtain replacement coverage.

(iii) Any notice of non-renewal will be mailed or delivered to the **First Named Insured's** and agent's addresses shown in the Policy.  If notice is mailed, proof of mailing will be sufficient proof of notice.

All other terms, conditions, provisions and exclusions of this policy remain the same.

WT_000639

# Amendatory Endorsement - Texas



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  SECTION 6.1 – LOSS ADJUSTMENT AND SETTLEMENT is amended as follows:

1.  Paragraph a. DUTIES IN THE EVENT OF LOSS OR DAMAGE, Subparagraph (2) is replaced with the following:

   (2)  Give the Company prompt notice of the loss or damage, including a description of the property involved. However, with response to loss or damage in the State of Texas caused by a windstorm or hail in the catastrophe areas as defined by the Texas Insurance Code, any claim must be filed with the Company not later than one year after the date of the loss or damage that is the subject of the claim, except that a claim may be filed after the first anniversary of the date of the loss or damage for good cause shown by the person filing the claim.

2.  Paragraph a. DUTIES IN THE EVENT OF LOSS OR DAMAGE, Subparagraph (8) is replaced with the following:

   (8)  Send the Company a signed, sworn proof of loss containing the information the Company requests to investigate the claim. The Company must do this within 91 days after the Company's request. The Company will supply the Insured with the necessary forms.

3.  Paragraph c. SETTLEMENT OF CLAIMS is replaced with the following:

   c.  SETTLEMENT OF CLAIMS

   (1)  Loss Payment

   In the event of loss or damage to Property Insured, the Company will, at its option:

   (a)  Pay the value of lost or damaged property;

   (b)  Pay the cost of repairing or replacing the lost or damaged property;

   (c)  Take all or any part of the property at an agreed valuation; or

   (d)  Pay to repair, rebuild or replace the property with other property of like kind and quality.

   (2)  Within 15 days after the Company receives written notice of claim, the Company will:

   (a)  Acknowledge receipt of the claim. If the Company does not acknowledge receipt of the claim in writing, the Company will keep a record of the date, method and content of the acknowledgment;

   (b)  Begin any investigation of the claim; and

   (c)  Request a signed, sworn proof of loss, specify the information the Company must provide and supply the Company with the necessary forms. The Company may request more information at a later date, if during the investigation of the claim such additional information is necessary.

   (3)  The Company will not pay more than the Insured's financial interest in the Property Insured.

(4) The Company will notify the Insured in writing as to whether:

    (a) The claim or part of the claim will be paid;

    (b) The claim or part of the claim has been denied and inform the Insured of the reasons for denial;

    (c) More information is necessary; or

    (d) The Company needs additional time to reach a decision. If the Company needs additional time, the Company will inform the Insured of the reasons for such need.

(5) The Company will send the above-noted notification within:

    (a) 15 business days after the Company receives the signed, sworn proof of loss and information the Company requested; or

    (b) 30 days after the Company received the signed, sworn proof of loss and information the Company requested, if the Company has reason to believe the loss resulted from arson.

(6) If the Company has notified the Insured that the Company needs additional time to reach a decision, the Company must then either approve or deny the claim within 45 days of such notice.

(7) The Company will pay for covered loss or damage within five business days after:

    (a) The Company has notified the Insured that payment of the claim or part of the claim will be made and have reached agreement with the Insured on the amount of loss; or

    (b) An appraisal award has been made.

However, if payment of the claim or part of the claim is conditioned on the Insured's compliance with any of the terms of this Policy, the Company will make payment within five business days after the date the Insured has complied with such terms.

(8) Priority of Payment

In the event of a claim that involves more than one interest and/or coverage and/or peril; the Insured has the option to apportion recovery under this Policy when submitting final proof of loss, subject to the overall amount of claim not exceeding the applicable Limit of Liability and subject to all other terms and conditions of the Policy.

For the purpose of attachment of coverage for excess layers, claims involving any interest and/or peril covered in the primary or underlying excess layers, but not covered in higher excess layers, will be recognized by such excess layers as eroding or exhausting the Occurrence Limits of Liability of the primary and/or underlying excess layer(s). Nothing, however, will extend coverage in such layers(s) to include loss from any interest and/or peril not covered in the excess layer(s) itself.

