**Hearing Date: June 8, 2023 at 10:00 a.m.**

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Golden Seahorse LLC*
*Debtor and Debtor-in-Possession*
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
Scott S. Markowitz, Esq.
Rocco Cavaliere, Esq.
smarkowitz@tarterkrinsky.com
rcavaliere@tarterkrinsky.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | |
| | Chapter 11 |
| GOLDEN SEAHORSE LLC, | |
| | Case No.: 22-11582 (PB) |
| Debtor. | |

# DEBTOR'S MEMORANDUM OF LAW IN AID OF CONFIRMATION OF DEBTOR'S PLAN SEEKING REINSTATEMENT OF A LOAN BETWEEN DEBTOR AND PREPETITION LENDERS UNDER THE RELEVANT PROVISIONS OF THE BANKRUPTCY CODE

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Golden Seahorse LLC*
*Debtor and Debtor-in-Possession*

Scott S. Markowitz, Esq.
Rocco Cavaliere, Esq.
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .......... 1

STATEMENT OF RELEVANT FACTS .......... 3

LEGAL ARGUMENT .......... 7

I. The Debtor Is Not Required to Pay Default Interest/Fees In Order to Reinstate The Loan In Accordance with Sections 1123(d) and 1124(2) of the Bankruptcy Code .......... 7

II. The Lenders' Argument That Default Interest Is Payable Under New York Applicable Law Is Subject to Defenses That Exist Under Applicable Law .......... 21

RESERVATION OF RIGHTS .......... 25

CONCLUSION .......... 27



089271\1\170213847.v2

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

In re American Solar King Corp.,
90 B.R. 808 (Bankr. W.D. Tx. 1998)....................19

In re Bownetree, LLC,
2009 WL 2226107 (Bankr. E.D.N.Y. July 24, 2009)....................24, 26

Brody v. Geared Equity, LLC,
2014 WL 4090549 (D. Ari. Aug. 4, 2014)....................16

In re Countrywood Investment Group, Ltd.,
117 B.R. 338 (Bankr. D. Tenn. 1990)....................11

In re Depietto,
2021 WL 3287416 (S.D.N.Y. 2021)....................11, 20, 21

Egate-95 LLC v. Fitness International LLC,
Index No. 805964/2001....................23

In re Entz-White Lumber & Supply Inc.,
850 F.2d 1338 (9th Cir. 1988).................... *passim*

In re Hertz Corp.,
637 B.R. 781 (Bankr. D. Del. 2021)....................19

JN Contemporary Art LLC v. Phillips Auctioneers, LLC,
507 F.Supp.3d 490 (S.D.N.Y. 2020)....................24

In re Kalian,
178 B.R. 308 (Bankr. D. R.I. 1995)....................21

Kel Kim Corp. v. Cent. Mkts., Inc.,
70 N.Y.2d 900 (1987)....................23

In re Kizzac Mgmt. Corp.,
44 B.R. 496 (Bankr. S.D.N.Y. 1984)....................10

In re Latam Airlines Group, S.A.,
55 F.4th 377 (2d Cir. 2022)....................20, 21

Levy v. Forest Hills Assocs. (In re Forest Hills Assoc.),
40 B.R. 410 (Bankr. S.D.N.Y. 1984)....................11, 17, 20



089271\1\170213847.v2

Lord v. Limited Liability Company,
146 N.Y.S.3d 466 (Sup Ct. 2021) ....................23

In re Madison Hotel Assocs.,
749 F2d 410 (7th Cir. 1984) ....................3, 11

In re Moshe,
567 B.R. 438 (Bankr. E.D.N.Y. 2017) ....................18, 20, 21

In re New Investments, Inc.
840 F.3d 1137 (9th Cir. 2016) .................... *passim*

In re Phoenix Busines Park Ltd. P'Ship,
257 B.R. 517 (Bankr. D. Ariz. 2001) ....................10, 15, 16

In re PPI Enterprises (US) Inc.,
324 F.2d 197 (3d Cir. 2003) ....................19

Rake v. Wade,
508 U.S. 464 (1993) ....................16, 17, 18

In re Residential Capital, LLC,
497 B.R. 403 (Bankr. S.D.N.Y. 2013) ....................25

In re Southeast Co.,
868 F.2d 335 (9th Cir. 1989) ....................26

In re Sylmar Plaza, L.P.,
314 F.3d 1070 (9th Cir. 2002) ....................16

In re Taddeo,
685 F.2d 24 (2d Cir. 1982) ....................10, 11, 12, 21

Matter of Terry Ltd. Partnership,
27 F.3d 241 (7th Cir. 1994) ....................21

Travelers Cas. & Sur. Co of America v. Pac. Gas & Elec. Co.,
549 U.S. 443 (2007) ....................20

In re Udhus,
218 B.R. 513 (9th Cir. B.A.P. 1998) ....................16

United States v. Gen Douglas MacArthur Senior Vill., Inc.,
508 F.2d 377 (2d Cir. 1974) ....................22

Urban Communications PCS Ltd. Partnership v. Gabriel Capital, L.P.,
394 B.R. 325 (S.D.N.Y. 2008) ....................24

In re Zamani,
390 B.R. 680 (Bankr. N.D. Cal. 2008) ....16

**Statutes**

11 U.S.C. § 365(b)(2) .... passim

11 U.S.C. § 1123(a)(5)(G) ....9, 10

11 U.S.C. § 1123(d) .... passim

11 U.S.C. § 1124(2) .... passim

**Legislative History**

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 408 (1977) ....12

H.R. Rep. No. 103-835 (1994)....17

S. Rep. No. 103-168 (1993) ....17

**Other Authorities**

Jacob Dean, *Finding a Cure, How Much Interest Is Enough For a Chapter 11 Cure*, 33 Emory Bankr. Dev. J. 523, 524 (2017) ....18

Kenneth N. Klee, *Adjusting Chapter 11: Fine Tuning the Plan Process*, 69 Am. Bankr. L.J. 551, 558 & n. 38 (1995) ....15

Ralph Brubaker*, Default Rates of Interest and Cure of a Defaulted Debt in a Chapter 11 Plan of Reorganization (Part I): Entz-White's Overlooked Choice of Law Dimension*,36 No. 12 Bankruptcy Law Letter NL 1....1, 12, 13, 14

Ralph Brubaker*, Default Rates of Interest and Cure of a Defaulted Debt in a Chapter 11 Plan of Reorganization (Part II): Entz-White and the "Penalty Rate" Amendments,* 37 No. 1 BLL-NL 1 .... passim

Golden Seahorse LLC, the above-captioned debtor and debtor-in-possession (the "Debtor"), by and through its undersigned counsel, hereby files this memorandum of law (the "Memorandum of Law") in aid of confirmation of the Debtor's Plan of Reorganization dated March 28, 2023 (the "Plan") seeking reinstatement of the Debtor's Loan (defined below) with Wilmington Trust, N.A. ("Wilmington Trust") as trustee on behalf of various holders of Commercial Mortgage Pass Through Notes and representative for HiFi B Note Holder LLC (collectively, the "Prepetition Lenders").

