**PERKINS COIE LLP**
1155 Avenue of the Americas, 22nd Floor
New York, NY 10036
Telephone: (212) 262-6900
Gary F. Eisenberg, Esq.
Email: geisenberg@perkinscoie.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:

GOLDEN SEAHORSE, LLC,                                    Chapter 11

dba Holiday Inn Manhattan Financial District,[1]

Debtor.                                                 Case No. 22-11582 (PB)

-------------------------------------------------------------x

**WILMINGTON TRUST'S
MEMORANDUM OF LAW IN OPPOSITION TO THE DEBTOR'S
MEMORANDUM OF LAW IN AID OF CONFIRMATION OF DEBTOR'S PLAN
SEEKING REINSTATEMENT OF A LOAN BETWEEN DEBTOR AND PREPETITION
LENDERS UNDER THE RELEVANT PROVISIONS OF THE BANKRUPTCY CODE**

---

[1] The Debtor's last four digits of its tax identification number is 4770.  The Debtor's principal place of business is 99 Washington Street, New York, New York.

# TABLE OF CONTENTS

**Page**

I.    Preliminary Statement ................................................................................ 1

II.   Statement of Relevant Facts ...................................................................... 4

III.  Legal Argument ......................................................................................... 5

    A.    What Section 1124(2) Actually Does ................................................. 6

    B.    Section 1123(d) Protects Even Creditors Deemed Unimpaired under 1124(2) ................................................................................................. 7

    C.    Section 365(b)(2) Only Excuses Non-Monetary Defaults .................... 7

    D.    Section 365(b)(2) Only Applies to Executory Contracts and Unexpired Leases .................................................................................................. 9

    E.    In Aiming at 365(b)(2)(D), Professor Brubaker and the Debtor Misfire the "Canons" ............................................................................................ 10

    F.    The Proper Way to Parse 365(B)(2)(D) ............................................... 11

    G.    The Court Should Determine that "Penalty" is Not a "Determiner" ...... 13

    H.    How The "Competent Drafter" Would Draft the Language Professor Brubaker Wants ................................................................................... 15

    I.    The Need to Consider How the Statutes Have Been Amended ............. 16

    J.    The Absurdities Arising From Failure to Consider Statutory Changes ... 17

    K.    Section 365(b)(1) Also Uses "Penalty Rates or Penalty Provisions" ..... 18

    L.    Section 1124(2) Permits Decelerating a Claim Arising from an Unexpired Lease; Section 365 Does Not .............................................................. 19

    M.    The Debtor's Analysis of the Caselaw is Deeply Flawed .................... 20

IV.   Conclusion ................................................................................................ 25

162347584.1

## CASES

*Eagle Ins. Co. V. Bankvest Capital Corp. (In re Bankvest Capital Corp.)*,
  360 F.3d 291 (1st Cir. 2004) ................................................................16

*Grubbs v. Houston First Am. Sav. Ass'n*,
  718 F.2d 694 (5th Cir. 1983), on reh'g, 730 F.2d 236 (5th Cir. 1984) ...................................24

*Hepner v. PWP Golden Eagle Tree, LLC (In re K & J Props., Inc.)*,
  338 B.R. 450 (Bankr. D. Colo. 2005) ...............................................................4

*In re 1 Ashbury Court Partners, L.L.C.*,
  2011 WL 4712010 (Bankr. D. Kan. 2011) ........................................................1, 3

*In re 139-141 Owners Corp.*,
  306 B.R. 763 (Bankr. S.D.N.Y. 2004) ..................................................................1

*In re 139-141 Owners Corp.*,
  306 B.R. 763 (Bankr. S.D.N.Y.), *Aff'd in part, vacated in unrelated part,
  remanded*, 313 B.R. 364 (S.D.N.Y. 2004) ..........................................................22

*In re Adejobi*,
  404 B.R. 78 (2009) ...........................................................................1, 10

*In re Claremont Acquisition Corp., Inc.*,
  113 F.3d 1029 (9th Cir. 1997) ..................................................................12, 16

*In re Entz-White Lumber & Supply, Inc.*,
  850 F.2d 1338 (9th Cir. 1988) ..........................................................12, 20, 24, 25

*In re General Growth Properties, Inc.*,
  451 B.R. 323 (Bankr. S.D.N.Y. 2011) ................................................1, 20, 23, 24

*In re Johnson*,
  279 B.R. 218 (Bankr. M.D. Tenn. 2002) ...........................................................21

*In re Johnston*,
  2004 WL 3019472 (Bankr. N.D. Iowa Dec. 20, 2004) ............................................4

*In re Moody Nat. SHS Houston H, LLC*,
  426 B.R. 667 (Bankr. S.D. Tex. 2010) ..........................................................2, 3, 10

*In re Moshe*,
  567 B.R. 438 (Bankr. E.D.N.Y. 2017) ............................................................1, 22

*In re New Invs., Inc.*,
  840 F.3d 1137 (9th Cir. 2016) ..................................................................3, 24, 25

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re Phoenix Bus. Park Ltd. P'ship*,
  257 B.R. 517 (Bankr. D. Ariz. 2001) ........................................................................20

*In re Sagamore Partners, Ltd.*
  620 F. App'x 864 (11th Cir. 2015) .............................................................................3

*In re Sweet*,
  369 B.R. 644 (Bankr. D. Colo. 2007) ..............................................................1, 4, 20

*Rake v. Wade*,
  508 U.S. 464 (1993) ..................................................................................10, 17, 21, 25

### STATUTES

11 U.S.C. 365(b)(2)(D) ....................................................................................................8

Code § 365(b)(2)(D) .............................................................................................. passim

### OTHER AUTHORITIES

7 Collier on Bankruptcy ¶ 1123.04 (16th ed. 2020) ........................................................4

Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts*
  (2012) ......................................................................................................................13

*Ralph Brubaker, Paying a Default Rate of Interest to Cure Payment Defaults in a
  Chapter 11 Plan of Reorganization: Sweet!*, 28 Bankr. L. Letter No. 3, Mar.
  2008 ........................................................................................................................20

162347584.1

Wilmington Trust, National Association, as Trustee for the noteholders previously identified as the "Prepetition Lenders"[2] submits this memorandum of law (the "MOL") and the Declaration of Gary Eisenberg, Esq. ("Eisenberg Decl.") pursuant to the Court's order dated April 20, 2023.[3]

## I.    **Preliminary Statement**

1.      The Debtor's entire premise that it is not obligated to pay default interest rests on (i) a single law review article; (ii) a case from 1982 that was more than a decade prior to enactment of the relevant statutes at play (and was a Chapter 13 case to boot); and (iii) arguments that the Court has determined are premature.[4]

2.      On the other hand, the Prepetition Lenders' case rests on a (i) straightforward reading of the plain meaning of the applicable statutory language, aided by application of canons of statutory construction that reinforce the natural way to read the applicable Bankruptcy Code Sections; (ii) analysis of how Sections 1123, 1124 and 365 have been amended in 1994 and 2005 to show how those sections should be construed and (iii) the vast majority of caselaw (including

---

[2] The full name of the Prepetition Lenders is referenced in the signature block.

