**HEARING DATE: JULY 6, 2023**
**HEARING TIME: 10:00 A.M.**

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Golden Seahorse LLC*
*dba Holiday Inn Manhattan Financial District*
*Debtor and Debtor-in-Possession*
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
Scott S. Markowitz, Esq.
Rocco A. Cavaliere, Esq.
smarkowitz@tarterkrinsky.com
rcavaliere@tarterkrinsky.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:

GOLDEN SEAHORSE LLC
dba Holiday Inn Manhattan Financial District,[1]

Debtor.
-----------------------------------------------------------x

Chapter 11

Case No. 22-11582 (PB)

**DEBTOR'S REPLY TO SECURED LENDERS' MEMORANDUM OF LAW IN
OPPOSITION TO THE DEBTOR'S MEMORANDUM OF LAW IN AID OF
CONFIRMATION OF DEBTOR'S PLAN SEEKING REINSTATEMENT OF A
LOAN BETWEEN DEBTOR AND PREPETITION LENDERS UNDER THE
RELEVANT PROVISIONS OF THE BANKRUPTCY CODE**

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Golden Seahorse LLC*
*Debtor and Debtor in Possession*

Scott S. Markowitz, Esq.
Rocco A. Cavaliere, Esq.
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000

---

[1] The Debtor's last four digits of its tax identification number are 4770. The Debtor's principal place of business is 99-103 Washington Street, New York, New York.

## TABLE OF CONTENT

PRELIMINARY STATEMENT ........................................................................................................... 1

STATEMENT OF RELEVANT FACTS ......................................................................................... 1

LEGAL ARGUMENT IN SUPPORT OF REPLY TO OPPOSITION ........................................... 2

    A.    The Secured Lenders Incorrectly Apply Their Selected Canons  of Construction To Their Selected Statutory Sections When Convenient ................................................................................. 3

    B.    The Secured Lenders Do Not Meaningfully Distinguish the Cases Cited in the Debtor's MOL ....... 14

CONCLUSION ............................................................................................................................... 16

089271\1\170263442.v2

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

In re 139-141 Owners Corp.,
306 B.R. 763 (Bankr. S.D.N.Y. 2004)...........................................................................8

In re Adejobi,
404 B.R. 78 (Bankr. E.D.N.Y. 2009) ......................................................................8, 14

In re American Express Anti-Steering Rules Antitrust Litigation,
361 F.Supp.3d 324 (S.D.N.Y. 2019) ............................................................................8

Bank of America Nat'l Trust and Savings Assoc. v. 203 North Lasalle Street Partnership,
119 S. Ct. 1411 (1999) ..................................................................................................5

Bank of America v. Brooklyn Carpet Exch., Inc.,
2016 W.L. 8674686 (S.D.N.Y. May 13, 2016) ............................................................7

In re Bankvest Capital Corp.,
360 F.3d 291 (1st Cir. 2004)........................................................................................13

Chickasaw Nation v. United States,
534 U.S. 84 (2001) ........................................................................................................5

In re Claremont Acquisition Corporation, Inc.,
113 F.3d 1029 (9th Cir. 1997).....................................................................................13

Colonial Realty Corp. v. MacWilliams,
381 F.Supp. 26 (S.D.N.Y. 1974) ..................................................................................8

Connecticut Nat. Bank. V. Germain,
503 U.S. 249 (1992) ................................................................................................5, 12

Dodge v. County of Orange,
282 F.Supp.2d 41 (S.D.N.Y. 2003) ..............................................................................8

In re Empresas Omajede Inc.,
537 B.R. 63 (Bankr. D. P.R. 2015)................................................................................7

In re Enron Corp.,
379 B.R. 425 (S.D.N.Y. 2007) ................................................................................4, 12

Facebook Inc. v. Duguid,
141 S. Ct. 1163 (2021) ..............................................................................................6, 7

In re Fairfield Sentry Litigation Ltd.,
458 B.R. 665 (S.D.N.Y. 2011) ....................................................................................12

Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.,
554 U.S. 33 (2008) ........................................................................................................5

089271\1\170263442.v2

In re Frontier Airlines,
    Case No. 20-22476, Dkt. No. 905 ........................................................................................10

In re General Growth Properties, Inc.,
    451 B.R. 323 (Bankr. S.D.NY 2011)...............................................................................7, 14

Hepner v. PWP Golden Eagle Tree LLC (In re K&J Props., Inc.),
    338 B.R. 450 (Bankr. D. Colo. 2005).................................................................................15

In re I Ashbury Court Partners, L.L.C.,
    2011 WL 4712010 (Bankr. D. Kan. 2011) .........................................................................15

INS. V. Nat'l Ctr. For Immigrants Rights, Inc.,
    502 U.S. 183 (1991) ...........................................................................................................13

In re Johnson,
    184 B.R. 570 (Bankr. D. Minn 1995)...................................................................................7

In re Johnston,
    2004 WL 3019472 ...............................................................................................................16

Levy v. Forest Hills Assocs. (In re Forest Hills Assoc.),
    40 B.R. 410 (Bankr. S.D.N.Y. 1984)...................................................................................8

In re Liberty Warehouse Assoc.,
    220 B.R. 546 (Bankr. S.D.N.Y. 1998).................................................................................15

