UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x

In re:                                                    **FOR PUBLICATION**

                                                          Chapter 11

Golden Seahorse LLC,
  d/b/a Holiday Inn Manhattan Financial District,         Case No. 22-11582 (PB)


                          Debtor.              x
-------------------------------------------------------------


**MEMORANDUM DECISION AND ORDER CONCERNING WHETHER
REINSTATEMENT OF ACCELERATED DEBT UNDER BANKRUPTCY CODE
§ 1124(2) REQUIRES PAYMENT OF DEFAULT RATE INTEREST**

**A P P E A R A N C E S** :

**TARTER KRINSKY & DROGIN LLP**
*Counsel for the Debtor, Golden Seahorse LLC*
1350 Broadway, 11th Floor
New York, New York 10018
By: Scott Markowitz, Esq.
Rocco Cavaliere, Esq.


**PERKINS COIE LLP**
*Counsel for the Lenders Wilmington Trust, National
Association, as Trustee for the benefit of the Registered
Holders of Commercial Mortgage Pass-Through Certificates
Series 2018-C6, Wells Fargo Commercial Mortgage Trust
2018-C47, Commercial Mortgage Pass-Through Certificates,
Series 2018-C47 And CSAIL 2018-C14 Commercial Mortgage
Trust, Commercial Mortgage Pass-Through Certificates, Series 2018-C14
and as authorized representative for HI FIDI B Note Owner LLC*
1155 Avenue of the Americas, 22nd Floor
New York, NY 10036
By: Gary F. Eisenberg, Esq.

1

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................. 3

FACTUAL BACKGROUND ................................................................................................ 6

STATUTORY BACKGROUND ........................................................................................... 8

DISCUSSION ..................................................................................................................... 15

   I.    THE CASE LAW ........................................................................................................ 15

      A.   The Second Circuit's Taddeo Decision ..................................................... 15

      B.   Lower Court Decisions in the Second Circuit ............................................ 17

      C.   Case Law in Other Circuits......................................................................... 18

   II.    STATUTORY ANALYSIS .......................................................................................... 20

      A.   Do Sections 1124(2)(A) and 365(b)(2)(D) Create an Exception to Section 1123(d)'s Plain Terms? ..................................................................................... 20

      B.   Does Section 1124(2)(A)'s Cure Carve-out Apply to Loan Agreements or to Executory Contracts and Unexpired Leases?.................................................... 24

      C.   Does Section 365(b)(2)(D) Excuse Payment of all Penalty Rates and Provisions, or just Those Associated with Non-Monetary Defaults? ................ 27

          1.   Statutory Text................................................................................. 28

          2.   Legislative History of the 1994 Amendments ........................... 32

          3.   Legislative History of the 2005 Amendments ........................... 36

          4.   The Purposes of Chapter 11 ........................................................ 37

CONCLUSION ................................................................................................................... 40

APPENDIX.......................................................................................................................... 41

**Hon. Philip Bentley**
**U.S. Bankruptcy Judge**

## Introduction

The Debtor owns and operates a hotel in downtown Manhattan, which is subject to a 10-year mortgage at a fixed interest rate of about 5%. Six months before its bankruptcy filing, the Debtor defaulted on its mortgage by failing to make the required monthly payments, and its lenders accelerated the loan and began to charge interest at the contractual default rate (an additional 5%). The Debtor has now filed a chapter 11 plan that would reinstate the loan and treat it as unimpaired under § 1124(2). Before scheduling a vote or other proceedings on confirmation of that plan, the Debtor and its lenders have asked the Court to rule on a threshold issue: whether the Debtor is required to pay default-rate interest and fees, totaling about $20 million, as a condition of reinstatement.

This issue—whether reinstatement of defaulted and accelerated debt requires payment of default-rate interest and fees—has divided courts across the country for decades. The issue is particularly important in a rising interest rate environment such as the present, in which debtors with long-term debt at lower than current interest rates may seek to use reinstatement to lock in the favorable rates on their pre-bankruptcy debt. Yet the case law on this issue leaves much to be desired. No court has conducted a comprehensive analysis of the three interrelated Bankruptcy Code provisions—§§1123(d), 1124(2)(A) and 365(b)(2)(D)—that bear directly on the issue. Most surprisingly, only a handful of decisions have even mentioned all three of these provisions.[1]

_____

[1] The incompleteness of the courts' analyses was noted several years ago by Judge Robert Drain, who in comments

The Court has attempted to fill this gap in the case law by undertaking a careful analysis of the three relevant provisions, using the standard interpretive tools: examination of the text of each provision, supplemented by consideration of context, canons, and legislative history. The analysis is not simple. For starters, the text of the three provisions leaves many questions unanswered. Compounding the problem, the statutory and historical context complicates, rather than clarifies, the picture. These provisions, in their current form, were not part of the Bankruptcy Code when it was enacted in 1978. Instead, each provision was added or amended by one or both of the omnibus bankruptcy reform statutes that Congress passed in 1994 and 2005, and the congressional purposes underlying these amendments are not always discernable. As Professor Ralph Brubaker observed in connection with his extensive review of these issues, "[g]iven the immense complexity (intensified by perplexing ambiguity) of the Code provisions at issue, as well as the large dollar amounts that can be at stake, we may not have heard the last of" these issues. Ralph Brubaker, *Default Rates of Interest and Cure of a Defaulted Debt in a Chapter 11 Plan of Reorganization (Part II): Entz-White and the "Penalty Rate" Amendments* ("*Default Rates of Interest, Part II*"), 37 BANKR. L. LETTER No. 1 (2017), at 2 [https://perma.cc/4CBK-4268].

A proper analysis requires the Court to answer three questions:

1. To determine the amount required to cure defaults and de-accelerate debt, should the Court apply § 1123(d)'s plain terms, which require payment of all cure amounts required by the parties' agreement and permitted by non-bankruptcy law? Or should the Court instead limit the

---

from the bench in the Frontier Airlines bankruptcy expressed surprise at the underdeveloped state of the case law and urged counsel to undertake a comprehensive review of the relevant Bankruptcy Code sections. *In re Frontier Airlines*, Case No. 20-22476, tr. of June 29, 2020 hearing at 78-79. However, because Frontier Airlines and its lender subsequently settled, these issues were not brought back to Judge Drain for further consideration.

scope of that section, such as by recognizing an exception for any cure amounts excused by virtue of § 1124(2)'s incorporation of § 365(b)(2)(D)?

2. Should the Court read § 365(b)(2)(D)'s cure carve-out, as incorporated by § 1124(2)(A), to apply to loan agreements, or instead to executory contracts and unexpired leases?

3. What scope should the Court give to § 365(b)(2)(D)'s cure carve-out? In particular, should it apply that carve-out to all "penalty rates," or only to penalty rates triggered by non-monetary defaults?[2]

For the reasons explained below, the Court rules for the Debtor on the first and second of these questions but against it on the third question. Specifically, based on a close review of the governing statutory provisions, the Court concludes that (i) §§ 1124(2) and 365(b)(2)(D) create an exception to § 1123(d)'s otherwise absolute mandate; (ii) § 365(b)(2)(D)'s cure carve-out, as incorporated by § 1124(2)(A), applies to loan agreements; but (iii) § 365(b)(2)(D)'s cure carve-out extends only to penalty rates triggered by non-monetary defaults. Consequently, when the debtor's default arises from its failure to perform monetary obligations, as it does here, the debtor

---

[2] The Debtor's lenders raise a fourth issue as well: They argue that not all default rates are "penalty rates," and that the default rate required by their loan agreement should not be deemed a penalty rate. This contention may have merit. As the Second Circuit has observed, a default rate is not always "a penalty, nor should it be considered unconscionable." *Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir.1959) (a default rate "can be beneficial to a debtor in that it may enable him to obtain money at a lower rate of interest than he could otherwise obtain it, for if a creditor had to anticipate a possible loss in the value of the loan due to his debtor's bankruptcy or reorganization, he would need to exact a higher uniform interest rate for the full life of the loan"); *see also In re Phoenix Bus. Park Ltd. P'ship*, 257 B.R. 517, 521 (Bankr. D. Ariz. 2001) (holding that not all default rates are "penalty rates"); *In re Sweet*, 369 B.R. 644, 650 (Bankr. Colo. 2007) (same). On the other hand, there is evidence in the legislative history suggesting that Congress may have intended to equate the terms "default rate" and "penalty rate." *See* H.R. Rep. No. 103-835, at 50 (1994) ("[S]ection 365(b) is clarified to provide that when sought by a debtor, a lease can be cured at a nondefault rate (i.e., it would not need to pay penalty rates)."). Given the Court's resolution of the issues noted above, the Court need not and does not reach this additional issue.

must pay default interest to the extent provided by its agreement and permitted by non-bankruptcy law in order to reinstate its defaulted debt under § 1124(2).[3]

## **Factual Background**

The relevant facts are simple and not disputed.

The Debtor owns and operates a full-service hotel located at 99 Washington Street in downtown Manhattan. The hotel operates under the Holiday Inn flag and, at 50 stories tall, is billed as the tallest Holiday Inn in the world.  The Debtor constructed the hotel between 2010 and 2014, and it opened for business in October 2014.

In September 2018, the Debtor refinanced its existing indebtedness by obtaining a loan in the approximate principal amount of $137 million. The loan has a non-amortizing 10-year term and bears interest at the rate of 5.259%. As security for the loan, the Debtor executed and delivered a first-lien mortgage on the property. Shortly thereafter, the loan was split into four separate tranches, which were assigned to two new lenders (together, the "Lenders").

