**Hearing Date: October 24, 2023**
**Hearing Time: 10:00 a.m.**

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Golden Seahorse LLC*
*Debtor and Debtor-in-Possession*
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
Scott S. Markowitz, Esq.
Rocco Cavaliere, Esq.
smarkowitz@tarterkrinsky.com
rcavaliere@tarterkrinsky.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
In re:                                                    :
                                                          :    Chapter 11
GOLDEN SEAHORSE LLC,[1]                                    :
                                                          :    Case No.: 22-11582 (PB)
                              Debtor.                      :
---------------------------------------------------------- x

### NOTICE OF HEARING ON DEBTOR'S OBJECTION TO PROOFS OF CLAIM NOS. 13, 14, 15, AND 16 FILED BY WILMINGTON TRUST NATIONAL ASSOCIATION, ON BEHALF OF PREPETITION LENDERS, PURSUANT TO 11 U.S.C. § 502(b), FED. R. BANKR. P. 3001 AND 3007

**PLEASE TAKE NOTICE**, that upon the objection (the "Objection") of Golden Seahorse

LLC (the "Debtor"), by its attorneys, Tarter Krinsky & Drogin LLP, and upon the declaration of

Jianfeng Qin, the hearing will be held before the Honorable Philip Bentley, United States

Bankruptcy Judge via Zoom for Government[2] at the United States Bankruptcy Court for the

Southern District of New York (the "Bankruptcy Court"), located at One Bowling Green, New

York, New York 10004, on **October 24, 2023 at 10:00 a.m.** or as soon thereafter as counsel may be

---

[1] The Debtor's last four digits of its tax identification number are 4770. The Debtor's principal place of business is 99-103 Washington Street, New York, New York.

[2] Any party who wishes to attend the Hearing is required to register their appearance 48 hours before any scheduled Zoom® hearing with the eCourtAppearances tool on the Court's website. Judge Bentley's Zoom instructions may be viewed at https://www.nysb.uscourts.gov/content/judge-philip-bentley The Hearing may be adjourned, from time to time, by announcement in open Court without any further or other notice thereof.

heard (the "Hearing"), for an order, pursuant to §502(b) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3007 for an Order expunging portions of Proofs of Claim Nos. 13 through 16 ("Proofs of Claim") filed by Wilmington Trust National Association on behalf of various prepetition lenders or alternatively reducing the Proofs of Claim as more fully set forth herein.

**PLEASE TAKE FURTHER NOTICE**, that a copy of the Objection may be obtained from the Bankruptcy Court's website at http://www.nysb.uscourts.gov using a Pacer password (to obtain a Pacer password, go to the Pacer website at http://www.pacer.gov) or by contacting Debtor's undersigned attorneys by email or telephone.

**PLEASE TAKE FURTHER NOTICE**, that responses, if any, to the Objection:

(1)     shall be set forth in a writing describing the basis therefor, and conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the United States Bankruptcy Court for the Southern District of New York; and

(2)     shall be filed and served as follows, so as to be received no later than **October 4, 2023 at 5:00 p.m.**:

(i)     shall be filed with the United States Bankruptcy Court for the Southern District of New York (a) in accordance with General Order M-399, electronically, by registered users of the Bankruptcy Court's case filing system, or (b) in accordance with Local Bankruptcy Rules 5005-1 and 9004-1, submitted to the Clerk of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004;

(ii)     shall be submitted in hard-copy form directly to the chambers of the Honorable Philip Bentley, United States Bankruptcy Judge, at the Bankruptcy Court, One Bowling Green, New York, New York 10004 in accordance with Local Bankruptcy Rule 9070-1; and

(iii)    shall be served upon: (a) Tarter Krinsky & Drogin LLP, 1350 Broadway, 11th Floor, New York, New York 10018 (Attn: Scott S. Markowitz, Esq.), counsel to the Debtor; and (b) the Office of the United States Trustee, Alexander Hamilton Custom House, One Bowling Green, Suite 534, New York, NY 10004-1408 (Attn: Shannon Scott, Esq.).

Dated: New York, New York
         September 21, 2023

**TARTER KRINSKY & DROGIN LLP**
*Counsel to Golden Seahorse LLC*
*Debtor and Debtor-in-Possession*

By: /s/ Scott S. Markowitz
     Scott S. Markowitz, Esq.
     Rocco A. Cavaliere, Esq.
     1350 Broadway, 11th Floor
     New York, New York 10018
     Tel: (212) 216-8000
     Fax: (212) 216-8001
     smarkowitz@tarterkrinsky.com
     rcavaliere@tarterkrinsky.com

**Hearing Date: October 24, 2023**
**Hearing Time: 10:00 a.m.**

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Golden Seahorse LLC*
*Debtor and Debtor-in-Possession*
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
Scott S. Markowitz, Esq.
Rocco Cavaliere, Esq.
smarkowitz@tarterkrinsky.com
rcavaliere@tarterkrinsky.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x

In re:                                                          :
                                                               :    Chapter 11
GOLDEN SEAHORSE LLC,[1]                                         :
                                                               :    Case No.: 22-11582 (PB)
                                             Debtor.            :
---------------------------------------------------------- x

**DEBTOR'S OBJECTION TO PROOFS OF CLAIM NOS. 13, 14,**
**15, AND 16 FILED BY WILMINGTON TRUST NATIONAL**
**ASSOCIATION, ON BEHALF OF PREPETITION LENDERS,**
**PURSUANT TO 11 U.S.C. § 502(b), FED. R. BANKR. P. 3001 AND 3007**

**TO:    THE HONORABLE PHILIP BENTLEY**
**UNITED STATES BANKRUPTCY JUDGE**

Golden Seahorse LLC, the debtor and debtor-in-possession (the "Debtor"), by and

through its counsel, Tarter Krinsky & Drogin LLP, hereby submits this claim objection (the

"Objection") and supporting declaration of Jianfeng Qin sworn to on September 21, 2023 (the

"Qin Declaration") annexed hereto as **Exhibit "A"**, pursuant to section 502(b) of Title 11 of the

United States Code (the "Bankruptcy Code"), Rules 3001 and 3007 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and applicable New York law, seeking (i) to

---
[1] The Debtor's last four digits of its tax identification number are 4770.  The Debtor's principal place of business is
99-103 Washington Street, New York, New York.

089271\1\170359177.v1

reduce the proofs of claim docketed as claim nos. 13, 14, 15, and 16 (collectively, the "Proofs of Claim") filed by Wilmington Trust, National Association ("Wilmington Trust") as Trustee for the benefit of the Registered Holders of Commercial Mortgage Pass-Through Certificates Series 2018-C6, Wells Fargo Commercial Mortgage Trust 2018-C47 And CSAIL 2018-C14 Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2018-C14 and as authorized representative for HI FIDI B Note Owner LLC (collectively, the "Prepetition Lenders") and (ii) to obtain such other and further relief as the Court deems appropriate.   In support of this Objection, the Debtor states as follows:

## JURISDICTION; VENUE; STATUTORY BASES FOR RELIEF

1.    This Court has jurisdiction over the Objection pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of the Objection is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (B).  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for the relief requested herein are section 502(b) of the Bankruptcy Code, Bankruptcy Rules 3001 and 3007 and the applicable law of the State of New York.

