**PERKINS COIE LLP**

1155 Avenue of the Americas, 22nd Floor
New York, NY 10036
Telephone: (212) 262-6900
Gary F. Eisenberg, Esq.
Email: geisenberg@perkinscoie.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:

GOLDEN SEAHORSE, LLC,                          Chapter 11

dba Holiday Inn Manhattan Financial District,[1]

Debtor.                                        Case No. 22-11582 (PB)

-------------------------------------------------------------x

**SECURED LENDERS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR ORDER TO RECOVER POSTPETITION
INTEREST, FEES AND COSTS AND EXPENSES PURSUANT TO 11 U.S.C. § 506(b)**

---

[1] The Debtor's last four digits of its tax identification number is 4770. The Debtor's principal place of business is 99 Washington Street, New York, New York.

## TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ........................................................................................ 1

II.     STATEMENT OF FACTS .............................................................................................. 2

      A.      Secured Lenders are Amply Over-Secured ........................................................... 2

      B.      Claims Background .................................................................................................. 5

      C.      Co-Lender Agreement ............................................................................................. 6

      D.      Default Interest........................................................................................................ 7

      E.      Reasonable Legal Fees ............................................................................................ 8

      F.      Special Servicing Fees .......................................................................................... 11

      G.      Interest on Advances ............................................................................................. 13

III.    LEGAL ARGUMENT ................................................................................................... 13

      A.      Secured Lenders Are Over-Secured, And Thus, Entitled to Postpetition
             Interest, Fees, and Costs Under Applicable Second Circuit Law ........................ 13

      B.      Secured Lenders Are Entitled to These Amounts Whether Over-Security
             Is Measured as of the Petition Date or as of the Confirmation Date ................... 17

      C.      Secured Lenders Are Entitled to Their Attorneys' Fees and Costs, which
             are Reasonable. ...................................................................................................... 20

IV.     CONCLUSION ............................................................................................................. 26

167356992.8

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*1300 Ave. P Realty Corp. v. Statigakis*,
186 Misc. 2d 745, 720 N.Y.S.2d 725 (2000) ........................................................................ 2

*Dewsnup v. Timm*,
502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) .............................................. 14, 17, 20

*In re 139–141 Owners Corp.*,
306 B.R. 763 (Bankr.S.D.N.Y.2004), *rev'd in part*, 313 B.R. 364
(S.D.N.Y.2004) .................................................................................................................... 16

*In re Dalessio*,
74 B.R. 721 (B.A.P. 9th Cir. 1987) ...................................................................................... 20

*In re Melbell Assocs.*,
99 B.R. 31 (Bankr. E.D. Cal. 1989) ...................................................................................... 20

*In re Mills*,
77 B.R. 413 (Bankr. S.D.N.Y. 1987) ................................................................................ 20, 21

*In re Route One W. Windsor L.P.*,
225 B.R. 76 (Bankr. D.N.J. 1998) ........................................................................................ 16

*In re SW Boston Hotel Venture*,
LLC, 748 F.3d 393 (1st Cir. 2014) .............................................................................. 17, 18, 19

*In re Vanderveer Estates Holdings, Inc.*,
283 B.R. 122 (Bankr. E.D.N.Y. 2002) .................................................................................. 16

*In re Vest Assocs.*,
217 B.R. 696 (Bankr. S.D.N.Y 1998) .................................................................................. 16

*Matter of T-H New Orleans Ltd. Partnership*,
116 F.3d 790 (5th Cir. 1997) .......................................................................................... 18, 19

*Ruskin v. Griffiths*,
269 F.2d 827 (2d Cir. 1959) .......................................................................................... 15, 16

*Sultan Realty*, 2012 WL 6681845 at *6-*7 (Bankr. S.D.N.Y. Dec. 21, 2012) ............................ 16

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs. (In re Timbers of Inwood Forest Assocs.)*,
793 F.2d 1380 (5th Cir.1986) .............................................................................................. 17

167356992.8

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*United States v. Ron Pair Enterprises, Inc.*,
489 U.S. 235 (1989)..............................................................................................14, 18

*Urban Communicators PCS Ltd. Partnership v. Gabriel Capital, L.P.*,
394 B.R. 325 (S.D.N.Y 2008)..............................................................................16, 17

*Vanston Bondholders Protective Committee v. Green*,
329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), rehearing denied 329 U.S.
833, 67 S.Ct. 497, 91 L.Ed. 706 (1947) ..................................................................15

**STATUTES**

11 U.S.C. § 506(b) .............................................................................................. passim

11 U.S.C. § 507(b) ...............................................................................................5, 14, 19, 20

**OTHER AUTHORITIES**

Black's Law Dictionary ..............................................................................................21

Secured Lenders[2] submit this memorandum of law (the "MOL") and the Declaration of Christopher Hamilton ("Hamilton Decl.") in support of Secured Lenders' motion for an award of post-petition interest at the Default Rate, for post-petition servicing fees and for legal fees, as asserted in Proofs of Claim Nos. 13, 14, 15 and 16 filed by Wilmington Trust National, Association, on Behalf of Secured Lenders (the "Claims"), and supported further by the Declaration of Christopher Hamilton dated May 21, 2024 ("Hamilton Decl."), the Declaration of Gary Eisenberg ("Eisenberg Decl."), and the Request for Judicial Notice filed herewith ("Request for Judicial Notice") pursuant to 11 U.S.C. Section 506(b), and in support state as follows:

## I.    PRELIMINARY STATEMENT

1.    Secured Lenders are over-secured.  Thus, each of them has a claim on which it is entitled to "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose."  11 U.S.C. § 506(b).

2.    This over-security is substantial and indisputable.  Accordingly, the Secured Lenders must be granted post-petition interest at the Default Rate and their reasonable fees, costs, or charges provided for under the Loan Documents.

---

[2] The "Secured Lenders" consist of:  Wilmington Trust, National Association, as Trustee for the benefit of the Registered Holders of Commercial Mortgage Pass-Through Certificates Series 2018-C6, Wells Fargo Commercial Mortgage Trust 2018-C47, Commercial Mortgage Pass-Through Certificates, Series 2018-C47 And CSAIL 2018-C14 Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2018-C14 and as authorized representative for HI FIDI B Note Owner LLC.

- 1 -

## II.   STATEMENT OF FACTS

### A.   Secured Lenders are Amply Over-Secured

3.      As stipulated in the pre-trial order, Secured Lenders sought to overrule objections of the Debtor to challenges to the Claims.   Secured Lenders have sought allowance of the pre-petition Claims as follows:

| | |
|---|---|
| Principal | $137,025,000.00 |
| Interest | $10,741,718.67[3] |
| Default Interest on Principal | $17,813,250.00 |
| Late Fees Due | $0.00[4] |
| Special Servicing Fee | $660,013.08 |
| IOA | $68,371.29 |
| Liquidation Fee | $1,000,000.00 |
| Tax and Insurance Advances | $680,938.01 |
| Property Protection Advances | $147,671.36 |
| Interest on Advances | $222,201.82 |
| Estimated Prepayment Premium | $0.00[5] |
| Payoff Processing Fee | $1,750.00 |
| Insurance Balance | ($117.79) |
| Reserve Balance | ($9.03) |
| **Total Amount Due** | **$168,360,787.41** [6] |

---

[3] This amount is reduced from $11,190,841.24, the amount listed in the Claims.