(9) Catastrophe Claims

If a claim results from a weather-related catastrophe or a major natural disaster, the claim handling and claim payment deadlines described this Texas Amendatory are extended an additional 15 days.

Catastrophe or Major Natural Disaster means a weather-related event which:

    Is declared a disaster under the Texas Disaster Act of 1975; or

    Is determined to be a catastrophe by the State Board of Insurance.

(10) The term "business day" as used in the Settlement of Claims, Loss Payment Condition, means a day other than Saturday, Sunday or a holiday recognized by the State of Texas.

4. Paragraph f. APPRAISAL is replaced with the following:

    f. APPRAISAL

(1) If the Insured and the Company disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such demand. The two appraisers will select an umpire. If they cannot agree within 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. Each appraiser will select the amount of loss. If they fail to agree, they will

submit their differences to the umpire. A decision agreed to by any two will be binding as to the amount of loss. Each party will:

    (a) Pay its chosen appraiser;

    (b) Bear the other expenses of the appraisal and umpire equally.

(2) If there is an appraisal:

    (a) The Insured will still retain the right to bring a legal action against the Company, subject to the provisions of the Loss Condition, Suit Against The Company; and

    (b) The Company will still retain the right to deny the claim.

5. Paragraph h. SUIT AGAINST THE COMPANY, is replaced with the following:

  h.  SUIT AGAINST THE COMPANY

    (1) No one may bring a legal action against the Company under this Policy unless:

      (a) There has been full compliance with all of the terms of this Policy; and

      (b) The action is brought within 2 years and 1 day from the date the cause of action first accrues. A cause of action accrues on the date of the initial breach of our contractual duties as alleged in the action.

    (2) With response to loss or damage in the State of Texas caused by windstorm or hail in the catastrophe area as defined by the Texas Insurance Code, no one may bring a legal action against the Company under this Policy unless:

      (a) There has been compliance with all of the terms of this Policy; and

      (b) The action is brought within the earlier of the following:

        (i) 2 years and 1 day from the date the Company accepts or rejects the claim; or

        (ii) 3 years and 1 day from the date of the loss or damage that is the subject of the claim.

6. The following is added to Paragraph j. VALUATION:

A fire insurance policy, in case of total loss by fire of property insured, shall be held and considered to be a liquidated demand against the Company for the full amount of such policy. This subsection does not apply to personal property.

B. SECTION 6.2 - GENERAL PROVISIONS is amended as follows:

1. Paragraph a. CANCELLATION/NON-RENEWAL, is replaced with the following:

  a.  CANCELLATION/NON-RENEWAL

    (1) Cancellation

      (a) The **First Named Insured** shown in the Declarations may cancel this Policy by mailing or delivering to the Company advance written notice of cancellation.

      (b) The Company may cancel this Policy:

        (i) By mailing or delivering to the **First Named Insured** written notice of cancellation, stating the reason for cancellation, at least 10 days before the effective date of cancellation.

        (ii) However, if this Policy covers a condominium association, and the condominium property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then the notice of cancellation, as described above, will be provided to the **First Named Insured** 30 days before the effective date of cancellation. The Company will also provide 30 days' written notice to each unit-owner to whom the Company issued a certificate or memorandum of insurance, by mailing or delivering the notice to each last mailing address known to the Company.

      (c) For the following reasons, if this Policy does not provide coverage to a governmental unit, as defined under 28 TEX. ADMIN. CODE, Section 5.7001 or on one – and two- family dwellings:

(i) If this Policy has been in effect for 60 days or less, the Company may cancel for any reason except that, under the provisions of the Texas Insurance Code, the Company may not cancel this Policy solely because the policyholder is an elected official.

(ii) If this Policy has been in effect for more than 60 days, or if it's a renewal or continuation of a Policy issued by the Company, the Company may cancel for one or more of the following reasons:

    i    Fraud in obtaining coverage;

    ii    Failure to pay premiums when due;

    iii    An increase in hazard within the control of the insured which would produce an increase in rate;

    iv    Loss of the Company's reinsurance covering all or part of the risk covered by the Policy; or

    v    If the Company has been placed in supervision, conservatorship or receivership and the cancellation is approved or directed by the supervisor, conservator or receiver.