## PRELIMINARY STATEMENT

1. The Debtor has filed the Plan, which calls for the reinstatement of the Debtor's $137.02 million loan with an interest rate of 5.259% and a maturity date in September 2028 (the "Loan"), a favorable loan in this interest rate environment. As a direct result of the closure of the Debtor's hotel in the early months of the Covid-19 pandemic, the Debtor defaulted on its loan for the first time. Attempts to settle the dispute failed, and ultimately when the interest rate environment and economic outlook changed in early 2022, the Prepetition Lenders started the State Court Action (defined below) and obtained an order appointing a Receiver. Before the Receiver posted a bond, the Debtor filed for bankruptcy protection in order to maintain control of its hotel and stabilize operations with the intention to utilize various provisions of the Bankruptcy Code to reinstate the Loan without payment of the Default Interest/Fees in accordance with a restructuring plan. If successful, the Debtor will achieve a fresh start with payment to all Allowed Claims in full, including the Prepetition Lenders, who, under the Bankruptcy Code, are not required to be paid on account of the Default Interest/Fees as a "cure" under various provisions of the Bankruptcy Code, including sections 1123(a)(5), 1123(d) and 1124(2) of the Bankruptcy Code.

2. The Debtor's case presents the somewhat unusual circumstance in which the Debtor's operations have actually improved since the filing of the case. This result could not have been achieved without management's steadfast efforts to maximize value through the NYCHH Contract (defined below), as well as the benefits of the Bankruptcy Code, such as the automatic stay and management's control as a debtor in possession in a Chapter 11 case. Having presently stabilized its business operations, the Debtor now looks forward to its future as it proceeds with its exit from Chapter 11. In that regard, the Debtor has filed its first version of the Plan, that, if confirmed, will allow it to (i) reinstate its Loan without the payment of Default Interest/Fees, as contemplated by the Bankruptcy Code, (ii) pay the Prepetition Lenders its principal at maturity, together with, as of the Effective Date of the Plan, all undisputed Non-Default Interest aggregating more than $10.5 million as well as tax, insurance and property advances of over $828,000[1] and reasonable legal fees in connection with the alleged default, and (iii) pay creditors holding allowed claims in full in accordance with the Plan. To the extent such Plan is confirmed, this case will reflect the quintessential example of a successful restructuring, hinging on the relevant provisions of the Code, as envisioned by Congress when it enacted the Bankruptcy Code in 1978, as amended from time to time.

3. As this Memorandum of Law will make clear, a close review of sections 1123(d), 1124(2) and 365(b)(2)(D), when read together, coupled with the legislative history surrounding those sections pertaining to reinstatement of a loan in a chapter 11 case, and relevant case law in the Second Circuit and elsewhere, dictate that curing the Default Interest/Fees (defined below) alleged to be owed to the Prepetition Lenders is not necessary in order to reinstate the Loan under sections 1123 and 1124 of the Bankruptcy Code.

---

[1] There is also an item called Interest on Advances totaling $222,201.82 in the Lenders' Statement (defined below). The Debtor needs more information to understand whether the Prepetition Lenders are charging default interest on such Advances and to otherwise understand the methodology concerning such calculation.

## STATEMENT OF RELEVANT FACTS

4. On November 29, 2022 (the "Petition Date"), the Debtor filed a petition with this Court commencing a voluntary case under chapter 11 of the Bankruptcy Code. The Debtor is authorized to continue operating its business and managing its property as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been appointed in this Chapter 11 case.

5. The Debtor operates a full-service hotel under the Holiday Inn flag located at 99 Washington Street, New York, New York (the "Hotel"). The Debtor constructed the Hotel between 2010 and 2014 and it opened for business in October 2014. Pursuant to a license/franchise agreement dated October 15, 2014, the Hotel operates under the Holiday Inn flagship/brand. The Hotel is fifty (50) stories, the tallest Holiday Inn in the world and consists of 492 rooms and includes a full-service restaurant at the Hotel.

6. In or about September 2018, the Hotel obtained the Loan from Ladder Capital Finance LLC, before such Loan was assigned to the Prepetition Lenders. The Loan was ultimately split into four separate tranches and as of the Petition Date, three tranches in the amount of roughly $87 million are held by Wilmington Trust, National Association as trustee for various note holders and one tranche in the amount of roughly $50 million is held by Note B Lender. The non-default interest rate under the Loan is 5.259%, which equates to roughly $612,000 in monthly interest payments. The Debtor was current on all payments under the Loan up until the onset of the Covid-19 pandemic when the Hotel was forced to close from March 2020 through July 2020. Indeed, the Debtor's first payment default on the Loan was the interest payment due by May 5, 2020 for the May 2020 interest payment. However, the Prepetition Lenders continued to sweep the Debtor's cash management accounts and applied at least $11

million of the Debtor's funds to interest payments on the A Notes. In short, the Debtor was essentially current on all interest payments at the non-default rate on the A Notes through February 2022 but, notwithstanding the Debtor's good faith efforts and substantial payments, the Prepetition Lenders accelerated the Loan and commenced the State Court Action (defined below) shortly thereafter. See Letter annexed as **Exhibit "A"**.

7. As of the Petition Date, the full amount of the $137.02 million in principal on the Loan remains outstanding, together with unpaid interest. The Loan matures in September 2028. According to the Prepetition Lenders' *Statement of Additional Prepetition Secured Obligations Assertions Pursuant to Final Cash Collateral Order* (the "Lenders' Claim Statement") [Dkt. No. 39], the unpaid non-default interest is $11,190,841, albeit the Debtor's calculation reveals the amount of non-default interest is $10,578,400.31 (the "Non-Default Interest"). See *Debtor's Statement in Response to Prepetition Lenders' Statement of Additional Prepetition Secured Obligations Assertions Pursuant to Final Cash Collateral Order* [Dkt. No. 62]. The Prepetition Lenders also assert default interest of $17,813,250.00, late fees of $517,370.82, a liquidation fee of $1,000,000, a special servicing fee of $660,000 and interest on advances of over $200,000.00, all of which aggregates an astronomical amount of $20,180,620.82 (collectively, the "Default Interest/Fees").

8. As indicated, solely due to the Covid-19 pandemic, and for the first time since 2014 when the Hotel was built, the Debtor was unable to pay monthly interest payments and defaulted on the Loan. Thereafter, as previously noted, Wilmington Trust, swept all of the Debtor's funds (over $11 million) in various cash management accounts that included sales taxes due to New York State and Hotel's occupancy taxes due to New York City. The Debtor attempted to reach a consensual resolution with Midland Loan Services, the special servicer to



089271\1\170213847.v2

Wilmington Trust but unfortunately, the special servicer rejected the Debtor's overtures and proceeded to commence an action (the "State Court Action") in March 2022 to, among other things, (i) foreclose on the mortgage, (ii) appoint a receiver and (iii) enjoin the Debtor from taking certain actions. By Decision and Order dated September 27, 2022, the Honorable Frances A. Kahn, III granted Wilmington Trust's motion to appoint a receiver but denied Wilmington Trust its request for injunctive relief finding it had not satisfied the factors for a preliminary injunction and that such relief was, in any event, superfluous, to the appointment of a receiver.