[3] *See* Docket No. 112.

[4] Pursuant to the Court's order on May 23, 2023, no response to Part II of the Debtor's MOL is necessary and all arguments are reserved with respect to the issues raised in Part II.  *See* Docket No. 125.  Accordingly, the Prepetition Lenders reserve all rights with respect to Part II and pursuant to the Court's order have not addressed Part II issues in this Response.

- 1 -

decisions by <u>four</u> of this Court's present and former colleagues)[5] and many sister bankruptcy courts throughout the country.[6] [7]

3.      The contract interest rate on the Debtor's secured loan with Prepetition Lenders is 5.259%, a rate no one disputes is low in today's market.  The current market rate would be higher than 5.259% even if the Debtor were a pristine borrower.  The Debtor is not -- it was in default for nearly two and a half years before filing this chapter 11 case.

4.      The Debtor wants to preserve that below-market interest rate of 5.259%, a rate even a pristine borrower could not obtain.  And, it wants to avoid paying default interest.  The pre-petition default interest alone is $17,813,250.00.  See Prepetition Lenders' *Additional Prepetition Secured Obligations Assertions Pursuant to Final Cash Collateral Order* (Docket No. 39).

5.      Ordinarily, the Debtor could propose a plan to do that.  Prepetition Lenders would vote to reject that plan, as it impairs their rights.

6.      The Debtor could seek confirmation anyway.  But, in that case, Section 1129(b) would apply to entitle the Prepetition Lenders to interest at current market rates, much higher than the 5.259% rate the Debtor seeks to preserve despite its defaults.

7.      The Debtor thus seeks to confirm a plan where the Prepetition Lenders are deemed unimpaired and thus deemed to have accepted the plan, denying them Section 1129(b) protection.

---

[5] *See In re Moshe*, 567 B.R. 438 (Bankr. E.D.N.Y. 2017) (Judge Stong); *In re General Growth Properties, Inc.,* 451 B.R. 323 (Bankr. S.D.N.Y. 2011) (Judge Gropper); *In re 139-141 Owners Corp.*, 306 B.R. 763 (Bankr. S.D.N.Y. 2004) (Judge Hardin); *In re Adejobi*, 404 B.R. 78 (2009) (Judge Feller) (hereinafter the "SDNY and EDNY Caselaw")

[6] There are numerous cases in support of the Prepetition Lenders position.  A sampling include: *In re 1 Ashbury Court Partners, L.L.C.*, 2011 WL 4712010 (Bankr. D. Kan. 2011) (if default interest was not allowed, the end result would be to "write Section 1123(d) out of the Code"); *In re Sweet*, 369 B.R. 644, 650 (Bankr. D. Colo. 2007) (providing an extensive analysis of 1123(d) and ultimately concluding that default interest must be paid); *In re Moody Nat. SHS Houston H, LLC*, 426 B.R. 667, 773 (Bankr. S.D. Tex. 2010); (finding that "Entz White's vitality is – at best – questionable.").

[7] The sections that are at the heart of the proof that Professor Brubaker is simply wrong are contained in Sections E-H of this MOL.

- 2 -

The Debtor wants to keep its below-market interest rate, avoid paying default interest, deny the Prepetition Lenders a vote and deny the Prepetition Lenders the benefit of Section 1129(b) arising from a rejecting vote.  The Bankruptcy Code does not permit this bonanza.

8.      To accomplish its ambition, the Debtor proposes to "cure" and decelerate the Prepetition Lenders' claims.  The Debtor's misplaced argument centers on a misreading of what Section 1124(2) does.  The Debtor claims that under Section 1124(2), the Debtor need not pay default interest and there is no impairment to the Prepetition Lenders, when decelerating.  The Prepetition Lenders respectfully submit that is an incorrect reading of the statute.

9.      The Debtor must concede that Section 1123(d) requires the cure payment to include default interest to the extent applicable non-bankruptcy law provides (because that is what the statute explicitly and clearly says). This requirement is not negated by a convoluted reference to a subsection of the Bankruptcy Code that only addresses curing of non-monetary defaults under executory contracts and unexpired leases.

10.     Section 1123(d) provides:

> Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

11.     The Debtor does not dispute (and there can be no dispute) that Section 2.2.2 of the Loan Agreement plainly accrues interest on the unpaid principal amount at the Default Rate (5% higher than the interest rate) upon an Event of Default and requires the Borrower to pay it.  Applicable non-bankruptcy law in New York long has held that a loan obligation may accrue and require payment of default interest of five percent above the contract rate. Accordingly, this section unequivocally requires payment of default interest to cure defaults.

- 3 -

12.     Based on this plainly worded statute, following the enactment of Section 1123(d) in 1994, *virtually every court* that has considered the issue has held that a debtor must pay post-default interest as part of a cure to reinstate a claim under Section 1124(2) while denying the creditor a vote on the plan.[8]  The cases that hold a debtor must pay post-default interest as part of a cure to reinstate have not gone into the detailed analysis that Prepetition Lenders have here, because they did not need to do so.  The statutory language is clear and precise; reading it consistently with the various canons of construction[9] compels the conclusion that all of the courts have reached, as will be explained below.

## II.    Statement of Relevant Facts

13.     As explained in more detail in the Cash Collateral Order (as defined below), Ladder Capital Finance LLC, the original lender, extended a loan (the "Loan") to the Debtor in an aggregate principal amount of up to $137,025,000.  *See* Request for Judicial Notice of Prepetition Lenders ("RJN"), ¶1.  As security for payment of the Loan, the Debtor executed and delivered a

---

[8] *See e.g., In re New Invs., Inc.* 840 F.3d 1137, 1138 (9th Cir. 2016) (explaining that Section 1123(d) "affects [ ] *how* a debtor returns to pre-default conditions," and, where an underlying agreement required post-default interest, "it is only once these penalties are paid that the debtor can return to pre-default conditions as to the remainder of the loan obligation."); *In re Sagamore Partners, Ltd.* 620 F. App'x 864, 869 (11th Cir. 2015) (holding that "where, as here, the underlying agreement calls for default-rate interest and the applicable bankruptcy law permits it, a party cannot cure its default without paying the agreed-upon default rate interest."); *In re I Ashbury Court Partners, L.L.C.*, 2011 WL 4712010, at *4 (Bankr. D. Kan. 2011) (holding that the denial of default rate interest upon reinstatement "where it is otherwise legally enforceable would be to write 1123(d) out of the Code."); *see also Moody Nat'l SHS Houston H, LLC,* 426 B.R. 667, 670-76 (holding that "[w]ith respect to post-petition amounts that must be treated to cure the note, guidance from 1123(d) is quite direct" and that "ambiguity evaporated in 1994 when 1123(d) was added."); *In re Sweet*, 369 B.R. 644, 650 (Bankr. D. Colo. 2007) (holding that to exercise statutory cure rights accorded to them in bankruptcy, debtors would have to pay post-default interest at the default rate); *Hepner v. PWP Golden Eagle Tree, LLC (In re K & J Props., Inc.*), 338 B.R. 450, 461 (Bankr. D. Colo. 2005) ("Section 1123(a)(5)(G) and section 1124(2) provide no basis to nullify the post-petition default interest claimed by PWP to the extent it is otherwise allowable under PWP's loan documents and applicable nonbankruptcy law."); *In re Johnston*, 2004 WL 3019472, at *7 (Bankr. N.D. Iowa Dec. 20, 2004) (concluding that "1123(d) controls this issue" and that the debtor's "cure must include the payment of default interest.") (along with the cases in FN 6, hereinafter, the "Nationwide Caselaw"). *See also*, 7 Collier on Bankruptcy ¶ 1123.04 (16th ed. 2020) ("A majority of courts have held that to cure and reinstate a claim under a plan, the debtor must pay post-default interest to the extent provided under the debtor's agreement with the creditor" and noting that only a minority of courts have held the opposite and those that have relied on Entz White issued prior to the enactment of Section 1123(d)).