Merit Management Group LP v. FTI Consulting Inc.,
    138 S. Ct. 883 (2018) .........................................................................................................11

In re Moody Nat'l SHS Houstin H, LLC,
    426 B.R 667 (Bankr. S.D. Tex. 2010) ...............................................................................15

In re Moshe,
    567 B.R. 438 (Bankr. E.D.NY. 2017) .............................................................................7, 14

Nielsen v. Preap,
    139 S. Ct. 954 (2019) ...........................................................................................................5

In re Phoenix Business Park Ltd. P'Ship,
    257 B.R. 517 (Bankr. D. Ariz. 2001)...........................................................................11, 13

In re PPI Enterprises (US) Inc.,
    324 F.2d 197 (3d Cir. 2003) ...............................................................................................12

Robinson v. Shell Oil Co.,
    519 U.S. 337 (1997) .............................................................................................................4

In re Sagamore Partners, Ltd.,
    620 F. App'x 864 (11th Cir. 2015)....................................................................................15

In re Se Com,
    81 B.R. 587-590 (BAP 9th Cir. 1987)..................................................................................7

089271\1\170263442.v2

In re Sweet,
    369 B.R. 644 (Bankr. D. Colo. 2007).....................................................................................15

In re Taddeo,
    9 B.R. 299 (Bankr. E.D.N.Y. 1981) .......................................................................................9

**Other Authorities**

Bankruptcy Reform Act of 1994, Pub. L. 103-394, 108 Stat. 4106...................................................13

H.R. No. 103-835 (1994)...............................................................................................................13

Ralph Brubaker, *Default Rates of Interest and Cure of a Defaulted Debt in a Chapter 11 Plan of*
    *Reorganization (Part II): Entz-White and the Penalty Rate Amendments*, 37 No. 1 BLL-NL...........passim

The Law of Interpretation, 130 Harv. L. Rev. 1079, 1125 (2017)......................................................6

089271\1\170263442.v2

Golden Seahorse LLC, the above-captioned debtor and debtor-in-possession (the "Debtor") respectfully submits this reply ("Reply") to (1) Secured Lenders'[2] opposition (the "Opposition") to the *Debtor's Memorandum of Law In Aid of Confirmation of Debtor's Plan Seeking Reinstatement of a Loan Between Debtor and Prepetition Lenders Under the Relevant Provisions of the Bankruptcy Code* (the "Debtor's MOL").

## PRELIMINARY STATEMENT

1.      The Opposition hinges most of its argument on this Court finding the Secured Lenders' specifically selected "canons of construction" dictate that a secured lender that called a monetary default as well as nonmonetary defaults is automatically entitled to "default interest" under section 1123(d) because all other sections of the Bankruptcy Code, including sections 1124(2) and 365(b)(2)(D) should either be ignored or be read in the manner dictated by the Secured Lenders.  The Secured Lenders' position is not meaningfully supported by any binding or persuasive case law authority, scholarly articles, references to the purposes and objectives of the Bankruptcy Code or to legislative history surrounding the Bankruptcy Code and subsequent amendments thereto.  For these reasons, amongst others, as more fully set forth in this Reply and the Debtor's MOL, the Court should determine the Debtor need not cure the Default Interest/Fees (aggregating almost $20 million) in accordance with the Debtor's reinstatement plan.

## STATEMENT OF RELEVANT FACTS

2.      On April 18, 2023, the Court held a hearing (the "Exclusivity Hearing") on the Debtor's Exclusivity Motion and the Lenders' Motion to terminate exclusivity.

---

[2] All capitalized terms not otherwise defined herein, shall have the meaning ascribed to such terms set forth in the Debtor's MOL [ECF Dkt. No. 121].

Thereafter, the Court entered the Exclusivity Order, granting, in part, the Debtor's Exclusivity Motion, which, among other things, established a briefing schedule. As set forth in the Debtor's briefing in connection with the foregoing motions, and the transcript of the Exclusivity Hearing, a copy of which is annexed hereto as **Exhibit "A"**, aside from the reinstatement issues set forth in Part I of the Debtor's MOL, the Debtor included legal arguments related to the issues in Part II, which included state law defenses and "equitable considerations" that may apply to the legal issues at hand. <u>See</u> Exclusivity Hearing Transcript, pp. 21:5 to 21:11 ("we will be making some COVID arguments").

3.      By letter dated May 18, 2023, the Secured Lenders wrote the Court suggesting that Part II of the Debtor's MOL "appears to contain nearly a dozen defenses that are unrelated to relevant provisions of the Bankruptcy Code" and "are not what the Court instructed the parties to address". The Court endorsed the May 18, 2023 letter [Dkt. No. 125], limiting briefing on Part I of the Debtor's MOL. While the Debtor respectfully disagrees with the deferral of these related issues, as per the Court's instructions, the Debtor will address Part II at a later date.[3]

4.      The Debtor respectfully refers the Court to the Debtor's MOL for additional background in connection with the hearing on July 6, 2023 (the "<u>Hearing</u>").