The Debtor was current on all payments under the loan until May 2020, when it failed to make the interest payment due that month following the hotel's closure at the outset of the Covid-19 pandemic. The Lenders subsequently exercised the rights afforded them by the loan documents upon default, including accelerating the loan and charging the Debtor default interest at 5% above the non-default interest rate. The Lenders also sought and obtained the appointment of a receiver

---

[3] To aid the reader in parsing the three operative statutory provisions, the Court has prepared an Appendix, annexed to this decision, which reproduces the relevant language of §§ 365(b), 1123 and 1124(2)(A) and shows the changes made to each of these provisions by the 1994 and 2005 amendments.

in state court.

Before the receiver could take possession of the hotel, the Debtor commenced this chapter 11 case on November 29, 2022. The Debtor has continued to operate its business and manage the hotel as a debtor in possession. The Lenders have filed proofs of claim totaling approximately $179 million (exclusive of legal fees) as of the petition date.

The Debtor has filed a plan of reorganization that would reinstate the loan and treat it as unimpaired under § 1124(2). This would allow the Debtor, following its emergence from bankruptcy, to continue to pay interest under the reinstated loan at the non-default rate of 5.259%, which is significantly below current market rates of interest. To reinstate the loan, the Debtor proposes to pay all the outstanding amounts it owes other than those triggered by its default. By the Debtor's estimates, the default amounts that it proposes *not* to pay total approximately $20 million, consisting of $17.8 million of default-rate interest, a $1 million liquidation fee, and late charges and a special servicing fee totaling about $500,000 and $660,000, respectively.

The Debtor has said that, if the Court concludes that reinstatement of the loan would require the Debtor to pay default-rate interest and related fees, it may not have the financial ability to pay these arrearages. In that event, its plan of reorganization provides for an alternate treatment of the loan: instead of reinstating the loan under § 1124(2), the Debtor would "cram down" the loan under § 1129(b) by leaving the mortgage in place and giving the Lenders a restructured note paying interest at a market interest rate going forward.

The Debtor and the Lenders have informed the Court that they believe an up-front ruling on the default interest issue, prior to voting on the Debtor's plan of reorganization or briefing of other confirmation issues, will facilitate the efficient administration of this case, as it will enable

the Debtor to file an amended plan consistent with the Court's ruling. The Court agrees that this approach promotes efficiency. Consequently, the parties have briefed the default interest issue — whether to cure and reinstate the loan under §§ 1123 and 1124, the Debtor is required to pay default interest and fees to the extent required by its loan agreement and New York law—and the Court heard oral argument on this issue on July 6, 2023.[4]

### Statutory Background

Cure and reinstatement of defaulted debt, along with the related concepts of cure and assumption of defaulted executory contracts and unexpired leases, have been integral to chapter 11 reorganizations since the enactment of the Bankruptcy Code. When it is beneficial for a chapter 11 debtor to keep in place a loan on which it has defaulted, such as a long-term loan bearing interest below current market rates, the Code permits the debtor to reinstate that loan under its plan of reorganization. Even if the lender has already accelerated the loan, the debtor may "de-accelerate" it—that is, reinstate the loan's original maturity and other terms—so long as the plan cures defaults, compensates the lender for certain losses, and does not otherwise alter the lender's legal rights. *See* 11 U.S.C. § 1124(2); *see also id*. § 1123(a)(5)(G) (plan of reorganization may provide for the curing of any default).

Similarly, the ability of a debtor to preserve its valuable defaulted contracts and leases by curing existing defaults and providing adequate assurance of its future performance has been a

---

[4] The Debtor reserves the right to argue that, as a matter of New York law, it does not owe default interest or fees because the doctrines of impossibility and frustration of purpose excused its performance following the onset of the Covid-19 pandemic. The Debtor also reserves the right to challenge the specific amounts of default interest and fees owed.

core feature of chapter 11 since its inception. To the extent a debtor has ongoing contracts and leases (referred to in the Code as "executory contracts" and "unexpired leases") that it wishes to keep in place going forward, the Code permits the debtor to assume those contracts and leases, so long as it cures defaults, compensates the counterparty for losses caused by its defaults, and provides adequate assurance that it will continue to meet its contractual obligations going forward. *See* 11 U.S.C. § 365(b)(1).

Certain types of defaults have always been carved out of the cure requirements for both reinstatement and assumption—namely breaches of so-called *ipso facto* clauses, which provide that a bankruptcy filing, or a related development such as insolvency or the appointment of a trustee, by itself ("*ipso facto*") terminates the parties' agreement. Defaults of these sorts, by their nature, are impossible for a debtor in bankruptcy to cure, since it cannot rewind the clock. Consequently, unless these defaults were excused, parties could use *ipso facto* clauses to "bankruptcy-proof" their agreements—that is, to ensure against their reinstatement or assumption. The Bankruptcy Code therefore has always excused cure of these defaults – both in § 365(b)(2), which exempts *ipso facto* clauses from the cure requirements for assumption of contracts and leases, and in § 1124(2), which exempts "default[s] of a kind specified in 365(b)(2)" from the cure requirements for de-acceleration of defaulted debt. *See* 11 U.S.C. §§ 365(b)(2)(A)-(C), 1124(2)(A); *see generally* 3 COLLIER ON BANKRUPTCY ¶ 365.06 (16th ed. 2018) ("The bars to the enforcement of *ipso facto* clauses in subsections 365(b)(2) and (e) are intended to prevent a party to a contract from opting out of bankruptcy through the use of such clauses."); 7 COLLIER ON BANKRUPTCY at ¶ 1124.04.

The Bankruptcy Code's scheme for addressing the cure requirements for reinstatement and

assumption was straightforward until 1994, when the passage of the Bankruptcy Reform Act threw a wrench into the works. That Act—a sprawling set of largely unrelated amendments to a host of Bankruptcy Code sections[5]—amended both§ 365(b) and§ 1123 in ways that have confounded courts ever since.

*First*, the 1994 Reform Act added a new subsection (D) to§ 365(b)(2), supplementing the existing cure carve-outs for *ipso facto* provisions contained in subsections (A) through (C). With this amendment, § 365(b)(2) now read in its entirety as follows:

> (2) Paragraph (1) of this subsection [requiring cure, compensation and adequate assurance with respect to any defaults] does not apply to a default that is a breach of a provision relating to--
>
>> (A) the insolvency or financial condition of the debtor at any time before the closing of the case;
>>
>> (B) the commencement of a case under this title;
>>
>> (C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement; or
>>
>> (D) the satisfaction of any penalty rate or provision *relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.*

11 U.S.C. § 365(b)(2) (emphasis added).

As discussed further in Point II.C below, the wording of the new subsection 365(b)(2)(D) is ambiguous and has generated conflicting case law and commentary as to its meaning. At bottom,

---

[5] According to Congressional Quarterly Almanac, the Act "read more like a disjointed series of revisions than an overhaul with a distinct legislative mission. 'Generally the bill does not have a theme,' said Samuel Gerdano, executive director of the American Bankruptcy Institute, which supported the legislation. 'It's virtually an in-box stapled together, with some provisions that favor debtors and some which favor creditors.'" *Congress Revises Bankruptcy Code*, *in* CQ ALMANAC 1994, at 175-77 (50th ed., 1995), *available at* http://library.cqpress.com/cqalmanac/cqal94-1103120 [https://perma.cc/75CR-JK87].

the debate is over whether the "relating to" clause of this subsection (italicized above) modified only the word "provision" or, instead, modified the words "penalty rate" as well. Courts and commentators adopting the latter reading construed the new subsection to create a single exception to the cure requirements of subsection 365(b)(1)—namely, an exception for a failure to pay a penalty rate or a penalty provision arising from a nonmonetary default.[6] Other courts and commentators adopted the former reading and interpreted the new subsection to create two distinct exceptions—one for failure to pay a penalty rate arising from contractual breaches of *any* sort, including payment defaults, and a second exception covering any breaches of nonmonetary obligations.[7]

*Second*, for reasons unrelated to the amendment of § 365, the 1994 Reform Act also amended § 1123, the Bankruptcy Code section addressing the provisions required or permitted to

---

[6] CHARLES J. TABB, LAW OF BANKRUPTCY 844 (5th ed. 2020) ("If the default arose from the debtor's failure to perform nonmonetary obligations, the trustee will not have to satisfy 'penalty' rates or penalty provisions in order to assume."); Grant T. Stein & Ralph S. Wheatly, *The Impact of Cure and Reinstatement on Default Interest*, 16 AM. BANKR. INST. J. 1 (Jul./Aug.1997) ("Section 365(b)(2)(D) is now clear that part of cure under § 1124(2) requires the payment of default interest associated with monetary defaults."); *In re Shangra-La, Inc.,* 167 F.3d 843, 848, fn. 3 (4th Cir. 1999) ("Recent amendments also provide that the landlord may not charge the debtor the default rate of interest under the contract or lease when the default with which the debtor is charged is nonmonetary in nature.") (citing 11 U.S.C.A. § 365(b)(2)(D)); *1 Ashbury Court Partners, L.L.C.*, 2011 WL 4712010 at *4 (Bankr. D. Kan. 2011) ("[B]oth the 'penalty rate' and the 'penalty provision' language refer to and modify the words beginning with 'relating to,' meaning that only penalty rates that punish non-monetary default need not be cured.").