## PRELIMINARY STATEMENT

2.    This Court recently rendered the "Bankruptcy Code Decision" (defined below) that determined under various provisions of the Bankruptcy Code the Debtor would be required to pay the Default Interest/Fees (as defined below) as a result of a prepetition monetary default in order to reinstate its Loan (defined below) with the Prepetition Lenders.  The legal briefing leading to the Bankruptcy Code Decision was limited to the arguments pertaining to the Bankruptcy Code but left open the possibility the Default Interest/Fees could be expunged or reduced under applicable non-bankruptcy law.  By this Objection, the Debtor objects to the Default Interest/Fees as a whole, or in part, for the reasons set forth herein.

2

## BACKGROUND

A.   **General**

3.      On November 29, 2022 (the "Petition Date"), the Debtor filed a petition with this Court commencing a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtor is authorized to continue operating its business and managing its property as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in this Chapter 11 case.

4.      The Debtor operates a full-service hotel under the Holiday Inn flag located at 99 Washington Street, New York, New York (the "Hotel").   The Debtor constructed the Hotel between 2010 and 2014 and it opened for business in October 2014. Pursuant to a license/franchise agreement dated October 15, 2014, the Hotel operates under the Holiday Inn flagship/brand.  The Hotel is fifty (50) stories, the tallest Holiday Inn in the world and consists of 492 rooms and includes a full-service restaurant at the Hotel.

5.      The Debtor obtained a loan in 2014 in connection with the construction of the Hotel.   Thereafter, in or about September 2018, the Debtor refinanced the 2014 loan in connection with a loan agreement (the "Loan Agreement") in the total principal amount of $137,025,000 (the "Loan") from Ladder Capital Finance LLC ("Ladder"). A copy of the Loan Agreement is annexed hereto as **Exhibit "B"**.  At the time of the original Loan in 2014 and later in 2018, as more fully set forth in the Qin Declaration, neither the Debtor nor Ladder could have foreseen there would be a worldwide pandemic less than two years after the refinancing. See Qin Declaration, ¶ 7.  The Loan was ultimately split into four separate tranches and as of the Petition Date and continuing to this date, three tranches in the amount of roughly $87 million in principal are held by Wilmington Trust as trustee for various note holders and one tranche in the principal

3

amount of $50 million is held by Note B Holder. The non-default interest rate is 5.259%, which equates to roughly a $612,000 monthly payment.

6.      The Debtor was current on all payments under the Loan up until the onset of the Covid-19 pandemic when the Hotel was forced to close from March 22, 2020 through July 14, 2020. Indeed, the Debtor's first payment default on the Loan was the interest payment due by May 5, 2020 for the May 2020 interest payment. Thereafter, prior to the Petition Date, Wilmington Trust, on behalf of the Prepetition Lenders, swept all of the Debtor's funds (over $11 million) in various cash management accounts that included sales tax due to New York State and the Hotel's occupancy taxes due to New York City. Wilmington Trust utilized such cash to apply to unpaid non-default interest and special servicer fees, among other things. In short, the Debtor was essentially current on all interest payments at the non-default rate on the A Notes through February 2022, but notwithstanding the Debtor's good faith efforts and substantial payments, once the interest rate environment changed in early 2022, the Prepetition Lenders accelerated the Loan. See Letter dated February 2, 2022, annexed as **Exhibit "C"**.

7.      The Debtor attempted to reach a consensual resolution with Midland Loan Services ("Midland"), the special servicer to Wilmington Trust, but unfortunately, Midland rejected the Debtor's overtures and proceeded to commence an action styled as Wilmington Trust, National Association as Trustee v. Golden Seahorse, LLC, et al., Index No. 850073/2022 (the "State Court Action") in March 2022. In support of the relief requested, which included, among other things, (i) foreclosure on the mortgage, (ii) appointment of a receiver and (iii) an injunction to prevent the Debtor from taking certain actions, the Lenders filed the Declaration of Kyle Morris dated June 14, 2022 (the "Morris Declaration"), annexed hereto as **Exhibit "D"** and the Lenders' Statement of Material Facts dated June 21, 2022 (the "Lenders' Statement of

4

Material Facts"), annexed hereto as **Exhibit "E"**.  In such documents, the Prepetition Lenders identified various Events of Default under the Loan Agreement, including a "payment default" related to non-payment of interest and other non-monetary defaults.  In reliance on the Lenders' submissions, including the documents identified above, by Decision and Order dated September 27, 2022, the Honorable Frances A. Kahn, III granted Wilmington Trust's motion to appoint a receiver but denied Wilmington Trust its request for injunctive relief finding, among other things, it had not satisfied the factors for a preliminary injunction.  Thus, faced with the prospect of a complete loss of equity and value as well as the potential loss of rights under various contracts as a result of the appointment of the receiver, the Debtor filed its bankruptcy petition to preserve the Debtor's business and maximize value for all creditors and constituents.

8.      In accordance with this Court's *Final Order (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Adequate Protection to the Pre-Petition Lenders, (III) Modifying the Automatic Stay and (IV) Granting Related Relief*, the Debtor has been satisfying its post-petition obligations, including an adequate protection payment of $612,000 per month to its Prepetition Lenders.  Indeed, since the Petition Date, the Prepetition Lenders have received well over $6 million on account of non-default interest. As confirmed by counsel to the Prepetition Lenders at a hearing on April 18, 2023, there is presently no dispute the Prepetition Lenders are adequately protected.

9.      After legal briefing by the parties focused solely on the Bankruptcy Code implications of the Default Interest/Fees on reinstatement of the Loan the Court rendered a written decision on July 31, 2023 in favor of the Prepetition Lenders, which decision was subsequently modified on August 16, 2023 (the "Bankruptcy Code Decision").  On August 17, 2023, the Court entered the Order Concerning Treatment of Lenders' Claims in Debtor's Plan of

Reorganization.  The Debtor appealed the Order and Bankruptcy Code Decision on August 30, 2023.  The parties have agreed to certify the appeal to the Second Circuit.

## B.  The Prepetition Lenders' Proofs of Claim

10.    There are four tranches to the Debtor's Loan with the Prepetition Lenders, and thus, the Prepetition Lenders filed four separate Proofs of Claim specifically setting forth its claim amount related to each tranche, as follows:

| | | |
|---|---|---|
| (a) Note A-1-A: | $35,474,902.52 (Claim No. 13) |
| (b) Note A-2: | $43,823,949.13 (Claim No. 14) |
| (c) Note A-3-A: | $31,302,920.71 (Claim No. 15) |
| (d) Note B: | $68,879,818.47 (Claim No. 16) |
| Total: | $179,481,590.83 |

Copies of each of the Proofs of Claim together with the calculation of the Proofs of Claim (excluding the notes as attachments thereto) are annexed hereto as **Exhibit "F"**.