[4] This amount is reduced from approximately $1,000,000, the amount listed in the Claims.

[5] This amount is reduced from $9,009,982.87, the amount listed in the Claims (the "Prepayment Premium").  However, this reduction is only effective if there is a confirmation of a plan whereby the Lenders' Claims are not being prepaid. The Debtor's plan pending before the Court is such a plan.  Accordingly, Secured Lenders seek determination of their right to post-petition interest, fees, costs, and charges premised on the claim amount of $168,360,787.41.

[6] To the extent that the Debtor's pending challenges to pre-petition default interest, servicing fees and/or liquidation fees are sustained, the amount of the over-security only increases – even under the Debtor's most favorable scenario.

Secured Lenders note for the record that the Loan Documents plainly entitle the Secured Lenders both to Default Interest and late charges.  Secured Lenders are aware of the decisional authority to which the Debtor has pointed from bankruptcy courts holding that, in bankruptcy, courts do not allow claims both for default interest and late charges. Nevertheless, the two items cover different aspects of defaults and both should be allowed.  Secured Lenders further note that state law does allow recovery of both.  *See e.g., 1300 Ave. P Realty Corp. v. Statigakis*, 186 Misc. 2d 745, 720 N.Y.S.2d 725 (2000).

Presumably the Debtor concedes that, were it to succeed on the default interest challenge, the late fees would be allowed.  But, since the default interest challenge must fail, and thus since pre-petition default interest must be allowed

4.      Based on the foregoing (regardless of the outcome of the trial on the Debtor's objections to the Secured Lenders' claims), Secured Lenders are over-secured and therefore seek the following post-petition interest on the Claims, and reasonable fees, costs, and charges provided for under the Loan Agreement as of July 1, 2024 (with sums to continue to accrue as provided under the Loan Documents):

| | |
|---|---|
| Default Interest on Principal | $11,076,187.50 |
| Late Fees Due | $1,956,856.10[7] |
| Special Servicing Fee | $553,809.38 |
| Interest on Advances | $862,998.89[8] |
| Legal Fees | $4,547,875.51 (est.) |
| Appraisal fees | $11,630.07 |
| **Total Post-Petition Amount Due** | **$18,863,063.37** [9] |

5.      Per diem default interest is $19,031.25.   Accrued post-petition default interest through July 1, 2024 is $11,076,187.50.  See Hamilton Decl. ¶ 34, Exhibit C.

6.      Secured Lenders have incurred legal fees through April 30, 2024 of $4,131,336.90 and estimate the total through May 31, 2024 to exceed $4.5 million.  The Loan Documents as described in Secured Lenders' proofs of claim entitle Secured Lenders to payment of legal fees.

7.      Secured Lenders have accrued special servicing fees post-petition of $553,809.38. They have incurred fees for appraisals of $11,630.07.  They have accrued interest on advances

---

in the amount Secured Lenders have calculated, then Secured Lenders agree that the late fees are not also allowed assuming the default interest is allowed.

[7] See note 6 above.  Presumably the Debtor concedes that, were it to succeed on any default interest challenge to this motion, the late fees would be allowed.

[8] Debtor did not object to allowance of interest on advances on the pre-petition amounts.  Secured Lenders submit that Debtor is estopped from challenging that the interest on advances are allowed post-petition to the extent that Secured Lenders are over-secured.

[9] If the late fees of $1,956,856.10 were not to be allowed, then the total would be $16,906,207.27.

167356992.8

(payable pursuant to the pooling and servicing agreement and Section 11.23 of the Loan Agreement because the Debtor's defaults resulted in the master servicer making advances to certificate holders on account of lack of sufficient funds to pay them occasioned by the Debtor's defaults) in the amount of $862,998.89. The following amounts are calculated through July 1, 2024. In aggregate these amounts are **$18,863,063.37** (if the late fees of $1,956,856.10 were not to be allowed, then the total would be $16,906,207.27, plus such amounts as continue to accrue through the effective date of any plan). See Hamilton Decl. ¶ 34, Exhibit C.

8.      This sum, when added to the $168,360,787.41 pre-petition claim, totals $187,223,850.78.[10]

9.      Secured Lenders are fully secured. Their appraisal shows a property value for the hotel of $191,000,000.00 as of April 28, 2024. The Debtor's appraisal as of roughly the same time frame opines a property value for the hotel of $185,000,000.00. See Eisenberg Decl., Exhibits D and F.

10.      Both appraisals value only the Debtor's hotel, not the cash on hand. That cash on hand is Secured Lenders' cash collateral. This is indisputable based on the terms of the cash collateral order the Court entered in December 2022 ("Cash Collateral Order") (Dkt. No. 38). In addition, in approving a contract approved by the Bankruptcy Court on or about January 30, 2023 (the "NYHHC Contract"), the Court's order approving that NYHHC Contract (the "Approval Order") (Dkt. No. 74) also granted Secured Lenders' cross-motion providing that, to the extent the Secured Lenders demonstrate the adequate protection under the Cash Collateral Order afforded

---

[10] Secured Lenders have been paid post-petition contract interest pursuant to the Cash Collateral Order defined below. Had that not been the case, their post-petition claim would have been $11,489,750.23 higher but the Debtor would have had an extra $11,489,750.23 of cash on hand. So post-petition contract interest should not have to factor into the analysis. If the Debtor contends that the adequate protection payments under the Cash Collateral Order should be applied to anything other than the post-petition contract interest to which they have been applied, Secured Lenders reserve all rights (and note that the parties entered into a stipulation so that the first adequate protection payment applied to reduce pre-petition interest and thus is not subject to further litigation).

turns out to be inadequate, the Secured Lenders shall be entitled to a super-priority administrative expense claim pursuant to section 507(b) of the Bankruptcy Code (as did the Court's order approving its extension). The two approval orders and Cash Collateral Order thus combine to subject the Debtor's cash to the Secured Lender's liens and to provide that such cash further adequately protects the Secured Lenders. See Eisenberg Decl., Exhibits G through I.