(d) For the following reasons, if this Policy provides coverage to a governmental unit, as defined under 28 TEX. ADMIN. CODE, Section 5.7001 or on one- and two-family dwellings:

(i) If this Policy has been in effect for less than 90 days, the Company may cancel coverage for any reason.

(ii) If this Policy has been in effect for 90 days or more, or if it is a renewal or continuation of a Policy issued by the Company, the Company may cancel coverage, only for the following reasons:

    i.    If the **First Named Insured** does not pay the premium or any portion of the premium when due;

    ii.    If the Texas Department of Insurance determines that continuation of this Policy would result in violation of the Texas Insurance Code or any other law governing the business of insurance in Texas;

    iii.    If the Named Insured submits a fraudulent claim; or

    iv.    If there is an increase in the hazard within the control of the **Named Insured** which would produce an increase in rate.

(2) Non-Renewal

(a) The Company may elect not to renew this Policy except that, under the provisions of the Texas Insurance Code, the Company may not refuse to renew this Policy solely because the policyholder is an elected official.

(b) This paragraph applies unless the paragraph below regarding condominium association coverage applies.

(c) If the Company elects not to renew this Policy, the Company may do so by mailing or delivering to the **First Named Insured**, at the last mailing address known to the Company, written notice of nonrenewal, stating the reasons for nonrenewal, at least 60 days before the expiration date. If notice is mailed or delivered less than 60 days before the expiration date, this Policy will remain in effect until the 61st day after the date on which the notices is mailed or delivered. Earned premium for any period of coverage that extends beyond the expiration date will be computed pro rata based on the previous year's premium.

(d) If this Policy covers a condominium association, and the condominium property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then the Company will mail or deliver written notice of nonrenewal, at least 30 days before the expiration date of the Policy, to:

(i) The **First Named Insured**; and

(ii) Each unit-owner to whom the Company issued a certificate or memorandum of insurance.

(e) The Company will mail or deliver such notice to each last mailing address known to the Company.

(f) If notice is mailed, proof of mailing will be sufficient proof of notice.

(g)  The transfer of a policyholder between admitted companies within the same insurance group is not considered a refusal to renew.

2.  Paragraph g. JURISDICTION, is replaced with the following:

g.  JURISDICTION

Any disputes arising in Texas in which the **First Named Insured's** property or corporate headquarters is located in Texas will be exclusively subject to the jurisdiction of a court of competent jurisdiction within the state of Texas.

3.  The following is added to Paragraph h. LENDERS LOSS PAYEE AND MORTGAGE HOLDER INTERESTS AND OBLIGATIONS:

When the Policy is cancelled due to the Insured's nonpayment of premium, the Company will give written notice to the Lender or Mortgage Holder at least 14 days before the effective date of cancellation.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Vermont



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A. Section 6.1 **–** LOSS ADJUSTMENT AND SETTLEMENT, Paragraph c. SETTLEMENT OF CLAIMS**,** Subparagraph (4) is replaced with the following:

(4) The Company will pay for covered loss or damage within 10 working days after we receive the sworn statement of loss, if the Insured has complied with all the terms of this Policy; and

(a) The Company has reached agreement on the amount of loss; or

(b) An appraisal award has been made, subject to Condition f. of Subsection 6.1.

B. The following is added to Section 6.1 – LOSS ADJUSTMENT AND SETTLEMENT, Paragraph h. SUIT AGAINST THE COMPANY:

The Insureds' right to bring legal action against the Company is not conditioned upon compliance with the Appraisal Condition of this Policy.

C. Section 6.2 **-** GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, is replaced with the following:

a. CANCELLATION/NON-RENEWAL

(1) Cancellation

(a) The **First Named Insured** shown in the Declarations may cancel this Policy by mailing or delivering to the Company advance written notice of cancellation.

(b) If this Policy has been in effect for less than 60 days and this Policy is not a renewal of a Policy the Company issued, the Company may cancel this Policy by mailing or delivering to the **First Named Insured** written notice of cancellation at least:

(i) 15 days prior to the proposed cancellation date for nonpayment of premium or substantial increase in hazard; or

(ii) 45 days prior to the proposed cancellation date for any other reason.