9. Faced with the prospect of a complete loss of equity and value as well as the potential loss of rights under various contracts and licenses as a result of the appointment of the receiver, the Debtor determined that Chapter 11 was necessary to preserve the Debtor's business and maximize value for all creditors and constituents. As further discussed below, the Debtor commenced this chapter 11 case in order to attempt to negotiate a restructuring and/or reinstatement of the Loan or to utilize the provisions of the Bankruptcy Code to confirm a plan of reorganization over Wilmington Trust's objection.

10. On December 21, 2022, this Court entered the *Final Order (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Adequate Protection to the Pre-Petition Lenders, (III) Modifying the Automatic Stay and (IV) Granting Related Relief*. [Dkt. No. 38].

11. On January 17, 2023, the Debtor filed a motion seeking authority to enter into a contract The ("NYCHH Contract") with NYCHH to provide accommodations to asylum seekers at a guaranteed price of $190 per room through April 30, 2024, absent an earlier termination as set forth in the NYCHH Contract. After a seven-hour evidentiary hearing on January 27, 2023, the Court entered an Order dated January 30, 2023 approving the NYCHH Motion. [Dkt. No. 74] The Debtor has been receiving its payments under the NYCHH Contract and satisfying its post-

petition obligations, including an adequate protection payment of $612,000 per month to its Prepetition Lenders. Indeed, for the period from December 2022 through May 2023, the Prepetition Lenders have received well over $3.6 million since the Petition Date on account of regular non-default interest. As confirmed by counsel to the Prepetition Lenders at a recent hearing on April 18, 2023, there is presently no dispute regarding whether Prepetition Lenders are adequately protected.

12. On March 10, 2023, the Prepetition Lenders filed a motion to attempt to terminate the Debtor's exclusive rights to file and solicit acceptances of a plan (the "Lenders' Motion") [Dkt. No. 83]. On April 11, 2023, the Debtor filed an objection to the Lenders' Motion [Dkt. No. 103], and on April 14, 2023, the Prepetition Lenders filed a reply to the Debtor's objection [Dkt. No. 108].

13. On March 27, 2023, the Debtor filed a motion seeking a short extension of ninety days to file a plan through June 27, 2023 and to solicit votes in connection with such plan through August 26, 2023 (the "Debtor's Exclusivity Motion"). [Dkt. No. 94]. On April 11, 2023, the Prepetition Lenders filed an objection (the "Lenders' Exclusivity Objection") [Dkt. No. 104] to the Debtor's Exclusivity Motion and, on April 14, 2023, the Debtor filed a reply to such objection (the "Debtor's Exclusivity Reply") [Dkt. No. 107].

14. On March 28, 2023, the Debtor filed its initial version of its Plan [Dkt. No. 95] and supporting disclosure statement [Dkt. No. 96].

15. On April 18, 2023, the Court held a hearing to consider the Lenders' Motion and the Debtor's Exclusivity Motion. At the hearing, the Court granted the Debtor's Exclusivity Motion in part and denied it in part, and further denied the Lenders' Motion. The Court agreed with the Debtor that determination of whether the Debtor needs to cure the Default Interest/Fees

in connection with reinstatement was a "gating issue" to be addressed through briefing with the Court well in advance of a future confirmation hearing on the Debtor's Plan.[2] The Court's decision was memorialized in two separate orders of the Court styled as *Scheduling Order Establishing Briefing Schedule Pertaining to Certain Legal issues Relevant to Debtor's Reinstatement Plan* [Dkt. No. 112] and *Order Granting In Part, and Denying In Part, Debtor's Motion Pursuant to 11 U.S.C. § 1121(d) Extending the Debtor's Exclusive Periods to File and solicit Acceptances Thereto and (II) Denying Secured Lenders' Motion to Terminate Debtor's Exclusive Periods Under Section 11 U.S.C. § 1121* (the "Exclusivity Order") [Dkt. No. 111]. The hearing to consider oral argument regarding the legal issues set forth in this Memorandum of Law, the Prepetition Lenders' anticipated objection, and the Debtor's future reply (the "Legal Briefing") thereto is scheduled for June 8, 2023 at 10:00 a.m. In the meantime, pursuant to the Court's Exclusivity Order, the Debtor's exclusive period to solicit acceptance to its Plan is currently 30 days after the Court renders a decision on the "gating issue" after considering the Legal Briefing and oral argument related thereto.

## LEGAL ARGUMENT

### I. The Debtor Is Not Required to Pay Default Interest/Fees In Order to Reinstate The Loan In Accordance with Sections 1123(d) and 1124(2) of the Bankruptcy Code[3]

16. As will be demonstrated, after consideration of the various relevant provisions of the Bankruptcy Code, the relevant legislative history, and compelling case law authority from the

[2] Many weeks prior to the April 18, 2023 hearing, the Debtor requested the Prepetition Lenders agree to a briefing schedule on the legal issues pertaining to the Default Interest/Fees [See Debtor's Objection to Lenders' Motion, Exh. A] but the Prepetition Lenders declined to do so, until the hearing on April 18, 2023, at which time, counsel indicated it would be "efficient" to address the "gating issue" at this time and in advance of confirmation of the Debtor's Plan.

[3] For the avoidance of all doubt, the parties are proceeding with the Legal Briefing to address the legal issues pertaining to the requirement to cure the Default Interest/Fees in furtherance of reinstatement of the Loan. The Debtor reserves all rights concerning the calculation of the amounts asserted to be owed by the Prepetition Lenders. For instance, to the extent that the Prepetition Lenders' calculation of default interest reflects "interest on interest", such amounts would be objectionable pursuant to longstanding New York law.

Second Circuit and beyond, as well as thoughtful scholarly articles, the Debtor is not required to "cure" the Default Interest/Fees to the Prepetition Lenders to render them unimpaired in accordance with section 1124(2) of the Bankruptcy Code.

17. Section 1124(2) of the Bankruptcy Code, provides as follows:

> Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan-
>
> (2) Notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default-
>
> (A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title of or a kind that section 365(b)(2) expressly does not require to be cured;
>
> (B) reinstates the maturity of such claim or interest as such maturity existed before such default;
>
> (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;
>
> (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or the insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and
>
> (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

11 U.S.C. § 1124(2).

18. Section 1123(d) of the Bankruptcy Code, incorporated into the Bankruptcy Code by way of the 1994 Amendments, states as follows:

> (d) notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7) and 1129(b) of this title, if it is proposed in a plan to cure a default the amount

> necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

11 U.S.C. § 1123(d).

19. Section 365(b)(2) is expressly referenced in the key impairment provision, section 1124(2)(A), and provides as follows:

> Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to-
>
> (A) the insolvency or financial condition of the debtor at any time before the closing of the case;
>
> (B) the commencement of a case under this title;
>
> (C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement; or
>
> (D) the satisfaction of any penalty rate or penalty[4] provision relating to default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

11 U.S.C. § 365(b)(2). Notably, section 365(b)(2)(A) through 365(b)(2)(C) were part of the Bankruptcy Code prior to the 1994 Amendments. In 1994, Congress, when making their 1994 Amendments, added section 1123(d) to the Bankruptcy Code simultaneously with subsection 365(b)(2)(D).