[9] *See* Exhibit B to the Eisenberg Decl. for a listing and description of the canons of construction referred to herein.

- 4 -

mortgage, evidencing a first priority lien on the Property, to the original lender (the "Mortgage"). The Loan, Mortgage, and other loan documents have since been assigned to Prepetition Lenders.

14.    Prepetition Lenders have filed proofs of claim in this case.  In aggregate, their proofs of claim exclusive of legal fees, as of the petition date in this case, totaled $179,481,590.83. *See* RJN, ¶2.  They are by orders of magnitude the largest creditors in this case.

15.    The contract interest rate is 5.259%.  The default interest rate is an additional 5%. A total of $17,813,250.00 of default interest accrued prior to the date (the "Petition Date") on which the Debtor filed this bankruptcy case.  Default interest continues to accrue.

16.    Months before this bankruptcy case was filed, in April 2022, Prepetition Lenders filed an application for the appointment of a receiver in New York state court because the Debtor was in default on its payment obligations.  As explained in more detail in the receivership filings, the Debtor was not depositing all its revenues from the Hotel into the cash management account that it was required to deposit them in; rather, it was diverting revenues to the detriment of Prepetition Lenders' lien on those funds.  On or about September 27, 2022, the Supreme Court of New York, New York County granted Prepetition Lenders' motion for appointment of a receiver. Before the receiver could take possession, the Debtor filed this bankruptcy case.

### III.    Legal Argument

17.    The Debtor seeks to "cure" its defaults under the Loan Documents, deny the Prepetition Lenders a vote and deny Prepetition Lenders the protections of Sections 1129(a)(7)(A)(ii) and 1129(b).  It seeks to do so while also claiming it need not pay default interest. Its sole basis for doing so is Professor Brubaker's law review article and his arguments regarding Section 1124(2), which the Debtor must invoke because the entire amount of the Prepetition Lenders' claim is currently immediately due and owing in full.  Absent Section 1124(2) and its

- 5 -

permit of deceleration, the Debtor could only deny Prepetition Lenders a vote by paying the allowed amount of their claims, including default interest, pursuant to Section 1123(d). *See* ¶ 8, *supra.*

### A.    <u>What Section 1124(2) Actually Does</u>

18.    The Debtor thus seeks to argue that Section 1124(2) somehow negates the clear command of Section 1123(d) that default interest is part of what must be paid to effectuate a cure. That contention cannot be squared with the proper reading of Section 1124(d).  Section 1124(2) in pertinent part, today, renders a class of claims unimpaired when, *inter alia*, the plan "cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in Section 365(b)(2) of this title or of a kind that Section 365(b)(2) expressly does not require to be cured."[10] Section 1124(2) does not determine *what* is required to cure; it only sets forth when a claim is unimpaired under a plan.[11]  A debtor who meets Section 1124(2) can provide treatment of a claim and have the creditor be deemed to have accepted the plan, denying the creditor protections of Sections 1129(a)(7)(A)(ii) and 1129(b) it would have were it to vote to reject the plan.

19.    However, doing such deceleration while treating the creditor as unimpaired requires cure, with certain exceptions that do not include excusing paying default interest.   The only effect of Section 1124(2) is that a debtor that complies with it need not obtain the vote of the creditor to confirm the debtor's plan.  The creditor is deemed to accept the plan.

---

[10] The Debtor omits discussion of how the relevant sections of the Bankruptcy Code have been amended in 1994 and why that matters.  A timeline tracing the amendments to the pertinent Code sections is attached to the Eisenberg Decl. as Exhibit A.

[11] See *Moody*, 426 B.R. at 670 (stating that 1124(2) does not address how to cure defaults, it "merely defines the standards for unimpaired status"); see also H.R. Rep. 95-595, at 396, 1978 U.S.C.C.A.N. 5963, 6352 ("Section 1124 is one part of the new confirmation standard. It defines impairment, for use in section 1129.").

B.    **Section 1123(d) Protects Even Creditors Deemed Unimpaired under 1124(2)**

20.    Section 1123(d) in turn specifies what the cure amount is.  This is important, because the cure amount payable under Section 1123(d) is required "notwithstanding..." both "Section 1129(a)(7), and Section 1129(b)."  A debtor proposing a plan that renders a creditor unimpaired under Section 1124(2) must still satisfy Section 1129(a)(7) to obtain confirmation (even though Section 1129(b) will be inapplicable because of the class's deemed acceptance).  The debtor need not meet the "best interest test" for the minimum distribution to the creditor provided under Section 1129(a)(7)(A)(ii).  This is because Section 1124(2) renders the creditor to have accepted the plan under Section 1129(a)(7)(A)(i).

21.    But, default interest still must be paid pursuant to Section 1123(d) notwithstanding that the effect of Section 1124(2) renders the creditor to have accepted the plan (thereby enabling the debtor to satisfy Section 1129(a)(7)(A)(i) through Section 1129(a)(7)(A)(ii)).  This is because Section 1123(d) cure amounts must be paid to cure "notwithstanding..." both "Section 1129(a)(7), and Section 1129(b)."  This is consistent with the "Subordinating/Superordinating Canon."  See Eisenberg Decl.., Exh. B (the "Canons Exhibit") (which contains every canon reference Prepetition Lenders cite herein).

C.    **Section 365(b)(2) Only Excuses Non-Monetary Defaults**

22.    The Section 365(b)(2) exceptions in Section 1124(2) to the defaults excused from being met in order to treat the creditor as unimpaired all are ***non-***monetary defaults and thus they do not change the Section 1123(d) conclusion above.   This is clear from a proper reading of Section 365(b)(2) as explained below. A monetary default, even a default interest monetary default, is not "a default of a kind specified in Section 365(b)(2) of this title or of a kind that Section 365(b)(2) expressly does not require to be cured..."