## <u>LEGAL ARGUMENT IN SUPPORT OF REPLY TO OPPOSITION</u>

5.      In light of the Court's 15-page limitation, the Debtor will be brief in this Reply in responding to the main arguments in the Opposition, and to the extent necessary,

---

[3] Curiously, the Secured Lenders want this Court to focus solely on section 1123(d) for the proposition that default interest is permitted under New York law but they failed to cite the operative New York law or refer to the loan agreement sections that give them rights to default interest and when payment is required in event of default. Any rights to default interest, if they do exist after adjustment by the reinstatement provisions under the Bankruptcy Code, remain subject to state law defenses, to which all rights are reserved.

2

looks forward to supplementing its analysis at the Hearing.

**A.      The Secured Lenders Incorrectly Apply Their Selected Canons
of Construction To Their Selected Statutory Sections When Convenient**

6.      At the Exclusivity Hearing, this Court remarked that Professor Brubaker's
article titled *Default Rates of Interest and Cure of a Defaulted Debt in a Chapter 11 Plan
of Reorganization (Part II): Entz-White and the Penalty Rate Amendments*, 37 No. 1 BLL-
NL ("<u>Brubaker Part II</u>") was "quite persuasive", further indicating that Professor Brubaker
did a "very rigorous job of addressing the statute" and "his analysis is hard to brush aside".
<u>See</u> Exclusivity Hearing Transcript, pp. 12:14 to 13:4.  This Court was correct as Professor
Brubaker went through an exhaustive analysis of the Bankruptcy Code's plan reinstatement
provisions, and cited to <u>numerous</u> reasons supporting his analysis, including one isolated
reason, *i.e.* certain canons of construction supported his thoughtful position.[4]  It is puzzling,
to say the least, that notwithstanding the significant case law in the Debtor's MOL and all
of the analysis set forth in all of the scholarly articles cited by the Debtor, the Opposition
expends a full 13 pages on the Secured Lenders' tortured interpretation and application of
various canons of construction, unilaterally concluding (without case law support) they are
more "competent drafters" than Professor Brubaker or Congress.[5]  Unfortunately for the
Secured Lenders, a close review of these statutory construction tools reveals the Secured
Lenders have figuratively shot themselves with those same "canons" that have caused

---

[4] Brubaker Part II was cited in the Debtor's Reply in connection with its Exclusivity Motion.  The Debtor's
MOL also cited to Professor Brubaker's first article ("<u>Brubaker Part I</u>") and many other law review articles,
including from Professor Klee.  The Opposition does not address those other articles and is singularly
focused on convincing this Court that it was wrong for it to state that Brubaker Part II was "quite persuasive".
[5] Notably, the Secured Lenders went so overboard in their interpretation of the "canons of construction", that
they needed to supplement their "legal analysis" in various "charts" annexed to the separate "Declaration" of
Gary Eisenberg, in which they unilaterally added more pages to their 25 page memorandum of law limit
under the Court's Chambers' Rules, thereby providing lip service to the "plain meaning" of Chambers Rules.

"destruction" to their legal position.

7.      The Secured Lenders seek to apply certain canons of construction to §
1123(d), while applying other canons of construction to §§ 365(b)(2) and 1124(2) and
when it suits their purposes, the Secured Lenders wish to get into the statutory purpose of §
365(b)(2) (i.e. it is an executory contract section) in isolation from §§ 1124(2) and
1123(d).[6]  This is not appropriate.  "The Court must read the Bankruptcy Code as a whole,
taking care that it does not construe any provision "in a manner that would place it in
conflict with other provisions." See In re Enron Corp., 379 B.R. 425, 432 (S.D.N.Y. 2007)
(statutes should be interpreted to avoid untenable distinctions and unreasonable results
whenever possible), citing Auburn Hous. Auth, v. Martinez, 277 F.3d 138, 144 (2d Cir.
2002) ("statutory construction is a holistic endeavor…[T[he preferred meaning to a
statutory provision is one that is consonant with the rest of the statute"); see also Robinson
v. Shell Oil Co., 519 U.S. 337, 341 (1997) (evaluating term "employee" in § 704(a) of
Civil Rights Act by analyzing, among other things, "the specific context in which the
language is used and the broader context of the statute as a whole"). While page limitations
prevent the Debtor from going through each and every one of the ten selected canons of
construction (out of the 57 canons identified in Reading Law), the Debtor will address
some of them in this Reply (and, if necessary, at oral argument) but is otherwise confident
the Court will be able to easily sift through the Secured Lenders' favored canons, which
are themselves merely tools and are subject to many interpretations. See Exclusivity

---

[6] The Secured Lenders make other unsupportable statements without guidance from any court, including
sentences such as "In 1994, as explained above, Congress amended the Bankruptcy Code to add Section
1123(d) which requires the payment of default interest as part of the amount required to cure any debt" See
Opposition, ¶ 28 (emphasis added).  Of course, section 1123 does not refer to "default interest" at all.

Hearing Transcript, p. 12:24–13:1 (Judge Bentley: "I've done a lot of construing statutes in my time…And I think [Brubaker] does a very rigorous job of addressing the statute"). In short, the Court should read the statute as a whole (and holistically) and not in the labored manner set forth in the Opposition.