[7] *See* Brubaker, *Default Rates of Interest, Part II*, at 7 (§ 365(b)(2)(D) "was arguably enacted to *codify Entz-White*") (emphasis in original); Kenneth N. Klee, *Adjusting Chapter 11: Fine Tuning the Plan Process*, 69 AM. BANKR.L.J. 551, 558 (Fall 1995) (the amendments appear to "codify applicable Ninth Circuit precedent that construed the Code as not requiring a default or penalty rate to be paid"); *Claremont*, 113 F.3d at 1034 (reading 365(b)(2)(D) to excuse from cure "penalty rates which are commonly imposed where a debtor's breach was monetary in nature" and "penalties under liquidated damages provisions where the debtor's breach was nonmonetary in nature."); *In re Zamani*, 390 B.R. 680, 686 (Bankr. N.D. Cal. 2008) (following *Claremont* and holding that penalty rates need not be paid as part of cure); *Phoenix*, 257 B.R. at 521 (similarly following *Claremont*); *Matter of GP Exp. Airlines, Inc.*, 200 B.R. 222, 233–34 (Bankr. D. Neb. 1996) (holding that the "relating to" clause applied only to "penalty provision" because "[b]y definition, there is no interest accrual on a nonmonetary obligation.").

11

be included in a plan of reorganization. This amendment added a new subsection 1123(d), which
provided:

> Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and
> 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary
> to cure the default shall be determined in accordance with the underlying agreement
> and applicable nonbankruptcy law.

11 U.S.C. § 1123(d). According to the House Report for the bill that became the 1994 Reform Act,
Congress added this subsection for the specific purpose of overruling a Supreme Court decision
of the year before, *Rake v. Wade*, 508 U.S. 464, 113 S. Ct. 2187, 124 L. Ed. 2d 424 (1993). That
decision held that a Chapter 13 debtor who proposed to cure a default was required to pay interest
on arrears to a secured creditor even if the underlying loan agreement did not provide for such
interest. *Id.* at 465–66. The House Report characterized *Rake* as providing a windfall to
oversecured creditors, which the amendment eliminated by limiting secured creditors' rights to
those provided by their contracts and permitted by state law. *See* H.R. Rep. No. 103-835, at 55;
*see also* S. Rep. No. 103-168, at 53 (1993) (discussing parallel provision in Senate bill).

This amendment, too, has generated significant debate. By its plain terms, § 1123(d)
requires the debtor to pay all contractually required amounts, including default-rate interest and
fees, in order to cure defaults and reinstate debt under a plan.[8] However, as discussed further in
Point II.A below, that directive conflicts with § 1124(2)(A)'s incorporation of § 365(b)(2)(D)'s

---

[8] *See*, e.g., *In re New Invs., Inc.*, 840 F.3d 1137, 1140 (9th Cir. 2016) ("The plain language of § 1123(d) compels the
holding that a debtor cannot nullify a preexisting obligation in a loan agreement to pay post-default interest solely by
proposing a cure."); *In re Sagamore Partners, Ltd.*, 620 F. App'x 864, 869 (11th Cir. 2015) (the "'straightforward
statutory command' in § 1123(d) . . . require[s] a debtor to cure its default in accordance with the underlying contract
or agreement, so long as that document complies with relevant nonbankruptcy law.'"); *In re Depietto*, No. 20-CV-
8043 (KMK), 2021 WL 3287416 at *6-7 (S.D.N.Y. Aug. 2, 2021) (quoting *New Investments*); *In re Moshe*, 567 B.R.
438, 444-46 (Bankr. E.D.N.Y. 2017) (same).

cure carve-outs. To conform § 1123(d) to Congress's supposedly "pro-debtor" intent in enacting it or to harmonize this section with § 1124(2)(A), a few courts have construed § 1123(d) narrowly so as not to require payment of default interest.[9]

Congress added yet another set of complications to the Bankruptcy Code's cure requirements in 2005, when it enacted another omnibus bankruptcy reform statute, the Bankruptcy Abuse Protection and Consumer Protection Act ("BAPCPA"). While this act was aimed principally at perceived abuses in consumer bankruptcies, it also contained a grab-bag of amendments to the Bankruptcy Code's business bankruptcy provisions. As with the 1994 Reform Act, these business bankruptcy amendments were not linked by much of an overarching theme. *See generally* Tracy Whitaker, *Congressional Changes to Business Bankruptcy*, 54 UNITED STATES ATTORNEYS' BULLETIN, No. 4 (July 2006), at 27-28.

Three of BAPCPA's business bankruptcy amendments—to §§ 365(b)(1), 365(b)(2) and 1124(2)—address the Code's cure requirements. The apparent catalyst for these three interrelated amendments was a circuit court split over an issue *not* before this Court: whether § 365(b)(2)(D) carved out from § 365(b)(1)'s cure requirements only penalties triggered by nonmonetary defaults, or also the nonmonetary defaults themselves. In 1997, the Ninth Circuit had adopted the former of these readings, holding that § 365 required cure of nonmonetary defaults, even though many

---

[9] *See Zamani*, 390 B.R. at 687 ("[T]he legislative intent behind the enactment of § 1123(d) was a pro-debtor intent to preclude creditors from demanding payment of interest on interest to cure a loan default; it was not enacted to promote or endorse the imposition of default interest rates."); *Phoenix*, 257 B.R. at 521 ("[T]he incorporation of new section 365(b)(2)(D), as interpreted by the Ninth Circuit, into section 1124(2)(A) squarely suggests a congressional intent directly contrary to the Trust's interpretation of section 1123(d), a section added at exactly the same time."); *see also* Brubaker, *Default Rates of Interest and Cure of a Defaulted Debt in a Chapter 11 Plan of Reorganization (Part I): Entz-White's Overlooked Choice of Law Dimension* ("*Default Rates of Interest, Part I*"), 36 BANKR. L. LETTER No. 12 (2016), at 7 (arguing that § 1123(d), by its terms, does not require payment of default interest).

nonmonetary defaults are by their nature incapable of cure. *In re Claremont Acquisition Corp., Inc.*, 113 F.3d 1029 (9th Cir. 1997). The First Circuit subsequently adopted a contrary reading, holding that § 365(b)(2)(D) excuses cure of all nonmonetary defaults. *In re BankVest Cap. Corp.*, 360 F.3d 291, 298 (1st Cir. 2004).

Congress responded by adopting a "split the baby" resolution: it added provisions applicable to unexpired real estate leases—but not to executory contracts or unexpired personal property leases—exempting incurable nonmonetary defaults, as well as related penalty rates and provisions, from § 365(b)(1)'s cure requirements.[10] To implement this somewhat curious resolution, BAPCA amended §§ 365(b)(1), 365(b)(2) and 1124(2):

- To § 365(b)(1)(A), Congress added language that, while far from a model of clarity, has generally been read to exempt incurable nonmonetary defaults under real property leases from the cure requirements. *See* 3 COLLIER ON BANKRUPTCY ¶ 365.06[3][c].

- To § 365(b)(2)(D), Congress added the word "penalty" before "provision," so that the subsection now reads: "the satisfaction of any penalty rate or **penalty** provision . . . ." (emphasis added). This revision clarified that the carve-out created by subsection (D) did not extend to nonmonetary defaults (which were now addressed in 365(b)(1)(A)), but only to penalty rates and penalty provisions triggered by such defaults.[11]

---

[10] The legislative history sheds no light on why Congress chose to provide a solution to the problem of incurable nonmonetary defaults for real estate leases but not for executory contracts or personal property leases.

[11] As the Collier treatise observes, these two amendments to § 365 together had the effect of overruling the substance of the Ninth Circuit's *Claremont* holding, while at the same time ratifying *Claremont*'s semantic analysis of the pre-2005 statutory language. 3 COLLIER ON BANKRUPTCY ¶ 365.06[3][c]; *see also In re Empire Equities Cap. Corp.*, 405 B.R. 687, 690-91 (Bankr. S.D.N.Y. 2009) (same).

14

- In § 1124(2)(A), Congress clarified the clause that incorporates § 365(b)(2)'s cure carve-outs, expanding it to read: "other than a default of a kind specified in section 365(b)(2) of this title **or of a kind that section 365(b)(2) expressly does not require to be cured**." (emphasis added on amended language).

Not surprisingly, because these 2005 amendments were crafted as responses to the circuit court split over the scope of § 365(b)(2)(D)'s carve-out for *nonmonetary* defaults, they did not resolve the separate controversy now before the Court: whether that section excuses cure of penalty rates for *monetary* defaults.

## Discussion

### I. The Case Law

Before turning to an analysis of the relevant statutory provisions, the Court briefly reviews the case law, beginning with the Second Circuit's seminal – but now outdated – ruling on the issue of cure. The Court concludes that the case law, both within this circuit and elsewhere, provides little help in resolving the difficult statutory construction issues facing the Court. While many courts have touched on one aspect or another of the various statutory provisions, none has conducted the sort of rigorous and comprehensive review of the three interrelated Bankruptcy Code sections that is needed.

#### A. The Second Circuit's *Taddeo* Decision

The Debtor contends that the default interest issue before the Court is controlled by the Second Circuit's decision in *DiPierro v. Taddeo (In re Taddeo)*, 685 F.2d 24 (2d Cir. 1982). The Court does not agree. Although the court in *Taddeo* enunciated principles that arguably could be read to support the reinstatement of debt under a Chapter 11 plan without payment of default-rate

15

interest, *Taddeo* pre-dated the 1994 Reform Act, and any application it might otherwise have to this case has been legislatively overruled by that Act.