11.    Collectively, the four tranches equal $179,481,590.83, which are broken down as follows by the type of claim it represents as of the Petition Date, as follows:

| | |
|---|---|
| (a) Principal: | $137,025,000.00 |
| (b) Non-Default Interest: | $11,190,841.34 |
| (c) Penalty Interest: | $17,813,250.00 |
| (d) Late Fees: | $1,661,697.88 |
| (e) Special Servicing Fees: | $660,013.08 |
| (f) Liquidation Fee: | $1,000,000.00 |
| (g) Real Estate Tax Advances: | $680,938.01 |
| (h) Protection Advances – Legal: | $130,316.11 |
| (i) Protection Advances: Inspection, Appraisals: | $17,355.25 |
| (j) Interest on Advances: | $290,573.11 |
| (k) Prepayment Premium: | $9,009,982.87 |
| (l) Payoff Processing Fees: | $1,750.00 |
| (m) Less Credit for Reserves: | ($126.82) |
| | $179,481,590.83 |

12.    With respect to the amounts above, there is no disagreement regarding the amount of principal, as of the Petition Date, *i.e.* $137,025,000. As to non-default interest, based on recent

communications between the Debtor and Prepetition Lenders, the Debtor believes the amount of the non-default interest should be reduced to $10,590,330.70 from the asserted amount of $11,190,841.34 and the Prepetition Lenders believe the amount of non-default interest should be reduced to $10,724,714.44. The Debtor hopes to resolve this discrepancy in advance of the hearing on this Objection; otherwise, the Debtor intends on pressing its Objection in support of its calculation of non-default interest. Further, the Debtor and Prepetition Lenders agree that if the Debtor's plan seeking reinstatement or modification of the Loan is confirmed, the Debtor will not have to satisfy or pay the prepayment premium of $9,009,982.87.[2] As such, in light of this agreement, the Debtor does not need to object to the prepayment premium as part of this Objection. Finally, of the amounts reflected in the Proofs of Claim and aggregated in the paragraph above, without waiving any legal arguments impacting the balance of the Proofs of Claim, the Debtor is not objecting to (i) real estate tax advances in the amount of $680,938.01, (ii) protection advances related to legal fees of $130,316.11, (iii) inspections and appraisals of $17,355.25,[3] (iv) interest on advances of $290,573.11, and the (v) payoff processing fees of $1,750.

13.    As a result of the agreements between the parties and the Debtor's reconciliation, the only portions of the Proofs of Claim that are the subject of this Objection relate to: (i) Default Interest in the amount of $17,813,250.00, (ii) Late Fees in the amount of $1,661,697.88, (iii) Special Servicing Fees in the amount of $660,013.08, and (iv) the Liquidation/Workout Fee in

---

[2] However, the Prepetition Lenders intend to reserve for argument at confirmation the right to a prepayment premium for possible future payment in the event of a subsequent sale or prepayment of the Loan (or in the context of a Court-approved plan to sell or payoff the Loan). Likewise, the Debtor is reserving the right at confirmation of its Plan to eliminate any prepayment premium from the Loan under all circumstances.

[3] Copies of the appraisals sought to be paid by the estate will be requested in connection with discovery requests pertaining to this Objection or any valuation hearing.

7

the amount of $1,000,000, which, in the aggregate, total $21,134,960.96 (collectively referred to herein as the "Default Interest/Fees").

14.     Importantly, Wilmington Trust is not the trustee on Note B, but the Debtor and this Court have been advised they are authorized to act as agent to the holder of the Note B.

## RELIEF REQUESTED

15.     By this Objection, and pursuant to § 502(b) of the Bankruptcy Code, Bankruptcy Rules 3001 and 3007 and applicable New York law, the Debtor hereby seeks (i) to expunge the Proofs of Claim or alternatively reduce them for the reasons set forth herein, and (ii) such other and further relief as the Court deems appropriate.

## APPLICABLE LAW

### A.     General Law

16.     A filed proof of claim is "deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). If an objection refuting at least one of the claim's essential allegations is asserted, the claimant has the burden to demonstrate the validity of the claim. See In re Oneida Ltd., 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009).

17.     Correctly filed proofs of claim "constitute [ ] prima facie evidence of the validity [and amount] of the claim. To overcome this prima facie evidence, the objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." Sherman v. Novak (In re Reilly), 245 B.R. 768, 773 (2d Cir. BAP 2000) (internal citations omitted); see also In re Vivaro Corp., 541 B.R. 144, 153–54 (Bankr. S.D.N.Y. 2015). By producing "evidence equal in force to the prima facie case," an objector can negate a claim's presumptive legal validity, thereby shifting the burden back to the claimant to "prove by a preponderance of the evidence that under applicable law the claim should be allowed." Creamer

v. Motors Liquidation Co. GUC Tr. (In re Motors Liquidation Co.), 2013 WL 5549643, at *3 (S.D.N.Y. Sept. 26, 2013) (internal quotation marks omitted); see also Vivaro Corp., 541 B.R. at 154.  As a result, by virtue of this Objection, the burden shifts back to the Prepetition Lenders to demonstrate a legally viable basis in support of the Proofs of Claim.

18.    Section 502(b)(1) disallows any claim that is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1). This provision is most naturally understood to provide that, with limited exceptions, any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy.  Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 549 U.S. 443, 450–51, 127 S. Ct. 1199, 1204–05, 167 L. Ed. 2d 178 (2007)(citing 4 Collier ¶ 502.03[2] [b], at 502–22 (explaining that § 502(b)(1) is generally understood to "make available to the trustee any defense" available to the debtor "under applicable nonbankruptcy law"—i.e., any defense the debtor "could have interposed, absent bankruptcy, in a suit on the [same substantive] claim by the creditor")).

**B.  The Default/Interest Fees Should Be Expunged
In Accordance With Applicable State Law**

19.    The Court's Bankruptcy Code Decision was based on the Court's interpretation of the Bankruptcy Code and application of the series-canon qualifier to the statutory sections at issue to ultimately conclude that Congress determined that only "nonmonetary" defaults could potentially escape default interest but that default interest arising from "monetary" defaults was required to be paid under section 1123(d).  The Court's Bankruptcy Code Decision made clear, however, that it did not address whether the Default Interest/Fees could be avoided based on arguments and defenses under "applicable nonbankruptcy law", i.e. New York law.

9

20.     The Debtor respectfully submits that due to various New York state law defenses and the facts and circumstances of this case, including numerous governmental orders which effectively closed down the Hotel and did not allow it to operate at all from March 22, 2020 through July 14, 2020 and, thereafter from January 28, 2021 through April 14, 2021 as a result of the Omicron surge, with limited to no business until mid/late 2022, this Court should disallow the Default Interest/Fees.   New York courts have historically provided relief to parties to contracts in which unforeseeable circumstances gave rise to the inability to perform under a contract.   These defenses include (i) force majeure, (ii) frustration of purpose, and (iii) impossibility or impracticability.  A brief recitation of the law on these principles follows.

21.     There does not appear to be a "force majeure clause" in the Loan Agreement. However, the parties negotiated various provisions of the Loan Agreement which contemplated the Hotel was to remain open and the Debtor was to maintain access at all times (Loan Agreement, § 3.1.12), with the anticipation that it would not cease continuously operating (Loan Agreement, § 7.2.2(xvii)).[4]  Further, the Debtor was required by the Loan to comply with all "Legal Requirements"[5] applicable to the Hotel (Loan Agreement, § 4.1.2) and thus, the Debtor did not have an option (even from the perspective of the Prepetition Lenders) to disregard governmental shutdown orders.   While the Prepetition Lenders will no doubt argue the Debtor should have insisted on a "force majeure" clause, the same holds true for the sophisticated Prepetition Lenders.  A "missing term [may] be fairly and reasonably fixed by the surrounding

---

[4] One of the Events of Default under the Loan Agreement was triggered by New York's executive Orders and is, in essence, a nonmonetary default, whether or not called by the Prepetition Lenders.  Namely, under section 10.1(xvii), it is an Event of Default if Borrower ceases to continuously operate (1) 99 Washington or any material portion thereof as a hotel or (2) 103 Washington or any material portion thereof as a residential building with ground floor and basement retail for any reason whatsoever.  See generally Loan Agreement, §§ 10.2 to 10.4 (preserving Prepetition Lenders' rights to call or not call defaults, without waiver and without election of remedies).