11. Cash on hand per the Debtor's most recent operating report as of the end of April 30, 2024 is $20,200,085. See Eisenberg Decl., Exhibit J. Adding that to the property value yields $211,200,085.00 as the Secured Lenders' collateral value, as the Secured Lenders assert. The Secured Lenders' collateral value is no less than $205,000,000.00 as the Debtor can most plausibly assert based on its own appraisal report. Either figure is $18 million greater than the sum of (a) the pre-petition Claims of the Secured Lenders and (b) the post-petition amounts sought by Secured Lenders pursuant to this motion. This renders Secured Lenders over-secured by a substantial margin.[11]

### B.    Claims Background

12. As explained in more detail in the Cash Collateral Order (as defined below), Ladder Capital Finance LLC, the original lender, extended a loan in connection with a loan agreement (the "Loan Agreement") to the Debtor in an aggregate principal amount of $137.025 million (the "Loan"). As security for payment of the Loan, the Debtor executed and delivered a mortgage, granting and evidencing a first priority lien on the Property, to the original lender (the "Mortgage"). The Loan, Mortgage, and other loan documents have since been assigned to Secured Lenders.

---

[11] This substantial margin increases dollar for dollar to the extent any pre-petition default interest, servicing fees or workout/liquidation fees would, contrary to Secured Lenders' assertion, not be allowed.

167356992.8

13. The contract interest rate is 5.259%. The default interest rate is an additional 5%. See Eisenberg Decl., Exhibit K (Loan Agreement), pp. S-I-7 and -10. As illustrated in the Secured Lenders' Claims (as defined herein), a total of $17,813,250.00 of default interest accrued prior to the date (the "Petition Date") on which the Debtor filed this bankruptcy case. Default interest continues to accrue post-petition until the Debt is paid. See Loan Agreement, Section 2.2.2.

14. As Debtor concedes in its Objection, the Debtor's first payment default on the Loan occurred in May 2020 when Debtor failed to make its interest payment, which was due on May 5, 2020. Secured Lenders then filed a foreclosure action and, in that action, an application for the appointment of a receiver in New York state court. As explained in more detail in the receivership filings (which, in part, are attached to Debtor's Objection), the Debtor was not depositing all its revenues from the Hotel into the cash management account that it was required to deposit them in; rather, it was diverting revenues to the detriment of Secured Lenders' lien on those funds. On or about September 27, 2022, the Supreme Court of New York, New York County granted Secured Lenders' motion for appointment of a receiver. Before the receiver could take possession, the Debtor filed this bankruptcy case.

15. The Loan has four tranches, and thus, Secured Lenders filed four separate Proofs of Claim, as explained in more detail in Debtor's Objection, which will be referred to herein as the "Claims". The Claims include the amounts due and owing under the Loan Agreement as of the Petition Date, which, in aggregate, totaled $179,481,590.83. Those Claims are filed at Claims 13 through 16 on the Claims Registry in this case.

**C.    Co-Lender Agreement**

16. Midland Loan Service, a division of PNC Bank, National Association ("Midland") serves as special servicer for all of the Secured Lenders (including HI FIDI B Note Owner LLC (the "B Note Holder")). Midland does so pursuant to that certain Co-Lender Agreement by and

- 6 -

between the original lender of each of the notes held by the A Note Holders from the Debtor,

Ladder Capital Finance LLC and IGIS US Private Placement Real Estate Investment Trust No.

228 (B Note Holder's predecessor in interest) dated September 18, 2018 (the "Co-Lender

Agreement"). See Prior Declaration [ECF No. 319] (as that term is defined in the Hamilton Decl.),

¶ 47. A true and correct copy of the Co-Lender Agreement is attached to the Hamilton Decl. as

Exhibit B.[12]

17.     The Co-Lender Agreement remains in effect today.  See Prior Declaration (as

defined in the Hamilton Decl. at ¶ 6), ¶ 48.

18.     Pursuant to the Co-Lender Agreement, the Special Servicer continues to act on

behalf of the Secured Lenders in connection with this bankruptcy case.  Prior Declaration., ¶ 49.

This includes acting on behalf of the B Note Holder.  See Hamilton Decl. Exhibit B, Section 5.

19.     Pursuant to Section 4 of the Co-Lender Agreement, because a Sequential Pay Event

has occurred, the A Note Holders have priority of payment over the B Note Holder, to the extent

of and on the terms and conditions set forth in that section of the Co-Lender Agreement.  Prior

Declaration, ¶ 50. Because of the differences in priority of payments, the special servicing on the

Loan is more complex than it would be had the Loan not been split into four notes and been made

subject to the Co-Lender Agreement.  Prior Declaration, ¶ 50.

D.     **Default Interest**

20.     Interest accrues on the unpaid principal at the Default Rate under the Loan

Agreement.  See Loan Agreement, Section 2.2.2.  The Default Rate is defined as the rate five

percent higher than the Interest Rate (which is 5.259% per annum).  See Loan Agreement, page S-

I-7.  Interest is payable at the Default Rate until the default is cured.  See Loan Agreement, Section

---

[12] Capitalized terms used herein that are not otherwise defined shall have the meaning as set forth in the Co-Lender
Agreement.

2.2.2.  Here, the obligations have been accelerated, so interest at the Default Rate is payable until the Debt is paid in full.  See Loan Agreement, Sections 2.2.2, 10.1.

     **E.**    **Reasonable Legal Fees**

21.    Secured Lenders are entitled to payment of all legal fees incurred in enforcing the Debt.  See Loan Agreement, Section 11.13.  Secured Lenders have incurred legal fees of $4,131,336.90 through April 30, 2024 and estimate they will exceed $4.5 million as of May 31, 2024 and will continue to accrue.

22.    As explained below, the legal fees incurred by Secured Lenders are reasonable. The Debtor has been extremely litigious, necessitating substantial legal expenditures by the Secured Lenders.  Those expenditures have been reasonable.

23.    The Debtor initially sought to reinstate the Loan Agreement without paying default interest and without permitting the Secured Lenders to vote on the Debtor's plan that so provides. The Court sustained the Secured Lenders' objection to that treatment and ruled that plan unconfirmable.

24.    Since then, the Debtor has filed four amended plans, rejiggering voting classes as Secured Lenders' affiliate acquired claims.  The Court over-ruled the Debtor's convenience class. Based on certain of the Court rulings regarding executory contracts and certain claims being disallowed, further litigation regarding cross-allegations of bad faith in tabulating votes and acquiring claims and the like is likely postponed, perhaps indefinitely.  However, the proposed treatment of the SBA claim that the Secured Lenders' affiliate acquired remains a confirmation issue.

25.    The Debtor contested the Secured Lenders' right to default interest on the grounds that COVID excused such default interest on the grounds of impossibility (though the Debtor conceded that it did not excuse payment of interest or certain other charges accruing on account of

Debtor's sustained pre-petition default). That led to a contested trial in a truncated time frame with multiple experts, dozens of trial exhibits and production of thousands of pages of discovery by the Secured Lenders (many thousands more than the Debtor produced).

26.    The trial was extended to address the health of the Debtor's principal, who suffered a stroke between the time the Court ordered trial on the impossibility issue and servicing fees challenge and the initially scheduled trial date. Secured Lenders cooperated on a more extended schedule to ensure that the Debtor's principal could testify under oath without having to fly to the United States to testify in person.