(c) If cancellation is for nonpayment of premium, written notice may be sent by certified mail. If cancellation is for any reason other than nonpayment of premium, written notice must be sent by certified mail.

(d) If this Policy has been in effect for 60 days or more, or if this is a renewal of a Policy the Company issued, the Company may cancel this Policy only for one or more of the following reasons:

(i) Nonpayment of premium;

(ii) Fraud or material misrepresentation affecting this Policy or in the presentation of claims under this Policy;

(iii) Violation of any provisions of this Policy; or

(iv) Substantial increase in hazard, provided the Company has secured approval for the cancellation from the commissioner of insurance.

If the Company cancels this Policy for one of the reasons specified above, the Company may cancel this Policy by mailing or delivering at least:

(i) 15 days notice before the effective date of cancellation for nonpayment of premium; or

(ii) 45 days notice before the effective date of cancellation for any other reason.

(e) Notice of cancellation will state the effective date of cancellation. The Policy period will end on that date.

(f) If this Policy is cancelled, the Company will send the **First Named Insured** any premium refund due. If the Company cancels, the refund will be pro rata. If the **First Named Insured** cancels, the refund may be less than pro rata but no less than the customary short rate amount. The cancellation will be effective even if the Company has not made or offered a refund.

(g) If notice is mailed, proof of mailing will be sufficient proof of notice.

(2) Non-Renewal

(a) The Company may non-renew this Policy by mailing, certified mail, or delivering to the **First Named Insured** written notice, at the last known address, of non-renewal at least 45 days before the expiration of this Policy or the anniversary date of this Policy, if this Policy has been written for a term of more than one year.

(i) This non-renewal provision does not apply if the Company has indicated a willingness to renew, in case of nonpayment of premium, or if the Insured does not pay any advance premium required for renewal.

(ii) If the Company fails to mail or deliver proper notice of non-renewal, this Policy will end on the effective date of any other Policy with respect to property designated in both policies.

(b) If the Company elects to renew this Policy and has the necessary information to issue a renewal Policy, the Company will confirm in writing at least 45 days before the Policy expires the intention to renew this Policy and the premium at which this Policy will be renewed.

If the Company fails to comply with this provision, the Insured will have renewal coverage. The renewal coverage will be at the rates in effect under the expiring or expired Policy or in effect on the expiration date, that have been approved by the Commissioner, whichever are lower. This renewal coverage will be on a pro rata basis and will continue for 45 days after the Company confirms renewal coverage and premium. If the Insured accepts this renewal Policy, this paragraph does not apply.

D. Section 6.2 - GENERAL PROVISIONS, Paragraph c. CONCEALMENT, MISREPRESENTATION OR FRAUD is replaced with the following:

c. CONCEALMENT, MISREPRESENTATION OR FRAUD

The Company does not provide coverage to one or more Insureds who at any time engage in fraudulent conduct as it relates to this Policy. The Company also does not provide coverage to one or more Insureds, who at any time intentionally conceal or misrepresent a material fact or make a false statement concerning:

(1) This Policy;

(2) The Covered Property;

(3) The Insured's interest in Covered Property; or

(4) A claim under this Policy.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Virginia



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  SECTION 5.2 – SPECIAL COVERAGES, Paragraph u. FIRE DEPARTMENT SERVICE CHARGE is replaced with the following:

u.  FIRE DEPARTMENT SERVICE CHARGE

The Company will pay for the reasonable additional expenses, resulting from costs of fire extinguishing materials expended, incurred by the Insured when the Fire Department is called to save or protect Property Insured from a **Covered Cause of Loss** at an Insured Location. The Fire Department Service Charges are those assumed by contract or agreement prior to loss or damage or required by local ordinance.

If the charges are billed to the Insured by a volunteer fire department, the Company will pay for the volunteer fire department service charges, provided that the volunteer fire department is not fully funded by real estate taxes or other property taxes.

The most the Company will pay under this Additional Coverage at any one Insured Property, in any year beginning on the date coverage for such Insured Property was effective, is the greater of $250 or the Limit of Liability shown in the Declarations for Fire Department Service Charge. The Limit for this Additional Coverage is in addition to the applicable Limit of Liability shown in the Declarations for that covered property.