20. Finally, section 1123(a)(5) of the Bankruptcy Code, provides, as follows:

> (a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall-…
>
> (5) provide adequate means for the plan's implementation, such as-…
>
> (G) curing or waiving any default.

11 U.S.C. § 1123(a)(5)(G).

[4] By way of clarification, in 2005, Congress amended section 362(b)(2)(D) to add the word "penalty" before the word "provision".

21. A short time after the enactment of the Bankruptcy Code in 1978, several decades ago, the Second Circuit in In re Taddeo, 685 F.2d 24 (2d Cir. 1982) determined that default interest was not required to be cured in connection with reinstatement of a loan in a Chapter 13 plan. Section 1123(a)(5)(G) allows a debtor to propose a plan that allows for the curing or waiving of any default. The Second Circuit stated "a default is an event in the debtor-creditor relationship which triggers certain consequences…curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are nullified. This is the concept of 'cure' used throughout the Bankruptcy Code." See Taddeo, 685 F.2d at 26-27. Further, "curing a default, even though it inevitably changes a contractual acceleration clause, does not thereby impair a creditor's claim." Id. at 28-29. After analyzing the relevant statute, the Second Circuit also considered the legislative history surrounding the enactment of the Bankruptcy Code in 1978 which stated, in relevant part, "the holder of a claim or interest who under the plan is restored to his original position, when others receive less or get nothing at all, is fortunate indeed and has no cause to complain." Id. at p. 29, citing S. Rep. No. 989, 95th Cong., 2d Sess. 120 (1978).

22. Due to the similarities in the relevant sections of the Plan cure provisions in Chapter 13 and Chapter 11, it was not long before many courts applied the Second Circuit's ruling to Chapter 11 cases. See In re Entz-White Lumber & Supply Inc., 850 F.2d 1338 (9th Cir. 1988) (a Chapter 11 case, citing Taddeo, among other cases, with approval, finding that "the underlying concept of cure is the same throughout the Bankruptcy Code"); In re Phoenix Busines Park Ltd. P'Ship, 257 B.R. 517, 519 (Bankr. D. Ariz. 2001) (calling Taddeo the "seminal case on cure"); In re Kizzac Mgmt. Corp., 44 B.R. 496, 500, n.8 (Bankr. S.D.N.Y. 1984) ("Although Taddeo was a chapter 13 case, the principles enunciated therein have been held to apply equally

in a chapter 11 reorganization." (gathering cases)); Levy v. Forest Hills Assocs. (In re Forest Hills Assoc.), 40 B.R. 410, 414 (Bankr. S.D.N.Y. 1984) (noting that "although Taddeo involved a chapter 13 debtor, the Second Circuit Court of Appeals likened section 1322(b) to section 1124" and applying Taddeo's principles to a debtor's proposed cure under chapter 11; In re Madison Hotel Assocs., 749 F2d 410, 422 (7th Cir. 1984) (treating a debtor's ability to cure a default under Chapter 11 as identical to the same ability under Chapter 13); In re Countrywood Investment Group, Ltd., 117 B.R. 338 (Bankr. D. Tenn. 1990) ("curing of defaults at confirmation of a chapter 11 plan eliminates the consequences of default, including a higher interest rate"). Even In re Depietto, 2021 WL 3287416 at *8 (S.D.N.Y. 2021), a Chapter 11 case cited by the Prepetition Lenders in the Lenders' Exclusivity Objection coined Taddeo a "leading case" and concluded "that Taddeo's holding applies to a proposed cure under Chapter 11 is beyond dispute". Finally, by way of an analogy, when addressing section 1322(b)'s cure language, the Second Circuit itself in Taddeo noted "section 1124(2) merely takes away the creditor's right to vote in the event of cure; the authority to cure is found in 1123(a)(5)(G) in plain language similar to section 1322(b)."

23. In sum, while other cases and scholarly commentary relevant to the provisions of sections 1124(2), 1123(d) and 365(b)(2)(D) need to be closely analyzed and considered by this Court when making the threshold decision on the Default Interest/Fees here, the Debtor respectfully submits that Taddeo represents controlling Second Circuit law that should be considered the most authoritative source for this Court on the issues at hand. In other words, until unequivocally reversed and vacated by the Bankruptcy Code or the Supreme Court of the United States in a subsequent case addressing these legal issues, debtors in the Second Circuit seeking to "cure" its obligations to a secured creditor in furtherance of reinstatement of a loan

under section 1124(2) without the payment of default interest should continue to be guided by Taddeo.

24. Subsequent to Taddeo, the 9th Circuit in In re Entz-White Lumber & Supply, Inc., 850 F.2d 1338 (9th Cir. 1988) was confronted with a similar dispute between a debtor and a secured lender, albeit in a chapter 11 case. Naturally, considering the Second Circuit addressed the issues in a related matter, the Ninth Circuit began its analysis by focusing on Taddeo, and agreeing with its holding. Entz-White's analysis went even further, citing to the House Report on section 1124, stating that section 1124 permits a bankruptcy plan "to reinstate a claim or interest and thus leave it unimpaired. Reinstatement consists of curing any default (other than a default under an *ipso facto* or bankruptcy clause) and reinstatement of the maturity of the claim or interest." See H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 408 (1977), U.S. Code Cong. & Admin News 1978, pp. 5963, 6364. Ultimately, Entz-White, 850 F.2d at 1342, followed the reasoning of Taddeo and other courts addressing the meaning of "cure", and concluded that "[the debtor] is entitled to avoid all consequences of the default - including higher post default interest rates…consistent with the treatment by other courts of the Bankruptcy Code's cure provisions." The Ninth Circuit emphasized this exact point later in its own decision. See Entz-White, 850 F.2d. at 1342 ("It is clear that the power to cure under the Bankruptcy Code authorizes a plan to nullify all consequences of default, including avoidance of default penalties such as higher interest").

25. In 1994, Congress made various amendments to certain provisions of the Bankruptcy Code, namely adding section 1123(d) of the Bankruptcy Code as well as subsection 365(b)(2)(D). As bankruptcy practitioners and even bankruptcy judges in some cases consider section 365 of the Bankruptcy Code the "executory contracts" section of the Code, it is often

"neglected" in the analysis of reinstatement of loans in a chapter 11 case, but as will be explained, courts that fail to consider section 365(b)(2), which is expressly referred to in section 1124(2), suffer from weak analysis. That neglect is noticeably evident from a careful review of the Ninth Circuit's decision in In re New Investments, Inc. 840 F.3d 1137 (9th Cir. 2016), which purported to override the reasoning of Entz-White and vacate its ruling. However, as explained herein, New Investments, which is expected to be the Prepetition Lenders' "leading case" in support of its position, merely "muddied the waters" on chapter 11 plan reinstatement issues and is not at all persuasive authority that this Court is bound by.