- 7 -

23. The Debtor cannot show otherwise. Its attempt to argue that Prof. Brubaker's analysis lets it do so is unavailing. A construction of Sections 365, 1123, and 1124 (with proper canons of construction) and a tracing of how these sections have been amended (neither of which tasks the Debtor did) shows this.[12]

24. Section 365(b)(2)(D), like Section 1123(d), was enacted as part of the 1994 amendments to the Bankruptcy Code.[13] It is specifically referred to in Section 1124(2) because the types of defaults identified in Section 365(b)(2) are non-monetary defaults that are impossible (or nearly impossible) to cure because they would involve undoing past events that cannot be undone (the filing of the case, the appointment of a custodian and insolvency, referred to below as the "(A) to (C) Defaults" because they have (continuously since prior to 1994) been set forth in Sections 365(b)(2)(A), (B) and (C)). Indeed, prior to 1994, the only defaults listed in Section 365(b)(2) were the (A) to (C) Defaults and thus prior to 1994 they were the only defaults excused from cure in order to decelerate under Section 1124(2) while denying the creditor a vote.[14]

25. Section 365(b)(2)(D) as enacted in 1994 added a type of (non-monetary) default not required to be cured when assuming an executory contract or unexpired lease, leaving Section 365(b)(2)(D) to read in its entirety as modified by the 1994 Bankruptcy Code Amendments:

Paragraph (1) [the Court should note that that paragraph permits the trustee to assume an executory contract or unexpired lease if and only if the trustee cures defaults thereunder] of this subsection does not apply to a default that is a breach of a provision relating to --

[(A) to (C) Defaults deliberately omitted]; or

(D) the satisfaction of any penalty rate or provision relating to a default arising from any failure by the debtor to perform *nonmonetary* obligations under the executory contract or unexpired lease.

---

[12] The word "canon" does not appear in the Debtor's MOL.

[13] *See* Exhibit A to the Eisenberg Decl.

[14] That makes the defaults listed in (A) through (C) those that are "of a kind specified in Section 365(b)(2)."

162347584.1

11 U.S.C. 365(b)(2)(D) (emphasis added).   As parsing of the statutory language below will reinforce, the structure here shows how similar (D) is to the (A) through (C) Defaults – the failure to satisfy a penalty rate or provision that arises from a default of a *non-monetary* obligation (a type of default often itself not curable because of the inability to "undo" a past event) ***and*** one that is *under an executory contract or unexpired lease*.  This is consistent with both the Associated-Words (*Noscitur a sociis*) Canon and the Scope-of-Subparts Canon.

### D.    <u>Section 365(b)(2) Only Applies to Executory Contracts and Unexpired Leases</u>

26.     Thus, as a threshold matter, Section 365(b)(2)(D) is inapplicable to the Prepetition Lenders' claims because its language, incorporated into section 1124(2)(A), only applies to *executory contracts and unexpired leases*.  In other words, the defaults of a kind under Section 365(b)(2) all are only applicable when a debtor seeks to cure a default under an executory contract or an unexpired lease.  They do not apply to loans, which are not executory contracts

27.     Three of the four excused defaults that a trustee or debtor *who proposes to assume an executory contract or unexpired lease* need not cure are the (A) to (C) Defaults.  Those non-monetary defaults are conditions existing independent of any executory contract or unexpired lease.  By its terms, however, the items under (D) (first added in 1994) are non-monetary defaults that expressly tie to an executory contract or unexpired lease (hence the concluding language of "relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease."  Henceforth we refer to it as the "relating to..." clause.).  Reading it this way is consistent with the Surplusage Canon, which Prof. Brubaker's reading violates.

28.     In 1994, as explained above, Congress amended the Bankruptcy Code to add Section 1123(d), which requires the payment of default interest as part of the amount required to cure any debt (and requires it "notwithstanding Section 1129(a)(7)", which otherwise would allow

- 9 -

the Debtor to confirm a plan without providing the creditor at least what it would get in a chapter 7). Its language parallels that of Section 1322(e), which section Courts consistently hold to have overruled *Rake v. Wade*, thus, because of its clarity, overcoming the presumption against a statute negating common law.[15]

29.    Thus, a Debtor must satisfy Section 1123(d). This is even though the debtor would gain the involuntary "acceptance" of the creditor by decelerating under Section 1124(d).

### E.    In Aiming at 365(b)(2)(D), Professor Brubaker and Debtor Misfire the "Canons"

30.    Prof. Brubaker and the Debtor would nonetheless have the Court conclude that Congress, in the very same act in 1994 in which it expressly added Section 1123(d) to require default interest as part of a cure (and included language in Section 1123(d) that overrode the ability of the debtor to satisfy Section 1129(a)(7) even without providing treatment less favorable than the creditor would get in a chapter 7 through such coerced "acceptance"), somehow negated that very requirement in the next section of the Bankruptcy Code – a section that does not address cure amounts generally.

31.    According to them, Congress accomplished this not by expressly excluding default interest from required cure amounts. Instead, they posit, Congress deployed a convoluted approach to all debts through a reference to language in a section of the Bankruptcy Code that, by its express terms, only applies to nonmonetary defaults under executory contracts and unexpired leases. That violates the Harmonious Reading Canon.

---

[15] *In re Moody Nat. SHS Houston H, LLC*, 426 B.R. 667, 674 (Bankr. S.D. Tex. 2010) (concluding that the legislative history reflects that Section 1123(d) was, indeed, added to overrule *Rake); In re Adejobi,* 404 B.R. 78 (2009) (Judge Feller) (providing an excellent discussion of the caselaw and intent behind congressional amendments).

162347584.1

32.     Prof. Brubaker and the Debtor simply misread Section 365(b)(2)(D) in claiming that it excuses the cure of every default rate, contending that the "relating to..." clause only modifies "penalty provision" and not "penalty rate."   That is a misapplication of the Series-Qualifier Canon on which Prof. Brubaker relies, and this is why.

33.     As a result of the amendments in 1994, Section 365(b)(2)(D) was added to Section 365(b)(2).  However, Section 365(b)(2)(D) cannot be read on its own.  It is a subpart of the larger Section 365(b)(2).  After the 1994 amendment (but before the 2005 amendment), and omitting subsections (A), (B) and (C) for the moment, the full text of Section 365(b)(2)(D) (including its predicate) then read:

> Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to --. . . (D) the satisfaction of any penalty rate or provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

34.     That is an intelligible sentence – but only if the "relating to..." clause modifies both "penalty rate" and "penalty provision."  Prof. Brubaker's construction would, by contrast, render the language unintelligible, violating the Unintelligibility Canon.

## F.     The Proper Way to Parse 365(B)(2)(D)

35.     Prof. Brubaker would have to concede (as the Ninth Circuit has observed, as noted below) that dropping the word "or" after "penalty rate" and having the "relating to…" clause modify only "provision" should yield intelligible sentences on both sides of the "or" if one applies the canons properly (and one applies the predicate language of Section 365(b)(2) to both of the parts of subsection (D)).[16]  The first clause would read:

> Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to -- (D) the satisfaction of any penalty rate.