8.      As the Supreme Court has repeatedly indicated, "[c]anons of construction are no more than rules of thumb that help courts determine the meaning of legislation." See Connecticut Nat. Bank. V. Germain, 503 U.S. 249, 253 (1992); Chickasaw Nation v. United States, 534 U.S. 84, 94 (2001) ("the canons are not mandatory rules…and other circumstances evidencing congressional intent can overcome their force").

9.      Importantly, while the Secured Lenders present all of these canons of construction as though, once applied, they are very straightforward, this is simply not true. Indeed, statutory construction arguments often lead to conflicting opinions from many judges, including numerous Supreme Court cases in which there are majority, concurring and dissenting opinions, each with their own view of statutory construction. See Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc., 554 U.S. 33, 58 (2008) (Breyer, dissenting) ("I think the statute supplies a clear enough rule – transfers are exempt when there is confirmation and are not exempt when there is no confirmation. And I see no reason to adopt the majority's preferred construction (that only transfers completed after plan confirmation are exempt), where it conflicts with the statute's purpose"); see Bank of America Nat'l Trust and Savings Assoc. v. 203 North Lasalle Street Partnership, 119 S. Ct. 1411 (1999) (addressing the new value corollary to codification of the absolute priority rule with a concurring opinion and separate dissenting opinion); see e.g. Nielsen v. Preap, 139 S. Ct. 954 (2019) (containing a plurality opinion, several concurring opinions and a

dissenting opinion, with different views on the canons of interpretation).

10.    The Secured Lenders quote extensively from Reading Law, a book authored by Justice Scalia and Bryan Garner.  However, this book is not the only authoritative source for statutory construction principles, with some courts and scholars questioning its utility in all cases.  For instance, one of the canons discussed at length in the Opposition is the "series-qualifier canon," which is cited by the Secured Lenders in support of its interpretation of section 365(b)(2)(D).[7]  As Justice Alito stated in a recent case, "canons are useful tools, but it is important to keep their limitations in mind. This may be especially true with respect to the particular canon at issue here, the series-qualifier canon". Facebook Inc. v. Duguid, 141 S. Ct. 1163, 1173 (2021) Justice Alito also cautions about the limitations on the "series-qualifier canon" by Reading Law itself, which may have created the canon in the first place:[8]

> [Reading Law] goes out of its way to emphasize the limitations of the series-qualifier canon, warning 'perhaps more than most of the other canons [the series-qualifier canon] is highly sensitive to context. Often the sense of the matter prevails: 'He went forth and wept bitterly does not suggest he went forth bitterly', citing Reading Law, p 150…
>
> The strength and validity of an interpretive canon is an empirical question, and perhaps someday it will be possible to evaluate these canons by…an

---

[7] A simple search of Westlaw's database of lower court bankruptcy cases reveals only four bankruptcy cases in the entire country that have even mentioned the words "series-qualifier canon".  Meanwhile, to illustrate how infrequently bankruptcy courts apply the other canons that were identified by the Secured Lenders, research reveals (i) the surplusage canon was cited in just eight bankruptcy cases, (ii) the associated words canon in just five bankruptcy cases, (iii) the scope-of-subparts canon in one bankruptcy case, (iv) the harmonious reading canon in nineteen bankruptcy cases, (v) the omitted-case canon in three bankruptcy cases, (vi) the presumption of consistent usage in three bankruptcy cases, (vii) the subordinating-superordinating canon and the unintelligibility canon were cited in no bankruptcy cases, and (viii) the absurdity doctrine is cited in fifteen bankruptcy cases. Importantly, in none of these bankruptcy cases, has a court applied any of these canons in disagreement with the Debtor's position and Professor Brubaker's thoughtful analysis on the actual statutory provisions at hand.

[8] Justice Alito indicated "some scholars have claimed that "nobody proposed [the series qualifier] canon until Justice Scalia pioneered it" in Reading Law. Facebook, 141 S. Ct. at 1175, fn. 8, citing Baude & Sachs, The Law of Interpretation, 130 Harv. L. Rev. 1079, 1125 (2017).

analysis of how particular combinations of words are used in a vast database of English prose…if the series qualifier canon were analyzed in this way, I suspect we would find that series qualifiers sometimes modify all the nouns or verbs in a list and sometimes modify just the last noun or verb".

Facebook, 141 S. Ct. at 1173 to 1175. The Secured Lenders' version of the application of the series-qualifier canon to the "penalty rate" or "penalty provision" language in section 365(b)(2)(D) is incorrect. Professor Brubaker, who is well qualified to interpret statutes, made clear in his articles that "penalty rate" in section 365(b)(2)(D) can be interpreted to mean that default interest need not be paid, and that such phrase (i.e. "penalty rate")[9] is not limited to executory contracts or to nonmonetary defaults.[10]

11.   At the Exclusivity Hearing, while noting it had not made up its mind, the Court indicated that Brubaker Part II was "quite persuasive". After unconvincingly attempting to tackle only a portion of Professor Brubaker's thorough analysis, the Secured Lenders suggest this Court should follow in lockstep with four former and current "colleagues" that purport to support the Secured Lenders' view, even though none of these cases closely analyzed the §§ 365(b)(2), 1124(2) and 1123(d) statutory interplay. See In re Moshe, 567 B.R. 438 (Bankr. E.D.N.Y. 2017) (Judge Stong); In re General Growth