*Taddeo* was a chapter 13 case, in which the Second Circuit (in an opinion by Judge Lumbard, joined by Judges Friendly and Newman) held that § 1332(b), by permitting a chapter 13 plan to "provide for the curing of any default," by implication authorized such a plan to "de-accelerate" and reinstate defaulted and accelerated debt. *Id*. at 26. The court reasoned:

> [T]he power to cure must comprehend the power to 'de-accelerate.' This follows from the concept of 'curing a default.' . . . Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. This is the concept of 'cure' used throughout the Bankruptcy Code.

685 F.2d at 26-27. The court added, "'curing a default' in Chapter 11 means the same thing as it does in Chapters 7 or 13: the event of default is remedied and the consequences are nullified." *Id.* at 29; *see also id.* ("'The holder of a claim or interest who under the plan is restored to his original position, when others receive less or get nothing at all, is fortunate indeed and has no cause to complain.'") (quoting S. Rep. No. 95-989, at 120 (1978)).

The Debtor contends that *Taddeo*'s reasoning—that cure "return[s the parties] to pre-default conditions" and "nullifies" the consequences of default, 685 F.2d at 27, 29—compels the conclusion that cure does not require the payment of default interest. This might be true had Congress not subsequently enacted the 1994 and 2005 amendments to the Bankruptcy Code provisions bearing on this issue.[12] But those later amendments materially changed the governing

---

[12] Or maybe not. As Professor Brubaker has pointed out, the conclusion that cure returns the parties to the pre-default status quo does not answer the question of whether cure is retroactive or merely prospective with respect to the applicable interest rate—that is, whether cure requires payment of interest at the default rate, instead of the non-default

statutory provisions. Most obviously, § 1123(d) mandates the payment of default interest to the extent required by the parties' contract and permitted by non-bankruptcy law. The Second Circuit in *Taddeo* not only did not address default interest (which was not at issue); it did not address, and could not have addressed, how to construe § 1123(d) or how to harmonize that section with the conflicting provisions of §§ 1124(2) and 365(b)(2)(D).

### B. Lower Court Decisions in the Second Circuit

Since the enactment of the 1994 amendments, there have been few decisions of note within the Second Circuit. Several decisions by lower courts in this circuit have held that, under §§ 1123 and 1124, reinstatement of debt requires payment of default interest to the extent provided by the parties' agreement and permitted by state law – but curiously, none of these decisions makes any mention of § 1124(2)'s incorporation of the cure carve-out created by § 365(b)(2). *See In re Depietto*, No. 20-CV-8043 (KMK), 2021 WL 3287416 at *6-8 (S.D.N.Y. Aug. 2, 2021); *In re 139-141 Owners Corp.*, 306 B.R. 763 (Bankr. S.D.N.Y. 2004), *aff'd in part and vacated in part,* 313 B.R. 364, 368 (S.D.N.Y. 2004); *In re Moshe*, 567 B.R. 438, 443-47 (Bankr. E.D.N.Y. 2017).[13]

---

rate, during the period between default and cure. *See* Brubaker, *Default Rates of Interest, Part I*, at 7-8. *Taddeo* did not involve default interest, and the Second Circuit therefore had no occasion to address this issue.

In any event, Congress subsequently addressed this issue, and supplied an answer to it, in its 2005 amendment of § 1124(2)(A). As noted above, that amendment clarified that the debtor must cure all defaults "other than a default of a kind specified in section 365(b)(2) of this title *or of a kind that section 365(b)(2) expressly does not require to be cured.*" (emphasis added on amended language). As discussed in Point II.B below, the reference to defaults "of a kind that section 365(b)(2) expressly does not require to be cured" can only be a reference to the "penalty rates and penalty provisions" carved out from the cure requirements by § 365(b)(2)(D). It follows that a debtor's failure to pay penalty-rate interest is itself a default that must be cured (except to the extent it is excused from cure by § 365(b)(2)) *before* a defaulted loan can be reinstated.

[13] A review of the briefs filed in these cases suggests that this oversight was due to the fact that counsel in these cases failed to alert the court to § 1124(2)(A)'s incorporation of § 365(b)(2)(D)'s cure carve-outs.

In another case, *In re General Growth Properties, Inc.*, 451 B.R. 323, 327 (Bankr. S.D.N.Y. 2011), the court noted the conflict between §§ 1123(d) and 1124(2) but declined to resolve it. Instead, the court held that, because the debtor in that case was solvent, the secured creditor was entitled to payment of default interest under the so-called solvent debtor exception— an equitable doctrine entitling creditors to post-petition interest, including default interest, in those rare bankruptcy cases where the debtor is able to pay its debts in full. *Id.* at 327-28.[14]

### C.  Case Law in Other Circuits

The case law outside the Second Circuit also provides only limited assistance in resolving the default-rate interest issue. Prior to the 1994 amendments, the leading case on the default interest issue was *Great Western Bank and Trust v. Entz-White Lumber and Supply, Inc. (In re Entz-White Lumber and Supply, Inc.)*, 850 F.2d 1338 (9th Cir. 1988) ("*Entz-White").* Relying on *Taddeo*, the Ninth Circuit held that the payment of default-rate interest is not required to cure and reinstate defaulted debt under a Chapter 11 plan because cure effectively nullifies all aspects of the default and returns the parties to the *status quo ante. Id.* at 1342 ("[T]he power to cure under the Bankruptcy Code authorizes a plan to nullify all consequences of default, including avoidance of default penalties such as higher interest.").

Since the passage of the 1994 amendments, most courts have held that § 1123(d) compels the opposite conclusion: that cure must include payment of any default-rate interest, to the extent

---

[14] In a footnote in *In re LATAM Airlines Grp. S.A.*, 55 F.4th 377, 386, fn. 5 (2d Cir. 2022), the Second Circuit cited *DePietto*, *Moshe* and *General Growth* as examples of cases within the circuit that have applied § 1123(d) to require a debtor to pay post-petition interest to reinstate defaulted debt under § 1124(2). However, this was a mere passing reference, in a case that involved issues of post-petition interest, not default interest. The Second Circuit's *LATAM* decision contains no other discussion of default interest.

required by the parties' agreement and permitted by nonbankruptcy law. The leading case is the

Ninth Circuit's decision in *In re New Investments, Inc*, 840 F.3d 1137 (9th Cir. 2016), which held

that Congress' enactment of § 1123(d) had legislatively overruled *Entz-White*. *Id.* at 1141.

Curiously, though, the *New Investments* decision makes no mention at all of either § 1124(2)(A)

or § 365(b)(2)(D), an omission that appears to be due to the parties' failure to address the effect of

those two subsections in their briefs.[15] *See* Brubaker, *Default Rates of Interest, Part II*, at 8.

Notwithstanding *New Investments*, a few lower court decisions outside the Second Circuit

have addressed the interrelationship among §§ 1123(d), 1124(2) and 365(b)(2), and these courts

have reached varying conclusions. For example:

- In one leading case, *In re Phoenix Bus. Park*, an Arizona bankruptcy court held that §
  1123(d) must be read together with §§ 1124(2) and 365(b)(2), and that the only way to
  harmonize those provisions is to read the latter two sections to create an exception to the
  former. 257 B.R. at 521. The court further held that § 365(b)(2)(D) excused payment of
  default interest for monetary, as well as nonmonetary, defaults. *Id.*

- Another leading case, *In re Moody Nat. SHS Houston H, LLC*, reached the opposite
  conclusion, holding that the debtor must pay default interest to the extent required by
  contract and permitted by state law. 426 B.R. 667, 672-73 (Bankr. S.D. Tex. 2010). The
  court found that § 1123(d)'s plain terms require payment of all such amounts, and that §

---

[15] As Professor Brubaker has noted, the *New Investments* panel instructed counsel to "be prepared at oral argument to discuss the opinions in [*Phoenix* and *Moody*], particularly as they relate to the relationship between 11 U.S.C. §§ 1123(a)(5)(G), 1123(d), 1124(2)(A), and 365(b)(2)(D)." However, "in deciding the case, the panel obviously decided not to go beyond the issues and arguments briefed by the parties . . . as was their prerogative." Brubaker, *Default Rates of Interest, Part II*, at 8.

1124(2) is not to the contrary because § 365(b)(2)'s carve-out applies only to executory contracts and unexpired leases, not to loans. *Id.* at 673-75.

- Another court, with little analysis, held that § 1124(2) creates an exception to § 1123(d)'s mandate, but only for payment of default interest associated with nonmonetary defaults. *Ashbury Court Partners*, 2011 WL 4712010 at \*4 (stating, without elaboration or any supporting citations, that "the majority view considers that both the 'penalty rate' and the 'penalty provision' language refer to and modify the words beginning with 'relating to,' meaning that only penalty rates that punish non-monetary default need not be cured.").

As discussed below, the Court agrees with some of the conclusions just noted and disagrees with others. However, none of these decisions rest on a thorough analysis of the three operative Bankruptcy Code sections and how they intersect, and the Court therefore must undertake its own analysis.

## II. <u>Statutory Analysis</u>

A comprehensive analysis of the default interest issue requires the Court to address three questions: (i) do §§ 1124(2) and 365(b)(2)(D) create an exception to § 1123(d)'s otherwise absolute mandate?; (ii) does § 365(b)(2)(D)'s cure carve-out, as incorporated by § 1124(2)(A), apply to loan agreements?; and (iii) does § 365(b)(2)(D)'s cure carve-out extend to all penalty rates, or only to those triggered by non-monetary defaults? The Court considers those issues in turn below.