[5] "Legal Requirements" was defined in the Loan to mean, among other things, "federal, state, county, and municipal statutes and ordinances".  See Loan Agreement, p. S-I-10.

circumstances and the parties' intent". <u>In re World Trade Ctr. Disaster Site Litig.</u>, 754 F.3d 114, 123 (2d Cir. 2014).   The parties' intent and the Loan as a whole, with direct references to expectation of continuous operation demonstrate the parties intended and agreed the Debtor's Hotel was to remain open during the term of the Loan.   As the Second Circuit has made clear, under general principles of contract law, a failure to locate exact contractual language does not mark the end of proper judicial interpretation and construction and if the court can discern from the contract as a whole what the parties must have intended, it should enforce that intention despite a lack of express terminology. <u>See</u> <u>Dobson v. Hartford Financial Services Group, Inc.</u>, 389 F.3d 386, 399 (2d Cir. 2004).  Under this rule, "terms are to be implied in contract", where for example, the parties must have intended them and must have failed to express them only because of sheert inadvertence or because they are too obvious to need expression. <u>Id</u>. (quoting Willison on Contracts section 31:7).

22.    In any event, even where there is no "force majeure" clause, parties may pursue other defenses. <u>1877 Webster Ave. Inc. v. Tremont Center, LLC</u>, 72 Misc.3d 284, 288 (Sup. Ct. 2021) ("the fact that the lease does not contain a force majeure clause does not conclusively establish a defense to all of plaintiff's claims as a matter of law…such as frustration of purpose and impossibility of performance").   Similarly, "caselaw has demonstrated that a party's performance may be excused even if the contract contained no express provision for the event that made performance impossible." <u>Id</u>. (citing cases).

23.    Courts have found the frustration doctrine is properly invoked where "the frustrated purpose [is] so completely the basis of the contract that, as both parties understood, without it, the transaction would have made little sense."  <u>Warner v. Kaplan</u>, 71 A.D.3d 1, 6 (1st Dept. 2009) <u>appeal denied</u> 14 N.Y. 3d 706 (2010); <u>Crown IT Servs., Inc. v. Koval-Olsen,</u> 11

A.D.3d 263, 265 (1st Dept. 2004); see also Restatement [Second] of Contracts, § 265, Comment (a). "Stated differently: frustration of purpose "focuses on events which materially affect the consideration received by one party for his performance. Both parties can perform, but as a result of unforeseeable events, performance by party X would no longer give party Y what induced him to make the bargain in the first place." United States v. Gen. Douglas MacArthur Senior Vill., Inc., 508 F.2d 377, 381 (2d Cir. 1974).

24.    More generally, New York courts have routinely found frustration of purpose where one of the parties was denied the benefit of the bargain or was denied of use for the contractual purpose. For example, in Benderson Dev. Co. v. Commenco Corp., 44 A.D.2d 889 (4th Dept. 1974), aff'd 37 N.Y.2d 728 (1975), the court found frustration where the tenant was unable to use the premises it had leased as a restaurant until a public sewer was completed. Similarly, in Jack Kelly Partners LLC v. Zegelstein, 140 A.D.3d 79, 85 (1st Dept. 2016), frustration was found where an office space tenant could not occupy the premises because the certificate of occupancy allowed only residential use. The doctrine even reaches back to prohibition, when the First Department affirmed a finding that a brewery's lease was frustrated when a Constitutional amendment barred the sale of alcohol. Thus, the intended activity could not take place at the premises. Doherty v. Eckstein Brewing Co., 115 Misc. 175, 179 (1st Dept. 1921).

25.    The frustration of purpose doctrine discharges a party's contractual duties "where a virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party." See United States v. Gen Douglas MacArthur Senior Vill., Inc., 508 F.2d 377, 381 (2d Cir. 1974).

26.    Similar to the frustration of purpose doctrine, courts rely on the impossibility defense to "excuse a party's performance when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible." See Kel Kim Corp. v. Central Mkts., 70 N.Y.2d 900, 902 (1987) ("Impossibility excuses a party's performance only when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible."); UMNV 205-207 Newbury LLC v. Caffe Nero Americas Inc., 2021 WL 956069 at *4 (Mass. Sup. Ct. Feb. 8, 2021) ("under impossibility, performance is excused where the contracting parties assumed that something would continue to exist, neither party guaranteed that thing would continue to exist and performance becomes impossible because the thing was destroyed through no fault of either party"). "Moreover, the impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract." Id.

27.    Hornbrook contract law provides that performance will be excused if it is rendered impossible by unforeseeable governmental activities.  Metpath, Inc. v. Birmingham Fire Ins. Co., 86 A.D.2d 407, 411-412 (1st Dept. 1982); Matter of A&S Transp. Co. v. County of Nassau, 154 A.D.2d 456, 459 (2d Dept. 1989); Bush v. Protravel International, Inc., 192 Misc. 2d 743 (N.Y. Sup. Ct. Richmond Cty., 2002) (parties seeking to cancel travel tickets after the terrorist attacks of September 11, 2001 could be excused from performing under the contract, because of the extraordinary situation which arose after that occurrence); See Sage Realty Corp. v. Jugobanka, D.D., 1998 WL 702272, at *4, n. 4 (S.D.N.Y. 1998) (the relevant inquiry is, "whether the party seeking to avoid liability could have anticipated the frustrating event **and** guarded against it.") (emphasis added).  "Determinations of foreseeability turn on the application of a legal standard to facts".  See Banco Santander Brasil S.A. v. American Airlines, Inc., 2021

13

WL 4820646 (E.D.N.Y. Oct. 15, 2021); see also United States v. Ekwunoh, 12 F.3d 368, 372 (2d

Cir. 1993). Accordingly, foreseeability may be determined as a question of law only when the

facts bearing on foreseeability are not in genuine dispute. Banco Santander, 2021 WL 4820646 at

* 5 ("even if one link in the chain of events on which the bank relies was foreseen by the parties

– the suspension of flights – it would be inappropriate to dismiss a frustration of purpose claim

that also relies in substantial in part on other assertedly unprecedented events"); see also 1877

Webster, 72 Misc.3d at 290 (denying motion to dismiss declaratory judgment action brought by

club that was denied use of its premises as a result of Covid pandemic and Governor Cuomo's

order, finding that tenant raised legally cognizable theories on frustration of purpose and

impossibility).