27.    Finally, it has to be noted that the Secured Lenders produced a savings to the Debtor of over $4 million. In its Original Schedules, the Debtor listed a claim for H.I. Wallstreet Hotel, LLC ("H.I. Wallstreet"), which the Debtor did not owe. The Debtor originally scheduled that claim at $4 million. H.I. Wallstreet also filed a claim docketed at claim no. 20 for $4,925,553.97 ("The H.I. Wallstreet Claim"). The H.I. Wallstreet Claim was larger than all the rest of the scheduled claims combined.

28.    With the H.I. Wallstreet Claim, the Debtor faced many greater obstacles to paying all of its unsecured creditors in full than it would face without the H.I. Wallstreet Claim being allowed. Thus, Secured Lenders' successful objection to the H.I. Wallstreet Claim has facilitated the undisputed ability of the allowed unsecured creditors to be paid in full.[13]

29.    Also, after serving discovery on H.I. Wallstreet (since its proof of claim filings were deficient) and obtaining documents after delayed responses by H.I. Wallstreet, on September 18, 2023, Secured Lenders filed an objection to the H.I. Wallstreet claim ("H.I. Wallstreet Claim Objection"). The basis for the H.I. Wallstreet Claim Objection was simple. A non-Debtor entity

---

[13] They should be unimpaired. That issue is reserved for confirmation.

167356992.8

was actually the party liable on the underlying loan.  The Debtor was not liable.  The HI Wallstreet

claim had, in fact, arisen before the Debtor existed.  ECF No. 174.

30.     H.I. Wallstreet objected and contended in essence that the Debtor was intended to

be liable for this debt though it was not party to any of the written documents evidencing the H.I.

Wallstreet Claim, all of which predated the Debtor's formation.

31.     The Debtor's principal Jubao Xie joined in, claiming that the Debtor should be

liable despite not being a signatory to any document evidencing the H.I. Wallstreet Claim.

32.     The Court ordered an evidentiary hearing on the H.I. Wallstreet claim objection.  In

response, the Secured Lenders filed amended Claims asserting interest at the Default Rate from

the inception of the Loan on the grounds that the Debtor's statement that it owed the H.I. Wallstreet

claim triggered an Event of Default at the outset of the Loan, thereby triggering interest at the

Default Rate as of then, an additional $11.2 million of Default Rate interest.  The Debtor realized

the shortsightedness of its assertion that it should be liable for the H.I. Wallstreet Claim and

recognized the egregious consequences were the H.I. Wallstreet Claim to be allowed.  Thus, it

agreed that the H.I. Wallstreet Claim was disallowed, in exchange for withdrawal of the Secured

Lenders' amendment of their proofs of claim.

33.     The Debtor plan proposes to pay all unsecured creditors in full eventually.[14]  Thus,

it is the Secured Lenders who have produced value of over $4 million to the estate by its efforts in

obtaining disallowance of a claim that the Debtor had no business allowing in the first place.  This

more than amply demonstrates that the Secured Lenders have added value to this Debtor's estate.

34.     Redacted copies of the Secured Lenders' legal invoices are submitted in support of

this motion.  See Eisenberg Decl. Exhibit A.

---

[14] As noted above, this class should be unimpaired.  That issue is reserved for confirmation.

167356992.8

### F.      Special Servicing Fees

35.      The special servicer services the Loan payable to the Secured Lenders pursuant to both the Co-Lender Agreement and the pooling and servicing agreement entered into in connection with the securitization of the note held by Trust 1 (the "PSA").  Prior Declaration, ¶ 52.  A true and correct copy of the PSA without exhibits is attached to the Hamilton Decl. as Exhibit A.

36.      Under the PSA, when the Loan became a specially serviced loan, its administration became the responsibility of the special servicer, Midland.  As a result, special servicing fees payable to Midland began to accrue at the rate of 25 basis points (one-quarter of one percent of the outstanding principal balance of the Loan) annually.  Prior Declaration, ¶ 53.

37.      As the Debtor is aware, the Senior Notes were securitized.  The Loan Agreement anticipated securitization of the Loan.  Section 11.24(a) of the Loan Agreement clearly states that Borrower is responsible for any and all workout expenses including special servicing fees, workout fees, liquidation fees, advances and interest on advances in connection with the exercise of any or all remedies.  The applicable language of Section 11.24(a) reads:

> In addition, Borrower shall pay (i) **any fees and expenses of Servicer (including, without limitation, attorneys' fees and disbursements)** in connection with any release of the Property or a portion thereof, any prepayment, defeasance, transfer, assumption, amendment or modification of the Loan, any documents or other matters requested by Borrower or Guarantor, **any special servicing or workout of the Loan or enforcement of the Loan Documents, including, without limitation, any advances made by Servicer and interest on such advances, any liquidation fees in connection with the exercise of any or all remedies permitted under this Agreement.**

See Loan Agreement, Section 11.24(a).  [Emphasis added].

38.      Section 11.24(a) of the Loan Agreement (as set forth above) clearly covers the servicing fees, which accrue at the rate of 0.25% per annum (see page 115 of the PSA for definition of Servicing Fee and Servicing Fee Rate and Section 3.12(c) on page 225 of the PSA, which entitles the special servicer to these fees).  Prior Declaration, ¶ 55.

- 11 -

39.     Securitized loans are owned by securitization trusts.  Unlike banks, securitization trusts have no employees responsible for enforcing loans on which borrowers default.  If borrowers knew that they could default on securitized loans without consequence, there would be no incentive for borrowers to perform as agreed and the entire foundation and principle behind the securitization of commercial loans would crumble.  *See* Prior Declaration, ¶ 56.  The special servicer is appointed under the PSA to enforce loan provisions and maximize recovery for the noteholders, whether that is through a workout with the borrower or enforcing remedies available under the loan documents.  *Id*. at ¶ 57.  The Debtor knew this when it agreed to the contract, the Loan Agreement, and no one would expect, especially the Debtor, that the special servicer should work for free.  *Id*. at ¶ 58.  The Debtor's position that it does not owe special servicing fees, workout fees, liquidation fees, advances and/or interest on advances notwithstanding the Loan Documents is unusual.  *Id*. at ¶ 59.

40.     In the majority of securitized loans, the associated servicing agreements typically have designated the payment of a special servicing fee equal to 0.25% on the scheduled principal balance per annum, payable to the special servicer on a monthly basis.  This is the case within this specific PSA and the subject loan documents clearly obligate the borrower to pay those special servicing fees that accrue as a result of borrower's default.  *Id*. at ¶ 60.

41.     In substance, borrowers who default pay the cost of the infrastructure for enforcing defaults.  Within CMBS there is no "lender" that routinely services or enforces remedies upon default.  That responsibility lies with the servicer and special servicer and as such they are paid for their services.  *Id*. at ¶ 61.