B.  SECTION 6.1 – LOSS ADJUSTMENT AND SETTLEMENT, Paragraph h. SUIT AGAINST THE COMPANY, is replaced with the following:

h.  SUIT AGAINST THE COMPANY

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless the Insured has fully complied with all the provisions of this Policy. Legal action must be started within 2 years from the date of loss.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Washington



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  SECTION 3.3 EXCLUSIONS is amended as follows:

1.  Paragraph c. is replaced with the following:

c.  The Company will not pay for loss or damage caused by any excluded event described below. Loss or damage will be considered to have been caused by an excluded event if the occurrence of that event directly and solely results in loss or damage; or initiates a sequence of events that results in loss or damage, regardless of the nature of any intermediate or final event in that sequence.

2.  The following is added to Subparagraph (4):

This exclusion does not apply to acts of direct physical loss or damage resulting from an act of domestic abuse caused by another insured under the policy if such loss is an otherwise covered property loss and the insured making claim: files a police report, cooperates with any law enforcement investigation relating to the act of domestic abuse and did not cooperate in or contribute to the creation of the loss.

B.  SECTION 6.1 – LOSS ADJUSTMENT AND SETTLEMENT is amended as follows:

1.  Paragraph j. VALUATION, Subparagraph (1) **Replacement Cost** is replaced by the following:

(1)  **Replacement Cost**

The basis of adjustment is on a replacement cost basis unless a specific valuation applies. **Replacement Cost** shall be the cost to repair, rebuild or replace the damaged property (without deduction for depreciation) with new materials of like kind, quality and capacity at the same or another site.

2.  The following is added to SECTION 6.1 – LOSS ADJUSTMENT AND SETTLEMENT:

CAUSE OF LOSS

As required by Washington law, the Company will not deny a claim if a risk, hazard or contingency insured against is the dominant cause of a loss and an excluded risk, hazard, or contingency is also in the chain of causes but operates on a secondary basis.

C.  SECTION 6.2 - GENERAL PROVISIONS, Paragraph a. CANCELLATION/NON-RENEWAL, is amended as follows:

1.  The following is added to Subparagraph (1) Cancellation:

Notice of cancellation will state the reason for cancellation.

The Company will send written notice of cancellation to each mortgagee, pledge or other person shown by the Policy to have an interest in any loss which may occur.

2.  Subparagraph (2) Non-Renewal is replaced with the following:

(2)  Non-Renewal

The Company may non-renew this Policy by mailing or delivering to the **First Named Insured** written notice, 45 days before the non-renewal. Notice of non-renewal will state the reason for non-renewal.

G.  The following is added to SECTION 6.2 - GENERAL PROVISIONS, Paragraph e. INSPECTIONS AND SURVEYS:

However, this condition does not apply to any inspections, surveys, reports or recommendations the Company may make relative to certification under state or municipal statutes, ordinances or regulations referenced above.

H.  SECTION 6.2 - GENERAL PROVISIONS, Paragraph k. OTHER INSURANCE, Subparagraph (1) is replaced with the following:

(1)  The Company will not be liable if, at the time of loss or damage, there is any other insurance that would attach in absence of this insurance; except that this insurance shall apply only as pro rata contributing insurance.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - West Virginia



| Insured Name Crescent Hotels & Resorts | Policy Number ERP1150909-04 | Effective Date 05/31/2022 | Endorsement Number |
|---|---|---|---|

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  SECTION 6.1 – LOSS ADJUSTMENT AND SETTLEMENT is amended as follows:

   1.  Paragraph c. SETTLEMENT OF CLAIMS, subparagraph (4) is replaced with the following:

      (4)  The Company will pay for loss of or damage to within 15 business days after we receive the signed, sworn statement of loss if the Insured has complied with all the terms of this Policy and the Company has reached agreement with the Insured on the amount of loss.