26. The Ninth Circuit in New Investments stated the issue before it as follows:

> The case before us requires us to decide whether Entz-White's rule that a debtor may nullify a loan agreement's requirement of post-default interest remains good law *in light of 11 U.S.C. 1123(d)*, a provision that Congress enacted after Entz-White.

New Investments, 840 F.3d 1137, 1139 (9th Cir. 2016) (emphasis added). After phrasing its own mandate which was to analyze the singular provision of section 1123(d), in a 2-1 opinion, over the course of a few short pages (i.e. 3.5 printed 8 x 11 size pages), jumped to the conclusion that "Entz-White's rule of allowing a curing debtor to avoid a contractual post-default interest rate in a loan agreement is no longer valid in light of section 1123(d)." Id. In so doing, the New Investments court claims to have reversed well established Ninth Circuit precedent. Simply stated, New Investments incorrectly applied the law and failed to consider the legislative history surrounding the 1994 Amendments, as more fully set forth here.

27. First, as previously noted, section 1123(d) states, in relevant part, "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and *applicable nonbankruptcy law*." See 11 U.S.C. § 1123(d) (emphasis added). Based on the purported plain meaning of these three words:



089271\1\170213847.v2

"applicable nonbankruptcy law", the Ninth Circuit essentially determined the secured lender was entitled to default interest merely because there was a Washington state foreclosure statute in place that gave lenders the right to default interest under Washington law. The Prepetition Lenders, of course, now argue that New York law also provides secured lenders with the right to default interest, and thus under New Investments, this Court should similarly require the Debtor to pay approximately $20 million in Default Interest/Fees to them. Of course, too much is at stake to merely accept New Investments' flawed analysis. As noted in the Debtor's Exclusivity Reply, commentators have seriously questioned the incorrect ruling in New Investments, which itself had a very strong dissent that made clear the majority was wrong in suggesting that Entz-White was now overruled. In particular, in a very thorough series of law review articles authored by Professor Ralph Brubaker,[5] a leading scholar of bankruptcy law, there are multiple reasons why New Investments should not be followed. See Ralph Brubaker, *Default Rates of Interest and Cure of a Defaulted Debt in a Chapter 11 Plan of Reorganization (Part II): Entz-White and the "Penalty Rate" Amendments*, 37 No. 1 BLL-NL 1(referred to herein as "Brubaker Part II"); see also Ralph Brubaker, *Default Rates of Interest and Cure of a Defaulted Debt in a Chapter 11 Plan of Reorganization (Part I): Entz-White's Overlooked Choice of Law Dimension*, 36 No. 12 Bankruptcy Law Letter NL 1 (referred to herein as "Brubaker Part I").[6]

28. In reaching its quick decision to analyze merely section 1123(d), as Professor Brubaker noted, the New Investments opinion likely has no precedential value, even within the Ninth Circuit because it wholly failed to address the implications of section 365(b)(2)(D), which

[5] Professor Brubaker's biography can be viewed at https://law.illinois.edu/faculty-research/faculty-profiles/ralph-brubaker/.

[6] The Debtor is tempted to essentially cut and paste every single line of Professor Brubaker's two instructive articles (totaling 29 printed single space pages) into this Memorandum of Law. However, logic and space limitations dictate that a brief summary of the legal points raised in these law review articles will suffice here to outline the reasons the New Investments' analysis in its short 3.5 page majority opinion is seriously flawed.

is incorporated into section 1124(2)(A). See Brubaker Part II. While section 1123(d) refers to applicable nonbankruptcy law, Congress also made clear the Bankruptcy Code further dictates that a debtor is permitted to avoid penalty rates such as default interest. See 11 U.S.C. 365(b)(2)(D). Professor Brubaker explained that section 365(b)(2)(D) excuses "a debtor paying (as party of its cure) any penalty interest rate", meaning the 1994 Amendments, by inclusion of section 365(b)(2)(D), "can be seen as simply a codification of the Ninth Circuit holding in Entz-White, which reasoned that the "power to cure under the Bankruptcy Code authorizes a plan to nullify all consequences of default, including avoidance of default penalties such as higher interest." See Brubaker Part II. In reaching this conclusion, Professor Brubaker points out that Professor Kenneth Klee, shortly after the 1994 Amendments, "made precisely the same point in a law review article." See Kenneth N. Klee, *Adjusting Chapter 11: Fine Tuning the Plan Process*, 69 Am. Bankr. L.J. 551, 558 & n. 38 (1995) (stating that "the congressional amendment appears to codify applicable Ninth Circuit precedent that construed the Code as not requiring a default or penalty rate to be paid when a plan reversed the acceleration and reinstated the terms of an obligation", citing Entz-White). For different reasons, the dissent in New Investments, 840 F.3d at 1145, also determined that Entz-White should remain controlling law in the Ninth Circuit and section 1123(d) was not meant to disturb the holding in Entz-White.

29. Curiously, as noted by Professor Brubaker, the Ninth Circuit did not rule on a clean slate when it decided to neglect section 365(b)(2) in its analysis. The court in In re Phoenix Business Park Limited Partnership, 257 B.R. 517 (Bankr. D. Ari. 2001), a lower court within the Ninth Circuit, decided after the 1994 Amendments, dutifully followed the controlling authority of Entz-White in denying a secured lender default interest in connection with a "cure" under section 1124(2). The Phoenix Business court carefully analyzed the 1994 Amendments,



089271\1\170213847.v2

and in particular, section 365(b)(2)(D), and rejected the lender's simplistic section 1123(d) argument based on "applicable nonbankruptcy law", concluding that:

> In construing legislative changes to the Code, it is important to harmonize all changes made at the same time that affect the same Code sections. Here Congress also made changes in 1994 to 365(b)(2). That section dealt with enumerated kinds of default that need to be cured as part of the assumption of an executory contract. Its relevance to this case derives from the provision in section 1124(2) that defaults of the kind specified in section 365(b)(2) need not be cured in order for a claim to be 'unimpaired' under section 1124.

See 257 B.R. at 521; see also In re Zamani, 390 B.R. 680, 688 (Bankr. N.D. Cal. 2008) (rejecting a 5% default interest rate, stating that "an interest rate providing more than appropriate compensation is a penalty against the debtor and should not be allowed", noting that section 1123(d) does not prohibit the debtor's use of the basic contract rate of interest in curing his debt); Brody v. Geared Equity, LLC, 2014 WL 4090549 at *3 (D. Ari. Aug. 4, 2014) ("Rather than repeat at length what Judge Case has already said so well, this Court adopts his opinion in In re Phoenix Bus. Park. Ltd. P'ship, Entz-White remains the law of the Circuit, binding on this Court"). Other courts, including higher courts within the Ninth Circuit, after passage of the 1994 Amendments continued to rely on Entz-White, suggesting it is binding precedent. See In re Sylmar Plaza, L.P., 314 F.3d 1070, 1073 (9th Cir. 2002) ("Entz-White "lays to rest" any argument that a plan which proposes to nullify the effects of a default does not satisfy the Code's requirements"); In re Udhus, 218 B.R. 513, 516 (9th Cir. B.A.P. 1998) ("under Entz-White, a § 1123 cure corrects all defaults and prohibits an aware of default interest").