---

[16] *See e.g.*, *In re Claremont Acquisition Corp., Inc.,* 113 F.3d 1029 (9th Cir. 1997).

36.     That is a complete sentence and an intelligible thought.  But Prof. Brubaker's construction works only if the second clause so fully parsed is also intelligible.  But it is not.  The second clause would read:

> Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to -- (D) provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

37.     That construction "is both grammatically incorrect and nonsensical."  *See Claremont Acquisition Corp., supra*, 113 F.3d at 1032 (9th Cir. 1997) (notably, decided after *In re Entz-White Lumber & Supply, Inc.*, 850 F.2d 1338 (9th Cir. 1988)).

38.     Now, perhaps Prof. Brubaker would contend that such a construction is farcical, because he would contend that of course what has to be understood in construing Section 365(b)(2)(D) as enacted in 1994 is that "satisfaction of any" must be understood to be included before "provision" so that the proper reading is as if worded as follows (non-enacted words presumed by Prof. Brubaker in ***bold italics***):

> Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to -- (D) the satisfaction of any penalty rate or ***the satisfaction of any*** provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

39.     But, if so, then Prof. Brubaker must concede that the modifier "satisfaction of any" was not actually inserted before "provision" as the statute was actually enacted in 1994 and ***is not there as it reads today***.  Thus, by the Series-Qualifier Canon, the lack of insertion of "satisfaction of any" MUST mean that the "relating to..." clause modifies BOTH "penalty rate" and "penalty provision."

40.     Had the statute been written with "satisfaction of any" before "penalty provision" as well, Prof. Brubaker's argument might have merit.  But, it was not.  Because "satisfaction of any" is not repeated before "penalty provision," then its absence before "provision" means that the

- 12 -

"relating to..." clause as of 1994 modifies both "penalty rate" and "provision" (but not "penalty provision," because, as Professor Brubaker does not stress, "penalty" was not included in Section 365(b)(2)(D) prior to 2005).

41.    In essence, "satisfaction of any" is the "determiner" that must appear before "penalty provision" for Prof. Brubaker's construction to work.  But Congress has never included those words a second time.  There is no determiner, and thus this Court should determine that the "relating to..." clause modifies both "penalty rate" and "penalty provision."

### G.    The Court Should Determine that "Penalty" is Not a "Determiner"

42.    A singular flaw in Prof. Brubaker's article's reasoning is that he posits that the word "penalty" is a "determiner."  He provides no support for the assertion that a mere adjective can be a determiner.  Moreover, his attempt to do so misapplies the very canons that he cites in Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* (2012), at pages 148-149.[17]  On page 148, all of the "determiners" that Scalia and Garner offer are articles or pronouns (the examples they give include 'a', 'the', 'some', etc. — *none* of those is an adjective).

43.    There is in fact no determiner before "penalty provision."  Thus, the postpositive modifier "relating to…" clause modifies ***both*** "penalty rate" and "penalty provision."

44.    Therefore, the "relating to..." clause modifies both of the items covered by "satisfaction of any" - both "penalty rate" and "provision."  The result is that the canons compel the enacted language to be read the same as if it actually read:

> Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to -- (D) the satisfaction of any penalty rate ***relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease*** or provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

---

[17] *See* Exhibit D attached to the Eisenberg Decl. for the pertinent pages from *Reading Law*.

45.     That is a complete sentence and an intelligible thought.[18]   The Series-Qualifier

Canon, however, teaches that the repetition of the italicized language is not needed because the

application of the "relating to…" clause is understood properly to modify both "penalty rate" and

"provision."

46.     The enactment of an amendment in 2005 to add the word "penalty" before

"provision" does not change the analysis.   Congress's addition of the word "penalty" before

"provision" in 2005 (the language currently in the Bankruptcy Code) did not salvage the

grammatically incorrect and nonsensical construction that Prof. Brubaker advocates.   The first

clause, when construed above per Prof. Brubaker's canons, remains unaltered from 1994.   The

second clause, parsed per his canons, now reads:

> Paragraph (1) of this subsection does not apply to a default that is a breach of a provision
> relating to -- (D) penalty provision relating to a default arising from any failure by the
> debtor to perform nonmonetary obligations under the executory contract or unexpired
> lease.

47.     This reading remains just as grammatically incorrect and nonsensical.   *See*

*Claremont Acquisition Corp., supra*, 113 F.3d at 1032.   Adding "penalty" before "provision" does

not change that.   That is because "penalty" is not a determiner, despite Prof. Brubaker's attempt to

---

[18] Though that is so, when parsed this way, such a literal application results in excusing all nonmonetary defaults
from cure requirements.

This is true unless, of course, one applies the statutory canon that a modifier in a series is understood to apply to all
items in the series when the context requires it to avoid an absurd reading.  Even the Debtor likely concedes that
reading Section 365(b)(2)(D) to have excused cure of ALL nonmonetary defaults is so radical as to be absurd on its
face.  Such a reading is also inconsistent with the reality that the defaults excused from cure in subsections (A), (B)
and (C) are also nonmonetary defaults, and thus the enactment of Section 365(b)(2)(D) if it were to be read to
excuse cure of ALL nonmonetary defaults would have warranted repeal of subsections (A), (B) and (C) as
superfluous - they would be covered by the new (D).  So why were they left in? This is because the proper reading
of Section 365(b)(2)(D) as enacted requires understanding "penalty" to modify both "rate" and "provision."
Understood that way, it makes eminent sense why Congress added "penalty" before "provision" in 2005 to avoid
any absurd counter-construction - particularly when one considers that the parallel language was added to Section
365(b)(1) as well.

162347584.1

"determine" that it is.  The determiner required to be added here would have "satisfaction of any" before "penalty provision."  That has never been done, and thus Prof. Brubaker's construction remains incorrect.

**H.    How The "Competent Drafter" Would Draft the Language Professor Brubaker Wants**

48.    There is simple verbiage that a "competent drafter" (the term Scalia and Garner use in *Reading Law*, p. 149) could have used to generate the meaning Prof. Brubaker wishes to ascribe to Section 365(b)(2)(D).  That prescription will ensure that the post-positive modifier (in this case, the "relating to..." clause) does not apply to each item.

49.    The simple solution is to position the post-positive modifier earlier.  That would mean that the competent drafter (as so labeled by Scalia and Garner), seeking to have Section 365(b)(2)(D) read as Prof. Brubaker proposes, would have written it to read as follows:

> Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to — (D) the satisfaction of ***any*** penalty provision ***relating to a default arising from any failure by the debtor to perform non-monetary obligations under the executory contract or unexpired lease or*** any penalty rate.  (moved words emphasized)

*Reading Law*, Scalia & Garner, p. 149.  Such language would result in Section 365(b)(2)(D) being read the way Prof. Brubaker wishes it had been enacted.