---

[9] Although the phrase "default rate" is now more commonly used, "penalty rate" was in common usage, including in credit documents, as a synonym through the 1990s when Congress enacted section 365(b)(2)(D). See e.g., In re Se Com,81 B.R. 587-590 (BAP 9th Cir. 1987); In re Johnson, 184 B.R. 570 (Bankr. D. Minn 1995); Rev Model Simplified Indenture at 1184, The Business Lawyer, Col 55, No. 3 (May 2000) ("while indentures generally provide for interest on overdue principal…at the pre-default rate…If used, a penalty rate may better be placed in the Indenture"). Nuveen Senior Income Fund, Reg Stmt. at p. 33 (Form N-2/A) (Sept. 7 1999), pdf.secdatabase.com/1321/0000950131-99-005444.pdf ("penalty rate" may be incurred upon certain events of default). Even today, the phrase "penalty rate" can have the same meaning. See Bank of America v. Brooklyn Carpet Exch., Inc., 2016 W.L. 8674686 at *5 (S.D.N.Y. May 13, 2016) (referring to default rate generically as "penalty rate"); In re Empresas Omajede Inc., 537 B.R. 63, 90 (Bankr. D. P.R 2015) (same).

[10] Professor Brubaker does not have a stake in the outcome of this matter or does he generally interpret statutes in favor of the debtor. Indeed, very recently, Professor Brubaker submitted an Amicus Brief before the Second Circuit against the debtors in Purdue Pharma, arguing that nonconsensual non-debtor releases should not be permitted. In short, Judge Brubaker is correct in his objective and straight-forward analysis and application of the series-qualifier and surplusage canons in support of the interpretation that "penalty rates" such as default interest need not be paid in connection with reinstatement.

7

Properties, Inc., 451 B.R. 323 (Bankr. S.D.NY 2011) (Judge Gropper); In re 139-141 Owners Corp., 306 B.R. 763 (Bankr. S.D.N.Y. 2004) (Judge Hardin); In re Adejobi, 404 B.R. 78 (Bankr. E.D.N.Y. 2009) (Judge Feller) (defined by the Secured Lenders as the "SDNY and EDNY Caselaw"). Of course, there is no statutory canon of construction or related principle the Secured Lenders rely on to support the view the SDNY and EDNY Caselaw is "authoritative" on issues they did not even address. The Debtor has gone through each of the briefs in each of those cases and in none of them, do the parties have the benefit of the Brubaker articles nor do the debtors in those cases identify as a potential argument the fact that 1124(2) excludes from a cure the defaults "of the kind" noted in section 365(b)(2), which include "penalty rates".  Indeed, the Secured Lenders want this Court to conduct a counting exercise of former and current jurists from this district and a nearby district, even though such jurists made decisions without a full record and based on unique facts.  However, if this Court were so arbitrary, it would be neglecting to follow the guidance of the Second Circuit in Taddeo, as well as numerous other former "colleagues" in the Southern District of New York, including, among others Judge Lifland, who most practitioners and historians would agree is one of the most influential bankruptcy judges to have graced the bench since the 1978 enactment of the Bankruptcy Code.[11]  See Levy v. Forest Hills Assocs. (In re Forest Hills Assoc.), 40 B.R. 410, 414 (Bankr. S.D.N.Y. 1984) (Judge Lifland) (noting that "although Taddeo involved a chapter 13 debtor, the Second

---

[11] If properly analyzed, decisions from sister courts are indeed quite persuasive; however, they are not binding.  On the other hand, decisions by the Second Circuit, even if the bankruptcy court disagrees with the reasoning therein, must be followed as a result of the doctrine of *stare decisis*. See In re American Express Anti-Steering Rules Antitrust Litigation, 361 F.Supp.3d 324, 337 (S.D.N.Y. 2019) (The doctrine *of stare decisis* compels a district court to abide by the legal decisions of higher courts in the same jurisdiction); Dodge v. County of Orange, 282 F.Supp.2d 41, 80 (S.D.N.Y. 2003) (same); see also Colonial Realty Corp. v. MacWilliams, 381 F.Supp. 26, 28 (S.D.N.Y. 1974) (same).

089271\1\170263442.v2

Circuit Court of Appeals likened section 1322(b) to section 1124" and applying <u>Taddeo</u>'s

principles to a debtor's proposed cure under chapter 11); <u>see e.g.</u> <u>In re Taddeo</u>, 9 B.R. 299

(Bankr. E.D.N.Y. 1981) (Judge Parente). But perhaps even more compelling is that Judge

Drain, also a very well respected recently retired judge, was well aware of the Brubaker

articles and, eerily similar to this Court's instincts, at a disclosure statement hearing in the

<u>Frontier Airlines</u> case, Judge Drain made the following statements:

> The parties have briefly addressed already the issue on interest in connection with an unimpairment plan. **And what neither party has focused on yet – and what, to me, is somewhat incomprehensible, no courts appear to have focused on either - - is 1124(2)(a)**,[12] so you all should be thinking about that.