### A. Do Sections 1124(2)(A) and 365(b)(2)(D) Create an Exception to Section 1123(d)'s Plain Terms?

Section 1123(d) provides that, if a plan proposes to cure a default, "the amount necessary

to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." 11 U.S.C. § 1123(d). The meaning of this provision is plain, and most courts have applied § 1123(d) as written, looking to the underlying loan agreement and state law to determine whether a debtor must pay interest at the default rate to cure and reinstate its agreement under a chapter 11 plan. *See*, e.g., *New Invs.*, 840 F.3d at 1140-42; *In re Sagamore Partners, Ltd.*, 620 F. App'x 864 (11th Cir. 2015); *Depietto*, 2021 WL 3287416 at *6-7; *Moshe*, 567 B.R. at 444-46; *Moody*, 426 B.R. at 674.[16]

The Debtor urges the Court not to follow these cases, but instead to follow the few courts that have construed § 1123(d) narrowly so as not to require payment of default interest. *See Phoenix*, 257 B.R. at 521; *Zamani*, 390 B.R. at 686; *see also New Invs.,* 840 F.3d at 1143-46 (dissenting opinion). The Debtor argues that such a reading is required, first, to conform § 1123(d) to the supposedly "pro-debtor" intent behind its enactment, and second, to harmonize § 1123(d) with §§ 1124(2)(A) and 365(b)(2)(D).

The Debtor bases its first argument on the House Report for the bill that became § 1123(d), H.R. Rep. No. 103-835, at 55, which states that Congress was primarily concerned with overruling the Supreme Court's holding in *Rake v. Wade*, 508 U.S. 464 (1993). The Supreme Court there had held that a chapter 13 debtor who proposed to cure a default was required to pay interest on arrears

---

[16] In this case, there is no dispute that the Debtor's loan agreement requires the payment of a higher interest rate (5% above the pre-default rate), and certain fees, upon an event of default. Moreover, applicable non-bankruptcy law—here, New York law—allows for a higher interest rate upon default when provided for in the loan agreement. *See Jamaica Sav. Bank, FSB v. Ascot Owners, Inc.*, 245 A.D.2d 20, 665 N.Y.S.2d 858, 858 (N.Y. App. Div. 1st Dep't 1997); *see also Dominion Fin. Corp. v. Haimil Realty Corp.*, 546 B.R. 257, 265 (Bankr. S.D.N.Y. 2016) (awarding interest at 24% default rate and stating that "New York courts have enforced agreements that provide for similar default rates."). As noted, the Debtor has reserved the right to argue that New York law excuses its defaults because the Covid-19 pandemic rendered its continuing performance impossible.

to a secured creditor even if the underlying loan agreement did not provide for such interest. *Id*. at 472. According to the House Report, this result "provid[ed] a windfall to secured creditors at the expense of unsecured creditors," which § 1123(d) would eliminate by "limit[ing] the secured creditor to the benefit of the initial bargain with no court contrived windfall." H.R. Rep. No. 103-835, at 55.

This argument fails for several reasons. When the meaning of a statutory provision is plain, as it is here, courts are required to apply that plain meaning even if Congress's stated or apparent purpose was more limited. As the Ninth Circuit observed in *New Investments*, "The fact that Congress had a particular purpose in mind when enacting a statute does not limit the effect of the statute's text." 840 F.3d at 1141; *see also id.* ("'The fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning'") (quoting *Union Bank v. Wolas,* 502 U.S. 151, 158 (1991)); *accord General Growth,* 451 B.R. at 328; *Moshe*, 567 B.R. at 446; *Moody*, 426 B.R. at 674.

Moreover, Congress's stated intent for enacting § 1123(d) was not merely to prevent windfalls to secured creditors. As Judge Isgur noted in *Moody*, the House Report framed Congress's intent more broadly than simply overruling *Rake*: "the Congressional repair to *Rake* solved the issue by a broader declaration—*Thou shall look to state law when determining cure amounts.*" *Id*. at 674 (emphasis in original); *see also In re New Invs.,* 840 F.3d at 1141 (requiring payment of default interest is "consistent with the intent of 1123(d) because it holds the parties to the benefit of their bargain."). Applying § 1123(d) as written furthers that intent.

The Court therefore concludes that § 1123(d), *if looked at in isolation,* requires payment of all contractually-required amounts. But this does not end the analysis, because § 1124(2)(A)

22

sets forth a conflicting, and equally unambiguous, directive: to de-accelerate defaulted debt and render it unimpaired, the debtor need *not* cure "a default of a kind specified in § 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured." Section 365(b)(2)(D), in turn, provides that penalty rates and penalty provisions relating to nonmonetary defaults need not be cured. The conflict with § 1123(d) is unavoidable: either *all* amounts required by the parties' contract and permitted by state law must be paid, or this facially absolute rule is subject to an exception for whatever penalty rates and provisions § 365(b)(2)(D) excuses.

Settled statutory interpretation principles supply the answer to this conflict. "'[I]t is a commonplace of statutory construction that the specific governs the general.'" *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645-47, 132 S. Ct. 2065, 2070-72, 182 L. Ed. 2d 967 (2012) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992)); *accord Davis v. Shah*, 821 F.3d 231, 251 (2d Cir. 2016) ("[A] 'specific provision takes precedence over a more general' one.") (quoting *United States v. Torres–Echavarria*, 129 F.3d 692, 700 n. 3 (2d Cir.1997)).

Here, there can be no doubt that the carve-out created by § 1124(2)'s incorporation of § 365(b)(2)(D)—excusing payment of penalty rates and penalty provisions triggered by non-monetary defaults—is more specific than § 1123(d)'s general command that the amount needed to cure be governed by the parties' agreement and non-bankruptcy law. This carve-out therefore must be treated as an exception to § 1123(d)'s facially absolute mandate.

This result has the additional virtue of avoiding an interpretation that would nullify § 1124(2)'s incorporation of § 365(b)(2)(D). *See Corley v. United States*, 556 U.S. 303, 314, 129 S. Ct. 1558, 173 L.Ed.2d 443 (2009) ("[A] statute should be construed so that effect is given to all its

provisions, so that no part will be inoperative or superfluous, void or insignificant.") (cleaned up);

*Pharaohs GC, Inc. v. United States Small Bus. Admin.*, 990 F.3d 217, 227 (2d Cir. 2021) (same).

Whereas a contrary reading would render meaningless § 1124(2)'s incorporation of §

365(b)(2)(D), the Court's reading does not nullify 1123(d), but merely makes it subject to a limited

exception. § 1123(d) remains effective in all other contexts, including the specific context—

overruling *Rake v. Wade*—that, according to the House Report, motivated its enactment.

For both of these reasons, the carve-out created by § 1124(2)'s incorporation of §

365(b)(2)(D) must be treated as an exception to § 1123(d)'s otherwise absolute mandate.

### B. Does Section 1124(2)(A)'s Cure Carve-out Apply to Loan Agreements or to Executory Contracts and Unexpired Leases?

The Lenders contend that § 1124(2)(A) does not excuse any defaults arising under loan

agreements, but only defaults arising under executory contracts and unexpired leases. Specifically,

they argue that § 1124(2)(A)'s exemption for defaults "*of a kind* specified in section 365(b)(2) of

this title or *of a kind* that section 365(b)(2) expressly does not require to be cured" (emphasis

added) must apply only to defaults arising under executory contracts and unexpired leases, since

those are the only types of contracts that § 365 addresses. In *Moody*, the bankruptcy court adopted

this construction of § 1124(2)(A), holding that "[i]t would stretch the language of § 1124(2)(A)

far beyond its plain meaning to believe that it refers to any default rate of interest on any type of

agreement." 426 B.R. at 673-74.

The Court respectfully disagrees with this interpretation. In the first place, it rests on a

strained reading of § 1124(2)(A)'s "of a kind" reference. § 1124(2)(A) refers to "*default[s]* of a

kind specified in section 365(b)(2)," not "default[s] in *contracts and leases* of a kind" governed

24

by that section. Thus, the most natural reading of the "of a kind" reference is that it refers to the kinds of *default provisions* addressed in § 365(b)(2), not to the kinds of contracts and leases governed by that section. That is, it refers to any *ipso facto* default, and any failure to satisfy a penalty rate or penalty provision relating to a non-monetary default, regardless of the nature of the underlying contract.

A second, and more fundamental, problem with the Lenders' interpretation of § 1124(2)(A)'s cure carve-out is that it would deprive that carve-out of any effect. The Lenders would interpret that carve-out to apply only to executory contracts and unexpired leases. However, § 1124 does not apply to such contracts and leases. Consequently, the Lenders' interpretation would strip § 1124(2)(A)'s reference to § 365 of any meaning, a result that is strongly disfavored. *See Puello v. Bureau of Citizenship & Immigr. Servs.*, 511 F.3d 324, 330 (2d Cir. 2007) ("'[A] statute must, if reasonably possible, be construed in a way that will give force and effect to each of its provisions rather than render some of them meaningless.'") (quoting *Allen Oil Co. v. Comm'r*, 614 F.2d 336, 339 (2d Cir. 1980)).

By its terms, § 1124 applies only to "class[es] of claims or interests" that the debtor seeks to treat as unimpaired under its plan of reorganization. Claims for cure amounts owed under assumed contracts or leases are not claims that may be classified under a plan. Instead, such cure claims are administrative priority claims under §§ 503(b) and 507(a)(2), which are entitled to be paid in full on the plan's effective date, *see* 11 U.S.C. § 1123(a)(1), and are not classified under the plan. *See id*. § 1129(a)(9)(A); *see also In re George Washington Bridge Bus Station Dev. Venture LLC*, 65 F.4th 43, 50-52 & n. 4 (2d Cir. 2023) ("because a debtor must 'cure' a default under § 365(b)(1)(A) before assuming an executory contract, '[c]laims arising under contracts or

leases so assumed are afforded administrative priority' under Sections 503 and 507 of the Bankruptcy Code.") (internal citation omitted); *see generally* TABB, LAW OF BANKRUPTCY, at 1103-04 & n. 407.