28.    After the Covid-19 pandemic, numerous parties in contractual relationships

invoked these defenses in various New York courts with varying degrees of success depending

on the facts and circumstances of each case.[6] Banco Santander Brasil S.A. v. American Airlines,

Inc., 2021 WL 4820646 (E.D.N.Y. Oct. 15, 2021) (denying motion to dismiss because Santander

Bank adequately pleaded the Covid-19 pandemic was an unforeseen event whose impact on air

travel has rendered the parties' contract essentially valueless to the bank, and thus, after

discovery, it was possible Santander Bank could demonstrate frustration of purpose); UMNV

205-207 Newbury LLC, 2021 WL 956069 at *8  (declaring defendant need not pay rent for the

period in which government did not allow restaurant to operate indoors, that tenant was not in

default of lease, and that any written notice of termination during Covid-19 was not effective);

Elmsford Apartment Associates v. Cuomo, 2020 WL 3498456 (S.D.N.Y. June 29, 2020) (noting

---

[6] A subset of cases that denied relief to restaurants, for instance, did so because they were "essential businesses" that were permitted to provide outside dining and curbside pickup and generated revenue during Covid-19, and thus those entities were able to produce revenue. The same does not apply to hotels in which travel was restricted and guests were not allowed indoors, an essential element of the service hotels provide (i.e. guests cannot sleep outside).

the unprecedented scope of COVID-19); see 1877 Webster Ave. Inc., 72 Misc. at 292 (denying

motion to dismiss declaratory judgment action as a result of allegations of legally cognizable

theories of frustration of purpose and impossibility which required further discovery on, among

other things, foreseeability); see Bench Decision dated October 6, 2021, Egate-95 LLC v. Fitness

International LLC, Index No. 805964/2001, Supreme Court of the State of New York (Erie

County), a copy of which is annexed hereto as **Exhibit "G"** (denying a landlord its motion to

vacate the tenant due to missed rent in April 2020, stating "it seems to me draconian that, based

on what arose during the pandemic, that the petitioner could unilaterally terminate the lease or

say the leased was terminated based on what occurred, frustration of purpose, the inability for the

respondent to conduct its business as intended."); see also Lord v. Limited Liability Company,

146 N.Y.S.3d 466 (Sup. Ct. 2021) (ordering return of deposit from catering hall as a result of

impossibility of performance due to Covid-19); JN Contemporary Art LLC v. Phillips

Auctioneers, LLC, 507 F.Supp.3d 490 (S.D.N.Y. 2020) (dismissing art seller's complaint

seeking specific performance against art gallery in light of art gallery's inability to perform due

to Covid-19).[7]

29.      In a recent analogous case styled 360 N. Rodeo Drive LP v. Wells Fargo Bank,

N.A., Midland Loan Services, and Does 1 through 10,[8] Index No. 22-00767 (S.D.N.Y. March 20,

2023), a borrower that was a luxury hotel commenced an action with various causes of action,

including (a) breach of the loan agreement and (b) breach of implied covenant of good faith and

---

[7] Courts outside of New York similarly apply these defenses. See e.g. Simon Property Group, L.P. v. Pacific
Sunwear Stores, LLC, Cause No. 49DO1-2006-PL-020195 (Indiana Commercial Court, June 26, 2020) (granting
defendant's motion for a temporary restraining order, and provisionally finding that defendant's impossibility
defense satisfies the likelihood of success on the merits of because "the effects of both the COVID-19 disease and
the public health responses to it on the national economy have sent profound shockwaves throughout all facets of the
commercial sector…affecting arrangements between businesses and other service providers who entered into deals
without ever entertaining the possibility that the performance would be interrupted by a global pandemic.")

[8] Notably, Midland Loan Services (a division of PNC Bank) is the special servicer of the Debtor's loan here.

fair dealing (the "Contract Claims"), against its senior lenders after they forced a sale of the hotel due to their insistence on charging default interest after a few missed payments during Covid-19. In its decision from earlier this year, a copy of which is annexed as **Exhibit "H"**, the Southern District of New York denied the senior lenders' motion to dismiss various causes of action, including the Contract Claims, finding the borrower had adequately alleged the elements of those claims, commenting further the borrower may ultimately be able to prove extra-contractual doctrines such as frustration of purpose and impossibility of performance. Those same defenses appear available here to the Debtor. In other words, as the complaint survived the dismissal motion, it is possible the District Court will find that a lender is not allowed to charge default interest in circumstances similar to the Debtor's case. Indeed, the District Court has scheduled a jury trial in the 360 Rodeo action for early 2024.

30.    Recognizing the impact of Covid-19 on their contractual arrangements, bankruptcy courts have also frequently tailored relief in favor of a debtor to address the impact of the Covid-19 pandemic and/or various governmental orders requiring closure. In re Cinemax USA Real Estate Holdings, Inc., 627 B.R. 693 (Bankr. S.D. Fla. 2021) (noting the burden of Covid-19 on theaters, restaurants, bars, hotels and the travel industry, and denying any payment of rent during the period in which theater was closed); In re Pier 1 Imports, Inc., 2020 WL 2374539 (Bankr. E.D. Va. May 10, 2020) (delaying debtor-retailers payment of certain accrued but unpaid rent during a "limited operations period" when their stores were closed due to stay-at-home orders entered in connection with corona virus pandemic); In re Hitz Restaurant Group, 2020 WL 29245223, at *3 (Bankr. N.D. Ill. 2020) (granting the debtor-tenant's request to suspend rental payments and clarified the issue was not ability or inability to pay rent); In re Bread & Butter Concepts, LLC, No. 19-22400 (DLS) [Dkt. 219] (Bank. D. Kan. May 15, 2020)

(acknowledging that if the debtor were forced to pay rent immediately despite pandemic-related shut downs, it would likely be unable to continue operations, holding "these *unprecedented circumstances* require flexible application of the Bankruptcy Code and exercise of the Court's equitable powers…to grant further relief" such as deferring rent payments) (emphasis added);

31.     Thus, in light of all of the foregoing authorities that recognize the use of force majeure, frustration of purpose and impossibility (or impracticability), upon completion of a proper record, the Debtor submits the Court may conclude the Debtor has strong defenses to any assertion of default interest under applicable New York law.  In light of Covid-19 and New York state's and city's shutdown orders, the tourist industry came to an abrupt halt. The Hotel, once generating income of over $2.5 million per month in revenue, which, after payment of regular expenses, allowed the Debtor to pay the $612,000 in monthly interest, almost immediately began generating $0.00 in revenue. See Qin Declaration, ¶ 8. In these circumstances, where the Loan Agreement expressly provides the Debtor is obligated to comply with Legal Requirements and could not use the Hotel for any alternative use, i.e. it was to be used solely to service guests at the Hotel, the Debtor maintained no option to conduct any business whatsoever in order to generate revenue to pay the debt service on the Loan. See generally Loan Agreement, §§ 4.1.2 and 4.2.4.  In other words, the Loan Agreement negotiated with the Prepetition Lenders required the Debtor to operate only as a Hotel and for no other use.  See Loan, § 4.2.4. As a result, the Debtor was not able to derive income from other sources, such as potentially as a homeless shelter, as such "use" would be prohibited and cause the Debtor to default.  Since the Prepetition Lenders expressly required the Debtor to operate only as a Hotel, thereby tying the Debtor's hands in regard to income generation, it was improper for the Prepetition Lenders to, at the same time, serve default notices on the Debtor while the Hotel was closed.

17

32.     To make matters worse, any cash the Debtor "built up" once the Debtor was back open on a limited basis, was, in a commercially unreasonable manner and in contrast to the Debtor's good faith workout efforts, immediately swept by the Prepetition Lenders on numerous occasions. See **Exhibit "I"**. Notwithstanding the Prepetition Lenders' improper sweep of over $11 million that was used to satisfy a significant portion of the unpaid non-default interest, the Prepetition Lenders continued to accrue, month over month, additional default interest, based on remaining amounts that had not yet been paid. Notably, at no time did the Prepetition Lenders send monthly notices to the Debtor identifying the calculated amount of default interest. See Qin Declaration, ¶ 16. It is also likewise undisputed it was not foreseeable at the time of entry into the Loan that a Covid-19 pandemic would close down the Hotel for several months at a time in 2020 and 2021.[9] Id.