42.     The same section of the Loan Agreement that expressly provides for the Debtor to pay special servicing fees upon default – Section 11.24(a) – also provides for the Debtor to pay any workout or liquidation fee.  The Secured Lenders' Claims include the fee and denominate it

as a Liquidation Fee on the premise of anticipating a sale of the mortgaged property. Under the PSA (and therefore the Loan Agreement), if the specially serviced loan is restored to performing status without liquidation of the collateral, the fee payable instead is a workout fee. Both are calculated the same way and subject, in this case because the Loan is in the original principal amount of over $100,000,000, to the same $1,000,000 cap, to Debtor's benefit. Prior Declaration, ¶ 63, n.1.

### G.    <u>Interest on Advances</u>

43.    Under the PSA, when the Debtor defaults on a required payment, the master servicer under the PSA advances the sums payable by the Debtor so that the certificate holders under the PSA receive their regular payments. Such advances accrue interest at the prime rate of interest under the PSA. Under the Loan Agreement, that interest is part of the Debt that the Debtor owes. See Loan Agreement, Section 11.24(a).

44.    The Debtor conceded it owed interest on advances on the pre-petition Claims. The interest on advances continues to accrue post-petition. Because Secured Lenders are fully secured, 11 U.S.C. § 506(b) entitles them to this interest.

## III.    LEGAL ARGUMENT

### A.    <u>Secured Lenders Are Over-Secured, And Thus, Entitled to Postpetition Interest, Fees, and Costs Under Applicable Second Circuit Law</u>

45.    As explained above, Secured Lenders are over-secured, amply. Thus, 11 U.S.C. § 506(b) entitles each of the Secured Lenders to "interest on [its] claim, and any reasonable fees, costs, or charges provided for under the" Loan Agreement. Their over-secured status affords each of them the right to "postpetition interest and, in addition, gives one having a secured claim created pursuant to an agreement the right to reasonable fees, costs, and charges provided for in that agreement." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989).

- 13 -

46.    The over-secured status is easy to determine.  The two most recent appraisals, from Secured Lenders' appraiser and the Debtor's appraiser, opine that the value of the Hotel is $191 million and $185 million, respectively.

47.    The Debtor's most recent operating report shows cash on hand of over $20 million. That cash on hand is Secured Lenders' cash collateral.  See Eisenberg Decl., Exhibits G through J.  Moreover, not only do Secured Lenders have a lien on the Debtor's cash; they have the right under Section 507(b) to a super-priority administrative expense payment to the extent that the adequate protection granted by the lien to them in the Debtor's cash proceeds derived from operating and renting the Hotel proves inadequate.

48.    This result is consistent with a bedrock principle in bankruptcy law.  An increase in collateral value during a chapter 11 case inures to the benefit of the secured creditor, not the debtor.

49.    This is clear Supreme Court pronouncement.  "Any increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit of the creditor, not to the benefit of the debtor and not to the benefit of other unsecured creditors whose claims have been allowed and who had nothing to do with the mortgagor-mortgagee bargain."  *Dewsnup v. Timm*, 502 U.S. 410, 417, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

50.    Thus, the analysis to determine over-secured status is simple.  Assuming a maximum allowed pre-petition claim for the Secured Lenders of roughly $168.5 million, the value of the combined collateral of the Hotel and the cash is at least $205 million, even if the Debtor's 2024 valuation were to be adopted, over $211 million if the Secured Lenders' 2024 valuation were to be adopted.  Thus, Secured Lenders are over-secured by at least $36.5 million and perhaps by

more than $41.5 million.  Therefore, they are entitled to post-petition default interest, legal fees and other charges as provided under the Loan Documents.

51.    That amount in total that Secured Lenders seek is under $17 million as of July 1, 2024 if late charges are excluded.  That leaves the Debtor solvent, by a wide margin of at least $19.5 million even according to its 2024 valuation.  See Eisenberg Decl., Exhibit F.

52.    As a result of the Debtor's solvency, the interest to which Secured Lenders are entitled is at the Default Rate.  *Ruskin v. Griffiths*, 269 F.2d 827, 831 (2d Cir. 1959), quoting *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), rehearing denied 329 U.S. 833, 67 S.Ct. 497, 498, 91 L.Ed. 706 (1947).[15]  As this Court is familiar, having cited to a portion of this language in its July 31, 2023 decision determining that the Debtor's plan (that provided for "curing" Secured Lenders' defaults without paying default interest and deeming them to accept the plan rendered the plan unconfirmable), *Ruston* remains good law.  The following language includes the portion of *Ruskin* that this Court previously cited favorably:[16]

> A variable interest provision in event of a stated default such as we have here is not a penalty, nor should it be considered unconscionable.  [citations omitted].  It can be beneficial to a debtor in that it may enable him to obtain money at a lower rate of interest than he could otherwise obtain it, for if a creditor had to anticipate a possible loss in the value of the loan due to his debtor's bankruptcy or reorganization, he would need to exact a higher uniform interest rate for the full life of the loan.  The debtor has the benefit of the lower rate until the crucial event occurs; he need not pay a higher rate throughout the life of the loan.

*Id*. at 832.

---

[15] The quoted language from *Vanston* includes: "But where an estate was ample to pay all creditors and to pay interest even after the petition was filed, equitable considerations were invoked to permit payment of this additional interest to the secured creditor rather than to the debtor" *Ibid*.

[16] The Court's cite to Ruskin appears at page 38 of its memorandum decision on the Debtor's initial plan, regarding the impermissibility of the Debtor's effort to "cure" the defaults without paying default interest and treat the Secured Lenders as unimpaired.  See ECF No. 158, p. 38.

53.     Though *Ruskin, supra*, was decided before enactment of the Bankruptcy Code, it remains binding Second Circuit precedent. *See, e.g.*, *Urban Communicators PCS Ltd. Partnership v. Gabriel Capital, L.P.*, 394 B.R. 325, 340 (S.D.N.Y 2008); *In re 139–141 Owners Corp.*, 306 B.R. 763, 771–73 (Bankr.S.D.N.Y.2004) ("Ruskin remains effective to date in the Second Circuit and is recognized by other circuits.") (collecting cases), *rev'd in part*, 313 B.R. 364 (S.D.N.Y.2004) ("Ruskin remains the law of the Second Circuit and applies to this case.").  Indeed, as noted above, this Court considers *Ruskin* persuasive and binding.  See ECF No. 158, p. 38.

54.     The Default Rate under the Loan Agreement, five percentage points higher than the non-default rate, is enforceable.  Numerous courts have reached this conclusion under New York law and Section 506(b).  *See e.g., Sultan Realty*, 2012 WL 6681845 at *6-*7 (Bankr. S.D.N.Y. Dec. 21, 2012) (approving postpetition default rate almost four times higher than non-default rate); *In re Vanderveer Estates Holdings, Inc*., 283 B.R. 122, 134 (Bankr. E.D.N.Y. 2002) (5% default rate approved in solvent debtor case as being "well within the range of default rates that have been allowed as reasonable charges under § 506(b)."); *In re Route One W. Windsor L.P.*, 225 B.R. 76 (Bankr. D.N.J. 1998) (allowing 8% default rate under applicable New York law); *In re Vest Assocs*., 217 B.R. 696, 703 (Bankr. S.D.N.Y 1998) ("[i]f a debtor is solvent, there is much more leeway to grant the default rate because other creditors will not be injured") (citations omitted).