   2.  Paragraph f. APPRAISAL, is replaced with the following:

      f.  APPRAISAL

      If the Insured and the Company fail to agree as to the actual cash value of the amount of loss, then on the written demand of either party, each shall select a competent and disinterested appraiser and notify the other appraiser selected within 20 days of such demand. The appraiser shall first select a competent and disinterested umpire; and failing for 15 days to agree upon such umpire, then either on the Insured's or the Company's request, such umpire shall be selected by a judge of a court of record in the state in which the property covered is located.  The appraisers shall then appraise the loss, stating separately actual cash value and loss as to each item; and, failing to agree, shall submit their differences only, to the umpire.  An award in writing, so itemized, of any two when filed with this Company shall determine the amount of actual cash value and loss.  Each appraiser shall be paid by the parties equally.

   3.  SECTION 6.1 – LOSS ADJUSTMENT AND SETTLEMENT, Paragraph h. SUIT AGAINST THE COMPANY, is replaced with the following:

      h.  SUIT AGAINST THE COMPANY

      No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless the Insured has fully complied with all the provisions of this Policy. Legal action must be started within 2 years after the date of direct physical loss or damage to Covered Property or to other property as set forth herein.

B.  SECTION 6.2 - GENERAL PROVISIONS, Paragraph k. OTHER INSURANCE, Subparagraph (4), is replaced with the following:

   (4)  The Company will not be liable if, at the time of loss or damage, there is any of the following other insurance that would attach in absence of this insurance:

      (a)  A National Flood Insurance Program policy;

      (b)  A specific policy for construction, additions, renovations or alterations; or

      (c)  A specific policy for **Finished Stock**, **Merchandise**, **Raw Materials** or **Stock in Process**,

      (d)  A Mine Subsidence Fund Endorsement,

except that this insurance:

(e)  Will apply only as excess after the Limit of Liability for the other insurance described in (a) through (d) of this paragraph that has coverage for the loss or damage, has been exhausted by payment; and

(f)  Will not contribute on any basis, drop down, replace or assume any obligation within the Limit of Liability of the other insurance described in (a) through (c) of this paragraph for any reason including, difference in terms or conditions, uncollectibility or application of a sub-limit or deductible, of such insurance.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Wisconsin



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A.  Section 6.1 - Loss ADJUSTMENT AND SETTLEMENT, Paragraph g. Subrogation, is replaced with the following:

g.  SUBROGATION

The Insured is required to cooperate in any subrogation proceedings. To the extent of the Company's payment, the Insured's rights of recovery against any party are transferred to the Company.

The Company acquires no rights of recovery that the Insured has expressly waived prior to a loss, nor will such waiver affect the Insured's rights under this Policy.

The Company will be entitled to any recovery from subrogation proceedings only after the **First Named Insured** has been fully compensated for Damages.

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Amendatory Endorsement - Wyoming



| Insured Name<br>Crescent Hotels & Resorts | Policy Number<br>ERP1150909-04 | Effective Date<br>05/31/2022 | Endorsement Number |
|---|---|---|---|

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**The Zurich Edge II Policy**

A. SECTION 6.1 – LOSS ADJUSTMENT AND SETTLEMENT, Paragraph c. SETTLEMENT OF CLAIMS, Subparagraph (2) is replaced with the following:

(2) The Company will pay for the undisputed covered loss or damage within 45 days, after receiving the sworn statement of loss, if the Insured has complied with all the terms of this Policy.

B. The following is added to SECTION 6.1 - LOSS ADJUSTMENT AND SETTLEMENT, Paragraph g. SUBROGATION:

The Company will be entitled to recovery only after the Insured has been fully compensated for the deductible amount, without any deduction for expenses of collection, out of any recovery on the subrogated claim, before any part of the recovery is applied to any other use. If the amount of the deductible exceeds the recovery, the Company shall pay only the amount of the recovery to the Insured.

C. SECTION 6.1- LOSS ADJUSTMENT AND SETTLEMENT, Paragraph h. SUIT AGAINST THE COMPANY is replaced with the following:

h.  SUIT AGAINST THE COMPANY

No one may bring a legal action against the Company under this Policy unless:

(i)  All of its terms have been complied with; and,

(ii)  The action is brought within 4 years beginning from the date on which the direct physical loss or damage was discovered.

All other terms, conditions, provisions and exclusions of this policy remain the same.