30. Aside from failing to consider section 365(b)(2)(D), perhaps even more negligently, the Ninth Circuit consciously disregards the main impetus for the 1994 Amendments which was expressly set forth in the legislative history as the need to vacate the Supreme Court's ruling in Rake v. Wade, 508 U.S. 464 (1993) which improperly required the debtor in Rake to

pay "interest on interest", in contravention of numerous state court laws. See Forest Hills Assocs., 40 B.R. at 416 (citing various state law cases for the proposition that "agreements to pay interest on interest or compounded interest have been held void as against public policy by the courts of New York for over a century") Thus, this is the stated reason for Congress adding section 1123(d) to the Bankruptcy Code, that is, to ensure that bankruptcy courts consider state laws rejecting "interest on interest" in evaluating a proper "cure amount". However, at the same time, Congress also added section 365(b)(2)(D) to make clear the Bankruptcy Code further dictates that a debtor is permitted to avoid penalty rates such as default interest. The strong dissent in New Investments noted the legislative history of section 1123(d) as follows:

> In adding 1123(d), Congress focused on addressing an entirely separate matter – the Supreme Court's holding in Rake v. Wade, 508 U.S. 464 (1993). H.R. Rep. No. 103-835, at 55 (1994); see also S. Rep. No. 103-168, at 53 (1993) (discussing the parallel provision in the Senate bill)
>
> In Rake, the Supreme Court held that an oversecured creditor was entitled to pre- and post-confirmation interest on mortgage arrearages paid to cure a default under a chapter 13 plan. The reading of the relevant provisions of the Bankruptcy Code, §§ 506, 1322(b) and 1325(a)(5), permitted secured creditors to collect interest on top of the interest payments paid by debtors under their mortgages.
>
> Congress overtly rejected this result in enacting section 1123(d). H.R. Rep. No. 103-835, at 55. The amendments to section 1123 were contained in section 305 of the Bankruptcy Reform Act of 1994, which is entitled "Interest on Interest." Pub L. No. 103-394, section 305, 108 Stat. 4106, 4134 (1994). The relevant House Report states that the amendments "will have the effect of overruling the decision of the Supreme Court in Rake v. Wade because Rake "had the effect of providing a windfall to secured creditors" by giving them "interest on interest payments, and interest on the late charges and other fees, even where applicable laws prohibit such interest and even when it was something that was not contemplated by either party in the original transaction. H.R. Rep. No. 103-835, at 55….

New Investments, 840 F.3d at 1145. "The legislative history thus indicates, at the very least, that the new provision was not meant *sub silentio* to enact a definition of cure conflicting with that adopted in Entz-White. It also suggests that the relevant provisions of the underlying agreement

for a cure are those that would have applied if the default had not occurred." Id. Other commentators, besides Professor Brubaker, have commented on the "fiery dissent", noting it offers a "cogent explanation for the majority's error." See Jacob Dean, *Finding a Cure, How Much Interest Is Enough For a Chapter 11 Cure*, 33 Emory Bankr. Dev. J. 523, 524 (2017).

31. As a result, New Investments is not a precedential opinion that should be followed by this Court. Likewise, In re Moshe, 567 B.R. 438 (Bankr. E.D.N.Y. 2017), a case the Prepetition Lenders cited in the Lenders' Exclusivity Objection, which relied on the fundamental flaws of New Investments in reaching its decision, cannot be seriously considered as persuasive authority in the Second Circuit. Unfortunately, what has happened since the 1994 Amendments is that creditors, seizing on the new verbiage in section 1123(d), have taken a "pro-debtor amendment" in section 1123(d) to nullify the effect of Rake v.Wade and used it to "their own advantage." See Jacob_Dean, *Finding a Cure, How Much Interest Is Enough For A Chapter 11 Cure*, 33 Emory Bankr. Dev. J., 523, 524 (2017).

32. Yet another way to conceptualize these issues pertaining to section 365(b)(2) (to the extent it is not crystal clear, after considering the compelling Phoenix Business case law analysis and Professor Brubaker's rigorous analysis), is to consider the many other provisions of the Bankruptcy Code, as a whole, that regularly step in to adjust a creditor's rights under state law. The Prepetition Lenders' simplistic argument in this case thus far, which will be emphasized in their objection due on May 23, 2023 is as follows: outside of bankruptcy, New York applicable law allows them the full amount of the Default Interest/Fees and therefore, this Court should follow their version of "applicable nonbankruptcy law". This argument is too basic and ignores the adjustment of state law rights under various provisions of the Bankruptcy Code, in furtherance of the multiple policies surrounding a chapter 11 case, including, among others,

equality of distribution, a debtor's successful restructuring and a fresh start. A few examples follow:

- By way of example, landlords, outside of bankruptcy, have a right to seek damages for multiple years of unpaid rent accruing after an early surrender or termination of a lease. Section 502(b)(6) steps in to affect the landlord's rights under "applicable law", capping the landlord's claim to rent to the "greater of of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of (i) the date of the filing of the petition; and (ii) the date on which such lessor repossessed or the lessee surrendered, the leased property". See e.g. In re PPI Enterprises (US) Inc., 324 F.2d 197, 204 (3d Cir. 2003) (holding that a creditor is unimpaired if it is the effect of the Bankruptcy Code that modifies its rights, not the Debtor's plan);

- Similarly, it is universally recognized that unsecured and undersecured creditors' rights to interest on unpaid debts ceases immediately on the date of the filing of a bankruptcy petition pursuant to section 502(b)(2), whereas outside of bankruptcy, "applicable law" generally provides that interest may accrue on creditors' unpaid debts up to and including the actual date in which payment is made. See e.g. In re Hertz Corp., 637 B.R. 781, 793 (Bankr. D. Del. 2021) ("the Court concludes that section 502(b)(2) is as absolute as section 502(b)(6)");

- Further, outside of bankruptcy, "applicable nonbankruptcy law" would uphold an anti-assignment clause of a nondebtor contract counterparty, whereas, under section 365(f)(1) of the Bankruptcy Code, anti-assignment provisions in contracts and leases are disregarded;

- Outside of bankruptcy, claims of insiders and other parties may not necessarily be subordinated by applicable law. However, the Code includes section 510 that changes applicable nonbankruptcy law in certain instances. See In re American Solar King Corp., 90 B.R. 808 (Bankr. W.D. Tx. 1998); and

- Even state taxing authorities take a back seat to the Bankruptcy Code: under section 1146(a), transfer taxes are not required to be paid in connection with a sale of a debtor's real property in accordance with a chapter 11 plan, whereas, outside of bankruptcy, state laws dictate payment of transfer taxes at all times when real estate is sold.