50.    But, that is not what Congress did.  Congress, in expressly requiring default interest in cures in Section 1123(d), did not negate the very concept with grammatically incorrect and nonsensical language in 1994 and then insist on preserving that grammatical incorrectness and nonsensical language to this day.  That is not how Congress legislates.

51.    Rather, in 2005, Congress intentionally added the word "penalty" before "provision" to resolve differences in readings between the Ninth and First Circuits and to make it clear that the phrase now refers to "the satisfaction of any penalty rate or penalty provision." *See*

- 15 -

3 Collier on Bankruptcy P 365.LH (16ᵗʰ 2023).[19]  Moreover, Congress did so at the same time it amended Section 365(b)(1) to include language that explicitly excepts both "penalty rates" and "penalty provisions" from the universe of non-monetary defaults that need not be cured to assume an unexpired lease.  *See* Eisenberg Decl., Exhibit A.

52.     Therefore, based on the Scalia and Garner analysis, Prof. Brubaker posits that Congress is not a competent drafter.  That violates perhaps the most implicit overarching canon of statutory construction so pervasive that it is not even listed.  There is an overarching implicit canon against Congressional incompetence.

## I.     The Need to Consider How the Statutes Have Been Amended

53.     Even more tellingly, in positing that "penalty" is a determiner (despite not being an article or pronoun like 'a', 'the', 'some', etc., as noted above), Prof. Brubaker fails to consider the history of the statute.  From 1994 to 2005, the second use of the word "penalty" before the word "provision" was not part of section 365(b)(2)(D).  The failure to analyze this is glaring.

54.     If the second "penalty" is the determiner, then its absence for eleven years (Section 365(b)(2)(D) was not part of the statute until 1994) would require Prof. Brubaker to conclude that, during those eleven years, (a) the "relating to…" clause modified "penalty rate" as well as "provision" and thus (b) default interest during those years had to be included in a cure to deny a creditor a vote on a plan.

---

[19] Prior to 2005, the Ninth Circuit, in analyzing Section 365(b)(2)(D) concluded that the adjective "penalty" in the phrase "satisfaction of any penalty rate or provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations" modified "provision" as well as "rate." *Worthington v. General Motors Corp. (In re Claremont Acquisition Corp., Inc.)*, 113 F. 3d 1029 (9ᵗʰ Cir. 1997).  The First Circuit, however, came to the opposite conclusion, absolving the trustee of curing a nonmonetary historical default. *Eagle Ins. Co. V. Bankvest Capital Corp. (In re Bankvest Capital Corp.),* 360 F.3d 291 (1ˢᵗ Cir. 2004).  Through the 2005 Act, Congress clearly adopted the Ninth Circuit's interpretation of 365(b)(2)(D) and decided to add the word "penalty" in front of "provision" to keep future courts from guessing (incorrectly) like the First Circuit.

**J.**    **The Absurdities Arising From Failure to Consider Statutory Changes**

55.    Prof. Brubaker would also have to convince the Court that Congress took the following series of steps:

a.    Congress in 2005 intended to deprive holders of claims that *did not arise from executory contracts and unexpired leases* from a right to default interest when being deprived of a vote on a plan.

b.    Congress **did not** do this by excluding default interest from cure amounts in section 1123(d) (the very section of the Bankruptcy Code added previously in 1994 when it also added the parallel Section 1322(e) to overrule *Rake v. Wade*, *supra*).

c.    Congress **did not** amend Section 502 to disallow default interest generally.

d.    Instead of either simple drafting feat, Congress intended to exempt default interest from cure when decelerating and depriving a creditor of a vote by insertion of the word "penalty" in Section 365(b)(2)(D) (a section of the Bankruptcy Code dealing *only with unexpired leases and executory contracts*).

e.    This one-word "penalty" change in 2005 to the statute that applies only to unexpired leases and executory contracts would somehow negate default interest on non-executory contract loans.

However, that runs afoul of the Scope-of-Subparts Canon, by expanding Section 365(b)(2)(D) to apply beyond the executory contracts and unexpired leases to which by its express terms its reach is limited.

56.    Second, according to Prof. Brubaker, from 1994 to 2005 the post-positive modifier beginning "relating to . . ." modified both "penalty rate" and "provision" (without "penalty"). However, the effect of that would be to reach the conclusion that, from 1994 to 2005, according to Prof. Brubaker, ***every*** debtor under the Bankruptcy Code was excused from curing **ALL** non-

- 17 -

monetary defaults under every executory contract and unexpired lease in order to treat a creditor as unimpaired.  That construction runs afoul of the Absurdity Canon.

**K.      Section 365(b)(1) Also Uses "Penalty Rates or Penalty Provisions"**

57.     The simpler explanation for adding "penalty" before "provision" is as noted above. Reinforcing this is the contemporaneous amendment in 2005 of Section 365(b)(1).   The amendment to Section 365(b)(1) in 2005 (part of the same 2005 amendments that added "penalty" before "provision") excepted, from the class of non-monetary defaults excused from being required to be cured to assume an unexpired lease (but NOT an executory contract), those that were "(other than a penalty rate or penalty provision)."  *See* Eisenberg Decl., Ex. A.

58.     There can be no doubt that each of a "penalty rate" and a "penalty provision" in section 365(b)(1) is equally excepted from the defaults required to be cured that are addressed in that section.  Under the Presumption of Consistent Usage Canon, the words in Section 365(b)(1) are presumed to have the same meaning in the very next section, section 365(b)(2)(D).  That points to construction of 365(b)(2)(D) precisely the opposite of how Prof. Brubaker advocates.

59.     Professor Brubaker might claim that this renders Section 365(b)(2)(D) superfluous, but that is not the case.  That section expands the exemption from payment of penalty rates or penalty provisions relating to non-monetary default *to executory contracts* as well as unexpired leases.  The use of "penalty rate or penalty provision" in Section 365(a)(1) is used clearly in a way that both are applicable *only with respect to non-monetary defaults*.

60.     That consistency of use of language should be presumed to carry over into the identical use of the phrase in Section 365(b)(2)(D), particularly since "satisfaction of any" in that section is to be read as applicable to both "penalty rate" and "penalty provision" for the reasons set forth above.  This is a result consistent with the Presumption of Consistent Usage Canon.

- 18 -

Accordingly, "any penalty rate or penalty provision" is excused from having to be paid when a debtor assumes an executory contract or unexpired lease, in either case, only when the default arises from a ***non-monetary default under*** an executory contract or unexpired lease.

61.    Another flaw is that Prof. Brubaker fails to recognize that acceleration of obligations is possible under an executory contract or unexpired lease.  However, deceleration is ***not*** permitted as a general matter in an assumption under Section 365 (because acceleration is not a penalty rate or penalty provision).  Section 1123(b) permits assumption of an executory contract or unexpired lease, but only subject to Section 365, which, by its terms, ***does not permit deceleration***.