> And you might want to look at a couple of articles by **Professor Brubaker** that appear in 36, Bankruptcy Law Letter No. 12, and 37, Bankruptcy Law Letter No. 1, both deal with default rates of interest and cure of a defaulted debt in a chapter 11 plan and the penalty rate amendments.

> I'm sure you're aware of all the cases; you've addressed them, many of them already, **but you haven't addressed that issue because the cases haven't.** They've addressed (b), and they've addressed the notion on ipso facto generally as Judge Gropper did in 39-141 Owners Corp and noted that 365 doesn't apply in 1129. **But apparently, no one pointed out to them that it actually appears in 112[4](2)(a).**

> So I think, as far as focusing on the hearing coping up, that's the only suggestion I would have to the parties, not that I've made up my mind on it, but that they should address it…**And, of course, 1123(d) doesn't reference 1124**.

<u>See</u> Frontier Airlines Transcript, pp 78:14 – 79.16 (emphasis added), the relevant

provisions of which are annexed hereto as **Exhibit "B"**.

     12.    In other words, while it was not a reported decision, the transcript makes

---

[12] There appear to be some typos to statute sections in the transcript.

clear Judge Drain was well aware of the EDNY and SDNY Case Law the Secured Lenders are now advancing, and he was not persuaded with their analysis, calling on the parties to address the issues raised by Professor Brubaker in further briefing. Ultimately, after the disclosure statement hearing in that case, the Frontier Debtors and the first lien and second lien creditors entered into a successful mediation with former Judge Chapman as mediator, to resolve the foregoing creditors' potential rights to (i) make whole premiums aggregating over $463 million, (ii) default interest of $78 million, and (iii) cost savings of about $100 million on a forced refinancing, which in total aggregated over $641 million. Tellingly, the Frontier Debtors resolved the dispute with a payment of just $57.5 million, subject to a $7.5 million increase if the plan Effective Date was extended for more than 6 months from confirmation.[13]  Had the matter not been settled,  Judge Drain would have been the very first judge to have addressed the Brubaker article and likewise, the interplay of sections 365(b)(2), 1124(2) and 1123(d) with a full backdrop of the purposes of the Bankruptcy Code, among other things.[14]  Now this Court has that privilege.

13.    It is important to see what 1123(d) does not contain, and Judge Drain spotted it at the end of his colloquy when addressing the parties in the <u>Frontier</u> case.  The preamble to 1123(d) reads, "notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, before going on to say "if it is proposed in a

---

[13] In connection with the briefing on the Exclusivity Motion, the Debtor requested the Secured Lenders consider mediation to attempt to settle the dispute over the payment of default interest and related fees but the Secured Lenders declined.

[14] In  <u>Frontier Airlines</u>, the default was on account of the filing of the bankruptcy case. Before settlement, the Debtor planned to deny any default interest retroactive to the petition date, the date of the default.  However, the same arguments maintained herein, pertaining to the Brubaker analysis, and the continued vitality of <u>Taddeo</u> and <u>Entz-White</u> and their retroactive nullification of a default as of the date thereof were made by the Frontier unsecured noteholders, and as such, the Court may take judicial notice of the similar arguments made therein. <u>See</u> In re Frontier Airlines, Case No. 20-22476, Dkt. No. 905, pp. 29-37.

plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." Importantly, §§ 1124(2) or 365(b)(2) are not sections that are included in that list of statutory sections in the "notwithstanding phrase" in § 1123(d).  See In re Phoenix Business Park Ltd. P'Ship, 257 B.R. 517 (Bankr. D. Ariz. 2001) ("because of the conflict between sections 365(b)[4](d) and 1124(2)(A), one would expect the limiting preliminary language of section 1123(d) to include reference to one or both of those sections to make clear Congress' intent, if that intent was to overrule, rather than codify, the Entz-White line of cases").  As such, while the Secured Lenders assertion that section 1123(d) trumps sections 1124(2) or 365(b)(2), it is simply not the case, and instead, the "competent drafter and reader" must read the statute as a whole.  In contrast, had those sections been referenced in the "notwithstanding" clause, the Secured Lenders' position would carry more weight. See e.g. Merit Management Group LP v. FTI Consulting Inc., 138 S. Ct. 883, 893 (2018) (the very first clause, "Notwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(b) of this title – already begins to answer the question. It indicates that § 546(e) operates as an exception to the avoiding powers afforded to the trustee under the substantive avoidance provisions," citing Reading Law ("a dependent phrase that begins with notwithstanding indicates that the main clause that it introduces or follows derogates from the provision to which it refers").  Section 1123 does not derogate from § 1124(2).  It must be read together with it.  Courts that are subservient to § 1123(d) and do not fully analyze §§ 1124(2) and 365(b)(2) and the statute holistically reach incorrect results on

reinstatement.[15]

14.    In sum, the Secured Lenders have not properly analyzed the various canons of construction, which could easily be read in the Debtor's favor.  In a best case scenario for the Secured Lenders, these relevant reinstatement sections are ambiguous, whereby resort to legislative history for guidance would be useful.  "Whenever there is some uncertainty about the meaning of a statute, it is prudent to examine its legislative history, especially where there is "an unusual overlap [between competing statutory sections], noting that "if Congress had intended such a significant change in the scheme of appellate jurisdiction, some indication of this purpose would almost certainly have found its way into the legislative history". See Germain, 503 U.S. at 255; In re Fairfield Sentry Litigation Ltd., 458 B.R. 665, 674 (S.D.N.Y. 2011) ("where the statutory language remains ambiguous, the Court resorts to canons of construction and if the meaning still remains ambiguous, to legislative history") (citation omitted); see also Enron, 379 B.R. at 432 ("A court may depart from the plain language if literal application of the statute will produce a result demonstrably at odd with the intentions of [the statute's] drafters. Accordingly, if the statutory language is ambiguous and resort to canons of construction does not clarify the meaning, the Court may look to the legislative history…to discern Congress's intent").