Yet another problem with the Lenders' interpretation of § 1124(2)(A) is that, by nullifying the effect of that section's cure carve-out, the Lender's interpretation would risk making § 1124(2) itself a dead letter. Under the Lenders' reading, *ipso facto* default clauses would be excused in executory contracts and unexpired leases, but not in loan agreements. As discussed above, *ipso facto* provisions are inherently incapable of cure. Consequently, the Lenders' reading would enable any lender to prevent its borrower from using § 1124(2) to reinstate the loan following a bankruptcy filing, simply by including an *ipso facto* clause in its loan agreement. *See* 3 COLLIER ON BANKRUPTCY ¶ 365.06. It is difficult to believe that Congress, having enacted multiple Bankruptcy Code provisions that override *ipso facto* provisions, would have meant to allow lenders to use such provisions to defeat the reinstatement right enshrined in § 1124(2).[17]

The Court need not adopt an interpretation that has consequences of this sort. Instead, the

---

[17] At oral argument, Lenders' counsel advanced a variation on the argument discussed above, contending that even if subsections (A) through (C) of § 365(b)(2) apply to loan agreements when incorporated by § 1124(2)(A), subsection (D) does not. This is a more plausible reading of the statute, since subsection (D), unlike the other subsections, does specifically mention executory contracts and unexpired leases. A further virtue of this reading, in contrast to the one just discussed, is that it would not nullify § 1124(2)(A)'s cure carve-out in its entirety, nor would it allow the use of *ipso facto* default provisions to defeat a debtor's ability to reinstate its debt.

However, this interpretation suffers from a flaw of a different sort: It would render meaningless the language that Congress added to § 1124(2)(A) in 2005—specifically, the reference to any "default . . . of a kind that section 365(b)(2) expressly does not require to be cured." As Lenders' counsel acknowledged at argument, this added language appears to refer only to subsection (D); no other reading of this language makes sense. Consequently, reading subsection (D) to apply only to executory contracts and unexpired leases, and not also to loan agreements, would strip this added language of any meaning—because, as discussed above, § 1124(2) does not apply to executory contracts or unexpired leases, but only to loans and other claims that can be classified under a plan of reorganization.

Court adopts the more natural reading of § 1124(2)(A): that it excuses defaults arising under loan agreements, so long as the defaults are "of a kind" addressed by § 365(b)(2) – that is, *ipso facto* defaults, and failures to satisfy penalty rates and penalty provisions relating to non-monetary defaults.

### C.  Does Section 365(b)(2)(D) Excuse Payment of all Penalty Rates and Provisions, or just Those Associated with Non-Monetary Defaults?

The analysis so far has led to two conclusions: first, that §§ 1124(2) and 365(b)(2)(D) must be read to create an exception to § 1123(d)'s otherwise absolute mandate; and second, that § 1124(2)(A)'s cure carve-out applies to loan agreements, not to executory contracts and unexpired leases.

This leaves us with a final question: What is the scope of subsection 365(b)(2)(D), which exempts from § 365(b)'s cure requirements "the satisfaction of any penalty rate or penalty provision relating to a default arising from any failure by the D to perform nonmonetary obligations under the executory contract or unexpired lease"? Should this provision be read as a single phrase, in which the "relating to" clause modifies both penalty rate and penalty provision, or should it instead be read to create two separate and distinct exceptions? Stated differently, does § 365(b)(2)(D) only excuse the satisfaction of penalty rates and penalty provisions relating to breaches of nonmonetary obligations, as the Lenders contend? Or does it excuse the satisfaction of (i) penalty rates relating to both monetary and non-monetary defaults *and* (ii) penalty provisions relating to non-monetary defaults, as the Debtor contends?

As discussed above, courts and commentators have disagreed on the proper reading. Some have adopted the former interpretation, construing § 365(b)(2)(D) to excuse only penalties

27

triggered by non-monetary breaches, while others have adopted the latter construction of this provision, reading it to create two separate cure carve-outs. However, the analysis presented by the courts is sparse, with few decisions providing extensive analysis.

This issue is not simple, and a proper resolution requires a thorough analysis. We start with a close review of the text of § 365(b)(2)(D), viewed in its historical and statutory context. We then consider the legislative history of the amendments to this section made by the 1994 Reform Act and the 2005 BAPCA amendments, as well as the Debtor's argument that the Court should construe this section in a way that furthers chapter 11's broader purposes. Based on this analysis, the Court concludes that § 365(b)(2)(D) creates a single cure exception, excusing penalty rates and provisions triggered by nonmonetary defaults. It does not also create an exception for penalty rates that arise from monetary defaults.

### 1. Statutory Text

We start with the text of § 365(b)(2)(D), which reads as follows:

(2) Paragraph (1) of this subsection [requiring cure, compensation and adequate assurance with respect to any defaults] does not apply to a default that is a breach of a provision relating to--

. . .

(D) the satisfaction of any penalty rate or penalty provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

11 U.S.C. § 365(b)(2).

This provision is not a model of clarity. As the First Circuit has observed, "the text of § 365(b)(2)(D) is awkward and ungrammatical on any reading." *BankVest*, 360 F.3d at 297-98. The fact that multiple courts and commentators have adopted one reading of the provision and others

have adopted a contrary reading reinforces the point.[18] Nevertheless, the Court believes that one

of the two competing readings of this provision—to create a single exception to § 365(b)(1)'s cure

requirements, rather than two distinct exceptions—is far more natural than the other. This is not

just the Court's subjective view. The conclusion is rooted in conventions of ordinary speech, to

which courts properly look for guidance when construing statutory language.[19]

Assume you're negotiating a contract that includes penalty rates and other penalty

provisions, and you want to propose that such penalties be excused for any non-monetary defaults,

but not for monetary defaults. It would be natural to say, "Let's excuse performance of any penalty

rate or penalty provision relating to a non-monetary default." And this, in essence, is what the text

of § 365(b)(2)(D) says.

Now assume, alternatively, that you want to propose that *all* penalty rates be excused, as

---

[18] It is worth noting, though, that the leading cases that have read § 365(b)(2)(D) to create two exceptions, rather than one, appear to have simply assumed this conclusion, rather than basing it on any reasoned analysis. In particular, the Ninth Circuit in *Claremont* has been repeatedly cited for its statement that § 365(b)(2)(D) excuses from cure all penalty rates, as well as all non-monetary defaults. However, in that case, only the latter issue—whether all non-monetary defaults are excused—was before the court, and the briefs filed by both sides simply assumed that 365(b)(2)(D) excused all penalty rates. *See*, e.g., Brief of Appellant Cal Worthington and Worthington Dodge, Inc., *In re Claremont Acquisition Corporation, Inc.*, 1996 WL 33418817 (9th Cir. Jan. 26, 1996); Brief of Appellee and Cross-Appellant General Motors Corporation, *In re Claremont Acquisition Corporation, Inc.*, 1996 WL 33485752 (9th Cir. Mar. 20, 1996). As a result, the Ninth Circuit appears to have merely accepted the parties' shared assumption on this issue, without any analysis of its own. See *Claremont*, 113 F.3d at 1034. Courts within the Ninth Circuit have uncritically cited *Claremont Acquisition* for this point, with no apparent recognition that the penalty rate issue was not in dispute before the Ninth Circuit. *See Phoenix*, 257 B.R. at 521; *Zamani*, 390 B.R. at 686.

[19] *See* WILLIAM N. ESKRIDGE, JR., INTERPRETING LAW: A PRIMER ON HOW TO READ STATUTES AND THE CONSTITUTION 41 (2016) (courts should "read statutes in accord with the ordinary meaning their words and phrases would have for the typical English-speaking citizen"); *id.* at 55 (the inquiry should take into account "widely accepted and understood conventions of word usage and grammar"); Frank H. Easterbrook, *The Role of Original Intent in Statutory Construction*, 11 HARV. J.L. & PUB. POL'Y 59, 65 (1988) (courts should try to "hear the words [of the statute] as they would sound in the mind of a skilled, objectively reasonable user of words."); Oliver Wendell Holmes, Jr., *The Theory of Legal Interpretation*, 12 HARV. L. REV. 417, 417-18 (1899) (the primary task for statutory interpreter is to determine "what [the statutory] words would mean in the mouth of an ordinary speaker of English, using them in the circumstances in which they were used").

well as penalty provisions triggered by non-monetary defaults. Would you say (to repeat the above paraphrase of § 365(b)(2)(D)), "Let's excuse performance of any penalty rate or penalty provision relating to a non-monetary default"? Presumably not—that would not convey your intended meaning. More likely, you'd say something like, "Let's excuse performance of any penalty rate, and any penalty provision relating to a non-monetary default." If you wanted to be even clearer, you might say, "Let's excuse performance of any penalty rate, whether relating to monetary or non-monetary defaults, and also penalty provisions relating to non-monetary defaults."