33.     Finally, it is also important to note that when the Prepetition Lenders served their initial default notice in May 2020, courts were closed for business. And thus, in a normal environment, a borrower such as the Debtor could have filed an action in court for a declaratory judgment that a breach did not occur, thereby sparing the Debtor from paying default interest. However, the Debtor was deprived of this option as courts were closed at the time that the Prepetition Lenders called the default and began charging default interest. It is also questionable whether the Prepetition Lenders, who were denied the right to foreclose on the Hotel during the early months of Covid-19 was permitted by law to send contractual notices of default and begin charging default interest under the circumstances. See e.g. Ronald Benderson 1995 Trust v. Erie

---

[9] The initial hearing on a motion is generally not an evidentiary hearing. The Debtor reserves the right to take discovery, to the extent deemed necessary, on the applicability of the various state law defenses referenced herein, including on the issues of (i) expectation of the parties, (ii) the circumstances under which the principal purpose of the Loan was thwarted, and (iii) foreseeability, among other things. See e.g. In re M&M Transp. Co., 13 B.R. 861, 869 (Bankr. S.D.N.Y. 1981) ("an analysis of the facts is critical for the proper application of [the commercial frustration] doctrine").

County Medical Center, 72 Misc.3d 502 (N.Y. Sup. Ct. 2021) (notice of cancellation letter void as conflicting with state moratorium).

34.    As noted in the cases above, the extra-contractual defenses (frustration of purpose, impossibility, and force majeure) have been available to contract parties for over 100 years under New York law, and the use of these defenses have been frequently applied both before and after Covid-19 by multiple contract parties.  See e.g. Korff v. Corbett, 18 A.D.2d 248, 250 (App. Div. 1st Dep't 2005) ("the doctrine of definiteness or certainty is well established in contract law. In short, it means that a court cannot enforce a contract unless it is able to determine what in fact the parties have agreed to").  Such defenses are equally applicable here, if not more so, in light of the Prepetition Lenders' aggressive steps to take the Hotel due to the favorable interest rate under the Loan, as compared to the current economic environment.

35.    In sum, the Debtor respectfully submits there is ample authority under New York law for this Court to deny all of the Default Interest/Fees asserted by the Prepetition Lenders. Alternatively, this Court could also exercise its discretion to deny all the Default Interest/Fees that accrued in the many months in which courts were closed or alternatively while the Hotel was closed due to the Covid-19 pandemic and various surges in Covid-19 cases from time to time in 2020 and 2021.

## C.    The Default/Interest Fees Should Be Reduced By 50% Due To Lenders' Assertion of Non-Monetary Defaults During the State Court Action

36.    In its Bankruptcy Code Decision, this Court expressly concluded, among other things, "§ 365(b)(2)(D)'s cure carve-out extends only to penalty rates triggered by non-monetary defaults", further stating "Consequently, when the debtor's default arises from its failure to perform monetary obligations, as it does here, the debtor must pay default interest to the extent provided by its agreement and permitted by non-bankruptcy law in order to reinstate its defaulted

debt under § 1124(2)." See In re Golden Seahorse, LLC, 652 B.R. 593, 596 (Bankr. S.D.N.Y. 2023). There is no dispute that one of the most significant events of default at issue in this case relates to the Debtor's missed payments in the early part of the Covid-19 pandemic. As such, it is undisputed that there was a monetary default. The Debtor respectfully disagrees with the legal conclusions reached in the Bankruptcy Code Decision and accordingly, has appealed the Bankruptcy Code Decision. Such appeal will address numerous legal issues, including the merits of the Court's conclusion applying section 365(b)(2)(D)'s cure carve-out to nonmonetary defaults only.

37.      However, the Bankruptcy Code Decision fails to address another important question, which remains open and for which the Debtor requests be considered through this Objection now before the Court. That question is, *what happens when a debtor has **multiple** pre-bankruptcy events of default that were identified by its lender, which defaults were of a **monetary and nonmonetary** nature?* A full record of the State Court Action indicates the Prepetition Lenders asserted not just a monetary default related to the Debtor's missed interests payments in the early stages of the Covid-19 pandemic, but the Prepetition Lenders also expressly identified in the State Court Action numerous non-monetary defaults (the "Non-Monetary Defaults"), as more fully identified in the Morris Declaration and Lenders' Statement of Material Facts, annexed hereto as **Exhibits "D"** and **"E"**. Each of the Morris Declaration and Lenders' Statement of Material Facts refer to multiple "Events of Default" (see Morris Declaration, ¶¶ 45 to 73 and see Lenders Statement of Material Facts, ¶¶ 37-66) which included the following Non-Monetary Defaults and allegations supporting same:

       (i)      Debtor's failure to deposit funds into the Cash Management Account;

(ii)    Debtor's threats to close the Hotel and Lender's insecurity in regards to such threats as it pertained to possible termination of the Franchise Agreement and ultimately the harm such termination would have on the Lenders' collateral; and

(iii)    Ongoing accrual of state sales taxes and occupancy taxes to appropriate governmental entities.

38.    Importantly, the Prepetition Lenders advanced their positions before the State Court and convinced the State Court to enter an order appointing a receiver for the Hotel, in part, based on allegations and "evidence" in their papers concerning alleged diversion of funds from the Cash Management Account to other accounts and the Lenders' insecurity pertaining to accruing state tax and occupancy taxes and possible termination of the Franchise Agreement. Specifically, the Prepetition Lenders' documents filed with the State Court separately identified the "payment default" in a separate subsection of their filings with the State Court (see Morris Declaration, ¶¶ 45 and 46; see also Statement of Material Facts, ¶¶ 37 and 38), thereby expressly distinguishing between "monetary defaults" and the Non-Monetary Defaults, which they were relying on to obtain the relief they sought. Further, littered throughout their papers, the Prepetition Lenders referred to "defaults", not a *singular* monetary default, in support of their position. See Morris Declaration, p. 14 (title of section refers to "Defaults" in plural), ¶ 78 ("Events of Default"); see also Lenders' Statement of Material Facts, p. 11 (title of section refers to "Defaults" in plural), ¶ 71 ("Events of Default").

39.    The Bankruptcy Code Decision unexpectedly made a distinction between defaults that are monetary versus nonmonetary in nature. The facts are clear that both of these types of defaults are present here. The Prepetition Lenders may attempt to argue the Court should re-write history and find the Non-Monetary Defaults should not have been "called", or relied upon, or they were not very important (compared to the payment default), but such efforts should ring

hollow. By way of analogy, as reflected in the Second Circuit's opinion in <u>In re AMR Corp.</u>, 730 F.3d 88, 101 (2d Cir. 2013), once a lender has taken a position in the pre-bankruptcy period that is no longer advantageous during the bankruptcy case, it is not permitted to reverse course. <u>See</u> <u>AMR Corp.</u>, 730 F.3d at 101, (lender is not permitted, after acceleration and the filing of a bankruptcy case, to rescind acceleration and decelerate in order to obtain the benefit of a make whole premium under the loan agreement, as such action would violate the automatic stay).