55.     The Debtor is solvent.  Its unsecured claims are under $2 million.  That is but a fraction of the at-least $19.5 million by which the Debtor's assets in value exceed what it owes Secured Lenders when including the post-petition amounts to which Secured Lenders are entitled. Debtor will be unable to cite any case in which a court has found an equitable basis for reducing a lawful contractual interest rate prescribed by a contract where a debtor was able to pay all of its unsecured creditors.  Cf. *Urban Communicators, supra,* 394 B.R. at 340.  This is all the more so

- 16 -

when, as here, the proposed post-petition amounts through July 1, 2024 are less than half the over-security margin.

**B.**   **Secured Lenders Are Entitled to These Amounts Whether Over-Security Is Measured as of the Petition Date or as of the Confirmation Date**

56.     The Debtor may attempt a hyper-twisted attempt to circumvent this clear outcome by claiming that the Secured Lenders were only *barely* fully secured at the start of the case and that therefore the Secured Lenders are only entitled to the difference between that fixed-point collateral value and their allowed claim (see Eisenberg Decl., Exhibit E).  However, that analysis is rejected by the vast majority of cases that have considered the issue.  This makes sense, since those courts' rejections of any such possible contention by the Debtor better enables fulfillment of the Supreme Court directive that increases in collateral value inure to the benefit of the secured creditor, not the debtor.  See, e.g., *Dewsnup*, 502 U.S. at 417.

57.     The Bankruptcy Code does not compel the determination at the petition date of a valuation for purposes of determining over-secured status for the balance of a chapter 11 case.  This is particularly so given that post-petition interest is not payable until confirmation.  See *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs. (In re Timbers of Inwood Forest Assocs.)*, 793 F.2d 1380, 1407 (5th Cir.1986).

58.     The courts have consistently rejected the idea that a petition date valuation governs every valuation issue for the course of the bankruptcy case.  *See, e.g.*, *In re SW Boston Hotel Venture*, LLC, 748 F.3d 393, 412 (1st Cir. 2014).  As the *SW Boston Hotel Venture* court noted, if the Debtor were to contend that a single point as of the petition date were to be dispositive, post-petition interest entitlements would create a "winner take all" approach to post-petition interest that would be unfair.  "[R]ather than yielding the fairest result, a rigid single-valuation approach guarantees an all-or-nothing result that hinges more on fortuity than reality.  For example, if the

- 17 -

petition date were the required measuring date, a creditor that first became oversecured even one day later would be allowed no post-petition interest, even though it was oversecured throughout almost the entire bankruptcy and even though it could receive substantial post-petition interest under a flexible approach.  Conversely, if the confirmation date were the required measuring date, a creditor that first became oversecured just one day earlier would be allowed post-petition interest for the entirety of the bankruptcy proceeding (up to the amount of the equity cushion)."  *Id*. at 407.[17]  As the First Circuit noted, it did "not believe that Congress intended entitlement to post-petition interest to depend so heavily on chance."  *Ibid*.

59.    Eliminating this chance element has led the Fifth Circuit to reject the "petition date only" approach as well on valuation.  Instead, "a secured creditor's entitlement to accrue interest under § 506(b) matures at that point in time where the creditor's claim becomes oversecured."  *Matter of T-H New Orleans Ltd. Partnership*, 116 F.3d 790 (5th Cir. 1997).

60.    The Fifth Circuit reasoned this to be consistent with Supreme Court precedent.  "A flexible approach recognizes the fact that a creditor's allowed claim, which is being reduced over time, may become entitled to accrue postpetition interest, and that under the plain language of § 506(b) there is nothing limiting that right.  *See United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (employing a plain meaning reading of § 506(b)).  A flexible approach also recognizes that any increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit of the creditor, and not to the debtor."  *Ibid*.  Thus, as the

---

[17] In a footnote in that section, the First Circuit noted that the increase in collateral in that case had come about through funding by a governmental junior creditor, who should not be deprived of its ability to recoup its claim because of increases in collateral value inuring to the senior secured creditor.  Here, by contrast, the increase in collateral value did not involve any infusion of funding by any other creditor or Debtor's equity.  The continued operations that made the cash generation possible came about through use of the Secured Lenders' cash collateral with which the Debtor has funded operations at the Hotel.

Fifth Circuit has reasoned, even a creditor who is under-secured at the outset of a chapter 11 case can become over-secured during the case and thus entitled to post-petition interest.

61.     All the more so Secured Lenders here are entitled to post-petition interest at the Default Rate.  They have been over-secured throughout this case, no matter whose valuations are used.

62.     First, as their appraisal report from the petition date valued the Hotel at $185 million.  Plus, the Debtor held over $2 million in cash on hand as of the petition date per its schedules.  See ECF No. 4, p. 4.  The Secured Lenders' allowed pre-petition claim under the Debtor's proposed plan does not exceed $168.5 million.  Thus, Secured Lenders have been fully secured at the outset of this case by over $18 million.

63.     But, even had they not been, the cash collateral that is part of their collateral is subject to the Secured Lenders' lien.  See Cash Collateral Order and Approval Order.  Moreover, the Approval Order entitles Secured Lenders to Section 507(b) administrative super-priority to the extent that the adequate protection granted under the Cash Collateral Order is inadequate. However, adhering to the rule in *SW Boston* and *T-H New Orleans* ensures that, consistent with Supreme Court precedent, even a creditor who was under-secured at the outset of the case but becomes over-secured is entitled to post-petition interest.  Secured Lenders, who were over-secured at the outset of this case, should have their right to post-petition interest that existed at that point enforced and vindicated.  Upholding that principle ensures that the Secured Lenders' lien on the cash secures their full claims, including to post-petition interest, ensuring that the adequate protection they have remains adequate.

64.     The Debtor may cite to an appraisal report prepared well after the petition date that posits a retrospective valuation of $169.5 million (Eisenberg Decl. Exh. E).  However, even under

that scenario, the Secured Lenders have been over-secured since day 1. Add to $169.5 million the $2 million of cash collateral on hand as of the petition date, and Secured Lenders have been over-secured as of the petition date even under the Debtor's worst-case scenario. The Secured Lenders' entitlement to Section 507(b) super-priority adequate protection entitles them to protect the benefit of their fully secured position (and entitlement to the post-petition amounts, including interest at the Default Rate). Moreover, since collateral increases in value inure to the benefit of the Secured Creditors (as the Supreme Court stated in *Dewsnup, supra*, 502 U.S. at 417), Secured Lenders have only become even more entitled to the amounts allowed to them under Section 506(b).