There are many other examples under the Bankruptcy Code that carefully balance the interests of a debtor, on the one hand, and its creditor body, on the other hand, and adjust the state law rights

of creditors outside of bankruptcy. Similarly, sections 365, 1123(d), 1124(2) and 1123(a)(5)(G), when read together, like many of the foregoing Code provisions in other contexts, furthers Congress's initiative to promote the restructuring of the businesses of debtors in possession. Indeed, these sections, crafted by Congress, allow a debtor to reinstate its loan with a secured creditor, without having to pay for default interest and related fees. And any rights secured creditors have to default interest, outside of bankruptcy, are necessarily trumped by the Supremacy Clause and specifically sections 1124(2) and section 365(b)(2)(D). See Travelers Cas. & Sur. Co of America v. Pac. Gas & Elec. Co., 549 U.S. 443 (2007) ("creditors' entitlements in Bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code"). As Judge Lifland once said in denying default interest in connection with reinstatement of a debtor's loan, "it is thus clear that Code section 1124(2) provides the debtor in distress with statutory tools necessary to effect a total healing of the scars of contractual default, by placing the parties into the same position they were in immediately before the default occurred." See Forest Hills Assocs., 40 B.R. at 415.

33. Lastly, the Debtor is aware that there is a footnote in the Second Circuit's recent decision in In re Latam Airlines Group, S.A., 55 F.4th 377, 386, n. 5 (2d Cir. 2022) "highlighting many cases that require payment of default interest to decelerate and treat the decelerated claim as unimpaired." See Lenders' Exclusivity Objection, p. 11-12. The footnote included a reference to Depietto, New Investments and Moshe, cases previously cited by the Prepetition Lenders. Id. A close reading of Latam Airlines, of course reveals the legal issues decided in that case, related to, among other things, the allowance of postpetition interest owed to creditors on their unsecured claims in a solvent debtor case. In other words, the Second Circuit in Latam Airlines

did not prescribe any view towards whether default interest needed to be paid as a "cure" in order to reinstate a secured loan, as is the case here, with the Latam Airlines court finding "no guidance" on the foregoing cases (Depietto, New Investments and Moshe) that were cited by the losing party in Latam Airlines. In contrast, the only Second Circuit case that has ever weighed in directly on whether default interest needs to be cured in order to reinstate a loan under a bankruptcy plan was Taddeo. It remains good law and should be followed here.[7]

34. In sum, for all of the foregoing reasons, the Debtor need not "cure" the Default Interest/Fees in connection with its reinstatement of the Loan.

## II. The Lenders' Argument That Default Interest Is Payable Under New York Applicable Law Is Subject to Defenses That Exist Under Applicable Law

35. The Debtor respectfully submits that as set forth in **Section I** of this Memorandum of Law, there is ample authority for the proposition the Debtor is not required to cure default interest in connection with reinstatement of the Loan. However, if this Court refused to follow the Second Circuit's decision in Taddeo and likewise reject the reasoning of the legal points raised in Section I below, it is still not necessarily the case the Prepetition Lenders are required to receive default interest in bankruptcy cases as a "cure" under § 1124(2) due to the "applicable nonbankruptcy law" language in § 1123(d).

36. Initially, the Debtor notes the Prepetition Lenders have not yet expressly stated what "applicable New York law" applies to their purported rights to default interest under New York law. As such, the Debtor reserves the right to amplify the legal arguments set forth herein

---

[7] In the event the Court were to reject the Debtor's analysis and require an additional cure of some or all of the Default Interest/Fees, the Debtor respectfully submits that the Prepetition Lenders cannot request both default interest of almost $18 million and late charges of over $517,000, as courts have viewed the assertion of both amounts as "duplication" and courts are loathe to allow both. See Matter of Terry Ltd. Partnership, 27 F.3d 241, 243-44 (7th Cir. 1994) (disapproving of award of both late fees and default interest to oversecured creditor where it provides double recovery for the same loss); see also In re Kalian, 178 B.R. 308 (Bankr. D. R.I. 1995) (rejecting additional default interest as unreasonable).

in its reply once the Prepetition Lenders outline their legal position in their objection to this Memorandum of Law.

37. As a reminder to the Court, the Default Interest/Fees emanate from a few missed interest payments in the early stages of Covid-19 when the entire hotel industry and many businesses were shut down and not operating. Due to numerous potential defenses the Debtor may have, it is not a foregone conclusion that such default interest is payable under "applicable law", as the Prepetition Lenders appear to be suggesting. Indeed, in a recent case styled 360 N. Rodeo Drive LP v. Wells Fargo Bank, N.A., Midland Loan Services, and Does 1 through 10,[8] Case No. 22-00767 (S.D.N.Y. March 20, 2023), a borrower that was a luxury hotel commenced an action with various causes of action, including (a) breach of the loan agreement and (b) breach of implied covenant of good faith and fair dealing (the "Contract Claims"), against its senior lenders after they forced a sale of the hotel due to their insistence on charging default interest after a few missed payments during Covid-19. In its recent decision, a copy of which is annexed as **Exhibit "B"**, the Southern District of New York denied the senior lenders' motion to dismiss various causes of action, including the Contract Claims, finding the borrower had adequately alleged the elements of those claims, commenting further the borrower may ultimately be able to prove extra-contractual doctrines such as frustration of purpose and impossibility of performance. Those same defenses are available here to the Debtor.

38. The frustration of purpose doctrine discharges a party's contractual duties "where a virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party." See United States v. Gen Douglas MacArthur Senior Vill., Inc., 508 F.2d 377, 381 (2d Cir. 1974). Further, under New York law, "impossibility" will be deemed to "excuse a party's performance only when the destruction of the subject matter of the contract or the means of

[8] Notably, Midland Loan Services (a division of PNC Bank) is the special servicer of the Debtor's loan here.

performance makes performance objectively impossible." See Kel Kim Corp. v. Cent. Mkts., Inc., 70 N.Y.2d 900, 902 (1987). "Moreover, the impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract." Id. The Debtor believes it can demonstrate that these defenses are available here. In light of Covid-19 and New York state's and city's shutdown orders, the tourist industry came to an abrupt halt. The Hotel, once generating income of over $2.5 million per month in revenue, which, after payment of regular expenses, allowed the Debtor to pay the $612,000 in monthly interest, immediately began generating $0.00 in revenue. To make matters worse, any cash the Debtor "built up" once the Debtor was back open and began generating cash, was, in a commercially unreasonable manner, immediately swept by the Prepetition Lenders without notice. See **Exhibit A**. Notwithstanding the Prepetition Lenders' improper sweep of over $11 million that was used to satisfy a significant portion of the unpaid default interest, the Prepetition Lenders continued to accrue, month over month, additional default interest, based on remaining amounts that had not yet been paid.