L.    <u>**Section 1124(2) Permits Decelerating a Claim Arising from an Unexpired Lease; Section 365 Does Not**</u>

62.    However, deceleration of an executory contract or unexpired lease can be accomplished in a plan pursuant to Section 1124 even though it normally cannot be done under Section 365 (or Section 1123(b)).  As a result, the reference to Section 365(b) in Section 1124 is not surplusage, and treating it as such also runs afoul of the Omitted-Case Canon.  Applying the Surplusage Canon, and bearing in mind that, outside of a plan, a debtor cannot decelerate a claim under an executory contract or unexpired lease even when assuming it under Section 365. The Section 365(b) reference in Section 1124(2) is needed to permit deceleration of claims under executory contracts and unexpired leases without payment of penalty rates or provisions triggered by non-monetary defaults under those executory contracts and unexpired leases.

63.    A debtor need not cure certain defaults.  Those are the defaults that are "those of a kind" as in Section 365(b), the only ones that existed prior to 1994, namely, non-monetary defaults that are either (A) to (C) Defaults (and thus not tied to executory contracts or unexpired leases) or "those of a kind that Section 365(b) expressly does not require to be cured" such as non-monetary

- 19 -

defaults *under executory contracts or unexpired leases*.[20] Thus, there is no basis to conclude that "penalty rates" are not qualified by the "relating to…" clause that only covers non-monetary breaches of executory contracts and unexpired leases so as to exclude them from cure when denying a creditor a plan vote. [21]

### M.    The Debtor's Analysis of the Caselaw is Deeply Flawed

64.    The Debtor writes off existing caselaw that squarely addresses the Chapter 11 default interest issue, all while relying on two main cases to make its argument: (i) *Taddeo*, a decision in a Chapter 13[22] case reached over a decade before the relevant bankruptcy code statutes were even in place and (ii) *Entz White*, a Ninth Circuit case which the very Ninth Circuit has said it overruled. Each is addressed in turn.

65.    Before addressing those points, however, the Court should note the following. First, *Taddeo* is a chapter 13 case. Second, it only addresses whether deceleration is permitted in chapter 13. It does not address the requirement to pay default interest. Third, chapter 13 has no

---

[20] It is defaults that are "those of a kind" that are covered by Section 1124(2), not types of contract provisions, as Professor Brubaker incorrectly contends on page 5 of his article.

[21] There is even less of a basis to argue that every default rate is a penalty rate. Prof. Brubaker cites no authority for the notion that "penalty rate" includes all default rates. And interestingly, in an earlier writing, Prof. Brubaker himself concedes that "penalty" refers to an unenforceable liquidated damages provision. *See Ralph Brubaker, Paying a Default Rate of Interest to Cure Payment Defaults in a Chapter 11 Plan of Reorganization: Sweet!*, 28 Bankr. L. Letter No. 3, Mar. 2008 ("there is no reason to believe that this common-law meaning of the term 'penalty' (an unreasonably large and unenforceable liquidated damages provision) is exactly what Congress intended to codify in Code § 365(b)(2)(D).") As seen in Section 362(d)(3)(B)(ii), Congress knows how to distinguish between a "nondefault contract rate of interest" and a "penalty rate" so its reference to a "penalty rate" in Section 365 cannot be synonymous with default rate or Congress would have used the term "default rate." Case law confirms that Section 365(b)(2)(D) does not apply to all default rates. *See In re Phoenix Bus. Park Ltd. P'ship*, 257 B.R. 517, 521 (Bankr. D. Ariz. 2001) ("Thus, if a default interest rate is a 'penalty rate,' then it does not need to be paid as part of section 1123(2) cure. Here, the Court has little difficulty concluding that a default rate of 24%-- against a contract rate of 10.75% . . . should be construed as 'penalty rate[s]' within the meaning of the statute."; see also *In re Sweet*, 369 B.R. 644, 650 (Bankr. D. Colo. 2007) (citing *Phoenix Business Park* and noting "that even under the reasoning employed in *Entz-White*, if a default rate is not considered a penalty, default interest may nevertheless be appropriate to effectuate a § 1124(2)(A) cure."). And, this accords with the Presumption of Consistent Usage Canon.

[22] Chapter 13 cases are different in fundamental ways from Chapter 11 cases. *See*, e.g., *In re Johnson*, 279 B.R. 218 (Bankr. M.D. Tenn. 2002) (comparing differences between chapter 11 and chapter 13 plan and noting differences including voting, length of time an average case is pending, discharge, and other fundamental differences).

1124(2) equivalent (Section 1124(2) addresses unimpairment, a concept not applicable under chapter 13 because there is no plan voting in chapter 13) and thus *Taddeo* has no applicability to the issue the Court has instructed the parties to address. Thus, *Taddeo* cannot be precedent on how to construe 1124(2). Fourth, Section 1123(d) was enacted after *Taddeo*. As 1123(d) legislatively overruled the Supreme Court case of *Rake v. Wade*, 508 U.S. 464 (1993), any similar implication in *Taddeo* to the overruled Supreme Court case of *Rake, supra*, is and necessarily would be overruled.

<u>The Debtor's Taddeo Fallacy</u>

66.    The Debtor grossly misstates the applicability of *Taddeo* in this case. The Debtor concludes that *Taddeo*:

> "represents controlling Second Circuit law that should be considered the most authoritative source for this Court on the issues at hand. In other words, until unequivocally reversed and vacated by the Bankruptcy Code or the Supreme Court of the United States in a subsequent case addressing these legal issues, debtors in the Second Circuit seeking to "cure" its obligations to a secured creditor in furtherance of reinstatement of a loan under section 1124(2) without the payment of default interest should continue to be guided by Taddeo." (¶ 23 of Debtor's MOL).

67.    The Debtor, of course, does not explain to the Court why *Taddeo*, a case that does not address the issue at hand, can be precedent on that issue.

68.    As a preliminary matter, it is interesting to note, and to its credit, the Debtor does not simply say, that *Taddeo* is binding precedent and leave it at that (because it is not). Rather, the Debtor spends page upon page explaining *Taddeo*'s purported coordinated interplay within some kind of integrated structure in the development of the caselaw. Generally speaking, when a party needs pages and pages to explain a case that is asserted to be binding precedent, it implicitly recognizes that it is not actually binding precedent.

162347584.1

69.    The following section outlines how *Taddeo* has been treated on the issue of default interest in a Chapter 11 cases, in both this district and throughout the country.

70.    Starting right here in the S.D.N.Y., former Judge Hardin concluded in *In re 139-141 Owners Corp.*, 306 B.R. 763, 768 (Bankr. S.D.N.Y.)[23] that:

i.    "There is not a single reference in Taddeo to default interest rates, nor is there any suggestion that Section 1124(2) could be construed to modify contractual interest rates in addition to a contractual acceleration provision."

ii.    "Nothing in the statute provides expressly or by implication that a debtor has the power to avoid or vitiate a secured creditor's contractual right to default interest by complying with the four subdivisions of Subsection (2). Subsection (2) on its face is concerned only with a contract provision requiring "accelerated payment" upon a default, and the statute permits the debtor to de-accelerate and reinstate the pre-default maturity of the loan only if the plan (D) "does not otherwise alter" the secured creditor's contractual rights."