15.    Of course, the Secured Lenders hope this Court stops its analysis in its tracks by simply adhering to the Secured Lenders' contrived canons of construction analysis and neglects the legislative history altogether.  Because once the Court considers

---

[15] Also, notably, "impairment" of a lender's claim by virtue of §§ 365(b)(2) and 1124(2) in the manner set forth herein is not "plan impairment" at all, but is instead "Code impairment". See e.g. In re PPI Enterprises (US) Inc., 324 F.2d 197, 204 (3d Cir. 2003) (adjustment of state law claim under § 502(b)(6)).

the legislative history and parses through the meanings and purposes of the reinstatement sections, this Court should readily conclude the Debtor's and Professor Brubaker's positions are correct.[16]  Aside from the citations in the Debtor's MOL (including the long recitation in New Investments' dissent), these excerpts are relevant:

a. The legislative history notes the title of the 1994 Amendments was "Interest on Interest", reflecting Congress's desire to overrule the Supreme Court's case in Rake v. Wade, which had ordered the payment of interest on interest, in contravention of numerous state laws, with the House Report, stating among other things, "it is the Committee's intention that a cure pursuant to a plan should operate to put the debtor in the same position as if the default had never occurred. See e.g. House Report, at p. 55;

b. Congress did not intend § 1123(d) to overhaul the rules for reinstatement of commercial loans, which is why Congress placed § 1123(d) in Title III of the Bankruptcy Reform Act, "Consumer Bankruptcy Issues" (emphasis added). Cf. INS. V. Nat'l Ctr. For Immigrants Rights, Inc., 502 U.S. 183, 189 (1991) ("the title of a statute or section can aid in resolving an ambiguity in the legislation's text");

c. The House Report to the Bankruptcy Reform Act provides: "Section 365(b) is clarified to provide that when sought by a debtor, a lease can be cured at a nondefault rate (i.e. it would not need to pay penalty rates"). 5 U.S. Congressional & Admin. News, at 3357 (1994) (H.R. No. 103-835 (1994);

d. Section 1123(d) was added in 1994 at the same time as section 365(b)(2)(D) in the Bankruptcy Reform Act of 1994, Pub. L. 103-394, 108 Stat. 4106; and

e. In 2005, Congress made it even more clear the phrase "penalty rate" stood alone. The amendment addressed the splits between In re Bankvest Capital Corp., 360 F.3d 291 (1st Cir. 2004) and In re Claremont Acquisition Corporation, Inc., 113 F.3d 1029 (9th Cir. 1997). Congress knows when to cite to Circuit court cases, when there is a split or where a Circuit Court or the Supreme Court was wrongly decided. Notably, at no point has Congress ever questioned, in 1994 or otherwise, the

---

[16] While most courts have not done an exhaustive analysis of the various provisions, In re Phoenix Business Park Ltd. P'Ship, 257 B.R. 517 (Bankr. D. Ariz. 2001) comes the closest. See Debtor's MOL, pp. 10, 15-16. As the Phoenix Business court emphasized, "in construing legislative changes to the Code, it is important to harmonize all changes made at the same time that affect the same Code sections." Id. at 520. The only way to harmonize sections 1123(d) and 365(b)(2)(D) is to recognize the division of labor between them: section 1123(d) requires a court to calculate cure amounts on the basis of non-bankruptcy law when a cure is necessary while section 365(b)(2)(D) excludes the failure to pay penalty rate interest from the kind of defaults that must be cured.  The result is that a claim can be reinstated (and its holder remain unimpaired) without paying a contractual penalty. Id. at 522.

vitality of <u>Entz White</u> and <u>Taddeo</u>.

16.     After considering the plain language of the various statutes, and reading
them as a whole, with due consideration of canons of construction and legislative history,
together with the guidance of <u>Taddeo</u> and <u>Entz-White</u> and all of the case law support in the
Debtor's MOL and this Reply, this Court should find in favor of the Debtor.