The point is that the language Congress used in § 365(b)(2)(D) largely mirrors the language one would use in everyday speech—or, for that matter, in everyday writing—if one meant to create one exception, rather than two, to the § 365(b)(1)'s cure requirements. This pattern of language use is reflected in an interpretative canon known as the series-qualifier canon, which provides that, when a series of nouns are followed by a modifying clause, that clause modifies every noun in the series, not just the last. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, 147 (2012) ("When there is a straightforward, parallel construction that involves all nouns or verbs in a series," a modifier at the end of the list "normally applies to the entire series.").[20]

---

[20] Professor Brubaker contends that the language of § 365(b)(2)(D) falls within an exception to the series-qualifier canon: that "'the insertion of a determiner [such as the word "any" or "a"] before the second item tends to cut off the modifying phrase so that its backward reach is limited.'" Brubaker, *Default Rates of Interest, Part II*, at 3 (quoting SCALIA & GARNER, READING LAW, at 149). According to Professor Brubaker, the insertion of the word "penalty" before "provision" serves as a determiner, thereby causing the "relating to" phrase to modify only "penalty provision," and not also "penalty rate." *Id.*

This argument rests on a misunderstanding of the nature and use of determiners. Determiners are not adjectives; typically, they are either articles or pronouns. *See* SCALIA & GARNER, READING LAW, at 148-49 (listing "a, the, [and] some" as typical determiners); *see also Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 672 & n. 21 (E.D. Pa. 2018) ("'Any' is a determiner that quantifies the noun it modifies."); *see also id.*, at 672-73 (under series-qualifier

Had Congress instead meant to create two exceptions, it presumably would have used quite different language. Most simply, the addition of a comma and the word "any" after the words "any penalty rate"—to make the phrase read "the satisfaction of any penalty rate, or **any** penalty provision relating to a [nonmonetary] default"—would have made this meaning much more apparent. Even better, the addition of a few more words—to make the phrase read "the satisfaction of any penalty rate, or **the satisfaction of any** penalty provision relating to a [nonmonetary] default"—would have left little doubt that Congress intended to create two distinct exceptions.

Consideration of the historical context underscores the significance of the word choices Congress made when it enacted § 365(b)(2)(D). As discussed above, Congress added both that section and § 1123(d) to the Bankruptcy Code at the same time, as part of the 1994 Bankruptcy Reform Act, and Congress's stated purpose for adding the latter section was to overrule the Supreme Court's 1993 *Rake v. Wade* decision. *Rake*, in turn, rested heavily on the reasoning of a then-recent Supreme Court decision, *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989), which had drawn extensive criticism for its "hyper-textualist" reading of § 506(b)—in particular, the decisive weight the Court gave to the placement of a comma and the word "any" in

---

canon, modifier applied only to the second series of words "because the determiner 'any' signals the start of the second series"). Whereas an adjective modifies a noun, a determiner "determines the use of a noun without essentially modifying it," *Webster's New World College Dictionary*, 4th ed. (2010). The use of determiners also differs from that of adjectives: Determiners must be placed *before* the noun (and any descriptive adjectives), while adjectives can modify the noun even if placed after the noun. *See id.*; *see also* Rodney Huddleston & Geoffrey K. Pullum, The Cambridge Grammar of the English Language 253 (2002). In both of these respects, "penalty" is not a determiner: It modifies "provision," and it can be placed either before or after that word (e.g., "a penalty provision" or "a provision that is a penalty").

that section.[21] Having enacted § 1123(d) to overrule *Rake*, Congress presumably was aware of the importance the Supreme Court gave to syntactical details of this sort, yet it chose not to add a comma, or the word "any," or to use any other grammatical device to set off the words "penalty rate" and make clear that those words were not modified by the "relating to" phrase that followed.

Finally, consideration of § 365(b)(2) as a whole provides still further support for the conclusion that subsection (D) creates one exception, rather than two, to § 365(b)(1)'s cure requirements. Each of § 365(b)(2)'s three other subsections addresses a single type of default provision—relating either to the debtor's financial condition, or to the filing of a bankruptcy case, or to the appointment of a trustee or custodian. *See* 11 U.S.C. § 365(b)(2)(A), (B) & (C). Had Congress intended subsection (D) to create cure exceptions for two separate and distinct sorts of default provisions, one might reasonably expect Congress to have put each of these exceptions in a subsection of its own, to maintain the parallelism of this structure. Congress's decision to create only a single new subsection (D), rather than two new subsections, suggests that it intended to create only one new cure carve-out, not two.

## 2. Legislative History of the 1994 Amendments

When a statute is ambiguous, as it is here, consideration of legislative history can aid in

---

[21] Overturning long-settled case law and practice, *Ron Pair* held that a nonconsensual lienholder was entitled to post-petition interest under § 506(b) to the extent it was oversecured. 489 U.S. at 237. The Court based this holding on a close reading of the text of § 506(b)—in particular, the phrase "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement." *Id.* at 241. The Court held that the modifier at the end of this phrase (the words "provided for under the agreement") modified only "any reasonable fees, costs, or charges," and not also "interest on such claim." *Id.* at 241-42. In so holding, the Court gave primary weight to the fact that the words "interest on such claim" were followed by a comma and the word "any," which to the Court indicated an intent to make these words independent of the modifier. *Id.*; *see also* Charles J. Tabb & Robert M. Lawless, *Of Commas, Gerunds, and Conjunctions: The Bankruptcy Jurisprudence of the Rehnquist Court*, 42 SYRACUSE L. REV. 823, 843-46 (1991) (criticizing *Ron Pair* as "textualism at its most extreme").

determining the statute's meaning. *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 143–44 (2d Cir. 2002); *United States v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000) ("When the plain language and canons of statutory interpretation fail to resolve statutory ambiguity, we will resort to legislative history."). Care must be taken, however, to ensure that the legislative history is relevant, reliable, and useful. *See* ESKRIDGE, INTERPRETING LAW, at 237-40; *see also id.* at 240-45 (discussing application of these criteria to committee reports).

The Debtor, citing to Professor Brubaker's article, argues that its reading of § 365(b)(2)(D) is supported by the legislative history—in particular, the House Report for H.R. 5116, the bill that became the Bankruptcy Reform Act of 1994. That House Report stated, in relevant part: "section 365(b) is clarified to provide that when sought by a debtor, a lease can be cured at a nondefault rate (i.e., it would not need to pay penalty rates)." H.R. Rep. No. 103-835, at 50. To the Debtor and Professor Brubaker, this report—which did not limit the carve-out to non-monetary defaults— shows that Congress intended § 365(b)(2)(D) to excuse payment of penalty rates of all sorts, whether triggered by monetary or non-monetary defaults. *See* Brubaker, *Default Rates of Interest, Part II*, at 6-7.

At first blush, the House Report does appear to support this conclusion. The problem, however, is that the language of the Judiciary Committee's bill—the bill the House Report addressed—differed in key respects from the language of the statute that Congress passed two days later.[22] Most significantly, the carve-out language in the Judiciary Committee's bill was not limited

---

[22] The bill was reported out of the House Judiciary Committee, together with the House Report, on October 4, 1994. Later that day, an amended version of the bill – the version that was ultimately enacted – was presented on the House floor. The House voted to approve that amended bill on October 5; the Senate voted to approve it, with no further amendments, on October 6; and President Clinton signed the bill into law later that month. Actions - H.R.5116 - 103rd

to non-monetary defaults, as the eventual statutory language was, but instead appeared to excuse penalty rates and provisions relating to defaults of any sort. Specifically, the Judiciary Committee bill would have added a new subsection (D) to § 365(b)(1), causing it to read as follows:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> . . .
>
> (D) satisfy [sic] any penalty rate or provision relating to a default arising from any failure by the debtor to perform *the obligations under the contract or executory lease* after the order for relief.

H.R. 5116 [Report No 103-835], 103d Cong., 2d Sess. (Oct. 4, 1994) (emphasis added) (PDF) [https://perma.cc/9ZHY-L8MY].[23]

This language is poorly drafted, and its meaning is far from clear. But it is amenable to a reading consistent with the House Report: By requiring the debtor to satisfy any penalty rate or provision relating to any default after the order for relief—*i.e.,* any *post*-petition default—it can be read to excuse the debtor's satisfaction of any penalty rate or provision relating to any *pre*-petition default. This reading jibes with the House Report, which as noted described the bill as allowing the debtor to cure defaults of all sorts, monetary as well as nonmonetary, without paying penalty rates.

---

Congress (1993-1994): Bankruptcy Reform Act of 1994, H.R.5116, 103rd Cong. (1994), https://www.congress.gov/bill/103rd-congress/house-bill/5116/all-actions [https://perma.cc/Y4RT-LS4F].

[23] It is curious that the Judiciary Committee bill, unlike the ultimately-enacted version of the bill, would have added the new subsection (D) to § 365(b)(1), rather than to § 365(b)(2). However, the choice between adding the new subsection to (b)(1) or instead to (b)(2) made little difference: Either way, the new subsection (D) specified the sorts of penalty rates and provisions that the debtor was not required to cure.

However, the bill was amended on the House floor, later on October 4, to change "*the obligations* under the contract or executory lease" to "*nonmonetary obligations* under the contract or executory lease" (emphasis added), the language that was ultimately enacted. That is, the carve-out language was narrowed, presumably because the broader version of that language in the Judiciary Committee's bill could not command sufficient votes to secure approval on the House floor. The House Report, having been addressed to the earlier version of the bill, sheds no light on the intent behind this crucial amendment, nor does any other part of the legislative record illuminate the specific political dynamics or negotiations that resulted in this amendment.[24] As a result, we can only speculate about what happened behind the scenes.[25] The sole conclusion we can safely draw is that the House Report cannot be relied upon to accurately reflect the meaning of § 365(b)(2)(D) as ultimately enacted.