40.    As the Court identified in the Bankruptcy Code Decision, there are few courts, if any, that have analyzed the interplay of sections 365(b)(2)(D), 1123(d) and 1124(2) in a meaningful way. Likewise, no court, including this one, has ever decided what happens when there are prepetition monetary <u>and</u> nonmonetary defaults in the same case. This Court now has the ability to fill the gap. Fortunately, this Court is a court of equity and has the ability to fashion appropriate relief, as more fully set forth under section 105(a) of the Bankruptcy Code. Based on a fair and objective reading of the Bankruptcy Code Decision and its reasoning, had there been <u>only</u> the Non-Monetary Defaults identified by the Prepetition Lenders here, this Court would likely have found that section 365(b)(2)(D)'s "cure carveout" applied to eliminate any requirement to pay the Default Interest/Fees as part of the Debtor's plan reinstatement. Because the undisputed facts here include both the Monetary Default and several Non-Monetary Defaults, the Debtor respectfully requests the Court exercise its discretion to reduce the Default

089271\1\170359177.v1

Interest/Fees by fifty percent (50%) from $21,134,960.96 to $10,567,480.40.[10]  This proposed apportionment is the fairest and best manner to resolve this dispute.[11]

**D.    The Debtor Objects to Certain Components of Proofs Of Claim**

41.    Aside from the state law defenses and arguments set forth in Sections **B and C** above, to the extent the Court does not sustain the Claim Objection for the reasons set forth above, the Debtor has the following specific objections to certain components of the Proofs of Claim.

**1.    Late Fees**

42.    Aside from default interest of approximately $18 million, the Lenders' Proof of Claim requests late fees in the amount of $1,661,697.88 (the "Late Fees") through the Petition Date.  The Prepetition Lenders' request for Late Fees on top of Default Interest is duplicative and thus not appropriate under applicable New York and bankruptcy law, as reflected in numerous cases. See In re 243rd Street Bronx R&R, 2013 WL 1187859 at *2 (Bankr. S.D.N.Y. Mar. 21, 2013) (bankruptcy court denied "duplicative prepetition late charges", when secured creditor was permitted prepetition default interest); see also In re 785 Partners LLC, 470 B.R. 126, 138 (Bankr. S.D.N.Y 2012) ("The additional costs incurred in handling payments, late or otherwise, are already covered by the Default Rate of interest and the Administrative Fee, and any

---

[10] By analogy, abundant case law exists to reflect that this Court has authority to consider "equitable considerations" in determining whether post-petition default interest should be paid to an oversecured creditor.  See In re Bownetree, LLC, 2009 WL 2226107 at *4, fn. 1 (Bankr. E.D.N.Y. July 24, 2009) (applying "equitable considerations" and finding that application of default interest rate, which is twice as much as the non-contract rate, would be inequitable and have an adverse impact on other creditors); See Urban Communications PCS Ltd. Partnership v. Gabriel Capital, L.P., 394 B.R. 325, 338 (S.D.N.Y. 2008) (citing cases). As noted, this Court has the authority to reach a fair and equitable result that balances the rights of the parties in light of the facts at issue and the Court's views of the law on the interplay of sections 365(b)(2)(D), 1123(d) and 1124(2). Notably, before courts began to apply "equitable considerations" in the section 506(b) landscape, there had to be a first judge and case to begin setting that standard. As the first court to have drafted comprehensively on the legal issues underlying the Bankruptcy Code Decision, this Court should likewise be the first court to begin filling the gaps in the recently decided Bankruptcy Code Decision and whether apportionment of the Default Interest/Fees is appropriate.

[11] Mediation in advance of Plan confirmation may also be appropriate as another potential avenue for resolution.

additional charge in the form of the Late Payment Premium would provide a double recovery"); In re Vest Assocs., 217 B.R. 696, 701 (Bankr. S.D.N.Y. 1996); In re Market Center East Retail Property Inc., 433 B.R. 355, 365 (Bank. D. N.M. 2010); In re Cliftondale Oaks LLC, 357 B.R. 883, 887 (Bankr. D. Ga. 2006) ("the reason is that the late fee and default interest are designed to compensate the lender for the same injury and awarding both amounts to double recovery"); In re 1095 Commonwealth Ave Corp., 204 B.R. 285, 305 (Bankr. D. Mass 1997) (same).

43.     In addition to the foregoing, courts evaluating the allowance of late fees will also analyze whether the late fees were reasonable based on whether the lender can prove there was a reasonable cost associated with administrative functions as a result of the borrower's default. See e.g. 785 Partners, 470 B.R. at 136-137 (denying additional costs associated with collecting late payments when there is already a charge for default interest and administrative fees); See e.g. Beltway 7 & Properties, Ltd. v. Blackrock Realty Advisors, Inc., 167 A.D.3d 100, 106-107 (1st Dep't 2018) (declining to declare that late fee was not an unenforceable penalty at the motion to dismiss stage because of the limited record before the court); see also Newage Garden Grove LLC v. Wells Fargo Bank, N.A., 2023 WL 4565031 (1st Dep't Dec. 12, 2022) (state court case involving default interest but denying Lender's motion to dismiss borrower's cause of action seeking denial of late fees, finding that permissibility of late fees required additional factual record).   As a result, since the Prepetition Lenders bear the ultimate burden of persuasion on the allowance of the Late Fees and their right to such Late Fees may require them to prove actual losses on their part demonstrating why the Default Interest does not otherwise compensate them, on this record, the Late Fees should be denied in their entirety for the reasons set forth herein.

44.     Finally, while the Debtor submits the Late Fees should be denied for all of the reasons set forth above, based on communications with the Prepetition Lenders, it appears the

Prepetition Lenders, after further reflection and calculation, have now determined the Late Fees should be, at most $1,198,727.40, which is the amount of the Late Fees up to the point of acceleration of the Loan.

### 2. Special Servicing Fees

45.    The Prepetition Lenders also seek special servicing fees of $660,013.08 (the "Special Servicing Fees") related to fees incurred from the date of the alleged default through the Petition Date, which amounts would otherwise have been roughly $856,406, but for the Prepetition Lenders' improper application of funds on reserve in the amount of $226,508.43 as set forth in a letter dated January 13, 2022, a copy of which is annexed hereto as **Exhibit "J"**.[12] The Prepetition Lenders calculate the amount of the Special Servicing Fee at the rate of .25% per annum, as referenced in the Pooling and Servicing Agreement dated December 1, 2018, a document executed amongst the Prepetition Lenders and the Special Servicer (but not the Debtor) a few months after entry by the Debtor into the Loan with Ladder.  However, courts have rejected calculations of special servicing fees in similar situations, finding instead that courts are required to analyze the actual amount that was expended by the lender on a special servicer and determining whether such amounts expended were reasonable.  See In re John Q Hammonds Fall 2006 LLC, 612 B.R. 779, 805-806 (Bankr. D. Kan. 2020) (rejecting the .25% per annum calculation in pooling and servicing agreement, finding "the Court has absolutely no basis upon which to judge the reasonableness of these fees…The bottom line is that Midland Loan Servicing[13] 'has the ultimate burden of persuasion and amount of the claim, and it did not meet that burden with respect to the special servicing fee and the workout fee.  Both fees, in the

---

[12] If the Court agrees the Special Servicing Fees are not allowed, it should also determine the amounts previously credited by Prepetition Lenders prior to the Petition Date to the Special Servicing Fees should be allocated or otherwise credited to the principal owing on the Loan or otherwise returned to the Debtor.

[13] Ironically, Midland Loan Servicing is also the "special servicer" in this case.

amounts of $351,143.12 and $608,340.32, respectively, will be disallowed"); See In re South Side, 451 B.R. 248 (Bankr. E.D.N.Y. 2011) (court limited special servicer fee to roughly $6,000 per month, reflecting the actual cost incurred, with permission to charge an additional $6,000 per month for an additional six months based on estimated timing of confirmation of plan); Newage Garden Grove LLC v. Wells Fargo Bank, N.A., 2023 WL 4565031 (1ˢᵗ Dep't Dec. 12, 2022) (denying lender's request for payment of a special servicing fee, finding that "court is unable to ascertain from this limited record whether, as a matter of law, these fees did, in fact, bear a reasonable proportion to Defendants' probable loss, or whether the amount of actual loss to Defendants was incapable or difficult of precise estimation at the time of contracting").