C.   **Secured Lenders Are Entitled to Their Attorneys' Fees and Costs, which are Reasonable.**

65.   Generally, "allowance of attorneys' fees and costs [under § 506(b) is mandatory when they are provided for in the underlying agreement, when the creditor is oversecured, and so long as those fees and costs are 'reasonable.'" *In re Melbell Assocs*., 99 B.R. 31 (Bankr. E.D. Cal. 1989) (emphasis in original) (*citing In re Dalessio*, 74 B.R. 721, 723 (B.A.P. 9th Cir. 1987)); *In re Mills*, 77 B.R. 413, 418 (Bankr. S.D.N.Y. 1987).

66.   Here, Section 11.13 of the Loan Agreement clearly entitles Secured Lenders' to reimbursement of their legal fees (if Borrower fails to pay them) when said legal fees are incurred in connection with numerous scenarios, including "incurred by Lender in connection with . . . enforcing any Obligations of or collecting any payments due from Borrower or Guarantor under the Loan Documents or with respect to the Property or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a 'work-out' or of any Bankruptcy Action." Loan Agreement, Section 11.13.

67.   "Reasonable" is defined in Black's Law Dictionary by the following:

Fair, proper, just, moderate, suitable under the circumstances. Fit and appropriate to the end in view. Having the faculty of reason; rational; governed by reason;

under the influence of reason; agreeable to reason.  Thinking, speaking, or acting
according to the dictates of reason.  Not immoderate or excessive, being
synonymous with rational, honest, equitable, fair, suitable, moderate, tolerable.

*In re Mills*, 77 B.R. at 419.

68.    "Success in bankruptcy litigation is not a prerequisite for an award of reasonable

attorney fees to an oversecured creditor pursuant to Section 506(b)." *In re Mills*, 77 B.R. at 418.

Rather, in determining reasonableness, the Court can consider such factors as "whether the

attorneys fees and costs were incurred in an action reasonably calculated to protect the creditors'

rights." *Id.* at 419 (citation omitted).

69.    Here, since the inception of this bankruptcy case, Secured Lenders have been

intimately involved and taken actions that any similarly situated secured creditor would reasonably

have taken to protect their interests.  This particularly has been the case given the hyper-litigious

Debtor, who has challenged Secured Lenders' claims repeatedly.  The activities Secured Lenders

have taken include the following:

- **Cash Collateral**.  At the outset, Secured Lenders and the Debtor consensually
  negotiated the cash collateral order, which was ultimately entered by the Court
  and has not been revisited throughout the case.

- **Opposition to Agreement with New York City Health and Hospitals**.  In
  January 2023, the Debtor filed its motion for authority to enter into an agreement
  with NYCHH to use the Hotel as a migrant shelter (ECF No. 54).  Secured
  Lenders' concerns related to this motion were serious, as the Court noted in
  reviewing the Secured Lenders' objection, and their opposition (ECF No. 64)
  was necessary to protect their interests.  Specifically, Secured Lenders'
  opposition focused on concerns over enforcement of rules against fires that
  could damage their collateral, lack of consent from the insurer (which was not
  procured until after the hearing on the motion to approve the agreement, and
  which confirmation the Debtor's counsel did not provide to Secured Lenders'
  counsel for another two months despite repeat email correspondence seeking it;
  had the insurer not provided approval, debtor would have been left uninsured).
  Moreover, Secured Lenders filed a cross motion for 507(b) adequate protection,
  which the Court granted.  See Eisenberg Decl., Exhibits F through H.

- 21 -

167356992.8

- **Proofs of Claim.**  Secured Lenders prepared detailed proofs of claim and addenda thereto illustrating the pre-petition amounts owed pursuant to the Loan. Notably, Secured Lenders also had to prepare and file amended proofs of claim (to add additional default interest) after learning of Debtor's earlier defaults.

- **Motion to Terminate Exclusivity.**  Secured Lenders moved to terminate exclusivity on the grounds that there was "cause" to do so, as explained in more detail in the motion (ECF No. 83).  Cause included indicating that Secured Lenders were prepared to cause all allowed unsecured claims to be paid in full, a prime goal in any chapter 11 case.  Only after the Secured Lenders filed their exclusivity motion did the Debtor file its first plan of reorganization.

- **Extensive Briefing Related to Debtor's Plan/Reinstatement.**  As this Court is well aware, the Court entered an order (ECF No. 112) instructing the Debtor to file a memorandum of law in aid of confirmation of its plan, relating to the Debtor's proposed treatment of the Secured Lenders' claim as "unimpaired" even though the Debtor proposed to "cure" without including payment of default interest outstanding and yet still treat Secured Lenders as unimpaired.  The Debtor filed such a brief. Secured Lenders, of course, were obligated to file a brief and a supplemental brief in opposition to the Debtor's memorandum of law to refute the assertions in the Debtor's brief, which are explained extensively in the Secured Lenders' brief (ECF Nos. 131, 150). The Court agreed with the Secured Lenders' position as set forth in its Memorandum Decision entered on August 16, 2023 (ECF No. 158), which the Debtor is now appealing to the Second Circuit.

- **Objection to H.I. Wallstreet Claim**.  Secured Lenders prepared and filed an objection to the H.I. Wallstreet claim (ECF No. 174) and a reply brief (ECF No. 210), which successfully resulted in the parties entering a stipulation (ECF No. 239) and disallowance of a $4 million claim and savings for the estate.  In this solvent case, this redounds to equity.  Had the Secured Lenders not objected to this claim, it is possible that the Debtor never would have done so, and the estate would not have received this $4 million savings precipitated by Secured Lenders' objection and negotiations.

- **Objection to SBA Claim**.  Secured Lenders also filed a motion to reclassify the SBA's secured claim to an unsecured claim (ECF No. 175).  This came about because the Debtor's initial plan classified the SBA claim as secured, even though the Debtor's schedules listed the SBA as unsecured.  It was clear that the Debtor was seeking to line up the SBA claim as a separate potential impaired non-insider accepting class, to Secured Lenders' detriment.  The SBA claim should not have been classified as secured.  In fact, the Secured Lenders' motion resulted in the SBA filing an amended claim acknowledging its lack of security. The Debtor has changed the SBA claim treatment at least three times from what its initial plan proposed.

- 22 -

- **Extensive Briefing Related to Proofs of Claim.** The Debtor filed an objection to Secured Lenders' Proofs of Claim, and as a result, Secured Lenders, in order to protect their rights and their claims, prepared and filed an extensive brief in response (ECF No. 200). Then, upon the Court's request, the Secured Lenders filed additional briefing related to the Proofs of Claim as well (ECF Nos. 227, 232).