39. Indeed, aside from the District Court case above, state law judges in New York have struggled with these Covid-19 related issues, leading one judge to deny a landlord its motion to vacate the tenant as a result of breaches arising from missed rent in April 2020, and stating "it seems to me draconian that, based on what arose during the pandemic, the petitioner could unilaterally terminate the lease or say the leased was terminated based on what occurred, frustration of purpose, the inability for the respondent to conduct its business as intended." See Bench Decision dated October 6, 2021, Egate-95 LLC v. Fitness International LLC, Index No. 805964/2001, Supreme Court of the State of New York (Erie County), a copy of which is annexed hereto as **Exhibit "C"**; see also Lord v. Limited Liability Company, 146 N.Y.S.3d 466

(Sup Ct. 2021) (ordering return of deposit from catering hall as a result of impossibility of performance due to Covid-19); JN Contemporary Art LLC v. Phillips Auctioneers, LLC, 507 F.Supp.3d 490 (S.D.N.Y. 2020) (art seller's complaint seeking specific performance from art gallery dismissed as art gallery permitted to terminate agreement in light of its inability to perform due to Covid-19).

40. Separate and apart from the state law defenses available to the Debtor, it has long been said that bankruptcy courts are courts of equity and this court may apply section 105 of the Bankruptcy Code to disallow the Default Interest/Fees. As the Court considers the legal defenses available to the Debtor under applicable law as well as the "equitable considerations" at play here in connection with the Default Interest/Fees, by way of analogy, in evaluating the rights to pendency interest pursuant to section 506(b) to oversecured creditors during a chapter 11 case, even such oversecured creditors do not have "carte blanche" rights to default interest under the Bankruptcy Code, with bankruptcy courts frequently essentially "re-writing" loan default provisions to adjust default interest and late charge payments based on "equitable considerations". See In re Bownetree, LLC, 2009 WL 2226107 at *4, fn. 1 (Bankr. E.D.N.Y. July 24, 2009) (applying "equitable considerations" and finding that application of default interest rate, which is twice as much as the non-contract rate, would be inequitable and have an adverse impact on other creditors); See Urban Communications PCS Ltd. Partnership v. Gabriel Capital, L.P., 394 B.R. 325, 338 (S.D.N.Y. 2008) (citing cases). Thus, if bankruptcy courts have the authority to limit default interest set forth in a loan agreement based on "equitable considerations" pursuant to section 506(b), this Court certainly has the ability to deny the Prepetition Lenders, arguably undersecured creditors, the right to the extraordinary amount of Default Interest/Fees they are seeking here.

41. Thus, the Court should readily conclude the Debtor has strong defenses to any assertion of default interest under applicable New York law. However, the issues pertaining to this separate legal issue may, at least in part, be fact driven and the Debtor reserves all rights to assert these principles as a separate reason why the Default Interest/Fees should not be required to be paid here.

**RESERVATION OF RIGHTS**

42. At several times throughout this proceeding, the Prepetition Lenders have alleged that default interest continues to accrue. See e.g., Lenders' Motion, p. 2-3 ("termination [of exclusivity]…[would] allow resolution of this case without prolonging the case for additional months during which more default interest will accrue"). However, more recently, at the hearing on April 18, 2023, the Prepetition Lenders have conceded they are adequately protected by the monthly interest payment of $612,000 in monthly interest. See Transcript of April 18th Hearing, p. 35 (Mr. Eisenberg: "I would be hard-pressed to demonstrate the kind of harm that would, for example, enable me to claim that I lacked adequate protection"). As it is unclear whether the Prepetition Lenders will press for pendency default interest during the Chapter 11 case, the Debtor reserves its legal argument until such time as the Prepetition Lenders identify their basis for this view of the law. From the Debtor's perspective, this legal issue appears to be premature because it is possible the Prepetition Lenders are undersecured such that they would not be entitled to any additional interest under section 506(b). The Prepetition Lenders have the burden of demonstrating that they are oversecured here. See In re Residential Capital, LLC, 497 B.R. 403, 412 (Bankr. S.D.N.Y. 2013).

43. Moreover, even if the Prepetition Lenders were able to prove they were oversecured, courts have found that if a debtor successfully reinstates a loan, bringing the lender



089271\1\170213847.v2

to the *status quo*, no pendency default interest during the Chapter 11 case needs be paid to a secured creditor under such circumstances, See In re Bownetree, LLC, 2009 WL 2226107 at *4, fn. 1 (Bankr. E.D.N.Y. July 24, 2009) ("Courts have found that when a debtor cures a default, such as by reinstating the maturity date, compensating the holder for any damages incurred, and not altering any other rights, the debtor has cured the default and need not pay a default rate of interest that would be applicable under section 506(b)", citing cases)); see also Entz-White, 850 F.2d at 1342-1343 (finding that the natural reading of sections 506 and 1124 is that the interest awarded should be at the market rate or at the pre-default rate provided for in the contract", thereby rejecting secured lender's section 506(b) argument); see e.g. In re Southeast Co., 868 F.2d 335, 339 (9th Cir. 1989) (denying prepetition interest at post-default rate to alleged oversecured creditor in order to preserve the benefits of cure).

44. On the other hand, if the Debtor is not successful in reinstating the Loan, and the Prepetition Lenders are later determined, after a valuation of the Hotel, to be oversecured creditors, the Debtor reserves the right to reduce any request for Default Interest/Fees allegedly accruing during this case pursuant to "equitable considerations" utilized by the bankruptcy courts in this instance.[9] See Bownetree, 2009 WL 2226107 at *4 (applying equitable considerations and finding that application of default interest rate, which is twice as much as the non-contract rate, would be inequitable and have an adverse impact on other creditors)

45. The Debtor expressly reserves the right to supplement this Memorandum of Law and incorporate additional arguments at the hearing to consider this Memorandum of Law.

[9] Likewise, after a valuation and/or sale of the Hotel, to the extent that the Prepetition Lenders are deemed to have been "undersecured" during this case, this Court may require the Prepetition Lenders to apply the non-default interest it has been receiving as adequate protection during this case to outstanding principal. See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365 (1988) (undersecured creditor not entitled to post-petition interest payments as "adequate protection").

## CONCLUSION

46. For all of the foregoing reasons, the Default Interest/Fees, totaling over $20 million do not need to be cured in order for the Debtor to reinstate the Loan under section 1124(2) of the Bankruptcy Code. The Prepetition Lenders should be deemed to be "unimpaired" under the Debtor's Plan, as long as the Debtor contemplates full payment of the principal at maturity, together with Non-Default Interest as well as the Prepetition Lenders' reasonable legal fees on the Effective Date of the Plan.

Dated: New York, New York
May 9, 2023

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Golden Seahorse LLC*
*Debtor and Debtor-in -Possession*

By: /s/ Scott S. Markowitz
Scott S. Markowitz, Esq.
Rocco Cavaliere, Esq.
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
smarkowitz@tarterkrinsky.com
rcavaliere@tarterkrinsky.com