71.    Moving across the river to the E.D.N.Y, Judge Stong also addressed the default interest issue just several years ago in *In re Moshe*, 567 B.R. 438, 444-446 (Bankr. E.D.N.Y. 2017).

a.    While the Debtor does not cite Judge Hardin's opinion, it does cite Judge Stong's opinion, but concludes "it cannot be seriously considered as persuasive authority in the Second Circuit." Debtor MOL at ¶ 31.  The Debtor, of course, offers no actual justification why this is so.

b.    Yet, the Debtor appears to reach that conclusion by criticizing Judge Stong's cite to *New Investments* (which is just a part of her analysis) and then writing off the entire balance of Judge Stong's opinion – all without any analysis of its own.  By contrast, Judge Stong wrote that "[c]ourts interpreting Section 1123(d) have held that the underlying loan agreement and state law determine whether a debtor must cure using the default rate of interest in a Chapter 11 plan."

---

[23] *Aff'd in part, vacated in unrelated part, remanded*, 313 B.R. 364 (S.D.N.Y. 2004).

c.  Judge Stong rejected the argument that Section 1124(2) allows reinstatement with a non-default interest rate, finding that "a debtor cannot disregard Section 1123(d) and cure a default under Section 1124(2) by paying the arrears at the non-default rate of interest."

d.  The Debtor also fails to cite Judge Gropper's decision in *In re General Growth Properties, Inc.*, 451 B.R. 323 (Bankr. S.D.N.Y. 2011).  That case addressed a note containing a provision that a bankruptcy filing was an event of default, which triggered default interest.

e.  Judge Gropper rejected a narrow interpretation of Section 1123(d) and concluded default interest was warranted.  He also found that the note was not an executory contract or unexpired lease and that neither party even made such an argument.

f.  Judge Gropper did not even need to address *Taddeo* to reach his conclusion, further demonstrating its inapplicability.[24]

72.    While there is no doubt that a Second Circuit case on point would be binding on this Court, it is worth noting that the Fifth Circuit came to the opposite conclusion in *Grubbs* (like *Taddeo* decided 40 years ago prior to the enactment of the relevant statutes) finding *Taddeo* "ignores the plain meaning of the lucid words of the statute."  *Grubbs v. Houston First Am. Sav. Ass'n*, 718 F.2d 694, 699 (5th Cir. 1983), *on reh'g*, 730 F.2d 236 (5th Cir. 1984).

73.    The Lender respectfully submits that this Court should take pause when the Debtor concludes that Judge Hardin, Judge Stong and Judge Gropper are all wrong in their analysis which is all post enactment of the relevant statues.

Entz White

---

[24] Note that *General Growth* is a solvent debtor case.  Whether that is the case here remains to be seen.

162347584.1

74.    Like *Taddeo*, the Debtor does only a rudimentary analysis of *Entz White*. Predictably, the Debtor gives great weight to *Entz White* and Professor Brubaker's law review, because that is all they really have.[25]

75.    The Ninth Circuit, the very court that issued *Entz White* in 1988, clearly overruled its 2016 decision in *New Investments*.

76.    As expected, the Debtor takes great pain to find that *New Investments* did not overrule Entz White (or otherwise its arguments go up in flames). Below are the main reasons the Debtor cites for why *New Investments* does not overrule *Entz White* and the Lender's brief responses:

a.    The decision was a "few short pages." Debtors MOL at ¶ 26.  But overruling a case that has been abrogated by statute does not take many pages.

b.    *New Investments merely* "muddied the waters."  Debtors MOL ¶ 25.  The Ninth Circuit's holding says the opposite - "[w]e conclude that Pacifica (the lender) is entitled to receive payment of the loan at the post-default interest rate."  *New Investments* at 1142.

c.    There was a strong dissent in *New Investments*.  Debtors MOL ¶ 30. Dissents are often strong but never binding.

d.    *New Investments* is not a precedential opinion.  Debtors MOL ¶ 31.  That is true in the Second Circuit.  But it overrules the Ninth Circuit's own decision in *Entz White*, also a non-precedential opinion, which is one of the two main cases on which the Debtor

---

[25] In FN 5 and 6 of the Debtor's MOL, the Debtor cites to Professor Brubaker's biography and states they are "tempted to essentially cut and paste every single line from Professor Brubaker's two instructive articles (totaling 29 printed pages into this Memorandum of Law)."  Judges Hardin, Stong, Gropper and Feller, however, all have issued decisions that in substance reject Prof. Brubaker's contentions, as have courts throughout the country.

162347584.1

relies.  So, one of the Debtor's two leading cases was overruled by the very court that issued it.

e.   The *New Investments* decision suffers from a "weak analysis" and shows "neglect." Debtors MOL ¶ 25.  But it overrules *Entz White*, on which Debtor and Professor Brubaker are relying.

f.   The Ninth Circuit "negligently" disregarded the impetus for the 1994 amendments. That argument is desperation.  The Debtor's analysis has it backwards.  The case law consistently notes that Congress legislatively overruled the Supreme Court's *Rake v Wade* decision.  Congress further added language similar to Section 1322(e) (that overrode *Rake v Wade*) by adding Section 1123(d) (compelling the same result in chapter 11 cases as in chapter 13 cases going forward after the overruling of the Supreme Court).

## IV.   <u>Conclusion</u>

Section 1123(d) requires payment of default interest when a debtor cures.  A debtor may decelerate and render a lender unimpaired, but only by curing.  That requires payment of default interest.  Section 365(b)'s carveouts from defaults required for cure that renders unimpaired are all nonmonetary defaults.  Canons of statutory construction applied to the ordinary reading of Section 365(b)(2)(D) prevent the conclusion that Congress has permitted debtors to avoid default interest and deny lenders votes on the plans that deny them default interest.  The Nationwide Caselaw, the SDNY and EDNY Caselaw and supporting authorities cited herein demonstrate default interest must be paid in order to confirm the Debtor's plan.  Accordingly, as currently drafted, the Debtor's plan is unconfirmable.

Respectfully submitted,

PERKINS COIE LLP

By: */s/ Gary F. Eisenberg* _____

    Gary F. Eisenberg
    1155 Avenue of the Americas, 22nd
    Floor
    New York, New York 10036-2711
    Telephone: 212.262.6900
    Facsimile: 212.977.1649
    GEisenberg@perkinscoie.com

    *Attorneys for Wilmington Trust, National
    Association, as Trustee for the benefit of
    the Registered Holders of Commercial
    Mortgage Pass-Through Certificates
    Series 2018-C6, Wells Fargo
    Commercial Mortgage Trust 2018-C47,
    Commercial Mortgage Pass-Through
    Certificates, Series 2018-C47 And
    CSAIL 2018-C14 Commercial Mortgage
    Trust, Commercial Mortgage Pass-
    Through Certificates, Series 2018-C14
    and as authorized representative for HI
    FIDI B Note Owner LLC*

162347584.1