**B.      The Secured Lenders Do Not Meaningfully
          <u>Distinguish the Cases Cited in the Debtor's MOL</u>**

17.     Aside from incorrectly applying their favored canons of construction to
whichever sections of the Code worked best for their interpretation, the Secured Lenders
failed to meaningfully distinguish the numerous cases cited by the Debtor in the Debtor's
MOL.  At the same time, the Secured Lenders advance the SDNY and EDNY Caselaw
cited earlier, which are all distinguishable.  The Debtor previously noted in prior briefing
that <u>General Growth</u> was a solvent debtor case, and thus distinguishable.  <u>139 Owners</u> is
also a solvent debtor case, whereby the dispute concerned payment of default interest from
sale proceeds to an oversecured creditor as it was no longer possible to reinstate the loan.
Further, as noted by Brubaker Part II, <u>139 Owners</u> failed to mention 365(b)(2) and its
analysis suggested that even prospective nullification of default interest was not permitted
under section 1124(2).  <u>Moshe</u>, yet another solvent debtor case, as noted in the Debtor's
MOL, is distinguishable for this reason alone, but also because it adopted the reasoning of
<u>New Investments</u>, without the benefit of any analysis of the statutory interplay and an
unawareness of the Brubaker analysis. Ironically, while criticizing <u>Taddeo</u> as a chapter 13
case, the Secured Lenders are not bashful about advancing Judge Feller's decision in
<u>Adejobi</u>, also a Chapter 13 case.  Finally, while the Secured Lenders' chosen definition, i.e.

14

the "SDNY and EDNY Caselaw", would suggest these are the only probative cases in nearby courts, that is not the case. See generally Debtor's MOL for additional case law support; see also In re Liberty Warehouse Assoc., 220 B.R. 546 (Bankr. S.D.N.Y. 1998) (noting that under § 1124(2), as long as loan has not matured, "a debtor can cure its prepetition default under a note or other instrument. When it does so, it need only pay pendency interest at the non-default rate stated in the underlying agreement. It need not pay at the default rate"); see also PCH Assoc., 122 B.R. 181, 198 (Bankr. S.D.N.Y. 1990) (debtor could avoid default interest under §§ 1123, 1124(2), former 1124(3) and 1129).

18.    Outside of the Secured Lenders' SDNY and EDNY Caselaw, they point to only seven (7) other cases in their favor from outside of these jurisdictions, which they define as the "Nationwide Caselaw".  Aside from New Investments, which was already addressed in the Debtor's MOL and the Brubaker articles, as it relates to the balance of the "Nationwide Caselaw", the Debtor notes:

a. In re Sagamore Partners, Ltd., 620 F. App'x 864 (11th Cir. 2015): This is an unpublished nonprecedential opinion in which, similar to New Investments, did not consider the impact of § 365(b)(2)(D) and thus suffers from incomplete analysis.
b. In re Moody Nat'l SHS Houstin H, LLC, 426 B.R 667 (Bankr. S.D. Tex. 2010): In this case, the court determined that § 365(b)(2) did not apply in reinstatement context because this provision related to executory contracts and not loans.  This distinction was not appropriate because, among other things, the statute refers to "defaults of a kind" in § 365(b)(2) and, loans also have *ipso facto* provisions. The Debtor also adopts Brubaker Part II's rejection of the Moody analysis;
c. In re I Ashbury Court Partners, L.L.C., 2011 WL 4712010 (Bankr. D. Kan. 2011): In requiring default interest, this case noted the inclusion of section 1123(d) in the 1994 amendments, without any discussion of section 365(b)(2), and further relied on the incorrect analysis in Moody (cited above);
d. In re Sweet, 369 B.R. 644 (Bankr. D. Colo. 2007): The parties had entered into a stipulation deeming default interest, if permitted, not to be a "penalty", with the lower court ultimately analyzing the Colorado state statute and finding there was no prohibition on default interest.  This analysis neglects the role of §§ 365(b)(2) and 1124(2) in the impairment analysis, which supersedes the state law analysis;
e. Hepner v. PWP Golden Eagle Tree LLC (In re K&J Props., Inc.), 338 B.R. 450

(Bankr. D. Colo. 2005): This court allowed default interest to an oversecured creditor under § 506(b) and finding that 1124(2) did not trump 1123(d); and

f.   In re Johnston, 2004 WL 3019472 *Bankr. N.D. Iowa Dec. 20, 2004): While determining that a cure can nullify consequences such as acceleration, the court blindly followed § 1123(d) without reference to §§ 365(b)(2) or 1124(2).

19.     Finally, it is also noteworthy that aside from their non-persuasive and incomplete case law, the Secured Lenders could not find even one scholarly article that meaningfully supports their legal theories.  On the other hand, aside from numerous case law support, including Taddeo and Entz White, the Debtor's MOL also includes multiple articles from commentators, including Professors Brubaker and Klee, each of whom concluded, among other things, the 1994 amendments codified Entz-White.

## CONCLUSION

20.     Among the tools available to a debtor in a chapter 11 case is the right to reinstate its loan, notwithstanding a prior default, as long as the debtor is able to comply with the relevant provisions of the Code.  Courts should not look at only § 1123(d) in this important exercise but must review the statutory scheme as a whole, including §§ 365(b)(2), 1124(2)(A) through (E), and 1123(a)(5).  The Default Interest/Fees are "penalty rates" "of a kind" prohibited by § 365(b)(2)(D).  In sum, the Debtor should be permitted to proceed with its reinstatement plan without payment of the Default Interest/Fees.

Dated: New York, New York
         June 23, 2023

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Golden Seahorse LLC*

By:/s/ Scott S. Markowitz
     Scott S. Markowitz, Esq.
     Rocco A. Cavaliere, Esq.
     1350 Broadway, 11th Floor
     New York, New York 10018
     (212) 216-8000