---

[24] None of the House floor statements on October 4 or 5 make any mention of the amendment, or even of § 365. 140 Cong. Rec. D1199-01, 1994 WL 545726; 140 Cong. Rec. H10726-08, 1994 WL 545701; 140 Cong. Rec. H10752-01, 1994 WL 545773. Moreover, because the Senate on October 5 voted to approve an identical bill, no conference report was needed. Actions - H.R.5116 - 103rd Congress (1993-1994): Bankruptcy Reform Act of 1994, H.R.5116, 103rd    Cong.    (1994),    https://www.congress.gov/bill/103rd-congress/house-bill/5116/all-actions [https://perma.cc/Y4RT-LS4F].

[25] The bill's drafting history gives some clues as to the special interests that may have been involved. Specifically, the amendments to § 365(b) were part of a section of the bill—Section 219, entitled Leases of Personal Property— principally aimed at protecting personal property lessors, such as equipment lessors and airplane manufacturers. In addition to amending § 365(b), Section 219 amended *§ 365(d)* to require debtors to begin performing their obligations under personal property leases within 60 days after the petition date. *See* Pub. L. No. 103-394, tit. II, § 219, 108 Stat. 4106 (Oct. 22, 1994). The bulk of the House Report's discussion of Section 219 addressed these amendments to § 365(d). *See* H.R. Rep. 103-835, at 50. Only the final sentence of that discussion mentioned the amendment of § 365(b), and (oddly) even that sentence referred only to cure of leases, not to cure of executory contracts. *See id.*

Viewed in this context, it appears that the amendment to § 365(b) may have been included in the bill as a *quid pro quo*—a bone thrown to lessees (e.g., manufacturers that lease equipment, airlines that lease planes) to partially compensate them for the benefits that equipment and other lessors got from the 60-day-performance requirement. If that is indeed what happened, then the scaling back of the penalty-rate carve-out after the bill left the Judiciary Committee (so that it covered only nonmonetary defaults, not all defaults) presumably was due to the lessee lobby having less support, relative to the lessor lobby, on the House floor than it had on the Judiciary Committee.

### 3. Legislative History of the 2005 Amendments

The Debtor, citing Professor Brubaker, argues that the 2005 BAPCPA amendments—which added a second "penalty" modifier to the text of § 365(b)(2)(D)—provide further confirmation that Congress intended that section to create two exceptions, not one, to § 365(b)(1)'s cure requirements. *See* Brubaker, *Default Rates of Interest, Part II*, at 2-3. However, as discussed in Point II.C.1 above, a review of the text of § 365(b)(2)(D) does not support this conclusion. This was true before the 2005 amendments to § 365, and it is no less true thereafter.

Moreover, the context of the 2005 amendments makes clear that Congress's focus in making these amendments was not on whether § 365(b)(2)(D) carved out penalty rates triggered by monetary defaults. Rather, as discussed in the Statutory Background section above, Congress's focus was on the scope of that section's carve-out with respect to *non-monetary* defaults—specifically, whether the carve-out covered only penalty provisions triggered by non-monetary defaults, or also the non-monetary defaults themselves. To resolve the circuit split over that issue, Congress added the second "penalty" qualifier, thereby making it impossible to read the word "provision" to include all non-monetary default provisions, as the First Circuit had read it in *BankVest. See* 360 F.3d at 300. Nothing in the context of the 2005 amendments suggests that Congress also intended to clarify the separate issue before this Court: whether § 365(b)(2)(D) carves out penalty rates triggered by *monetary* defaults.

The Debtor contends that the House Report for the 2005 BAPCPA amendments does address this issue, albeit in a single sentence. H.R. Rep. 109-31(I), at 83 (2005). Specifically, that House Report states, without further explanation, that the second "penalty" modifier was added to § 365(b)(2)(D) "to clarify that [this section] applies to penalty provisions." *Id.* at 83. On its face,

36

this statement does appear to support the Debtor's reading. However, the statement is in a section of the House Report bearing the title "Defaults Based on Nonmonetary Obligations." *See id.* Viewed in that context, the statement in the House Report appears to refer only to penalty provisions for non-monetary obligations. And this conclusion is confirmed by consideration of the larger context: As just discussed, Congress's focus in enacting the 2005 amendments to § 365(b)(2)(D) was to make clear that that section excused cure only of penalty provisions, and not also of the underlying defaults.

Thus, there is no basis to conclude that the legislative history of the 2005 amendments supports the Debtor's reading of § 365(b)(2)(D).

### 4. The Purposes of Chapter 11

The Debtor urges the Court to construe § 365(b)(2)(D) in a manner that furthers the overarching purposes of the Bankruptcy Code, and Chapter 11 in particular, such as facilitating reorganization and maximizing creditor recoveries. Those purposes, Professor Brubaker has argued, would be promoted by reading § 365(b)(2)(D) to excuse payment of default interest, because default interest provisions can operate in a fashion similar to *ipso facto* clauses: If sufficiently extreme, they can be impossible for a debtor to cure. Moreover, this problem could snowball if parties began to put exorbitant default interest provisions into their agreements, pre-bankruptcy, as a means of preventing assumption or reinstatement in the event of a bankruptcy filing. *See* Brubaker, *Default Rates of Interest, Part II,* at 2 & n. 7; *see also BankVest,* 360 F.3d at 301 (noting "similar interests" served by excusing cure of *ipso facto* clauses, non-monetary defaults and penalty rates).

This policy argument is not frivolous. As the First Circuit observed in *BankVest,*

37

"'Congress's basic purpose in [enacting] § 365 [was] to promote 'the successful rehabilitation of the business for the benefit of both the debtor and all its creditors,'" and Congress therefore presumably did not intend to make a debtor's assumption of essential contracts contingent on cure of default provisions that may be incurable. *Id.* at 300 (construing § 365(b)(2)(D), prior to the 2005 amendments, not to require cure of incurable nonmonetary defaults) (internal citation omitted).

However, the argument ultimately is unpersuasive for a number of reasons. First, default interest provisions are not the same as *ipso facto* clauses or incurable nonmonetary defaults. As the Second Circuit observed in *Ruskin v. Griffiths*, a default rate "can be beneficial to a debtor in that it may enable him to obtain money at a lower rate of interest than he could otherwise obtain it." 269 F.2d at 832. Moreover, in contrast to *ipso facto* clauses or incurable nonmonetary defaults, default interest provisions do not in fact appear to pose an appreciable threat to debtors' ability to reorganize. Courts have been requiring payment of default interest as part of cure for decades, yet the Court is unaware of any instances of default interest provisions hamstringing reorganizations, as nonmonetary default provisions had sometimes done before Congress addressed that issue through its 2005 amendments to § 365. *See BankVest*, 360 F.3d at 299-300.

Second, as discussed above, a natural reading of the text of § 365(b)(2)(D) runs strongly counter to the Debtor's interpretation. While the statute's text is not unambiguous, it is clear enough to set a high bar for any policy argument advanced in support of a contrary reading.

Finally, section 365(b)(2)(D) was the product of a messy legislative process, which had little to do with the Bankruptcy Code's broader purposes. Recall that § 365(b)(2)(D)'s final wording (including the crucial insertion of the word "nonmonetary") was a last-minute addition. It was not part of the Judiciary Committee's bill, nor was it the product of any recorded debate,

much less any committee hearings, over competing policies or principles. Instead, the key language appears to be the product of behind-the-scenes haggling among special interests, who for reasons of their own agreed to the cryptic language that appears in the final bill. As some commentators have observed, unrecorded compromises of this sort can be particularly ill-suited to a "purposivist," or policy-based, interpretation. *See* John F. Manning, *What Divides Textualists From Purposivists*, 106 COLUM. L. REV. 70, 74 (2006) ("[T]he final wording of a statute may reflect an otherwise unrecorded legislative compromise, one that may—or may not—capture a coherent set of purposes."); Frank H. Easterbrook, *Statutes' Domains*, 50 U. CHI. L. REV. 533, 548 (1983) ("[W]hen logrolling is at work the legislative process is submerged and courts lose the information they need to divine the body's design."). In circumstances of this sort, the Court should be particularly reluctant to depart from a natural reading of the statute's text.

**<u>Conclusion</u>**

For the foregoing reasons, the Court rules that, to cure and reinstate its loan under a plan of reorganization, the Debtor must pay default interest and fees to the extent required by its loan agreement and New York law. The Debtor has reserved its right to argue that it does not owe such interest and fees as a matter of New York law, as well as its right to challenge the amount of any default interest and fees it may owe, and the Court therefore has not addressed those reserved issues.

Counsel for the Lenders shall email an order consistent with this ruling to chambers, copying counsel for the Debtor. The parties shall consult and schedule a status conference with the Court in the next three weeks.


   Dated: New York, New York
   July 31, 2023


                                          /s/ Philip Bentley
                                    _____
                                    **Honorable Philip Bentley**
                                    **United States Bankruptcy Judge**

# Appendix

## 11 U.S.C. § 365(b)

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee--

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;[26]

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

(2) Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to--

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title; ~~or~~

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement~~.~~; or

***(D) the satisfaction of any penalty rate or*** penalty ***provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.***

---

[26] Key: 1994 amendments are in bold and italic. 2005 amendments are underlined.

41

### <u>11 U.S.C. § 1123</u>

(a)Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

    (5) provide adequate means for the plan's implementation, such as—

        (G ) curing or waiving of any default; . . . .

. . .

***(d) Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.***

## <u>11 U.S.C. § 1124(2)</u>

Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—

. . .

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—

(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title <u>or of a kind that section 365(b)(2) expressly does not require to be cured</u>;

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; ~~and~~

(D) <u>if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and</u>

<u>(E)</u> does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.