46.     Furthermore, to the extent the Court were to find the Special Servicing Fees are a reasonable approximation of the costs associated with "servicing the Loan" and the Debtor is saddled with this fee notwithstanding it did not execute the Pooling and Servicing Agreement, the Debtor respectfully submits the amount allowed be fixed only as it relates to the three tranches of the Loan (Notes A-1 to A3) aggregating $87 million, as opposed to the calculation asserted by the Prepetition Lenders on the full amount of the Loan, i.e. $137 million, which includes the $50 million in principal owed on Note B.   According to correspondence from a representative of Note B in April 2020, the Note B Holder agreed that Midland Loan Servicing, the special servicer for the A-1 and A-2 Notes was not representing the Note B holders.  Copies of the separate pre-negotiation letters by and between the Debtor and Midland Loan Servicing and between Debtor and Note B holder are annexed hereto as **Exhibit "K"**.  Based on the Debtor's calculation, if the Debtor is correct in its interpretation, the amount owed would be $419,132.39, which is roughly 63.5% of the $660,013.08 asserted by the Prepetition Lenders.

089271\1\170359177.v1

### 3.    Liquidation/Workout Fee

47.    The Prepetition Lenders also request a $1 million "Liquidation Fee", which is sometimes referred to as a "workout" fee in practice.  The Debtor respectfully submits this Liquidation Fee should be denied in full.

48.    Similar to Special Servicing Fees, courts have found the amount of a liquidation fee should be based on the actual damages incurred by the lender. See John Q. Hammons, 612 B.R. at 805-806 (rejecting workout fees to secured lender for failing to satisfy burden of demonstrating reasonableness of such fees, even though the fee was expressly set forth in the loan agreement).

49.    However, separate and apart from the Prepetition Lenders' burden to show the actual damages that support the Liquidation Fee, the Liquidation Fee is not compensable for another stand-alone reason: the Loan has not been liquidated. Indeed, the Debtor is seeking reinstatement or modification under its proposed plan, and under those circumstances, the rights to the Liquidation Fee are not triggered. In re Northbelt, LLC, 630 B.R. 228, 269-70 (Bankr. S.D. Tex. 2020) (liquidation fee was denied to Wilmington Trust when it could not show whether it was allowable in event of an acceleration, and evidence reflected that Debtor "had not proposed to liquidate the real property, pay off the loan early or anything of the nature that would require a Liquidation Fee"); In re Neelkanth Hotels, LLC, 2021 WL 4944100 at *6-7 (Bankr. N.D. Ga. Oct. 22, 2021) (no liquidation fee in amount of 1% is payable until the special servicer "obtains a full, partial, or discounted payoff from the related Borrower" or obtains any "Liquidation Proceeds" as that term is defined in the servicing agreement); Tantallon Austin Hotel LLC v. Wilmington Trust, National Association, 177 N.Y.S.3d 6 (App. Div. 1st Dep't 2022) (denying Wilmington Trust's motion to dismiss seeking unjust enrichment and other

causes of action pertaining to borrower's return of liquidation where it was not clear that liquidation fee was payable by borrower in connection with default and early payoff of loan).

## **RESERVATION OF RIGHTS**

50.     The Debtor's Objection pertains to the Proofs of Claim on file related to prepetition amounts owed as of the Petition Date.  As such, the Debtor reserves all rights to object through the Plan process or otherwise pertaining to alleged post-petition amounts to the Prepetition Lenders on any basis.  The determination of allowance of post-petition interest or other charges and fees will be based, at least, in part, on whether the Prepetition Lenders are undersecured or oversecured. See In re Residential Capital, LLC, 497 B.R. 403, 412 (Bankr. S.D.N.Y. 2013) (lenders have the burden of showing they are oversecured); see e.g. In re Bownetree, LLC, 2009 WL 2226107 at *4, fn. 1 (Bankr. E.D.N.Y. July 24, 2009) ("Courts have found that when a debtor cures a default, such as by reinstating the maturity date, compensating the holder for any damages incurred, and not altering any other rights, the debtor has cured the default and need not pay a default rate of interest that would be applicable under section 506(b)", citing cases).  To the extent the Lenders have been undersecured during the pendency of this case, any contractual interest it has received during the case may need to be returned to the Debtor or otherwise be applied to reduce the principal.[14]

51.     The Debtor expressly reserves the right to supplement this Claim Objection and incorporate additional arguments at the hearing to consider this Claim Objection.

52.     Should one or more of the grounds for objection stated in this Objection be denied, the Debtor reserves its right to object on any other or additional grounds it discovers.

---

[14] Likewise, after a valuation of the Hotel, to the extent the Prepetition Lenders are deemed to have been "undersecured" during this case, this Court may require the Prepetition Lenders to apply the non-default interest it has been receiving as adequate protection during this case to outstanding principal. See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365 (1988) (undersecured creditor not entitled to post-petition interest payments as "adequate protection").

089271\1\170359177.v1

53.     Furthermore, the Debtor reserves the right, at the appropriate time, to file an adversary proceeding against (i) the Prepetition Lenders for damages on account of their breach of contract and unjust enrichment, among other causes of action and (ii) Midland on account of damages it separately has caused the Debtor.  As reflected in a detailed amended complaint in a separate New York action styled as <u>Newage Garden Grove LLC v. Wells Fargo Bank, N.A. as Trustee and Rialto Capital Advisors, L.L.C.</u>, Index No. 653775/2022 (New York County), many corporate borrowers after Covid-19 (such as the hotel plaintiff in that case) were the victims of improper conduct by loan servicers, who, in accordance with pooling and servicing agreements in these CMBS transactions, often receive the lion's share of default interest to the exclusion of the actual CMBS certificate holders.  As alleged, servicers are incentivized to pretend to work in good faith with their borrowers before actually exercising their rights, because during such time, there is a substantial accrual of default interest that is then ultimately demanded from the borrowers.  A copy of the Newage Garden Grove amended complaint is annexed as **Exhibit "L"**.

## <u>NOTICE</u>

54.     A copy of this Objection and the Qin Declaration, together with the notice of hearing is being provided to: (a) the Office of the United States Trustee and (b) counsel for Wilmington Trust. Additionally, all parties that have filed notices of appearance will receive a copy of the notice of hearing on the Objection.

55.     The Debtor submits that, under the circumstances, no other notice need be given. No previous request for the relief requested herein has been made to this or any other Court.

089271\1\170359177.v1

**WHEREFORE**, the Debtor respectfully requests the Court enter an order (i) expunging portions of the Proofs of Claim or alternatively reducing the Proofs of Claim as more fully set forth hereinj, and (ii) granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
September 21, 2023

**TARTER KRINSKY & DROGIN LLP**
*Counsel to Golden Seahorse LLC*
*Debtor and Debtor-in-Possession*

By: ___/s/Scott S. Markowitz___
Scott S. Markowitz, Esq.
Rocco A. Cavaliere, Esq.
1350 Broadway, 11th Floor
New York, New York 10018
Tel: (212) 216-8000
Fax: (212) 216-8001
smarkowitz@tarterkrinsky.com
rcavaliere@tarterkrinsky.com

30