- **Trial Related to Debtor's Impossibility Defense**. Secured Lenders spent a significant amount of time preparing for trial, including taking and defending depositions, preparing witnesses for testifying, strategizing, gathering and preparing exhibits to be used during trial, etc. Regarding the servicing fees, the Court noted prior to the trial that Secured Lenders would likely prevail on servicing fees, yet the Debtor decided to proceed with challenging the servicing fees anyways, so Secured Lenders had no choice but to spent time and resources (i.e., hiring an expert) on this issue.

- **Written Discovery**. Secured Lenders have spent a significant amount of time responding to discovery requests propounded by the Debtor and have produced over 22,000 pages of documents. On multiple occasions, the Debtor has failed to review Secured Lenders' document productions in their entirety, causing Secured Lenders to have to do extra work to justify their production based on Debtor's claims that they didn't produce certain documents (which they did) – claims in which the Debtor persisted to make even after Secured Lenders told them we had produced said documents. *See e.g.* ECF No. 329, where the Debtor submitted a letter apologizing to the Court for accusing Secured Lenders of failing to produce a certain document even though Secured Lenders did produce it, stating, "[w]e have now confirmed the Hidden Agreement was produced in discovery, but we were unaware of the production."

  Further, Secured Lenders have spent an unusual amount of time getting the Debtor and its principal to produce responsive documents by repeatedly emailing them regarding their failure to produce certain documents and/or categories of documents. As a result of their persistence, Secured Lenders were ultimately able to coax the Debtor and its principal into complying with the production requests (or so they thought) without having to involve the Court. Despite obtaining additional documents from the Debtor and its principal on numerous occasions after many requests, the Debtor still did not fully comply and produce all responsive documents, as all parties and the Court learned during the trial (*i.e.*, Debtor/its principal failed to produce the Line of Credit Agreement in advance of trial), which resulted in the parties spending substantial time and effort negotiating stipulations to resolve issues precipitated by Debtor's failure to produce responsive documents.

- **Other Discovery and Depositions.** The Secured Lenders, in preparation for the impossibility trial, deposed the Debtor's witnesses and experts, including its principal who lives in China, which created some challenges and required

additional time and resources. Prior to trial, the Secured Lenders also had to defend numerous depositions of their own witnesses and experts. Notably, the Debtor insisted on taking Secured Lenders' former asset manager's deposition, which turned out to be, as Secured Lenders foreshadowed, an unproductive use of everyone's time.

- **Post-trial Brief.** Secured Lenders, upon the Court's request, prepared and filed an extensive post-trial brief (ECF No. 362) and supplement (ECF No. 374).

- **Motion to Designate Votes.** The estate has the ability to pay all claims in full and only impairs unsecured claims to gerrymander votes. As a result, the Secured Lenders filed a motion to designate certain votes (ECF No. 302), as any reasonable secured lender would in this instance. Had the Debtor also left creditors unimpaired, then this case would focus on reinstatement, but it is the Debtor's manipulation that triggered the litigation surrounding the claims and voting.

- **Settlement Negotiations.** Secured Lenders have had numerous conversations with the Debtor's counsel and representatives regarding possible settlement of this case, but, to date, none of have been fruitful.

*See* Eisenberg Decl., ¶5.

70. In response, the Debtor may fault the Secured Lenders for delaying this case and thus causing post-petition interest and attorneys' fees to accrue. However, that ignores some undeniable realities.

71. First, Debtor first filed its plan only after Secured Lenders moved to terminate exclusivity. The Debtor cannot fault the Secured Lenders for moving with more alacrity than did the Debtor.

72. Second, the Debtor delayed the case while pursuing a plan that the Court ruled was unconfirmable. And, because the Debtor insisted on pursuing its unconfirmable plan, the issue of claim objections was bifurcated, increasing the length of this chapter 11 case. Had the Debtor filed a claim objection at the outset and not persisted on trying to deny both default interest and the Secured Lenders' right to vote (the Debtor defaulted four years ago and knew of the bases it had

available to challenge the allowance of default interest), this case would not have taken as long as it did.

73.    Third, the Debtor delayed this case by scheduling a purported creditor with a claim of over $4 million (more than the rest of the Debtor's unsecured claims in aggregate), even though that entity was not in fact a creditor of the Debtor.  That claim was disallowed only because of Secured Lenders' efforts.  The Debtor cannot fault Secured Lenders for a delay in a case where the Debtor's own effort to allow a claim to a bogus unsecured creditor that exceeded all other unsecured claims in aggregate prompted that delay in large part.  Moreover, as a result of the Secured Lenders' efforts, opposed by the Debtor, unsecured claims now can and should be unimpaired.

74.    Fourth, the impossibility trial was delayed because of health concerns of Debtor's principal.  That is unfortunate, but it is not an act of Secured Lenders' doing (Secured Lenders hope the Debtor does not deign to accuse the Secured Lenders of being responsible for their principal's health problems).

75.    Finally, early on, Secured Lenders indicated that they would propose to pay all unsecured creditors with allowed claims in full.  The Debtor has twisted itself to impair an unsecured class knowing that it cannot confirm a plan without doing so.  That generated litigation over disclosure, solicitation, claims purchases and the like – none of which would have happened had the Debtor proposed to pay its unsecured creditors in full as the Secured Lenders have offered to do.

76.    Thus, the following principles emerge that can be summarized as follow:

      a.    The Secured Lenders are over-secured.

      b.    They have been over-secured since the Petition Date.

167356992.8

c.    By reason of being over-secured, they are entitled to post-petition interest and reasonable fees, costs, and charges.

d.    This is so whether over-security is measured as of the petition date or as of the confirmation date.

e.    The post-petition interest to which they are entitled is at the Default Rate.

f.    The unsecured creditors can and should be paid in full in this case, reinforcing the conclusion that interest at the Default Rate is the proper calculation.

g.    All increases in collateral value occurring post-petition inure to the benefit of Secured Lenders.

h.    This vindicates Secured Lenders' entitlement to adequate protection, its liens on the Debtor's Hotel and its cash collateral and Secured Lenders' 507(b) adequate protection rights.

## IV.    CONCLUSION

77.    For the foregoing reasons, Secured Creditors are entitled to the full amount of $18,863,063.37 ($16,906,207.27 if late charges post-petition are not allowed), such sum consisting of their post-petition interest at the Default Rate and their reasonable legal fees, costs and expenses.

Respectfully submitted,

PERKINS COIE LLP

By: */s/ Gary F. Eisenberg*

Gary F. Eisenberg
1155 Avenue of the Americas, 22nd Floor
New York, New York 10036-2711
Telephone: 212.262.6900
Facsimile: 212.977.1649
GEisenberg@perkinscoie.com

*Attorneys for Wilmington Trust, National Association, as Trustee for the benefit of the Registered Holders of Commercial Mortgage Pass-Through Certificates Series 2018-C6, Wells Fargo Commercial Mortgage Trust 2018-C47,*

- 26 -

*Commercial Mortgage Pass-Through Certificates, Series 2018-C47 And CSAIL 2018-C14 Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2018-C14 and as authorized representative for HI FIDI B Note Owner LLC*

167356992.8